1                  United States District Court

2              For the Southern District of California

3                                         )
4    KIM RHODE, et al.,                    )
                                           )   No. 18cv0802-BEN
5          Plaintiffs,                     )
                                           )   September 20, 2018
6              v.                          )
                                           )   San Diego, California
7    XAVIER BECERRA, etc., et al.,         )
                                           )
8          Defendants.                     )
                                           )

9

10               Transcript of Motion to Dismiss
               BEFORE THE HONORABLE ROGER T. BENITEZ
11                  United States District Judge

12   APPEARANCES:

13   For the Plaintiffs:      CALIFORNIA ATTORNEY GENERAL'S OFFICE
                              NELSON RICHARDS
14                            MARK BECKINGTON
                              DEPUTIES ATTORNEY GENERAL
15
     For the Defendants:      MICHEL & ASSOCIATES PC
16                            SEAN BRADY
                              CLINT B. MONFORT
17                            Attorneys at law

18

19

20
     Court Reporter:          Dana Peabody, RDR, CRC
21                            District Court Clerk's Office
                              333 West Broadway, Suite 420
22                            San Diego, California, 92101
                              DanaPeabodyCSR@gmail.com
23

24

09:48  25

|   |   |
|---|---|
| | 1 |

1        San Diego, California, September 20, 2018

2                           *   *   *

3        THE COURT:  Good morning.

4        MR. MONFORT:  Good morning, Your Honor.

10:05   5        THE CLERK:  1 on calendar, 18CV0802, Rhode, et al., v.

6   Becerra, et al., motion hearing.

7        THE COURT:  Counsel, please register your appearances

8   for the record.

9        MR. RICHARDS:  Good morning, Your Honor.  Nelson

10:05   10  Richards for defendant Javier Becerra in his official capacity

11  as the Attorney General of California.

12       MR. BECKINGTON:  Mark Beckington also from the

13  Attorney General's office on behalf of the defendant.

14       MR. BRADY:  Sean Brady on behalf of plaintiffs.

10:05   15       MR. MONFORT:  Clint Monfort also on behalf of

16  plaintiffs.

17       THE COURT:  All right.  So this morning we have a

18  motion to dismiss I believe it's a 12(b)(6) motion filed by the

19  state and Mr. Becerra.  I've read the briefs.  I've read the

10:06   20  reply.  And, Counsel, was there oral argument that you wish to

21  present?

22       MR. RICHARDS:  Yes, Your Honor.

23       THE COURT:  All right.  Then please step up to the

24  lectern, and let's hear what you have to say.

10:06   25       MR. RICHARDS:  I think the parties' briefing on this

1    covers the issues fairly well, and so I'll keep my comments

2    this morning brief there.

3        Just a couple points on each of the three claims that we're

4    challenging that I'd like to make first on the dormant Commerce

5    Clause claim that on the --

6            THE COURT:  Can you do me a favor and speak up,

7    please.  I'm having a hard time hearing you.

8            MR. RICHARDS:  Yes.  As I was saying, that I'd like to

9    make a few points about each of the claims that we're

10   challenging starting with the dormant Commerce Clause claim and

11   then going to the preemption claim, and then going to the Equal

12   Protection claim.

13       On the dormant Commerce Clause claim I'd like to make three

14   points that I think bear highlighting after the briefing.  The

15   first one, and briefly it's an overarching point, that the law

16   challenged here is in no way an economic protection measure.

17   It has none of the character of the laws that courts have

18   struck down as protecting local or state interests over

19   out-of-state interests, and that's really a hallmark of the

20   cases that the plaintiffs cite that strike down laws for

21   violating the dormant Commerce Clause.  This is a big picture

22   issue.  There's nothing about this that is designed to protect,

23   say, California ammunition manufacturers.

24       That leads to the second point which is on this issue of

25   whether any of the challenged provisions here affect

1      transactions that are wholly out of state, and I think the

2      parties have set up the disagreement on this point in their

3      briefs fairly well, but I'd like to reiterate that there's no

4      way by operation of any of the challenged provisions, Penal

10:08    5      Code 30312, 30314, or any of the other challenged positions

6      that a transaction that takes place wholly outside of

7      California is regulated by any of these statutes.

8           So that per se claim, the claim that plaintiffs are making

9      for per se invalidity --

10:09   10           THE COURT:  Explain to me how that happens.  If

11     someone decides to buy ammunition online from an out-of-state

12     vendor, that's not an out-of-state transaction?

13           MR. RICHARDS:  That is not a transaction that occurs

14     wholly outside of California, which is what's necessary for our

10:09   15     per se invalidity.

16           THE COURT:  What occurs in California?

17           MR. RICHARDS:  Under section 30312 in that type of

18     transaction when someone purchases ammunition from an online or

19     remote vendor, under the new rules, that ammunition will have

10:09   20     to be sent to a licensed ammunition vendor for processing.

21           THE COURT:  Isn't that precisely the problem that

22     you're creating?  So it would otherwise be an entirely

23     out-of-state transaction.  By virtue of the statute, you're

24     creating the situation where you can now say oh, look, it's not

10:09   25     an out-of-state transaction because we're creating the precise

1   situation that obviates or extinguishes the entirely

2   out-of-state transaction?  That's an odd thing to do, isn't it?

3           MR. RICHARDS:  I don't think so, Your Honor.  And the

4   reason why is because, as you've described, that's not a wholly

10:10   5   out-of-state transaction.  A wholly out-of-state transaction is

6   a transaction where someone is in Nevada and goes to a Nevada

7   firearms dealer, ammunition dealer, and purchases ammunition

8   there or is in Nevada and goes online and buys ammunition from

9   a dealer.

10:10   10          THE COURT:  All right.  I asked you the question.  I

11   said if someone is in California and buys ammunition online,

12   it's an out-of-state transaction, and you said no because under

13   the new section, you'd have to have the registration or go to

14   the dealer and that makes it not a completely out-of-state

10:10   15   transaction.  So what you're saying is that irrespective of the

16   new law, regardless of this new law, it still would not be a

17   totally out-of-state transaction?  Is that right?

18          MR. RICHARDS:  That is correct.  If the person going

19   online is in California and buying that ammunition having it

10:11   20   sent into California, if that ammunition is going to come into

21   the state, then that is not a wholly out-of-state transaction.

22          THE COURT:  Okay.  Now I gotcha.  All right.

23          MR. RICHARDS:  And I think some of the examples from

24   the briefing and the cases cited in the briefing highlight

10:11   25   this.  The Sam Francis case, the en banc Ninth Circuit decision

10:11

1   from just a year or two ago, set up a hypothetical of what an
2   out-of-state transaction would look like.  In that case the
3   California Resale Royalty Act requires that royalties be paid
4   on any art sales where one of the parties to the sale was a
5   resident of California, and the Ninth Circuit struck down that
6   statute because it on its face regulated transactions that
7   occurred wholly outside of the state, and they gave the example
8   of a Californian who has a residence in New York and buys art
9   from, I think it was an artist in North Dakota, and wants to
10  sell the art in New York to another New Yorker.  No part of
11  that transaction is occurring in the state, and that is a
12  wholly out-of-state transaction.

13      By the same token, in the Healy case that the plaintiffs
14  cite in their opposition, the effect of the Connecticut statute
15  in that case, the statute there was a price affirmation
16  statute, and it requires beer vendors to affirm that they were
17  not going to offer alcohol for sale at a price any higher than
18  it was offered on the date they made their affirmation.  The
19  practical effect of that statute given the laws in the
20  surrounding states was that they would -- the beer vendors
21  wouldn't be able to change their prices in neighboring states
22  such as Massachusetts.  So in effect it was controlling a beer
23  sale to -- from a Massachusetts vendor to a Massachusetts
24  resident in Massachusetts, and that's a wholly out-of-state
25  transaction.

1      And while I'm on that point, there was one thing that we

2  probably should have raised in our reply with regard to that

3  Healy case, and that is the Ninth Circuit has on multiple

4  occasions said that those types of price control statutes,

10:13    5  price control cases, don't apply in other dormant Commerce

6  Clause contexts, so the Ninth Circuit said that in the Foie

7  Gras case, which we cited in both our motion and our reply

8  briefs, and in the Chinatown case, and so that's a side point.

9  It turns out the case I don't think helps plaintiffs very much,

10:13   10  but, in any event, it's not a case that can provide much

11  guidance here because the Ninth Circuit has held that it just

12  doesn't apply.

13      So that's the first component of the plaintiffs' dormant

14  Commerce Clause claim.  They assert that this statute controls

10:13   15  transactions wholly outside the state, and we contend as a

16  matter of law that it simply does not and that that claim

17  should be dismissed for that reason.

18      The second step -- the second aspect or theory under which

19  the plaintiffs bring the dormant Commerce Clause claim is under

10:14   20  a discrimination -- a discrimination theory.  And under a

21  discrimination theory you can have discrimination purpose,

22  facial discrimination, or discrimination in effect, and if I

23  understand the plaintiffs' opposition correctly, they've

24  disavowed a purpose or facial challenge -- or a discrimination

10:14   25  on its face claim and have brought a discriminatory effect

1    claim.

2        But these types of discriminatory effect claims fail where

3    laws regulate evenhandedly, and this context, none of the new

4    challenged provisions, Section 30312, 30352, 30370, none of

10:14   5    these provisions treat in state and out-of-state vendors

6    differently.  Similarly situated vendors are treated the same

7    way under the law.  And when that's the case, courts will

8    reject Equal Protection -- excuse me -- dormant Commerce Clause

9    challenges.

10:15   10        THE COURT:  Well, let me ask you about that.  But the

11   way I understand this statute, if someone buys ammunition

12   outside the state, even though they may be buying the

13   ammunition, say, from a federally licensed facility, they now

14   have to send it to some special licensed person in California

10:15   15   who will charge a fee.  We don't know what that fee will be.

16   We don't know how many of these specially licensed agencies

17   there may be.  Of course, the state can in its desire to

18   control the amount of ammunition that is brought into the

19   state, they could issue one license to one person, right?  And

10:16   20   thereby essentially curtail the import of ammunition into the

21   state of California.  And on top of that, they have to pay a

22   fee, a fee that we don't know what that fee will be.

23        So, A, we don't know -- so we're using some licensed

24   person, not a federal licensed entity, right, but a special, as

10:16   25   I understand it, a California licensed arms dealer.  We now

                    1   have to have the vendor or the person who bought the ammunition

                    2   out of state ship it to that person, which, of course, means

                    3   there's an added cost.  And we don't know how many of those

                    4   licensed people there are going to be.  And we don't know

    10:17          5   whether they're going to accept it.  And why would they if in

                    6   fact they can sell their own ammunition, right?  Why would they

                    7   want to say yeah, sure, we'll take the ammo from Arizona or

                    8   Nevada or Montana?  I mean it strikes me there's a whole lot of

                    9   things that that out-of-state vendors wouldn't have to be

    10:17         10   subjected to, right?  And costs.  And delays.  And so it seems

                   11   like it's almost designed to prevent, to prevent out-of-state

                   12   vendors from selling ammunition into the state of California,

                   13   and to prevent or at least impede consumers in the state of

                   14   California from being able to buy ammunition out of the state.

    10:18         15   Doesn't it sound that way to you?

                   16            MR. RICHARDS:  No, Your Honor, it does not.  And three

                   17   points on that, two to address some of your concerns you raised

                   18   generally about the law and then one specifically on the

                   19   treatment of in state versus out-of-state vendors.

    10:18         20       The first, Your Honor voiced some concern in that the state

                   21   may not license any ammunition vendors and may license a very

                   22   few.  I would direct the Court's attention to Penal Code

                   23   Section 30835(c) -- excuse me -- (d), and that subdivision

                   24   provides that commencing on January 1st, 2018, a firearms

    10:18         25   dealer licensed pursuant to the Penal Code shall automatically

1    be deemed a licensed ammunition vendor.  So licensed firearms

2    vendors are grandfathered in under the statute, at least

3    initially, and then they'll maintain their licenses, be able to

4    maintain their licenses.

10:19    5         THE COURT:  Now, are those the same people as are

6    licensed under the federal firearms licensing statutes?

7         MR. RICHARDS:  I believe, Your Honor, to sell firearms

8    in California you need to be -- both have your federal firearms

9    license and be licensed by the California Department of

10:19   10    Justice.

11         THE COURT:  Okay.  So if you have a federally licensed

12    firearms dealer in the state of California, they would

13    automatically then be able to receive the ammunition from out

14    of state?

10:19   15         MR. RICHARDS:  As I understand it, yes, as of January

16    of this year if a business or person has a license, they would

17    be grandfathered in, and then there's an additional licensing

18    scheme that I'm sure we'll get into later in this case as part

19    of the Second Amendment challenge, but I just wanted to allay

10:19   20    your concern that the state may issue no licenses.

21         And the second concern you mentioned was there may be some

22    sort of design here to limit the influx of ammunition from out

23    of California, and I think that it's -- the purpose and the

24    goal of the statute is I think fairly well set forth in the

10:20   25    uncodified section of Proposition 63 which is included in our

1    request for judicial notice.  I believe it's sections 2 and 3

2    of that set forth the voters' findings and declarations and

3    then declaration of purpose of the law, and the purpose here is

4    to conduct background checks during ammunition transactions to

5    ensure that prohibited persons --

6              THE COURT:  Let me ask you about that.  Let me ask you

7    about that.  If that were the real reason, if that were the

8    real reason for this, if I went across state lines, for

9    example, to Sprague's in Yuma, Arizona, and I bought ammunition

10   from them, they're federally licensed.  They do background

11   checks.  They run background checks all the time.  Why is that

12   not enough?

13             MR. RICHARDS:  The dealers I think you're describing

14   will be running background checks for firearms purchases.  I'm

15   not aware of any state --

16             THE COURT:  But what I'm saying is why couldn't you

17   just say -- because one of the things we're going to look at is

18   the benefit to the state versus the burden on commerce, right?

19   So why couldn't you just say that you can go buy the

20   ammunition, but you have to buy it from a federally licensed

21   facility that would also run a background check for the person

22   who's buying the ammunition just like they would if they were

23   buying a weapon?  Why this other -- what's the real reason for

24   adding this other obstacle, if you will?

25             MR. RICHARDS:  I think there's -- there's a lot there,

1   Your Honor, but the simple answer is that -- and it goes back

2   to my point earlier.  I'm not sure California could require an

3   Arizona company to run a background check on an ammunition

4   purchase.

10:22  5              THE COURT:  But you're not requiring the company,

6   you're requiring -- what you're forbidding is the importation

7   of the ammunition.  So the law doesn't change anything, does

8   it?  If you say no resident of the state of California may

9   import ammunition into the state of California without having

10:22 10  purchased the ammunition through a federally firearms licensed

11  dealer that has run a background check on, you've done that,

12  and you've created no obstruction to interstate commerce.  You

13  haven't made it any more difficult for anyone.  The only thing

14  is that they go over to Arizona or Nevada or Montana and they

10:23 15  buy the ammunition.  They go to a federally licensed dealer

16  there.  And they say I want to buy some ammo.  And they say

17  fine, we'll sell it to you.  We've got to run a background

18  check on you.  And they do that.  And once they've done that,

19  they can just bring the ammunition into the state of

10:23 20  California?

21              MR. RICHARDS:  I think again the issue there is two

22  potential problems with that.  One is that as far as I know,

23  New York is the only other state that actually requires

24  background checks to be run in ammunition sales.

10:23 25              THE COURT:  No, but it's not the state.  That's not

1    what I'm saying.  What I'm saying is your law actually -- what

2    it does is it penalizes or imposes a burden on the consumer,

3    not the companies.  I mean it doesn't matter what

4    company -- there's no law that requires Arizona, for example,

10:23    5    to run a background check or to send any information to this

6    new California licensed person or entity, right?

7              MR. RICHARDS:  That's right.

8              THE COURT:  Because the burden is on the consumer.  If

9    the consumer doesn't do -- it's the consumer who is to be held

10:24    10    liable, not the company, right?

11              MR. RICHARDS:  Yes.

12              THE COURT:  Okay.  So I get back to my question.  When

13    we're looking at burdens on interstate commerce, why not simply

14    say a consumer may not bring ammunition into the state of

10:24    15    California unless they've purchased it through a federally

16    firearms licensed dealer that has conducted a background check?

17    Simple.

18              MR. RICHARDS:  And I think we'd be here with

19    plaintiffs saying that no state other than New York -- that

10:24    20    these background checks aren't run for ammunition purchases as

21    it was in California before 2018.

22              THE COURT:  But if that were the case, then you

23    wouldn't be able to bring the ammunition into the state of

24    California.

10:24    25              MR. RICHARDS:  And I think you'd be here in that

1   scenario with plaintiffs saying that that's obstruction of

2   interstate commerce, and this actually allows people to bring

3   the ammunition in -- into the state, so that would be the issue

4   with that scenario.

10:25   5          THE COURT:  Gotcha.

6          MR. RICHARDS:  You mentioned balancing burdens.  The

7   interstate -- the local framework for a dormant Commerce Clause

8   claim, it's complicated, and the courts treat these

9   things -- treat the claims differently and describe them

10:25   10   differently, but there's essentially three steps.  The first

11   step is looking at whether there's the challenged statute

12   regulates conduct occurring wholly outside the state.  If

13   that's the case, then the statute's invalid per se, and that's

14   what we were talking about earlier this morning.

10:25   15      The second step is what we're sort of talking about now,

16   which is does the law have a discriminatory effect.

17          THE COURT:  Right, but does it apply equally?

18          MR. RICHARDS:  And then the third is what we call Pike

19   balancing test, and that's the step where the state interests

10:25   20   are balanced against the incidental effects on interstate

21   commerce.  And the plaintiffs have disavowed that theory, so

22   where we are here is really on the first two steps of the

23   analysis.  And to bring it back to the discriminatory effect

24   claim, this is something the Court can resolve as a matter of

10:26   25   law.  It doesn't need to balance the state's interests as it

 1   would under Pike balancing.  It just looks at the law and says

 2   is this regulating evenhandedly?  And if the law is, then it's

 3   not a dormant Commerce Clause.

 4            THE COURT:  Let me ask you a question just out of

 5   curiosity.  This is basically at least on its face stated to

 6   protect the public, right?  I mean it's got a wonderful title.

 7   Safety For All.

 8            MR. RICHARDS:  Yes.

 9            THE COURT:  They must have somebody in Sacramento that

10   sits around in some room and they figure out how are we going

11   to come up with cute names for statutes that will make this

12   palatable to the public.  Safety For All.  So tell me

13   something.  What's the evidence or what's the -- just out of

14   curiosity, what's the evidence that in fact enacting this law

15   is really going to protect the public at all?  And what's the

16   evidence that there's been people bringing ammunition from

17   outside of the state of California that have created unsafety

18   for all?  Is there such evidence?

19            MR. RICHARDS:  Yes, Your Honor, there is.  And I think

20   that's what we'll be adjudicating or resolving in the next

21   stage of the case on the Second Amendment.

22            THE COURT:  I'm getting ahead of you, but I just think

23   it's kind of an interesting --

24            MR. RICHARDS:  I understand what you're asking, and I

25   could just respond with sort of an overarching point or

1    hypothetical that until this law was passed, someone who's a

2    career violent felon if he could get his hands on a gun could

3    go into a store and buy ammunition to use in that gun, and

4    that --

5          THE COURT:  Is this going to stop him?

6          MR. RICHARDS:  I think -- I can't say that -- no law

7    is perfect.  And no law --

8          THE COURT:  What are the chances that it's going to

9    stop a whole lot of them?  I mean look, if I'm someone who

10   wants to injure people or kill people, I'm going to go over to

11   Arizona or Nevada or Montana and I'm going to buy ammunition

12   and I'm going to bring it across the border.  You think I'm

13   going to declare -- I'm going to tell the dealer in Montana or

14   Nevada or Arizona hey, you know, I want you to send this to a

15   California dealer so that I can go pick it up there so then

16   once I pick it up, I can go do my horrible deeds?  Do you think

17   that's going to happen?

18         MR. RICHARDS:  I understand the Court's point, and I

19   think again we're getting a little ahead of ourselves.  I don't

20   want to limit what we argue later in the case, but I can

21   respond by saying that, you know, again, with any law you're

22   going to have people who try and figure out a way around it,

23   but in the hypothetical example I just gave of the career

24   violent felon who undertakes a significant amount of risk in

25   obtaining a firearm now is going to have to undertake that same

1    risk every time he wants ammunition for that firearm; that is,

2    every transaction that he engages in to obtain ammunition is

3    going to be one where he could potentially be arrested.

4         THE COURT:  And this statute doesn't have a limit,

10:29    5    does it?  So it doesn't say, for example, somebody who buys

6    more than a thousand rounds has to do this?  If I buy one round

7    I have to do this.

8         MR. RICHARDS:  I believe that's the case, yes.

9    There's limits on -- for sellers, who needs to obtain a

10:29    10   license, if you sell more than 500 rounds in 30 days.

11        THE COURT:  But for the consumer, does that really

12   make any sense?  So, for example, if you're a dove hunter -- do

13   you know anything about dove hunting?

14        MR. RICHARDS:  Not enough to say I do, no.

10:30    15        THE COURT:  Probably not.  So you're a dove hunter and

16   you've got two boxes of shells that you bought here in

17   California.  You go over to Arizona and go do some dove

18   hunting, but it's just a lousy day for you.  You can't hit a

19   thing, right?  And so then you go over to Walmart or somewhere

10:30    20   and you buy another box of shells.  As long as you're using

21   them in Arizona, you're okay, but suppose you only need three

22   more shells and you got your limit.  So then that means you got

23   22 shells left in that box.  That box cost you 7 or $8

24   or -- I'm not sure.  I have no idea what they cost anymore, but

10:30    25   I'm going to take a wild guess.  $8 a box of 25 12 gauge.  So

1  now you've got 23 shells that you've not used.  For $8 now in

2  order to bring -- you've got some choices.  You can either just

3  put it in the trunk of your car and drive it into the state of

4  California and violate the law and not tell anyone about

10:31  5  anything.  Or you can go back to Walmart and you can say hey,

6  I've got these 23 shells that I didn't use.  I want to send

7  them over to California.  So how much is that going to cost me?

8  And can you find a licensed person that will accept these for

9  me?  And what's he or she going to charge me?  And how long is

10:31  10  it going to take me to go pick up these 23 shells?  You see

11  what I'm saying?  Does that really make any sense?  Does that

12  really make any sense to you?

13          MR. RICHARDS:  I think -- what you're essentially

14  describing here is a fit issue about how closely is the

10:31  15  law -- is the fit for the law to achieving its purpose.  And I

16  think you can come up with hypothetical examples where the

17  effect of the law is going to impose some burdens or some

18  inconvenience on people.  And I think the example you've

19  highlighted might well be one of those, might well be one of

10:32  20  those scenarios.

21          THE COURT:  I mean don't you think that what this law

22  is really likely to do is to encourage people to violate the

23  law?  I mean don't you think what it's really going to do is

24  encourage people like the people that I just -- by the way, you

10:32  25  know, I lived in Imperial County.  Do you know where that is?

1        MR. RICHARDS:  On the map, yes.

2        THE COURT:  On the map.  You've never been there.  So

3   it's about two hours east of here.  It borders with Arizona.

4   So people from Imperial Valley go to Arizona all the time to go

10:32   5   quail hunting and go dove hunting.  They do it all the time.

6   You see them, hundreds if not thousands of them that do this.

7   Right?  What you're doing is you're encouraging people to

8   essentially violate the law or, on the other hand, guess what

9   they're going to do with those 23 shells?  They're going to

10:32  10   dump them somewhere and possibly risk some kid getting their

11   hands on them and injuring themselves.

12        So what I'm saying is from a practical perspective, does

13   this thing make any sense?  I realize that's not one of the

14   tests I have to look at, but since you're standing there and

10:33  15   you seem like a reasonable man, I just wanted to pick your

16   brain about it.

17        MR. RICHARDS:  Yeah, and I appreciate that,

18   Your Honor.  I mean we'll be discussing this I think over the

19   course of this case quite a bit, and I would proffer a third

10:33  20   option for those dove hunters who intend to cross the state.

21        THE COURT:  Shoot more doves over the limit and then

22   bury the over-the-limit doves in the trunk of your car and not

23   declare them?

24        MR. RICHARDS:  No, no, Your Honor, no advocating for

10:33  25   any sort of criminal activity whether it be skirting the

1    ammunition laws, hunting laws, or environmental laws, what have

2    you, by dumping ammunition, but those hunters can bring

3    ammunition with them from California and bring that ammunition

4    back with them into the state because sections 30314 only

10:33    5    applies to ammunition that they purchase outside of California,

6    so --

7    THE COURT:  But that's what I'm getting at.  Maybe I

8    didn't make my hypothetical clear to you.  So you take two

9    boxes.  You bought them here.  You take them over there, but it

10:34    10    turns out it's a bad day, so you used all two boxes.  You

11    didn't get your ten-dove limit.  So you need some more because,

12    you know, you're with your buddies and you want to get your

13    limit.  So you go over to Walmart or Sprague's or Kmart and you

14    buy another box, but you only need three more shells to get

10:34    15    your limit.  You've got your three shells.  You've got 22

16    shells left over.  Under this statute it would be against the

17    law, would it not, to take those 22 shells, put them into the

18    trunk of your car, and drive them into the state of California

19    without going through this whole long process that's described

10:34    20    in the statute, right?

21    MR. RICHARDS:  Yes, that would be an infraction under

22    30314 in the hypothetical you're giving, and I understand what

23    I was suggesting was that for all the folks you're describing

24    in Imperial County and other border regions, whether it be the

10:34    25    Oregon border or the Nevada border, Arizona border who want to

1    go into another state to go hunting, that this law will -- it

2    will impose some burden on them, and they're going to have to

3    plan slightly differently than they would have planned before.

4    That may mean planning for those occasional bad days and

10:35    5    bringing slightly more ammunition that you expect to use or in

6    this scenario that you used even more than you expected to use

7    and have to buy some more.  You may have to ship the ammunition

8    back to the state in compliance with the statute or find some

9    way to dispose of it, return it, or some other method to get

10:35    10    rid of it before bringing it back into the state, and that is

11    how the law will work, yes.

12    THE COURT:  So I suspect the next law will be that all

13    ammunition sold in the state of California will have to be

14    stamped with some number so that law enforcement can identify

10:35    15    that it was sold or bought in the state of California because

16    otherwise how would you ever know?

17    MR. RICHARDS:  I can't speak to what the future laws

18    may be, and --

19    THE COURT:  Are you a betting man?

10:35    20    MR. RICHARDS:  No, I'm not.

21    THE COURT:  That's too bad.  I was going to bet you.

22    All right.

23    MR. RICHARDS:  So to return to the dormant Commerce

24    Clause analysis, again I really want to focus on this

10:36    25    evenhanded application.  I think all remote vendors are treated

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:36 | 5 |
| | 6 |

the same under the statute whether they be a California company
or whether they be an out-of-state company like one of the
out-of-state claims here.  And I think the Ninth Circuit has
time and again applied that standard, and we cite these cases
in our brief, but I'll highlight two briefly, one of which the
plaintiffs relied on a little bit in their opposition.

The first one is the Pharmaceutical Research &
Manufacturers of America case.  In that case the coalition of
pharmaceutical companies challenged an Alameda statute which
requires that people -- companies that sold prescription drugs,
pharmaceutical drugs, in Alameda County had to pool together to
fund and oversee a system that allowed for the safe disposal of
pharmaceutical drugs.  And there the Court found that the law
applied evenhandedly with regard to California and out-of-state
pharmaceutical companies, and it said there's no dormant
Commerce Clause violation.

Similarly --

THE COURT:  Wait, but there's a difference.  But
there's a difference.  So if I want to buy a box of shells in
California, I go to Walmart.  And they charge me for the
shells.  And, by the way, I guess they have to do a background
check, right, to make sure that I'm a law-abiding person under
this statute?

MR. RICHARDS:  A background check, yes.

THE COURT:  So they do a background check, and they

1    sell me the box of shells for whatever the cost is.  We'll just

2    say $8 a box.  Okay?  But if I go over to Arizona or if an

3    Arizona company wants to sell me that same box of shells,

4    they're going to sell me that box of shells for $8, but on top

5    of that $8, I now have to pay not only for the shipping, but I

6    also have to pay for the special licensed person or persons in

7    the state of California who are themselves going to charge me a

8    fee.  I'm just going to throw a number hypothetically.  It's

9    $2.  The cost of shipping.  50 cents.  $2 for the fee.  So now

10   that $8 box of shells that I could have bought for $8 here in

11   California is now actually going to cost me $10.50, right?

12              MR. RICHARDS:  Yes.

13              THE COURT:  So that puts out-of-state sellers at a

14   disadvantage, doesn't it?

15              MR. RICHARDS:  No, it does not.  And for two reasons.

16   I mean -- the first and the primary reason in the hypothetical

17   you gave is that that out-of-state seller is not running the

18   background check, and that is a crucial -- that is a crucial

19   policy goal that the voters have determined they want to happen

20   inside California.  So it's not quite the same transaction

21   because that background check, well, has to occur, so you're

22   adding an additional step there.

23              THE COURT:  Let me ask you, though, because I didn't

24   understand.  So say, for example, I'll just use a company.

25   Let's say Big 5.  I understand Big 5, they have stores all over

1   the country.  Or let's say Cabela's.  So if I go to Cabela's in

2   Arizona and I buy a box of shells, right, they have a Cabela's

3   here in California, right, so if the Cabela's in Arizona runs

4   the background check, why would I have to ship the box of

10:40   5   shells to the Cabela's in California and have them run a

6   background check?  Do you see what I'm saying?

7            MR. RICHARDS:  I see what you're saying.  I think

8   we're maybe back to where we were a little while ago, which is

9   I think the Cabela's in Arizona wouldn't run the -- there's no

10:40   10   background check for them to run.

11           THE COURT:  If you go to Nevada -- but there is an

12   added cost.  If you buy the ammunition outside the state of

13   California, there is an added cost, right?  I mean you concede

14   that, don't you?  There's a shipping, and there's a cost that

10:40   15   the licensed person in California is going to charge you,

16   right?

17           MR. RICHARDS:  Yes, however, the standard in the

18   dormant Commerce Clause is to look at whether there is a

19   discrimination against interstate commerce, whether

10:41   20   out-of-state businesses are treated the same.  And if in your

21   hypothetical, just to modify it slightly, but if we said

22   Cabela's was a California company and you -- and it had stores

23   all over the western United States and you were in Arizona and

24   you went to that Cabela's, that California company with its

10:41   25   outpost in Arizona, it's going to have the same cost of sending

1    the ammunition into the state, so it applies -- the law applies

2    evenly regardless of whose economic interests are at stake.

3    And that's why there's no dormant Commerce Clause violation

4    here because another way of looking at this is for remote

5    vendors.  Your remote vendor in Huntsville, Texas, like one of

6    the plaintiffs here, and a remote vendor in Los Angeles have to

7    go through the exact same process.  If people want to buy from

8    them, they're both going to have to send their ammunition to a

9    licensed --

10            THE COURT:  But if I give you my hypothetical, once

11   again, if I go to -- let's see.  Maybe I'll use one of our

12   actual plaintiffs.  Let's say Able's Sporting.

13            MR. RICHARDS:  I believe they're the one in

14   Huntsville, Texas.  Paragraph 18 of the complaint.

15            THE COURT:  So if I buy a box of shells, I'm over in

16   Texas with my buddies, and I'm out there hunting, and I buy a

17   box of shells.  I pay $8 for the box there.  I pay $8 for it if

18   I buy it here in California, right?  So that box of shells that

19   I bought in Huntsville, now I have to pay for shipping or they

20   have to charge me for shipping, and then on top of that, they

21   have to charge me for someone in California running the

22   background check and delivering it to me.

23       So, again, getting back to my hypothetical, we assume that

24   they charge you $2 for running the background check and 50

25   cents for the shipping.  That $8 box of shells, I could go here

1    to Walmart or wherever and I could buy it for $8, but if I'm

2    over in Huntsville and I buy it, it's now going to cost me

3    $10.50.   That certainly does put an out-of-state entity at a

4    disadvantage because what's it going to do?  It's going to

10:43    5    essentially encourage people in California to buy ammunition

6    from California-based companies or entities as opposed to

7    buying them from out-of-state entities, right?  Doesn't that

8    make sense to you?

9          MR. RICHARDS:  Not necessarily for the reason that you

10:44   10    gave in your hypothetical.  I mean I understand from the

11    hypothetical, and Your Honor's correct that there are going to

12    be costs associated with purchasing ammunition outside of

13    California and bringing it into California.

14          THE COURT:  Which will not exist if you buy in

10:44   15    California, so it is sort of a protectionist statute, isn't it?

16          MR. RICHARDS:  Again, I would respectfully disagree.

17    And for the reason given in your hypothetical because if the

18    person -- the hypothetical person were to go to Walmart, the

19    law's there not promoting a California economic interest.

10:44   20    Walmart is I believe an Arkansas company, it's not a California

21    company, and that is not promoting California -- the California

22    interests, and again I think here -- this is somewhere where

23    the purpose of the law I think -- there's no reason to really

24    question the voters' intent.  The voters were not trying to

10:44   25    protect the California ammunition industry or the California

1  ammunition vendor industry like you see in some of these other

2  cases where laws get shot down.

3       THE COURT:  When did we become so trusting in what

4  legislators and voters do as courts?  I mean when did we say,

5  you know, whatever the voters say, whatever the

6  legislators say, we're going to be solicitous and defer to

7  them, whatever they say is the real motive, we're going to buy

8  into that?

9       MR. RICHARDS:  I think that there's a whole body of

10  case law there about probing legislative intent and legislative

11  motive, and I would agree with the Court that it's not -- that

12  the courts don't have to take in every scenario the stated

13  legislative purposes dogma.  My point is simply here that

14  there's really no question -- there's no reason or legitimate

15  question about the motive here with regard to protectionism at

16  least.  There's, for example, the gun industry was not

17  supporting this initiative.  I think you can look at the

18  request for judicial notice and see that.  This is not an

19  initiative where the California firearms dealers put it on the

20  ballot and said yeah, we're going to really protect our

21  industry here.  Those types of -- that type of evidence might

22  call into question the voters' intent or the voters' motive.

23  My point here is there's no evidence of that sort anywhere in

24  the record, and the plaintiffs have alleged no facts that would

25  support questioning the motive in this way for purposes of just

1  determining whether there's a protectionist intent behind this

2  law.  There's just none there.

3          THE COURT:  Okay.

4          MR. RICHARDS:  And so --

10:46  5          THE COURT:  What about the effect, though?  Even if

6  the intent is pure.

7          MR. RICHARDS:  Yes.

8          THE COURT:  What about the effect?

9          MR. RICHARDS:  So the effect again goes back to how

10:46  10  the courts look at the effect, and they look at whether

11  similarly situated entities in state versus out of state are

12  treated the same, and I think that it doesn't mean that there

13  might be some incidental burdens on out-of-state businesses.  I

14  think several of the cases we cited in our brief make that

10:47  15  point.

16          THE COURT:  That was what I was talking about earlier,

17  about the incidental burden, though.  So how do I -- first of

18  all, who makes the decision as to whether the incidental burden

19  is high enough that the dormant Commerce Clause is triggered?

10:47  20  Number one.

21      Number two, what's the standard that we use to make that

22  determination?

23      And, number three, what evidence do we rely upon, right?

24  Does the Court have absolute discretion to say well, you know,

10:47  25  the, quote, incidental burdens in this case are such that the

1    dormant Commerce Clause is triggered?

2         MR. RICHARDS:  Again, I think the weighing of the

3    burdens is a Pike balancing issue that the plaintiffs have

4    disavowed, but to Your Honor's question, if that were the case,

10:48  5    I think that's something that it would depend on the facts, and

6    courts certainly -- and in this case the Court should rule on

7    this as a matter of law.  The courts can look at the law and

8    see whether it applies evenhandedly and make that determination

9    on a motion to dismiss as the Western District of New York did

10:48  10   in the New York Rifle and Pistol Association v. Cuomo case

11   where we cited where the Court denied a dormant Commerce Clause

12   challenge to a law that's essentially the same as the law in

13   this case.  For all intents and purposes they were essentially

14   the same.  I'd note the only difference between the New York

10:48  15   law and the law in this case is that the New York law

16   effectively banned all sales over the Internet.  And here

17   California has allowed remote sales, so if anything, it's more

18   permissive than the New York law was.

19        But there are other cases too where courts have held that

10:48  20   dormant Commerce Clause claim fails as a matter of law.  I

21   think some of the cases -- I believe it was either the Foie

22   Gras or the Shark Fin case -- was a motion to dismiss matter,

23   that procedural posture.  So the Court can certainly make that

24   determination, and again in this case you can look at the law

10:49  25   and how it operates and say it regulates evenhandedly, and that

1   should be the end of the analysis for purposes of the dormant

2   Commerce Clause.

3           THE COURT:  All right.  You want to get to preemption?

4           MR. RICHARDS:  Yes.

10:49   5   Just briefly before I do I would encourage the Court -- the

6   parties didn't discuss the facts of the Valley Bank of Nevada

7   versus Plus Systems, Inc.  That's another good case the

8   plaintiffs cited, but if you look at the reasoning, that's a

9   good example of the Court looking at a law saying it regulates

10:49   10   evenhandedly and upholding the law.  So that's just by way of

11   reference for the Court.

12           In addition, the Foie Gras and the Shark Fin case that we

13   cited.

14           Moving on to the preemption case, I think the lines on this

10:50   15   one are fairly clear.  I'd just like to emphasize for our

16   purposes here today two points.  The first is that section 926A

17   has to be read in conjunction with the following section, 927,

18   and the plaintiffs haven't really shown here that an

19   alleged -- really, it's a question of law that section 926A and

10:50   20   13 -- excuse me, 30314, the statute we've been talking a lot

21   about today, that there is an irreconcilable conflict and the

22   two can't stand together.  The text of 926A is not

23   clear -- does not clearly control or govern ammunition --

24   transport of ammunition, and, more importantly, almost if you

10:51   25   look at the intent of this law, both by the people who enacted

 1   it and the courts that have interpreted it, is not to

 2   invalidate laws in destination states.  In fact, plaintiffs

 3   have cited no case where 926A has been held to invalidate the

 4   law of the state that someone wanted to travel to, and so

 5   they're really asking for a pretty radical expansion of this

 6   law in the face of a fairly narrow preemption statute, 927A,

 7   and I think that they just haven't met that burden here.

 8            THE COURT:  Let me ask you a question.  If you are one

 9   of these snow birds.  You know what a snow bird is?

10            MR. RICHARDS:  Yes.

11            THE COURT:  So you're a snow bird, and you're coming

12   from Montana in the winter, and you're driving your motor home,

13   and you come to California, and you've got your .357 magnum

14   with your ammunition, and you drive into the state of

15   California, and you're going to be in the state of California

16   for five months waiting for the snow to melt in Montana.  Can

17   you bring your ammunition in without going through the process

18   described in the Safety For All Act?

19            MR. RICHARDS:  I think the answer is it would depend.

20            THE COURT:  That's great for lawyers.  I mean that's

21   just going to create a new cottage industry for lawyers.

22            MR. RICHARDS:  Well, I think it would depend on a few

23   factors, but the most important one is are you a resident of

24   California coming to wait out the winter in Montana or are you

25   a resident of Montana coming to wait out the winter in

1   California?  If you're a Montana resident, 30314 doesn't apply

2   to you.  And if you're a California resident, then yes, you

3   would have to --

4       THE COURT:  So the state concedes that 926A would

10:53   5   exempt someone who is not a California resident who brings

6   ammunition into the state of California, right?

7       MR. RICHARDS:  No, just -- just to be clear, 30314

8   would not apply to that nonresident, so there'd be no 926A

9   analysis or discussion because what we concede here is that if

10:53   10   in your hypothetical the person is a Montana resident, there's

11   no law enforcement issue there, there's nothing to preempt

12   because the law doesn't apply to that person.

13       THE COURT:  But you're making an assumption that when

14   the highway patrolman or whoever pulls that person over and

10:53   15   finds the ammunition pulls out the briefs in Rhode versus

16   Xavier Becerra and understands, right, that because the snow

17   bird is a resident of Montana, he or she has the right to bring

18   that ammunition in, right?

19       MR. RICHARDS:  Yeah, yes, Your Honor, I think it's

10:54   20   fair to assume in the absence of evidence to the contrary that

21   law enforcement officers will carry out the law just like we

22   can assume they'll know things closer to home, like the speed

23   limit or even the laws regulating a prohibited person

24   possessing a gun.  I think we can make that presumption that as

10:54   25   a general matter that will happen.

                1    And the Court's concern here I think is quite similar to
                2   the concern raised by the plaintiffs in the Florio case in the
                3   District of New Jersey that we cited in our brief.  I think
                4   that case challenged the New Jersey's assault weapon ban from
10:54           5   the early '90s, and the plaintiffs there had said well, we just
                6   want to bring our assault weapons through New Jersey.  So they
                7   were actually -- as opposed to the plaintiffs in this case,
                8   they were making a claim that they were concerned that
                9   traveling through New Jersey they would be stopped and arrested
10:55          10   and that they wanted the Court to hold the 926A preempted
               11   New Jersey law because there's no assurance that the New Jersey
               12   highway patrol would -- or New Jersey police or whoever law
               13   enforcement would respect section 926A, and the Court said --
               14   rejected that argument and said no, we're going to presume that
10:55          15   the law will be enforced as it's written, and so I think that
               16   concern has been addressed by another court.  And --
               17           THE COURT:  All right.
               18           MR. RICHARDS:  And so as I was saying, I think the
               19   real kind of -- the real advance the plaintiffs are
10:55          20   asking -- the leap the plaintiffs are asking this Court to make
               21   is to apply 926A to invalidate the law of a destination state,
               22   and they've cited no authority that would support the use of
               23   that law in that way.
               24           THE COURT:  What about the Equal Protection --
10:56          25           MR. RICHARDS:  I'll be very brief on this, Your Honor.

1   I think at this point, you know, the parties appear to be in

2   agreement that this is a rational basis challenge, and as we

3   pointed out in our reply brief, the plaintiffs didn't respond

4   to one of the bases that we offered.  They have a very high

10:56   5   burden here.

6           THE COURT:  Why is this a rational bases claim if in

7   fact -- if it's been held that the Second Amendment is a

8   fundamental right.  So I know that this is not about the Second

9   Amendment itself, but an Equal Protection realm.  If it's a

10:56   10  Constitutional fundamental right, then the rational bases

11  analysis doesn't apply.  It's at a minimum a heightened

12  scrutiny that applies, right?

13          MR. RICHARDS:  That's generally speaking, yes.

14          THE COURT:  So why are we saying that rational bases

10:57   15  applies in this case?

16          MR. RICHARDS:  Two reasons.  The first reason is just

17  as on the record in this case, the plaintiffs have claimed that

18  they're not trying to merge -- what we call merging a Second

19  Amendment claim or having their Second Amendment claim form the

10:57   20  bases for their protection claim.  So the plaintiffs haven't

21  presented that to the Court, but I think a more fundamental

22  reason --

23          THE COURT:  Practically speaking, realistically that's

24  what it is, isn't it?  When you cut to the chase, that's what

10:57   25  this really is.  What they're talking about, okay, do I have a

1    right to bring ammunition into the state of California?

2    Ammunition they claim, and I don't want to say one way or the

3    other, may be protected by the Second Amendment.  And so why is

4    it a rational basis analysis?

10:58    5        MR. RICHARDS:  And that gets to the second point I was

6    going to make, which is very simple or a little bit more

7    complicated.  The simple answer is the Ninth Circuit said you

8    can't do that.  It said that in the Teixeira case, the panel

9    decision which was adopted by the en banc panel and decided

10:58   10   again recently in the Pena v. Lindley case of a couple months

11   ago that we cited in our reply brief.  And so that's the short

12   answer.

13       The little bit longer answer is those cases are -- the

14   holdings in those cases are based on a determination that while

10:58   15   Your Honor's correct that generally speaking under the Equal

16   Protection context when someone challenges a law's violating a

17   fundamental right, some of them heightened scrutiny will apply,

18   but courts in other areas, not just in the Second Amendment

19   area, recognizes that where the right is not just the

10:58   20   fundamental right, but an enumerated right, such as the First

21   Amendment, that the proper analysis is under the framework

22   established under that amendment.  And the cases that the Ninth

23   Circuit cited in Teixeira --

24       THE COURT:  Wait a minute.  I hear you, but I keep a

10:59   25   copy of the Constitution by my chair where I watch the news and

1   television.  I've read it many, many times.  Where does that

2   come from?  Where does one find that in the Constitution?

3          MR. RICHARDS:  I think there's no express language in

4   the Constitution.

10:59   5          THE COURT:  It's something that's been judicially

6   conjured up, right?  We just decided okay.  We want to arrive

7   at a different result than these cases, so we come up with this

8   different view.

9          MR. RICHARDS:  I would respectfully disagree with the

10:59  10   Court's recitation of conjuring it.  I think since the Carolene

11   Products case in the mid 20th century the courts have developed

12   a framework that is not on the face of the Constitution, but

13   that courts have interpreted as necessary or decided are

14   necessary to effectuate the rights guaranteed in the

11:00  15   Constitution, and I think again looking forward in this case a

16   little bit --

17          THE COURT:  If we decided tomorrow that First

18   Amendment, we don't really care that much about that, we'll

19   turn it into a second-class right, we can then change how we

11:00  20   approach First Amendment rights cases and sort of make them

21   more analogous to Second Amendment cases, right?

22          MR. RICHARDS:  Again, I would -- that's a complicated

23   question.  I would disagree I think that it would be as simple

24   as deciding we want to go a different course.  What the Court's

11:00  25   talking about is overturning well over a century of

1    jurisprudence, and case law does evolve, and I think using the

2    First Amendment example, we're seeing some of that already in

3    the court in recent terms.  So case law does evolve.

4         THE COURT:  What do you mean?  Tell me about that.

11:01  5    What did you mean by that?

6         MR. RICHARDS:  That the case law evolves?

7         THE COURT:  Yeah, you just said something about the

8    First Amendment and the case law turning.

9         MR. RICHARDS:  Well, I think you can see in

11:01  10   certain -- in certain contexts, and certain commentators have

11   observed that the Court is -- this Court is perhaps more

12   protective of First Amendment rights than some courts have been

13   in the past or maybe not protective is the best way to put it.

14   You could also say is more favor -- more in favor of using the

11:01  15   First Amendment as a deregulatory tool.  There's different ways

16   to characterize it, but I think people can agree that the Court

17   is ratcheting up its First Amendment standard.

18        THE COURT:  So notwithstanding the fact that the Bill

19   of Rights doesn't say we'll give greater protection to First

11:01  20   Amendment rights than we will to Second Amendment rights or

21   Second Amendment rights we'll give greater protections than

22   Fourth Amendment rights, we can again in order to arrive at a

23   result come up with different tests that will give us the

24   desired result, right?

11:02  25        MR. RICHARDS:  I think some people view the judicial

1    process that way.  I mean that's certainly I think what you

2    might call a legal realist view of how courts operate, and I

3    think there's -- again this is getting to scholarly research

4    that I'm not an expert on, but that a lot of people disagree

5    with that, and I think courts don't as a general matter, at

6    least in my experience and in my reading as well, try to craft

7    tests to come up with the outcome that they want.  And

8    that's -- I think that's a matter of perspective that people

9    can debate, but I don't think that's likely what's really going

10   on.  I think judges care about principles, and they care about

11   effectuating --

12            THE COURT:  But the principle is that the Second

13   Amendment is in the Bill of Rights just like the First

14   Amendment, the Fourth Amendment, the Fifth Amendment, the Sixth

15   Amendment, right?

16            MR. RICHARDS:  Yes.

17            THE COURT:  So getting back to my question, if the

18   Second Amendment -- again, let's forget about the ammunition

19   issue, but if that's a fundamental right, then why do we use

20   rational bases analysis for deciding whether or not the Equal

21   Protection clauses have been violated?

22            MR. RICHARDS:  Perhaps another way of looking at this

23   is because the two are -- some courts have used the language

24   mergers, that the two claims are merged.  It's essentially one

25   claim.  I mean whether -- if we're going to analyze it under

1  the Second Amendment, why do we also need to analyze it under

2  Equal Protection?  There's nothing really to be achieved by

3  that.

4          THE COURT:  I can certainly understand that, but I

11:03  5  just have a very difficult time grasping this idea that we

6  apply rational bases analysis to a fundamental Constitutional

7  right as opposed to other fundamental Constitutional rights.

8          MR. RICHARDS:  And again I think it's not that

9  rational basis is being applied to the Constitutional right,

11:03  10  it's being applied to a secondary use of that right through the

11  Equal Protection clause.  Again, we're going to have to

12  probably spend a lot of time talking about the standard under

13  the Second Amendment, but here we're talking about the standard

14  under the Equal Protection clause, and that standard is

11:04  15  rational basis for -- or otherwise every Constitutional claim

16  would be a First Amendment claim, Second Amendment claim, Third

17  Amendment claim, you know, any claim that can be effectuated in

18  a lawsuit such as this one would also be an Equal Protection

19  violation.

11:04  20          THE COURT:  I understand.  I understand.

21          MR. RICHARDS:  And so with that I think I've been up

22  here for a little while.  We ask that the Court grant our

23  motion to dismiss, and I'll --

24          THE COURT:  Why, thank you.  You've answered all of my

11:04  25  questions and done it quite well.

1        Let's hear from plaintiffs.

2            MR. BRADY:  Thank you, Your Honor.

3        So I guess I will go in the order that the state did in

4    making their case.  First on the dormant Commerce Clause

11:05  5    question.

6            THE COURT:  Tell me what's the closest case, the best

7    case, that you have, the best case that you have, that supports

8    your position?

9            MR. BRADY:  Sure.  I think it's a little bit difficult

11:05  10    because of the nature of California scheme, how it's broken up,

11    and its effect, but I think that with respect to the defense

12    that the state is using or at least some of the defenses, I

13    would look to the Granholm case that we cite in our brief.

14    It's Granholm v. Heald, H-E-A-L-D, 544 U.S. 460.  Because at

11:05  15    the end of the day, what the state is saying, that there's no

16    discrimination, is that out-of-state corporations that are

17    headquartered out of state can simply -- there's nothing

18    preventing them from having a physical presence here.  Well,

19    that's essentially saying that they must have a physical

11:06  20    presence here in order to have access to the California market,

21    which is exactly --

22            THE COURT:  No, they don't because they can just ship

23    the ammo to someone who is present here, right?

24            MR. BRADY:  Correct, but then they wouldn't be on the

11:06  25    even playing field with the local marketplace, and setting

1    aside the practical reality of the in-state marketplace, the

2    in-state companies have veto power over whether an out-of-state

3    company even gets to do -- gets to transact ammunition within

4    California.

11:06    5    THE COURT:  Let me ask you this, though:  I suppose if

6    a case came up -- I mean if there was evidence of the fact that

7    no in state or that -- or that somehow the state was trying to

8    make it so that those licensing agencies within the state of

9    California would be more difficult on the importation of

11:07    10    ammunition into the state or they were putting hurdles in front

11    of these licensing agencies so that it would become more

12    difficult to import ammunition into the state, in that case

13    then your case would be stronger, but I realize we're at the

14    motion to dismiss stage, but there really is no indication,

11:07    15    there's no reason for the Court to believe that additional

16    hurdle is ever going to come to pass, right?  And the only

17    thing I can see is there's this cost, there's this additional

18    cost that's going to have to be borne out by people who want to

19    import ammunition to the state of California.  And that has to

11:08    20    be balanced by the noneconomic interests or motive of the state

21    to protect the safety of its citizens, right?

22    MR. BRADY:  Your Honor, just to clarify your question,

23    are you -- are you stating or saying that the veto that I've

24    described as the veto power of the in-state company would never

11:08    25    come to pass?

```
 1          THE COURT:  I'm saying that it's strictly
 2    hypothetical.  It's conclusory.  It's not based on -- you
 3    haven't alleged any facts that would indicate that that is
 4    true, that that's happening.
```
11:08
```
 5          MR. BRADY:  That is correct, we have not alleged that
 6    that has happened in practice.  I think just the fact that
 7    companies have that leverage over an out-of-state company that
 8    hey, we can or cannot take your -- this transaction provides
 9    them with leverage in a negotiation that the out-of-state
```
11:09
```
10    company doesn't have.
11          And even setting aside the veto power, as Your Honor
12    indicated, just the fee issue alone is problematic enough under
13    the dormant Commerce Clause.  If an individual from California
14    wishes to purchase ammo directly from a California company in
```
11:09
```
15    person, there's no additional fee.  They want to acquire
16    ammunition from out of state, they're subject to whatever fee
17    amount the in-state vendor wishes to place on that transaction.
18    How does that not rob the out of -- all out-of-state vendors of
19    any economic -- of any advantage competitive advantage, which
```
11:09
```
20    is part of the test for a dormant Commerce Clause claim?
21          THE COURT:  But don't we also look to see what the
22    motive or what the intent of the law is?  I mean if it's
23    clear -- if the state enacts a law that's clearly designed to
24    grant an economic benefit or advantage to in-state companies or
```
11:10
```
25    businesses, that's one thing, but if the state adopts a statute
```

1    for some other reason -- of course, safety I think as I

2    recall -- it might have been Kentucky versus Davis.  I read

3    somewhere in there where they talked about -- I can't remember

4    now, but anyway, they talk about how if there's another reason

11:10    5    for the state law other than just economic benefit, and if that

6    other reason is safety -- now, of course, you know, almost

7    anything can be justified.  So I was chiding counsel about the

8    cute title of the statute.  Safety For All.  What about the

9    victims of crimes?  What about their safety?  You know, but if

11:11    10    it can legitimately be said that the state has a good reason

11    for enacting this law that is noneconomic.  The way I read the

12    cases, that seems to be fine.  It doesn't affect the dormant

13    Commerce Clause.  Am I wrong?

14            MR. BRADY:  I believe you are wrong, and I have a case

11:11    15    at my fingertips because I was prepared to address this, which

16    is the laws on economic protectionism.  If you look at

17    Associated Industry of Montana v. Lohman, L-O-H-M-A-N, at 511

18    U.S. 641 --

19            THE COURT:  I'm sorry, say that again.

11:12    20            MR. BRADY:  511 U.S. 641, it's quoted on page 12 of

21    plaintiffs' opposition brief in footnote 5, and it says, "A

22    court need not inquire into the purpose or motivation behind a

23    law to determine that in actuality it impermissibly

24    discriminates against interstate commerce."  It is true that

11:12    25    once there is a discriminatory effect, in other words,

1    when determining whether there's a discriminatory effect or not

2    is a separate question from whether that discriminatory effect

3    can be justified.

4        Okay.  So the state will get its chance to justify the

11:12   5    discrimination.  It's a very -- it's an extremely high burden.

6    I'm only aware of a single case where the Court has said yes,

7    there's discrimination, but it's justified.

8        You know, if you look at the classic dormant Commerce

9    Clause cases, you know, like Dean Milk versus City of Madison,

11:13   10   Wisconsin, that we all learned about in law school, they all

11   had this other justification, right, you have to use our milk

12   processing plant within a five-mile radius of Madison because

13   we need to have our inspectors confirm that this milk is up to

14   Wisconsin standards, right?

11:13   15       The other cases that talk about flow control of garbage,

16   right, you have to use our in-state processing plant in order

17   to process garbage.  They had environmental concerns and safety

18   concerns about garbage.  So there's always this other

19   justification or at least a pretext, and so the state can say

11:14   20   it's about safety, but that doesn't -- that doesn't change the

21   fact that it is discriminatory.  It doesn't change the fact

22   that it regulates extraterritorially.

23       And on that point I would like to -- unless Your Honor has

24   any questions, I would like to explain why we believe there is

11:14   25   an extraterritorially effect which certainly makes a per se

1    invalidation, and you would not even consider the purpose if it

2    regulates extraterritorially.

3             THE COURT:  All right.  Go ahead.

4             MR. BRADY:  I think the best way to explain that, the

11:14   5    state's constrained view of the extraterritorially doctrine

6    isn't borne out by case law.  They don't pay attention to the

7    practical effect which is what the Supreme Court says is the

8    critical inquiry, the practical effect of the law.  They solely

9    focus on the fact that there's some California connection with

11:14   10   these statutes, so they're looking at the purpose of the law,

11   but if you look at the practical effect, if a California

12   resident is dove hunting in Arizona and they swing in to Sam's

13   Shooters' Emporium, plaintiff Sam's Shooters' Emporium store,

14   and notices hey, look, they have this ammunition I've been

11:15   15   looking for everywhere and couldn't find.  I'm going to get

16   this.  Goes to the counter, tells the clerk at Sam's Shooters'

17   Emporium, you know, I'm a California resident, and so for me to

18   get this ammunition back home, I'm going to have to ship it to

19   an in-state vendor who's then going to have to accept it,

11:15   20   charge me a fee, and then I'll be able to pick it up.  So if

21   you, clerk, can find me an entity near where I live in

22   California that will agree to process this transaction, I will

23   purchase this ammunition right here.  The clerk gets on the

24   phone, makes some phone calls, can't find any takers.  That

11:15   25   just nullified that transaction.  A wholly out-of-state

1   transaction that would have taken place in Arizona is now

2   completely nullified because the practical effect of 30314 --

3           THE COURT:  Isn't it hypothetical?  I mean I guess

4   what I'm getting at, again, I realize this is a motion to

11:16   5   dismiss, but what I'm getting at is so plaintiff Rhode is

6   perhaps I think one of the most problematic plaintiffs in this

7   case.  So here's this woman who's a world class shooter, an

8   Olympic shooter, right, and it strikes me from looking at this

9   that she's probably going to have some problems, which of

11:17   10   course hopefully she'll remember at the ballot box next time

11   she goes to vote, but it strikes me she's going to be at a real

12   disadvantage getting her ammunition even though I guess she

13   gets her ammunition from the U.S. Olympic folks, right, I mean

14   the way I read it and the way I understand it.

11:17   15           MR. BRADY:  That is correct, Your Honor.

16           THE COURT:  So even the U.S. Olympic ammunition has to

17   go through this long, convoluted process, but, for example, in

18   your complaint say that Ms. Rhode has tried to get ammunition,

19   but nobody will accept it or she can't do it, it's just not

11:17   20   happening, that would be a different story altogether, but this

21   is all kind of hypothetical, isn't it?

22           MR. BRADY:  The particular hypothetical I gave is

23   indeed just that, a hypothetical.  But the fact that that

24   transaction is contingent upon -- that wholly out-of-state

11:18   25   transaction is potentially contingent on finding an in-state

1   vendor to agree to the transaction to process the ammunition

2   delivery is problematic, and even if you set aside that

3   hypothetical, what is not hypothetical is that that in-state

4   vendor gets to set the price for what that transaction is going

11:18   5   to be, right?  It is --

6           THE COURT:  So if you were say -- if I understand this

7   correctly, so you go to Walmart in Yuma, Arizona, you buy a box

8   of shells, then they can ship it to a Walmart here in

9   California, right, and then that Walmart would perhaps charge a

11:18   10  fee, they may not, I don't know, depends on -- they may decide

11  as an economic matter that they're not going to charge an extra

12  fee for that, but let's assume that they are, but so they

13  charge a fee.  You get your product.  But on the other hand, if

14  you're an entity that does not have a representative, does not

11:19   15  have a coequal Walmart store or Kmart or Big 5, now you

16  actually have to find someone, some independent licensed dealer

17  who will agree to do this for you, right?

18          MR. BRADY:  And set the price, that is correct.

19          THE COURT:  And set the price, right.  Okay.  I

11:19   20  gotcha.

21          MR. BRADY:  And it's simply out of state -- in state

22  brick and mortar.

23          THE COURT:  So if I'm going to buy ammunition out of

24  state, what it's going to do is it's going to essentially

11:19   25  encourage me to go buy from the Walmarts and the Kmarts and the

1    Big 5s as opposed to, for example, from Able's Sporting good,

2    right, because they don't have a representative here in

3    California?

4         MR. BRADY:  Conceivably.  Although Walmart has since

11:20   5    ceased selling ammo is my understanding.

6         THE COURT:  Oh, is that right?  I don't know.  I know

7    they used to.

8         MR. BRADY:  They did.  But yes, you know, I think

9    that's fair to say, that it ironically does give more of a

11:20   10   competitive advantage to these big companies, but it most

11   certainly does take away a competitive advantage, which is part

12   of the test when you're talking about actual territoriality of

13   out-of-state vendors that in-state vendors simply do not have

14   to deal with.  And so that is the extraterritorial fact.

11:20   15      And then when you're talking about discrimination, I'd like

16   to clarify one thing because counsel for the state indicated

17   that plaintiffs are not making a facial challenge, you know, a

18   law can discriminate for purpose on its face or effect.  We've

19   already established we are not indicating that there's -- we're

11:21   20   not alleging that there is an inappropriate purpose, but we are

21   alleging -- plaintiffs are alleging that there is a facial

22   discriminatory issue at least with respect to their Penal Code

23   Section 30414.

24        THE COURT:  So you're not alleging that this law

11:21   25   inappropriately affects Second Amendment rights?

 1          MR. BRADY:  Oh, we are alleging that as well.  We're

 2   not alleging the purpose aspect.  There's three aspects.

 3   There's the -- in other words --

 4          THE COURT:  The purpose is to curtail Second Amendment

 5   rights.  You're not saying that?

 6          MR. BRADY:  I don't know if that would even be part of

 7   the -- I think that would be more -- fall more under the Second

 8   Amendment analysis.  I think for the purposes of the dormant

 9   Commerce Clause analysis, the only purpose that matters is if

10   they're trying to have an economic advantage for their in

11   state -- I don't think the --

12          THE COURT:  That's not the way I read the cases.

13   Maybe I'm missing the point, but what I read was look, if the

14   statute is designed to create some economic advantage or

15   disadvantage or to impede interstate commerce, then we look at

16   it in one way, but if that same statute has other underlying

17   purposes such as, for example, the protection of the safety of

18   the population, now we look at it in a different way, right?  I

19   mean that's the way I understood it.

20          MR. BRADY:  That's my understanding as well, but I

21   think Your Honor said pretty much what I just said.  We're not

22   alleging that they have -- that the state has an inappropriate

23   economic purpose under the dormant Commerce Clause for doing

24   this.  We are --

25          THE COURT:  You're saying that it does not?

1       MR. BRADY:  It does not.  In other words, they're

2   not -- the purpose of Prop 63, which was voted on by the

3   people, not by the legislature, was not to protect in-state

4   ammunition vendors.  That wasn't its intent or purpose as

11:23    5   stated in, you know, the preamble of the proposition.  So there

6   was no intent to benefit in-state economic interests.  That is

7   the effect.  And that is -- on its face, it does that, and

8   that's where we're at.

9       On the facial aspect Penal Code Section 30414 expressly

11:23   10   says if a California resident goes out of state to acquire

11   ammunition from a brick-and-mortar store in another state, it

12   has to go through the whole rigamarole that Your Honor

13   described, find somebody to accept it, pay for the shipping,

14   pay the in-state fee for processing, and then go pay the

11:24   15   background check fee when they get there.  Versus that same

16   California resident goes to an in-state brick-and-mortar store,

17   buys the exact same ammunition, and they walk out the store

18   with it with only paying the background check fee, no paying

19   for the shipping, no having to find somebody to accept it, no

11:24   20   having to pay the shipping fee, no having to pay an additional

21   fee, and no having to make a second trip to go pick up your

22   ammunition.

23       THE COURT:  That's kind of an incidental burden,

24   though, isn't it, at best?

11:24   25       MR. BRADY:  I would --

1          THE COURT:  Minimal?

2          MR. BRADY:  I would have to respectfully disagree.  I

3     guess it would depend to a certain extent on where somebody

4     lives, how much the fee is that's going to be charged in state.

5          THE COURT:  I see.

6          MR. BRADY:  I mean at the end of the day we're saying

7     that this law, California's regime has given in-state vendors

8     basically carte blanche to set the standards for out-of-state

9     companies to do business in California.  In other words,

10    they've given --

11         THE COURT:  I wonder why.  California sets fees for

12    all sorts of stuff, you know, statutorily.  I wonder why they

13    didn't do it with this statute.  I mean I wonder why they

14    didn't say, for example, that in-state vendor will only charge

15    $2 per box of ammunition or whatever, and that would take care

16    of that problem, wouldn't it?

17         MR. BRADY:  Conceivably although I think that -- and I

18    can't pretend to know what whoever was thinking when they wrote

19    this legislation because obviously it's 42 pages of all kinds

20    of stuff, and there's lots of problems with it, which is why

21    there's been lots of lawsuits challenging multiple provisions

22    of it.  But, you know, the main point with respect to whether

23    it discriminates on the facial aspect is that it treats --

24    out-of-state vendors are subject to a wholly different set of

25    conditions that in-state vendors simply are not.

1          THE COURT:  Yeah, there's no question that

2     out-of-state vendors are going to be at a disadvantage.  I

3     mean --

4          MR. BRADY:  And that's all that plaintiffs need to

11:26    5     show, Your Honor, for a dormant Commerce Clause claim, and then

6     the state gets to attempt to justify that disparate treatment

7     with saying that, you know, we have these public safety needs.

8     Now, I don't think that they will be able to meet their burden

9     frankly because it is a very high burden.  I'm only aware of

11:26   10     one case where the Supreme Court has upheld that, and --

11          THE COURT:  But we're at the Ninth Circuit.  We're not

12     talking Supreme Court yet.

13          MR. BRADY:  Indeed.  I'm not aware of a Ninth Circuit

14     case that said that the discriminatory effect can be justified

11:27   15     by ulterior motives.

16          THE COURT:  We're talking about ammunition.

17          MR. BRADY:  Correct.  Which is protected by the Second

18     Amendment, which is a whole other question we'll get into down

19     the road, but I think -- and in any event, we will have

11:27   20     that -- we can have that discussion, but at the motion to

21     dismiss stage, I don't think that it would be proper for a

22     dismissal of a dormant Commerce Clause claim when there

23     is -- when the plaintiffs have shown or alleged a

24     discriminatory effect that Your Honor's conceded that there is

11:27   25     such an effect -- I don't think that they can -- that you then

1    justify -- allow a state to justify it at this stage of the

2    game and kick the dormant Commerce Clause claim.  They'll have

3    their opportunity to do that at a merits briefing.

4              THE COURT:  What about the preemption issue?

11:28  5              MR. BRADY:  Sure.  So I think --

6              THE COURT:  Don't you think you have kind of a tough

7    row to hoe on the preemption issue?

8              MR. BRADY:  No, and when we first developed this

9    claim, I was skeptical and thought I don't know, this is

11:28  10   obviously -- 926A, as the state has indicated, is primarily

11   intended to be a shield versus a sword, right?  It's intended

12   to protect people when traveling interstate from laws, not to

13   strike laws down.  That being said, 927 which the state has

14   also cited, 18 USC 927 says that at least in some instances

11:29  15   926A must be a sword, and those are the instances when the

16   local law and 926A are irreconcilable, and if you just --

17             THE COURT:  What makes it irreconcilable in this case?

18   Because 926 is talking about the transportation of firearms,

19   and although it doesn't say "ammunition," it's implied.  Not

11:29  20   too many people are likely to carry firearms, at least not for

21   self-protection, without also having ammunition, right?  So

22   unless they plan to throw the gun at someone.  So you've got

23   the gun, you've got the ammunition, but it's intended to

24   protect people that are either driving through a place or

11:29  25   driving to a place on a temporary basis.  That's the way I

1    understand 926A.  How does that impact any of these statutes,

2    30385, 30370, et cetera?

3             MR. BRADY:  To be clear, plaintiffs are only making a

4    preemption challenge to 30414, which is the you cannot

11:30   5    transport ammunition from out of state into California if

6    you're a California resident.

7             THE COURT:  Right.

8             MR. BRADY:  And on that score -- so --

9             THE COURT:  But didn't you just answer the question if

11:30  10    you're a California resident?

11            MR. BRADY:  Correct.

12            THE COURT:  But 926A doesn't talk about residents.

13    It's intended to protect people traveling through places or to

14    places temporarily.  I mean I realize what's going to happen

11:30  15    is, look, if you're that snow bird and you're driving into

16    California and you get pulled over and you get cited, and the

17    officer is not going to do a -- you know, he's not going to ask

18    you for your tax return to see what you claim to be your place

19    of residence.  They're not going to see if you have utility

11:31  20    bills.  They're not going to do any of that.  They're going to

21    do whatever it is that they need to do quickly to decide right

22    then and there whether they have probable cause to find that

23    you have violated 30314, and then of course it will be your

24    unfortunate circumstance that you'll have to go out and hire a

11:31  25    lawyer, and the lawyer will have to present your case, and then

1    hopefully you'll be found guilty of violating 30314 because as

2    it turned out, you weren't a resident of the state of

3    California, you were a resident of Montana, you were simply

4    driving through or here temporarily.  But that's a practical

11:32    5    problem, that's a problem that we always face.  But the reality

6    is that 926A is intended to protect people who are driving from

7    one place to another where it is lawful to possess the firearm

8    where you started, it is lawful to possess the firearm -- and I

9    should add ammunition -- where you end.  That's what 926A is

11:32    10   all about.  But if you're a California resident and you go

11   outside, right, so it's unlawful for you to possess that

12   ammunition or that firearm in the state of California.  You go

13   outside and you acquire the ammunition or the firearm, you

14   bring it back, 926A doesn't apply at all.  Right?

11:32    15           MR. BRADY:  Well, a few things, Your Honor.

16           THE COURT:  Okay.

17           MR. BRADY:  Because you said a lot, but I think, you

18   know, just a point on your initial point, that 926A only

19   applies to driving through a place or temporarily in a place.

11:33    20   The statute says nothing about through or temporary.  It says

21   from any place to any place, and for all of California's

22   foibles, it still is a place in the United States, and so the

23   problem is that it's a possession law that 926A will not help

24   against striking down, right, so, for example, I think it's

11:33    25   helpful to look at 926A.

```
 1              THE COURT:  But look, 30314 makes it unlawful to bring
 2     in ammunition unless you've gone through this process, right?
 3     926A, one of the basic premises of 926A is that it is lawful
 4     wherever you start, wherever you finish that the ammunition and
 5     the firearm are lawful.  But 30314 by its own terms makes it
 6     unlawful for you to bring that ammunition into the state of
 7     California.  So 926A again would not apply, would it?
 8              MR. BRADY:  I think the way Your Honor just described
 9     it explains precisely why the two statutes are irreconcilable.
10     There is nothing restricting the possession of ammunition in
11     California.  There's no law.  30314 doesn't mention possession.
12     No other statute mentions possession unless you're a felon or
13     some other person who can't touch it.  There's no law
14     restricting possession, so it is lawful to process.  What is
15     made criminal by 30414 expressly is, quote, a resident of the
16     state shall not bring or transport into this state.  What does
17     926A say?  It says, quote, an individual's entitled to
18     transport.  So, in other words, 926A says you are entitled to
19     transport across state lines firearms and ammunition and --
20              THE COURT:  But not if the place where you transport
21     it to is unlawful.
22              MR. BRADY:  The unlawful act under 30414 is crossing
23     the border.  It's not possessing the ammunition in the state.
24     That's why this is wholly different from the assault weapon
25     cases where plaintiffs try to say oh, I want to strike down a
```

1   ban on the possession of assault weapons in state because, you

2   know, I'm allowed to transport my assault weapon through there.

3   In that instance 926A would work as a shield against those

4   possession laws.  You wouldn't use it as a sword to strike them

11:35   5   down.  But where 926 -- the sole purpose of 926A is expressly

6   that a person shall be entitled to transport, and the statute

7   says you shall not transport.  Those are irreconcilable.

8   There's no situation in which 30414 can be read to not curtail

9   926A, and that is your classic federal preemption case.

11:36   10   So I think the focus needs to be on what activity is being

11   restricted.  In other words, if that were the case, every state

12   could just nullify 926A by saying you can't cross into our

13   state with this stuff, right?  That's the very activity that

14   926A protects, so that is our position on the preemption claim.

11:36   15   As for the Equal Protection claim, I think Your Honor is

16   spot on in questioning why the Second Amendment is being

17   treated differently under this Equal Protection analysis, and

18   to be clear, counsel for the state is not correct that we are

19   not asserting, that plaintiffs are not asserting, a heightened

11:37   20   level of scrutiny for our Equal Protection challenge.  We

21   certainly are, and it's in our briefing.  We cite all the Equal

22   Protection cases that use heightened scrutiny.

23   That being said somewhat in the state's defense, the Pena

24   case has thrown a little bit of a curveball into that analysis

11:37   25   because --

```
 1        THE COURT:  That's what I was saying to you.  What are
 2   the odds that any of this is going to survive at least in the
 3   Ninth Circuit?  It couldn't possibly, some of this, survive in
 4   the Supreme Court, but the odds of it surviving in the Ninth
 5   Circuit, that is your challenge.
 6        MR. BRADY:  Yes.
 7        THE COURT:  A snowball in hell.
 8        MR. BRADY:  Perhaps on Equal Protection challenge with
 9   respect to getting heightened scrutiny; however, so I think the
10   whole heightened scrutiny analysis of plaintiffs do contend
11   that the appropriate application of Equal Protection
12   jurisprudence at the Supreme Court level is that -- and even
13   previously at the Ninth Circuit before Pena, and admittedly
14   Pena throws an odd curveball into the mix, is that whenever
15   you're discriminating against a group of people with respect to
16   their engaging in Constitutionally protected activity,
17   heightened scrutiny applies.  The Supreme Court has said the
18   Second Amendment is no different from any other right.  It
19   should not be treated lesser, so apparently the panel in the
20   Pena case didn't read that portion of the Heller McDonald case,
21   wherever that quote comes from.
22        THE COURT:  I'm sure they did.  They just have a
23   different view or a different take.  Was that written by -- was
24   that Judge McKeown and Judge Owens, and who was the third
25   judge?  Was it Judge Wallace?
```

11:37

11:38

11:38

11:38

11:39

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| 11:39 | 5 |

1    MR. BRADY:  Correct.

2    THE COURT:  They just have a different view or

3 perspective of what the Heller case says.

4    MR. BRADY:  Sure.  I apologize.  I apologize if I

5 sounded flippant about their approach to it.  What I was

6 getting at is there has been this sort of funneling down on

7 this Equal Protection analysis in these Ninth Circuit cases

8 where they've now reached the point in Pena where rather than

9 saying hey, look, you guys are trying to get heightened

10 scrutiny on a Second Amendment claim that is identical to your

11 Second Amendment claim under Equal Protection.  You can't do

12 that because you're not saying that another group is being

13 treated differently, which is what the Teixeira panel said and

14 which is why we continued saying well, that is what we're

15 alleging here to now the Pena panel simply said well, it's the

16 Second Amendment, so if there's a Second Amendment issue, you

17 don't get heightened scrutiny.  I don't see how they can square

18 that with the Supreme Court's admonition that you're to treat a

19 Second Amendment just the same as all other federal rights, but

20 I digress.

21    THE COURT:  There's a case -- I can't remember if it's

22 from the -- I think it's from the Seventh Circuit -- where --

23 was it a concurring opinion that started out and said, "The

24 Second Amendment is the Rodney Dangerfield of the Bill of

25 Rights."  I thought it was a wonderful line in that opinion,

but, you know, it's treated differently.  Why?  Beats me, but

it is, and so I think the state may have a good case in that

regard.  Anyway.

            MR. BRADY:  But the good news for plaintiffs is that

we still survive under rational basis review here, and the

reason --

            THE COURT:  Why?

            MR. BRADY:  I'll explain exactly why.  There's two

reasons.  The state's sole defense to saying that there's a

rational basis for treating an out-of-state resident and a

California resident differently in the requirement that they

send ammunition from out of state to in state is that they can

only do background checks on a California resident.  Plaintiffs

said that the state -- in our opposition brief plaintiffs

stated that the state is set up to run background checks on

nonresidents.  I now need to walk that back a little bit

because the reality is at this point, we do not know whether

the state will be able to run background checks on nonresidents

because the state has not yet rolled out the regulations

implementing the background check system, but nothing in the

statute -- and I would direct Your Honor to Penal Code Section

30370, which says, "The following persons are authorized to

purchase ammunition."

            THE COURT:  Just a minute.

            MR. BRADY:  Sure.

1    THE COURT:  You said 30370?

2    MR. BRADY:  Yes, Your Honor.

3    THE COURT:  What subsection?

4    MR. BRADY:  So beginning with (a).

11:42    5    THE COURT:  Okay.

6    MR. BRADY:  It says, "Commencing July 1, 2019," and it

7    has, you know, all this stuff about background checks, and it

8    says, "The following persons are authorized to purchase

9    ammunition."  And it gives three categories.  One of them is,

11:42    10    "A purchaser or transferee whose information matches an entry

11    into the Automated Firearms System and who is eligible to

12    possess ammunition as specified in (b)."  So the state in its

13    briefing has only addressed that particular aspect of the

14    background check, and while there may be some nonresidents who

11:43    15    are in the Automated Firearms System because they previously

16    lived here and registered a firearm and then moved out of state

17    and it's still there, admittedly a nonresident would most

18    likely not be in the Automated Firearms System.  That being

19    said, if you go to (3), (a)(3) --

11:43    20    THE COURT:  The Automated Firearms System, that's the

21    California system.

22    MR. BRADY:  Correct, that's California's firearms

23    registration system.

24    THE COURT:  As opposed to the federal firearms

11:43    25    licensing system.

1          MR. BRADY:  Correct, the federal government does not

2     have a registration scheme yet.  They're precluded from having

3     one under federal law.

4          THE COURT:  Got it.

11:43   5          MR. BRADY:  So you go to (3), though.  It says, "A

6     purchaser or transferee who is not prohibited from purchasing

7     or possessing ammunition in a single ammunition transaction or

8     purchase made pursuant to the procedure developed pursuant to

9     (c).  (C) then says, "The department shall develop a procedure

11:44   10    in which a person who is not prohibited from purchasing or

11    possessing ammunition may be approved for a single ammunition

12    transaction or purchase."  In other words, if somebody does not

13    have a firearm registered to them in the AFS, in the Automated

14    Firearms System, because many people do not for various

11:44   15    reasons.  Long guns were not required to be registered in AFS

16    until 2014.  So there are many people who do not have firearms

17    registered to them lawfully.  They possess these guns that are

18    not registered.  So they would have to go through this one-time

19    system that's contemplated by 30370(a)(3), and that (c) says

11:44   20    the department will develop.  It doesn't say nonresidents,

21    residents.  It says "person."  And so if the state of

22    California will be able to run a background check on a

23    California resident who does not have a firearm registered in

24    the AFS under (1), but they will have a system that can run a

11:45   25    background check on a person who does not have a gun registered

1    to them, then why can't they do that same background check on a

2    nonresident?  But the --

3            THE COURT:  I'm sorry.  You're going to have to do

4    that again.

11:45  5            MR. BRADY:  Of course.  So (1) says if you have a

6    firearm registered to you in AFS, the Automated Firearm

7    System --

8            THE COURT:  So all those people who have purchased

9    firearms before they were required to be registered through

11:46  10   AFS, right?

11           MR. BRADY:  Correct.

12           THE COURT:  Okay.  What about those people?

13           MR. BRADY:  So those people are not -- they do not

14   meet (1), which is how they're running some background checks,

11:46  15   right?  So, in other words, what the state's doing is saying if

16   you have a gun in AFS, okay, we know you, we know who you are,

17   we know that you have guns, we're now going to crosscheck the

18   list of AFS with the prohibited person list, okay, because they

19   have a list of everybody's who's prohibited from owning

11:46  20   firearms, and then they say okay.  There's not a match.  You're

21   clear.  You're not on the prohibited person list.  You have a

22   gun registered to you.  You passed the background check.  Pay

23   us a dollar.  You passed the background check.  But for those

24   people who are not in AFS for whatever reason, California

11:46  25   residents who want to acquire ammunition, 30370(3) and (a)(3)

1  and (c) say that the state shall develop a system for running

2  background checks for one-time purchases for people who are not

3  in AFS. So the person --

4        THE COURT: One-time purchase meaning that every time

5  that they're going to purchase ammunition, they have to go

6  through this as opposed to somebody -- what's the difference

7  between if they went through the background check to buy, I

8  don't know, a .357, right, or whatever, then I guess they don't

9  have to go through --

10        MR. BRADY: Correct, then they would be in AFS because

11  they bought the firearm. This is for people who either don't

12  own firearms but are buying ammunition because maybe their

13  friend's taking them hunting and their friend says you buy the

14  ammo, I've got the guns, and we call it even.

15        THE COURT: Or they had a gun a long time ago.

16        MR. BRADY: Correct.

17        THE COURT: 30 years ago or whatever.

18        MR. BRADY: Like I said, prior to 2014, long guns did

19  not need to be registered, so every rifle and shotgun that a

20  California resident acquired prior to 2014 is not in AFS.

21  Unless it was a so-called assault weapon. Then it would be.

22  But I mean we're talking about tens of thousands, hundreds of

23  thousands of people, right, people more senior than myself

24  haven't bought guns in a decade, right, and they've bought

25  plenty of shotguns and rifles, those are not in AFS.

1        THE COURT:  What about handguns?

2        MR. BRADY:  Handguns have been in AFS since I believe

3   1994, so that's going to be a little bit older class of people

4   who have bought guns, so that class is still around.  I mean

11:48   5   it's not that far out where you don't have those individuals.

6   It's still a significant number of people, but that number will

7   shrink as time goes on.

8        THE COURT:  As we die.

9        MR. BRADY:  I didn't mean to go there, Your Honor.

11:49   10        THE COURT:  Or move out of state.

11        MR. BRADY:  I wanted to lay all this out to explain

12   that at the end of the day, there's going to have to be a new

13   background check system set up for people who are not in AFS,

14   California residents who are not in AFS.  The law requires it,

11:49   15   requires the Attorney General's office, the Department of

16   Justice, Bureau of Firearms to develop the regulations

17   implementing this system, and we don't know what it looks like.

18        THE COURT:  Why does that not meet the rational basis

19   test?

11:49   20        MR. BRADY:  Because their sole argument is that

21   there's a rational basis because they cannot run a background

22   check on a nonresident, and they can on a California resident,

23   so why not just -- it's better to have a background check on at

24   least some than none, but if the state can do a background

11:50   25   check on an out-of-state resident just the same as an in state

1    resident, so you have person A and person B in Nevada.   Person

2    A is from California.   Person B is from Nevada.   California can

3    run background checks on both of them.   They acquire ammo at

4    Las Vegas, and then they're going home to -- they're going to

11:50    5    L.A., one to home, one to visit.   A has to ship it in.   B does

6    not.   Even though they could run a background check on B.   What

7    rational basis is there if you can equally run a background

8    check at the store in California?   What is the rational basis

9    for treating those two differently?

11:50    10          THE COURT:   But it doesn't have to be a perfect -- on

11    a rational bases test, it doesn't have to be perfect, right?

12          MR. BRADY:   But you have to have some justification.

13          THE COURT:   Safety For All.

14          MR. BRADY:   But there's no -- I still don't see the

11:51    15   rational basis for saying that would go against Safety For All.

16    You're saying person B gets to come in without doing the

17    background check even though we could do the background check,

18    and we get to get paid for it because there's a fee built into

19    it.   So it's not like the state wouldn't have the basis or the

11:51    20   argument to say well, we don't want to incur the cost.   First

21    off, it's not a state employee who's going to be processing it.

22    It is a private licensed ammunition vendor, right.   The state

23    will run the background check, but they charge their $19 fee

24    for this one-time background check, which is to cover their

11:51    25   cost, as the statute indicates.   30370.   So, in other words, to

1    say that nonresidents don't have to ship ammo in to have a

2    background check done in order to get the ammo, but California

3    residents do, there's literally zero distinguishing the two if

4    they can run a background check and get paid for it.

11:52    5    So that's why I would submit that at least at this stage on

6    the Equal Protection claim it's premature to dismiss

7    plaintiffs' Equal Protection claim even under rational basis

8    until we know whether the state can run a background check on a

9    nonresident.

11:52    10    THE COURT:  Okay.  Anything else?

11    MR. BRADY:  I just want to --

12    THE COURT:  I want to give the state an opportunity to

13    respond briefly.

14    MR. BRADY:  Of course.  I would like to -- because I

11:52    15    told you, Your Honor, that Granholm is probably our plaintiffs'

16    best case, I'd like to leave you with some quotes because I

17    think Your Honor agrees -- I don't want to put words in your

18    mouth -- that there is at least a discriminatory effect with

19    respect to out-of-state vendors to the benefit --

11:52    20    THE COURT:  It sure sounds like it.

21    MR. BRADY:  So Granholm says at 472, "Time and again

22    this Court has held that in all but the narrowest circumstances

23    state laws violate the Commerce Clause if they mandate, quote,

24    differential treatment of in-state and out-of-state economic

11:53    25    interests that benefits the former and burdens the latter."

1      THE COURT:  Let me stop you there.  I think you just

2  said something that -- what's the narrowest -- what they said

3  about the narrowest?  What were they talking about?

4      MR. BRADY:  That is where the state can justify the

11:53  5  discriminatory treatment, and the case that comes to mind --

6      THE COURT:  And the justification in this case would

7  be the protection of the public?

8      MR. BRADY:  Correct, but they have to say that there

9  is no -- the state's burden is to show that there is no other

11:53  10  alternative without that discriminatory effect and that the

11  evidence shows -- and that's the other point, that it's not

12  appropriate at this stage to do it.  They have -- that their

13  interest is furthered by that.  So it's essentially strict

14  scrutiny.  It's even more, I believe, strict than traditional

11:54  15  strict scrutiny.

16      THE COURT:  I thought we talked about rational basis a

17  moment ago.

18      MR. BRADY:  I'll give Your Honor an example of a case

19  where the Supreme Court said that there was a justification for

11:54  20  discriminatory law, and I believe it was the state of Maine had

21  a restriction on selling nonnative bait fish.  And so other

22  states could not -- did not have access to the Maine market for

23  bait fish.  And Maine's justification was we have a very

24  fragile ecosystem.  And if you introduce -- there's no way to

11:54  25  not introduce native -- nonnative species into our fragile

1    ecosystem by allowing nonnative species into the state, and so

2    there, there was no other alternative.  What's the alternative?

3    There isn't any, and obviously protection of a fragile

4    ecosystem is highly important, so I think that's the only case

11:55    5    that I'm aware of, at least at the Supreme Court level, where

6    they justify discriminatory treatment.  It's virtually per se

7    invalid.  Once you find discrimination, the case law says it's

8    virtually per se invalid.  That's why it says only in the

9    narrowest of circumstances like protection of an ecosystem, and

11:55    10    it's indisputable that the ecosystem is, you know, subject to

11    harm by nonnative species, right?  Here there is dispute, but

12    we have to flush that dispute out at merits briefing, not at

13    the motion to dismiss, so I'd ask Your Honor to deny the

14    state's motion.

11:55    15             THE COURT:  Great.  Well, thank you.  All right.

16        Quickly.  I'll give you five minutes.

17             MR. RICHARDS:  I'll try and be quick, Your Honor.

18             THE COURT:  All right.

19             MR. RICHARDS:  I'll take the arguments in reverse

11:56    20    order.  I think I can deal with Equal Protection and preemption

21    issues pretty quickly here.

22        On the Equal Protection issue the plaintiffs' explanation

23    of why there's no rational basis, as Your Honor expressed his

24    confusion, shows that it's an extremely convoluted way to show

11:56    25    no rational basis.  The reasons we point out in our briefing

1    for this law are, as the plaintiffs conceded up here, that the

2    vast majority of the background checks here are going to be

3    conducted in the Automated Firearms System under 30370.  And

4    that's a choice that under rational basis the voters can make.

5    And plaintiffs challenged the law here entirely on an

6    interpretation of (a)(3) -- of (a)(3) that some other form of

7    background check on nonresidents is possible.  Plaintiffs

8    suggested that California could run a background check on a

9    Nevada resident for ammunition, and they've cited no authority

10   that the state's able or capable of doing that or that that's

11   the way that the statute will work out.

12          THE COURT:  Let me ask you a question.  So for us old

13   dinosaurs who may have an old musket from, you know, when we

14   were in ROTC, and so our weapon is not in the AFS system, those

15   dinosaurs would have to have a background check run every time

16   they purchased ammunition, right, under this statute, but on

17   the other hand, so if I wanted to avoid that, I would go out

18   now and buy, you know, some weapon now so that they would run

19   it through the AFS, and then every time I went to buy ammo, I

20   would no longer have to run through that system?  Is that

21   right?  That's what I thought I understood.

22          MR. RICHARDS:  I'm not entirely sure that that's

23   correct, Your Honor.  And I am not certain about this, but I

24   believe there's a waiver of having a firearm introduced into

25   AFS, so if your old musket, for example, I believe there's a

11:58   1   way to get that entered into the system so that you could then
       2   have the normal process take place, but even if that's not the
       3   case, (a)(2) would give you another option, which is to obtain
       4   a certificate of eligibility, which is essentially like a
11:58   5   preclearance.  That's Exhibit 2 request for judicial notice.
       6   That sets forth what the certificate of eligibility is.  And
       7   there's some Penal Code Sections that accompany that.  So that
       8   would be a solution short of buying a gun.

       9       But as I said, I believe under (a)(1) you can also -- not
11:58  10   under (a)(1), but under the Automated Firearms System there's a
      11   way to get older weapons in, but I'm not 100 percent sure about
      12   that.

      13       But in any event, the point here is on rational basis they
      14   have a duty not to point out a conceivable better way to do
11:58  15   things.  They have to negative all possible justifications for
      16   the law.  And they haven't done that in their briefing or even
      17   here today.  They've continued to ignore the second
      18   justification offered by the state, which is that under the
      19   Williamson v. Lee Optical case, and under the rational basis
11:59  20   standard, voters and lawmakers are allowed to proceed
      21   incrementally, and they're simply allowed to do that.

      22           THE COURT:  But, you know, I've heard that argument
      23   before.  The incremental.  They're entitled to proceed
      24   incrementally.  You know, there's a Chinese word.  It's
11:59  25   lingchi, L-I-N-G-C-H-I.  It's otherwise known in the western

1    culture as death by a thousand cuts.  So you can incrementally

2    reduce the Sequoia tree down to a pencil incrementally.

3        Here we're dealing with something that at least arguably is

4    protected by the Bill of Rights.  This isn't like the state

5    saying you have to wear a blue shirt on Friday.  There's no

6    Constitutional right that protects your right to wear a white

7    shirt or striped shirt, and so the state wants to say you have

8    to wear a blue shirt on Friday.  They can do that.  But this is

9    something that's protected by the Constitution.  The

10   Constitution gave the people, you know, individual liberties,

11   freedoms, so it strikes me that this whole idea of increment,

12   increment to what extent, and who makes the determination as to

13   when we have incrementally whittled the Sequoia tree down

14   enough?  And how do we make that decision?

15       MR. RICHARDS:  I understand your question, Your Honor,

16   and I would submit to the Court that that's not a decision that

17   needs to be made with regard to the Equal Protection claim.  I

18   think we'll get there in the Second Amendment claims down the

19   road after --

20       THE COURT:  But you're the one who raised -- I mean

21   you're the one who made mention of the increment, and I saw

22   that there's a case, and I read it, and I thought, you know,

23   incrementally, you can justify anything incrementally if you

24   want to.

25       MR. RICHARDS:  That is a function of rational basis

 1    review that virtually all rational basis review challenges

 2    fail.  There are exceptions, and you can cite the one off case

 3    here and there.

 4         THE COURT:  So there's nothing that the state can ever

12:01  5    do that would not withstand rational basis review?

 6         MR. RICHARDS:  No, I don't think -- that's not what

 7    I'm saying.  There are things that the state can do that don't

 8    withstand rational basis review, and I would direct the Court

 9    to the cases where courts have invalidated laws on rational

12:01 10    basis few and far between as they may be.  But generally

11    speaking, I mean this is how rational basis works, is it's

12    deference to the law-making branch of government.

13         THE COURT:  I agree, and I understand that, and again,

14    if it was a question that the state said, you know, we think

12:01 15    that too many people are wearing white shirts and that's

16    contributing to global warming, there's no Constitutional right

17    to wear a white shirt, and they want to make you wear a blue

18    shirt, sorry, too bad, so sad, but this is something that's

19    enshrined in the Bill of Rights, so, you know, this whole

12:02 20    increment approach troubles me when we start talking about

21    Constitutional rights.

22         MR. RICHARDS:  I understand Your Honor's concern, and

23    again, I think our response here today is that we will address

24    that issue when we get to the Second Amendment case.

12:02 25         It provides a segue to the other point I wanted to make on

|  | 1 | the Equal Protection issue, which is it's not just the Pena v. |

1   the Equal Protection issue, which is it's not just the Pena v.

2   Lindley case that is cited.  It's not some one-off decision by

3   the Ninth Circuit, binding, though, that decision may be, that

4   recognizes this principle that enumerated fundamental rights

12:02   5   are analyzed under the framework that courts have developed to

6   analyze those rights and not under heightened scrutiny under

7   the Equal Protection clause.  We cited, for example, the Second

8   Circuit case, Kwong v. Bloomberg in our case.

9         THE COURT:  Let me go back.  You just said something.

12:03   10   So enumerated rights?  Enumerated rights are those that are set

11   forth under the Bill of Rights.  Am I correct?

12         MR. RICHARDS:  Yes.

13         THE COURT:  So those are looked at with --

14         MR. RICHARDS:  Using the First Amendment, for example,

12:03   15   there are multiple different types of analyses under the First

16   Amendment, you know, depending on what the challenge may be.

17   If it's an establishment clause challenge, there's one way to

18   look at things.  If there's a First Amendment challenge, an

19   obscenity case, there's a whole body of law developed for

12:03   20   analyzing obscenity issues.  There's another body of law --

21         THE COURT:  I thought I understood you to say that if

22   it's an enumerated right, we look at it under a rational basis.

23         MR. RICHARDS:  I apologize.  That is not what I meant

24   if that's what I said.  What I'm saying is each of the

12:03   25   enumerated rights in the Constitution has a corresponding body

1   of case law that's developed for analyzing those rights.  Using

2   the First Amendment as an example, again those laws under the

3   First Amendment challenges the laws under the First Amendment.

4         THE COURT:  I misheard you.  I apologize.  I misheard

12:04  5   you.  Go ahead.

6         MR. RICHARDS:  Those laws are often analyzed under

7   strict scrutiny, so you wouldn't bring an Equal Protection

8   claim and a First Amendment claim in that context.  Your First

9   Amendment claim would be analyzed under strict scrutiny.  The

12:04  10  same standard applies in this case, we argue, that you don't

11  get a second Equal Protection review with some hypothetical

12  heightened standard review that's different from the standard

13  review that's applied in the Second Amendment context.

14        THE COURT:  I understand.  I understand what you're

12:04  15  saying.

16        MR. RICHARDS:  And I would just redirect the Court to

17  the Kwong case where they actually did a little search of the

18  case law.  This isn't a one off by the Ninth Circuit.  They

19  said like every circuit to address this issue, we simply

12:04  20  conclude that plaintiffs should not be allowed to --

21        THE COURT:  Slow down.

22        MR. RICHARDS:  -- should not be allowed to use the

23  Equal Protection clause to obtain review under a more stringent

24  standard than the standard applicable to their Second Amendment

12:05  25  claim.

1          THE COURT:  That makes sense.  Now I understand what

2      you're saying.  All right.

3          MR. RICHARDS:  Moving along on the preemption issue, I

4      think Your Honor's intuition on this is correct.  I think that

12:05   5  the plaintiffs are using the law in a way that it's never been

6      used, both in their opposition and then here today.  They

7      haven't gotten up and cited a case where it's been used that

8      way, and I think Your Honor's intuition on that is correct.

9          So with that I'd turn to the dormant Commerce Clause point,

12:05  10  and I think what the problem with the plaintiffs' argument here

11     is that they're conflating two steps in this dormant Commerce

12     Clause analysis.  There's a question of discriminatory effect,

13     and I think as far as that goes, plaintiffs have one aspect of

14     that correct, that if there is a discriminatory effect, a form

12:05  15  of heightened scrutiny applies.  But there's also an incidental

16     burden, and that's what gets you to the Pike balancing test,

17     which is the step that you get to if you determine there's no

18     discrimination and they're merging those two things.

19         I think it's fair to say that there may be an incidental

12:06  20  burden under these laws on interstate commerce, but that does

21     not amount to a discriminatory effect, and I think plaintiffs

22     have conflated those two things both in their briefing and here

23     today.

24         I think the Exxon case that we cited in our brief is a good

12:06  25  example of how a law that may impose an incidental burden, but

1    so long as it regulates evenhanded, it's not going to be

2    invalidated under the dormant Commerce Clause as a

3    discriminatory effect.  In the Exxon case, in the wake of the

4    oil crunch of the '70s, New Jersey passed a law that said that

12:06    5    businesses that refine petrolum can't also operate petroleum

6    stations, gas stations, in the state.

7        Now, it so happened that the only companies that had that

8    business model were out-of-state companies.  And so in that

9    case the entire effect of that law was felt by out-of-state

12:07    10    companies.

11        But the Court nonetheless upheld the law because it applied

12    evenhandedly, and that's been the Attorney General's point here

13    today and in our briefing, that these laws regulate in-state

14    and out-of-state economic interests evenly.

12:07    15        And if you look at them, any similarly situated party,

16    whether they be an in-state or out-of-state entity, is going to

17    be treated the same under the law.

18        And the cases I cited earlier today to the Court, the

19    pharmaceutical manufacturing association case and the Nevada

12:07    20    Bank case are two good examples of the Court conducting that

21    analysis.

22        And that's an analysis that the plaintiffs have ignored.

23    They haven't -- they just say well, out-of-state businesses

24    will be affected.  Well, of course they will, but so will

12:07    25    in-state businesses, and the analysis is looking at whether

          1    they're treated the same, in an evenhanded manner under the
          2    law.

          3        And I'll just conclude by discussing the Granholm case.
          4    And it gets back to Your Honor's questions to the plaintiffs
12:08     5    about the purpose here.  I think, you know, one of the issues
          6    here that I was talking about earlier this morning is that the
          7    touchstone of the analysis of a dormant Commerce Clause is to
          8    consider whether there's some sort of discriminatory or
          9    protective purpose or intent behind the law.  In the case, in
12:08    10    Granholm, I think epitomizes that because the Court observed
         11    that the law in that case that required out-of-state wineries
         12    to have an in-state presence in order to ship directly to
         13    customers was part of -- there's actual two laws.  There's a
         14    Michigan law and New York law.  But the Court observed that
12:08    15    these are part of a longstanding, ongoing, simmering trade war
         16    among the states on the topic of wine and alcohol regulation,
         17    wine in particular, and there's no analog here, and this sort
         18    of sets the background to the analysis, but the Granholm case
         19    is distinguishable here for the reasons I was just talking
12:09    20    about.

         21        It did not regulate evenhandedly.  The in-state wineries in
         22    the Granholm case were able to ship directly to customers in a
         23    way that -- on terms that the out-of-state companies were not
         24    able to do.  And that is the distinguishing factor with that
12:09    25    case and this case.

1      Another factor is -- again, it's a smaller distinction, but

2   the difference in Granholm and this case is that the wineries

3   that are actually making the wine, so it was a protectionist

4   measure not just for vendors but for producers of a product.

12:09   5   Again, this case is distinguishable because as I mentioned

6   earlier this morning, this is not a law that was designed to

7   promote ammunition manufacturing in California.  And the

8   plaintiffs have essentially conceded that that's not the

9   purpose of the goal of the law.  So that the whole milieu of

12:09   10   the case is quite different, but the real distinguishing factor

11   is the differential treatment of in-state and out-of-state

12   interests, so that that just isn't present in this case.

13      And so with that, I'd ask the Court to grant our motion.

14   Thank you very much.

12:10   15      THE COURT:  Well, thank you, Counsel.  I appreciate

16   it.  You have all answered my questions.  You've done a

17   wonderful job advocating for your respective clients, and I

18   really enjoyed hearing from both sides this morning.

19      I will take the matter under submission.  I will warn you

12:10   20   it is possible that I may call you back.  It's an important

21   issue, I believe.  I'm going to look at the cases, I'll review

22   the transcript of the proceedings.  It may be that I have some

23   other questions that I wish to pose to you in which case I will

24   call you back and see.  If not, I will simply issue an order.

12:10   25   Okay?  But I really enjoyed having you all here this morning.

1    Have a wonderful trip home, wherever it is you're going, and we

2    are in recess for lunch.  Thank you.

3              MR. MONFORT:  Thank you, Your Honor.

4              MR. RICHARDS:  Thank you, Your Honor.

5                          ---oOo---

6

7                   C-E-R-T-I-F-I-C-A-T-I-O-N

8

9        I certify that the foregoing is a correct transcript from

10   the record of proceedings in the above-entitled matter.

11

12              Dated September 27, 2018, at San Diego, California.

13

14
                         /s/ Dana Peabody_____
15                       Dana Peabody,
                         Registered Diplomate Reporter
16                       Certified Realtime Reporter

17

18

19

20

21

22

23

24

25