XAVIER BECERRA
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General
P. PATTY LI
Deputy Attorney General
NELSON R. RICHARDS
Deputy Attorney General
State Bar No. 246996
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7867
  Fax: (916) 324-8835
  E-mail: Nelson.Richards@doj.ca.gov
*Attorneys for Defendant Attorney General*
*Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Kim Rhode et al.,**<br><br>                              Plaintiffs,<br><br>        **v.**<br><br>**Xavier Becerra, in his official capacity as Attorney General of the State of California, et al.,**<br><br>                              Defendants. | 3:18-cv-00802-BEN-JLB<br><br>**DEFENDANT XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:           August 19, 2019<br>Time:          10:30 a.m.<br>Dept:          5A<br>Judge:        Hon. Roger T. Benitez<br>Action Filed:     4/27/2018 |

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Background ................................................................................................... 2

    I.    Before July 2019, Violent Criminals and Other Prohibited Persons Could, and Did, Purchase Ammunition from Legal Sources .............................................................................................. 2

    II.   Proposition 63 Requires Eligibility Checks for Ammunition Purchases. ...................................................................................... 4

    III.  The Department of Justice Promulgated Regulations and Upgraded Its Dealer Record of Sale Entry System to Implement Ammunition Eligibility Checks ...................................................... 5

    IV.  The Department Adopted New Identification Requirements for Purchasing Firearms and Ammunition. ............................................ 7

    V.   Ammunition Eligibility Checks Commenced on July 1, 2019. .......... 10

Legal Standard ........................................................................................... 11

Argument ................................................................................................... 11

    I.    Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Second Amendment Challenge. ............................... 11

         A.   Intermediate Scrutiny Is the Appropriate Standard. ................. 12

         B.   The Ammunition Eligibility Check Laws Satisfy Intermediate Scrutiny .............................................................. 13

             1.    The Ammunition Eligibility Check Laws serve California's substantial interest in public safety and crime prevention. .................................................... 14

             2.    The Ammunition Eligibility Check Laws reasonably fit the public's interest in protecting safety and reducing crime associated with unregulated ammunition sales. ....................................... 16

    II.   Plaintiffs Cannot Establish a Likelihood of Success on the Merits of Their Dormant Commerce Clause Claim. .......................... 22

    III.  Plaintiffs Have Not Shown Irreparable Harm. .................................. 23

    IV.  The Balance of Equities and the Public Interest Weigh Against Preliminary Injunctive Relief. ....................................................... 24

Conclusion ................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Alliance for the Wild Rockies v. Cottrell*
    632 F.3d 1127 (9th Cir. 2011) ............................................................................ 11

*Bauer v. Becerra*
    858 F.3d 1216 (9th Cir. 2017) ................................................................ 12, 13, 14

*Burford v. Sun Oil Co.*
    319 U.S. 315 (1943) ............................................................................................ 25

*Carrico v. City & County of San Francisco*
    656 F.3d 1002 (9th Cir. 2011) ............................................................................ 18

*Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby*
    958 F.2d 941 (9th Cir. 1992) .............................................................................. 17

*Coal. for Econ. Equity v. Wilson*
    122 F.3d 718 (9th Cir. 1997) .............................................................................. 25

*Constructors Ass'n of W. Penna. v. Kreps*
    573 F.2d 811 (3d Cir. 1978) ............................................................................... 23

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ..................................................................... 11, 12, 15, 22

*Draper v. Healey*
    98 F. Supp. 3d 77 (D. Mass. 2015) ................................................................... 12

*Dymo Indus., Inc. v. Tapeprinter, Inc.*
    326 F.2d 141 (9th Cir. 1964) .............................................................................. 20

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) ...................................................... 15

*Heller v. District of Columbia*
    801 F.3d 264 (D.C. Cir. 2015) (*Heller III*) ...................................................... 13

*Jackson v. City & County of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ......................................................................*passim*

1

2

# TABLE OF AUTHORITIES
### (continued)

**Page**

3

4

*Libertarian Party of Eire Cty. v. Cuomo*
  300 F. Supp. 3d 424 (W.D.N.Y. 2018) ................................................ 18

5

6

*LSO, Ltd. v. Stroh*
  205 F.3d 1146 (9th Cir. 2000)............................................................. 18

7

8

*Lydo Enters. v. Las Vegas*
  745 F.2d 1211 (9th Cir. 1984) ............................................................ 24

9

*Maryland v. King*
  133 S. Ct. 1 (2012) ............................................................................. 25

10

11

*McDonald v. Chicago*
  561 U.S. 742 (2010) ........................................................................... 11

12

13

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*
  990 F. Supp. 2d 349 (W.D.N.Y. 2013) ............................................... 23

14

15

*Nationwide Biweekly Admin., Inc. v. Owen*
  873 F.3d 716 (9th Cir. 2017) .............................................................. 23

16

17

*Nken v. Holder*
  556 U.S. 418 (2009) ........................................................................... 24

18

19

*Pac. Radiation Oncology, LLC v. Queens Med. Ctr.*
  810 F.3d 631 (9th Cir. 2015) .............................................................. 18

20

21

*Pena v. Lindley*
  898 F.3d 969 (9th Cir. 2018)........................................................*passim*

22

*Pharm. Research & Mfrs. of Am. v. Alameda*,
  768 F.3d 1037 (9th Cir. 2014) ............................................................ 22

23

24

*Preminger v. Principi*
  422 F.3d 815 (9th Cir. 2005) .............................................................. 23

25

26

*Rhode v. Becerra*
  342 F. Supp. 3d 1010 (S.D. Cal. 2018) ......................................... 4, 23

27

28

*San Diego Cty. Gun Rights Comm. v. Reno*
  98 F.3d 1121 (9th Cir. 1996) .............................................................. 18

iii

## TABLE OF AUTHORITIES
### (continued)

Page

*Silvester v. Harris*
   843 F.3d 816 (9th Cir. 2016) ............................................................ 12, 13, 17, 19

*Spokeo, Inc. v. Robins*
   136 S. Ct. 1540 (2016) ....................................................................... 18

*Teixeira v. County of Alameda*
   873 F.3d 670 (9th Cir. 2017) (en banc) .................................... 11, 12, 22

*Tracy Rifle & Pistol LLC v. Harris*
   118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................ 24

*United States v. Salerno*
   481 U.S. 739 (1987) ..................................................................... 17, 22

*W. Mining Council v. Watt*
   643 F.2d 618 (9th Cir. 1981) .............................................................. 18

*Wash. State Grange v. Wash. State Republican Party*
   552 U.S. 442 (2008) ........................................................................... 17

*Winter v. Nat. Res. Def. Council, Inc.*
   555 U.S. 7 (2008) .............................................................................. 11

**FEDERAL STATUTES**

18 United States Code
   § 922 (d)(5)(A) ................................................................................. 8
   § 922 (g)(5)(A) ................................................................................. 8

Federal REAL ID Act of 2005, Pub. L. No. 109-13, 119 Stat. 231,
   § 201(c)(1)(B) .................................................................................. 8
   § 202(a)(1) ....................................................................................... 8
   §§ 201-202 ..................................................................................... 8, 9

**FEDERAL REGULATIONS**

6 Code of Federal Regulations
   § 37.5(b) ........................................................................................... 21

# TABLE OF AUTHORITIES
### (continued)

**Page**

27 Code of Federal Regulations
§ 478.11 ................................................................................20, 21

**CALIFORNIA STATUTES**

Penal Code
§ 30000 ...................................................................................... 6
§ 30312 .....................................................................................22
§ 30312(a)(1) ...........................................................................24
§ 30312(b) ................................................................................22
§ 30352 ........................................................................... 1, 5, 15
§ 30352(a) ................................................................................. 7
§ 30352(a)(2) ............................................................................ 8
§ 30355 .....................................................................................15
§ 30370 ...................................................................................... 1
§ 30370(g) ................................................................................. 5

Vehicle Code
§ 12801.5(a) .............................................................................. 8
§ 12801.5(b) .............................................................................. 8
§ 12801.9 ................................................................................... 8

Assembly Bill (AB) 60, Stats. 2013, Ch. 524 ........................... 8

Senate Bill 1235 (2016 Cal. Stat., ch. 55) ................................ 4

**CALIFORNIA REGULATIONS**

California Code of Regulations Title 11
§ 4045.1 ...............................................................10, 18, 20, 24
§ 4045.1(b) ..............................................................................10
§ 4301(i) .................................................................................... 6
§ 4301(m) .................................................................................. 6
§ 4302(a)-(b) ............................................................................. 6
§ 4302(c) ................................................................................... 6
§ 4303 ........................................................................................ 7
§ 4305 ........................................................................................ 7
§ 4308(c)(2) .............................................................................. 7

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Code of Regulations Title 13
    § 15.00(a) ................................................................................. 10, 20
    § 16.04-08 ....................................................................................... 20
    § 17.02(b) ................................................................................. 10, 20

**MUNICIPAL CODES**

L.A., Cal., Mun. Code
    § 55.11 ............................................................................................ 2

Sacramento City Code
    § 5.66 ............................................................................................. 2
    § 5.66.040 ....................................................................................... 3
    § 5.66020 .................................................................................... 2, 3

**COURT RULES**

Federal Rules of Civil Procedure, Rule 15(c) ........................................ 18

**OTHER AUTHORITIES**

11A Charles Alan Wright et al., Federal Practice and Procedure
    § 2948.1 (3d ed.) ........................................................................... 24

**INTRODUCTION**

Proposition 63 enacted ammunition eligibility check laws that work.  In the first month these laws were in effect, they stopped over 100 prohibited persons from purchasing ammunition in California.  And countless other prohibited persons were likely deterred from even trying to purchase ammunition that they cannot lawfully possess.  These reasonable and effective public safety laws should not be enjoined while this lawsuit proceeds.

Plaintiffs are not entitled to the broad relief they seek here—a court order enjoining enforcement of the Ammunition Eligibility Check Laws (Cal. Pen. Code §§ 30352, 30370, and their implementing regulations) in all of their applications.  Plaintiffs do not claim that they have been unable to buy ammunition, or even that they have experienced substantial delays.  Instead, they rely on imprecise estimates of nonparty ammunition vendors to outline a handful of burdens that no Plaintiff has experienced.  These anecdotal reports, however, do not establish a constitutional violation.  As a matter of law, there is a reasonable fit between the Ammunition Eligibility Check Laws and California's compelling public safety interest:  they prevent criminals from buying ammunition at gun shops, sporting goods stores, and other lawful vendors.  And the burden on the average ammunition purchaser is minimal:  about five minutes and a $1 transaction fee.

Plaintiffs also cannot meet their burden to establish the other preliminary injunction factors.  Their claimed irreparable harm relies solely on their arguments on the merits, and fails for the same reasons—and, as to their dormant Commerce Clause claim, also fails because they delayed over a year-and-a-half to bring the motion.  The balance of the equities and public interest both weigh against enjoining enforcement of laws that are actively stopping dangerous people from purchasing ammunition.  The short wait imposed by the eligibility checks does not offset that public good.

This Court should therefore deny Plaintiffs' motion.

# BACKGROUND

## I.   BEFORE JULY 2019, VIOLENT CRIMINALS AND OTHER PROHIBITED PERSONS COULD, AND DID, PURCHASE AMMUNITION FROM LEGAL SOURCES

The evidence shows that, in the absence of eligibility checks like the ones challenged here, prohibited persons regularly purchase ammunition from unwitting vendors.

Los Angeles and Sacramento have both enacted ordinances regulating the sale of ammunition within their borders.  Los Angeles adopted its ordinance in 1998.  L.A., Cal., Mun. Code, § 55.11 (1998).  That ordinance requires purchasers to provide identification, address, birth date, and a thumbprint, and requires vendors to keep logs of purchasers' information, the date of each sale, and the type and quantity of ammunition sold.  *Id.*  A group of researchers working with the United States Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), studied the data for ammunition sales by vendors in the San Fernando Valley over a two-month period in 2004.  Req. for Judicial Notice in Supp. of Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (Def. RJN), Ex. 1 at 309.  The data included "2031 purchasers who made 2540 transactions that resulted in the sale of 4823 boxes of ammunition" totaling over 435,000 rounds.  *Id.*  Of these transactions, 2.8% were made by prohibited persons accounting for 2.3% of the ammunition sold (or 10,050 rounds).  *Id.* at 310.  The numbers reflecting sales to prohibited persons may have been low, however, because the businesses studied were not located near the "high crime" area of the city, which had the highest homicide rate.  *See id.* at 309.  Law enforcement agencies believed that ammunition in that area came largely from the nearly one dozen vendors located just outside the city limits that were not documenting the purchases because they were not subject to the ordinance.  *Id.*

In 2007, Sacramento enacted a similar ammunition sales ordinance.  Sacramento, Cal., City Code, ch. 5.66.  The law requires ammunition vendors to

2

1  maintain logs that record all ammunition sales.  *Id.* § 5.66020.  At the time of sale,
2  purchasers must provide, and vendors must record, information similar to that
3  required by the Los Angeles ordinance, including the purchaser's name, address,
4  and ID number, and the brand, type, and quantity of ammunition sold.  *Id.*
5  Purchasers must also submit a thumbprint.  *Id.*  Vendors must then submit the
6  information electronically to the Sacramento Police Department.  *Id.* § 5.66.040.

7      In August 2008, the Sacramento Police Department prepared a report for the
8  City Council on the effectiveness of the ordinance.  Def. RJN, Ex. 2.  The report
9  explained that the data collected "has allowed the Department to identify and
10  investigate offenders involved in firearm-related crimes."  *Id.* at 4.  It noted that the
11  "rate of detection of criminal violators has proven to be higher than originally
12  expected."  *Id.*  It then provided data for 2,250 purchasers over a six month period.
13  *Id.* at pdf p. 6.

14      Seventy-four purchasers, 3.2% of the total, were prohibited from possessing a
15  firearm or ammunition.  *Id.* at pdf p. 8.  Sixty-one of those purchasers had felony
16  convictions.  *Id.*  And, of those, 21 had violent felony convictions.  *Id.*  The data led
17  state prosecutors to file felony charges against 53 people, and federal prosecutors to
18  file seven indictments.  *Id.* at pdf pp. 13-14.  The data also provided probable cause
19  for 28 search warrants, which uncovered evidence of additional crimes, including
20  additional unlawfully possessed ammunition, firearms, illegal drugs, and stolen
21  property.  *Id.* at pdf pp. 16-17.  Pictures of seized firearms show what appear to be
22  high-capacity magazines, including two drum magazines, and assault rifles.  *Id.* at
23  pdf p. 19.

24      Evidence from other jurisdictions also shows that unregulated ammunition
25  sales contribute to crime.  In 2007, New Jersey's State Commission on
26  Investigation issued a report titled *Armed and Dangerous: Guns, Gangs and Easy*
27  *Access to Firearms Ammunition in New Jersey*.  Def. RJN, Ex. 3.  The Commission
28  gathered evidence regarding ammunition and crime and heard testimony from law

3

enforcement experts on the subject.  At a 2006 hearing, Chris Christie, then the United States Attorney for New Jersey, told the Commission that it was performing a "great service" by looking into the problem of ammunition, saying "you're only dealing with half the problem when you're dealing with the gun issue."  *Id.* at 17.  State law enforcement officials testified that it was "not unusual to find caches of commercially-purchased ammunition during searches of property linked to criminal suspects."  *Id.* at 18.  They gave an example of a person with an outstanding warrant who was stopped with ammunition in a bag "bearing the name of a prominent sporting goods store along with what appeared to be a handwritten ammunition shopping list."  *Id.*  Officials later determined that he was purchasing the ammunition at the behest of a high-ranking member of the Bloods, a prominent street gang.  *Id.*

The Commission found evidence that gang members lawfully purchased ammunition that was later used in crimes, including homicides.  *Id.* at 3.  And it found that "purchases of ammunition by convicted felons are widespread."  *Id.*  As an example, it cited one store where "more than 15,000 rounds of handgun ammunition were sold to 42 convicted felons over one four-year period."  *Id.*  A survey of 60 retail outlets spanning 19 of New Jersey's 21 counties uncovered that 43 had "sold handgun ammunition to individuals with criminal records."  *Id.* at 2.

## II.   PROPOSITION 63 REQUIRES ELIGIBILITY CHECKS FOR AMMUNITION PURCHASES.

Prop. 63 introduced "reasonable and common-sense reforms" to California's gun laws while "safeguarding the Second Amendment rights of all law-abiding, responsible Californians."  Prop. 63 § 3.1.[1]  The voters found that these reforms were necessary because gun violence kills or seriously injures thousands of

---

[1] Before the November 2016 election, the California Legislature enacted Senate Bill 1235 (2016 Cal. Stat., ch. 55).  That law prospectively amended aspects of Prop. 63.  References to Prop. 63 are to the law as amended.  This Court has taken judicial notice of the Proposition 63 voter guide in this case.  *Rhode v. Becerra*, 342 F. Supp. 3d 1010, 1012 (S.D. Cal. 2018).

4

Californians each year, "destroy[ing] lives, families and communities."  Prop. 63 §§ 2.1-2.4.  Loopholes in the State's gun safety laws permitted violent felons and other persons prohibited from possessing firearms and ammunition to perpetuate gun violence.  Prop. 63 §§ 2.5-2.8.

One of the most significant of these regulatory gaps allowed people who could not pass a firearms background check to purchase ammunition from a gun shop, sporting goods store, or other lawful vendor.  Prop. 63 §§ 2.6-2.7.  Recognizing that background checks for firearms blocked 82,000 purchases by felons in 2012 alone, the voters decided that the law should "require background checks for ammunition sales just like gun sales[.]"  Prop. 63 §§ 2.6-2.7.  Prop. 63 amended the California Penal Code to close the loophole, and regulate the sale or transfer of ammunition. As of July 1, 2019, licensed ammunition vendors must conduct eligibility checks before selling or transferring ammunition to a buyer in California.  Cal. Pen. Code §§ 30352, 30370.

### III. THE DEPARTMENT OF JUSTICE PROMULGATED REGULATIONS AND UPGRADED ITS DEALER RECORD OF SALE ENTRY SYSTEM TO IMPLEMENT AMMUNITION ELIGIBILITY CHECKS

Prop. 63 authorizes the Department to promulgate regulations to implement the eligibility check requirement.  Cal. Pen. Code § 30370(g).  The Department started the rulemaking process in 2018.  The new regulations were outlined in a Notice of Proposed Rulemaking.  Decl. of Mayra G. Morales in Supp. of Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (Morales Decl.) Ex. 1.  The notice discussed four types of eligibility checks:  (1) a "Standard Ammunition Eligibility Check" for people with entries in the State's Automated Firearms System (AFS); (2) a "Basic Ammunition Eligibility Check" for people without an entry in AFS or a Certificate of Eligibility (COE); (3)  a "Firearms Eligibility Check" for ammunition purchased at the same time as a firearm; and (4) a verification process for COE holders to purchase ammunition (COE Verification Check).  *See* Morales Decl. ¶ 14.

5

Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (3:18-cv-00802-BEN-JLB)

The Department invited written comments and held public hearings on the proposed regulations in Sacramento and Los Angeles in January 2019.  Morales Decl. ¶¶ 9-10.  In response to the comments it received, the Department revised the proposed regulations in April 2019 and re-submitted them for another round of public comment.  *Id.* ¶ 11.  The regulations became final on June 24, 2019.  *Id.* ¶ 13.

The regulations establish the procedures for each type of eligibility check.  A Standard Ammunition Eligibility Check costs $1 and allows a person to purchase ammunition if their information matches an AFS entry and does not match an entry in the Prohibited Armed Persons File established by Penal Code section 30000.  Cal. Code Regs., tit. 11, §§ 4302(a)-(b), 4301(m).  To perform the check, an ammunition vendor submits the purchaser's "name, date of birth, current address," and ID number to the Department electronically via the "Dealer Record of Sale Entry System" or "DES" website.  *Id.* §§ 4302(c), 4301(i); *see also* Morales Decl. ¶¶ 16-24.  Submitting a buyer's information via the DES website involves a series of steps that the Department outlined, among other places, in a June 2019 bulletin to ammunition vendors.  Morales Decl., Ex. 5.  After accessing the DES website, logging in, and navigating a dropdown menu, the vendor scans the purchaser's ID using a magnetic card swipe reader to populate the majority of the following fields:



Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (3:18-cv-00802-BEN-JLB)

*Id.* at 3.  The vendor then selects the preview button to review the information, and, if the information is accurate, submits it to the Department.  *Id.* at p. 4.  Once the information has been submitted, the vendor can review the results of the eligibility check.  *Id.* at 5.  An approval will come with an "Eligibility Check DROS number" and remains valid for 18 hours.  *Id.* at 8, 13.

To complete the transaction, the vendor confirms the purchaser's identification and verifies the approval using the Eligibility Check DROS number.  *Id.* at 8.  The vendor then enters information about the ammunition being sold in the following fields:



*Id.*; *see also* Cal. Code Regs., tit. 11, § 4308(c)(2); Cal. Penal Code § 30352(a).  After completing the mandatory fields marked by red asterisks, the vendor finalizes the transaction by printing out the record of sale, signing it, having the purchaser sign it, and then storing the hardcopy record.  Morales Decl., Ex. 5 at 11.

The process for COE Verification Checks is similar.  *See* Cal. Code Regs., tit. 11, § 4305; *see also* Morales Decl. ¶¶ 27-29.  The Basic Ammunition Eligibility Check for a single transaction or purchase involves a manual review by Department staff, costs more ($19), may take several days, and is valid for 30 days after approval.  *Id.* § 4303; Morales Decl. ¶ 26.

## IV.   THE DEPARTMENT ADOPTED NEW IDENTIFICATION REQUIREMENTS FOR PURCHASING FIREARMS AND AMMUNITION.

Federal law prohibits certain categories of non-citizens from purchasing or possessing a firearm or ammunition, including anyone who is "illegally or

7

unlawfully in the United States."  18 U.S.C. § 922 (d)(5)(A), (g)(5)(A).  California law requires a prospective ammunition purchaser to provide a driver's license or identification card (hereafter referred to interchangeably as IDs), as part of the eligibility check process.  Cal. Pen. Code § 30352(a)(2).

Proof of lawful presence in the United States is ordinarily required to obtain a California ID.  Cal. Veh. Code §§ 12801.5(a), (b).  In 2013, however, the Legislature enacted Assembly Bill (AB) 60, Stats. 2013, Ch. 524, which permits persons who cannot provide proof of lawful presence in the United States to obtain a California ID.  Cal. Veh. Code § 12801.9.  When the California Department of Motor Vehicles first began issuing AB 60 IDs in 2015, they were distinguishable from regular California IDs, by the notation "FEDERAL LIMITS APPLY" (FLA) imprinted on the front.  *See, e.g.*, Morales Decl., Ex. 10 at 1; *id.*, Ex. 12 at 3.

After the AB 60 IDs became available, the ATF issued a letter to all federally licensed firearms dealers stating that because California's AB 60 IDs are "only issued to a person who cannot provide proof of lawful presence in the United States," there is "reasonable cause to believe a potential transferee in possession of an AB [60] driver license is illegally or unlawfully in the United States and prohibited from receiving or possessing firearms or ammunition.  As such, you may not transfer firearms or ammunition to the person . . . ."  Morales Decl., Ex. 10.

In January 2018, DMV began issuing IDs in compliance with the federal REAL ID Act of 2005.  Pub. L. No. 109-13, 119 Stat. 231, §§ 201-202.  That law sets minimum security standards for the issuance and production of IDs.[2]  As part of its REAL ID implementation, DMV began offering two forms of visually distinct IDs: a REAL ID compliant version, which has a golden bear and star in the

---

[2] The REAL ID Act provides that "[b]eginning 3 years after the date of the enactment of this division, a Federal agency may not accept, for any official purpose, a driver's license or identification card issued by a State to any person unless the State is meeting the requirements of this section." 119 Stat. 231 at § 202(a)(1). The Act sets minimum standards for states issuing compliant IDs, including evidence of lawful status. *Id.* at § 201(c)(1)(B).

8

top right corner; and a federal non-compliant version, which has the words "FEDERAL LIMITS APPLY" in the top right corner.  Morales Decl., Ex. 12 at 3. The federal non-compliant version is issued to both: (1) individuals applying under AB 60; and (2) individuals who chose not to apply for a REAL ID.  *See* Morales Decl. ¶ 37.

Following this change, ATF withdrew its earlier guidance on AB 60 licenses and identification cards.  ATF later provided informal guidance on federal non-compliant licenses in an e-mail to the law firm representing Plaintiffs in this case. That e-mail states that firearms dealers "'may consider asking for additional documentation (e.g., passport) so that the transfer is not further delayed.'"  Brady Decl., Ex. 37 at 4 & n.7 (quoting ATF e-mail), ECF NO. 32-2.  The National Rifle Association (NRA) then issued a March 2018 alert, advising firearms dealers to ask for "additional documentation" if the dealer has "cause to believe the individual using one of these licenses may be prohibited from possessing firearms," and that "Californians who want to make sure they have zero problems purchasing a firearm in the future may want to consider applying for and acquiring a REAL ID through the DMV."  Morales Decl., Ex. 9.

In November 2018, the Department issued guidance consistent with the ATF and NRA's guidance, suggesting that firearms dealers "may wish to consider asking for documentation of lawful presence in the United States" from prospective purchasers presenting an FLA ID.  Def. RJN, Ex. 4.  The Department simultaneously issued a consumer alert, advising California residents with FLA IDs that a firearms dealer may require additional documentation for firearms purchases. Def. RJN, Ex. 5.

The Department concluded that its voluntary guidance (which was not uniformly observed by vendors) was insufficient to address the threat to public safety from potential sales of firearms and ammunition to prohibited persons. Morales Decl., Ex. 8 at 4-5.  The Department thus promulgated a new regulation

9

requiring firearms and ammunition purchasers presenting an FLA ID to also present additional proof of lawful presence.  Cal. Code Regs. tit. 11, § 4045.1.  That regulation took effect on July 1, 2019.

The new regulation's list of acceptable documents for additional proof of lawful presence is identical in substance to the list of documents in the voluntary guidance that preceded it, which in turn was drawn from the list of documents required when applying for a California ID, other than one issued under AB 60.  *Compare* Cal. Code Regs. tit. 11, § 4045.1(b) *with* Cal. Code Regs. tit. 13, §§ 15.00(a), 17.02(b).

## V.   AMMUNITION ELIGIBILITY CHECKS COMMENCED ON JULY 1, 2019.

The Department's DES started processing ammunition eligibility checks on July 1, 2019.  Morales Decl. ¶ 46.  During its first month, the system processed over 62,000 transactions, and denied over 100 ammunition transactions by prohibited persons.  *Id.* ¶¶ 48-49.  Of the over 57,000 Standard Ammunition Eligibility Checks processed, roughly 46,700 were approved.  *Id.* ¶ 50.  Over 850 COE Verification Checks and over 3,500 Basic Ammunition Eligibility Checks were processed as well.  *Id.* ¶¶ 51-52.

The average processing time for a Standard Ammunition Eligibility Check (measured by the time between when the vendor submits the eligibility check and when the vendor hits the "Deliver" button in DES) was just under five minutes for the first month.  *Id.* ¶¶ 55, 57.  It took the system, on average, less than a second to determine whether the purchaser was eligible.  *Id.* ¶¶ 53-54.

During the first week of operation, the Department's Customer Support Center experienced a spike in calls, which dropped significantly in the following weeks.  *Id.* ¶¶ 70-73.  The Department also received notice of some technical issues with DES.  *Id.* ¶ 73.  For instance, purchasers who had more than two first names were experiencing delays.  The Department has since resolved this issue, and is in the process of addressing other issues as well.  *Id.* ¶¶ 73-74.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**LEGAL STANDARD**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Plaintiffs seeking an injunction must establish that:  (1) their claims are likely to succeed on the merits; (2) they will likely suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Id.* at 20.  Alternatively, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted).  Plaintiffs must make a showing of all four *Winter* factors, even under the alternative sliding scale test. *Id.* at 1132, 1135.

**ARGUMENT**

**I.    PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR SECOND AMENDMENT CHALLENGE.**

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that "the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *McDonald v. Chicago*, 561 U.S. 742, 791 (2010).  "*Heller* indicated that the Second Amendment does not preclude certain 'longstanding prohibitions' and 'presumptively lawful regulatory measures,' such as . . . 'laws imposing conditions and qualifications on the commercial sale of arms[.]" *Jackson v. City & County of San Francisco*, 746 F.3d 953, 959 (9th Cir. 2014) (quoting *Heller*, 554 U.S. at 626-27 & n.26).  To analyze a Second Amendment challenge, courts first ask whether a law burdens the Second Amendment at all; if it does, they will then determine the appropriate level of scrutiny. *Teixeira v. County of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc).

11

1    "[C]ourts determine the appropriate level by considering (1) how close the

2    challenged law comes to the core of the Second Amendment right, and (2) the

3    severity of the law's burden on that right." *Bauer v. Becerra*, 858 F.3d 1216, 1221-

4    22 (9th Cir. 2017) (quotation marks omitted). This test "amounts to a sliding

5    scale." *Id.* (quotation marks omitted). "A law that imposes such a severe

6    restriction on the fundamental right of self defense of the home that it amounts to a

7    destruction of the Second Amendment right is unconstitutional under any level of

8    scrutiny." *Id.* (quotation marks omitted). "Further down the scale, a law that

9    implicates the core of the Second Amendment right and severely burdens that right

10   warrants strict scrutiny." *Id.* "Otherwise, intermediate scrutiny is appropriate." *Id.*

11       Prop. 63's Ammunition Eligibility Check Laws are the kind of presumptively

12   lawful regulatory measures that the Supreme Court has said do not implicate the

13   Second Amendment. *See Jackson*, 746 F.3d at 959.[3]  But even if they did implicate

14   the Second Amendment, these laws would be subject to, and satisfy, intermediate

15   scrutiny.

16       **A.   Intermediate Scrutiny Is the Appropriate Standard.**

17       Intermediate scrutiny applies to the Ammunition Eligibility Check Laws

18   because they "regulate only the '*manner* in which persons may exercise their

19   Second Amendment rights'" and are thus "less burdensome than those which bar

20

21       [3] The ammunition eligibility check process constitutes a permissible

22   condition or qualification on the commercial sale of arms. *See Heller*, 554 U.S.
     at  626-27 & n. 26.  It imposes requirements similar to other laws that judges and

23   courts have found do not implicate the Second Amendment, such as firearms
     background checks, zoning ordinances that affect firearms dealers, and consumer

24   protection requirements, such as load indicators. *See Silvester v. Harris*, 843 F.3d
     816, 830 (9th Cir. 2016) (Thomas, C.J., concurring) (firearms background check

25   and waiting requirements); *Teixeira*, 873 F.3d at 690 (Owens, J., concurring)
     (zoning restrictions); *Draper v. Healey*, 98 F. Supp. 3d 77, 85 (D. Mass. 2015)

26   (load indicator and magazine safety disconnect requirements in handguns).
     Because Plaintiffs' claim fails under the intermediate scrutiny standard, this Court

27   need not reach this question. *See, e.g.*, *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir.
     2018) (noting numerous cases where Ninth Circuit had assumed without deciding

28   that a law burdened the Second Amendment and doing the same).

12

Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (3:18-cv-00802-BEN-JLB)

firearm possession completely."[4]  *See Silvester*, 843 F.3d at 827 (quoting *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013)).  The Ammunition Eligibility Check Laws do not prevent law-abiding people who are permitted to possess ammunition from purchasing it, and thus does not implicate "the core Second Amendment right of 'self defense of the home.'"  *Pena*, 898 F.3d at 977 (quoting *Silvester*, 843 F.3d at 821).  The Ninth Circuit has analyzed similar laws under intermediate scrutiny.  *See Silvester*, 843 F.3d at 827 (10-day waiting period for firearm purchases); *Jackson*, 746 F.3d at 964 (law requiring handguns to be stored in a locked safe or with a trigger lock when not carried on the person and law banning the sale of hollow-point bullets); *Bauer*, 858 F.3d at 1222 ("[W]e have repeatedly applied intermediate scrutiny in cases where we have reached this step."); *see also Heller v. District of Columbia*, 801 F.3d 264, 275 (D.C. Cir. 2015) (*Heller III*) (applying intermediate scrutiny to Washington D.C.'s firearms registration law, which required an in-person appearance, fingerprinting, and photographing).

### B.   The Ammunition Eligibility Check Laws Satisfy Intermediate Scrutiny.

The intermediate scrutiny "test is not a strict one."  *Silvester*, 843 F.3d at 827.  "Intermediate scrutiny requires (1) a significant, substantial, or important government objective, and (2) a 'reasonable fit' between the challenged law and the asserted objective."  *Pena*, 898 F.3d at 979.  It does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest.  *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems."  *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).  Courts do not

---

[4] Despite a perfunctory argument to the contrary, Plaintiffs appear to concede that intermediate scrutiny applies.  *See* Pls.' Br. 13:9-17.

13

look to evidence "in the technical sense" because "legislatures are not obligated, when enacting their statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review[.]"  *Pena*, 898 F.3d at 979 (quotation marks omitted).

California has a substantial interest in increasing public safety and preventing crime, and the Ammunition Eligibility Check Laws, which prevent convicted felons and other prohibited persons from purchasing ammunition, is a reasonable fit to address that interest.  *See* Prop. 63 §§ 2.7-2.8, 3.2-3.3.

### 1.   The Ammunition Eligibility Check Laws serve California's substantial interest in public safety and crime prevention.

Prop. 63 was intended to "keep ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition." Prop. 63 § 3.2.  The voters declared that "[w]e should require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals."  Prop. 63 § 2.7.  Thus, the purpose of the law was to protect public safety and prevent crime, which are undeniably substantial government interests.  *See, e.g.*, *Pena*, 898 F.3d at 981-82 ("public safety and crime prevention . . . are substantial government interests").  As the Ninth Circuit has recognized, "public safety is advanced by keeping guns out of the hands of people who are most likely to misuse them[.]" *Bauer*, 858 F.3d at 1223.  The same holds true for keeping ammunition out of the hands of violent felons and other prohibited persons.  *Cf. Jackson*, 746 F.3d at p. 967 (equating ammunition to firearms for Second Amendment analysis).

Compelling evidence demonstrates the danger to public safety and criminal activity associated with unregulated ammunition sales.  The experiences of Los Angeles and Sacramento show that prohibited persons purchase ammunition in gun stores—and that they constitute about 3% of all purchasers.  Def. RJN, Ex. 1 at 310; Def. RJN, Ex. 2 at pdf p. 8.  In Sacramento, these prohibited purchasers

14

1  included violent felons who drew the interest of state and federal prosecutors.  *See*

2  Def. RJN, Ex. 2 at pdf pp. 13-17.  California's experiences are confirmed by the

3  report of New Jersey's State Commission on Investigation.  Def. RJN, Ex. 3.

4  Among other things, the Commission found that "purchases of ammunition by

5  convicted felons are widespread."  *Id.* at 3.

6      Plaintiffs do not dispute the substantial public interest in preventing dangerous

7  people from purchasing ammunition.  *See* Pls.' Br. 14:3.  Instead, they urge this

8  Court to use a standard that the Ninth Circuit has implicitly rejected.  They argue

9  that California's interest in ammunition background checks cannot be substantial

10  because "only one other state in the county has adopted an ammunition scheme

11  even remotely comparable to California's[.]"  Pls.' Br. 14:6-11 (citing *Heller v.*

12  *District of Columbia*, 670 F.3d 1244, 1294 (D.C. Cir. 2011) (*Heller II*)

13  (Kavanaugh, J., dissenting).)  If this were the standard, states would be prevented

14  from innovating and experimenting with new ways to address, for example, "the

15  problem of handgun violence in this country[.]"  *See Heller I*, 554 U.S. at 636.  But

16  this is not the proper standard, as the Ninth Circuit's decision in *Pena* shows.

17  Applying intermediate scrutiny, the court upheld California's "microstamping

18  requirement," a law that was "the first of its kind," and "an experimental solution to

19  admittedly serious problems."  *Pena*, 898 F.3d at 984 ("[A] single courageous state

20  may, if its citizens choose, serve as a laboratory, and try novel legislative

21  experiments." (internal alterations and quotation marks omitted)).[5]

22

23      [5] Plaintiffs also contend that "the State has identified no interest in its
maintaining records about what ammunition people purchase."  *See* Pls.' Br. 15:82-
24  16:14.  But their motion does not seek to enjoin the data collection requirements in
Penal Code sections 30352 and 30355.  This may be because no Plaintiff would
25  have standing to raise such a claim, because none is a licensed ammunition vendor.
*See* FAC ¶¶ 11-22.  The contention is also wrong.   The data collection
26  requirements advance California's interest in public safety and crime prevention by
providing evidence that law enforcement can use to solve crimes, including straw
27  purchases.  *See, e.g.*, Def. RJN, Ex. 2 at pdf pp. 13-14 (noting that ammunition
ordinance had led to search warrants that uncovered additional crimes).
28

The remainder of Plaintiffs' argument on the first prong of the intermediate scrutiny test mirrors their argument on the second prong, and it fails for the same reasons.

### 2. The Ammunition Eligibility Check Laws reasonably fit the public's interest in protecting safety and reducing crime associated with unregulated ammunition sales.

In the first month of operation, the Ammunition Eligibility Check Laws have prevented over 100 prohibited persons from purchasing ammunition.[6]  Morales Decl. ¶ 49.  This evidence that persons prohibited from possessing firearms try to purchase ammunition in the commercial market is consistent with the experience of Sacramento and Los Angeles.  Data collected following adoption of these municipal regulations of ammunition sales showed the frequency with which prohibited persons purchase ammunition.  Def. RJN, Ex. 1 at 310; Def. RJN, Ex. 2 at pdf p. 8.  This evidence substantiates the voters' finding that, before Prop. 63, "any violent felon or dangerously mentally ill person can walk into a sporting goods store or gun shop in California and buy ammunition, no questions asked." Prop. 63 § 2.7.  The number of people stopped from purchasing ammunition confirms their finding that "[w]e know background checks work," and that ammunition background checks would "keep . . . ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law form possessing . . . ammunition."  Prop. 63 §§ 2.6, 3.2.

This "'legislative history of the enactment as well as studies in the record'" demonstrates "a 'reasonable fit between the government's stated objective and the regulation' considers."  *See Pena*, 898 F.3d 979 (quoting *Fyock v. Sunnyvale*, 779

---

[6] This number does not include the undoubtedly large number of prohibited persons who, fearing arrest, avoided purchasing ammunition.  Plaintiffs' own declarants explain that many people, "after learning of the new requirements to purchase ammunition, [do] not wish to attempt an ammunition transaction."  Ortiz Decl. ¶ 15; Burwell Decl. ¶ 10; Puehse Decl. ¶ 12; Morgan Decl. ¶ 10; Bartel Decl. ¶ 10; Lowder Decl. ¶ 10; Gray Decl. ¶ 10.  This is a predictable and intended side-effect of eligibility checks.  *See Pena*, 898 F.3d at 984 (recognizing that the Legislature may make predictive policy judgments).

16

1    F.3d 991, 1000 (9th Cir. 2017)).  "The State is required to show only that the

2    regulation 'promotes a substantial government interest that would be achieved less

3    effectively absent the regulation."  *Silvester*, 843 F.3d at 829 (quoting *Fyock*, 779

4    F.3d at 1000).)  Undeniably, California's efforts to prevent prohibited persons from

5    purchasing ammunition would be less effective in the absence of the Ammunition

6    Eligibility Check Laws.  This kind of fit is similar to others that the Ninth Circuit

7    has upheld as reasonable under intermediate scrutiny.  It is no different from the fit

8    between the 10-day waiting period and the cooling-off period in *Silvester*, 843 F.3d

9    at 827-29.  And it is less burdensome than the handgun storage requirement in

10   *Jackson*, 746 F.3d at 966; *Silvester*, 843 F.3d at 827 (holding that "requiring an

11   applicant to wait ten days before taking possession of [a] firearm" was less

12   burdensome than the ordinances in *Jackson*).

13       Plaintiffs' arguments to the contrary are unavailing.  *See* Pls.' Br. 16:26-20:6.

14   Because they seek to enjoin enforcement of the Ammunition Eligibility Check

15   Laws in all their applications, Plaintiffs "must establish that no set of circumstances

16   exists under which the [regulation or statute] would be valid."  *See United States v.*

17   *Salerno*, 481 U.S. 739, 745 (1987); *see also Chem. Specialties Mfrs. Ass'n, Inc. v.*

18   *Allenby*, 958 F.2d 941, 943 (9th Cir. 1992).  In other words, a plaintiff must show

19   that the laws are unconstitutional in *all* of their applications.  *See Wash. State*

20   *Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).  Where, as

21   here, laws have a "plainly legitimate sweep," a facial challenge must fail.  *See id.* at

22   449 (citation and internal quotations omitted).  Given that tens of thousands of

23   ammunition transactions were processed in July alone, *see* Morales Decl. ¶¶ 48, 50-

24   52, Plaintiffs cannot satisfy this demanding standard.

25       Plaintiffs rely almost entirely on declarations by nonparty ammunition

26   vendors.  Plaintiffs use these declarations to support four incorrect contentions:

27   (1) the laws are causing ammunition transactions to take too long; (2) the laws

28   impose too big a burden on FLA ID holders, by requiring them to bring a second

17

form of identification; (3) the laws are resulting in too many rejections; and (4) the laws are threatening the commercial viability of ammunition vendors.  *See* Pls.' Br. 14:22-19:22.  As a preliminary matter, no Plaintiff complains that they have an FLA ID, have had an ammunition eligibility transaction rejected, or are a licensed ammunition vendor.  Plaintiffs lack standing to challenge the purported burdens of laws that do not apply to them.[7]  *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016); *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154 (9th Cir. 2000) ("When plaintiffs seek to establish standing to challenge a law or regulation that is not presently being enforced against them, they must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement."); *see also Libertarian Party of Eire Cty. v. Cuomo*, 300 F. Supp. 3d 424, 434 (W.D.N.Y. 2018) ("No court has held that an individual who applied for and received a firearms license has standing to challenge the constitutional validity of the licensing laws; indeed, courts have only found standing where the individual applied for a license and was denied.").[8]

---

[7] To the extent Plaintiffs intend to argue that CRPA has associational standing to bring claims on behalf of its members, *see* Travis Decl. ¶¶ 5-14, they should fail for three reasons.  First, the facts they rely on are not alleged in any pleading.  *See W. Mining Council v. Watt*, 643 F.2d 618 (9th Cir. 1981) ("[F]acts demonstrating standing must be clearly alleged in the complaint.").  Second, even if they had been, the CRPA's statements are the sort of conclusory statements that the court need not credit.  *See, e.g., Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1006 (9th Cir. 2011).  And third, CRPA cannot meet the test for associational standing, including showing that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *See San Diego Cty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1130-31 (9th Cir. 1996).

[8] Plaintiffs also appear to request that the new ID regulation be enjoined.  *See* Pls.' Br. 14:22-15:15.  In addition to the standing problem, this is not an appropriate request for relief because "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint."  *Pac. Radiation Oncology, LLC v. Queens Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015).  Enjoining enforcement of section 4045.1 is not of the same character as the relief requested in the FAC, which seeks an injunction prohibiting the eligibility checks.  *See* FAC ¶¶ 104-110 & Prayer for Relief ¶ 5. Plaintiffs could have moved to supplement the FAC, but they did not.  *See* Fed. R. Civ. P. 15(c).

Beyond the threshold standing problem, Plaintiffs rely on weak evidence.  The testimony of the nonparty declarants is unreliable because it is anecdotal, imprecise, and at odds with the Department's program-wide and precise electronic evidence.

Most notable among the nonparty ammunition vendors' claims is the boilerplate that "it takes on average 15-25 minutes to enter all of the information required into DES for a transaction involving more than one type of ammunition." Burwell Decl. ¶ 8; Puehse Decl. ¶ 10; Morgan Decl. ¶ 8; Bartel Decl. ¶ 8; Lowder Decl. ¶ 8; Gray Decl. ¶ 8; *see also* Ortiz Decl. ¶¶ 10-11 (stating transactions take 5-20 minutes); McNab Decl. ¶ 26 ("[I]t now takes at least 20 minutes—often more—to process an ammunition transaction.").  Even if the average processing time were 15-25 minutes, that would not make the fit unreasonable.  Other laws imposing greater burdens have withstood intermediate scrutiny.  *See, e.g.*, *Silvester*, 843 F.3d at 827-29.

But it is unlikely that Plaintiffs' anecdotal estimates are accurate.  The Department's electronic records show that across the over 42,000 Standard Ammunition Eligibility Checks that were approved in July, it took on average just under five minutes to process a transaction, from the point where the background check is submitted to the point where the vendor clicks the delivery button. Morales Decl. ¶¶ 55-58.  Data on the nonparty declarants' transactions shows that their own transactions take roughly the same amount of time on average.  Morales Decl. ¶¶ 59-67.  Many of these declarants averaged around three minutes.  Morales Decl. ¶¶ 62-65.  In addition, the one Individual Plaintiff who has offered testimony about her own experience purchasing ammunition seems to have significantly overestimated the transaction time.[9]  *See* Morales Decl. ¶¶ 67-69.

---

[9] Plaintiff Welvang states that she purchased ammunition on July 13 and that the process took "nearly 30 minutes."  Welvang Decl. ¶ 4, ECF No. 32-6.  But Department records show that it took about one minute from the time her background check was submitted to the time the vendor hit the delivery button. Morales Decl. ¶¶ 67-68.  For her estimate to be correct, the vendor would have had to have spent over 25 minutes to pull the ammunition from the shelf, enter her

19

Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (3:18-cv-00802-BEN-JLB)

1        This conflict in the evidence counsels against issuing a preliminary injunction.

2    *See Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141, 143 (9th Cir. 1964)

3    ("[O]n application for preliminary injunction the court is not bound to decide

4    doubtful and difficult questions of law or disputed questions of fact.").

5        Other deficiencies in Plaintiffs' evidence of the burdens imposed by the

6    eligibility checks also counsel against issuing a preliminary injunction.  Plaintiffs

7    contend that "countless people" are being prevented from purchasing ammunition

8    because they have FLA IDs.  Pls.' Br. 17:13.  But they offer no evidence of this,

9    likely because presenting an approved form of additional documentation, such as a

10   passport, is an easy cure.  *See* Cal. Code Regs. tit. 11, § 4045.1.[10]  Requiring a

11   subset of purchasers to provide a second form of identification hardly makes the

12   Ammunition Eligibility Check Laws an unreasonable fit for the goal of keeping

13   ammunition out of the hands of prohibited persons.

14       Plaintiffs do not dispute that the purpose and effect of the identification

15   requirements is to prevent persons without lawful presence from purchasing

16   ammunition (or firearms) in violation of federal law.  They nevertheless object that

17   the identification requirements are invalid because:  (1) California issues the federal

18   non-compliant IDs "as a default and thus implicitly deems sufficient for all other

19   purposes," except for "purchasing ammunition," and (2) "the federal government

20   accepts [federal non-compliant] IDs as sufficient for its own purposes—including

21   to pass background checks to purchase a firearm."  Pls.' Br. 15:8-11 (citing 27

22   C.F.R. § 478.11 and Plaintiffs' Ex. 37).[11]  Plaintiffs' assertion that an FLA ID is

23   _____

information into the background check fields, and print out the record of sale for

24   her signature.  In addition, Department records show that Welvang made a second
purchase on July 13 from a different ammunition vendor.  *Id.* ¶ 69.  That

25   transaction, too, appears to have taken about a minute.  Morales Decl. ¶ 69.

    [10] Section 4045.1 lists the same type of documents that anyone must present

26   to get their first California ID.  *See* Cal. Code Regs., tit. 13, §§ 15.00(a), 16.04-08,
17.02(b).

27       [11] The federal regulation Plaintiffs cite simply defines an "identification

28   document" as one that contains "the name, residence address, date of birth, and

20

sufficient for all purposes other than purchasing firearms or ammunition is simply incorrect.  Under federal law, a REAL ID will be required to access federal facilities, including airport security checkpoints, starting on October 1, 2020.  6 C.F.R. § 37.5(b).  To avoid the exact problem California is now trying to avoid, both the ATF and NRA have suggested that firearms vendors request additional documentation from customers with FLA IDs to avoid selling to prohibited persons. *See* Morales Decl., Exs. 9-10.

Plaintiffs' attempt to assert the interests of potential ammunition purchasers whose transactions have been rejected fairs no better.  *See* Pls.' Br. 18:5-18.  Again, no party to this lawsuit—or *anyone* who is not a prohibited person—has told this Court that the law has prevented them from lawfully purchasing ammunition.  Even if they had, resolving the source of the rejection, such as updating an address in the AFS to match the purchaser's current address, can be done quickly via the Department's website in many cases.  *See* Morales Decl. ¶¶ 20-24.  Plaintiffs' nonparty declarants place the number of such rejections between 10% and 60% of transactions.  *See* Pls.' Br. 18:6; *compare* Bartel Decl. ¶ 9 *with* Lowder Decl. ¶ 9. The actual number for July was just over 18%.  Morales Decl. ¶ 50.  There is no reliable evidence of an intractable problem preventing law-abiding Californians from purchasing ammunition.

Finally, Plaintiffs' suggest that the Ammunition Eligibility Check Laws "may" cause some ammunition vendors to "close their doors."  Pls.' Br. 19:2:15.  This again arises out of boilerplate assertions by nonparty declarants, based on anecdotal and apparently unreliable estimates of the time it takes to complete an eligibility check.  *See* Burwell Decl. ¶ 12; Puehse Decl. ¶ 15; Morgan Decl. ¶ 13; Bartel Decl. ¶ 12; Lowder Decl. ¶ 13; Gray Decl. ¶ 13.  None of these vendors has said the

---

photograph of the holder," is issued by a government, and is "of a type intended or commonly accepted for the purpose of identification of individuals." 27 C.F.R. § 478.11.  The regulation does not reflect a determination by the federal government that California's FLA IDs are sufficient to purchase a firearm or ammunition.

21

Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (3:18-cv-00802-BEN-JLB)

threat to their business is imminent.  Nor could they state a Second Amendment

claim if they had.  *See Teixeira*, 873 F.3d at 682 ("Nothing in the text of the

Amendment, as interpreted authoritatively in *Heller*, suggests the Second

Amendment confers an independent right to sell or trade weapons.").  As of July

31, 2019, there were over 2,000 licensed ammunition vendors in California.

Morales Decl. ¶ 7.  Plaintiffs have not suggested that any have gone out of business,

or that any appreciable number will.

Plaintiffs have not shown that they will be able to meet their "heavy burden"

to facially invalidate the law, and thus cannot establish a likelihood of success on

the merits of their claim that the Ammunition Eligibility Check Laws violate the

Second Amendment.  *See Salerno*, 481 U.S. at 745.

## II.   PLAINTIFFS CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS OF THEIR DORMANT COMMERCE CLAUSE CLAIM.

Plaintiffs contend that Penal Code section 30312 violates the dormant

Commerce Clause because it "prevents out-of-state vendors . . . from accessing

California customers in a particular manner" and "authorizes . . . in-state Vendors

[to] completely exclude[] them from accessing the California market.  Pls.'

Br. 21:23-22:1.  To the contrary, Prop. 63 treats California and out-of-state online

sellers the same.  A California company that sells ammunition over the internet

must have ammunition delivered to customers in California through a California-

licensed ammunition vendor, just like Plaintiff out-of-state businesses.  *See* Cal.

Pen. Code § 30312(b).  And an out-of-state ammunition vendor that has a physical

store in California may obtain a license and sell ammunition in California.  *See id.*

§ 30312.  Laws that treat "all private companies exactly the same" do not

discriminate against interstate commerce in violation of the dormant Commerce

Clause.  *See Pharm. Research & Mfrs. of Am. v. Alameda*, 768 F.3d 1037, 1042

(9th Cir. 2014) (quotation marks omitted).  That is why the Western District of New

York dismissed a dormant Commerce Clause challenge to a similar provision of

22

Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (3:18-cv-00802-BEN-JLB)

New York law that effectively bans remote sales by requiring that ammunition purchases take place in person. *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 379-81 (W.D.N.Y. 2013) *aff'd in part and rev'd in part on other grounds*, 804 F.3d 242, 251 n.20 (2d Cir. 2015).

Although this Court previously relied on the Ninth Circuit's decision in *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716 (9th Cir. 2017) in denying the Attorney General's motion to dismiss, there is reason to reconsider. *See Rhode*, 342 F. Supp. 3d at 1014. In *Nationwide*, the court held that making incorporation under California law a prerequisite to obtain a state-issued license likely violated the Dormant Commerce Clause. 873 F.3d at 736. Proposition 63 does not require businesses to incorporate in California, and is therefore distinguishable.

### III.   PLAINTIFFS HAVE NOT SHOWN IRREPARABLE HARM.

Plaintiffs cannot establish that they will suffer irreparable harm in the absence of preliminary injunctive relief because they have not shown that they are likely to succeed on their Second Amendment or dormant Commerce Clause theories. *See Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Moreover, even if there were a likelihood of success on the merits, the mere assertion of constitutional claims would not be dispositive on this factor. *See, e.g.*, *Constructors Ass'n of W. Penna. v. Kreps*, 573 F.2d 811, 820 n. 33 (3d Cir. 1978) ("[U]nlike First Amendment rights whose deprivation even from minimal periods of time constitutes irreparable injury . . . , a denial of equal protection rights may be more or less serious depending on the other injuries which accompany such deprivation."). Here, the Individual Plaintiffs will still be able to purchase ammunition, and will be able to do so in about five minutes. *See* Morales Decl. ¶ 55. The harm they suffer, in the form of the additional minutes it now takes to complete a purchase of ammunition, is not substantial.

Similarly, Plaintiffs cannot establish irreparable harm under a dormant Commerce Clause theory because the law they are challenging has been in effect

23

1   for over a year-and-a-half.  *See* Cal. Pen. Code, § 30312(a)(1) ("Commencing

2   January 1, 2018, the sale of ammunition by any party shall be conducted by or

3   processed through a licensed ammunition vendor.").  "A long delay by plaintiff

4   after learning of the threatened harm also may be taken as an indication that the

5   harm would not be serious enough to justify a preliminary injunction."  11A

6   Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (3d ed.); *Lydo*

7   *Enters. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("Delay in seeking a

8   preliminary injunction is a factor to be considered in weighing the propriety of

9   relief.").

10  **IV.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST WEIGH
         AGAINST PRELIMINARY INJUNCTIVE RELIEF.**

11

12          The balance of the equities and the public interest "merge when the

13  Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

14  Here, these factors tip decidedly against granting Plaintiffs' motion.  In their first

15  month, the Ammunition Eligibility Check Laws have stopped over 100 prohibited

16  persons from purchasing ammunition.  Morales Decl. ¶ 49.  And they have likely

17  dissuaded many more prohibited persons from attempting to purchase ammunition.

18  Even the possibility that those prohibited purchasers may have used the

19  ammunition they attempted to purchase in crimes weighs against Plaintiffs' motion.

20  *See, e.g.*, *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193-94 (E.D.

21  Cal. 2015), *aff'd* 637 F. App'x 401 (9th Cir. 2016).

22          There is no substantial impediment to Plaintiffs' purchase of ammunition.

23  What they have shown is that ammunition purchasers must pass an eligibility check

24  that, in the vast majority of cases, delays a purchase by a few minutes.  *See* Morales

25  Decl. ¶¶ 55-56.  A subset of purchasers—none of whom are parties—will need to

26  provide a second form of identification or correct their AFS records.  *See id.* ¶¶ 20-

27  24, 36-45; Cal. Code Regs., tit. 11, § 4045.1.  Still others—also not parties—may

28  have to take other minor steps, such as correcting their address in the AFS.  These

24

inconveniences do not outweigh the public safety interests at stake.  *See Burford v. Sun Oil Co.*, 319 U.S. 315, 318 (1943) ("[I]t is in the public interest that federal courts of equity should exercise their discretionary power with proper regard for the rightful independence of state governments in carrying out their domestic policy." (internal quotation marks omitted)); *Maryland v. King*, 133 S. Ct. 1, 2 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quotation marks omitted)); *see also Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[I]t is clear that a state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined.").

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' motion for preliminary injunction.


Dated:  August 5, 2019                         Respectfully Submitted,

                                               XAVIER BECERRA
                                               Attorney General of California
                                               TAMAR PACHTER
                                               Supervising Deputy Attorney General



                                               /s/ Nelson Richards
                                               NELSON R. RICHARDS
                                               P. PATTY LI
                                               Deputy Attorneys General
                                               *Attorneys for Defendant Attorney*
                                               *General Xavier Becerra*

# CERTIFICATE OF SERVICE

Case Name:   **Rhode v. Becerra**                    No.   **3:18-cv-00802-BEN-JLB**

I hereby certify that on <u>August 5, 2019</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 5, 2019</u>, at Sacramento, California.

| Tracie L. Campbell | */s/  Tracie Campbell* |
|:---:|:---:|
| Declarant | Signature |

SA2018101286
13985065.docx