MATTHEW E. SLOAN (SBN 165165)
matthew.sloan@probonolaw.com
MATTHEW J. TAKO (SBN 307013)
matthew.tako@probonolaw.com
EVAN G. SLOVAK (SBN 319409)
evan.slovak@probonolaw.com
AGNES N. ANIOL (SBN 324467)
agnes.aniol@probonolaw.com
300 South Grand Avenue
Los Angeles, California 90071-3144
Telephone:   (213) 687-5000
Facsimile:    (213) 687-5600

Attorneys for *Amicus Curiae*
Everytown for Gun Safety Support
Fund

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM RHODE, *et al.*,<br><br>      Plaintiffs,<br><br>  v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>      Defendant. | CASE NO.: 3:18-cv-00802-BEN-JLB<br><br>BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION<br><br>Hearing Date: August 19, 2019<br>Hearing Time: 10:30 a.m.<br>Courtroom:  5A<br>Judge:   Hon. Roger T.<br>      Benitez |

1

## <u>CORPORATE DISCLOSURE STATEMENT</u>

2        Everytown for Gun Safety has no parent corporations. It has no stock and

3 hence no publicly held company owns 10% or more of its stock.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ..................................................1

TABLE OF AUTHORITIES ..................................................................ii

INTEREST OF *AMICUS CURIAE* ........................................................1

INTRODUCTION ...............................................................................1

ARGUMENT ....................................................................................3

    I.      Prop. 63's Ammunition Background Checks Are Closely
Analogous to Longstanding Regulations on the Commercial Sale
of Firearms. ..........................................................................5

    II.     The Record-Keeping Obligations Imposed on Dealers by Prop. 63
Are Consistent with Longstanding Historical Record-Keeping
Obligations Regarding the Sale of Firearms. ...................................9

    III.    The Identification Requirements Imposed by Prop. 63 Are
Consistent with Longstanding Firearm Sale Regulations. .................11

    IV.    Any Administrative Delays Imposed by Prop. 63 Are Consistent
with Historical Practice and Are Substantially Shorter Than
Historically Permissible Delays. .................................................13

CONCLUSION................................................................................15

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## CASES

*District of Columbia v. Heller,*
 554 U.S. 570 (2008) ............................................................ 3, 4, 5, 12

*Fyock v. Sunnyvale,*
 779 F.3d 991 (9th Cir. 2015) ................................................... 4

*Heller v. District of Columbia,*
 670 F.3d 1244 (D.C. Cir. 2011) .............................................. 9

*Jackson v. City & County of San Francsico,*
 746 F.3d 953 (9th Cir. 2014) ................................................2, 5

*Pena v. Lindley,*
898 F.3d 969 (9th Cir. 2018) .................................................. 3

*Peruta v. Cty. of San Diego,*
824 F.3d 919 (9th Cir. 2016) (en banc ..................................... 9

*Silvester v. Harris,*
 843 F.3d 816 (9th Cir. 2016),
 cert. denied sub nom, *Silvester v. Becerra*, 138 S. Ct. 945 (2018) ..........3, 9, 13, 14

*United States v. Skoien,*
 614 F.3d 638 (7th Cir. 2010) ................................................... 4

## STATUTES AND SESSION LAWS

18 U.S.C. 922(t)(1)(C) .......................................................2, 12

27 Stat. 116 (D.C. July 13, 1892) ...........................................10

1911 Colo. Sess. Laws 408 ..................................................... 6

Vol. 26 Del. Laws 28 (1911)..................................................6, 10

1911 N.Y. Laws 442 ..........................................................6, 10

1913 Iowa Acts 307 ...............................................................10

1913 Or. Laws 497 ..............................................................6, 10

1918 Mont. Laws 6 .............................................................6, 10

Vol. 30 Del. Laws 55 (1919) .................................................... 6

1919 Haw. Sess. Laws 167 .......................................................10

1919 N.C. Sess. Laws 398 ............................................................7, 10

1921 Mo. Sess Laws 691 .............................................................7, 10

1923 Ark. Acts 379 (*repealed by 1925 Ark. Acts 1047*)...........................7

1923 Cal. Stat. 695 .....................................................................7, 13

1923 Cal. Stat. 699 ....................................................................10, 11

1923 Cal. Stat. 701 ................................................................5, 7, 12

1923 Conn. Pub. Acts 3707 ....................................................7, 12, 13

1923 Conn. Pub. Acts 3708 ................................................. 11, 12, 13

1923 N.D. Laws 379 ............................................................. 7, 12, 13

1923 N.D. Laws 381 .......................................................................11

1923 N.H. Laws 138 ........................................................... 7, 11, 12

1925 Ark. Acts 1047 ........................................................................7

1925 Haw. Sess. Laws 790 ..............................................................8

1925 Ind. Acts 495 ...........................................................7, 11, 12, 13

1925 Mich. Pub. Acts 473 ..........................................................11, 12

1925 N.J. Laws 185................................................................ 11, 12, 13

1925 Or. Laws 468 ............................................................. 7, 12, 13

1927 Haw. Laws 209......................................................................13

1927 Mass. Acts 413 ...............................................................8, 11, 13

1927 Mich. Pub. Acts 887 ...............................................................8

1927 N.J. Laws 742.....................................................................8, 13

1931 Pa. Laws 497 .....................................................5, 9, 11, 12, 13

1931 Tex. Gen. Laws 447 ................................................................9

47 Stat. 650 (D.C. July 8, 1932) ............................................ 11, 12, 13

75 Cong. Rec. 12754 (Cal. June 13, 1932) ...................................13

1935 S.D. Sess. Laws 355 ......................................................9, 11, 12, 13

1935 Wash. Sess. Laws 599.......................................................9, 12, 13

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

1936 Ala. Laws 51 ....................................................................9, 11, 12, 13

## OTHER AUTHORITIES

Everytown for Gun Safety, *Background Checks Save Lives and Protect Our Communities* (Jan. 8, 2019), https://every.tw/31mDhTG ......................................... 2

Charles V. Imlay, *The Uniform Firearms Act*, 12 A.B.A. J. 767 (1926) ................... 7

National Conference of Commissioners on Uniform State Laws, *Third Report of the Committee on a Uniform Act to Regulate the Sale and Possession of Firearms*, Handbook Proceedings, 36th Annual Conference 571 (1926). ................. 7, 8, 14

National Conference of Commissioners on Uniform State Laws, *The Uniform Fire Arms Act*, Handbook Proceedings, 40th Annual Conference 563 (1930) ............. 8

Robert J. Spitzer, *Gun Law History in the United States & Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017) ...................................................4, 5

*Sportsmen Fight Sullivan Law*, 23 J. Crim. L. & Criminology 665 (1932)............................................................. 8-9

1

## INTEREST OF *AMICUS CURIAE*

Amicus curiae Everytown for Gun Safety Support Fund ("Everytown") is the education, research, and litigation arm of Everytown for Gun Safety, the nation's largest gun-violence-prevention organization, with millions of supporters in all 50 states. Everytown for Gun Safety was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after the murder of twenty children and six adults in an elementary school in Newtown, Connecticut. Everytown's mission includes defending gun laws through the filing of amicus briefs that provide historical context and doctrinal analysis that might otherwise be overlooked. Everytown has drawn on its expertise to file briefs in numerous Second Amendment cases, including challenges to background checks and waiting periods like those at issue in this case, offering historical and doctrinal analysis that might otherwise be overlooked. *See, e.g.*, *Libertarian Party of Erie Cty. v. Cuomo*, No. 18-0386-cv (2d Cir.); *Colo. Outfitters Ass'n v. Hickenlooper*, No. 14-1290 (10th Cir.); *Silvester v. Harris*, No. 14-16840 (9th Cir.). It seeks to do the same here.[1]

## INTRODUCTION

The United States has a longstanding, constitutional tradition of background checks for the purchase of firearms, and, relatedly, the recording of certain information regarding both the firearm and the purchaser to facilitate this process. But despite the requirement of a background check to purchase a firearm, throughout most of the country, violent felons and other people forbidden from possessing firearms (and ammunition) can readily purchase the ammunition necessary to use

---

[1] An appendix of historical gun laws accompanies this brief. All parties have consented to the filing of this brief, and no counsel for any party authored the brief in whole or in part. Apart from *amicus curiae*, no person contributed money intended to fund the brief's preparation and submission.

those firearms without any form of background check or screening. Federal law requires that federally licensed firearms dealers contact the FBI to run a background check on prospective gun buyers before transferring firearms to those buyers. 18 U.S.C. § 922(t)(1). However, background checks are not required under federal law for firearms sales by unlicensed sellers—including in private sales, online, and at gun shows. Twenty-one states (including California) and the District of Columbia, comprising more than half the nation's population, have acted to close this background check loophole on private gun sales. Everytown for Gun Safety, *Background Checks Save Lives and Protect Our Communities* (Jan. 8, 2019), https://every.tw/31mDhTG.

In 2016, California's voters closed this loophole within the State by approving Proposition 63 ("Prop. 63"), also known as the "Safety for All Act of 2016," in an effort to promote public safety by "requir[ing] background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals." Prop. 63 § 2.7.[2] Under Prop. 63, individuals purchasing ammunition are required to pass a background check similar to the check required when purchasing a firearm. If an individual passes this background check, the ammunition purchase is successfully processed. If an individual fails the background check that would have likewise prevented him or her from purchasing a firearm, then he or she cannot purchase ammunition.

As Plaintiffs argue in their moving papers, ammunition is necessary for utilizing a firearm. *See* Memorandum of Points and Authorities In Support of Plaintiffs' Motion for Preliminary Injunction ("Pls.' PI") (ECF No. 32-1) at 12-13. Indeed, the Ninth Circuit has made clear that ammunition is protected by the Second

---

[2] The California Legislature prospectively amended Prop. 63 prior to its approval by the voters. *See* Defendant's Opposition to Plaintiffs' Motion for Preliminary Injunction ("State's Br.") (ECF No. 34) at 4 & n.1. References to Prop. 63 are to the law as amended.

Amendment only to the extent "necessary to use" a firearm. *Jackson v. City & County of S.F.*, 746 F.3d 953, 967-68 (9th Cir. 2014); *see also id.* at 967 (noting that the Second Amendment "does not explicitly protect ammunition"). It therefore follows that longstanding, lawful regulations applicable to the purchase of a firearm would similarly pass constitutional muster when applied to the purchase of ammunition. And logic thus dictates that the regulations governing one should be similarly lawful when applied with equal force to the other.

As discussed below, the sorts of regulations Prop. 63 imposes on the purchase and sale of ammunition have long been recognized as constitutionally sound restrictions on the purchase and sale of firearms. Due to the inextricable connection between firearms and ammunition, it follows that Prop. 63 is, like these historical firearm regulations, a longstanding, presumptively lawful regulation on the commercial sale of arms and thus falls outside of the scope of the Second Amendment's protections. To grant Plaintiffs' preliminary injunction motion would be to agree that their claims have a likelihood of success and that ammunition is somehow afforded *greater* constitutional protection than firearms. That simply cannot be. Plaintiffs' motion should be denied.

## ARGUMENT

Prop. 63's ammunition eligibility check process is consistent with a longstanding and presumptively lawful tradition of "conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008); *see* State's Br. at 12 & n.3.[3] It thus does not implicate the Second

---

[3] *See also, e.g., Silvester v. Harris*, 843 F.3d 816, 830-31 (9th Cir. 2016) (Thomas, C.J., concurring) (finding waiting periods, which were first enacted in the 1920s, to be a "longstanding condition or qualification on the commercial sale of arms" and thus presumptively lawful). As Judge Bybee has noted, the sort of "point-of-sale restrictions such as background checks and waiting periods" that are at issue in this case may also be defended "as 'restrictions on the possession of firearms by felons and the mentally ill.'" *Pena v. Lindley*, 898 F.3d 969, 1009 n.19 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part) (quoting *Heller*, 554 U.S. at 626).

Amendment right at all.  For that reason alone, Plaintiffs' motion for a preliminary injunction fails, at step one of the constitutional analysis.[4]

Both the Supreme Court and the Ninth Circuit have emphasized that "longstanding" regulations—including "laws imposing conditions and qualifications on the commercial sale of arms"—are "traditionally understood to be outside the scope of the Second Amendment." *Heller*, 554 U.S. at 626-27, 635; *Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015).  These regulations need not "mirror limits that were on the books in 1791." *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).  Instead, as the Ninth Circuit has noted, even "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997.[5]

Prop. 63 is consistent with this history and tradition.  Indeed, as the Supreme Court expressly stated in *Heller*, such "conditions and qualifications on the commercial sale of arms" are permissible under the Second Amendment. *Heller*, 554 U.S. at 626-27, 635.  And, in fact, many similar laws regulating firearms —laws that, like Prop. 63 does for ammunition, required background checks, dealer record-keeping, buyer identification, and waiting periods—were passed around the same time as the prohibitions on sales to felons and the mentally ill that *Heller* identified as "longstanding" and therefore valid. *See id.*; *see also* Robert J. Spitzer, *Gun Law History in the United States & Second Amendment Rights*, 80 LAW & CONTEMP.

---

[4] For the reasons set forth in the State's brief, Plaintiffs are also unlikely to succeed on the merits either under step two heightened scrutiny or their Dormant Commerce Clause claims, and have failed to demonstrate the other preliminary injunction factors.

[5] *See also, e.g., Skoien*, 614 F.3d at 639-40 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by *all* felons was not enacted until 1961" (internal quotation marks omitted) (emphasis in original)).

1    Probs. 55, 72, 75-76 (2017) (discussing the early 20th century passage of

2    prohibitions on the possession of firearms by felons and the mentally ill and of

3    restrictions on firearm sales).

4         Thus, while Plaintiffs erroneously claim that California's ammunition

5    eligibility check process "plainly implicates Second Amendment conduct," that is

6    simply wrong. Rather, as explained below, there is a longstanding historical

7    tradition of analogous regulation which, in and of itself, is sufficient to find Prop. 63

8    constitutional—and to demonstrate that Plaintiffs cannot show, as they must on this

9    motion, a strong likelihood of success on the merits of their Second Amendment

10   claims.[6]

## I.    Prop. 63's Ammunition Background Checks Are Closely Analogous to Longstanding Regulations on the Commercial Sale of Firearms.

13        California's ammunition background check requirement is consistent with

14   longstanding and analogous requirements for firearms. Indeed, as noted above, the

15   earliest background check requirements originated during the same period as the

16   "prohibitions on the possession of firearms by felons and the mentally ill" that *Heller*

17   deemed presumptively lawful by virtue of their lengthy history. *Heller*, 554 U.S. at

18   626; *see* Spitzer at 72, 75-76. And, in most cases, those laws were adopted in the

19   very same legislation that prohibited firearm possession by felons and the

20   dangerously mentally ill. *See, e.g.*, 1923 Cal. Stat. 701, §§ 2, 9 (requiring

21   background checks and prohibiting possession by felons); 1931 Pa. Laws 497, §§ 2,

22   _____

23   [6]  Plaintiffs appear to assume that the Ninth Circuit's decision in *Jackson*, 746 F.3d
24   953 (9th Cir. 2014), ends any step one inquiry in this case. Pls.' PI at 12-13. But
     that is not so. *Jackson* did not find that all regulation of ammunition is
25   necessarily within the scope of the Second Amendment, only that "*Heller* did not
     differentiate between regulations governing ammunition and regulations
26   governing the firearms themselves." *Jackson*, 746 F.3d at 967. Regulations on
     ammunition like Prop. 63 are therefore subject to the same historical scope
27   inquiry as regulations on firearms. *See id.* at 968. Under that inquiry, as
     demonstrated here, there is "persuasive historical evidence," *id.*, that regulations
28   of the type imposed by Prop. 63 are fully consistent with the Second Amendment.

8-9 (requiring background checks and prohibiting possession by those convicted of crimes of violence and those of unsound mind).

Firearm background check laws were first enacted in the early 20th century. In 1911, New York enacted the Sullivan Act, which required prospective purchasers of handguns to apply for a permit from law enforcement in order to possess a firearm, and prohibited gun dealers from selling to anyone without such a permit. *See* 1911 N.Y. Laws 442, 442-45. That same year, Delaware passed a law that forbade the sale of firearms to minors or intoxicated individuals. *See* Vol. 26 Del. Laws 28, 28-29 (1911). The statute also required an investigation into a gun purchaser's background, prohibited the sale of a firearm until "the purchaser ha[d] been positively identified," and imposed extensive record-keeping requirements on firearms dealers. *See id.* at 29.[7] Colorado enacted similar legislation in 1911 as well, requiring commercial gun dealers to keep detailed records on purchasers of firearms and to share these records with law enforcement. *See* 1911 Colo. Sess. Laws 408, 409.

In the ensuing years, several more states adopted legislation that provided standards to guide law enforcement investigations into gun purchasers' backgrounds. Oregon enacted a law in 1913 requiring a would-be handgun buyer to first acquire a permit to purchase, and before a magistrate would issue a permit, an applicant had to prove his good character by providing affidavits signed by two "reputable freeholders" testifying to the applicant's "good moral character." 1913 Or. Laws 497, 497. A 1918 Montana law required registration of all firearms and prohibited certain sales unless law enforcement issued a permit after an investigation that concluded a gun buyer was "of good moral character and [did] not desire such fire arm or weapon for any unlawful purpose." 1918 Mont. Laws 6, 7. And, over the

---

[7] In 1919, Delaware enhanced its identification provision by requiring that two witnesses positively identify a firearm purchaser before a sale could be completed. *See* Vol. 30 Del. Laws 55, 55-56 (1919).

1 next few years, North Carolina, Missouri, and Arkansas enacted comparable

2 legislation. *See* 1919 N.C. Sess. Laws 397, 398 (prohibiting firearm sales until a

3 clerk of the Superior Court is satisfied of the "good moral character of the

4 applicant"); 1921 Mo. Laws 691, 692 (requiring the sheriff to investigate a

5 purchaser's background); 1923 Ark. Acts 379, 380; repealed by 1925 Ark. Acts

6 1047, 1047 (requiring a permit which was issued only after law enforcement

7 concluded the purchaser was "of good character").

8        In the wake of this initial wave of laws, the U.S. Revolver Association

9 ("USRA"), a "non-commercial organization of amateur experts in the use of

10 revolvers," began drafting and urging the adoption of uniform firearm legislation to

11 combat a growing wave of violence (the "USRA Model Act"). Charles V. Imlay,

12 *The Uniform Firearms Act*, 12 A.B.A. J. 767, 767 (1926). USRA Vice President

13 Karl T. Frederick (who also later served as president of the National Rifle

14 Association) served as "one of the draftsmen" of the proposed legislation. *Nat'l*

15 *Conf. of Comm'rs on Uniform State Laws, Third Report of the Comm. on a Uniform*

16 *Act to Regulate the Sale and Possession of Firearms, Handbook Proceedings,* 36th

17 Ann. Conf. 571, 573 (1926) ("*1926 Conference Report*"). Among the regulations

18 included in the USRA Model Act were: a prohibition on the possession of pistols

19 and revolvers by felons and noncitizens; a requirement that sellers transmit detailed

20 sales records to local law enforcement; and a one-day waiting period between the

21 application to purchase a firearm and receipt of that firearm. *See* Imlay at 767. The

22 records and waiting period requirements enabled local law enforcement to conduct

23 their own background check investigation and prevent purchases prohibited by law.

24 *See id.*

25        Between 1923 and 1925, several states—including California—passed laws

26 modeled on the USRA Model Act. *See* 1923 Cal. Stat. 695, 696-97, 701; 1923

27 Conn. Pub. Acts 3707, 3707-10; 1923 N.D. Laws 379, 380-82; 1923 N.H. Laws 138,

28 138-39; 1925 Ind. Acts 495, 495-98; 1925 Or. Laws 468, 468-71. During the same

period, other states continued to enact laws modeled after New York's Sullivan Act, requiring a law-enforcement-issued permit to purchase firearms. *See* 1927 Mich. Pub. Acts 887, 887-88 (requiring applicants to demonstrate that they had not been convicted of a felony or adjudicated insane); 1927 N.J. Laws 742 (limiting purchase permits to people "of good character and . . . good repute in the community," and increased the waiting period from one day to seven days to facilitate background investigations); 1925 Haw. Sess. Laws 790, 793 (requiring purchasers to obtain pre-approval from law enforcement before they could purchase a firearm); 1927 Mass. Acts 413, 415-16 (same).

Then, in 1926, the National Conference of Commissioners on Uniform State Laws (the "Conference") selected the USRA Model Act "as the model of the draft of the Uniform Act," because it had "already gained ground" in the states. *Nat'l Conf. of Comm'rs on Uniform State Laws*, *The Uniform Fire Arms Act, Handbook Proceedings*, 40th Ann. Conf. 563, 569 (1930) ("*1930 Conference Report*"). The Conference expressed its belief that "the provisions of the proposed law present no constitutional obstacles" and "constitute no radical changes in existing laws." *1926 Conference Report* at 574.

Four years later, after some committee revisions of the USRA Model Act, the Conference approved the new Uniform Firearms Act (the "UFA"). Among other things, the UFA expanded the waiting period for a firearm purchase to forty-eight hours, to provide additional time for law enforcement to complete an investigation into the fitness of the purchaser. *See 1930 Conference Report* at 563-67. The UFA also prohibited the sale of firearms to "any person under the age of eighteen or to any [a seller] [had] reasonable cause to believe [had] been convicted of a crime of violence, or [was] a drug addict, an habitual drunkard or of unsound mind." *Id*. And it required dealers to submit detailed purchaser information to law enforcement within six hours of an application so a background investigation of the purchaser could be conducted within the allotted 48 hours. *Id.*; *see also Sportsmen Fight*

1  *Sullivan Law*, 23 J. Crim. L. & Criminology 665 (1932) (discussing "the police

2  investigation" that occurs during the 48-hour waiting period to ensure a purchaser

3  has "a clean record as an upright citizen."). The UFA was subsequently adopted in

4  some form by Pennsylvania, South Dakota, Washington, and Alabama, and enacted

5  by Congress for the District of Columbia. *See* 1931 Pa. Laws 497; 1935 S.D. Sess.

6  Laws 355; 1935 Wash. Sess. Laws 599; 1936 Ala. Laws 51; 47 Stat. 650 (1932).[8]

7        In sum, as this history demonstrates, investigations into a prospective

8  purchaser's background are at least as longstanding as many of the regulations found

9  presumptively lawful by the Supreme Court in *Heller*. Prop. 63's ammunition

10 eligibility check process is merely a continuation of that history and tradition. And,

11 for that reason alone it is "outside the scope of the Second Amendment and

12 presumptively lawful." *Silvester*, 843 F.3d at 832 (Thomas, C.J., concurring) (citing

13 *Peruta v. County of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc)).

14 **II.  The Record-Keeping Obligations Imposed on Dealers by Prop. 63 Are**
15 **Consistent with Longstanding Historical Record-Keeping Obligations**
   **Regarding the Sale of Firearms.**

16       Prop. 63's requirement that dealers collect and retain records of ammunition

17 sales is likewise unproblematic under the Second Amendment. Like the background

18 check laws just discussed, *see supra* Section I, laws mandating record-keeping for

19 firearm sales have existed for more than a century. Prop. 63 is a natural extension of

20 this record-keeping tradition and thus, under step one of the applicable Second

21 Amendment inquiry, constitutional.[9]

---

[8] Texas created a similar background check requirement to ensure that its prohibitions on gun ownership by unreliable or dangerous people were enforced, requiring purchasers to obtain a "certificate of good character" from a justice of the peace or judge before they could purchase a pistol. *See* 1931 Tex. Gen. Laws 447, 447-48.

[9] *See also Heller v. District of Columbia*, 670 F.3d 1244, 1292 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (noting that "[s]ome record-keeping requirements on gun sellers are traditional and common," and thus constitutional under the Second Amendment).

9

BRIEF OF *AMICUS CURIAE* EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT OF
DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

These dealer record-keeping laws date back to at least 1892, when Congress passed a gun law for the District of Columbia that required gun dealers to "keep a written register of the name and residence of every purchaser" and to make a weekly report to the police of all gun sales or transfers. *An Act to Punish the Carrying or Selling of Deadly or Dangerous Weapons Within the District of Columbia*, 27 Stat. 116 (July 13, 1892). Several states then followed suit. Delaware and New York first required dealers to keep records of gun sales in 1911. *See, e.g.*, Vol. 26 Del. Laws 28, § 4 (1911); 1911 N.Y. Laws 442, 444, § 2. Both states' laws required dealers to record the purchaser's name, age, occupation, address, and pistol permit number, as well as make and model of the weapon being purchased. *Id.* Iowa and Oregon were next in 1913. *See* 1913 Iowa Acts 307, 308-09, § 10; 1913 Or. Laws 497. And, by 1921, four more states had adopted record-keeping requirements for firearms sellers.[10]

As discussed above, *see supra* Section I, in the years that followed, the USRA Model Act led to a number of new firearms regulations at the state level. These state laws—which included California law—imposed stringent record-keeping requirements on firearms dealers. Starting in 1923, California required every person "in the business of selling firearms" to keep a record of the sale. 1923 Cal. Stat. 699, § 9. California gun retailers were required to log the purchaser's name, age address, height, occupation, skin color, eye color, and hair color, as well as the purchased firearm's manufacturer, serial number, and caliber. *Id.* The State even created a specific form for retailers to use, specifying that the dealers were to keep the originals for their own records, and that a "[c]arbon duplicate must be mailed on the

---

[10] *See, e.g.*, 1918 Mont. Laws 6 ("On sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered"); *see also* 1919 Haw. Sess. Laws 167; 1919 N.C. Sess. Laws 398; 1921 Mo. Sess. Laws 691.

evening of the day of the sale" to the head of the municipal police department. *Id*. Connecticut, North Dakota, and New Hampshire all adopted similar laws that same year. *See* 1923 Conn. Pub. Acts 3708, § 5; 1923 N.D. Laws 381, § 10; 1923 N.H. Laws 138, § 8.

These record-keeping laws based on the USRA Model Act were similar from state to state, reflecting their shared source material.[11] *See, e.g.*, 1925 Ind. Acts 495.[12] And, notably, every one required that the seller transmit a record of the sale to state or local officials. *Id*.

Prop. 63's record-keeping requirement for ammunition sales is consistent with this long historical tradition of analogous requirements on the commercial sale of arms. That robust history further demonstrates that Prop. 63 does not fall within the scope of the Second Amendment right, and that Plaintiffs are thus unlikely to succeed on the merits of their claims.

## III. The Identification Requirements Imposed by Prop. 63 Are Consistent with Longstanding Firearm Sale Regulations.

Prop. 63's purchaser identification requirements are also consistent with longstanding firearm regulations. That, too, supports constitutionality here.

---

[11] *Compare* 1923 N.H. Laws 138, § 8 ("Before a delivery be made the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, and nationality, the date of sale, the caliber, make, model, and manufacturer's number of the weapon. The seller shall, within seven days, sign and forward to the chief of police of the city or selectmen of the town one copy thereof and shall retain the other copy for one year") *with* 1936 Ala. Laws 51, 53 § 9 ("At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in this State or elsewhere of a crime of violence. The seller shall within six hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident . . . the triplicate he shall retain for six years.").

[12] 1925 Mich. Pub. Acts 473; 1925 N.J. Laws 185, § 3; 1927 Mass. Acts 413; 1931 Pa. Laws 497, 499, § 9; 47 Stat. 650 (1932) (District of Columbia); 1935 S.D. Sess. Laws 355.

11

Since at least the 1920s, in addition to requiring that dealers record identifying information about purchasers, firearm laws have mandated that a purchaser present some form of identification to the seller. California is no exception. As early as 1923, California required that a purchaser either be "personally known to the seller or shall present clear evidence of his identity." 1923 Cal. Stat. 701, § 11. Numerous other states enacted similar requirements throughout the 1920s and 1930s.[13] And, during this same time period, Congress enacted an identification statute for the District of Columbia, requiring the purchaser of a handgun to present "clear evidence of [the purchaser's] identity." Act of July 8, 1932, 47 Stat. 650, ch. 465, § 10.[14] These identification requirements have persisted into the modern era.[15]

In short, that Prop. 63 requires a purchaser to present identification is not new. Rather, it is of a piece with "conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27 & n.26, that have existed for a century. Such longstanding regulations are not within the scope of the right protected by the

---

[13] *See, e.g.*, 1923 Conn. Pub. Acts 3707, 3708 ("no sale or delivery of any pistol or revolver shall be made unless the purchaser or person to whom the same is to be delivered shall be personally known to the vendor of such pistol or revolver or the person making delivery thereof or unless the person making such purchase to whom delivery thereof is to be made shall provide evidence of his identity."); *see also* 1923 N.D. Laws 379; 1923 N.H. Laws 138, § 10; 1925 Ind. Acts 495 §11; 1925 Or. Laws 468; 1931 Pa. Laws 497, 500, § 11; 1935 S.D. Sess. Laws 355, 357; 1935 Wash. Sess. Laws 599, 602; 1936 Ala. Laws 51, 53, § 11.

[14] Beyond these specific requirements, the importance of proper identification was emphasized by many of these statutes also making the presentation of "false evidence" of one's identity a crime. *See, e.g.*, 1925 Mich. Pub. Acts 473, 475-76, No. 313 §§ 9, 13; *see also* 1925 N.J. Laws 185, 187, ch., 64 § 2 (stating that giving false personal information shall be punishable by "high misdemeanor"); Act of July 8, 1932, 47 Stat. 650, ch. 465, § 11 (District of Columbia) ("No person, shall, in purchasing a pistol . . ., or in purchasing a sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of identity.").

[15] *See, e.g.*, 18 U.S.C. § 922(t)(1)(C) ("[a] licensed dealer shall not transfer a firearm to any other person who is not [another dealer], unless . . . the transferor has verified the identity of the transferee by examining a valid identification document.").

---

12

1 Second Amendment, and do not create a substantial likelihood that Plaintiffs'

2 challenge will succeed on the merits.

3 **IV.  Any Administrative Delays Imposed by Prop. 63 Are Consistent with
   Historical Practice and Are Substantially Shorter Than Historically
4  Permissible Delays.**

5      Any delays incidental to completing Prop. 63's ammunition eligibility process

6 are likewise fully consistent with historical tradition.  As the Ninth Circuit has noted,

7 "[t]here is . . . nothing new in having to wait for the delivery of a weapon." *Silvester*,

8 843 F.3d at 827.  "[T]he ability to immediately exercise Second Amendment rights

9 has no foundation in history." *Id.* at 831 (Thomas, C.J., concurring).

10      In California, a one-day waiting period law was originally enacted in 1923.

11 *See* Law of June 13, 1923, ch. 339, § 10, 1923 Cal. Stat. 695, 696.  California was

12 not alone.  In all, a dozen states enacted waiting periods in the 1920s and 1930s, with

13 Congress also enacting a waiting period for the District of Columbia.[16]  During

14 Senate debate before enacting a forty-eight-hour waiting period for Washington

15 D.C., Senator Arthur Capper (R-KS) remarked on the Senate floor that the slight

16 delay would not disturb "[t]he right of an individual to possess a pistol in his home

17 or on land belonging to him." 75 Cong. Rec. 12754 (June 13, 1932).  The waiting

18 period laws passed at that time were nearly identical, as they were part of the USRA

19

20

21

22

---

23 [16] *See* Law of Mar. 7, 1923, ch. 266, § 10, 1923 N.D. Laws 379, 381; Law of June
   2, 1923, ch. 252, § 7, 1923 Conn. Pub. Acts 3707, 3708; Law of Feb. 26, 1925,
24 ch. 260, § 10, 1925 Or. Laws 468, 473; Law of Mar. 12, 1925, ch. 207, § 9, 1925
   Ind. Acts 495, 497; Law of Mar. 12, 1925, ch. 64, § 4, 1925 N.J. Laws 185, 188;
25 Law of Mar. 30, 1927, ch. 321, § 6(4)(b), 1927 N.J. Laws 742, 745; Law of June
   11, 1931, No. 158, §§ 4, 9, 1931 Pa. Laws 497, 498-99; Law of Mar. 14, 1935,
26 ch. 208, §§ 4, 8, 9, 1935 S.D. Sess. Laws 355, 356; Law of Mar. 23, 1935, ch.
   172, §§ 4, 8, 9, 1935 Wash. Sess. Laws 599, 601; Law of Apr. 6, 1936, No. 82, §§
27 4, 8, 9, 1936 Ala. Laws 51, 52; Law of Apr. 27, 1927, Act 206, §§ 4, 9, 1927
   Haw. Sess. Laws 209, 211; Law of Apr. 27, 1927, ch. 326, §§ 2, 3, 1927 Mass.
28 Acts 413, 414; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 652.

Model Act, and later UFA, that was being rapidly adopted across the country. *See* Section I, *supra*.[17]

The Ninth Circuit has held that California's ten-day waiting period is constitutional. *See Silvester*, 843 F.3d at 829. Specifically, waiting periods which extend beyond the completion of a background check do not "prevent, restrict, or place any conditions on how guns are stored or used after a purchaser takes possession" nor does waiting "prevent any individuals from owning a firearm." *Id.* at 827. In *Silvester*, the Ninth Circuit explained that the impact of a waiting period was "very small" and "does not place a substantial burden on Second Amendment rights." *Id.* "[M]inor temporal regulation" of a Second Amendment right "is not without precedent," nor is it "anomalous" among various other constitutional rights such as obtaining marriage licenses or permits for a protest. *Id.* at 832 (Thomas, J., concurring).

Here, Plaintiffs claim that completing the ammunition background check process, which, they assert, takes up to thirty minutes imposes a "time-consuming" burden, which poses a "significant barrier" to exercising Second Amendment rights. (Pls.' PI at 18-19.) As the State has demonstrated, Plaintiffs' claims as to the amount of time needed to conduct the Prop. 63 check appear to be inaccurate. *See* State's Br. at 10 ("The average processing time . . . was just under five minutes."). But, in any event, for nearly a century, states and Congress have mandated significantly longer delays for an individual to take possession of a firearm to allow for the completion of a background check. Simply put, such a delay is "nothing new" and does not implicate the Second Amendment. For this reason, Plaintiffs' argument that they will succeed on the merits here is without merit.

//

---

[17] When adopting the USRA Model Act, the Conference noted that the waiting period was "intended to avoid the sale of a firearm to a person in a fit of passion." *1926 Conference Report* at 583.

1

## CONCLUSION

2     For the foregoing reasons, and those set forth by State, the Court should deny

3  Plaintiffs' Motion for Preliminary Injunction.

4  Dated: August 9, 2019          Respectfully submitted,

5

6                            By:___/s/ Matthew J. Tako_____
                                  Matthew E. Sloan
7                                 Matthew J. Tako
                                  Evan G. Slovak
8                                 Agnes N. Aniol

9                                 Attorneys for *Amicus Curiae*
10                                Everytown for Gun Safety Support
                                  Fund

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28