

14TH LEGISLATURE

REGULAR SESSION

HAWAII

1927

HEIN

STATE
SESSION
LAWS

## ACT 206

[H. B. No. 322]

AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925.

*Be it Enacted by the Legislature of the Territory of Hawaii:*

Section 1. Definitions. "Pistol" or "revolver" as used in this Act, means any firearm with barrel less than twelve inches in length.

"Crime of Violence", as used in this Act means any of the following crimes, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, larceny, burglary and housebreaking.

Section 2. Committing crime when armed. If any person, when armed with a pistol or revolver, shall commit or attempt to commit an act constituting a crime of violence, he may in addition to the punishment otherwise provided for the crime, be punished by imprisonment for not more than one year or by a fine of not more than one thousand dollars ($1,000.00) or by both; provided, that the act aforesaid be one which is capable of being committed or facilitated by means of a pistol or revolver.

Section 3. Being armed prima facie evidence of intent. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol or revolver and had no license to carry the same, shall be prima facie evidence of his intention to commit said crime of violence; provided, that the criminal act committed or attempted be one which is capable of being committed or facilitated by means of a pistol or revolver.

Section 4. Persons forbidden to possess small arms. No person who has been convicted in this territory, or elsewhere, of having committed or attempted a crime of violence, shall own or have in his possession or under his control, a pistol or revolver.

Section 5. Carrying or keeping small arms by unlicensed persons. Except as otherwise provided in Sections 7 and 11 hereof in respect of certain licensees, no person shall carry, keep, possess or have under his control a pistol or revolver; provided, how-

14

triplicate shall be preserved for six years by the authority issuing said license.

Section 8.   Selling to minors.   No person shall sell, barter, hire, lend, or give any pistol or revolver to any person under the age of eighteen years.

Section 9.   Transfers regulated.   No person shall transfer by way of sale, gift, loan or otherwise, a pistol or revolver unless the prospective transferee, when he applies for the transfer, presents a permit duly granted under Section 2141 of the Revised Laws of Hawaii 1925; nor shall he make such transfer unless the transferee be a person in respect of whom there is no reasonable cause, known to the transferor, for believing that such transferee has committed or attempted, or has been convicted of committing or attempting, a crime of violence.   No seller shall in any event deliver a pistol or revolver on the day when the application to purchase and the statement hereinafter mentioned shall be made.   When delivered, said pistol or revolver shall be securely wrapped and shall be unloaded.   Before a delivery be made the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, race, nationality, color, and place of birth, the date of sale, the caliber, make, model, and manufacturer's number of the weapon, and stating that he has never been convicted of a crime of violence.   The seller shall promptly sign and forward by registered mail one copy thereof to the treasurer of the territory, and one copy thereof to the sheriff of the county or city and county of which the seller is a resident, and shall retain the other copy for six years.   A statement shall be deemed promptly forwarded if it is forwarded within seven days, unless a shorter time is provided therefor in regulations established by the Governor.

Section 10.   Dealers to be licensed.   No retail dealer or selling agent shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol or revolver without being licensed as hereinafter provided.

Section 11.   Dealers' Licenses; by whom granted, and conditions thereof.   The duly constituted licensing authorities of any political subdivision of this territory may grant licenses in form prescribed by the treasurer of the territory, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols and revolvers, subject to the following conditions, for breach of any of which the license shall be subject to forfeiture:

# HEINONLINE

Citation: 1927 413 1927



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Tue Mar 24 15:35:28 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

App. 107

vent the state treasurer from deducting at any time, from any moneys which may be due from the commonwealth to the delinquent city or town, the whole or any part of said tax, with the interest accrued thereon, which shall remain unpaid.                    *Approved April 27, 1927.*

Deduction of tax from money due from commonwealth.

---

An Act relative to the choice of a third member of the state board of retirement.

*Chap.*325

*Whereas,* The deferred operation of this act would in part defeat its purpose, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

Emergency preamble.

*Be it enacted, etc., as follows:*

Chapter ten of the General Laws is hereby amended by striking out section eighteen and inserting in place thereof the following: — *Section 18.* There shall be a state board of retirement serving in the department, consisting of three members, one of whom shall be the state treasurer, ex officio, who shall be chairman, a second member elected by the state retirement association established under section two of chapter thirty-two from among their number in such manner as the commissioner of insurance may determine, and a third member chosen by the other two. If the third member is not so chosen within thirty days after the election of the second, the governor shall appoint the third member for a term of three years. Upon the expiration of the term of office of an elected, chosen or appointed member or in case of a vacancy in either of said offices, his successor shall be elected, chosen or appointed as aforesaid for three years.
                    *Approved April 27, 1927.*

G. L. 10, § 18, amended.

State board of retirement, members, election.

Expirations and vacancies.

---

An Act relative to machine guns and other firearms.

*Chap.*326

*Be it enacted, etc., as follows:*

Section 1. Chapter one hundred and forty of the General Laws, as amended in section one hundred and twenty-one by section one of chapter four hundred and eighty-five of the acts of nineteen hundred and twenty-two, is hereby further amended by striking out said section one hundred and twenty-one and inserting in place thereof the following: — *Section 121.* In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breech, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action,

G. L. 140, § 121, etc., amended.

Definition of "firearms."

Definition of "machine gun."

shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty-one B. As used in this section and in sections one hundred and twenty-two to one hundred and thirty-one A, the words "purchase" and "sale" shall include exchange, the word "purchaser" shall include exchanger, and the verbs "sell" and "purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense. Said sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, shall not apply to antique firearms incapable of use as firearms nor to sales of firearms at wholesale.

SECTION 2. Said chapter one hundred and forty, as amended in section one hundred and twenty-three by section four of said chapter four hundred and eighty-five, by section one of chapter two hundred and eighty-four of the acts of nineteen hundred and twenty-five and by section one of chapter three hundred and ninety-five of the acts of nineteen hundred and twenty-six, is hereby further amended by striking out said section one hundred and twenty-three and inserting in place thereof the following: — *Section 123*. The license shall be expressed to be and shall be subject to the following conditions: First, That the provisions in regard to the nature of the license and the building in which the business may be carried on under it shall be strictly adhered to. Second, That every licensee shall before delivery of a firearm make or cause to be made a true entry in a sales record book to be furnished by the licensing authorities and to be kept for that purpose, specifying the description of the firearm, the make, number, whether single barrel, magazine, revolver, pin, rim or central fire, whether sold, rented or leased, the date and hour of such delivery, and shall, before delivery as aforesaid, require the purchaser, renter or lessee personally to write in said sales record book his full name, sex, residence and occupation. The said book shall be open at all times to the inspection of the licensing authorities and of the police. Third, That the license or a copy thereof, certified by the recording officer of the licensing authorities or by the clerk of the town by which it is issued, shall be displayed on the premises in a position where it can easily be read. Fourth, That no firearms shall be displayed in any outer window of said premises or in any other place where they can readily be seen from the outside. Fifth, That the licensee shall, once a week, send a copy of the record of sales, rentals and leases made by him for the preceding seven days to the licensing authorities and to the commissioner of public safety. Sixth, That every firearm shall be delivered securely wrapped and fastened and shall be unloaded when delivered. Seventh, That no delivery of a pistol or revolver shall be made on the day of application for the purchase, rental or lease thereof, except to a person having a license to carry the

**Words "purchase" and "sale" to include exchange, word "purchaser" to include exchanger, and verbs "sell" and "purchase" to include verb exchange.**

**Sections not applicable to certain firearms.**

**G. L. 140, § 123, etc., amended.**

**Conditions of licenses to sell, rent or lease certain firearms.**

same issued under section one hundred and thirty-one. Conditions of licenses to sell, rent or lease certain firearms. Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. Ninth, That upon a sale, rental or lease of a pistol or revolver, the licensee under section one hundred and twenty-two shall take up such permit and shall endorse upon it the time and place of said sale, rental or lease, and shall forthwith transmit the same to the commissioner of public safety, and that upon the sale, rental or lease of a machine gun shall endorse upon the license to possess the same the time and place of said sale, rental or lease, and shall forthwith transmit a notice thereof to said commissioner. Tenth, That this license shall be subject to forfeiture as provided in section one hundred and twenty-five for breach of any of its conditions, and that, if the licensee hereunder is convicted of a violation of any such condition, this license shall thereupon become void.

SECTION 3. Section one hundred and thirty-one of said G. L. 140, § 131, etc., amended. chapter one hundred and forty, as amended by section nine of said chapter four hundred and eighty-five and by section four of said chapter two hundred and eighty-four, is hereby further amended by inserting after the word "commonwealth" in the twelfth line the words: — or to possess therein a machine gun, — so as to read as follows: — Section License to carry pistols or revolvers, or possess machine gun, issuance to certain persons, etc. 131. The justice of a court or a trial justice, the board of police or mayor of a city, the selectmen of a town, or the commissioner of public safety, or persons authorized by them, may, upon the application of any person residing or having a place of business within the jurisdiction of the person or body issuing the license, except an unnaturalized person, a person who has been convicted of a felony or of the unlawful use or sale of drugs or a minor other than one fifteen years of age or over in the employ of a bank, public utility corporation or business of a similar nature whose application is endorsed by his employer, issue a license to such applicant to carry a pistol or revolver in the commonwealth or to possess therein a machine gun, if it appears that he has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed. Such license shall be Duration of license. issued for a term not to exceed one year, but may be for a less period, and all such licenses shall be revocable at the Revocation. will of the person or body issuing the same, who shall forthwith send written notice of such revocation to the commissioner of public safety. Said licenses shall be issued on Form, etc. forms furnished by said commissioner and a copy of every license so issued shall within one week after the granting thereof be sent to the said commissioner. Whoever issues Penalty.

a license in violation of this section shall be punished by imprisonment for not less than six months nor more than two years in a jail or house of correction.

**G. L. 140, § 131B, etc., amended.**

SECTION 4. Section one hundred and thirty-one B of said chapter one hundred and forty, inserted by section three of said chapter three hundred and ninety-five, is hereby amended by striking out the word "or" where it occurs a second time in the second line and inserting in place thereof a comma and also by inserting after the word "revolver" in the same line the words: — or machine gun, —

**Penalty for loans of money on pistol, revolver or machine gun.**

so as to read as follows: — *Section 131B.* Whoever loans money secured by mortgage, deposit or pledge of a pistol, revolver or machine gun shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than one year, or by both.

**G. L. 269, § 10, etc., amended.**

SECTION 5. Section ten of chapter two hundred and sixty-nine of the General Laws, as amended by section one of chapter two hundred and forty-eight of the acts of nineteen hundred and twenty-three and by section five of said chapter two hundred and eighty-four, is hereby further amended by inserting after the word "unloaded" in the third line the words: — , or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty, — so as to read as follows: —

**Penalty for carrying dangerous weapons or possessing machine gun without permission, etc.**

*Section 10.* Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty, without permission under section one hundred and thirty-one of chapter one hundred and forty, or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and one half years in a jail or house of correction or for not less than two and one half years nor more than five

**Confiscation.**

years in the state prison, and upon conviction the pistol or other article shall be confiscated by the commonwealth.

**Forwarding to commissioner of public safety, etc.**

The pistol or article so confiscated shall, by the authority of the written order of the court or trial justice, be forwarded by common carrier to the commissioner of public safety, who, upon receipt of the same, shall notify said court or justice thereof. Said commissioner may sell or destroy the same, and, in case of a sale, after paying the cost of forwarding the article, shall pay over the net proceeds to the commonwealth.      *Approved April 27, 1927.*

# HEINONLINE

Citation: 1927 887 1927



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Tue Mar 24 15:47:48 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

other purpose. Such persons shall hold office during the term of their employment by the state highway department but the authority herein vested shall cease upon the termination of such employment. The persons so appointed shall by reason of such appointment be members of the department of public safety during the terms of such appointment but shall serve without pay as members thereof.

Approved June 2, 1927.

---

## [No. 372.]

AN ACT to regulate and license the selling, purchasing, possessing and carrying of certain firearms; to prohibit the buying, selling or carrying of certain firearms without a license therefor; to prohibit the possession of certain weapons and attachments; to prohibit the pawning of certain firearms; to prohibit the sale, offering for sale, or possession for the purpose of sale of written or printed matter containing any offer to sell or deliver certain firearms or devices within this state; to provide penalties for the violations of this act, and to repeal act number two hundred seventy-four of the public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen.

*The People of the State of Michigan enact:*

SECTION 1. The word "pistol" as used in this act shall mean any firearm, loaded or unloaded, thirty inches or less in length. The word "purchaser" shall mean any person who receives a pistol from another by purchase, gift or loan. The word "seller" shall mean any person who sells, furnishes, loans or gives a pistol to another. *Words defined.*

SEC. 2. No person shall purchase a pistol as defined in this act without first having obtained a license therefor as *License before purchase.*

prescribed herein. The commissioner or chief of police, or his duly authorized deputy, in incorporated cities or in incorporated villages having an organized department of police, and the sheriff, or his authorized deputy, in parts of the respective counties not included within incorporated cities or villages, are hereby authorized to issue licenses to purchase pistols to applicants residing within the respective territories herein mentioned. No such license shall be granted to any person except he be nineteen years of age or over, and has resided in this state six months or more, and in no event shall such a license be issued to a person who has been convicted of a felony or adjudged insane in this state or elsewhere. Applications for such licenses shall be signed by the applicant under oath upon forms provided by the commissioner of public safety. Licenses to purchase pistols shall be executed in duplicate upon forms provided by the commissioner of public safety and shall be signed by the licensing authority. One copy of such license shall be delivered to the applicant and the duplicate of such license shall be retained by such licensing authority as a permanent official record for a period of six years. Such license shall be void unless used within ten days after the date of its issue. Any person who shall sell to another any pistol as defined in this act without complying with the requirements of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail not more than ninety days, or both such fine and imprisonment in the discretion of the court. Such license shall be signed in ink by the holder thereof in the presence of the person selling, loaning or giving a pistol to such licensee and shall thereupon be taken up by such person, signed by him in ink and shall be delivered or sent by registered mail within forty-eight hours to the commissioner of public safety. The seller shall certify upon said license in the space provided therefor the name of the person to whom such pistol was delivered, the make, style, calibre and number of such pistol, and shall further certify that such purchaser signed his name on said license in the presence of the seller. The provisions of this section shall not apply to the purchase of pistols from wholesalers by dealers regularly engaged in the business of selling pistols at retail, nor to the sale, barter or exchange of pistols kept solely as relics, souvenirs or curios.

**To whom granted.** *(margin note)*

**Executed in duplicate.** *(margin note)*

**Misdemeanor; penalty.** *(margin note)*

SEC. 3. It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand

**Unlawful to manufacture, etc., certain firearms, etc.** *(margin note)*

**Penalty for violation.** *(margin note)*

dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. The provisions of this section shall not apply, however, to any person, firm or corporation manufacturing firearms, explosives or munitions of war by virtue of any contracts with any department of the government of the United States, or with any foreign government, state, municipality or any subdivision thereof.

SEC. 4. Any person who, with intent to use the same unlawfully against the person of another, goes armed with a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over three inches in length, or any other dangerous or deadly weapon or instrument, shall be guilty of a felony and on conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court. *Felony, what deemed.* *Penalty.*

SEC. 5. No person shall carry a dagger, dirk, stiletto or other dangerous weapon except hunting knives adapted and carried as such, concealed on or about his person, or whether concealed or otherwise in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him. No person shall carry a pistol concealed on or about his person, or, whether concealed or otherwise, in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him, without a license therefor as herein provided. Any person violating the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court. *Unlawful to carry, etc., dagger, etc.*

SEC. 6. The prosecuting attorney, the commissioner or chief of police and the commissioner of public safety or their respective authorized deputies in incorporated cities or in incorporated villages having an organized department of police, and the prosecuting attorney, the commissioner of public safety or their authorized deputies, and the sheriff, under-sheriff or chief deputy sheriff in parts of the respective counties not included within incorporated cities or villages shall constitute boards exclusively authorized to issue licenses to carry pistols concealed on the person to applicants residing within the respective territories herein mentioned. The county clerk of each county shall be clerk of such licensing boards, which boards shall be known in law as "The Concealed Weapon Licensing Board." No such license to carry a pistol concealed on the person shall be granted to any person except he be nineteen years of age or over and has resided in this state six months or over, and in no event shall such license be issued unless it appears that the applicant has good reason to fear injury to his person or property, or has *Concealed weapon licensing board.* *To whom license granted.*

other proper reasons, and that he is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony or adjudged insane in this state or elsewhere.

**Chairman of board.**
The prosecuting attorney shall be the chairman of the said board, which shall convene at least once in each calendar month and at such other times as they shall be called to convene by the chairman. Such licenses shall be issued only upon written application signed by the applicant and on his oath and upon forms provided by the commissioner of public safety. Such licenses shall issue only with the approval of a majority of said board and shall be executed in triplicate upon forms provided by the commissioner of public safety and shall be signed in the name of the concealed weapon licensing board by the county clerk and the seal of the circuit court affixed thereto. One copy of such license shall be delivered to the applicant, the duplicate of said license shall be retained by the county clerk as a permanent official record for a period of six years, and the triplicate of such license shall be forwarded to the commissioner of public safety who shall file and index licenses so received by him and keep the same as a permanent official record for a period

**Duration of license.**
of six years. Each license shall be issued for a definite period of not more than one year, to be stated in the license, and no renewal of such license shall be granted except upon the filing of a new application. Every license issued hereunder shall bear the imprint of the right thumb of the licensee, or, if that be not possible, of the left thumb or some other finger of such licensee. Such licensee shall carry such license upon his person at all times when he may be carrying a pistol concealed upon his person and shall display such license upon the request of any peace officer.

**When license to expire.**
SEC. 7. All licenses heretofore issued in this state permitting a person to carry a pistol concealed upon his person shall expire at midnight, December thirty-one, nineteen hundred twenty-seven.

**When license revoked.**
SEC. 8. The licensing board herein created by section six may revoke any license issued by it upon receiving a certificate of any magistrate showing that such licensee has been convicted of violating any of the provisions of this act, or has been convicted of a felony. Such license may also be revoked whenever in the judgment of said board the reason for granting such license shall have ceased to exist, or whenever said board shall for any reasonable cause determine said licensee to be an unfit person to carry a pistol concealed upon his person. No such license shall be revoked except upon written complaint and then only after a hearing by said board, of which at least seven days' notice shall be given to the licensee either by personal service or by registered mail to his last known address. The clerk of said licensing board is hereby authorized to administer an oath to any person testifying before such board at any such hearing.

SEC. 9. On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county. Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section. A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and filed and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be. The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five. Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

*Safety inspection of weapons.*

*Certificate issued.*

SEC. 10. No pawnbroker shall accept a pistol in pawn. Any person violating this section of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail for not more than ninety days or by both such fine and imprisonment in the discretion of the court.

*Pistol not accepted in pawn.*

SEC. 11. No person shall wilfully alter, remove or obliterate the name of the maker, model, manufacturer's number or other mark of identity of any pistol. Possession of any such firearm upon which the number shall have been altered, removed or obliterated, shall be presumptive evidence that such possessor has altered, removed or obliterated the same. Any person convicted under this section shall be punished by a fine not to exceed five hundred dollars or by imprisonment

*Alteration of pistol unlawful.*

in the state prison not to exceed two years or by both such fine and imprisonment in the discretion of the court.

**Exceptions to act.**

SEC. 12.    The provisions of section two, three, five and nine shall not apply to any peace officer of the state or any subdivision thereof who is regularly employed and paid by the state or such subdivision, or to any member of the army, navy or marine corps of the United States, or of organizations authorized by law to purchase or receive weapons from the United States or from this state, nor to the national guard or other duly authorized military organizations when on duty or drill, nor to the members thereof in going to or returning from their customary places of assembly or practice, nor to a person licensed to carry a pistol concealed upon his person issued by another state, nor to the regular and ordinary transportation of pistols as merchandise, or to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business, or in moving goods from one place of abode or business to another.

**When unlawfully possessed.**

SEC. 13.    When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases that any pistol or other weapon or device mentioned in this act is unlawfully possessed or carried by any person, such magistrate shall, if he be satisfied that there is reasonable cause to believe the matters in said complaint be true, issue his warrant directed to any peace officer, commanding him to search the person or place described in such complaint, and if such pistol, weapon or device be there found; to seize and hold the same as evidence of a violation of this act.

**Forfeited to state.**

SEC. 14.    All pistols, weapons or devices carried or possessed contrary to this act are hereby declared forfeited to the state.

**Certain books, etc., unlawful to sell, etc.**

SEC. 15.    It shall be unlawful to sell or deliver within this state, or to offer or expose for sale, or to have in possession for the purpose of sale, any book, pamphlet, circular, magazine, newspaper or other form of written or printed matter offering to sell or deliver, or containing an offer to sell or deliver to any person within this state from any place without this state any pistol or any weapon or device mentioned in section three hereof. The provisions of this section shall not apply to sales of or offers to sell pistols at wholesale to persons regularly engaged in the business of selling such pistols at wholesale or retail, nor to sales or offers to sell such pistols made or authorized by the United States government or any department or agency thereof.

**Penalty for violation.**

SEC. 16.    Any person violating the provisions of section fifteen of this act shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed one hundred dollars or by imprisonment in the county jail not to exceed ninety days, or by both such fine and imprisonment in the discretion of the court.

SEC. 17. Act number two hundred seventy-four of the public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen, are hereby repealed: *Provided, however,* That any proceedings pending under any of said sections herein repealed shall not be affected hereby but shall be concluded in accordance with the law of such repealed section or sections. *[margin: Acts repealed.]* *[margin: Proviso.]*

SEC. 18. This act is declared to be severable, and should any section hereof be hereafter declared unconstitutional or otherwise invalid, the remainder of the act shall not be affected thereby. *[margin: Saving clause.]*

Approved June 2, 1927.

---

## [No. 373.]

AN ACT to amend section twenty-five of chapter thirty of act number three hundred fourteen of the public acts of nineteen hundred fifteen, entitled "An act to revise and consolidate the statutes relating to the organization and jurisdiction of the courts of this state; the powers and duties of such courts, and of the judges and other officers thereof; the forms of civil actions; the time within which civil actions and proceedings may be brought in said courts; pleading, evidence, practice and procedure in civil actions and proceedings in said courts; to provide remedies and penalties for the violation of certain provisions of this act; and to repeal all acts and parts of acts inconsistent with, or contravening any of the provisions of this act," being section thirteen thousand two hundred fifty-three of the compiled laws of nineteen hundred fifteen, as amended by act number two hundred forty-three of the public acts of nineteen hundred seventeen, and to add a new section thereto to stand as section thirty-one.

*The People of the State of Michigan enact:*

SECTION 1. Section twenty-five of chapter thirty of act number three hundred fourteen of the public acts of nineteen *[margin: Section amended.]*

# HEINONLINE

Citation: 1927 742 1927



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Mon Mar 23 17:39:49 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

## VII. MISCELLANEOUS.

Repealer.

25. All acts and parts of acts inconsistent with the provisions hereof are repealed in so far as applicable to

Proviso.

the matters which are the subject of this act; *provided,* that nothing herein contained shall affect the practice and procedure prescribed under the State Motor Vehicle and Traffic acts.

As to constitutionality of act.

26. In case for any reason any section, part of section or provision of this act shall be questioned in any court, or determined to be unconstitutional or invalid, the same shall not in anywise affect any other section,

Proviso.

part of section or provision of this act; *provided,* that in cities bordering on the Atlantic ocean having a population in excess of fifty thousand the salary shall not exceed six thousand dollars.

27. This act shall take effect immediately.

Approved March 30, 1927.

---

## CHAPTER 321.

A Further Supplement to an act entitled "An act for the punishment of crimes" (Revision of 1898), approved June fourteenth, one thousand eight hundred and ninety-eight.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

Pawnbrokers not to deal in weapons.

1. No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb

Penalty.

or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

2. Any person who shall commit or attempt to com- Additional Sentence for Armed Criminals. mit any assault, robbery, larceny, burglary, or breaking and entering, when armed with, or having in his possession, any revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive, shall, in addition to the punishment provided for the crime, be punished on a first conviction by imprisonment for not more than five years; upon a second conviction for a period of not more than ten years; upon a third conviction by imprisonment for a period of not more than fifteen years; upon a fourth or subsequent conviction, by imprisonment for life, or for an additional period of not more than twenty years, in the discretion of the court; *provided, however,* the indictment or alle- Proviso. gation shall aver that the person was armed with or had in his possession any such instrument and conviction is had thereon.

3. In the trial of a person for committing or attempt- Arms as evidence of intent. ing to commit any crime enumerated in section two hereof, the fact that he was armed with or had in his possession any of the firearms or instruments enumerated in section one hereof without a license to carry the same, shall be prima facie evidence of his intention to commit said crime of violence.

The presence of a firearm in a vehicle is presump- Firearms in vehicle. tive evidence of possession by all persons occupying or using the vehicle at the time.

4. No person who shall have been convicted in this Convicted person not to have weapons. State or elsewhere of any of the crimes enumerated in section two hereof shall purchase, own, or have in his possession or under his control any of the firearms or instruments enumerated in section one hereof. Viola- Penalty. tion of this section shall be punished by imprisonment for not more than five years.

5. Every person who manufactures, or who sells at Manufacturers of weapons registered. wholesale, any of the firearms or instruments enumerated in section one hereof, shall be registered with the Secretary of State and shall furnish to the Secretary of State such particulars as may be prescribed by law for such registration; *provided,* that if the Secretary Proviso.

of State is satisfied that any applicant for such registration cannot be permitted to carry on business as a manufacturer or wholesale dealer in the firearms or instruments enumerated in section one hereof without danger to the public safety, he may refuse to register that person.

**Certificate furnished.**

The Secretary of State shall furnish to every person who is registered under this section, a certificate of registration.

**Removal of name from registration list.**

If any person desires to have his name removed from registration, or if the Secretary of State is satisfied that any person whose name is registered is no longer carrying on business as such manufacturer or wholesale dealer, or has ceased to have a place of business within the State, or cannot longer be permitted to carry on business as such manufacturer or wholesale dealer without danger to the public safety, he shall, after giving reasonable notice to such manufacturer or wholesale dealer and hearing thereon, cause the name of such person to be removed from registration.

**Appeal may be taken.**

Any person aggrieved by the refusal of such State official to register him as such manufacturer or wholesale dealer, or by the removal of his name from registration, shall have a right of appeal to the Supreme Court of the State.

**Record of sales.**

Every manufacturer and wholesale dealer shall keep a detailed record of each firearm or instrument sold by him. Such record shall include date of sale, name of purchaser, description of arm, and serial number thereof. The information contained in such record shall be available to police and other public officials in the performance of their official duties.

**Retail dealers licensed.**

6. No retail dealer shall sell or expose for sale, or have in his possession with intent to sell, any of the firearms or instruments enumerated in section one hereof without being licensed as hereafter provided.

**Licenses granted by Common Pleas judge.**

The Common Pleas judge of any court of this State, may, in his discretion, grant licenses in form prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell at retail within the said city or town or political subdivision, pistols or revolvers, subject to the follow-

ing conditions, for breach of any of which the license shall be subject to forfeiture:

1. The business shall be carried on only in the building or buildings designated in the license. *Place;*

2. The license or a copy thereof certified by the issuing authority shall be displayed in a conspicuous place on the premises where it can be easily read. *License displayed;*

3. No pistol or revolver, or imitation thereof, or placard advertising the sale thereof, shall be placed in any window or in any part of said premises where it can be readily seen from the outside. *No advertising;*

4. No pistol or revolver shall be delivered (a) unless the purchaser shall have obtained a permit to purchase under the provisions of section nine; (b) until seven days shall have elapsed after the application for the permit; (c) unless the purchaser either is personally known to the seller or shall present evidence of his identity; (d) unless the pistol or revolver shall be unloaded and securely wrapped; *provided, however,* a permit to cover a pistol or revolver shall, for the purposes of this section and of section nine of this act, be equivalent to a permit to purchase a pistol or revolver. *Delivery to purchaser;* *Proviso*

5. A true record of every pistol or revolver sold shall be made in a book kept for the purpose, the form of which shall be prescribed by the Secretary of State and shall be personally signed by the person effecting the sale, and shall contain the date of the sale, the calibre, make, model, and manufacturer's number of the weapon, and the name, address and permit number of the purchaser. *Record kept by retailer;*

No license to sell at retail shall be granted except as provided in this section. *Licensing;*

Violation of any of the provisions of this section (viz. section six) shall be a misdemeanor. *Penalty.*

7. Any person who shall knowingly sell any of the firearms or instruments enumerated in section one hereof to a minor under the age of eighteen years, or to a person not of sound mind, or to a drug addict, or to a person who has been convicted of committing or attempting to commit any of the crimes enumerated in section two hereof when armed with any of the firearms or instruments enumerated in section one hereof, shall be guilty of misdemeanor. *Sale to minors, etc., illegal.*

**Penalty for loaning on firearms.**

8. Any person who loans money secured by mortgage, deposit or pledge of a pistol or revolver shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than one year, or both.

**Purchaser must have permit.**

9. No person shall sell a pistol or revolver to another person unless the purchaser has first secured a permit to purchase or carry a pistol or revolver. No person of good character and who is of good repute in the community in which he lives, and who is not subject to any of the disabilities set forth in other sections of this act, shall be denied a permit to purchase a pistol or

**By whom granted.**

revolver. The judge of any court within this State (except, however, justices of the peace), the sheriff of a county or the chief of police of a city, town or municipality shall upon application issue to any person qualified under the provisions of this section a permit to purchase a pistol or revolver, and the Secretary of State shall have concurrent jurisdiction to issue such permit in any case, notwithstanding it has been refused by any other licensing official, if in his opinion the applicant is qualified.

**Application for permit.**

Applications for such permits shall be in form as prescribed by the Secretary of State and shall set forth the name, residence, place of business, age, occupation, sex, color, and physical description of the applicant, and shall state whether the applicant is a citizen, and whether he has ever been convicted of any of the crimes enumerated in section two hereof as defined in this act. Such application shall be signed by the applicant and shall contain as reference the names and addresses of two reputable citizens personally acquainted with him.

**Blank forms.**

Application blanks shall be obtainable from the Secretary of State and from any other officers authorized to grant such permit, and may be obtained from licensed

**Fee.**

retail dealers. The application, together with a fee of fifty cents, shall be delivered or forwarded to the licensing authority who shall investigate the same, and unless good cause for the denial thereof shall appear, shall grant said permit within seven days from the date of

**Permit in triplicate.**

the receipt of the application. The permit shall be in form prescribed by the Secretary of State and shall be

issued to the applicant in triplicate. The applicant shall deliver to the seller the permit in triplicate and the seller shall indorse on the back of each copy the make, model, calibre and serial number of the pistol or revolver, sold under the permit. One copy shall then be returned to the purchaser with the pistol or revolver, one copy shall be kept by the seller as a permanent record, and the third copy shall be forwarded by the seller within three days to the Secretary of State. If the permit is not granted, the fee shall be returned to the applicant. *Disposition of copies.*

All fees for permits shall be paid into the general fund of the State if the permit be issued by the Secretary of State; to the municipality if the permit be issued by a municipal officer; in all other instances to the general fund of the county wherein the officer acts or the licensee resides or does business. *Disposition of fees.*

A person shall not be restricted as to the number of pistols or revolvers he may purchase, if he applies for and obtains permits to purchase the same, but only one pistol or revolver shall be purchased or delivered on each permit. *One pistol to each permit.*

10. The granting of permits to carry a revolver, pistol or other instrument, enumerated in section one hereof shall be under and according to the provisions of an act entitled "An act to amend an act entitled 'A further supplement to an act entitled "An act for the punishment of crimes" (Revision of 1898), approved June fourteenth, one thousand eight hundred and ninety-eight,' which supplementary act was approved March eleventh, nineteen hundred and twenty-four," and the supplements thereto and amendments thereof. *Act relative to granting permits.*

11. No person shall, without a license therefor issued as provided in the statute referred to in the preceding section, carry a pistol or revolver in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him; *provided, however,* that nothing in this act contained shall be construed in any way to apply to the United States marshal or his deputies, the sheriff, or the under-sheriffs of any county, nor to the regularly employed members of any police department, nor to any special policemen appointed by the governing body of any *Carrying pistol without license.* *Proviso— exceptions to act.*

municipality of this State, nor to any prosecutor or assistant prosecutor of any county, regular fish and game wardens, constable, railway police, canal police, steamboat police, and prosecutor's detectives; nor to any member of the State Police, nor to any motor vehicle inspector; nor to any officer of the Society for the Prevention of Cruelty to Animals; nor to any prison or jail wardens or their deputies; nor to guards while in the employ of any banking or building and loan institution of this State; nor to any court attendant engaged in attending the Circuit Court, Court of Oyer and Terminer, Court of Common Pleas, or General Court of Quarter Sessions, justices of the peace; nor to the members of the Army, Navy or Marine Corps of the United States or of the National Guard when on duty; nor to duly authorized military organizations when under orders, nor to the members thereof when going to or from places of meeting of their respective organizations, carrying the weapons prescribed for such

*Proviso.* drill, exercise or parade; *and provided, further,* nothing in this act contained shall be construed to apply to any person having a written permit to carry any revolver, pistol or other firearm, when such permit has been obtained pursuant to the provisions of this act; nor to public utility corporations in the transportation of ex-

*Proviso* plosives; *provided, however,* that nothing herein contained shall prevent any person from keeping or carrying about his or her place of business, dwelling house or premises, any such revolver, pistol, firearm or other weapon, or from carrying the same from any place of purchase to his or her dwelling house or place of business, or from his or her dwelling house or place of business to any place where repairing is done, to have the same repaired and returned or to carry a gun, rifle or knife in the woods or fields or upon the waters of the State for the purpose of hunting or target practice.

*Definition of pistol.* Whenever the words "pistol" or "revolver" are used in this act such words shall include a shotgun, rifle or other firearm with over-all length less than twenty-six inches.

*Penalty for false information.* 12. Any person who shall give or cause to be given false information in applying for a permit to purchase or a license to carry a pistol or revolver, or in purchasing

or otherwise acquiring delivery of a pistol or revolver, shall be deemed to be guilty of a misdemeanor and shall be subject to the same penalty as is provided for the crime of misdemeanor in this State.

13. It shall be unlawful within this State to manufacture, sell, purchase or possess, except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged. Any violation of this section shall be a misdemeanor. *Mufflers forbidden.*

14. Any person, except a duly appointed law enforcement officer, or a member of the Army, Navy, or Marine Corps of the United States, or of the National Guard or organized reserves when on duty, who possesses, or carries on or about his person or in a vehicle, a bomb or bomb shell, except for blasting or other commercial use, or who, with intent to use the same unlawfully against the person or property of another, possesses or carries any explosive substance, or any explosive liquid, gas or like substance, shall be guilty of a high misdemeanor. *As to bombs.*

15. No person shall change, alter, remove or obliterate the name of the maker, model, manufacturer's number, or other mark of identification of any pistol or revolver. Any violation of this section shall be a misdemeanor. *Not alter maker's name and number.*

16. No property right shall exist in any firearms unlawfully possessed, carried or used, and all such firearms are hereby declared to be nuisances and forfeited to the State. When such forfeited firearms shall be taken from any person, they shall be surrendered to the sheriff of the county in which taken or to the head of the police department in cities or to the office of the prosecutor of the county. *Provided, however,* that if any such firearms shall be found to be the property of an innocent owner, it shall be returned to such owner if and when no longer needed for evidential purposes. *As to property right in firearms.* *Proviso.*

17. In the case of the conviction under this act of a person who is not a citizen of the United States, it shall be the duty of the clerk of the court in which such conviction is secured to certify the fact of such conviction to the proper officer of the United States Government having supervision of the deportation of aliens. *Conviction of aliens.*

48 LAWS

**Antiques, or-naments ex-cepted.**  18. This act shall not apply to antique pistols unsuitable for use as firearms and possessed as curiosities or ornaments.

**Expiration of previous licenses.**  19. All licenses heretofore issued within this State permitting the sale or purchase of pistols or revolvers shall expire ninety days after the passage of this act.

**Repealer.**  20. All acts or parts of acts inconsistent herewith are hereby repealed.

Approved March 30, 1927.

---

## CHAPTER 322.

An Amendment amending an act entitled "An act respecting coroners" (Revision), approved March twenty-seventh, one thousand eight hundred and seventy-four.

BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:

**Section 26 amended.**  1. The twenty-sixth section of the act to which this is amendatory be and the same is hereby amended to read as follows:

26. That the following fees shall be allowed:

**Fees allowed coroners.**  To coroner, or person acting in his stead, for viewing the body five dollars;

Mileage per mile, going and returning, ten cents, or actual carfare;

Sitting with jury at inquest each day, three dollars.

Taking deposition of witnesses at inquest, ten cents per folio, counting not more than two folios of manuscript to each page;

For every witness attending such inquest, when resident in the county, fifty cents for each day, and when from a foreign county, one dollar a day, in which shall be included his or her going to and returning from the same, allowing one day for every thirty miles from and to his or her place or residence;

**Jurors' fees.**  Jurors' fees, twenty-five cents for each case; but in cases of special importance the board of chosen free-

# HEINONLINE

Citation:  1931 497 1931



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Mon Mar  9 16:24:13 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

*as having been inspected and passed or otherwise approved as being wholesome and fit for food.*

*(b) To affix or attach any stamp, brand, emblem, tag, or other marking to any meat or meat-food product, or to any container or wrapping or covering of any meat or meat-food product, indicating or suggesting that the meat or meat-food product was slaughtered, manufactured, or prepared under inspection, unless the stamp, brand, emblem, tag, or other marking shall have been previously approved and the use thereof authorized by the United States Department of Agriculture or the Pennsylvania Department of Agriculture or an incorporated or chartered or established municipality of the Commonwealth of Pennsylvania.*

Affixing or attaching stamp which has not been officially approved.

APPROVED—The 10th day of June, A. D. 1931.

GIFFORD PINCHOT

———

No. 158

AN ACT

Regulating and licensing the sale, transfer, and possession of certain firearms; prescribing penalties, procedure, and rules of evidence; conferring powers and imposing duties on courts of quarter sessions, sheriffs, and heads of police departments; and to make uniform the law with reference thereto.

Section 1. Be it enacted, &c., That "firearm," as used in this act, means any pistol or revolver with a barrel less than twelve inches, any shotgun with a barrel less than twenty-four inches, or any rifle with a barrel less than fifteen inches.

The Uniform Firearms Act.
"Firearm," defined.

"Crime of violence," as used in this act, means any of the follwing crimes, or an attempt to commit any of the same, namely: murder, rape, mayhem, aggravated assault and battery, assault with intent to kill, robbery, burglary, breaking and entering with intent to commit a felony, and kidnapping.

"Crime of violence," defined.

"Person," as used in this act, includes firm, partnership, association, or corporation; and the masculine shall include the feminine and neuter.

"Person," defined.

Section 2. If any person shall commit or attempt to commit a crime of violence when armed with a firearm contrary to the provisions of this act, he may, in addition to the punishment provided for the crime, be punished also as provided by this act.

Crimes committed with firearms.
Additional punishment.

Section 3. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a firearm used or attempted to be used, and had no license to carry the same, shall

Evidence of intent.

be evidence of his intention to commit said crime of violence.

**Former convict not to own a firearm, etc.**

Section 4. No person who has been convicted in this Commonwealth or elsewhere of a crime of violence shall own a firearm, or have one in his possession or under his control.

**Firearms not to be carried without a license.**

Section 5. No person shall carry a firearm in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

**Exceptions.**

Section 6. The provisions of the preceding section shall not apply to constables, sheriffs, prison or jail wardens, or their deputies, policemen of the Commonwealth or its political subdivisions, or other law-enforcement officers; or to members of the army, navy or marine corps of the United States or of the national guard or organized reserves when on duty; or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States or from this Commonwealth; or any organization incorporated under the laws of this Commonwealth engaged in target shooting with rifle, pistol or revolver, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employes of the United States duly authorized to carry a concealed firearm, or to agents, messengers and other employes of common carriers, banks, or business firms, whose duties require them to protect moneys, valuables and other property in the discharge of such duties, from carrying any such firearm while actually engaged in such duties; or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person, having in his possession, using or carrying a firearm in the usual or ordinary course of such business; or to any person while carrying a firearm unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving from one place of abode or business to another.

**Police heads in cities and sheriffs in counties may issue licenses.**

Section 7. The chief or head of any police force or police department of a city, and, elsewhere in this Commonwealth, the sheriff of a county, may, upon the application of any person, issue a license to such person to carry a firearm in a vehicle or concealed on or about his person within this Commonwealth for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a firearm, and that he is a suitable person to be so

licensed. The license shall be in triplicate, in form to be prescribed by the Secretary of the Commonwealth, and shall bear the name, address, description, and signature of the licensee, and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall, within seven days, be sent by registered mail to the Secretary of the Commonwealth, and the triplicate shall be preserved for six years by the authority issuing said license. The fee for issuing such license shall be fifty cents ($0.50), which fee shall be paid into the county treasury, except that if the applicant exhibits a resident hunter's license issued to him for the current license year, the fee shall not be charged.

License to be issued in triplicate. Form.

Fee.

Any such license to carry firearms may be revoked by the person issuing the same, at any time, upon written notice to the holder thereof.

Revocation.

Section 8. No person shall deliver a firearm to any person under the age of eighteen, or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind.

Persons to whom delivery shall not be made.

Section 9. No seller shall deliver a firearm to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, and, when delivered, said firearm shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a firearm, the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, length of barrel, make, model, and manufacturer's number of the firearm to be purchased, and a statement that he has never been convicted in this Commonwealth, or elsewhere, of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief or head of the police force or police department of the city or the sheriff of the county of which the seller is a resident; the duplicate, duly signed by the seller, shall, within seven days, be sent by him, with his address, to the Secretary of the Commonwealth, the triplicate he shall retain for six years. This section shall not apply to sales at wholesale.

Time and manner of delivery.

Statement to be signed by purchaser.

Duty of seller.

Sales at wholesale.

Section 10. No retail dealer shall sell, or otherwise transfer or expose for sale or transfer, or have in his possession with intent to sell or transfer, any firearm without being licensed as hereinafter provided.

Retail dealer required to be licensed.

Section 11. The chief or head of any police force or police department of a city, and, elsewhere in this Commonwealth, the sheriff of the county, shall grant to

Issuance of licenses.

Form to be pre-
scribed by Secre-
tary of Common-
wealth.
reputable applicants licenses, in form prescribed by the Secretary of the Commonwealth, effective for not more than one year from date of issue, permitting the licensee to sell firearms direct to the consumer within this Commonwealth, subject to the following conditions in addition to those specified in section nine hereof, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in this act:

**Conditions.**

**Business place.**
1. The business shall be carried on only in the building designated in the license;

**Display of license.**
2. The license, or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read;

**Known identity of purchaser.**
3. No firearm shall be sold (a) in violation of any provision of this act, nor (b) shall a firearm be sold, under any circumstances, unless the purchaser is personally known to the seller or shall present clear evidence of his identity;

**Record.**
4. A true record in triplicate shall be made of every firearm sold in a book kept for the purpose, the form of which may be prescribed by the Secretary of the Commonwealth, and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model, and manufacturer's number of the firearm, the name, address, occupation, color, and place of birth of the purchaser, and a statement signed by the purchaser that he has never been convicted in this Commonwealth, or elsewhere, of a crime of violence. One copy shall, within six hours, be sent by registered mail to the chief or head of the police force or police department of the city or the sheriff of the county of which the dealer is a resident; the duplicate, the dealer shall, within seven days, send to the Secretary of the Commonwealth; the triplicate, the dealer shall retain for six years.

**Display of firearms prohibited.**
5. No firearm or imitation thereof, or placard advertising the sale thereof, shall be displayed in any part of any premises where it can readily be seen from the outside.

**License fee.**
The fee for issuing said license shall be ten dollars ($10.00), which fee shall be paid into the county treasury.

**Revocation.**
6. Any license granted under this section may be revoked by the person issuing the same, upon written notice to the holder thereof.

**Petition to common pleas for reversal.**
Section 12. Any applicant aggrieved by the refusal of his application for a license to carry a firearm or for a dealers license, or any person or retail dealer whose license has been revoked, may file, within thirty days thereafter, in the court of quarter sessions of his county,

a petition against the official who refused his application, as defendant, alleging therein, in brief detail, the refusal complained of and praying for a reversal thereof. Upon service of a copy of the petition upon the **Procedure.** defendant, returnable within ten days from its date, the defendant shall, on or before the return day, file an answer in which he may allege by way of defense the reason for his refusal, and such other reasons as may in the meantime have been discovered. Thereupon, upon application of either party, the cause shall be heard without delay. The court may either sustain or reverse the action of the defendant. If the defendant's action is reversed, he shall forthwith issue the license upon payment of the fee. A judgment sustaining a refusal to grant a license shall not bar, after one year, a new application; nor shall a judgment in favor of the petitioner prevent the defendant from thereafter revoking or refusing to renew such license for any proper cause which may thereafter occur. The court shall have full power to dispose of all costs.

Section 13. No person shall make any loan secured **Loans on, or lend-** by mortgage, deposit, or pledge of a firearm; nor shall **ing or giving fire-** any person lend or give a firearm to another or otherwise deliver a firearm contrary to the provisions of this act.

Section 14. No person shall, in purchasing or other-**False evidence** wise securing delivery of a firearm or in applying for **of identity.** a license to carry the same, give false information or offer false evidence of his identity.

Section 15. No person shall change, alter, remove, or **Altering or obliter-** obliterate the name of the maker, model, manufacturer's **ating marks of** number, or other mark of identification on any firearm. Possession of any firearm, upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same.

Section 16. All licenses heretofore issued within **Expiration of** this Commonwealth permitting the carrying of firearms **present licenses.** concealed upon the person shall expire at midnight of the thirty-first day of August, one thousand nine hundred and thirty-one.

Section 17. This act shall not apply to antique fire-**Antique firearms.** arms unsuitable for use and possessed as curiosities or ornaments.

Section 18. Any person violating any of the provi-**Violation.** sions of this act shall be guilty of a misdemeanor, and, **Misdemeanor.** upon conviction thereof, shall be sentenced to pay a fine of not more than three thousand dollars ($3,000.00), **Penalty.** or imprisonment for not more than three years, or both.

Section 19. If any part of this act is for any reason **Invalidity of part of act.**

declared void, such invalidity shall not affect the
validity of the remaining portions of this act.

Title of act

Section 20. This act may be cited as the "Uniform
Firearms Act."

Uniformity.

Section 21. This act shall be so interpreted and con-
strued as to effectuate its general purpose to make uni-
form the law of those states which enact it.

Repeal.

Section 22. All acts or parts of acts inconsistent here-
with are hereby repealed: Provided, however, That this

Act of April 25,
1929 (P. L. 777),
not repealed.

act shall not repeal or in any manner affect any provi-
sions of an act, approved the twenty-fifth day of April,
one thousand nine hundred and twenty-nine (Pamphlet
Laws, seven hundred seventy-seven), entitled "An act
prohibiting the sale, giving away, transfer, purchasing,
owning, possession and use of machine guns; providing
penalties; and providing for certain exemptions, and
the granting of permits by sheriffs to own and possess
machine guns as relics."

APPROVED—The 11th day of June, A. D. 1931.

GIFFORD PINCHOT

———

No. 159

AN ACT

To amend section three of the act, approved the ninth day of
May, one thousand nine hundred and twenty-nine (Pam-
phlet Laws, one thousand seven hundred and two), entitled
"An act regulating the closing of public highways and pro-
viding for the locating, marking, and maintenance of de-
tours necessitated by such closing; requiring boroughs, cities,
and towns to notify the Department of Highways of the
creation and discontinuance of certain detours; providing
penalties for removing, destroying, defacing signs erected
for warning or detour purposes, and for driving on, over
or across highways which are closed by the proper persons
or authorities, except in certain cases; further providing
that the authorities responsible for the maintenance of
highways which have been damaged, or their agents or
contractors, shall have the right to recover the amount of
such damages from the person or persons responsible, in
addition to the penalties herein provided; and repealing
certain acts."

Highways.

Section 3, act of
May 9, 1929 (P.
L. 1702), amended.

Section 1. Be it enacted, &c., That section three of
the act, approved the ninth day of May, one thousand
nine hundred and twenty-nine (Pamphlet Laws, one
thousand seven hundred two), entitled "An act regu-
lating the closing of public highways and providing for
the locating, marking, and maintenance of detours ne-
cessitated by such closing; requiring boroughs, cities
and towns to notify the Department of Highways of
the creation and discontinuance of certain detours; pro-

# HEINONLINE

Citation: 1931 447 1931



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Thu Apr  9 11:23:38 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

## OCCUPATION TAX ON SALE OF PISTOLS.

H. B. No. 514.]          CHAPTER 267.

An Act imposing an occupation tax on certain persons engaging in the business of selling and otherwise disposing of pistols, as herein defined; providing for the obtaining of licenses by such persons; authorizing counties and municipalities to impose a tax; providing for the keeping of records; prescribing conditions incident to the sale of pistols under named conditions and providing the Act shall not affect the law relating to the carrying of pistols; prescribing offenses and fixing punishments; repealing Article 7068; making exceptions, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. That hereafter there shall be collected from every person, firm or corporation engaging in the business of bartering, leasing, selling, exchanging, or otherwise dealing in pistols for profit, whether by wholesale or retail, an annual occupation tax of ten dollars ($10), to be paid on or before January 1st of each year, and to be paid before continuing said business, within thirty (30) days from the effective date hereof. Before so engaging in said business, each such dealer shall obtain a license therefor, to be issued by the county tax collector of each county in which the applicant has a place of business, and for each separate place of business. The Comptroller of Public Accounts shall furnish said forms to the tax collectors.

SEC. 2. The commissioners court of the several counties, as well as municipalities, shall also have the power to levy and collect such a tax, equal to one-half of the amount herein levied.

SEC. 3. Each such dealer shall keep a permanent record of all such pistols bartered, leased, or otherwise disposed of, as above. Such record shall show the number of the pistol, name of the manufacturer, date of transaction, salesman, purchaser, and their addresses, which said record shall at all times be accessible to the Comptroller, prosecuting attorney, grand jury, and Attorney General, and a copy of this record shall be mailed to and filed for record with the State Adjutant General's Department. This filing to be made each three (3) months.

"Pistols," as used herein, shall include every kind of pistol, revolver, automatic, semi-automatic, magazine pistol, and every other such short firearm intended or designed to be aimed or fired from one hand.

SEC. 4. If any person shall knowingly sell, rent, or lease any pistol to a minor, or any other person under the heat of passion, he shall be guilty of a misdemeanor, or, if any person violates any of the provisions hereof, he shall be guilty of a misdemeanor, and upon conviction, punished by a fine of not less than ten dollars ($10) nor more than two hundred dollars ($200), provided that no person may purchase a pistol unless said purchaser has secured from a justice of the peace, county judge, or district judge, in the county of his or her residence a certifi-

cate of good character. Said certificate to be kept with the permanent record of the dealer. No person may purchase a pistol who has served a sentence for a felony.

Nothing in this bill shall affect the law against carrying pistols.

SEC. 5. That Article 7068 of the Revised Civil Statutes of 1925 be and the same is in all things repealed.

SEC. 6. Provided, however, that no such person shall be required to have a license or pay the tax where such person is engaged exclusively in selling pistols to the militia of the United States or other agencies of the Federal government authorized by law to purchase the same.

SEC. 7. The fact that there is no adequate tax on dealers in pistols, and that pistols are being sold by dealers to persons in the heat of passion, which should be prohibited, create an emergency and an imperative public necessity that the constitutional rule requiring bills to be read on three several days in each House be suspended and that this act shall take effect and be in force from and after its passage, and said rule is hereby suspended, and it is so enacted.

Approved May 28, 1931.
Effective May 28, 1931.

[NOTE: H. B. No. 514 passed the House by a vote of 105 yeas, 0 nays; passed the Senate by a vote of 30 yeas, 0 nays.]

---

## PROHIBITING MOLESTATION OF DEAD BODIES.

H. B. No. 993.]          CHAPTER 268.

An Act to amend Article 529 of the Penal Code, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. That Article 529 of the Penal Code of Texas, revision of 1925, be, and the same is, hereby amended so as to hereafter read as follows:

"Art. 529. (511) (367) (345). Interference with Dead Bodies.—If any person not authorized by law or by a relative for the purpose of reinterment, shall disinter, disturb, remove, dissect, in whole or in part, or carry away, any human body or the remains thereof, or remove any jewels, apparel or anything therefrom, or shall conceal said body, knowing it to be so illegally disinterred, he shall be confined in the penitentiary for not more than twenty-five (25) years, or be confined in jail for not more than twelve (12) months, or fined nor more than five hundred dollars ($500), or be punished by both such fine and imprisonment in jail."

# HEINONLINE

Citation: 47 Stat. 650 1922-1933



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Thu Mar 12 12:59:32 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided*, That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*
*Proviso.*
*Jurisdiction.*

Approved, July 8, 1932.

---

[CHAPTER 465.]

July 8, 1932.
[H. R. 8754.]
[Public, No. 275.]

AN ACT

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*Definitions.*

## DEFINITIONS

*"Pistol."*

SECTION 1. " Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

*"Sawed-off shotgun."*

" Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

*"Machine gun."*

" Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

*"Person."*

" Person," as used in this Act, includes, individual, firm, association, or corporation.

*"Sell" and "purchase," etc.*

" Sell " and " purchase " and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

*"Crime of violence."*

" Crime of violence " as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

### COMMITTING CRIME WHEN ARMED

*Committing crime of violence when armed. Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

*Persons forbidden to possess certain firearms.*

Sec. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

*Convicted of a crime.*

### CARRYING CONCEALED WEAPONS

Sec. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

*Illegally carrying, etc., dangerous weapon.*

### EXCEPTIONS

*Exceptions.*

Sec. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another. .

*Law enforcement officers.*

*Army, Navy, or Marine Corps.*

*National Guard, etc., on duty.*

*Other organizations.*

*Carrying to places of assembly, etc.*

*Manufacturer, etc.*

### ISSUE OF LICENSES TO CARRY

*Licenses.*

Sec. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

## SELLING TO MINORS AND OTHERS

Selling to minors or others.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

## TRANSFERS REGULATED

Time, etc., provisions.

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase Register to be kept. of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the Limitation. other copy for six years. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the Wholesale trade. superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

## DEALERS TO BE LICENSED

Dealers to be licensed.

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

## DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

Conditions, etc., for issuing dealers' licenses.
*Ante,* p. 558.

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

*Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as is applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

*Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

*False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

*Alteration, etc., of identification marks, prohibited.*

*Proviso.*
*Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

*Toys, etc., excepted.*

POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain dangerous weapons forbidden. SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or Proviso.
Exceptions. muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

PENALTIES

Punishment for violations. SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

CONSTITUTIONALITY

Invalidity of any provision not to affect remainder. SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

CERTAIN ACTS REPEALED

Vol. 31, p. 1328, repealed. SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.
Approved, July 8, 1932.

---

[CHAPTER 466.]

JOINT RESOLUTION

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.] Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes.
Post, p. 701. *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Proviso.
Credited as a loan. Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.
Approved, July 8, 1932.



Content downloaded/printed from                    *HeinOnline*

Thu Aug  8 20:10:01 2019

Citations:

Bluebook 20th ed.
CONG. REC. , .

Chicago 7th ed.
, "," Congressional Record : -

OSCOLA 4th ed.
, " CONG REC

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
        Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
Use QR Code reader to send PDF to your smartphone or tablet device



CONSTRUCTION OF SCHOOL BUILDING IN SOUTH DAKOTA

The bill (S. 2340) to provide funds for cooperation with the School Board of Shannon County, S. Dak., in the construction of a consolidated high-school building to be available to both white and Indian children was announced as next in order.

Mr. REED. Mr. President, I would like to have an explanation as to why so large a sum as $150,000 is asked to be appropriated for this purpose.

The PRESIDENT pro tempore. Neither the author of the bill nor the Senator who reported it is present.

Mr. REED. I ask that the bill may go over.

The PRESIDENT pro tempore. The bill will be passed over.

The bill (S. 4412) to provide for the safer and more effective use of the assets of Federal reserve banks and of national banking associations to regulate interbank control, to prevent the undue diversion of funds into speculative operation, and for other purposes, was announced as next in order.

SEVERAL SENATORS. Over.

The PRESIDENT pro tempore. The bill will be passed over.

SENATOR FROM NORTH CAROLINA

The resolution (S. Res. 60) to hear and determine the contest of George M. Pritchard v. Josiah W. Bailey for a seat in the Senate from the State of North Carolina, was announced as next in order.

Mr. GEORGE. I ask that that may go over.

The PRESIDENT pro tempore. The resolution will go over.

REGULATION OF USE OF DANGEROUS WEAPONS

The Senate proceeded to consider the bill (H. R. 8754) to control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, which had been reported from the Committee on the District of Columbia with amendments.

Mr. McKELLAR. Whoever is the author of the bill or whoever reported it I hope will give some explanation.

Mr. CAPPER. Mr. President, this is a House bill, but had very careful consideration by the Senate Committee on the District of Columbia. The bill also has the very strong approval of the police department of the District of Columbia, of the District Commissioners, and of the civic organizations.

Under the terms of the bill the purchaser of a pistol would be required to sign in duplicate and give the dealer a statement containing his name, his address, his occupation, and other pertinent information. The sale would not be consummated until 48 hours after the application was made.

The right of an individual to possess a pistol in his home or on land belonging to him would not be disturbed by the bill. As it is now all types of deadly weapons are sold in the District of Columbia with virtually no restriction. The District authorities and everyone here who has anything to do with the Government and the administration of the law strongly favor this measure.

Mr. McKELLAR. I have no objection.

The PRESIDENT pro tempore. The clerk will state the first amendment.

The first amendment of the committee was, on page 1, section 1, line 5, after the word "length," to strike out "or any weapon commonly designated as a sawed-off shotgun regardless of length" and insert a new paragraph, as follows:

"Sawed-off shotgun," as used in this act, means any shotgun with a barrel less than 20 inches in length.

The amendment was agreed to.

The next amendment of the committee was, on page 6, line 16, after the word "gun," to insert "sawed-off shotgun"; on page 7, line 1, after the words "machine gun," to insert "sawed-off shotgun"; in line 6, after the words "machine gun," to insert "sawed-off shotgun"; in line 13, after the word "guns," to insert "sawed-off shotguns"; on page 8, line 4, after the word "gun," insert "sawed-off

shotgun"; in line 12, after the word "all," strike out the words "pistols and" and insert the word "pistols"; and after the words "machine guns," in line 12, insert the words "and sawed-off shotguns"; in line 18, after the words "machine guns," insert "sawed-off shotgun"; on page 9, in line 16, after the words "machine gun," insert "sawed-off shotgun"; in line 23, after the word "any," strike out "pistol or" and insert "pistol," and after the words "machine gun" insert "or sawed-off shotgun"; in line 24, after the word "any," strike out "pistol or" and insert "pistol"; on page 10, line 1, after the word "gun," insert "or sawed-off shotgun"; in line 20, after the words "machine guns," insert the words "sawed-off shotguns"; and in line 21, after the word "by," strike out "any foreign government," so as to make the bill read:

Be it enacted, etc.—

DEFINITIONS

SECTION 1. "Pistol," as used in this act, means any firearms with a barrel less than 12 inches in length.

"Sawed-off shotgun," as used in this act, means any shotgun with a barrel less than 20 inches in length.

"Machine gun," as used in this act, means any firearm which shoots automatically or semiautomatically more than 12 shots without reloading.

"Person," as used in this act, includes individual, firm, association, or corporation.

"Sell" and "purchase" and the various derivatives of such words, as used in this act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

"Crime of violence," as used in this act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

COMMITTING CRIME WHEN ARMED

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than 10 years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than 15 years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than 30 years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person within the District of Columbia shall carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSE TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has

good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia, and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

### SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of 18 years.

### TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until 48 hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased, and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession, with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of 18 years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

### EXCEPTIONS

SEC. 13. This act shall not apply to toy or antique pistols unsuitable for use as firearms.

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this act.

### PENALTIES

SEC. 15. Any violation of any provision of this act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

SEC. 16. If any part of this act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this act.

### CERTAIN ACTS REPEALED

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other acts or parts of acts inconsistent herewith, are hereby repealed.

The amendments were agreed to.

The amendments were ordered to be engrossed, and the bill to be read a third time.

The bill was read the third time, and passed.

### CHANGE OF NAME OF COMMITTEE ON PENSIONS

The resolution (S. Res. 26) changing the name of the Committee on Pensions to the Committee on Veterans' Affairs, and defining its jurisdiction, was announced as next in order.

Mr. KING. Over.

The PRESIDENT pro tempore. The resolution will go over.

Mr. BROOKHART. Mr. President, I move that the Senate proceed to the consideration of the resolution.

The PRESIDENT pro tempore. The Senator from Iowa moves that the Senate proceed to the consideration of Senate Resolution 26.

Mr. BROOKHART. Mr. President——

The PRESIDENT pro tempore. The motion is not debatable.

Mr. BROOKHART. I ask for the yeas and nays.

The PRESIDENT pro tempore. Is the demand seconded? Apparently it is not sufficiently seconded.

Mr. LA FOLLETTE. Mr. President, I suggest the absence of a quorum.

The PRESIDENT pro tempore. The clerk will call the roll.

The Chief Clerk called the roll, and the following Senators answered to their names:

# HEINONLINE

Citation:  1935 355 1935



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Mon Mar  9 16:30:07 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

# UNIFORM LAWS

## CHAPTER 208

### (H. B. 212)

#### ADOPTING THE UNIFORM FIREARMS ACT

AN ACT Entitled, An Act Regulating the Sale, Transfer and Possession of Certain Firearms, Prescribing Penalties and Rules of Evidence, and to Make Uniform the Law with Reference Thereto.

*Be It Enacted by the Legislature of the State of South Dakota:*

Section 1. DEFINITIONS. "Pistol," as used in this Act, means any firearm with barrel less than twelve inches in length.

"Crime of Violence," as used in this Act, means any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, kidnapping and larceny.

"Person," as used in this Act, includes firm, partnership, association or corporation.

Section 2. COMMITTING CRIME WHEN ARMED. If any person shall commit or attempt to commit a crime of violence when armed with a pistol, he may in addition to the punishment provided for the crime, be punished also as provided by this Act.

Section 3. BEING ARMED PRIMA FACIE EVIDENCE OF INTENT. In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be PRIMA FACIE evidence of his intention to commit said crime of violence.

Section 4. CERTAIN PERSONS FORBIDDEN TO POSSESS ARMS. No person who has been convicted in this State or elsewhere of a crime of violence, shall own a pistol or have one in his possession or under his control.

Section 5. CARRYING PISTOL. No person shall carry a pistol in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

Section 6. EXCEPTION. The provisions of the preceding Section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen or other law-enforcement officers or employees of railway or express companies while on duty, or to members of the army, navy, or marine corps of the United States or of the national guard or organized reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States or from this state, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms or the agent or representative of any such person having in his possession, using, or carry-

ing a pistol in the usual or ordinary course of such business, or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving from one place of abode or business to another.

Section 7. ISSUE OF LICENSES TO CARRY. The judge of a court of record, the chief of police of a municipality, the sheriff of a county, may upon the application of any person issue a license to such person to carry a pistol in a vehicle or concealed on or about his person within this State for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the Secretary of State, and shall bear the name, address, description, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent by registered mail to the Secretary of State, and the triplicate shall be preserved for six years by the authority issuing said license. The fee for issuing such license shall be $.50, which fee shall be collected by the official issuing such license, and shall be remitted by him to the State Treasurer.

Section 8. DELIVERY TO MINORS AND OTHERS FORBIDDEN. No person shall deliver a pistol to any person under the age of eighteen or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind.

Section 9. SALES REGULATED. No seller shall deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been comvicted in this State or elsewhere of a crime of violence. The seller shall within six hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident; the duplicate duly signed by the seller shall within seven days be sent by him with his address to the Secretary of State; the triplicate he shall retain for six years. This Section shall not apply to sales at wholesale.

Section 10. DEALERS TO BE LICENSED. No retail dealer shall sell, or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol without being licensed as hereinafter provided.

Section 11. DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF. The duly constituted licensing authorities of any city, town, or political subdivision of this state may grant licenses in forms prescribed by the Secretary of State effective for not more than one year from date of issue, permitting the licensee to sell pistols at retail within this State subject to the following conditions in addition to those specified in Section 9 hereof, for breach of any of which

the license shall be forfeited and the licensee subject to punishment as previded in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol shall be sold (a) in violation of any provision of this Act, nor (b) shall a pistol be sold under any circumstances unless the purchaser is personally known to the seller or shall present clear evidence of his identity.

4. A true record in triplicate shall be made of every pistol sold, in a book kept for the purpose, the form of which may be prescribed by the Secretary of State and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturer's number of the weapon, the name, address, occupation, color, and place of birth of the purchaser, and a statement signed by the purchaser that he has never been convicted in this State or elsewhere of a crime of violence. One copy shall within six hours be sent by registered mail to the chief of police of the municipality or the sheriff of the county of which the dealer is a resident; the duplicate the dealer shall within seven days send to the Secretary of State; the triplicate the dealer shall retain for six years.

5. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of any premises where it can readily be seen from the outside.

The fee for issuing said license shall be $2.00, which fee shall be collected by the official issuing such license, and shall be remitted by him to the State Treasurer.

Section 12. CERTAIN TRANSFERS FORBIDDEN. No person shall make any loan secured by a mortgage, deposit, or pledge of a pistol; nor shall any person lend or give a pistol to another or otherwise deliver a pistol contrary to the provisions of this Act.

Section 13. FALSE INFORMATION FORBIDDEN. No person shall, in purchasing or otherwise securing delivery of a pistol or in applying for a license to carry the same, give false information or offer false evidence of his identity.

Section 14. ALTERATION OF IDENTIFYING MARKS PROHIBITED. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol. Possession of any pistol upon which any such mark shall have been changed, altered, removed, or obliterated, shall be PRIMA FACIE evidence that the possessor has changed, altered, removed or obliterated the same.

Section 15. EXCEPTIONS. This Act shall not apply to antique pistols unsuitable for use as firearms and possessed as curiosities or ornaments.

Section 16. PENALTIES. Any violation of any provision of this Act constitutes an offense punishable by a fine not exceeding One Hundred Dollars ($100.00), or imprisonment for not more than one year, or both.

Section 17. CONSTITUTIONALITY. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

Section 18. SHORT TITLE. This Act may be cited as the "Uniform Firearms Act".

Section 19. UNIFORM INTERPRETATION. This Act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 20. CERTAIN ACTS REPEALED. All Acts or parts of Acts in conflict with or inconsistent with the provisions of this Act are hereby repealed.

Approved March 14, 1935.

---

# CHAPTER 209

## (H. B. 213)

### ADOPTING THE UNIFORM NARCOTIC DRUG ACT

AN ACT Entitled, An Act Defining and Relating to Narcotic Drugs and to Make Uniform the Law with Reference Thereto.

*Be It Enacted by the Legislature of the State of South Dakota:*

Section 1. Definitions. The following words and phrases, as used in this Act, shall have the following meanings, unless the context otherwise requires:

(1) "Person" includes any corporation, association, co-partnership, or one or more individuals.

(2) "Physician" means a person authorized by law to practice medicine in this State and any other person authorized by law to treat sick and injured human beings in this State and to use narcotic drugs in connection with such treatment.

(3) "Dentist" means a person authorized by law to practice dentistry in this State.

(4) "Veterinarian" means a person authorized by law to practice veterinary medicine in this State.

(5) "Manufacturer" means a person who by compounding, mixing, cultivating, growing, or other process, produces or prepares narcotic drugs, but does not include an apothecary who compounds narcotic drugs to be sold or dispensed on prescriptions.

(6) "Wholesaler" means a person who supplies narcotic drugs that he himself has not produced nor prepared, on official written orders, but not on prescriptions.

(7) "Apothecary" means a licensed pharmacist as defined by the laws of this State and, where the context so requires, the owner of a store or other place of business where narcotic drugs are compounded or dispensed by a licensed pharmacist; but nothing in this Act shall be construed as conferring on a person who is not registered nor licensed as a pharmacist any authority, right, or privilege, that is not granted to him by the pharmacy laws of this State.

(8) "Hospital" means an institution for the care and treatment of the sick and injured, approved by the State Board of Health; as proper to be entrusted with the custody of narcotic drugs and the professional use of narcotic drugs under the direction of a physician, dentist, or veterinarian.

(9) "Laboratory" means a laboratory approved by the State Board of Health; as proper to be entrusted with the custody of narcotic drugs and the use of narcotic drugs for scientific and medical purposes and for purposes of instruction.

# HEINONLINE

Citation:  1935 599 1935



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Mon Mar  9 16:34:29 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

# CHAPTER 172.

## [S. B. 147.]

### SHORT FIREARMS.

AN ACT relating to short firearms and other weapons; defining terms; regulating the sale, possession and use thereof; providing for certain licenses and fixing fees; defining certain crimes and prescribing penalties.

*Be it enacted by the Legislature of the State of Washington:*

SECTION 1. "Short Firearm" as used in this Definitions. act means any firearm with a barrel less than twelve (12) inches in length.

"Crime of Violence" as used in this act means any of the following crimes or an attempt to commit any of the same: Murder, manslaughter, rape, mayhem, first degree assault, robbery, burglary and kidnapping.

SEC. 2. *Committing Crime When Armed.* If Committing crime when armed. any person shall commit or attempt to commit a armed. crime of violence when armed with a pistol, he may in addition to the punishment provided for the crime, be punished also as provided by this act.

SEC. 3. *Being Armed Prima Facie Evidence of* Prima facie evidence of *Intent.* In the trial of a person for committing or intent. attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit said crime of violence.

SEC. 4. *Certain Persons Forbidden to Possess* Persons forbidden to *Arms.* No person who has been convicted in this possess arms. state or elsewhere of a crime of violence, shall own a pistol or have one in his possession or under his control.

SEC. 5. *Carrying Pistol.* No person shall carry Carrying pistol. a pistol in any vehicle or conceal on or about his person, except in his place of abode or fixed place

of business, without a license therefor as hereinafter provided.

**Exception to preceding section.** SEC. 6. *Exception.* The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen or other law-enforcement officers, or to members of the army, navy or marine corps of the United States or of the national guard or organized reserves when on duty, or to regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States or from this state, or to regularly enrolled members of clubs organized for the purpose of target shooting and affiliated with a national shooting organization: *Provided,* Such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business, or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving from one place of abode or business to another.

**Issue of licenses.** SEC. 7. *Issue of Licenses to Carry.* The judge of a court of record, the chief of police of a municipality, the sheriff of a county, shall upon the application of any person issue a license to such person to carry a pistol in a vehicle or concealed on or about his person within this state for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol, and that he is a suitable person

to be so licensed. The license shall be in triplicate, in form to be prescribed by the state director of licenses, and shall bear the name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent by registered mail to the director of licenses and the triplicate shall be preserved for six years, by the authority issuing said license. The fee for such license shall be one dollar ($1.00) which shall be paid into the state treasury.

SEC. 8. *Delivery to Minors and Others Forbidden.* No person shall deliver a pistol to any person under the age of twenty-one or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind. *Delivery to minors and forbidden persons.*

SEC. 9. *Sales Regulated.* No seller shall deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in this state or elsewhere of a crime of violence. The seller shall within six hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident; the duplicate duly signed by the seller shall within seven days be sent by him with his address to the director of licenses; the triplicate he shall *Sales regulated.*

retain for six years. This section shall not apply to sales at wholesale.

**Dealers to be licensed.**

SEC. 10. *Dealers to be Licensed.* No retail dealer shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol without being licensed as hereinafter provided.

**Dealer's licenses, by whom granted and conditions thereof.**

SEC. 11. *Dealer's Licenses, by Whom Granted and Conditions Thereof.* The duly constituted licensing authorities of any city, town, or political subdivision of this state shall grant licenses in forms prescribed by the director of licenses effective for not more than one year from the date of issue permitting the licensee to sell pistols within this state subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in this act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol shall be sold (a) in violation of any provisions of this act, nor (b) shall a pistol be sold under any circumstances unless the purchaser is personally known to the seller or shall present clear evidence of his identity.

4. A true record in triplicate shall be made of every pistol sold, in a book kept for the purpose, the form of which may be prescribed by the director of licenses and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturer's number of the weapon, the name, address, occupation, color and place of birth of the purchaser and a statement signed by the purchaser that he

has never been convicted in this state or elsewhere of a crime of violence. One copy shall within six hours be sent by registered mail to the chief of police of the municipality or the sheriff of the county of which the dealer is a resident; the duplicate the dealer shall within seven days send to the director of licenses; the triplicate the dealer shall retain for six years.

5. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of any premises where it can readily be seen from the outside.

The fee for issuing said license shall be five dol- **Fee.** lars ($5.00) which fee shall be paid into the state treasury.

SEC. 12. *Certain Transfers Forbidden.* No per- **Certain transfers** son other than a duly licensed dealer shall make any **forbidden.** loan secured by a mortgage, deposit or pledge of a pistol. Any licensed dealer receiving a pistol as a deposit or pledge for a loan shall keep such records and make such reports as are provided by law for pawnbrokers and second-hand dealers in cities of the first class. A duly licensed dealer may mortgage any pistol or stock of pistols but shall not deposit or pledge the same with any other person. No person shall lend or give a pistol to another or otherwise deliver a pistol contrary to the provisions of this act.

SEC. 13. *False Information Forbidden.* No per- **False information** son shall, in purchasing or otherwise securing de- **forbidden.** livery of a pistol or in applying for a license to carry the same, give false information or offer false evidence of his identity.

SEC. 14. *Alteration of Identifying Marks Pro-* **Alteration of identifying** *hibited.* No person shall change, alter, remove, or **marks prohibited.** obliterate the name of the maker, model, manufacturer's number, or other mark of identification on

any pistol. Possession of any pistol upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same.

*Exceptions.*

SEC. 15. *Exceptions.* This act shall not apply to antique pistols unsuitable for use as firearms and possessed as curiosities or ornaments.

*Penalties.*

SEC. 16. *Penalties.* Any violation of any provision of this act constitutes an offense punishable by a fine of not more than five hundred dollars ($500.00) or imprisonment for not more than one year in the county jail or both, or by imprisonment in the penitentiary for not less than one year nor more than ten years.

*Partial invalidity.*

SEC. 17. *Constitutionality.* If any part of this act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this act.

*Short title.*

SEC. 18. *Short Title.* This act may be cited as the "Uniform Firearms Act."

*Uniform interpretation.*

SEC. 19. *Uniform Interpretation.* This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

*Effective date.*

SEC. 20. *Effective Date.* This act shall take effect on the first day of July, 1935.

*Conflicting statutes repealed.*

SEC. 21. *Certain Acts Repealed.* All laws or parts of laws inconsistent herewith are hereby repealed.

Passed the Senate February 26, 1935.
Passed the House March 14, 1935.
Approved by the Governor March 23, 1935.

# HEINONLINE

Citation:  1936 51 1936



Content downloaded/printed from
HeinOnline (http://heinonline.org)
Mon Mar  9 16:14:02 2015

-- Your use of this HeinOnline PDF indicates your acceptance
   of HeinOnline's Terms and Conditions of the license
   agreement available at http://heinonline.org/HOL/License

-- The search text of this PDF is generated from
   uncorrected OCR text.

STATE HEALTH DEPARTMENT. (1) The salary of the State Health Officer, $3,600.00 for every year; (2) For other personal services $193,500.00 for every year; (3) For other expenses including County Health Work $202,900.00 for every year. 2. PASTEUR TREATMENTS: For Pasteur Treatments $30,000.00 for every year. 3. STATE SERUM PLANT: Salaries and other expenses $3,000.00—$3,000.00. 4. STATE SERVICE COMMISSION: For compensation of Commissioner $2,400.00; Other salaries $8,000.00; Supplies and materials $250.00; Postage, telephone and telegraph $400.00; Printing and binding $60.00; Travel Expense $250.00; Insurance and bonding $10.00; Rent, lights, heat and water $630.00—$12,000.00.

Section 2. This Act shall be effective from October 1, 1935.

Approved April 3, 1936.

---

No. 82)                                               (S. 63—Simpson

## AN ACT

To regulate the sale, transfer and possession of certain types of firearms; to provide for the licensing of dealers and owners of such firearms; to fix rules of evidence in the Courts of this State in prosecutions for violations of this Act; to prescribe penalties for the violations of any provision herein and to make uniform the law with reference thereto.

*Be It Enacted by the Legislature of Alabama:*

Section 1. DEFINITIONS: "Pistol" as used in this Act, means any firearm with barrel less than twelve inches in length. "Crime of Violence" as used in this Act, means any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, rape, mayhem, assault with intent to rob, assault with intent to ravish, assault with intent to murder, robbery, burglary, kidnapping, and larceny. "Person" as used in this Act, includes firm, partnership, association or corporation.

Section 2. COMMITTING CRIME WHEN ARMED: If any person shall commit or attempt to commit a crime of violence when armed with a pistol, he may in addition to the punishment provided for the crime, be punished also as provided in this Act.

Section 3. BEING ARMED PRIMA FACIE EVIDENCE OF INTENT: In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be prima facie evidence of his intention to commit said crime of violence.

Section 4. CERTAIN PERSONS FORBIDDEN TO POSSESS ARMS: No person who has been convicted in this State or elsewhere of a crime of violence, shall own a pistol or have one in his possession or under his control.

Section 5. CARRYING PISTOL: No person shall carry a pistol in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

Section 6. EXCEPTION: The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen or other law-enforcement officers, or to members of the Army, Navy or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States or from this State, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business, or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving from one place of abode or business to another.

Section 7. ISSUE OF LICENSES TO CARRY: The Probate Judge, the Chief of Police of a municipality, the Sheriff of a County, may upon the application of any person issue a license to such person to carry a pistol in a vehicle or concealed on or about his person within this State for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the Secretary of State, and shall bear the name, address, description, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent by registered mail to the Secretary of State and the triplicate shall be preserved for six years, by the authority issuing said license. The fee for issuing such license shall be 50c (fifty cents) which fee shall be paid into the State Treasury.

Section 8. DELIVERY TO MINORS AND OTHERS FORBIDDEN. No person shall deliver a pistol to any person under the age of eighteen or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, and habitual drunkard, or of unsound mind.

Section 9. SALES REGULATED: No seller shall deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof,

and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in this State or elsewhere of a crime of violence. The seller shall within six hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident; the duplicate duly signed by the seller shall within seven days be sent by him with his address to the Secretary of State; the triplicate he shall retain for six years. This section shall not apply to sales at wholesale.

Section 10. DEALERS TO BE LICENSED: No retail dealer shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol without being licensed as hereinafter provided.

Section 11. DEALER'S LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF: The duly constituted licensing authorities of any city, town, or political subdivision of this State may grant licenses in forms prescribed by the Secretary of State, effective for not more than one year from date of issue, permitting the licensee to sell pistols at retail within this State subject to the following conditions in addition to those specified in Section 9 hereof, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read. 3. No pistol shall be sold (a) in violation of any provision of this Act, nor (b) shall a pistol be sold under any circumstances unless the purchaser is personally known to the seller or shall present clear evidence of his identity. 4. A true record in triplicate shall be made of every pistol sold, in a book kept for the purpose, the form of which may be prescribed by the Secretary of State and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturer's number of the weapon, the name, address, occupation, color and place of birth of purchaser and a statement signed by the purchaser that he has never been convicted in this State or elsewhere of a crime of violence. One copy shall within six hours be sent by registered mail to the chief of police of the municipality or the sheriff of the county of which the dealer is a resident; the duplicate the dealer shall within seven days send to the Secretary of State; the tripli-

cate the dealer shall retain for six years. 5. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of any premises where it can readily be seen from the outside. The fee for issuing said license shall be 50c (fifty cents) which fee shall be paid into the State Treasury.

Section 12. CERTAIN TRANSFERS FORBIDDEN: No person shall make any loan secured by a mortgage, deposit, or pledge of a pistol contrary to this Act, nor shall any person lend or give a pistol to another or otherwise deliver a pistol contrary to the provisions of this Act.

Section 13. FALSE INFORMATION FORBIDDEN: No person shall, in purchasing or otherwise securing delivery of a pistol or in applying for a license to carry the same, give false information or offer false evidence of his identity.

Section 14. ALTERATION OF IDENTIFYING MARKS PROHIBITED: No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification of any pistol. Possession of any pistol upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

Section 15. EXISTING LICENSES REVOKED: All licenses heretofore issued within this State permitting the carrying of pistols concealed upon the person shall expire at midnight of the 1st day of October, 1936.

Section 16. EXCEPTIONS: This Act shall not apply to antique pistols unsuitable for use as firearms and possessed as curiosities or ornaments.

Section 17. PENALTIES: Any violation of any provision of this Act constitutes an offense punishable by a fine of not more than $500.00 (five hundred dollars) or imprisonment for not more than one year, or both.

Section 18. CONSTITUTIONALITY: If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

Section 19. SHORT TITLE: This Act may be cited as the "Uniform Firearms Act."

Section 20. It is hereby declared to be the Legislative intention in the passage of this Act to further aid in the suppression of crime and the Act is to be liberally construed to effectuate this purpose.

Section 21. EFFECTIVE DATE: This Act shall take effect on the 1st day of October, 1936.

Section 22. CERTAIN ACTS REPEALED: This Act is intended as an entire revision of the subject matter contained herein and all laws or parts of laws inconsistent herewith are hereby repealed.

Approved April 6, 1936.



Content downloaded/printed from                    *HeinOnline*

Wed Aug  7 19:40:52 2019

Citations:

Bluebook 20th ed.
Charles V. Imlay, The Uniform Firearms Act, 12 A.B.A. J. 767, 769 (1926).

APA 6th ed.
Imlay, C. V. (1926). The uniform firearms act. American Bar Association Journal, 12(11), 767-769.

Chicago 7th ed.
Charles V. Imlay, "The Uniform Firearms Act," American Bar Association Journal 12, no. 11 (November 1926): 767-769

McGill Guide 9th ed.
Charles V Imlay, "The Uniform Firearms Act" (1926) 12:11 ABA J 767.

MLA 8th ed.
Imlay, Charles V. "The Uniform Firearms Act." American Bar Association Journal, vol. 12, no. 11, November 1926, pp. 767-769. HeinOnline.

OSCOLA 4th ed.
Charles V Imlay, 'The Uniform Firearms Act' (1926) 12 ABA J 767

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
    Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
    *Copyright Information*

Use QR Code reader to send PDF to your smartphone or tablet device



# THE UNIFORM FIREARMS ACT

Recent Development of Firearms Legislation and History of Act——Proposed Measure Preserves Fundamental Provisions of Revolver Association Act—License to Carry As Against License to Purchase or Possess—Summary of Provisions

CHARLES V. IMLAY

*Chairman, Committee on Uniform Firearms Act, Conference of Commissioners on Uniform State Laws*

UNDER the head of "Current Legislation" in the September, 1925, number of this Journal,[1] Mr. Joseph P. Chamberlain reviewed under the title of "Legislatures and the Pistol Problem" a number of recent state statutes enacted to regulate the sale and possession of pistols and revolvers, the general trend of these enactments and their relation to prevailing laws in the various states. At the time Mr. Chamberlain's article was printed, the subject of firearms legislation had just been presented in an exhaustive report to the National Conference of Commissioners on Uniform State Laws by a committee of that body at its sessions in Detroit, August 25-31, 1925, and a first tentative draft of a proposed "Uniform Act to Regulate the Sale and Possession of Firearms" had been discussed in full by the Conference.[2] The proposed act was recommitted by the Conference to its committee and was brought again before the Conference at its sessions in Denver, July 6-12, 1926, in the form of a second tentative draft. As a result, the Conference, after another full discussion, has approved and recommended for adoption by the states, the completed Uniform Firearms Act, which received the approval of the American Bar Association along with other acts presented to the Association at the same place on July 15th by the Standing Committee on Uniform State Laws.

When the subject matter of the Act was first brought to the attention of the National Conference at its meeting at Minneapolis in August, 1923, a movement in the direction of uniform firearms legislation inaugurated by the United States Revolver Association was well under way. That Association, a non-commercial organization of amateur experts in the use of revolvers, has through its legislative committee drafted a proposed uniform law, which had already been enacted in whole or in part in a number of states. The California Act of 1923[3] which had just been passed follows the Revolver Association Act very closely. North Dakota[4] had adopted it on March 7, 1923, practically verbatim. New Hampshire had on May 4, 1923,[5] adopted it with some changes.

Because then of the favor already shown the Revolver Association Act, as well as its intrinsic merits for clearness and simplicity, that law was made the model for discussion by the Conference. Although the draft finally approved by the Conference shows some variations from the model law in

the way of additions or omissions and in changes in phraseology, the fundamental principles of the model law have been preserved. And the decision of the committee of the Conference in selecting this model law has received further support in statutes passed since the matter of firearms legislation came before the Conference. The Indiana Act of 1925[6] is almost a verbatim adoption of the Revolver Association Law. And a number of the sections of the latter law are incorporated, without changes, into the Michigan Law of 1925:[7] some others being incorporated with changes. Recent acts in Connecticut,[8] New Jersey,[9] and Oregon,[10] contain more or less verbatim parts of the model law.

## Need for Uniformity

That there is need of more careful regulation of the use of firearms and in particular small firearms (the subject matter of the Uniform Act) is evident from the daily newspaper records of crimes of violence committed with the revolver. The same records attest the desirability of adopting no system of regulation which would prevent the law-abiding citizen from possessing firearms for the defense of his person and property. And the same exigencies which demand the regulation of the sale and use of firearms require that the laws upon the subject be uniform: for no matter how rigid the law of one state may be upon the subject, if the law of a neighboring state be lax, it is easy for the criminal to obtain his weapon in the latter and carry it into the former.

Schemes of regulation have heretofore ranged all the way from the proposal made in the French legislature some months ago that all persons be permitted to arm *ad libitum* to be prepared for the miscreant, to the suggestion made by one of the members of the Conference in the discussion in Detroit, that no one other than a peace officer under any circumstances be permitted to carry a revolver.[11] Nor has there been any serious effort made to regulate the subject by regulating the manufacture of weapons. The nearest approach to this method was the so-called "Shields Bill" introduced in the Senate, April 25, 1921,[12] which was designed to prohibit the transportation in interstate commerce of firearms other than those of army and navy makes. The bill failed of passage. (A more

1. American Bar Association Journal, Vol. XI, p. 596.
2. Handbook Nat. Conf. Commissioners on Uniform State Laws, 1925, pp. 294, 316, 859.
3. Cal. Laws 1923, Ch. 339.
4. N. D. Laws, 1923, Ch. 266.
5. N. H. Laws 1923, ———.
6. Ind. Laws 1925, Ch. 207.
7. Mich. Public Acts 1925—No. 313.
8. Conn. Laws 1923, Ch. 252.
9. N. J. Laws 1924, Ch. 137.
10. Ore. Laws 1925, Ch. 339.
11. Handbook Nat. Conf. Commissioners on Uniform State Laws, 1925, p. 831.
12. S. 1184, 67th Cong.—1st Sess.

recent bill,[13] in the United States House of Representatives, along the same lines, also failed of passage). And no success has attended various other efforts to control the sale of firearms through Congressional legislation.

### License to Carry—Not License to Purchase

In adopting the principle of the Revolver Association Act of a license to carry a concealed pistol as against the requirement of a license to purchase or possess, the Uniform Act follows the almost universal system of regulation which has prevailed in the various states, and which has recently been affirmed in the adoption of the act named in North Dakota, New Hampshire, California and Indiana.

New York has long stood virtually alone in favoring the form of regulation by license to purchase under the so-called Sullivan Law, first enacted in 1888 and now existing there with certain amendments.[14] Massachusetts has recently enacted a law along this line.[15] And a recent West Virginia Law seems to approach the principle.[16] Recently there have been a few states which have attempted to go the whole length and require a state-wide registration or a license to possess. In the first group is the Arkansas Law of 1923,[17] which provided for a state-wide registration of pistols already owned and a license and registration of those afterwards acquired. This law was found so impracticable in enforcement that it was later repealed.[18] The Michigan Law of 1925, mentioned above, likewise requires a state-wide registration of all arms possessed, but it does not go the length of the Arkansas Law in imposing the requirement of a license to possess. The registration feature had upon last information not yet been put into effect, because of technical difficulties.

Another attempt to regulate is a law like that of North Carolina of 1923[19] making it unlawful for any person to receive from any postal employee or express or railroad agent within the state, any pistol without having and exhibiting a pistol permit. The latter law Mr. Chamberlain states to be of doubtful constitutionality.[20]

Much has been said of late in the public press in favor of the license to purchase or possess like that of New York. It has been advocated strongly by prosecutors and others engaged in suppressing crime as the surest means of preventing a pistol from getting into the hands of the criminal. But the Conference has inclined to the view of a license to carry, heretofore almost universal and reaffirmed in the recent enactments named.

It is doubtful whether or not a license to purchase or possess could ever be enforced. Legislation to that end would no doubt be followed by an era of pistol bootlegging similar to the liquor bootlegging which followed Prohibition. The criminal records in New York amply demonstrate that the Sullivan Law has not kept weapons out of the hands of criminals. One of the best safeguards against crime is the consciousness on the part of the criminal that the householder possesses arms. A regulation which would make it difficult for a law-abiding

citizen to possess arms would make for lawlessness. The requirement of a license to purchase might render it impossible for a citizen to obtain a pistol when he might need it the most: the requirement of a license to possess would forbid his borrowing a pistol from a neighbor at the moment of a pressing emergency. He would be unarmed as against a criminal armed in defiance of law.

### Summary of Provisions of Uniform Act

The Act defines a "pistol or revolver" as a firearm with barrel less than twelve inches in length.[21] It includes in the definition of a "crime of violence" such crimes as are usually committed with the aid of a revolver.[22] When such a crime is committed by one armed with such weapon, a penalty in addition to that for the substantive offense is prescribed.[23] The fact that a criminal is armed with such weapon is *prima facie* evidence of his intention to commit the crime charged.[24]

One convicted in a state of a crime of violence is absolutely forbidden to own or possess a pistol or revolver.[25] The Act forbids the carrying of concealed weapons according to the universal principle in state legislation adopting the modern theory of making the prohibition extend, not only to weapons concealed on the person, but also to vehicles. This is intended to remove the easy method by which a criminal, on being pursued, may transfer a weapon from his pocket to a concealed place in a vehicle.[26] All classes of persons usually excepted by state statutes from the above provisions are excepted by the terms of the Act, and also exceptions are permitted under certain circumstances, for example, carrying a weapon in a dwelling house or place of business.[27]

The Act provides for the issuance of licenses for the carrying of concealed weapons upon a satisfactory showing being made by the applicant as to his character and the necessity for his application.[28] Delivery of firearms to minors under eighteen is forbidden; the age of eighteen being deemed more desirable than the younger age named in a number of statutes and the higher age named in some.[29]

The transfer of a firearm is forbidden to any one who the transferrer may have reasonable cause to believe has been convicted of a crime of violence. A seller may not transfer a weapon on the day of purchase. The Act specifies the means of identifying the purchaser and the preservation of this identification.[30] These provisions, however, do not forbid the lending of a weapon by one citizen to another in case of an emergency.

The Act requires a license of dealers.[31] The giving of this license to the dealer and its retention by him is upon careful conditions, for the breach of which such license will be forfeited.[32] False information in purchasing a firearm or in applying for a license to carry the same is forbidden.[33] The changing of identifying marks on weapons is also forbidden and this prohibition is

13. H. R. 4002, 69th Cong., 1st Sess.
14. N. Y. Consolidated Laws of 1897, ss. 1-14.
15. Mass. Gen. L., Chap. 395, Act. of May 29, 1926.
16. Act April 23, 1925; Laws 1925, Ch. 95, Amending s. 7, Ch. 148, Code W. Va.
17. Ark. Acts 1923, Ch. 430.
18. Ark. Acts 1925, p. 1047, Act No. 351.
19. N. C. Laws, 1923, Ch. 106.
20. Am. Bar Assn. Journal, vol. XI, p. 598.

21. S. 1 Uniform Firearms Act.
22. *Ibid.*
23. S. 2.
24. S. 3.
25. S. 4.
26. S. 5.
27. S. 6.
28. S. 7.
29. S. 8.
30. S. 9.
31. S. 10.
32. S. 11.
33. S. 12.

fortified by another provision that possession of firearms from which such identifying marks have been obliterated shall be *prima facie* evidence that the possessor has changed the same.[34]

The Act revokes all existing licenses.[35] It exempts antique weapons that are merely curiosities.[36] By a specific provision it supersedes all local ordinances.[37]

A special section provides for penalties for violations of the various provisions of the Act.[38] The amounts of fines and lengths of imprisonment are left blank so that these may be fixed in accordance with the needs and usages of the particular state, having regard to the differences in definitions of misdemeanors and felonies obtaining in the various states. The Act conforms to what

is believed to be the sound view of putting the matter of punishment in the discretion of the court.

The Act concludes with the usual provision found in Uniform State Laws, viz., a provision that if any part of the Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of the Act,[39] the definition of a short title, "Uniform Firearms Act,"[40] the naming of an effective date,[41] and the specific repeal of inconsistent laws.[42]

It is believed that the provisions of the Uniform Firearms Act present no constitutional objections, constitute no drastic changes in the law of any jurisdiction, and if adopted generally will not only secure uniformity, but will remove the evils of the present lack of uniformity.

34. S. 13.
35. S. 14.
36. S. 15.
37. S. 16.
38. S. 17.

39. S. 18.
40. S. 19.
41. S. 20.
42. S. 21.

# DEPARTMENT OF CURRENT LEGISLATION

## Current Federal Legislation (Continued)

BY J. P. CHAMBERLAIN AND MIDDLETON BEAMAN

THE Prohibition Amendment did not relegate to the Congressional waste-paper basket, all the experience gained in the long series of federal statutes under the commerce power to aid the states in enforcing their liquor laws.

The Plant Quarantine Act authorizes the Secretary of Agriculture to quarantine any State against plant diseases and when such quarantine is established shipment of plants into the quarantined State is unlawful under a criminal penalty. Public Resolution 14 provides that until the Secretary has established a quarantine, the act shall not be construed to prevent any state from enforcing its quarantine laws preventing transport of plants into or through the state from any other state in which the transit state finds that a plant disease exists. This statutory interpretation of the earlier law permits the states to act independently of the Government until the Government has acted.* The direct application of the principle of the old laws regulating liquor is in another provision which declares that when a quarantine has been established by the Secretary, plants shipped in violation of the quarantine are subject to the laws of the states into which they are brought "to the same extent and in the same manner as though" the plants "had been produced in such state . . . and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise." This is a further illustration of the divesting by Congress of its power over interstate com-

merce, in respect to a particular article, a procedure sanctioned when applied to intoxicating liquor.[1] The question arises as to whether a violator of the Federal quarantine will be subject to penalty under the Federal law in the Federal courts as well as to a penalty under the State law in the state courts.[2] It is to be noted that previous acts divesting articles of protection against state legislation while in interstate commerce, applied only where interstate commerce was being used as a means of circumventing state laws, while by this statute, the state authority is permitted to act upon articles being transported in breach of a Federal law. Formerly the article was stripped of Federal protection to enforce the law of the state; here it is in addition, a sort of penalty imposed for violation of the Federal regulation.

A further example of the use by Congress of its power over interstate commerce to aid the States in the enforcement of their laws is found in Public 256 which makes it unlawful for any person to deliver to a common carrier for transportation, or for any person knowingly to transport or carry in interstate or foreign commerce any black bass which has been caught, sold, purchased, or possessed in violation of the law of the State or Territory wherein the delivery of the bass for transportation is made or the carrying thereof begins. A criminal penalty is provided for violation. The Act is much the same as the Act of May 25, 1900, commonly known as the "Lacey Act", applicable to wild animals and birds. That Act has never been passed on by the Supreme Court, but has been sustained

*A prior judicial interpretation was that the states were prevented from acting in such cases even before any action by the Secretary. Oregon-Washington Railway Co. v. Washington, 46 Sup. Ct. Rep. 279.

1. Re Rahrer, 140 U. S. 545.
2. U. S. v. Lanza, 260 U. S. 377. See also footnote 6.

NATIONAL CONFERENCE
OF COMMISSIONERS ON
UNIFORM STATE LAWS

HANDBOOK PROCEEDINGS
36TH ANNUAL MEETING
1926



PROCEEDINGS OF
24:1 UNIFORM
STATE
LAWS

## THIRD REPORT OF THE COMMITTEE ON A UNIFORM ACT TO REGULATE THE SALE AND POSSESSION OF FIREARMS

*To the National Conference of Commissioners on Uniform State Laws:*

The special committee upon a Uniform Act to Regulate the Sale and Possession of Firearms was appointed at the Minneapolis meeting of the National Conference in 1923. A first report was made in Philadelphia in 1924 and at that time the committee was continued for further consideration of the subject and "to prepare and report a tentative draft of a proposed uniform act at the next meeting of this Conference." (Handbook 1924 p. 173.) A second report with a first tentative draft of the proposed act was submitted to the Conference at its meeting in Detroit in 1925 (Handbook 1925 pp. 854-898). The proposed law was read section by section in full and was fully discussed by the Conference as a committee of the whole. Thereupon the act was referred back to the committee for further consideration (*Ibid.* p. 324). The committee accordingly begs leave to present herewith its third report and second tentative draft of a proposed uniform law on the subject.

### CONTINUED DEVELOPMENT OF FIREARMS LEGISLATION

In the previous reports the committee has called attention to the timeliness of firearms legislation and has pointed out how the matter was brought to the attention of the legislatures of various states by the United States Revolver Association in the form of its proposed Uniform Revolver Act simultaneously with the bringing of the matter to the attention of this Conference in 1923. Former reports have stated that the reasons why the committee at the outset decided to recommend to this Conference the proposed law of the United States Revolver Association as the model for its consideration were not only because of the intrinsic merits of the Revolver Association Act for clearness and simplicity, but for the fact that the proposed act had already received favor in its adoption by a number of states: first by the North Dakota Legislature on March 7, 1923, then by the New Hampshire Legislature on May 4, 1923, and then by the California Legislature on June 13, 1923. These three legislatures follow the Revolver Association Act verbatim with a few variations pointed out in the report of last

—571—

App. 171

year. Then followed the adoption in Indiana, March 12, 1925, of the Revolver Act in toto, as also pointed out in the previous report.

On February 26, 1925, while the previous report of this committee was being completed, the legislature of Oregon passed a firearms act modeled very closely on the text of the Revolver Association Act. It is significant in this connection that the new Oregon Act supersedes the provisions of the Oregon Laws of 1913, Chapter 256, Section I, which in effect required a license to purchase firearms very much along the same lines as the Sullivan Law of New York, reproduced in the last report in full (Handbook 1925 p. 895).

The next act was that of the Legislature of West Virginia of April 25, 1925. (House Bill No. 406, amending Sec. 17 of Chapter 148 of West Virginia Code.) That act forbids the carrying "about the person" of any revolver or pistol as well as other deadly weapons named in detail, without a state license to be obtained by procedure set forth in the act, the license to be conditioned upon the furnishing of a bond. This act, it will be noted, seems to require the license to carry the weapon on the person whether the weapon is concealed or not. A license to purchase is not required.

There next followed the Michigan Act of May 26, 1925, the sections of which are in a great many instances modeled upon the National Revolver Act, but which contains a radical feature in the requirement of a state-wide registration of all firearms possessed within the state. The latter provision went into effect while the Conference was in session in Detroit last summer. The requirement of the Michigan Law of state-wide registration is believed by the Committee to be the only instance of such a requirement other than that of the Arkansas Act of March 16, 1923. This act was, however, repealed by the Arkansas Legislature in 1925. (Acts of 1925, Act No. 351, p. 1047.) One of the commissioners from Arkansas has stated to the committee that the act "proved a complete failure; that scarcely anybody registered his pistols and it was realized that it worked an injustice to the few who did so."

There was printed in the first report of this committee the full text of the so-called Capper Bill, being the National Association Act, with some modifications, introduced into the United States

Senate by Senator Capper, September 20, 1922 (Handbook 1924, p. 728). This bill expired with the Congress during which it was introduced. Senator Capper reintroduced a bill of substantially the same kind on December 21, 1925 (S. 1907, 69th Congress, 1st Session). This is proposed local legislation for the District of Columbia. It differs from the previous Capper bill in several particulars, viz., (1) the inclusion of other deadly weapons, (2) the omission of the prohibition against aliens and criminals possessing arms, although it retains the prohibition against selling arms to such and (3) in the requirement of a bond of $5,000 from a dealer in firearms. This new Capper Bill has been considered by the Committee of the Senate on the District of Columbia, but no final action has been taken thereon.

There are other bills pending before Congress but which are inactive. The bill introduced by Mr. Byrns (H. R. 4002, 69th Congress, 1st Session) seeks to regulate the sale and possession of firearms in the District of Columbia and in interstate commerce by prohibiting the sale and delivery of firearms other than those of the form, size, or description used in the United States Army or Navy. This was the purpose of the so-called Shields Bill of April 25, 1925, printed in the former report of this committee (Handbook 1925 p. 888) which failed of passage. The bill of December 9, 1925, (H. R. 4502, 69th Congress, 1st Session) introduced by Mr. Miller seeks to declare pistols and revolvers, capable of being concealed on the person, non-mailable.

The entire subject of a uniform firearms law has moreover been brought forward in the decision of the National Crime Commission in its sessions in Washington at the end of April to study the question of a uniform law and recommend one to the states.

## SECOND TENTATIVE DRAFT

The committee, like other committees of the Conference, was unable for lack of funds to hold a midwinter meeting. But the chairman of the committee had an extended conference early in the year with Mr. Karl F. Frederick, of New York, one of the draftsmen of the model act, who was present at the sessions in Detroit and took part in the discussions there. Mr. Frederick considered with the chairman all the points covered in those

—573—

discussions. Moreover some members of the committee took advantage of their presence together in Washington in attendance on the American Law Institute to consider the subject further. Further exchanges of opinion between members of the committee have been had by correspondence.

The second tentative draft printed herein adopts in a number of instances the vote of the Conference and the suggestions of members. These, however, have involved no radical change in the second tentative draft over the first. They are indicated specifically in connection with the individual sections of the draft which follow.

## GENERAL PRINCIPLES OF DRAFT

The general principles of the draft are those set forth in the previous report (Handbook 1925 p. 856). The proposed law does not aim to require a license to purchase arms, a method of regulation existing, so far as the Committee is informed, only in New York, although the principle has received some support recently by agencies concerned with the suppression of crime and was urged on the Conference by some members last summer. (Handbook 1925 pp. 322–324.) But the committee was not instructed to change the principle in this regard. It is believed by the committee that the license to purchase would not prevent criminals from obtaining arms but would make it difficult for law-abiding citizens to obtain arms for their protection.

The committee states again, as it did last year, that the provisions of the proposed law present no constitutional obstacles, constitute no radical changes in existing laws of the states, and if adopted generally will secure uniformity in the laws of the states and remove the present evils of a lack of uniformity.

## RECOMMENDATIONS OF THE COMMITTEE

The committee submits this report and second tentative draft and recommends its adoption.

| | |
|---|---|
| CHARLES V. IMLAY, *Chairman* | J. M. TUNNELL |
| HENRY U. SIMS | O. L. PHILLIPS |
| JOSEPH F. O'CONNELL | D. A. McDOUGAL |
| J. W. VANDERVORT | GEORGE B. MARTIN |

*Ex-officio:* GEORGE B. YOUNG, *President*

—574—

App. 174

# COMMENTS ON INDIVIDUAL SECTIONS

SECTION 1. A "pistol" or "revolver" is defined as a firearm with barrel less than twelve inches in length, in accordance with definitions already prevailing in state statutes. Other kinds of dangerous weapons are not included. "Crime of violence", which is used in numerous places in the Act, is defined to cover such crimes as are ordinarily committed with the aid of firearms.

SECTION 2. An additional penalty is provided for persons committing crimes of violence when armed. This provision is found, not only in recent enactments following the Revolver Association Act, but in other statutes of other states, some of long standing.

SECTION 3. The fact that a criminal is armed with a pistol or revolver without license is deemed *prima facie* evidence of his intention to commit the crime of violence with which he is charged. This provision is also found not only in those states which have followed the Revolver Association Act, but in a number of other states.

SECTION 4. One convicted of a crime of violence is absolutely forbidden to own or possess a pistol or revolver. This provision also has numerous precedents in existing state legislation and is thought to be useful in keeping firearms out of the hands of criminals.

SECTION 5. This section forbids the carrying of concealed weapons and is similar to provisions prevailing in practically every jurisdiction in this country. It adopts the modern theory of making the prohibition extend not only to weapons concealed on the person, but also in vehicles. It is intended thus to remove the easy method by which a criminal on being pursued may transfer a weapon from his pocket to a concealed place in a vehicle.

SECTION 6. This section enumerates all the classes of persons who, it seems, should be excepted from the provisions of Section 5, the list being adopted after a comparison of persons named in existing state statutes. The exception of a concealed weapon in a dwelling house or place of business is contained in the preceding section: this section extends the exceptions to cases where the weapon may be in process of being carried for mere purposes of legitimate transfer or for repair.

—582—

SECTION 7. This section defines the method for application and issuance of licenses to carry concealed weapons and for the preservation of the record of the same. It is in line with existing provisions. No bond provision has been added because it is believed that, if a proper showing is made on the part of the applicant as to character and necessity, the bond provision should not be introduced to make the obtaining of the license difficult and burdensome.

SECTION 8. The provisions of this section forbidding the delivery of a weapon to a minor are similar to those generally now prevailing. The age of eighteen years named in the section has been deemed more desirable than the younger age named in a number of statutes and the higher age named in some. It is believed that in ordinary instances youths will be of sufficient maturity at eighteen, and that the naming of a higher age might make it impossible to deliver weapons to mature youths who might need them.

SECTION 9. This section first forbids a transfer of any kind of firearm to one who the transferrer may have reasonable cause to believe has been convicted of a crime of violence. The provision forbidding a seller to transfer on the day of purchase is intended to avoid the sale of a firearm to a person in a fit of passion. The section further requires identification of purchaser and weapon and the preservation of this identification.

SECTION 10. This section requires a license of dealers and is in line with existing statutes.

SECTION 11. This section constitutes the conditions under which licenses will be granted to dealers and for the breach of which such licenses will be forfeited. These conditions are in line with all modern legislation on the subject and constitute the chief safeguard against firearms coming into the possession of undesirables.

SECTION 12. This section prohibits the giving of false information in purchasing a firearm or in applying for a license to carry the same. The principles of the section have been adopted not only by those states adopting the Revolver Act, but by a number of other states.

SECTION 13. This section, also designed to preserve the identification of weapons in connection with transfers, forbids the changing of identifying marks and provides that the possession of pistols

App. 176

HANDBOOK PROCEEDINGS
40TH ANNUAL CONFERENCE
1930

NATIONAL CONFERENCE
OF COMMISSIONERS ON
UNIFORM STATE LAWS

HEIN

PROCEEDINGS OF
24:1 UNIFORM
STATE
LAWS

# THE UNIFORM FIRE ARMS ACT

An Act Regulating the Sale, Transfer and Possession of Certain Firearms, Prescribing Penalties and Rules of Evidence, and to Make Uniform the Law with Reference Thereto.

1     Section 1. *Definitions.* " Pistol," as used in this act, means
2 any firearm with barrel less than twelve inches in length.
3     " Crime of Violence," as used in this act, means any of the
4 following crimes or an attempt to commit any of the same,
5 namely, murder, manslaughter, rape, mayhem, assault to do
6 great bodily harm, robbery, burglary [housebreaking, breaking
7 and entering, kidnapping and larceny].[1]
8     " Person," as used in this act, includes firm, partnership,
9 association or corporation.

1     Section 2. *Committing Crime When Armed.* If any person
2 shall commit or attempt to commit a crime of violence when
3 armed with a pistol, he may in addition to the punishment
4 provided for the crime, be punished also as provided by this act.

1     Section 3. *Being Armed Prima Facie Evidence of Intent.*
2 In the trial of a person for committing or attempting to
3 commit a crime of violence, the fact that he was armed with
4 a pistol and had no license to carry the same shall be *prima*
5 *facie* evidence of his intention to commit said crime of violence.

1     Section 4. *Certain Persons Forbidden to Possess Arms.*
2 No person who has been convicted in this state or elsewhere
3 of a crime of violence, shall own a pistol or have one in his
4 possession or under his control.

1     Section 5. *Carrying Pistol.* No person shall carry a pistol
2 in any vehicle or concealed on or about his person, except in
3 his place of abode or fixed place of business, without a license
4 therefor as hereinafter provided.

[1] Crimes here enumerated to be modified to suit local definitions.

SECTION 6. *Exception.* The provisions of the preceding
section shall not apply to marshals, sheriffs, prison or jail
wardens or their deputies, policemen or other law-enforcement
officers, or to members of the army, navy, or marine corps of
the United States or of the national guard or organized re-
serves when on duty, or to the regularly enrolled members of
any organization duly authorized to purchase or receive such
weapons from the United States or from this state, provided
such members are at or are going to or from their places of
assembly or target practice, or to officers or employees of the
United States duly authorized to carry a concealed pistol, or
to any person engaged in the business of manufacturing, re-
pairing, or dealing in firearms or the agent or representative
of any such person having in his possession, using, or carrying
a pistol in the usual or ordinary course of such business, or to
any person while carrying a pistol unloaded and in a secure
wrapper from the place of purchase to his home or place of
business or to a place of repair or back to his home or place of
business or in moving from one place of abode or business to
another.

SECTION 7. *Issue of Licenses to Carry.* The judge of a
court of record, the chief of police of a municipality, the
sheriff of a county, may upon the application of any person
issue a license to such person to carry a pistol in a vehicle or
concealed on or about his person within this state for not more
than one year from date of issue, if it appears that the appli-
cant has good reason to fear an injury to his person or
property, or has any other proper reason for carrying a pistol,
and that he is a suitable person to be so licensed. The license
shall be in triplicate, in form to be prescribed by the Secretary
of State, and shall bear the name, address, description, and
signature of the licensee and the reason given for desiring a
license. The original thereof shall be delivered to the licensee,
the duplicate shall within [seven days] be sent by registered
mail to the [Secretary of State] and the triplicate shall be
preserved for six years, by the authority issuing said license.
The fee for issuing such license shall be $...... which fee
shall be paid into the [..................... Treasury].

564

SECTION 8. *Delivery to Minors and Others Forbidden.* No person shall deliver a pistol to any person under the age of eighteen or to one who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind.

SECTION 9. *Sales Regulated.* No seller shall deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in this state or elsewhere of a crime of violence. The seller shall within six hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident; the duplicate duly signed by the seller shall within seven days be sent by him with his address to the [Secretary of State]; the triplicate he shall retain for six years. This section shall not apply to sales at wholesale.

SECTION 10. *Dealers to be Licensed.* No retail dealer shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol without being licensed as hereinafter provided.

SECTION 11. *Dealers' Licenses, by Whom Granted and Conditions Thereof.* The duly constituted licensing authorities of any city, town, or political subdivision of this state may grant licenses in forms prescribed by the [Secretary of State] effective for not more than one year from date of issue, permitting the licensee to sell pistols at retail within this state subject to the following conditions in addition to those specified in Section 9 hereof, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in this act.

565

App. 180

10    1. The business shall be carried on only in the building
11  designated in the license.

12    2. The license or a copy thereof, certified by the issuing
13  authority, shall be displayed on the premises where it can
14  easily be read.

15    3. No pistol shall be sold (*a*) in violation of any provision
16  of this act, nor (*b*) shall a pistol be sold under any circum-
17  stances unless the purchaser is personally known to the seller
18  or shall present clear evidence of his identity.

19    4. A true record in triplicate shall be made of every pistol
20  sold, in a book kept for the purpose, the form of which may
21  be prescribed by the [Secretary of State] and shall be per-
22  sonally signed by the purchaser and by the person effecting the
23  sale, each in the presence of the other, and shall contain the
24  date of sale, the caliber, make, model and manufacturer's
25  number of the weapon, the name, address, occupation, color,
26  and place of birth of the purchaser, and a statement signed by
27  the purchaser that he has never been convicted in this state or
28  elsewhere of a crime of violence. One copy shall within six
29  hours be sent by registered mail to the chief of police of the
30  municipality or the sheriff of the county of which the dealer
31  is a resident; the duplicate the dealer shall within seven days
32  send to the [Secretary of State]; the triplicate the dealer
33  shall retain for six years.

34    5. No pistol or imitation thereof or placard advertising the
35  sale thereof shall be displayed in any part of any premises
36  where it can readily be seen from the outside.

37    The fee for issuing said license shall be $.......... which
38  fee shall be paid into the [.................... Treasury].

1    SECTION 12. *Certain Transfers Forbidden.* No person
2  shall make any loan secured by a mortgage, deposit, or pledge
3  of a pistol; nor shall any person lend or give a pistol to
4  another or otherwise deliver a pistol contrary to the provisions
5  of this act.

1    SECTION 13. *False Information Forbidden.* No person shall,
2  in purchasing or otherwise securing delivery of a pistol or in
3  applying for a license to carry the same, give false information
4  or offer false evidence of his identity.

566

SECTION 14. *Alteration of Identifying Marks Prohibited.*
No person shall change, alter, remove, or obliterate the name
of the maker, model, manufacturer's number, or other mark
of identification on any pistol. Possession of any pistol upon
which any such mark shall have been changed, altered, re-
moved, or obliterated, shall be *prima facie* evidence that the
possessor has changed, altered, removed or obliterated the same.

SECTION 15. *Existing Licenses Revoked.* All licenses here-
tofore issued within this state permitting the carrying of pistols
concealed upon the person shall expire at midnight of the
........ day of ..................., 19...

SECTION 16. *Exceptions.* This act shall not apply to antique
pistols unsuitable for use as firearms and possessed as curiosi-
ties or ornaments.

SECTION 17. *Penalties.* Any violation of any provision of
this act constitutes an offense punishable by [a fine of not more
than [$............] or imprisonment for not more than
[............] or both, or by imprisonment in the peniten-
tiary for not less than [..................], nor more than
[..................]].

SECTION 18. *Constitutionality.* [If any part of this act is
for any reason declared void, such invalidity shall not affect
the validity of the remaining portions of this act.]

SECTION 19. *Short Title.* This act may be cited as the
"Uniform Firearms Act."

SECTION 20. *Uniform Interpretation.* This act shall be so
interpreted and construed as to effectuate its general purpose
to make uniform the law of those states which enact it.

SECTION 21. *Effective Date.* This act shall take effect on the
........ day of ..................., 19.....

SECTION 22. *Certain Acts Repealed.* All laws or parts of
laws inconsistent herewith are hereby repealed.

App. 182

# EXPLANATORY STATEMENT REGARDING
# UNIFORM FIREARMS ACT

The National Conference of Commissioners on Uniform State Laws is composed of Commissioners appointed by legislative or executive authority from the states, the District of Columbia, the Territory of Alaska, the Territory of Hawaii, and the Insular Possessions of the United States. The organization meeting was held at Saratoga, New York, in August, 1892; and annual meetings have been regularly held since that time, immediately preceding the meetings of the American Bar Association. The purpose of the organization, as its name imports, is to promote uniformity of legislation on subjects of common interest throughout the United States. Proposed acts are carefully drawn by special committees of trained lawyers, assisted by experts in many instances, and are printed, distributed and discussed in the Conference at more than one annual session. When finally approved by the Conference, the uniform acts are submitted to the American Bar Association and recommended for general adoption throughout the jurisdiction of the United States. Each uniform act is thus the fruit of one or more tentative drafts submitted to the criticism of the Commissioners in annual conference and of the American Bar Association, and represents the experience and judgment of a select body of lawyers chosen from every part of the United States.

### RELATION OF ACT TO PAST AND RECENT FIREARMS' LEGISLATION

The Conference at its fortieth annual meeting held at Chicago, August 11-16, 1930, approved the Uniform Firearms Act and voted that it be recommended to the states for adoption. On August 21st the American Bar Association, meeting at the same place, approved the act. This was in effect a second approval of the subject-matter by both bodies, inasmuch as the Conference and Bar Association had at a previous meeting held at Denver, Colorado, in July, 1926,

approved an act in substantially the same form. The matter was, however, after the Denver meeting taken under reconsideration by both bodies and for that reason temporarily withdrawn from state legislatures. After four additional years of reconsideration the principles of the former draft have been reaffirmed in the new draft and that new draft with only a few changes from the former draft is now recommended to the states for adoption.

When the subject-matter of the act was first brought to the attention of the National Conference at Minneapolis in August, 1923, much had already been acomplished in the direction of uniform firearms legislation by the United States Revolver Association, a disinterested non-commercial organization of marksmen. Its legislative committee had drafted a uniform law which had already been adopted with some few changes by North Dakota, and New Hampshire. California had also adopted it with some qualifications and additions. The law was thereafter adopted in Indiana in 1925, and much of its subject-matter was enacted in the Oregon, West Virginia and Michigan acts of the same year. The extent to which the Revolver Association Act had thus already gained ground as well as the intrinsic merits of that act induced the committee of the Conference to select it as the model of the draft of the Uniform Act approved by the Conference in 1926. During these four years in which the subject-matter has been under reconsideration and prior to the final approval by the Conference and the Bar Association in 1930, the substance and form of the act has gained additional recognition. Much of its text has been incorporated in recent acts in Massachusetts, Michigan, New Jersey and Rhode Island, and to a very great extent in a 1927 act of Hawaii. The act with some minor changes was adopted by the United States House of Representatives in 1929, too late, however, to reach the Senate. With some changes it again passed the House early in 1930, and at the end of that year is still pending in the Senate.

It is believed that the favor thus already shown to the principles of the act is due to recognition by the various state legislatures of the necessity of uniform legislation on the subject of small firearms, and the soundness of the principles of regulation embodied in the act. These principles are believed to be consonant with legislative precedent and practical experience, and superior to minority

views reflected in some past legislation and in a few recent enactments. For example, the uniform act adopts the principle of a strict regulation of the sale and purchase of pistols at the same time that it rejects the comparatively rare provision of a license to purchase, on the theory that the securing of a pistol by a householder as a legitimate means of defense should not be made difficult. The principle of license to purchase was for a long time limited to New York where it was first adopted in 1888. It has in recent years received recognition in Massachusetts, Michigan, New Jersey and Hawaii, and has been approached in West Virginia and perhaps one or two other places. But beyond that the theory of license to purchase has not been recognized. The Uniform Act also rejects such extreme theories of regulation as that embodied in the Arkansas Law of 1923, requiring a state-wide registration of pistols, which principle though repealed subsequently in Arkansas has more recently found some recognition in the Michigan Act of 1927, and is approached by the Virginia Act of 1926.

It will be noted that the act deals with pistols and revolvers only. The Conference after careful consideration decided to confine the act to small arms of this nature as a subject by itself, leaving the matter of other dangerous weapons of not legitimate use to be regulated in separate acts.

## GENERAL PRINCIPLES OF ACT

The general principles embodied in the act may be summarized as follows:

1. Without making it difficult for a law-abiding citizen to secure arms for the protection of his home, as by the inconvenient requirements of a license to purchase, the act seeks by strict regulation of dealers, identification of purchasers, and strict licensing of those who carry concealed firearms, to keep such weapons out of the hand of criminals and other prohibited classes.

2. A heavier penalty is provided for a crime of violence by one who is armed, whether legally or not, and the possession of a pistol by a criminal is made *prima facie* evidence of intent.

3. The universal principle is adopted as in all state statutes forbidding the carrying of concealed weapons with a complete enumera-

570

tion of classes of excepted persons and without sufficient exceptions to suit special circumstances. It prohibits carrying pistols in a vehicle whether concealed or not.

4. The act forbids the possession under any circumstances of pistols by persons who have committed crimes of violence as defined by the act.

5. The general principle of forbidding the transfer of pistols to minors is included.

6. A detailed method of identification is provided in the case of sales by private persons and transfers by dealers, requiring licenses of dealers.

7. A complete system is set up for granting licenses to carry concealed weapons in cases where the character of the applicants and emergencies justify the same.

8. The provisions of the act are made effective by prohibitions against the giving of false information by purchasers and applicants for licenses, and the alteration of identification marks on weapons.

9. Pawning pistols or trading in them by way of mortgage is forbidden.

10. A general penalty provision is contained in the act with terms of imprisonment and amounts of fines left blank so as to suit the needs of the particular state enacting the law.

In general it is submitted that the proposed Uniform Act embodies sound forms of regulation which have stood the test of experience in this country and that it embodies such new ideas as have been presented from time to time by individuals and organizations working in the same subject-matter. Thus at the same time that it preserves the traditional methods of firearms' regulation it takes advantage of enlightened experience of recent years. It comes as near, it is believed, as it is possible to come in meeting the two divergent views of a too drastic regulation on the one hand and a too liberal lack of regulation on the other.

### COMMENTS ON INDIVIDUAL SECTIONS

Section 1. A " pistol " is defined as a firearm with barrel less than twelve inches in length, in accordance with definitions already prevailing in state statutes. It thus includes a revolver or any small

571

firearm capable of being concealed on the person. Other kinds of dangerous weapons are not included. "Crime of violence," which is used in numerous places in the act, is defined to cover such crimes as are ordinarily committed with the aid of firearms.

Section 2. An additional penalty is provided for persons committing crimes of violence when armed. This provision is found, not only in recent enactments following the Revolver Association Act, but in other states, some of long standing.

Section 3. The fact that a criminal is armed with a pistol without license is deemed *prima facie* evidence of his intention to commit the crime of violence with which he is charged. This provision is also found not only in those states which have followed the Revolver Association Act, but in a number of other states.

Section 4. One convicted of a crime of violence is absolutely forbidden to own or possess a pistol or revolver. This provision also has numerous precedents in existing state legislation and is useful in keeping firearms out of the hands of criminals.

Section 5. This section forbids the carrying of concealed weapons and is similar to provisions prevailing in practically every jurisdiction in this country. It adopts the modern theory of making the prohibition extend not only to weapons concealed on the person but also weapons carried in vehicles whether concealed or not. It is intended thus to remove the easy method by which a criminal on being pursued may transfer a weapon from his pocket to a concealed place in a vehicle.

Section 6. This section enumerates all the classes of persons who, it seems, should be excepted from the provisions of Section 5, the list being adopted after a comparison of persons named in existing state statutes. The exception of a concealed weapon in a dwelling house or place of business is contained in the preceding section: this section extends the exceptions to cases where the weapon may be in process of being carried for mere purposes of legitimate transfer or for repair.

Section 7. This section defines the method for application and issuance of licenses to carry concealed weapons and for the preservation of the record of the same. It is in line with existing provisions. No bond provision has been added because it is believed that, if a proper showing is made on the part of the applicant as

572

to character and necessity, the bond provision should not be introduced to make the obtaining of the license difficult and burdensome.

Section 8. The provisions of this section forbidding the delivery of a weapon to a minor, a criminal or incompetent, are similar to those now generally prevailing. The age of eighteen years named in the section has been deemed more desirable than the younger age named in a number of statutes and the higher age named in some. It is believed that in ordinary instances youths will be of sufficient maturity at eighteen, and that the naming of a higher age might make it impossible to deliver weapons to mature youths who might need them.

Section 9. The provision of this section forbidding a seller to transfer on the day of purchase is intended to avoid the sale of a firearm to a person in a fit of passion. The section further requires identification of purchaser and weapon and the preservation of this identification.

Section 10. This section requires a license of dealers and is in line with existing statutes.

Section 11. This section constitutes the conditions under which licenses will be granted to dealers and for the breach of which such licenses will be forfeited. These conditions are in line with all modern legislation on the subject and constitute the chief safeguard against firearms coming into the possession of undesirables.

Section 12. This section in prohibiting a loan of a pistol secured by any of the methods mentioned is intended primarily to prohibit dealing in pistols by pawnbrokers.

Section 13. This section prohibits the giving of false information in purchasing a firearm or in applying for a license to carry the same. The principles of the section have been adopted not only by those states adopting the Revolver Association Act, but by a number of other states.

Section 14. This section, also designed to preserve the identification of weapons in connection with transfers, forbids the changing of identifying marks and provides that the possession of pistols from which such identifying marks have been obliterated shall be *prima facie* evidence that the possessor has changed the same. It has been adopted by all states which have enacted the Revolver Association Act.

573

App. 188

Section 15. This section revokes all existing licenses on a date to be inserted by the enacting state.

Section 16. This section is designed to remove from the operation of the act firearms that are kept merely as curiosities. It has been adopted already in those states which have passed the Revolver Association Act.

Section 17. This is the general section which provides penalties for violations of the various provisions of the act. The amounts of fines and the lengths of imprisonment are left blank so that these may be fixed according to the needs and usages of the particular state. This section is so framed as to be applicable to different state definitions of misdemeanors and felonies. A general penalty section has been thought more scientific than the naming of penalties in connection with specific sections.

Section 18. This section is intended to avoid the invalidity of the entire act by a judicial holding that a particular part is unconstitutional. It has been included by the Conference as one of its model sections contained in most uniform acts.

Section 19. This section, in accordance with the practice of the Conference, provides for a short designation of the act to avoid the longer definition at the beginning. In the selection of the words, "Uniform Firearms Act," the definite article "the" has been omitted in order to reduce the short title to its smallest terms.

Section 20. This section is the usual section in uniforms acts embodying the legislative intent that the act shall be so interpreted as to make uniform the laws of the states.

Section 21. This section is the usual section found in uniform acts providing for an effective date.

Section 22. This section is the usual section in uniform acts and contained in the Revolver Association Act, repealing existing laws inconsistent with the Uniform Act.

574

# HEINONLINE

Content downloaded/printed from          *HeinOnline*

Wed Aug  7 19:38:53 2019

Citations:

Bluebook 20th ed.
23 AM. INST. CRIM. L. & CRIMINOLOGY 663, 686 (1932).

APA 6th ed.
(1932). Journal of the American Institute of Criminal Law and Criminology 23(4),
663-686.

Chicago 7th ed.
, "," Journal of the American Institute of Criminal Law and Criminology 23, no. 4
(November--December 1932): 663-686

OSCOLA 4th ed.
, " (1932) 23 AM INST CRIM L & CRIMINOLOGY 663

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
      Conditions of the license agreement available at *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your  license, please use:
      *Copyright Information*

Use QR Code reader to send PDF to your smartphone or tablet device



# CURRENT NOTES

NEWMAN F. BAKER [ED.]

Northwestern University School of Law
Chicago, Illinois

**Addresses by Judge Bruce —** During the month of September, 1932, Judge Andrew A. Bruce, President of the American Institute of Criminal Law and Criminology; spoke before the North Dakota State Bar Association on "New Era and the Law"; The Chicago Chapter of the D. A. R. on the "Spirit of the Constitution"; The Minnesota State Conference and Institute of Social Work on the subjects, "The Juvenile Delinquent" and "The Philosophy of Probation" (two addresses); and on October 3rd before the Annual Meeting of the American Prison Association on the subject of the "Ex-Convict and His Struggle for Rehabilitation."

**Reforms Proposed—**Writing in the Brooklyn Eagle, Mr. Thomas S. Rice, associate editor of The Panel and formerly a member of the New York Crime Commission, proposes a number of reforms in the administration of the criminal law.

"Remove the right of the arrested person to refuse to explain the suspicious circumstances, to remain mute at his trial, and then to have the judge and prosecutor barred from mentioning that he has refused to offer an explanation at any stage. That is responsible for practically all of the charges of third degree against the police and is the biggest stumbling block to justice in our system. The European system compelling the suspect to explain the circumstances or be convicted should be adopted.

"Habeas corpus and bail have made a laughing stock of the law for professional criminals with financial and gang backing. Curtail both, as is done in Canada and England.

"The laws against perjury could and should be made workable.

"Notice of an alibi defense, with details of place and witnesses, should be required in every state, as required in Ohio and Michigan. New York's legislature has twice defeated a bill to that end in two years.

"Either side should have the right to impeach a witness who has radically changed his testimony.

"Convictions of receivers of stolen goods should be made easier, the state laws should be made broader, and the bill in congress providing a heavy penalty for interstate transportation of stolen goods should be passed. A similar federal law relating to stolen motor cars works well.

"Indefensible postponements of criminal cases by complaisant judges, with the object of wearing out the other side, should be grounds for charges against lawyers asking and judges granting the postponements.

"Wipe out exemptions from jury duty, as they have been wiped out in the province of Quebec, Canada, with highly satisfactory results.

"Increase federal penalties for the use of the mails to defraud until they are commensurate with the evil done to thousands of persons annually, and bring public pressure to bear upon federal judges to impose adequate sentences in such cases and in cases of fraudulent bankruptcy.

"Stop the browbeating of witnesses by half-baked and half-educated lawyers.

"See that an honest complainant and his witnesses get at least 20 per cent of the breaks in a criminal court and are allowed to talk at least three minutes without interruptions and noting of objections. I saw a witness in Judge Charles A. Taylor's court in Montreal two years ago tell his story for more than an hour in a murder trial without an interruption or exception. If in Quebec, why not in the United States?

"Take judges and prosecutors out of local politics."

---

Licensing Firearms Experts — The Commercial Standards Monthly has printed the statement of Wilmer Souder of the Department of Commerce that there is need for an examining and licensing board to pass upon the qualifications of those who desire to advise or testify as experts in firearms identification. He says:

"An organization of approved experts could advise intelligently the bench and bar upon the value and limitations of expert testimony and the general method of collecting and presenting evidence. Courts now accept various statements as supporting claims for expert qualifications and admit much evidence which can not be supported.

"The fact that one holds a medal for marksmanship or has had Army or police service is often accepted as proof of ability in identification. This popular qualification is enhanced, in the minds of the jury, if the witness has written articles or has lectured on some phase of ballistics or if his picture has appeared in the local papers. Experience in selling or using sporting goods is not overlooked as a quality which might suggest expert abilities. The public knows so little about this science of identification that it fails to realize that experience in one or all of the above fields does not guarantee ability of any value whatever in this work.

"Such persons wishing to be accepted as experts without having actually to qualify are usually very anxious for publicity in the press and are quite free in their interviews. Favorable attributes which contribute to expert ability are:

"1. Experience in metrology either in a school or laboratory shop, where accurate measurements of small dimensions are made by the use of micrometer microscope and photographic camera.

"2. Familiarity with the details of manufacture of arms and ammunition, the defects in new arms and the defects which develop with use. These are absolutely necessary.

"3. Demonstrated ability to identify exhibits, bearing secret identifying marks, approximating, in difficulty, those on which he is testifying. These tests if not previously taken might well be arranged before the expert takes the stand, but never after. The preparation of such tests to be effective must not be delegated to amateurs. Unfor-

App. 192

tunately courts will not permit the introduction of such proof of ability unless all parties conducting the tests are present in person to testify.

"4. Ability to prepare evidence in photographic form so that permanent records may be available for use in appeal cases and for study by those wishing to verify the 'expertness of the expert.'

"Firearm identification will undoubtedly be retarded in its services to the administration of justice so long as so-called experts, inadequately trained to collect and to interpret physical data correctly and in harmony with the refinements peculiar to this science, are permitted to testify. Courts should be more correctly advised regarding the training and equipment necessary for such work, regarding the type of testimony and permanent records which should be required, and finally regarding limitations which must be observed in this as in all other sciences. There should be adopted:

"1. Minimum standards of equipment to be used.

"2. Standards for records of evidence to accompany and substantiate the expert's opinion; these to include photographs, metrological data, and interpretations in permanent form.

"3. Standards for qualification of experts which will include actual tests made against secretly designated materials and reported in compliance with item 2.

"4. Methods for constant following up of experts testifying in court to guarantee the highest efficiency.

"The compliance with such standards shuld be a guarantee of ability which could not be ignored by any court or jury. Conversely, those unwilling to comply with such regulations should be permitted to explain why they are unwilling to do so. It is felt, however, that any one who has given the time and effort to properly qualify in this field will welcome an opportunity to cooperate in a plan such as has been outlined."

---

Sportsmen Fight Sullivan Law—
The members of the National Rifle Association of America, from more than ten states, held their sixty-second annual meeting September 18, in New York City. The organization, which is the governing body of rifle shooting, represents 2,800 affiliated rifle clubs.

The main order of business was the adoption of a resolution to continue the fight for the repeal of the Sullivan law in New York State and the substitution of the uniform firearms act, now in force in several states and recently adopted by Congress for the District of Columbia.

The main aim in the fight against the Sullivan law is to give the honest man a chance to have a pistol in his home without having to be finger-printed and photographed. The organization believes the present situation makes the honest man appear associated with crime whenever he seeks to purchase a pistol.

The association plans to have the matter brought before the New York Legislature at the next meeting in an effort to substitute the uniform firearms act. Under that law, the applicant for pistol files an application with a firearms dealer and forty-eight hours later receives the pistol for home use, providing the police investigation that has been made in the meantime shows him to have a clean record as an upright citizen.

App. 193

**Parole Study—**Mr. Frederick A. Moran, Executive Director, Division of Parole, State of New York, recently discussed "The Indeterminate Sentence and Parole— Scientific Study and Treatment" in the U. S. Daily. He said:

"Since July, 1930, the parole methods followed in New York State have been revolutionized. Through the enactment of legislation, a full time Board of Parole was created and provisions were made for a staff of 68 parole officers. From the creation of the Division of Parole, intensive investigations have been made of the criminal and the social histories of men appearing before the Board of Parole and definite efforts have been made to give constructive help and supervision to prisoners released on parole.

"Parole today is not a negative form of discipline, consisting of a certain number of stereotyped reports of miscellaneous advices, but individualized treatment carried on by trained social workers.

"If one needs to be convinced of the fact that individuals can not be treated as isolated units, but that consideration must be given not only to the man but to his family and to his friends as well as to his job, his health and his recreation, a study of the individual records kept by the Board of Parole would convince any unbiased person how little society has to expect in either protection or deterrence, unless the social and economic conditions that played a part in making the individual antisocial are changed.

"The Board of Parole, basing its opinions not on emotions but on factual data, wants the present sentencing laws changed so that the maximum sentence for the offense committed will be imposed on convicted offenders and the Board of Parole will be given the authority to consider the case of each prisoner after he has served one year of his sentence.

"If such changes were made to the law, it does not follow that offenders would be released on parole after they have served one year. In fact, in states where similar laws exist, the period of incarceration is longer than under the old laws which were similar to those in operation in New York State today.

"It does mean, however, that emphasis would be shifted from the necessity of releasing men from prison at fixed times, and it would let us hope to make possible the selection of prisoners for parole upon a different basis than time sentences. It might destroy the myth that, when a criminal is convicted and sentenced to prison, locking him up in a steel cage solves the problem either for society or the individual.

"It might focus attention upon the complex social problems that exist not only in the case of the prisoner himself but in his family. Something might even be done to solve these family problems, so that when the doors of the prison are opened the released prisoner will not return to economic and social conditions frequently far worse than those from which he was removed."

---

**Judicial Criminal Statistics —** A very important report to the Judicial Section of the American Bar Association and the National Conference of Judicial Councils was prepared by Leon C. Marshall of the Institute of Law, The Johns Hopkins University, in collaboration with Willis L. Hotchkiss of Fenn

College and Charles E. Gehlke of Western Reserve University. Among others serving on the Advisory Group were E. R. Cass, Secretary of the American Prison Association, Emil Frankel, New Jersey Department of Institutions and Agencies, J. Edgar Hoover, United States Bureau of Investigation, A. H. MacCormick, United States Bureau of Prisons, and Thorsten Sellin, Bureau of Social Hygiene. Mr. Marshall says:

"The movement for judicial criminal statistics in this country has apparently reached the stage where a rapid development would take place, if the various public organizations concerned could have available for use a practical plan that had the approval of expert opinion."

Mr. Marshall and his colleagues have been working upon their report for many months and it deserves wide notice. Copies may be obtained from The Institute of Law, Baltimore, Md. The study by Mr. Marshall for the State of Ohio was mentioned in "Current Notes" in the July-August number of this Journal (p. 295).

---

**N. Y. Court for Adolescents —** George Gordon Battle, writing in the New York Times, draws attention to the new children's court of New York City. He says:

"Chief City Magistrate James E. McDonald deserves the gratitude of the community for his efforts to establish a court for adolescents. At present the age limit in the Children's Court is 16 years. That should be increased at least to 18 and probably to 19 years.

"There has been in recent years an amazing and fearful increase in the number of young boys and girls between 16 and 18 who have com-

mitted serious offenses. Nevertheless, they are not criminals but for the most part reckless and heedless children. If they are brought up on these charges in a criminal court and are discharged, there is no agency to look after them.

"In the Children's Court the child is kept under observation in proper cases even though discharged. If such policy were followed for the children between 16 and 18 many of them could be saved who otherwise become criminals for life. It is hoped that the Legislature next year will increase the jurisdiction of the Children's Court so that it will have power over children up to the age of 18 or 19 years.

"In the meantime, without expense to the city, Chief Magistrate McDonald is making an experiment along these lines in setting up this voluntary court for adolescents, which is being conducted by judges and clerks outside of the regular hours as a voluntary matter and without compensation. It is also a subject of congratulation that Magistrate Jonah J. Goldstein will preside over the first of these tentative tribunals. Magistrate Goldstein has shown not only an excellent knowledge of law but, what is far more important, a deep sense of humanity and justice, which marks him as eminently fitted for this most responsible position."

---

**Increase of Suicide —** The Spectator, the business paper of insurance, gives the figures for 1931 suicides. They indicate a steady increase and the consulting statistician, Dr. Frederick L. Hoffman, declares that such an increase is to be expected in view of the financial and industrial depression.

"Making allowances for a lower

rate in the rural sections, it is a safe assumption that for the nation at large the actual loss of life by suicide in 1931 was not less than 20,000, in addition to which we lost say 12,000 lives by murder and possibly 35,000 more by motor car accidents. In other words, these three causes of death, most of which are preventable, account for not less than 70,000 lives during the course of a year at an average age of possibly thirty-five years."

---

**Depression and Prison Population** —Writing for the Monthly Bulletin of the Pennsylvania Department of Welfare, Dr. B. L. Scott, Director of the Bureau of Restoration, states:

"In times of unemployment, prison populations increase. The great majority are sentenced to the penitentiaries for crimes against property when work is hard to find. Even more important is the mental attitude of the inmates which makes prison administration more difficult in periods of depression. These are the conclusions reached after a study by the Bureau of Restoration in the Department of Welfare as to the commitments, population, and types of crime during the past six years in Pennsylvania.

"On December 31, 1927, the total population of the four state penitentiaries and reformatories in this state was 4,509. On March 31, 1932, the population of the same four institutions had grown to 6,312, an increase of 1,803 in four and a quarter years. By far the greater part of this increase has occurred since December 31, 1929.

"Even more startling is the increase in the population of the sixty-nine county penal institutions. On December 31, 1929, the total

population in these institutions was 8,054. On December 31, 1931, after two years of unemployment, the population was 8,860, while by February 29, 1932, it had grown to 9,569, an increase of 709 in two months.

"In 1930 there were 838 persons sentenced to the Eastern State Penitentiary in Philadelphia, and in 1931 the number was 919. Of these groups 527 in 1930 and 592 in 1931 were committed for crimes against property. At the time of sentence 416 were totally unemployed in 1930 and 488 in 1931.

"The figures from the Western State Penitentiary in Pittsburgh are in much the same proportion. Of the 616 sentenced to this institution in 1930, 416 were charged with crimes against property and 285 claimed to be unemployed. Of the 628 commitments in 1931, 433 were charged with crimes against property and 364 said they were unemployed."

---

**Crime Laboratory Offers Instruction**—The Scientific Crime Detection Laboratory of Northwestern University will offer a course of instruction of two weeks duration beginning February 6, 1933. An additional week will follow for those desiring further study at the Laboratory. The course is designed to furnish the basis for further individual studies by police officers.

The major subjects will include: Firearms Identification (frequently termed "ballistics") ; Examination of Questioned Documents; The Detection of Deception by means of the "Lie-Detector"; Specialized Instruction in the Photography of Evidence. Other subjects treated more briefly will include chemistry, toxicology and serology, criminal

law, criminological applications of ultra-violet rays, how to collect and preserve evidence, finger-printing, verbal descriptions (portrait parlé), microscopy and photomicrography, legal medicine, fallibility of eye witnesses, sketching a crime scene, etc.

---

**Crime News**—Those interested in the article by Morris Gilmore Caldwell, entitled "Sensational News in the Modern Metropolitan Newspapers" which appeared in the July-August number of this Journal will be pleased to know that the subject of "Crime News" is discussed in two articles in the July, 1932, number of the United States Law Review. "Trial by Newspaper" was written by Stuard H. Perry. He says:

"Obviously there is need of co-operation between the courts and lawyers and the newspapers, and it is noteworthy that the demand for it comes more distinctly from the bar than from the press. Judging by the expressions of many prominent legal spokesmen and legal journals, what the bar chiefly wants the press to do is to help improve the administration of law all along the line, and to make specific criticisms of the shortcomings of courts, judges, laws and lawyers. I heartily agree with these spokesmen. They have pointed out the exact field where the press can best serve the courts and the bar, and at the same time best serve the public."

The other writer was Charles T. Le Viness II whose essay is called "Crime News." He made this statement as his conclusion:

"And those who are prone to lambaste a newspaper for its treatment of crime news should know that the judge is the boss of his courtroom and all that goes on therein, including newspaper reporting. But the judges show little interest. Some are frankly indifferent and others seem unaware of their rights and powers. Judge after judge sits idly by while the courtroom scene beneath him is transformed into a three-ring circus for the nation. And, indeed, many of them seem to enjoy it all hugely! The fault, dear judge, is not in thy five-stars but in thyself."

---

**Probation Salaries**— The National Probation Association has prepared a 30-page study of the salaries paid to probation officers. The study may be obtained from the Association's editorial office, 450 Seventh Avenue, New York City. The report is given in summary form in the official publication of the Association:

"The average salary of probation officers in the United States on December 31, 1931, was at the rate of $2,234 per year. This figure was reached by an analysis of the tabulation of probation officers' salaries in the United States. When we say probation officers, we mean the officers in the ranks and not their chiefs or deputy chiefs whose salaries were eliminated for the purpose of obtaining the average. Men's salaries and women's salaries were averaged together to reach this figure. The average male probation officer's salary in the United States was somewhat larger — $2,487. The average woman probation officer received $2,003 per year.

"There is a marked difference in the salaries of probation officers in large cities and small. For instance, men probation officers, serv-

ing in population areas under 100,-000, receive an average of $1,725 per year. Women in similar areas receive somewhat less, $1,522 per year. In population areas from 100,000 to 500,000 men officers get $2,047 per year, women officers, $1,700 per year. In population areas of over 500,000 and under 1,000,000 the average male officer receives $2,447 and the average woman officer, $2,292. In population areas of over 1,000,000 the salaries of men officers average $2,841 and women officers receive an average of $2,089 per year.

"Chief probation officers naturally receive somewhat larger salaries. The average male chief probation officer in areas of under 100,000 population receive $2,116 per year, the average female chief, $1,984. In population areas of 100,000 to 500,000 the average male chief receives $2,958 and the woman chief, $2,491. In population areas of 500,000 to 1,000,000 the average male chief receives $4,807 per year and the average woman chief, $2,500. In populations of over 1,000,000 the male chief receives on an average of $5,289 per year, the woman chief, $4,067."

The article states that in 33 cities studied the average population served by a probation officer is 49,000. In this publication investigations have shown that there will be about 130 children with behavior problems, 100 mentally retarded, 44 children who are actually delinquent and 111 children who are dependent. This would make a case load for every probation officer of about 385 children. It is needless to state that a large number of these children, unless properly supervised, would be addicted to criminal careers. If we allow an average of $2,234 a year for the

salary of the probation officer, we would have a total cost of $6.00 a year for each child. If too, we consider the enormous cost of criminal trials, the cost of our police and the cost of maintaining our penitentiaries, to say nothing of the injury to the public which the criminal creates we can readily see the economy of the probation system and how valuable a piece of social insurance it constitutes.

---

New Finger Print Method — A new finger print method which eliminates the photographer has been made public by Dr. Lunge, Assistant Director of the technical laboratories of the Lyons Friends Police Department. The invention consists of a mixture which has a base of collodion amylacetate, acetone and ether. The object is first dusted with "animal black." Over this the mixture is then poured and the result obtained in a few seconds, a thin transparent film. This can be easily lifted from the object and on it is a perfect reproduction of the finger print. The film can be carried about like a piece of paper and there is no necessity for photographs or other reproductions. Since the film is transparent the finger prints can be studied from both sides. The slogan of the advocates of the new method is that "a bottle replaces three photographers."

---

Hooton Study—At a recent meeting of the American Philosophical Society which was held in Philadelphia, Professor Earnest A. Hooton of Harvard University, after his study of 18,000 inmates of penal institutions and insane asylums and 2,000 members of the

non-criminal class, gave his sanction to the early Lombrosian theories of marked physical characteristics. He said that first degree murderers diverge significantly from the total criminal population in that they are older, heavier, taller, bigger-chested, with greater head circumferences, narrower foreheads, long and relatively narrower noses, broader jaws, broader ears, relatively narrower shoulders, relatively shorter trunks, relatively longer heads, less head hair, more body hair, straighter hair, more pronounced forehead slope, more convex noses, fewer and poorer teeth, both flatter and more projecting ears, less facial asymmetry, etc.

---

Parole in California—Charles L. Neumiller, Chairman of the Board of Prison Terms and Paroles, State of California, reports that California is having marked success with its parole system. Even the parole of second-termers has not proved a failure from the standpoint of the rehabilitation of the prisoner. He says: "There is less probability of a paroled prisoner returning to a life of crime than a prisoner who is discharged from the prison gate with a state gratuity of $10, a prison suit of clothes, and no job or check by the state parole officer."

Eighty-five per cent of the paroled convicts in California make good. Of the 15 per cent who fail, only 6 per cent are for new crimes, the remaining 9 per cent being violators of parole rules. In the five-year period, 1927 to 1931, 975 convicts were paroled and only 125 or 12.82 per cent failed to make good. Of those who violated their parole, 23 were first termers and 102 were recidivists.

Parole Administration—Writing in the United States Daily, Winthrop D. Lane, Director of Parole, State of New Jersey, discusses parole administration. He declares that it is clear that parole is badly practiced in many jurisdictions.

"When a parole board sits for only four hours a month at an institution and gives two minutes each to the consideration of persons eligible for parole, it is not doing effective parole work.

A session of this kind in a middle western state prison was recently attended by the writer. When an inmate entered the room, he faced 24 persons. Some of these were wives and daughters of members of the board, there for a thrill, and others were newspaper reporters.

Members of the board, sitting in serious inquiry on the offender's affairs, made jokes at his expense. One prisoner was told by a board member that he was 'just about the most contemptible cur that walks the earth' and another heard the words shouted at him, 'What you need is a horsewhipping.'

Time and again offenders were stopped as they sought to make some personal communication to the members of the board with the remark: 'You cannot say that in the presence of these women.' The next day local newspapers published such titillating tid-bits from the session as they wished.

Many prisoners must have received strange impressions of the interest taken in their welfare by members of the parole board.

One of the fundamental questions concerning parole is what information ought to be used in deciding whether an offender is to be paroled or at what time he is to be paroled. In many jurisdictions the only facts

really entering into this question are the offender's conduct in the institution, as viewed by the disciplinary officer, and his previous criminal record. Important as these may be, they do not constitute the full set of facts interesting to a person concerned with the reclamation of the offender and the protection of society.

What is the offender's attitude toward his responsibilities and obligations? Has he improved since he entered the institution?

Does a job await him on the outside? If not, can one be obtained?

What are his family 'relationships? Will he return to his own family, or will he be placed to board and live with another family?

What is the nature of the neighborhood to which he will return? Who is there, among relatives and friends, who will take an interest in him on the outside?

What type of supervision awaits him when he is released? What are his economic prospects?

Have the factors contributing to his delinquent or criminal conduct been modified—and if not can they be? What, in short, are the plans for this offender when released?

Such questions as these ought to be asked in respect to every offender up for parole. The answers, obtained by pre-parole investigations, ought to be in the hands of every paroling authority before it decides whether the present is a proper time for the offender's release."

Mr. Lane's study, "Parole Procedure in New Jersey," appeared in this Journal September, 1931, pp. 375-405.

_____

Warden Lawes—According to a recent broadcast by Warden Lewis E. Lawes of Sing Sing Prison less than 1 per cent of the prison population of Sing Sing had ever been actively engaged in religious work, less than 1/3 of 1 per cent had any fraternal affiliations, less than 1/2 of 1 per cent had ever belonged to a boys' club and only 6/10 of 1 per cent ever belonged to any political group. He derived from this the conclusion that the average criminal lacks social responsibility and is altogether too individualistic.

Warden Lawes' recent book on "Twenty Thousand Years in Sing Sing" is to be filmed by Warner Brothers.

The results of a recent study of 15,000 ex-convicts by Warden Lawes show that *only two children* of the 15,000 studied now have prison records.

A. A. B.

_____

Price Article—In an article by G. Ward Price in The Panel, the organ of the Association of Grand Jurors of New York County, we are told that in England crimes of violence against individuals went up from 1,284 in 1921 to 1,986 in 1930; burglary and house-breaking from 15,402 to 25,190; larcenies from 61,370 to 96,189; and cases of fraud from 9,622 to 16,856. The article also states that 2/3 of all of the convicted criminals in 1930 were below the age of 30 and nearly 1/2 of them under 21. A significant statement in the article is one to the effect that the new educational advantages have not tended towards a reduction of crime.

_____

Virginia Welfare Work—The official publication of the State Department of Public Welfare of Virginia contains a summary of the welfare work of the State under the unique

title "Public Welfare A Problem Not A 'Moral Gesture.'"

The State furnished hospitalization for a daily average of 7,600 mental cases, with 2,000 additional on parole; treatment and special education for 2,400 physically handicapped and several thousand inmate-days care for general and special hospitalization.

The four industrial schools for boys and girls had an average daily population of 675 with nearly 500 on parole, while the children's bureau had under its supervision 2,500.

At the close of the year (June 30, 1931) the penitentiary system had a population of 3,034 while the county and city jails were accommodating 3,070.

Counties and cities furnished "indoor" and "outdoor" relief to thousands of chronic cases and temporary or emergency help was given many more.

10,000 children (delinquent, neglected or dependent) appeared before the juvenile and domestic relations charges.

Private agencies were active in dealing with various types of problems, including child welfare, homes for the aged, emergency relief, hospitalization, etc.

In dollars and cents this means that the State spent last year for charitable or correctional work more than $6,000,000.00 to which the counties and cities added $2,500,-000.00 and private agencies $4,000,-000.00 more.

It is interesting to note that the population of Virginia is 2,421,851 ranking 20th among the States.

---

A. B. A. Meeting—The American Bar Association met in Washington, D. C., from October 11 to 15, inclusive. The Section of Criminal

Law and Criminology convened on October 11, the council meeting in the morning and the afternoon was devoted to committee reports. The following reports which may be secured from the Executive Secretary, 1140 North Dearborn Street, Chicago, Ill., were made: Cooperation with American Law Institute, Howard B. Warren, Shreveport, La.; Psychiatric Jurisprudence, Rollin M. Perkins, Iowa City, Iowa; Medico-Legal Problems, Albert J. Harno, Urbana, Ill.; Mercenary Crime, George A. Bowman, Milwaukee, Wis.; Cooperation with American Prison Association, James J. Robinson, Bloomington, Ind.; Examination of Code of Criminal Procedure prepared by American Law Institute, J. Weston Allen Boston, Mass.; Training and Selection of personnel in Administration of Criminal Justice, John Barker Waite, Ann Arbor, Mich. The evening program was as follows: Address by Charles L. Chute, New York City, Secretary of the National Probation Association, "Juvenile Probation"; Address by Charles E. Hughes, Jr., New York City, President of the National Probation Association, "Adult Probation"; Discussion; Report of Nominating Committee; Election of Officers.

---

Progress in New York Prison Administration— Mr. E. R. Cass, an associate editor of this Journal, has listed a number of interesting phases of the expansion and development of the New York Prison System. Much credit is due to Commissioner Richard C. Patterson who completed five years of unusual public service on August 15 of this year. Mr. Cass' communication is as follows: "It is not necessary for anyone

to talk of Commissioner Patterson's official achievements. His record speaks for itself. The following list of outstanding accomplishments of his administration will give a better idea than volumes of writing of just how successful his conduct of the Department of Correction has been. Here is what has been done:

1. *New Prisons:*
   a. The construction of a new women's House of Detention at Sixth Avenue and Tenth Street to take place of the seventy-five'year old Jefferson Market Prison on that site—the first new prison constructed in New York City in more than forty years.
   b. The construction (now nearly completed) of a new penitentiary on Riker's Island to house 2,140 prisoners and to take the place of the hundred year old penitentiary and workhouse on Welfare Island.
   c. The occupation of the Women's Farm Colony at Greycourt, which had been allowed to stand idle for two or three years.
   d. The addition of two new housing wings to the Women's Farm Colony at Greycourt.
   e. The addition of a new housing building, with a kitchen, dining-room and mess hall at the Boys' Reformatory at New Hampton.

   NOTE: The cost of these new prison buildings, all of them begun under the Patterson administration, approx i m a t e s fourteen million dollars, more

money than has been expended in New York City for prison construction during the past one hundred years, notwithstanding the outmoded condition of many of these institution during the past fifty years.

2. *Safety Survey:*
   A thorough safety survey of all the institutions under the jurisdiction of the Department. Many leaks and weak spots were corrected.

3. *Escapes:*
   The reduction of the ratio of escapes in the Department to the lowest of any prison in the United States, if not indeed in the entire world. The rate for the Department is approximately one escape per 15,000 prisoners, which is much less than any other prison in the country, as shown by a questionnaire.

4. *Emergency Alarms:*
   The installation of an emergency alarm system in every institution, which is connected with the police switchboard, so that in the event of riots help can be summoned within a few moments.

5. *No Riots:*
   The complete absence in the City's institutions of any major disturbance of any kind during the years when the country saw prison uprisings of major proportions in many of the penal institutions throughout the land. There was

one fight between the whites and negroes which was quelled without police assistance by efficient work on the part of the guards.

6. *Prison Keeper's School:*

a. The inauguration of a school for prison guards, the first of its kind in the United States, with an intensive eight weeks' course covering every phase of prison administration. So successful was it that within a few months similar schools based on the same lines were started by the United States Government and by the States of New York, Massachusetts and New Jersey.

b. The inauguration of a firing school in which guards were taught how to handle and care for firearms.

c. The holding of public graduation exercises of the Prison Keepers' School and of public exercises for awarding prizes for the most proficient marksman in the firing school. This has served to raise the morale of the keepers to an extraordinary degree as it makes them feel, for the first time, that they are an important part of the City's government machinery.

7. *Enlightened Publicity:*

The inauguration of the policy of enlightened publicity in order to acquaint the public with the work the Department is doing. In this way the Department has obtained the friendship and cooperation, practically without exception, of all the leading civic and socially-minded groups in the City.

8. *Narcotic Survey:*

The appointment of seven prominent physicians, to make a study of narcotic addiction in order to see if the handling of the problem could be simplified in the City's penal institutions. This committee worked a year in a ward especially set aside at Bellevue Hospital, and submitted the most comprehensive report concerning narcotic addiction in prisons which has ever been made in this country.

9. *Inmates Commissary:*

The reorganization of the Inmates Commissary, the control of which was placed under a Board of Trustees, monthly audits of the book being made and all expenditures carefully supervised.

10. *Federal Prisoners:*

An arrangement with the Federal government, under which Federal prisoners, who for years had been very much of a nuisance in the City's Prisons, were taken out and kept elsewhere, thus releasing much valuable space for the City's own prisoners.

11. *Tombs Annex:*

The reconditioning and opening of the old annex prison at the Tombs so that the younger prisoners could be kept entirely separated from the others.

App. 203

12. *Prison Industries:*

The complete reorganization of the prison industries of the Department, by which a .profitless venture was changed into one under which the city is being paid a surplus of approximately $50,000 a year.

13. *Food Committee:*

The complete overhauling of the feeding system and the appointment of a committee to hold monthly meetings to go into every phase of the food problem. As a result the Department does not get five complaints a year from prisoners concerning the food, a phenomenal record, as anyone acquainted with prisons can testify. This accounts to a large extent for its freedom from riots and other disturbances, as bad or improperly cooked food causes, at least in part, 60 per cent of the large prison disturbances.

14. *Magazine for Keepers:*

The starting of a prison guards magazine, also the first of its kind in the United States, which was designed for the double purpose of increasing the morale of the guards and of acquainting the outside public with the problems of the Department.

15. *Salaries Raised:*

An increase in the minimum salary for prison keepers from $1,560 to $1,769 per year. The increase itself, while small, has had the effect of in-

ducing a high type of man to take the examination for this position. At the same time it has been the first tangible indication that prison keepers have had for many years that their work was considered sufficiently hazardous and important to justify a living wage. It has heartened them immensely and done much for their morale.

16. *Monthly Meetings:*

The holding of monthly meetings of our physicians, chaplains and wardens. Some .of the physicians and chaplains who had been in the Department for many years did not even know each other.

17. *Libraries:*

The complete overhauling of the libraries in all the institutions and the making of arrangements with the Public Library by which approximately eight thousand books are sent to us each year.

18. *Social Service Bureau:*

The inauguration of a social service bureau, also the first of its kind in the United States to function within prisons. It maintains a contact between the prisoners and the outside world and has been extraordinarily successful in uniting prisoners with their estranged families, securing positions and assistance for meritorious cases and actually reforming criminals. It also has bee*. copied by the Federal gov-

ernment, which has started a similar school.

19. *Educational Survey:*

The making of a complete educational survey of all the prisons through a committee obtained from the Board of Education. This committee will make specific recommendations and based on their report the Department will endeavor to inaugurate a complete educational system, starting with the Boys' Reformatory at New Hampton, in both academic and vocational branches. Prior to this no attention at all had been paid to an educational program for the City's prisons.

20. *Crime Clinic:*

The starting of a crime clinic to make a study of the mental, physical and emotional characteristics of a large group of prisoners at the Penitentiary. This is being done so that arrangements can be made to weed out of the Penitentiary and send to suitable institutions those who do not belong in a prison.

21. *Lecture Programme:*

The holding of lectures by prominent speakers at the Workhouse which will be extended to other prisons this year. These lectures are by speakers of national and even international note, and are designed to give the prisoners something to think about during the week other than crime and sex, two great topics in every

prison where men's minds are not otherwise employed.

22. *Bail Bonds:*

The making of arrangements with first class bonding companies and the posting of notices in the prisons concerning them so that prisoners know where they can obtain bail and can avoid falling into the clutches of so-called "bail sharks" who in former days haunted the prisons.

23. *Prizes:*

The offering of a prize of fifty dollars every year for the uniformed employee making the best suggestion for the good of the service. This has stimulated the interest of the keepers and has redounded to the good of the Department.

24. *Prison Hospital:*

The equipment, with very slight expense to the City, of the Workhouse on Welfare Island, the central hospital of the Department, giving it 450 beds, the largest prison hospital in the world.

25. *Medical Work:*

The medical work of the Department has been coordinated and the efficiency of the personnel increased by the elimination of physicians who did not fit into the work required of them.

26. *Wardens Penal Trips:*

The sending of the wardens each year to visit different institutions throughout the the country in order to familiarize them with what

is being done in the field of penology. This is the first time this has been done in the history of the Department. The wardens and deputy wardens make written reports on the result of their visits.

27. *American Prison Association:*
The sending of wardens and deputy wardens to the annual meeting of the American Prison Association, the official organization of prison men of the United States. This is also the first time this has been done in the history of the City, and the things which the officials have learned at these meetings have been of immense value to the Department.

28. *Uniform Inspection:*
The inauguration of uniform inspection of our keepers at monthly intervals, so that now they present at all times a clean and smart appearance.

29. *Prison Vans:*
The designing of a new type of prison van with opaque glass windows on the sides, and better lighting and ventilation, thus ultimately doing away with the unsightly prison van in general use everywhere and at the same time making for greater safety, more comfort for the prisoners and better supervision.

30. *Waterproof Mattresses:*
The installation of waterproof mattresses in the institutions. Formerly only blankets were used as bedding and due to the absence of mattresses the wear and tear on these was extraordinarily great.

31. *Annual Report:*
The writing of an annual report which discusses intelligently and comprehensively the various human problems of the Department instead of the usual hodge-podge of figures and statistics.

As this record shows, Commissioners Patterson has not been content only to improve the physical equipment of the city's institutions and to raise the standard of morale of its officials. He has also realized from the beginning that the foremost problem in any penal system is the human problem and that no prison system can be considered enlightened which does not make an honest, intelligent and wholehearted effort to study prisoners individually, to treat them as their mental, physical and emotional makeup requires and to turn them out better men and women than when they came in."

---

**Police Reorganization in Chicago—** Reorganization of the Chicago Police Department has at last been achieved by the action of the City Council in approving and of Commissioner Allman in putting into effect the recommendations made by Bruce Smith. Mr. Smith's program is the result of a three year study which he has conducted for the Citizens' Police Committee with the co-operation of the police department

Three important changes are involved:

(1) The number of police sub-executives reporting directly to the

commissioner has been reduced to a number small enough to enable him to exercise an effective control;

(2) Many units of the department, which formerly operated independently of each although performing similar functions, have been consolidated to eliminate duplication of effort or brought under common control to provide for correlation of closely related functions;

(3) The record system of the department has been studied and thoroughly revised.

Under the administrative set-up in force before these changes were effected, each of the forty police districts and several other units of the department such as the traffic bureau, the detective bureau, and the miscellaneous division reported directly to the commissioner of police with no intervening divisional supervision whatever. The burden of detail thus thrown upon the commissioner by the supervision of so many separate units was far more than any executive, no matter how competent, could reasonably be expected to handle. The situation is so altered that under the new scheme only eight division or bureau heads report to the commissioner: The director of personnel, the chief of detectives, the captain in charge of the traffic bureau, the lieutenant in charge of the crime prevention bureau, the captain in charge of the morals division, the department secretary, the director of the bureau of criminal information and statistics, and the chief supervisory captain in charge of the uniformed force. Because of the burden thrown upon the commissioner under the former system he could not give adequate supervision to the districts and each police captain became the independent police commissioner of his district.

Now each district captain reports to one of six supervisory captains who in turn report to the chief supervisory captain in charge of the uniformed force. This chief supervisory captain is alone responsible to the commissioner for conditions in the districts.

The miscellaneous division, in the former organization, was placed under the control of the first deputy commissioner of police, and constituted one of the most interesting agglomerations of administrative units to be seen anywhere. It consisted of nineteen utterly unrelated sections and divisions ranging in function from the dog pound and the department stables to the radio section, the medical division, and the motion picture censor board. Although at that time there was a traffic bureau, the motorcycle section, engaged entirely in traffic work, was placed in this miscellaneous division and the captain of the traffic bureau had no control whatever over it. Similarly the radio section and the signal division paid no attention to each other although performing closely related duties. Under the reorganization, the traffic bureau now includes the motorcycle division, the vehicle division, the accident prevention division, and the central traffic division which consists of all mounted and fixed post traffic officers and the department stables. In the same way, all the signal systems in the department have been consolidated as one unit under the bureau of criminal identification and statistics. The motion picture censors, the police matrons, and the juvenile officers have been consolidated into a crime prevention bureau. By means of these combinations and transfers of units, related functions have been brought together, numerous duplications of

functions have been eliminated, and many persons consequently released for other duties. The office of department secretary has been expanded somewhat beyond the usual functions of such an office and in addition to the usual duty to keep the financial records of his department he is also given control of the dog pound, the division of building maintenance, and the division of motor vehicle maintenance. The personnel records are also left in his office which raises the question of what is the exact function of the personnel bureau which has been created.

The record system of the Chicago Police Department has been in a most chaotic condition, and an important item of this survey has been the revision of this record system. The property control records of the department have been entirely inadequate and the hopeless lack of proper personnel records has made it almost impossible to keep track of the men in the department. Many of the forms used in actual police work have been used only from force of habit and not because they contribute to the efficiency of the department.

Wholesale reorganization of this sort is not by any means a guarantee of effective police work, but at least it allows the commission to work with a wieldy organization instead of a hopelessly cumbersome one.

E. H. D.

Indiana Conference — The first state-wide conference of sheriffs, chiefs of police and other peace officers ever to be held in Indiana met August 5 and 6, at Bloomington. It was arranged and conducted by the following organizations:

State Bar Association, Indianapolis Police Department, Indiana State Police Department, Indiana State Bureau of Criminal Identification and Investigation, and the Associations of sheriffs, police and other peace officers. Among the topics discussed were arrest, police radio, state police patrol, railway police, police training schools, identification of firearms, finger prints, search and seizure, chemistry in police work, first aid, detection of deception, etc.

Although plans are not yet announced, a similar course of instruction is being developed in Iowa. The University of Iowa Law School, E. A. Gilmore, Dean, in cooperation with the State Attorney General and the Bureau of Criminal Investigation, is studying courses of instruction used in other states in preparation for the Iowa course.

Connecticut Report — The Report of the Connecticut Commission, which was recently appointed to study the jails of the State, has just filed a report in which it finds a great overcrowding and lack of adequate segregation of the sick from the well in the various penal institutions of the State. It recommends "a greater use of the judicial and the administrative policies of the release bail or on their own recognizance of persons bound over for trial and of probation with or without fine for such as are convicted of jail offenses. The Commission is composed of Dr. Jerome Davis of Yale University, Mrs. William M. Maltbie of Granby, Connecticut, Dean Charles E. Clark of the Yale Law School, John G. Ross, Vice-President of the Scovill Company and George S. Hawley,

President of the Bridgeport Gas & Light Company.

---

**Crime Commission and Probation**—The Chicago Crime Commission, Henry Barrett Chamberlin, Operating Director, recently drew attention to the extraordinarily large number of cases in which persons convicted of grave offenses were granted probation by Cook County Judges. The Crime Commission tabulation for one year ending July 31, 1932, is as follows:

| | Robbery | Burglary | Larceny | Embezzlement | Total |
|---|---|---|---|---|---|
| August | 7 | 1 | 5. | 1 | 21 |
| September | 11 | 8 | 29 | 3 | 68 |
| October | 5 | 22 | 42 | — | 105 |
| November | 22 | 16 | 30 | 4 | 121 |
| December | 19 | 12 | 19 | 7 | 86 |
| January | 7 | 8 | 13 | 5 | 59 |
| February | 12 | 8 | 8 | 1 | 44 |
| March | 16 | 23 | 13 | 4 | 98 |
| April | 15 | 17 | 13 | 1 | 66 |
| May | 20 | 7 | 13 | 3 | 57 |
| June | 22 | 13 | 25 | 8 | 105 |
| July | 20 | 21 | 24 | 3 | 106 |
| Totals | 176 | 146 | 234 | 40 | 936 |

Records of the Chicago Crime Commission show that, although Illinois law forbids probation for defendants convicted of many of the more serious crimes, this provision is circumvented when judges change the non-probation charges to charges which permit probation.

The State's Attorney, John A. Swanson, and the Judges of the Criminal Court are studying the administration of the probation system.

---

**Exchange of Fingerprints**—Broadening of the work of the Bureau of Investigation of the Department of Justice in aiding law enforcement by fingerprint exchange is to be made so that an international exchange can be effected, according to information made available August 13 by the Bureau.

Many foreign countries already have agreed to participate in this activity. Law enforcement agencies, located throughout the United States and Canada which have transmitted fingerprint records regularly, have been asked to indicate to the Bureau the instances wherein they desire that the foreign exchange or treatment be arranged, and to furnish to the Bureau duplicate copies of prints which are to be relayed to foreign countries, according to the Bureau.

It is felt by the United States Bureau of Investigation that the development of the international exchange of fingerprints should prove to be a further step in the cause of effective law enforcement, should insure the regular receipt by the Bureau of the criminal records of Americans arrested in the countries named, and should provide also for the completion of the records of citizens or natives of the designated

countries who may be taken into custody in the United States.

---

.Research Projects at Northwestern —The James Nelson Raymond Fellowship in Criminal Law, established at Northwestern University School of Law, was awarded to Mr. Fred Inbau, formerly Editor-in-Chief of the Tulane Law Review. Mr. Inbau is a graduate of the Tulane University School of Law and formerly served as instructor in biology at that Institution. Part of his work will be in connection with the Scientific Crime Detection Laboratory of Northwestern University, and he will publish several studies on the legal phases of scientific crime detection.

Mr. Harvey Wienke, a graduate of Northwestern University School of Law, is engaged in a study of the administration of the criminal law by Cook County criminal courts, which study has been fostered by the American Institute of Criminal Law and Criminology.

Mr. Earl H. De Long and Professors A. A. Bruce and Newman F. Baker are preparing a study of the administration of the office of the Prosecuting Attorney in the United States. Parts of this study will appear in the forthcoming issues of this Journal.

---

Kansas Judicial Council—Judge J. C. Ruppenthal of Russell, Kansas, who recently revised Wharton's Criminal Law and edited the 12th edition of that work, has reported some of the activities of the Judicial Council for the State of Kansas. Judge Ruppenthal, who is Secretary to the Council, writes that the Council is actively engaged in collecting criminal statistics. He says:

"For five successive years, July 1, 1926 to July 1, 1931, the data reported by the clerks of all 105 counties for the (district) courts of general trial jurisdiction, has been both for criminal and civil cases.

Unfortunately, economic conditions gave rise to apprehensions that the outlay of money of the public might readily result in utter abolition of the organization that has done so much toward survey of our judicial system, that no call was issued this year for data of 1931-2. Just now such data would have an added value in its disclosures as to the effect of the economic situation on litigation both civil and criminal.

For five years all counties have reported their criminal cases in the district courts. We secured also reports of all criminal cases in all county courts (inferior to district courts) from 1923 to July 1, 1929. We secured some data from justice of the peace courts, and from juvenile courts. Police courts of our cities are wholly untouched. We have but little data from the few city courts. Only a small part of the material thus gathered has been tabulated or otherwise made generally available or published.

Our reports give year by year, by counties, the tabulation of criminal cases disposed of in the year from July 1 to June 30 following. These are divided into dismissals, pleas of guilty, and jury trials with verdicts of guilty, acquittal, and instances of disagreement. The time progress of . prosecutions toward trial, and the length of time cases that remain undisposed of at the end of the year have been pending has been reported quite fully. The

nature of offense, and number of each, is in the reports on file, but so far time and means have not been available to tabulate or publish these facts.

Justice of the peace courts reported between 3000 and 4000 misdemeanor cases for the year 1927-1928, with many details, and likewise of such courts' preliminary examinations of felony charges. Seven city courts also reported on misdemeanors and preliminaries for the same year. Delinquents, etc., for four years from 1924 to 1928 were reported by the juvenile courts.

All classes of offenses both misdemeanors and felonies, were reported by the county courts by years from their organization to July 1, 1929. The nature of offense, with numbers is set out."

The studies under way in Kansas promise to be most interesting and it is to be hoped that the Council will have an opportunity to complete and make public their findings.

---

National Identification Association —The National Identification Association, Elmer A. Lee, of the Jamestown, N. Y., police department, President, has announced its first annual meeting to be held in New York City. Charles H. Sheraton of the Burns Agency, Brooklyn, is Secretary and those interested in identification work should communicate with him. A feature of the first meeting was to be a stereopticon illustrated talk on the study of the Human Ear in Identification, presented by Dr. Theron W. Kilmer, Member N. Y. State and International Associations, Chiefs of Police, Congress Police and Fire Surgeons, N. I. A., etc.

Also there will be an illustrated lecture by Donald D. Millikin, U. S. A. R., late U. S. A. Intelligence, his subject being "Codes and Cyphers." Major Millikin has obtained the permission of the Federal Authorities for this talk.

---

Miscellaneous— *The annual crime bill of the United States* is greater today than the annual cost to the nation of carrying on the World War, according to Gordon L. Hosstetter, executive director of the Employers' Association of Chicago.

Speaking today before the National Conference of Government, he said that racketeering cost Chicago yearly extortion toll equal to the cost of the entire government of the city.

"Multiply that cost to one city," said Mr. Hosstetter, "in all the cities of America and you have an appalling total as well as a subject demanding national thought as well as action."

Mr. Hosstetter spoke as the representative of the National Municipal League. He termed racketeering a new and repulsive phase of American life," declaring that there was scarcely a commodity exposed for sale that did not cost more as a result of the widespread evil.

*Charges that twenty-eight national labor groups are in the hands of gangsters, radicals and crooked politicians* will be made in a nationwide radio campaign to be sponsored by the American Federation of Labor.

William Green, President of the American Federation of Labor, and Matthew Woll, Vice-President, will be the keynoters in a series of daily broadcasts over a coast-to-coast hookup designed to lay the alleged facts before the 2,000,000

members of the unions affected, and before union labor generally.

*A society has been formed in Paris,* on the initiative of Dr. Toulouse, to study in a group of psychiatrists, medico-legalists, jurisconsults and magistrats, the means of diminishing crime, and particularly that due to uncontrolled passion, which is increasing in France.

*The Illinois Bureau of Criminal Identification and Investigation* commenced to receive criminal records on January 1, 1932, and now has on record 30,000 finger prints. In case adequate appropriations are secured the Bureau expects to be in a position to serve as a scientific crime investigation bureau with experienced investigators, especially trained to handle certain classes of crime; expert technicians for the analysis of evidence; ballisticians; typewriting and handwriting identification experts; modus operandi and stolen automobile file; and various other scientific crime detection departments.

*At the summer session of the American Association for the Advancement of Science* a paper was distributed among the scientists by the Human Betterment Foundation of Pasadena, Cal., which warned that America is in danger of race degeneration unless steps are taken to provide for the eugenic sterilization of large numbers of the mentally defective who are likely to produce children. The paper gives the result of a critical study of 6,000 operations, mostly in California, extending over a period of twenty years. The study was organized at the beginning of 1926 by E. S. Gosney of Pasadena, President of the Human Betterment Foundation, with the assistance of a group of specialists in various fields.

*The Bureau of Municipal Research of Philadelphia* under the Thomas Skelton Harrison Foundation has published in its Philadelphia Municipal Court Series a study of the "Medical Department of the Municipal Court of Philadelphia," 201 pp. The Report was prepared by Dr. Ralph P. Truitt.

*The Warden of the New Mexico State Penitentiary,* Mr. Ed. Swope, says: "It has long been my contention that first offenders should not be committed to the penitentiary at all, unless their crimes are of an exaggerated nature. The average first offender is not a criminal, in the usual sense of the word. He will not repeat·if handled humanely by officers of the law. He should be given a chance to work out his own problem outside the prison walls."

*Mr. Tyre C. Taylor,* Executive Counsel, State of North Carolina, has written concerning the value of the Parole System. He says: "In any parole system which pretends to be even reasonably adequate there is provision made for the careful supervision of all those who are given their conditioned freedom. I believe that there are at least 1,000 prisoners who are now proper subjects for parole if we had some system for adequate supervision after they are released. Expressed in terms of dollars and cents, 1,000 prisoners cost the taxpayers of North Carolina $500 a day for maintenance. This is at the rate of $182,000 a year. An adequate parole system would cost, at the outside, not more than $40,000 a year."

*More than 30,500 young people in 20 metropolitan areas* of the United States receive protective care for the prevention of delinquency from 69 supervising agencies, the Chil-

App. 212

dren's Bureau of the Department of Labor announced in a statement just made public.

*Figures of the Department of Correction* do not bear out the theory that crime increases to a great extent in times of business depression, Commisioner Richard C. Patterson, Jr., declared in his annual departmental report to the Mayor, made public July 16.

The table of convictions for the last eleven years, submitted by Mr. Patterson, follows:

| | |
|---|---|
| 1921.....12,684 | 1927.....17,174 |
| 1922.....15,663 | 1928.....19,856 |
| 1923.....15,655 | 1929.....19,890 |
| 1924.....17,190 | 1930.....22,502 |
| 1925.....16,323 | 1931.....22,812 |
| 1926.....16,913 | |

*Mr. Justice William Renwick Riddell has just completed a translation* of the work on Oriental Criminal Law written by Professor Ladisloa Thót of the University of La Plata. The English version, with an introduction by the translator, will soon go to press.

*A total of 1800 speakeasies,* beer flats and saloons have been located in Chicago during a survey by prohibition forces, Administrator M. L. Harney said recently. The survey required three months of intensive work by imported investigators directed by Chief Elliot Ness. About 7,500 licensed saloons dotted Chicago before prohibition.

*The Mutual Welfare League of Sing Sing Prison* has recently presented to Mr. E. R. Cass, the Secretary of the American Prison Association, a testimonial of appreciation of his efforts in Albany and elsewhere in its behalf.

*The University of Oregon Press* announces that a limited supply of the Survey of the Administration of Criminal Justice in Oregon has been printed. The authors of the survey are Wayne L. Morse, Dean of the University of Oregon School of Law, and Ronald H. Beattie, Research Assistant. The volumes bound in paper cover sell for $1.50 each, and the volumes bound in buckram sell for $3.00 each.

*Mr. Tyre Taylor, Executive Counsel, State of North Carolina,* says:

"The greatest difficulty in connection with parole work at the present time is the very limited opportunity of securing productive employment for prisoners after they have been released. Simply to turn them adrift without making any provision for their employment does not solve their personal and family problem and aggravates the general condition of unemployment. The likelihood that they will violate the terms of their paroles and embark again upon criminal pursuits is likewise increased unless they can be given an opportunity to make some sort of honest living."

*The Second Mexican National Police Congress* will be held in the City of Mexico in January, 1933. Complete information can be obtained by addressing:

Teodoro A. Gonzales Miranda
Criminal Identification Laboratory,
Police Headquarters
Mexico, D. F.

In a recent letter addressed to this JOURNAL he says:

"As this Congress will take up matters of vital interest to all Police Authorities, Mexico through your JOURNAL wishes to extend a cordial invitation to those who will honor us by their presence as observers as did Col. Joseph A. Gerk, Chief of Police of St. Louis, Mo., in 1929 at our First National Police Congress."

App. 213

Current Literature of Interest—
*American Bar Association Journal,*
June (Chicago, Illinois) — Legal
Medicine in Europe and America,
by John R. Oliver; *Bombay Law
Journal,* June (Bombay, India)—
The Increase in Crime, Anon.; *The
Police Journal,* April (London,
Eng.)—The Value of Our Jury
System, by W. Summerfield; *United
States Law Review,* April (New
York City)—Religion in the Law
of Dying Declarations, by Frank
Swancara; *Los Angeles Bar Asso-
ciation Bulletin,* August (Los An-
geles, Calif.)—The Physician as an
Expert, by Daniel Beecher; *The
Eugenics Review,* July, 1932 (Lon-
don, Eng.)—Sterilization in the
Empire, by Hilda F. Pocock; *On
Guard,* August (New York City)—
Prison Keepers the Worst Paid
Public Servants in Modern Life,
by Thomas S. Rice; *News Bulletin,*
August (New York City)—Parole
Becoming a Profession, by Win-
throp D. Lane; *Mental Hygiene,*
July (Albany, N. Y.)—Psychiatry
in College: A Discussion of a
Model Personnel Program, by V. V.
Anderson and Willie-Maude Ken-
nedy; Psychiatry in the Community,
by Clarence O. Cheyney; An Ap-
proach to a Difficult Child Care
Problem, by Samuel Z. Orgel, Julia
Goldman, and Myron B. Blanchard;
*Kansas Judicial Council Bulletin,*
July (Topeka, Kan.)—Economy in
Jury Trials: More Capable Jurors,
by E. L. Fischer; *Police "13-13,"*
September (Chicago, Ill.) — The
Third Degree, by John Gulknecht;
*United States Department of Labor,*
Publication No. 212 (Washington,
D. C.)—Juvenile-Court Statistics:
1930; *Ye News Letter,* July (Wash-
ington, D. C.)—Economy—Circular
to All Departments of Justice Offi-
cials on the Subject of Economy;
*Michigan Law Review,* June—Ju-
dicial Examination of the Accused
—A Remedy for the Third Degree,
by Paul G. Kauper.