C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM RHODE, et al., <br><br> Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California, <br><br> Defendant. | Case No.: 3:18-cv-00802-BEN-JLB <br><br> **DECLARATION OF MATTHEW D. CUBEIRO IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** <br><br> Hearing Date:   August 19, 2019 <br> Hearing Time:   10:30 a.m. <br> Courtroom:   5A <br> Judge:   Hon. Roger T. Benitez |

1

DECLARATION OF MATTHEW D. CUBEIRO

## DECLARATION OF MATTHEW D. CUBEIRO

1.      I am an attorney at the law firm of Michel & Associates, P.C., attorneys of record for plaintiffs in this action. I am licensed to practice law before the United States Court for the Southern District of California. I am also admitted to practice before the superior courts of the state of California and the United States Supreme Court. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.      In early 2018, our office was notified that on January 22, 2018, the California Department of Motor Vehicles ("DMV") would begin issuing REAL IDs that meet federal standards for boarding airplanes or entering federal facilities. Our office was also informed that such licenses would be optional, and that should an individual not meet the requirements for the issuance of a REAL ID, they would instead be issued an identification with the notation "FEDERAL LIMITS APPLY."

3.      Our office was also notified that DMV would issue a different identification for individuals pursuant to California Assembly Bill No. 60 ("AB 60"), which requires DMV to issue an original driver's license to a person who is unable to submit satisfactory proof of their lawful presence in the United States. Our office was informed that such licenses would be distinguishable from those issued to persons who provided satisfactory proof of their lawful presence but otherwise did not obtain a REAL ID.

4.      In February 2018, our office discovered that licenses issued pursuant to AB 60 were indistinguishable from those issued to individuals who were able to submit satisfactory proof of their lawful presence but did not obtain a REAL ID. After bringing this issue to the attention of DMV and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), our office received guidance from ATF stating that an identification issued by DMV after January 22, 2018, could be used for the purchase of a firearm.

5.      Following this guidance from ATF, the National Rifle Association and the California Rifle & Pistol Association both published an alert in March 2018 regarding the guidance provided by ATF (included as Exhibit 9 in Defendant's exhibits). At that time,

the California Department of Justice had not provided any official guidance to California licensed firearm dealers or members of the public regarding the use of "FEDERAL LIMITS APPLY" identification when purchasing a firearm in California.

6.     In April 2018, our office was informed that DOJ was considering emergency regulations regarding the use of "FEDERAL LIMITS APPLY" identification issued after January 22, 2018, when transferring a firearm.

7.     In May 2018, our office received a letter from Deputy Attorney General P. Patty Li stating that "[g]oing forward, [DOJ] will inform interested parties that any valid California driver's license or identification card may be used as "clear evidence of the person's identity and age," including REAL ID and "FEDERAL LIMITS APPLY" versions." A true and correct copy of this letter is attached as **Exhibit 38**.

8.     Despite the above guidance from DOJ, our office was later contacted by multiple California licensed firearm dealers who had received citations from DOJ agents for accepting "FEDERAL LIMITS APPLY" identification issued after January 22, 2018, when transferring a firearm.

9.     In an effort to educate California licensed firearm dealers and individuals on the matter, on October 26, 2018, our office, on behalf of Plaintiff California Rifle & Pistol Association, Incorporated ("CRPA"), published an "Information Bulletin" regarding the purchase of a firearm using a REAL ID or "FEDERAL LIMITS APPLY" type license issued by the California Department of Motor Vehicles. This bulletin explained the steps taken by both DOJ and the Bureau of Alcohol, Tobacco, Firearms and Explosives up to that point and clarified that California residents "are ***not*** prohibited from purchasing a firearm simply because they have been issued a non-REAL ID from DMV." A true and correct copy of this bulletin is attached as **Exhibit 39**.

10.     A true and correct copy of Castillo-Carniglia, Kagawa, Cerdá, Crifasi, Vernick, Webster, Wintemute, *California's Comprehensive Background Check and Misdemeanor Violence Prohibition Policies and Firearm Mortality*, Annals of Epidemiology 30, 50-56 (Oct. 11, 2018), is attached as **Exhibit 40**.

3

DECLARATION OF MATTHEW D. CUBEIRO

11.     A true and correct copy of Ronald J. Frandsen, *Enforcement of the Brady Act, 2010: Federal and State Investigations and Prosecutions of Firearm Applicants Denied by a NICS Check in 2010*, Regional Justice Information Service, https://www.ncjrs.gov/pdffiles1/bjs/grants/239272.pdf (Aug. 2012), is attached as **Exhibit 41**.

12.     A true and correct copy of an email chain between the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives and Plaintiffs' counsel regarding "California AB60 IDs and Real ID Act" is attached as **Exhibit 42**.


I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on August 12, 2019.


*s/ Matthew D. Cubeiro*
Matthew D. Cubeiro
Declarant

4
DECLARATION OF MATTHEW D. CUBEIRO

# EXHIBIT 38



**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 510-4400
Telephone: (415) 510-3817
Facsimile: (415) 703-1234
E-Mail: Patty.Li@doj.ca.gov

May 18, 2018

## VIA EMAIL AND FIRST CLASS MAIL

Michel & Associates, P.C.
180 E. Ocean Blvd., Suite 200
Long Beach, CA 90802

RE: Purchase of Firearms Using California Driver's Licenses or Identification Cards

Dear :

I write in response to your April 9, 2018 letter, which asked that the California Department of Justice, Bureau of Firearms (BOF) "rescind [its] policy" that California licensed firearms dealers should not "accept a driver's license with the phrase 'FEDERAL LIMITS APPLY' on the front as 'clear evidence of the person's identity and age' when attempting to purchase a firearm no matter when the license was issued." (Letter, at p. 1.) As you are aware, recent changes to California driver's licenses and identification cards have caused the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to withdraw previously issued guidance on this topic. As explained below, BOF is no longer relying on that prior guidance regarding "FEDERAL LIMITS APPLY" licenses issued on or after January 22, 2018.

From January 2, 2015 to January 21, 2018, California driver's licenses and identification cards with the notation "FEDERAL LIMITS APPLY" imprinted on the front were issued only to persons applying under California State Assembly Bill 60 (AB 60), Stats. 2013, Ch. 524. That law allows the Department of Motor Vehicles to issue driver's licenses and identification cards without receiving satisfactory proof that the applicant's presence in the United States was authorized under federal law. As of January 22, 2018, however, California driver's licenses and identification cards with the words "FEDERAL LIMITS APPLY" on the front are now issued to both: (1) persons applying under AB 60; and (2) persons who may be able to submit satisfactory proof that their presence in the United States is authorized under federal law, but choose not to apply for a "REAL ID" driver's license or identification card. REAL ID licenses comply with minimum requirements for official federal purposes (including boarding federally regulated commercial aircraft), and do not bear the "FEDERAL LIMITS APPLY" disclaimer.

On June 30, 2016, ATF issued an "Open Letter to All California Federal Firearm Licensees," which stated that because a "FEDERAL LIMITS APPLY" driver's license "is only issued to a person who cannot provide proof of lawful presence in the United States," there is

May 18, 2018
Page 2

"reasonable cause to believe a potential transferee in possession of an AB [60] driver['s] license is illegally or unlawfully in the United States and prohibited from receiving or possessing firearms or ammunition. As such, you may not transfer firearms or ammunition to the person . . . ." Since the issuance of this open letter, BOF has relied on it in responding to inquiries from firearms dealers or members of the public regarding "FEDERAL LIMITS APPLY" driver's licenses and identification cards. However, it is our understanding that, because "FEDERAL LIMITS APPLY" licenses are now being issued to the general public, and not only to AB 60 applicants, ATF recently withdrew the June 30, 2016 open letter, and BOF is no longer relying on it when responding to inquiries regarding "FEDERAL LIMITS APPLY" licenses issued on or after January 22, 2018.

Going forward, BOF will inform interested parties that any valid California driver's license or identification card may be used as "clear evidence of the person's identity and age," including REAL ID and "FEDERAL LIMITS APPLY" versions. (Pen. Code, § 16400.) However, BOF will continue to advise interested parties that: (1) a "FEDERAL LIMITS APPLY" driver's license or identification card issued **before** January 22, 2018 indicates that the applicant was unable to submit satisfactory proof that his or her presence in the United States is authorized under federal law; (2) it is unclear whether a person with a "FEDERAL LIMITS APPLY" driver's license or identification card issued **on or after** January 22, 2018 was able to submit satisfactory proof that his or her presence in the United States is authorized under federal law; and (3) a person whose presence in the United States is not authorized under federal law is prohibited from receiving or possessing a firearm or ammunition, under federal law. (18 U.S.C. § 922(d)(5)(A).)

Sincerely,

P. PATTY LI
Deputy Attorney General

For   XAVIER BECERRA
Attorney General

# EXHIBIT 39



# INFORMATION BULLETIN:

## PURCHASING A FIREARM IN CALIFORNIA USING A REAL ID, NON-REAL ID, OR AB 60 TYPE LICENSE

### October 26, 2018

In 2005, the United States Congress enacted the REAL ID Act which, among other provisions, will require federally compliant identification (i.e., REAL ID) to board any airplane, enter any military base, or enter any federal facility as of October 1, 2020.[1] But it was unclear if this new law would also apply to the purchase of a firearm. To clarify the ambiguity, ATF in 2012 issued a newsletter clarifying that non-REAL IDs may continue to be used to purchase firearms so long as the provided ID satisfied the requirements under the Gun Control Act.[2]

Then in 2013, California enacted Assembly Bill No. 60 ("AB 60"). This new law required the DMV to begin issuing licenses and IDs to individuals who could not provide proof of their lawful residence in the United States. Licenses and IDs issued pursuant to AB 60 had the words "FEDERAL LIMITS APPLY" printed on the front of the license or ID. Because federal law generally prohibits individuals who are not lawful residents of the United States from purchasing firearms,[3] ATF issued an open letter in June 2016 clarifying its position regarding its previously issued 2012 newsletter.[4] In this open letter, ATF stated that AB 60 licenses cannot be used to purchase a firearm.

---

[1] REAL ID Act of 2005, H.R. 418, 109th Cong.

[2] *FFL Newsletter: Federal Firearms Licensee Information Service*, U.S. DEPARTMENT OF JUSTICE, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, https://www.atf.gov/firearms/docs/newsletter/federal-firearms-licensees-newsletter-may-2012/download (May 2012).

[3] As stated on the required 4473, the FFL "must establish the identity, place of residence, and age of the transferee/buyer. The transferee/buyer must provide a valid government-issued photo identification document to the transferor/seller that contains the transferee's/buyer's name, residence address, and date of birth." See *ATF E-Form 4473 (5300.9)*, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download (Oct. 2016).

[4] This letter has since been de-published from ATF's website and is no longer available. But a copy of this letter is available online at http://michellawyers.com/wp-content/uploads/2018/09/Open-Ltr-to-All-CA-FFLs-re-AB60.pdf.

**Disclaimer:** This information has been prepared for general information purposes only. The information contained herein is not legal advice, should not be acted on as such, may not be current, and is subject to change without notice. Michel & Associates, P.C., does not warrant or guarantee the accuracy, completeness, adequacy, or currency of the information contained herein. Users of this information do so at their own risk. This document does not create an attorney-client relationship. Individual facts and circumstances may alter the conclusion(s) drawn. For legal advice consult an attorney.

Copyright © 2018 MICHEL & ASSOCIATES, P.C. All Rights Reserved
Republishing this document or any part thereof without permission is prohibited.
Contact Michel & Associates, P.C. for permission to reprint this document.



*Examples of a REAL ID (left) versus a non-REAL ID (right)[5]*

At first, this clarification from ATF had no effect on a lawful resident's ability to purchase a firearm.[6] But then in January 2018, DMV began issuing non-REAL IDs to U.S. citizens. These IDs contained the same "FEDERAL LIMITS APPLY" language as those issued pursuant to AB 60 and were otherwise indistinguishable. As a result, lawful U.S. residents issued such a license were seemingly prohibited from purchasing a firearm according to ATF's open letter.

The issuance of non-REAL IDs identical to that of AB 60 type licenses by DMV resulted in mass confusion among law enforcement, California gun owners, and licensed firearm dealers. Our office immediately contacted ATF for clarification. At first, ATF responded that it received confirmation from DMV that IDs

---

[5] For more information regarding the REAL ID Act and how to obtain a REAL ID from DMV, visit https://www.dmv.ca.gov/portal/dmv/detail/realid.

[6] Nevertheless, AB 60 licenses presented a unique problem for California licensed firearm dealers, requiring dealers to physically inspect a subtle detail on the license. Outside of the "FEDERAL LIMITS APPLY" language on the front, such licenses and IDs constitute "clear evidence of the person's identity and age" as required for the purchase of a firearm because "clear evidence" is defined as a valid California Driver's License or ID and such IDs are in fact "valid" California licenses/IDs. See P.C. § 16400. This meant that unless a dealer physically inspected the license for such language, it is unlikely any part of the background check process would result in a denial for the attempted firearm purchase unless the person admitted to their unlawful presence in the United States on the required 4473 form.

**Disclaimer:** This information has been prepared for general information purposes only. The information contained herein is not legal advice, should not be acted on as such, may not be current, and is subject to change without notice. Michel & Associates, P.C., does not warrant or guarantee the accuracy, completeness, adequacy, or currency of the information contained herein. Users of this information do so at their own risk. This document does not create an attorney-client relationship. Individual facts and circumstances may alter the conclusion(s) drawn. For legal advice consult an attorney.

Copyright © 2018 MICHEL & ASSOCIATES, P.C. All Rights Reserved
Republishing this document or any part thereof without permission is prohibited.
Contact Michel & Associates, P.C. for permission to reprint this document.

issued pursuant to AB 60 will have additional language on the back distinguishing them from non-REAL IDs.[7] But this was later proven to be incorrect, as both types still had the same language printed on the back.[8] The exact reason for this remains uncertain, but we believe one root cause to be California's recent efforts to prevent the identification of individuals who cannot provide proof of their lawful presence in the U.S.—the same efforts that are currently being challenged in a lawsuit by the United States Department of Justice against California.[9]

After bringing this issue to ATF's attention, ATF de-published its 2016 open letter. In its place, ATF authored a new letter that stated California licensed firearms dealers:

> [M]ay accept post-January 22, 2018 licenses/identification documents that meet the definition in 18 U.S.C. 1028(d) in fulfilling their requirements under 18 U.S.C. 922(t)(1)(C) and 27 CFR 478.124(c)(3)(i). However, licensees may consider asking for additional documentation (e.g., passport) so that the transfer is not further delayed.[10]

In other words, California residents who are issued non-REAL IDs after January 22, 2018, by DMV may use their IDs to purchase a firearm, even if the ID contains the language "FEDERAL LIMITS APPLY" on the front of the license. Despite this clarification from ATF, DOJ still maintained a position that any "FEDERAL LIMITS APPLY" licenses could not be used for purposes of purchasing a firearm. We don't know exactly what reason DOJ had for taking this position, but we do know it had no basis in law. My office requested clarification from DOJ, and after several weeks, we received a letter in response which stated:

> Going forward, [CA DOJ] will inform interested parties that any valid California driver's license or identification card may be used as "clear evidence of the person's identity and age," including REAL ID and "FEDERAL LIMTIS APPLY" versions.[11]

---

[7] See Firearms Purchases and Identifications Issued by CA DMV, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, https://www.crpa.org/crpa-news/firearms-purchases-identification-issued-ca-dmv/ (last visited Sept. 18, 2018).

[8] See Firearm Purchases and Identification Issued by CA DMV: Part 2, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, https://www.crpa.org/crpa-news/firearm-purchases-identification-issued-ca-dmv-part-2/ (last visited Sept. 18, 2018).

[9] See Justice Department Files Preemption Lawsuit Against the State of California to Stop Interference with Federal Immigration Authorities, UNITED STATES DEPARTMENT OF JUSTICE, https://www.justice.gov/opa/pr/justice-department-files-preemption-lawsuit-against-state-california-stop-interference (March 7, 2018).

[10] See REAL ID Update: Part 3, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, https://www.crpa.org/crpa-news/real-id-update-part-3/ (last visited Sept. 18, 2018).

[11] See REAL ID Update: Part 3, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, https://www.crpa.org/crpa-news/real-id-update-part-3/ (last visited Sept. 18, 2018) (emphasis in original). But DOJ cautioned that they "will continue to advise interested parties that: (1) a "FEDERAL LIMITS APPLY" driver's license or identification card issued **before** January 22, 2018 indicates that the applicant was unable to submit satisfactory proof that his or her presence in the United States is authorized under federal law; (2) it is unclear whether a person with a "FEDERAL LIMITS APPLY" driver's license or identification card issued **on or after** January 22, 2018 was able to submit satisfactory proof that his or her presence in the United States is authorized under federal law; and (3) a person whose presence in the United States is not authorized under federal law is prohibited from receiving or possessing a firearm or ammunition, under federal law."

---

**Disclaimer:** This information has been prepared for general information purposes only. The information contained herein is not legal advice, should not to be acted on as such, may not be current, and is subject to change without notice. Michel & Associates, P.C., does not warrant or guarantee the accuracy, completeness, adequacy, or currency of the information contained herein. Users of this information do so at their own risk. This document does not create an attorney-client relationship. Individual facts and circumstances may alter the conclusion(s) drawn. For legal advice consult an attorney.

Copyright © 2018 MICHEL & ASSOCIATES, P.C. All Rights Reserved
Republishing this document or any part thereof without permission is prohibited.
Contact Michel & Associates, P.C. for permission to reprint this document.

# THE BOTTOM LINE

Lawful California residents are *not* prohibited from purchasing a firearm simply because they have been issued a non-REAL ID from DMV. That said, CRPA has been informed that some DOJ field representatives are still instructing California licensed firearm dealers to not accept "FEDERAL LIMTS APPLY" licenses or IDs regardless of this letter from DOJ, leaving those dealers with a sense of confusion and hesitancy. CRPA is currently working to educate California licensed firearm dealers on this issue and update them with any information as it becomes available.

**Disclaimer:** This information has been prepared for general information purposes only. The information contained herein is not legal advice, should not to be acted on as such, may not be current, and is subject to change without notice. Michel & Associates, P.C., does not warrant or guarantee the accuracy, completeness, adequacy, or currency of the information contained herein. Users of this information do so at their own risk. This document does not create an attorney-client relationship. Individual facts and circumstances may alter the conclusion(s) drawn. For legal advice consult an attorney.

Copyright © 2018 MICHEL & ASSOCIATES, P.C. All Rights Reserved
Republishing this document or any part thereof without permission is prohibited.
Contact Michel & Associates, P.C. for permission to reprint this document.

# EXHIBIT 40

Annals of Epidemiology 30 (2019) 50—56



Contents lists available at ScienceDirect

## Annals of Epidemiology



---

Original article

# California's comprehensive background check and misdemeanor violence prohibition policies and firearm mortality



Alvaro Castillo-Carniglia, PhD, MSc [a,b,*], Rose M.C. Kagawa, PhD, MPH [a],
Magdalena Cerdá, DrPH, MPH [a,c], Cassandra K. Crifasi, PhD, MPH [d],
Jon S. Vernick, JD, MPH [d], Daniel W. Webster, ScD, MPH [d], Garen J. Wintemute, MD, MPH [a]

[a] Violence Prevention Research Program, Department of Emergency Medicine, UC Davis School of Medicine, Sacramento, CA
[b] Society and Health Research Center, Facultad de Humanidades, Universidad Mayor, Santiago, Chile
[c] Department of Population Health, New York University School of Medicine, New York
[d] Center for Gun Policy and Research, Johns Hopkins Bloomberg School of Public Health, Baltimore, MD

---

ARTICLE INFO

Article history:
Received 10 July 2018
Accepted 3 October 2018
Available online 11 October 2018

Keywords:
Firearms
Homicide
Suicide
Policy

ABSTRACT

Purpose: In 1991, California implemented a law that mandated a background check for all firearm purchases with limited exceptions (comprehensive background check or CBC policy) and prohibited firearm purchase and possession for persons convicted within the past 10 years of certain violent crimes classified as misdemeanors (MVP policy). We evaluated the population effect of the simultaneous implementation of CBC and MVP policies in California on firearm mortality.
Methods: Quasi-experimental ecological study using the synthetic control group methodology. We included annual firearm and nonfirearm mortality data for California and 32 control states for 1981 −2000, with secondary analyses up to 2005.
Results: The simultaneous implementation of CBC and MVP policies was not associated with a net change in the firearm homicide rate over the ensuing 10 years in California. The decrease in firearm suicides in California was similar to the decrease in nonfirearm suicides in that state. Results were robust across multiple model specifications and methods.
Conclusions: CBC and MVP policies were not associated with changes in firearm suicide or homicide. Incomplete and missing records for background checks, incomplete compliance and enforcement, and narrowly constructed prohibitions may be among the reasons for these null findings.

© 2018 Elsevier Inc. All rights reserved.

---

## Introduction

Firearm violence is one of the leading causes of death and injury in the United States, resulting in more than 38,000 deaths in 2016 [1]. Firearm ownership and access are risk factors for death from both suicide and homicide [2–6], and firearm access is a necessary precondition for committing firearm-related violent crimes.

Federal law prohibits certain categories of individuals from purchasing or possessing firearms; examples include persons convicted of felonies or domestic violence misdemeanors [7]. To help prevent prohibited persons from acquiring firearms, the Brady Handgun Violence Prevention Act requires that purchases from federally licensed retailers be subject to a background check. Since Brady's inception in 1994, more than 3 million attempted purchases by prohibited persons have been denied [8]. Sales by unlicensed private parties are exempt from background check requirements in many states; however, it is estimated that more than 20% of all firearm acquisitions do not involve background checks [9]. About 80% of all firearms acquired for criminal purposes—96% of those acquired by prohibited persons—are obtained through private-party transfers [10].

Among legal purchasers of firearms, as in the general population, a history of violence is strongly associated with an increase in risk for future violence [11]. A prospective study of California handgun purchasers found that individuals with a

Conflict of interests: No potential conflicts of interest relevant to this article were reported.
* Corresponding author. Society and Health Research Center, Facultad de Humanidades, Universidad Mayor, Badajoz 130, Room 1305, Las Condes, Santiago, Chile. Tel.: +56 2 2518 9800.
E-mail address: alvacasti@gmail.com (A. Castillo-Carniglia).

https://doi.org/10.1016/j.annepidem.2018.10.001
1047-2797/© 2018 Elsevier Inc. All rights reserved.

A. Castillo-Carniglia et al. / Annals of Epidemiology 30 (2019) 50–56    51

single prior conviction for a nonprohibiting violent misdemeanor crime (such as assault and battery) were nearly five times as likely as those with no prior criminal history to be arrested for a subsequent firearm-related or violent offense [12]. For purchasers with multiple such prior convictions, risk was increased by a factor of 15.

In 1991, California mandated background checks for nearly all firearm sales (a comprehensive background check [CBC] policy) and a 10-year prohibition on gun purchase and possession for persons convicted of most violent misdemeanor crimes (a misdemeanor violence prohibition [MVP] policy). These policies are complementary. Expanded background check requirements are meant to create an additional barrier to firearm access for prohibited persons; nationally, they are associated with a lower proportion of private-party firearm sales conducted without background checks (26% vs. 57%) [9]. Expanded prohibitions reflect an intent to reduce violence through preventing access to firearms by larger numbers of high-risk individuals.

We know little about the effectiveness of CBC policies. Studies showing clear benefits have focused on permit-to-purchase (PTP) laws, a particularly rigorous subset of CBC policies that require a background check and a permit, typically issued by a law enforcement agency, to purchase a firearm [13–17]. Some cross-sectional, ecological studies of CBC policies have shown negative associations between CBC laws and firearm mortality [18,19]. However, a more rigorous time-series analysis found no effect on firearm suicide and homicide rates from repealing CBC policies in two states [20]. Newly enacted CBC policies led to increases in background checks, presumably the principal mechanism of action, but would exert intended effects on violence, in only 1 of 3 states studied [21].

Incomplete compliance and enforcement have been suggested as possible reasons for these findings. The possibility of other mechanisms of action is reinforced by studies showing benefits to more thorough background checks [22,23] and by well-known instances of violence, including mass shootings, where prohibited persons purchased firearms because the data on which their background checks were performed were incomplete [24].

Evaluations of MVP policies have yielded positive results, but the literature is sparse. At the individual level, a controlled longitudinal study of California's MVP policy found that denial of firearm purchase because of a prior violent misdemeanor conviction was associated with a substantial reduction in risk of arrest for future violent or firearm-related crimes [25]. A recent multistate population-level study found similar benefits from MVP policies for intimate partner homicide [15].

The objective of our study was to evaluate the effects of California's CBC and MVP policies on firearm-related homicide and suicide. Given their simultaneous implementation and limited possibilities for estimating individual policy effects (both were intended to prevent high-risk people from acquiring firearms), we evaluated the two policies together.

## Methods

### Design and study sample

We used a quasi-experimental design at the state level, with California as the treated state and "treatment" defined as the simultaneous implementation of CBC and MVP policies in 1991. The control units, also known as the donor pool, were 32 states that did not have CBC or MVP policies at the start of the study period and did not implement them or other major firearm policy changes during that period (Table 1). The main analysis considered the preintervention period to be all years before the intervention for which data were available (1981–1990) and assessed effects for 10 years postintervention (1991–2000).

### Data sources and variables

Outcomes: Our main outcomes were the annual rates of firearm-related homicides and suicides per 100,000 people, available from the US Centers for Disease Control and Prevention [1]. As these data do not include numbers when there are fewer than 10 cases, we performed simple imputation using linear regression. This resulted in the imputation of 2 years for New Hampshire, South Dakota, Vermont, and Wyoming, and 1 year for Delaware. We rejected multiple imputation because inference in the synthetic control group method does not rely on variance estimates (the main concern in single imputation methods) but on permutation tests (see Supplemental Material).

To account for potential spurious associations and explore the influence of additional exogenous factors, we included rates of non–firearm-related homicides and suicides as negative control outcomes. The rationale is that these outcomes should not be affected by policies restricting access to firearms, but if there is a relationship, it should be in the opposite direction (i.e., other

**Table 1**
States with nonzero weights in synthetic California for firearm and nonfirearm homicide and suicide rates[*]

| State | Firearm homicide[†] | Nonfirearm homicide[†] | Firearm suicide[‡] | Nonfirearm suicide[‡] |
|---|---|---|---|---|
| Alaska | 0 | 0.021 | 0 | 0 |
| Arizona | 0 | 0.015 | 0 | 0 |
| Colorado | 0 | 0.123 | 0 | 0 |
| Georgia | 0.101 | 0 | 0 | 0 |
| Louisiana | 0.259 | 0 | 0 | 0 |
| Nevada | 0 | 0.2 | 0 | 0.308 |
| New Mexico | 0 | 0.039 | 0 | 0 |
| Ohio | 0 | 0 | 0.681 | 0.237 |
| Texas | 0 | 0.603 | 0.319 | 0 |
| Virginia | 0.566 | 0 | 0 | 0 |
| Wisconsin | 0.073 | 0 | 0 | 0.455 |
| RMSPE synthetic control/all control states | 0.299/2.408 | 0.230/1.675 | 0.294/2.191 | 0.482/1.811 |

[*] States in the donor pool (n = 32): Alabama, Alaska, Arizona, Arkansas, Colorado, Delaware, Florida, Georgia, Idaho, Kansas, Kentucky, Louisiana, Maine, Minnesota, Mississippi, Montana, Nevada, New Hampshire, New Mexico, Ohio, Oklahoma, Oregon, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.
[†] Covariates included in the homicide models are percentage Hispanic; percentage black; percentage male; percentage living below the federal poverty line; percentage unemployment; percentage of population aged 15–29 years; percentage of population aged older than or equal to 65 years; number of gallons of ethanol from spirits consumed per capita; percentage veterans; gun availability (annual); outcomes at 1984, 1987, and 1990.
[‡] Covariates included in the suicide models are the same as[†], plus the natural logarithm of the states' populations.

*A. Castillo-Carniglia et al. / Annals of Epidemiology 30 (2019) 50–56*

methods would be substituted for firearms, increasing the rates of non–firearm-related deaths). A decline in the rates of non–firearm-related homicides and suicides associated with the implementation of CBC and MVP policies would likely be the result of other unmeasured confounders.

Covariates: Based on previous research [17,20] and model performance (lowest root mean square prediction error [RMSPE]), we defined the following set of covariates: percentage of people 15–29 years of age; percentage of people older than or equal to 65 years of age; logarithm of the population (which improved the RMSPE only for the suicide models); percentages of the population who were white, Hispanic, and males [1]; living below the federal poverty line, veterans [26], and unemployed [27]; the per capita consumption of gallons of ethanol from spirits by people aged older than or equal to 14 years [28]; and as an indicator of gun availability, firearm suicides as a percentage of total suicides [29,30]. We also included as predictors in the models the values of each of the outcomes at three time points in the preintervention period; using three time points yielded the lowest RMSPE: 1984, 1987, and 1990 [31,32].

In generating the final models, we removed variables with low V-weights, that is, variables with low predictive values in final models. Variables tested but not included were additional age and race/ethnicity categories; percentages of people with different categories of marital status and religion; an indicator for state mental health parity laws; a measure of the crack epidemic, which incorporates cocaine-induced emergency room visits, deaths, arrests, among other proxies [33]; and a violent crime index [34].

### Statistical analyses

For the main analysis, we used the synthetic control group method, which aims to generate a trend counterfactual to the observed outcome by creating a weighted average of the states in the donor pool [32].

The policy effect is estimated as the difference between the values in the treated state (California) and the values in the synthetic control group (synthetic California) in the post-intervention period. Consistent with other studies that have used this method [20], we averaged the annual differences across the 10 years after CBC and MVP implementation (to the year 2000); in secondary analyses, we also considered 5 years (to 1995) and 15 years (to 2005) after the intervention. We did not include longer postintervention periods to avoid forecasting counterfactual trends too far removed from the preintervention period.

Given that the synthetic control group method does not produce traditional measures of uncertainty (e.g., 95% confidence intervals), inference is based on permutation tests, also known as placebo tests (see Supplemental Material).

To account for imperfect fit in the preintervention period, we provided estimates that subtracted the preintervention average difference between California and the synthetic control from the postintervention difference (as in a difference-in-difference estimator) [35,36]. In addition, we showed results produced by states that had a comparable fit in the preintervention period, that is, RMSPE less than or equal to 5 and less than or equal to 2 times the RMSPE for California [13].

We conducted multiple sensitivity analyses, which included removing states that prohibited firearm purchases by people convicted of domestic violence before the national enactment of such a law in 1996, testing for a delayed and gradual effect of CBC/MVP policies, restricting the population to the age groups that have the greatest risk of firearm-related homicide and suicide, and changing the methodological approach to estimate the results (see Supplemental Material).

All analyses were conducted using Stata 14.1 (StataCorp, College Station, Texas, USA).



**Fig. 1.** Trends in annual rate of firearm homicides (A), non-firearm homicides (B), firearm suicides (C) and non-firearm suicides (D) per 100,000 people in California and all control.

https://reader.elsevier.com/reader/sd/pii/S1047279718306161?token=13E3DB359B770850E5F41B73B6AF3988C76BDEAA1696172D57B6E640…	3/7

A. Castillo-Carniglia et al. / Annals of Epidemiology 30 (2019) 50–56

53

## Results

Annual trends in firearm and nonfirearm homicide and suicide rates are in Figure 1. California experienced a large increase in firearm-related homicides from the mid-1980s until the early 1990s (peaking at 10.2/100,000 people in 1993). A sharp decline followed until approximately 2000, then relative stabilization until 2012. Non–firearm-related homicides showed a stable decline, from the beginning of the time series until the first years of the 2000s.

For firearm-related suicides, there was an overall decline, concentrated mostly between the years 1997 and 2000. Non–firearm-related suicides showed a similar trend but with an increase from 2002 to the last years of the series.

### Results from the synthetic control group method

Of the 32 states in the donor pool, 11 had nonzero weights and were included in one or more of the synthetic controls for the four outcomes (Table 1). None of the states with imputed data were included in the synthetic controls.

Levels and trends for firearm homicide rates in the preintervention period were similar for California and synthetic California, although the increase in the 2 years before 1991 was slightly higher in California (Fig. 2A). For firearm suicides, California witnessed a similar trend compared with synthetic California until 1988, but a small relative decline thereafter (Fig. 2C). Nonfirearm outcomes for California and all control states are shown in Figure 1B and D. Both were well balanced in the preintervention period in relation to the trend in synthetic California.

Estimated absolute and relative effects of CBC and MVP policies on each outcome and the results from the permutation tests are presented in Table 2. The 10-year postintervention period

provided our primary results. The average difference in the rate of firearm homicides between California and synthetic California in the postintervention period was 0/100,000; for firearm suicides, it was −0.7/100,000, corresponding to a 10.9 percent decrease. Five of the 32 states eligible to serve as controls experienced larger effects for firearm suicides over the same time period in the permutation tests. However, after restricting the comparison states to those with a reasonable preintervention fit (≤2 times the RMSPE for California), no states (out of 11) experienced a decrease larger than California. Consistent results were observed for firearm homicides and suicides at both 5 and 15 years postintervention.

In the 10 years following implementation, the average differences in nonfirearm homicides and suicides were −0.3/100,000 (−9.7 percent) and −0.4/100,000 (−7.0 percent), respectively. For nonfirearm suicides, only one state experienced a larger decrease than California, regardless of the number of control states used as comparison. For the nonfirearm homicide rate, the decline observed after policy implementation was within the range that would be expected given random variation.

Results from sensitivity analyses were consistent with those of the main analysis (see Supplemental Material).

## Discussion

This study evaluated the association between rates of firearm-related homicides and California's simultaneous enactment of two policies aimed at preventing firearms acquisition by people who are at increased risk of interpersonal and self-directed violence: a comprehensive background check requirement and a firearm prohibition for persons convicted of violent misdemeanors. Enactment was not associated with significant and specific changes in rates of fatal firearm violence.



**Fig. 2.** Trend in annual rate of firearm homicides (A), non-firearm homicides (B), firearm suicides (C) and non-firearm suicides (D) per 100,000 people in California, synthetic California, and average for all control states, 1981–2000.

**Table 2**
Association between CBC and MVP policies and firearm-related and non-firearm-related homicides and suicides in California for 3 post-implementation periods

| | Firearm homicide | Nonfirearm homicide | Firearm suicide | Nonfirearm suicide |
|---|---|---|---|---|
| **Five years postimplementation** | | | | |
| California's rate per 100,000[*] | 9.5 | 3.3 | 6.4 | 5.7 |
| Counterfactual rate per 100,000[†] | 8.5 | 3.4 | 7.1 | 5.6 |
| Estimated absolute effect of CBC/MVP[‡] | 1.0 | −0.1 | −0.7 | 0.1 |
| Estimated relative effect (%) of CBC/MVP[§] | 11.8 | −2.9 | −9.9 | 1.8 |
| Number of states with effect ≥ CA | | | | |
| All control states[ǁ] | 27/32 | 11/32 | 4/32 | 14/32 |
| ≤5 × CA RMSPE | 26/30 | 11/32 | 3/30 | 14/32 |
| ≤2 × CA RMSPE | 15/17 | 6/18 | 1/11 | 12/28 |
| **Ten years postimplementation (main results)** | | | | |
| California's rate per 100,000[*] | 7.3 | 2.8 | 5.7 | 5.3 |
| Counterfactual rate per 100,000[†] | 7.3 | 3.1 | 6.4 | 5.7 |
| Estimated absolute effect of CBC/MVP[‡] | 0.0 | −0.3 | −0.7 | −0.4 |
| Estimated relative effect (%) of CBC/MVP[§] | 0.0 | −9.7 | −10.9 | −7.0 |
| Number of states with effect ≥ CA | | | | |
| All control states[ǁ] | 17/32 | 6/32 | 5/32 | 1/32 |
| ≤5 × CA RMSPE | 16/30 | 6/32 | 4/30 | 1/32 |
| ≤2 × CA RMSPE | 10/17 | 2/18 | 0/11 | 1/28 |
| **Fifteen years postimplementation** | | | | |
| California's rate per 100,000[*] | 6.6 | 2.5 | 5.1 | 5.2 |
| Counterfactual rate per 100,000[†] | 6.8 | 2.9 | 6.2 | 6.0 |
| Estimated absolute effect of CBC/MVP[‡] | −0.2 | −0.4 | −1.1 | −0.8 |
| Estimated relative effect (%) of CBC/MVP[§] | −2.9 | −13.8 | −17.7 | −13.3 |
| Number of states with effect ≥ CA | | | | |
| All control states[ǁ] | 11/32 | 3/32 | 3/32 | 1/32 |
| ≤5 × CA RMSPE | 10/30 | 3/32 | 2/30 | 1/32 |
| ≤2 × CA RMSPE | 5/17 | 0/18 | 0/11 | 1/28 |

[*] Mean rate per 100,000 people in California after CBC and MVP implementation.
[†] Mean rate per 100,000 people in synthetic California after CBC and MVP implementation.
[‡] Average difference between California and synthetic California in the postintervention period.
[§] Percentage difference compared with synthetic California.
[ǁ] Results from the permutation test (control states = 32). To generate comparable estimates across control states, effects were computed as a difference in difference (DiD); $DiD_{state} = (Outcome_{post}^{state} - Outcome_{post}^{Synth}) - (Outcome_{pre}^{CA} - Outcome_{pre}^{Synth})$. Because the hypothesis of the study is that CBC and MVP are associated with reductions in mortality from firearms, we counted only states with reductions in mortality larger than those in California.

Firearm-related suicide rates during the 10 years after policy implementation were, on average, 10.9 percent lower in California than in synthetic California, a difference greater than for any of the 11 control states with a comparable model fit. Non−firearm-related suicides also decreased by 7.0 percent; however, a decrease exceeding that was seen in 27 of 28 states with RMSPE less than or equal to two times the RMSPE for California. This suggests that the policies' estimated impact on firearm suicide may be part of broader changes in suicide risk around the time that California's CBC and MVP policies were implemented. Still, the difference between changes in firearm and non-firearm suicides (3.9 percentage points) may indicate a preventive role of CBC/MVP policies in firearm suicide, although this study was not designed to test whether this difference is statistically meaningful.

Firearm-related homicide rates rose substantially from the mid-1980s through the early 1990s and fell thereafter. Both the increase and the decline were greater in California than in synthetic California; the net difference during the 10 years postintervention was practically 0. Sensitivity analyses testing for delayed and gradual effects did not change the overall conclusions. It is worth noting that the negative slope observed in California in the years following CBC/MVP implementation was more pronounced than the slope observed for the control group; however, the difference in slopes between California and the control group was not statically significant (see Supplemental Material).

Our findings conflict with those of studies associating CBC policies with a reduction in firearm homicide and suicide in Connecticut, where implementation occurred in 1995, and Missouri, where firearm homicide and suicide increased following CBC repeal in 2007 [13,14,17]. However, these states had PTP laws, a particularly rigorous form of CBC policy that several studies have found to be effective [37−39]. Consistent with our findings, repeal by

Indiana and Tennessee in 1998 of CBC policies without a PTP component was recently found not to be associated with changes in rates of firearm homicide or suicide [20].

Other mechanisms for our findings are plausible; however, several or all may be in play simultaneously. One well-documented example, which would diminish the population-level effects of both CBC and MPV policies, is that the criminal and mental health records on which background checks were performed were very incomplete in the 1990s, including in California [37−42]. For example, in 1990, only 25 percent of criminal records were accessible via the interstate identification index, the primary source of arrest and conviction information for background checks [37]. Centralized records of mental health prohibitions were almost nonexistent [37]. As a result, background checks almost certainly produced a large number of false negative results, which is a shortcoming that may have limited the effectiveness of the CBC and MVP policies.

Purchases by undetected prohibited persons would likely decrease the population-level effects of CBC policies and may account in part for negative findings here, in the assessment of CBC repeal in Indiana and Tennessee [20], and in an earlier study of trends in homicide and suicide following the Brady Handgun Violence Prevention Act [43]. Increased thoroughness of background checks and improvements in the data used to perform them are associated with reductions in violent crime, firearm homicide, and firearm suicide [22,23,44−46]. It is therefore important to note that the quality and completeness of the records on which background checks are performed have improved since our study period [47].

Incomplete compliance with and enforcement of background check and prohibition requirements may also play a role. After CBC policies were implemented in Colorado, Delaware, and

A. Castillo-Carniglia et al. / Annals of Epidemiology 30 (2019) 50–56

Washington, an overall increase in background checks was detected only in Delaware, and incomplete compliance and enforcement were reported in the two western states [21]. Enforcement may not be a law enforcement priority; in the 1990s, chief law enforcement officers in Montana and Arizona sued successfully to avoid conducting background checks [48]. The vigor with which firearm laws are enforced is variable and susceptible to a variety of external factors [49].

Finally, the population-level effect of CBC and MVP policies may be small if only a small number of transactions or individuals are affected. In California, on average, 0.54 percent of handgun purchases were denied before CBC and MVP policy implementation (data available from 1982 to 1990); this rose to 1 percent in the 10 years following implementation (1991–2000) [50]. The increase represents an annual average increase in denials of handgun purchases by approximately 1250 people considered to be at risk—a number too small, perhaps, for a decrease in firearm-related violence among those individuals to produce a detectable change in state-level, population-based outcome measures. A similar argument has been advanced as partial explanation for the lack of observed effects on homicide of the Brady Act [51,52]. California's MVP policy has been shown to have a substantial beneficial effect on those directly affected, however [25], and a multistate population-level analysis has associated MVP policies with a decrease in intimate partner homicide [15].

### Limitations

We carefully identified states that were "at risk" of implementing CBC and MVP policies and used additional criteria to select control states in sensitivity analyses (e.g., excluding states that had banned firearm purchases by people convicted of domestic violence before 1996, when this policy was adopted nationwide). Although we are fairly confident that no other major firearm policies were implemented during the study period in our study states, we cannot be certain about other policies (e.g., criminal, public health, or social policies) or idiosyncratic changes at the local level that may have affected firearm violence, including firearm homicide, the frequency of which was particularly unstable during our study period. Finally, in 1998, the National Instant Criminal Background Check System was launched; the interim provisions of the Brady Law, including a 5-day waiting period, were removed; and the federal background check requirement for handgun sales by licensed retailers was extended to rifles and shotguns. These changes may have had mixed and varying effects on our control states in the final two years of our study period; California had a waiting period throughout the time of our study.

### Conclusions

Our findings suggest that the simultaneous implementation of CBC and MVP policies did not result in population-level changes in the rates of firearm-related homicides and suicides in California. A combination of inadequate criminal and mental health records, incomplete compliance and enforcement, the absence of a permit requirement, and the small size of the population directly affected by the laws may account for these findings.

### Acknowledgments

Funding: This study was funded by the Joyce Foundation [grant ID 15–36377], the Heising-Simons Foundation [grant ID 2016-219], and UCFC, the University of California Firearm Violence Research Center. Dr. Castillo-Carniglia and Dr. Kagawa were supported by the Robertson Fellowship in Violence Prevention Research. Dr. Castillo-Carniglia was also supported by Becas Chile as part of the National Commission for Scientific and Technological Research (CONICYT).

### Supplementary data

Supplementary data related to this article can be found at https://doi.org/10.1016/j.annepidem.2018.10.001.

### References

[1] Centers for Disease Control and Prevention. Web-based Injury Statistics Query and Reporting System (WISQARS). Atlanta, GA: National Center for Injury Prevention and Control; 2015. https://www.cdc.gov/injury/wisqars/fatal.html. [Accessed 6 April 2018].

[2] Branas CC, Richmond TS, Culhane DP, Ten Have TR, Wiebe DJ. Investigating the link between gun possession and gun assault. Am J Public Health 2009;99(11): 2034–40.

[3] Kellermann AL, Rivara FP, Rushforth NB, Banton JG, Reay DT, Francisco JT, et al. Gun ownership as a risk factor for homicide in the home. N Engl J Med 1993;329(15):1084–91.

[4] Webster DW, Starnes M. Reexamining the association between child access prevention gun laws and unintentional shooting deaths of children. Pediatrics 2000;106(6):1466–9.

[5] Kellermann AL, Rivara FP, Somes G, Reay DT, Francisco J, Banton JG, et al. Suicide in the home in relation to gun ownership. N Engl J Med 1992;327(7):467–72.

[6] Wintemute GJ, Parham CA, Beaumont JJ, Wright M, Drake C. Mortality among recent purchasers of handguns. N Engl J Med 1999;341(21):1583–9.

[7] 18 U.S. Code § 922(g) – Unlawful acts.

[8] Karberg JC, Frandsen RJ, Durso JM, Buskirk TD, Lee AD. Background Checks for Firearm Transfers, 2015. Statistical Tables Bureau of Justice Statistics. Washington D.C.: U.S. Department of Justice; 2017. Contract No.: NCJ, 250978.

[9] Miller MJ, Hepburn L, Azrael D. Firearm Acquisition Without Background Checks: Results of a National Survey. Ann Intern Med 2017;166(4):233–9.

[10] Vittes KA, Vernick JS, Webster DW. Legal status and source of offenders' firearms in states with the least stringent criteria for gun ownership. Inj Prev 2013;19(1):26–31.

[11] Campbell JC, Webster D, Koziol-McLain J, Block C, Campbell D, Curry MA, et al. Risk factors for femicide in abusive relationships: results from a multisite case control study. Am J Public Health 2003;93(7):1089–97.

[12] Wintemute GJ, Drake CM, Beaumont JJ, Wright MA, Parham CA. Prior misdemeanor convictions as a risk factor for later violent and firearm-related criminal activity among authorized purchasers of handguns. JAMA 1998;280(24):2083–7.

[13] Rudolph KE, Stuart EA, Vernick JS, Webster DW. Association Between Connecticut's Permit-to-Purchase Handgun Law and Homicides. Am J Public Health 2015;105(8):e49–54.

[14] Webster D, Crifasi CK, Vernick JS. Effects of the repeal of Missouri's handgun purchaser licensing law on homicides. J Urban Health 2014;91(2):293–302.

[15] Zeoli AM, McCourt A, Buggs S, Frattaroli S, Lilley D, Webster DW. Analysis of the Strength of Legal Firearms Restrictions for Perpetrators of Domestic Violence and Their Association With Intimate Partner Homicide. Am J Epidemiol 2018;187:1449–55.

[16] Center for Gun Policy and Research. Permit-to-purchase licensing for handguns: Johns Hopkins University. https://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/PTP-policy-brief.pdf. [Accessed 6 April 2018].

[17] Crifasi CK, Meyers JS, Vernick JS, Webster DW. Effects of changes in permit-to-purchase handgun laws in Connecticut and Missouri on suicide rates. Prev Med 2015;79:43–9.

[18] Santaella-Tenorio J, Cerda M, Villaveces A, Galea S. What Do We Know About the Association Between Firearm Legislation and Firearm-Related Injuries? Epidemiol Rev 2016;38(1):140–57.

[19] Crandall M, Eastman A, Violano P, Greene W, Allen S, Block E, et al. Prevention of firearm-related injuries with restrictive licensing and concealed carry laws: An Eastern Association for the Surgery of Trauma systematic review. J Trauma Acute Care Surg 2016;81(5):952–60.

[20] Kagawa RMC, Castillo-Carniglia A, Vernick JS, Webster DW, Crifasi CK, et al. Repeal of Comprehensive Background Check Policies and Firearm Homicide and Suicide. Epidemiology 2018;29(4):494–502.

[21] Castillo-Carniglia A, Kagawa RMC, Webster DW, Vernick JS, Cerda M, Wintemute GJ. Comprehensive background check policy and firearm background checks in three US states. Inj Prev 2017. https://doi.org/10.1136/injuryprev-2017-042475 [Epub ahead of print].

[22] Sen B, Panjamapirom A. State background checks for gun purchase and firearm deaths: an exploratory study. Prev Med 2012;55(4):346–50.

[23] Sumner SA, Layde PM, Guse CE. Firearm death rates and association with level of firearm purchase background check. Am J Prev Med 2008;35(1):1–6.

[24] Dewan S, Oppel RA. For the Military: a Long History of Failure to Report Crimes. New York, NY: New York Times; 2017.

56                                                                    A. Castillo-Carniglia et al. / Annals of Epidemiology 30 (2019) 50–56

[25] Wintemute GJ, Wright MA, Drake CM, Beaumont JJ. Subsequent criminal activity among violent misdemeanants who seek to purchase handguns: risk factors and effectiveness of denying handgun purchase. JAMA 2001;285(8):1019–26.

[26] U.S. Census Bureau. American Community Survey, 2010 American Community Survey 5-Year Estimates. Suitland, MD: U.S. Census Bureau; 2016.

[27] Bureau of Labor Statistics. Local Area Unemployment Statistics. http://www.bls.gov/lau/home.htm. [Accessed 6 April 2018].

[28] Surveillance report #98: apparent per capita alcohol consumption — national, state, and regional trends, 1977–2012. http://pubs.niaaa.nih.gov/publications/surveillance98/pcyr19702012.txt. [Accessed 10 September 2017].

[29] Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership measurement, structure, and trends. J Quant Criminol 2004;20(1):43–62.

[30] Cook PJ, Ludwig J. The social costs of gun ownership. NBER Working Paper. Cambridge, MA: National Bureau of Economic Research; 2004.

[31] Kaul A, Klößner S, Pfeifer G, Schieler M. Synthetic Control Methods: Never Use All Pre-Intervention Outcomes Together With Covariate. 2017. MPRA Paper No. 83790. https://mpra.ub.uni-muenchen.de/83790/. [Accessed 15 January 2018].

[32] Abadie A, Diamond A, Hainmueller J. Synthetic Control Methods for Comparative Case Studies: Estimating the Effect of California's Tobacco Control Program. J Am Stat Assoc 2010;105(490):493–505.

[33] Fryer RG, Heaton PS, Levitt SD, Murphy KM. Measuring Crack Cocaine and Its Impact. Econ Inq 2013;51(3):1651–81.

[34] Federal Bureau of Investigation. Uniform Crime Reports. http://www.fbi.gov/about-us/cjis/ucr/leoka. [Accessed 6 April 2018].

[35] Maclean JC, Saloner B. Substance Use Treatment Provider Behavior and Healthcare Reform: Evidence from Massachusetts. Health Econ 2018;27(1):76–101.

[36] Brazil N. Large-Scale Urban Riots and Residential Segregation: A Case Study of the 1960s. U.S. Riots Demogr 2016;53(2):567–95.

[37] Bureau of Justice Statistics. Survey of Criminal History Information Systems. Washington, DC: United States Department of Justice; 1991.

[38] Bureau of Justice Statistics. Survey of Criminal History Information Systems. Washington, DC: United States Department of Justice; 1992.

[39] Bureau of Justice Statistics. Survey of Criminal History Information Systems. Washington, DC: United States Department of Justice; 1993.

[40] Bureau of Justice Statistics. Survey of Criminal History Information Systems. Washington, DC: United States Department of Justice; 1995.

[41] Bureau of Justice Statistics. Survey of Criminal History Information Systems. Washington, DC: United States Department of Justice; 1997.

[42] Bureau of Justice Statistics. Survey of Criminal History Information Systems. Washington, DC: United States Department of Justice; 1999.

[43] Ludwig J, Cook PJ. Homicide and suicide rates associated with implementation of the Brady Handgun Violence Prevention Act. JAMA 2000;284(5):585–91.

[44] Swanson JW, Easter MM, Robertson AG, Swartz MS, Alanis-Hirsch K, Moseley D, et al. Gun Violence, Mental Illness, And Laws That Prohibit Gun Possession: Evidence From Two Florida Counties. Health Aff (Millwood) 2016;35(6):1067–75.

[45] Swanson JW, McGinty EE, Fazel S, Mays VM. Mental illness and reduction of gun violence and suicide: bringing epidemiologic research to policy. Ann Epidemiol 2015;25(5):366–76.

[46] Swanson JW, Robertson AG, Frisman LK, Norko MA, Lin HJ, Swartz MS, et al. Preventing gun violence involving people with serious mental illness. In: Webster DW, Vernick JS, editors. Reducing gun violence in America: informing policy with evidence and analysis. Baltimore: Johns Hopkins University Press; 2013. p. 33–51.

[47] SEARCH. Improving the national instant background screening system for firearm purchases: The National Consortium for Justice Information and Statistics. www.search.org. [Accessed 6 April 2018].

[48] Printz v. United States (95-1478), 521 U.S. 898 (1997).

[49] Crifasi CK, Francis MM, Webster DW, Wintemute GJ, Vernick JS. Changes in the legal environment and enforcement of firearm transfer laws in Pennsylvania and Maryland. Inj Prev 2018. https://doi.org/10.1136/injuryprev-2017-042582 [Epub ahead of print].

[50] State of California Department of Justice. Dealer record of sale transactions. https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/forms/dros_chart.pdf. [Accessed 6 April 2018].

[51] Cook PJ, Ludwig J. The limited impact of the Brady Act: evaluation and implications. In: Webster DW, Vernick JS, editors. Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore: The Johns Hopkins University Press; 2013.

[52] Wintemute GJ. Impact of the Brady Act on homicide and suicide rates. JAMA 2000;284(21):2719–20. author reply 20-1.

# EXHIBIT 41

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Enforcement of the Brady Act, 2010: Federal and State Investigations and Prosecutions of Firearm Applicants Denied by a NICS Check in 2010** |
| **Author:** | **Ronald J. Frandsen** |
| **Document No.:** | **239272** |
| **Date Received:** | **August 2012** |
| **Award Number:** | **2011-BJ-CX-K017** |

**Errata Notice: This report has been updated to correct two errors: on page 8, the date was listed incorrectly in the first sentence as November 28, 2010. The correct date is December 13, 2011. On page 14 in Appendix Table F., the date listed in parentheses was incorrectly listed as December 13, 2010. The correct date is December 13, 2011.**

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Enforcement of the Brady Act, 2010

Federal and state investigations and prosecutions of
firearm applicants denied by a NICS check in 2010

Ronald J. Frandsen

*Regional Justice Information Service*
4255 West Pine Boulevard
St. Louis, Missouri 63108

August, 2012

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Enforcement of the Brady Act, 2010

## Abstract

The Brady Handgun Violence Prevention Act (Brady Act) requires criminal history background checks by the Federal Bureau of Investigation (FBI) and state agencies on persons who attempt to purchase a firearm from a licensed dealer. In 2010, the FBI and state agencies denied a firearm to nearly 153,000 persons due to National Instant Criminal Background Check System (NICS) records of felonies, domestic violence offenses, and other prohibiting factors. *Enforcement of the Brady Act, 2010* reports on investigations and prosecutions of persons who were denied a firearm in 2010. The report describes how the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) screens denied-person cases and retrieves firearms that were obtained illegally. Statistics presented include charges most often filed against denied persons by United States Attorneys and results of prosecutions. Investigation statistics from two states are also presented. Key statistics are compared for the five-year period from 2006 to 2010. Statistical highlights are presented in the body of the report and complete details are included in an Appendix.

## Disclaimer

This project was supported by Grant No. 2011-BJ-CX-K017 awarded by the Bureau of Justice Statistics, Office of Justice Programs, U.S. Department of Justice. Points of view in this document are those of the author and do not necessarily represent the official position or policies of the US Department of Justice.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Background

**The Brady Act.**  The Brady Handgun Violence Prevention Act (Brady Act) was enacted in 1993 to provide a method for blocking transfers of firearms to prohibited persons. From February 28, 1994 to November 30, 1998, the interim Brady provisions, 18 U.S.C. 922(s), required a Federal Firearms Licensee (FFL) to request a background check on a handgun applicant from the Chief Law Enforcement Officer (CLEO) of the jurisdiction where the licensee operated.  A handgun could be transferred if a notice of denial was not transmitted to the FFL within five days by the CLEO.

**National Instant Criminal Background Check System.**  Pursuant to the permanent provisions of the Brady Act, 18 U.S.C. 922(t), the NICS began operations on November 30, 1998.  The NICS allows a licensee to contact the system by telephone or other electronic means for information, to be supplied immediately, on whether receipt of a firearm by a transferee would violate federal or state law.  In addition to regulation of handgun sales, the permanent provisions mandate background checks on long gun purchasers and persons who redeem a pawned firearm.  A licensee has the option of requesting a check on a person who attempts to pawn a firearm.

A NICS inquiry is not required if a transferee presents a state permit qualified by ATF as an alternative to the point-of-transfer check.  Qualified permits allow a transferee to possess, acquire, or carry a firearm, and were issued not more than five years earlier by the state in which the transfer is to take place, after verification by an authorized government official that possession of a firearm by the transferee would not be a violation of law.  A permit issued after November 30, 1998 qualifies as an alternative only if the information available to the state authority includes the NICS.

The NICS process begins when a licensee receives a completed Firearms Transaction Record (ATF Form 4473) and a government-issued photo identification from an applicant.  Completion of a state disclosure form may also be required.  Submitting false information in regard to a firearm transaction is illegal under federal law and many state statutes.

A licensee initiates a NICS check by contacting either the Federal Bureau of Investigation (FBI) or a point of contact (POC) agency designated by state government. The FBI and the POC agencies always check three major federal databases, the National Crime Information Center (NCIC), the Interstate Identification Index (III), and the NICS Index.  If the transferee is not a citizen of the United States, the NICS will query Bureau of Immigration and Customs Enforcement (ICE) records.  A POC may check additional state records.  A check may include contacting an agency that maintains a record that the FBI or POC cannot access directly.

After a search of available federal and state records, the checking agency responds with a notice to the licensee that the transfer may proceed, may not proceed, or is delayed

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

pending further review of the applicant's record.  If further review of a record indicates that the transfer would not violate federal or state law, the checking agency notifies the licensee that the transfer may proceed.  If the licensee does not receive a response within three business days, the transfer may proceed at the licensee's discretion.  A person who is not allowed to proceed may appeal to the FBI or POC and submit information to correct the record on which the denial was based.

NICS checking agencies most often block the transfer of a firearm or a permit to a person whose records indicate a felony indictment or conviction, a fugitive warrant, unlawful drug use or addiction (within the prior year), a mental defective adjudication or an involuntary commitment to a mental institution, illegal or non-immigrant alien status, a domestic violence restraining order, or a misdemeanor domestic violence conviction.  These and other prohibitors are stated in the Gun Control Act (GCA), 18 U.S.C. 922.  A NICS denial may also be based on a state law prohibition.

**NICS Denials in 2010.**  The FBI conducted over six million NICS transfer checks in 2010 and denied over 72,000 applications, a denial rate of about 1%.  The most common reason for denial by the FBI was a record of a felony indictment or conviction (over 47%), followed by fugitives from justice (19%), and state law prohibitions (about 11%) (Table 1).  Other reasons included drug use or addiction (about 10%), domestic violence misdemeanor convictions (over 6%), and domestic violence restraining orders (over 4%) (Appendix table A).

**Table 1. Background checks by the FBI in 2010**

|                                               | Number    | Percent |
|-----------------------------------------------|-----------|---------|
| Applications for firearm transfer             | 6,037,394 |         |
| Denials / denial rate                         | 72,659    | 1.2%    |
|                                               |           |         |
| Most common denial reasons / percent of denials |         |         |
| Felony indictment or conviction               | 34,459    | 47.4%   |
| Fugitive                                      | 13,862    | 19.1%   |
| State law prohibition                         | 7,666     | 10.6%   |

## ATF Investigations

Denial data is electronically transmitted by the FBI on a daily basis to ATF's Denial Enforcement and NICS Intelligence (DENI) Branch (formerly Brady Operations Branch).  Transactions denied by the FBI contain data on prohibited persons who unlawfully attempted to purchase a firearm.  Some prohibited persons obtain a firearm during a "delayed transaction," where the FBI has not completed a check in three business days and the dealer is allowed to transfer the firearm.  When the FBI finds a prohibitory record and is informed by the dealer that a transfer occurred, a "delayed denial" referral is made to ATF.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

As a way to assist ATF investigations, the FBI NICS Section implemented a system enhancement that ranks a delayed denial transaction based on ATF categories applicable to the specific denial and separates the ranked delayed denials from the standard denials.  (*NICS Operations 2005*, FBI CJIS Division, January 2006, http://www.fbi.gov/about-us/cjis/nics/reports/2005-operations-report/ops_report_2005.pdf).

In addition, the DENI Branch queries the daily NICS referrals to identify collateral (pre-pawn) checks where a person who attempted to pawn a firearm was found to be prohibited.  Research by the DENI Branch that covered October 2001 to November 2005 concluded that collateral checks have a denial rate of 3.3%, which is over two times greater than the overall FBI denial rate.  The pawnbroker who requested the collateral check is contacted to find out if the denied person left the pawnshop with the firearm.  If the denied person still possesses the firearm, the referral is expedited in the same manner as a delayed denial.  If the pawnbroker retained the firearm, the denial is processed as a standard denial.

The DENI Branch searches databases available to ATF for additional data on denied persons referred by the FBI.  After an initial screening, denials are referred to the 19 ATF field divisions serviced by the DENI Branch (six other divisions' territories are only comprised of POC states).  All delayed denials are required to be referred within 48 hours.  Routinely, delayed denials are referred within 24 hours of receipt from the FBI.  Referrals are made in accordance with criteria established for the federal judicial districts within each division's territory.  ATF and United States Attorneys have developed referral criteria for all 94 judicial districts that reflect the types of cases most likely to merit prosecution.  Cases involving restraining orders, domestic violence misdemeanors, non-immigrant aliens, violent felonies, warrants, and indictments are most often included in referral criteria.

The DENI Branch screened 76,142 NICS denials received from the FBI during 2010, and referred 4,732 denials (approximately 6%) within the established guidelines to field divisions.  The referred cases were made up of 2,265 delayed denials (3% of all denials) and 2,467 standard denials (over 3%).  The remaining denials (71,410, or nearly 94%) did not meet referral guidelines or were overturned or canceled.  Overturns occurred after review by the DENI Branch or after the FBI received additional information.  The FBI canceled a small number of denials in cases where a NICS check should not have been conducted.  (Table 2.)  Standard denials that are not being referred are reported weekly to the field divisions and made available in a database if further review is deemed necessary.

Denials that were caused by protective orders, felony convictions, and domestic violence misdemeanor convictions comprised nearly 76% of referrals to field divisions.  (Table 2.)  Somewhat less frequent were referrals involving persons who were an unlawful user of a controlled substance, under indictment or information, or a fugitive

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

from justice.  The six most common reasons for referral accounted for about 98% of the cases.  (Appendix table B.)

**Table 2. NICS denials by FBI referred to ATF field divisions in 2010**

|  | Cases | Percent |
|---|---|---|
| FBI denials referred to ATF DENI Branch | 76,142 | 100.0% |
| DENI Branch referrals to ATF field divisions | 4,732 | 6.2% |
|     Delayed denials | 2,265 | 3.0% |
|     Standard denials | 2,467 | 3.2% |
| Not referred to field, overturned, or canceled | 71,410 | 93.8% |
|  |  |  |
| Most common reasons for referrals to field |  |  |
|     Subject to protective order | 1,395 | 29.5% |
|     Convicted felon | 1,144 | 24.2% |
|     Domestic violence misdemeanor | 1,049 | 22.2% |

A NICS coordinator in each ATF division receives and distributes referrals to the appropriate field office.  A state point of contact may also refer denials to the nearest field office.  Special agents at the field offices verify conviction and prohibition information and conduct additional investigations.  The FBI is notified if ATF determines that a person should not have been denied.

In a delayed denial case, the agent contacts the firearm purchaser and seizes or takes an abandonment of the firearm or coordinates a transfer of the firearm to a licensed dealer or to a third party who is not a prohibited person.  In POC states, a retrieval may be handled by local law enforcement, a statewide firearms unit, or ATF.   In addition to the delayed denials, a small number of 2010 standard denials potentially involved unlawful firearm possession.  Field offices investigated a total of 1,923 unlawful possession cases that began in 2010.  A retrieval of a firearm (or firearms) from a prohibited person by field agents occurred in 1,164 (about 61%) of the cases.  The subject of the investigation was cleared in 509 cases (approximately 27%).  About 93% of the cases had been resolved by December 13, 2010, with the subject missing in nearly 7% of the cases.  (Table 3.)

**Table 3. Outcomes of 2010 unlawful possession cases**

|  | Cases | Percent |
|---|---|---|
| Total | 1,923 | 100.0% |
| Retrieval of a firearm (or firearms) | 1,164 | 60.5% |
| Subject not prohibited | 509 | 26.5% |
| Unable to locate subject | 128 | 6.7% |
| Other outcomes | 122 | 6.3% |

The 1,164 retrieval cases reached the following resolutions: transfers to non-prohibited third parties -  577 (30% of total cases); returns to firearms dealers - 505 (about 26%); seizures by ATF - 47 (over 2%); and abandonments by transferees - 35 (nearly 2%). These cases resulted in retrieval of 1,181 firearms.  (Appendix table C.)  Charges were

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

referred for prosecution in 11 cases where ATF retrieved a firearm and in two cases that were given to local law enforcement.

## Prosecutions by U.S. Attorneys

When an investigation is complete, the field office and the U.S. Attorney decide whether the case merits prosecution.  A case that is not deemed appropriate for federal prosecution may be referred to a state prosecutor.  If the U.S. Attorney decides to prosecute, an arrest is made or a warrant is issued.

Field offices declined to refer 4,184 cases for prosecution.  The most common reasons for declinations were no prosecutive merit (1,661 cases or almost 40%), federal or state guidelines were not met (1,092 cases or 26%), and subjects found to not be prohibited (480 cases or about 12%).  (Table 4).  Other reasons for declination by a field office included closure by a supervisor (457 or 11%) and no potential or unfounded (396 cases or about 10%).  (Appendix table D.)

**Table 4. 2010 cases declined by ATF field offices**

|  | Cases | Percent |
|---|---|---|
| Total | 4,184 | 100.0% |
| Most common reasons for declination |  |  |
| No prosecutive merit | 1,661 | 39.7% |
| Federal or state guidelines not met | 1,092 | 26.1% |
| Not a prohibited person | 480 | 11.5% |

A total of 62 charges from the 2010 cases were referred by field offices for consideration by prosecutors.  The most common charge referred was submitting falsified information when buying firearms, which accounted for 22 charges and 36% of all charges.  The second and third most common charges were possession of a firearm by a convicted felon (11 charges or approximately 18%) and possession of a firearm after a domestic abuse charge (7 charges or about 11%).  (Table 5.)

**Table 5.  Charges referred for prosecution, 2010**

| Charge definition | Charges | Percent |
|---|---|---|
| Total | 62 | 100.0% |
| Falsified information when buying firearms | 22 | 35.5% |
| Possession of firearm by convicted felon | 11 | 17.7% |
| Possess firearm after domestic abuse charge | 7 | 11.3% |
| Receive/ship/transport firearm after indictment | 5 | 8.1% |
| Other charges | 17 | 27.4% |

Subsections of the Gun Control Act, 18 U.S.C. 922, were the basis for 49 charges (approximately 79% of all charges).  The 2010 cases produced charges referred for prosecution against 33 persons, 25 from delayed denials and 8 from standard denials. (Appendix table E.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Of the 62 charges referred from the 2010 cases, 18 (29%) had been declined by a prosecutor as of December 13, 2011.  A guilty plea was obtained on 13 charges (about 21%) and 10 charges (about 16%) were dismissed as part of a plea agreement. Twelve charges (approximately 19%) were still pending action by a prosecutor as of December 13, 2011.  (Table 6.)  In addition, five charges (8%) were dismissed prior to or after an indictment (Appendix table F).

**Table 6.  Status of 2010 charges referred for prosecution**

| Judicial status | Charges[a] | Percent |
|---|---|---|
| Total | 62 | 100.0% |
| Selected outcomes: | | |
| Declined by prosecutor | 18 | 29.0% |
| Guilty plea by defendant | 13 | 21.0% |
| Pending action by prosecutor | 12 | 19.4% |
| Dismissed per plea agreement | 10 | 16.1% |

[a]As of December 13, 2011

Of the 13 charges that resulted in a guilty plea, six (about 46%) were for possession of a firearm by a convicted felon and two (over 15%) were for receiving, shipping, or transporting a firearm after an indictment (Table 7).  State offenses accounted for three of the charges and the remainder were federal charges.  Ten charges in the guilty pleas (nearly 77%) were based on subsections of the Gun Control Act.  Of the 13 defendants who pled guilty, 11 were from delayed denial cases and two were from standard denial cases.  (Appendix table G.)

**Table 7. 2010 charges that resulted in guilty pleas**

| Charge definition | Charges | Percent |
|---|---|---|
| Total | 13 | 100.0% |
| Possession of firearm by convicted felon | 6 | 46.2% |
| Receive/ship/transport firearm after indictment | 2 | 15.4% |
| Other charges | 5 | 38.4% |

## Federal Judicial District Summary

The District of Arizona had the highest number of unlawful possession investigations from the 2010 cases (154), followed by the Southern District of Texas (86).  The District of Arizona had the most field office declinations (240), followed by the Eastern District of Kentucky (192).  The highest number of charges referred for prosecution was in the Northern District of Indiana (12), which also had the most charges that resulted in a guilty plea (5).  (Appendix table H.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Comparisons With Prior Years, 2006-2010

Data on enforcement of the Brady Act is available for the five-year period from 2006 to 2010.  Selected statistics from each year's cases are summarized in Appendix table I.  FBI referrals of NICS denials to the DENI Branch decreased about 1%, from 77,233 in 2006 to 76,142 in 2010.  The DENI Branch's referrals to ATF field divisions decreased nearly 50%, from 9,432 for 2006 to 4,732 for 2010.  Unlawful possession investigations decreased by 26% from 2006 to 2010 and investigations that resulted in a firearm retrieval decreased by over 21%.  The number of charges referred by field offices for prosecution fell by over 77%, from 273 for the 2006 cases to 62 for the 2010 cases.  The number of charges that resulted in guilty pleas and verdicts fell by about 82%, from 73 for the 2006 cases to 13 for the 2010 cases.  (Appendix table I).  Citations to the prior years' reports are listed in the appendix table.

## State Investigations of Denied Persons, 2006-2010

As of December 31, 2010, 13 states maintained a full point of contact for the NICS and conducted background checks on all persons who applied to purchase a firearm from a licensed dealer.  Eight states maintained a partial NICS point of contact and conducted checks on all persons who applied to purchase a handgun from a dealer (the FBI checked long gun purchasers in these states).  See *Background Checks for Firearm Transfers, 2010* (publication pending).  In addition, six states require an applicant for a purchase or a purchase permit to undergo a background check that does not access the NICS Index.

When a denied person is suspected of violating federal law, most state point-of-contact agencies refer the case to the nearest ATF field office.  States differ as to how potential state law violations are investigated.  In some states, the checking agency immediately notifies the police or sheriff's department that has jurisdiction over a denied person's residence or the gun shop where the transaction occurred.  The local agency is then responsible for investigation and prosecution of the case.  Other states have a unit with statewide jurisdiction that screens cases before deciding whether a referral should be made to a state police troop or local law enforcement.  Data on denied person investigations from two states is available for the five-year period from 2006 to 2010.

**Pennsylvania.**  The Pennsylvania State Police (PSP) Firearms Division is a NICS point of contact and conducts background checks on prospective firearm purchasers.  PSP denials that involve federal prohibitions are referred to ATF.  Cases with potential state law violations may be referred to PSP troops or local law enforcement.  PSP denied 10,596 firearm transfers in 2010, an increase of almost 11% from the 9,535 denials issued in 2006.  Denials referred for investigation increased about 55%, from 285 in 2006 to 441 in 2010.  Apprehensions of wanted persons decreased from 119 in 2006 to 114 in 2010 (about 4%) and reported arrests increased from 194 in 2006 to 205 in

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

2010 (about 6%).  Convictions of denied persons decreased by over 25%, from 173 in 2006 to 129 in 2010.  (Appendix table J.)

**Virginia.**  The Virginia State Police (VSP) Firearms Transaction Center is a NICS point of contact and conducts background checks on prospective firearm purchasers.  VSP reports denied persons with federal prohibitors to ATF.  Potential state law violations are reviewed by VSP Troopers, who consult with Commonwealth Attorneys as part of their investigative process.  VSP denied 2,999 firearm transfers in 2010, a 26% increase from the 2,380 denials issued in 2006.  Denials referred for investigation decreased by approximately 6%, from 1,005 in 2006 to 942 in 2010.  The number of reported arrests increased by about 16%, from 727 in 2006 to 846 in 2010.  In addition, VSP investigations led to the apprehension of 65 wanted persons and the retrieval of 6 firearms from prohibited persons in 2010.  (Appendix table K.)

## Methodology

The DENI Branch provided the Regional Justice Information Service (REJIS) with statistics on denied person cases received from the FBI's NICS Section and referred to ATF field offices after screening.  The National Field Office Case Information System (NFOCIS) unit provided REJIS with records from ATF's case management system (NForce) on field office and U.S. Attorney processing.  The records reflect activity up to December 13, 2011.  Court decisions are included in the records but sentencing information was not available.

No personal identifiers were included in the records.  Cases or charges could only be distinguished by NICS numbers.  NICS numbers for the 2011 cases were compared to those for the 2010 cases and a small number of duplicate entries were deleted.  In calculating the number of persons referred for prosecution and the number of persons convicted, it was assumed that each separate NICS number represented one person. However, it is possible that a person could have more than one NICS number.

## Additional Contributors

Scott Stargel, ATF
Provided case management data

Jennifer Karberg and Gene Lauver, REJIS
Terrence Clark, Busey Ward, and Christine Raposa, ATF
Reviewed the report

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Appendix

**Table A.  Background checks on firearm applicants processed by the FBI in 2010**

|  | FBI / NICS[a] | |
|---|---|---|
|  | Number | Percent |
| Applications | 6,037,394 | -- |
| Denials / Denial rate | 72,659 | 1.2% |
|  |  |  |
| Appeals / Appeal rate | 16,513 | 22.7% |
| Appeals reversed / Reversal rate | 3,491 | 21.1% |
|  |  |  |
| Reasons for denials: |  |  |
|   Felony indictment/conviction | 34,459 | 47.4% |
|   State law prohibition | 7,666 | 10.6% |
|   Domestic violence |  |  |
|     Misdemeanor conviction | 4,475 | 6.2% |
|     Restraining order | 3,107 | 4.3% |
|   Fugitive | 13,862 | 19.1% |
|   Illegal or non-immigrant alien | 576 | 0.8% |
|   Mental illness or disability | 1,292 | 1.8% |
|   Drug use or addiction | 6,971 | 9.6% |
|   Other prohibitions[b] | 251 | 0.3% |

-- Not applicable
[a]Firearm transfer transactions reported by the FBI NICS Section.
[b]Includes juveniles, persons dishonorably discharged from the Armed Services, persons who have renounced their U. S. citizenship, and other unspecified persons.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table B.  NICS denials by FBI referred to ATF field divisions in 2010**

|  | Cases | Percent |
|---|---|---|
| FBI denials referred to ATF DENI Branch | 76,142 | 100.0% |
| DENI Branch referrals to ATF field divisions |  |  |
|     Total referred to field | 4,732 | 6.2% |
|       Delayed denials | 2,265 | 3.0% |
|       Standard denials | 2,467 | 3.2% |
| Not referred to field | 68,209 | 89.6% |
| Not referred and overturned | 3,163 | 4.2% |
| Canceled | 38 | --- |
| Reasons for referrals to ATF field divisions |  |  |
|     Subject to protective order | 1,395 | 29.5% |
|     Convicted felon | 1,144 | 24.2% |
|     Domestic violence misdemeanor | 1,049 | 22.2% |
|     Unlawful user of controlled substance | 411 | 8.7% |
|     Under indictment or information | 344 | 7.3% |
|     Fugitive from justice | 286 | 6.0% |
|     Adjudicated mentally defective | 46 | 1.0% |
|     Illegal or unlawful alien | 36 | 0.8% |
|     Other reasons[a] | 21 | 0.4% |

Note: Totals may not sum to 100% due to rounding.
[a]The category "other reasons" is compiled from four other prohibiting categories utilized by the DENI Branch to refer denials for field investigation.

**Table C.  2010 NICS denial cases involving unlawful firearm possession**

| Outcome of ATF investigation | Delayed | Standard | All Cases | Percent |
|---|---|---|---|---|
|     Total | 1,858 | 65 | 1,923 | 100.0% |
| Retrieval of a firearm[a] by: |  |  |  |  |
|     Transfer to third party | 573 | 4 | 577 | 30.0% |
|     Return to firearms dealer | 503 | 2 | 505 | 26.3% |
|     Seizure by ATF | 46 | 1 | 47 | 2.4% |
|     Abandonment by transferee | 35 | 0 | 35 | 1.8% |
|  | 1,157 | 7 | 1,164 | 60.5% |
| Subject not prohibited | 498 | 11 | 509 | 26.5% |
| Unable to locate subject | 128 | 0 | 128 | 6.7% |
| Firearm not transferred | 43 | 46 | 89 | 4.6% |
| Given to local law enforcement | 20 | 0 | 20 | 1.0% |
| Referred to other agency | 12 | 1 | 13 | 0.7% |

[a]A total of 1,181 firearms were retrieved by ATF, 1,174 from delayed denial cases and seven from standard denials cases.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table D.  2010 NICS denial cases declined by ATF field offices**

| Reason for case declination | Delayed | Standard | All cases | Percent |
|---|---|---|---|---|
| Total | 2,063 | 2,121 | 4,184 | 100.0% |
| No prosecutive merit | 748 | 913 | 1,661 | 39.7% |
| Federal or State guidelines not met | 527 | 565 | 1,092 | 26.1% |
| Not a prohibited person | 409 | 71 | 480 | 11.5% |
| Closed by supervisor | 210 | 247 | 457 | 10.9% |
| No potential or unfounded | 159 | 237 | 396 | 9.5% |
| Referred to another agency | 6 | 85 | 91 | 2.2% |
| Assisted prosecution | 4 | 3 | 7 | 0.2% |

Note: The number of cases declined is obtained from NForce. On occasion, a field office will close a case initially transferred from the DENI Branch and open the case under a different number; therefore the number of prosecuted cases may seem low compared to the number of cases referred to the field.

**Table E.  Charges in 2010 NICS denial cases referred for prosecution**

| 18 USC 922 Subsection | Charge definition | Delayed | Standard | All charges[a] | Percent |
|---|---|---|---|---|---|
| | Total[b] | 49 | 13 | 62 | 100.0% |
| (a)(6) | Falsified information when buying firearms | 15 | 7 | 22 | 35.5% |
| (g)(1) | Possession of firearm by convicted felon | 8 | 3 | 11 | 17.7% |
| (g)(9) | Possession of firearm after domestic abuse charge | 7 | 0 | 7 | 11.3% |
| (n) | Receive/ship/transport firearm after indictment | 5 | 0 | 5 | 8.1% |
| (g)(3) | Possession of firearm by drug user | 2 | 0 | 2 | 3.2% |
| (g)(8) | Possession of firearm while under restraining order | 0 | 1 | 1 | 1.6% |
| Other | | 1 | 0 | 1 | 1.6% |
| | Total 18 USC 922 | 38 | 11 | 49 | 79.0% |
| | Other statutes[c] | 11 | 2 | 13 | 21.0% |

[a]Charges were referred against 33 persons, 25 from delayed denials and eight from standard denials.

[b]Seven charges were for State offenses; the remainder were Federal charges.

[c]Includes five charges for causing a firearms dealer to falsify records, 18 USC 924(a)(1)(A), one charge for making a false statement, 18 USC 1001, two state narcotics charges, and five charges based on unspecified state statutes.

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table F.  Judicial status of charges in 2010 NICS denial cases referred for prosecution**

| Judicial status (as of December 13, 2011) | Delayed | Standard | All charges | Percent |
|---|---|---|---|---|
| Total | 49 | 13 | 62 | 100.0% |
| Declined by prosecutor | 13 | 5 | 18 | 29.0% |
| Guilty plea by defendant | 11 | 2 | 13 | 21.0% |
| Pending action by prosecutor | 12 | 0 | 12 | 19.4% |
| Dismissed per plea agreement | 9 | 1 | 10 | 16.1% |
| Complaint filed | 2 | 2 | 4 | 6.5% |
| Dismissed prior to indictment | 2 | 1 | 3 | 4.8% |
| Dismissed after indictment | 0 | 2 | 2 | 3.2% |

**Table G.  Charges in guilty pleas and verdicts, 2010 NICS denial cases**

| 18 USC 922 Subsection | Charge definition | Delayed | Standard | All charges[a] | Percent |
|---|---|---|---|---|---|
| | Total[b] | 11 | 2 | 13 | 100.0% |
| (g)(1) | Possession of firearm by convicted felon | 4 | 2 | 6 | 46.2% |
| (n) | Receive/ship/transport firearm after indictment | 2 | 0 | 2 | 15.4% |
| (a)(6) | Falsified information when buying firearms | 1 | 0 | 1 | 7.7% |
| (g)(3) | Possession of firearm by drug user | 1 | 0 | 1 | 7.7% |
| | Total 18 USC 922 | 8 | 2 | 10 | 76.9% |
| | Other statutes | 3 | 0 | 3 | 23.1% |

[a]13 defendants pled guilty, 11 from delayed denials and two from standard denials.

[b]Three charges were for State offenses; the remainder were Federal charges.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table H.  Federal judicial district summary, 2010 NICS denial cases**

Districts with the most unlawful possession cases

| | |
|---|---|
| Arizona | 154 |
| Texas Southern | 86 |
| Georgia Northern | 81 |
| Missouri Western | 80 |
| Kansas | 79 |

Districts with the most case declinations

| | |
|---|---|
| Arizona | 240 |
| Kentucky Eastern | 192 |
| Kentucky Western | 161 |
| South Carolina | 158 |
| Missouri Western | 152 |

Districts with the most charges referred for prosecution

| | |
|---|---|
| Indiana Northern | 12 |
| Arizona | 6 |
| Indiana Southern | 6 |
| Georgia Middle | 5 |
| New York Northern | 5 |

Districts with the most charges that resulted in a guilty plea

| | |
|---|---|
| Indiana Northern | 5 |
| Indiana Southern | 3 |
| Arkansas Eastern | 1 |
| Georgia Middle | 1 |
| Kentucky Western | 1 |
| New York Northern | 1 |
| South Dakota | 1 |

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table I.  Selected statistics on NICS denial cases, 2006-2010**

| | Number of Cases | | | | | Change |
|---|---|---|---|---|---|---|
| | 2010 | 2009[a] | 2008[b] | 2007[c] | 2006[d] | 2006-2010 |
| FBI denials referred to DENI Branch | 76,142 | 71,010 | 78,906 | 73,992 | 77,233 | -1.4% |
| DENI referrals to ATF field divisions | 4,732 | 4,681 | 5,573 | 6,275 | 9,432 | -49.8% |
| Unlawful possession investigations | 1,923 | 2,063 | 2,154 | 2,212 | 2,600 | -26.0% |
| Investigations with firearm retrieved | 1,164 | 1,256 | 1,218 | 1,258 | 1,480 | -21.4% |
| Field office declinations | 4,184 | 4,726 | 6,086 | 6,072 | 9,410 | -55.5% |
| | Number of Charges | | | | | Change |
| | 2010 | 2009 | 2008 | 2007 | 2006 | 2006-2010 |
| Referred for prosecution | 62 | 140 | 147 | 196 | 273 | -77.3% |
| Declined by prosecutor[e] | 18 | 63 | 42 | 74 | 99 | -81.8% |
| Guilty plea or verdict[e] | 13 | 32 | 43 | 48 | 73 | -82.2% |

[a]*Enforcement of the Brady Act, 2009*, (NCJ No. 234173, April 2011), https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=256112

[b]*Enforcement of the Brady Act, 2008*, (NCJ No. 231052, June 2010), https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=253101

[c]*Enforcement of the Brady Act, 2007*, (NCJ No. 227604, July 2009), https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=249609

[d]*Enforcement of the Brady Act, 2006*, (NCJ No. 222474, April 2008), https://www.ncjrs.gov/App/Publications/abstract.aspx?ID=244375

[e]Counts for each year may be undercounted because some cases were pending action by a prosecutor or a court on the date that data was extracted from ATF records (see yearly reports for details). Results of the pending cases are not available for any year.

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table J.  Investigations of Pennsylvania POC Denial Cases, 2006-2010**

|                                    | 2010   | 2009  | 2008   | 2007  | 2006  | Change 2006-2010 |
|------------------------------------|--------|-------|--------|-------|-------|------------------|
| Total denials                      | 10,596 | 9,449 | 10,823 | 7,420 | 9,535 | 11.1%            |
|                                    |        |       |        |       |       |                  |
| Referred for investigation         | 441    | 328   | 504    | 440   | 285   | 54.7%            |
| State police troops                | 382    | 222   | 294    | 300   | 175   | 118.3%           |
| Local police departments[a]        | 59     | 96    | 90     | 139   | 102   | -42.2%           |
| ATF field offices                  | 0      | 10    | 120    | 1     | 8     | -100.0%          |
|                                    |        |       |        |       |       |                  |
| Investigation outcomes             |        |       |        |       |       |                  |
| Firearms retrieved                 | ---    | ---   | ---    | ---   | ---   | ---              |
| Wanted persons apprehended         | 114    | 114   | 112    | 124   | 119   | -4.2%            |
| Arrests reported                   | 205    | 215   | 96     | 252   | 194   | 5.7%             |
| Prosecutor declinations            | 78     | 74    | 41     | 76    | 100   | -22.0%           |
| Convictions                        | 129    | 151   | 69     | 181   | 173   | -25.4%           |

---Not applicable or not available

Source: Pennsylvania State Police, Firearms Annual Reports, 2006-2010,
http://www.portal.state.pa.us/portal/server.pt?open=512&objID=4451&&PageID=462425&level
=2&css=L2&mode=2
[a]Pennsylvania cases were initially referred to state police troops and further referred to local
police departments.

**Table K.  Investigations of Virginia POC Denial Cases, 2006-2010**

|                                    | 2010  | 2009  | 2008  | 2007  | 2006  | Change 2006-2010 |
|------------------------------------|-------|-------|-------|-------|-------|------------------|
| Total denials                      | 2,999 | 3,101 | 2,777 | 2,222 | 2,380 | 26.0%            |
|                                    |       |       |       |       |       |                  |
| Referred for investigation         | 942   | 1,286 | 891   | 935   | 1,005 | -6.3%            |
| State police troops                | 942   | 1,286 | 891   | 935   | 1,005 | -6.3%            |
| Local police departments[c]        | ---   | ---   | ---   | ---   | ---   | ---              |
| ATF field offices                  | ---   | ---   | ---   | ---   | ---   | ---              |
|                                    |       |       |       |       |       |                  |
| Investigation outcomes             |       |       |       |       |       |                  |
| Firearms retrieved[a]              | 6     | 6     | 11    | 5     | ---   | ---              |
| Wanted persons apprehended         | 65    | 74    | 77    | 75    | ---   | ---              |
| Arrests reported                   | 846   | 930   | 810   | 716   | 727   | 16.4%            |
| Prosecutor declinations            | ---   | ---   | ---   | ---   | ---   | ---              |
| Convictions                        | ---   | ---   | ---   | ---   | ---   | ---              |

---Not applicable or not available
[a]Includes firearms retrieved by the state police or returned voluntarily by a prohibited person.
Source: Virginia State Police.

# EXHIBIT 42

**From:**

**Sent:** Friday, March 16, 2018 3:11 PM

**To:**

**Cc:**

**Subject:** RE: 811365    California AB60 IDs and Real ID Act [IWOV-Interwoven.FID44801]

Yes, I believe that resolves the issue. Thank you for your quick reply.

When do you expect to rescind the June 30, 2016 letter concerning "federal limits apply" licenses? Will there be additional information or comment issued when this is done? The problems that we're currently having with California Department of Justice appear to be based on them continuing to rely on that letter.

Under *California law*, there should be no issues with firearm dealers accepting licenses with or without "federal limits apply" on them. This is certainly not an issue that concerns you and one we will take up with them.

But California DOJ appears to still focus on the June 30, 2016 letter and a belief that firearm dealers cannot accept any license that states "Federal Limits Apply" on it.



Special Counsel

MICHEL & ASSOCIATES, P.C.
Attorneys at Law

Environmental · Land Use · Firearms · Employment Law
Civil Litigation · Criminal Defense

Direct:
Main:   (562) 216-4444
Fax:    (562) 216-4445
Email
Web:    www.michellawyers.com

180 E. Ocean Blvd.
Suite 200
Long Beach, CA 90802

This e-mail is confidential and is legally privileged.  If you have received it in error, you are on notice of its status.  Please notify us immediately by reply e-mail and then delete this message from your system.  Please do not copy it or use it for any purposes, or disclose its contents to any other person.  To do so could violate state and Federal privacy laws.  Thank you for your cooperation.  Please contact Michel & Associates, PC at (562) 216-4444 if you need assistance.

**From:**

**Sent:** Friday, March 16, 2018 3:57 AM

**To:**

**Cc:**

**Subject:** RE: 811365 California AB60 IDs and Real ID Act [IWOV-Interwoven.FID44801]

As a follow-up to our response, you are asking if it is correct to presume that dealers can accept post-January 22, 2018 licenses as identification for firearm purchases, provided the person checks the boxes to question 12 of the 4473 to reflect that they 1) are a U.S. citizen, 2) have not renounced their U.S. citizenship, and 3) are not an alien illegally or unlawfully in the country, *and* the dealer does not have reason to believe that the person is prohibited and/or illegally in the country.

Licensees may accept post-January 22, 2018 licenses/identification documents that meet the definition in 18 U.S.C. 1028(d) in fulfilling their requirements under 18 U.S.C. 922(t)(1)(C) and 27 CFR

478.124(c)(3)(i).  However, licensees may  consider asking for additional documentation (*e.g.,* passport) so that the transfer is not further delayed.

We trust the foregoing has been responsive to your inquiry.  Should you have additional questions, please contact us a ▮▮▮▮▮▮▮▮▮.

Regards,

▮▮▮▮▮ | Firearms Enforcement Specialist
**U.S. Department of Justice | Bureau of Alcohol, Tobacco, Firearms and Explosives**
Firearms Industry Programs Branch
99 New York Avenue NE, Mail Stop 6.N-518
Washington, DC 20226



*To the extent that this electronic communication contains case-related information, it is only a summary or excerpt and is not intended to be a complete statement of facts or a formal report.*

**CONFIDENTIALITY NOTE**
This email is covered by the Electronic Communications Privacy Act, 18 U. S. C. §§ 2510-2521 and is legally privileged. This electronic message transmission, which includes any files transmitted with it, may contain confidential or privileged information and is only intended for the individual or entity named above. If you are not the intended recipient of this email, please be aware that you have received this email in error and any disclosure, copying, distribution or use of the contents of this information is strictly prohibited. If you have received this email in error, please immediately purge it and all attachments and notify me immediately by electronic mail.

**From:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Sent:** Wednesday, March 14, 2018 3:27 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Cc:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** RE: 811365 California AB60 IDs and Real ID Act [IWOV-Interwoven.FID44801]

Thank you for your attention in this matter.

A point of clarification: Because it is "unclear whether persons who possess California DL/IDs issued with the endorsement "Federal Limits Apply" after January 22, 2018 are prohibited," is it a correct presumption that dealers can accept the post-January 22, 2018, licenses as identification for firearm purchases provided the person checks the boxes to question 12 of the 4473 to reflect 1) that they are a U.S. citizen, 2) have not renounced their U.S. citizenship, and 3) are not an alien illegally or unlawfully in the country, *and* the dealer does not have reason to believe that the person is prohibited and/or illegally in the country?

Once we have this cleared up we will be contacting DOJ.

Thanks

▮▮▮▮▮▮▮

## **CERTIFICATE OF SERVICE**
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Rhode, et al. v. Becerra*
Case No.: 3:18-cv-00802-JM-JMA

IT IS HEREBY CERTIFIED THAT:

       I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

       I have caused service of the following documents, described as:

### **DECLARATION OF MATTHEW D. CUBEIRO IN SUPPORT OF PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

on the following parties by electronically filing the foregoing on August 12, 2019, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Nelson R. Richards               *Attorneys for Defendant Attorney General*
Deputy Attorney General          *Xavier Becerra*
nelson.richards@doj.ca.gov
2550 Mariposa Mall, Room 5090
Fresno, CA 93721

       I declare under penalty of perjury that the foregoing is true and correct. Executed on August 12, 2019, at Long Beach, CA.

                       *s/ Laura Palmerin*
                       Laura Palmerin