Pages 1 - 136

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

Before The Honorable Roger T. Benitez, Judge

```
KIM RHODE, et al.,            )
                             )
          Plaintiffs,        )
                             )
   VS.                       )      NO. 18-CV-00802-BEN-JLB
                             )
XAVIER BECERRA, et al.,       )
                             )
          Defendants.        )
_____)
```

San Diego, California
Monday, August 19, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    MICHEL & ASSOCIATES, P.C.
                    180 East Ocean Boulevard, Suite 200
                    Long Beach, California 90802
          **BY:  SEAN A. BRADY, ESQ.**

For Defendants:

                    OFFICE OF THE ATTORNEY GENERAL
                    State of California
                    1300 I Street, Suite 125
                    P.O. Box 944255
                    Sacramento, California 94244-2550
          **BY:  NELSON RICHARDS, ESQ.**

Reported By:   James C. Pence-Aviles, RMR, CRR, CSR No. 13059
               Official Court Reporter

<u>**Monday - August 19, 2019**</u>                                    <u>**11:00 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

**---000---**

**THE COURT:**  Okay.  Good morning.

**MR. BRADY:**  Good morning, Your Honor.

**MR. RICHARDS:**  Good morning, Your Honor.

**THE CLERK:**  3 on calendar, 18-CV-0802, Rhode, et al.,
v. Becerra, et al., motion hearing.

**THE COURT:**  All right.  Counsel, please register your
appearances for the record.

**MR. BRADY:**  Good morning, Your Honor.  Sean Brady on
behalf of the plaintiffs.

**MR. RICHARDS:**  Good morning, Your Honor.  Nelson
Richards for defendant.

**THE COURT:**  Okay.  So this morning, we have a motion
for preliminary hearing -- or preliminary injunction to be
issued against the State.

And there's considerable -- boy, is that an
understatement -- considerable filings that have occurred in
connection with this -- with this motion.  I wish -- I wish
there was some way to briefly summarize those, but I don't know
that there is.

So, Mr. Brady, this is your -- your motion.  So perhaps I
should -- I should let you go first and tell me why you think I
should grant your request for preliminary injunction.

1          **MR. BRADY:**   Thank you, Your Honor.

2      I think that the large amount of filings that accompany

3  these motions can be sort of described succinctly, and that is

4  they describe an undue burden placed on the exercise of a

5  constitutional right.

6      We're talking about the Government acting as a gatekeeper

7  here, and in that gatekeeping capacity, it is denying a

8  significant number of people their exercise of a constitutional

9  right and, as far as plaintiffs can see, unnecessarily so.

10      We're talking about a system that, in one month, has

11  resulted in approximately 18 percent of the people who undergo

12  the background check system not being able to proceed to

13  acquire ammunition.

14      Of -- of those people who are denied, according to the

15  State's own evidence, you can -- to make things even more

16  simple for Your Honor, I think you can almost wholly ignore

17  plaintiffs' evidence that they brought at the outset because

18  the State's evidence corroborates and actually bolsters --

19  makes the case even more so than what plaintiffs suspected was

20  the case with the declarations from ammunition vendors.

21      You know, the State has confirmed that, you know, 11,000

22  individual -- almost 11,000 -- I don't want to exaggerate.

23  It's 10,000 and change -- individuals were unable to acquire

24  ammunition.

25          **THE COURT:**   As I recall, there was 106 prohibited

1    persons out of -- out of -- out of that 62- or 63,000

2    applications.   There were 106 prohibited persons.

3              **MR. BRADY:**  According to the State, Your Honor.  And,

4    of course, we do not have -- plaintiffs do not have access to

5    that information to corroborate it.  I have no reason to

6    suspect why Mr. Richards or the State would not be telling the

7    truth on that matter.  However, I do think that's -- that

8    number --

9              **THE COURT:**  Where did you get the number?

10             **MR. BRADY:**  The 106?

11             **THE COURT:**  Yes.

12             **MR. BRADY:**  That is from the State's declaration.

13             **THE COURT:**  Okay.  All right.

14             **MR. BRADY:**  Yes.

15        And so that's where that -- they say that they stopped 106

16   individuals in one month who are prohibited persons.  That

17   number, I think, can -- will come down upon a scrutiny, how

18   much so, whether it will be, you know, eight of those people

19   were not prohibited or 80 of them were not.

20        One of the big issues here -- and this goes perhaps a

21   little bit beyond this case, but generally -- is the Bureau of

22   Firearms' records are not so reliable, particularly the system

23   that this particular background check system relies on, the

24   Automated Firearm System.  It is renowned for having --

25             **THE COURT:**  That's not the NCIS?

1          **MR. BRADY:**  No.  That is the federal system.

2      Now, the state system, when checking firearms, checks

3  NCIS -- NCIS, but this system is not allowed to because federal

4  law only allows firearm purchases to be -- to use -- to utilize

5  the NCIS system, and this is ammunition.

6      So there --

7          **THE COURT:**  Okay.  Well, that was the question that I

8  had.

9      All right.  So, look, you guys have been living with this

10 case a lot longer -- I mean, I've had the case for quite a

11 while, but you folks have been working it up for a lot longer

12 than I have.  So I have lots and lots and lots of questions,

13 but that was one question that I had, which was why is the NCIS

14 system not used.

15     Okay.  Got it.

16         **MR. BRADY:**  So, you know, to get back to the original

17 point as far as what all these filings show, I think it boils

18 down to can the Government say -- let's assume that there are

19 106 or so prohibited persons that were prevented from acquiring

20 ammunition is accurate.  Can the Government preclude 11,000

21 people from -- non-prohibited people from acquiring ammunition

22 and going through some process to ultimately potentially fix

23 that?

24     I think that's a crucial point that needs to be

25 considered, is that the State is claiming that this is just a

1   simple fix, that these people are temporarily denied, perhaps

2   so, perhaps for some.  For how many, we don't know, but --

3          THE COURT:  What sorts of things would -- has the

4   State told you what sorts of things might cause someone who's

5   not a prohibited person from being rejected?

6          MR. BRADY:  Yes, Your Honor.  Yes, Your Honor.

7       The State gave one example in its briefing that perhaps

8   the address on the person's Automated Firearms System record

9   would be different than the address they have on their

10  identification.

11         THE COURT:  So then let me ask you this.  So wouldn't

12  that be a simple fix?  I mean, if -- when the application is

13  rejected, the applicant is told, "Your application is rejected

14  because your address is not the same."

15      And then the person would be able to perhaps pull out a

16  driver's license.  Say, for example, they had moved since the

17  time that they were first in the system, or maybe they used

18  their office address, for example, on their driver's license,

19  or maybe they have something else.  So they could fix it right

20  then and there.

21      Is that not a possibility?

22         MR. BRADY:  I think it is for certain individuals, but

23  that is assuming that the only issue is the address

24  discrepancy, and that's an example that the State gave.  But

25  they said that, you know, that is something that's easily

1    fixed.

2        First -- first --

3        **THE COURT:**  Okay.  So then let's make sure I

4    understand because, as I said, you folks know a lot more about

5    this than I do.

6        So -- so I go in -- so, for example, since -- by the way,

7    this database that's being used -- what is it?  It's the --

8        **MR. BRADY:**  The Automated Firearm System.  It's

9    essentially -- you know, the layman's terminology would be a

10   firearm registration, if you will, although it's not a

11   registration.  It's just a record of the individual having

12   acquired a firearm through a licensed firearm --

13       **THE COURT:**  Federal or state?

14       **MR. BRADY:**  State.  This is a state database.

15       **THE COURT:**  And how far back does it go?

16       **MR. BRADY:**  Oh, boy.  That is a -- that would be a

17   historical question of some dispute, potentially back into the

18   1920's, I believe.

19       **THE COURT:**  Does it apply to long guns as well as

20   handguns, or is it only handguns, or is it only long guns?

21       **MR. BRADY:**  So once upon a time, it was only handguns,

22   or it was long guns that people voluntarily registered.

23       **THE COURT:**  Okay.  So when did it become long guns?

24       **MR. BRADY:**  It was -- so then there was long gun

25   assault weapon registration.  That's a separate class of long

1    guns that had to be put in as so-called assault weapons.  And

2    then after three iterations or so of assault weapons, I believe

3    the beginning of 2014 was when the State started requiring that

4    long gun transfers also --

5            THE COURT:  What year was that?

6        MR. BRADY:  2000 -- January 1st, 2014, was when long

7    gun transfers had to also be recorded in Automated Firearms

8    System.

9        So prior to 2014, if you went in and bought a pump-action

10   shotgun, that would not meet the -- the definition of an

11   assault weapon.  There would not be a record of that.

12           THE COURT:  So then what would happen?

13       So let me give you an example.  Say somebody bought a

14   Remington 7-millimeter hunting rifle, and they bought it in

15   2002, and now they go in to buy some ammunition.

16       All right.  So what happens?  What would -- what would

17   happen?

18           MR. BRADY:  So assuming that's the only firearm they

19   own and they never registered it and it never made its way into

20   the Automated Firearm System, which it would not other than

21   some odd circumstances, for example, police having seized it in

22   the interim -- but let's assume that that never happened.

23           THE COURT:  Okay.

24           MR. BRADY:  Then the individual would go to the

25   vendor, and the vendor would say, "Okay.  Here are your options

1  for a background check."  You can do the instant background

2  check, which is the Automated Firearm System search, but this

3  person can't -- doesn't qualify for that.

4      Then the next one is "Do you have a Certificate of

5  Eligibility"?  If the person does not have a Certificate of

6  Eligibility, which is a -- an item that people can acquire from

7  the department for a -- they fill out an application.  They pay

8  a fee of up to -- I think the department's fees are somewhere

9  in the 75-dollar range, and then there's usually a fee for the

10  fingerprinting, which is required for the COE.

11      If they don't have the COE, then they have to do a

12  full-blown background check that the State does for firearms.

13  However, I don't think it's identical to the firearm background

14  check system because, as we just discussed, they cannot access

15  NCIS.

16      So I do not know the particulars.  Perhaps Mr. Richards

17  could better, you know, inform the Court about what happens on

18  the full-scale background check, but that full-scale background

19  check requires a 19-dollar fee.  And potentially, the State

20  says that it can take up to days for it to be processed because

21  they have ten days to do a firearm background check -- excuse

22  me -- under the law.

23          **THE COURT:**  So the -- so the hypothetical I just gave

24  you -- so that person would walk into -- I don't know -- say,

25  Turner's or Big 5 or somewhere to buy some ammunition, say,

1   "Here, I want some ammunition."  And because they bought a

2   hunting rifle in 2000 or 2002 or 1995, they're not in this

3   system.

4        And so then the person at the counter says, "Sorry.  I

5   can't give you" -- "I can't sell you this ammunition."  There's

6   no way they can't tell the person right then and there to do

7   something to fix the problem immediately; is that correct?

8           MR. BRADY:  No, Your Honor.  So they would be able to

9   undergo the full-scale background check, pay $19, undergo the

10  full-scale background check --

11          THE COURT:  Right then and there?

12          MR. BRADY:  Well, potentially.  It could take hours.

13  It could take days.

14       There's no set time on how long the full-scale background

15  check would take because the instant background check, if you

16  will, the one that is resulting in the address issues and all

17  that, that relies on an Automated Firearms System, simply

18  checks to see if the person is in AFS, the Automated Firearm

19  System, and then checks to see if they're on the prohibited

20  person list, which the State maintains through their Armed

21  Prohibited Person Systems Database.

22       And if the person is not -- is in AFS and is not on the

23  APPS database, then they're clear.  They're good to go.  But

24  because this person does not have that AFS record, then they

25  would have to undergo the full-scale background check and take

```
 1    hours to days to -- to be able to acquire the ammunition and

 2    pay $19 for potentially separate boxes of 7-millimeter ammo.

 3        You know, to go deer-hunting, you need what, a box of, you

 4    know, ten -- ten rounds, costs 20 bucks, and here you are --

 5            THE COURT:  What?

 6            MR. BRADY:  -- accompanying that.

 7            THE COURT:  20 bucks for 7-millimeter --

 8            MR. BRADY:  Well, remember, Your Honor, for hunting

 9    these days in California, you have to use non-lead ammunition.

10    So it's probably a little bit more than that, yeah, but --

11            THE COURT:  Okay.  So can someone just walk into, say,

12    for example, Big 5 and say, "Hey, I don't know if I'm in this

13    AFS system.  Can you check for me" without buying -- without

14    buying ammo?

15            MR. BRADY:  I believe they could.  I believe they -- I

16    think it would still be the dollar fee, and that's sort of the

17    initial filter -- right? -- is "Okay.  Here's the background

18    check processes you could take."

19        "Okay.  I'll check to see if I'm in AFS.  I believe I am,"

20    although a lot of people mistakenly believe they are because

21    they are -- in the situation of the 7 -- the 7-millimeter

22    Remington, many people believe, because they had to go through

23    the California State's process of acquiring that rifle through

24    a licensed dealer, fill out the DROS paperwork, fill out the

25    4473, they believe that that gun had been registered in AFS,
```

1    even though it had not been under the law.

2        So a lot of people believe they are in AFS and end up not

3    being.  But yes, they would go and submit, and then the dealer

4    would say, "Sorry.  You do not qualify for AFS.  Give me your

5    one dollar for running that.  Do you want to run" -- "do you

6    want to do the full-scale background check for the $19?"

7            THE COURT:  And that could take days?

8            MR. BRADY:  Hours to days.

9            THE COURT:  Okay.  All right.  I interrupted you.

10           MR. BRADY:  It's okay.

11           THE COURT:  I have a million questions.

12           MR. BRADY:  I understand, Your Honor.

13           THE COURT:  We're just getting started.  So --

14           MR. BRADY:  I understand, Your Honor, and I think that

15   in and of itself is indicative of the issue here.

16       We are talking about such a clunky system, and the State

17   wants to talk about the attributes of background checks

18   generally; right?  They tout the benefits of the federal

19   background check system and the City's, but we're talking about

20   this system, and this system relies on the Automated Firearms

21   System for -- and we're not even sure it needs to.

22       I have yet to -- the State has yet to make its cases to --

23           THE COURT:  Well, what else would it be able to rely

24   on if it can't rely on NCIS for ammunition?

25           MR. BRADY:  I think -- sure.  I think it can rely on

1    simply the -- the prohibited person systems side of the -- of

2    the DOJ system.  They have a list of -- so AFS is "Do you have

3    a record of ever having acquired a firearm?"  Then there's the

4    prohibited person system list, which just is all your, you

5    know, prohibited people, whether they've ever registered a gun

6    or not.

7              THE COURT:  So where's that come from?

8         MR. BRADY:  The California Department of Justice

9    maintains that, and I believe that it is populated via courts

10   when somebody -- the people who were just in here getting

11   sentenced.  The Court will send a record to the California

12   Department of Justice that this person is now a felon who's

13   been convicted.  Well, I think they've already been convicted.

14      So the record would go there, mental --

15            THE COURT:  Would that disclose someone who's been

16   convicted, say, in Alabama?

17            MR. BRADY:  Probably not.  Probably not.

18            THE COURT:  Would the AFS system?  Well --

19            MR. BRADY:  They would probably not have a record in

20   there.  I don't even know if an individual could have -- a

21   non-California resident could have an AFS record, which is

22   another --

23            THE COURT:  Well, what if you were a California

24   resident, you acquire the firearm, went to Alabama --

25            MR. BRADY:  Sure.

1        **THE COURT:**  -- and committed a felony?  You'd still be

2  in the AFS system.

3        **MR. BRADY:**  He would be in the AFS system, but I don't

4  know if he would be in the prohibited person system.

5        **THE COURT:**  Okay.  But none of -- none of this -- none

6  of this is ever going to show that, whether or not he committed

7  a felony in Alabama -- right? -- because it's not a national

8  system that we're looking at.

9        **MR. BRADY:**  Correct, which is why -- I don't know.  To

10  be clear, I don't know about the --

11        **THE COURT:**  We're going to find out somehow.

12        **MR. BRADY:**  The back -- the full-scale -- just to be

13  clear, on the full -- I -- Your Honor is correct on the -- on

14  the initial -- the instant background check, the one-dollar

15  one, we'll call it, that one -- I believe they would not be

16  able to get information on a person out of state.

17     That is why I believe the State is requiring

18  non-California residents to acquire a Certificate of

19  Eligibility to be able to acquire ammunition in California,

20  which is a whole other, you know, problem to force.

21     So say somebody wants to come to Imperial Valley on

22  September 1st next week for the dove opener --

23        **THE COURT:**  Yeah.

24        **MR. BRADY:**  -- and they didn't realize that California

25  requires non-lead shot in order to hunt, and they brought all

 1    their lead shot.  So they say, "Uh-oh.  I need to go get, you

 2    know, non-lead shot at Turner's or wherever."

 3        And they say, "Well, you had to bring your Certificate of

 4    Eligibility," which, keep in mind, Your Honor, it's a process

 5    of about a month to apply for a Certificate of Eligibility, for

 6    them to run the back -- to run the fingerprints, run the

 7    background check, get you your certificate.

 8        THE COURT:  Well, let me -- let me interrupt you for

 9    just a second.  I'll take this over and ask Mr. Richards.

10        So tell me what a Certificate of Eligibility -- how is

11    that obtained?

12        MR. RICHARDS:  There's an application process with the

13    Bureau of Firearms.  I believe that the plaintiffs --

14        THE COURT:  Bureau of Firearms is a state agency;

15    right?

16        MR. RICHARDS:  Yes.  It's a bureau within the

17    California Department of Justice.

18        THE COURT:  Okay.  We all know there's federal and

19    state laws, and somehow -- sometimes they -- they seem to

20    conflict with each other, and sometimes they don't, but

21    anyway -- so okay.

22        So then what?  So --

23        MR. RICHARDS:  There's an application process that's

24    submitted to the Bureau of Fire -- an application that's

25    submitted to the Bureau of Firearms.  I'm going to say the

plaintiffs, I believe, submitted a description of that process

with their moving papers.

     **THE COURT:**  Yeah.  Yeah.  If you think I remember

everything, I don't.  I don't even remember what I had for

breakfast.  So --

                     (Laughter)

     **MR. RICHARDS:**  I understand.  Given the volume of

documents submitted in this case, there's quite a bit of

information.

    But the Certificate of Eligibility process entails a full

background check.  I believe that is an NCIS check and a check

of the state databases.  So --

     **THE COURT:**  I thought you couldn't do an NCIS check

for ammunition.

     **MR. BRADY:**  Of -- a Certificate of Eligibility is not

necessarily for ammunition.  It is for eligibility for firearm

possession generally.

    So the feds would -- do recognize that.  There's a federal

regulation that allows, for example, COE's and CCW's, which

then raises another issue that I don't think plaintiffs

necessarily want to pick this fight here due to all the other

little skirmishes we're having in this big battle.

    But it's unclear whether, because a Certificate of

Eligibility is for firearms generally that the feds

recognize -- that it even can be used for ammunition.  But like

```
 1   I said, plaintiffs are not --

 2         THE COURT:  Well, I guess we would know if they had

 3   and -- I mean, if it's been done.

 4         MR. BRADY:  Well, it's post -- once the feds allow the

 5   background check for the COE, it's out of their hands as to how

 6   California -- what California recognizes the COE for.  So I

 7   think they would be okay.  I'm just saying it's a question.

 8         THE COURT:  Okay.  All right.  So -- so you can get a

 9   COE if -- if you are from out of state, you come into

10   California, like Mr. Brady just pointed out -- you come in,

11   you're going to go hunt doves in Imperial Valley on

12   September 1st, but then you find out that you have to use steel

13   shot or copper shot.  You go down to Big 5 or Imperial

14   Hardware, and you say, "I want to buy some" -- "some ammo."

15      And they say, "Well, you've got to go through this COE

16   process."

17      And how long does that take, Mr. Richards?

18         MR. RICHARDS:  I believe Mr. Brady was correct when he

19   described it as approximately a month.  It would probably take

20   a little more, a little less, depending on the person.

21         THE COURT:  So a poor guy from Arizona -- or gal from

22   Arizona -- who came -- go hunting in Imperial Valley on

23   September 1st has to sit there and watch his or her buddies

24   annihilate the doves, and he or she gets to sit there and --

25         MR. RICHARDS:  In that -- in that scenario, that's
```

 1   probably the most likely outcome.  There may be some potential

 2   workarounds, but I think that's probably the most likely

 3   outcome.

 4        **THE COURT:**  That you know of unless -- unless --

 5   unless they want to violate the law and they get their buddy to

 6   go buy the ammunition and the buddy gives it to them.  Then

 7   they -- and then they use it, but then they'd be violating the

 8   law, wouldn't they?

 9             **MR. RICHARDS:**  Not necessarily, no, Your Honor.

10             **THE COURT:**  No?

11        **MR. RICHARDS:**  To be a licensed ammunition vendor, you

12   have to sell more than 500 rounds per year.  So that may be

13   a -- that may be one potential workaround.

14        **THE COURT:**  Wait.  Let me see -- let me see if I

15   understand.

16        See, I -- you know, the last one of these cases I had

17   is -- which you probably know.  It's no secret.  I think I

18   asked -- I think it was Mr. Echeverria -- where I mentioned to

19   him, "I think nowadays, if you want to have anything to do with

20   firearms, you have to have a lawyer on retainer."  You have to

21   have this lawyer that follows you around wherever you go.

22        So are you saying to me that if -- that if I'm the Arizona

23   hunter and I'm going to go hunt and I can't buy the ammunition,

24   I can get my buddy over here, Bob, to -- to buy the ammunition,

25   and then he can give me the ammunition, and that's perfectly

1   legal?

2           **MR. RICHARDS:**  Potentially, yes, but --

3           **THE COURT:**  Potentially?  Wait, wait, wait.

4   Potentially, but, look, I don't want to go to prison or jail

5   because of "potentially."  You represent the State.

6       So is it or is it not legal?

7           **MR. RICHARDS:**  Well, Your Honor is speaking in

8   hypotheticals here.  I think if you read the statute, it

9   appears that that would be permissible.  I don't see --

10          **THE COURT:**  Okay.

11          **MR. RICHARDS:**  -- a reason why it wouldn't be, but I'd

12  also like to clarify because I believe a similar hypothetical

13  came up at the motion to dismiss hearing in this case.

14          **THE COURT:**  Okay.

15          **MR. RICHARDS:**  And there -- this is a certain -- if

16  someone is going to come to California to go dove-hunting, they

17  do have an obligation to review the rules of the state and make

18  sure that they -- that they bring the -- you know, the

19  ammunition or firearms that are compliant with state law.

20          **THE COURT:**  Okay.  Okay.  What about this?  Look, I

21  used to hunt, haven't in many, many years, but I used to hunt.

22  Some days I was a really good shot, and some days I was a lousy

23  shot, and so some days I used up all my ammunition.

24      So I come from Arizona.  I've got my five boxes of seven

25  and a half shells, and, man, I haven't hit a thing.  I need

1    some more.

2        Now it's not such an odd hypothetical, is it?  It's a real

3    hypothetical.  It's something that happens quite often.

4            **MR. RICHARDS:**  I believe this is actually the inverse

5    of the hypothetical that Your Honor posed at the motion to

6    dismiss hearing, which is where a California resident leaves

7    the state, bringing in ammunition to go hunting in Arizona.

8        But in any event, I think the answer is quite similar, and

9    that is that if you're going to come to California to hunt,

10   that you should plan accordingly.  That would include planning

11   for the somewhat foreseeable situation that you just mentioned

12   where you may require more ammunition than you do on an average

13   day.

14           **THE COURT:**  Bring a case.  Well --

15           **MR. RICHARDS:**  Whatever it takes.

16           **THE COURT:**  -- let me ask you this, though, because,

17   see, this is all -- I mean, I don't think -- I don't think --

18   what was those charts we used to be able to buy when we were in

19   law school?  We were trying to figure out -- for example, in

20   real property, they had these huge charts.

21           **MR. BRADY:**  Flow charts?

22           **THE COURT:**  Yeah.  It's a flow chart, but they had a

23   particular name.  Anyway, you need one of these for California

24   and federal gun laws.

25       Okay.  So -- so -- so it's true.  So what you just told me

1   is this.  So I'm the Arizona hunter.  I come to the --
2   California.  I run out of ammunition or didn't buy it.  I can
3   go to my buddy, and I can say, "Hey, go buy me a box of, you
4   know, seven and a half ammo."  I'm not violating the law, and
5   he's not violating -- violating the law if he gives it to me.

6        As I understand the purpose of this law, it is to keep
7   prohibited people from getting their hands on ammunition,
8   which -- hey, I'm on board with that.  I mean, I -- you know,
9   but what's to stop, you know, the Gilroy young man; right?
10  Same situation.  He can come to -- he can come to California
11  with his AK-47, and he can get his buddy to get the ammunition
12  for him; right?

13       We've accomplished absolutely nothing; right?  He still
14  got his hands on the ammunition.  Neither one of them broke the
15  law.

16            **MR. RICHARDS:**  Yes.  And, Your Honor, I think that
17  there's two answers to that question.

18       The first is I think it's important to recognize that
19  firearms violence and firearms crime is an extraordinarily
20  complex problem and that we can't expect any one law to solve
21  all potential iterations of that problem.

22            **THE COURT:**  Well, you could.  Just ban all firearms
23  and all ammunition.

24            **MR. RICHARDS:**  Well, that law would be
25  unconstitutional, Your Honor --

1      **THE COURT:**  Yes, it will.

2        **MR. RICHARDS:**  -- and I don't think that that -- so it

3  would be no law at all.

4      But the -- but the -- but the other point here is that

5  the -- when the friend or straw purchaser goes out and

6  purchases the ammunition -- this gets to a point that the

7  plaintiffs raised in their brief.  They contend -- they

8  complain that there's no reason for the record requirement, of

9  maintaining records of these sales.

10     The -- law enforcement would then have a record to

11 understand how that shooter got the ammunition.  They'd be able

12 to potentially work backwards and see that a friend purchased

13 it for him or --

14     **THE COURT:**  But what does that accomplish?

15     **MR. RICHARDS:**  Well, if it were a situation that he

16 were a prohibited person, for example, then the friend would be

17 a straw purchaser and have committed a crime.  And so that

18 would help law enforcement solve crime, just to give one

19 example.

20     So to use a different example -- and this came up in the

21 record where we learned from the New Jersey experience that --

22 that the gang members would often go and do straw purchasing

23 for other gang members.  And if you had records of that, that

24 person could then be tried and convicted for or charged with --

25 with being a straw purchaser in violation of state and federal

1   law.

2       So there are -- there are values to all of this, and I

3   don't think that we can expect that any one of these laws is

4   really going to solve all of these problems, and I don't think

5   anyone is contending that they will.  They would just help

6   alleviate those problems to the best that the State is able to

7   do.

8       And that's why -- we're getting a little ahead of

9   ourselves, but we need to give some deference to the predictive

10   judgments of lawmakers in this context about what effects these

11   laws are going to have.  I think --

12       **THE COURT:**  You know -- I'm not trying to cut you out,

13   but Mr. Richards raises an interesting point.

14       I recently read, for example, that in the predictive

15   judgments of the legislature, somebody has come up with the

16   idea that an AR-15 can fire 300 to 500 rounds a minute.  That

17   has never been challenged to the best as I can tell.  It's

18   never been -- nobody has been cross-examined on that.  Nobody

19   has ever tested it.  I will eat my robe if you can take an

20   AR-15 and fire 300 to 500 rounds a minute.

21       So the problem with the predictive judgment of the

22   legislature is that -- think about this.  If I'm driving down

23   the road and the speed limit is 65 but I decide I want to go

24   75 miles an hour, I get a speeding ticket.  Now, what's going

25   to happen?  If -- if I'm guilty, I'm going to pay a fine;

1    right?  I can't go to prison.  I can't go to jail; right?  I'm

2    going to pay a fine.

3        Now, before the State can affect my driving privilege --

4    because we all agree that a driver's license is a privilege;

5    right?  It's not a right.  I think we agree on that; right?

6        **MR. RICHARDS:**  Yes.

7        **THE COURT:**  Okay.  Now, before the State can affect my

8    driving privilege and fine me for speeding, here's what has to

9    happen:

10       There has to be a hearing.  At that hearing, there has to

11   be due process.  At the due process stage, the Government --

12   the Government has the burden of proof.  So the Government has

13   to prove that I was speeding.  They have to do that

14   consistently with a rule -- the rules of evidence, which we

15   have established in order to make sure that we have relatively

16   reliable information before the trier of fact; right?

17       And I, as the person who's been charged, have the right to

18   confront and cross-examine witnesses and to call witnesses on

19   my own behalf.  That's all the things that have to happen in

20   order for my driving privilege to be affected and to be fined.

21       Now, how is it -- how is it that the State can actually

22   argue that the State can deprive millions of people of -- at

23   least allegedly -- a constitutional right by simply having

24   legislators say, "Well, we're making a predictive judgment that

25   this is what we need"?

```
 1        Do you see the difference?  There's, like, this huge world

 2   of difference.  You're telling people, "Yeah, you may have this

 3   constitutional right, but we don't care because we're the

 4   legislature, and we have the power to do whatever we want to

 5   do, and you must" -- "you, the Court, must" -- "must follow our

 6   predictive judgment."

 7        There's something odd about that, don't you think?

 8        MR. RICHARDS:  No, Your Honor, not necessarily.  I

 9   would disagree.

10        THE COURT:  Okay.

11        MR. RICHARDS:  And I think there's a short answer to

12   that, and it is that this is the framework that the courts have

13   set up to respect separation of powers and respective roles of

14   the different departments of government, and that's

15   longstanding both -- well, not as longstanding within the

16   Second Amendment context --

17        THE COURT:  Look --

18        MR. RICHARDS:  -- because that's relatively recent.

19        THE COURT:  -- if the State of California tomorrow

20   said, "We're going to require people who show up at the polling

21   place to have a" -- "to go through all of these processes, you

22   know, get a Certificate of Eligibility, have a real ID, have a

23   passport, et cetera, because we think that the right to vote is

24   important.  And when one person casts a vote that they

25   shouldn't be allowed to cast, it negates somebody else's
```

1    vote" -- right?

2        Would -- do you think that would pass muster?  I mean, how

3    long do you think it would take the Ninth Circuit to reverse a

4    ruling upholding that kind of a statute?

5            **MR. RICHARDS:**  Your Honor, I have no way of knowing,

6    and -- I mean, that's -- that's a hypothetical that comes from

7    a very different body of law with a much different background,

8    I mean, compared --

9            **THE COURT:**  But it's the same principle.  The

10   principle is we have rights; right?  We have certain rights.

11   They are delineated in something called a Bill of Rights.  They

12   were -- they were put into the Constitution for a reason.  They

13   were put into the Constitution to make sure that the

14   majority -- a majority was not able to oppress the minority

15   with regards to these issues.

16       It's the same issue, though, isn't it?  It's the same

17   principle.

18           **MR. RICHARDS:**  I don't think it can be reduced that --

19   that narrowly, Your Honor.  Different rights have different

20   backgrounds.  And, again, I think using voting as an example

21   and documents required for voting -- you can look at the

22   history of this country and see that it's quite different than

23   the history of firearms in this country.

24       And I think cases like *Glucksberg* from the Supreme Court

25   cases that examined fundamental rights under the substantive

1   due process clause make clear that history does play a role

2   in -- in defining and establishing rights.

3        So I think that it's -- it risks being reductionist to

4   compare rights at that level, saying, "Well, one right and

5   another right should be treated the exact same way."  We see

6   this even in the First Amendment context where we have

7   different doctrines to examine different issues that come up

8   within the First Amendment.

9        Just to give one example, commercial street speeches is

10  treated differently than political speech.

11           **THE COURT:**  Well, I was going to mention that perhaps

12  because you know, if you noticed, that the Gilroy shooter was

13  19.  The Dayton shooter was under 25.  I think he was 23.  The

14  El Paso shooter, I believe, also was under 25.

15       Now, I've read lots and lots of reports.  As you can tell,

16  I'm interested in the subject matter.  The number of shootings

17  that have occurred in the last few years, an overwhelming

18  number of them, are occurring by -- by people that are under

19  25.  And there are studies that seem to indicate that social

20  media has a big impact on how people are radicalized, how

21  people are moved, bullied, moved to do these acts.

22       So I suppose that in the interest of protecting the

23  public, then we could enact a law that says that people under

24  25 are not allowed to use the Internet or social media.  How

25  long do you think that would withstand before the Ninth Circuit

```
 1    or the Supreme Court said, "That ain't going to happen"?

 2          MR. RICHARDS:  Again, Your Honor, I think it's similar

 3    to the voting example, different -- different history,

 4    different case law, different -- different rights.  It's hard

 5    to make these kind of comparisons at such a broad -- a broad

 6    level.

 7          And we're bouncing all over the place here a little bit,

 8    but this does get to the issue of the problem with facial

 9    challenges generally, which is why they accepted and regarded

10    that courts aren't in a great position to make the kinds of

11    decisions and distinctions that you're talking about.  That's

12    why there's --

13          THE COURT:  But if we don't do it, who will?

14          MR. RICHARDS:  Well, the legislature.  That's the --

15    that's the role of the legislative department, and the Court

16    certainly can check that.  But the preferred method is for them

17    to do that in as-applied challenges, and that -- and that comes

18    up again and again.

19          And I think the language from the Supreme's -- the Supreme

20    Court's case in *Washington Grange* that the parties cited in

21    their brief is relevant here.  Justice Thomas writing for the

22    majority -- and I'll just -- it's a fairly long quote, but I

23    think it repeats --

24          THE COURT:  That's okay, but give me the cite on it

25    just to --
```

1          **MR. RICHARDS:**  Sure.

2      It's 522 U.S. at 540, and this is --

3          **THE COURT:**  Okay.

4          **MR. RICHARDS:**  This is, you know, Justice Thomas

5  writing for the majority of the Court.  He says facial

6  challenges are disfavored for several reasons.  Claims of

7  facial validity often rest on speculation.  As a consequence,

8  the risk -- they raise the risk of premature interpretation of

9  statutes on the basis of factually bare-bones records.

10      Facial challenges also run contrary to the fundamental

11  principle of judicial restraint.  The Court should neither

12  anticipate a question of constitutional law in advance of the

13  necessity of deciding it nor formulate a rule of constitutional

14  law broader than is required by the precise facts to which it

15  is to be applied.

16      Finally, facial challenges threaten to short-circuit the

17  democratic process by preventing laws embodying the will of the

18  people from being implemented in a manner consistent with the

19  Constitution.

20      And that's the end of that quote, and I think that -- that

21  highlights a lot of the issues that we're talking about now,

22  some of the problems with that.  Speaking in the abstracts,

23  speaking in generalities, not working with concrete evidence is

24  a big problem.  That's why courts are hesitant to do that,

25  including the Supreme Court.

1          **THE COURT:**  But if we don't have the evidence, the

2      legislature doesn't have the evidence.  I mean, they have -- I

3      told you I just read about somebody saying that an AR-15 could

4      fire 300 to 500 rounds a minute.

5          It can actually.  It can maybe.  Well, I shouldn't say

6      "can."  It might be able to under very, very limited

7      circumstances with a nonhuman pulling the trigger, but a human

8      can't do it.  But yeah, here, the legislature advised that as

9      if, in fact, it were gospel, and it's -- it's not gospel.

10         So if tomorrow -- if tomorrow -- I don't see very well,

11     but I think you have a -- I think you have a beard.  If

12     tomorrow the legislature said that, you know, bearded --

13     bearded men are -- are -- suffer from toxic masculinity; and

14     therefore, they should not be allowed to vote, and we find this

15     to be in the interest of the public -- right?

16         I mean, you think -- you think a court is going to sit

17     still for that and allow that to go forward?  Of course not

18     because that's our -- that's our job.  I mean, that -- we took

19     it on in *Marbury v. Madison*.  We said, "Hey, this is our job

20     to" -- you know, I don't want to go -- I don't want to go

21     there.  So I think there's those issues.

22         Anyway, we got off on a rabbit trail, but there's so much.

23     I mean, there's so much.  You know, this isn't just -- we're

24     not talking about a public policy issue.  This isn't a case

25     about a public policy, whether or not the State has decided

1    that somebody has to wear a blue shirt on Fridays or somebody

2    has to, you know, not eat meat on Friday or whatever.

3        I mean, this is a -- these are significant issues.  I'm

4    willing to spend the time, and I want to explore all my

5    questions, even if we do get off topic from time to time.  We

6    may have to go on into the afternoon or -- anyway, I

7    interrupted you, and I'm so sorry, but you were --

8            **MR. BRADY:**  No.

9            **THE COURT:**  You were making your pitch.

10       So go ahead.

11           **MR. BRADY:**  No need to apologize, Your Honor, because

12   I think that there was some interesting territory explored

13   there between you and Mr. Richards, and I think it's critical

14   to understand that the legislature made no findings here.  They

15   made no predictive judgments.

16       This is a proposition that created this law.  People who

17   have no idea of what the findings were based on just assumed

18   that the findings that were laid out in the proposition were

19   accurate and never got to examine the evidence, as Your Honor

20   just suggested, that the legislature rarely even does, but the

21   citizens of California certainly did not.

22           **THE COURT:**  Is the motivation -- since this was a --

23   since this was a -- an initiative, is the motivation of the

24   person or persons who are proposing the initiative -- is

25   that -- is that -- is that an issue?

1      Can that -- can that -- suppose, for example -- and I

2   don't remember who was the proponent of this initiative, but

3   suppose that it was someone who was really trying to find a way

4   around the Second Amendment, trying to find a way to keep

5   people from getting guns and getting ammunition.

6      Is that something that's discoverable, that's -- I mean,

7   we can look to and say, "Okay.  This is the motivation behind

8   the proponent of the initiative"?

9           **MR. BRADY:**  Potentially.

10     Just to be clear, the proponent was now-Governor Newsom,

11  then-Lieutenant-Governor Newsom, and his open hostility towards

12  the Second Amendment and desire to curtail it is not hidden by

13  any means.  He frankly expresses it.  Whether that is -- can be

14  considered by this Court, to be frank, Your Honor, I don't know

15  in this specific context.

16     I do know that there's recent case law in the First

17  Amendment context with respect to retaliation for speech that

18  the Government can -- or I'm sorry -- that the Court can

19  consider the Government's --

20          **THE COURT:**  Wasn't that one of the issues in the

21  Supreme Court case having to do with the citizens --

22  citizenship question on the census, was the motivation behind

23  putting the question on the census?

24          **MR. BRADY:**  That is correct, Your Honor, and that's

25  why -- I don't know the scope of this, but because I think that

1    it would be frankly -- and I know I'm not helping myself, but I

2    just want to be, you know, up front with the Court here.   I

3    don't know the scope of when it is appropriate for the Court to

4    take in -- to consider motivations.

5        For example, if a particular legislator or members -- and

6    I think it is different when you're talking about a legislature

7    or voters versus by a single individual making a regulation

8    because then it was their decision versus a legislature having,

9    you know, a hundred people having to vote on it.   They may not

10   have had the same motivations.

11       So I think in that sense, you would look not to the

12   motivation but to, you know, whether this is appropriate or

13   not.   In other words, yeah, they may want to curtail Second

14   Amendment rights, but if they do it in a way that's

15   constitutional, then I don't know if plaintiffs would be able

16   to, you know, make any hay with that argument.

17           **THE COURT:**   That makes sense.   That makes sense.

18          **MR. BRADY:**   I don't even necessarily know we need to

19   go there because, again, this was by proposition.   So -- and so

20   the legislator -- the legislature's -- no deference to the

21   legislature even if, you know, Mr. Richards' recitement of the

22   case law was correct, but it's not.

23       Where the courts owe this -- the legislature deference on

24   their predictive judgments is on whether the legislature --

25   whether the Government has an interest, not on whether it is

1    sufficiently tailored to further that interest.

2          **THE COURT:**  I think there's no question that the

3    Government has an interest in -- in protecting the public;

4    right?

5          **MR. BRADY:**  Correct.  Nobody is disputing that nor --

6    nor are we -- are plaintiffs even disputing that, more

7    specifically, they have an interest in keeping arms out of the

8    hands of dangerous people.

9          The question is a fit one, and that -- on that question,

10   the State is entitled to zero deference under, you know, *Turner*

11   case law, which is all cited in plaintiffs' brief.  And this

12   has been, you know, batted around, a lot of this briefing that

13   "Oh, we just relied on the predictive judgments of the

14   legislature."

15         But that is not with respect to whether there is a

16   sufficient fit here, and there clearly is not a fit when you're

17   talking about 11 -- almost 11,000 people in a single month

18   being denied their right.

19         And, again, the State will say, "Well, we believe that

20   that's only temporary, and that may be a simple fix," and they

21   give examples, but it's their burden.  It is the State's burden

22   to show why -- specifically explain how those people will be

23   able to easily remedy their situation.  They have not done

24   that.

25         We don't -- we do not believe that that easy fix exists.

 1   Nothing is ever easy to fix at the California Department of

 2   Justice Bureau of Firearms with respect to these records.

 3   There's evidence in the record that suggests, you know, it

 4   takes months to do anything, including a Certificate of

 5   Eligibility.

 6       So would months -- would it be okay for somebody who just

 7   wants to acquire ammunition -- let's assume that it's just

 8   this, you know, AFS records check that is the problem.  The

 9   California Department of Justice Bureau of Firearms is going to

10   help 11,000 people fix that problem quickly in one month?

11       And that's -- that's just their system problem.

12           THE COURT:  Well, what's the alternative?

13       MR. BRADY:  Like -- as I said before, Your Honor, we

14   explored it a little bit.  And to be frank, you know, it's not

15   plaintiffs' burden to propose alternatives.

16           THE COURT:  Of course not.  No, it's not.

17       MR. BRADY:  No.  Exactly.

18       And so I don't know.  I suggest -- I don't know if the

19   State necessarily needs to rely on the AFS, and I think it's

20   crucial to understand the -- the macro context here in that

21   California is not obligated to have any specific background

22   check system.  They're the only state in the nation that has

23   this -- that has any background check system for ammunition.

24       And so nobody is compelling them to say, "Oh, you have to

25   use the AFS record or, you know, check the AFS record," or

1    nobody is compelling them to say, "Oh, well, you can't use the

2    Federal Limits Apply ID's.  You have to use this additional

3    supplemented documentation."

4         So it's their decision to -- to make these burdens and

5    these hurdles higher on plaintiffs and ammunition purchasers

6    generally.

7              THE COURT:  Let me -- let me interrupt you, and I hope

8    you figured out by now that as questions come up, I explore

9    them rather than just simply allow you to -- to tell me what

10   you want me to hear.

11        So -- so as I understand it, with regards to the

12   identification issue, California has three types of driver's

13   licenses.  They have a real ID driver's license, they have a

14   citizen or a legal immigrant driver's license, and then they

15   have a legal alien driver's license, but you can only use the

16   real ID driver's license in order to buy ammunition.

17        Is that my understanding of the statute?

18             MR. BRADY:  If you're only -- well, it's not the

19   statute.  It's the California Department of Justice Bureau of

20   Firearms' regulation.  The statute does not require this.  This

21   is why I say they made this decision to put this extra burden.

22   But without the real ID, if you have a Cal- -- a California

23   real ID that meets the federal requirements, then you do not

24   need any other documentation.

25        If you have a Federal Limits Apply ID, which is currently

1    the standard issue by California -- if you go into the DMV and

2    request an ID and don't say anything specific, they will issue

3    you a Federal Limits Apply ID.  You would not be able to

4    acquire ammunition with that ID alone.

5         You would have to bring supplemental documentation,

6    including a passport or a birth certificate.  And, again, the

7    State, you know, challenges, "Well, how hard is it to go back

8    home and get your passport or your birth certificate?"

9              THE COURT:  What if you don't have a passport?

10             MR. BRADY:  What if you don't have it, and what if you

11   don't want one?  And these -- and plaintiffs lay out in detail

12   the time and money it takes to get a passport or to get a birth

13   certificate.  These are -- you know, this sometimes means

14   taking time off work on a weekday because your -- you know, the

15   Government is generally closed on the weekend.

16        Going and spending, I think, for a passport -- I didn't do

17   the math, but it was about 200ish dollars and, you know, time

18   off work to go get that passport.  And then if you want it

19   expedited, you know, then we're talking about waiting weeks,

20   weeks, months unless you want to spend the extra $60 for an

21   expedited.

22        This is all just so you can, you know, get a box of

23   ammunition.

24             THE COURT:  A box of .22-round soft nose --

25             MR. BRADY:  Yeah, a 5 -- 5-dollar box of .22's.

**THE COURT:**  I don't think you can buy a box of .22's

for five bucks anymore.  Those days are long gone.

Mr. Richards -- so let me ask you a question.  So -- so

why the requirement for this real ID license?

**MR. RICHARDS:**  Well, the requirement for the real ID

license is to ensure that when people are purchasing ammunition

that they have a lawful presence in the United States and

therefore aren't a prohibited person under federal law.

The -- the history here is somewhat long and set forth, I

think, fairly well by the parties in their pleadings, in -- or

the moving papers and supporting materials, and I'm happy to go

over it right now.

**THE COURT:**  Yeah.  Do it -- do it for me.

**MR. RICHARDS:**  Okay.  So starting in 2015, California

started issuing what are called AB60 licenses.  Those are

licenses that the State would issue to people who cannot

establish lawful presence in the United States.  Those -- those

licenses contained a notation on them that said, "Federal

Limits Apply."

**THE COURT:**  And what's the purpose of that notation?

To indicate that it's not a federal real ID?

**MR. RICHARDS:**  That the identification can't be used

for certain purposes, you know, I think, such as establishing

right to work, for example.  I think there's several more

purposes that are outlined in the State's finding of emergency

1    on this for the regulation.

2         And so at that point, you can tell from looking at a

3    driver's license that said, "Federal Limits Apply" that the

4    person wasn't lawful -- lawfully present in the United States

5    and therefore would be prohibited.

6         However, in 2016 -- I'm sorry.  In 2018, in connection

7    with the State's implementation of the Federal Real ID Act,

8    which is a federal law that required certain requirement --

9    states to impose certain requirements for obtaining ID that

10   could then be used to do things like board airplanes and enter

11   secured facilities -- it's now starting in 2020.

12        But when the State was implementing that requirement, it

13   chose to issue the Federal Limits Apply, the license, as a

14   default as to anyone who doesn't want to go through the process

15   of getting a -- a real ID.

16        And so from 2016 forward, you can't tell from a Federal

17   Limits Apply ID that the person is not lawfully present in the

18   United States.  They might be.  They might not be.  And that's

19   the genesis of the regulation, again, as set forth in the

20   finding for emergency.

21        **THE COURT:**  So -- so -- so what happened was that the

22   State decided that it would issue driver's licenses to people

23   who were unlawfully present in the state; right?

24        **MR. RICHARDS:**  Yeah.

25        **THE COURT:**  Okay.

1          **MR. RICHARDS:**  Yes.

2          **THE COURT:**  And when they did that, you and I -- well,

3     I don't know about you, but I know about me.  I'm legally

4     present in the state.

5          So if -- as you know, we do a lot of reentry cases in the

6     Southern District of California.  And if, you know, Jose or

7     Francisco or Pedro or whoever over there goes and applies to

8     DMV for a driver's license, they get a driver's license.

9          And if we were to be pulled over by a Highway Patrolman,

10    my license would look exactly the same as his license unless I

11    had gotten a real ID license; right?

12         **MR. RICHARDS:**  If your license had been issued after

13    January 2016, yes.

14         **THE COURT:**  Okay.

15         **MR. RICHARDS:**  If your license had been --

16         **THE COURT:**  Yeah.  Go ahead.

17         **MR. RICHARDS:**  If your license had been issued before

18    that, then they would be -- there would be a difference.  It

19    wouldn't have the notation.

20         **THE COURT:**  Well, they wouldn't have a license; right?

21    Because the State wasn't issuing licenses to --

22         **MR. RICHARDS:**  I was speaking about -- sorry,

23    Your Honor -- in the example Your Honor gave about Your Honor.

24         **THE COURT:**  Right.

25         **MR. RICHARDS:**  If your driver's license were issued

```
 1    before 2016, there's no notation on it.  It's just a plain
 2    driver's license that doesn't have any -- any sort of federal
 3    limits ID or -- I think it's a bear in the corner.  You can see
 4    the pictures in the record --
 5              THE COURT:  Okay.
 6         MR. RICHARDS:  -- but -- so that license would be
 7    different from the -- the AB60 license that the -- that the
 8    person who had entered the country illegally was able to get
 9    or -- or from a license issued after January 2016.
10              THE COURT:  So my license was issued after
11    January 2018, my renewal, and I looked at it, and it says,
12    "Federal Limits Apply."  So, again, my license would look just
13    the same as Jose or Francisco or Pedro's or whoever; right?
14         MR. RICHARDS:  That's correct.
15              THE COURT:  And so the real ID requirement is intended
16    to solve the problem created by the fact that the State decided
17    to issue driver's licenses to -- to people who are unlawfully
18    present in the United -- in the United States; right?  Because
19    otherwise, you'd just simply present your driver's license, and
20    that would be good enough; right?
21         MR. RICHARDS:  That's one way of looking at it,
22    Your Honor, but I think it's also important to note that if
23    that had been the process and the State implemented the federal
24    real ID law, which it must, you would have had to provide all
25    the supporting documentation that you would now need when you
```

1   use your Federal Limits Apply ID to purchase ammunition.

2       That is, you have to go in and bring in your Social

3   Security card or passport and a couple other documents to get

4   your federal real ID, which I myself did just two weeks ago.

5   So this is in --

6       **THE COURT:**  How long did you stand and wait at the DMV

7   office?  No, never mind.

8                          (Laughter)

9       **MR. RICHARDS:**  You won't believe this.  It was only 20

10  minutes.

11      **THE COURT:**  Would you go with me the next time because

12  I'll tell you what.  That wasn't my experience when I tried to

13  get a plain old driver's license.

14                         (Laughter)

15      **MR. RICHARDS:**  I understand it could take longer.

16  And, you know, not to make myself a focal point here, but I

17  think that when Mr. Brady talks about some of the burdens

18  here -- I mean, you know, I found myself in a similar position.

19  I had moved around the country several times over the last

20  several years, and during those many moves, I lost my Social

21  Security card.

22      So this process for me to get the federal real ID did take

23  some time, but it was not unduly burdensome on me.  I mean, I

24  had to go to the Social Security Administration, get a new

25  Social Security card, and then I had to collect my paperwork

```
 1    and go to the DMV.  And this is a process that's akin to any
 2    number of other things that grownups have to do in everyday
 3    life.
 4         And so, you know, I understand that -- the frustration of
 5    having to wait in the DMV is something that's at the forefront
 6    of people's minds.  This is a normal -- a normal process, and
 7    it's one that, by the way -- if the State hadn't made the
 8    choice to issue Federal Limits Apply ID's, then everyone would
 9    have to go through it anyway to get this federally compliant
10    law.
11         So to take another example, in a state that doesn't do
12    what California's doing, to get an ID in those states, you're
13    going to have to go through this process of getting a federal
14    real ID anyway.  It's not -- it's not that --
15              THE COURT:  But aren't there a lot of people who've
16    had their driver's licenses since before 2018?
17              MR. RICHARDS:  Do you mean before 2016?
18              THE COURT:  Yeah.
19              MR. RICHARDS:  Yeah, and those ID's will work.  You
20    can purchase that -- you don't need anything beyond that ID.
21              THE COURT:  I see.
22         So if you have a driver's license that was issued before
23    the FLA requirement came into being, you can use that -- that
24    ID?
25              MR. RICHARDS:  That's -- that's correct.  And --
```

1          **THE COURT:**  Okay.

2          **MR. RICHARDS:**  -- again, I've been touching on this a

3    lot today, Your Honor, but this is the problem with the facial

4    challenge.

5          Plaintiffs produced no evidence, made no suggestions that

6    this is any appreciable number of people, what number of people

7    this is, what the nature of the burden on these people is

8    beyond the description of the wait.  And most importantly, no

9    plaintiff in this case has actually said that they have a

10   federal limits ID and decide to do any of this stuff.

11         So this is -- this is mingling both standing issues and

12   facial constitutional problems that really pose a threshold --

13   a threshold problem for their request here today, and that's a

14   very big problem, Your Honor.  And like I said, I'm probably

15   going to be returning to it at several points in our talk.

16         **THE COURT:**  That's fine.  I'm not going to stop you

17   from it.  I promise.

18         All right.  Go ahead.

19         **MR. BRADY:**  So I think it's crucial to understand that

20   the Federal Limits Apply ID -- the only thing for which it does

21   not work in this state under state law, not under federal

22   law -- there are federal restrictions, hence the "Federal

23   Limits Apply."

24         The only thing the State of California will not accept a

25   Federal Limits Apply ID for is for firearm and

1   ammunition-related acquisition, and --

2          **THE COURT:**  And that's because it could be possessed

3   by someone who's unlawfully present --

4          **MR. BRADY:**  Correct.

5          **THE COURT:**  -- in the United States --

6          **MR. BRADY:**  But --

7          **THE COURT:**  -- or someone who is lawfully present in

8   the United States?

9          **MR. BRADY:**  It is to -- it is to attempt to make sure

10  that a person who is -- is acquiring a firearm or ammunition

11  has lawful presence in the United States, but --

12         **THE COURT:**  Which is -- which is federal law and which

13  is a great idea.

14         **MR. BRADY:**  Correct.

15         **THE COURT:**  A great idea.

16         **MR. BRADY:**  But -- sure, but the federal government

17  recognizes California's Federal Limits Apply ID for firearm

18  background checks.

19      So the State cannot say that this is some crucial, you

20  know, interest to -- to require additional documentation

21  particularly when the reason for these ID's is to protect the

22  very people they are saying that are too dangerous.

23         **THE COURT:**  Wait.  So if I want to go out and buy a

24  Glock, I can use my FLA driver's license as ID that will allow

25  me to purchase that Glock?

1    Is that what you're saying?

2         **MR. BRADY:**  You could have a few months ago before

3    this new regulation because their new regulation about Federal

4    Limits Apply ID's went to apply to ammunition and firearm

5    purchases.

6         **THE COURT:**  Okay.

7         **MR. BRADY:**  And this is a whole other -- I don't want

8    to --

9         **THE COURT:**  I can use it -- I can use it in Arizona.

10        **MR. BRADY:**  Well --

11        **THE COURT:**  I can use my FLA.

12        **MR. BRADY:**  If they had the equivalent.  Let's just

13   say that the FLA ID is not -- the fed- -- the federal

14   government is not the impediment to acquiring a firearm with an

15   FLA ID.  The State of California's regulation is.

16        **THE COURT:**  Okay.

17        **MR. BRADY:**  So the feds will recognize that -- an FLA

18   ID.  So the State is saying, "Oh, but we need to make sure that

19   these people are, you know, lawfully present in the country"

20   while at the same time having these ID's to protect those

21   people -- very people.

22        And I'm not trying to make an argument either way as to

23   whether that's good or bad policy.  I'm just talking about the

24   hypocrisy of it and how it shows that they really don't have

25   any interest in requiring this ID.  It's simply to place

1   another burden in the way of people who are exercising their

2   Second Amendment rights.

3       I mean, you can use that ID for everything other than

4   exercising a constitutional right.  California can't place this

5   burden in the way of -- you know, as the gatekeeper to a

6   constitutional right and say, "Oh, you have to show an ID.  Oh,

7   but the ID we gave you isn't sufficient.  You have to go get

8   something else" when they accept it for every other purpose and

9   the federal government has accepted this for similar purposes.

10      It just doesn't meet the fit test.  It's --

11          **THE COURT:**  Is California the only -- the only state

12  that use -- that imprints FLA on their driver's license?

13          **MR. BRADY:**  To my knowledge, yes, Your Honor.

14          **THE COURT:**  Okay.  All right.  Okay.

15          **MR. BRADY:**  I guess I can address the -- the facial

16  issues because Mr. Richards has indicated that's a big issue.

17      We're not talking about a challenge that is prospective

18  and theoretical.  That is why the plaintiffs have not brought

19  this motion until a year and a half after filing the case,

20  because we waited to see how this would unfold in reality, in

21  practice.  And it has been more of a burden and more of a

22  failure than plaintiffs even theoretically anticipated.

23      And so we're not talking about -- and just because the

24  specific individual plaintiffs have not suffered all of or most

25  of the harms that the system has, you know, imposed on people,

1    the California Rifle and Pistol Association is an organization

2    that represents tens of thousands of its members and its

3    supporters who are impacted by these laws.

4         If -- if it was -- according to the State, every

5    individual who gets denied for some reason would have to come

6    into Your Honor's court and bring an as-applied challenge.

7    That's not the way it works in any other constitutional context

8    when a substantial number of people are burdened by a law, and

9    it's un- -- it's unequivocally, undeniably the case here that a

10   significant number of people are.  11,000 folks just last month

11   are.

12        Then this is appropriate for a facial challenge,

13   especially when -- you know, they're citing basically the

14   *Salerno* standard, which is largely ignored, high -- highly

15   debated, and, if applied, would essentially mean that no case

16   can ever be an appropriate facial challenge because, you know,

17   if you were to -- there's going to be somebody who's going to

18   be prohibited from ammunition.

19        So if that person is not affected, then nobody else --

20   then that one person makes it so that the law applies to

21   somebody appropriately, and so a facial challenge wouldn't

22   work.  That's just not the way it works in any other context.

23        **THE COURT:**  Well, the balance of power is quite

24   different.  So that one person who may possibly be affected

25   doesn't have the resources or the money or the time that the

1    State has.  The State has an unlimited budget, unlimited number

2    of people taken to vote to defending this lawsuit; right?

3         So if every time someone is affected and they were

4    required to come in and hire a lawyer and -- and -- and fight

5    their case against the State -- I mean, we're not talking about

6    a dispute between two -- you know, between mom and pop.  We're

7    talking about a dispute between an individual who's been

8    affected versus the State with all of its power and all of its

9    unlimited budget.

10        I think your argument is a good one, but I just wanted to

11   telegraph that to Mr. Richards.  I think I've read cases that

12   lead me to conclude that your argument is persuasive in that

13   regard.

14        So anyway -- all right.

15            MR. BRADY:  So unless Your Honor has any more

16   questions for --

17            THE COURT:  Well, what about the commerce clause?

18            MR. BRADY:  Oh, sure.

19                        (Laughter)

20            THE COURT:  Yeah.  What about the commerce clause?

21            MR. BRADY:  You know, for that particular issue -- I

22   mean, the plaintiffs have made their arguments as to why this

23   law regulates extraterritorially, and the State has not even

24   attempted to refute that.  So I think that plaintiffs are

25   necessarily going to prevail on that aspect of our commerce

1   clause challenge.

2       But even setting that aside, I don't even think Your Honor

3   needs to go there or we need to have that debate in too much

4   detail because it really comes down to the fact that this law,

5   this scheme, directly discriminates against out-of-state

6   commerce.  It's -- it's really undeniable.

7       I know the State wants to make this distinction that

8   "Well, we're only impacting" -- that an instate vendor can't

9   ship ammo, either, so a California company -- based company and

10  Nevada-based company are in the same shoes because neither of

11  them can ship directly to a California resident.  But that's

12  not the way it works.

13      The California instate vendor has the option of at least

14  direct access to the California consumer whereas the Nevada

15  entity is subject to the mercy of instate vendors, who will

16  say, "No, I don't want to accept any ammunition.  So you cannot

17  access California residents" or "Oh, you want to sell

18  ammunition to my customers?  Okay.  Well, I'm going to hit my

19  customers with, you know, a 50-dollar fee for my troubles," and

20  there's nothing precluding them from doing that.

21      Indeed, the record shows that our -- the plaintiffs in

22  this matter, AMDEP and Able Ammo, experienced that very issue

23  with instate ammunition vendors saying, "No thanks.  We're not

24  going to accept ammunition.  We're not going to do out-of-state

25  ammunition transaction processing anymore" or they've said,

1    "Here's our fees."

2         And there was, I believe, a declaration from one

3    plaintiff.  I don't know if -- actually, I won't go there

4    because I don't know if it was in a declaration or in

5    discovery.  So I don't want to put anything into the record

6    without Mr. Richards having seen it yet.

7         But -- so in any event, the commerce clause is fairly

8    straightforward.  The case -- the *Nationwide Biweekly* case --

9    that is the only case that the State cites to in its briefing.

10   It wasn't -- the Court did not have an issue -- the Ninth

11   Circuit did not have an issue with the fact that the law was

12   requiring it to incorporate.  It was the effect of them

13   incorporating that they would have to become a resident of

14   California; in other words, having physical presence in

15   California.

16        That's a test -- that's the problem with this law.  In

17   order for that Nevada entity to be in the same footing, to be

18   at the same -- on the same playing field as a California

19   ammunition vendor, it would require them to have a physical

20   presence in the State of California.  That is as clear as it

21   gets in the commerce law -- commerce clause case law, that

22   that's not appropriate.

23        So I --

24             **THE COURT:**  Let me ask you about the Second Amendment

25   issue because I think we've sort of danced around it a little

1   bit, but do you think there's a Second Amendment violation

2   inherent in the law?

3         **MR. BRADY:**  Are you talking about -- is Your Honor

4   referring to the face-to-face transaction portion, or are we

5   now talking about the background check system and all of that,

6   too?

7         **THE COURT:**  However you want to address it.  I'm

8   basically -- my recollection is that the State is saying there

9   is no Second Amendment problem because it doesn't affect the

10  core of the Second Amendment, because it doesn't ban handguns,

11  which is the quintessential home self-defense weapon.  We're

12  only talking about ammunition.

13        **MR. BRADY:**  Sure.

14        **THE COURT:**  I think I remember that.

15        **MR. BRADY:**  Yeah.  That was -- so I think Your Honor

16  is referring to the *Chovan* -- *U.S. v. Chovan* test for

17  establishing -- for analyzing a Second Amendment challenge, and

18  that test requires that the Court first determine whether

19  Second-Amendment-protected conduct is at issue and then

20  determining what level of scrutiny applies and then applying

21  it.

22      At the first step, I believe the State argues that this

23  scheme, California's ammunition scheme, is among those

24  presumptively lawful regulations that *Heller* listed in a

25  footnote about conditions and qualifications on the commercial

1    transaction of arms.  I just --

2         THE COURT:  But -- help me out with this, but my

3    recollection is that *Heller* doesn't say that doesn't implicate

4    the Second Amendment.  It just simply says that it can be

5    regulated.

6         I mean, we can regulate; right?  We can regulate the First

7    Amendment; right?  You can't yell, "Fire" -- you can't yell,

8    "Fire" in a crowded theater; right?  Doesn't mean it doesn't

9    implicate the First Amendment.  It just simply means that

10   you -- that the State can under certain conditions regulate

11   that type of conduct; right?

12        MR. BRADY:  I think that's right, Your Honor.  There

13   is debate on that.  Unfortunately, that language is not

14   entirely clear, but I think that by saying "presumptively

15   lawful" necessarily means that there's a way to rebut that

16   presumption.

17        And so while, even if the *Heller* court intended to say

18   that those lists of presumptively lawful regulations, you know,

19   are just that, presumed lawful, they could be rebutted.  But I

20   don't even think we need to get there because I don't think

21   that this is even one of those identified regulations that are

22   presumptively lawful.

23        The Ninth Circuit has already made clear in the *Jackson v.*

24   *San Francisco* case --

25        THE COURT:  I was thinking about the *Jackson* case, and

1    that's why I asked you the question.

2            **MR. BRADY:**  Yes.

3        So I don't even think we need to get there, but even if it

4    was to get more specific and drill down on, you know, "Well,

5    they just were talking about ammunition generally," this is a

6    specific type of thing.  This is a law that is responsible for

7    potentially 11,000 people being denied their constitutional

8    right.  It would be odd, I believe, for -- for that to not at

9    least rise to the point of rebutting the presumption that --

10   that it doesn't apply even.

11       So that's -- that's what I have to say about -- about the

12   Second Amendment aspect.  And I think initially, when

13   plaintiffs brought this case, the Second Amendment aspect was

14   to point out sort of a birdcage theory of why this law violates

15   the Second Amendment.  It's death by a thousand paper cuts, by

16   a thousand regulations.

17       It's not necessarily one aspect of it that you can put

18   your finger on and say, "Oh, that" -- "that offends the Second

19   Amendment in and of itself."  I think there are aspects of it

20   that do do that.  When it's this one after the other, you

21   know -- and this is in addition to --

22            **THE COURT:**  It's called *lingchi* in case you want to

23   know.

24            **MR. BRADY:**  Sure.

25            **THE COURT:**  *Lingchi* is the Chinese term for what you

1    just referred to.

2         **MR. BRADY:**  And, you know, it's -- this is all -- this

3    whole scheme is graft on top of a firearm regulatory scheme

4    that's already in place.  The State has to at least implicitly

5    admit it fails.  If -- if the bad guys are getting the guns,

6    then what is going to stop them from getting the ammunition?

7         And I think that it's necessary to understand that this

8    law simultaneously is extremely burdensome on those who want to

9    follow the rules and is extremely easy to lawfully bypass for

10   those who do not.  For example, as Your Honor indicated back in

11   the dove-hunting context, non-California residents can bring

12   all the ammunition they want into this state lawfully, and they

13   can lawfully give it to anybody.

14        So if you have, you know, a very generous friend from out

15   of state who visits, you know, they can, you know, come bearing

16   gifts in the form of ammunition, and that's totally lawful.  So

17   how long --

18        **THE COURT:**  Like the young man did in the Gilroy

19   shooting.  Didn't he go to Nevada and --

20        **MR. BRADY:**  Well --

21        **THE COURT:**  -- buy the weapon and bring it into the

22   State of California?

23        **MR. BRADY:**  Yeah.  My understanding with him is he was

24   a Nevada resident.

25        **THE COURT:**  Well, he claimed to be, yeah, but --

1      **MR. BRADY:**  So it was lawful for him to bring the

2  ammunition in as a Nevada resident.  If he was a California

3  resident, it was not lawful.

4      But, you know, in any event, the bad guys -- and this goes

5  to the whole point of the hundred or so prohibited persons that

6  the State claims were -- were prevented from acquiring

7  ammunition.  I think it raises the question of why would

8  somebody who knows they're prohibited or think that they're a

9  bad guy say, "Oh, yeah, I'll submit to a background check to

10  get ammunition"?

11      **THE COURT:**  Well, 106 of them did.

12      **MR. BRADY:**  Well, that's my point, is I think that

13  what we're dealing with here generally -- first off, like I

14  said initially, I think that some of those will turn out to not

15  be prohibited persons.

16      There's -- there's issues with records where somebody

17  reduced their felony to a misdemeanor under California Penal

18  Code Section 17(b), and that should be noted as a -- as a

19  misdemeanor for all purposes, including firearm ownership.

20      **THE COURT:**  Really?

21      **MR. BRADY:**  Yes.

22      And the State oftentimes does not reflect that in the rap

23  sheet in their records for the individual.  And so people who

24  have had their firearm rights restored oftentimes will still be

25  denied, and then unfortunately they have to hire me or somebody

1    like me to go fix the problem, and it takes quite a bit of

2    fixing sometimes.

3         In some cases, I have clients who have tried to fix their

4    record with the California Department of Justice for years, and

5    so -- and this goes back to the other issue of, you know, an

6    easy fix.  That is why I'm highly dubious of the ability to

7    easily fix potentially 11,000 folks in one month who have

8    already, you know, shown that the system failed them.

9         So I think I was on my way to explaining why it's, you

10   know, burdensome for most people, but then there's -- it's easy

11   to bypass.  And so at the same time, when the State is saying

12   that they have a substantial interest, those -- those hundred

13   folks who were rightfully or wrongly -- let's just assume that

14   they were rightfully refused ammunition because they were

15   indeed prohibited persons.  Who knows what type of prohibited

16   person they are, you know?

17        And this is not to say that -- to challenge the law about,

18   you know, prohibiting certain people.  But some of these people

19   are, you know, people who had a marijuana possession felony

20   from the 60's or 70's because, you know, they were -- they were

21   back in the hippie days and, you know, having a joint -- a

22   joint in the park -- and back then, it was a big deal -- and

23   they got a felony record or -- you know, there's all -- so

24   we're not talking about, you know, ISIS members necessarily or,

25   you know, gang leaders.

```
 1        Gang leaders aren't going to go buy ammunition.  They're

 2   going to have their, you know, underlings go get it, or they're

 3   going to have it brought in from out of state.

 4        THE COURT:  I assume that there hasn't been enough

 5   time for the State to be able to produce information to you as

 6   to who the 11,000 people were that were rejected and why they

 7   were rejected and the 106 people that were rejected as

 8   prohibited persons as to why they were rejected unless --

 9        MR. BRADY:  There's not -- there's not been sufficient

10   time for that.  That will be coming up in discovery, not the

11   identities of the people.  I don't think the State would be

12   able to disclose to us the identities of the people, but I

13   think they --

14        THE COURT:  Well, if they don't give you the identity,

15   then how do you confirm whether or not that information is

16   accurate?

17        MR. BRADY:  I'm going to quote the lawyer before me.

18   I guess we're going to have to take their word for it because I

19   think that they would have legitimate grounds to --

20        THE COURT:  They can redact the name.

21        MR. BRADY:  Yes.

22        THE COURT:  They can redact the name and Social

23   Security number.

24        MR. BRADY:  Correct.  Yes, all identifying

25   information.
```

1          But yes, I think that we would be -- and that -- so to --

2    I think that that is almost the most crucial point of this

3    entire motion, is understanding that the State is saying that

4    "Oh, it was only 11,000" -- "these 11,000 people who may have

5    an easy fix."  But they have access to the records.  They

6    don't -- and they know who those 11,000 people were.

7          They don't say anything about how many of them went ahead

8    and fixed that problem.  If they had come back and said, "Yeah,

9    11,000 people were denied for some reason, and guess what?

10   They came back the next" -- "within the next week, and 8,000 of

11   them fixed that problem," we would have perhaps a little bit of

12   a different case here.

13         I would still be arguing the same, but I think here the

14   fact that they haven't indicated whether a single one of those

15   11,000 people has since remedied their situation with the

16   State -- it's their burden to show that those 11,000 folks were

17   not barred from acquisition of ammunition.

18         And just getting to the point I was making on the -- the

19   prohibited persons being precluded from acquiring ammunition,

20   even if -- that's been the case.  I mean, if a hundred people

21   were precluded from acquiring ammunition last month, then that

22   means a hundred, you know, or so folks have -- prohibited

23   persons had been acquiring ammunition every month for, you

24   know, decades; right?

25         And that's what's going on in every state in the country.

That's the status quo.  Prohibited persons are able to lock in and acquire ammunition.  The State's own study on background checks, which are intended to preclude, you know, bad guys from getting firearms -- they had a study that said that their background check system doesn't do anything to reduce overall firearm violence or suicide.

In other words, just because the prohibited persons are getting this stuff doesn't really change anything because the prohibited persons who are getting this ammunition in this manner probably aren't career criminals.  They just had a mistake in the past.

And the career criminals, the bad guys, are not going to be deterred by a background check system.  You know, they're not going to go, "Oh, I was going to go, you know, have my enemy offed, but, hey, you know, I can't get ammo from the background check.  So I guess that's" -- "that's canceled.  That hit's canceled."  That's -- that's just not the way it works.

So I think that's why -- and obviously, I'm speculating on all of this, but I think when you put it in context with the -- I shouldn't -- I should be careful.  It's not the State's study.  It was a study conducted by an entity created by the State.  It was the University of California that conducted the study but with -- basically under the auspices of a state-created program run by a gentleman by the name of Gary

```
 1   Wintemute, who is a renowned pro-gun-control advocate.
 2        And so I don't -- I don't see how the State can make their
 3   claim that even those -- barring those hundred folks made
 4   some -- you know, furthered some substantial interest.  But
 5   even if they could, when you get to the fit part of this -- and
 6   that's all I think Your Honor needs to focus on, is whether
 7   more constitutionally protected conduct is being restricted
 8   than necessary under the tailoring aspect of this, whether it's
 9   intermediate or strict scrutiny.
10        And we've argued that strict scrutiny applies --
11        THE COURT:  Well, let me -- I always used to tell my
12   associates when I was a lawyer, I said, "Okay.  So you've posed
13   a problem to me.  Now tell me what the solution is."
14        So give me a solution because, certainly, the State makes
15   a good point.  It's one that I agree with, and that is that we
16   should keep both firearms and ammunition away from certain
17   people, including people that are unlawfully present in the
18   United States.
19        So -- so what's your creative solution?  What is your
20   group, your association that is composed of a number of
21   gun-owners -- do you have a creative solution on how to
22   accomplish the State's goal?
23        MR. BRADY:  I think that one can be developed,
24   Your Honor, that is certainly less intrusive than this but that
25   would potentially address -- I think that, like I said, those
```

1    hundred folks -- I don't know why any person who believed

2    themselves to be prohibited from owning guns would go in and

3    undergo a background check and risk law enforcement, you know,

4    coming after them if they -- if they knew that they were a

5    problem person or if they were going to commit crimes with it.

6    Why would they say, "Hey, I'm going to undergo this"?

7         So if there was -- if there was something along the lines

8    of allowing people to -- before they purchased ammunition, to

9    say, "Hey, can I check myself," you know -- and there is the

10   system, by the way, but it's not readily available.  You have

11   to, like, know how to do it.

12        This is all the problem, is that there's so many moving

13   parts and machinations with how to determine whether or not

14   you're a prohibited person that I think most people just don't

15   even know.  A lot of people don't know that they are

16   prohibited.

17        And so I think that a less burdensome regulation could be

18   devised.  I haven't thought of one, but I would like to make

19   the comparison of the Fourth Amendment and how we let bad guys

20   get away because we didn't have the evidence to get a warrant;

21   right?

22        I mean, we don't say, "Hey, well, you know, public safety

23   demands that we just search everybody out in the street because

24   a bad guy might get away."  That's not the way it works under

25   the Fourth Amendment.

1     And I would submit to Your Honor that while a -- some type

2  of scheme could be devised potentially that does not burden

3  Second Amendment rights unduly, this one does not.  And it

4  should be respected the same as the Fourth Amendment, that

5  we're just going to have to let some bad guys potentially get

6  ammunition and then prosecute them after the fact.

7     This is not Minority Report where we -- the Government

8  puts up a gatekeeping function that says, "We're going to

9  burden everybody, and we're going to make you 11,000

10  law-abiding people have to undergo all these additional steps

11  to exercise your right just because we hope to accomplish

12  stopping this bad guy."  That's not the way our constitutional

13  system works in virtually any other aspect.

14     This nation is founded on the notion of, you know, rather

15  let ten guilty men go free than put one innocent man in jail

16  because we have due process.  This is the same thing.  We're

17  talking about a constitutional right, and so I don't -- I don't

18  think that, you know, respectfully, the burden is on

19  plaintiffs.  I know Your Honor is asking in general, but --

20     **THE COURT:**  Well, the reason why I'm asking is simply

21  this, not that I would expect the Government to agree to a

22  consent decree, but it strikes me that there may be a way to

23  resolve this issue by getting the State and the plaintiffs to

24  agree.

25     Now, it may be that the plaintiffs -- look, we all know

1   that -- the extremes of this argument.  There are people who

2   just don't like guns, they don't want guns, they don't want

3   anyone to have guns, and they wish that the Second Amendment

4   didn't exist, and they would do anything and everything they

5   could possibly do to essentially extinguishing it in some way,

6   whether it's by one fell swoop or by *lingchi*.  We know that.

7        We also know that there are people that are gun-owners who

8   don't want any restrictions at all.  They want to have bazookas

9   and stinger missiles and so on, and both of those are

10  understandable extremes.

11       The question is, as I think we all -- I think I heard

12  someone say that we should -- you know, we should have

13  common-sense laws with regards to gun control.  And what I'm

14  saying is that I'm not telegraphing my -- my ultimate outcome

15  on this so -- so we understand each other.

16       But if I were to say, "Yeah, I agree to grant the

17  preliminary injunction," it would seem to me that reasonable

18  minds would be able to sit down and come up with something

19  that's less burdensome and perhaps some kind of a consent

20  decree can be entered into whereby the State would agree to do

21  certain things, you know?

22       Anyway, all right.

23       **MR. BRADY:**  I think the impediment to that,

24  Your Honor, would be the fact that this was made by a

25  proposition, and this is -- this was the entire --

1          **THE COURT:**  Well -- but, look, the State has the

2    ability -- I mean, just like they did in Prop 8, they can --

3    they can refuse to enforce a statute enacted by -- by the

4    people -- right? -- like the Governor and the death penalty.  I

5    mean, he said, "Yeah, the death penalty has been approved" -- I

6    don't know how many times, three, four, five times.  I think

7    the last time was 61 percent of the people.  And the Governor

8    says, "Too bad, so sad.  I'm not..."

9        So the point is that this may be a legislative enactment,

10   but the State has ways.  I mean, there's ways that we can --

11   that we can get around some of these issues, but anyway -- all

12   right.  That's a whole different kettle of fish.

13       So thank you, Mr. Richards.  He's been very patient

14   sitting here, listening.  Maybe he has --

15          **THE CLERK:**  Do you want a break?

16          **THE REPORTER:**  Yeah.

17          **THE COURT:**  Yeah.  Are you doing okay?  Because if

18   you're not, I can take a break.

19          **THE REPORTER:**  Can we take a break, Your Honor?

20          **THE COURT:**  You want to take a break?

21          **THE REPORTER:**  Please.

22          **THE COURT:**  Well, I guess, Mr. Richards, how about if

23   I give you a chance -- let's see.

24       My calendar is at 2:00?

25          **THE CLERK:**  Yes, Judge.

1          **THE COURT:**  How about if we come back in 45 minutes?

2      Okay.  So say be back here at a quarter after 1:00, if I'm

3  looking at that clock correct.

4      Is that okay with you?

5          **MR. RICHARDS:**  Quarter after 1:00?  Yes, Your Honor.

6          **THE COURT:**  Okay.  All right.  That will give

7  everybody a break.  I'm sorry.  All right.

8          **MR. BRADY:**  Thank you, Your Honor.

9          **THE COURT:**  We'll take a lunch break.  Thank you.

10          **THE REPORTER:**  Thank you, Your Honor.

11          **THE COURT:**  Sorry about that.

12          **THE REPORTER:**  No.  It's okay.

13          (Luncheon recess was taken at 12:29 p.m.)

14  **AFTERNOON SESSION**                          **1:14 p.m.**

15          **THE COURT:**  Okay.  Welcome back.

16      Mr. Richards, I believe it's your turn.

17          **MR. RICHARDS:**  Thank you, Your Honor.

18      As we were discussing this morning, there's a lot to talk

19  about here.  But I wanted to start out this afternoon by

20  responding to a couple specific points that the plaintiffs were

21  making.

22      And the first one is that plaintiffs are suggesting that

23  the hundred-plus people who were prevented from purchasing the

24  ammunition in July because they're prohibited people somehow

25  doesn't advance public safety because we don't know if those

people are dangerous or might use those -- use that ammunition

in crimes.

     And I'd like to direct the Court's attention to Exhibit 2

of our request for judicial notice.  That's a 20 -- or 2008

ammunition ordinance presentation by the Sacramento Police

Department.  And among other sources of evidence, I think that

this document shows that pertinent people who purchase

ammunition from lawful vendors are criminals and are dangerous

criminals.

     In particular, I would direct the Court's attention to a

page in the presentation -- they're unnumbered, but it's ECF

Page 31, and that's in Docket No. 34-7, where you can see that

as a result of a search warrant obtained because someone had --

a prohibited person had purchased ammunition in Sacramento

County, they uncovered some pretty serious illegal firearms,

including what appeared to be a hundred round magazines and

assault rifles.

     In addition to that, the Sacramento Police Department

uncovered additional evidence of crimes such as burglary,

theft, other forms of theft, drugs, and that sort of thing.  So

we do know that prohibited people purchase the ammunition and

use them in crimes.

          **THE COURT:**  Wait.  So -- so if someone goes and

applies to buy a firearm or ammunition, then they're a

prohibited person?  That then leads to a warrant being issued

1   for the search of their premises?

2        **MR. RICHARDS:**  I believe so, yes.  This is, you'll

3   recall, in 2008, before the State's ammunition law went into a

4   check -- the State's ammunition background law went into

5   effect.

6        And at that point, I believe that if a police department

7   or other law enforcement agency had evidence that a prohibited

8   person had obtained ammunition, that would provide probable

9   cause for a warrant.  And indeed, I think that happened on

10  numerous occasions, as is outlined in this exhibit.

11       **THE COURT:**  I see.

12       So they weren't rejected.  They actually were able to buy

13  the ammunition.

14       **MR. RICHARDS:**  That's correct, and that's because the

15  way that both the Sacramento and Los Angeles County ordinances

16  worked, they didn't -- they didn't have access to the State's

17  databases or to large databases.  They only had access -- they

18  weren't able to set up a system using state resources because

19  they're county government.

20       So the way they did these background checks in their

21  ordinances was to require the person, the purchaser, to provide

22  a list of information, including their name, address, various

23  other information, including a thumbprint and a signature.

24       **THE COURT:**  But that doesn't necessarily translate --

25  I mean -- so what I think I understood Mr. Brady to say was

1    "Now, look, if you were someone who was convicted back in the

2    60's of smoking a joint, you would have a felony on" -- "on

3    your record.  So now you'd be a prohibited person."

4        But simply because you had been convicted of smoking a

5    joint in the 1960's -- can you believe that?  In the 1960's, if

6    you had a joint, it was a felony, and today you can have --

7            MR. RICHARDS:  That's a different topic, Your Honor.

8            THE COURT:  -- a hundred quantities and it's a

9    misdemeanor?  In fact, it's legal to possess it and smoke it

10   out on the street.

11       So -- so why would that give someone, an officer, probable

12   cause to go and search your premises?  I mean, what's the

13   connection between the two, the fact that I smoked a joint in

14   1960 and the fact that today I've decided to go buy some .22

15   rounds to go plinking?

16           MR. RICHARDS:  Well, Your Honor, I think what you're

17   discussing here is a concern about overbreadth with regard to

18   the federal prohibition on prohibited people possessing

19   ammunition and the inclusion of all felons in that group.

20       Certainly, the type of person you're discussing could

21   attempt to bring a facial challenge -- excuse me -- an

22   as-applied challenge to that law, saying, "Hey, I just smoked

23   some dope in the 60's, and I've otherwise been a law-abiding

24   citizen.  I'm not dangerous."

25           THE COURT:  Why would we want to make that an

1  individual -- I want you to -- look, you're the -- you're the

2  State.  By the way, it's not -- you've done a wonderful job so

3  far.  So I'm not talking about you personally.  All right?

4          **MR. RICHARDS:**  Thank you, Your Honor.  I understand.

5          **THE COURT:**  But you're representing the People of the

6  State of California.  That -- that includes people who like

7  guns, people who don't like guns.  It includes people who are

8  prohibited people and people who are not prohibited people, and

9  we all are entitled to get the same representation from you.

10      Some poor person who was convicted of smoking marijuana

11  back in 1960 now is put into a position where he or she -- I

12  mean, they may not have any money at all, but now they're put

13  into the position that if they want to go buy a box of .22 ammo

14  to take their child or grandchild or -- to just go plinking,

15  they have to sue the State, and they have to -- and they have

16  to -- they have to face you.

17      I mean, that's a pretty daunting ordeal, and multiply that

18  out times a number of people that might possibly have the same

19  type of situation.  Do you see what I'm saying?  So I'm not

20  sure that your remedy is really -- it may be a remedy, but it's

21  not a realistic remedy.

22          **MR. RICHARDS:**  Well, with respect, Your Honor, I think

23  there's a couple things here.

24          **THE COURT:**  Okay.

25          **MR. RICHARDS:**  First, yes, I do believe it is a

remedy, and I want to correct something that -- at least it was
a misunderstanding on my part, based on the colloquy you were
having with Mr. Brady earlier today, where the suggestion was
that because someone can't bring a facial challenge, that means
that an as-applied challenge can only apply to the specific
individual in the courtroom.

There are -- there are scenarios where an individual --
individual can represent a group of similarly situated people
and bring essentially an as-applied challenge that doesn't seek
to invalidate the law in all its applications but seeks to
invalidate the law, rather, with regard to certain
characteristics or traits.

So the example that you're talking about -- there may be a
whole group of people like this, and one of them would bring
the -- one or a group of them could bring a claim, indeed, much
like this case.  If it were as simple as Mr. Brady was
suggesting, there would be no need to have the individual
plaintiffs named in this case, which -- they're here.  They
joined the case.  It could have just been brought by the CRPA,
and it wasn't.

And I think that part of the case, we have some arguments
about why they have standing issues.  But generally speaking,
that might be how you would go about challenging the law if it
applied to you.  And as we've argued, in most cases in this
situation and in this case, it doesn't apply to plaintiffs.

1        But to go to your second point about your hypothetical,

2   that prohibition is a federal prohibition.  So it wouldn't be

3   the State of California defending it.  It would be the federal

4   government.  That's a -- that's a -- the ban on felons

5   possessing ammunition and firearms is in 18, U.S.C., 922.  And

6   so that's just the product of federal law.

7        So there may be concerns about how broadly it applies or

8   the policy and determinations that both or either the

9   California legislature or Congress has made, but those are

10  positions or issues best taken up with Congress, the

11  legislature, or the voters.

12       So the fact that there may be some people who are

13  sympathetic or that --

14           **THE COURT:**  Let's clear something up, though.  In

15  your -- in your opposition somewhere, I thought I read that you

16  do not think this scheme implicates the Second Amendment.

17       Did I read that?

18           **MR. RICHARDS:**  Yes.

19           **THE COURT:**  And I thought you said something to the

20  effect that "Well, this isn't a complete ban on the

21  quintessential home defense weapon; i.e., the handgun."

22       But hasn't -- refresh my recollection.  Doesn't the

23  *Jackson* case speak against your position?

24           **MR. RICHARDS:**  No, Your Honor, but I think -- let me

25  clarify that answer and clarify the position in our brief.

1       *Heller* and *McDonald*, the two cases where the Supreme Court

2  has recognized the Second Amendment right, were focused on a

3  handgun in the home for self-defense.  Those are the holdings

4  in those cases.  Subsequent cases expanded those holdings in

5  various areas, and we don't -- we don't dispute or contest

6  those cases.

7       Your Honor pointed to *Jackson* as an example, and we do not

8  contest that ammunition is subject to protections of the -- of

9  the Second Amendment.  That -- the Ninth Circuit held that in

10 *Jackson*, and we are accepting that as law in this case.  But

11 that said, in *Heller*, the Supreme Court still recognized that

12 there were presumptively lawful regulations that would fall

13 outside the Second Amendment and -- and essentially be upheld

14 without further question.

15      Our contention is that in this case, this particular

16 regulation of ammunition is just one such of those

17 presumptively lawful regulations as a restriction on the

18 commercial sale of ammunition and firearms.

19           **THE COURT:**  And the reason why is?

20           **MR. RICHARDS:**  Because it -- it's -- it is a

21 commercial restriction on the -- the sale of -- of --

22           **THE COURT:**  So let's see -- since -- I'm trying to

23 remember who does this or who said they do this, but I do it

24 quite often.  I argue from extremes.

25      So let's assume hypothetically, if you will, that the

1   State of California has decided that the Second Amendment

2   should be repealed, but they know they can't do that.  "So what

3   we're going to do is we're going to make it as difficult as we

4   possibly can for its citizens to exercise their Second

5   Amendment rights."

6       So then they say, "Well, you know what?  We're going

7   to" -- "we're going to enact laws that say that you can only

8   buy one round of ammunition a year."

9       What do you think about that?

10      **MR. RICHARDS:**  That law would probably be

11  constitutionally infirm, Your Honor.

12      **THE COURT:**  How about if they said five rounds?

13      **MR. RICHARDS:**  Also probably constitutionally infirm.

14      **THE COURT:**  How about if they said, "You can buy

15  ammunition, but you can only buy ammunition if you give us a

16  blood sample"?

17      **MR. RICHARDS:**  That's getting a little farther afield,

18  and it would depend on the -- the evidence and analysis and the

19  reasons for that.

20      And, Your Honor, there's a problem here with -- with a

21  line drawn like this.  I mean, Your Honor is posing

22  hypotheticals, all of which have pretty clear constitutional

23  implications, and those laws probably would be

24  unconstitutional.

25      But the -- the Second Amendment -- indeed, regulation in

1   any area doesn't lend itself to exact bright-line line-drawing

2   of this sort.

3          **THE COURT:**  I think it does.

4       So what we have to do is decide whether or not this law is

5   a reasonable fit; right?

6          **MR. RICHARDS:**  If we make it to that step in the

7   analysis, yes.  I think that there -- there's an argument that

8   the amicus brief submitted by Everytown USA in this case --

9   that outlines a very strong argument supporting the argument we

10  made in our brief about why this is a presumptively lawful

11  regulation.

12      But we also noted in our brief that every Ninth Circuit

13  case that has considered this question, including, I believe,

14  most recently in the *Pena* case -- the Ninth Circuit has said,

15  "Well, we're going to do the intermediate scrutiny analysis

16  first because the law survives under that analysis," and that's

17  what we believe should be done here.

18      So while it is --

19         **THE COURT:**  Was *Pena* -- was the *Pena* case the -- was

20  that the micro-stamping?

21         **MR. RICHARDS:**  Yes, Your Honor, and --

22         **THE COURT:**  So you want to test my clairvoyance?

23  Here's my clairvoyance.

24      I predict that within the next ten years, the State of

25  California will decide that there's a loophole in our gun laws,

1    and the loophole is that when they enacted the micro-stamping

2    statute, they left a loophole for those people who possessed

3    guns that do not have micro-stamping capabilities.

4        And so therefore, they will have to enact a law requiring

5    people who possess guns that don't micro-stamp, and they're

6    going to have to sell them or ship them out of state because of

7    the loophole created by that statute.

8        Would you like to put some money on it?

9        **MR. RICHARDS:**  Your Honor, actually, I don't think

10   that that's probable.  But I'd also point out that the

11   micro-stamping can be achieved on the firing pin of the

12   firearm, which is a replaceable component, but that's neither

13   here nor there.  But I see what Your Honor is saying.

14       Nonetheless, the standard that the Court discussed in that

15   case or that approach the Court took, I think, provides

16   guidance here.  And I'll just, as an aside -- this is an aside,

17   but this is also a significant point.

18       If you examine the plaintiffs' briefing, both their

19   opening brief and their reply brief, they rely on essentially

20   no Ninth Circuit controlling authority to discuss intermediate

21   scrutiny.  They cite *Chovan* to talk about the two-step

22   analysis, but then they cite no cases, some of which are pretty

23   close to on point here, if not directly on point, about the

24   standards and the burdens that apply.

25       And I think the cases that are most directly on point are

```
 1    Silvester and Jackson, and it's hard to see -- and the
 2    plaintiffs have not explained in their briefing -- you'd think
 3    that this would be sort of self-evident -- that if you can have
 4    a ten-day waiting period to purchase a firearm, that the
 5    ten-day waiting period to purchase ammunition or a waiting
 6    period to purchase ammunition would -- would need to be
 7    addressed at least if you're talking about alleged delays or
 8    burdens --
 9              THE COURT:  So is there a ten-day waiting period?
10              MR. RICHARDS:  There's no evidence that that's the
11    case.  There are certain people --
12              THE COURT:  No.  Wait.  But -- but -- either Mr. Brady
13    was being less than candid with me or something you just said
14    is not quite accurate.
15         So if I go buy a weapon, there's a ten-day waiting period
16    for me to get that weapon, and that's it.  So I do my
17    background check, and there's a ten-day waiting period.  I get
18    my weapon; right?
19         On the other hand, if you are someone who is not a
20    prohibited person and goes to apply to buy the ammunition and
21    is rejected like the 11,000 people that have been rejected,
22    we're not talking about a ten-day waiting period, are we?
23         We're talking about a whole lot longer than a ten-day
24    waiting period because now they've got to do all of these other
25    things in order to be able to get themselves in a position
```

1    where they can get their ammunition; right?

2            **MR. RICHARDS:**  No, Your Honor.  That's incorrect, and

3    I believe there's several things that I'd like to correct in

4    that --

5            **THE COURT:**  Okay.

6            **MR. RICHARDS:**  -- in that discussion, some of which

7    were raised earlier this morning that I was --

8            **THE COURT:**  All right.

9            **MR. RICHARDS:**  -- going to get to eventually anyway.

10       To start with, the comparison to the ten-day waiting

11   period to purchase a firearm -- that is the statutory period

12   for purchasing a firearm.  However, it can take longer than

13   that if the department is unable, using its records, to

14   determine whether you're a prohibited person or not.

15       This comes up most often in the context where someone has

16   a criminal history but the disposition of that history isn't in

17   the system.  So the Bureau of Firearms that administers the

18   background check process needs to check and confirm what the

19   nature of that criminal history is to see if you're a

20   prohibited person.

21       So that's something that can happen with firearms, too.

22   The standard waiting time is ten days, but the checks can -- or

23   the background check process can go on longer if there's a need

24   to do that.

25       And that actually ties over into the ammunition context

1    because at bottom, every person who's eligible to purchase

2    ammunition can use the basic ammunition eligibility check,

3    which is essentially the same process as the firearms

4    background check minus --

5              THE COURT:  Refresh my recollection.  What is that

6    again?

7              MR. RICHARDS:  So there are three types of background

8    checks.  There's actually four ways that you can purchase

9    ammunition.  The first one, we haven't discussed much.  You can

10   buy ammunition when you purchase a firearm.  You go through the

11   firearms background check.  It's good enough.  The check

12   cleared.  You can purchase the ammunition.

13        Outside that --

14             THE COURT:  But you can only buy it at that time;

15   right?  That only qualifies you to buy the ammunition while

16   you're buying the firearm; right?

17             MR. RICHARDS:  That's correct, but --

18             THE COURT:  Okay.

19             MR. RICHARDS:  -- in conjunction with purchasing that

20   firearm, you will then have an AFS entry and be able to do the

21   standard.

22        The next check, though, that's been discussed, which is

23   the standard ammunition eligibility check or what's called the

24   AFS check for short -- that's for people who have entries in

25   the Automated Firearm System.  They can go in the store, as

1    Mr. Brady described, pay a dollar, and have the check run in a

2    relatively short amount of time.  The evidence that we

3    submitted shows that takes on average less than five minutes.

4         This -- the third kind of check is the --

5         **THE COURT:**  But if you don't -- but if you haven't

6    purchased a firearm like the example I used, having bought a

7    long gun, say, in 2000 or 2002, you're not going to be in the

8    AFS system.  So that's not going to apply to you; right?

9    Doesn't work for you?

10        **MR. RICHARDS:**  At that time and if you take no further

11   steps, that's correct.  You would use the next type of

12   ammunition check, which is a basic -- called a basic ammunition

13   eligibility check, and that is essentially a background check

14   run by the Bureau at that time.

15        I would just point out with regard to what your -- the

16   situation that Your Honor was talking about, purchasing a long

17   gun before 2014 and it wasn't registered for some other reason

18   in the system, you can still submit a firearms report to the

19   Bureau and have that firearm entered in AFS so that you can use

20   AFS going forward.

21        So if you bought a long gun in 1995, you can submit this

22   report to the Bureau and get an AFS entry for that firearm.

23   That would allow you -- allow you to use the standard

24   ammunition --

25        **THE COURT:**  And how would I know that?

1          **MR. RICHARDS:**  It's available on the department's

2    website.  If you go to the California Department of Justice's

3    Bureau of Firearms website, there's discussions that describe

4    all these processes on there, and I believe it's laid out

5    fairly -- fairly clearly.

6       You know, there's different situations for different

7    people, but they -- these options are highlighted for -- for

8    purchasers.

9          **THE COURT:**  And if you're an old dinosaur like me who

10   doesn't know how to use the Internet?

11         **MR. RICHARDS:**  Hopefully, your local firearms dealer

12   can direct you to the resources and help you do what you need

13   to do.

14         **THE COURT:**  All right.  Good enough.

15         **MR. RICHARDS:**  Just to tie up the discussion --

16         **THE COURT:**  What's the fourth one?

17         **MR. RICHARDS:**  I was just going there, Your Honor.

18      That's the Certificate of Eligibility verification check.

19   That's essentially the same check as the standard ammunition

20   eligibility check except for it's relying on your status as a

21   COE-holder to deem you, you know, authorized to purchase

22   ammunition and just make sure that that certificate is still --

23         **THE COURT:**  Is that the one that's good for 18 months

24   or something?

25         **MR. RICHARDS:**  I believe it's good for a year,

1    Your Honor, and you can renew it annually --

2              **THE COURT:**  Okay.

3          **MR. RICHARDS:**  -- with a relatively -- relatively

4    straightforward process.

5              **THE COURT:**  Let me ask you a question.  So there are a

6    lot of people that are concealed-carry weapon --

7    concealed-carry permit holders.

8          Now, before you can become a concealed-carry

9    permit-holder, you have to go through a background check;

10   right?

11             **MR. RICHARDS:**  Yes.

12             **THE COURT:**  And if you purchased your weapon before

13   2000 -- what did you say?  '14?

14             **MR. RICHARDS:**  A long gun, yes.

15             **THE COURT:**  Yeah.

16         You wouldn't be in the AFS system; right?

17             **MR. RICHARDS:**  That's correct.

18             **THE COURT:**  But you'd have this permit that allows you

19   to carry this weapon.  You've -- you've had to pass a

20   proficiency test, you've had to take other tests, and you've

21   had to -- I can't remember if you had to do -- renew the target

22   practice every so often.

23         But there's no exception for -- for a concealed-carry

24   permit-user in the law, is there?

25             **MR. RICHARDS:**  Under the ammunition background check

1    law --

2              **THE COURT:**  Yeah.

3         **MR. RICHARDS:**  -- there's no exemption from the

4    background check laws for those purchasers.  They would either

5    use the basic ammunition eligibility check if they didn't have

6    an AFS entry or use the standard ammunition eligibility check

7    if they did have an AFS entry.

8              **THE COURT:**  Do you happen to know -- does the State

9    have any statistics about how many shootings -- how many -- how

10   many, quote, "gun violence incidents" there's been with people

11   who hold -- or by people who hold a concealed-carry permit?

12             **MR. RICHARDS:**  Not that I'm aware of, Your Honor.

13             **THE COURT:**  You don't know those statistics?

14             **MR. RICHARDS:**  I don't know if there are statistics or

15   not.

16             **THE COURT:**  Okay.

17             **MR. RICHARDS:**  I would also point out -- and I believe

18   it was a concealed-carry permit, but this was essentially the

19   challenge that the plaintiffs in *Silvester* brought.  They

20   weren't just random people who want -- or the average firearm

21   person -- person who wanted to purchase a firearm.

22        They were people who had concealed-carry permits, who had

23   multiple firearms, and were essentially making the same

24   argument that Your Honor's outlining here, that they had

25   already passed background checks and gone through extensive

```
 1    training and other -- other things that they argued would

 2    suggest that they were not dangerous, and the Court rejected

 3    that challenge.

 4         And that's another reason why that case is stronger

 5    authority here for a background check with much shorter

 6    duration.  The standard ammunition eligibility checks, of which

 7    there were over 40,000 in July, averaged just under five

 8    minutes.  So when you're talking about a burden on people, it's

 9    a dollar.

10         THE COURT:  I thought it was 60 -- I thought it was

11    68-.

12         MR. RICHARDS:  There was 68,000 transactions processed

13    for all types of background checks.  Of those, I believe there

14    were -- I'm speaking roughly here.  I'd have to refer to the

15    Morales declaration to get the exact numbers.  But

16    approximately 57,000 were standard ammunition eligibility

17    checks, and of those, 18 to 19 percent were rejected.

18         And that gets to another point that I wanted to discuss

19    with the Court because I don't want to leave the Court with the

20    impression that a rejection of a standard ammunition

21    eligibility check means that you can't purchase ammunition.

22         First of all, that number may be inflated for any number

23    of reasons.  I think Mr. Brady even -- I don't think

24    intentionally, but suggested one reason, and Your Honor was

25    talking about it as well this morning when you said, "Well, can
```

1   a person just run a check to see if they have an AFS entry?"

2        So everyone who did that, Mr. Brady said, was a large

3   number of people who were doing this.  Those are going in as

4   rejections because those people don't have AFS entries.  So

5   that number can be high for any number of reasons that -- the

6   clerk entering the transaction could mistype.

7        So we don't know that those people that are actually

8   individual people -- that there's a reason why they should have

9   been able to use that process and they weren't.  And, again,

10  this highlights the reason why facial challenges aren't good to

11  test these things and why you need plaintiffs to actually

12  experience what they're complaining about so that we can figure

13  out what's going on.

14       As we outlined in our papers, even those people who have

15  AFS entries who were rejected may have a very quick solution to

16  solve that.  There's an online database called CFARS, which

17  stands for the California Firearms Application Reporting

18  System.

19            **THE COURT:**  Hang on.

20       California Firearms Reporting System?

21       **MR. RICHARDS:**  California Firearms Application

22  Reporting System.  It's CFARS for short, C-F-A-R-S.

23            **THE COURT:**  All right.

24       **MR. RICHARDS:**  And, again, this system is described on

25  the Bureau of Firearms website as well.

1   But this system allows people to -- who have received a

2   rejection from purchasing firearms to go on and correct certain

3   potential reasons why they were rejected, as you described this

4   morning, a change in address, for example, change in name,

5   those sorts of things.

6        **THE COURT:**  Are they told that?  So if I go in and I'm

7   rejected, are they -- are they told -- are they told that?  Are

8   the people given information?  Is there a disclosure telling

9   them, "Okay.  This is why you were rejected.  This is how you

10  can fix it"?

11       **MR. RICHARDS:**  As part of the process, you will --

12  someone undergoing a background check will get a number that

13  they can -- they can go -- log onto the CFARS system and look

14  at the reason for the rejection.  I don't know if it

15  necessarily suggests that "Here's how you fix it," but I do

16  know that --

17       **THE COURT:**  Yeah.

18       **MR. RICHARDS:**  -- vendors are -- in the vendor

19  guidelines, there's discussions of providing that number to

20  people so that they can -- they can go check.

21       **THE COURT:**  So if I leave here this afternoon and I go

22  to Turner's and -- well, no.  That's not going to work.  I'm

23  trying to figure it out.

24       So somebody goes to buy some ammunition, and they're

25  rejected; right?  They're not told why they were rejected, but

they can go to this website.  So they can immediately -- if
they have a Smart Phone, I suppose, they can get on their Smart
Phone, go to that website, and then see why they were rejected,
and it might be something that they can fix quickly?

      **MR. RICHARDS:**  Yeah, and relatively quickly in the
context of an address change.  I think it would be -- again,
there's processing times, depending on how many people are
submitting changes at that time.  It can vary, but it's a
matter of minutes.  I think it lasts a little longer if it's a
busy time.

     And I don't know the exact nature of -- of what the
denial -- you know, what someone is told when they're denied.
But, you know, I think it's important to keep in mind -- and
this is what I was getting to a little bit earlier.  If that
happens to you, if you submit a standard ammunition eligibility
check and you are rejected, you can still submit the basic
ammunition eligibility check and go through that process.

     And essentially, what's going on here in the background is
if you have an entry in AFS and the vendor can confirm who you
are -- that's why the ID requirement's important.  It confirms
that the person there is the person on the identification card,
the person on the identification card is the person with the
entry in the Automated Firearms System.

     The Bureau can then run that name against the armed
prohibited persons list and determine whether you're -- you're

1    authorized to possess a -- to purchase or possess ammunition.

2           THE COURT:  Let me ask you.  That brings me to a -- to

3    a question.

4        What's the point of this face-to-face requirement on the

5    sale of -- or the -- or the transaction of the purchase of --

6    of ammunition?  What's the point of that?

7           MR. RICHARDS:  Well, it's to confirm that the person

8    purchasing the ammunition is the person on the identification

9    card and that the background check can be run on that person,

10   that the person there with the identification is the person who

11   is in the system and who's actually -- actually purchasing the

12   ammunition.

13       I should note that background checks -- or excuse me --

14   face-to-face transactions are not uncommon.  I mean, New York's

15   face-to-face ammunition background check was upheld in the *New*

16   *York State Rifle and Pistol Association v. Cuomo* case that we

17   cite in our brief.

18          THE COURT:  Is that still in effect?

19          MR. RICHARDS:  That law?

20          THE COURT:  Uh-huh.

21          MR. RICHARDS:  That law is on the books, but I believe

22   that New York has not implemented it.

23          THE COURT:  Yeah.

24          MR. RICHARDS:  The face-to-face aspect may actually be

25   implemented, but the background check process in New York has

1    not implemented, I believe.

2         **THE COURT:**  That reminds me, by the way.

3      So Sacramento and LA had an ammunition registration

4    program at one time; right?

5         **MR. RICHARDS:**  Sure.  Ammunition ordinances, yes.

6         **THE COURT:**  Yeah.

7       And the rejection rate on one was, like, 2.6, and the

8    other one was 3.4 percent?

9         **MR. RICHARDS:**  Yes, two to three percent.

10        **THE COURT:**  But in -- California's statewide is

11   18 percent so far, right, as best as we can determine?

12        **MR. RICHARDS:**  I want to be clear here.  I think using

13   different terminology can help here.

14        **THE COURT:**  Okay.

15        **MR. RICHARDS:**  I think if we talk about denials as a

16   determination that someone is a prohibited person and therefore

17   can't possess ammunition and we talk about a rejection as a

18   particular method for running a background check that can't be

19   processed, those are two different things.

20      So what we have in Los Angeles and Sacramento is two- to

21   three-percent denials.  That's the determination that -- well,

22   they're not denials, but they're a determination that those

23   people are prohibited persons.

24      The 18-, 19-percent rejection rate in California under the

25   standard ammunition eligibility check is just a determination

1    that those purchasers weren't eligible to use that specific

2    check because they didn't have an AFS entry.  Their record

3    didn't -- their identification didn't match their AFS entry.

4          **THE COURT:**  So if I understand you correctly, the

5    right calculation would be to take the 106 and divide that by

6    the 68,000?

7          **MR. RICHARDS:**  That would be -- that would be one way

8    to do it.  But, again, I think it's not quite the -- it's not

9    quite the same comparison because the -- we know that the

10   standard ammunition eligibility check is going to have a lower

11   hit rate on prohibited people because a lot of those people

12   have already undergone background checks, but it's still

13   picking up prohibited people.

14         And the State's armed prohibited persons file or system

15   that operates has approximately 20- to 24,000 people who at one

16   time were able to purchase a firearm but have since become

17   prohibited people, and this is something that the State -- it's

18   an ongoing issue in the state of making sure that people who

19   were once lawful possessors of firearms but have since become

20   prohibited don't get to keep those firearms.

21         And this is one step in -- in that process of making sure

22   the prohibited people who purchased a lawful -- lawfully

23   purchased a firearm at some point don't get to keep having it

24   now that they're prohibited.

25         So that's -- that's what the standard ammunition

1    eligibility check is doing.  And, again, that's a very short

2    check for -- for those people who have entries in the system,

3    but the default in the background -- the fallback is the basic

4    ammunition eligibility check, and everyone can do that.

5        That check consists of the Bureau essentially running the

6    same background check it would on a firearm transaction minus

7    the federal NCIS background check.  So that background check

8    looks at four databases, one that has convictions, one that has

9    restraining orders, one that has mental health holds.  I

10   believe one has warrants.

11       It draws from that information to determine whether

12   someone is a prohibited person or not.  And that's why the

13   basic ammunition eligibility check can take longer, because if

14   you run that check using the person's identifying information

15   and some form of criminal history comes up, someone at the

16   Bureau is going to have to check that to make sure the person's

17   not prohibited.

18       Now, if you have no criminal history, my understanding is

19   that those background checks run fairly -- fairly quickly, in a

20   matter of minutes or hours, not days.  But if you have some

21   sort of criminal background, if there's some flag in the

22   system, that means it's going to require what's called a manual

23   review, manual check.

24       And that can take a couple days, if not in some cases

25   longer, for the same reasons that I was describing with regards

1    to firearms background checks, just confirm that the person

2    who's there doesn't have a prohibiting offense on their record.

3    So those people are going to --

4         **THE COURT:**  Well, let me ask you from a practical

5    perspective, though.

6         So say you go in for an AFS and you do this AFS check and

7    your -- and you pass that check; right?  So what's so -- we

8    know you're not here -- you're not unlawfully present in the

9    United States.  We know you have a firearm.  We know that you

10   don't have a criminal history or record.

11        Why not give that person, say, for example, a 12-month

12   permit so that he or she can go buy ammunition and whatever

13   they need to during that 18 months or that 12 months?

14        **MR. RICHARDS:**  Because people are added to the arms --

15   armed prohibited persons file all the time.  I believe in 2018,

16   11,000 people were added to that list.  Again, that's a list of

17   people who once lawfully purchased or possessed firearms that

18   have since become prohibited.

19        So that's an ongoing --

20        **THE COURT:**  But how is that different when that

21   happens with a Certificate of Eligibility?  Right?

22        So you go in, you get the Certificate of Eligibility, you

23   get this permit that allows you to buy ammunition for -- is it

24   12 months or 18 months?  I can't remember.

25        **MR. RICHARDS:**  I believe it's 12.

1          **THE COURT:**  12 months; right?

2      So what's the difference?

3          **MR. RICHARDS:**  I believe if you get a -- if you become

4   prohibited, then you would lose your Certificate of

5   Eligibility.  I'd have to double-check on that.

6      But I don't believe that there's -- there's no -- it

7   doesn't matter if you have a CO -- COE or Certificate of

8   Eligibility.  If you get a conviction that makes you a

9   prohibited person, I think that would disqualify your COE, but

10  I would have to double-check with the Bureau.

11         **THE COURT:**  So if I have a COE, every time I want to

12  buy ammunition, I have to somehow or another let them know that

13  I have this COE?  Otherwise --

14         **MR. RICHARDS:**  Yes.

15         **THE COURT:**  Is that correct?

16         **MR. RICHARDS:**  That's correct.

17         **THE COURT:**  And so sometime in the process, I become a

18  prohibited person.  Then there's going to be some entry that

19  revokes my COE.  Is that --

20         **MR. RICHARDS:**  I believe -- I believe so.  Again,

21  that's the thing I'd have to double-check on.

22         **THE COURT:**  Look, if you don't know -- you're the

23  State, man.

24         **MR. RICHARDS:**  Well, this is a question that hasn't --

25  hasn't been raised.

(Laughter)

**MR. RICHARDS:**  And, again, we're back -- we're back to my sort of common theme for today, which is this is why facial challenges don't work because -- in this context, where there's no plaintiff, there's no one -- there's no COE-holder in this case saying, you know -- you know, "I was trying to purchase ammunition, and they said I was prohibited, and I'm not," that sort of thing.

Those are the types of cases that can be heard and these type of questions can be answered.

**THE COURT:**  Yeah.  It goes to the fit.  In my opinion, this all goes to the fit.

So the State has enacted this scheme, and the question is: Is it really -- really a reasonable fit to what the State is trying to accomplish?

**MR. RICHARDS:**  And I would direct the Court to *Silvester* and *Jackson* and -- indeed, a whole slew of other Ninth Circuit cases, but those two in particular -- and say, "Yes."  I mean --

**THE COURT:**  Okay.

**MR. RICHARDS:**  -- just taking *Jackson*, for example, the handgun storage requirement, you can make the same type of argument with regard to handgun storage.

Why should someone who's gone through a CCW training and, you know, is an expert marksman and a gun safety enthusiast and

all this sort of thing -- why should they have to lock their
guns up just like the novice who purchased their first handgun?
And the same type of finish is there.

The same thing in the *Silvester* case.  Why should the
multiple-firearms owner, CCW carriers -- why should they have
to go through the ten-day cooling-off period just like anyone
else?  And, again, fit was deemed to be satisfactory there and
within constitutional bounds.

And this case is no more onerous.  I mean, again, for the
people with the -- with the AFS entries and the -- and the
COE's, we're talking a matter of minutes and a couple of -- a
dollar, not even a couple dollars.

So the burden here is very slight in terms of when you
start looking at some of the other burdens that have been --
that have been upheld, and it's no different than -- than a
firearm background check that people often go through when they
purchase firearms and other laws of that nature.

So when you're talking about the fit, this is something
that's well within the established norm.  And, again, that's
what I was talking about earlier this afternoon when I was
saying it's hard to understand how plaintiffs didn't at least
try to distinguish these cases.

They didn't discuss them at all, and I think it's because
they're -- they're directly on point, and they tell the Court
which direction it needs to go both on analogizing to the facts

1    but also on the standard that should apply, how intermediate

2    scrutiny works.

3         Again, I think the Ninth Circuit has now outlined,

4    discussed, set forth the intermediate scrutiny standard that

5    applies in these cases multiple times, starting in *Chovan*,

6    going all the way up most recently in -- *Pena*, I believe, was

7    the most recent one.  But all those cases say essentially the

8    same thing.

9         THE COURT:  Can you -- can you tell me, has the Ninth

10   Circuit ever found a -- well, in general, a gun restriction

11   that did not -- that was not a reasonable fit?

12        MR. RICHARDS:  I don't know if it has.  I --

13   certainly, we didn't --

14        THE COURT:  Mr. Brady, do you know one?

15        MR. BRADY:  Well, Your Honor, there have been a couple

16   panels that have struck down certain restrictions as violative

17   of the Second Amendment, and then one was taken en banc.  It

18   was a carry case, a right to bear arms for those --

19        THE COURT:  Was that *Peruta*?

20        MR. BRADY:  That was *Peruta*.  It was taken en banc,

21   and it was over- -- the panel decision was overturned on the

22   basis that the appellants were requesting a right to

23   conceal-carry, not just to carry.  There is no such right.

24   They did not articulate whether there was or was not a right to

25   bear arms, which prompted several other cases to work their way

1   up there.

2       There was a case against the State of Hawaii, basically

3   the *Peruta* against Hawaii, that those plaintiffs challenged

4   open and concealed-carry restrictions, saying they would take

5   either license.  And a panel of the Ninth Circuit agreed that

6   that was a violation of the Second Amendment, and that case,

7   too, has been taken en banc.

8       Every pro --

9           **THE COURT:**  It hasn't been decided yet?

10          **MR. BRADY:**  Yes.

11      Every pro-Second-Amendment opinion to come out of a Ninth

12  Circuit three-judge panel has been taken en banc and

13  overturned.  Not a single Ninth Circuit panel that has upheld a

14  law has been taken en banc.

15          **THE COURT:**  The reason -- the reason why I ask the

16  question is because it kind of gives me -- again, it's not

17  parameters.  It tells me what the Ninth Circuit has found to be

18  acceptable and what is not acceptable.  I think I have some

19  parameters on the one side.  I have no parameters on the other

20  side.

21      So -- okay.  Good enough.  Go ahead.  I'm sorry.

22          **MR. RICHARDS:**  That's okay.

23      And I think that, again, *Silvester*, *Jackson*, those cases,

24  are the cases that should guide the Court's analysis.  Indeed,

25  I think they're very, very, very closely analogous to the

1    situation here.

2         You know, to get back to the standing issue, again, the

3    plaintiffs are challenging a number of aspects of this law, and

4    no named plaintiff has actually said that any of these

5    requirements applied to them.

6         So the Federal Limits Apply license issue.  No plaintiff

7    has said that they have a Federal Limits Apply license.

8         The rejection issue.  No plaintiff has said that they've

9    had a transaction rejected.

10        **THE COURT:**  You know, I -- I asked you about

11   face-to-face, and you told me that it was to verify that it's

12   the person that's on the ID, but couldn't -- couldn't --

13   couldn't that be done through -- I mean, a lot of what you have

14   told me today is basically dependent upon online services, for

15   example, going to the California Firearms Application Reporting

16   System, which requires a certain amount of technology to be

17   used; right?

18        Although I'm a dinosaur, I know that technology is -- you

19   know, is progressing.  And, in fact, at this point in time, I

20   can talk to a relative halfway around the world on something

21   called Skype; right?  Or I can talk to someone on FaceTime.  So

22   why wouldn't you be able to do that?

23        I mean, why not include something like that rather than --

24   because -- and the reason why I mention that is because this

25   face-to-face requirement necessarily requires that someone be

1    in the State of California, dealing with a State of California

2    vendor in order to be able to purchase the ammunition as

3    opposed to, say, someone being in Colorado, buying the

4    ammunition in Colorado, and being able to do, say, the Skype

5    or -- or FaceTime to confirm that the person who's buying

6    the -- the ammunition is, in fact, the person that's on the ID.

7           **MR. RICHARDS:**  Well, Your Honor, I think we're veering

8    to the dormant commerce clause issue there, but --

9           **THE COURT:**  Well, I did -- I did sort of try to sneak

10   one on you there for a minute, but --

11          **MR. RICHARDS:**  But to answer that question -- I mean,

12   I think there are a whole lot of reasons why you wouldn't want

13   to do that.  I mean, one, a face-to-face requirement still is

14   better than -- than a videoconferencing requirement, again, for

15   purposes of identifying straw purchasers, for confirming that,

16   you know, the person there is the actual person with the ID.

17          And I think face-to-face requirements -- they're not that

18   uncommon.  There's a whole number of products that, if you look

19   through the case law, you can see face-to-face requirements

20   imposed by the law.

21          I think there's a case out there on horse bedding, a case

22   out there on fireworks, cigarettes, which is cited in the -- in

23   the New York District Court case upholding New York's

24   face-to-face ammunition sales requirement.

25          So there's a number of scenarios where face-to-face

1    requirements are imposed.  I believe alcohol is another one.

2    We wouldn't want people to be able to Skype with their local

3    convenience store and say, "Hey, you know, I'm 21.  Here's an

4    ID.  You know, send me some alcohol to my house."  I mean --

5             THE COURT:  No, no, no, but I guess -- I guess maybe

6    I'm not understanding this, but if I'm in Colorado and -- well,

7    I was just in Las Vegas.  So -- so I go to Cabela's.  I go to

8    Cabela's, and I buy -- you know, I want to buy a box of

9    12-gauge shotgun shells; right?

10        I show that person my ID and -- whatever the ID may be,

11   and they look at me; right?  And then they can contact the

12   person that I guess they're going to have to ship the 20-gauge

13   shotgun shells to in California for me to go pick them up in

14   California.

15        The way I understand the law now, I would actually have to

16   go physically and pick up those shells from the person that is

17   delivering them to me in California; right?

18             MR. RICHARDS:  That's correct.

19             THE COURT:  Because they want to make sure that I'm

20   the one who's buying the shells.

21        But if -- but if, in fact, they send -- from Cabela's,

22   they send a Skype or a FaceTime picture of me to that vendor in

23   California, what's wrong with that?

24             MR. RICHARDS:  I might misunderstand Your Honor's

25   hypothetical here.  There's no requirement under California law

1    that if you're buying ammunition from Cabela's in Nevada --

2    that you do that in person.  It's only when you come pick up

3    the ammunition in California, when it's being delivered to you

4    in California, that you have to appear in person for that

5    background check.

6        So there's no requirement to get -- the law does not

7    regulate extraterritorially, and I think we briefed that fairly

8    well in our motion to dismiss, and I didn't understand the

9    Court's ruling on that motion to hold that the law does

10   regulate extra -- extraterritorially in violation of cases like

11   *Saint Francis* and that line of authority.

12       So --

13       **THE COURT:**  Well, maybe I can buy you a beer later on

14   this afternoon, and I'll try to explain it to you.

15                    (Laughter)

16       **MR. RICHARDS:**  Okay.  Well, again, I may have mis- --

17   misunderstood that.

18       But, again, the law -- the law -- the law is clear in the

19   Ninth Circuit that someone who's sending a product into

20   California can be subject to regulation without that being a

21   per se invalid extraterritorial regulation of interstate

22   commerce.

23       You know, there's a lot of issues on the Second Amendment

24   that I'd like to get back to, but I'm happy to keep going on

25   the dormant commerce clause, if you'd -- if you'd like.

```
1            THE COURT:  No.  It's your -- it's your --

2            MR. RICHARDS:  Okay.  Well --

3            THE COURT:  You spend it however you want.

4            MR. RICHARDS:  I'll just -- I'll just tie a knot up on

5    this dormant commerce clause issue.  And, again, in our moving

6    papers, we asked the Court to take a second look at the -- at

7    the Ninth Circuit's decision -- I apologize -- the National

8    Biweekly decision.

9            In that case, the Ninth Circuit held that the law at issue

10   violated the dormant commerce clause because it required

11   mortgage -- or loan proraters -- that's people who process

12   payments from a mortgagee and send them off to a creditor.  It

13   required those proraters to incorporate in California, and it

14   deemed that requirement a residency requirement, which makes

15   sense because a corporation's residency is determined both by

16   its domicile and its place of incorporation.  Corporations have

17   two -- two residences for legal purposes.

18           It also, among other things, require -- would mean that

19   those corporations would be subject to the California rules

20   governing corporate internal affairs as opposed to Delaware or

21   whatever other corporate internal operating rules would govern

22   if the state -- if the corporation had been incorporated in a

23   different state.

24           So that's quite a -- that's quite a bit different than

25   prohibiting face-to-face transactions.  It's not, as the
```

plaintiffs have argued, a residency requirement.  Indeed, we
know this because several of the most prominent vendors of
ammunition are, in fact, out-of-state businesses, Wal-Mart, for
example, Dick's, for example.

So this is not a requirement that forces -- that forces
residency, and --

THE COURT:  What about the not-so-big dealers like the
mom-and-pop's ammo store down the street?  What about them?
Kind of puts them at a bit of a disadvantage, doesn't it?

MR. RICHARDS:  It very well -- very well may, but
that's not the -- that's not the analysis for dormant commerce
clause purposes.  The analysis for dormant commerce clause
purposes is whether it -- it regulates unevenly in interstate
commerce and -- and --

THE COURT:  Well, you just told me that basically
those big companies like Wal-Mart and so on -- they have an
advantage; right?  It regulates unevenly because they have an
advantage.  The mom-and-pop store doesn't have that advantage.
They're just a mom-and-pop store.

MR. RICHARDS:  Again, that's not -- that's not -- the
advantage is not determined by their state of residency.
That's determined by how large they are.

I think the *Exxon* case is a good example of courts holding
that the economic effects on an individual business are not
what governs the dormant commerce clause analysis.  It's

1   whether the law regulates evenhandedly, and California's law

2   does regulate evenhandedly.

3        It says that you have to have a brick-and-mortar location

4   where you can do face-to-face transactions when you sell ammo,

5   and that applies to instate real -- or instate businesses and

6   out-of-state businesses.

7        And that's -- and on that front, I was -- actually, just

8   this weekend, I became aware of a case called *Wal-Mart Stores,*

9   *Incorporated v. Texas Alcoholic Beverage Commission* that the

10  Fifth Circuit issued on August 15th, and I think --

11            **THE COURT:**  You want to do that again?  That was

12  pretty fast.

13            **MR. RICHARDS:**  Yeah, sure.

14       It's *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage*

15  *Commission*.  That was published -- issued by the Fifth Circuit

16  on August 15th.  It's Case No. 18-50299.

17       Now, I won't get too far into it since it wasn't briefed,

18  but I would just direct the Court to look at Pages 16 really

19  through the conclusion, where the analysis is pretty much on

20  all fours with the arguments that we've been making about the

21  dormant clause -- commerce clause in this case.

22       Just -- and I'll leave it at that unless the Court would

23  like me to discuss the facts of it, but I think all the -- all

24  the analysis there is doing is just confirming the analysis

25  that we have been moving for in this case.

1       THE COURT:  Okay.

2       MR. RICHARDS:  To come back to the Second Amendment

3   issues, I do want to get back to this facial challenge issue

4   because it is -- like I said earlier this morning, it's a

5   significant issue, and --

6       THE COURT:  It must be.  You've only raised it now

7   about 25 times.

8                       (Laughter)

9       MR. RICHARDS:  But there's -- there's a lot -- there's

10  a lot of discussion on that.  And, you know, I think at the

11  starting point here, the plaintiffs' sort of downplaying of

12  *Salerno* is -- is pretty amazing because we have a Supreme Court

13  case that's held that this is the standard, and no case [sic]

14  has overturned that case, and they're saying it doesn't apply.

15      Their -- as the Supreme Court noted in the *Washington*

16  *State Grange* case, some Justices have criticized that standard,

17  but it's never been overruled.  Indeed, the Ninth Circuit has

18  said that's the governing standard.  In one case, it said,

19  "*Salerno* remains binding law on the Ninth Circuit, and we are

20  not free to ignore it."  That's a 2016 case called *Arizona v.*

21  *Arpaio*, and that's at --

22          THE COURT:  I'm not -- I'm not free to ignore it,

23  either; right?

24          MR. RICHARDS:  Yeah.  That's -- that is -- that's

25  right.  I'll just finish the cite there, 821 F.3d, 1098.

1        And, again, *Salerno* is going to apply in the Second

2   Amendment context as well.  The Ninth Circuit hasn't done it

3   because I don't believe the issue has come up, but the Eleventh

4   Circuit has done it in a case called *GeorgiaCarry.org v.*

5   *Georgia*.  That's 687 F.3d, 1244.

6        There, the Court said --

7             **THE COURT:**  Is that in your brief?

8        **MR. RICHARDS:**  It is not, but this is in response to

9   the arguments raised in the plaintiffs' reply brief about

10  whether *Salerno* applies.

11            **THE COURT:**  Okay.

12       **MR. RICHARDS:**  And just to cap this off, the Court can

13  take a look at that case, where the Court -- the Eleventh

14  Circuit applied *Salerno*.

15       I'd also direct the Court to the Eleventh Circuit's en

16  banc decision in *United States v. Skoien*, which was written by

17  Judge Easterbrook, where the Court said a person to whom a

18  statute properly applies can obtain relief on arguments that a

19  differently situated person might present.  That's exactly

20  what's happening here.  The plaintiffs in this case have not

21  said that the statute applies to them in the ways that they are

22  complaining of.

23       Now, plaintiffs have also suggested that CRPA may have

24  associational standing, but the facts that they rely on to

25  establish that standing are both inadequate and not alleged in

```
 1    any pleading.  As the cases we cited in our briefing papers
 2    said, the facts establishing standing have to be alleged in the
 3    complaint.
 4         Plaintiffs could have filed a supplemental complaint, but
 5    they didn't.  They're relying on a declaration that is itself
 6    deficient, but that -- that's a problem, and the second problem
 7    is that the allegations are just threadbare recitals of "We are
 8    aware of some members who've experienced this."  That's not
 9    enough to establish associational standing.
10         On the substance of the associational standing test, they
11    also have to show that the participation of those members isn't
12    necessary to the case.  And here, for reasons we discussed
13    earlier, it most certainly is.
14         If someone is rejected when they go in for a standard
15    ammunition eligibility check, there can be any number of
16    reasons why they may have been rejected, and determining what
17    those are is going to help the Court analyze whether there's an
18    issue or not, a constitutional issue or not.
19         So the participation of -- of members is going to -- is
20    going to be necessary at least to understand what the group of
21    people might have to do or go through.  So the associational
22    standing is not a sufficient basis for this -- for this to go
23    forward.
24         I'd also say that even under the lesser standard -- so
25    Salerno is a very high standard.  We all acknowledge that.  But
```

1   even under the lesser standard, it's still an extremely

2   demanding standard that plaintiffs can't meet.   The plainly

3   legitimate sweep test that the Court in -- the Supreme Court in

4   *Washington State Grange* applied is still a very, very high

5   standard.

6        And, again, here, in this case, we have no plaintiff who

7   said that they haven't been able to purchase ammunition, no

8   plaintiff who's alleged that they've been seriously denied --

9   delayed.   We have hypotheticals and -- and speculation about

10  how the law may work or may be working.

11       We don't know, again, for example, whether the people who

12  were rejected under the law have been unable to acquire

13  ammunition.   We just know that they weren't able to use one

14  avenue to obtain it.   So the standard's still quite high.

15       The -- it's undisputed that at least 80 percent of the

16  transactions for standard ammunition eligibility checks have

17  been processed and approved.   The numbers for basic ammunition

18  eligibility checks and COE checks are in keeping -- if not

19  better, I believe, for basic, the approval rate is -- is quite

20  high.

21       So what we have here is just a theoretical issue that

22  can't be the basis for providing -- or entering a preliminary

23  injunction against the State.   What we do know is that the law

24  is requiring people to wait on average five, maybe eight or ten

25  minutes and pay a small fee.

1    And for other people, they may have to wait a little bit

2    longer.  If they have a criminal background check or background

3    history -- criminal history, they may need to wait a little bit

4    longer, but all these things are in keeping with the same rules

5    that apply to firearms.

6    I think we've covered the application of the intermediate

7    scrutiny standard here pretty well.  Again --

8         **THE COURT:**  You know -- but I'm still -- I'm having a

9    hard time dealing with this.

10   I go out, and I buy a firearm.  They do a background check

11   on me.  I get the firearm.  Then I become -- let's see.  Let me

12   see if I can figure this out.

13   So I am a legal resident in the United States.  My

14   understanding is that I can, in fact, buy and possess firearms

15   and ammunition.

16   Is that your understanding?

17        **MR. RICHARDS:**  Yes, if you're not otherwise

18   prohibited.

19        **THE COURT:**  Right.

20   So -- but if -- but if somehow -- so I go out, and I buy

21   my weapon, which I can buy legally, but then my legal status is

22   revoked for whatever reason.

23   I still have my firearm; right?  But now I am here

24   illegally.  My -- I have an unlawful -- unlawful presence;

25   right?  But I still have my firearm; right?  And until, in

1    fact, I am deported and removed from the country, I have that

2    firearm.  That could be a year, two years, three years, 20

3    years; right?

4         And so I'm having a hard time understanding the State's --

5    the State's interest in making sure that every time that

6    someone goes to buy some ammunition, notwithstanding the fact

7    that they have no criminal history, notwithstanding the fact

8    that they are not here illegally, that every time that they're

9    going to go buy ammunition, they have to go through this

10   process.

11        If I can own that gun that I owned -- originally purchased

12   when I had legal status but then now I am a prohibited person

13   because my status has been revoked, I still have that gun;

14   right?  What's the difference between that and somebody who

15   goes out and buys ammunition today and buys ammunition tomorrow

16   and buys ammunition the next day and a year from now and two

17   years from now, and the only possible thing that can happen is

18   that sometime between that period of time -- say they -- you

19   issue them a year permit -- that somewhere during that year

20   permit period, they become a prohibited person; right?

21        Just like the guy that went out and bought the gun and

22   then became an unlawful alien, same -- same situation, isn't

23   it?

24             **MR. RICHARDS:**  Yeah, similar, but let me be clear

25   about something.

```
 1        If you -- if you were a lawful firearm-owner and you
 2   become a prohibited person for whatever reason -- you lose your
 3   lawful status in the United States, you become a felon, what
 4   have you -- you're on that armed prohibited persons list, and
 5   you may find law enforcement coming to your house to take your
 6   firearm away.
 7        That's why that list exists.  The armed prohibited persons
 8   list is designed to take guns away from people who lawfully
 9   possessed them at one point and has since become prohibited.
10        And Your Honor can go on the Bureau's website and look at
11   annual reports that the Department of Justice prepares that
12   talks about how that law is implemented.  I believe they
13   describe in detail how they go out and take guns away from
14   prohibited people, including violent felons.
15        So that's something that definitely happens.
16            THE COURT:  All right.
17            MR. RICHARDS:  And to answer your question about
18   "Well, why not a year" -- "why not a year permit?" and so on,
19   people become prohibited.  As I mentioned earlier, about 11,000
20   people a year end up on that list, and the --
21            THE COURT:  Right.  That was -- that was the point of
22   my question.
23        So -- so the point is that if you become a prohibited
24   person after you purchase that firearm, law enforcement will
25   come knocking on your door; right?
```

```
 1        And if you become a prohibited person after you bought
 2   ammunition last week, you're now a prohibited person this week.
 3   So they don't show up, and so you won't be able to buy the
 4   ammunition; right?
 5            MR. RICHARDS:  That's correct.
 6            THE COURT:  Okay.  I gotcha.
 7            MR. RICHARDS:  And, again, the -- and just to go back
 8   to this "Why can't you have a year-long permit?" there's the
 9   reason that we just discussed, but the -- the burden for the
10   person who has the AFS entry, owns the firearm, is going to be
11   most people who purchase firearms, you know, after 2014 -- is
12   going to be fairly insignificant.
13        You go in, you do the transaction, you wait a few minutes,
14   and you pay a dollar.  This is -- it's a very small burden.  I
15   mean, it's not --
16            THE COURT:  Yeah, if you're already in the AFS system.
17            MR. RICHARDS:  That's correct, yes.  And if you're
18   not, there's a way to get in there.
19        So there may be some longer-than-ideal delays in the
20   front-end application of this law, but those things are things
21   that can be addressed.  And going forward, most people will be
22   able to correct those -- ideally, all people would be -- and
23   they'll be able to use that same process that everyone else can
24   use.
25        It's, again, fairly short and hopefully will be faster and
```

1  more efficient as the learning curve of the new law kicks in

2  and people -- people see how it operates.

3        THE COURT:  So let me ask you this.

4     If you're on the AFS system because you bought a 12-gauge

5  shotgun or whatever, does the law allow you to buy a

6  .45-caliber Longbow -- Long Colt?

7        MR. RICHARDS:  Yes.

8        THE COURT:  So once you're in the system, the AFS

9  system, you can buy any ammunition you want?

10        MR. RICHARDS:  That's correct.

11        THE COURT:  Okay.

12        MR. RICHARDS:  And that is, again, for the same

13  reasons we were talking about earlier.  If you clear -- you

14  clear the background check at the time you purchase that -- the

15  firearm and you're undergoing a sort of mini-background check

16  every time you go buy that ammunition to make sure you haven't

17  become a prohibited person because your prohibited status --

18  you don't end up on the APPS list because you have your .45,

19  your 1911 --

20        THE COURT:  Right.

21        MR. RICHARDS:  -- versus your 12-gauge shotgun.  You

22  end up on the prohibited persons list because you commit a

23  felony or you've had a mental health hold or one or the other

24  events that would -- that would lead to that.

25     So it covers the range, and it does reflect that people

1   may not want -- people who have older guns may not want all

2   their guns in the system.  They can -- they can just have one

3   entered.

4        So if you have a large collection of long guns and

5   handguns, you can submit the report for one of them and have

6   that be your sort of AFS entry, the basis for your AFS entry,

7   and buy ammunition for all your other guns using that.

8           **THE COURT:**  Okay.

9           **MR. RICHARDS:**  And I'll just close by emphasizing

10  something that we've -- that I think we haven't talked directly

11  about here a whole lot today.  We focused more on the

12  intermediate scrutiny analysis and facial challenges and

13  whatnot.

14       But we are here today with the plaintiffs requesting the

15  extraordinary relief of a preliminary injunction, and it's not

16  just likelihood of success on the merits that controls that

17  analysis.

18       Even if they could establish likelihood of success on the

19  merits and the corresponding irreparable harm, which they

20  can't -- but even if they could, the public interest and

21  balance of the equity factors here still weigh strongly

22  against -- indeed, dispositively against -- issuing a

23  preliminary injunction.

24       The State has provided evidence that shows that over a

25  hundred prohibited persons have been stopped from buying

1  ammunition since the law went into effect.  That number is

2  growing daily.  I checked them last week.  I believe it's now

3  up to about 170 or so, and it's going to keep going up, more

4  and more prohibited people, as this law is in effect.

5       If this law is enjoined, those people, people like them,

6  and the other larger group of people who are deterred from

7  purchasing ammunition because they're prohibited persons will

8  be able to buy ammunition with impunity and use that ammunition

9  in crimes and other socially undesirable ways.

10      And that, I think, is dispositive here when you weigh it

11 against the countervailing considerations that the plaintiffs

12 have raised of a relatively short wait -- and, indeed, no one

13 saying that they have not been able to obtain or purchase or

14 use ammunition for self-defense or any other lawful purpose.

15      So I think we win on the likelihood of success on the

16 merits, we win on the irreparable harm, but we especially win

17 on the balance of the equities and the public interest because

18 dangerous people will get ammunition that they otherwise

19 wouldn't have been able to get if this law is enjoined.

20      And on that analysis, I would just direct the Court to the

21 *Tracy Rifle* decision.  It's an Eastern District of California

22 decision where the Court denied preliminary injunction

23 employing this type of reasoning.  We cite that case in our

24 brief.  But, again, I think that is an extremely important

25 aspect of what plaintiffs are asking for here.

1    So with that, we'd ask that the Court deny the plaintiffs'

2    motion for preliminary injunction.  Thank you.

3         **THE COURT:**  All right.  Mr. Brady, any response?

4         **MR. BRADY:**  Thank you, Your Honor.  I'll try to make

5    this quick because I know we've been here for a while and

6    there's a lot of content to cover.

7         **THE COURT:**  That's all right.  It's important.  I'm

8    willing to give it the time.

9    So take your time.

10        **MR. BRADY:**  So Mr. Richards says that there's

11   speculation on why people -- why these 11,000 individuals were

12   denied or delayed or whatever the terminology is or were

13   refused ammunition initially, and he's right.  We do have to

14   speculate because we're not the State.

15   The State should know this.  The State has the burden to

16   show whether these people were denied permanently, were denied

17   for cause, what remedy they can go about to fix that issue, and

18   the State --

19        **THE COURT:**  You know, I'm really concerned about the

20   fact that people aren't told why they're being denied -- at the

21   time they're told they're being denied.  I don't understand

22   that.  That doesn't seem to make any sense to me.

23        **MR. BRADY:**  Well, in addition to that, Your Honor, the

24   State is the one speculating that it's not that big of a

25   burden.

1        **THE COURT:**  I heard you.  I heard you.  I understand.

2        **MR. BRADY:**  And I just think one piece of evidence

3   that is the State's evidence that is -- goes to show that this

4   is not just some -- a few people are having problems and being

5   able to fix it.

6        It is -- is -- you know, Mr. Richards is correct that we

7   don't know how many of those 11,000 people that were rejected

8   have no AFS record.  We don't know that.  They could have been

9   people going up and they were denied because they didn't have

10  that AFS record, but we do know that one in eight COE-holders

11  is denied, based on the State's own evidence.

12       The COE-holder, to be clear, is essentially the system

13  Your Honor was asking about where someone has a permit that

14  says, "I am eligible."  They are -- on a daily basis, on a

15  regular basis, the State is doing on those individuals what's

16  called a --

17       **THE COURT:**  Yeah, but could that be because they've

18  become prohibited persons between the time that they got their

19  COE and the time that they did the check?

20       **MR. BRADY:**  One in eight COE-holders, people who went

21  out of their way to apply with the State, do fingerprint

22  checks --

23       **THE COURT:**  So you don't know?

24       **MR. BRADY:**  I do not know, but I would -- I would

25  be -- like Your Honor --

1      **THE COURT:**  The State knows.

2      **MR. BRADY:**  -- I would eat my tie, like Your Honor

3  wrote, if one in eight COE-holders becomes a prohibited person.

4  It's more of -- it is attributed to this clunky system that

5  does not know how to adapt to different situations and say,

6  "Oh, this is a COE-holder.  Why don't we just look at his COE

7  number and see if he or she is rejected."

8      They have to check for an AFS record.  Oh, different

9  address or different name or whatever problem, or they don't

10  have a Federal Limits -- they don't have a real ID, even though

11  they have a COE that tells us who this person is.

12      That in and of itself, I think, goes to show that this

13  system -- that and the fact that nonresidents from --

14  non-California residents have to get this COE is enough to

15  scrap this system, and I think that it's crucial to

16  understand --

17      **THE COURT:**  But just because -- just because the

18  system is perhaps ineffective or inefficient or difficult,

19  that's not necessarily a basis for me to grant a preliminary

20  injunction; right?

21      **MR. BRADY:**  I think it is, Your Honor, when we're

22  talking about the numbers of people and the undeterminability

23  of the problems that is resulting in 11,000 people being

24  denied.

25      **THE COURT:**  You're saying that if the number of

1 rejections -- unacceptable rejections is so high as to make it

2 essentially a farce, if you will, that the system is -- is

3 impairing too many people's rights to purchase ammunition.

4 Even though the system is designed as a system, it fails

5 because it doesn't fit?

6      **MR. BRADY:**  That's correct.  It covers -- it burdens

7 far too much constitutionally protected activity to justify the

8 little, if any, good it does, according to the State.

9      I think, Your Honor -- I know you were playing devil's

10 advocate in Your Honor's position with respect to the State,

11 but we would never accept this in a voting context where people

12 who need to be able to go vote have to show an ID and the State

13 says, "No, not the ID we issued you.  You have to show us

14 supplemental ID."

15      And then the people who have that have to go through a

16 background check process and then "Oh, sorry.  18 percent of

17 you, almost one in five of you, are not going to be able to do

18 that.  You're going to have to go figure out this problem, even

19 though it's our burden to tell you why you can't exercise your

20 right."

21      We're talking about constitutional rights here.  Is -- it

22 is the Government's burden even as a gatekeeper; right?  They

23 can be a gatekeeper and confirm that people are -- are able to

24 exercise their rights or punish those who are not entitled to

25 exercise those rights after the fact.

1          What I don't think they can do under the fit portion of

2     the heightened scrutiny analysis -- and I say "heightened

3     scrutiny" because plaintiffs do not concede that intermediate

4     scrutiny applies here, as we indicate in our papers.  I'll get

5     into that in a second.  I think -- I believe strict scrutiny

6     applies.

7          But even if intermediate scrutiny applies, under that

8     second portion of the analysis under the fit, that's just far

9     too much of a burden to impose on rights.  It's just not -- it

10    is the Government's burden to prove that it's necessary for

11    them or that it's not -- that it is not sufficiently tailored.

12         So -- or that it is sufficient -- it is their burden to

13    prove that it is sufficiently tailored, and they have not --

14    they have not done that.  They've just speculated that "Well,

15    these people could probably fix their problems fairly easily,"

16    but we do not know that.  And it's their burden to show that

17    they -- that that is indeed the case.  And even if they could

18    do that, I think that plaintiffs would still prevail because of

19    the systemic problems with this.

20         Again, the idea that a non-California resident has to pay

21    almost a hundred dollars in fees and undergo a process that

22    takes about a month, according -- that the State conceded, to

23    obtain a COE and know that ahead of time before coming here

24    raises all kinds of problems, Second Amendment problems, for

25    those individuals.  It may entail plaintiffs having to amend

 1   the complaint to raise equal protection challenges on them,

 2   potentially other challenges.

 3        And remember, Your Honor, this all just happened.  These

 4   were emergency regulations.  These were -- plaintiffs did not

 5   know about a lot of -- about the ID requirements until just a

 6   few months ago, about two months, a month and a half, prior to

 7   July 1st that the law -- the date that the law was set to take

 8   effect.

 9        The California --

10             THE COURT:  You expect notice?  You expect notice?

11             MR. BRADY:  Not from the California Bureau of

12   Firearms, not anymore.  This is their standard operating

13   procedure, Your Honor, and I don't mean to, you know, lack

14   decorum here.

15        But frankly, based on my experience, it's getting quite

16   frustrating to see, you know, time after time the California

17   Department of Justice Bureau of Firearms puts out these

18   regulations for laws that have been on the -- that have been

19   passed years ago and say, "Okay.  This law is going to take

20   effect in two years from now.  You all are going to implement

21   the regulations," and then they roll out emergency regulations

22   the month before or don't even bother rolling out regulations

23   sometimes.

24        And it's really quite frustrating, and obviously that's

25   not Mr. Richards' problem.  But I think that it's worth taking

1  into consideration, when Mr. Richards is attacking the way in

2  which we are bringing this motion and all the bases, to take

3  into account we just were notified, you know, relatively

4  recently of all of these problems.

5       Plaintiffs waited to see how this system would roll out.

6  We waited to see how the ID requirement would take effect, how

7  the background check process would work, and it's -- it has

8  been very problematic for many people.  And that's -- you know,

9  all these variables -- the State says that these are reasons

10  why this should be an as-applied challenge, you know, for each

11  individual.

12       To the contrary, I think that those show exactly why, you

13  know, a facial challenge is appropriate.  You know, I don't

14  even -- I don't even know how an as-applied challenge would

15  work here, particularly with those individuals who are denied

16  erroneously; right?

17       So those 11,000 folks who were denied -- maybe some of

18  them might say, "Hey, it's just an address change.  All you got

19  to do is change my address on CFARS," and we'll get into --

20  I'll explain in a minute why that's not just a simple

21  log-on-and-change-their-address issue.

22       But, you know -- so these 11,000 people don't know they're

23  denied or somebody doesn't know they're denied until they're

24  denied.  And then once they are denied, they're supposed to

25  bring an as-applied challenge on their individual

1  circumstances?  That's usually not the way it works in

2  constitutional rights.

3      The injury here is that there's so many people being

4  denied that an organization like the California Rifle and

5  Pistol Association will represent their interest for all these

6  variations of injury.

7      You know, that -- no one would suggest, I don't think,

8  that the ACLU wouldn't be able to defend, you know, this law --

9  would not have standing to attack this law if it applied to

10 voter registration versus ammunition registration.  I just

11 don't think that that would even be a plausible argument.

12     I would also direct Your Honor to -- on this facial

13 challenge issue to the case that we cite, this -- the

14 plaintiffs cited this in our reply brief, *Chicago v. Morales*,

15 527 U.S. 41, at 55, Footnote 22.

16     It -- it basically rejects the view that a plaintiff must

17 establish that no set of circumstances exists under which the

18 law would be valid to -- to bring a facial challenge, and I

19 believe there's a concurrence in that opinion that questions

20 whether even *Salerno* did that.

21     And so there is Supreme Court precedent to suggest that --

22 that you don't have to have -- that either *Salerno* is being

23 misread or that you don't have to adhere to this -- that a

24 plaintiff must show that there's no set of circumstances under

25 which the law would apply.

1      Otherwise, all the First Amendment cases that we always

2  see, you know, wouldn't be able to be facial challenges.  But

3  courts look away and say if a significant number of people are

4  being impacted, then plaintiffs have standing and -- or

5  plaintiffs can bring a facial challenge.

6      And as to standing, the California Rifle and Pistol

7  Association -- the complaint alleges that they are representing

8  those members and supporters who are impacted by the burdens of

9  this ammunition scheme.

10      We didn't know those -- what specific burdens those would

11  be until July 1st, at which time the California Rifle and

12  Pistol Association submitted a declaration by one Mr. Richard

13  Travis in support of our motion that lays out that there are

14  CRPA members with these very burdens.

15      So while it is true that none of the named individual

16  plaintiffs have alleged that they have been barred of

17  ammunition purchase or that they've been -- that they don't

18  have the supplemental documentation, there are CRPA members who

19  do, and I think this is a perfect example.

20      You know, the question is not whether anyone can clear the

21  system.  It's whether the State can require that everyone be

22  subjected to a system like this that results in about

23  18 percent of people being at least initially denied, that

24  won't accept the very standard-issued ID that the State issues,

25  and that results in a significant waiting period and burden,

 1    and then we don't know how exactly to fix that problem yet.

 2         And I think with all of that, there -- that shows that

 3    we're -- the plaintiffs are likely to succeed on the merits at

 4    least on the Second Amendment claim with respect to the

 5    background check system.

 6         With respect to the commerce clause issue, I think

 7    Your Honor has heard both sides.  I won't belabor the point.

 8    I'll take a look at the case that Mr. Richards pointed out, but

 9    I don't think his analysis is correct.

10         I think that -- that this statute forces presence in

11    California -- and that's "presence" with a c-e, not with a

12    t-s -- of these companies from out of state.  It forces them to

13    be present in California to -- physically present to be on the

14    same playing field.  I think that the case law --

15              THE COURT:  I think -- I think that's what I was

16    referring to when he referred to Wal-Mart and some of the

17    bigger -- the bigger companies that have a presence in

18    California.  They may have a presence somewhere else, but they

19    also have a presence in California.

20         That's not always true of -- I don't know -- for example,

21    Sprague's in Yuma, Arizona.  If they have a presence in

22    California, I don't know.

23              MR. BRADY:  Or -- or the plaintiff Able Ammo in this

24    matter.

25              THE COURT:  Yeah.

1          **MR. BRADY:**   Able Ammo would have to open a storefront

2     in California to be on an equal footing.   So that's the -- the

3     commerce clause.

4          With respect --

5          **THE COURT:**   I hate to cut you off, but I do have a

6     criminal calendar that I still have to get to.   So I'll give

7     you five more minutes, and then --

8          **MR. BRADY:**   I think I can be less than that,

9     Your Honor.

10          **THE COURT:**   Okay.

11          **MR. BRADY:**   Okay.   So with respect to the scrutiny,

12     like I said, plaintiffs don't accept that intermediate scrutiny

13     applies.   We're talking about a barrier to the access of your

14     constitutional right to acquire ammunition.

15          The other cases that -- that Mr. Richards pointed to --

16     *Silvester*, *Pena*, *Jackson* -- none of those resulted in a ban on

17     the people's rights to acquire ammunition.   *Silvester* was a

18     waiting period.   *Pena* was a restriction on types of handguns.

19     *Jackson* was a restriction on types of ammunition and itself

20     said that ammunition is protected.   Here, we're talking about

21     if you cannot meet the State's system here, you are barred from

22     exercising your right.

23          So not only do I think that triggers strict scrutiny

24     because it is a substantial burden on the core of the right to

25     even have the implements, the arms, to exercise the right, but

1    I think it also goes to counter Mr. Richards' claim that

2    plaintiffs do not address -- why they didn't address these

3    cases, that they're so similar.  I do not think they're similar

4    at all.  This is a whole other level of burden.

5        And I think with respect to the fit analysis, whether

6    you're talking about strict or intermediate scrutiny, at the

7    end of the day, we -- I do not think that the State can meet

8    its burden.

9        And once you say that there are -- that there is a

10   likelihood to succeed on the merits here, that -- then there's

11   necessarily irreparable harm because these people are being

12   deprived of their -- their constitutional rights.

13       And to the point about the balancing of the hardships, all

14   the State has to do is do nothing, and all it has to do is go

15   back to the status quo, to two years ago, that the rest of the

16   entire country is in currently.

17           **THE COURT:**  What's that?

18           **MR. BRADY:**  That is no background check system

19   until -- unless and until they can figure out the bugs, in

20   which case, we'll -- we can reconvene on that.  But with this

21   system, all plaintiffs are asking for is returning to the

22   status quo which is shared by literally every state in the

23   country.

24       And so to claim that this is necessary or, you know, the

25   Republic is going to crumble is simply not the case.  The

 1   Republic has rejected -- or has not adopted these laws.

 2        So with -- unless Your Honor has any questions, I will

 3   submit.

 4             **THE COURT:**  All right.  Well, thank you.

 5             **MR. RICHARDS:**  Your Honor --

 6             **THE COURT:**  Yeah.  Go ahead.

 7             **MR. RICHARDS:**  -- might I just have one more minute to

 8   make two brief points in response to something that came up --

 9             **THE COURT:**  Sure.  Sure.  Sure.

10             **MR. RICHARDS:**  -- because I think it's important.

11             **THE COURT:**  Sure.

12             **MR. RICHARDS:**  And I'll be very brief on it.

13        First, on the COE background checks and the rejections

14   there, there could be any number of reasons why those would be

15   rejected, including that the COE has lapsed.  That is, someone

16   comes in with a COE they got three years ago.  They haven't

17   renewed it.

18        So I don't think that that -- as Mr. Brady was suggesting,

19   that that is a good metric for determining, you know,

20   rejections.  And, again, I think the fallback here is everyone

21   can use the basic ammunition eligibility check, and they have

22   cited no one who's gone through that that's been prevented from

23   getting ammunition.

24        The second point -- and with regard to the identification

25   regulations --

1        **THE COURT:**  So -- I'm sorry.  I hate to do this to

2   you, but if you get that basic ammunition check -- right?  You

3   get that done.

4        Now, the next time you want to buy ammunition because

5   maybe you're, like, you know, someone who is on the Olympic

6   team and fires -- shoots 500 rounds a month -- next time she's

7   going to go buy ammunition, all she has to do is do what?  Go

8   through the AFS?  Pay a buck?

9        Is that right?

10       **MR. RICHARDS:**  Yes.  If you have a gun in the AFS, you

11  would just go through the -- through the --

12       **THE COURT:**  No, but if --

13       **MR. BRADY:**  No.  That's not what -- Your Honor, to --

14  if I may.

15       **THE COURT:**  Yeah.

16       **MR. BRADY:**  If you go through the basic background

17  check and you do not have a firearm in AFS and you never put a

18  firearm in AFS, you have to go through the basic background

19  check, pay the 19-dollar fee, and wait the hours to days every

20  single time --

21       **THE COURT:**  Every single time?

22       **MR. BRADY:**  And for the record, it's more like 1500

23  rounds a day for Ms. Rhode when she's training.

24       **MR. RICHARDS:**  And, Your Honor, just to be --

25       **THE COURT:**  I'm not going to quibble with you about

1    500 or 1500 rounds.

2                        (Laughter)

3         **MR. BRADY:**  I was joking.

4         **MR. RICHARDS:**  Yet Ms. Rhode is not here, and she's

5    not complained that this has happened.  And more importantly,

6    in a situation like one you're talking about, the person,

7    Ms. Rhode, or anyone else --

8         **THE COURT:**  I was just using that as a --

9         **MR. RICHARDS:**  Sure.  I understand.

10        **THE COURT:**  -- hypothetical, Counsel.

11        **MR. RICHARDS:**  They can submit the -- you know, can

12   submit their firearm for inclusion in AFS and have that

13   resolved, again, in a reasonable amount of time until it's

14   resolved.

15        **THE COURT:**  Right.

16     So what she has to do is she has to essentially tell the

17   State, "I own a firearm" --

18        **MR. RICHARDS:**  Yes.

19        **THE COURT:**  -- and go through the background check;

20   and thereafter, all she has to do is go through the AFS.

21     But if she does order ammunition from out of state, it

22   does have to come to a California vendor, who charges a fee,

23   and she has to be present in front of that ammunition vendor in

24   order to pick up her 1500 rounds; right?

25        **MR. RICHARDS:**  That is correct, just like anyone else.

1          THE COURT:  Okay.

2          MR. RICHARDS:  And the final thing I want to talk

3     about is the regulations because Mr. Brady made some points

4     about the way that they were promulgated which I think need to

5     be responded to.

6          THE COURT:  Okay.

7          MR. RICHARDS:  As the California Department of

8     Justice, the Bureau of Firearms followed the California

9     Administrative Procedure Act when it promulgated those

10    regulations.  So if they have a problem with how those

11    regulations were enacted, there's a procedure to address that.

12    They were -- Mr. Brady's --

13         THE COURT:  Is it controlled by the State?

14         MR. RICHARDS:  Well, it's the -- the Office of

15    Administrative Law and the state court system, yes.

16         THE COURT:  Okay.

17         MR. RICHARDS:  And finally, with regard to the ID

18    regulation, it was consistent with the recommendations that

19    both the NRA and ATF made to firearms vendors.  They suggested

20    that those vendors take a look at additional sources of

21    identification in situations where they get Federal Limits

22    Apply ID's presented to them.

23         Now, they didn't say in all situations, and they didn't

24    say all the time.  But nonetheless, the State thought that,

25    given the confusion that Mr. Brady's firm had identified in

1    various correspondence with the State, that this -- these

2    recommendations from both the ATF and NRA -- that this was an

3    appropriate solution.

4         So with that, I would submit.

5              **MR. BRADY:**  Our office brought those to the attention

6    of the DOJ to warn dealers that if they did not take that

7    precaution, they may be subject to criminal or -- penalties by

8    the State.  That's -- we did it not to say this is a good

9    policy.  It is to protect themselves from prosecution.

10             **THE COURT:**  Well, listen, I've enjoyed -- I hope

11   you've appreciated that from time to time, I smiled when I've

12   chided you or -- or teased you a bit, but it's a serious

13   subject.

14        I mean, look, I take, you know, the Second Amendment --

15   somebody -- I read someone who once said that the Second

16   Amendment is the Rodney Dangerfield of the Bill of Rights.  I

17   can't remember who wrote that.  Sometimes, it certainly seems

18   that way to me.

19        I don't remember anything in the Federalist Papers or

20   anywhere else or the drafters of the Constitution or the Bill

21   of Rights saying that the Second Amendment was going to be a

22   stepchild or -- or a -- the Rodney Dangerfield of the Bill of

23   Rights.

24        It's just as important as the First Amendment, the Fourth

25   Amendment, the Eighth Amendment, and we should give it the same

1    consideration.  And that's just, I think, the way it's supposed

2    to be.

3         I appreciate you both, your arguments, your briefing.

4    It's obvious you all get paid by the pound, and I appreciate

5    it.  I appreciate your being here.

6         I do have one -- one thing that's bothering me, and that

7    is this.  This system is so new that it's hard to really make a

8    decision or determination that the system is a de facto ban by

9    virtue of the way it has been structured because it is so new.

10   It really only has one month in effect, as I understand it.

11        So what I'm going to do is I'm going to take this matter

12   under submission, but I'm going to think about it.  What I'd

13   like for you to do is I'd like for the State to deliver to

14   Mr. Brady the documents showing the 11,000 applications that

15   were rejected.

16        Obviously, please redact any personal information, and I'd

17   like to know why they were rejected -- okay? -- and whether or

18   not -- if the State knows, whether or not the people that were

19   rejected have since reapplied and have been allowed to -- to go

20   ahead and purchase the ammunition.

21        I'd also like to know about the 106 because I think we've

22   all agreed that the 106 -- there may be some that were

23   considered to be prohibited persons who really aren't

24   prohibited persons, and I would like to do that for the July

25   group.

1     And I think -- I'm probably going to hold off on -- it may

2     not make the plaintiff very happy, but I'm inclined to hold off

3     for 30 days, maybe even 60, to make a decision to see if this

4     system gets to working any better, if it needs to work better,

5     and I'm not prejudging it.

6         But I'd like the same information to be provided for

7     August as well, whatever applications are rejected, and the

8     same thing for the prohibited -- for the prohibited users.

9     That will give me some idea.  Is this system improving?  Is it

10    getting better?  Is it fixable?  And that may factor into my

11    ultimate decision.

12        Okay.  It may be that I call you back.  I've enjoyed

13    having you both here, and you've taken my punishment with a

14    smile.  So I may ask you to come back sometime later on.  I may

15    not need you once I see -- if the plaintiff -- if Mr. Brady

16    sees that the information that has been provided to him helps

17    his -- his case, I'm sure that he will file something in the

18    meantime to alert me to it.

19        And, Mr. Richards, if you see that, in fact, the

20    information assists your side, you will obviously file

21    something to help me along those lines as well.  Okay?

22        **MR. RICHARDS:**  Yes, Your Honor.

23        And I just wanted to say something for the Court here --

24        **THE COURT:**  Sure.

25        **MR. RICHARDS:**  -- just so you don't have unreasonable

1   expectations.

2       This system -- this -- this -- the database the State uses

3   to run these background checks -- we can pull some information

4   from it, but it's not a discovery-spitting machine.  It's a law

5   enforcement machine.

6       And so while it might be nice -- and theoretically, when

7   we think of certain data that we'd like, I'm not sure -- I

8   can't promise that we'll be able to get all data from it now,

9   but we'll obviously discuss that later if that's the case.

10          **THE COURT:**  Okay.

11          **MR. RICHARDS:**  But I just want to say there are

12   limitations on what can -- what can be pulled.  I'll discuss

13   them with Mr. Brady, and we can talk about them in a future --

14          **THE COURT:**  Exercise your best efforts.

15          **MR. RICHARDS:**  We will, Your Honor.

16          **THE COURT:**  That's all I can expect.

17          **MR. RICHARDS:**  We will.

18          **THE COURT:**  Counsel, listen, I thank you very much.  I

19   appreciate it.  I enjoyed having you here, and I wish you a

20   good trip home.  Okay?

21          **MR. RICHARDS:**  Thank you, Your Honor.

22          **MR. BRADY:**  Thank you, Your Honor.

23          **THE COURT:**  All right.  I'm going to take a brief

24   recess for my staff.  I'll be back in ten minutes, and then

25   we'll pick up the criminal calendar.

1          Okay.   Thank you.

2                      (Proceedings adjourned at 2:44 p.m.)

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Wednesday, August 28, 2019

8

9

10

11                    /S/ James C. Pence-Aviles

12          James C. Pence-Aviles, RMR, CRR, CSR No. 13059
                       U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25