```
 1                    UNITED STATES DISTRICT COURT

 2                FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   KIM RHODE, et al.,                  )
                                         )
 5        Plaintiffs,                    ) No. 18-CV-00802-BEN-JLB
                                         )
 6             v.                        ) October 1, 2019
                                         )
 7   XAVIER BECERRA, et al.,             ) 1:05 p.m.
                                         )
 8        Defendants.                    ) San Diego, California
     _____ )
 9

10                  TRANSCRIPT OF STATUS CONFERENCE
               BEFORE THE HONORABLE ROGER T. BENITEZ
11                  UNITED STATES DISTRICT JUDGE

12   APPEARANCES (Telephonic):

13   For the Plaintiffs:        MICHEL & ASSOCIATES, P.C.
                                By:  SEAN BRADY, ESQ.
14                              180 East Ocean Boulevard
                                Suite 200
15                              Long Beach, California 90802

16   For the Defendants:        CALIFORNIA ATTORNEY GENERAL'S OFFICE
                                By:  NELSON RICHARDS, ESQ.
17                              2550 Mariposa Mall
                                Room 5090
18                              Fresno, California 93721

19

20   Court Reporter:            CYNTHIA R. OTT, RDR, CRR
                                District Court Clerk's Office
21                              333 West Broadway, Suite 420
                                San Diego, California, 92101
22                              cynthia_ott@casd.uscourts.gov

23

24

25   Reported by Stenotype, Transcribed by Computer
```

1          SAN DIEGO, CALIFORNIA, OCTOBER 1, 2019, 1:05 P.M.

2                              * * * *

3          THE COURT:  Good afternoon.  This is Judge Benitez.

4    How are you?

5          MR. BRADY:  Yes, Your Honor.  Sean Brady here on

6    behalf of plaintiffs.  Good afternoon to you.

7          MR. RICHARDS:  And good afternoon, Your Honor.  Nelson

8    Richards here for the defendant, Attorney General.

9          THE COURT:  All right.  Well, good to hear from both

10   of you again.

11         So I asked for this status telephone conference so

12   that we could kind of see what was going on with the case.  I

13   noticed that the Attorney General filed something on Friday, I

14   believe.  I have tried to go through it -- it has a lot of

15   statistics and information -- and I've tried to glean what I

16   could from it in the short amount of time that I've had to look

17   at it.

18         But I don't know -- Mr. Brady, have you had a chance

19   to look at this, the filing that was filed on Friday?

20         MR. BRADY:  We have, Your Honor.

21         THE COURT:  Okay.  All right.  So I'm not in a

22   position today, just so that we all understand, to make a

23   substantive decision on this, but I wanted to make sure that

24   things weren't going to fall through the cracks.  I had asked

25   for some additional information to be provided by the state.

1          Now, this filing has raised some questions in my -- in

2    my mind, and I just want to -- I just want to make sure

3    that -- that I'm understanding -- to the extent that I

4    understand any of it, I want to make sure that I'm

5    understanding it correctly.

6          So, Mr. Richards, I know you're not the one who filed

7    the declaration, but I suspect that you were very much involved

8    in the drafting, so you're somewhat familiar with what's in

9    this.

10          But now, as I understand this, 80 percent of the

11    people that applied using the AFS system were rejected; is

12    that -- do I have that right?

13          MR. RICHARDS:  No, Your Honor.  That 80 percent number

14    represents a percentage of people who were rejected.  So, about

15    20 percent of the AFS background checks in July and August were

16    rejected.  And then, of that 20 percent, we broke down the

17    numbers for the reasons why those rejections occurred.

18          THE COURT:  Okay.  By the way, I meant to tell you,

19    this is being reported.  And so if you would identify yourself

20    whenever you speak, I really would appreciate that, okay.

21          So is it the 80 percent --

22          MR. RICHARDS:  Your Honor, this is Nelson Richards.

23    Perhaps I can just give you -- try and clarify here.

24          THE COURT:  Sure.

25          MR. RICHARDS:  Using the July -- using the July data,

1    and I'm going to speak in sort of rough numbers, Ms. Morales'

2    August 2nd declaration that we submitted to the Court back in

3    August outlined the total number of AFS checks, also called

4    standard ammunition eligibility checks.

5             THE COURT:  I'm sorry, what did you call it?

6             MR. RICHARDS:  An AFS check or a standard ammunition

7    eligibility check.

8             THE COURT:  Standard ammunition eligibility check,

9    okay, all right, which is actually the AFS system, which I call

10   it the short -- the short, quick system.  Okay.  Go ahead.

11            MR. RICHARDS:  Yes, sure.  That's a good shorthand,

12   Your Honor, yeah.

13            THE COURT:  All right.

14            MR. RICHARDS:  And so looking at Ms. Morales'

15   August 2nd declaration, there were about -- I don't have it

16   right in front of me, but I believe there were about

17   50-some-odd-thousand submissions to the AFS system.  I think

18   this is repeated, actually, in the supplemental declaration, as

19   well, on page 7, table 2.1.

20            THE COURT:  Okay.

21            MR. RICHARDS:  And so you'll see there were 57,000 AFS

22   checks processed in July 2019.  Of that 57,000, 46,702 were

23   approved.

24            THE COURT:  Wait, wait, wait.  You went too fast for

25   me.  So let me find -- okay.  So you're looking at the page 8

1   of 15; is that what you're looking at?

2        MR. RICHARDS:   Correct.   On the ECF numbering, it's

3   page 8 of 15.   On the document numbering, it's page 7.

4        THE COURT:   All right.   So up at the top, it says:

5   57,553 AFS checks were processed; and, out of those 46,000 were

6   approved, 10,837 were rejected.

7        MR. RICHARDS:   That's correct.

8        THE COURT:   Which, according to my numbers, is

9   roughly -- what, that's roughly 20 percent?

10       MR. RICHARDS:   Thereabouts, Your Honor, yes.

11       THE COURT:   Okay.   So 20 percent of the people that

12   applied were rejected?

13       MR. RICHARDS:   Using the AFS check, that's correct.

14       And as we understood Your Honor's question at the

15   August 19th hearing, you asked us to provide an explanation for

16   those rejections.   And that's primarily the focus of this

17   supplemental declaration.

18       THE COURT:   All right.

19       MR. RICHARDS:   To describe the 10,000 number, and also

20   to update the numbers for August as well.

21       THE COURT:   Right.   And I appreciate that, by the way.

22   And thank you, Mr. Richards.   Your cooperation is certainly

23   welcomed.

24       Okay.   Now, out of that 57,553 applicants who were

25   processed through the AFS system, 14 of those were found to be

1    prohibited persons.

2         MR. RICHARDS:  That's correct, yes.

3         THE COURT:  All the others, apparently, were rejected

4    because their names didn't match, their addresses didn't

5    match -- that's it, right?

6         MR. RICHARDS:  Yes, Your Honor.  This is Nelson

7    Richards, again.

8         The -- those that were rejected, about 30 percent, so

9    about 3,300 of that 10,000 number, there's no corresponding AFS

10   entry that we can identify, which means that those rejections

11   were most likely mistakenly submitted AFS checks.

12        So the actual number of transactions that were

13   rejected that could be tied with some degree of certainty to an

14   actual AFS entry is more on the order of about 7,000.

15        THE COURT:  Okay.  But -- but the point -- I guess the

16   point I'm trying to make is -- or I'm trying to understand is

17   this:  So the average gun owner out there who wants to acquire

18   ammunition goes to the store.  And he or she may have purchased

19   a gun in the past, and then he or she wants to buy ammunition.

20   And they say, well, here's my dollar, I want to buy the

21   ammunition.  And out of those people that would show up,

22   20 percent of them would be rejected, if I understand these

23   numbers correctly, right?

24        MR. RICHARDS:  This is Nelson Richards.  That is a

25   close approximation.

1          The number of checks processed versus the number of

2     individuals who requested checks, there may be some difference

3     there, and that's discussed later in the declaration.

4          So, for example, this 10,837 number in table 2.1 in

5     the supplemental declaration, that doesn't directly correspond

6     to individuals.  We think that number is somewhere around

7     9,000, meaning some people tried twice.

8          THE COURT:  Okay.

9          MR. RICHARDS:  But I think, speaking in generalities,

10    we can say that, you know, roughly 20 percent of people who

11    came and requested to have an AFS check processed had that

12    check --

13          THE COURT:  And out of all of those people, out of all

14    of those people, 14 percent were actually prohibited persons --

15    I mean, 14 people were prohibited persons.

16          MR. RICHARDS:  That is correct, yeah.

17          THE COURT:  Okay.  Now, we don't know actually how

18    many of those 14 that are considered prohibited persons

19    actually turned out to be prohibited persons because, as we see

20    in the declaration later on, there are people who have been

21    classified as prohibited persons who really should not have

22    been prohibited persons in the first place, right?

23          I think I calculated out -- hopefully, I can read my

24    own notes, which is not an easy thing.

25          So in paragraph 45, they talk about the fact that

1    there were 289 purchasers -- and these are not just AFS

2    purchasers, these are total purchasers, I guess -- that the

3    department reviewed as of some date.  So there were 289

4    purchasers who were found to be prohibited persons.

5           Now, out of those 289, the department reviewed 45.  So

6    that's -- if I understand that correctly, 45 of the 289 means

7    that 15 percent were reviewed.  And out of that 45, it appears

8    that at least 20 percent were found to be ineligible, but were

9    then found to be eligible.

10          So if I apply that same number -- which I'm not saying

11   this is an absolutely crystal clear or absolutely accurate way

12   to calculate this -- I would say that probably 20 percent of

13   those 14 in July that were found to be prohibited persons would

14   not be prohibited persons, right?  Does that make sense?

15          MR. RICHARDS:  This is Nelson Richards, again.

16          I understand what Your Honor is saying.  If you pull

17   that number back and apply it to July, that would be an

18   inference that you could maybe draw from doing that, not

19   knowing specifically with regard to those 14, yes.

20          THE COURT:  So we're really looking at about 11, 11

21   people.  So the AFS system was able to identify 11 people out

22   of 57,553 applicants that went through the AFS process who

23   would have actually been prohibited persons.

24          I didn't do the same math on the August dates, but I

25   would say it appears that the numbers are pretty comparable.

```
1   There were 101,058 people who went through the AFS process in

2   August, and 28 people were found to be prohibited persons.  I

3   think that's about the same ratio or the same number, right?

4           MR. RICHARDS:  I think so, yes, Your Honor.

5           THE COURT:  Okay.  I've got a question for you

6   that -- something that jumped out right -- you know, jumped out

7   when I was looking at this.

8           Again, looking at page -- I'm sorry, paragraph 45.

9           MR. RICHARDS:  Okay.

10          THE COURT:  It says, "The department has reviewed

11  approximately 45 of the 289 purchasers that were denied in July

12  and August on the grounds of prohibiting offenses, mental

13  health commitments or restraining orders.  Four purchasers were

14  subsequently determined to have been eligible to purchase

15  ammunition at the time of purchase."

16          And then it goes on and lists the others that were

17  ultimately determined to be eligible.

18          Now, I have a question for you.  It

19  doesn't -- interestingly, there's a category of people that

20  would be prohibited from owning firearms.  And those would be

21  illegal aliens or people who are unlawfully present in the

22  United States.  And for some reason, that's not included

23  in -- in this review.  And I was wondering why, since -- since

24  the CCRs make it mandatory, essentially -- or not mandatory,

25  but make it almost -- almost necessary that you have a real ID
```

1  in order to buy ammunition.  And the reason for that, we're

2  told, is because they want to prohibit people who are

3  unlawfully present from buying ammunition.

4       And so I'm wondering why the department did not

5  analyze how many people of the prohibited persons were

6  prohibited because they were unlawfully present.

7       Do you know, Mr. Richards?

8       MR. RICHARDS:  This is Nelson Richards, Your Honor.

9       No, I do not know the answer to the question of how

10  many or whether any people were identified who attempted to

11  purchase ammunition who were unlawfully present in the United

12  States.

13       I can tell you, we did not look at that issue because

14  it, frankly, didn't come up at the hearing directly.  It's

15  something that I think we could look into and get back to Your

16  Honor about that.

17       I would add, though, that it's highly unlikely that

18  any of those people would have attempted to do an AFS check

19  because they would have had to have undergone a background

20  check to purchase a firearm that would have got them into the

21  AFS system.  So those people likely would have fallen in the

22  group of prohibited people who attempted to use the basic

23  check.  And, again, to my knowledge, I'm not aware of anyone

24  having done that, but I think that that may just be the

25  accuracy of the regulation.

1          If you have to have a real ID, or an ID plus whatever

2    documentation is required by the regulation that we discussed

3    at the hearing, those people wouldn't even make it into the

4    system because the check wouldn't be run.  The dealer wouldn't

5    be able to run the check for them.  So there wouldn't

6    necessarily be any records of those people because they

7    wouldn't be able to meet the ID requirements.

8          So I'm not sure that there is actually a way to

9    identify undocumented people at the back stage of the process

10   on the prohibited persons list because they would need to be

11   using some form of fake ID or straw purchaser or something

12   along those lines to even end up in the system.

13         THE COURT:  Do you have to -- in order to go through

14   the AFS system, do you have to present some form of

15   identification?

16         MR. RICHARDS:  Yes.  Again, this is Nelson Richards,

17   Your Honor.  The same identification requirements apply to all

18   three types of background checks.

19         THE COURT:  Okay.  So something -- so then,

20   essentially, there's a -- there's an error in these statistics,

21   and that is that there may be a number of people -- we don't

22   know what that number would be -- that were essentially

23   rejected from buying ammunition who would otherwise -- you

24   know, all things being equal, assuming that they're here

25   legally, assuming that they don't have convictions and so

1    on -- but there's a number of people who would have -- who

2    would have tried to purchase ammunition and tried to go through

3    the AFS system, but they would not show up in the statistics.

4    In other words, they would not show up in that 57,000 or a

5    hundred-and-some-odd-thousand number because they would have

6    never gotten there in the first place, because if they didn't

7    have a real ID driver's license when they showed up to buy the

8    ammunition, the vendor would have said, sorry, I can't run this

9    for you because you don't have the appropriate identification.

10            Does that make sense?

11            MR. RICHARDS:  This is Nelson Richards, Your Honor.

12            Yes, I understand what Your Honor is saying.  I

13   believe it's a bit more complicated than that.  You can use

14   either a California ID issued before 2016, which doesn't have

15   the real ID notification or federal limits apply notification

16   on it, or you can use a real ID, or you can use a federal

17   limits apply ID with the additional documentation required by

18   the regulations such as a passport.

19            What Your Honor is suggesting is --

20            THE COURT:  No, I understand what you're saying.  But

21   so, for example, my ID says federal limits apply.  My

22   California driver's license says federal limits apply.  So if I

23   show up at a vendor with my federal limits apply driver's

24   license, and I say to them, I want to buy a box of .30-06 ammo,

25   they would say, well, I can't do a background check on you, I

```
1   can't do it through the AFS, I can't do it through the default,

2   and I certainly wouldn't be able to do it with the third

3   system, that is, the one where you buy the weapon

4   simultaneously with the ammunition, right?

5          So there's a whole group of people that may show up at

6   vendors that have been rejected by the vendor, in other words,

7   have been told, sorry, I can't sell you the ammunition that you

8   want because what you have is a federal limits apply driver's

9   license, and we can't run it unless you have a real ID driver's

10  license or some other acceptable ID, right?

11         Do you follow what I'm saying?

12         MR. RICHARDS:  This is Nelson Richards, Your Honor.

13         Yes, that is correct.  We don't know what that number

14  of people is who have attempted to purchase, or, by the same

15  token, who have come in and experienced this narrative Your

16  Honor is talking about.  They have a federal limits ID.  They

17  come in and are told that they need to bring their supplemental

18  documentation, and then they subsequently come back with the

19  passport or the birth certificate or whatever other acceptable

20  form of supplemental documentation they're going to use, and,

21  in fact, purchase the ammunition.

22         THE COURT:  Right.

23         MR. RICHARDS:  I think this, actually -- this point

24  has a similar point that I believe we tried to make at the

25  hearing as well.  This is also true with regard to prohibited
```

```
 1    people.  We don't know how many prohibited people are

 2    essentially rejected or denied because they're not even

 3    attempting to engage in the process, that is, in fact,

 4    the -- you know, we could call it the group who's just deterred

 5    from entering the gun store in the first instance.  That is an

 6    important and significant number, but one that we don't have

 7    direct data on.  But it's similar to the number that Your Honor

 8    is talking about.

 9          And all this to say, there are numbers out there which

10    we don't have anywhere near the precision that we do have for

11    the people who went through the process and are in the system

12    that we reported in the two declarations submitted by

13    Ms. Morales.

14          THE COURT:  All right.  And in order to go through the

15    AFS system, you have to -- if you're the owner of a long gun,

16    you have to have bought the weapon after January 1, 2014; but,

17    if you owned your long gun before January 1, 2014, you would

18    not be able to use the AFS system; is that correct?

19          MR. RICHARDS:  This is Nelson Richards.

20          Without taking further steps, Your Honor, yes, that is

21    correct.

22          However, as I think we discussed at the hearing, I

23    think it's in this declaration, the supplemental declaration,

24    as well.  There is a process by which the hypothetical long gun

25    owner that you're discussing can obtain an AFS entry for that
```

1    firearm and then use it as a basis for purchasing ammunition,

2    with a form that's available on the department's website that

3    can be filled out and submitted and will result in an AFS entry

4    that can then be used for an AFS check ammunition purchase.

5            THE COURT:  Okay.  Now, do I understand this

6    correctly, that for the default background checks, the average

7    amount of time that it takes to get that default background

8    check is over a day?

9            MR. RICHARDS:  This is Nelson Richards, Your Honor.

10           Yes, that is correct.  I believe those numbers are

11   reported in table 1.2 on ECF page 5 of Ms. Morales'

12   supplemental declaration.

13           THE COURT:  So this kind of factors in a little bit,

14   in my mind, about the idea that these statutes may violate the

15   dormant commerce clause.  So if -- so if I want to have ammo

16   shipped to me from -- oh, I don't know -- XYZ corporation in

17   Michigan, it has to come to a vendor in the state of California

18   that will accept the ammo.  Then I have to go in, and I have to

19   do a face to face.  Then they have to run the background check.

20   And then the background check takes on average a day or more,

21   so then I'd have to go back to the vendor a second time in

22   order to find out whether or not I have been approved or not

23   approved.  And if I have been approved, then I get to purchase

24   my ammunition or to take it home.  If I've not been approved,

25   then I have to go through all of the other possible steps in

1  order to get approved to buy my ammo, right?

2        MR. RICHARDS:  This is Nelson Richards, Your Honor.

3        I think there was a lot there.  I don't think what

4  Your Honor is suggesting is necessarily wrong, but I'd like to

5  clarify, in that hypothetical, if the person who's going to be

6  purchasing that ammunition is using the basic check, they would

7  order it, have it delivered to their local licensed ammunition

8  vendor, and then they would need to do the face-to-face

9  transaction in which the basic eligibility check was run.

10        Depending on the scenario, that may take anywhere from

11  a couple hours to a day or more.  As detailed later in the

12  declaration, I believe, on the following page, on ECF page 6 in

13  table 1.3, there's different ways that the basic check can

14  proceed.

15        If the person in the hypothetical situation has some

16  sort of entry in one of the four state databases that are

17  checked to determine whether a person is prohibited, it

18  requires additional investigation and will require a manual

19  check by the department.  That process could take a day or

20  more.  If the checks run automatically, meaning the person has

21  no entries or hits in any of those systems, then the check is

22  on the order of an hour or so.

23        And so there's some variability there.  But if you're

24  talking about just on average, it would be about a day.  And I

25  think that that purchaser would be able -- they receive,

1    basically, a transaction number when the background check is

2    run.  So they can check -- using the department's CFAR system,

3    they can go online and check to see, I think, the status of

4    their background check before going back in.

5           Again, I think I'd have to double-check that, but I

6    believe we talked about that at the hearing, and I think that

7    would apply in this particular scenario that Your Honor is

8    talking about.  But they would need to go in, potentially,

9    twice.  That is correct.

10          THE COURT:  And if there's hits, and the person has

11   to, for whatever reason, go through the CFAR's website and get

12   that all taken care of and corrected, then, of course, the

13   person would have to make at a minimum a third trip to the

14   vendor, assuming -- to see if the problems have been resolved,

15   right?

16          MR. RICHARDS:  This is Nelson Richards, Your Honor.

17          Just to clarify there, there's sort of two

18   possibilities.  If there's hits in -- if they're using the

19   basic ammunition eligibility check, the basic check, the hits

20   in the system would process and be reviewed by the department

21   staff, by bureau analysts, who would go through.

22          For example, if someone had been charged with a

23   felony, and there's no disposition of that felony in the

24   system, they would then need to contact the superior court in

25   the county where the matter is from to see if there's a violent

1    disposition and find out whether that person had been convicted

2    or not.  I don't think on that side there's anything for the

3    purchaser to do.

4           If you're talking about an AFS check, that -- and the

5    person is rejected because there's a name mismatch or an

6    address mismatch, that's where they can go into the CFAR system

7    and update their record in a way that would allow them to have

8    the check run again.

9           THE COURT:  But they have to do that,

10   Mr. Richards -- and I apologize, I don't mean to -- to seem

11   obtuse about this, but it sounds to me like, okay, so if I go

12   in, and I go through this AFS system, because I think I'm -- I

13   think I have a weapon that I've purchased that's in the AFS

14   system.  I think that.  So I go in.  I give them the

15   information.

16          The only thing that happens is that the vendor then

17   says to me, you've been rejected, right?  Or you've been

18   approved?  One or the other?

19          MR. RICHARDS:  Yeah.

20          THE COURT:  The vendor doesn't say to me, you've been

21   rejected because your address doesn't match, or your ID number

22   doesn't match, or, no, you don't have a weapon in the AFS

23   system, right?

24          MR. RICHARDS:  That's correct.

25          THE COURT:  So now the purchaser has to go to the CFR

1    system and try to figure out what went wrong, why it is that he

2    or she was rejected.  And we don't know how long that would

3    take to clear up, right?

4              MR. RICHARDS:  This is Nelson Richards, Your Honor.

5              That is correct speaking at a fairly general level.

6    And I think, at this point, it bears repeating one of our

7    arguments that we made several times at the hearing on

8    August 19th, which is that starts to sound a lot like an

9    as-applied challenge.  We have no plaintiffs here who have

10   complained of that specific problem.  And we, as a result,

11   don't have data at the level of specificity that would allow us

12   to get good answers to those questions based on abstract

13   inquiries or hypotheticals.

14             And that is -- that is an issue, both with regard to

15   the nature of the claim that's been brought in this case and

16   the standard review for facial challenges, and it's also a

17   standing issue because there is no plaintiff who has alleged

18   that they've experienced this particular harm.

19             THE COURT:  Well, I understand.  But, look, I'm trying

20   to work through something that's pretty complicated.  I think

21   you'll agree that this is all pretty complicated, right?

22             So the CFRA's form, for example, is on -- is on the

23   website.  It's available to anyone.  So my courtroom deputy, my

24   law clerk, myself, we could all go look at that, right?  You

25   agree, right?

```
 1          MR. RICHARDS:  That's correct, yes.

 2          THE COURT:  And if you look at it, it's got some

 3   pretty complicated stuff, right?

 4          So -- and if you look at the statutes, and you look at

 5   the CCRs, it's kind of complicated.  So I'm just trying to work

 6   my way through trying to figure out how -- how -- how this

 7   whole thing comes together.

 8          And so getting back -- getting back to my question, so

 9   when the person shows up and says, here, I want to apply

10   for -- I want to buy ammunition, I want to give you my dollar,

11   I want to go through the AFS system, I don't want to go through

12   this background system, I don't need to, I've purchased a

13   firearm, and so I should be able to go through this AFS system,

14   but they're never told what the problem is.  So they walk away

15   shaking their heads and wondering, well, you know, what

16   happened?

17          And now they have to go through this remedial process.

18   And what you're saying to me, Mr. Richards, I guess, is that

19   you don't know how long that remedial process would take

20   because you just don't have the data for that, right?

21          MR. RICHARDS:  Your Honor, this is Nelson Richards.

22          We don't know how long it would take because -- for

23   various reasons.  I mean, we may have the data on a specific

24   person, but when you -- I'm not sure that there's a way to

25   generalize the data on that process.
```

1          The one thing I can point out -- and this is in the

2    supplemental declaration response to Your Honor's questioning

3    during the August 19th hearing -- and that is that a fairly

4    large number of the people who had AFS rejections have been

5    able to acquire ammunition as of August 31st.

6          For the July group, I think it was around 40 percent.

7    And for the August group, it was around 30 percent, which is,

8    you know, a much shorter time, because they only had from

9    August 1st to August 31st, as opposed from July 1st to August

10   31st.  But the people who are being rejected, a large number of

11   them are able to go back and obtain ammunition using --

12          THE COURT:  Well, I understand, Mr. Richards.  But I

13   suppose that if I was Mr. Brady, I would say, no, no, what that

14   statistic actually shows is that there are a large number of

15   people who have not been able to resolve the problem, because

16   30 or 40 percent who have been able to fix it means that 60 or

17   70 percent have not been able to fix it, right?

18          MR. RICHARDS:  Your Honor, this is Nelson Richards.

19          And with respect, I mean, that is -- it goes back to

20   the standing and the facial challenge issue.  We don't know.

21   That would be speculative.  We don't know why those people have

22   not gone through the system.  We don't have anyone in this case

23   saying that they've attempted to do this and have been

24   unsuccessful.

25          THE COURT:  But, look, look, Mr. Richards, I'm not

1    talking about -- there's a declaration that has been filed, and

2    I'm trying to get through it.  I'm trying to figure out what

3    it's actually saying and what it means.

4         What it means to me right now, as I understand this,

5    when I read this declaration, here's what I understood

6    this declaration -- I didn't file this.  It was filed, and I've

7    read it, and I'm trying to digest it.

8         What it means to me is that, roughly, so far, what

9    I've been able to glean from it, is that out of -- close to

10   160,000 people applied through the AFS system.  That out of

11   those 160,000 people, roughly 20 percent have been rejected for

12   some reason or another.  That out of those 160,000 people,

13   there were 42 people that were found to be prohibited people.

14        And that we also know that out of those -- the number

15   of people who were rejected -- and as we've agreed, we don't

16   know how many people just were rejected, but weren't really

17   rejected by the system.  They were just simply told, no, you

18   don't have the right identification, and so we can't even go

19   through the system to check and see whether or not we can sell

20   you the ammunition.  But what else we know is that 60 to

21   70 percent of the people have not been able to fix whatever the

22   problem was.

23        So it strikes me as kind of -- I don't know.  It

24   strikes me as kind of odd that you've got a system that

25   basically says to you, you're rejected, but we can't tell you

1  why you're rejected, and please go over to our website over

2  here, and then see if you can fix it, and we'll get back to you

3  sometime and let you know when and if you'll ever be able to

4  buy ammunition again.

5          But that's -- those are questions that I have that, as

6  I was going through this declaration, I was -- I was thinking,

7  you know, that's a huge problem for people who -- most of whom,

8  it appears to me, are actually law-abiding people, right?

9          I mean, the statistics seem to confirm that most of

10  the people that, in fact, are being rejected are people who are

11  not prohibited people, right?  And so they're having to go

12  through all of this.  And there's this huge number of people

13  that are trying to buy ammunition that are lawful citizens, but

14  who are being prevented from doing so just simply because of

15  the complexity of the problem.

16          And so I understand that, and I appreciate the

17  declaration.

18          Now, Mr. Brady, I have sort of been grilling

19  Mr. Richards on this declaration simply because it's basically

20  his filing and his declaration, but I wonder if you have any

21  comments about it.  As I said, I'm not prepared to make any

22  kind of substantive ruling on this yet, but I'd love to hear

23  your comments on anything that I've brought up or anything that

24  you've seen.  Or if you want to file a responsive document, I'd

25  love to read that as well, and then maybe we'll have another

1    status conference and I'll grill you on it.

2           So -- so, do you have anything you want to talk about?

3           MR. BRADY:  Sure, Your Honor.  This is Sean Brady.

4           Because Your Honor is not prepared to rule

5    substantively, my intention today was to urge you to do so,

6    urge Your Honor to do so because I believe this declaration not

7    only confirms plaintiffs', you know, problems with this system,

8    but it actually shows that it's potentially worse than what

9    plaintiffs had believed.

10          And I'll go through those -- a few specifics, if you

11   would like, but I do think it would be --

12          THE COURT:  Yeah, I would.  I would very much like it.

13   That's why I asked for the status hearing, so.

14          MR. BRADY:  Sure.  But I'm -- the reason I preface

15   saying that is, I think that laying it out in writing would

16   probably be most useful for all of us, so that Mr. Richards can

17   address those, Your Honor can grill me, just like you are with

18   Mr. Richards.

19          But, you know, I think a couple of the -- just the

20   high level questions -- or high level points is that this

21   declaration confirms that -- I believe Your Honor -- and I

22   don't want to put word or thoughts in your mouth, but one of

23   the reasons that you've sort of delayed ruling on plaintiffs'

24   preliminary injunction motion was to determine whether the

25   numbers laid out in July, as far as denial rates and the issues

1   that plaintiffs raised, were anomalies based on the initial

2   rollout, or if it was an issue, or if these problems are baked

3   into the cake, they are inherent in the system.

4          And I think that it has proven, with the data from

5   August, that it is the system itself that is problematic.  You

6   have not -- not only a -- there's not a lowering of the

7   rejection rates.  There was a one -- over one percent uptick in

8   the number of rejections in August.  And so I think Your Honor

9   has it -- has your finger on it with respect to how people can

10  remedy the issue.

11         If they do get a rejection, they essentially are left

12  guessing.  You know, the declaration indicates that about

13  30 percent of the people wrongfully chose the AFS check.  And I

14  think that raises the question, well, why are they not able to

15  determine whether they have an AFS record in the first place?

16  This is the government basically saying, pick a card -- you

17  know, when you show up to buy ammunition, to exercise your

18  fundamental right, pick a card, you know, the AFS check, the

19  standard check, or a COE.

20         I think most people know whether they have a COE or

21  not, so it comes down to the other two.  And, you know, do you

22  want to pay one dollar, or do you want to pay 19 dollars?  And

23  we're not going to tell you up front whether you have this.  If

24  you want to find out, you can request that information from us.

25  And when I say us, I'm saying -- I'm putting myself in the

1   shoes of the California Department of Justice.  The State is

2   saying, you know, fill out a form that has to be notarized, and

3   we'll get back to you at some point with whether or not you

4   have an AFS record.

5           And we do, indeed, have a plaintiff who is prepared to

6   submit a declaration that he's been waiting approximately four

7   months for the State to respond to him on what AFS records he

8   has.

9           THE COURT:  Well, how about filing that declaration,

10  if it hasn't already been filed?

11          MR. BRADY:  We're happy to, Your Honor.

12          THE COURT:  See -- I mean, that sort of -- you know,

13  Mr. Richards makes some good arguments about the as-applied

14  challenge.  And if you file the declaration, then perhaps

15  Mr. Richards will back off of that, and we won't have to deal

16  with that issue anymore.

17          So why don't you go ahead and file that.

18          MR. BRADY:  Well, just to be clear, this particular

19  plaintiff is not in the position of not being able to acquire

20  ammunition.  He didn't have any issues with his AFS check when

21  he went in.  He was able to acquire ammunition.

22          I'm simply raising the point of somebody who does not

23  have an AFS record -- or does not know -- okay, this is the

24  issue, right, Your Honor alluded to it -- if somebody goes in

25  and is rejected, and they say, well, I know I have an AFS

1    record, I've lawfully purchased a handgun in the last 10 years,

2    but they don't know what their AFS record is, you have to -- in

3    going into the CFAR system, you have to know what your current

4    AFS record already said.  And so if you don't have a copy of

5    your old paperwork, your DROS record, to know what your AFS

6    record says, you then have to order your AFS record from the

7    Department of Justice to know what your AFS record currently

8    says, and then make the fix to the -- the way it should be, if

9    that is the impediment.

10          And what I'm saying is that we have a plaintiff who

11   does not have that issue because he's -- his AFS records are

12   all squared away; but, he's requesting his AFS records, anyway,

13   and he has not heard a response for almost four months.

14          So a person who is not as fortunate as the plaintiff

15   to have his AFS records squared away could be waiting up to

16   four months just to be able to get the information to attempt

17   to fix their record.  Then it goes into how quickly it is that

18   they can have the record actually fixed.  Because my

19   understanding is then they submit it, and somebody at DOJ has

20   to review it and sign off on it.

21          So I raise this to point out that it is a -- there is

22   no indication, the state has provided no explanation for how

23   long it takes to remedy these problems.

24          We can brief whether it's a facial or as-applied

25   issue.  I think we hashed this out somewhat in detail at the

1  hearing; but, you know, if Your Honor still has concerns about

2  whether this is an appropriate facial or as-applied challenge,

3  we're happy to explain why we believe it is an appropriate

4  facial challenge.

5        But I think, you know, in addition to -- to the fixing

6  of records, there is the issue of the amount of people who were

7  prohibited.  I think it's crucial -- or who were denied as

8  prohibited.  I believe Your Honor said that your reading of

9  this declaration is that 280 people were denied as prohibited

10  persons, but I don't think the declaration says that.  I think

11  it says --

12        THE COURT:  No, no, no.  No, no, I'm sorry.  Let me

13  interrupt you.

14        What the declaration says is that there were

15  289 -- well, let me read it, so that I don't have to misstate

16  it.  But I believe it was paragraph 45 that says, "The

17  department has reviewed" -- what they have reviewed is

18  approximately 45 of the 289 purchasers --

19        MR. BRADY:  Yes.

20        THE COURT:  -- that were denied in July and August on

21  the grounds of being prohibited -- of prohibited offenses,

22  meaning mental health commitments or restraining orders.

23        Of course, it does not include that group of people

24  that we kind of would think we're somewhat concerned about

25  because the CCRs require that you have this real ID driver's

```
1    license.  The reason for that is because, right, if you're a
2    person who's unlawfully present in the United States, you're
3    not allowed to have -- to buy or possess firearms or
4    ammunition, right?
5            So that --
6            MR. BRADY:  Correct.
7            THE COURT:  So that's 289 purchasers that were denied
8    in July and August for these reasons as stated in the
9    paragraph.  And then they reviewed 45 of those 289, right, and
10   they found a number that were reviewed that ultimately were
11   found to actually -- should not be denied, right?
12           MR. BRADY:  Correct.  The point I wanted to make about
13   that number, about the 289 number, is that my
14   understanding -- if you look at page 4 of the declaration,
15   footnote 2 --
16           THE COURT:  Just a second.  Let me get to it.  Just a
17   second.  Just a minute.
18           MR. BRADY:  Sure.
19           THE COURT:  And what page of the file -- of the CM/ECF
20   document is that?
21           MR. BRADY:  It is page 5 of 15.
22           THE COURT:  All right.  And you're looking at
23   footnote 2.  All right.  Got it.
24           MR. BRADY:  Yes, Your Honor.
25           THE COURT:  All right.
```

1          MR. BRADY:  The very last sentence of that footnote,

2   it says, "If the department is unable to obtain the

3   information, it will ultimately deny the transaction because an

4   eligibility determination could not be made."

5          In other words, my understanding -- and perhaps I'm

6   misreading this and the declaration can be clarified, or

7   perhaps Mr. Richards has the information -- knows the answer to

8   this question, but I read that as saying that if a person

9   was -- could not be determined one way or the other to be a

10  prohibited person or not, they're just grouped into this

11  289 people of denied, not -- not rejected.

12         And if that's the case, that's enormously problematic,

13  not only because it then calls into question how many of these

14  289 people are actually prohibited; but, if that's what the

15  government is doing, the State is saying, oh, if you

16  can't -- if we can't figure out whether you're a prohibited

17  person or not, you're just not entitled to exercise your right,

18  that is, I think, confirmation that this system, or at least

19  that aspect of it, is -- is irreparably infirm in that that's

20  not the way rights work.

21         The government doesn't get to say, well, we don't

22  think you're entitled -- or you may not be entitled to exercise

23  your right, so we're just not going to let you.  They have to

24  make an affirmative case.  The burden is on them.  The burden

25  is on the State to prove as to why an individual is not

1    entitled to exercise their right.  And this sort of system gets

2    it backwards.

3         THE COURT:  Okay.  Anything else?

4         MR. BRADY:  I have -- yes, I just want to point out

5    that, you know, if somebody walks in and does not have an AFS

6    record, and they want to create an AFS record, you know, they

7    have to pay a separate $19 fee to create that AFS record, and

8    wait for the Department of Justice to process that application

9    to create that AFS record, which, in my experience -- and,

10   granted, this is obviously anecdotal -- it takes some time.  It

11   takes about a month.

12        So it's -- even -- you know, to be -- of course, you

13   can say, oh, well, they can just -- you know, I think the

14   State's rebuttal is you can just do the $19 fee, the basic

15   check, and wait a day or two -- or, you know, perhaps wait a

16   couple hours, depending.  But, you know, that $19, just to be

17   clear, the basic check, you pay the $19, you undergo that

18   check, you have to do that every single time you want to buy

19   ammunition.  It is not as if you do the basic check one time

20   for $19, and then an AFS record is created.  You have to do

21   that every single time.

22        THE COURT:  Funny thing you should mention that

23   because that was something that I thought about when I was

24   looking at this.  And I thought, well, wait a minute, wait a

25   minute, but if you do this basic background check, why doesn't

1   it spill over into the AFS system, so that you no longer have

2   to keep paying that $19 and going through this basic background

3   check?

4           Mr. Richards, do you know the answer to that?

5           MR. RICHARDS:  Your Honor, this is Nelson Richards.

6           I haven't specifically looked at that question, but I

7   think that the answer is that when you do the basic ammunition

8   eligibility check, what we're calling the basic check, there's

9   no firearm associated with that purchase.

10          So it's not clear how you -- the automated firearms

11  system, the AFS system, is a system that is based on firearms

12  entry.  With no firearm in the basic check, there would be no

13  way to get into the AFS system, short of the way we described

14  in our filings, to make what you're suggesting work.

15          THE COURT:  Well, let me ask you.  You know, the

16  problem with this case is that the more questions that I ask,

17  the more questions that I think of.  And I apologize.  Maybe

18  I'm overthinking this.

19          Okay.  So the way you get into the AFS system is that

20  you purchase a firearm -- if it's a long gun, you purchased it

21  sometime after January 1, 2014 -- or you have asked for an AFS

22  record to be created after you've gone into the CFAR'S website

23  and done all of that, right?

24          So what that says is this.  Here's the way I

25  understand this.  So let's assume, hypothetically, that I

1    bought a long gun on January 2nd, 2014.  On January 1, 2014,

2    they do the background check on me.  I do my 10-day waiting

3    period.  I get my gun.

4         The background check, they've gone through NICS and

5    gotten my credible history at the time.  And so now I am able

6    to go into one of the ammo stores and buy ammunition, right?

7         They run the AFS, and they've looked at my real ID

8    driver's license, and they see that I am in the AFS system.

9    Now, I can buy ammunition.

10        Do I have that right?  Is that correct?  Is there

11   anything that I've said that's not correct?

12        MR. RICHARDS:  This is Nelson Richards, Your Honor.

13        I believe what you're saying is correct.  And just to

14   make sure that I understand, the hypothetical you're positing

15   here is that someone purchases a long gun that is entered in

16   the AFS system at the time of the purchase, and they now, in

17   2019, want to come in and purchase ammunition.  Can they rely

18   on the AFS check?

19        THE COURT:  So let me ask you this, because -- you

20   know -- so, my understanding -- I mean, correct me if I'm

21   wrong, but my understanding is that if I'm here and I am a

22   legal resident, I can own and purchase a weapon, right?

23        MR. BRADY:  This is Sean Brady, Your Honor.  That is

24   correct.

25        THE COURT:  Okay.

```
 1            MR. RICHARDS:  And, Your Honor, this is Nelson

 2   Richards.

 3            That is correct as far as the hypothetical goes,

 4   assuming that you have no disqualifying --

 5            THE COURT:  Yeah, right.  I mean, yeah, of course.

 6            But my legal residency could be revoked or terminated

 7   sometime between January 2nd, 2014, and today when I go buy

 8   that ammunition, but the AFS check would not reveal that, would

 9   it?  Would not reveal that my legal residency has been revoked

10   or -- whatever it is they -- terminated or whatever, right?

11            MR. RICHARDS:  Your Honor, this is Nelson Richards.

12            I don't know for sure.  I believe it -- the way the

13   AFS check works is the purchaser comes into the licensed

14   ammunition vendor and presents the identification and --

15            Did we just have someone join the call?

16            UNIDENTIFIED SPEAKER:  Your Honor --

17            THE COURT:  Yes.  Hello?

18            MR. RICHARDS:  I apologize, Your Honor.  I believe

19   someone may be trying to log into the phone number we've

20   provided, but it sounds like they have hung up.

21            THE COURT:  Okay.  All right.

22            UNIDENTIFIED SPEAKER:  Hi, this is Amy.

23            MR. RICHARDS:  This is Nelson Richards.  We're on a

24   court call right now.

25            Your Honor, this is Nelson Richards.  I apologize.  I
```

1  believe that I scheduled this line through 2 p.m., and it

2  sounds like other people may be using it.

3       MS. HADDAD:  Yes, this is Laura Haddad from Government

4  Law.  I'll tell you what, I think we -- we usually -- we had

5  reserved this line, but it may have gotten lost.

6       So is anyone from Latham on the line?  I can call one

7  of you back on one of your numbers.  Is anyone from Latham on

8  this line?

9       MR. RICHARDS:  Laura, this is Nelson Richards.  I

10 apologize.  We're actually on the record right now in a court

11 proceeding.

12      MS. HADDAD:  Oh, I'm so sorry.  I will get off.  I

13 apologize.  My apologies.

14      MR. RICHARDS:  Judge Benitez, I apologize for this.  I

15 hadn't noticed that the hearing had gone into the 2 p.m. hour.

16 I was not anticipating that we would carry on this long, and I

17 apologize for that.  It sounds like this line has been maybe

18 reserved for another matter.

19      THE COURT:  No problem.  No apologies necessary.  But

20 if you're going to apologize, I'll apologize for holding you

21 this long.  But I'm sure you agree or you understand, this is

22 important.  This is a really important issue.  It's important

23 to a lot of people, and it's important to me because I want to

24 make sure that I make the right call.

25      So -- so getting back to my question, my question was,

1   okay, so the AFS system, if I bought a gun in January 2nd of

2   2014, they ran the background check on me at that time, I was

3   cleared, everything was great.  And now, in 2019, October of

4   2019, I show up to buy some ammunition.  They do the AFS, and,

5   sure enough, there it is.  I do own a gun.

6          And so my question, Mr. Richards, is this:  Would the

7   AFS check show, A, that my immigration status has been revoked

8   or terminated, or -- or, for example, that I have been

9   convicted of an offense since 2014, or that I've been found to

10  be mentally unfit by some court?  Maybe I've been found to be

11  5150 under the Welfare and Institutions Code.  Does any of that

12  show up in the AFS?

13         MR. RICHARDS:  Your Honor, this is Nelson Richards.

14         It will show up in the AFS check.  The way that that

15  works -- and, as I was starting to explain before we were

16  briefly interrupted there, the person comes into the store,

17  provides their identification, the AFS -- for an AFS check.  It

18  proceeds in two steps.

19         The first step is to determine whether the

20  identification provided, the name, address, date of birth and

21  ID number match an AFS record.  And if that is the case, that

22  record is then run against the APPS system, the Armed

23  Prohibited Person System.  It's a database that tracks firearms

24  owners who have since become prohibited, so people who lawfully

25  purchase the firearm, much like you're describing, who have

1   since become prohibited.  That system would determine whether

2   the person has been convicted of a felony or has had a mental

3   health hold -- Welfare and Institution Code 5150 commitment,

4   something along those lines.  And so, to answer that part of

5   Your Honor's question, yes, that would be picked up in the AFS

6   check.

7           Specifically with regard to a person's immigration

8   status, I do not know the answer to that.  My understanding is

9   that subsequent disqualifying or events that would make someone

10  prohibited are included in the APPS system, but I don't know

11  specifically whether a change in someone's immigration status

12  falls into that category.  That's certainly something that I

13  can look into.

14          THE COURT:  So the APPS system is an electronic system

15  that can be accessed.  So if I go in and make an AFS

16  application, first of all, they're going to verify that my ID

17  is correct, my name is correct, my address is correct, yes,

18  that I do -- that I am in the AFS system.  They're going to

19  check all of that.

20          And then it's going to go over into phase two.  And

21  that is done where?  Did you say it's the APPS system?

22          MR. RICHARDS:  That's correct, Your Honor.  This is

23  Nelson Richards.  The A-P-P-S, the Armed Prohibited Person

24  System.  And I believe that's described in Ms. Morales'

25  August 2nd declaration.

1          THE COURT:  Now, let's assume, hypothetically, if you

2     will, that everything is fine.  I show up.  I've got my correct

3     ID.  The ID matches my address, my name.  And the AFS system

4     does, in fact, show that I am in the system, that I purchased

5     this long gun on January 2nd, 2014.

6          And now, does it automatically switch over to the APPS

7     system?

8          MR. RICHARDS:  This is Nelson Richards.

9          That process is, as I understand it, simultaneous or

10    instantaneous.  Once the AFS check is run, both steps proceed.

11    So long as the information on the identification documents

12    submitted to the licensed ammunition vendor matches the record

13    in the AFS system, it then automatically goes into the APPS

14    system to check to see whether that person is prohibited.

15         THE COURT:  So if I have not been adjudicated to be

16    mentally ill or found to be 5150, I don't have any criminal

17    convictions, I don't have -- my immigration status has not been

18    revoked, instantaneously, going through the AFS check, I should

19    be approved, right?  The vendor of the ammunition should be

20    able to come back to me within minutes and tell me, you're

21    approved, you can buy the ammunition; is that a fair statement?

22         MR. RICHARDS:  This is Nelson Richards.

23         Yes, Your Honor, that is a fair statement.  And I

24    believe that that is reflected in the numbers reported in

25    Ms. Morales' August 2nd declaration about the time it takes to

1  run the average AFS check.  I believe, specifically, the check

2  portion of it takes about a second.

3        THE COURT:  Okay.  So, instantaneously, essentially,

4  by going through the APPS system, the APPS system will tell the

5  vendor that I do not have any criminal convictions or have been

6  adjudicated mentally insane or have any restraining orders

7  against me.  Is that my understanding?  I mean, is that

8  basically what I gather from the information you've just told

9  me?

10        MR. RICHARDS:  This is Nelson Richards.

11        Yes, Your Honor.  It tells the vendor that you're

12  eligible to purchase ammunition if you pass the AFS check.

13        THE COURT:  Right.  But what it tells you is that

14  you've looked at the APPS website, and it confirms that I don't

15  have any criminal convictions or restraining orders or my

16  immigration status has not been revoked, right?

17        MR. RICHARDS:  Yes.

18        THE COURT:  Okay.

19        MR. RICHARDS:  And, again, just to clarify, it's

20  essentially a way of saying -- this is a longer way of saying

21  it, but when you purchased your firearm you went through a

22  background check that involved both the NICS check at the

23  federal level and a state check through the same state

24  databases that are used in the basic ammunition eligibility

25  check.  And it's a confirmation that since that original check,

```
 1   you --
 2            THE COURT REPORTER:  Can you please slow down.
 3            THE COURT:  Mr. Richards, I'm sorry, but you were
 4   going too fast, and my reporter couldn't take down what you
 5   were saying.  So I hate to do this to you, but can you repeat
 6   that for me, a little slower, please.
 7            MR. RICHARDS:  Yes, Your Honor.  And I apologize to
 8   the court reporter.
 9            I was agreeing with what Your Honor said about when
10   you pass the AFS check, it essentially means that you don't
11   have any convictions or other disqualifying events such as
12   adjudication of -- a mental health adjudication.
13            But I just wanted to clarify, for purposes of keeping
14   the categories distinct here, that essentially what it means is
15   you went through a more complete background check when you
16   purchased your firearm, and this check is just confirming that
17   since the time of that purchase no disqualifying event has
18   occurred, which is what would get you in the AFS system.
19            So it's saying the same thing, but I just wanted to be
20   clear about how the process is working.  It's not running you
21   through the four systems that you would run through if you did
22   a basic ammunition eligibility check, because the APPS system
23   exists to avoid doing that, and also for other reasons that I
24   think we discussed at the August 9th hearing.  Those include,
25   you know, ensuring that people who are lawful firearms owners
```

```
 1   who commit felonies, you know, convicted of felonies,

 2   are -- that law enforcement knows about those people and is

 3   able to identify them and investigate them and take their guns

 4   away, if necessary.

 5         THE COURT:  Okay.  And is there -- is there not a way

 6   that the APPS system can be used -- so, I go in and I do my

 7   basic check, my default check.  And there's not any way that

 8   then the APPS system can be used thereafter to determine

 9   whether or not I have committed any offenses or have a

10   restraining order against me or have been considered to be

11   mentally ill?  Is there something to prohibit the use of the

12   APPS system to confirm that?

13         MR. RICHARDS:  This is Nelson Richards, Your Honor.

14         The APPS system is dependent on the AFS system.  So

15   you have to have the firearm entry in the system for the APPS

16   system to function.  So it gets back to needing to have a

17   firearm in the AFS for that system to work.

18         So there's no freestanding way that the APPS system

19   could work for just basic eligibility checks, unconnected to a

20   firearm ownership event that's in the AFS system.

21         THE COURT:  Okay.  Well, I think we've worked on this

22   enough for today.  I think I'm going to want to hear live

23   testimony on this before I make a -- a call.  But I'd like to

24   have some more data.  I'd like to have at least -- let's see,

25   we had July, August, September, October.
```

```
 1              MR. RICHARDS:  Yes.

 2              THE COURT:  So why don't we plan on having one more

 3    status conference sometime in early November.  I'll schedule

 4    it.  And I would like to have the same information,

 5    Mr. Richards -- and I really appreciate it, this is really very

 6    helpful -- I would like to have the same information that was

 7    provided in this filing sometime towards the -- the end of

 8    October, if you don't mind.

 9              And then I'll take a look at it.  And then I think

10    what I'll probably do is I'll schedule a hearing, and we'll

11    take live testimony.  Because I think some of these numbers

12    need to be explored more fully.  And as we all know, as I think

13    Professor Brookstone said, cross-examination is the greatest

14    engine for ascertaining the truth.  I think, perhaps,

15    questioning the folks that have submitted declarations and data

16    in this case would be helpful to the Court.

17              All right.  So please file a supplemental.  I'm going

18    to give you until November 1.  How's that?  November 1, where

19    you can give me information on September and October.

20              MR. RICHARDS:  Your Honor, this is Nelson Richards.

21              I think we can certainly get you the September data by

22    November 1st.  The October data will take a little bit longer

23    to prepare because we will only have the data once October

24    ends, and it does take some time to process that data,

25    somewhere on the order of a week to two weeks.  This does
```

1    involve analysts going in and compiling data, running strips,

2    checking, double checking, making sure that the numbers are

3    accurate.

4         THE COURT:  All right.  How about November 15?

5         MR. RICHARDS:  I think we can make that work.  And if

6    something comes up, I'll let Mr. Brady know.  But I certainly

7    think we'll be able to get the September numbers by that date,

8    and we will do our best to get you the October numbers by that

9    date.  I think that is realistic --

10        THE COURT:  So I'll be waiting -- November 15, I'll be

11   waiting to see your supplemental.  I'll look at them.  I'll

12   give you -- I'll set up a status conference.  We can do it

13   again telephonically.  I don't want to inconvenience either one

14   of you, if I don't have to.

15        And then the odds are pretty good that I will want to

16   set a -- an evidentiary hearing on the preliminary injunction

17   issue, okay?

18        Listen, I thank you very much.  Mr. Richards, I really

19   appreciate your filing the supplemental.  It's been helpful.

20   And I appreciate your answering all my questions because this

21   is complicated, to say the least.

22        Mr. Brady, I appreciate your being with us and raising

23   your issues as well.

24        So unless there's anything else, I'm going to conclude

25   our hearing today.

```
 1              MR. BRADY:  Your Honor, this is Sean Brady.

 2              I believe there is one -- this raises the issue of

 3    discovery cutoff, which Mr. Richards and I previously discussed

 4    asking for an extension of the upcoming discovery cutoff in

 5    light of this new information exchange and these new

 6    declarations.  And now that it's going to -- you know, we're

 7    going to do essentially another round of this, I think it makes

 8    it all the more, you know, reasonable to check out the

 9    discovery cutoff date or suspend it until we can agree to one a

10    few months, I think, after this whole process.

11              You know, as Your Honor has, you know, shown

12    throughout this phone call, this raises all sorts of new

13    questions, both on our side and, you know, I imagine, the

14    State's side and Your Honor's side.  So the discovery cutoff,

15    the current one is sort of hamstringing us to conduct real

16    thorough discovery.  So, unless Mr. Richards objects, I would

17    like to request that we suspend the current discovery cutoff

18    date.

19              THE COURT:  What is the -- remind me what the current

20    discovery date is.  What is it?

21              MR. BRADY:  I believe it's November 4th, which means

22    that, basically, we have to, you know, propound all of

23    our -- any additional discovery, like, this week.  And we would

24    have to conduct all of our depositions, you know, this month,

25    having just received this information.  Then, we're going to
```

1    get another round of information that could necessitate, you

2    know, deposing the same people a second time.

3           You know, I think it would be easier, more streamlined

4    for everybody, rather than, for example, you know, deposing

5    Ms. Morales now, based on this declaration, and then, you know,

6    having to recall her once we see the second round of

7    information, because there could be discrepancies, right, that

8    we want to ask about.

9           So I think it makes sense to kick it out past that.

10          THE COURT:  Well, I agree with you in a sense, except

11   for, of course, this is sort of a rolling dataset.  And so I

12   don't know that there would ever come a time when we would

13   really have the final data that we would be working with.

14          So I guess what I'm saying is there's going to come a

15   point where, for example, with interrogatories, you're going to

16   have to send the interrogatories out, and then we're going to

17   have to expect that there will be supplemental responses to the

18   original responses.  And then, of course, it may be possible

19   that we do need to go a second round of depositions.  Not in

20   all cases, but in some cases, there may be a second round of

21   depositions that's necessary.

22          But I hear you.  I understand what you're saying.  And

23   you're right, the current discovery date may be unrealistic.

24   So why don't I just cut that off, and let's -- let's think

25   about this when we have our next status conference.  If maybe

1    the two of you can meet and confer and give me dates by when we

2    can -- you know, for discovery cutoffs, experts and so on.

3            I would like to have the evidentiary hearing on this

4    when everybody is reasonably well prepared.  So I think it

5    would be a good idea to have most of the discovery done before

6    we do our hearing on the preliminary injunction.

7            So, I'll suspend the discovery cutoff date for now.

8    And then I want you to have a schedule for me, an agreed upon

9    schedule for me next time we talk, which will be sometime

10   probably in late November, okay?  Agreed?

11           MR. BRADY:  Perfect, Your Honor.  Thank you very much.

12           MR. RICHARDS:  This is Nelson Richards, Your Honor.

13   Thank you.  We agree to that.

14           THE COURT:  Thank you.  All right.  This hearing is

15   concluded.

16     (The proceedings concluded at 2:20 p.m., October 1, 2019.)

17

18

19

20

21

22

23

24

25

1                          COURT REPORTER'S CERTIFICATE

2

3        I, CYNTHIA R. OTT, Official Court Reporter, United States

4   District Court, Southern District of California, do hereby

5   certify that pursuant to 28 U.S.C. §753 the foregoing is a

6   true, complete and correct transcript of the stenographically

7   reported proceedings had in connection with the above-entitled

8   matter and that the transcript page format is in conformance

9   with the regulations of the Judicial Conference of the United

10  States.

11

12       DATED at San Diego, California, October 22, 2019.

13

14                          _____/s/ CYNTHIA R. OTT_____
                            CYNTHIA R. OTT, RDR, CRR
15

16

17

18

19

20

21

22

23

24

25