C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM RHODE, et al.,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>                              Defendant. | Case No.: 3:18-cv-00802-BEN-JLB<br><br>**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge:      Hon. Roger T. Benitez<br>Courtroom:  5A |

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

18cv802

# BACKGROUND

At the hearing on Plaintiffs' Motion for Preliminary Injunction, the Court deferred its ruling on the motion and ordered the State to disclose to Plaintiffs information about individuals who had been either "rejected" or "denied" ammunition purchases during July and August 2019.[1] Tr. of Proceedings at 133:6-135:21, Aug. 19, 2019. Essentially, the State was to provide documentation of the (1) reasons for and rates of *rejections*, (2) rate of those *rejected* who have since been able to purchase ammunition, and (3) reasons for *denials*, including wrongful ones for people who DOJ had incorrectly determined to be legally ineligible. *Id.* at 133:11-25.

In compliance with the Court's order, the State filed the Supplemental Declaration of Mayra G. Morales in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction. Morales Decl. Supp. Opp'n Pls.' Mot. Prelim. Inj. ("Suppl. Morales Decl."), Aug. 27, 2019, ECF No. 42. At the same time, the State provided Plaintiffs with Excel spreadsheets containing the figures on which the State claims it based the information presented in the supplemental declaration.

On October 1, 2019, the parties participated in a telephonic status conference, during which the Court ordered the State to disclose to Plaintiffs the same information from July and August it had provided in the supplemental declaration, but for September and October. The Court also invited Plaintiffs to file this supplemental brief, explaining their view of the information the State disclosed in its supplemental declaration and its impact on their motion. The Court then ordered the parties to participate in another telephonic status conference on November 15, 2019, and suggested that it might hold an evidentiary hearing before ruling on Plaintiffs' motion.

/ / /

---

[1] Plaintiffs understand the difference between "rejected" and "denied" is that the former describes those who lack required information in DOJ's system to complete a background check, while the latter describes those legally prohibited from possessing ammunition.

1

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

**SUMMATION OF ARGUMENT**

The State's supplemental declaration provides all the evidence this Court needs to preliminarily enjoin the challenged provisions. It confirms that around 20% of people seeking to purchase ammunition are prevented from doing so for an indefinite amount of time, not for being legally ineligible to possess ammunition, but because their records are not to the State's liking. And, when rejected, the State offers no specific explanation of the reason for the rejection or the process to remedy it. While some of those who were rejected resolve issues with their records in hours to days, the State cannot dispute that some may need weeks or months to do so, assuming they are able to at all. To that point, a clear majority of those rejected in July and August (60-70%) did not successfully purchase ammunition by the end of August. Others are denied because DOJ wrongly considers them prohibited. These problems are so prevalent that California alerted hunters that they "may have difficulty purchasing ammunition" and advised them to do so with time to spare for such a contingency. Req. Jud. Ntc. Supp. Suppl. Br. Pls.' Mot. Prelim. Inj. ¶ 1.

Not only do these undisputed facts raise serious doubts about whether the System furthers the State's interests at all, they confirm that it burdens far too much protected activity to be a reasonable "fit" under heightened scrutiny. What's more, these problems with the System are in addition to the identification and delay issues raised in Plaintiffs' motion briefing. Pls.' Mem. Supp. Mot. Prelim. Inj. ("Mot.") at 7, 10-11, 14, 17-19; Reply to Def.'s Opp'n to Pls.' Mot. Prelim. Inj. ("Reply") at 5-7. And purchasers seeking to acquire ammunition from an out-of-state seller not only face these burdens, but also the discretion of in-state vendors over whether they can even acquire the ammunition and at what cost, in violation of the dormant Commerce Clause. Mot. 20-23; Reply 7-8.

The parties largely do not dispute facts but rather the legal implications of the facts. Thus, neither the November 15 status conference nor an evidentiary hearing is necessary. Respectfully, the Court can and should decide Plaintiffs' motion on this record. Because facts in that record, as even the State relates them, show Plaintiffs are likely to succeed on the merits and that the System inflicts irreparable harm, the Court should grant the motion.

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

18cv802

## ANALYSIS

## I.   AMMUNITION PURCHASE REJECTION RATE

Reports of problematic ammunition purchase rejection rates following the launch of the ammunition background check system (the "System") were among the main reasons Plaintiffs sought a preliminary injunction. Mot. at 9, 15. Lacking access to any hard numbers on the prevalence of rejections, Plaintiffs had to rely on accounts from vendors to describe the problem. *Id*. In opposing Plaintiffs' motion, however, the State provided those numbers and removed any doubt that the rejection rate for July was high by any measure, being around 20%. Decl. Mayra G. Morales Supp. Def.'s Opp'n Pls.'s Mot. Prelim. Inj. ("Morales Decl.") ¶¶ 49-52. Plaintiffs still believe, as they did when filing the motion, that such an excessive rejection rate is constitutionally fatal. Mot. 15, 18; Reply 5.

In deferring its ruling on Plaintiffs' motion, this Court—perhaps wanting more time to pass to see whether that rate would decrease or was inherent in the background check system—ordered the State to provide Plaintiffs with details about people who had been rejected or denied. The State complied and, according to its most recent figures, the rejection rate in August remains virtually unchanged from July. Suppl. Morales Decl. ¶¶ 17, 26 (tbls. 1.3, 2.1). This outcome suggests that the high rejection rate is inherent in the System. Issuance of an injunction is thus warranted.

### A.   AFS Checks

AFS Checks had a rejection rate around 20% in July. That rate held steady in August, up about 1.2% from July. *Id*. ¶ 26 (tbl. 2.1). The State suggests that rate is artificially inflated because 30% of those rejected "appear" to have used an AFS Check without having the necessary AFS record to do so. *Id*. ¶¶ 2, 9. Plaintiffs cannot confirm that figure. But, even if accurate, it highlights a flaw in the System. If people do not already possess their AFS record, the State does not inform them whether they have a sufficient AFS record—or one at all—at the time of purchase. So, people must essentially guess whether they qualify for an AFS Check.

The State has determined that the remaining 70% of people rejected under an AFS

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

Check have AFS records, but there are trivial issues with those records. These issues could be an old address, a different name (perhaps a legal name change or the simple presence or absence of an affix or middle name or initial), or date of birth or ID number mismatches. *Id*. ¶¶ 9-10.[2] By noting the reasons these people were rejected, the State tacitly admits that it knows who they are, that they have an AFS record, and that they are not prohibited persons. But the State *still* rejects them indefinitely simply because of these clerical discrepancies. People should not be denied the exercise of their rights, even if temporarily, based on such trivialities.

## B.   Basic Checks

Basic Checks appear to continue to have a far less significant rejection rate than AFS Checks. But about one percent of purchasers who underwent a Basic Check in July and August were rejected for what appear to be the same trivial clerical discrepancies that plague the AFS Checks and which do not justify the denial of fundamental rights. *Id*. ¶ 4.

## C.   Certificate of Eligibility ("COE") Verification Checks

While previously providing figures for COE Verification Check rejections, Morales Decl. ¶ 11, the State provides no mention of those figures for August in its supplemental declaration. The original declaration showed that around one out of every eight people (about 12%) who used the COE Verification Check option were rejected. *Id*. ¶ 51. COE holders should have zero rejections or, at least rare ones. As Plaintiffs have explained, to obtain a COE, a person must have taken extra steps with the State, including submitting to an extensive background check and fingerprinting, to establish that they are eligible to purchase *firearms*, Req. Jud. Notice, Ex. 32. A COE is automatically revoked if its holder later becomes prohibited from firearm ownership. *See* Req. Jud. Ntc. Supp. Def.'s Mot.

---

[2] The State also identifies "[a] small number of purchasers [who] had AFS entries, but those entries were no longer valid because the purchaser had transferred the firearm associated with the entry to someone else." Suppl. Morales Decl. ¶ 31. But the State fails to explain why such an AFS entry would not be suitable for an AFS Check. The point of looking to AFS is to confirm the person has previously undergone a full background check. Whether the person is the current owner of the firearm in the AFS record is irrelevant for purposes of the AFS Check, as far as Plaintiffs can tell.

Dismiss First Am. Compl. ¶ 4. The State provides no justification for such a high rejection rate among COE holders, who have been pre-vetted and who are associated with a unique identifying number.[3] If that rejection rate remains constant, this is perhaps the strongest evidence that the System is inherently flawed.

## II.   REMEDIATION OF REASON FOR REJECTION

The State identifies four courses of action a person who is rejected under an AFS Check can take to overcome the rejection. Each supports Plaintiffs' view that the System is constitutionally offensive and should be immediately enjoined.

**First**, the State says that "in many scenarios the person may use the California Firearms Application Reporting System (CFARS) to update their personal information." Suppl. Morales Decl. ¶ 6. The State explains that those whose current address does not match their AFS records can log into CFARS and apply to update their AFS records with their current address, which "if a match is found in [AFS] . . . may take less than 10 minutes" for DOJ to update, "but depending on the number of pending applications, may take longer." Morales Decl. ¶ 21. Those needing to update an AFS record for changes to a name, identification number, or date of birth can also do so through CFARS; the process "may take a few hours, but depending on [DOJ] workload, can take several days (excluding weekends) . . . ." *Id.* ¶ 22. The reasons for the rejections and delays as the State describes them are unacceptable. But the System is even worse than the State's depiction.

To begin with, the State does not explain what people who do not fall within the "many scenarios" where CFARS can be used to update their AFS record are supposed to do. Even in the instances in which CFARS may be used to fix records, people must know they can do so. But no mechanism is in place to make sure that prospective purchasers know about CFARS, let alone how to use the complicated system. *See Id.* ¶ 20. They must

---

[3] The State suggests that the figures for people who did not pass the COE Verification Check could include denials. Morales Decl. ¶ 11. Setting aside the problems with the State's denial figures generally discussed below in Part III, Plaintiffs doubt that a COE holder could be a prohibited person because of the nature of the COE system.

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

1   either rely on the vendor to explain it to them—which the vendor has no obligation to do

2   or may not even know—or take it upon themselves to figure it out by research.

3          The State also grossly understates the time it can take to correct an AFS record.

4   While it may take DOJ just 10 minutes to update an address in an AFS record, the State

5   does not explain how long it takes for it to actually get around to updating it. *Id.* ¶ 21. It

6   can take well over a week. Decl. Nandu Ionescu Supp. Pls.' Mot. Prelim. Inj. ("Ionescu

7   Decl.") ¶ 10. The same is true for other AFS records. DOJ *can* update them in "a few

8   hours" or "several days" but admits that it does not know how long it could take. Tr. of

9   Proceedings at 18:25-19:1-5, 20:8-23, Oct. 1, 2019. Even if that were the case, a several-

10  day-wait is unnecessarily excessive; particularly when the law says a background check

11  "approval shall occur at the time of purchase or transfer." Cal. Penal Code § 30370. So

12  when the State claims that "people may use CFARS to correct their AFS information in a

13  relatively short amount of time," that is not necessarily the case. Suppl. Morales Decl. ¶ 8.

14         What's more, and perhaps most problematic, the State does not even provide a

15  specific explanation of the reason for a rejection. Rejected purchasers are told only that

16  their transaction has been rejected or denied and provided with a number "that can be used

17  to obtain the reason for the rejection through [DOJ's] CFARS website." Tr. of

18  Proceedings at 18:11-24, Oct. 1, 2019; Cal. Code Regs. tit. 11, § 4302(e). Assuming they

19  even learn from the vendor or through personal research about CFARS, that system does

20  not explain the specific reason for a rejection either. It merely provides a boilerplate

21  explanation that either the person has no AFS record or there is *some* discrepancy between

22  the person's existing AFS record and current personal information. Ionescu Decl. ¶¶ 4, 7,

23  9. And calling DOJ for assistance is generally futile; its staff will not explain to people

24  why they have been rejected. At best, the staff will give examples of what could be wrong

25  with the person's record and direct how to address hypothetical issues. Decl. William D.

26  Shepard Supp. Pls.' Mot. Prelim. Inj. ("Shepard Decl.") ¶ 4-7. So people need to either

27  figure out why they were rejected on their own or double down on the gamble by trying

28  another type of background check, each of which comes with its own problems, including

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

a risk of rejection, as explained further below. *See infra* p. 8.

To update an AFS record through CFARS, people must know the contents of at least one of their existing AFS records. Morales Decl. ¶ 20; Cal. Code Regs. tit. 11, § 4353(c). If unsure of existing AFS records, the State says that people can request a copy of their records from DOJ. Morales Decl. ¶ 23. Once they have those records, they can presumably see what the discrepancy is and fix the problem through CFARS. *See* Req. Jud. Ntc. Supp. Pls.' Mot. Prelim. Inj. Ex. 28. But again there is no guidance from the State on what specifically needs updating. What's more, there is no mechanism in place to notify people that they can order their AFS record—they must once again rely on the vendor or their own research for that information. Nor does the State explain how long it takes DOJ to process AFS record requests. To Plaintiffs' knowledge, DOJ has no established timeframe for doing so. In fact, Plaintiff Johnson waited over 110 days for DOJ to respond to his request for his AFS records. Decl. Edward Johnson Supp. Pl.'s Mot. Prelim. Inj. ("Johnson Decl.") ¶ 4. Plaintiffs are aware, however, of what they believe is a DOJ-BOF policy that "status checks for applications [for AFS records] that are not older than 90 days cannot be provided." Shepard Decl. ¶ 10. In sum, fixing AFS records can take a significant amount of time, potentially months, during which people waiting for the fix cannot exercise their constitutional right to purchase ammunition.

**Second**, for those who own a firearm that has no AFS record, the State explains that they may submit to DOJ a Firearms Owner Report along with a $19 fee to create an AFS record. Suppl. Morales Decl. ¶ 6. The State says that "[o]nce the report is processed and approved" the person will have an AFS entry that can be used to buy ammunition through an AFS Check. *Id*. Setting aside that this adds another fee for a background check, the State yet again fails to explain how long this process and approval will even take. There is no statutory or regulatory deadline. It is thus an indefinite—and thus unacceptable—delay.

The **third** option the State offers prospective ammunition purchasers is to buy a new firearm, which would create an AFS record that can be used for an AFS Check. *Id*. This is not only a costly option, but the ammunition cannot be delivered for at least 10

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

1    days, along with the firearm. Cal. Code Regs. tit. 11, § 4304; *see also* Cal. Penal Code §
2    27540. This is both an undue burden for existing firearm owners, and an unacceptable
3    barrier to entry for those who merely seek to obtain ammunition to learn about firearms by
4    attending a training course or learning to shoot with more experienced people.

5         **Finally**, the fourth option is to undergo either the full-scale Basic Check—which
6    requires payment of $19 and an average wait of almost two days, Suppl. Morales Decl. ¶¶
7    3-5[4]—or obtain a COE, which can take months to obtain and comes with a price tag of
8    around $100. *See* Mot. 6-7. These options are also both unacceptable burdens on current
9    gun owners and barriers to entry for people considering entering the world of firearm
10   ownership or familiarity. What's more, as with rejections under the AFS Check option,
11   the State again fails to explain specifically why people *rejected* under the Basic Check or
12   the COE Verification Check systems—who are by definition not legally prohibited from
13   acquiring ammunition—were rejected. Nor does the State explain how they are supposed
14   to remedy the reason for their rejection. While this is a less prevalent problem than AFS
15   Check rejections, the State does not purport to have a recourse for these people, which
16   account for *at least* 236 cases in July and August alone. Suppl. Morales Decl. ¶ 15 (tbl.
17   1.1); Morales Decl. ¶ 51 (not accounting for COE Verification Check rejections for
18   August because the State did not provide them). A system that denies people exercise of
19   their rights and leaves them unaided in remedying the cause of their denial simply cannot
20   be constitutionally sound.

21        The State claims that 30-40% of people rejected by AFS Checks in July or August
22   were able to purchase ammunition at some point before August 31, 2019. Suppl. Morales
23   Decl. ¶ 7. Plaintiffs have no way to verify that claim. But, even if true, it means the State
24   admits that a significant majority (60-70%) of non-prohibited persons who were rejected

25   _____

26        [4] What's more, undergoing a Basic Check does not create an AFS record. *See* Cal.
27   Penal Code § 11106. Those without an AFS record must pay $19 and wait hours to days
     *every time* they purchase ammunition. The State explains this is because AFS is based on
28   a firearm purchase and a Basic Check is not. Tr. of Proceedings at 31:22-32:1-14, Oct. 1,
     2019. But the State does not explain why such limitation is necessary.

ammunition purchases over the course of two months under the AFS Check system had not remedied their situation. What's more, the State offers no evidence about whether any of the at least 236 non-prohibited persons rejected under the Basic Check or COE Verification Check systems subsequently fixed the cause of their rejection and acquired ammunition. It must be assumed those people remain in limbo. Such a rate of attrition would never be tolerated in the context of any other constitutional right.

## III.   DENIALS INCLUDE MANY *NON*-PROHIBITED PERSONS

According to the State, in July and August 289 people were "denied" ammunition purchases. Suppl. Morales Decl. ¶¶ 41-42. The State says it reviewed "approximately 45" of those 289 individuals to confirm whether they were proper denials. *Id.* ¶ 45. That review resulted in the State finding that nine of those denied—or 20%—were *not* prohibited persons. In other words, they were wrongly denied. *Id.*[5] If that is representative of the entire class of people denied, that means about 58 people were wrongly denied.

But the number of wrongly denied people could be significantly higher. The State reveals that it will *deny* (not just reject) a purchase if DOJ cannot determine whether the person is prohibited. *Id.*  ¶ 15 n.2 ("[I]f the Department is unable to obtain the information [necessary to determine whether a purchaser is prohibited] it will ultimately deny the transaction because an eligibility determination could not be made.") Not only does this raise the question of how many of the people DOJ has denied fall into that camp, but it proves that such a system is an inappropriate gatekeeper to the exercise of a fundamental right. It is the government's burden to prove that an individual should be denied the exercise of a right. *See*, *e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). This system has that burden exactly backwards, denying people the exercise of a right and placing the burden on them to prove to the government they are entitled to exercise it.

---

[5] It is unclear whether the State subsequently notified any of those individuals that they are eligible for ammunition purchases. Without confirmation that they have been notified, those people, practically speaking, remain wrongly denied.

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

18cv802

## IV.   NON-RESIDENT RESTRICTIONS

Finally, according to the State, non-residents can only utilize the COE Verification Check to be able to purchase ammunition while in California. Req. Jud. Ntc. Ex. 12 (Attachment A- Public Comments and Department of Justice Responses, DOJ Response to Summarized Comment # 67b). The State has provided no information about how many non-residents have purchased ammunition from a licensed California vendor since July 1, 2019—the date the background check requirement took effect. Cal. Penal Code § 30370(a). As Plaintiffs have argued, this is effectively a ban on non-residents purchasing ammunition while present in California. Mot. 17-18. Without proof that non-residents are successfully purchasing ammunition in-state, this consequence of the State's background check system alone is enough to warrant its being enjoined as unconstitutional.

## CONCLUSION

Factual disputes are not a significant issue in this matter. The parties may quibble on details. But they agree that: (1) the System rejects 20% of ammunition purchasers; (2) the State does not directly inform those rejected of the specific reason for the rejection or how to remedy it; (3) there are no established timeframes for DOJ to update AFS records that would allow a rejected person to purchase ammunition; (4) according to the most recent data, a majority of those rejected do not later successfully acquire ammunition; (5) DOJ *denies* people whose eligibility status it cannot determine; and (6) DOJ has denied purchases to people who were later found to not be prohibited. For these reasons, Plaintiffs respectfully believe that neither the scheduled November 15 status conference nor an evidentiary hearing is necessary to rule on their preliminary injunction motion. The Court should grant that motion on the current record at its earliest convenience.

Dated: October 29, 2019                **MICHEL & ASSOCIATES, P.C.**

                                        *s/ Sean A. Brady*
                                        Sean A. Brady
                                        Email: sbrady@michellawyers.com
                                        Attorneys for Plaintiffs

SUPPLEMENTAL BRIEF ISO PLAINTIFFS' MOT. FOR PRELIM. INJUNCTION

## <u>CERTIFICATE OF SERVICE</u>
### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Rhode, et al. v. Becerra*
Case No.: 3:18-cv-00802-JM-JMA

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

on the following parties by electronically filing the foregoing on October 29, 2019, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Nelson R. Richards
Deputy Attorney General
nelson.richards@doj.ca.gov
2550 Mariposa Mall, Room 5090
Fresno, CA 93721
  *Attorneys for Defendant Attorney
  General Xavier Becerra*

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 29, 2019, at Long Beach, CA.

<u>*s/ Laura Palmerin*</u>
Laura Palmerin

CERTIFICATE OF SERVICE

18cv802