1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF CALIFORNIA

3   Before The Honorable ROGER T. BENITEZ, District Court Judge

4
    KIM RHODE, et al.,              )
5                                   )
                     Plaintiff,     )    CASE NO.
6     VS.                           ) 3:18-cv-802-BEN-JLB
                                    )
7   XAVIER BECERRA, et al.,         )
                                    )
8                    Defendants.    )
    _____)
9                                        San Diego, California
                                         Wednesday, April 1, 2020
10

11

12  APPEARANCES:

13  For Plaintiffs:      MICHEL & ASSOCIATES, P.C.
                         180 East Ocean Boulevard, Suite 200
14                       Long Beach, California 90802
                         BY: SEAN BRADY, ESQ.
15

16  For Defendants:      CALIFORNIA ATTORNEY GENERAL'S OFFICE
                         2550 Mariposa Mall, Room 5090
17                       Fresno, California  93721
                         BY: NELSON RICHARDS, ESQ.
18

19

20

21

22

23

24

25  Reported by:         Ellen L. Simone, RMR, CRR, CSR No. 14261
                         Official Court Reporter

```
 1                SAN DIEGO, CALIFORNIA; APRIL 1, 2020; 1:18 P.M.

 2                                    -oOo-

 3           THE COURT:  Good afternoon.  This is Judge Benitez.

 4     Please identify yourselves for the record.

 5           MR. BRADY:  Good afternoon, Judge Benitez.  This is --

 6     Your Honor, this is Sean Brady on behalf of the plaintiffs.

 7           MR. RICHARDS:  Good afternoon, Your Honor.  Nelson

 8     Richards on behalf of the defendants, and I have here with me

 9     Mayra Morales.

10           THE COURT:  Well, welcome to all of you.

11           Just some ground rules.  As you speak, every time that

12     you speak, please identify yourselves so -- since we're not

13     present, my court reporter is also not present, she is on the

14     phone, and so we're trying to be as compliant with government

15     nuisance orders as we possibly can be to keep people apart from

16     each other, but that means that we have to take some extra

17     precautions, which means that you have to identify yourself

18     every time that you speak.  Okay?  Please don't forget.

19           Let me start out by thanking you for being at this

20     conference on such short notice.  I appreciate it.  But I am

21     trying to get this order out, and I think there are some things

22     that are important that I just have not been able to get

23     through clear enough in my head, and so I thought we'd try and

24     get this, if we could, do it telephonically, anyway.

25           The second thing I want to do is I want to thank the
```

1    State for being responsive and producing information that I

2    have requested so far, which has certainly helped, to some

3    extent, crystalize some of the issues.  Okay?  So I thank you

4    all for being here and I thank you for providing me the

5    information.

6           Now, I have some questions, and I want to make sure

7    that I have my numbers straight.  So this may go to -- is it

8    Ms. Gonzalez?

9           MS. MORALES:  Yes.  Mayra Morales.

10          THE COURT:  Morales.  I'm sorry.  Yeah, okay.

11          So I was going through the numbers, and I want to make

12   sure I have these right.  If I understand correctly, by the end

13   of January, there had been 616,257 standard applications; is

14   that correct?

15          MS. MORALES:  Your Honor, can you please refer me to

16   the page that you are looking at?

17          THE COURT:  No, I can't.  I'm sorry.  I --

18          MS. MORALES:  Yes, that is -- if you're referring to

19   AFS checks process, yes, 616,257.

20          THE COURT:  Right.  And that's -- that's what -- I get

21   a little confused, because sometimes it's referred to as the

22   standard, sometimes it's referred to as the AFS, and so for

23   purposes of this conference, how about if we all agree that we

24   will call that the standard background check.  Agreed?

25          MS. MORALES:  Agreed.

1          THE COURT:  Okay, good.

2          Now, if I understand it correctly, there are 101,047

3  rejections; is that correct?

4          MS. MORALES:  That is correct, yes, due to no match

5  with AFS records.

6          THE COURT:  Okay.  Not matched with AFS records,

7  meaning -- and what does that mean?  Explain that to me.

8          MS. MORALES:  That the individual submitted a standard

9  check, and they did not match -- they were rejected because

10 they did not match a record in the Automated Firearms System.

11 One of the four criteria did not match, or any of them did not

12 match; their criteria being name, date of birth, ID, or main

13 address.

14         THE COURT:  Okay.  Now, there were 188 persons who

15 were rejected as being prohibited persons; is that correct?

16         MS. MORALES:  They were denied because they were

17 prohibited persons, yes, that is correct.

18         THE COURT:  All right.  Now, out of that 188 people,

19 how many have you been verified to, in fact, be prohibited

20 persons?

21         MS. MORALES:  Your Honor, I do not have that number

22 readily available for you.

23         THE COURT:  Can you tell me, though, the 188 people,

24 why they were deemed to be prohibited persons?

25         MS. MORALES:  No, Your Honor, I cannot.

```
 1              THE COURT:  In broad categories?  I mean, I'm not
 2    talking about tell me all 188, but can you tell me in broad
 3    categories what those categories were?
 4              MS. MORALES:  No, your Honor, I cannot.  I would have
 5    to get that information.
 6              THE COURT:  But you do have that information
 7    available --
 8              MS. MORALES:  Yes.
 9              THE COURT:  -- is that correct?
10              MS. MORALES:  Yes.  It is possible for me to get that
11    information.
12              THE COURT:  Okay.  So we have 188 people that were
13    failed to be prohibited persons, but as of right now, I don't
14    know why they were prohibited persons, in other words, I don't
15    know if they were persons unlawfully present in the United
16    States, or if they were felons, or people that had been found
17    to be mentally ill, et cetera.  But you do have that
18    information at the State level, correct?
19              MS. MORALES:  Correct.
20              THE COURT:  Okay.  I guess you're not really
21    identifying yourself each time you speak, but Ms. Morales,
22    we're going to give you a pass since I think we can figure out
23    that you're not one of the three male voices on this recording.
24              So Mr. Richards, Mr. Brady, and myself -- well,
25    Mr. Brady and Mr. Richards will identify themselves each time
```

 1   they speak.  Ms. Morales, we'll give you a pass.

 2            And I apologize for that.  Okay.

 3            MS. MORALES:  No, I apologize.  Thank you.

 4            THE COURT:  No, that's okay.  Don't worry about that.

 5   All right.

 6            Now, I wanted to ask, is there an appeal process if --

 7   if someone applies for an AFS, is there an appeal process that

 8   one can go through in order to be determined to not be a

 9   prohibited person?

10            Mr. Richards, do you know?

11            MR. RICHARDS:  Your Honor, this is Nelson Richards.

12            I guess, I'm not sure what you mean by "appeal

13   process".  Do you mean if they have an ammunition -- the

14   standard eligibility ammunition check rejected, is there an

15   internal process within the Bureau, a process that they can

16   resort to to challenge that determination?

17            THE COURT:  Yes.

18            MS. MORALES:  Yes.  This is Mayra speaking.  Yes, I

19   believe there is.

20            THE COURT:  And what is that process?  Can you

21   summarize it for me?

22            MS. MORALES:  Unfortunately, I don't know that process

23   well enough to be able to summarize it for you.

24            THE COURT:  Can you tell me where I would go to look

25   to see what the process would be?

 1            MS. MORALES:  Not specifically, but I believe it is on

 2    our website.

 3            THE COURT:  Is that the AFS website?

 4            MS. MORALES:  The Bureau of Firearms website.

 5            THE COURT:  Okay.  So please forgive me.  You folks

 6    are much more familiar with this than I am, so I'm trying to

 7    work my way through this.

 8            So the way I understand this, the standard background

 9    check, if I go into an ammunition vendor and I tell them I want

10    to buy a box of ammo, they will then run my information through

11    the AFS check, and then they will say, "You've been approved,"

12    or, "You've been rejected."

13            Now, I know one of the reasons for rejection is that I

14    may not be in the AFS system, right?

15            MS. MORALES:  Correct.

16            THE COURT:  Okay.  And that may be because I bought a

17    gun a long, long time ago, perhaps a shotgun or a rifle, or

18    could be that I inherited a gun sometime, or I purchased the

19    gun through a private sale in some other state, or I lived in

20    some other state and I moved into the State of California.

21    Those are all reasons why I might not be in the AFS system; is

22    that a fair statement?

23            MS. MORALES:  Yes.

24            THE COURT:  All right.  So the way I understand it, if

25    I fit one of those categories that I just mentioned, I will be

1   rejected, and I will be given a 15-digit number.  I can then go

2   to the website, and I can find out why I was rejected; is that

3   right?

4          MS. MORALES:  Correct.

5          THE COURT:  Okay.  And if it happens to be one of the

6   reasons that I just stated, ie., that I, say, for example,

7   inherited a gun -- right? -- from my father, let's just say, so

8   now somehow I can get into the AFS system by getting this

9   notarized statement or by -- if I can find the purchase

10  information of when I purchased the weapon, I can submit that,

11  and that will all get me into the AFS system; is that a fair

12  statement?

13         MS. MORALES:  Can you repeat that, please?

14         THE COURT:  Yes.  So I gave you a couple of

15  examples -- or several examples of why someone might not be in

16  the AFS system.  I'll just focus on one.  Okay?

17         All right.  So I bought a shotgun or a rifle in 1995.

18  My understanding is that prior to 2014, long guns did not make

19  the AFS system; is that true?

20         MS. MORALES:  Yes.

21         THE COURT:  Okay.  So hypothetically, I bought a long

22  gun in 1995.  I go in, I try to get an AFS standard background

23  check, and they tell me, "You have been rejected."  So they

24  give me a 15-digit number, I go over to the website, and it

25  tells me that I don't have a gun registered in the AFS system.

1    So now --

2    MS. MORALES:  Your Honor, can I interrupt for just a

3    moment?  The system --

4    THE COURT:  Absolutely.

5    MS. MORALES:  -- will tell you that you were rejected,

6    and it will give a generic statement to the effect of the

7    information that you provided did not match an AFS record or

8    you did not have an AFS record.  It doesn't specifically state

9    why you were rejected, though.  It doesn't go into the

10   specifics.

11   THE COURT:  Okay.  So then let's suppose then the

12   average person out there, I maybe have a high school education

13   or a ninth grade education, I bought a gun in 1995, it was a

14   shotgun, and I go in to buy ammunition at the vendor.

15   The vendor says, "You've been rejected."

16   I go to the website, I type in my 15-digit number.

17   Now, how do I know why I've been rejected, and how I can remedy

18   whatever the rejection issue is?

19   MR. RICHARDS:  Your Honor, this is Nelson Richards.

20   Can I jump in for just a moment?

21   THE COURT:  Sure.

22   MR. RICHARDS:  I just want to clarify something about

23   the hypothetical you're asking.

24   I think the way it's phrased -- the way that you

25   characterize it, I think I understand where you're going with

 1   this, but I'd just like to point out that, in that

 2   hypothetical, the person would not have an AFS entry and would

 3   thus not be -- because the long gun purchase in 1995 wouldn't

 4   be an AFS -- it wouldn't be eligible for the standard check.

 5        That would be someone who would have at least two

 6   options.  That the two main options would be to use a basic

 7   check, which are outlined in Ms. Morales' declarations, or to

 8   go through the process of having that long gun purchase in 1995

 9   entered into AFS.

10        And I think Ms. Morales could explain that process --

11        THE COURT:  Yes.

12        MR. RICHARDS:  -- for you.

13        THE COURT:  That second option that you were referring

14   to, Mr. Richards, is what I was trying to get at.  Okay.

15        So I got my rejection that says there is no AFS

16   record.  Okay.  So -- but it doesn't tell me -- or does it tell

17   me that it's because I don't have any weapons in the AFS

18   system, or is that just implied?

19        MS. MORALES:  It won't specifically tell you you don't

20   have any weapons in the AFS system, so it would be implied.

21        THE COURT:  Okay.  So I guess what I'm getting at is,

22   how would that person, that average Joe or Jill, if you will,

23   how would they know what they need to do in order to correct

24   whatever it is that rejected them?  How would they know that?

25        MS. MORALES:  Our website talks to the fact that if

1  they do not have a firearm recorded in their name, they have

2  options to record the firearm.  They have the ability to record

3  the firearm, and therefore, then create an entry into the

4  Automated Firearms System.

5         THE COURT:  Okay.  That's what I was trying to get at.

6         But somehow they learn that, right?  They're told you

7  are not in the AFS system because you do not have a firearm

8  recorded, right?

9         MS. MORALES:  They would have to glean that

10 information.

11        THE COURT:  I'm sorry.  They would have to what?

12        MS. MORALES:  They would not be told specifically.

13        THE COURT:  So they would have to devise this

14 information somehow?  They would have to say, oh, I've been

15 rejected, and the reason why I was rejected is because they

16 don't have a record of me, and the reason why they don't have a

17 record of me is because I don't have a firearm in the system?

18        MS. MORALES:  Yes.

19        THE COURT:  Just out of curiosity, why couldn't the

20 State tell someone we can't process -- I'm not talking about at

21 the point of sale, I'm talking about subsequently, when the

22 person enters the 15-digit number -- why couldn't the State

23 tell them this is why we can't process your application,

24 because you do not have a firearm registered in the AFS system?

25 That seems like such a simple thing to do.

 1                MR. RICHARDS:  Your Honor, this is Nelson Richards.

 2           THE COURT:  Yes.

 3                MR. RICHARDS:  I understand what you're asking, and

 4      with all due respect, I think that's a bit outside of the data

 5      that Ms. Morales has provided in her declaration.

 6           THE COURT:  Well, I'm asking you.  I mean, this

 7      doesn't have to go to Ms. Morales.

 8                Look, you're the State.  You folks have this set of

 9      laws and these sets of rules.  And one of the things that I'm

10      trying to work my way through is whether or not this is a

11      reasonable fit.  And in determining whether or not it's a

12      reasonable fit, I have to determine the degree of burden.

13                I mean, certainly, Mr. Richards, I think you would

14      agree that if the State said, "Well, you know, we'll allow you

15      to buy ammunition, but you can only buy ammunition on

16      February 29," my guess is that you would agree that that

17      probably would be rather an onerous burden.  Don't you think?

18                MR. RICHARDS:  Yes, Your Honor.  In other words, a law

19      that says you can only buy ammunition on the leap day of Leap

20      Year?  I think that would be constitutionally problematic.  I

21      would agree.

22           THE COURT:  Okay.  So all I'm trying to find out is,

23      if there is a reason why we make a process difficult for the

24      citizen -- and I assume, Mr. Richards -- I don't recall from

25      what you've filed -- but I assume that you agree that the right

1   to buy ammunition is protected by the Second Amendment,

2   correct?

3           MR. RICHARDS:  Yes, Your Honor.

4           THE COURT:  Okay.

5           MR. RICHARDS:  Under Jackson and other cases, yes.

6           THE COURT:  That's right.  That's right.

7           So what I'm trying to find out -- and this is kind --

8   this is really important, is, okay, so are the restrictions,

9   the manner of restricting the purchase of ammunition,

10  reasonable?

11          And all I'm trying to find out is, is there some

12  reason why that hypothetical 9th grade graduate or 12th grade

13  graduate who goes to and puts in and asks for a standard

14  background check, and is rejected, and is then given the

15  15-digit number, why he or she could not go to the website and

16  simply be told, rather than given this vague, ambiguous

17  response, that you're not in the system -- that they would be

18  told you're not in the system because there's not a firearm

19  registered to you in the AFS system.

20          See what I'm saying?  Why not make it easier for the

21  citizen rather than more difficult?  Is there something I'm

22  missing as to why that can't be done?

23          MR. RICHARDS:  Your Honor, I'm not sure that I'm able

24  to answer that question.  I think I'd say that there may be

25  reasons that it can't be done, but I don't know them off the

1  top of my head.

2          I do know that it's perhaps easy, from the outside, to

3  look at this as a monolithic system where you can very easily

4  change things, but that is not, in fact, the case.

5          We have several databases working with one another,

6  interacting, and what may seem, from the outside, like a simple

7  change to the system may be, in fact, quite a difficult thing

8  to accomplish.

9          I'm not saying as a matter -- you know, certainly,

10  that that's the case, but I do know that these questions are

11  more complex than could the system just be changed to do that,

12  and there may be reasons that I'm not aware of right now that

13  we -- that that may not be either feasible or optimal from,

14  say, a law enforcement point of view.

15          THE COURT:  But -- okay.  Well, it's just that it

16  seems to me, Mr. Richards, this.  Look, you, as the State,

17  create some --

18          So prior to July of last year, citizens of this State

19  could go in and buy ammunition anytime they wanted to, however

20  they wanted to, there were no restrictions.

21          Now, suddenly, the State says, "Well, we're going to

22  put restrictions on your buying the ammunition."  And

23  certainly, you can't make those restrictions such that it makes

24  it unnecessarily difficult for the citizens to buy the

25  ammunition.

 1          And so I was looking at this, and I was thinking,

 2   okay.  So fine.  So you go in, you put your dollar, and you ask

 3   for an AFS check, and you get a rejection, you get the 15-digit

 4   number, you go to the website, and you try to find out, okay,

 5   so why was I rejected?

 6          And by the way, I have -- you know, I'm probably a

 7   little older -- or quite a bit older than any of you.  Some of

 8   my buddies either do not have a computer or are not computer

 9   literate.  So, you know -- and we may not understand all that's

10   in that computer website.

11          But if the State creates the restriction, it would

12   seem that it would be the State's responsibility to make it as

13   simple or as easy for a citizen to be able to exercise their

14   Second Amendment right, rather than making it more difficult

15   for them.

16          So that's why I was asking the question.  To me, it

17   seems like it would be so simple to be able to say -- I mean,

18   somehow or another, whatever databases you're working with,

19   somehow that database is figuring out that this individual does

20   not have an AFS record.  Somehow, it figures that out.

21          And if it can figure that out, why can't it tell the

22   citizen, this is why we're rejecting you.  We're rejecting you

23   because you do not have a firearm registered to your name.

24          Now the person knows.  They don't have to devise this,

25   they can -- they know.  And so they know that there's a

1    process, right?  As Ms. Morales just indicated, there's a

2    process that you can go to in order to register your firearm,

3    right?

4            So, for example, going back to my hypothetical, the

5    individual bought a shotgun in 1995.  Maybe, maybe they have a

6    record of the purchase, or maybe they remember, if they bought

7    it through an FSL, who the FSL was, maybe they can go back and

8    get that record, and now they can submit the requisite

9    information to whomever that is so that they can get their

10   record created so that, from now on, they can use an AFS check.

11   I don't know.  Does that seem unreasonable?

12           MR. RICHARDS:  I understand what Your Honor is saying.

13   And if -- if that -- if you're asking for us to look into

14   whether that's possible and whether that can be done, that's

15   something I think we could do and get back --

16           THE COURT:  That would be great.  That would be great,

17   Mr. Richards.  If you could do that, I really would appreciate

18   that.

19           Now, as I understand this -- and Ms. Morales can

20   probably answer this --

21           All right.  Well, let me go back just a minute.

22           So I asked the question about what happens if you are

23   a citizen who wants to buy ammunition, you go through the AFS,

24   you're rejected.  And I asked whether or not there was some

25   appeal process, some due process that is provided to this

17

1    person, somewhere where they can go where they can correct the

2    issue.

3          And I think Ms. Morales said that there was, but she

4    didn't know what it was.

5          Did I get that correct?  Did I understand you

6    correctly?

7          MS. MORALES:  This is Mayra.

8          Yes, I said I believe there is, but I do not know the

9    details of that process.

10         THE COURT:  Okay.  So could you provide me,

11   Mr. Richards, with information of how -- what due process is

12   provided to an individual that has been rejected so that they

13   can go to some process that would help them resolve, if the

14   State says, no, you don't qualify for whatever reason, and the

15   individual says, well, the State's wrong, is there some vehicle

16   by which the individual can get that resolved, or is it just

17   simply that the State says, well, we're the State, too bad, so

18   sad, you're stuck with whatever we say?

19         So if you could provide me, Mr. Richards, with

20   whatever information you can that helps me determine whether or

21   not there's due process provided to the citizen to help the

22   citizen resolve any disagreement or dispute that may arise out

23   of his or her request for an AFS standard background check.

24   Will you do that for me?

25         MR. RICHARDS:  This is Nelson Richards.

1          Yes, Your Honor.  And may I have a moment to confer

2   with Ms. Morales?  I just have a question for her.  Would you

3   mind?

4          THE COURT:  I'm sorry?  I didn't hear you.  I

5   apologize.

6          MR. RICHARDS:  Would you mind if I take one moment to

7   confer with Ms. Morales on mute?

8          THE COURT:  Oh, absolutely not.  Go ahead.

9          MR. RICHARDS:  Okay.  One moment.  Thank you.

10          THE COURT:  Sure.

11          (Pause in the proceedings)

12          MR. RICHARDS:  Your Honor, I was just checking with

13   Ms. Morales because she has, in her declaration, described the

14   process by which someone who's been rejected, that is, someone

15   who has an AFS mismatch, can correct their record using the

16   CFARS's method in her declaration.  I think she was familiar

17   with that.  I just wanted to clarify that with her.

18          There is a second category of people, those are --

19   those who are denied as prohibited people, and I think it might

20   help us if we had some clarification from Your Honor.  Are you

21   talking about the process for someone who's been rejected

22   because of a mismatch in the Automated Firearms System, what

23   steps that person can take, or are you talking about the person

24   who's been denied because the Department's records showed them

25   as being prohibited, and what steps that person can take?

 1    Because I think they might be on two separate tracks.

 2              THE COURT:  Okay.  Well, I'm sorry, Mr. Richards, but

 3    the problem with this case for me is that every time that I

 4    answer a question, it results in my asking two more questions,

 5    and that's a little troublesome.  But okay.

 6              Let's assume, for example -- let's assume that my

 7    address -- or my address is XYZ, and the State says this does

 8    not comply -- or does not meet our records.  Your address is

 9    not XYZ, your address is ABC.  And you, the citizen, say, well,

10    your records are wrong, my address is XYZ.

11              How does that get resolved?

12              MS. MORALES:  Your Honor, this is Mayra.

13              That individual would have the option of logging onto

14    the California Firearms Application Reporting System and

15    submitting an AFS information update application for the

16    purpose of updating their address.

17              THE COURT:  I see.  Okay.  All right.

18              So the appeal process, I guess -- and we're then

19    limited to -- is whether or not someone is deemed to be a

20    prohibited person, but they don't think they are a prohibited

21    person, maybe they're not even the same person that is

22    determined to be a prohibited person.  What is the appeal

23    process that they have to go through in order to rid themselves

24    of that prohibited person designation?

25              I think that's -- to me, that might be important.  But

20

1    so anyway.

2          If there is an appeal process by which that can be

3    resolved, I'd like to know what that is.

4          MR. RICHARDS:  This is Nelson Richards.

5          Yes.  I understand the question.

6          THE COURT:  All right, great.  Thank you.

7          Now, turning my attention to the basic check.

8          Through January, as best as I can tell, there were 770

9    basic checks that were submitted, and that was through January

10   of this year.  Oh, no.  I'm sorry.  There was 19,000 -- I'm

11   sorry.  I misspoke.  I know what happened.  Just a second.

12   Let's backtrack for just a second.

13         So we know for a fact that there were 770 people

14   altogether who were determined to be prohibited persons.  And

15   that includes the standard and the basic checks.  And out of

16   those, there are 590 that were checked, and 16 of those citizen

17   eligible; is that right?

18         So 16 out of the 590 were found to be not prohibited

19   persons, even though the original finding was that they were

20   prohibited persons.

21         MS. MORALES:  A total of 10 were -- excuse me.  Just a

22   moment.  A total of -- this is Mayra.

23         A total of 10 purchasers who were ineligible to

24   purchase ammunition on the face of their official records were

25   later determined to be eligible.

1          THE COURT:  A total of 10 out of the 590?

2          MR. RICHARDS:  Your Honor, this is Nelson Richards.

3          I believe we're looking at paragraphs 55 and 56 of

4   Ms. Morales' third supplemental declaration?

5          THE COURT:  Yes.  Right. specifically, paragraph 56

6   says that 16 of the purchasers have been determined to be

7   eligible, not 10.

8          MS. MORALES:  I apologize, Your Honor.  Yes, that is

9   correct.

10         THE COURT:  Okay.  All right.  So there's still almost

11  200 that have not yet been screened to determine whether they

12  were really prohibited persons or not, right?  Almost 200.  My

13  math is terrible.  I'm going to guess that it's probably 180.

14         MS. MORALES:  Correct.

15         THE COURT:  Okay.  All right.  Now, getting to the

16  basic check.

17         As I understand it, there were 19,753 applications

18  through the end of January.

19         MS. MORALES:  Your Honor, can you repeat that, please?

20         THE COURT:  Yes.  19,753.

21         MS. MORALES:  Correct.

22         THE COURT:  All right.  And there were 342 rejections;

23  is that right?

24         MS. MORALES:  I would have to tabulate that, Your

25  Honor, to confirm that.

22

 1              MR. RICHARDS:  This is Nelson Richards.  107 plus 235

 2    would be 342.  Is that the number Your Honor is asking about?

 3              THE COURT:  Yes.  All right.

 4              Now, Mr. Richards, I have some questions that I think

 5    are probably more in your bailiwick than Ms. Morales.

 6              So I was looking at Senate Bill 1235.  And Senate Bill

 7    1235 provides -- it says the following:  "This bill would, if

 8    the Safety for All Act of 2016 as enacted by the voters of the

 9    November 8, 2016, statewide general election, amend the Act to

10    instead allow ammunition to be sold only to a person whose

11    information matches an entry in the Automated Firearms System

12    and who is eligible to possess ammunition, to a person who has

13    a current certificate of eligibility issued by the Department,

14    or to a person who purchases or transfers the ammunition in a

15    single ammunition transaction as specified."

16              I was trying to figure out what "as specified" means.

17    What does -- where do I find what that means?

18              MR. RICHARDS:  Your Honor, I apologize.  I don't have

19    the language of SB 1235 in front of me, and I don't know the

20    answer to that off the top of my head.

21              I do know that SB 1235 prospectively amended various

22    aspects of Proposition 63, but that reference could be to a

23    single purchase referred to in a provision of Proposition 63.

24    But sitting here right now, without those statutes -- the

25    proposition initiative and the Senate Bill in front of me, I'm

23

1     afraid I don't know.

2          THE COURT:  Would you be able to provide that for me

3     when you're providing the information regarding the appeal?

4          MR. RICHARDS:  Yes, Your Honor.

5          THE COURT:  Because I just have no idea what that

6     means, "as specified".

7          MR. BRADY:  Your Honor, this is Sean Brady on behalf

8     of the plaintiffs.

9          Mr. Richards' inclination is correct.  That is, in

10    reference to my understanding, is that is in reference to the

11    basic check.

12         The legislature, via that provision, tasked the

13    Department of Justice -- the California Department of Justice

14    with creating a system for a one-time ammunition purchase,

15    which is the basic check, and DOJ -- California DOJ went ahead

16    and created that system, which is what we are referring to as

17    the basic check, so that's what that provision refers to.

18         THE COURT:  But I was wondering about that language

19    "as specified".  Is there like -- so "as specified", meaning

20    where -- where do I look in the statute to see what "as

21    specified" means?

22         I understand what you're saying, Mr. Brady.  In fact,

23    I think that's probably what it was referring to, but I just

24    don't see any language that amplifies what "as specified"

25    means.

24

 1              MR. BRADY:  Your Honor, this is Sean Brady.  It's

 2    specified in regulations, not in the statute.

 3              So it basically said DOJ created this system, and DOJ

 4    did via regulations, which I could get you the section numbers

 5    for shortly, if you give me a minute.

 6              THE COURT:  All right.  Well, why don't you look that

 7    up, and while you're looking that up, I'm going to ask

 8    Mr. Richards another question, which is kind of, again, more in

 9    his bailiwick.

10              But going on, the next sentence says, "If the Act is

11    enacted by the voters, the bill would amend the Act to charge

12    ammunition purchasers and transferees a per transaction fee not

13    to exceed $1."

14              And so I'm wondering, because -- and the reason why I

15    ask Mr. Richards is this.  Look.  There are -- for some of us,

16    $18 may not be a lot of money, but for some people who enjoy,

17    for example, target practicing, or they want to take their kids

18    or grandkids out plinking, or maybe they want ammunition to

19    protect themselves, you know, that $18 could be a whole lot of

20    money.

21              I mean, right now, with this coronavirus stuff going

22    on, I suspect there are a lot of people who are hurting

23    financially, and that $18 can make a world of difference,

24    particularly if you do more than one transaction.

25              So I'm wondering, if the statute says $1, where does

 1  │ that $19 charge come from?

 2  │         MR. RICHARDS:  Your Honor, this is Nelson Richards.

 3  │         Again, I'm going to have to apologize.  Given the

 4  │ nature of today's hearing, we're -- I'm not in my office with

 5  │ all my materials, and I believe there's another provision in

 6  │ either Proposition 63 or somewhere in 1235 that specifies that

 7  │ $19 is the amount that we charge for the single transaction.

 8  │         And I'd have to double -- I'd have -- I might be

 9  │ wrong, but I'd have to look and figure out where the $19 number

10  │ comes from.  I don't know if it's in the statute or if it's

11  │ somewhere else, but I would have to doublecheck that.

12  │         THE COURT:  That kind of gets me to an issue that I

13  │ think is really interesting, so -- because I'll tell you.  I've

14  │ long been a believer that laws should be written and drafted so

15  │ that the reasonable person can understand them, not someone who

16  │ graduated summa cum laude from Harvard Law.

17  │         And obviously, I'm not in the latter category, as I'm

18  │ sure you've probably already figured out.

19  │         But I'm trying to figure out, what really is the law,

20  │ and I'm trying to figure out, where does this authority come

21  │ from to preemptively amend a proposition that is submitted to

22  │ the people for a vote?

23  │         So as I understand it, we have this proposition

24  │ initiative process in the State of California in which restores

25  │ or which provides the people the final say on what the law is,

 1    subject to being interpreted, of course, by the courts and so

 2    on, but --

 3              And so there was this proposition that was put on the

 4    ballot that the people voted on, and it was represented to them

 5    that this is what the law was on the subject.  And apparently,

 6    the legislature has decided that it doesn't matter what the

 7    people voted for, we're going to preemptively amend the

 8    proposition enacted by the people.

 9              There's something about that that strikes me as being

10    totally and completely anti Democratic and antithetical to the

11    whole proposition procedure.

12              So is there a case?  Because we tried to find

13    authority for the proposition that the State can preemptively

14    amend or modify a proposition that has been submitted to the

15    voters and represented to the voters as being the law on a

16    subject.  Couldn't find anything.

17              And I didn't see anything in your filings,

18    Mr. Richards, that indicated that there is -- that the

19    legislature has that power.

20              Can you find that for me and tell me where that comes

21    from?

22              MR. RICHARDS:  Yes, Your Honor.  I can give you, I

23    think, a broadbrush answer right now, and then if you'd like

24    more after I provide that answer, I'd be happy to provide more

25    detailed discussion.

 1          THE COURT:  Sure.  Why don't you give me the

 2   broadbrush.

 3          MR. RICHARDS:  Sure.  Article 2, Section 10(c) of the

 4   California Constitution is actually the controlling authority

 5   on the relationship between the legislature and the people with

 6   regard to the initiative process.

 7          While I don't have that right in front of me, I'm

 8   fairly familiar with that section.  It says something to the

 9   effect of, "Valid initiatives enacted by the people can only be

10   amended by their terms, and then the legislature can amend

11   those initiatives as permitted by the terms of the initiative."

12   But that's the controlling standard.

13          And so the way this works out in practice, when you

14   look at whether a legislative enactment is permissible, you

15   engage in a two-step inquiry.

16          First, you look at Article II, Section 10(c) of the

17   California Constitution, and then you conduct a two-step

18   inquiry where you say, well, does this initiative -- or excuse

19   me -- does the statute -- proposed statute or statute does it

20   amend the initiative.

21          I think with regard to SB 1235, that would -- the

22   answer would certainly be yes, as disputed in cases often, and

23   I've litigated a few of those cases.

24          But then you get to the second step of the inquiry

25   which is, is the legislature enactment permissible under the

1  terms of the initiative, and to answer that question, you go to

2  the text of the initiative, and you look to see whether the

3  initiative allowed for an amendment.

4      And I believe -- again, I don't have Proposition 63

5  right in front of me, but I believe Prop 63 did contain that

6  language and -- language allowing an amendment, and that is

7  what the legislature was relying on when it enacted SB 1235.

8      Now, people do litigate whether amendments are

9  permissible -- again, I've litigated a few of those cases in my

10  day -- but that is a question of state law and not one that we

11  understand the plaintiffs to have raised in this case, and not

12  really at issue, which is why we did not explain this

13  particular issue in our briefing.

14      THE COURT:  Well, let me tell you why I -- it may be a

15  question of state law, not a question of federal law, but it

16  becomes a question of federal law when I'm trying to figure out

17  whether the burden imposed by the State on a constitutionally

18  protected right is reasonable.

19      And so I've asked you questions about the basic and

20  the standard background checks, and the reason why I've asked

21  those questions is because one of the things I'm trying to

22  determine, as I said to you earlier, Mr. Richards, certainly,

23  the State can't say, well, you can buy ammunition, but you can

24  buy it on February 29th.  Only on February 29th.

25      So there's this broad spectrum, I suppose, of manner,

 1    time, and place restrictions that might be able to be imposed,

 2    but in the end, someone has to make a determination as to

 3    whether or not the manner, whether the fit is reasonable or not

 4    reasonable.

 5          And in doing that, I'm trying to figure out, for

 6    example, well, where does all this come from?

 7          Because if I look at the proposition, Mr. Richards --

 8    and I think this is very interesting -- the proposition that

 9    was represented -- I mean, there was an affirmative

10    representation made to the people of the State of California:

11    If you pass this, this is what's going to happen.  This will be

12    your burden.  In order to exercise your Second Amendment

13    rights, this will be your burden.

14          And specifically, specifically, I'm referring to a

15    couple of things.  First of all, at Article 4, Section 30370,

16    it talks about the State creating and maintaining internal

17    centralized lists of all persons who are authorized to purchase

18    ammunition.  So it places the burden on the State to create

19    this list or this database of people who are authorized to

20    purchase ammunition.

21          And then, there's this other very interesting

22    provision.  Again, this just simply goes to whether or not the

23    fit is a reasonable fit as currently imposed by the State where

24    there's this provision in what was represented to the people

25    would be the law, which is that you can apply for a certificate

1   to purchase ammunition, you pay 50 bucks, and that certificate

2   is good for four years.

3         And, of course, the State maintains the centralized

4   database, which means that if I have acquired this ammunition

5   purchase certificate, which is good for four years, if I become

6   an ineligible person, then the State can essentially revoke my

7   certificate.  You see?

8         Now, why is that important?  Because, you see, it

9   doesn't require that I tell the State, for example, what

10   firearms I own, number one, as I would have to if I wanted to

11   go through the AFS check.

12         Number two, I get my certificate, and I'm good to go.

13   I'm basically where I was prior to July of 2019.  I can walk in

14   anytime, to any vendor, I can present them with my certificate,

15   I walk out with my ammunition.  That's a -- to me, that's a

16   rather insignificant burden.  I mean, it's not completely

17   insignificant, but you see what I'm saying.

18         But otherwise, what I have to do is I have to go in,

19   and I would do the basic or the standard background.  And if I

20   do the basic background check, we're looking at, as best as I

21   can tell from Ms. Morales' declarations, we're looking at, you

22   know, two days that I'd have to wait, and I have to pay $18 --

23   I'm sorry -- $19 each time.  So to me, it's important.

24         And now, okay.  So now the people were told, this is

25   what will be required of you if you want to buy ammunition.

1    And then somehow or another, the State preemptively -- and by

2    the way, it's not mentioned anywhere in the proposition that

3    there's this other law that the legislature has enacted that

4    will essentially make some of what's in the proposition

5    meaningless or not effective, which I think is -- you know, I

6    don't know -- I think that's rather an odd way to deal with the

7    people.

8            But so that's why, to me, it's important.  I want to

9    know, where does this authority come from to preemptively enact

10   statutes that might either completely extinguish, or modify, or

11   alter, or amend a proposition that is subsequently amended --

12   I'm sorry -- subsequently passed by the people.

13           If we were talking about -- look.  If we were talking

14   about whether or not I have to have a GFI in my bathroom, when

15   I had a bathroom, who cares.  If -- maybe they're talking about

16   what I have to do in order to get a driver's license or an

17   identification card, who cares.

18           But here, we're talking about some pretty important

19   stuff.  I mean, this is in the Bill of Rights.  This is in --

20   and so, to me, it seems like, first of all, the people should

21   be told honestly what it is that they're voting for and what

22   effect it's going to have, and secondly, if the State's going

23   to tamper with what the people have voted for, that they should

24   be told ahead of time that, you know, whatever it is you vote

25   on, guess what, it doesn't mean anything because we, the

1   legislature, are going to change it.

2        So I'm not saying that it's not the law, but if it is

3   the law, I'd sure like to see some support for it, because I

4   did not see it in any of the filings.

5        So Mr. Richards, I would appreciate it if you could

6   get me authority that says that, in fact, the State can

7   preemptively modify, or amend, or extinguish a proposition that

8   is subsequently adopted by the voters of the State of

9   California.  So now --

10        And now that gets me to another issue.  Again, to me,

11   this goes to the burden that's being placed on the citizens'

12   right to exercise their Second Amendment right.

13        I'm wondering.  There's this database -- and I know,

14   Mr. Richards, you and I talked about this once before, but I

15   was left with considerable questions about how this works --

16   but the AFS, or standard background check, assumes that, at

17   some point in time, I have told the State of California that I

18   own a certain weapon.

19        So as I understand Ms. Morales' declaration, if I have

20   a record, an AFS record, I can walk into an ammunition vendor,

21   I can give them my Real ID or my passport, and they can almost

22   instantaneously, within minutes, tell me whether or not I can

23   buy that ammunition.

24        Is that a fair understanding of Ms. Morales'

25   declaration?

```
 1            MS. MORALES:  Your Honor, this is Maya.

 2            Yes, that is correct.

 3            THE COURT:  Okay.  Now, other than the fact that the

 4   State knows that I own a firearm, because either I have told

 5   them, having been rejected once -- okay? -- and now I did what

 6   I needed to do in order to create an AFS record, or the fact

 7   that sometime back I purchased a firearm -- what happens now is

 8   that there's this database that is accessed somehow when I go

 9   into that vendor, there's this database that's accessed that is

10   called the Armed Prohibited Persons Database.  And that Armed

11   Prohibited Persons Database is a database that was created by

12   and maintained by the State of California, right?

13            MR. RICHARDS:  Yes, that's correct.

14            This is Nelson Richards.

15            THE COURT:  Okay.  Now, I'm wondering.  Where does the

16   information for the Armed Prohibited Persons System Database,

17   where does that information come from?  What databases does

18   that database look to such that it makes it, essentially,

19   instantaneous for someone who applies for a standard background

20   check to be able to almost instantaneously know whether he or

21   she can buy ammunition?

22            MS. MORALES:  Your Honor, are you asking -- I want to

23   make sure I understand your question.

24            THE COURT:  Okay.

25            MS. MORALES:  You're asking where will you -- when you
```

1   conduct the standard ammunition eligibility test, and after I

2   have checked the Automated Firearms System to see if you have a

3   record, and then after that it checks APPS, where APPS gets

4   this information from?

5              THE COURT:  Yes.  Yes.  Precisely.

6              MS. MORALES:  So generally speaking, from what I

7   understand, or what I'm -- based on my experience, I believe

8   APPS gets the information from -- from the dealer record of

9   sales and --

10             THE COURT:  I'm sorry.  I'm sorry.  Say that again.

11             MS. MORALES:  -- the dealer record of sale

12   application.

13             And I believe our IT team can better speak to that.

14   But they get the info -- when an individual purchases a

15   firearm, that information not only goes into the AFS, but it

16   also populates the Armed Prohibited Persons System.

17             THE COURT:  Yes.  Okay.

18             But if you use my hypothetical where I didn't actually

19   purchase the firearm, the purchase is -- that the firearm was

20   given to me, I inherited it, or I bought it in a private sale

21   in some state that doesn't require registration, and so on -- I

22   was walking down the street and I found it, you know, I mean,

23   whatever, whatever the reason is, I know that there's a vehicle

24   by which I can go to the AFS system and say, hey, I have this

25   firearm, and I'm essentially -- I'm now creating a record in

1    the AFS system, right?

2              MS. MORALES:  Your Honor, if you had -- this is

3    Mayra -- if you had a firearm that you wanted to report under

4    your name, you would submit your application, it could be a

5    firearm ownership report to the Department of Justice, you

6    could submit that manually, or you could submit that

7    electronically through the California Firearms Application

8    Reporting System, and then we would process your application.

9    Once it was processed and approved, after conducting a

10   background, that info -- your -- your firearm record would be

11   in the Automated Firearms System.

12             THE COURT:  Right.  I got that.  Okay.  So I follow

13   that.

14             So I submitted my application.  I said, look, I've got

15   this firearm.  I was walking down the street, I found it.  You

16   know.  I don't have any criminal history.  Whatever I have to

17   do in order to get into the AFS system, I got into the AFS

18   system, however I got into the AFS system.

19             Now, perhaps a better example, because it's probably a

20   more realistic example.  I'll bet there are a lot of people,

21   lot of people that purchased firearms -- long guns, for

22   example, rifles, shotguns -- before 2014, so they would not be

23   in the AFS system, right?

24             MS. MORALES:  That is correct, unless they reported

25   the firearm after the fact.

36

```
 1          THE COURT:  Right.  So let's take the hypothetical
 2   system.  Jill Doe bought a shotgun in 1995.  She's not in the
 3   AFS system.  So she goes in and asks for a standard background
 4   check to buy ammunition.  She's rejected.  She goes to -- she
 5   gets her 15-digit number, she goes to the database -- or to the
 6   website, she does whatever she has to do, whatever she has to
 7   do in order to create the record that she owns this firearm.
 8          Now, what the standard background check does is it
 9   goes and looks at the Armed Prohibited Persons Database, right?
10          MS. MORALES:  Correct, after it checks the Automated
11   Firearms System.
12          THE COURT:  But all the Automated Firearms System
13   tells them is that this person owns this firearm, right?
14          MS. MORALES:  It has a record of the firearm
15   transaction, yes.
16          THE COURT:  Okay.  All right.  So the next thing that
17   happens is that somehow, somehow or another, however this
18   happens mechanically, the next thing that happens is that it
19   checks the Armed Prohibited Persons Database, and it looks to
20   see if this person has, for example, a domestic violence
21   restraining order against him or her, right?
22          MS. MORALES:  It checks to make sure there are no
23   prohibiting -- well, yes.
24          THE COURT:  Okay.  My question was essentially geared
25   to this:  Where does the Armed Prohibited Persons System get
```

 1 | its information?  What databases does it look to in order to

 2 | populate its database?

 3 | MR. RICHARDS:  Your Honor, this is Nelson Richards.

 4 | If Ms. Morales knows, she can answer.  I don't know

 5 | whether she does or not.  But I just wanted to, again, offer,

 6 | to the extent she's unable to answer, that that's additional

 7 | information that we can provide to the Court, if the Court is

 8 | interested in that specific question.

 9 | MS. MORALES:  Your Honor, it's Mayra.

10 | I believe -- and I can confirm this -- but it checks

11 | the Automated Criminal History System, the Wanted Persons

12 | System, the California --

13 | THE COURT:  Restraining and Protective Order System?

14 | MS. MORALES:  -- Restraining and Protective Order

15 | System, and the Mental Health Firearms Prohibition System.

16 | THE COURT:  Okay.  So -- so --

17 | MS. MORALES:  And, Your Honor --

18 | THE COURT:  Yes.

19 | MS. MORALES:  Excuse me.  This is Mayra.

20 | THE COURT:  Yes.

21 | MS. MORALES:  That is very -- that is a process -- the

22 | Armed Armed Prohibited Persons System and the way it works is a

23 | process all in itself, and I just wanted to let you know, it's

24 | more -- that is me just generally speaking.

25 | THE COURT:  I'm sorry.  I missed what you said.  Can

 1   you repeat what you said?

 2           MS. MORALES:  Yes.  I have said that the Armed

 3   Prohibited Persons System and the way it works, is obviously a

 4   process that is very involved, and what I provided is

 5   information generally speaking.

 6           THE COURT:  Okay.  I'm trying to be more specific,

 7   though, because I'm trying to find out -- here's what -- here's

 8   what's kind of troubling me.

 9           Again, getting back to what the initiative said as far

10   as the cost of getting an ammunition purchase certificate, and

11   the fact that there are people who cannot afford an extra $18

12   every time that they go purchase ammunition.

13           So what is it that makes the standard background check

14   so quick and so cheap as compared to, for example, the basic

15   background check?

16           MS. MORALES:  Your Honor, this is Mayra.

17           The standard ammunition eligibility check is a

18   systematic check, whereas the basic ammunition eligibility

19   check would require someone, potentially an analyst, to review

20   the crim -- the information or the background check, the hit on

21   an individual.

22           THE COURT:  Well, what -- what does the -- what does

23   the basic background check check that is not in the Armed

24   Prohibited Persons System?

25           MS. MORALES:  Your Honor, I don't understand your

39

 1   question.  I apologize.  Can you repeat that?

 2          THE COURT:  Okay.  So you tell me that it's an

 3   automated check.  So that means -- automated means that the

 4   State of California has created this automation system.  This

 5   automation system that then goes and looks at this other system

 6   called the Armed Prohibited Persons System, which then goes and

 7   looks at five databases.  This system that has been created by

 8   the State is apparently very quick and very cheap.

 9          What I'm trying to do is I'm trying to draw the

10   distinction between the standard and the basic check.  What is

11   it that the basic check looks to or looks at that is not in the

12   Armed Prohibited Persons check?

13          MS. MORALES:  Your Honor, I'm going to do my best.

14   Again, this is Mayra.

15          So once again, the standard check checks the Automated

16   Firearms System first and then the Armed Prohibited Persons

17   System.

18          Within the Armed Prohibited Persons System, an

19   individual is identified as either prohibited or not

20   prohibited.

21          So if an individual is not prohibited in the Armed

22   Prohibited Persons System, it's based on that status they will

23   be approved.  If they are prohibited, they will be rejected.

24          THE COURT:  Right.  I gotcha.

25          But what --

 1              MS. MORALES:  So, if they're --

 2              THE COURT:  Go ahead.  Go ahead.

 3              MS. MORALES:  So going --

 4              THE COURT:  Let me -- let me -- so the basic check.

 5     So I decide that I want to go through this expensive,

 6     time-consuming process, for whatever reason.  Maybe because I

 7     know I don't have an AFS record.  Okay?  So I decide I want to

 8     go through that.  Okay.

 9              So what happens next?  The vendors somehow or another

10     does something that causes someone to do something that then

11     eventually is going to result in either my being approved or

12     disapproved.  What I'm trying to find out is what those

13     somethings are.

14              MS. MORALES:  For the basic ammunition eligibility

15     check, the individual would submit the information to the

16     Department of Justice.  An analyst within our department -- or

17     the way it would work is the system would check the DMV to make

18     sure that the individual's information matches the record in

19     the DMV.

20              If it matches the record in the DMV, what then happens

21     is that a hit is generated for that individual based on their

22     identifying information.  And what happens is that the -- it

23     checks against the Automated Criminal History System, the

24     Mental Health Firearms Prohibition System --

25              THE COURT:  You're going too fast.  You're going to

 1    fast.

 2              So it goes and looks at what now?

 3              MS. MORALES:  Automated Criminal History System, the

 4    Wanted Persons System, the Mental Health Firearms Prohibition

 5    System, and the California Restraining and Protective Order

 6    System.

 7              So it generates, in a sense, what we call a base -- a

 8    basic ammunition eligibility check, which is a compilation of

 9    the information from those systems for that individual, and an

10    analyst reviews that information to determine if the individual

11    is eligible to own or possess ammunition.  So it takes a person

12    actually looking at that information.

13              Now, in some instances, an individual could

14    potentially be automatically approved if there are no hits in

15    the system.

16              THE COURT:  What does that mean, there are no hits?

17              MS. MORALES:  That no record came back on ACHS, CRPOS,

18    Wanted Persons System, or Mental Health Firearm Prohibition

19    System, there's no record of them in those systems.

20              THE COURT:  So if I understand you correctly,

21    Ms. Morales, what happens is that there is a body --

22              MS. MORALES:  Correct.

23              THE COURT:  -- that then goes and, assuming that the

24    DMV identification and information matches, that there is a

25    body that looks at four of the five databases that the AFS

1    database looks to, right?

2          MS. MORALES:  He has to check those four databases,
3    including the DMV.

4          THE COURT:  Okay.  Now, just out of curiosity, in
5    order to even run a background check, you have to have a Real
6    ID, and/or a passport, and/or a certified birth certificate,
7    right?  You have to have all of this when you go through the
8    standard or the basic, right?  In other words --

9          MS. MORALES:  Correct.

10          THE COURT:  -- you can't get your AFS background
11    checks unless you have one of those documents, one of which is
12    the driver's license, right?

13          MS. MORALES:  Yes.  You must have a Real ID, or if you
14    do not have a Real ID, if you have Federal Limits Apply ID, you
15    must have substantiating documentation showing that you are
16    legally present in the United States.

17          THE COURT:  Okay.  So really, the only difference, the
18    only differences that I can see between the standard and the
19    basic background checks are this:

20          Number one, for the standard, you have to have already
21    a record of a firearm.  In other words, you have to have told
22    the State that you own a firearm.  You don't have to do that if
23    you go through basic background check, right?

24          MS. MORALES:  Your Honor, it's Mayra.

25          You do not have to have a firearm record in AFS for

43

 1   the basic check.  That is correct.

 2          THE COURT:  So let's just see.  Again, I kind of

 3   warranted these things looking at possible hypotheticals.

 4          So let's assume that I'm a gang member of the East

 5   Side Gang.  I have no prior criminal history, no prior criminal

 6   record.  I can go down and I can buy a firearm.  And if I buy

 7   that firearm, I can then go and buy all the ammunition I want

 8   by going through an AFS standard background check.  So long as

 9   I do not become an armed prohibited person, I can be a member

10   of this gang, and I can buy all the ammo I want.  Is that --

11   does that make sense?

12          MR. RICHARDS:  Your Honor, this is Nelson Richards.

13          To the extent that we're using a hypothetical, I think

14   it's probably better that I answer the questions.

15          THE COURT:  Sure.  Go ahead.

16          MR. RICHARDS:  But I think that -- I think, as you set

17   forth that hypothetical, in other words, as I understand it,

18   someone who happens to be a member of a street gang that has no

19   criminal history or other event that would prohibit them from

20   possessing a firearm under state or federal law, that person

21   can go in, purchase the firearm, and have an AFS entry created

22   that would then, in turn, allow that person to use standard

23   checks -- a standard ammunition eligibility check to purchase

24   ammunition in the future.

25          THE COURT:  That's right.

```
 1              MR. RICHARDS:  Yes, that is correct.

 2              THE COURT:  Okay.  All right.  But let's forget the

 3    gang member for just a minute.  Let's go back to my being the

 4    person who bought a shotgun back in 1995.

 5              I've now created my AFS record.  The only difference

 6    between the standard and the basic background checks is that,

 7    for the standard, you have a firearm record.  So you told the

 8    State that you own a firearm.  You don't do that with the

 9    basic, you do it with the standard.

10              With the basic, there's an automated system set up by

11    the State of California called the Armed Prohibited Persons

12    System that looks at you because you are in the AFS system, in

13    other words, that person that bought the 1995 shotgun is now in

14    the AFS system.  John Doe, Jane Doe, it's in the system.

15              And now, the APPS system goes out and it looks at

16    those five databases, and it is able to, essentially, almost

17    instantaneously tell you whether you're approved or not

18    approved, right?

19              MS. MORALES:  Your Honor, this is Mayra.

20              I'd like to clarify.  For the Armed Prohibited Persons

21    System, an individual is either prohibited or not prohibited in

22    the system.  The system does not, once again, go out and check

23    those databases.  You're already in the system either a

24    prohibited or not prohibited.  That check has already been

25    done.
```

 1            THE COURT:   Okay.   But that's also done through a
 2   database.   So the Armed Prohibited Persons System accesses
 3   those five databases that you told me about.   That then is
 4   imported into the APPS system, and the APPS system is then used
 5   by the standard background check to determine whether or not
 6   you are eligible to buy ammunition, right?
 7            MR. RICHARDS:   Your Honor, this is Nelson Richards.
 8            I want to clarify exactly where the APPS system pulls
 9   the information from, as Ms. Morales did earlier.
10            I believe it -- those databases, it's a much more
11   complicated process.   As I understand things, and as
12   Ms. Morales is just saying, when you end up in the Armed
13   Prohibited Persons System, there's essentially a determination
14   that's been made that you are a prohibited person.   This forms
15   the basis, not just for ammunition background check purposes --
16   ammunition background check, it also -- in fact, its primary
17   purpose is to disarm people who should not have firearms.   The
18   Department of Justice and the Bureau of Firearms is actively
19   involved in taking away firearms from prohibited people.
20            THE COURT:   Sure.   I've read lots of reports.
21            Mr. Richards, believe it or not, I actually have
22   looked at various California publicly available records and
23   reports, and so on, and so yes, I understand all of that.
24            But I'm trying to find -- you see, what I'm trying to
25   do is I'm trying to find the mechanics how this all happens.

1    So the fact is that when you go to the AFS system, the

2    AFS looks to see that there's a record of you in the system.

3    So it's going to find your name.  John Doe.  Jill Doe.

4    And then it's going to check the Armed Prohibited

5    Persons System to see if you're a prohibited person or not a

6    prohibited person.

7    If it says -- finds that you're a prohibited person,

8    then it rejects you, and you would be turned down by the

9    vendor, and you could not buy any ammunition.

10    On the other hand, if you were not a prohibited

11    person, your purchase of the ammunition is almost

12    instantaneous, you pay your buck, you walk out with your box of

13    25 12-gauge shotgun shells, you're done, right?

14    MR. RICHARDS:  Yes.

15    THE COURT:  Okay.  And the way the Armed Prohibited

16    Persons System gets its information is because it accesses, not

17    necessarily at that moment, but at some other point in time, it

18    has already accessed -- it's able to access these five

19    databases that Ms. Morales has told me about, right?

20    MR. RICHARDS:  I'm not sure that that's the only thing

21    at work there.  And the reason why I say that is because one of

22    the reasons why the basic ammunition eligibility check takes

23    longer is because you can end up with partial hits in one of

24    those databases, for example, which is what would prompt a

25    manual review of a basic ammunition eligibility check.

 1          THE COURT:  I'm sorry.  Either I didn't hear you or

 2   you got cut out a little bit.  So go back.  Do that one more

 3   time.

 4          MR. RICHARDS:  Yes, Your Honor.  This is Nelson

 5   Richards.

 6          So as I was saying, the -- those -- the four -- the

 7   databases -- the Domestic Violence Database, for example,

 8   those -- someone may have a partial hit in one of those

 9   databases that may require a manual review for the basic

10   ammunition eligibility check.  This is some -- there may be

11   some connection to say that someone's name comes up, or, for

12   example, there's a record of a criminal arrest that has no

13   final disposition, so someone is arrested for a felony but

14   there's no final disposition of whether they were convicted or

15   acquitted, for example.

16          For the basic check, an analyst needs to run that

17   determination down, and it is a much more labor -- can be a

18   much more labor-intensive process that accounts for the

19   extended time that the manually processed, basic ammunition

20   eligibility checks that are outlined in Table 1.3 of

21   Ms. Morales' declaration -- most recent declaration, that's the

22   distinction between the automatically processed and manually

23   processed.  Manually processed requires an analyst to go out

24   and conduct some investigation.

25          What I think -- what I understand you to be asking is,

48

1  well, isn't there some similar process with regard to APPS?  I

2  don't believe that's come up before, and I -- sitting here

3  today, I don't know the answer, but that is another area where

4  we can provide you with some additional information, if you

5  would like, about what goes into someone entering APPS.

6  Because once they're -- my understanding is, once they're in

7  APPS, they are a prohibited person.  Again, as I mentioned

8  earlier, it forms the basis for --

9        THE COURT:  But they're not, really.  I'm sorry.  Let

10  me interrupt you for just a minute.

11        But they're not really, and the reason why they're not

12  really is because the same thing happens.  If I go in and I ask

13  for a standard background check, and it comes up with a

14  rejection because it says that I am a prohibited person, now --

15  and I disagree with that, then someone is going to have to go

16  through and look at the information -- say, for example, it was

17  the Restraining Order Database that generated a hit on the APPS

18  database that resulted in my being rejected.

19        So in that case, the very same thing is going to

20  happen, and that is that some individual is going to have to

21  walk back the hit at the Restraining Order Database in order to

22  determine whether or not I really am a prohibited person.

23        That's why I was so interested in the appeal process

24  at the very beginning, because it seems to me that the standard

25  and the basic background checks -- which, I'll go back, is not

1   in the initiative that was approved by the voters -- that

2   those -- I'm not saying that the State couldn't possibly -- in

3   fact, I would hope they could enact procedures that would be

4   even better than, but not to the exclusion of, that which the

5   voters approved in the initiative.

6        But if there's a hit in one of those four databases,

7   it's going to show up in the approved -- I'm sorry -- in the

8   Armed Prohibited Persons Database, which is going to wind up in

9   a rejection when the person goes to apply to purchase the

10  ammunition.

11        That person is going to say, well, wait a minute.  I

12  don't know why I was rejected, and so they're going to do

13  whatever they need to do in order to get that corrected, which

14  is going to result in an individual walking back to check and

15  see whether or not that was accurate information, just as the

16  analyst would in the case of a basic background check.

17        So what happens is that the analyst is going to do the

18  background check, is going to check these four databases, and

19  if there is a hit, then they're going to reject the

20  application.  But if there are no hits, then it's going to be

21  approved.

22        And the only difference, really, is -- besides the

23  fact that the standard background check checks one more

24  database -- well, actually, it's the same number of

25  databases -- but it's going to be the same thing.  They're

1  going to be looking at the very same information.  The only

2  difference being that one is automated, and the other one is

3  not; am I right?

4        MR. RICHARDS:  I don't believe so, Your Honor.

5        THE COURT:  Okay.  You have to tell me why not.

6        MR. RICHARDS:  And I think this gets to how the APPS

7  system works, which is not something that we provided

8  information on, and not something that I'm familiar enough

9  to -- with sitting here right now, to make representations to

10  the Court about.

11        And so, again, we could provide clarification on how

12  APPS works, to talk about how it's different from the -- both

13  the -- the automatic and the manual standard ammunition

14  eligibility check.  But --

15        THE COURT:  I could spend so much -- Mr. Richards, I

16  could spend so much time, because I am somewhat meticulously

17  trying to figure out the differences and how they affect the

18  buyer who is trying to buy ammunition.

19        And I thought that Ms. Morales did a really good

20  job -- which, by the way, I think I basically, probably already

21  knew, but I was trying to confirm it, because I didn't want to

22  put my big foot in my mouth by saying something that wasn't

23  true -- but Ms. Morales has pretty much confirmed exactly what

24  I just said, which is, if you have a record -- if your name is

25  in the AFS system, what it's going to do is it's going to check

1  the APPS system to see if you're a prohibited person or not.

2  And the way it's going to determine whether you're a prohibited

3  person or not is by checking the databases that she told me

4  about.

5       If you apply for a basic background check, what's

6  going to happen is that someone is going to manually check

7  those databases, and if there is a hit, they're going to try

8  and sort out why there's a hit.  That's what I understood

9  Ms. Morales to say.

10      Now, maybe you're telling me that Ms. Morales, you

11  know, has provided me with information that I misunderstood,

12  but that's -- I mean, I stand to be corrected.  I'm here.  I'm

13  asking these questions because I want to learn because I think

14  it's important.  I think this is an important issue for the

15  citizens of the State of California.  I'm taking my time

16  because I want to know.

17      So I don't know who I have to ask.  I don't know who I

18  have to bring in the court, if necessary, to get the

19  information from.  But I think it's important that we all know.

20      And if Morales -- Ms. Morales -- if she doesn't know,

21  then she should tell me that she doesn't know.

22      MS. MORALES:  Your Honor, it's Mayra.

23      THE COURT:  Yes.

24      MS. MORALES:  So you requested information on the

25  standard ammunition eligibility check and the process, and so I

1    did outline that it checks the Automated Firearms System, and

2    then it checks APPS.

3         It checks APPS to see if an individual is prohibited

4    in the system or if they're not prohibited.  If they're not

5    prohibited, they're approved.  If they're prohibited, they're

6    denied.

7         APPS, and how the individual gets in APPS, is separate

8    from the standard ammunition eligibility test.  Individuals go

9    into APPS -- when an individual purchases a firearm, after the

10   purchase has been approved, those individuals get populated

11   into the Armed Prohibited Persons as not prohibited.

12        Subsequent to that, if they become prohibited at -- or

13   if something happens and it changes their record, the APPS

14   staff will then -- that is, that individual then falls into a

15   queue for an analyst to work.

16        This is -- again, this is separate from the standard

17   ammunition eligibility check process.  Okay?

18        So going back, you end up in the Armed Prohibited

19   Persons System after you purchase the firearm, and you're in

20   there as not prohibited.

21        THE COURT:  Right.

22        MS. MORALES:  If for some reason something happens

23   with you, for example you get arrested, the system, on a -- I

24   want to say on a daily basis -- I believe it is on a daily

25   basis, but I am not sure -- the system checks the people who

53

1    are within the automated -- or in the Armed Prohibited Persons

2    System against the databases, which I believe are ACHS, Wanted

3    Person, Mental Health Firearm Prohibition System, and also

4    CRPOS.

5        So during that process, if an individual who is not

6    prohibited hits against any of those things, it drops into a

7    queue, and then an individual on the APPS team will review

8    that -- that queue for that individual, or that transaction,

9    and determine if that individual is, in fact, prohibited based

10   on the information that they see.

11       THE COURT:  Yes.  Got it.  Makes sense.

12       MS. MORALES:  So it's a completely different process

13   than the -- than the standard check.

14       The standard check utilizes that system to check if

15   they're prohibited or not prohibited.  But at that time that

16   the system is checked, it's not, once again, doing -- or it's

17   not requiring an individual to go back and review that

18   information for this individual all over again, that

19   determination has already been done.

20       THE COURT:  Yes.  Agreed.

21       But the determination has been made --

22       MS. MORALES:  Correct.

23       THE COURT:  -- on the basis of the fact that APPS is

24   constantly checking these databases, correct?

25       MS. MORALES:  Correct.

1    THE COURT:  All right.  And it is checking those

2 databases on the basis of somebody's name, John Doe, Jill Doe,

3 and whatever other information, I don't know, whether it be

4 date of birth or --

5    MS. MORALES:  Age, date of birth, ID, I believe, yes.

6 There's other criteria.

7    THE COURT:  Okay.  And those are the same criteria

8 that an ammunition purchaser has to give to the vendor in order

9 to have the vendor run the basic check, right?

10    MS. MORALES:  For the most part, yes.

11    THE COURT:  Okay.  And so getting back to my point.

12    My point is that the real difference between the two,

13 the standard and the basic, is that, because the State has not

14 automated the basic background check, it has to send an

15 individual to go check the databases.  That's it.  That's the

16 sum total difference between the two systems.

17    MS. MORALES:  Your Honor, this is Mayra.

18    The different system -- the basic ammunition

19 eligibility check, the individual at the point that submits the

20 application has to undergo that complete background check.  So

21 an analyst has to review it.

22    Whereas, for the standard -- at that point -- or at

23 that time, which would take -- could take up to two days, three

24 days on average, again, with the caveat -- the caveat that

25 there are some that are automatically approved, and there is no

1    intervention by an actual person.

2         So the difference is, at that point, they're going

3    through the background check, whereas, with the standard

4    ammunition eligibility check, they have already gone through

5    that because they purchased the firearm in the past.

6         THE COURT:  Okay.  All right.  Now, I'm trying to make

7    sure, because I don't want to -- I don't want to miss anything.

8         So what you're saying to me is that when someone goes

9    and applies for a standard background check, the APPS system,

10   by checking these other databases, has already determined

11   whether or not that person is a prohibited person or not.

12        If that person is not a prohibited person, that

13   person's purchase of the ammunition will be approved, they pay

14   $1, and they get their box of ammunition, and they walk out the

15   door, right?

16        MS. MORALES:  If they are not prohibited in APPS and

17   have no criminal record, yes, they would be approved.

18        THE COURT:  Okay.  On the other hand, they do not have

19   an AFS record, but they do have a name, they have a date of

20   birth, they have a Social Security number, they go into the

21   vendor, they say I want to buy a box of shells, they don't have

22   an AFS record.  Because the State does not have an automated

23   system, what happens is that now, an individual goes and checks

24   these databases.  If they don't find a hit, they then get back

25   to the vendor and say the sale is approved.  If there is a hit,

1    then someone will go and check and try to figure out why

2    there's a hit when it shouldn't be; am I right?

3              MS. MORALES:  For the basic ammunition eligibility

4    check, it checks the DMV.  And then, if there is -- if -- I

5    check the DMV record -- or the DMV to make sure that there is a

6    record for that individual.  It then proceeds to conduct the

7    check against those four databases.  If there is no hits, then

8    they would be automatically approved.  If there is a hit, then

9    yes, an analyst would then review that information to determine

10   eligibility.

11             THE COURT:  And if we were doing a standard background

12   check, and there was a hit, then the APPS system would show the

13   person as being an armed prohibited person, and the sale would

14   not be approved, right?

15             MS. MORALES:  Your Honor, for the standard ammunition

16   eligibility check, it would check AFS, check APPS -- check APPS

17   to see if the individual was marked as prohibited or not

18   prohibited.  If they're not prohibited, they would be approved.

19             THE COURT:  But the reason why they would be

20   prohibited is because, when APPS went and looked at the

21   databases, somewhere in one of those databases there would be a

22   hit, right?

23             MS. MORALES:  At some point in the past, yes, an

24   individual would have been in the Armed Prohibited Persons

25   System as not prohibited, something probably happened that

1   could have prohibited them, an analyst or -- requiring an

2   analyst to review the information.  The information would be

3   reviewed by the analyst, and then at that point, the individual

4   would make a determination as to whether -- if they're

5   prohibited or not prohibited, and that would be reported in

6   APPS at that point.

7             THE COURT:  And if, in fact, the person who was

8   attempting to buy the ammunition disagreed with the fact that

9   that person had been labeled a prohibited person, there would

10  be some due process provided to that individual that that

11  individual could use in order to have his or her good name

12  restored and be deemed to be a not prohibited person, right?

13            MR. RICHARDS:  Your Honor, this is Nelson Richards.

14            I believe that's the question that you asked near the

15  outset of the hearing.

16            THE COURT:  Yes, I know.

17            MR. RICHARDS:  Yes.

18            THE COURT:  Yes, it is.  But I'm trying to walk my way

19  through this, Mr. Richards, and I'm just trying to make sure

20  that I haven't missed something.  So I just wanted to make sure

21  that that was accurate and correct.

22            Okay, listen.  I mean, let me check my notes.  I think

23  I am pretty well done in more ways than one, if you know what I

24  mean.  Just a minute.

25            (Pause in the proceedings)

1              THE COURT:  All right.  So let me ask, does plaintiff

2    have any comments or anything that I should consider or hear?

3              MR. BRADY:  This is Sean Brady, Your Honor, for the

4    plaintiffs.

5              We've covered a lot of material, and I just want to

6    point out, you know, rather than make points on each thing we

7    went over, because we've been here for a while and I don't want

8    to take up everybody's time, unless Your Honor wants my

9    additional thoughts on specifics, but I think that a couple of

10   key points that have been made here, that the fact that the

11   Court has this many questions about this system that operates

12   as a gatekeeper to a fundamental right, I think, is, in and of

13   itself, evidence that this system should not be able to stand

14   as is.

15             It is either a dying storage system, or it's the best

16   the State can do, and in either case, it should not be allowed

17   to operate as a fundamental right -- or as the gatekeeper to a

18   fundamental right.

19             And I understand Your Honor wanting to, and I

20   appreciate Your Honor wanting to get everything squared away,

21   get all the facts right, but I think, based on just the fact

22   that the State can't answer some of the Court's legitimate

23   questions because the system is so confusing, and that there is

24   no -- there is no guidance for individuals, admittedly, I

25   believe.  I don't want to put words in Ms. Morales' mouth, but

59

 1   essentially, those who are rejected are left to their own

 2   devices to determine how best to chart their course to getting

 3   their ammunition.

 4          And the numbers that we have not gone over, that are

 5   extremely telling, is that the majority of people who are

 6   rejected -- not denied, because -- as being prohibited, but

 7   rejected because they have some trivial issue with their

 8   records that the DOJ keeps, the majority of those people have

 9   not gone back to acquire ammunition.

10          That means there is an over 50 percent -- and this is

11   since July.  This is a six-month -- it's just from July to

12   January -- over a six-month period, there are still over a

13   50 percent attrition rate of those people who are trying to

14   exercise their fundamental right.

15          (Talking over each other)

16          THE COURT:  I'm sorry.  Let me interrupt you.

17          How did you arrive at that 50 percent number?

18          MR. BRADY:  If you look at Ms. Morales' most recent

19   declaration -- let me pull it up here.  I just had it.  Oh,

20   okay.

21          So if you go to page -- it's way at the bottom.  Okay.

22   So it's page 21 of Ms. Morales' most recent declaration.

23          It says, "Purchasers who were rejected on an AFS check

24   and subsequently purchased ammunition on or before January 1st,

25   2020."  If you look in the July column, 9 -- over 9,000 people

1    that were rejected --

2             THE COURT:  Okay.  I got you.

3             MR. BRADY:  And just to be clear here.  These are

4    people who are, by definition, not prohibited people.

5    Otherwise, they would have been denied, not rejected.  These

6    are people who are entitled to exercise their fundamental right

7    and are being denied merely because of some trivial issue that

8    this system, the current system, does not specify to them how

9    to remedy.

10            It says you either don't have a record or there's an

11   issue with your record.  You go figure out -- go to our website

12   and see what may be your issue.

13            And just so we're clear on that specifically, it is my

14   understanding -- I could be wrong, but I'm 95 percent sure

15   about this -- that when you go to -- you're able to remedy any

16   discrepancies in your AFS record online by yourself --

17   right? -- if you go onto the DOJ's website, type in the number

18   they gave you, you are able to, by yourself, fix an AFS record.

19            Let's say, for example, you -- you changed addresses,

20   and you knew that that was the problem.  You could then just

21   type in your new address, and the AFS record will be fixed.

22            That said, it is my understanding that the complete

23   back record, to make the change, the individual would need to

24   have their -- their AFS record as currently shown identical to

25   how it's -- to how it's shown.  They have to know exactly what

 1   their current AFS record says, and they have to plug that in,

 2   and then they have to plug in the new updated information that

 3   they want changed.

 4          So if the person does not have their -- access to

 5   their current AFS record, then they are unable to change their

 6   AFS record without getting that, so they then would have to

 7   request a copy of their AFS record from the California

 8   Department of Justice.  I believe we have a declaration in

 9   our -- to our supplemental brief, plaintiffs do, from a

10   plaintiff who waited over four months for a response from the

11   DOJ as to what his AFS records contained.

12          I just -- I'm so -- while I appreciate the Court's

13   desire to get all the facts straight and lay this whole thing

14   out, I think just at -- at a superficial level and looking at

15   this case, six months out we are on the data, and we're now,

16   you know, nine months out from when it's been implemented, or

17   nine or ten, those facts alone, that there is no -- that

18   there's still over 10 percent of people being rejected for

19   trivial reasons, and even if that was acceptable, that they are

20   getting zero guidance by the State in the system to be able

21   to -- to remedy their situation.

22          And that is demonstrated by the over 50 percent of

23   people who end up just giving up on their fundamental right.

24   That, I think, says enough that this system, as currently

25   constituted, needs to be enjoined now, respectfully.

1          And while the Court -- while the State can go and

2     answer the Court's questions about alternative ways to do this

3     that are less burdensome or -- or explain how somebody could

4     remedy their records and make -- change their system, they --

5     the State can then come back and petition the Court to lift

6     this injunction if this has that -- that information and can

7     make its case for that -- you know, to do that.

8          But as we sit right now, this is a broken system.  It

9     hasn't been fixed thus far.  It's not going to be fixed.  And I

10    don't -- the State should not be entitled to more time without

11    this being enjoined, especially in this environment right now

12    when municipalities are closing gun stores around the State

13    because of the COVID-19 situation.  People are unable to get

14    ammunition.

15         And so the State, on one hand, is saying don't go

16    outside.  Don't stand in line.  Don't go in groups.  But, oh,

17    you have to go to a store and sit in line and do a background

18    check.

19         And that also goes for the restriction on shipping

20    ammunition.  I think that that has now become an even more

21    severe -- because of what's going on with the COVID-19 epidemic

22    and people being homebound, and municipalities shutting down

23    gun stores, the injury caused by the shipping ban has become

24    more severe, and the need to enjoin it and, you know, join the

25    rest of the country's economy at this time, when we need

1  continuity in the economy and commerce, is even more crucial.

2          So I apologize if I went off on a rant, I just wanted

3  to make a few main points because I think they are critical in

4  understanding that plaintiffs are of the position that, even

5  with all these other questions that the Court legitimately has,

6  just the fact that more than 50 percent of people have given up

7  on their right six months out, it should be enough to condemn

8  this system as unconstitutional.  So with that, I'll answer any

9  of the Court's questions.

10          THE COURT:  Yes.  Go ahead, Mr. Richards.

11          MR. RICHARDS:  Yeah.  I think there was a lot there,

12  and I'd definitely like an opportunity to respond to it.

13  However, if you have something, I would defer to you.

14          THE COURT:  No, no.  Go ahead.

15          Make it quick, though, because I think, as Mr. Brady

16  pointed out, we've been at this for quite a while.  I'm sure my

17  reporter probably needs a break.  So --

18          MR. RICHARDS:  I will -- I will endeavor to speak

19  slowly and do it efficiently here.

20          THE COURT:  Okay, Mr. Richards.

21          MR. RICHARDS:  Again, this is Nelson Richards.  Thank

22  you, Your Honor.

23          You know, I think Mr. Brady correctly identified what

24  he just went on, which was a rant.  There is a lot of

25  unsubstantiated information there about the affects of the

1   COVID outbreak, there's no evidence in the record, plaintiffs

2   have submitted nothing about that, about people not being able

3   to get ammunition because of the outbreak.  There's just an

4   attorney testifying, so I strongly object --

5           THE COURT:  Yes.  Just a second.  Let me interrupt you

6   for just a second.

7           Just -- but don't you think that -- don't you think

8   that the Court could take judicial notice of the fact that --

9   since we are being told to shelter in place, for example?  The

10  Governor -- I think the Governor himself has requested social

11  distancing.  That's no secret.  You would agree the Governor

12  has done that, right?  You're not going to dispute that.

13          MR. RICHARDS:  Yes, I agree.

14          THE COURT:  You agree -- so you would agree that it

15  really does make sense if -- and I know, I've seen reports out

16  there.  In fact, I think the Sheriff of Los Angeles decided

17  that gun stores were not essential businesses because people

18  were showing up in gun shops and lining up outside the gun

19  shops to buy guns.

20          Now, people that have never owned guns before, I

21  think, Mr. Richards, I think the State would not be -- I think

22  it would be disingenuous for the State to argue that, at this

23  point in time, there are many, many people out there who feel

24  unsecure and unsafe, which is what's prompting them to go out

25  and buy guns, form lines outside gun stores, and to buy

1   ammunition.  I mean, you're not really going to argue with

2   that, are you?

3          MR. RICHARDS:  Your Honor, I would agree, the Court

4   can take judicial notice of the Governor's Executive Orders and

5   any special actions taken by government officials at any level

6   of the State.

7          Now, with regard to anything beyond that, I do think

8   that's well beyond the Court's ability to take judicial notice

9   under the rules of evidence.  So --

10          THE COURT:  Well, let's --

11          MR. RICHARDS:  -- with respect to (inaudible).

12          THE COURT:  But so, you know, I always tell,

13   particularly young lawyers, you know, there are things that are

14   worth fighting over and things that are not worth fighting

15   over.

16          So the State's not really going to fight with me about

17   the fact that, for example, the Sheriff in Los Angeles County

18   decided that gun shops were not essential businesses and had to

19   close down, and you're not going to fight with me about whether

20   or not people have been, in fact, lining up outside gun stores

21   to buy guns, are you, Mr. Richards?

22          MR. RICHARDS:  Your Honor, this is Nelson Richards.

23          With regard to the first question about the actions of

24   the Sheriff, no, I would not.  That would fall under the type

25   of thing I think this Court could reasonably take judicial

66

 1   notice of.

 2          Whether they're lined up by the gun stores or not, you

 3   know, I personally -- I maybe have seen a news article where

 4   that's happened.  I have no way of knowing how prevalent that

 5   is, how common that is, whether that was a one-off experience,

 6   so I personally don't know, and as a result, I can't sit here

 7   and say that it's fine for the Court to take judicial notice to

 8   consider that fact without some sort of showing.

 9          And so I definitely -- yeah, I would -- this --

10   especially to the extent that that may impact the way that the

11   ammunition law works or the ammunition law's constitutionality.

12          We're very far afield from the challenge the

13   plaintiffs have alleged in their complaint and have pursued in

14   their motion for preliminary injunction.

15          And so we're just so far afield that, in dealing with

16   evidentiary issues and considerations and arguments that just

17   haven't been briefed or raised, that that is a serious concern.

18          THE COURT:  So what about this.  What about --

19   Mr. Richards, what about this.

20          So the Governor has ordered nonessential businesses to

21   close, ordered people to engage in social distancing.

22   Certainly, as someone of -- you know, as an Officer of the

23   Court, certainly, you would not disagree with the fact that

24   people might be more inclined to buy ammunition online, given

25   that situation, rather than actually showing up face-to-face at

1    a vendor, and providing them with their driver's license, and

2    exchanging things that might possibly potentially carry with it

3    the coronavirus.  You're not going to disagree with that, are

4    you, Mr. Richards?

5         MR. RICHARDS:  I personally, as a -- you know, may not

6    disagree with that, however, I would strongly object to that

7    being a basis for issuing a preliminary injunction with regard

8    to this law.

9         I mean, whether people feel that way or don't feel

10   that way I don't think should --

11        THE COURT:  No.

12        MR. RICHARDS:  -- affect whether this Court issues an

13   injunction.

14        THE COURT:  Here's my problem with that -- and I'm

15   just going to tell you, I'm going to do what I'm going to do.

16        But, you know, I read the initiative -- when I read

17   the initiative, one of the preambles to the initiative is that

18   we're going to enact, "common sense gun laws".

19        Now, "common sense gun laws" is a term that carries

20   with it no evidentiary weight whatsoever.  None.  It's a fancy

21   phrase that is used in order to justify doing whatever the

22   State is asking to do.  Whether or not that passes muster, I

23   don't know.

24        But all I'm getting at is, so if somehow or another

25   the State is able to use "common sense" to arrive at some of

1   the things that its legislates, explain to me why,

2   Mr. Richards, it is not common sense for me to understand that

3   if the Governor has told people to shelter in place, that gun

4   stores should be closed, and that we have to maintain the

5   social distance, and that in order for me to buy ammo, when I

6   go into a store, in order to get my purchase approved, I have

7   to hand a driver's license, or a passport, or something to the

8   individual, who then has to handle it, who then has to do

9   something with it, who then has to hand it back to me, and that

10  there is a great potential for -- if one of us has the virus,

11  for that to be transmitted, I don't understand why you would

12  want to argue with that.  I mean, it just seems like -- I mean,

13  common sense is common sense.

14          Anyway, whatever.  I appreciate it.  Listen.  Again, I

15  thank you all for giving me your time.

16          And I would like to see authority, Mr. Richards, on

17  the State being able to preemptively amend an initiative that

18  has been passed, and approved, and represented to the people as

19  containing certain things, and then what you give with one hand

20  you take away with the other.  I'd like to see -- I mean, maybe

21  that is the law, I don't know, but I'd like to see some

22  authority for that.

23          And I'd also like to see from Ms. Morales the appeal

24  process if I apply for a standard background check and I'm

25  rejected, and what the appeal process is if it says, for

69

 1   example, that I am an armed prohibited person, but I'm not.

 2            And I don't want to just yield to the State because it

 3   is the State, I want to exercise my rights, I want to know what

 4   that appeal process is, where do I find it, and I'd like for --

 5   Mr. Richards, for you to provide that information to me within

 6   the next seven days.  Okay?

 7            Again, I thank you all for giving me your time.

 8            Ms. Morales, I really appreciate your declarations.

 9   They're very helpful in helping me get through some of these

10   issues.

11            And with that, this hearing is concluded.  Thank you.

12            MR. RICHARDS:  Your Honor, this is Nelson Richards, if

13   I may.

14            While I appreciate the Court giving us the opportunity

15   to provide this additional information, given everything that's

16   going on, seven days is going to be a very tight turnaround.

17            Ms. Morales might be the person that we rely on here,

18   but we may need to consult with other staff who may or may not

19   be essential, may or may not be in the office.

20            I personally am not working from the office.  I'm on

21   an altered schedule because of child care issues.  It's going

22   to make doing it in seven days very difficult.

23            So I'd respectfully ask for at least two weeks on that

24   just because, you know, this is in addition to other work

25   obligations, including a Fifth Circuit brief and a couple of

1    State court appellate briefs, as well.

2              THE COURT:  We're going to split the difference.  I'll

3    give you ten days.

4              MR. RICHARDS:  Thank you, Your Honor.

5              THE COURT:  Ten days from now, 5:00 p.m.

6              All right?  Great.  Thank you.

7              All right.  This hearing is concluded.  Thank you.

8                    (Proceedings conclude at 3:15 p.m.)

9                              -o0o-

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            C E R T I F I C A T I O N

2

3            I hereby certify that I am a duly appointed,

4    qualified and acting official Court Reporter for the United

5    States District Court; that the foregoing is a true and correct

6    transcript of the proceedings had in the aforementioned cause;

7    that said transcript is a true and correct transcription of my

8    stenographic notes; and that the format used herein complies

9    with rules and requirements of the United States Judicial

10   Conference.

11   Dated:  April 6, 2020, at San Diego, California.

12

13

14

15

16                      /s/ Ellen L. Simone

17                      _____
                         Ellen L. Simone, RMR, CRR
18                       Official Court Reporter

19

20

21

22

23

24

25