1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT

8

SOUTHERN DISTRICT OF CALIFORNIA

9

10

KIM RHODE, et al.,

Case No.: 18-cv-802-BEN

11

Plaintiffs,

12

v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California,

ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

13

14

Defendant.

15

16

The experiment has been tried.   The casualties have been counted.

17

18

California's new ammunition background check law misfires and the Second

19

Amendment rights of California citizens have been gravely injured.   In this action,

20

Plaintiffs seek a preliminary injunction enjoining California's onerous and

21

22

convoluted new laws requiring ammunition purchase background checks and

23

implementing ammunition anti-importation laws.   For the reasons that follow, the

24

motion for preliminary injunction is granted.

25

26

1

27

28

The purported state interest to be achieved by these new laws is keeping ammunition out of the hands of prohibited Californians.   These new laws are constitutionally defective for several reasons.   *First*, criminals, tyrants, and terrorists don't do background checks.   The background check experiment defies common sense while unduly and severely burdening the Second Amendment rights of every responsible, gun-owning citizen desiring to lawfully buy ammunition.   *Second*, the implementing regulations systematically prohibit or deter an untold number of law-abiding California citizen-residents from undergoing the required background checks.   *Third*, in the seven months since implementation, the standard background check rejected citizen-residents who are not prohibited persons approximately 16.4 % of the time.   *Fourth*, the ammunition anti-importation laws directly violate the federal dormant Commerce Clause.

## I.   BACKGROUND

For the last 170 years, California citizens were able to purchase wanted or needed ammunition without background checks.   They could order ammunition over the internet and from vendors outside the state.   Today, the first state in the nation to do so, California extends the idea of firearm background checks to

ammunition purchasers.[1] [2] In other words, every time a person wants to buy ammunition legally, a licensed ammunition dealer must first conduct a California Department of Justice background check in a face-to-face transaction.   No doubt, to prevent gun crime by preventing felons and other prohibited persons from acquiring ammunition is a laudable goal.[3] But there is little evidence that pre-purchase

_____

[1] "Ammunition control is the next frontier in U.S. gun control policy."   Brendan J. Healey, *Plugging the Bullet Holes in U.S. Gun Law: An Ammunition-Based Proposal for Tightening Gun Control*, 32 J. Marshall L. Rev. 1 (1998).

[2] New York was the first state to enact a comprehensive ammunition background check system, but the system has yet to be implemented.   James B. Jacobs and Zoe A. Fuhr, *Universal Background Checking – New York's SAFE Act*, 79 Albany L. Rev. 1327, 1345 (2016).   Unlike California's goal of stopping prohibited persons from buying ammunition, New York's law was intended to identify mass shooters.   The Governor of New York argued that ammunition background checking would enable police to monitor high-volume ammunition transactions to prevent mass killings.   *Id.* at 1345-46.   However, constructing the New York system proved unworkable.   In 2015, the Governor suspended efforts to implement the background check provisions.   *Id.* at 1350.   The requirement that ammunition purchases be conducted in a face-to-face transaction is the only part of New York's SAFE Act currently in force.   *Id.* at 1352.   Not surprisingly, "the law is pushing out-of-state [ammunition vendor] competitors from the New York market," just like the California law has pushed out-of-state vendors from the California market.

[3] While the goal is laudable, choking off ammunition as a means to that end is constitutionally offensive.   The notion of reducing gun crime by controlling ammunition purchases can be traced back to at least 1993.   That year, United States Senator Daniel P. Moynihan introduced a series of bills to strictly regulate the sale of handgun ammunition.   Scott D. Dailard, *The Role of Ammunition in a Balanced*

3

ammunition background checking will accomplish the goal and the burden it places on the Constitutional rights of law-abiding firearm owners is profound. Furthermore, compared to the discouraging effect on criminals, the laws have a severely disproportionate effect on law-abiding citizen-residents.   As one commentator put it, "in the end, the [Safety for All] Act will have a much more profound effect on law-abiding citizens than it will on criminals or the mentally ill. While an average Californian would not risk breaking the law to purchase illegal ammunition, criminals and mentally ill individuals planning mass-shootings would be much more likely to do so."   Forrest Brown, *The Wild West: Application of the Second Amendment's Individual Right to California Firearm Legislation*, 92 S. Cal. L. Rev. 1203, 1231 (2019).

_____

*Program of Gun Control: A Critique of Moynihan Bullet Bills*, 20 J. Legis. 19 (1994).   Moynihan contended that society is so saturated with guns that gun crime would continue even if all firearm sales were halted, so instead he imagined a nation of empty guns.

The Senator's solution was the constitutionally offensive means of depleting stores of ammunition through government regulation.   "[C]ommerce in ammunition is readily amenable to legislative controls – bullets can be banned or taxed into obsolescence."   *Id.* at 22.   Because he estimated there exists only a four-year supply of ammunition in factory, commercial, or household inventories, Moynihan envisioned "the regulatory end in view [would be] a nation of empty guns . . . ." *Id.*

4

A ballot initiative known as Proposition 63 (the "Safety for All Act of 2016") (a misnomer), amended California's Penal Code to regulate the purchase of all firearm ammunition.[4]   Ammunition sales, deliveries, or transfers in California must now be conducted by a state-licensed ammunition vendor in a face-to-face transaction.   Cal. Penal Code § 30312(a)-(b).   A California resident who seeks to buy firearm ammunition must first pay for and pass an electronic background check each time he or she wishes to make a purchase.   And a resident may not purchase

_____

[4]  According to the Attorney General, the legislature enacted Senate Bill 1235 ("SB 1235") in July 2016 prior to the November 2016 general election at which Proposition 63 was passed by the electorate.   SB 1235 *prospectively amended* aspects of Proposition 63.   Def.'s Opp'n, Doc. 34, at n.1.   The result is a curious and complicated patchwork quilt of new Penal Code provisions covering ammunition sales, purchases, and background checks.

Some provisions spring from SB 1235; others flow from Proposition 63.   For example, SB 1235 § 19(a) anticipated the passage of Proposition 63 with the following language: "Sections 12, 15, and 16 of this act shall only become operative if the Safety for All Act of 2016 is enacted by the voters at the November 8, 2016, statewide general election and becomes effective, in which case Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, and 14 shall not become operative."   Proposition 63 § 13 also anticipated amendments to the voter-approved provisions with the following language: "The provisions of this measure may be amended by a vote of 55 percent of the members of each house of the Legislature and signed by the Governor so long as such amendments are consistent with and further the intent of this Act."   While it is not clear whether SB 1235 pre-amended Proposition 63, as a matter of state law, it makes no difference at this juncture because constitutional defects appear throughout both packages.   However, the issue may need to be addressed more thoroughly at some point.

from vendors outside of California, whether in person or through an internet transaction, unless the ammunition is delivered directly to a California-licensed ammunition vendor, whereupon the resident must then pay for and pass the background check in a face-to-face transaction.   *Id.*; § 30314.   Of course, the right to keep and bear arms is not unlimited.   Some laws imposing conditions and qualifications on the commercial sale of guns and ammunition do not infringe on Second Amendment rights.   One example of a permissible regulation is a law requiring stores to display ammunition beyond the reach of customers. Nevertheless, the Second Amendment is not a "loophole" that needs to be closed. *See* Proposition 63, § 3 describing various Second Amendment freedoms as loopholes, at ¶5 ("Although California has led the nation in gun safety laws, those laws still have loopholes…. We can close these loopholes."); at ¶6 (re: no background checks for sales of ammunition: "We should close that loophole."); at ¶12 (re: possessing magazine holding more than 10 rounds: "We should close that loophole.");   Def.'s Opp'n to Pls.' Mot. for Prelim. Inj., Doc. 34, at 5 ("Loopholes in the State's gun safety laws permitted violent felons and other persons prohibited from possessing firearms and ammunition to perpetuate gun violence."); *id.* ("Prop. 63 amended the California Penal Code to close the loophole…").

### A.   The Main Gate and Four Doors

Proposition 63 has constructed an unnecessarily complicated maze that all ammunition purchasers must navigate.   Metaphorically, all ammunition to be bought or sold must be kept in the back storeroom of a licensed ammunition vendor. In order to be admitted to the storeroom to buy ammunition, a California resident must first pass through a main gate.   The main gate requires proving citizenship. Proceeding through the gateway, the California resident is then presented with a choice of four doors.   Each door is a different kind of background check and each doorway leads to the back storeroom[5].   Door No. 1 is the "Standard" background check.   It is supposed to be quick and costs one dollar but it is only for people who have previously bought a firearm through a California licensed firearm dealer or

_____

[5] The original version of Proposition 63, which is the version the voters were presented with and voted on, takes a different approach to ammunition purchases. The original version provided for a four-year ammunition authorization card based on a single background check.   *See* Def.'s Resp. to Court's Apr. 1, 2020 Inquiry, Doc. 58, at 5 ("SB 1235's primary change to Prop. 63 relates to Penal Code section 30370.   Under Prop. 63, Penal Code section 30370 authorized the Department to issue "ammunition purchase authorizations" that would last four years, subject to revocation, if the holder became prohibited.   Prop. 63 § 8.15. SB 1235 repealed that provision and added a new Penal Code section 30370 that established the current, point-of-sale background check process.   *See* 2016 Cal. Stat., ch. 55, §§ 15, 16.").

who have registered a firearm.   Most try this door first.   Door No. 2 is a "Basic"

background check.   It is slow and costs $19.   Anyone can try this door and many

do.   Door No. 3 is a Certificate of Eligibility Verification check.   It is quick and

cheap, but it is only for those who have already gone through a long, expensive, and

arduous process of obtaining a Certificate of Eligibility or "C.O.E."   Door No. 4

leads to the new firearms showroom.   Here, a person purchases a firearm and

submits to an expensive and slow full background check conducted through federal

and state databases.   If the Californian passes the Door No. 4 background check, she

may also be admitted to the ammunition storeroom after the statutory ten-day

cooling off period.   Though based on complete database searches and live analyst

reviews, background checks for Doors No. 2 and No. 4, are good for one purchase

only—just like a Door No. 1 check.   Each of these passageways will be described in

more detail.

**B.  The Main Gate**

Between July 1, 2019 and January 31, 2020, almost 640,000 resident citizens

of California were admitted through the main gate and tried one of the four doors to

buy ammunition.   Ironically, while the State now requires background checks for

8

everyone, at the same time, it has adopted a regulation which is preventing many from starting the background test.

Before a person can go through the main gate and start a background test, he or she must prove citizenship.   By itself, a standard California driver's license or identification card is not good enough to prove citizenship.   If a person is relying on only his driver's license to buy ammunition, he needs a new California REAL ID-compliant driver's license ("DL") or identification card ("ID").   Obtaining a REAL-ID card from the Department of Motor Vehicles requires more proof of citizenship than the standard California card.   California made two important changes to its DL and ID in 2018.   In January 2018, California began issuing REAL IDs to qualified residents.   Def.'s Opp'n, Doc. 34, at 8.   At the same time, standard California DLs and IDs started being labeled with a phrase, "Federal Limits Apply" ("FLA") in the right corner.   The FLA label distinguishes standard California DLs and IDs from REAL ID-compliant cards.   All of this would be beside the point if it were not for two more California choices.

One California choice complicating the picture is a 2013 state law known as AB 60.   Among other things, AB 60 directed the Department of Motor Vehicles to issue California DLs to aliens who may be unlawfully present in the United States

9

and reside in California.   The California DMV began issuing AB 60 DLs in 2015. First Morales Declaration, Doc. 34-1, at ¶36.   AB 60 DLs are also labeled with the phrase "Federal Limits Apply" and *look exactly like* the standard DLs and IDs now issued to California's U.S. Citizen-residents.   *Id.* at ¶¶37-39 ("For those applicants with 'FEDERAL LIMITS APPLY' licenses issued after January 22, 2018, however, there is no practical way to determine from the face of the license whether the applicant is an AB 60 license holder.").   To emphasize the point, all standard California driver's licenses now look exactly the same, whether issued to a citizen resident or to an unlawfully present alien.

Here is the rub.   Without additional proof of citizenship, everyone who wants to buy ammunition with a standard California DL is rejected at the main gate because a person who presents a standard California DL at the main gate may be either a U.S. Citizen or an unlawfully-present alien.   The first person has a federal constitutional right to possess a firearm and buy ammunition.   The other person commits a federal crime by possessing either a firearm or ammunition.[6]   This

---

[6] *See* 18 U.S.C. § 922(g)(5)(A) ("It shall be unlawful for any person—who, being an alien—is illegally or unlawfully in the United States. . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or

10

identification confusion is likely a large problem affecting perhaps as many as 12 million California residents.[7]

California's decision to require proof of citizenship places heavy burdens on law-abiding citizens.   Today, a United States Citizen who has *only* a standard California-issued DL or ID will not qualify to take the first step in purchasing ammunition, *i.e.*, the ammunition background check.[8]   *That citizen is completely*

_____

transported in interstate or foreign commerce."). *United States v. Torres*, 911 F.3d 1253 (9th Cir. 2019) (The firearm and ammunition "prohibition applies only to those who are present in the United States 'illegally or unlawfully.'")

[7] Neither party attempts to quantify the problem.   According to the California Department of Motor Vehicles ("DMV") website, California residents number approximately 40 million.   Approximately 30 million persons have been issued DLs or IDs.  *See* www.dmv.ca.gov/portal/dmv/detail/pubs/media_center/statistics (California DMV Statistics as of January 1, 2019) (.pdf file).   Assuming these DLs and IDs expire every five years, one-fifth of the licensed population (or six million individuals) renew every year.   Since the standard DL that looks identical to the AB 60 DL began issuing two years ago, as many as 12,000,000 citizen residents may carry the ambiguous identity card.
    Unknown is the number of citizen residents who have not qualified for a REAL ID card or are otherwise content to carry a standard DL.   Also unknown is the number of unlawfully present aliens who have been issued an AB 60 card.   According to California's DMV website, by April 4, 2018, AB 60 DLs totaled **1,001,000.**  (*See* www.dmv.ca.gov/portal/dmv/detail/pubs/newsrel/2018/2018_30).

[8] *See* Declaration of George Dodd, Vietnam Veteran, recipient of the purple heart and bronze star, but without passport or birth certificate.   Doc. 32-16.

11

*blocked.*   To continue the metaphor, that citizen will never be admitted through the main gate.   There is no place within California where that citizen might go to buy even one round of ammunition, for anyone who sells it commits a misdemeanor. *See* Cal. Penal Code § 30312.[9]

If the citizen looks outside of California, he or she will run into the anti-importation laws.   *See* Cal. Penal Code §§ 30312, 30314, 30370, and 30385.   The California resident may try purchasing ammunition through the internet, but once again, the ammunition must first be delivered to an in-state vendor where the purchaser must qualify to pass through the main gate before choosing one of the four background check doors.   Cal. Penal Code § 30312(b).   Without some additional proof of citizenship, *that citizen is completely blocked*.   The California resident may personally travel outside of California and buy ammunition, but that person also

_____

[9] The law does provide an exception for ammunition purchased at a commercial target range, but the ammunition must not leave the range.   Cal. Penal Code § 30312(c)(9).   There is also an exception for purchasing ammunition from a spouse, registered domestic partner, or immediate family member. Cal. Penal Code § 30312(c)(10).   However, without a spouse, partner, or family member to buy from, there is nowhere in California one may go to buy ammunition for defense of self, defense of family, defense of property, use in a militia, hunting, or recreational shooting.

12

commits a crime by bringing ammunition back into California, even if the purpose is only for home defense.   Cal. Penal Code § 30314 (c).   As in the other cases, to obey the law he or she must first have the ammunition physically delivered to an in-state vendor for the ammunition purchase check, and that requires first being admitted through the main gate.   Cal. Penal Code § 30314(a).   All of this goes far beyond fine tuning a regulation on the commercial sales of ammunition.

Why the unnecessary complication over qualifying for a background check? Espousing a state interest in preventing unlawfully-present aliens from acquiring ammunition in violation of *federal law*, California's Department of Justice has made a choice.   Def.'s Opp'n, Doc. 34, at 20 ("*[T]he purpose and effect of the identification requirements is to prevent persons without lawful presence from purchasing ammunition (or firearms) in violation of federal law.*") (emphasis added).   The Attorney General cites no state statute for this choice.   The notion does not appear in the text of Proposition 63 or in SB 1235.   In fact, other California statutes require only that personal information be obtained from the magnetic strip of a DL or ID without specifying any particular type of DL or ID.[10]   As California has

_____

[10] *See* Cal. Penal Code § 30370(b), from SB 1235 § 15 (effective July 1, 2019) ("To determine if the purchaser or transferee is eligible to purchase or possess

13

declared itself a "sanctuary" state, it is not immediately clear what state or local

officials would or could do if they did discover an alien unlawfully present

attempting to acquire ammunition.[11]

_____

ammunition pursuant to paragraph (1) of subdivision (a), the department shall cross-reference the ammunition purchaser's or transferee's name, date of birth, current address, and *driver's license* or other government identification number, as described in Section 28180, with the information maintained in the AFS.   If the purchaser's or transferee's information does not match an AFS entry, the transaction shall be denied.") (emphasis added); Cal. Penal Code § 28180 ("The purchaser's name, date of birth, and *driver's license* or identification number shall be obtained electronically from the magnetic strip on the purchaser's *driver's license* or identification and shall not be supplied by any other means, except as authorized by the department.") (emphasis added).

Penal Code Section § 30352(c) requires an ammunition vendor to require "bona fide evidence of identity" prior to delivering ammunition to a person authorized to purchase.   Cal. Penal Code § 16300, in turn, defines "bona fide evidence of identity" as including a *motor vehicle operator's license* and a state identification card.   Section 16300 does not distinguish between standard DLs and IDs and AB 60 DLs or IDs.   It appears that the Real ID/citizenship requirement springs from nothing more than the recently approved implementing regulation (11 Cal. Code Reg. § 4045.1).

[11] When state and local law enforcement officers objected to being dragooned into federal service to carry out background checks of handgun purchasers under the Brady Act, the Supreme Court decided that, "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program [and] [t]he mandatory obligation imposed on CLEOs [chief local law enforcement officers] to perform background checks on prospective handgun purchasers plainly runs afoul of that rule."   *Printz v. United States*, 521 U.S. 898, 933 (1997).   Under the separation of powers doctrine, state law enforcement officers need not help the federal

14

To be clear, as stated before, it is a laudable goal to keep ammunition out of the possession of aliens illegally or unlawfully present.   But the State offers no evidence of an unlawful alien-in-possession-of-ammunition crime problem.   It almost seems like a pretext for further handcuffing Second Amendment rights. Why does California assume that all ammunition purchasers are unlawfully present aliens until proven otherwise?   Other constitutional rights are not treated this way. For example, the First Amendment protects a citizen's right to contribute money to a political candidate while aliens are prohibited from doing the same.[12]   Yet, federal

_____

government enforce the federal law criminalizing the possession of ammunition by an alien in the country unlawfully.

Beyond that, the State and several California counties have declared themselves to be sanctuaries for aliens unlawfully within their jurisdictions.   *See e.g.* Calif. SB 54, Cal. Govt. Code § 7284 ("The California Values Act"); Cal. Govt. Code § 7284.6 (a)(1)(A) ("California law enforcement agencies shall not: Use agency or department moneys or personnel to investigate, interrogate, detain, detect, or arrest persons for immigration enforcement purposes, including the following: Inquiring into an individual's immigration status.").   Consequently, the Attorney General's explanation that the State desires to prevent unlawfully present aliens from violating federal ammunition possession laws sounds off-key.

[12] Title 52 U.S.C. § 30121 (**"**It shall be unlawful for (1) a foreign national, directly or indirectly, to make (A) a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election.").

election laws do not require a political donor to prove U.S. citizenship as a pre-condition to making campaign contributions.   Enforcing ammunition possession laws against aliens can be done like election laws, if and when a crime is committed.

With a REAL ID,[13] a Californian may pass though the main gate and pick one of the four doors.   Without a REAL ID in hand, a person must present a U.S. Passport or a certified birth certificate *along with* their standard California DL. Unfortunately, neither a birth certificate nor a passport are obtained quickly or inexpensively.   According to Plaintiffs, to obtain a U.S. Passport, one born in the United States must generally provide a U.S. birth certificate and pay fees of at least

_____

[13] The process of applying for a REAL ID-compliant card and the documents required are set forth in Cal. Code Regs. tit.13, § 1700, *et seq.*   One of the documents is a certified birth certificate.   With the correct documents she must visit an office of the California Department of Motor Vehicles to apply for the REAL ID. Unfortunately, all DMV field offices were closed on March 27, 2020 with no date for re-opening due to the California State of Emergency arising from the covid-19 pandemic.   When the day comes that a resident is able to successfully apply, the Department of Motor Vehicles will *mail* the REAL ID-compliant card to the person's verified residence.   There is no evidence in the record as to how long the process requires.   Suffice it to say, even if one spends the time in line at an open DMV office and possesses the requisite U.S. Passport or certified birth certificate and two documents proving residence, it takes much longer than one day.

16

$145 and wait approximately six to eight weeks.   Plaintiffs's Memo of Ps & As, Doc. 32-1, at 10.   Of course, many citizens are content to live their entire lives within the United States and have no need to obtain a passport.   The alternative is a certified copy of a state birth certificate.   If a person does not possess a certified copy of their birth certificate, according to the Plaintiffs, obtaining a copy will require a search costing up to $34 and taking up to 22 weeks.   *Id*. at 10-11 and n. 8. According to the California Department of Public Health – Vital Records website, obtaining a certified copy of a California birth certificate may take between 3.5 weeks and 7.5 weeks.[14]   If a person needs ammunition soon, neither option is good. Yet, there is no other way around the requirement.   The Attorney General does not share the concern.   He says, "presenting an approved form of additional documentation, such as a passport, is an easy cure."   Def.'s Opp'n, Doc. 34, at 20.

Unfortunately, some law-abiding responsible citizen residents, who have a constitutional right to purchase ammunition, might never qualify to pass through the main gate (*i.e.*, undergo a background check).   Consider the case of Vietnam War Veteran, George Dodd.   *See* Declaration of G. Dodd, Doc. 32-16.   Dodd is an

_____

[14] Https://www.cdph.ca.gov/Programs/CHSI/Pages/Vital-Records-Obtaining-Certified-Copies-of-Birth-Records.aspx.

17

honorably retired member of the U.S. Navy.   Recipient of the Bronze Star and Purple Heart, Dodd is a U.S. Citizen and 40-year resident of California.   He has a California standard ID with the Federal Limits Apply notation.   He does not have a REAL ID-compliant ID and he cannot obtain one.   Dodd was adopted at a young age and does not know his biological father's full name, consequently he cannot easily obtain his birth certificate.   Without a certified copy of his birth certificate, he is unable to obtain a U.S. Passport.   Without a birth certificate or a passport, Dodd cannot obtain a California issued REAL ID card.   Without the REAL ID-compliant DL or ID, Dodd must have a birth certificate or passport to qualify to undergo an ammunition background check.   How does one quantify the burden on Dodd's constitutional rights?   Is it a complete ban?   A lesser but still severe burden?   A severe burden tempered by mechanisms which can hypothetically overcome the barriers to acquiring ammunition?

### C.  Door No. 1

Of the approximately 40 million residents of California, 640,000 citizens who wanted to buy ammunition somehow made it through the main gate.   Of those, 616,257 citizens chose Door No. 1 and underwent a "Standard" background check. It is an electronic Automated Firearms System ("AFS') check cross-checked by the

18

Armed Prohibited Persons System ("APPS") list.   With the Standard background check, there were 188 would-be purchasers identified as "prohibited persons" (felons, fugitives, violent misdemeanants, etc.) and denied authorization to purchase ammunition.   *See* Third Morales Declaration, Doc. 53, at ¶22.   These are the people the new laws are designed to stop.   Unfortunately, the Standard background check also rejected 101,047 other law-abiding citizen residents that the laws were not designed to stop.   Later analysis reveals the rejections were either because the State has no record of gun ownership or because of identifier mismatches.   To put this in perspective, 16% of those who established their citizenship were rejected and prevented from lawfully exercising their Constitutional right.   By comparison, .030% of those who made it through the main gate were found to be prohibited persons.

According to the State, at Door No. 1 "an AFS Check allows a person who owns a firearm and who has an entry in the State's Automated Firearms System to use that entry to establish their eligibility to purchase ammunition."[15]   More often than not the system works.   But what happens to a law-abiding citizen who goes to

————————————————

[15] First Supplemental Morales Declaration, Doc. 42, at ¶19.

19

buy ammunition but is rejected by the Standard AFS background check?   (Warning: the following description of background check obstacles will be dreadfully boring and convoluted.)   As previously mentioned, resident citizens faced that question 101,047 times in the seven months following the new law and the first hurdle they faced is *discovering the reason for the rejection*.

Since these are citizens and are not prohibited persons, why are they being blocked from purchasing ammunition – a constitutional right that should be protected by the Second Amendment?   The would-be ammunition purchaser is not informed of the reason for rejection.[16]   Instead of a reason, a person is given a 15-digit number and a government website address for the California Firearms Application Reporting System (CFARS).[17]   The rejected citizen must then go to that

_____

[16] During the preliminary injunction hearing the following colloquy took place:
   **The Court**:  *Are they told that?  . . .  Are the people given information?   Is there a disclosure telling them, "Okay. this is why you were rejected.   This is how you can fix it?"*
   **Deputy Attorney General:**  *As part of the process, you will – someone undergoing a background check will get a number that they can . . . log onto the CFARS system and look at the reason for the rejection.*
Tr. at 86:6-14.

[17] CFARS Guest User Ammunition Eligibility Check Status and Information page: cfars.doj.ca.gov/ammoBGCheckStatusSearch!displayAmmoBgCheckScreen.do

website to discover the reason for rejection.   Of course, this requires the person have access to a computer and the internet.   The State says that the most common reason a person is rejected is a mis-match of addresses.   Address mis-matches caused about 38% of the rejections.[18]   The second most common reason for a rejection accounting for about 26% of all rejections is that the purchaser did not have an AFS record.[19]   The AFS database is a record of firearm transfers, but it is limited to shotguns and rifles purchased since 2014 and handguns purchased mostly since 1990.   Thus, a person may lawfully own a firearm and have no AFS entry.

Some may be able to remedy whatever is causing the AFS rejection by creating an online account and submitting changes.   If a buyer has an inaccurate AFS record, the process for correcting a person's firearm record entails the following:

> Purchasers who are rejected on a Standard Ammunition Eligibility Check have the ability to electronically update one or more Automated Firearms System records through the California Firearms Application

_____

[18] Third Morales Declaration, Doc. 53, at ¶39.

[19] *Id.* at ¶40.   Approximately 17% were rejected because there was a mismatch for their name, although the date of birth, residential address and ID number did match. The remaining 18% of rejections were for other combinations of mismatched identifiers.

21

Reporting System, which is available on the Department's website at: https://cfars.doj.ca.gov.   People wishing to correct their records will need to create a California Firearms Application Reporting System account (if they do not already have one), log in, select the "Automated Firearm System Personal Information Update" link, and then enter their current personal information, firearm information, and personal information at time of firearm purchase.

First Morales Declaration, Doc. 34-1, at ¶20.   Even after doing all of this,

identifying the specific reason for rejection or the particular mismatched data is not

easy.   In October, a member of Plaintiff California Rifle & Pistol Association

(CRPA), was rejected by a Standard (AFS) background check.[20]   Visiting the

CFARS website to learn the reason for his rejection, he learned only the following:

"You have been rejected for one of the following reasons: 1) you do not have an

AFS record or 2) the information you provided to the ammunition vendor does not

match the AFS record that is on file."[21]   This is not a particularly informative

response.   If a person knows she purchased a firearm through a California licensed

vendor recently enough to create an AFS entry, a rejected ammunition purchaser

will have to compare her AFS information (*i.e.*, the information she provided at the

_____

[20] Declaration of Nandu Ionescu, Doc. 46-4.

[21] *Id.* at ¶ 4.

22

time she purchased her firearm) to her current information.   Hopefully, she saved her copy of the Dealer Record of Sale ("DROS") from the time of her firearm purchase.   (It is not at all clear what happens in the AFS database if a person has made several firearm purchases at different times with different addresses or name changes.)   Of course, this is a useless exercise without a firearm purchase in the State's database.   According to the State, "[b]y definition an AFS Check will work only for those who have an AFS record, and whose AFS record is up to date. . . .A purchaser without an AFS record, or with an AFS record that is not current, will not be able to obtain an eligibility determination; the system will reject that submission." *See* Third Morales Declaration, Doc. 53, at ¶25.

One CRPA member had this frustrating experience trying to buy ammunition. He chose Door No. 1 but was rejected by the Standard AFS check.   Following instructions for correcting whatever was wrong with his information, the CRPA member submitted his update on the CFARS website.   Declaration of N. Ionescu, Doc. 46-4, ¶5.   Still wanting to buy ammunition, two days later he returned to an ammunition store and again submitted to a Standard background check. Although he had corrected his information, he was rejected again.   *Id*. at ¶6.   Following the second rejection, he again logged in to the CFARS website where he was offered the

23

identical reason for rejection.   *Id*. at ¶7.   Still wanting to buy ammunition, one week later the CRPA member tried again to purchase ammunition.   Unfortunately, as one might guess, he was rejected again.   *Id*. at ¶8.   The CFARS website once again offered the same general explanation for the rejection.   *Id*. at ¶9.   Nine days after the initial rejection, the California Department of Justice sent him electronic notice that the personal information update had been approved and he was finally able to pass the background check the next day.   *Id*. at ¶9-10.

According to the State, simple "address changes are systematically processed . . . once the application is submitted, and if a match is found in the Automated Firearms System, the time it takes to update one's address on the system may take less than 10 minutes, but depending on the number of pending applications, may take longer."   First Morales Declaration, Doc. 34-1, at ¶21.   Name changes, identification number changes, and date of birth changes require additional documentation to be uploaded.   *Id*. at ¶22.   The uploaded documents must then be reviewed by an analyst before the change will be validated.   "[B]ecause an analyst must validate the change, these transactions may take a few hours, but depending on Department workload, can take several days (excluding weekends) to process and

24

subsequently update the record (assuming a match is found in the Automated

Firearms System).   *Id.*

What about the person who cannot find a copy of their old DROS form?

There is a solution to that, but it is even slower and more bureaucratic:

> "[i]f a person does not know the personal information that was used at the
> time of purchase of the firearm, they can request to obtain information on all
> firearms for which they are listed as the purchaser, transferee, or owner in the
> State of California Automated Firearms System database by submitting an
> Automated Firearms System Request for Firearm Records (BOF 053)
> application to the Bureau of Firearms.   That form is available on the
> Department's website at: https://oag.ca.gov/firearms/forms.

*Id.* at ¶23.   It is not mentioned, but the form also must be signed *and notarized* and

then mailed to the Bureau of Firearms.   Once the application is received,

> the Bureau of Firearms will conduct a diligent search of the Automated
> Firearms System for their records and will provide the individual with the
> listing of their firearms records via U.S. mail.   The individual can then
> reference the listing (which notes their personal information at time of
> purchase or transfer) and use it to submit an Automated Firearm System
> Personal Information Update application to update their records.

*Id.* at ¶24.   The State does not say how long a citizen should expect to wait for this

information-by-mail process.   But if one plaintiff's experience is a gauge, it takes

more than three months.   Edward Johnson submitted his request for his firearm

records to the California Department of Justice and *it took 110 days*.   Declaration of

Edward Allen Johnson, Doc. 46-2, at ¶¶3-4.

Of note, one additional way for a resident to create for herself an AFS record for use with the Standard background check in the future is to newly register an owned firearm for which the State has no existing record.   Second Morales Declaration, Doc. 48, at ¶23.   This process places the previously unknown firearm and its owner in the State's AFS database.   Defendant has not reported whether any residents have exercised this option or how many such unregistered firearms might exist, but at least one person has tried to register a shotgun.   He started the process on September 11, 2019.   As of October 24, 2019, and after several email interactions, the State's CFARS system still showed his shotgun registration application as "in progress."   *See* Declaration of William D. Shepard (a member of CRPA) at Doc. 46-3.

**D.   Door No. 2**

The Door No. 2 option is to undergo the "Basic" background check which costs $19 and may take several days.   Def.'s Opp'n, Doc. 34, at 7.   Of the approximately 640,000 citizens who made it through the main gate, 19,599 citizens chose Door No. 2.   There, 570 would-be purchasers were identified as "prohibited persons" (felons, fugitives, violent misdemeanants, etc.) and denied ammunition. *See* Third Morales Declaration, Doc. 53, at ¶11.   These are the people the laws are

designed to stop.   Unfortunately, once again, the Basic background check also

rejected 342 other law-abiding citizen residents that the laws were not designed to

stop.   *Id.* at Table 1.1.   For those people, post-analysis revealed that no DMV

match was found for 107 and 235 were rejected due to an "incomplete history."   *Id.*

The Basic background check checks for mostly the same things as the

Standard check except that an analyst gets involved in reviewing the application.

The check is more accurate, but it takes much longer.   With the Door No. 2 Basic

background check, the person's driver's license number, name, and date of birth, is

checked against the Department of Motor Vehicles databases.   If there is a DMV

match, then the person is run through four more State databases: (1) the Automated

Criminal History Record System ("ACHS"); (2) the Mental Health Firearms

Prohibition System ("MHFPS"); (3) the California Restraining and Protective Order

System ("CARPOS"); and (4) the Wanted Persons System ("WPS").   These four

databases coincidentally are the same databases checked to maintain the APPS list of

prohibited persons which is used with the Standard Door No. 1 background check.

If there are no hits, the Door No. 2 ammunition purchase is approved quickly.

This happens approximately 25% of the time.   The other 75% of the time, a manual

review by a California Department of Justice analyst is required.   A manual review

27

can take anywhere from a few minutes to days or weeks depending on the nature of the record.   On average, the processing time for a full Basic background check in January 2020 took one day, five hours, and sixteen minutes, which is an improvement from July 2019 when it took on average three days, one hour, and 30 minutes.   In all events, a person constitutionally entitled to buy ammunition who is not quickly approved, will have to make a return trip to the same store on another day in order to acquire ammunition.   *See* Third Morales Declaration, Doc. 53, at ¶¶8-9 and Tables 1.2 and 1.3.

For reasons unexplained, a resident who passes the full $19 Basic check must do so again for each and every future ammunition purchase.   In other words, even though that person passes the Basic background check, his name does not go on the State's AFS list and the quick and cheap Standard background check remains a futile exercise.   Recall that those without guns registered in the AFS list, never succeed using Door No. 1's quick and cheap option.

**E.   Door No. 3**

The Door No. 3 option is only for those people who hold a current Certificate of Eligibility or C.O.E.   Obtaining a C.O.E. is a long and expensive process resulting in a certificate that must be periodically renewed.   A C.O.E. Verification

Check is something similar to the Standard AFS check.   It is unknown how many choose Door No. 3.

## F.   Door No. 4

Finally, the Door No. 4 option is surprising.   The State suggests that an alternative option for buying ammunition is to *purchase a new firearm*.   Second Morales Declaration, Doc. 48, at ¶14; Def.'s Opp'n, Doc. 34, at 5.   Apparently, the idea is to encourage a resident to purchase a firearm as well as ammunition.   If he or she passes the federal and state background checks and waits the mandatory ten day waiting period, he or she also qualifies to complete the purchase of ammunition.   It is unknown how many choose Door No. 4.

## G.   Three Predictions From Judicial Experience

At this point, we know that a very large number of law-abiding citizens holding Second Amendment rights have been heavily burdened in order to screen out a very small number of prohibited persons attempting to buy ammunition through legal means.   At Door No. 1, where most gun owners go, the background check system has denied citizens identified as prohibited persons 0.03% of the time (188 divided by 616,257 = 0.03%).   And not all who are denied as prohibited are truly prohibited.   Through the State's own analysis, 590 of the 770 total persons

29

denied at Door No. 1 and Door No. 2 as prohibited have been reviewed as of February 28, 2020.   Sixteen of the 590 who were denied have since been determined to be not prohibited persons at all.   Third Morales Declaration, Doc. 53, at ¶56.

Beyond the intended burdens described above, experienced judges can also predict unintended effects of the ammunition background check system and its burdens.   *One*, even more ammunition and more firearms will be bought.   Human nature and the laws of economics being what they are, law-abiding citizens will probably delay ammunition purchases, purchase very large quantities when they do, and stockpile their ammunition, rather than submitting to more frequent background checks each time to buy smaller quantities as they may have need.   While there are no numerical limits on the quantity of ammunition one may buy today, Carnac the Magnificent might easily predict that in the not-to-distant future, this will be deemed a "loophole" that the State will endeavor to close.

*Two*, criminals will go underground.   Prohibited persons who may be unaware of their status will quickly learn they are prohibited[22] and that their

_____

[22] For example, in *Rehaif v. United States*, 139 S. Ct. 2191 (2019), an alien who was illegally or unlawfully in the United States before being prosecuted may not have

30

prohibitions include being prosecuted for the felony crime of possession of

ammunition.   They will seek out illicit suppliers.[23]   Prohibited persons will avoid

_____

known that he was a "prohibited person" in one of the nine categories of 18 U.S.C. § 922(g).   He does now.
    The nine prohibiting categories are: (1) persons convicted in any court of, a crime punishable by imprisonment for a term exceeding one year (*i.e.,* a felony); (2) persons who are fugitives from justice; (3) persons who are unlawful users of or addicted to any controlled substance; (4) persons who have been adjudicated as a mental defective or who has been committed to a mental institution; (5) a person who, being an alien — (A) is illegally or unlawfully in the United States; or (B) ... has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act; (6) persons who have been discharged from the Armed Forces under dishonorable conditions; (7) a person who, having been a citizen of the United States, has renounced his citizenship; (8) a person who is subject to a court order that — (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury; or (9) persons who have been convicted in any court of a misdemeanor crime of domestic violence.   Any person who falls into one of these categories is prohibited from possessing either a firearm *or ammunition.*

[23] One study interviewed 140 inmates in Los Angeles jails for gun-related charges about their knowledge of gun and ammunition laws.   *See* Melissa Barragan, et al., *Prohibited Possessors and the Law: How Inmates in Los Angeles Jails Understand*

background checks.   Prohibited persons will find alternate sources of ammunition as they do for firearms, whether through straw purchasers, social connections, or out-of-state sellers.[24]

*Three*, future criminals will be more careful.   Persons with clean criminal histories that are planning future gun violence will obtain the ammunition they want

_____

*Firearm and Ammunition Regulations*, 3 The Russell Sage Foundation Journal of the Social Sciences (2017) 141-163.   The study found that prohibited persons had very little knowledge about ammunition restrictions or penalties.   "One of the most significant gaps in our respondents' knowledge was about ammunition laws."   *Id.* at 156.   "When it came to the punishments associated with ammunition possession . . . respondents reported both a lack of knowledge concerning ammunition law and an overall astonishment at the severity of sanctions."   *Id.* at 154.   The authors noted the lack understanding ammunition law is not surprising in that several inmates told them, "the guns they had purchased in the underground market came with ammunition, and others described the bullets as readily available in their communities."   *Id.* at 159.

[24]   Another study of Los Angeles jail inmates charged with firearms offenses found that their perception is that guns are ubiquitous, frequently recirculated, and easily available from social connections within the community.   *See* Kelsie Y. Chesnut, et al., *Not an 'Iron Pipeline', But Many Capillaries: Regulating Passive Transactions in Los Angeles' Secondary, Illegal Gun Market*, 23 Injury Prevention (2017), 226-231. "Strictly enforced regulation of Federal Firearms License holders has successfully reduced illegal access to guns in LA's primary market.   This success, however, has made the secondary market diffuse; guns are seemingly ubiquitous, and illicit access is perceived to be relatively easy."   *Id.* at 230.

32

from an illicit or out-of-state source, rather than create an electronic purchase trail

from buying their ammunition at a California-licensed ammunition vendor.

## II.   DISCUSSION

### A.   The Right to Keep and Bear Arms, U.S. Const. amend. II

In their quest to insure freedom and liberty for our country's citizens, our

Founders enshrined the Bill of Rights in our Constitution.   One intended effect of

the Bill of Rights is to protect the minority from abuse by the majority by keeping

some rights beyond the reach of majoritarian rule.   Included within the Bill of

Rights is the Second Amendment.   Citizens of the United States[25] have a

constitutional right to keep and bear firearms *and* the ammunition which makes a

firearm useful.   On this point the law is clear.   "Thus the right to possess firearms

for protection implies a corresponding right to obtain the bullets necessary to use

them."   *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)

(quotation marks omitted); *United States v. Miller*, 307 U.S. 174, 180 (1939) (in

_____

[25] "We noted that while *Heller* did not resolve who exactly possesses a Second Amendment right, the decision 'described the Second Amendment as 'protecting the right of citizens' and 'belonging to all Americans.'"   *United States v. Singh*, 924 F.3d 1030, 1056 (9th Cir. 2019) (quoting *Torres,* 911 F.3d 1253, 1259 (9th Cir. 2019) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 581, 595 (2008))).

33

both the American colonies and England, in the militia system, "[t]he possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former.").

The California background check system long term average rejection rate of 16.4% suggests that the system is seriously flawed.   For comparison, Californians purchasing firearms using the federal NICS background system fail background checks at a much lower rate of approximately 1.1%.[26]

In August, the Attorney General touted the system as a success because out of 62,000 would-be purchasers in the first month, 103 were denied because they were listed on California's prohibited-persons list (the APPS list).   Based on all types of background checks through January 2020, a total of 770 out of 635,856 have been denied as prohibited (0.12%).   Of 590 re-examined by the State so far, 16 were erroneously categorized.   Success to date measures 754 persons with felony convictions, mental health holds, certain misdemeanor convictions, or illegally present in the United States, prevented from buying new ammunition.   Considering

_____

[26] U.S. Department of Justice, Bureau of Justice Statistics, *Background Checks for Firearm Transfers, 2015 Statistical Tables,* (Nov. 2017) at Table 3.

the heavy burdens of proving citizenship saddled onto American ammunition purchasers, it is noteworthy that the State's data are silent on the number prohibited because of unlawful alien status.

Beyond the 101,047 residents who are not prohibited persons but who still failed a background check, an untold additional number of ammunition purchasers were turned away or deterred and did not even start a background check.   To use the metaphor, they did not have a Real ID or a U.S. Passport or certified birth certificate to go through the main gate and simply gave up.   How many gave up?   If it is any indication, early on at two California stores, approximately one-half of the potential ammunition customers were turned away without a background check.[27]

It is undoubtedly telling that before the background check system went into effect, the State estimated the number of ammunition purchases that would be made

_____

[27] Declaration of Travis Morgan, General Manager of Guns, Fishing and Other Stuff in Vacaville, California, at ¶11 ("Since the implementation of the new ammunition sales restrictions on July 1, 2019, GFOS has been forced to turn away approximately half of its potential customers who had a "FEDERAL LIMITS APPLY" identification and did not have the necessary supplemental documentation to establish proof of lawful U.S. presence as required."); Declaration of Daniel Gray, President and General Manager of Discount Gun Mart in San Diego, California, at ¶11 (forced to turn away half of its potential customers).

in one year.   The implications are astounding.   The California Department of Justice noted that there are currently 4.5 million people with distinct entries in the Automated Firearms System.   The State estimated that roughly 3 million of these persons would purchase ammunition approximately 4-5 times each year.   The estimate forecasts approximately 13 million ammunition transactions with Standard background checks, yearly.[28]   In reality, there have been far, far less.   In the seven months since July 1, 2019, there have been only 635,856 Standard and Basic checks.

What happened to the other 12 million projected ammunition transactions? One explanation could be that the State's estimate is far off -- not comforting when it comes to the State's predicitive judgment.   Another explanation could be that the background check laws are having incredibly chilling effects on law-abiding gun owners.   Another explanation could be that the onerous and inescapable burden these background check laws impose are forcing purchasers to find alternative, possibly illicit, sources.   Whatever the reason, of the 4.5 million California gun

_____

[28] *See Initial Statement of Reasons Addendum*, Ammunition Purchases of Transfers – Title 11, Division 5, Chapter 11, OAL File No. Z-2018-1204-08, California Department of Justice (April 23, 2019), Plaintiffs' Request for Judicial Notice, Doc. 33, Exhibit 8, at 2-3.

36

owners on the AFS list, only 14% (635,856 divided by 4,500,000) have tried to buy ammunition with a background check.   Plaintiffs say that the laws offend the Second Amendment and should be enjoined.   The Attorney General says the background check system works fine and that rejections are easy to fix.   Easily said. Nobody really knows how many law-abiding citizen residents continue to be completely blocked from buying ammunition due to the burdens and complexity of the California scheme, but the number is surely substantial.

## B.   Constitutional Analysis

The right to possess firearms includes a corresponding right to obtain ammunition.   *Jackson*, 746 F.3d at 967.   This right was respected in California until July 1, 2019.   Once a citizen's right, purchasing ammunition has now become a matter of government license and largesse.   As a result, California's gun laws have become even more complicated.   *See Peruta v. County of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (*en banc*), *cert. denied*, 2017 WL 176580 (Jun. 26, 2017) ("California has a multifaceted statutory scheme regulating firearms."); *id*. at 953 (Callahan, J., dissenting) ("The counties and California have chipped away at the Plaintiffs' right to bear arms. . . . Constitutional rights would become meaningless if states could obliterate them by enacting incrementally more burdensome restrictions

37

while arguing that a reviewing court must evaluate each restriction by itself when determining constitutionality.").   In California, the State has enacted incrementally a burdensome web of restrictions on the Second Amendment rights of law-abiding responsible gun owners.   The ammunition background check system and anti-importation laws add even more complexity, and there are more laws on the way. While this motion has been pending, the Governor has signed a raft of new "gun violence prevention" laws into existence (including a firearm precursor part background check).[29]   California already has an universal background check for

_____

[29] *See* www.gov.ca.gov/2019/10/11/governor-gavin-newsom-signs-gun-violence-prevention-legislation/.   Of the numerous bills signed into law, AB 879 is particularly interesting as it pertains to this case in that beginning July 1, 2025, anyone who desires to purchase a "firearm precursor part" will have to pass a background check similar to the ammunition background check.   That person will have to purchase the firearm precursor parts from a state-licensed firearm precursor parts vendor similar to a state-licensed ammunition vendor.   And that person may not purchase firearm precursor parts from an out-of-state vendor unless first delivered to an in-state licensed firearms precursor parts vendor and delivered in a face-to-face transaction similar to the restriction on out-of-state sales on ammunition.   *See* Assembly Bill 879, leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=201920200AB879.
   The California bills signed into law on October 11, 2019 include:
   •AB 12 extending the duration of a gun violence restraining order (GVRO) to a maximum of five years.
   •AB 61 allowing an employer, coworker, or an employee or teacher to file a petition requesting a gun violence restraining order.

1

2   •AB 164 holding any person subject to a valid restraining order, injunction, or
protective order issued out of state to the same restrictions on buying or possessing
3   firearms in California as they are under in the state where the order or injunction is
4   operative.

•AB 339 requiring law enforcement agencies to develop and adopt written
5   policies and standards regarding the use of gun violence restraining orders.

6   •AB 1493 authorizing a person who is the subject of a gun violence
7   restraining order to petition to submit a form to the court voluntarily relinquishing
their firearm rights.

8   SB 61 prohibiting the sale of a semiautomatic centerfire rifle to any person
9   under 21 years of age, and applications to purchase more than one semiautomatic
centerfire rifle in any 30-day period, with a few exceptions.

10   •SB 376 preventing individuals from selling large numbers of firearms
11   without a license by capping the number of annual sales at five transactions or 50
firearms.

12   •AB 645 requiring packaging for firearms to contain a warning statement on
13   suicide prevention.

•AB 879 requiring, starting in 2024, that the sale of firearms precursor parts
14   be conducted through a licensed firearms precursor part vendor.

15   •AB 1669 updating existing law by applying the same gun show regulations
that already apply to firearms dealers to ammunition vendors and ensures that
16   sufficient funding is available for firearm regulatory efforts.

17   •AB 1297 requiring any local authority issuing concealed firearm licenses to
18   charge an applicant a fee sufficient to cover the reasonable costs of processing,
issuing and enforcement of the license, and eliminates the existing $100 limit on
19   processing fees for concealed firearm licenses.

20   •AB 893 prohibiting the sale of firearms and ammunitions at the Del Mar
Fairgrounds in the County of San Diego, the City of Del Mar, the City of San Diego.

21   AB 1548 codifying the California State Nonprofit Security Grant Program to
22   improve the physical security of nonprofit organizations that are at high risk of
violent attacks or hate crimes due to ideology, beliefs, or mission.

23   •AB 1603 codifying the California Violence Intervention and Prevention
24   Grant Program to help reduce violence in communities that are disproportionately
impacted by violence.
25

26   39

27

28

firearms, an "assault weapon" ban, a ban on magazines holding more than 10 rounds, a gun registry, firearm confiscation orders, a minimum gun purchase age of 21 years, a limit of one firearm purchase per month, a requirement that would-be gun buyers first earn a safety certificate, a 10-day waiting period on gun purchases even for persons who already own a firearm, a ban on campus carry for self-defense, a ban on K-12 teachers being armed for self-defense, a ban on openly carrying a firearm, a highly restrictive concealed carry law, and a moribund roster of handguns permitted for retail sale, among others.   With its newest over-arching and sweeping background check system, the State completely chokes off many law-abiding responsible gun owners while burdening all citizens who want to buy ammunition. Another pesky loophole closed.

———————————————

•AB 521 requiring, with the adoption of a resolution by the University of California, the UC Firearm Violence Research Center at the University of California, Davis to develop multifaceted education and training programs for medical and mental health providers on the prevention of firearm-related injury and death.

### III.   Motion for Preliminary Injunction

Plaintiffs are a group of U.S. Citizens residing in California,[30] an association of firearm owners,[31] and several out-of-state ammunition sellers.[32]   Plaintiffs bring a facial challenge through 42 U.S.C. § 1983 seeking a declaratory judgment that

_____

[30] Plaintiff Kim Rhode is an Olympic medalist in skeet and double trap shooting with three World Championship medals.   Rhode requires specialized competition ammunition, a lot of it, for training and competing.   Gary Brennan is a hunter and volunteers his time as a Master Hunter Education Instructor under the California Department of Fish and Wildlife Hunter Education Program.   Cory Henry is a Colonel in the U.S. Army Reserve.   Edward Johnson is a volunteer range safety officer for a local firing range who regularly travels to Oregon and buys ammunition.   Scott Lindemuth is a U.S. Navy veteran of 13 years.   He resides in California and owns a residence in North Carolina.   He buys ammunition in both states.   Richard Ricks is a resident of California who owns property in Oregon.   He buys ammunition in both states.   Denise Welvang previously purchased ammunition from on-line vendors and local vendors.

[31] The California Rifle and Pistol Association, Inc, is a membership organization almost as old as the State of California.   The organization is representing tens of thousands of its California-resident members.

[32] Able's Sporting, Inc. is a Texas seller of ammunition which previously sold and shipped ammunition directly to residents of California.   AMDEP Holdings, LLC, is a Florida seller of ammunition which previously sold and shipped ammunition directly to residents of California.   R&S Firearms, Inc. is an Arizona seller of ammunition located within two miles of the California-Arizona border.   R&S Firearms previously sold ammunition in its store and through direct delivery to residents of California.

41

California Penal Code §§ 30312, 30314, 30342, 30347, 30348, 30350, 30352, 30370, 30385, 30390, and 30395, as well as California Code of Regulations, tit. 11 § 4263, are unconstitutional on their face or, alternatively, as applied to plaintiffs, because these sections violate the Second and Fourteenth Amendments to the United States Constitution.   Plaintiffs also seek a declaratory judgment that California Penal Code §§ 30312, 30314, 30352, 30363, 30370, and 30385, as well as California Code of Regulations, tit. 11 § 4263, are unconstitutional on their face because they discriminate against interstate commerce in violation of the dormant Commerce Clause, Article I, § 8 of the United States Constitution.   By this motion for preliminary injunction, Plaintiffs seek to maintain the status quo ante by enjoining the State from enforcing the ammunition background check system that went into effect on July 1, 2019 and the anti-importation laws that went into effect on January 1, 2018.

The Attorney General with his seemingly unlimited resources objects that the Plaintiffs lack standing.   But the individual plaintiffs clearly have standing because they have demonstrated a direct injury of having to undergo eligibility checks for every purchase, and beyond that, by being placed at the mercy of an imprecise, slow, and erratic system.   This is an actual injury to a legally protected interest, fairly

42

traceable to the new state statutes and it is likely that this injury will be redressed by a favorable decision.   Plaintiffs have therefore satisfied their burden of establishing standing.   *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1174 (9th Cir. 2018); *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154-55 (9th Cir. 2000).   The individual plaintiffs and the ammunition store plaintiffs have standing to challenge the anti-importation measures.   *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 687 (9th Cir. 2017) (*en banc*), *cert. denied sub nom., Teixeira v. Alameda Cty., Cal.*, 138 S. Ct. 1988 (2018) ("We emphasize that in many circumstances, there will be no need to disentangle an asserted right of retailers to sell firearms from the rights of potential firearm buyers and owners to acquire them, as the Second Amendment rights of potential customers and the interests of retailers seeking to sell to them will be aligned.   As we have noted, firearms commerce plays an essential role today in the realization of the individual right to possess firearms recognized in *Heller*.").

CRPA is a California association which meets the test for associational standing and may assert the rights of its individual members.   "Organizations can assert standing on behalf of their own members, or in their own right."   *E. Bay Sanctuary Covenant v. Trump*, 950 F.3d 1242, 1265 (9th Cir. 2020) (citations omitted); *Innovation Law*

43

*Lab v. Wolf*, 951 F.3d 1073, 1078 (9th Cir. 2020) ("The organizational plaintiffs also have Article III standing.").

Ultimately, this case asks two questions.   Is an untried, untested, sweeping ammunition background check system, that returns an unusually high percentage of rejections, a constitutionally-permissible burden to impose on the Second Amendment rights of law-abiding responsible citizens who desire to defend themselves with whatever common ammunition suits their situation?   Does a law which discriminates against ammunition sales in interstate commerce with alternative means to achieve its ends violate the dormant Commerce Clause?

Because a final decision on the merits is likely to answer both questions "yes," but a final decision will take too long to offer relief, and because the statutes visit irrevocable harm on plaintiffs and those similarly situated, a state-wide preliminary injunction is necessary and justified to maintain the status quo ante. Because Plaintiffs have demonstrated, on this preliminary record, a likelihood of success on the merits, a likelihood of irreparable harm, a balance of equities that tips in their favor, and that an injunction would be in the public interest, a preliminary injunction is justified.

44

### A.   Standard for Preliminary Injunction

The standard for issuing a preliminary injunction is well established.   A plaintiff must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest.   *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).   Both the evidence presented and the evidence that is absent is important.[33]

### 1.   Likelihood of Success on the Merits

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made clear that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table."   *Heller*, 554 U.S. at 636.   The right to bear arms includes at least the right to keep and carry ammunition for both self-defense and to be ready to serve in a militia.   *United States v. Miller*, 307 U.S. 174, 179-80 (1939) (quoting *The American Colonies in The 17th Century*, Osgood, Vol. 1, ch. XIII)

───────────────────

[33] The Court has considered all the evidence and ignored none.   The fact that the Court does not mention some evidence simply means that the Court has not found it to be credible or persuasive or that other evidence was more convincing.

1   ("The possession of arms also implied the possession of ammunition.").   Had the

2   Second Amendment not been adopted, perhaps a state could rationally decide as a

3   matter of public policy to end all ammunition sales.   But that is not the case.   A

4

5   government may not choose to implement a first-of-its-kind background check

6   system that impedes, defeats, and completely bars the acquisition of ammunition by

7

8   numerous law-abiding, responsible citizens.   That choice infringes the Second

9   Amendment.

10

11          a.   **The Second Amendment Puts Certain Policy Choices off the Table**

12

13          The Second Amendment provides that "the right of the people to keep and

14   bear arms, shall not be infringed."   U.S. Const. amend. II.   "[I]t is clear that the

15   Framers and ratifiers of the Fourteenth Amendment counted the right to keep and

16

17   bear arms among those fundamental rights necessary to our system of ordered

18   liberty."   *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010).   The right to

19   bear arms for a legal purpose is an inherent right even pre-dating and transcending

20

21   the Second Amendment.   "The right there specified is that of 'bearing arms for a

22   lawful purpose.'   This is not a right granted by the Constitution.   Neither is it in

23

24   any manner dependent upon that instrument for its existence."   *United States v.*

25   *Cruikshank*, 92 U.S. 542, 553 (1875), *overruled on other grounds, United States v.*

26                                                        46

27

28

*Miller*, 307 U.S. 174 (1939).   This right to keep and bear arms is fundamental and is incorporated against the states under the Fourteenth Amendment.   *McDonald*, 561 U.S. 742.

Some may fear that the right to keep and bear arms means citizens have a right to possess a deadly implement.   For example, there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries.   *McDonald*, 561 U.S. at 782-83 (argument of the City of Chicago).   Some citizens may live a lifetime without feeling a need to handle a firearm.   They may feel that it is safer if only police officers have guns. But a state's claim to public safety may not eviscerate a citizen's Second Amendment rights.   The right to keep and bear arms is not the only Constitutional right that has controversial public safety implications.   All the Constitutional provisions that impose restrictions on law enforcement and inhibit the prosecution of crimes fall into the same category.   *McDonald*, 561 U.S. at 783 (collecting cases where those likely guilty of a crime are set free because of constitutional rights).

The Supreme Court also recognizes that the Second Amendment guarantee includes firearms that have "some reasonable relationship to the preservation or efficiency of a well-regulated militia."   *United States v. Miller*, 307 U.S. 174, 178

47

(1939).  *Miller* implies that possession by a law-abiding citizen of a weapon and ammunition commonly owned, that could be part of the ordinary military equipment for a militia member and would contribute to the common defense, is also protected by the Second Amendment.

*Heller* and *Miller* are consistent.   *Heller* took the already expansive zone of protection for weapons that could be used by a militia and focused on the core use of firearms for defending the home.   "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon . . . . Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."  *Heller*, 128 S. Ct. at 2818.   As *McDonald* puts it,

> "[i]n *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias.   On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense.   As we put it, self-defense was 'the central component of the right itself.'"

*McDonald*, 561 U.S. at 787.   In *Caetano v. Massachusetts*, the Court underscored these two points.   One, the Second Amendment extends to common modern firearms useful for self-defense in the home.   Two, common firearms beyond just

48

those weapons useful in warfare are protected.   *See Caetano*, 136 S. Ct. 1027, 1028

(2016) (per curiam) (quoting *Heller*, 554 U.S. at 582, 624-25); *contra Kolbe v.*

*Hogan*, 849 F.3d 114, 131 (4th Cir. 2017) (weapons useful in warfare are not

protected by the Second Amendment).

### b.   Ammunition and Arms

The Second Amendment protects firearms and ammunition.   Of course, the

Second Amendment does not explicitly mention ammunition.   "Nevertheless,

without bullets, the right to bear arms would be meaningless.   A regulation

eliminating a person's ability to obtain or use ammunition could thereby make it

impossible to use firearms for their core purpose."   *Jackson*, 746 F.3d at 967.

"Thus, the right to possess firearms for protection implies a corresponding right to

obtain the bullets necessary to use them."   *Id.* (citing *Ezell v. City of Chicago*, 651

F.3d 684, 704 (7th Cir. 2011) (holding that the right to possess firearms implied a

corresponding right to have access to firing ranges to train to be proficient with such

firearms).   *Heller* certainly did not differentiate between regulations governing

ammunition and regulations governing the firearms themselves.   *Id.*

"Constitutional rights thus implicitly protect those closely related acts necessary to

their exercise . . . The right to keep and bear arms, for example 'implies a

corresponding right to obtain the bullets necessary to use them.'" *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson*, 746 F.3d at 967).

The Attorney General does not contest the idea that acquiring and keeping ammunition is protected by the Second Amendment.   Instead he urges two other defenses.   Incredibly, he argues that the background check system is a presumptively lawful regulation.   Def.'s Opp'n, Doc. 34, at 12. & n. 3.   Why would it be presumptively lawful?   The Attorney General seems to argue that anything short of a complete ban is presumptively lawful.   Alternatively, he argues that the background check system is a reasonable fit to achieve the State's legitimate safety interests and thus satisfies intermediate scrutiny.   Oppo. at 12-20.

### c.   Second Amendment Tests

#### i.   The tripartite binary test with a sliding scale and a reasonable fit

For a Second Amendment challenge, the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit.   There are three different two-part tests, after which a point on the sliding scale of scrutiny is selected.   Most courts select intermediate scrutiny in the end.   Intermediate scrutiny, in turn, looks for a "reasonable fit."   It is a complex analysis that only a

50

law professor can appreciate.   Worse, these complicated legal tests usually result in

upholding Second Amendment restrictions upon something akin to a rational basis

test.   The test stands at odds with the simple test used by the Supreme Court in

*Heller*.   *Heller*'s test is a test that any citizen can understand.

### *ii.*    The Simple *Heller* Test

*Heller* asks whether the law bans the types of firearms commonly used for a

lawful purpose.   It is a hardware test.   *Heller* draws a distinction between firearms

commonly owned for lawful purposes and firearms specially adapted to unlawful

uses and not commonly owned.   As applied to laws prohibiting ammunition, the

simple *Heller* test would ask: is the ammunition commonly used by law-abiding

citizens for a lawful purpose?   If yes, then it is protected ammunition.   A .38

caliber or 9mm round of ammunition or a 12 gauge shotgun shell would easily pass

the test because this type is commonly owned by law-abiding citizens and it is

commonly used for lawful purposes like self-defense in the home.   A contrasting

example might be an incendiary round or an armor-piercing round.   Incendiary

rounds and armor-piercing rounds are probably neither commonly used by law-

abiding citizens nor commonly used for lawful purposes.   Such ammunition would

fail the simple *Heller* test and be constitutionally closely-regulated or completely banned.

The majority of citizens who use common ammunition do so for lawful purposes, including self-defense.   Under *Heller* and *McDonald*, that is all that is needed for citizens to have a right under the Second Amendment to acquire and keep common ammunition.   Using the simple *Heller* test, it is obvious that the California background check laws that *de facto* completely block some law-abiding responsible citizens from buying common ammunition are unconstitutional.[34]   Under the simple *Heller* test, judicial review could end right here.

### *iii.*   Burden & Scrutiny

Nevertheless, the background check system for purchasing ammunition is suspect even under the more complicated heightened scrutiny analysis because the

_____

[34] One author suggests the ammunition background check provisions may fail the simple *Heller* test for the reason that the background check provisions do not distinguish between ammunition use for home self-defense and all other purposes. Forrest Brown, *The Wild West*, 92 S. Cal. L. Rev., 1231 (The Safety for All Act "does not restrict ammunition purchases less within the home than it does outside the home.   Therefore, the Act may fall into *Heller*'s bright-line rule against restricting the use of firearms for self-defense within the home.").

legislative scheme is not a reasonable fit to achieve the State's interests.   The

heightened scrutiny analysis is as follows.   First, a court must evaluate the burden

and then apply the correct scrutiny.   *Jackson*, 746 F.3d at 960 (citing *United States*

*v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013)).   "This two-step inquiry: '(1)

asks whether the challenged law burdens conduct protected by the Second

Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny.'"

*Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (quoting *Jackson*, 746 F.3d at

960 (citing *Chovan*, 735 F.3d at 1136)).

### *iv.*    **Presumptively Lawful or Historical Regulation**

In determining whether a law comes within the scope of the Second

Amendment under the first step of this inquiry, another two-step test is used.   Here,

the first step asks, "whether the regulation is one of the presumptively lawful

regulatory measures identified in *Heller*, or whether the record includes persuasive

historical evidence establishing that the regulation at issue imposes prohibitions that

fall outside the historical scope of the Second Amendment."   *Jackson*, 746 F.3d at

960 (internal quotes and citations omitted).   If the regulation is presumptively

lawful, the inquiry ends.   Likewise, if the regulation is a historically-approved

prohibition not offensive to the Second Amendment, the inquiry ends.

53

The California background check system for purchasing ammunition fails both parts of the test.   First, a background check on ammunition purchasers is not one of the presumptively lawful regulatory measures identified in *Heller*.   *See Teixera v. Cty. of Alameda*, 873 F.3d 670, 676-77 (9th Cir. 2017) (*en banc*) ("We held in *Jackson* that a prohibition on the sale of certain types of ammunition burdened the core second amendment right and so was subject to heightened scrutiny.").   Second, an ammunition background check has no historical pedigree. In fact, a background check required each time ammunition is purchased has never been implemented before.   As *Jackson* concluded more generally about a city ordinance prohibiting the sale of hollow-point ammunition in San Francisco,

> "*Heller* does not include ammunition regulations in the list of 'presumptively lawful' regulations.   Nor has San Francisco pointed to historical prohibitions discussed in case law or other 'historical evidence in the record before us' indicating that restrictions on ammunition fall outside the historical scope of the Second Amendment."

*Jackson,* 746 F.3d at 968 (citations omitted).

### v.     Closeness to the Core and Severity of the Burden

Continuing the Ninth Circuit's constitutional inquiry, if there is a burden, the correct level of scrutiny must be selected.   For that selection a third two-step evaluation is required.   The first step measures how close the statute hits at the core

54

of the Second Amendment right.   The second step measures how severe the statute burdens the Second Amendment right.   "Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'"   *Bauer*, 858 F.3d at 1221-22 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

*Jackson* decided that an ordinance banning the sale of hollow-point ammunition burdens the core right of keeping firearms for self-defense, but only indirectly because: (a) "ordinary bullets" are effective for self-defense, and (b) because a San Francisco resident may still use hollow-point bullets in her home if she purchases such ammunition outside of San Francisco's jurisdiction.   *Jackson*, 746 F.3d at 968.   Here, unlike *Jackson*, if a citizen resident is unable to pass the background check for whatever reason, she may not purchase ordinary ammunition at all.   She may not purchase ammunition inside or outside of California for self-defense.   She may buy neither ten rounds nor 10,000 rounds.   In this case, the California statutes *directly* burden the Second Amendment right directly to its core, which is the right to defend one's self, family, and home.

55

*Jackson* also decided a Second Amendment burden was not severe because the city ordinance left open ammunition alternatives for self-defense in the home. *Id*.   *Jackson* explained, "Jackson may either use fully-jacketed bullets for self-defense or obtain hollow-point bullets outside of San Francisco's jurisdiction."   *Id.* Here again, unlike *Jackson*, if a citizen resident cannot undergo and pass the background check, he may not purchase ammunition of any type, or in any amount, inside of California and he may not purchase ammunition of any type outside of California for his California home.

In this case the California state statutes not only burden the core of the Second Amendment but often impose upon the core the *severest* burden – a complete ban. It is true that many have been able to buy ammunition.   But at least 101,047 or 16.4% of applying citizen residents have not.   Under this law, an inexplicably large number of firearm owners are suffering the severest burden.   Because a severe restriction on the core right of self-defense amounts to a destruction of the Second Amendment right, it is unconstitutional under any level of scrutiny.   Once again, judicial review could end right here.   Where a law imposes the severest burden on the core of the Second Amendment right for 101,047 citizen residents (and counting), the law is unconstitutional *per se*.   "'A law that imposes such a severe

56

restriction on the fundamental right of self-defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.'"   *Bauer*, 858 F.3d at 1222 (quoting *Silvester*, 843 F.3d at 821)

### vi.   Sliding Scale of Scrutiny

Assuming, however, the analysis must continue, the Ninth Circuit employs a sliding scale of scrutiny.   "[O]ur test for the appropriate level of scrutiny amounts to 'a sliding scale.'"   *Silvester*, 843 F.3d at 821.   "Further down the scale, 'a law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny.'"   *Id.*   "Otherwise, intermediate scrutiny is appropriate." *Id.*

The Attorney General argues that intermediate scrutiny should apply.   Def.'s Opp'n, Doc. 34, at 12.   If a challenged law does not implicate a core Second Amendment right or does not place a substantial burden on the Second Amendment right, intermediate scrutiny is applied.   *Jackson*, 746 F.3d at 961; *United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) ("Although not dispositive of the question, we note that there has been 'near unanimity in the post-*Heller* case law that, when considering regulations that fall within the scope of the Second Amendment, intermediate scrutiny is appropriate.'").

57

*Torres* suggests that intermediate scrutiny applies where the burden is "tempered."  *Id.* at 1263).   In *Torres*, the severe burden from a ban on possession of a firearm by a person unlawfully in the United States was tempered by the fact that a prohibited person could remove his prohibition by acquiring lawful immigration status.   *Id.*   In a similar approach, the Attorney General argues that there is no complete ammunition ban here because a person can remedy whatever the problem is that prevents successfully passing a background check.[35]   For citizen residents that have only the standard California DL or ID which is insufficient to start a background check under the ammunition check scheme, the Attorney General explains that "presenting an approved form of additional documentation, such as a passport, is an easy cure."   Def.'s Opp'n, Doc. 34, at 20.   Absent is evidence (or even an estimate) of the number of California residents who hold a current U.S. Passport.   For those who do not, that solution will have a disproportionate impact

---

[35]  The Attorney General writes, "[t]he Ammunition Eligibility Check Laws do not prevent law-abiding people who are permitted to possess ammunition from purchasing it, and thus does not implicate 'the core Second Amendment right of 'self defense in the home.' "   Def.'s Opp'n, Doc. 34, at 13.   This is obviously hyperbole.   So far at least 101,047 times people were, in fact, blocked from purchasing ammunition.

58

on people who lack transportation, lack access to computers, or fall within the lowest economic classes.   The Attorney General also offers that, "resolving the source of the rejection . . . can be done quickly via the Department's website in many cases."   Def.'s Opp'n, Doc. 34, at 21 (citing Morales Decl. ¶¶ 20-24).   The evidence shows that the hope does not match the reality.

Many persons who were rejected at first do later successfully purchase ammunition.   For example, of the persons rejected in July 2019, 47.5% have been able to later successfully purchase ammunition (as of January 31, 2020).   *See* Third Morales Declaration, Doc. 53 at ¶46.   Likewise, 45.3% of August rejectees later succeeded; 44.1% of September rejectees later succeeded; 43.3% of October rejectees later succeeded; 42.7% of November rejectees later succeeded; 40.2% of December rejectees later succeeded; and 40% of January 2020 rejectees later succeeded.   *Id.* at ¶¶47-52.   These numbers sound good, but on the flip side of the coin, between 53.5% and 60% of residents who are rejected each month still have not been authorized to purchase ammunition.   Counted in terms of months or years, perhaps resolving the source of a rejection can be done "quickly."   Counted in terms of days or hours, for a citizen who needs or wants ammunition to defend herself or home, the resolution process is hardly quick.

59

### vii.   Tailoring Required: a Reasonable Fit

Intermediate scrutiny requires a final two-part test.   The government's interest must be important and the fit of the law to the objective must be reasonable. "Our intermediate scrutiny test under the Second Amendment requires that (1) the government's stated objective . . . be significant, substantial, or important; and (2) there . . . be a 'reasonable fit' between the challenged regulation and the asserted objective."   *Silvester*, 843 F.3d at 821-22 (quoting *Chovan*, 735 F.3d at 1139).   The State's objective, which is to keep aliens illegally or unlawfully present, felons, and other prohibited persons from obtaining ammunition, passes the first prong of the test.   Under the second prong of the test, intermediate scrutiny does not demand the least restrictive means.   *Id*. at 827 (quoting *Jackson*, 746 F.3d at 969).   "Instead, the statute simply needs to promote a substantial government interest that would be achieved less effectively absent the regulation."   *Mai v. United States*, 952 F.3d 1106, 1116 (9th Cir. 2020) (quoting *Torres*, 911 F.3d at 123).

The Court notes that this deferential treatment of government restrictions of Second Amendment rights is not to be found anywhere in the Bill of Rights or in the text of the Second Amendment.   It begs the question, is there anything that a government cannot claim to be a substantial state interest?   And if that is the case

60

then can the state, through its legislative powers, run roughshod over constitutionally protected rights by claiming they are "common sense laws" that promote the government interest?   After all, there is hardly any governmental intrusion that cannot be rationalized as important (for example, a Japanese internment camp). *E.g., Toyosaburo Korematsu v. United States*, 323 U.S. 214, 218–19 (1944), *abrogated by, Trump v. Hawaii*, 138 S. Ct. 2392 (2018) ("Like curfew, exclusion of those of Japanese origin was deemed necessary because of the presence of an unascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country.   It was because we could not reject the finding of the military authorities that it was impossible to bring about an immediate segregation of the disloyal from the loyal that we sustained the validity of the curfew order as applying to the whole group."); *Dred Scott v. Sandford*, 60 U.S. 393 (1857).

While the Second Amendment intermediate scrutiny standard is an overly relaxed standard, it is not a free pass.   When subjected to intermediate scrutiny, "the [State] is not thereby 'insulated from meaningful judicial review.'"   *Heller v. District of Columbia (Heller II)*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) (quoting *Turner Broad. Sys., Inc. v. FCC (Turner I)*, 512 U.S. 622, 666 (1994).   So, even under intermediate scrutiny, a court must determine whether the legislature has

61

"base[d] its conclusions upon substantial evidence." *Turner II*, 520 U.S. at 196. The government must carry the burden of establishing that its regulations are reasonably tailored. *Id.* ("[T]he State bears the burden 'affirmatively to establish the reasonable fit we require.' ") (quoting *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989)). The government "must do more than just simply posit the existence of the diseases sought to be cured," and "demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner I*, 512 U.S. at 664. "As for the novel registration requirements, to pass muster under intermediate scrutiny the District must show they are 'substantially related to an important governmental objective.'" *Heller v. D.C.*, 670 F.3d 1244, 1258 (D.C. Cir. 2011) (quoting *Clark v. Jeter*, 486 U.S. 456, 461 (1988)). "The District must establish a tight 'fit' between the registration requirements and an important or substantial governmental interest, a fit 'that employs not necessarily the least restrictive means but ... a means narrowly tailored to achieve the desired objective.'" *Id.* (quoting *Board of Trustees of State University of New York v. Fox*, 492 U.S. 469, 480 (1989)); *see also Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be

62

achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest).   "What our decisions require is a ' 'fit' between the legislature's ends and the means chosen to accomplish those ends,' a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.   Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed."   *Bd. of Trustees of State Univ. of New York,* 492 U.S. at 480 (citations omitted).

### viii.   The California Interests

In this case, the Attorney General identifies a public safety interest.   There is a state interest in "prevent[ing] criminals from buying ammunition at gun shops, sporting goods stores, and other lawful vendors."   Def.'s Opp'n, Doc. 34, at 1.   It is also described as a state interest in "clos[ing] the loophole" that "permitted violent felons and other persons prohibited from possessing firearms and ammunition to perpetuate gun violence."   Def.'s Opp'n, Doc. 34, at 5.   The Attorney General states, "California has a substantial interest in increasing public safety and

63

preventing crime, and the Ammunition Eligibility Check Laws, which prevent convicted felons and other prohibited persons from purchasing ammunition, is a reasonable fit to address that interest."   Def.'s Opp'n, Doc. 34, at 14.

Few would dispute that the state has a legitimate interest in increasing public safety and preventing crime.   The question is how to achieve this objective while respecting the freedoms of law-abiding citizens.   State and federal laws already criminalize the *possession* of ammunition by felons, prohibited persons, and aliens unlawfully in the United States.   *See* Cal. Penal Code § 30305[36]; 18 U.S.C. § 922(g).[37]   Even without the background check system, violent felons, prohibited

_____

[36] California Penal Code § 30305(a)(1) states,
> "No person prohibited from owning or possessing a firearm under Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, shall own, possess, or have under custody or control, any ammunition or reloaded ammunition."

[37] The Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.*, establishes a detailed federal scheme governing firearms and ammunition.   Among other things, it forbids possession of ammunition by convicted felons, fugitives from justice, unlawful users of controlled substances, persons adjudicated as mentally defective or committed to mental institutions, aliens unlawfully present in the United States, persons dishonorably discharged from the Armed Forces, persons who have renounced their citizenship, and persons who have been subjected to certain restraining orders or been convicted of a misdemeanor offense involving domestic violence. §§ 922(d) and (g).   *Printz v. United States*, 521 U.S. 898, 902 (1997).

64

persons, and aliens unlawfully in the United States commit a new crime if they acquire possession of ammunition from a gun shop, sporting goods store, or other vendors.[38]

Is a state-wide blanket background check system and anti-importation barriers for purchasing ammunition on top of existing felon-in-possession and alien-in-possession laws a reasonable fit for achieving these important goals?   This Court finds on the preliminary evidentiary record that the ammunition background check system and the anti-importation law is not a reasonable fit.   Perhaps with more time and more evidence than three old studies about ammunition purchase recordkeeping, the State will be able to establish a reasonable fit.   At this point, however, the government has done little more than simply posited the existence of the disease

_____

[38] The Attorney General posits that the existence of the background check system has dissuaded "an undoubtedly large number of prohibited persons" from trying to purchase ammunition because they fear arrest.   Def.'s Opp'n, Doc. 34,. at n. 6.   He explains that this is a predictable and intended side-effect of eligibility checks.   *Id.* However, it is not clear why this would be.   A prohibited person who hazards an ammunition background check and fails, need not fear arrest.   He will not be able to acquire and possess ammunition, and therefore will not be committing the crime of possession of ammunition.   If the prohibited person somehow passes the background check, he will have the chance to acquire and illegally possess ammunition as he could before the background check system was implemented.

65

sought to be cured.   And the cure, making it difficult for law-abiding citizens to acquire ammunition, is far worse than the disease.   The government has certainly not demonstrated that the blanket background check system will cure any disease and alleviate harm in a direct and material way without unnecessarily burdening the rights of citizens.   *Turner I*, 512 U.S. at 664.   So far, the benefit of the background check laws is that a very small number of prohibited persons have been denied authorization to buy ammunition at a licensed ammunition vendor.   *See* Third Morales Declaration, Doc. 53, at ¶56.   On the other hand, the burden is that 101,047 law-abiding citizens (plus an untold additional number who may have been discouraged by the clumsiness of the system) were unable to exercise their Second Amendment right to acquire ammunition for their firearms.

The Attorney General asserts that the government must be allowed to experiment with solutions to serious problems.   Def.'s Opp'n, Doc. 34, at 13.   The Attorney General says that courts do not look to evidence "in the technical sense" because "legislatures are not obligated when enacting their statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review."   Def.'s Opp'n, Doc. 34, at 13-14 (quoting *Pena*, 898 F.3d at 979).   When did the federal courts become so deferential to government intrusions into

constitutionally protected rights?   On intermediate scrutiny, can the state "get away with shoddy data or reasoning"?   *NYSR&PA v. Cuomo*, 804 F.3d 242, 264 (2nd Cir. 2015) (citations omitted) (emphasis in original) (striking down New York State's 7-round magazine limit).

Here, the fit is far from narrowly tailored.   The fit is that of a large square peg for a small round hole.   This state experiment is a one-size-fits-all, one-of-a-kind approach with no legislative record.   The State justifies the experiment upon little more than conjecture springing from three old studies: (1) an old study of Los Angeles recordkeeping law; (2) an old study of Sacramento recordkeeping law; and (3) the straw purchaser experience of the State of New Jersey.   Each of these studies is addressed *infra*.

California's background check for ammunition purchases is the first state experiment in the country.   But it is not the first experiment.   The federal Gun Control Act of 1968 required ammunition be sold by federally licensed firearm dealers who would maintain records of ammunition sales.   The Gun Control Act also prohibited, like the new California anti-importation law, interstate mail-order ammunition sales.   After 18 years of that experiment, Congress repealed the prohibition on mail-order sales and the ammunition purchase recordkeeping

67

requirement in the Firearm Owners Protection Act of 1986.   In support of the changes, the federal Bureau of Alcohol Tobacco and Firearms and the Treasury Department said the ammunition recordkeeping *had no substantial law enforcement value*.[39]

The California experiment does not take into account the lessons from this national Gun Control Act experiment.   Nor does it take into account the fact that Congress more recently declined to pass an ammunition background check law in 2013.[40]  Perhaps more importantly, the experiment is based on a naive assumption that prohibited persons will subject themselves to background checks to buy

———————————————

[39] Congressional Record—House, Apr. 9, 1986, at 6850 ("Fourth, it repeals ammunition recordkeeping requirements (except armor-piercing bullets) which BATF and Treasury says have no substantial law enforcement value."); 6861 (same); 6864 (same); 6869 ("[W]e also limit the licensing of ammunition dealers because ammunition and *recordkeeping for ammunition, BATF and most everybody agrees, there is just a waste of time because you cannot trace ammunition*."); Federal Firearms Reform Act of 1986, House Report 99-495, 99th Cong., 2nd Sess., 17 (1986) (emphasis added).

[40] United States Senate Bill 174, Ammunition Background Check of 2013, sponsored by Senator Richard Blumenthal (D-CT).   Senator Blumenthal re-introduced his bill in 2018 without success.   The California legislature also rejected a background check system for ammunition purchases in 2014.   California SB-53 (introduced in the Senate on December 20, 2012) would have required backgrounds checks for ammunition purchases, but failed in the House on Aug. 30, 2014.

68

ammunition.   As mentioned earlier, the State estimated there would be 13 million ammunition purchases in one year, yet in fact, there has been only 500,000 during the first six months.   Is anyone surprised that large numbers of Californians, both prohibited persons and even otherwise law-abiding residents, will find ways to bypass the onerous ammunition background checks.   For firearm purchases, large numbers of Californians already have somehow bypassed background checks.   A 2018 University of California survey found "that roughly 25% of those who purchased their most recent firearm in California reported that they did not undergo a background check."[41]

And of course, criminals don't do background checks.

The California background check experiment is not tailored to differentiate between a purchaser of a twenty-round box of home-defense cartridges and a purchaser of 10,000 rounds of rifle or birdshot ammunition.   A person living alone in a low-crime neighborhood may feel safe with as few as twenty rounds for a home-

_____

[41] *See* UC Davis Health, *2018 California Safety and Wellbeing Survey Details Firearm Ownership in the State*, (Nov. 11, 2018).   Found at https://health.ucdavis.edu/publish/news/newsroom/13336 (last visited Feb. 27, 2020).

defense handgun.   That same person who wants to buy 10,000 rifle rounds may raise legitimate suspicions.   Could not the statute be tailored to permit purchase of a single box without a background check?   Or could the statute require a background check only for purchasing quantities greater than 1,000 rounds?   The experiment does not differentiate between purchasers of common types of home-defense 12 gauge shotgun shells or small .22 caliber plinking rounds and purchasers of particularly dangerous types of ammunition.   Could not the statute differentiate between low-power, small rounds, and high-power unusual rounds?   The experiment does not differentiate between a would-be purchaser who is an honorably discharged member of our military, a concealed carry permit holder, a hunter, or a former law enforcement officer, versus an edgy-looking, furtive-glancing, impatient and angry customer.   Could not the state statute recognize that Federal Firearm License ammunition sellers have some discretion?[42]   The statute

_____

[42] "Notably, while FFLs have never been required under federal law to conduct a background check for purchasers of ammunition, they still may choose to do so because it remains unlawful for any seller of ammunition to transfer ammunition knowing or having reasonable cause to believe that such person is a prohibited possessor."   Vivian S. Chu, *Internet Firearm and Ammunition Sales*, Congressional Research Service (Aug. 28, 2012) at 3.

does not differentiate between residents living in high-density metropolitan areas with large, fast response. police forces and residents living in rural areas with natural predators and few sheriff's deputies.   Could not the statute offer some degree of tailoring to account for the ammunition needs arising from the vast differences between urban and rural life?   Other California firearm statutes do so.[43]

### ix.   The Evidence

The Plaintiffs-citizens do not have to carry the burden of proving that they are entitled to enjoy Second Amendment rights.   Quite the opposite, it is the government that must carry the burden of demonstrating that the restriction of Second Amendment rights is a reasonable fit for the asserted substantial interest.   If the government does not support its case, the Plaintiffs-citizens win.

---

[43] For example, the issuance of concealed-carry permits is treated differently in California counties having a population less than 200,000.   *See* Cal. Pen. Code § 26155.   Also, while openly carrying an unloaded handgun or long gun is prohibited in a public place or on a public street within an incorporated city and in a prohibited area of an unincorporated area of a county (*see* Cal. Pen. Code §§ 26350, 26400), the carrying is not prohibited in non-prohibited areas of an unincorporated county area, such places generally being rural.   No doubt, in the not too distant future, this too will be deemed a "loophole" that must be closed.

71

The State's evidence is thin.   As part of the review, a federal court may consider "the legislative history of the enactment as well as studies in the record or cited in pertinent case law."   *Fyock*, 779 F.3d at 1000.   "[T]he municipality's evidence must fairly support the municipality's rationale for its ordinance." *Jackson,* 746 F.3d at 969 (quoting *City of Los Angeles v. Alameda Books, Inc.,* 535 U.S. 425, 438 (2002)).   And while courts "should not conflate legislative findings[44] with 'evidence' in the technical sense," (*Pena*, 898 F.3d at 979 (citation omitted)), neither should they "credit facially implausible legislative findings."   *Jackson*, 746 F.3d at 969.   The Ninth Circuit Court of Appeals recently put it this way:

> In assessing congressional judgment, "we do not impose an 'unnecessarily rigid burden of proof,' and we allow the government to rely on any material 'reasonably believed to be relevant' to substantiate its interests." That standard applies because "we are weighing a legislative judgment, not evidence in a criminal trial."   Thus, we do not require "scientific precision."

---

[44] Congress, and by extension, a state or municipality, need not make legislative findings in order to legislate.   *Katzenbach v. McClung*, 379 U.S. 294, 304 (1964) ("Here, of course, Congress had included no formal findings.   But their absence is not fatal to the validity of the statute.").   Where there are congressional findings, they may assist a court in evaluating the legislative judgment.   *United States v. Lopez*, 514 U.S. 549, 563 (1995).

1
2

> We ask only whether the evidence "fairly supports" Congress' "reasonable" conclusions.   When empirical evidence is incomplete, we "must accord substantial deference to the predictive judgments of Congress."

3
4

*Mai,* 952 F.3d at 1118 (citations omitted) (assessing act of Congress and

5

considering, *inter alia*, statements in Congressional Record).

6

In this case, the Attorney General points to "findings" from the ballot

7

8

proposition, Proposition 63, and studies of three jurisdictions that tried ammunition

9

sales recordkeeping.   The Attorney General cites as a finding Proposition 63, § 2.7

10

explaining that "voters declared that 'we should require background checks for

11

12

ammunition sales just like gun sales, and stop both from getting into the hands of

13

dangerous people.'"   Def.'s Opp'n, Doc. 34, at 5, 14.   But no federal court has

14

deferred to the "legislative findings" in a state ballot proposition.   No court has

15

16

accorded legislative deference to ballot drafters.   A ballot proposition is precisely

17

what the Bill of Rights was intended to protect us from – a majority trampling upon

18

19

important individual rights.

20

When a legislature's findings may be given deference it is because a

21

22

legislative body may be better equipped than the judiciary to amass and evaluate the

23

potentially vast amounts of data bearing upon complex issues.   Yet, the referendum

24

process does not invoke the same type of searching fact-finding by a deliberative

25

26

27

28

73

body.   Consequently, a referendum's "legislative findings" do not "justify

deference."   *Vivid Entm't, LLC v. Fielding*, 965 F. Supp. 2d 1113, 1127 (C.D. Cal.

2013), *aff'd*, 774 F.3d 566 (9th Cir. 2014) (citations and internal quotations omitted);

*see also California Prolife Council Political Action Comm. v. Scully*, 989 F. Supp.

1282, 1299 (E.D. Cal. 1998), *aff'd*, 164 F.3d 1189 (9th Cir. 1999) ("Because the

referendum process does not invoke the same type of searching fact finding, a

referendum's fact finding does not justify deference.").   The initiative process

inherently lacks the indicia of careful debate that would counsel deference.   *Carver

v. Nixon*, 72 F.3d 633, 645 (8th Cir. 1995) (the process of legislative enactment

includes deliberation, compromise and amendment, providing substantial reasons for

deference that do not exist with respect to ballot measures); *Yniguez v. Arizonans for

Official English*, 69 F.3d 920, 945 (9th Cir. 1995), *vacated on other grounds*, 520

U.S. 43 (1997) (deference normally accorded legislative findings does not apply

with same force when First Amendment rights are at stake; in addition, because

measure was a ballot initiative, it was not subjected to extensive hearings or

considered legislative analysis before passage); *Daggett v. Webster*, No. 98-223-B-

H, 1999 WL 33117158, at *1 (D. Me. May 18, 1999) (no court has given legislative

deference to a ballot proposition).

74

In this case, as in *Scully*, California argues that deference ought to be given to the predictive judgments and novel legislative experiments contained in a popular ballot measure.   *Scully* rejected the approach.   It persuasively reasoned:

> [T]he deference formulation, however, ignores the context of the quotation which requires federal courts to "accord substantial deference to the predictive judgments of Congress."   Thus, the deference recognized in *Turner* is the consequence, at least in part, of the constitutional delegation of legislative power to a coordinate branch of government, a factor not present in the instant case.   Of course, this is not to say that the predictive judgments of state legislatures are not entitled to due weight.   It would seem odd, however, that this court would be required to give greater deference to the implied predictive judgments of a state's legislation than the state's own courts would. In this regard, California courts accord deference to the predictive judgments of their legislature on a sliding scale, according significant deference to economic judgments, but employing "greater judicial scrutiny" "when an enactment intrudes upon a constitutional right."   It is of course true that deference in the federal courts is not simply a function of the separation of powers doctrine.   It also rests upon the legislative branch being "better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon ... complex and dynamic" issues.   Once again, given that the statutes at bar are the product of the initiative process, their adoption did not enjoy the fact gathering and evaluation process which in part justifies deference.

*Scully*, 989 F. Supp. at 1299 (citations omitted).

The background check and anti-importation statutes are the product of a majority vote on a complicated multi-part ballot.   Proposition 63 was one among 16 propositions on the state ballot during the 2016 presidential election.   Among other

topics, there were propositions for school bonds, cigarette taxes, the death penalty, recreational marijuana legalization, and a ban on plastic bags.   The text of the proposed law changes from Proposition 63 ran on for 15 single spaced pages of the Official Voter Information Guide.   Proposition 63 included 14 findings and 9 purposes: it amended several statutes relating to lost and stolen firearms, it strengthened state reporting to the National Instant Criminal Background Check System, it instituted dispossession and criminalization provisions for ammunition magazines able to hold more than 10 rounds, it imposed several new requirements on existing firearm dealers and a new category of ammunition vendors, it created new avenues for law enforcement to seize firearms from known prohibited persons, and it created the ammunition background and anti-importation provisions.[45]   The

_____

[45] The complexity of Proposition 63 is a sharp contrast to the simplicity of other California propositions, like Proposition 8.   "In its entirety, Proposition 8 provides: 'Only marriage between a man and a woman is valid or recognized in California.'" *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 927 (N.D. Cal. 2010).

adoption of Proposition 63 did not include voters reviewing reams of data, attending days of hearings, considering thoughtful committee reports or listening to statehouse floor arguments.   In short, there are no legislative findings.

But the Attorney General remonstrates, "courts do not look to evidence 'in the technical sense' because 'legislatures are not obligated when enacting their statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review.'"   Def.'s Opp'n, Doc. 34, at 13-14 (quoting *Pena*, 898 F.3d at 979).   It is telling that *Pena* quoted this language from its earlier decision in *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192 (9th Cir. 2013) (*en banc*).   In *Minority Television*, the court reviewed a federal statute, not a state ballot measure, and noted the extensive legislative record upon which Congress relied.   736 F.3d at 1199 ("Congress enacted §§ 399a and 399b after a two-year FCC notice and comment proceeding, days of hearings, and a thoughtful committee report.   Indeed, the record before Congress provides a sufficient basis to uphold the statute even without the supplemental evidence offered in the district court.").   The

77

Attorney General's call to defer to Proposition 63's "legislative history" is

unpersuasive.[46]

Since the legislative history of the enactment is absent, studies in the record or

cited in pertinent case law may be considered.   *Fyock*, 779 F.3d at 1000.   Yet, there

is no pertinent case law about pre-purchase ammunition background checks.   In

fact, regarding the constitutionality of any kind of background checks, there is little

caselaw at all.   Consequently, the Court's review turns to the studies in the record.[47]

_____

[46] If the statutes produced by Proposition 63 are invalidated, perhaps the precursor bill, Senate Bill 1235, that "prospectively amended" Proposition 63 will go into effect under state law.   At that point, the Attorney General's argument might have more force, although there is nothing in the current record about the legislative history of SB 1235.   But he does not make the argument today and he does not suggest that there are particular hearings, committee reports, or floor debates.   In any event, the issue will be left for another day.   Moreover, no amount of deference may both overcome a complete ban on Second Amendment rights and justify violating the dormant Commerce Clause.

[47] The Attorney General requests the Court take judicial notice of six exhibits under Federal Rule of Evidence 201(b).   *See* Request for Judicial Notice, doc. 34-7 (filed Aug. 5, 2019).   Exhibit 1 is a copy of a peer-reviewed journal article.   Exhibits 2 through 6 are government-issued documents.   The Court takes judicial notice that such documents are copies of authentic documents.   However, the Court does not take judicial notice that the contents are necessarily true or accurate.   Plaintiffs also

### a.  The 2004 Los Angeles Study

There are no studies of the effectiveness of pre-purchase, background checks for ammunition purchasers.   The Attorney General relies, instead, on three studies or reports about ammunition sales recordkeeping and the problem of straw buyers. The first is a dated sociological study of the Los Angeles municipal record-keeping requirement for retail ammunition purchases.   Since 1998, Los Angeles Municipal Code § 55.11 has required retail ammunition sellers to record a buyer's name, address, birth date, driver's license number and the type and quantity of ammunition bought and sold.   Two months of records from April and May 2004 were studied and the results published in 2006.   *See* Tita, Braga, Ridgeway, and Pierce, *The Criminal Purchase of Firearm Ammunition,* 12 Injury Prevention 308 (2006) (Exhibit 1, doc. 34-7 at 8-11).   The Attorney General asserts that this study shows

---

request judicial notice be taken of 34 documents under Rule 201.   Doc. 33.   For the same reasons and with the same limitations the Court takes judicial notice.

79

that without the statewide background check, "prohibited persons regularly purchase ammunition from unwitting vendors" and that prohibited persons constitute "about 3% of all purchasers."   Def.'s Opp'n, Doc. 34, at 2, 14.

The Los Angeles study recorded 2,031 purchasers who bought 4,823 boxes of ammunition totaling 436,956 rounds.   *Id.* at 9.   Thirty of the 2,031 purchasers had felony convictions (two had convictions for weapon offense).   Twenty-two had disqualifying misdemeanor convictions.   *Id.* at 10, Table 2.   As a group, 52 prohibited persons bought 10,050 of the 436,956 rounds sold, averaging a little less than 200 rounds each.   *Id.* at 10.   The average rounds purchased per person for the entire group of 2,031 persons was not much different (a little over 200 rounds each). *Id.*

The Court notes that close to 97% of the purchasers were law-abiding citizens and the buying behavior of prohibited persons was similar to the buying behavior of the law-abiding citizens.   Consequently, the recordkeeping requirement already burdens approximately 97% of law-abiding citizens buying ammunition in the City of Los Angeles.   Requiring these buyers to pay for and pass a pre-purchase

background check unnecessarily adds to the burden.   As the study authors note, "[a] *criminal background check would be an unnecessary inconvenience in about 97% of ammunition transactions* in Los Angeles."   *Id.* (emphasis added).

The Attorney General offers the study to justify the State's universal ammunition background check.   But the authors of the study predict that adding a background check requirement would probably *reduce* the denial rate for prohibited persons down to 0.8% (the denial rate for firearms) and induce prohibited persons to find alternative sources of ammunition.   "*Prohibited purchasers seem likely to exploit alternative sources of ammunition such as unregulated private sellers operating in the secondary [underground] firearms markets.*"   *Id.* (emphasis added).   "*[D]ealers in Nevada and Arizona are already noteworthy out-of-state sources of crime guns recovered in Los Angeles and seem likely to become illicit sources of ammunition.*"   *Id.* (emphasis added).

The Los Angeles study is a limited study.   It is limited to two months in 2004 and has not been updated.   The study is limited to ten ammunition sellers in the relatively crime-free area of the San Fernando Valley (in the northern part of the city).   None of the ten ammunition sellers were located near the "high crime South Los Angeles area of the city."   *Id.*   The authors explain that although the southern

81

area leads the city in total homicides and gun crime, local places selling ammunition there are outside the city limits and are not required to keep records.   *Id.*   The study does not attempt to compare rates of homicide and gun crime in Los Angeles before and after the introduction of § 55.11 to observe whether the ordinance has had a salutary effect.   The study does not attempt to uncover whether any of the 52 prohibited persons who were able to buy ammunition during April and May of 2004 later committed gun crimes with the acquired ammunition.   Finally, the Plaintiffs correctly note that the Los Angeles ordinance does not require purchasers to pass a background check and does not automatically reject persons with standard California DLs and IDs.

### b. *The 2008 Sacramento Police Report*

In 2007, Sacramento passed an ammunition sales record-keeping ordinance similar to the Los Angeles ordinance.   After six months of experience, the police department made a report to the Sacramento City Council.   *See* Exhibit 2, doc. 34-7 at 12-35.   This report is the second exhibit upon which the Attorney General relies to establish the "fit" of the state background check regimen.   Like the Los Angeles study, the Sacramento report is not about the effectiveness of imposing pre-purchase background checks on ammunition purchasers.   Instead, it reports on the utility of

82

record-keeping as a means to investigate crime.   Purchasing trends were similar in both cities.

The Sacramento report recorded 2,250 purchasers of ammunition over six months.   Doc. 34-7 at 18.   Sixty-one of the 2,250 purchasers had felony convictions and 12 purchasers had disqualifying misdemeanor convictions.   *Id.* at 20.   As a group, the 74 prohibited persons made up 3.2% of all ammunition buyers. *Id.* at 20.   The report does not indicate the number of rounds purchased by either law-abiding citizens or prohibited purchasers.   The report notes that the record-keeping data led to prosecutions and search warrants which, in turn, uncovered 56 firearms that were seized (three firearms were stolen).   *Id.* at 25-29.   The police noted that cooperation from ammunition dealers was very good.   *Id.* at 16.   The most striking part of the Sacramento approach and apparently important to the success of the law enforcement program was that the Sacramento Police Department *retrospectively checked the legal eligibility of every purchaser.*   *Id.* at 17.

The Court notes that in Sacramento, as in Los Angeles, close to 97% of the purchasers were law-abiding citizens.   Twenty-one persons (*e.g.*, less than 1% of all purchasers) had a previous violent felony conviction.   *Id.* at 21.   Like the Los Angeles study, the Sacramento report is a limited report.   It is limited to six months

in 2008 and has not been updated.   The study does not attempt to compare rates of homicide and gun crime in Sacramento before and after the introduction of the record-keeping requirement to observe whether the ordinance has had a salutary effect.   The study does not attempt to uncover whether any of the 74 prohibited persons who were able to buy ammunition later committed gun crimes.   The Plaintiffs correctly note that the Sacramento ordinance does not require passing a background check and does not automatically reject persons with standard California DLs and IDs.   The Attorney General asserts that the report demonstrates that approximately 3% of ammunition purchasers were prohibited persons.   Other than the crime of possession of ammunition by a prohibited person, the report says nothing about whether a pre-purchase background check would have actually prevented a later crime.

On the contrary, the report suggests that diligent police investigation using ammunition purchase records leads to the successful prosecution of prohibited persons.[48]   The requirement of a pre-purchase criminal background check would

_____

[48] Without passing on the constitutionality of a record-keeping requirement, a statewide system like Sacramento's would seem to be a reasonable fit for achieving the State's interest while preserving Second Amendment rights.

84

likely scare away prohibited persons from acquiring ammunition from lawful sellers and record-keepers.   If the predictions of the Los Angeles study authors are correct, Sacramento's prohibited persons would likely find alternate, illicit sources of ammunition if a pre-purchase background check were mandatory.   Why?   While simple recordkeeping requirements may lull prohibited persons into a false sense of safety, the background check requirement awakens criminals to the dangers of arrest when buying ammunition from lawful dealers.   That, in turn, drives underground the ones bent on gun crime.

### c. *The 2007 New Jersey Commission Report*

For his final study, the Attorney General goes outside of California to locate an old 2007 report from the New Jersey State Commission of Investigation.   *See* Exhibit 3, doc. 34-7 at 38-71.   In that year, a commission conducted an investigation to discover how the New Jersey system of selling ammunition was vulnerable "to subversion by criminal elements."   *Id.* at 42.   According to the report, to purchase ammunition, New Jersey state regulations require a person to display personal identification and proof of age (but no particular type of identification was mandated).   *Id.* at 48.   There was a recordkeeping requirement for sales of handgun ammunition, but not for long gun ammunition.   *Id.*   The

records were often handwritten and difficult to read.   *Id.* at 60-61.   The Commission found that purchases of ammunition by convicted felons in New Jersey were widespread.   *Id.* at 43.   The report cited one example of a store where over four years 42 convicted felons bought 15,000 rounds of handgun ammunition.[49]   *Id.* Significantly, the New Jersey report is barren of overall sales data and tells nothing of the number of ammunition purchases by law-abiding citizens with no criminal records.   Consequently, the report does not indicate whether New Jersey's problem in that regard is large or small.

The Attorney General cites then-U.S. Attorney, Chris Christie, in regard to ammunition as saying that "you're only dealing with half the problem when you're dealing with the gun issue."   Def.'s Opp'n, Doc. 34, at 4 (quoting report doc. 34-7 at 57).   However, what Christie was commenting about was *not* convicted felons or prohibited persons buying ammunition or illegal aliens possessing ammunition.

_____

[49]  The Court notes that this volume would amount to an average of 357 rounds per person at a rate of 7.4 rounds per month.   This is significantly more and less than the amounts reported in the Los Angeles study.   In the Los Angeles study, a prohibited person purchased an average of 200 rounds, rather than 357 rounds.   Yet, the Los Angeles prohibited person made his purchases in just two months, while the New Jersey felon purchased his average of 357 rounds over four years.

86

Christie was *not* advocating for ammunition background checks.   Rather, it was the phenomenon of gangs using "straw purchasers" to buy large amounts of ammunition that was Christie's main concern.   Doc. 34-7 at 57 ("'*The straw purchaser aspect of the ammunition problem is enormous*,' he testified.   'Not only with individuals using fake ID, but people who are just going in at the direction of members of gangs and buying incredible amounts of ammunition. . . tens of thousands of rounds of ammunition that they will use and they will store in safehouses throughout the city, separate from where they keep the firearms, and then they have people who. . .will collect the ammunition from the safehouses for use.'") (emphasis added).   Christie did not recommend state-wide background checks as a solution.   Neither is it obvious how California's new background check can prevent a gang member with a clean record from performing the role of a straw purchaser and buying thousands of rounds to hide in gang safehouses.

It is telling that the New Jersey Commission made nine recommendations. *Id.* at 63-68.   None of the recommendations include requiring an ammunition purchaser to prove citizenship, as California does.   None of the Commission recommendations include requiring citizens at the point of purchasing ammunition

87

to pass a state background check.   As of today, New Jersey still does not require a point-of-sale background check for citizens purchasing ammunition.

### d. *The 2018 University of California Davis School of Medicine Study*

Plaintiffs highlight a more recent study about the ineffectiveness of California's firearm purchase background check system.[50] *See* Alvaro Castillo-Carniglia, et al., *California's Comprehensive Background Check and Misdemeanor Violence Prohibition Policies and Firearm Mortality*, 30 Annals of Epidemiology 50 (2019), Reply Exhibit 40, Doc. 37 at 14-20.[51]   Observing that "we know little about the effectiveness of CBC [comprehensive background check] policies," the authors recently set out to determine the impact of California's background check system for purchasing firearms implemented in 1991.   *Id.* at 14-15.   The study identified the

_____

[50] Four of the researchers work at, and the study was partially funded by, the University of California Davis School of Medicine, Department of Emergency Medicine, Violence Prevention Research Program.   The University of California system is an arm of the State of California, according to state law.   Cal. Govt. Code § 811.2 (" 'Public entity' includes. . .the Regents of the University of California….").

[51] The Annals of Epidemiology describes itself as a peer-reviewed journal.

88

rate of homicides and suicides from firearms during the ten years preceding the background check law and the ten years following.   The conclusion is that the implementation of California's firearm background check law had little or no effect on firearm-related homicide rates.   "[T]he net difference during the 10 years postintervention was practically 0."   *Id.* at 18.

The authors of the study confirmed that the findings are consistent with experiences in Indiana and Tennessee where ending background checks in 1998 did not change the rates of firearm homicide or suicide.   *Id.*   The important point of this new study is that if implementing a comprehensive background check for firearm purchasers has had practically zero effect on California gun violence, then one would not expect a reduction of gun violence from a similar background check for ammunition purchases.

### e.  Other Evidence

The parties offer no other evidence.   That there is a dearth of direct evidence on the efficacy of a state-wide ammunition background check is not surprising. California is the only state to impose a background check.   There are other evidentiary clues, however, that suggest the California ammunition background check will not reduce criminal gun violence.

89

Two clues were touched upon earlier.   First is Congress' experiment of the 1968 Gun Control Act.   After 18 years of experience, the Treasury Department and the Bureau of Alcohol, Tobacco and Firearms informed Congress that the ammunition recordkeeping requirement was not useful for law enforcement. Congress then removed the ammunition regulations in 1986.   The result of that national experiment calls into question the effectiveness of new state ammunition regulations.

Second, it does not take the imagination of Ray Bradbury or George Orwell to predict that a person planning a firearm-related crime will find a way around the background check system.   In fact, it is predicted by the authors of the Los Angeles ammunition study upon which the State relies.   Others have also observed the criminal tendency to avoid background checks.   For example, the authors of the study provided by Plaintiffs identified the phenomenon of criminal avoidance of background checks.   They noted, "[a]bout 80% of all firearms acquired for criminal purposes – 96% of those acquired by prohibited persons – are obtained through private-party transfers."[52] Consistent with these findings, a recent University of

_____

[52] A. Castillo-Carniglia, *California's Comprehensive Background Check*, 30 Annals of Epidemiology, at 50, Reply Exhibit 40, Doc. 37 at 14 (citing K.A. Vittes, et al.,

California Davis survey found that 25 % of firearms are somehow acquired by Californians without going through a background check.   "We also found, unexpectedly, that roughly 25 percent of those who purchased their most recent firearm in California reported that they did not undergo a background check."[53]

### x.   Analysis

For California's background check system and anti-importation measures, legislative history is non-existent.   As for studies in the record, none of the studies suggest the new regulations will achieve the State's interest of reducing gun violence.   In fact, it is not even close.   Quite the opposite, the studies suggest that persons with criminal intent will avoid background checks by using alternative sources such as out-of-state retailers, private person-to-person transfers, or straw

_____

*Legal Status and Source of Offenders' Firearms in States with the Least Stringent Criteria for Gun Ownership,* 19 Injury Prevention 26-31 (2013)).

[53] *See* UC Davis Health, *2018 California Safety and Wellbeing Survey Details Firearm Ownership in the State,* (Nov. 11, 2018).   Found at https://health.ucdavis.edu/publish/news/newsroom/13336 (last visited Feb. 27, 2020).   According to the press release, the 2018 California Safety and Wellbeing Survey is a comprehensive, web-based survey of more than 2,500 Californians age 18 and older on a wide range of topics related to firearms and violence.   It was conducted by the UC Davis Violence Prevention Research Program (VPRP), with funding from the state of California for the UC Firearm Violence Research Center.

91

buyers.   To be clear, at this point in the case, the evidence does not fairly support the notion of Proposition 63 that background check and anti-importation provisions for ammunition acquisition will make the public safer.

Unlike in *Pena* (898 F.3d at 979–80), this Court is not simply substituting its judgment for that of the California legislature.   After all, "in the face of policy disagreements, or even conflicting legislative evidence, 'we must allow the government to select among reasonable alternatives in its policy decisions.'" *Peruta v. Cty. of San Diego*, 824 F.3d 919, 944 (9th Cir. 2016) (*en banc*) (Graber, J., concurring), *cert. denied*, 137 S. Ct. 1995 (2017).   In this case, there is no conflicting legislative evidence supporting the efficacy of state-wide background checks.   None of the evidence supports background checks as a policy choice.   In any event, this is not a question of policy decision making.   This is a question of how far should courts go in allowing states to gut Constitutional rights.   When does a court step in and say "enough"?   When a right has been eviscerated by incremental policy decisions?

Beyond the sheer lack of evidence, the problem with according deference to the state legislature in this kind of a case, as in the *Turner Broadcasting* approach, is that deference is exactly the argument promoted by dissenting Justice Breyer and

92

*rejected* by the Supreme Court's majority in *Heller*.   Yet, the notion of *Turner* deference lives on like a legal zombie lurching through Second Amendment jurisprudence.   Even with deference, a court must determine whether the legislature has based its conclusions upon *substantial* evidence, regardless of whether it is technically admissible evidence.   *Turner II*, 520 U.S. at 196.   The State still bears the burden "affirmatively [to] establish the reasonable fit we require."   *Bd. of Trs. of State Univ. of N.Y.*, 492 U.S. at 480.   To do that, a court resolves a constitutional challenge by an analytical process that parallels its work in ordinary litigation.   "[D]eference afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'"   *Sable Communications of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989).

No case has held that intermediate scrutiny would permit a state to impinge even slightly on the Second Amendment right by employing a known failed experiment.   If the authors of the 2018 study of California's firearms background check are correct, background checks have not worked and do not work.   If Congress is correct, ammunition recordkeeping and anti-importation laws do not work.   It is a quixotic notion that criminals (and those bent on committing crimes) will abide by the law, and pay for a background check where their identifiers are

93

recorded and information about their firearms and ammunition is transmitted to law

enforcement.[54]   Human experience and evidence teaches otherwise.   As Los

Angeles jail inmates reportedly said, underground market guns usually come with

ammunition.[55]

Any other right in the Bill of Rights could not be subjugated upon such

flimsy grounds.   But the rights embedded in the Second Amendment are unwanted

by some and unappreciated by many.   "The right to keep and bear arms is apparently

this Court's constitutional orphan."   *Silvester v. Becerra*, 138 S. Ct. 945, 952 (Justice

_____

[54] "A licensing regime is unlikely to prevent criminals from gaining access to ammunition illegally.   With states like Nevada and Arizona just a short drive away from much of California, criminals will have little problem purchasing out-of-state ammunition with a very low risk of being caught. . . .An ammunition license may prevent a mentally ill individual from purchasing ammunition at the local gun store, and prevent a pure crime of opportunity.   However, many mass-shootings are carefully premeditated, and a perpetrator could just as easily cross the border to buy ammunition.   The most profound effect of the Act will be on the average, law-abiding Californian, who will have to pay for a license and then pay authorized dealers to do the paperwork for ammunition purchases."   Forrest Brown, *The Wild West*, 92 S. Cal. L. Rev., 1232.

[55] *See* Melissa Barragan, et al., *Prohibited Possessors and the Law: How Inmates in Los Angeles Jails Understand Firearm and Ammunition Regulations*, 3 The Russell Sage Foundation Journal of the Social Sciences (2017), at 149.

94

Thomas, dissenting from denial of certiorari).   Beyond the Supreme Court, the

Second Amendment has been described as "the Rodney Dangerfield of the Bill of

Rights."   *Mance v. Sessions*, 896 F.3d 390, 396 (5th Cir. 2018) (Willett, J.,

dissenting).   Well, Mr. Dangerfield can feel better about himself now, because with

Proposition 63, the Second Amendment gets even less respect than he does.

You might not know it, but this case is about what should be a muscular

constitutional right and whether a state can impinge on that right based upon a

popular vote and unconvincing research.   It should be an easy question and answer.

Government is not free to impose its own pure policy choices on American citizens

where Constitutional rights are concerned.   As *Heller* explains, the Second

Amendment takes certain policy choices and removes them beyond the realm of

state action.   California may certainly conceive of an extreme policy like any

amount of ammunition is dangerous in the hands of criminals and that therefore it is

good public policy to keep ammunition out of the hands of every citizen.   A

contrary policy position (a policy many other states endorse) is that ammunition in

the hands of law-abiding citizens makes every individual safer and the public safer.

Either way, the Second Amendment takes that choice of policy away from state

government.

95

There is only one policy enshrined in the Bill of Rights.   Guns and ammunition in the hands of criminals, tyrants and terrorists are poisonous; guns in the hands of law-abiding responsible citizens are the antidote.   To give full life to the core right of self-defense, every law-abiding responsible individual citizen has a constitutionally-protected right to keep and bear firearms *and ammunition*.   No legislature or popular vote has the constitutional authority to dictate to a citizen that he or she may not acquire ordinary and popular ammunition for his or her guns. Nor may the acquisition process be made so unreasonably difficult that she simply throws up her hands and surrenders the right.   Plaintiffs have made a sufficient showing of their likelihood of succeeding on the merits of the Second Amendment claims.

### b.   Interstate Commerce Clause, U.S. Const. Art, I, § 8, Clause 3

Plaintiffs also claim that the anti-importation provisions of Proposition 63, codified at California Penal Code §§ 30312, 30314, 30370, and 30385, violate the Commerce Clause because they favor businesses in California by erecting a barrier to ammunition sellers in other states.

The Commerce Clause, found in Article I, § 8, clause 3 of the United States Constitution, gives Congress the power "[t]o regulate commerce ... among the

96

several states."   Courts have consistently held that this affirmative grant of power to Congress includes a negative implication, which restricts the ability of states to regulate and interfere with interstate commerce.   *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 571 (1997).   That restriction upon the states, referred to as the dormant Commerce Clause, "prohibits economic protectionism — that is, 'regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"   *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996).   Under the dormant Commerce Clause, courts "protect[ ] the free flow of commerce, and thereby safeguard[ ] Congress' latent power from encroachment by the several States[ ]" when Congress has *not* affirmatively exercised its Commerce Clause power.   *Merrion v. Jicarilla Apache Indian Tribe*, 455 U.S. 130, 154 (1982).

The Attorney General argues that the anti-importation provisions pass the usual three Commerce Clause tests, *i.e.*, (1) Prop 63 does not regulate transactions taking place wholly out-of-state; (2) Prop 63 applies equally to California and out-of-state vendors; and (3) Prop 63 does not impose a substantial burden on interstate

commerce.   Thus, it is claimed that Prop 63 is permissible regulation.   This Court is unpersuaded.

Time and again the Supreme Court has held that "in all but the narrowest circumstances state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."   *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (citing *Oregon Waste Systems, Inc. v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994)); *see also New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988). Under Proposition 63, the single fact of residence in another state forecloses a vendor of ammunition from selling directly to California residents.   But *Granholm* says, "[t]he mere fact of nonresidence should not foreclose a producer in one State from access to markets in other States."   *Id.* (citing *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949)).   "This mandate 'reflects a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'"   *Id.* (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325–326 (1979)).

98

Proposition 63 now prohibits a seller of ammunition physically located beyond California from selling directly to customers in California.   *See* § 30312(b).[56]   Prior to January 1, 2018, any merchant physically located outside California was permitted to sell ammunition directly to a customer in California, whether the transaction was accomplished by U.S. Mail, email, an internet web store, a text message, or a telephone.   Shipping arrangements were left up to the seller and buyer.

Since January 1, 2018, Proposition 63 criminalizes all of those transactions with merchants conducting business from other states such as Plaintiff Able's Sporting, Inc. in Texas, Plaintiff AMDEP Holdings, LLC in Florida, and Plaintiff R&S Firearms, Inc. in Arizona.   These transactions are permitted now only if the out-of-state merchant opens a physical store in California and obtains a California

---

[56] (b) Commencing January 1, 2018, the sale, delivery, or transfer of ownership of ammunition by any party may only occur in a face-to-face transaction with the seller, deliverer, or transferor, provided, however, that ammunition may be purchased or acquired over the Internet or through other means of remote ordering if a licensed ammunition vendor initially receives the ammunition and processes the transaction in compliance with this section and Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of this part.

ammunition vendor license.   The only alternative is to hire and arrange for a third-party California-based and California-licensed ammunition vendor to complete the delivery.   The out-of-state product must be delivered first to the California vendor and then from the California vendor to the California customer.   In-state ammunition merchants are not required to accept such a delivery from a non-California merchant.   Because of the face-to-face delivery requirement in Proposition 63, out-of-state businesses who want to continue to sell directly to their California customers will have to open not just one store inside California, but stores in every local market inside California in which they seek to sell ammunition.

Proposition 63's restrictions are similar to the constraint on interstate commerce struck down in *Nationwide Biweekly*.   In *Nationwide Biweekly*, the Ninth Circuit held,

> Thus, California's [prorater] statute does precisely what the Supreme Court says cannot be done except in the "narrowest circumstances," it requires any corporation that wants to engage in a certain kind of business within the state to become a resident.
> If states were allowed to require local incorporation [or residency] as a condition of engaging in interstate commerce, then national corporations could be required to incorporate in all 50 states in order to do business—either by creating an individual subsidiary for each state or by some similar means. No matter the specific approach taken, requiring incorporation under the laws of each individual state in order to operate a national business would contribute toward precisely the "Balkanization" the Dormant Commerce Clause is meant to prevent.

100

*Nationwide Biweekly Admin., Inc. v. Owen,* 873 F.3d 716, 736-37 (9th Cir. 2017), *cert. denied sub nom., Nationwide Biweekly Admin., Inc. v. Hubanks,* 138 S. Ct. 1698 (2018) (citing *Heald*, 544 U.S. at 472) (reversing the denial of a preliminary injunction); c*.f., American Fuel & Petrochemical Manufacturers v. O'Keefe*, 903 F.3d 903, 914 (9th Cir. 2018) (no Commerce Clause violation in Oregon fuel carbon tax scheme because, "the Program does not require or even incentivize an out-of-state operator to become a resident in order to compete on equal terms."); *see also Philadelphia v. New Jersey*, 437 U.S. 617, 628 (1978) ("The New Jersey law at issue in this case falls squarely within the area that the Commerce Clause puts off limits to state regulation. . . .What is crucial is the attempt by one State to isolate itself from a problem common to many by erecting a barrier against the movement of interstate trade.").

The Attorney General objects that Proposition 63 does not force out-of-state ammunition stores to *incorporate* in California like the statute struck down in *Nationwide Biweekly.*   While correct, the objection misses the point.   In that case the court explained that by incorporating in California, a firm became a California resident.   *Id.* at 736.   The Commerce Clause problem was forcing a corporation to become a state resident in order to compete.   "Thus, California's statute does

101

precisely what the Supreme Court says cannot be done except in the 'narrowest

circumstances': it requires any corporation that wants to engage in a certain kind of

business within the state to *become a resident*."   *Id.* at 736-37 (emphasis added).

Proposition 63 also requires any ammunition seller that wants to engage in business

with California customers to *become a resident*.   *Cf. Rosenblatt v. City of Santa*

*Monica*, 940 F.3d 439, 451 (9th Cir. 2019) (no dormant commerce clause problem

because ordinance did not require out-of-state firm "to become a resident in order to

compete on equal terms").

Defendant argues that Proposition 63 treats out-of-state online sellers and in-

state online sellers the same.   Both must complete a sale through a third-party

ammunition vendor and therefore, argues the Attorney General, the regulation is

even handed.[57]  Def.'s Opp'n, Doc. 34, at 22 (citing *Pharm. Research & Mfrs. Of*

*Am. v. Alameda*, 768 F3d 1037, 1042 (9th Cir. 2014).   But how a state disfavors its

_____

[57] This is similar to the argument made by the in-state New York wineries to justify
its burden on interstate commerce.   "New York and those allied with its interests
defend the scheme by arguing that an out of state winery has the same access to the
State's consumers as in state wineries: All wine must be sold through a licensee fully
accountable to New York; it just so happens that in order to become a licensee, a
winery must have a physical presence in the State."   *Granholm v. Heald*, 544 U.S.
460, 474-75 (2005).   It was an argument the Court found unconvincing.   *Id.*

resident online sellers compared to its resident brick-and-mortar sellers is of no

moment for Commerce Clause analysis.   What is important is that California's

resident businesses are the only businesses that may sell directly to ammunition

consumers.   Sales of any quantity, by all other sellers, anywhere else in the country,

must be funneled through a California resident vendor licensed to sell ammunition.

*Nationwide Biweekly*, 873 F.3d at 737 ("The correct comparison, however, is

between California corporations that are organized for the purpose of being proraters

and out-of-state corporations that are organized for the purpose of being proraters . .

. . The out-of-state corporation must either incorporate in California or create a

subsidiary incorporated in California.   The statute therefore discriminates against

out-of-state economic interests.").

California's ammunition anti-importation laws are similar to New York's

wine anti-importation law prohibiting direct sales from out-of-state wineries which

was struck down for violating the Commerce Clause in *Heald*.   There, the U.S.

Supreme Court observed, "[w]e have viewed with particular suspicion state statutes

requiring business operations to be performed in the home State that could more

efficiently be performed elsewhere.   New York's in-state presence requirement runs

contrary to our admonition that States cannot require an out-of-state firm to become

a resident in order to compete on equal terms." *Heald*, 544 U.S. at 474–75

(quotation marks and citations omitted); *but see Brown & Williamson Tobacco*

*Corp. v. Pataki*, 320 F.3d 200 (2nd Cir. 2002) (statute requiring in-state face-to-face

sales of more than four cartons of cigarettes did not violate Commerce Clause).

Courts analyze dormant Commerce Clause claims using the Supreme Court's

two-tiered approach. *Pharm. Research & Mfrs. of Am.,* 768 F.3d at 1041.   The first

tier test is whether the state law discriminates directly against interstate commerce or

directly regulates interstate commerce. *Id.*   If the state law does either, "it violates

the Commerce Clause per se, and we must strike it down without further inquiry."

*Id.* (citation omitted).   Proposition 63 does both and directly violates the dormant

Commerce Clause.

In the second tier, where a statute regulates even-handedly to effectuate a

local public interest and has only incidental effects on interstate commerce, courts

weigh whether the burden on commerce is excessive in relation to the putative local

benefit. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).   Though a full trial

is down the road, at this early stage there are reasonable inferences to be drawn that

Proposition 63 significantly burdens interstate commerce in ammunition.   Out-of-

104

state firms could administer the same background checks for ammunition purchases as do California sellers.

A Federal Firearms dealer in California is automatically deemed a licensed ammunition vendor.   A Federal Firearms dealer in Arizona, for example, would presumably be as trustworthy.   The Arizona dealer could run the same website software to connect to the California Department of Justice as do in-state dealers. The Arizona dealer could presumably require a California buyer to fill and sign the same application forms and display the same identification documents through an on-line connection and/or a live video phone call.   Once a customer qualified for a background check, the Arizona dealer could then access the same California Department of Justice website to run the background check and receive the same results in the same manner as an in-state vendor.   Persons prohibited under Federal and California law would still fail the test and would still be unable to acquire ammunition.   California residents passing the background test, on the other hand, would then be able to arrange with the Arizona dealer the method of delivery. Delivery could be restricted to the physical address of the California customer.   The primary difference would be that in the case of the California vendor there would be immediate delivery into the hands of the resident with no waiting and no restriction

105

to delivery at the customer's physical address.   In the case of the Arizona dealer, the product would require shipping to a specific address (which could aid law enforcement) and waiting for the delivery (which could alleviate the same concerns addressed by the 10-day cooling off period for firearm purchases).   The isolationist burdens on interstate commerce created by California's Proposition 63 appears at this early stage of litigation to far outweigh whatever benefit it is designed to achieve.   *Dep't of Revenue of Kentucky v. Davis*, 533 U.S. 328, 353 (2008) ("We generally leave the courtroom door open to plaintiffs invoking the rule in *Pike*, that even nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice."); *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, (1970) ("And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.").   State laws that directly discriminate against out-of-state entities can survive only if the state "demonstrate[s] both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means."   *Maine v. Taylor*, 477 U.S. 131, 138 (1986) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)).

106

The Attorney General may argue that stopping the flow of ammunition into the state is a matter of public safety.   A similar argument was addressed and rejected where the State of New Jersey legislated a stop to the flow of refuse from other states to protect its environment.   The Supreme Court teaches that a good legislative purpose does not matter.

> The Court has consistently found parochial legislation of this kind to be constitutionally invalid, whether the ultimate aim of the legislation was to assure a steady supply of milk by erecting barriers to allegedly ruinous outside competition, or to create jobs by keeping industry within the State, or to preserve the State's financial resources from depletion by fencing out indigent immigrants.   In each of these cases, a presumably legitimate goal was sought to be achieved by the illegitimate means of isolating the State from the national economy.

*Philadelphia,* 437 U.S. at 627 (citations omitted).   Even if the Attorney General were to characterize California's solution as isolating itself from the flow of obnoxious ammunition into the state, *Philadelphia* paints the picture of how the unconstitutional barrier building plays out,

> Today, cities in Pennsylvania and New York find it expedient or necessary to send their waste into New Jersey for disposal, and New Jersey claims the right to close its borders to such traffic.   Tomorrow, cities in New Jersey may find it expedient or necessary to send their waste into Pennsylvania or New York for disposal, and those States might then claim the right to close their borders. The Commerce Clause will protect New Jersey in the future, just as it protects her neighbors now, from efforts by one State to isolate itself in the stream of interstate commerce from a problem shared by all.

107

437 U.S. 617 at 629.

*Granholm* struck down a state law that prohibited purchasing wine from out-of-state using the internet in order to prevent illicit purchases by minors.   However, the state provided little evidence to show that internet sales to minors was a problem. *Granholm*, 544 U.S. at 490.   In fact, there were no complaints of the sort in the 26 states allowing direct wine shipments.   *Id*.   The Court also noted that the lack of a problem was not surprising.   Among other things, the Court noted direct shipping is an imperfect avenue of obtaining alcohol for minors who "want instant gratification."   *Id*. (citation omitted).   Regardless, the Court said that minors are just as likely to buy wine from in-state producers and thus a ban on direct shipping from out-of-state wineries could not be justified.   *Id.*

*Granholm* teaches that "[o]ur Commerce Clause cases demand more than mere speculation to support discrimination against out-of-state goods.   The burden is on the State to show that the *discrimination* is demonstrably justified."   *Id.* at 492 (internal quotation marks omitted).   "Without concrete evidence that direct shipping of wine is likely to increase alcohol consumption by minors, we are left with the States' unsupported assertions.   Under our precedents, which require the 'clearest showing' to justify discriminatory state regulation, this is not enough."   *Id.* at 490.

108

The State of California has not offered any evidence at this stage that out-of-state ammunition businesses have been selling ammunition to prohibited persons in California.   Like the minors in *Granholm* who want instant gratification and for whom waiting upon interstate shipping is a discouragement, some ammunition buyers bent on immediate crime want ammunition right away and would likely be frustrated in their criminal purposes by waiting for interstate shipping of ammunition.   Also, it is not hard to imagine that a prohibited person would not want to lead law enforcement to his door by internet-ordering ammunition to be delivered to his home address.   Judicial speculation aside, without concrete evidence that direct shipping of ammunition is likely to supply violent criminals and prohibited persons with ammunition, the Court is left with the State's unsupported assertions. Under *Granholm*, which requires the clearest showing to justify discriminatory state regulation, California's purely legal argument without evidence is not enough.

Plaintiffs have made a sufficient showing of their likelihood of succeeding on the merits of the dormant Commerce Clause claims.

## 2.  Irreparable Harm

As to the second element for injunctive relief, the Court finds Plaintiffs have carried their burden to show the likelihood of irreparable harm.   There are elements

of Second Amendment jurisprudence that have First Amendment analogies.

*Jackson*, 746 F.3d at 960.   The Ninth Circuit has held that the "[t]he loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes

irreparable injury."   *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012)

(alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).   "A

colorable First Amendment claim" is "irreparable injury sufficient to merit the grant

of relief,"   *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal

quotation marks omitted), and "[i]f the underlying constitutional question is close. . .

we should uphold the injunction and remand for trial on the merits."   *Ashcroft v.*

*Am. Civil Liberties Union*, 542 U.S. 656, 664-65 (2004).

The same is true for Second Amendment rights.   Their loss even for minimal

times constitutes irreparable injury.   Perhaps even more so in this context, where

Plaintiffs and those like them may want ammunition for self-defense but are not

permitted to buy ammunition until bureaucratic hurdles are cleared.   The right to

keep and bear arms is the insurance policy behind the right to life.   If a state

regulation prevents a citizen from protecting his life, his other constitutional rights

will be superfluous.   The right to keep and bear arms protects both tangible and

intangible interests which cannot be compensated by damages.   *Grace v. District of*

110

*Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) (quoting *Ezell v. City of Chicago*, 651 F.3d at 684, 699 (7th Cir. 2011).   "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence and psychic comfort that comes with knowing one could protect oneself if necessary." *Grace*, 187 F. Supp. 3d at 150.   Loss of that peace of mind, loss of the ability to acquire ammunition when needed, and the loss of enjoyment of Second Amend rights constitutes irreparable injury.

The Attorney General suggests that even if there is a likelihood of success on the merits, any harm is not irreparable because Plaintiffs will still be able to purchase ammunition and it will only take about five minutes.   Def.'s Opp'n, Doc. 34, at 23.   With an accurate and instant background check system working, and if all residents qualified to take the background check, the harm could indeed be reduced.   Even so, reduced harm is still unlawful harm when, as appears to be the case here, a Constitutional right is burdened with scant justification.   But the background check system is not working well.   Thousands of law-abiding citizen residents have been completely and unjustifiably rebuffed.   Others are delayed days and weeks while trying to overcome bureaucratic obstacles.   Worse, more than 50% of law-abiding citizens who were rejected since last July remain rejected.   These

111

residents have no other lawful alternatives for acquiring ammunition they need. When one needs to defend herself, family, or property right now, but is defenseless for lack of ammunition, it is the heaviest kind of irreparable harm.

The dormant Commerce Clause impingement by the anti-importation provisions of Proposition 63 visit irreparable harm on both California purchasers and non-California ammunition vendors.   For the 101,047 California citizen residents who are law-abiding owners of firearms and who have already been rejected by in-state background check, the anti-importation provisions extend the reach of the Second Amendment harm.   Where a citizen resident could buy ammunition from beyond state lines previously, now she is completely cut off from enjoying his Second Amendment rights.   The Attorney General argues that the Plaintiffs waited too long to seek preliminary relief.   But the effect of the anti-importation law was tempered by the freedom to buy ammunition within the State prior to July 1, 2019. The inefficiencies and inexactitude of the system implemented by the State could not have been know until then.   The preliminary injunction motion was brought shortly afterwards.

The harm suffered by the non-California Plaintiff ammunition vendors, and all out-of-state vendors who previously did business with California residents is

dramatic.   The vendors' declarations do not tell of flattening sales curves or diminishing customer demand.   The drop in business with California customers was immediate and complete.

### 3.   Balance of Hardships

As to the third element, on balance, the hardships faced by Plaintiffs significantly outweigh those faced by Defendant.   Balancing in the First Amendment context weighs more heavily the chilled rights of individuals, especially when criminal sanctions loom.   "As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some hardship on the State.   Nevertheless, the balance of equities favors Appellees, whose First Amendment rights are being chilled.   This is especially so because the Act under scrutiny imposes criminal sanctions for failure to comply."   *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014).   "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial.   There is a potential for extraordinary harm and a serious chill upon protected speech."   *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 670-71 (2004).

The same is true here.   While a preliminary injunction is pending, there may be some hardship on the State.   Nevertheless, because the ammunition background check statutes threaten criminal sanctions on sellers and residents and often completely block the acquisition of ammunition, the statutes pose the potential for harm on Plaintiffs by inhibiting and obstructing their ability to defend their properties, families, and lives.   The balance of hardships favors Plaintiffs.

The Attorney General argues that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.   "But the Ninth Circuit has distanced itself from this understanding of a state's irreparable injury."   *Lydia Olson, et al. v. State of California, et al.*, No. CV1910956-DMG-RAOx, 2020 WL 905572, at *15 (C.D. Cal. Feb. 10, 2020) (citing *Latta v. Otter*, 771 F.3d 496, 500 n.1 (9th Cir. 2014)) ("Individual justices, in orders issued from chambers, have expressed the view that a state suffers irreparable injury when one of its laws is enjoined.   No opinion for the Court adopts this view.") (internal citations omitted).   And if there is any injury to the State, it is unquestionably of its own making.

114

### 4. Public Interest

Once Plaintiffs satisfy the first two factors (likelihood of success on the merits and irreparable harm), the traditional injunction test calls for assessing the harm to the opposing party and weighing the public interest.   Sometimes these factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).   The public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens.   It is always in the public interest to prevent government from violating a citizen's constitutional rights.   *Hobby Lobby Stores, Inc. v. Sibelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *Doe v. Harris*, 772 F.3d at 583 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002) ("Finally, the public interest favors the exercise of First Amendment rights . . . . we 'have consistently recognized the significant public interest in upholding First Amendment principles.'").   Where a likely constitutionally infringing statute is preliminarily enjoined to maintain the status quo pre-infringement, the injunction is in the public interest.   That is the case here.

This is not like the case in *Tracy Rifle & Pistol LLC v. Harris* (118 F. Supp. 3d 1182 (E.D. Cal. 2015), *aff'd*, 637 F.App'x 401 (9th Cir. 2016)), finding the

balance of harms weighed in favor of the government.   There the court was understandably concerned noting, "[t]he costs of being mistaken, on the issue of whether the injunction would have a detrimental effect on handgun crime, violence, and suicide, would be grave."   *Id.* at 1193.   On the other side of the scale in *Tracy*, the irreparable harm to plaintiffs was slight.   In one case, the plaintiff's harm involved taking down window handgun decals and in another case the plaintiff's harm was taking down a three-by-two-foot sign shaped like a handgun hung outside the plaintiff's store.   *Id.* at 1191.   The stores were still permitted to advertise firearms in other ways.   *Id.*   Consequently, *Tracy*'s balancing in favor of the government and denial of injunctive relief, despite the plaintiffs' likelihood of success on the merits, makes sense.   Here, in contrast, the potential for the most serious kind of irreparable harm a person can suffer due to the government blocking access to ammunition, is far weightier than the harm in *Tracy*.

The public interest also lies in maintaining the unitary strength of the many United States of America, which dormant Commerce Clause principles support. Though the State of California is a large and important member, it is still only one part of the greater 50-state economy.   The anti-importation provisions insulate the

116

state from ammunition commerce and competition from the other states.   The United States Congress may have the authority to do that, but not state lawmakers.

## III.   CONCLUSION

Together, the background check requirement for all ammunition purchases in California and the anti-importation provisions that prohibit direct sales to residents often effect a complete statutory barrier to the lawful purchase of ammunition. Moreover, the provisions are interlocking and derive from the same section of Proposition 63.   See §§ 8.1 through 8.16.   The anti-importation provisions are not severable from the ammunition background check requirements.   Even if only one part was unconstitutional both parts would need to be enjoined.   But severability does not matter here, as both parts fail constitutional muster and require injunctive relief.

The Court does not lightly enjoin a state statute, even on a preliminary basis. However, just as the Court is mindful that a majority of California voters approved Proposition 63 and that government has a legitimate interest in protecting the public from gun violence, it is equally mindful that the Constitution remains a shield from the tyranny of the majority.   As Senator Kennedy said, "[t]he judiciary is – and is often the only – protector of individual rights that are at the heart of our

117

democracy."[58] Law-abiding citizens are imbued with the unalienable right to keep

and bear firearms along with the ammunition to make their firearms work.   That a

majority today may wish it were otherwise, does not change the Constitutional right.

It never has.   California has tried its unprecedented experiment.   The casualties

suffered by law abiding citizens have been counted.   Presently, California and many

other states sit in isolation under pandemic-inspired stay-at-home orders.   Schools,

parks, beaches, and countless non-essential businesses are closed.   Courts are

limping by while police make arrests for only the more serious crimes.   Maintaining

Second Amendment rights are especially important in times like these.   Keeping

vigilant is necessary in both bad times and good, for if we let these rights lapse in

the good times, they might never be recovered in time to resist the next appearance

of criminals, terrorists, or tyrants.

Accordingly, the Court enjoins the State of California from enforcing the

ammunition sales background check provisions found in California Penal Code §§

_____

[58] Senator Ted Kennedy, Senate Hearing on the Nomination of Robert Bork, 1987.
Norma Vieira & Leonard Gross, *Supreme Court Appointments: Judge Bork and the Politicization of Senate Confirmations* 26 (Southern Illinois University Press 1998).

118

30370(a) through (d) and 30352, and the ammunition anti-importation provisions found in §§ 30312(a) and (b), 30314(a).   Criminal enforcement of California Penal Code §§ 30365, 30312(d) and 30314(c) is preliminarily enjoined by the Attorney General and all other law enforcement defendants during the pendency of this action.

It is not the Court's role to dictate to a state how it should go about attempting to accomplish its goal.   If the state objective is to make it extremely difficult, if not impossible, for its law-abiding citizens to purchase protected ammunition, then this law appears to be well-drafted.   However, if the genuine object is to keep ammunition out of the hands of those who should not be able to buy it, perhaps the State could create a database (that would include persons prohibited, *i.e.*, aliens unlawfully present, felons, and others) and simply make that information available to sellers by cross-checking with the magnetic strip on a standard driver's license and by allowing out-of-state vendors the same ability to engage in commerce as it does California vendors.

**IT IS HEREBY ORDERED** that:

1.   Defendant Attorney General Xavier Becerra, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or

119

participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing the ammunition sales background check provisions found in California Penal Code §§ 30370(a) through (d) and 30352, and the ammunition anti-importation provisions found in §§ 30312(a) and (b), and 30314(a) as well as the criminal enforcement of California Penal Code §§ 30365, 30312(d) and 30314(c).

2. Defendant Attorney General Xavier Becerra shall provide forthwith, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.   Within 10 days, the government shall file a declaration establishing proof of such notice.   Alternatively, the parties may file a stipulation.

**IT IS SO ORDERED.**

**DATED: April 23, 2020**

**Roger T. Benitez**
**United States District Judge**

120