1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  JOHN D. ECHEVERRIA
   Deputy Attorney General
4  State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
5   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
6   Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta, in his*
   *official capacity as California Attorney*
8  *General*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

13  **KIM RHODE et al.,**                Case No. 3:18-cv-00802-BEN-JLB

14                        Plaintiffs,    **DEFENDANT'S BRIEF IN**
                                         **RESPONSE TO THE COURT'S**
15       **v.**                          **ORDER ENTERED ON**
                                         **DECEMBER 15, 2022**
16

17  **ROB BONTA, in his official capacity**  Courtroom:   5A
    **as Attorney General of the State of**  Judge:       Hon. Roger T. Benitez
18  **California, et al.,**                   Action Filed:  April 26, 2018

19                        Defendant.

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

Introduction .......................................................................................... 1

Background ........................................................................................... 2

    I.     California's Ammunition Laws ................................................... 2

          A.     Requirement for Face-to-Face Transactions ................... 3

          B.     Record-Keeping and Background Check Requirements ........... 3

               1.     The Basic Check ................................................... 3

               2.     The Standard Check ................................................ 5

    II.    Procedural History ................................................................... 7

Argument .............................................................................................. 8

    I.     The Attorney General Objects to the Expedited Post-Remand Proceedings ............................................................................... 8

    II.    Plaintiffs Lack Standing for any As-Applied Challenge, and Their Facial Challenge Fails Outright .................................... 10

          A.     Plaintiffs Lack Standing for any As-Applied Challenge ......... 10

          B.     Plaintiffs' Facial Challenge Necessarily Fails .......................... 11

    III.   Plaintiffs' Second Amendment Claims Fail Under *Bruen* ................. 13

          A.     *Bruen*'s Text-and-History Standard for Analyzing Second Amendment Claims ................................................. 13

          B.     Plaintiffs Have Not Shown That the Ammunition Laws Burden Conduct Covered by the Plain Text of the Second Amendment .......................................................... 15

          C.     The Ammunition Laws Are Consistent with Traditions of Firearms Regulation ............................................... 18

               1.     This Case Requires a "More Nuanced" Approach ........ 18

               2.     The Ammunition Laws Are Relevantly Similar to Laws Restricting Possession of Firearms and Ammunition ......................................................... 20

Conclusion ......................................................................................... 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Abramski v. United States*
    573 U.S. 169 (2014) ................................................................ 24

*Bauer v. Becerra*
    858 F.3d 1216 (9th Cir. 2017) ................................................... 6

*Binderup v. Attorney General of the United States*
    836 F.3d 336 (3d Cir. 2016) ..................................................... 22

*Calvary Chapel Bible Fellowship v. City of Riverside*
    948 F.3d 1172 (9th Cir. 2020) .................................................. 12

*Defense Distributed v. Bonta*
    2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) .................. 8, 14, 15, 16

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ...................................... 13, 15, 16, 24

*Dred Scott v. Sandford*
    19 How. 393 (1857)................................................................. 21

*Duncan v. Bonta*
    19 F.4th 1087 (9th Cir. 2021) (en banc)............................ 11, 22

*Duncan v. Bonta*
    49 F.4th 1228 (9th Cir. 2022)................................................... 11

*E. Bay Sanctuary Covenant v. Biden*
    993 F.3d 640 (9th Cir. 2021) .................................................. 10

*Folajtar v. Att'y Gen. of the United States*
    980 F.3d 897 (3d Cir. 2020) ..................................................... 22

*Fouts v. Bonta*
    561 F. Supp. 3d 941 (S.D. Cal. 2021) ..................................... 8, 9

*Hightower v. City of Boston*
    693 F.3d 61 (1st Cir. 2012) ..................................................... 11

ii

1

2

## TABLE OF AUTHORITIES
### (continued)

Page

3
*Jackson v. City & Cnty. of S.F.*
4
    746 F.3d 953 (9th Cir. 2014) .................................................. 12, 13, 17

5
*Kanter v. Barr*
6
    919 F.3d 437 (7th Cir. 2019) ............................................................ 22, 23

7
*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*
8
    624 F.3d 1083 (9th Cir. 2010) ............................................................. 11

9
*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ............................................................... 2, 15
10

11
*Medina v. Whitaker*
    913 F.3d 152 (D.C. Cir. 2019) ............................................................ 22

12

13
*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
    2022 WL 3083715 (N.D. Cal. Aug. 3, 2022) .............................. 13, 15

14
*Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms &*
15
    *Explosives*
    700 F.3d 185 (5th Cir. 2012) ............................................................ 22
16

17
*New York State Rifle & Pistol Ass'n v. Bruen*
    142 S. Ct. 2111 (2022) ...............................................................*passim*
18

19
*Ocean State Tactical, LLC v. State of Rhode Island*
    2022 WL 17721175 (D.R.I. Dec. 14, 2022) ................................. 9, 14

20
*Or. Firearms Fed'n v. Brown*
21
    2022 WL 17454829 (D. Or. Dec. 6, 2022) ................................. 14, 23

22
*Printz v. United States*
23
    521 U.S. 898 (1997) ....................................................................... 23

24
*Puente Ariz. v. Arpaio*
25
    821 F.3d 1098 (9th Cir. 2016) ............................................................ 11

26
*San Diego Cnty. Gun Rights Comm'n v. Reno*
    98 F.3d 1121 (9th Cir. 1996) ............................................................. 11
27

28

iii

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016) ......................................................................... 18, 19

5
6

*Sprint Telephony PCS, L.P. v. Cty. of San Diego*
    543 F.3d 571 (9th Cir. 2008) ............................................................................. 11

7
8

*States v. Carter*
    669 F.3d 411 (4th Cir. 2012) ............................................................................. 22

9

*Teixeira v. County of Alameda*
    873 F.3d 670 (9th Cir. 2017) (en banc) ............................................................ 10

10
11

*United States v. Carpio-Leon*
    701 F.3d 974 (5th Cir. 2012) ............................................................................. 22

12
13

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) ........................................................................... 10

14
15

*United States v. Kelly*
    2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ............................................... 9

16
17

*United States v. Rahimi*
    2023 WL 1459240 (5th Cir. Feb. 2, 2023) ......................................................... 12

18
19

*United States v. Reyna*
    2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) ................................................. 16

20
21

*United States v. Salerno*
    481 U.S. 739 (1987) ........................................................................................... 11

22

*United States v. Skoien*
    614 F.3d 638 (7th Cir. 2010) ............................................................................. 23

23
24

*United States v. Vongxay*
    594 F.3d 1111 (9th Cir. 2010) ....................................................................... 2, 22

25
26

*Wash. State Grange v. Wash. State Republican Party*
    552 U.S. 442 (2008) ........................................................................................... 12

27
28

*Wiese v. Becerra*
    306 F. Supp. 3d 1190 (E.D. Cal. 2018) ............................................................. 11

iv

1

## **TABLE OF AUTHORITIES**
### (continued)

2

**Page**

3

**STATUTES**

4

United States Code, Title 18

5
  § 922(c) .................................................................................................. 24

6
  § 922(g) ..................................................................................... 2, 12, 24

  § 922(g)(8) ........................................................................................... 12

7
  § 926A .................................................................................................... 7

8
Assembly Bill No. 1621

9
  § 1(a) .................................................................................................... 20

  § 1(a)(5) ............................................................................................... 20

10
Senate Bill 1235 ....................................................................................... 1

11

12
California Penal Code

  § 11106 .................................................................................................. 5

13
  § 26905 .................................................................................................. 5

  § 28180(a) .......................................................................................... 4, 5

14
  § 28180(b) ............................................................................................. 4

15
  §§ 29800, 29805 ......................................................................... 2, 12, 24

  §§ 30000, 30005 .............................................................................. 5, 6

16
  § 30312 .............................................................................................. 3, 7

17
  § 30312(a)(1) ......................................................................................... 3

  § 30312(b) ............................................................................................. 3

18
  § 30312(c) .......................................................................................... 3, 4

19
  § 30314 .................................................................................................. 7

  § 30352 ....................................................................................... 3, 12, 24

20
  § 30352(a)(2) ......................................................................................... 4

21
  §§ 30352(b)–(d) ..................................................................................... 3

  § 30352(e) .......................................................................................... 3, 4

22
  § 30370 ............................................................................................ 3, 12

23
  § 30370(a) ............................................................................................. 3

  § 30370(a)(1) ......................................................................................... 5

24
  § 30370(a)(3) ......................................................................................... 4

25
  § 30370(d) .......................................................................................... 5, 6

  § 30370(e) ............................................................................................. 5

26
  § 30385(d) ............................................................................................. 3

27

28

v

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4
California Welfare & Institutions Code
　　§ 8103 ........................................................................... 2, 12, 24

5
2016 Cal. Stat., Chapter 55 .................................................... 1

6
Pub. L. No. 109-13, 119 Stat. 231 ......................................... 4

7
8
**REGULATIONS**

9
California Code of Regulations, Title 11
　　§ 4045.1 .......................................................................... 4

10
　　§§ 4260-4264 .................................................................. 3

11
　　§§ 4280–4289 .................................................................. 3
　　§§ 4282-4283 .................................................................. 12

12
　　§ 4282 ........................................................................... 5, 6

13
　　§ 4282(a) ........................................................................ 5
　　§ 4282(c) ........................................................................ 5

14
　　§ 4283 ............................................................................ 3

15
　　§ 4283(a)–(c) .................................................................. 4
　　§ 4284 ............................................................................ 6

16
17
**CONSTITUTIONAL PROVISIONS**

18
United States Constitution
　　First Amendment ............................................................ 11

19
　　Second Amendment........................................................ *passim*

20
　　Thirteenth Amendment .................................................. 21
　　Fourteenth Amendment .................................................. 8, 20, 21

21
22
**COURT RULES**

23
Federal Rules of Civil Procedure
　　Rule 42............................................................................ 10

24
**OTHER AUTHORITIES**

25
26
87 Fed. Reg. at 24662 ............................................................ 20

27
Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135
　　Harv. L. Rev. F. 537 (2022) ............................................ 21

28

vi

# TABLE OF AUTHORITIES
### (continued)

Page

C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741 (1993)................. 15

Cal. Sec'y of State, Cal. Gen. Election Official Voter Info. Guide 164
(2016).......................................................................................................... 25

Margot Sanger-Katz & Quoctrung Bui, *People Kill People. But the
Bullets Seem to Matter*, N.Y. Times, Mar. 27, 2019 ........................................ 19

William Baude & Stephen E. Sachs, *Originalism & the Law of the
Past* l. & Hist. Rev. 809 (2019) .......................................................................... 21

vii

**INTRODUCTION**

California's Ammunition Laws[1] guard against the purchase of ammunition by persons prohibited from doing so under state or federal law.  The Ammunition Laws are constitutional under the new text-and-history standard for Second Amendment claims adopted by the Supreme Court in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).  Under this standard, courts must determine whether "the Second Amendment's plain text covers an individual's conduct" regulated by the challenged law, and if it does, the burden then shifts to the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126.  Here, the Ammunition Laws are constitutional at both stages of the analysis.

*First*, at the textual stage, Plaintiffs cannot show that their proposed course of conduct is covered by the "plain text" of the Second Amendment.  *Bruen*, 142 S. Ct. at 2126.  Plaintiffs fail to carry their burden of demonstrating that the "plain text" of the Second Amendment covers their proposed course of conduct—purchasing ammunition without complying with the Ammunition Laws.  *See Bruen*, 142 S. Ct. at 2126.  Those laws do not prevent any law-abiding citizen from "keep[ing]" or "bear[ing]" any "Arms," U.S. Const. amend. II, or from purchasing ammunition necessary to operate a firearm and effectively exercise that right.

*Second*, even if Plaintiffs could satisfy their initial burden under *Bruen*, the Ammunition Laws are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.  In *Bruen*, the Supreme Court approved of background checks to ensure that only law-abiding individuals are permitted to

---

[1] The Attorney General uses "Ammunition Laws" to refer to the laws that require that (1) ammunition transactions take place in a face-to-face interaction at a licensed ammunition vendor, (2) purchasers submit to a background check before the ammunition sale or transfer may be completed, (3) purchasers demonstrate proof of lawful presence in this country, and (4) ammunition vendors report certain information to the California Department of Justice.  These provisions were enacted by Proposition 63, as amended by Senate Bill 1235.  2016 Cal. Stat., ch. 55.

1

1   carry firearms in public.  *Bruen*, 142 S. Ct. at 2138 n.9.  Nothing in the opinion

2   questions the constitutionality of background checks to ensure that only law-

3   abiding citizens are able to purchase and possess firearms and ammunition.  The

4   Ammunition Laws merely extend the application of background checks to the

5   purchase of ammunition, ensuring that individuals prohibited under state and

6   federal law from possessing firearms and ammunition are not able to acquire

7   ammunition.  This requirement is consistent with the recognized tradition of

8   preventing dangerous or unvirtuous individuals from keeping or bearing arms.  *See*

9   *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010).

10       California may be the first state to extend the use of background checks to

11   ammunition purchases, but *Bruen* made clear that the Second Amendment is not a

12   "regulatory straightjacket."  *Bruen*, 142 S. Ct. at 2133.  It does not preclude

13   California from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh,

14   J., concurring), and "experiment[ing] with reasonable firearms regulations" to

15   address threats to public safety, *McDonald v. City of Chicago*, 561 U.S. 742, 785

16   (2010) (plurality opinion).  California's expansion of background checks to prevent

17   prohibited persons from acquiring ammunition is a permissible exercise of its

18   police powers, responsive to emerging concerns about the acquisition of firearms

19   by prohibited persons, and entirely consistent with the Second Amendment.

20   **BACKGROUND**

21   **I.   CALIFORNIA'S AMMUNITION LAWS**

22       Federal and state law prohibit certain groups of people from possessing

23   firearms and ammunition, including felons, the dangerously mentally ill, and those

24   convicted of domestic violence. 18 U.S.C. § 922(g); Cal. Penal Code §§ 29800,

25   29805; Cal. Welf. & Inst. Code § 8103.  The Ammunition Laws guard against the

26   purchase of ammunition by prohibited persons, by requiring face-to-face

27   transactions and background checks.

28

2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A.    Requirement for Face-to-Face Transactions

As of January 2018, ammunition vendors must obtain a license.  Cal. Penal Code § 30312(a)(1); Cal. Code Regs., tit. 11, §§ 4260-64.  A licensed vendor must process all ammunition sales, deliveries, or transfers in face-to-face transactions.  Cal. Penal Code §§ 30312, 30352, 30385(d).  Californians may still purchase ammunition online or from other lawful sources.  *Id*. § 30312(b).  But those purchases must be received and processed in-person by a licensed vendor.  *Id.*  Similarly, residents bringing ammunition obtained outside the State into California must first deliver it to a licensed ammunition vendor for processing.  *Id.* § 30314.

### B.    Record-Keeping and Background Check Requirements

As of July 2019, licensed vendors must record information about the purchase—including the purchaser's driver's license number and home address, and the brand, type, and amount of ammunition—and submit that information to the California Department of Justice (the "Department").  Cal. Penal Code §§ 30352(b)–(d), 30370(a).  Vendors must also conduct background checks before selling or transferring ammunition, to ensure that the purchaser is not a prohibited person.  *Id.* §§ 30352, 30370; Cal. Code Regs., tit. 11, §§ 4280–4289.  Vendors determine most purchasers' eligibility in one of two ways, as described below.[2]

#### 1.    The Basic Check

Vendors can determine whether any Californian is prohibited from purchasing ammunition by conducting a "Basic Ammunition Eligibility Check," which costs $19.  Cal. Code Regs., tit. 11, § 4283.  These checks authorize a purchase of any quantity of ammunition in a single transaction, meaning that a person must complete another Basic Check for any subsequent ammunition transaction (unless

---

[2] The law exempts certain groups, such as sworn peace officers, from various requirements.  *See* Cal. Penal Code §§ 30312(c), 30352(e).  These exemptions are not at issue in this case.

3

1    that person can use one of the other background checks described below).  *See* Cal.

2    Penal Code § 30370(a)(3).

3        To run a Basic Check, the vendor submits the purchaser's identifying

4    information—including their name, date of birth, current address, and driver's

5    license or "other government identification" number—to the Department through

6    the online Dealer Record of Sale Entry System ("DES"), which then checks to see

7    whether the purchaser is prohibited.  Cal. Code Regs., tit. 11, § 4283(b)–(c).

8    Vendors begin this process by going to the DES website, and, in most cases,

9    populating the purchaser's information by swiping the purchaser's California

10   driver's license or other government ID card (generally, "ID") through a magnetic

11   card reader.  Cal. Penal Code § 28180(a); *id.* § 28180(b) (identifying exceptions).[3]

12   Once the vendor enters the required information into DES, the system compares it

13   against four state databases to determine whether the purchaser is a prohibited

14   person:  (1) the Automated Criminal History Record System; (2) the Mental Health

15   Firearms Prohibited System; (3) the California Restraining and Protective Order

16   System; and (4) the Wanted Persons System.  Suppl. Morales Decl. in Supp. of

17   Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. ("1st Morales Suppl. Decl.") (Dkt. 42)

18   ¶ 13.  If the database search yields no hits, then the transaction is approved, and the

19   vendor may proceed with the sale.  Cal. Penal Code § 30370(a)(3); Cal. Code Regs.,

20   tit. 11, § 4283(a).  If, however, the purchaser's information results in a hit in one of

21   the databases, a Department analyst will manually review the submitted information

22   to check whether the purchaser is in fact a prohibited person.  1st Morales Suppl.

---

23        [3] Any ID that meets the requirements of the federal REAL ID Act of 2005,
24   Pub. L. No. 109-13, 119 Stat. 231, may be used for this purpose.  Cal. Code Regs.,
     tit. 11, § 4045.1; *see also* Cal. Penal Code § 30352(a)(2).  Vendors can also conduct
25   background checks for purchasers who have IDs that do not comply with the REAL
     ID Act, so long as those purchasers provide additional supporting documentation
26   showing lawful status in the United States, such as a passport or birth certificate.
     Cal. Code Regs., tit. 11, § 4045.1.  These IDs are visually distinct from REAL ID-
27   compliant ones because they feature the phrase "Federal Limits Apply" in the top
28   right corner.

4

Decl. ¶ 14.  Purchasers who are not prohibited are approved and may take possession of the ammunition; but purchasers who are prohibited are denied, and the vendor cannot transfer the ammunition to them.  Cal. Penal Code § 30370(d).

### 2.    The Standard Check

Another way to obtain an ammunition background check is through a "Standard Ammunition Eligibility Check," which currently costs $1.  Cal. Code Regs., tit. 11, § 4282; Cal. Penal Code § 30370(e).  This check streamlines the background check process for purchasers who have up-to-date firearms records in the Department's Automated Firearms System ("AFS").  Cal. Penal Code § 30370(a)(1).  The Standard Check begins when the vendor enters the prospective purchaser's information, including name, address, date of birth, and ID number, into DES by swiping the person's ID through a magnetic card reader.  Cal. Code Regs., tit. 11, § 4282(a), (c); Cal. Penal Code § 28180(a).  DES then searches for a matching record in the AFS.  Cal. Code Regs., tit. 11, § 4282(a).  The AFS keeps a record of sales, transfers, and ownership of firearms.  Cal. Penal Code § 11106.[4]

What happens next depends on whether the information entered into DES matches a record in the AFS.  If there is a match, then DES will check the purchaser's information against California's Armed Prohibited Persons System.  Morales Decl. in Supp. of Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. ("Morales Decl.") (Dkt. 34-1) ¶ 19.  That system "enforces California's prohibitions on firearm possession by identifying 'persons who have ownership or possession of a firearm' yet who, subsequent to their legal acquisition of the firearm, have later come to 'fall within a class of persons who are prohibited from owning or possessing a firearm' due to a felony or violent misdemeanor conviction, domestic

---

[4] Records in the AFS have been created for handguns purchased from firearms vendors after 1995, and all long guns purchased from firearms vendors after 2013.  Cal. Penal Code §§ 11106, 26905, 30000.

1  violence restraining order, or mental health-related prohibition." *Bauer v. Becerra*,

2  858 F.3d 1216, 1219 (9th Cir. 2017) (quoting Cal. Penal Code §§ 30000, 30005).

3       If the purchaser's identifying information does not appear in the Armed

4  Prohibited Persons System, the transaction is approved, and the purchaser may take

5  possession of the ammunition. *See* Cal. Code Regs., tit. 11, § 4282.  However, a hit

6  in the Armed Prohibited Persons System results in a denial, and the purchaser may

7  not take possession of the ammunition.  Cal. Penal Code § 30370(b), (d).

8       If the information entered into DES does not match a record in the AFS, the

9  transaction is rejected.  Cal. Penal Code § 30370(d).  Purchasers who experience a

10  rejection, however, may still seek to purchase ammunition in one of three ways.

11  First, they may utilize the Basic Check.  Second, if they own a firearm that is not in

12  the AFS, they can create a new record by submitting a Firearms Ownership Report

13  to the Department.  Or, they can purchase ammunition as part of a firearms

14  purchase, which will also create a record for them in the AFS that can then be used

15  for Standard Checks in future ammunition transactions. *See* Cal. Code Regs.,

16  tit. 11, § 4284.  Third, a person who owns a firearm and believes that they have a

17  record in the AFS may update their records using the California Firearms

18  Application Reporting System on the Department's website.  Morales Decl. ¶ 20.

19       In transactions where the purchaser's information matches a record in the

20  AFS, the background check is processed almost instantaneously, and the entire

21  transaction takes a matter of minutes.  Morales Decl. ¶¶ 53–69.

22       People who have a transaction denied because the Department's records show

23  that they are prohibited will receive a letter after the Standard Check is complete,

24  informing them of that fact and providing them details about how they can contest

25  that designation.  4th Suppl. Morales Decl. in Supp. of Def.'s Opp. to Pls.' Mot. for

26  Prelim. Inj. ("4th Suppl. Morales Decl.") (Dkt. 59) ¶ 5; *id.*, Exs. A, B.  People who

27  have a Standard Check rejected, but who are not prohibited persons, may log on to

28  the California Firearms Application Reporting System, where they are told that the

1   information submitted in their background check does not match a record in the
2   AFS.  Dkt. 15-2.  Those people may update their records, so they can use Standard
3   Checks in the future.  *See* Morales Decl. ¶ 20.

4   **II.   PROCEDURAL HISTORY**

5          Plaintiffs in this action are seven California residents, four out-of-state
6   ammunition vendors, and the California Rifle & Pistol Association (CRPA), who
7   allege that the Ammunition Laws violate the Second Amendment, that the face-to-
8   face transaction requirements on purchases and transfers in California Penal Code
9   sections 30312 and 30314 violate the dormant Commerce Clause, and that section
10  30314 is preempted by 18 U.S.C. § 926A.  Dkt. 9.  Plaintiffs' preliminary
11  injunction motion sought an injunction against enforcement of the face-to-face
12  transaction requirements and the background check requirements in all their
13  applications, based on the Second Amendment and the dormant Commerce Clause.
14  Dkt. 32.  On April 23, 2020, this Court issued the requested injunction, finding that
15  Plaintiffs were likely to succeed on their Second Amendment and dormant
16  Commerce Clause claims.  Dkt. 60.

17         The Attorney General appealed and secured a stay pending appeal from the
18  Ninth Circuit.  Dkt. 68.  The appeal was argued and submitted in November 2020.
19  In March 2021, the Ninth Circuit vacated the submission and held the appeal in
20  abeyance pending issuance of the mandate in *Duncan v. Becerra*, an appeal of a
21  judgment issued by this Court in a Second Amendment challenge to California's
22  large-capacity magazine restrictions.  Dkt. 71.  After the Supreme Court issued its
23  decision in *Bruen*, the parties submitted supplemental briefing.  In November 2022,
24  the Ninth Circuit vacated this Court's preliminary injunction order and remanded to
25  this Court "for further proceedings consistent" with *Bruen*.  Dkt. 74.

26         On December 12, 2022, this Court held a status conference in this case, and
27  consolidated that conference with hearings in three other cases pending before the
28  Court:  *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB; *Miller v. Bonta*, No. 3:19-

7

cv-01537-BEN-JLB; and *Fouts v. Bonta*, 3:19-cv-01662-BEN-JLB.  During the joint conference, counsel for the Attorney General requested time to conduct expert discovery in support of the historical analysis required by *Bruen*, but the Court denied the request and ordered the Attorney General to prepare surveys of relevant laws within 30 days.  Dec. 12, 2022 Hr'g Tr. at 38.  On December 15, 2022, the Court entered an Order requiring the Attorney General to "create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that shall "begin at the time of the adoption of the Second Amendment and continue through twenty years after the Fourteenth Amendment."  Dkt. 77.  The Order also permitted Defendants to create a second survey "covering a time period following that of the first list."  *Id.*[5]  The Attorney General filed the surveys on January 11, 2023.  Dkt. 79.

**ARGUMENT**

**I.   THE ATTORNEY GENERAL OBJECTS TO THE EXPEDITED POST-REMAND PROCEEDINGS**

The Attorney General objects to the current post-remand proceedings and expedited briefing schedule, which prejudices his ability to prepare a record that *Bruen* requires, to conduct in-depth historical search into relevant laws, and to address potential counterarguments.  *See Defense Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *5 n.9 (C.D. Cal. Oct. 21, 2022) ("There is no possibility this Court would expect [the California Attorney General] to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice).").  This brief responds to the Court's December 15 Order, but the Attorney General notes that there is no motion pending, and this is the first

---

[5] The Order also provided that the parties were to agree within 20 days on deposing Raymond Roth and Clayton Cramer.  Roth is an expert witness for the Attorney General in *Miller* and *Duncan*, while Cramer was a declarant for the plaintiffs in *Duncan* and *Fouts*.  Neither has provided testimony in this action.

8

1    opportunity for the Attorney to brief the effect of *Bruen* in this matter.[6]  Consistent

2    with his position in other Second Amendment cases post-*Bruen*, the Attorney

3    General maintains that a reasonable discovery period, followed by dispositive

4    motions, is warranted in light of *Bruen* and the Ninth Circuit's remand order.

5         To the extent that the Court has suggested that expert testimony may be

6    irrelevant and that a survey of historical laws may suffice to resolve this case, *see*

7    Dec. 12, 2022 Hr'g Tr. at 23-25, the Attorney General reiterates that expert

8    elucidation is fundamental to application of the *Bruen* standard.  *Bruen*'s text-and-

9    history standard is not a "game of spot-the-analogy-across-the-ages." *United States*

10   *v. Kelly*, No. 3:22-cr-00037, 2022 WL 17336578, at *6 (M.D. Tenn. Nov. 16,

11   2022).  Instead, *Bruen* requires "an evaluation of the challenged law in light of the

12   broader attitudes and assumptions demonstrated by those historical prohibitions."

13   *Id.* at *5 n.7.  Expert testimony is needed to provide the requisite context for

14   interpreting the laws in the record.  *Cf. Fouts v. Bonta*, 561 F. Supp. 3d 941, 951

15   (S.D. Cal. 2021) ("Digging into history is the work of historians rather than

16   judges."), *vacated and remanded*, 2022 WL 4477732 (9th Cir. Sept. 22, 2022).

17        In addition, the Attorney General objects to the current proceedings to the

18   extent that the Court is considering this case together with *Duncan*, *Miller*, and

19   *Fouts*.  Those cases concern hardware restrictions under the Second Amendment

20   and historical restrictions on certain dangerous weapons.  This case, by contrast,

21   concerns the constitutionality of background checks and an entirely different

22   historical tradition of firearms regulation, as Plaintiffs' counsel pointed out during

23   the joint conference.  *See* Dec. 12, 2022 Hr'g Tr. at 47 (noting that *Rhode* may

24   "complicate things" because the analysis is a little bit different that these other

---

[6] Plaintiffs in this case assert claims other than their Second Amendment claim, namely, dormant Commerce Clause and federal preemption claims.  Those causes of action remain to be addressed, and the Attorney General will not address them in this brief, which is limited to the constitutionality of the Ammunition Laws under the Second Amendment.  *See* Dkt. 77.

9

1    cases").  The four cases should not be consolidated.  *See* Fed. R. Civ. P. 42

2    (allowing consolidation if the actions "involve a common question of law or fact").

3         The Attorney General preserves his objections to the post-remand

4    proceedings.  *See Miller*, Dkt. 137 at 73-77; *Duncan*, Dkt. 118 at 56-60.

5    Nevertheless, the Attorney General has complied with the Court's Order and filed

6    surveys of relevant laws demonstrating a historical tradition with which the

7    Ammunition Laws are consistent.  Even assuming Plaintiffs have met their burden

8    at the textual stage of the *Bruen* analysis and have established standing in this

9    action—and they have not, *see infra* at 10–18—the material submitted here and the

10   applicable case law are sufficient to uphold the Ammunition Laws under *Bruen*.

11

12   **II.   PLAINTIFFS LACK STANDING FOR ANY AS-APPLIED CHALLENGE, AND THEIR FACIAL CHALLENGE FAILS OUTRIGHT**

13        **A.   Plaintiffs Lack Standing for any As-Applied Challenge**

14        Plaintiffs have not demonstrated that they have standing to challenge the

15   Ammunition Laws—they have not shown that any Plaintiff has been prohibited

16   from purchasing ammunition in California.  "[C]onspicuously missing from this

17   lawsuit is any honest-to-God resident of [California] complaining that he or she

18   cannot lawfully buy [ammunition]" because of the Ammunition Laws.  *Teixeira v.*

19   *County of Alameda*, 873 F.3d 670, 680-81 (9th Cir. 2017) (en banc) (quotation

20   marks omitted).  "A person to whom a statute properly applies can't obtain relief

21   based on arguments that a differently situated person might present."  *United States*

22   *v. Chovan*, 735 F.3d 1127, 1135 (9th Cir. 2013) (internal quotation marks and

23   citation omitted).  Here, no individual plaintiff alleged in the operative complaint

24   that the Ammunition Laws prevented him or her from purchasing ammunition.

25        Nor does CRPA have standing.  Organizations may "assert standing on behalf

26   of their own members, or in their own right."  *E. Bay Sanctuary Covenant v. Biden*,

27   993 F.3d 640, 662 (9th Cir. 2021) (citation omitted).  To sue on its own behalf, an

28   organization must establish that it has suffered "both a diversion of its resources

10

and a frustration of its mission." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (quotation marks omitted).  But CRPA submitted no evidence in this regard.  Nor does CRPA have associational standing, which requires a showing (among other things) that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *San Diego Cnty. Gun Rights Comm'n v. Reno*, 98 F.3d 1121, 1130-31 (9th Cir. 1996).  CRPA cannot meet that requirement here, because determining whether the Ammunition Laws have actually prohibited any of their members from purchasing ammunition requires a case-by-case evaluation of the facts and circumstances of each person's situation.[7]

## B.   Plaintiffs' Facial Challenge Necessarily Fails

As with any plaintiff asserting a facial claim, Plaintiffs bear the burden of showing that "no set of circumstances exists under which the [Ammunition Laws] would be valid." *Duncan v. Bonta*, 19 F.4th 1087, 1101 (9th Cir. 2021) (en banc) (citation omitted) (quoting *Salerno*, 481 U.S. at 745), *vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022) (Mem).[8]  In identifying only a limited number of *applications* in which the Ammunition Laws allegedly frustrated the

---

[7] This Court's prior reasoning in rejecting the Attorney General's argument that Plaintiffs lack standing rests implicitly on the overbreadth doctrine, which "essentially argues that a statute could not be enforced against a plaintiff, because it could not be enforced against someone else." *Hightower v. City of Boston*, 693 F.3d 61, 81 (1st Cir. 2012).  That doctrine, however, does not apply outside the First Amendment context.  *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." (citation omitted)); *Hightower*, 693 F.3d at 82–83 (collecting cases rejecting overbreadth arguments in Second Amendment context); *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1202 (E.D. Cal. 2018) (refusing to apply overbreadth doctrine in Second Amendment case).

[8] Although the Supreme Court and this Court have "called into question the continuing validity of the *Salerno* rule in the context of First Amendment challenges," *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en banc), *Salerno* "remains binding law in the Ninth Circuit," *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1104 n.6 (9th Cir. 2016).

11

1    ability of some purchasers to complete certain ammunition sales, Plaintiffs have

2    failed to properly assert a facial attack on the Ammunition Laws.

3         Even under the more relaxed standard for facial challenges that courts

4    sometimes use, California's laws have a "plainly legitimate sweep." *Jackson v.*

5    *City & Cnty. of S.F.*, 746 F.3d 953, 961-62 (9th Cir. 2014); *see also Wash. State*

6    *Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (identifying

7    consensus on "plainly legitimate sweep" standard").  California may, consistent

8    with the Second Amendment, prohibit felons, those without lawful status, and the

9    dangerously mentally ill from procuring ammunition.  *See Bruen*, 142 S. Ct. at

10   2162 (Kavanaugh, J., concurring).  Although Plaintiffs object to the particulars of

11   California's background check system for ammunition purchases, when considering

12   a facial challenge, courts "consider only the text of the [laws], not [their]

13   application" to a particular circumstance.  *Calvary Chapel Bible Fellowship v. City*

14   *of Riverside*, 948 F.3d 1172, 1176 (9th Cir. 2020).  On their face, the Ammunition

15   Laws allow residents to purchase ammunition unless they are prohibited from

16   purchasing or possessing firearms and ammunition.  *See* Cal. Pen. Code §§ 30352,

17   30370; Cal. Code Regs., tit. 11, §§ 4282-4283.  Plaintiffs do not claim that the

18   designation of any particular category of prohibited persons is unconstitutional.  *See*

19   18 U.S.C. § 922(g); Cal. Penal Code §§ 29800, 29805; Cal. Welf. & Inst. Code

20   § 8103.[9]  Nor do they claim that background checks are an unconstitutional method

21   for preventing prohibited persons from purchasing firearms or obtaining concealed-

22   carry permits.  Plaintiffs only challenge the constitutionality of the Ammunition

23   Laws.  *See* 1st Am. Compl. at 31-32.  Although this Court has previously found the

24   _____

25   [9] To the extent Plaintiffs may claim that a particular category of prohibited
     persons is unconstitutional, *see, e.g.*, *United States v. Rahimi*, __ F.4th __, 2023

26   WL 1459240, at *1 (5th Cir. Feb. 2, 2023) (striking down 18 U.S.C. 922(g)(8) for
     people subject to restraining orders), such a claim would not amount to a facial

27   challenge to the Ammunition Laws' background check requirement.  And there is
     no evidence that any of the Plaintiffs have been unable to purchase ammunition for

28   being a prohibited person under any particular provision of state or federal law.

1  Ammunition Laws constitutionally problematic based on their implementation

2  during the earliest months that the laws were in effect, courts "may not resolve

3  questions of constitutionality with respect to each potential situation that might

4  develop, especially when [a] moving party does not demonstrate that the legislation

5  would be unconstitutional in a large fraction of relevant cases." *Jackson*, 746 F.3d

6  at 962 (quotation marks omitted).

7

8  **III.  PLAINTIFFS' SECOND AMENDMENT CLAIMS FAIL UNDER *BRUEN***

   **A.  *Bruen*'s Text-and-History Standard for Analyzing Second**
9  **Amendment Claims**

10  As a threshold issue, *Bruen* directs courts to assess whether the "Second

11  Amendment's "plain text" covers an individual's conduct," *Bruen*, 142 S. Ct. at

12  2126—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]"

13  or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II.  If so, the

14  Constitution "presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.  The

15  plaintiff bears the burden of establishing that the plain text applies, by

16  demonstrating that each of the "textual elements" of the Second Amendment's

17  operative clause covers the proposed course of conduct.  *Id.* at 2134 (quoting

18  *Heller*, 554 U.S. at 592); *see also Nat'l Ass'n for Gun Rights, Inc. v. City of San

19  Jose*, No. 22-cv-501-BLF, __ F. Supp. 3d __, 2022 WL 3083715, at *8 (N.D. Cal.

20  Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second

21  Amendment, the burden then *shifts* to the government to show why the regulation is

22  consistent with the Nation's historical tradition of firearm regulation" (emphasis

23  added)).  *Bruen* makes clear that a party challenging a law under the Second

24  Amendment bears this threshold, textual burden.  *See Bruen*, 142 S. Ct. at 2134

25  (noting that the government "d[id] not dispute" that the plain text of the Second

26  Amendment covered the plaintiffs' proposed conduct); *see also Defense Distributed

27  v. Bonta*, 2022 WL 15524977, at *5 (C.D. Cal. Oct. 21, 2022) ("Much as [plaintiff]

28  would like to move history and tradition forward in the course of relevant analysis

13

under *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of that decision."); *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022) ("Although it is their burden to show that large-capacity magazines fall within the purview of the Second Amendment, *the plaintiffs* offer no expert opinion on the meaning of the word 'Arms.'" (emphasis added)); *Or. Firearms Fed'n, Inc. v. Brown*, __ F. Supp. 3d __, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022) ("*Plaintiffs have not shown*, at this stage, that magazines specifically capable of accepting more than ten rounds of ammunition are necessary to the use of firearms for self-defense." (emphasis added)), *notice of appeal filed*, No. 22-36011 (9th Cir. Dec. 7, 2022).

If a challenged restriction regulates conduct protected by the "plain text" of the Second Amendment, *Bruen* then directs the government to justify its regulation by showing that the law is "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126.  And while the Court recognized that the historical analysis conducted at the first step of the two-step approach that lower courts had adopted for analyzing Second Amendment claims was "broadly consistent with *Heller*," *id.* at 2127, it clarified how that analysis should proceed in important respects.  In some cases, the Court explained, this historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century."  *Id.* at 2131.  But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach."  *Id.* at 2132.

Under this "more nuanced approach," governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*."  *Bruen*, 142 S. Ct. at 2133 (emphasis in original).  Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster.  *Id.*  Instead, in evaluating whether a "historical regulation is

a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein*, On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Id.* (quoting *McDonald*, 561 U.S. at 767, and *Heller*, 554 U.S. at 599). After *Bruen*, a modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified." *Id*.

### B.   Plaintiffs Have Not Shown That the Ammunition Laws Burden Conduct Covered by the Plain Text of the Second Amendment

Plaintiffs cannot carry their burden of showing that the Second Amendment's text covers their intended conduct, which is essentially to purchase ammunition without any kind of verification of whether they may lawfully do so. To determine whether the plain text covers an individual's conduct, the Court "must first identify and delineate the specific course of conduct at issue." *Defense Distributed*, 2022 WL 15524977, at *4 (quoting *Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022))). The proposed course of conduct must be defined with specificity—not simply "purchasing ammunition"— for the textual stage of the analysis to have any meaning. For example, in *United States v. Reyna*, the district court characterized the proposed course of conduct as "possession of a firearm *with an obliterated serial number*" and not more generally as "mere possession [of a firearm]," because if the conduct was "mere possession," any number of other challenged regulations would similarly boil down to mere

1   possession, then promptly and automatically proceed to" the historical stage of the

2   analysis.  2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) (emphasis added).

3       Here, Plaintiffs wish to purchase ammunition without passing a background

4   check.  They also wish to purchase ammunition without having to complete a face-

5   to-face transaction at a licensed firearms dealer, and without the dealer retaining

6   records of the transaction.  This conduct is not covered by the plain text of the

7   Second Amendment.  That is, these requirements do not prevent any "people" from

8   "keep[ing]" or "bear[ing]" "Arms" for lawful purposes.  Nor do they prevent any

9   "law-abiding, responsible citizens" from keeping, carrying, or "us[ing] arms for

10  self-defense." *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635)

11  (quotation marks omitted).  This is evidenced by the fact that not a single plaintiff

12  was even substantially delayed—let alone prevented—from obtaining ammunition

13  because of these laws.  *See supra* at 10–11.

14      Nor does a general desire for "access to ammunition" fall within the plain text

15  of the Second Amendment simply because it relates to the right to keep and bear

16  arms.  It is not appropriate to go beyond the plain text to infer a "penumbra" of

17  other covered activities beyond keeping and bearing arms because such an

18  interpretation "is quite-clearly not a 'plain text' analysis, required under *Bruen*."

19  *Defense Distributed*, 2022 WL 15524977, at *4.  And it cannot be correct that all

20  requirements or conditions precedent applied to any aspect of firearms use and

21  possession, regardless of their content or effect, are "covered" by the Second

22  Amendment's "plain text."  The purchasing of ammunition "may be subjected to

23  governmental restrictions." *Jackson*, 746 F.3d at 970.  *Bruen* did not change this.

24      Indeed, several Justices emphasized that the decision in *Bruen* did not

25  "disturb[] anything" that the Court previously said "about restrictions that may be

26  imposed on the possession or carrying of guns."  142 S. Ct. at 2157 (Alito, J.,

27  concurring); *id.* at 2162 (Kavanaugh, J., concurring).  Rather, *Bruen* explicitly

28  acknowledges that "nothing" in its analysis casts doubt on the constitutionality of

16

1    licensing regimes that require applicants to "undergo a background check or pass a

2    firearms safety course" as a condition of carrying firearms in public.  *Id.* at 2138

3    n.9.  Concurring justices confirmed that "presumptively lawful regulatory

4    measures" described in *Heller*—which include but are not limited to laws

5    "imposing conditions and qualifications on the commercial sale of arms" and

6    "longstanding prohibitions on the possession of firearms by" prohibited persons—

7    remain presumptively lawful.  *Id.* at. 2162 (Kavanaugh, J., concurring).  These are

8    the exact types of regulations that the Ammunition Laws codify.

9        Another clear indication that the Ammunition Laws fall outside of the plain

10   text of the Second Amendment—and thus pass constitutional muster without the

11   need for any historical analysis—is *Bruen*'s explicit approval of "background

12   check[s]" or requirements to "pass a firearms safety course," so long as the schemes

13   are not "put toward abusive ends" where "lengthy wait times" or "exorbitant fees

14   deny ordinary citizens their right to public carry."  *Bruen*, 142 S. Ct. at 1238 n.9.

15   Background check requirements are constitutionally permissible, "subject of course

16   to an as-applied challenge if a shall-issue licensing regime does not operate in that

17   manner in practice."  *Id.* at 2162 (Kavanaugh, J., concurring).  Here, the required

18   backgrounds checks are neither "abusive" nor legally burdensome.  For purchasers

19   using the Standard Check background check option, the required check takes, on

20   average, five to ten minutes and currently costs only $1.  Morales Decl. ¶¶ 53–69;

21   *id.*, Ex. 6 at 27.  For others who use the alternative Basic Check option, it takes a

22   day or two to complete and costs $19.  2d Suppl. Decl. of Mayra G. Morales in

23   Supp. of Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. ("2d Suppl. Morales Decl.")

24   (Dkt. 48) ¶ 15; *id.*, Ex. 6 at 27.  Rejections of persons who are not otherwise

25   prohibited from possessing ammunition are rare and can be handled by addressing

26   the reason for the rejection (by, for example, updating records), using a different

27   method of background check, or both.  3d Suppl. Morales Decl. ¶ 26.  The

28   Ammunition Laws are thus consistent with the standards for a constitutional

17

1   background-check system described in *Bruen*.  The Ammunition Laws establish the

2   same type of "condition precedent" to purchasing ammunition that the Ninth Circuit

3   has approved before in the context of purchasing firearms, *Silvester v. Harris*, 843

4   F.3d 816, 830–31 (9th Cir. 2016) (Thomas, J., concurring), and that *Bruen*

5   explicitly recognizes as constitutional, 142 S. Ct. at 1238 n.9; *id.* at 2162

6   (Kavanaugh, J., concurring); Dec. 12, 2022 Hr'g Tr. at 48 ("The *Bruen* case did say

7   that background checks were ok, right, with regard to the concealed carry.").

8   Because the Ammunition Laws do not prevent law-abiding citizens from keeping or

9   bearing arms of any sort, or the ammunition necessary to operate them, they do not

10  burden conduct covered by the plain text of the Second Amendment.

11

12  **C.    The Ammunition Laws Are Consistent with Traditions of Firearms Regulation**

13      Even if Plaintiffs could show that the conduct regulated by the Ammunition

14  Laws is covered by the "plain text" of the Second Amendment and the original

15  public meaning of that text (they have not), California's Ammunition Laws are

16  consistent with the Nation's traditions of firearm regulation and should be upheld.

17          **1.    This Case Requires a "More Nuanced" Approach**

18      A "more nuanced" analogical approach is called for in assessing the

19  similarities between the Ammunition Laws and the surveyed historical laws.  *See*

20  *Bruen*, 142 S. Ct. at 2131–32.  In a case that proceeds to the historical stage of the

21  *Bruen* analysis, the government need not identify a "historical *twin*" or a "dead

22  ringer"; it can justify a modern restriction by identifying a "relevantly similar"

23  restriction enacted when the Second or Fourteenth Amendments were ratified.  *Id.*

24  at 2132–33.  And when the challenged law addresses "unprecedented societal

25  concerns or dramatic technological changes," the courts should engage in a "*more*

26  nuanced approach."  *Id.* at 2131–32 (emphasis added).

27      Here, the Ammunition Laws must be subject to a "more nuanced" analysis of

28  the relevant history because the Supreme Court has expressly endorsed background

18

1    checks as a condition to obtain a concealed-carry permit, *see Bruen*, 142 S. Ct. at

2    2138 n.9, even though background checks related to the acquisition or carrying of

3    firearms did not appear until the early 20th century. *See* Dkt. 36-1 at 6–9

4    (summarizing history of background check requirements dating back to New

5    York's 1911 Sullivan Law); *see also Silvester*, 843 F.3d at 824. The Ammunition

6    Laws are relevantly similar to those laws, and thus should be subject to the same

7    degree of nuance in the historical analysis. Moreover, the Ammunition Laws'

8    background check requirements implicate "dramatic technological changes" since

9    1791 or 1868 because they became possible only after the development of a reliable

10   and fast internet, computer databases, and other technologies that enable the

11   accurate and efficient processing of ammunition sales, which happen more

12   frequently than firearm sales.[10]

13        Moreover, the Ammunition Laws address the "unprecedented societal

14   concerns [and] dramatic technological changes," *Bruen*, 142 S. Ct. at 2132,

15   presented by the modern-day proliferation of "ghost guns." Ghost guns are self-

16   assembled fully-functional firearms that are typically made from user-friendly kits

17   purchased online. 87 Fed. Reg. at 24662. And they are typically assembled

18   without a background check to confirm that the person is not a prohibited person.

19   As the California Legislature recognized in passing legislation to regulate these

20   modern firearms, ghost guns have become "a leading source of crime guns,

21   including firearms built by people such as minors who cannot legally possess or

22   acquire firearms in our state, as well as individuals seeking to conceal their

23   involvement in firearm trafficking and other crimes." Assembly Bill No. 1621

24

25

26

27

28

---

[10] The Ammunition Laws were also necessitated by technological changes in ammunition, including substantially more lethal higher-caliber rounds than what was commonly available at the founding. *See* Margot Sanger-Katz & Quoctrung Bui, *People Kill People. But the Bullets Seem to Matter*, N.Y. Times, Mar. 27, 2019 (describing popularity of higher-caliber rounds used in semiautomatic firearms in the 1990s, such as 9 millimeter rounds, that are capable of causing significantly greater damage than smaller caliber rounds), https://nyti.ms/3v0VPcB.

19

1   (Reg. Sess. 2021-2022) ("AB 1621") § 1(a)(5).  The manufacture and sale of these

2   unregulated and unserialized firearms has "caused enormous harm and suffering,

3   hampered the ability of law enforcement to trace crime guns and investigate firearm

4   trafficking and other crimes, and dangerously undermined the effectiveness of laws

5   and protections critical to the health, safety, and well-being of Californians."  AB

6   1621 § 1(a).  The Ammunition Laws serve as a backstop to the acquisition of

7   firearms by prohibited persons:  with the proliferation of such ghost guns,

8   background checks for ammunition purchases confirm that firepower is not being

9   acquired by prohibited persons.  The laws were made possible by and address

10  "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132, so a more nuanced

11  approach is required here.

### 2.    The Ammunition Laws Are Relevantly Similar to Laws Restricting Possession of Firearms and Ammunition

12
13          In compliance with the Court's Order, Dkt. 77, the Attorney General prepared

14  two surveys—one listing relevant laws from the pre-founding era to 1888,

15  Dkt. 79-1, and another listing relevant laws from 1889 to the 1930s, Dkt. 79-2—as

16  well as a third survey that included Plaintiffs' positions concerning the relevance of

17  those laws, Dkt. 79-3.[11]  The Attorney General's surveys identify hundreds of laws

18  restricting the ability for certain designated groups to possess weapons, as well as

19
20
21
22
23
24

---

[11] During the December 12 hearing, the Court characterized an 1888 cut-off as "an arbitrary and capricious number."  Dec. 12, 2022 Hr'g Tr. at 30.  In *Bruen*, the Supreme Court did not specify a 20-year limit after the ratification of the Fourteenth Amendment.  *See* 142 S. Ct. at 2163 (Barrett, J., concurring) (noting that the Court did not answer the question of "[h]ow long after ratification may subsequent practice illuminate original public meaning?").

laws requiring an oath of allegiance or loyalty to possess arms [47, 48, 50–54, 106].[12]  These laws demonstrate that the Ammunition Laws are permissible.[13]

The courts have recognized that these laws comprise a robust tradition of firearm regulation that can justify contemporary restrictions on the ability of certain individuals to acquire and possess firearms and ammunition.  *See Vongxay*, 594 F.3d at 1118 (noting that "the right to bear arms was 'inextricably . . . tied to' the concept of a 'virtuous citizen[ry]' that would protect society through 'defensive use

---

[12] Most of the surveyed laws were based on race, nationality, or enslaved status and were enacted before ratification of the Thirteenth and Fourteenth Amendments.  These laws are morally repugnant and would obviously be unconstitutional today.  They are provided only as evidence of a regulatory tradition that the courts have already recognized.  *See infra* at 18–25.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees. *See Bruen*, 142 S. Ct. at 2150–51 (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.").

[13] To the extent the surveys do not provide information on repeal status or judicial review, it is Plaintiffs' burden to rebut the historical record assembled by the Attorney General and provide potentially adverse information about the analogues.  This Court's Order did not impose the burden of identifying any repeal or adverse judicial opinions solely on the Attorney General, but required Plaintiffs to provide information that they view as relevant to the Court's analysis in this regard.  *See* Dec. 12, 2022 Hearing Tr. at 9–12 ("So I would suggest *both sides*, if you can, please do that for me." (emphasis added)).  And *Bruen* itself did not envision defendants providing the entire historical record for review, but rather viewed this as a task of all parties; the Court noted that judges may "decide a case based on the historical record compiled by *the parties*."  *Bruen*, 142 S. Ct. at 2130 n.6 (emphasis added) (citation omitted).  In any event, the tradition relied upon here has been well-recognized by the courts.

of arms against criminals, oppressive officials, and foreign enemies alike,' and that 'the right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e. criminals)'"); *Duncan*, 19 F.4th at 1157 & n.27 (9th Cir. 2021) (Bumatay, J., dissenting) ("Prohibiting the possession of arms by those found by the state to be dangerous, like violent criminals, dates to the Founding." (citing *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019) (Barrett, J., dissenting)).[14]  As explained by then-Judge Barrett, history "support[s] the proposition that the state can take the right to bear arms away from a category of people that it deems dangerous." *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting).  This power "is not limited to case-by-case exclusions of persons who have been shown to be untrustworthy with weapons, nor need these limits be established by evidence presented in court.'  Instead the legislature can make that judgment on a class-wide basis.  And it may do so based on present-day judgments about categories of people whose possession of guns would endanger the public safety." *Id.* (citations omitted).

---

[14] *See also Nat'l Rifle Ass'n of Am., Inc. v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 203 (5th Cir. 2012) (noting the "longstanding tradition of targeting select groups' ability to access and to use arms for the sake of public safety"); *United States v. Carpio-Leon*, 701 F.3d 974, 980 (5th Cir. 2012) (noting colonial laws restricting ownership of firearms by "potential subversives" and "suspect populations" who were considered disloyal or dangerous"); *Folajtar v. Att'y Gen. of the United States*, 980 F.3d 897, 905 (3d Cir. 2020) (explaining that excluding felons from "the people" comports with principles supporting founding-era disarmament of those who were unwilling to abide by societal norms and thereby placing them outside the community); *Binderup v. Attorney General of the United States*, 836 F.3d 336, 349 (3d Cir. 2016) (noting that "'[c]rimes committed'—violent or not—were thus an independent ground for exclusion from the right to keep and bear arms" and that "there is reason to believe that felon disarmament has roots that are even more ancient"): *States v. Carter*, 669 F.3d 411, 415 (4th Cir. 2012) ("[N]othing in the historical record suggests a popular understanding of the Second Amendment at the time of the founding that extended to preserving gun rights for groups who pose a particular risk of using firearms . . . against innocent people, including those who committed drug felonies."); *Medina v. Whitaker*, 913 F.3d 152, 160 (D.C. Cir. 2019) ("[D]uring the revolution, the states of Massachusetts and Pennsylvania confiscated weapons belonging to those who would not swear loyalty to the United States.").

22

1       The Supreme Court has indicated that 20th century "prohibitions on the

2   possession of firearms by felons and the mentally ill" are examples of

3   "presumptively lawful regulatory measures." *Bruen*, 142 S. Ct. at 2162

4   (Kavanaugh, J., concurring) (citation omitted).  The first category of prohibited

5   persons designated under federal law, convicted felons, did not appear until 1938.

6   *See United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc).  Yet,

7   those restrictions, which result in total disarmament, are "presumptively lawful."

8   *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).  The Supreme Court has

9   also approved of background checks based on objective criteria to ensure that

10  prohibited people are not authorized to carry firearms in public.  *See id.* at 2138 n.9.

11  The Supreme Court's sanction of such background checks for the public carry of

12  firearms logically extends to background checks for firearm purchases as well.  *Or.*

13  *Firearms Fed'n*, 2022 WL 17454829, at *15 (relying on the "clear guidance from

14  *Bruen*" in holding that permit-to-purchase requirement, including successful

15  completion of a background check, does not violate the Second Amendment).  The

16  first background check system for firearm purchases was enacted in 1998, *see*

17  *Printz v. United States*, 521 U.S. 898, 902–03 (1997) (describing the initial

18  implementation of National Instant Criminal Background Check System in 1998

19  following enactment of the Brady Act of 1993), and states did not begin requiring

20  background checks for firearm sales or carry permits until the early 20th century,

21  *see* Dkt. 36-1 at 6–9.  Despite appearing in the 20th century, these restrictions and

22  requirements are "'lineal descendants' of historical laws banning dangerous people

23  from possessing guns."  *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting).[15]

24      As with those requirements, California's Ammunition Laws ensure that people

25  prohibited under federal and state law from possessing firearms or ammunition are

26  _____

27      [15] These 20th century developments are relevant because they are consistent
with earlier traditions.  *Cf. Bruen*, 142 S. Ct. at 2153 n.28 (discounting probative

28  value of 20th century laws that "contradict[ed] earlier evidence").

1 unable to acquire ammunition.  Contemporary background checks, like the
2 categories of persons prohibited from possessing firearms or ammunition, *see*
3 18 U.S.C. § 922(g); Cal. Penal Code §§ 29800, 29805; Cal. Welf. & Inst. Code
4 § 8103, are rooted in the historical tradition—dating back to the founding—of
5 disarming groups of people perceived to be dangerous or unvirtuous.  The
6 Ammunition Laws are consistent with that tradition according to the two metrics
7 identified in *Bruen*:  "how and why the regulations burden a law-abiding citizen's
8 right to armed self-defense." *Bruen*, 142 S. Ct. at 2133.

9      The Ammunition Laws impose a comparably minimal burden on the right of
10 "law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554
11 U.S. at 635), to acquire ammunition.  The background check requirement uses
12 objective criteria to determine whether an ammunition purchaser is prohibited
13 under federal or state law, which is similar to the background check requirements
14 approved of by the Supreme Court.  *See id.* at 2138 n.9.  The in-person
15 requirements are also minimally burdensome "conditions and qualifications on the
16 commercial sale of arms," which are not called into question by *Bruen*.  *Id.* at 2162
17 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626).  They mirror federal
18 requirements for firearm purchases, as federal law generally prohibits "the sale of
19 guns 'to a person who does not appear in person at [the dealer's] business
20 premises.'" *Abramski v. United States*, 573 U.S. 169, 181 (2014) (citing 18 U.S.C.
21 § 922(c)).  Finally, the recordkeeping and reporting requirements applicable to
22 licensed ammunition vendors, *see* Cal. Penal Code § 30352, do not burden their
23 customers' right to armed self-defense.

24      Moreover, any minimal burden imposed by the Ammunition Laws is
25 comparably justified in seeking to ensure that only law-abiding, responsible citizens
26 are able to purchase ammunition and thus use firearms.  Both the Ammunition
27 Laws and the background checks sanctioned by the Supreme Court are means of
28 enforcing existing prohibitions under federal and state law.  In 2016, decided to

24

1    close "loopholes that leave communities throughout the state vulnerable to gun

2    violence and mass shootings."  Cal. Sec'y of State, Cal. Gen. Election Official

3    Voter Info. Guide 164 (2016), https://bit.ly/3Y5MlcB.  Among other things,

4    Proposition 63 sought to close a loophole in ammunition sales.  While California

5    law required background checks for people purchasing firearms, no similar

6    requirement existed for those purchasing ammunition.  *Id.*  As a result, "[a]ny

7    violent felon or dangerously mentally ill person" could "walk into a sporting goods

8    store or gun shop in California and buy ammunition, no questions asked."  *Id.*

9    Recognizing that "background checks work" and stop "roughly 225 felons from

10   buying firearms every day," the voters decided that the State "should require

11   background checks for ammunition sales just like gun sales," which would "stop

12   both from getting into the hands of dangerous individuals."  *Id.*

13        The Ammunition Laws also address the problem posed by ghost guns.  People

14   prohibited from possessing firearms or ammunition can evade a background check

15   by acquiring a ghost gun, but might be stopped from buying ammunition for these

16   weapons because of the background check the Ammunition Laws require.

17                                    **CONCLUSION**

18        For the foregoing reasons, and for the reasons given in the Attorney General's

19   prior briefing in this matter and on appeal, Plaintiffs' Second Amendment, dormant

20   Commerce Clause, and preemption claims fail as a matter of law.[16]

21

22

23

24

25

26   _____

27        [16] If the Court is inclined to rule in Plaintiffs' favor, the Attorney General
     respectfully requests a stay of any judgment, at least for a sufficient period to allow
28   him to seek a stay from the Ninth Circuit.

Dated:  February 10, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
P. PATTY LI
Supervising Deputy Attorney General


*s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as California*
*Attorney General*

Defendant's Brief in Response to the Court's Order Entered on December 15, 2022
(3:18-cv-00802-BEN-JLB)