C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Matthew D. Cubeiro – SBN 291519
**MICHEL & ASSOCIATES, P.C.**
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM RHODE, et al., <br><br>                Plaintiffs, <br><br>v. <br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, <br><br>                Defendant. | Case No.: 3:18-cv-00802-BEN-JLB <br><br>**PLAINTIFFS' BRIEF RE: RELEVANT ANALOGS** |

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................................ ii

Table of Authorities .......................................................................................................... iii

Introduction ........................................................................................................................ 1

Argument ............................................................................................................................ 2

    I. The Challenged Laws Impose Unprecedented and Thus Unconstitutional Restrictions on the Right to Acquire Ammunition ...................................................... 3

    II. The State's Surveys Reaffirm What This Court Has Already Held—the Challenged Laws Do Not Belong to Any Enduring American Tradition ................. 3

        A. Medieval England to Colonial America (1402 – 1740) ............................ 5

        B. The Founding Era (1750 – 1790) ............................................................... 7

        C. Antebellum America and the Reconstruction Era (1812 – 1877) .............. 8

        D. The Late-nineteenth and Early-twentieth Centuries (1878 – 1934) ........... 9

Conclusion ........................................................................................................................ 12

# TABLE OF AUTHORITIES

Page

**Cases**

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965 (N.D.N.Y. Oct. 6, 2022)................... 4

*Antonyuk v. Hochul*,
  No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944 (N.D.N.Y. Nov. 7, 2022)................... 9

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ............................................................................................... 5

*Drummond v. Robinson Twp.*,
  9 F.4th 217 (3d Cir. 2021) ...................................................................................... 1

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011) .................................................................................. 3

*Firearms Pol'y Coal., Inc. v. McCraw*,
  No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834 (N.D. Tex. Aug. 25, 2022) ............. 10

*Hardaway v. Nigrelli*,
  No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813 (W.D.N.Y. Nov. 3, 2022)................. 10

*Jackson v. City & Cty. of San Francisco*,
  746 F.3d 953 (9th Cir. 2014) ............................................................................. 2, 3

*Konigsberg v. State Bar of Cal.*,
  366 U.S. 36 (1961) ................................................................................................ 2

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
  597 U.S. __, 142 S. Ct. 2111 (2022)............................................................... passim

*Rhode v. Becerra*,
  445 F. Supp. 3d 902 (S.D. Cal. 2020) .................................................................... 2

*Scott v. Sanford*,
  60 U.S. (19 How.) 393 (1856) ............................................................................... 6

*Sekhar v. United States*,
  570 U.S. 729 (2013) .............................................................................................. 5

*United States v. Harrison*,
  2023 U.S. Dist. LEXIS 18397 (W.D. Okla. 2023) ..................................................... 6

*United States v. Miller*,
    307 U.S. 174 (1939)......................................................................................................2

*United States v. Nutter*,
    No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038 (S.D. W. Va. Aug. 29, 2022) ........10

**Statutes**

Cal. Pen. Code § 30370..................................................................................................3

Cal. Penal Code § 30312................................................................................................3

Cal. Penal Code § 30352................................................................................................3

**Other Authorities**

Cal. Code Regs. tit. 11, § 4045.1 ...................................................................................3

# INTRODUCTION

This Court ordered the State to prepare a survey of historical laws that the State contends supports its defense of California's ammunition scheme under the Supreme Court's recent decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. __, 142 S. Ct. 2111 (2022). Without even knowing how specifically the State believes they support its case, it is obvious on their face that the laws that the State has offered are insufficient to meet its burden in justifying California's ammunition scheme.

*Bruen* guides courts to "not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" *Id.* at 2133 (quoting *Drummond v. Robinson Twp.*, 9 F.4th 217, 226 (3d Cir. 2021)). Frankly, virtually none of the one-hundred and forty-seven proposed "analogues" that the State has included in its survey even shares remote resemblances with the provisions that make up California's ammunition scheme. Puzzlingly, the State saw fit to include an assortment of laws that exclusively restricted the rights of "Indians," "Negros," slaves, Catholics, or some other discreet, oppressed group. What the State *did not* include were laws dating to the ratification of the Second or Fourteenth Amendments that restricted ammunition sales at all, let alone laws with the issues that California's scheme suffers from—because, try as it might, the State could not find a single example of such a law.

Indeed, one would not even know that this case is entirely about ammunition based on the laws that the State says are relevant analogues. Leaving aside the discriminatory laws, the State cites only *two* laws even mentioning ammunition. One 1933 law from the Hawaii Territory apparently requiring a license to carry ammunition with a concealed firearm. ECF No. 79-2, at 10. And a federal law prohibiting those convicted of violent crimes or fugitives from possessing ammunition. *Id.* at 11. Neither of those imposes the type of burden on people entitled to exercise their right to acquire ammunition like California's ammunition scheme. And, even assuming they do, *Bruen* makes clear that

two mid-twentieth century laws (one from a Territory) cannot be sufficient evidence of an "enduring American tradition." *Bruen*, 142 S. Ct. 2135.

At bottom, the State cannot show a "well established and representative" analogue to California's ammunition scheme because none exists. *Id*. It thus has not—and cannot—"demonstrate that [California's ammunition scheme] is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2126. These laws violate the Second Amendment.

## ARGUMENT

California's ammunition scheme cannot survive scrutiny under *Bruen*. According to that opinion, when confronted with a Second Amendment challenge, a court must begin by asking whether the conduct in which an individual seeks to engage is covered by plain text of the Second Amendment as interpreted by the Supreme Court. *Id.* at 2129-30. If so, then "the Constitution presumptively protects that conduct," *id.* at 2130, and "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127. "Only" if the government can "identify a well-established and representative historical analogue" to the regulation it seeks to defend, *id.* at 2133, "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command,'" *id.* at 2130 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

First, as this Court has already correctly concluded, acquisition of ammunition is covered by the Second Amendment's text. *Rhode v. Becerra*, 445 F. Supp. 3d 902, 923 (S.D. Cal. 2020) (citing *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) and *United States v. Miller*, 307 U.S. 174, 180 (1939)). Nothing in *Bruen* alters that conclusion. This case thus boils down to whether the State can meet its burden of showing that the Challenged Laws are part of an "enduring American tradition." Based on the laws that it has produced in the surveys that this Court ordered, the State cannot make that showing. California's ammunition scheme is the first of its kind in the nation's

history and is unlike any other legal regime regarding any right that Plaintiffs are aware of. These laws are thus unconstitutional and should be declared as such and enjoined.

### I. The Challenged Laws Impose Unprecedented and Thus Unconstitutional Restrictions on the Right to Acquire Ammunition

Ninth Circuit precedent has made it unequivocally clear that the Second Amendment "'right to possess firearms for protection implies a corresponding right' to ***obtain*** the bullets necessary to use them." *Jackson*, 746 F.3d at 967, quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (emphasis added). California's ammunition scheme plainly implicates that right.

The scheme requires a face-to-face transaction with the buyer and seller physically present, which precludes direct sales from out-of-state. Cal. Penal Code § 30312(b). Purchasers cannot take possession of ammunition they purchase unless DOJ electronically approves the sale. Cal. Pen. Code § 30370(a). All ammunition sales are electronically recorded with DOJ. Cal. Penal Code § 30352(a)(1)-(7). It also requires that ammunition purchasers present identification but deems California's own state-issued identification insufficient. Cal. Code Regs. tit. 11, § 4045.1. And, by the State's own telling, arbitrarily precludes law-abiding citizens from obtaining ammunition more than 15% of the time because they were unable to pass the background check for technical reasons unrelated to their status as a prohibited person. Indeed, it is undisputed that tens of thousands of law-abiding Californians have been stymied in their efforts to purchase lawful ammunition as a result of this regime. On top of that, the regime facially discriminates against out-of-state ammunition vendors and impermissibly regulates transactions that take place entirely outside of California.

### II. The State's Surveys Reaffirm What This Court Has Already Held—the Challenged Laws Do Not Belong to Any Enduring American Tradition

Because California restricts the acquisition of ammunition—conduct that "the Constitution presumptively protects"—the State must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2126, 2130. "Only then may [this] court conclude that" the conduct Plaintiffs wish to engage in "falls outside the Second Amendment's 'unqualified command.'" *Id.* Try as it might, California has not—because it cannot—meet this heavy burden.

*Bruen* demands that the State present "well established and representative" historical analogues. *Bruen*, 142 S. Ct. at 2133. While the State need not identify a "historical twin," it must present a genuine analogue that is "relevantly similar" to the modern restriction it seeks to defend. *Id.* at 2122. The *Bruen* Court did not establish all the ways proposed analogues may be "relevantly similar," but it explained that "*Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133 (emphasis added). When looking at the "how," courts should ask whether a proposed analogue imposes a "comparable burden." *Id.* In conducting that analysis, courts should consider whether the challenged modern law and the proposed historical analogue impose a similar *type* of burden (not just a similarly *severe* of burden) on the right of armed self-defense. When looking at the "why," courts should consider "whether th[e] burden is comparably justified." *Id.* This ensures that historical laws enacted for one purpose are not used as a pretext to justify a modern law that was enacted for entirely different reasons. *Id.* In short, "a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 182965, at *20 (N.D.N.Y. Oct. 6, 2022). But this is the sort of strained comparison-making that nearly all of the State's proposed historical analogues rely on.

In response to this Court's request for a compendium of laws that the State contends are relevant historical analogues, the State filed two charts, listing a total of 255

supposed[1] laws spanning from the year 1403 in England to the year 1938 in the United States. Survey of Relevant Statutes (Pre-Founding-1888), ECF No. 79-1; Survey of Relevant Statutes (1889-1930), ECF No. 79-2. The State's first survey appears designed to construct a narrative that because government historically had a tradition of denying the right to keep and bear arms to certain disfavored groups, while such discriminatory practices are no longer acceptable, the government can still constitutionally restrict *all* peoples' exercise of that right. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). To be fair, Plaintiffs have not yet seen the State's arguments for why it relies on these laws. But it is clear form their face that they **differ in kind** from California's ammunition scheme.

Plaintiffs' objections to the inclusion of each of the State's proposed analogues are laid out in Plaintiffs' Disagreements Re: Defendant's Survey of Relevant Statutes, ECF No. 79-3. Plaintiffs explain those objections and additional points in more detail below.

### A.   Medieval England to Colonial America (1402 – 1740)

In describing the Second Amendment's history-and-tradition-based analysis, the *Bruen* Court cautioned that not all history is created equal: "The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years." 142 S. Ct at 2136. Because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them," the Court gave very little weight to evidence of medieval English and Colonial American restrictions that did not survive to take hold in post-Revolution America. *Id.* (citing *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008)). As the Court explained, "[s]ometimes, in interpreting our own Constitution, 'it [is] better not to go too far back

---

[1] "Supposed" because Plaintiffs do not concede that the State has accurately summarized the laws it listed in each survey or that such laws even existed because the State has not provided Plaintiffs with either the full text of most of these laws or a primary or secondary source from where the State obtained them.

into antiquity for the best securities of our liberties,' [citation omitted] *unless evidence shows that medieval law survived to become our Founders' law*." *Id*. (citing *Funk v. United States*, 290 U.S. 371, 382 (1933)) (emphasis added).

All thirty-six supposed laws from **before** the Founding Era (pre-1750) that the State includes in its survey are thus automatically dubious based of their vintage alone. ECF No. 79-1, at 1-8. But being anachronistic is perhaps the least problematic aspect of those laws. Indeed, all of them but three restrict the right to arms based exclusively on race, religion, or slave-status, making them wholly irrelevant to the analysis here. It should go without saying that slave codes and explicitly racist laws enacted to disarm classes of oppressed people provide no legitimate analogue for any modern restrictions on constitutional rights. Otherwise, the *Bruen* Court would have mentioned them even once. But the Court rightly ignored them. Aside from being repugnant to American (and Californian) values of liberty equality, and human dignity,

> historical restrictions on slaves and Indians provide *no* insight into the constitutionality of [a modern gun restriction]. That is because neither slaves nor Indians were understood to be a part of the 'political community' of persons protected by the Second Amendment. Slaves, of course, were not made a part of the political community until the post-Civil War amendments and thus did not hold any Second Amendment rights—a point infamously, yet explicitly, made by *Dred Scott v. Sanford* itself. Indians, likewise, were also generally not considered to be a part of the political community protected by the Second Amendment.

*United States v. Harrison*, 2023 U.S. Dist. LEXIS 18397, at *41 (W.D. Okla. 2023) (citing *Scott v. Sanford*, 60 U.S. (19 How.) 393, 404 (1856)). "[H]istorical restrictions on these groups [thus] provide little insight into the meaning of the Second Amendment because the ratifying public would not have understood those groups to be protected by" it. *Id.* at *41-42.

The State's "reliance on these laws is concerning, but in any event, they do not support the constitutionality of" California's ammunition scheme. *Id.* at *41 (declaring federal ban on possession of firearms by marijuana users unconstitutional). As stated previously, under *Bruen* determining whether an analogue is relevantly similar involves

an examination of "why" and "how" the Second Amendment right was burdened. <u>Bruen</u>, 142 S. Ct. at 2133. Denying minority groups access to arms to oppress them is wholly different than a scheme designed to gatekeep objectively dangerous people from obtaining ammunition. The "why" for these laws is thus different. And while most of these laws involved complete bans and were thus as severe as laws get, there is no evidence that they involved the type of up-front screening process, let alone the erroneous or trivial denials of rights like California's ammunition scheme. The "how" is thus quite distinct; other than unfairly restricting peoples' rights.

The same goes for the remaining three laws that the State cites to from this era, all of which are from England. One (from 1662) authorizes the king's agents to seize arms from persons deemed "dangerous to the Peace of the Kingdom." Another (from 1671) essentially prohibits poor people without land from possessing firearms. The third (literally from Medieval times, the year 1401) prohibits the use of arms in sensitive places by people who do not have the king's permission. In any event, what one utterly un-American law like depriving poor people of their constitutional rights and two laws that harken from the era of protecting the king have to do with California's ammunition background check scheme is a mystery. Plaintiffs will await the State's explanation but are not holding their breath on it making a difference in the analysis here.

### B. The Founding Era (1750 – 1790)

Moving to the Founding—the only period that *Bruen* makes unmistakably clear is relevant to the analysis—the State's survey still falls woefully short of making a case for an "enduring American tradition" of "relevantly similar" laws. 142 S. Ct. at 2132. The State cites one English law and seventeen American laws adopted between 1750 and 1790, plus another fourteen adopted before 1812. All but eight of those thirty-six laws, however, restrict the right to arms based exclusively on race, religion, national origin, or slave-status and are thus, for the same reasons explained above, irrelevant here.

As for those remaining eight laws, none is remotely similar to the Challenged Laws. All of them essentially deal with restricting access to arms by those who did not

support the Revolution. ECF No. 79-1, at 10-11. All but one of those laws, a 1787 Massachusetts law, were adopted during the actual Revolutionary War. The "why" for these laws seems to be disarming enemies during war time. The "how" is arguably somewhat similar to California's scheme in that one must prove entitlement before being allowed to access arms. But declaring one's loyalty is a very simple process, versus the proof that is required of Californians to purchase ammunition; particularly when there is a problem with the State's records for a purchaser of which the purchaser is left on her own to remedy. The "how" is different. What's more, the burden California imposes is indisputably worse because declaring loyalty is a simple, straight-forward process that does not have the snags like California's system that can bar someone their rights for trivial issues—like a driver's license having an old address—without even informing them how to remedy the problem. In any event, a handful of war-time laws from four states (Massachusetts, Pennsylvania, South Carolina, and Virginia) provides little, if any, relevance to determining the scope of the right to keep and bear arms. The State has, therefore, failed to point to a single Founding-era statute that is sufficiently analogous to the Challenged Laws.

### C. Antebellum America and the Reconstruction Era (1812 – 1877)

The State cites thirty-nine laws from this era. Of those, thirty-four restrict the right to arms based exclusively on race, religion, national origin, or slave-status and are thus, for the same reasons explained above, irrelevant to the analysis here. ECF No. 79-1, at 14-22. Another three of those laws are essentially codifications of discriminatory practices, each merely recognitions by Tennessee, Arkansas, and Florida of the right of "free white men" to keep and bear arms (suggesting non-whites have no such right). *Id*. at 15, 17.

The remaining two laws are a Kansas law from 1868 prohibiting arms from what appears to be loiterers, drunks, and former confederate military members, *Id*. at 22; and an 1881 Florida restriction on giving firearms to minors or mentally ill individuals. *Id*. While the "why" for these laws is fairly similar to California's ammunition scheme, the

"how" is not. These laws "presumed that individuals had a right to" purchase arms and left the onus on the government to police that presumption. *Bruen*, 142 S. Ct. at 2148. California, by contrast, has flipped the presumption, treating everyone—even someone who has passed a background check just a few days earlier (and another one a few days before that, and so on)—as if they were a prohibited person, and requiring law-abiding citizens to overcome that presumption again and again. The burdens imposed are thus wildly different between these laws and California's ammunition scheme. These distinctions are key because, as explained above, the State's proposed historical analogues must be similar in both type and justification. *Bruen*, 142 S. Ct. at 2133.

### D. The Late-nineteenth and Early-twentieth Centuries (1878 – 1934)

The Supreme Court gave little weight to pre-Founding era history, finding it only relevant where there is a "long, unbroken line of common-law precedent stretching from Bracton to Blackstone" that is "far more likely to be part of our law than a short-lived, 14th-century English practice." *Bruen*, 142 S. Ct at 2136. The Court considered 20th century history even *less* important. It only referenced it in a footnote, stating that it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their *amici*. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154, n.28.

Indeed, based on *Bruen*'s clear guidance, the first wave of post-*Bruen* Second Amendment decisions have rebuked calls to rely on evidence of 20th century regulations. As the Northern District of New York recently observed, "to the extent these laws were from the 17th or 20th centuries, the [c]ourt has trouble finding them to be 'historical analogues' that are able to shed light on the public understanding of the Second Amendment in 1791 and/or of the Fourteenth Amendment in 1868." *Antonyuk v. Hochul*, No. 22-cv-0986, 2022 U.S. Dist. LEXIS 201944, at *127 (N.D.N.Y. Nov. 7, 2022). And the Western District of New York likewise observed that:

> *Bruen* itself invalidated a century-old New York proper-cause requirement similarly in effect in five other states as well as the District of Columbia. That seven jurisdictions enacted similar restrictions was *insufficient* in the face of a much broader and much older public-carry tradition. ***If such was a failure of analogs or tradition in Bruen, the State's argument must also fail here.***

*Hardaway v. Nigrelli*, No. 22-cv-771, 2022 U.S. Dist. LEXIS 200813, at *37, n.16 (W.D.N.Y. Nov. 3, 2022) (double emphasis added); *see also United States v. Nutter*, No. 21-cr-00142, 2022 U.S. Dist. LEXIS 155038, at *9 (S.D. W. Va. Aug. 29, 2022) (holding that laws originating in the 20th century alone cannot uphold a law unless similar laws existed in the Founding era); *Firearms Pol'y Coal., Inc. v. McCraw*, No. 21-cv-1245, 2022 U.S. Dist. LEXIS 152834, at *29 (N.D. Tex. Aug. 25, 2022) (holding that 22 state laws adopted in the 20th century was insufficient historical justification for a ban on firearms purchases for those under the age of 21).

The State nevertheless cites several laws adopted in the 20th century (and one in 1899) that it claims are analogues to California's ammunition scheme. These laws fail because they are too late in time to be relevant analogues. But even assuming *arguendo* that they are not barred because of their recent vintage, they are also not relevantly similar in any way to the modern laws at issue here.

The State's 20th century collection of laws fall into four main categories.

First, the State cites a series of hunting laws. Nos. 108-113, and 115-117. Of course, such laws are irrelevant. These laws are not about public safety or combating gun-related crime. They are about preserving game populations for the residents of a state. These laws thus have a different "why" from California's ammunition scheme. And they seek to achieve that result by restricting foreigners and non-residents (non-tax payers) from hunting. But there is no evidence, as far as Plaintiffs can tell, that there is any screening process. They, thus, have a different "how" from California's ammunition scheme. The burden is also sharply different. Not being able to enjoy the privilege of hunting as a foreigner is quite distinct from not being able to exercise the right to obtain ammunition as a citizen. The laws are thus not relevantly similar restrictions.

Second, the State presents a handful of laws barring noncitizens from carrying or possessing arms, or requiring them to get a license before doing so. Nos. 113-114, 119-121, 123-129, 133-139. These laws did not apply to the populace *generally*, but just noncitizens *specifically*. The State really should let go of its attachment to discriminatory old laws, they won't save its unprecedented ammunition background check. It appears that some of these were hunting laws too and thus irrelevant for the reasons above.

Third, there are a series of laws that pertain to firearm possession by convicts and violent criminals. Nos. 131-132, 136, 138, 140-148. First, none of these laws regulated the sale of ammunition, just firearms themselves. To the extent these 20th century laws stand as an analogue for background checks, they only support background checks for firearms at most. They do not provide any backing for gatekeeping ammunition background checks like California's, for the reasons explained above. They certainly do not support the recording of ammunition transactions.

Finally, are the one-off laws that do not fit into any particular category. The State includes a Massachusetts law from 1922 that prohibited the sale of firearms and certain other weapons to minors under the age of 15 (and to noncitizens who lack a permit). No. 130. Obviously, such a prohibition on a specific set of people is not an analogue to requiring paid background checks each time every law abiding resident of California wants to purchase ammunition.

The state also cites a 1916 New Jersey law that generally prohibits going into the "woods or fields" with a firearm while intoxicated. No. 122. A sensible regulation perhaps, but not one that has any apparent bearing on ammunition background checks. Lastly, the State includes a local Chicago law from 1914 that required all weapon sales to be completed through licensed dealers only, and purchasers first had to receive a permit from a Superintendent who had discretion on whether or not to issue such permits. No. 118. *Bruen* expressly rejected that anomalous local restrictions can be persuasive analogues. "[T]he bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition permitting public

11
PLAINTIFFS' BRIEF RE: RELEVANT ANALOGS
18cv802

carry." *Bruen*, 142 S. Ct. at 2154.[2] This Chicago ordinance does not even survive *Bruen*. A fortiori it cannot be a valid analogue for the unrelated topic of ammunition background checks.

Thus, even if the State could rely on 20th century history, and it cannot, it hasn't presented any relevantly similar laws from the 20th century to justify California's unprecedented ammunition scheme.

## CONCLUSION

At bottom, the State offers no basis to disturb this court's previous conclusion that California's alone-in-the-nation regime "has no historical pedigree" whatsoever, *Rhode*, 445 F.Supp.3d at 931-32. Under *Bruen*, that means the regime is unconstitutional. For that reason and the above additional reasons, the Court should (again) declare California's ammunition scheme unconstitutional and enjoin its enforcement.

Dated: February 10, 2023                    **MICHEL & ASSOCIATES, P.C.**

*/s/ Sean A. Brady*
Sean A. Brady
Email: sbrady@michellawyers.com
Attorneys for Plaintiffs

---

[2] Moreover, that law is antithetical to *Bruen*'s core holding that such discretion is unconstitutional.

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Rhode, et al. v. Becerra*
Case No.: 3:18-cv-00802-JM-JMA

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**PLAINTIFFS' BRIEF RE: RELEVANT ANALOGS**

on the following parties by electronically filing the foregoing on February 10, 2023, with the Clerk of the District Court using its ECF System, which electronically notifies them.

  John D. Echeverria
  Deputy Attorney General
  john.echeverria@doj.ca.gov
  Anthony P. O'Brien
  Deputy Attorney General
  anthony.obrien@doj.ca.gov
  455 Golden Gate Ave., Suite 11000
  San Francisco, CA 94102-7004
    *Attorneys for Defendant Attorney General Rob Bonta*

    I declare under penalty of perjury that the foregoing is true and correct. Executed on February 10, 2023, at Long Beach, CA.

*[signature]*
Laura Palmerin