ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
CHRISTINA R.B. LÓPEZ
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his
official capacity as California Attorney
General*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **KIM RHODE et al.,** <br><br> Plaintiffs, <br><br> **v.** <br><br> **ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,** <br><br> Defendant. | 3:18-cv-00802-BEN-JLB <br><br> **DECLARATION OF ROBERT SPITZER** <br><br> Courtroom:  5A <br> Judge:  Hon. Roger T. Benitez <br> Action Filed:  May 17, 2017 |

1

# DECLARATION OF ROBERT SPITZER

I, Robert Spitzer, declare under penalty of perjury that the following is true and correct:

1.      I have been asked by the Office of the Attorney General of the California Department of Justice to prepare a declaration on the history and tradition of background checks and related restrictions in the United States. This declaration ("Declaration") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## PROFESSIONAL QUALIFICATIONS

2.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland. I was also a visiting professor at Cornell University for thirty years. I am currently an adjunct professor at the College of William and Mary School of Law. I earned my Ph.D. in Government from Cornell University. I reside in Williamsburg, Virginia. A copy of my curriculum vitae is attached as **Exhibit A** to this Declaration.

3.      I have been studying and writing about gun policy for over thirty years. My first publication on the subject appeared in 1985. Since then, I have published six books and over one hundred articles, papers, and essays on gun policy. My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues. My book, *The Politics of Gun Control*, has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology. The eighth edition of the book was published in 2021 by Routledge Publishers. My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws. I am frequently

1  interviewed and quoted in the national and international media on gun-related

2  matters. For over twenty years, I have been a member of the National Rifle

3  Association and of Brady (formerly, the Brady Campaign to Prevent Gun

4  Violence).

5      4.    I have provided written testimony as an expert witness in the following

6  cases (in addition to this case): *Worman v. Healey*, No. 1:17-10107-WGY (D.

7  Mass.); *Hanson v. District of Columbia*, No. 1:22-cv-02256 (D.D.C.); *Brumback v.

8  Ferguson*, No. 22-cv-3093 (E.D. Wash.); *Sullivan v. Ferguson*, No. 3:22-cv-05403

9  (W.D. Wash.); *Miller v. Bonta*, No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*,

10  No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*, No. 19-cv-1662 (S.D. Cal.); *Rupp v.

11  Bonta*, No. 17-cv-00746 (C.D. Cal.); *Gates v. Polis*, No. 1:22-cv-01866 (D. Colo.);

12  *Oakland Tactical Supply LLC v. Howell Township*, No. 18-cv-13443 (E.D. Mich.);

13  *State v. Misch*, No. 173-2-19 Bncr (Vt. Super. Ct. Bennington Cnty.); *Nat'l Ass'n

14  for Gun Rights, Inc. v. City of Highland Park*, No. 22-cv-4774 (N.D. Ill.); *Nat'l

15  Ass'n for Gun Rights & Capen v. Campbell*, No. 22-cv-11431 (D. Mass.); *Nat'l

16  Ass'n for Gun Rights v. Lopez*, No. 1:22-cv-00404 (D. Haw.); *Abbot v. Lopez*,

17  No. 20-00360 (D. Haw.); *Santucci v. City & Cnty. of Honolulu*, No. 1:22-cv-00142

18  (D. Haw.); *Yukutake v. Lopez*, No. 1:22-cv-00323 (D. Haw.); *Baird v. Bonta*,

19  No. 19-cv-00617 (E.D. Cal.); *Nichols v. Newsom*, No. 11-cv-9916 (C.D. Cal.); *Del.

20  State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-

21  cv-00951(D. Del.); *Mark Fitz, Grayguns, Inc. v. Rosenblum*, No. 22-cv-01859 (D.

22  Or.); *Harrel v. Raoul*, No. 23-141 (S.D. Ill.); *Mitchell v. Atkins*, No. 19-cv-5106

23  (W.D. Wash.); *Keneally v. Raoul*, No. 23-cv-50039 (N.D. Ill.); *McGregor v. Cnty.

24  of Suffolk*, No. 2:23-cv-01130 (E.D.N.Y.); *Lane v. James*, No. 22-cv-10989

25  (S.D.N.Y.); *Rocky Mountain Gun Owners v. Town of Superior*, No. 22-cv-02680

26  (D. Colo.); *Wiese v. Bonta*, No. 17-cv-00903 (E.D. Cal.); *Langley v. Kelly*, No. 23-

27  cv-192-NJR (S.D. Ill.); *Barnett v. Raoul*, No. 23-cv-209-RJD (S.D. Ill.); *Fed.

28  Firearms Licensees of Ill. v. Pritzker*, No. 23-cv-215-NJR (S.D. Ill.); *Herrera v.

*Raoul*, No. 23-cv-532 (N.D. Ill.); *Banta v. Ferguson*, No. 23-cv-00112 (E.D. Wash.); *Hartford v. Ferguson*, No. 23-cv-05364 (W.D. Wash.).

5.  I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals for the Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq v. Beaty*, U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v. Chicago*, U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012).

6.  I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

7.  I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $500 per hour.

## OPINIONS

### I.  INTRODUCTION

8.  This Declaration examines the history of background checks for firearms purchases and permits, as well as two types of historical weapons regulations that are similar to the modern regulatory technique of background checks: licensing laws and laws relating to weapons confiscation.

9.     Modern background checks for firearms purchases as we understand them did not begin until the 20th century. However, the absence of modern background check technologies in early America did not mean that evaluations of those entitled to have weapons did not occur or exist.

10.     Weapons licensing or permitting, which dates to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s, was a widespread and varied regulatory tool utilized in America. These laws were and are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates some kind of evaluation that resembles what in modern parlance is called a background check.

11.     Weapons confiscation laws further buttress the tradition of using background facts or information to regulate firearms and ammunition ownership. From the 1600s to the early 1900s, numerous weapons laws provided for weapons confiscation for various behaviors, infractions, or reasons—in particular as seen in violations of weapons carry laws and hunting laws—as discussed below.

12.     Since our country's earliest beginnings, there were numerous and varied laws restricting weapons ownership, possession, or use. These early restrictions on who could lawfully acquire and possess firearms were precursors to more targeted licensing and confiscation laws in the 19th and 20th centuries and, eventually, the institution of background checks in the 20th century.

13.     After discussing modern background checks, their antecedents in licensing restrictions and weapons confiscation laws will be examined in turn.

## II.   GUN PURCHASE BACKGROUND CHECKS

14.     Gun purchase background checks as they are understood and implemented today did not exist early in the country's history. No special wisdom is required to discern why.

15.    In the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers,[1] private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of modern background checks. Modern technology allows for wide-ranging and rapid background checks. No similar technologies existed earlier in our history. Indeed, rapid, convenient gun-sale processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get.

16.    As Kennett and Anderson note, "By the 1880s gunmaking had completed the transition from craft to industry."[2] The rise of handgun mail-order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors.[3] When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous gun-carry restrictions in the late 1800s and early 1900s.[4] This is but one example of a broader trend in the history of weapons regulations in America: that regulation occurred when new weapons or weapons technologies entered civilian life and were then

---

[1] As of 2021, there were over 52,900 dealer licensees and over 7,000 licensed pawnbrokers. http://www.atf.gov/about/foia/ffl-list.html; "Gun Dealers," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/gun-sales/gun-dealers/#footnote_1_5597.

[2] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 97.

[3] Kennett and Anderson, *The Gun in America*, 99-100. Sears ended handgun catalog sales in 1924, and other companies followed as pressure for government intervention rose. Ibid., 194.

[4] Robert J. Spitzer, "Gun History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017), 59-60, 63-67.

Declaration of Robert Spitzer (3:18-cv-00802-BEN-JLB)

associated with harm, disorder, crime, or related threats to public safety and good order.

17.   This aside, the absence of modern background check technologies in early America did not mean that evaluations of those entitled to have or own weapons did not occur or exist. Since our country's earliest beginnings, numerous and varied laws were enacted to restrict weapons ownership, possession, or use pertaining to various individuals and groups, including Indigenous people, the enslaved and free persons of color (before the Civil War), those who refused to swear an oath of loyalty to the government or who expressed unpopular views, vagrants, non-residents, those who were inebriated, minors, those of poor moral character, and people of unsound mind.[5] Obviously some of these categories are considered abhorrent in modern society, but they are important to recognize both because the only thing worse than acknowledging them would be to ignore them, and because they shed important light on the broader principle that gun and weapons restrictions existed in prolific and varied types from the nation's earliest days.

18.   Modern background checks are generally traced to an "innovative provision"[6] of the New York State Sullivan Law of 1911,[7] which established a system of permitting for those wishing to possess a handgun, extending to their sale, possession, and carrying. It barred gun dealers from selling concealable firearms to anyone who did not already have a state-issued permit, and required dealers to keep and maintain records pertaining to gun sales. Dealers were required to "keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or

---

[5] Spitzer, "Gun History in the United States and Second Amendment Rights."

[6] Adam Winkler, *Gunfight* (NY: W.W. Norton, 2011), 205.

[7] 1911 N.Y. Laws ch. 195.

Declaration of Robert Spitzer (3:18-cv-00802-BEN-JLB)

other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[8] It also made it a felony to carry a pistol without a license.[9] Yet as the account to come will show, gun permitting and licensing schemes predated the 1911 law by many decades.[10]

19.    The first significant national gun law, the National Firearms Act of 1934,[11] imposed detailed regulations on those seeking to own certain highly destructive gangster-type weapons, including fully automatic firearms, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities. Firearms importers, manufacturers, and dealers were required to be registered and maintain proper records of any such firearms sales or transfers. Those seeking such weapons were (and are) required to pay a $200 fee and have the weapon's serial number, along with the other collected information kept by the appropriate federal agency.[12] The Federal Firearms Act of 1938[13] was "a licensing and record-keeping law for gun dealers," and it "also barred felons from receiving firearms."[14]

20.    The contemporary uniform federal background check system was established by the Brady Handgun Violence Prevention Act of 1993. The law also included a five business day waiting period that was phased out in 1998 and replaced with an instant background check system. Under this system, persons

---

[8] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 2.

[9] Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 174-79.

[10] Kennett and Anderson, *The Gun in America*, 169-73.

[11] 48 Stat. 1236.

[12] National Firearms Act of 1934, 48 Stat. 1236.

[13] 52 Stat. 1250.

[14] Winkler, *Gunfight*, 204.

attempting to purchase a gun through a licensed firearms dealer complete an ATF form. The dealer contacts NICS electronically or by phone and passes on the information on the form. NICS personnel complete the background check. As long as the applicant does not fall into a prohibited category of persons, such as having a criminal record, the purchase is approved.[15]

21.    The "instant" element of the background check system was made possible through computerization and the rise of the internet, both of which only developed and became widely available in the 1990s. Indeed, as early as 1991, an instant background check system was proposed for the Brady bill in Congress instead of a waiting period, but the idea of swapping an instant background check system for a waiting period was rejected because in 1991 only ten states had the necessary automation of records; eight states still handled files manually, and nine states did not even maintain the necessary felony records. Further, the time lapse between the closing of a criminal case and its logging in state records ran from weeks to months.[16] Eventually, these limitations were overcome by 1998. As of today 21 states plus the District of Columbia have background check systems that go beyond the federal standard, and 14 states plus D.C. have a universal background check system extending to all sales, including private sales, that cover all firearm purchases.[17]

22.    Before the 1990s, states that issued pistol carry permits generally had some kind of background check process. For example, as of 1981, 29 states were "may issue" concealed carry permit states, meaning that carry licenses were issued

---

[15] "Firearms Checks (NICS)," https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics.

[16] 107 Stat. 1536. Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 213.

[17] "Universal Background Checks," Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/background-checks/universal-background-checks/#footnote_15_4119.

to applicants subject to a discretionary review process by local officials. Two states were "shall issue" states, meaning that the states had to issue carry licenses as long as the applicants did not fall into a prohibited category, such as being a convicted felon or judged mentally incompetent. One state (Vermont) did not require carry permits for citizens to carry handguns, and 19 states (including D.C.) barred any civilian concealed gun carrying.[18] Among those states that did issue carry licenses, part of the consideration was to bar from permitting those with criminal backgrounds, which could only be determined through some kind of background check process. For example, an analysis of pistol licensing and permitting published in 1938 noted the necessity of a "careful examination of each [license] applicant"[19] that would include "a report of a search of the files for the [pistol permit/license] applicant's prior criminal record and of interviews with his employers and neighbors."[20] According to this 1938 study, as of that time only two states (Minnesota and Vermont) did not have a pistol licensing system in place.[21] As of this writing in 2023, 27 states have eliminated all required permitting for concealed handgun carrying (although 26 of these 27 states do still provide permits for those seeking them), with 23 states (plus D.C.) retaining a "shall issue" system.[22]

23.   The discussion below examines two types of historical gun laws analogous to modern background check laws: historical weapons licensing laws, and early laws that called for weapons confiscation.

---

[18] Rick Schmitt, "How the NRA Pushed the Right to Pack Heat Anywhere," *Mother Jones,* November 15, 2011, https://www.motherjones.com/politics/2011/11/concealed-guns-laws/.

[19] Sam B. Warner, "The Uniform Pistol Act," *Journal of Criminal Law and Criminology* 29(Winter 1938): 541.

[20] Warner, "The Uniform Pistol Act," 542.

[21] Warner, "The Uniform Pistol Act," 530.

[22] "Concealed Carry, Giffords Law Center, https://giffords.org/lawcenter/gun-laws/policy-areas/guns-in-public/concealed-carry/.

Declaration of Robert Spitzer (3:18-cv-00802-BEN-JLB)

### III.  HISTORICAL WEAPONS LICENSING LAWS

24.    Weapons licensing or permitting was a widespread and varied regulatory tool utilized in America. By one definition, licensing is the "permission by competent authority to do an act which, without such permission, would be illegal . . . ."[23] Despite the difference of hundreds of years, licensing in early America functioned similarly to the way it functions today.

25.    Historical weapons licensing and permitting laws were and are predicated on a process whereby a license applicant provides or submits some kind of information which is then judged to be acceptable or not. If the judgment is affirmative, the license is granted. By its nature, then, licensing contemplates some kind of evaluation that resembles what in modern parlance is called a background check.

26.    In addition, like background checks, licensing generally represented a more mature and nuanced form of regulation that in many instances succeeded or supplemented more rigid but less complicated laws (see discussion below).

27.    State and local laws encompassing the licensing, permitting, or registration of dangerous weapons and substances date to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s. These laws mostly pertained to those weapons that posed a threat to public safety: concealable weapons, including handguns, fighting knives, various types of clubs, and explosives (ranging from firecrackers and gun powder to nitroglycerine after its invention).

28.    In all, a total of at least 45 states plus the District of Columbia enacted some type of licensing law from the 1700s through the early 1900s. At least 29 states enacted 62 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time (see Exhibits B and C for enacting

---

[23] Henry C. Black, *Black's Law Dictionary*, 6th ed. (St. Paul, MN: West Publishing, 1991), 634.

jurisdictions and years of enactment); 16 of those states did so in the 1800s. At least 26 states enacted laws to regulate firearms discharging through licensing, with 13 of those states doing so from the 1700s up to the start of the Civil War, and another 20 states doing so between the end of the Civil War and 1900 (some states enacted laws in both periods). At least 12 states licensed hunting with firearms from the post-Civil War period through the early 1900s. At least 21 states licensed the commercial sale, transport, or firing of weapons at locations like shooting galleries. At least 21 states licensed the possession, handling, or transport of gunpowder and other explosives. At least 15 states required those selling or otherwise providing weapons to individuals to record and keep information pertaining to the buyers of weapons.

29.    At least 14 states imposed licensing requirements on specified marginalized groups (variously including Native Americans, felons, non-citizens, non-state residents, or minors). In the pre-Civil War period, at least 12 states imposed licensing on enslaved persons or free Blacks.

30.    Most weapons licensing laws pertaining to weapons carrying, discharge, commercial sales, and gunpowder licensing generally were applied at first to populated areas, since misuse of weapons posed a far greater risk to public safety in areas where larger numbers of people lived in close proximity to each other.

31.    With regard to concealed carry of pistols and other dangerous weapons, for example, from the 1700s through the early 1900s virtually every state in the country restricted or criminalized such carrying.[24] With the spread of licensing requirements in the post-Civil War nineteenth century, however, governing units began to allow legal weapons carrying through licensing, subject to the review criteria as conducted by local officials who were empowered to grant carry licenses.

---

[24] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017), 63-67.

The criteria for the granting of these licenses were generally discretionary for the individuals or bodies granting them. In some laws, no criteria were specified; in others, the criteria were vague or broad, but often included wording that the applicants must be persons of good character or sound judgment, again emphasizing the determinative judgment of those granting the licenses. For example, an 1881 permitting system for New York City said that permits would be issued to "a proper and law abiding person."[25] An 1898 Oregon City law called for carry permits to be issued if the magistrate believed it "necessary or prudent to grant such permission."[26] Permit laws usually set a time limit for permit duration, ranging from a month to a year (see below).

32.   Regarding hunting licenses, many earlier laws criminalized various hunting practices, dating back to the 1600s, for reasons related to protection of private property and lands, conservation, and safety.[27] The hunting related laws listed here are all instances where hunting was allowed through permitting by a government entity, meaning that the permits or licenses could be withdrawn if the licensees violated whatever rules the laws imposed (such as hunting out of season, or hunting certain types of game). Licensing related to Indigenous people, enslaved persons, and free persons of color is discussed in more detail below. All of these types of laws are detailed in Exhibits B and C.

33.   Many of these licensing laws were instances where the prevailing legal standard had often been to ban the activity or practice outright—banning concealed

---

[25] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-15, Image 214-15 (1881).

[26] The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898); An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.

[27] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 73-74.

carrying, banning weapons discharge in cities and towns, banning weapons from marginalized groups, etc. The jurisdictions enacting licensing for these activities were now allowing firearms or other dangerous weapons or substances to be used or possessed with the granting of a license to do so, when their possession or use would otherwise be subject to criminal penalties. The proliferation of licensing represented in most instances a new and more mature form of government regulation of the activities in question—by tailoring prohibitions to address public-safety threats posed by firearms-related activities rather than banning those activities outright, and by utilizing regulatory techniques that require more of those involved in the licensing process, including the gathering and keeping of relevant information—though traditional laws that simply penalized weapons carrying or use remained in many if not most places. Like licensing, background checks seek to limit (and not categorically prohibit) those who may engage in certain firearms-related activities.

### A.   Licensing of Weapons Carrying or Possession

34.   In 1871, Missouri enacted a measure to license the otherwise illegal practice of concealed carrying of handguns and other named weapons, including "any other dangerous or deadly weapon" in St. Louis by means of "written permission from the Mayor."[28] St. Louis enacted its own municipal version of this law in 1892.[29] A similar measure was enacted for Kansas City, Missouri, in 1880.[30]

---

[28] Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-92, Image 499-500 (1871).

[29] The Municipal Code of St. Louis (St. Louis: Woodward 1901), 738, Sec. 1471. 1892; Chapter 18. Of Misdemeanors, Sec. 1471.

[30] An Ordinance in the Revision of the Ordinances Governing the City of Kansas (Kansas City, MO; Isaac P. Moore's Book and Job, 1880), p. 264, Sec. 3. 1880; Chapter XXXIV. Public Safety, Sec. 3.

Jersey City, New Jersey enacted a licensing scheme in 1871 for concealed weapons carrying of pistols and other dangerous weapons, defined in the law as "any gun, pistol, cannon, or fowling piece or other fire-arms . . . ."[31] As this wording makes clear, this extended to long guns as well (a fowling piece is a long-barreled shotgun for shooting small animals[32]). Jersey City's 1873 law laid out a broadly discretionary set of criteria for granting licenses, described below (as determined by the city's municipal court), that bears great similarity to contemporary gun licensing schemes:

> The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper.[33]

The Jersey City ordinance added that carry permits would not be granted "to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control."[34]

35.   Hyde Park, Illinois enacted a similar licensing law for concealed weapons carrying, including handguns, in 1876. In this instance, the licenses were

---

[31] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," passed March 31, 1871, and the Supplements Thereto Page 46, Image 46 (1874) available at The Making of Modern Law: Primary Sources. 1871.

[32] https://www.thefreedictionary.com/fowling+piece.

[33] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86-87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources. 1873.

[34] Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871.

granted "by written permission of the Captain of Police."[35] Evanston, Illinois's concealed carry licensing law of 1893 granted licensing issuance authority to the city mayor.[36]

36. New York City criminalized the carrying of "a pistol of any description concealed on his person" in 1881 but provided for a legal carry license exception:

> Any person, except as provided in this article, who has occasion to carry a pistol for his protection, may apply to the officer in command at the station-house of the precinct where he resided, and such officer, if satisfied that the applicant is a proper and law abiding person, shall give said person a recommendation to the superintendent of police, or the inspector in command at the central office in the absence of the superintendent, who shall issue a permit to the said person allowing him to carry a pistol of any description.[37]

This provision also allowed for non-residents who had occasional business in the city to apply for permits as well.

37. An 1884 New York state law barred the carrying or possession of named weapons, including fighting knives and types of clubs, from those under eighteen, unless they possessed a license to do so. Licenses could only be granted for up to one year and were subject to revocation "at the pleasure of the mayor."[38] A year

---

[35] Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources. 1876. Misdemeanors, § 39.

[36] George W. Hess, Revised Ordinances of the City of Evanston: Also Special Laws and Ordinances of General Interest Page 131-32, Image 143-44 (1893) available at The Making of Modern Law: Primary Sources.

[37] Elliott Fitch Shepard, Ordinances of the Mayor, Aldermen and Commonalty of the City of New York, in Force January 1, 1881; Adopted by the Common Council and Published by Their Authority Page 214-15, Image 214-15 (1881) available at The Making of Modern Law: Primary Sources.

[38] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of

later, the law was extended to all cities in the state and included "any pistol or other firearms of any kind."[39] (This would have included long guns as it did not specify only concealed carry.) In 1891, the state extended permitting to Buffalo covering handguns and other dangerous weapons.[40]

38.    Wheeling, West Virginia enacted a law in 1881 making it "unlawful for any person to carry" various named weapons, including a "colt" revolver, or to "carry about his person, hid from common observation" any pistol or other named weapon without a permit from the mayor.[41] Under the heading "License," an 1882 law applying to St. Paul, Minnesota criminalized any concealed weapons carrying, absent such licensing.[42]

39.    An 1888 Salt Lake City, Utah ordinance barred the carrying of "any concealed weapon" unless the person obtained a permit from the city mayor.[43] New Haven, Connecticut enacted a similar anti-carry law in 1890, extending to pistols, unless the person first obtained a permit either from the mayor or police

---

the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources. 1884.

[39] George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5. Fourth Edition Page 298, Image 824 (1885) available at The Making of Modern Law: Primary Sources.

[40] 1891 N.Y. Laws 129, 177, An Act to Revise the Charter of the City of Buffalo, ch. 105, tit. 7, ch. 2, § 209.

[41] Laws and Ordinances for the Government of the City of Wheeling, West Virginia (Wheeling, WV: W. Va. Printing 1891), p. 206, SEC. 14. 1881.

[42] W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources. 1882.

[43] The Revised Ordinances of Salt Lake City, Utah, Chapter XXVI, Misdemeanors, p. 283 Sec. 14 (1888), Dangerous and Concealed Weapons. SEC. 14.

superintendent.[44] Oakland, California enacted a similar law in 1890 making it unlawful "to wear or carry concealed about his person" a pistol or other listed weapon unless the person obtained a permit from the mayor. The permit was good for up to a year, and could be granted to "any peaceable person whose profession or occupation may require him to be out at late hours of the night to carry a concealed deadly weapon upon his person."[45] The California cities of Stockton (1891)[46] and Fresno (1896)[47] did the same.

40.   A law passed by the U.S. Congress in 1892 for the District of Columbia criminalized the concealed carry of "any deadly or dangerous weapons," including pistols, unless granted a permit by a judge of the police court "for a period of not more than one month at any one time, upon satisfactory proof to him of the necessity for the granting thereof. . . ."[48] Florida's 1893 law made it "unlawful to carry or own a Winchester or other repeating rifle without first taking out a license from the County Commissioner. . . ."[49] In addition, the law specified that the applicant "shall give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with

---

[44] Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

[45] Fred L. Button, ed., General Municipal Ordinances of the City of Oakland, California (Oakland, CA; Enquirer, 1895), p. 218, Sec. 1, An Ordinance to Prohibit the Carrying of Concealed Weapons, No. 1141. 1890.

[46] Charter and Ordinances of the City of Stockton (Stockton, CA: Stockton Mail Printers and Bookbinders, 1908), p. 240, Ordinance No. 53. 1891.

[47] L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

[48] Washington D.C. 27 Stat. 116 (1892), ch. 159.

[49] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4.

sureties to be approved by the County Commissioners," along with "a record of the name of the person taking out such license, the name of the maker of the firearm so licensed to be carried and the caliber and number of the same."[50]

41.   Montana enacted a wide-ranging state licensing law in 1895 that threatened imprisonment and fines for anyone "who brings into this state an armed person or armed body of men for the preservation of the peace or the suppression of domestic violence, except at the solicitation and by the permission of the legislative assembly or of the governor . . . ."[51]

42.   A state law in Nebraska granted the mayor of Lincoln the authority to issue concealed carry weapons licenses good for a year "at his pleasure" in 1895.[52] The city of Spokane, Washington criminalized the concealed carrying of "either a revolver, pistol or other fire-arms" unless persons obtained a "special written permit from the Superior Court" to do so.[53] Milwaukee, Wisconsin enacted a permitting system in 1896 for persons to carry various otherwise barred dangerous weapons including "any pistol or colt." The city police chief granted a license if "it is necessary for the personal safety of such person or for the safety of his property or

---

[50] 1893 Fla. Laws 71-72, An Act to Regulate the Carrying of Firearms, ch. 4147, §§ 1-4.

[51] Decius Spear Wade, The Codes and Statutes of Montana. In Force July 1st, 1895. Including the Political Code, Civil Code, Code of Civil Procedure and Penal Code. As Amended and Adopted by the Fourth Legislative Assembly, Together with Other Laws Continued in Force Page 873, Image 914 (Vol. 2, 1895) available at The Making of Modern Law: Primary Sources. 1895. Crimes Against the Public Peace, § 759.

[52] 1869 Neb. Laws 53, An Act to Incorporate Cities of the First Class in the State of Nebraska, § 47.

[53] Rose M. Denny, ed., The Municipal Code of the City of Spokane, Washington (Spokane, WA; W.D. Knight, 1896), p. 309-10, Ordinance No. A544, Sec. 1. 1895.

of the property with which he may be entrusted, to carry such weapon." The chief could also "revoke such permit at any time."[54]

43.    In the twentieth century, permitting accelerated, spread, and broadened. In 1905, New Jersey enacted a state law licensing concealed weapons carrying for a year "unless sooner revoked by the officer or body granting the same."[55] Licensing was extended to long guns—machine guns and automatic rifles—in New Jersey in 1927[56] and 1934.[57] In 1906, a Massachusetts state law noted that prosecution for carrying "a loaded pistol or revolver" did not apply to those with a license.[58] It extended licensing to a variety of guns in 1927.[59] In 1908, Virginia enacted a dangerous weapons concealed carry permit law, with permits granted for one year "upon a written application and satisfactory proof of the good character and necessity of the applicant to carry concealed weapon."[60] It extended the permitting process in 1926.[61] Georgia enacted a detailed handgun permitting system in 1910.[62]

---

[54] Charles H. Hamilton, ed., The General Ordinances of the City of Milwaukee to January 1, 1896: With Amendments Thereto and an Appendix (Milwaukee, WI: E. Keough, 1896), pp.692-93, Sec. 25. Chapter XX. Misdemeanors. Section 25.

[55] 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

[56] 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

[57] 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

[58] 1906 Mass. Acts 150, ch. 172, An Act to Regulate by License the Carrying of Concealed Weapons.

[59] 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123).

[60] 1908 Va. Laws 381, An Act To Amend And Re-Enact Section 3780 Of The Code In Relation To Carrying Concealed Weapons, § 3780.

[61] 1926 Va. Acts. 285-87, ch. 158.

[62] Orville Park, Park's Annotated Code of the State of Georgia 1914, Penal Code,

As discussed earlier, New York State established comprehensive handgun licensing in 1911.[63]

44.   A paradigmatic example of a modern permitting system was enacted in Montana in 1918:

> every person within the State of Montana, who owns or has in his possession any fire arms or weapons shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered.[64]

Thereafter, permitting was enacted in states (not including those that enacted permitting in the 1800s, most of which also enacted permitting laws in the 1900s as

---

Article 3, Carrying pistols without license, § 348(a)-(d). 1910.

[63] 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, §§1-2.

[64] 1918 Mont. Laws 6-7, 9, An Act Entitled "An Act Providing for the Registration of All Fire Arms and Weapons and Regulating the Sale Thereof and Defining the Duties of Certain County Officers and Providing Penalties for a Violation of the Provisions of This Act," ch. 2, §§ 1, 3, 8.

well) including Hawaii,[65] Indiana,[66] Michigan,[67] New Hampshire,[68] North Carolina,[69] North Dakota,[70] Ohio,[71] Oregon,[72] Pennsylvania,[73] Rhode Island,[74] and South Carolina.[75]

---

[65] 1927 Haw. Sess. Laws 209-17, AN ACT Regulating the Sale, Transfer and Possession of Certain Firearms and Ammunitions, and Amending Sections 2136, 2137, 2138, 2139, 2140, 2141, 2142, 2143, 2146 and 2147 of the Revised Laws of Hawaii 1925 (the "Small Arms Act"), §§ 10-11, § 17; 1933 Haw. Sess. Laws 39, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 8, 10-16.

[66] 1925 Ind. Acts 495, 495-98.

[67] 1925 Mich. Pub. Acts 47, An Act to Regulate the Possession and Sale of Pistols, Revolvers and Guns; to Provide a Method of Licensing Those Carrying Such Weapons Concealed; and to Provide Penalties for Violations of Such Regulations, § 7; 1927 Mich. Pub. Acts 888-89, 91, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, §§ 3, 9.

[68] 1923 N.H. Laws 138.

[69] 1919 N.C. Sess. Laws 397-99, Pub. Laws, An Act to Regulate the Sale of Concealed Weapons in North Carolina, ch. 197, §§1, 5.

[70] 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5; 1923 N.D. Laws 379, 380-82 ch. 266; 1925 N.D. Laws 216–17, Pistols and Revolvers, ch. 174, § 2; 1931 N. D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.

[71] 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

[72] 1913 Or. Laws 497; 1917 Or. Sess. Laws 804-808; 1925 Or. Laws 468, 469-71.

[73] 1929 Pa. Laws 777; 1931 PA. Laws 498, No. 158.

[74] 1927 (January Session) R.I. Pub. Laws 256.

[75] 1934 S.C. Acts 1288.

### B. Permits for Discharge of Firearms or Use of Explosives and Licensing of Gunpowder

45.   Laws pertaining to the licensing or permitting of firearm discharges, the use of explosives, and gunpowder are similar to requiring background checks for firearm ammunition, in that they extend licensing beyond the firearms themselves to the firing processes or implements.

46.   As noted above, at least 26 states enacted licensing mechanisms to allow firearms and like discharges under certain circumstances. Generally speaking, firearms discharge licensing pertained to any firearm, not just handguns. From the 1700s to 1860, at least 13 states enacted discharge licensing authority to local officials. The earliest were in Pennsylvania. In 1713, Philadelphia penalized various activities in the city including "firing a Gun without license."[76] An act pertaining to the entire colony from 1721 imposed "penalties and forfeitures" to anyone who engaged in various activities including firing "any gun or other fire arm" or selling or setting off various types of fireworks "without the governor's special license."[77] Another Philadelphia ordinance to prevent "mischief [that] may happen by shooting of guns" or setting off fireworks, criminalized such activities unless individuals first obtained a "governor's special license."[78] A 1750 law did the same for the District

---

[76] Pennsylvania Archives. Selected And Arranged From Original Documents In The Office Of The Secretary Of The Commonwealth, Conformably To Acts Of The General Assembly, February 15, 1851, & March 1, 1852 Page 160, Image 162 (1852) available at The Making of Modern Law: Primary Sources. 1713.

[77] Act of 26th August 1721. [An Act of 9th of February, 1750-51], § 1.

[78] John C. Lowber, Ordinances of the Corporation of the City of Philadelphia; to Which are Prefixed, the Original Charter, the Act of Incorporation, and Other Acts of Assembly Relating to the City; with an Appendix, Containing the Regulation of the Bank of the River Delaware, the Portraiture of the City, as Originally Laid Out by the Proprietor, &c. &c. Page 15-16, Image 18-19 (1812) available at The Making of Modern Law: Primary Sources. 1721.

of Southwark (Penn.),[79] as did a colony-wide law also in 1750.[80] In 1824,

permission from the president of the board of commissioners was required for

anyone seeking to test through firing any gun, cannon, or similar weapons in certain

sections of Philadelphia.[81]

47.    Charleston, South Carolina enacted an ordinance in 1802 similar to those

of Philadelphia where Commissioners of the Streets would grant a license for gun

firing and fireworks "at times of public rejoicing" and at specified locations.[82] New

Hampshire enacted a discharge permit system for Portsmouth in 1823.[83] New York

State enacted a law in 1824 that allowed the Schenectady mayor or other city

officials to grant permission for discharge of any gun or various fireworks.[84]

Marietta, Ohio enacted a discharge licensing law in 1823 because of concern that

"the quiet of any of the inhabitants may be disturbed, or their lives and safety

endangered."[85] New London, Connecticut singled out "some public day of review"

---

[79] Ordinances of the Corporation of the District of Southwark and the Acts of Assembly Relating Thereto Page 49, Image 47 (1829) available at The Making of Modern Law: Primary Sources. 1750.

[80] 1750 Pa. Laws 208.

[81] An Act of Incorporation for that Part of the Northern Liberties, Lying between the Middle of Sixth Street and the River Delaware, and between Vine Street and Cohocksink Creek, with Ordinances for the Improvement of the Same Page 51, Image 52 (1824) available at The Making of Modern Law: Primary Sources. 1824.

[82] Alexander Edwards, Ordinances of the City Council of Charleston, in the State of South-Carolina, Passed since the Incorporation of the City, Collected and Revised Pursuant to a Resolution of the Council Page 289, Image 299 (1802) available at The Making of Modern Law: Primary Sources. 1802.

[83] 1823 N.H. Laws 73-74, An Act to Establish a System of Police in the Town of Portsmouth, and for Other Purposes, ch. 34, § 4.

[84] Laws of the State of New-York, Relating to the City of Schenectady: And the Laws and Ordinances of the Common Council of the City of Schenectady Page 58, Image 58 (1824) available at The Making of Modern Law: Primary Sources.

[85] The Act of Incorporation, and the Ordinances and Regulations of the Town of

in an 1835 law as a permissible reason for issuing a discharge permit,[86] and New Haven enacted a similar law in 1845.[87] The same was enacted for Quincy, Illinois in 1841,[88] Jeffersonville, Indiana in 1855,[89] and Richmond, Virginia in 1859.[90] Another 20 states enacted such laws from the end of the Civil War up to the end of the 1800s (not including states that enacted laws both before and after the Civil War: Alabama, Arkansas, California, Colorado, Louisiana, New Jersey, Oregon, Texas, Vermont, Washington State, West Virginia, Wisconsin, and Wyoming). Most of them applied to specified cities and towns within their states (see Exhibits B and C).

48.    In addition, gunpowder was widely and extensively regulated in the colonies and states. In fact, with one exception, every state in the country enacted one or more gunpowder laws from the seventeenth century through the start of the twentieth century.[91] One element of this regulation was gunpowder licensing; at

Marietta, Washington County, Ohio Page 17-18, Image 17-18 (1837) available at The Making of Modern Law: Primary Sources. 1823.

[86] The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855) available at The Making of Modern Law: Primary Sources. 1835.

[87] 1845 Conn. Acts 10, An Act Prohibiting the Firing of Guns and Other Fire Arms in the City of New Haven, ch. 10.

[88] Samuel P. Church, The Revised Ordinances of the City of Quincy, Ill. to Which are Prefixed the Charter of the City of Quincy, and the Amendment Thereto Page 47, Image 47 (1841) available at The Making of Modern Law: Primary Sources. 1841.

[89] W. G. Armstrong, The Ordinances and Charter of the City of Jeffersonville Page 15-17, Image 15-17 (1855) available at The Making of Modern Law: Primary Sources. 1855.

[90] The Charters and Ordinances of the City of Richmond, with the Declaration of Rights, and Constitution of Virginia Page 227, Image 274 (1859) available at The Making of Modern Law: Primary Sources. 1859.

[91] Mark Anthony Frassetto, "The Duty to Bear Arms: Historical Militia Law, Fire

least 21 states enacted such licensing from the 1700s through the early 1900s (see Exhibits B and C).

### C.   Commercial Licensing and Recording

49.   A number of licensing and recording laws demonstrate a tradition of placing requirements on vendors, in addition to the purchasers themselves.

50.   As noted, a total of at least 21 states enacted commercial licensing laws with 16 states doing so throughout the 1800s, and 9 states doing so in the early 1900s (some states enacted laws in both centuries).

51.   The earliest commercial licensing law was an 1814 Illinois measure that made it unlawful for whites to engage in commercial activities with Native Americans unless they obtained a license from the governor.[92] A century later, a Chicago ordinance imposed a licensing requirement both on persons or entities to sell concealable weapons, and also a licensing requirement to those seeking to buy them.[93] An 1854 law for San Francisco, California licensed commercial shooting

---

Prevention Law, and the Modern Second Amendment" (January 12, 2022), 8, in *New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society* (eds. Jacob Charles, Joseph Blocher & Darrell Miller) (Oxford University Press, Forthcoming), available at SSRN: https://ssrn.com/abstract=4007491 or http://dx.doi.org/10.2139/ssrn.4007491; Saul Cornell and Nathan DeDino, "A Well Regulated Right: The Early American Origins of Gun Control," *Fordham Law Review* 73(2004): 510; Winkler, *Gunfight*, 116-17, 286.

[92] An Act concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815). 1814. This law is placed under this category because it pertained to white settler commerce; it was not a law that licensed Natives to engage in commerce.

[93] Samuel A. Ettelson, Opinions of the Corporation Counsel and Assistants from May 1, 1915, to June 30, 1916 Page 458-59, Image 458-59 (Vol. 7, 1916) available at The Making of Modern Law: Primary Sources. 1914.

galleries.[94] Indeed, at least 10 of the states in this category enacted shooting gallery licensing requirements.

### D.   Weapons Sellers Recording Purchases

52.   Aside from direct licensing of weapons purchasers by a government official or entity, at least 15 states required those who sold or otherwise transferred guns (mostly handguns) or other weapons to others to record information about the buyer, with that information to be maintained and subject to possible later examination. This regulatory mechanism put the burden of information collection and maintenance on the seller or dealer, rather than directly on the government, though it served the same purpose: to acquire and maintain information about those who obtained the weapons in question and when, for future reference or inspection by government officials or others. In some instances these requirements existed along with direct governmental licensing.

53.   In 1885, Illinois enacted this registration requirement for weapons dealers:

> All persons dealing in deadly weapons, hereinbefore mentioned, at retail within this State shall keep a register of all such weapons sold or given away by them. Such register shall contain the date of the sale or gift, the name and age of the person to whom the weapon is sold or given, the price of the said weapon, and the purpose for which it is purchased or obtained. The said register shall be in the following form. [Form of Register] Said register is to be kept open for inspection of the public. . . .[95]

With minor variations, this law was typical of such requirements. For example, a 1911 Colorado law offered this detailed set of instructions:

---

[94] Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220, Image 256 (1854) available at The Making of Modern Law: Primary Sources. 1854.

[95] Merritt Starr & Russell H. Curtis, Annotated Statutes of the State of Illinois in Force (1885), Criminal Code, ch. 38, ¶ 90.

Every individual, firm or corporation engaged . . . in the- retail sale, rental or exchange of firearms, pistols or revolvers, shall keep a record of each pistol or revolver sold, rented or exchanged at retail. Said record shall be made at the time of the transaction in a book kept for that purpose and shall include the name of the person to whom the pistol or revolver is sold or rented, or with whom exchanged; his age, occupation, residence, and, if residing in a city, the street and number therein where he resides; the make, calibre and finish of said pistol, or revolver, together with its number and serial letter, if any; the date of the sale, rental or exchange of said revolver; and the name of the employee or other person making such sale, rental or exchange. Said record-book shall be open at all times to the inspection of any duly authorized police officer.[96]

54.    The 1911 New York law discussed earlier required every person selling any handgun to maintain a register "at the time of sale, the date of sale, name, age, occupation and residence of every purchaser of such a pistol, revolver or other firearm, together with the calibre, make, model, manufacturer's number or other mark of identification on such pistol, revolver or other firearm."[97] The purchaser also had to produce a permit at the time of the transaction, with the seller to note the permit information.

### E.    Licensing Pertaining to Named Groups

55.    The licensing of "Named Groups" referenced in Exhibit B includes the granting of weapons licenses to non-state residents, non-citizens, minors, felons, the intoxicated (who stood to lose their licenses), and Native Americans/Indigenous people. Licensing the sale of weapons to Native Americans might seem paradoxical, since white leaders fought protracted conflicts with Natives from the 1600s through the end of the nineteenth century. But whites also traded arms with Natives throughout this entire period, as they sought profitability, access to highly

---

[96] 1911 Colo. Sess. Laws 408, § 3.

[97] 1911 N.Y. Laws 444-45, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 2.

desired goods made available by Indigenous people, and security alliances with some Indians through the supplying of weapons. This steady and enduring trade revealed "the high degree of interdependence between Indians and Euro-Americans."[98]

56.   As for licensing related to enslaved persons and free African Americans (listed separately in Exhibit B), found in Southern and border states, it is well understood that white racist regimes before the Civil War were frantic to keep weapons out of the hands of enslaved persons.[99] The laws listed here, however, are all instances when enslaved persons or free persons of color were allowed to have possession of weapons under listed, restricted circumstances through licensing in the pre-Civil War era. Some whites who owned enslaved persons sought the convenience of allowing the enslaved to carry weapons for hunting or other purposes designated by, and often under the supervision of, the white owners.

57.   The fact that groups treated as marginalized in prior centuries—especially African Americans and Native Americans—were authorized to gain limited access to dangerous weapons through licensing may seem incompatible with an otherwise racist tradition aimed at subjugating these groups, but such measures reflect the fact that it was in the interest of whites to allow weapons acquisition to these groups under limited circumstances.

## IV.   WEAPONS CONFISCATION/FORFEIT LAWS

58.   As discussed, a background check system exists to provide for some kind of process to examine or evaluate an individual seeking a firearm, or related information, or for other similar purposes. It naturally suggests circumstances where the check may produce information that might prevent the completion of, say, a weapons sale. But in the exploration of analogous weapons laws, what about

---

[98] David J. Silverman, *Thundersticks* (Cambridge, MA: Harvard University Press, 2016), 15-16 and passim.

[99] Carl T. Bogus, *Madison's Militia* (NY: Oxford University Press, 2023).

circumstances where an individual who owns a firearm is actually deprived of that weapon for various behaviors, infractions, or reasons? The most common penalties for firearms violations in historic gun laws, including violations of weapons carrying restrictions, were some combination of fines and incarceration. But as the account below demonstrates, numerous old weapons laws also provided for weapons confiscation (usually in addition to fines and imprisonment). That weapons could be confiscated as a penalty for something in an individual's life or behavior demonstrates the tradition—carried out today through background checks—of limiting possession based on those enumerated traits. The account below details gun confiscation penalties in at least two broad circumstances: violation of weapons carrying laws, and violation of hunting laws.

### A.     Weapons Confiscation for Violating Carry and Related Laws

59.    Weapons confiscation was by no means a ubiquitous penalty, but it was a remarkably frequent penalty for violating weapons carrying laws. From the 1600s to the early 1900s, at least 35 states had such laws. Of those, 5 states adopted confiscation laws only applied to enslaved persons or persons of color (these were Southern states before the Civil War[100]). Subtracting those 5 leaves 30 states with confiscation laws. Broken down by century, 5 of the remaining states had weapons confiscation laws in the 1700s. In the 1800s, 20 states had such laws. In the 1900s, 13 states had such laws (note that some states enacted laws in more than one century) (see Exhibits D and E).

60.    Among the earliest of these laws was one from Virginia in 1633 which called for anyone who sold or bartered with Native Americans "any arms or ammunition" to forfeit "all the goods and chattels" owned by the individual found

---

[100] Alabama (1805), Georgia (1768), Kentucky (1798), Louisiana (1806), and Missouri (1818). See Exhibit D.

bartering with Natives (which, one assumes, would include any firearms).[101] In 1642, Virginia enacted a similar law punishing any who would sell or barter with any Native any "piece, powder and shot . . . shall forfeit his whole estate."[102] A 1651 Virginia law called for "all ammunition, powder and arms, other than for private use" to "be delivered up, security being given to make satisfaction for it," a measure apparently aimed at insuring weapons availability for community use.[103]

61.   The Massachusetts colony enacted a law in 1637 that required named individuals who expressed "opinions & revelations" that "seduced & led into dangerous errors many of the people" of New England to turn in all "guns, pistols, swords, powder, shot, & match as they shalbee owners of, or have in their custody" and it further barred them from "buy[ing] or borrow[ing]" any of the same until such time as the local court said otherwise. If those disarmed admitted to their "seditious libel" to two magistrates, they could have their weapons restored.[104]

62.   In 1708, New Hampshire enacted a law that punished any "who shall go armed offensively, or put his Majesty's subjects in fear, by menaces or threatening speeches." The penalty, in part, was that "the arms or weapons so used by the offender, to be taken away, which shall be forfeited and sold for his Majesty's use."[105] A 1746 Massachusetts law called for the seizure of "any gun or pistol" discharged in Boston or anywhere near the harbor.[106] A 1783 Massachusetts law

---

[101] 1633 Va. Acts 219, Acts Made by the Grand Assembly, Holden At James City, August 21st, 1633, An Act That No Arms or Ammunition Be Sold To The Indians, Act X.

[102] 1642 Va. Acts 255, Acts of March 2nd, 1642, Act XXIII.

[103] 1651 Va. Acts 365, Articles At The Surrender Of The Country, art. 13.

[104] I RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211–12, enacted November 20, 1637 (Nathaniel B. Shurtleff ed., 1853).

[105] New Hampshire Public Carry Prohibition (1708).

[106] 1746 Mass. Acts 208, An Act to Prevent the Firing of Guns Charged with Shot

31

subjected to seizure "any cannon, swivel, mortar, howitzer, cohorn, or fire arm, loaded with or having gunpowder in the same" if found in any dwelling or other building or structure in Boston.[107] A 1786 Virginia law called for any who "ride armed by night nor by day, in fair or markets, or in other places, in terror of the county" to "forfeit his armour" (i.e. weaponry). This law also applied the same penalty to any who would come before local officials with "force and arms."[108]

63.    Pennsylvania enacted a law at the start of the Revolutionary War in 1776 that provided for local militias to confiscate firearms from any who refused to pledge loyalty to the new government.[109] Massachusetts enacted a similar law in 1776,[110] as did Virginia in 1777.[111] These were not penalties for anti-carry law violations, and as Scott Paul Gordon notes, those from whom the guns were taken were typically law-abiding and peaceful.[112] Still, these were gun confiscation laws for those viewed as disloyal (unwilling to pledge loyalty), as was a 1756 Maryland

---

or Ball in the Town of Boston, ch. 11, § 1.

[107] 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[108] 1786 Va. Acts 35. (Ch. 49, An Act Forbidding and Punishing Affrays).

[109] 1776 Pa. Laws 11, An Ordinance Respecting The Arms Of Non-Associators, § 1; also 1778 Pa. Laws 123, An act for the further security of the government, ch. LXI, §1; 1779 Pa. Laws 193, An Act. . . for Disarming Persons Who Shall not Have Given Attestations of Allegiance and Fidelity to this State, §§ 4-5.

[110] Act of Mar. 14, 1776, ch. VII, 1775-1776 Mass. Act at 31–32, 35.

[111] Act of May 5, 1777, ch. 3, in 9 HENING'S STATUTES AT LARGE 281, 281-82 (1821). Winkler reported that ten of the colonies impressed firearms that were privately owned to be used during the Revolutionary war. *Gunfight*, 113.

[112] Scott Paul Gordon, "A Moravian Rifle Goes to War: Disarming and Arming Pennsylvanians, 1775–1776," *Pennsylvania History* 90 (April 2023), https://scholarlypublishingcollective.org/psup/pa-history/article/90/2/155/352020/A-Moravian-Rifle-Goes-to-War-Disarming-and-Arming.

law that stripped "Papists" (i.e. Catholics) of their "Armour, Gunpowder, and Ammunition."[113]

64.    Aside from firearms, other early laws called for confiscation of gunpowder in individuals' possession (though gunpowder was of course indispensable to the firing of guns well into the nineteenth century). A Massachusetts law from 1719 directed that any gunpowder found on board any vessel docked at the port of Boston was subject to confiscation.[114] The concern over gunpowder led Massachusetts to enact a more sweeping measure in 1801 directing that all gunpowder entering Boston that was not promptly stored in a designated Powder House would be confiscated.[115] Similar New Hampshire laws in 1786 and 1793 said that any container or building which housed ten pounds of gunpowder or more in Portsmouth would be subject to seizure.[116] A 1795 Pennsylvania law imposed a series of testing, transport, storage, and sale requirements on gunpowder

---

[113] An Act to Prevent Popery within this Province, Votes and Proceedings of the Lower House of Assembly of the Province of Maryland (22 May, 1756). At the time, Catholics were perceived as potentially more loyal to the Pope in Rome than to local governmental authorities. Maryland was established as a haven for English Catholics, but they were soon outnumbered by Protestants, who feared a replication of Catholic-Protestant warfare in England. And antagonists France and Spain were both Catholic countries, all of which sparked repressive measures against Catholics in the colony. "The Founding of Maryland," Bill of Rights Institute, https://billofrightsinstitute.org/essays/the-founding-of-maryland.

[114] 1719 Mass. Acts 348, An Act In Further Addition To An Act For Erecting A Powder House In Boston, ch. III, § 1.

[115] 1801 Mass. Acts 507, An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same, ch. XX.

[116] 1786 N.H. Laws 383-84, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town; 1793 N.H. Laws 464-65, An Act to Prevent the Keeping of Large Quantities of Gun-Powder in Private Houses in Portsmouth, and for Appointing a Keeper of the Magazine Belonging to Said Town.

that called for the confiscation of any powder over twenty-five pounds to be sold in Philadelphia if not inspected first.[117]

65.   An ordinance for Columbia, South Carolina in 1817 penalized firearms discharging with a fine, but for minors or others who had no "ostensible property" against which the fine could be levied would find their gun or pistol seized.[118] An 1859 ordinance for Georgetown, District of Columbia, provided that anyone found carrying various concealed dangerous weapons, including pistols, would pay a fine and also that "all such weapons named above shall be taken away from the persons on whom they may be found."[119] An 1867 Mississippi law imposed a tax on "every gun and pistol which may be in the possession of any person" in Washington County. Those who failed to pay the tax would have their guns seized and sold.[120] Lexington, Virginia enacted an ordinance, also in 1867, that subjected anyone found carrying concealed any of several listed weapons, including pistols, to a fine and confiscation of the weapons in question.[121] An 1869 ordinance for Baltimore, Maryland said that if any collection of firearms or other weapons or ammunition

---

[117] Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten Page 240-44, Image 284-88 (1810) available at The Making of Modern Law: Primary Sources. 1795.

[118] Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto Page 61-61, Image 61-62 (1823) available at The Making of Modern Law: Primary Sources. 1817.

[119] An Ordinance Prohibiting the Carrying of Firearms, Ordinances of the Corporation of Georgetown (1859).

[120] 1867 Miss. Laws 327-28, An Act To Tax Guns And Pistols in The County Of Washington, ch. 249, § 1.

[121] Staunton, The Charter and General Ordinances of the Town of Lexington, Virginia Page 87, Image 107 (1892) available at The Making of Modern Law: Primary Sources, 1867.

was discovered in the vicinity of any election polling places for the purpose of intimidation or otherwise believed to be for "interfering with the freedom or peace of any election," they would be seized and appropriately disposed of.[122] A state law was enacted for Baltimore in 1884 that called for weapons confiscation for anyone charged with any offense.[123]

66.   An 1871 Texas law said that anyone found "carrying on or about his person, saddle, or in his saddle bags" any pistol or other named weapon would be fined and also forfeit the weapon or weapons to the county where the violation occurred.[124] Texas enacted a similar law in 1879.[125] The town of Front Royal, Virginia enacted an ordinance to penalize the carrying of various concealed weapons, including pistols, by levying a fine and confiscation of the weapons in question.[126] The same measure was enacted statewide in Virginia in 1887.[127] South Carolina enacted a weapons seizure law for concealed carry of named weapons,

---

[122] The Baltimore City Code: Comprising the Statutes and Ordinances Relating to the City of Baltimore, at 171 – Art. XVI, Section 27 (1869).

[123] John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-23, Image 531-32 (Vol. 1, 1888), 1884.

[124] 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons, § 1; George Washington Paschal, A Digest of the Laws of Texas: Containing Laws in Force, and the Repealed Laws on Which Rights Rest [Carefully Annotated] Page 1322-24, Image 292-94 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources, 1871, An Act to Regulate the Keeping and Bearing of Deadly Weapons, Art. 6512.

[125] 1879 Tex. Crim. Stat. tit. IX, ch. 4.

[126] Charter and Ordinances of the Town of Front Royal, Va. Page 18, Image 18 (1899) available at The Making of Modern Law: Primary Sources, 1884.

[127] The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887); Offences Against the Peace, § 3780.

including pistols, in 1880.[128] Arizona enacted a state-wide law in 1889 that called for weapons seizure for anyone found carrying named weapons including pistols.[129] The U.S. Congress enacted a similar concealed carry weapons seizure law for the District of Columbia that included pistols in 1892.[130] Rhode Island added weapons seizure in addition to other penalties in an 1893 law for any caught carrying a concealed weapon, including any kind of firearm, if the individual were charged with any offense.[131] Three years later, Rhode Island extended weapons confiscation to anyone found simply carrying a concealed weapon.[132] St. Paul, Minnesota enacted a penalty of weapons confiscation for anyone found carrying a concealed pistol or other weapon in 1882,[133] as did the city of New Ulm (Minn.) in 1888.[134] Many other cities did the same, including Walla Walla, Washington in 1878,[135]

---

[128] 1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.).

[129] Act of Mar. 18, 1889, 1889 Ariz. Sess. Laws 16-17.

[130] Washington D.C. 27 Stat. 116 (1892), ch. 159.–An Act to punish the carrying or selling of deadly or dangerous weapons within the District of Columbia, and for other purposes.

[131] 1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, ch. 1180, § 1.

[132] General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-11, Image 1026-27 (1896); Offences Against Public Policy, § 23.

[133] Concealed Weapons-License, Article 18, §§ 1-9, The Municipal Code of Saint Paul (1884), 1882.

[134] Ordinance No. 22: An Ordinance Relating to the Promotion of the Public Peace, Feb. 7, 1888, reprinted in Charter and Ordinances of the City of New Ulm, Minnesota 110–11 (Jos. A. Eckstein ed., 1888).

[135] Wall Walla City Ordinance No. 2. An Ordinance Defining Offenses and Fixing the Punishment Thereof, §27 (16 Aug., 1878).

Wisconsin state laws for Nicolet (1883),[136] Oshkosh (1883),[137] and La Crosse (1888),[138] Danville, Illinois (1883),[139] Nashville, Tennessee (1893),[140] and Fairfield, Nebraska (1899).[141]

67.    Also in the 1800s those who violated gunpowder transport, storage or related laws faced seizure of the powder in various states and localities.[142]

---

[136] 1883 Wis. Sess. Law 1034, An Act to Incorporate the City of Nicolet, ch. 351, § 32, pt. 45.

[137] 1883 Wis. Sess. Laws 713, vol. 2, An Act to Revise, Consolidate and Amend the Charter of the City of Oshkosh, the Act Incorporating the City, and the Several Acts Amendatory Thereof, ch. 6, § 3, pt. 56.

[138] Charter and Ordinances of the City of La Crosse, with the Rules of the Common Council Page 176, Image 179 (1888) available at The Making of Modern Law: Primary Sources.

[139] Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883); Ordinances of the City of Danville. Concealed Weapons. § 22.

[140] Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-65, Image 372-73 (1893), Ordinances of the City of Nashville, § 738.

[141] Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899), Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.

[142] E.g. The Charter and Ordinances of the City of Providence, Together with the Acts of the General Assembly Relating to the City Page 89-96, Image 89-96 (1854) Available at The Making of Modern Law: Primary Sources, 1821; Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 72-73, Image 72-73 (1856) available at The Making of Modern Law: Primary Sources, 1847; Offenses Affecting Public Safety, Ordinances of the City Council of Memphis, ch.14, Art. 3, §1 (1867); Asa Fowler, The General Statutes of the State of New-Hampshire; to Which are Prefixed the Constitutions of the United States and of the State. With a Glossary and Digested Index Page 206, Image 227 (1867), 1854, Safe-Keeping of Gunpowder, § 1.

68.   In the early 1900s, gun seizure laws, pertaining mostly to violations of laws against concealed weapons carrying, were enacted by Arizona (1901),[143] Arkansas (1931, 1935),[144] California (1917),[145] Hinsdale, Illinois (1912),[146] Indiana (1905, 1925),[147] Maine (1909),[148] Massachusetts (allowing for seizure of an "unreasonable number" of guns or ammunition located "in a particular house or place" upon receipt of a complaint, 1919),[149] Anaconda, Montana (1905),[150] New Hampshire (1923),[151] North Dakota (1923),[152] Oregon (1925, 1933),[153] Washington State (1933),[154] and West Virginia (1925).[155] Finally, Pennsylvania enacted a law in 1810 that penalized any found participating in a duel to "forfeit and be deprived of all the rights of citizenship" for seven years.[156]

---

[143] Laws regulating weapons in certain places, Title 11, §§ 381, 387, 388, & 391 in The Revised Statutes of Arizona Territory (1901).

[144] Act of Mar. 26, 1931, No. 225, §§ 1-6, Ark. Acts 705-06; Uniform Machine Gun Act, Act No. 80, §§ 1-14, 1935 Ark. Acts 171-75; ACT 80.

[145] 1917 Cal. Sess. Laws 221-25.

[146] Ch. 26—Concealed Weapons, §§ 1-8, in, Revised Ordinances of the Village of Hinsdale, Illinois (1912).

[147] 1905 Ind. Acts 687–88, Weapon—Carrying Dangerous § 449; 1925 Ind. Acts 495, 495-98.

[148] 1909 Me. Laws 141.

[149] 1919 Mass. Acts 139.

[150] Chapter 22—Concealed Weapons, §§ 526-534 in Codified Ordinances of the City of Anaconda (1905).

[151] 1923 N.H. Laws 138.

[152] 1923 N.D. Laws 380, Pistols and Revolvers, ch. 266, § 6.

[153] 1925 Or. Laws 468, 469-71; 1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.

[154] 1933 Wash. Sess. Laws 335-36.

[155] 1925 W.Va. Acts 30-31.

[156] Laws of the Commonwealth of Pennsylvania, from the Fourteenth Day of

69.   Many of these laws pertained to cities or towns for the obvious reason that irresponsible gun carrying or use had far greater consequences in places where large numbers of people lived in close proximity to each other. But what they all have in common is the penalty of confiscation, an action viewed by some in the modern era as draconian, but that was one type of punishment for various weapons infractions earlier in our history.

### B.    Hunting Law Violations and Gun Confiscation

70.   At least 9 states enacted hunting-related laws where a violation could lead to, or include, gun confiscation. Of these, 3 states enacted such laws in the 1700s, 4 states did so in the 1800s, and 3 states in the early 1900s (one state enacted laws in more than one century).

71.   In 1717, Massachusetts enacted a law that barred anyone caught hunting any kind of waterfowl from any kind of boat from using a gun to engage in that activity for three years.[157] While not a confiscation law, it prohibited use of the weapon for the activity in question—a deprivation of gun use. A 1771 New Jersey law penalized non-New Jersey residents caught hunting on others' property with a fine and also forfeiting of the gun.[158] Two North Carolina deer hunting laws included gun confiscation in 1768. One penalized any person found hunting who had "no settled habitation, or not tending five thousand corn hills."[159] The other called for gun forfeiture of anyone found to be deer hunting if they did not have "a

October, One Thousand Seven Hundred, to the Twentieth Day of March, One Thousand Eight Hundred and Ten Page 182, image 226 (Vol. 3, 1810).

[157] 1717 Mass. Acts 336, An Act For The Better Regulation Of Fowling.

[158] Charles Nettleton, Laws of the State of New-Jersey Page 26, Image 53 (1821), 1771.

[159] 1756-1776 N.C. Sess. Laws 168, An Act To Amend An Act Entitled, "An Additional Act To An Act, Entitled, An Act To Prevent Killing Deer At Unseasonable Times, And For Putting A Stop To Many Abuses Committed By White Persons Under Pretense Of Hunting, ch. 13, 1768.

freehold of one hundred acres of land within this province, or tending ten thousand corn hills, at least five feet distance each."[160]

72.   An 1834 Kentucky law penalized deer hunting at night by firelight by a fine, but included gun confiscation as a penalty if the hunters were Indians.[161] An 1839 Virginia law penalized any who would hunt waterfowl from a skiff in Accomack or Fairfax counties by confiscating both their guns and their boats.[162] The state did the same in an 1852 law that applied state-wide.[163] A more wide-ranging 1865 state law criminalized hunting on private land without the owners' permission, or shooting "along any public road, or in the streets of any town or village" anywhere in the state with part of the penalty to include forfeiting of "his gun and shooting apparatus."[164] An 1875 Virginia law that criminalized the shooting of wild fowl in the counties bordering the Potomac and Rappahannock rivers "with any gun which cannot be conveniently discharged from the shoulder at arm's length without a rest." Any such guns were to be confiscated and destroyed.[165]

[160] John. A Haywood, Manual of the Laws of North-Carolina, Arranged under Distinct Heads in Alphabetical Order. With References from One Head to Another, When a Subject is Mentioned in Any Other Part of the Book Than under the Distinct Where It is Placed Page 178, Image 186 (1801), 1768.

[161] A Digest of the Statute Laws of Kentucky, of a Public and Permanent Nature, from the Commencement of the Government to the Session of the Legislature, Ending on the 24th February, 1834. With References to Judicial Decisions Page 788, Image 794 (Vol. 1, 1834).

[162] Virginia State Laws 1839 ch. 80. – An ACT to prevent the destruction of wild fowl in the counties of Accomack and Fairfax (Passed April 9, 1839).

[163] 1852 Va. Acts 133, An Act Amending The Twentieth Section Of Chapter . . . Concerning Wild Fowl, § 20.

[164] Third Edition of the Code of Virginia: Including Legislation to January 1, 1874 Page 802-03, Image 821-22 (1873), 1865.

[165] 1875 Va. Acts 109, An Act To Amend And Re-enact Section Twelve, Chapter Ninety-nine, Code of Eighteen Hundred And Seventy-Three, for the Protection Of

73.   In 1863, Delaware enacted a law making it a crime for any non-state residents to hunt fish or geese on any waters of the state. The penalty included confiscation of any guns used along with any other tackle or apparel.[166] An 1893 state law levied a fine against any who shot birds or game on the lands of another without the owners' permission, but any who failed to pay the fine would face gun forfeit.[167] An 1882 Maryland law punished any caught "in the act of hunting or shooting crippled ducks, or in purloining ducks that have been killed by other persons." Those so caught would pay a fine and also "forfeit the gun, pistol or other firearm" used.[168] An 1890 Maryland state law penalized any who would shoot or hunt "with dog or gun on the Lord's day, commonly called 'Sunday'" with a fine and forfeiting of the "pistol or other firearm used in such violation."[169]

74.   In the 1900s, Arizona (1936) confiscated guns and silencers if used or possessed to kill "any song or insectivorous bird" while hunting. Kentucky (1904) authorized game wardens to "destroy or confiscate such guns" or other devices if used to hunt in violation of state fish, game, and bird hunting laws.[170] A 1905 New

Wild Fowl in the Counties Bordering on the Potomac And Rappahannock, ch. 100, § 12.

[166] 1863 Del. Laws 365, An Act to Amend Chapter 55 of the Revised Code of the State of Delaware, Entitled "For The Protection Of Fish, Oysters and Game," ch. 328, § 10.

[167] 1893 Del. Laws 410, For the Protection Of Fish, Oysters, and Game, ch. 422, § 16.

[168] 1882 Md. Laws 257, An Act to . . . Exempt All That Portion of the Waters of the Chesapeake Bay Lying Northward of a Certain Line Therein Described from the Operation and Effect of Sections One and Three . . ., ch. 180, § 8.

[169] 1890 Md. Laws 297, Sabbath Breaking, ch. 290, § 1.

[170] 1904 Ky. Acts 150-51, An Act Creating the Offices of Fish and Game Wardens and Defining the Powers and Duties and Fixing the Compensation of such Officers, and for the Further Protection and Preservation of Fish, Game and Birds in the State of Kentucky, ch. 68, § 3.

Hampshire law called for confiscation and destruction of "any punt gun swivel gun, or other gun not fired from the shoulder, or of larger bore than ten gauge" if used to hunt any game birds.[171]

75.   This range of hunting laws varies as to their particulars, including types of game being hunted, locations of hunting or firearms discharges, and other circumstances undoubtedly unique to the particular problems faced by these states and localities. But the sheer number and variety of hunting laws that included gun confiscation as a penalty make clear that it was a well established and accepted penalty for the otherwise routine and relatively common activity of hunting. Thus, it demonstrates a tradition that is carried through in modern point-of-sale background checks that prevent a purchase at the outset of a gun sale.

## V.   CONCLUSION

76.   Early weapons licensing and permitting laws are best understood as the ancestors of modern background check laws, as the very purpose of licensing was and is to provide permission to do something subject to some kind of process or procedure. Background checks today are commonly employed in areas such as employment, granting of credit or loans, insurance, rental housing, and college admissions. Applying the same technique to gun and ammunition purchases serves a similar purpose as is the case with past licensing schemes pertaining to weapons acquisition or use, as discussed here. The existence of weapons confiscation laws goes a step further—actual weapon deprivation for various infractions, purposes, or circumstances. The fact that such latter activities were utilized by state and local governments in America's past demonstrates a tradition of using certain facts in, or information about, a person's background to remove weapons from their possession

---

[171] 1905 N.H. Laws 515, An Act to Prohibit the Use of Swivel and Punt Guns, ch. 98, § 1.

and buttresses the utilization of contemporary background checks for firearms and ammunition to confirm the same.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 15, 2023 at Williamsburg, VA.

*Robert J. Spitzer*

_____
Robert Spitzer