ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
CHRISTINA R.B. LÓPEZ
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3479
  Fax: (415) 703-1234
  E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his official capacity as California Attorney General*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **KIM RHODE et al.,**<br><br>                Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,**<br><br>                Defendant. | 3:18-cv-00802-BEN-JLB<br><br>**DECLARATION OF MICHAEL VORENBERG**<br><br>Courtroom: 5A<br>Judge: Hon. Roger T. Benitez<br>Action Filed: May 17, 2017 |

1

**DECLARATION OF MICHAEL VORENBERG**

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1. I have been asked by the Office of the Attorney General of the State of California to prepare an expert report on the history and tradition of "background checks" for firearms (guns and ammunition) during the period of the U.S. Civil War and Reconstruction. This Declaration is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## I. PROFESSIONAL QUALIFICATIONS

2. I am an associate professor of history at Brown University. I received my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard in 1995. After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B. Du Bois Institute at Harvard, and then served as an assistant professor of History at the State University of New York at Buffalo. I joined the faculty at Brown University in 1999, and have taught history there ever since.

3. I have concentrated my research on the history of the U.S. Civil War and Reconstruction. My first book, *Final Freedom: The Civil War, the Abolition of Slavery, and the* Thirteenth *Amendment*, was published by Cambridge University Press in 2001. The book was a Finalist for the Gilder Lehrman Lincoln Prize. I am also the author of *The Emancipation Proclamation: A Brief History with Documents*, published by Bedford/St. Martin's in 2010. I am the author of a number of articles and essays on Reconstruction and the law. These include: "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander

Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (Oxford University Press, 2006); and "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec. 2005), 416-26.

4. I have provided expert testimony in *Miller v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) and *Rupp v. Bonta*, a lawsuit in the Central District of California (Case No. 8:17-cv-00746-JLS-JDE), both challenging California's regulations of assault weapons; *Wiese v. Bonta*, a lawsuit in the Eastern District of California (Case No. 2:17-cv-00903-WBS-KJN) and *Duncan v. Bonta*, a lawsuit in the Southern District of California (Case No. 3:17-cv-01017-BEN-JLB), both challenging California's regulations of large-capacity magazines; *Ocean State Tactical LLC v. Rhode Island*, a lawsuit in the District of Rhode Island (Case No. 1:22-cv-246-JJM-PAS) challenging that state's regulation of large-capacity magazines; *Oregon Firearms Federation, Inc. v. Brown*, a lawsuit in the District of Oregon (Case No. 2:22-cv-01815-IM) challenging that state's regulation of large-capacity magazines; *National Association for Gun Rights v. City of Naperville, Ill.*, a lawsuit in the Northern District of Illinois (Case No. 1:22-cv-04775) challenging the state of Illinois' and the City of Naperville's regulation of assault weapons; and *National Association of Gun Rights v. Campbell*, a lawsuit in the District of Massachusetts (Case No. 1:22-cv-11431) challenging the state of Massachusetts' regulation of assault weapons and large-capacity magazines.

5. My curriculum vitae is attached as Exhibit A.

6. I am being compensated at a rate of $250 per hour.

## II. SUMMARY OF OPINIONS

7. This Declaration provides results of an investigation into qualifications imposed by federal, state, and local governments on the ability of individuals to acquire and possess firearms and ammunition during the Reconstruction period of U.S. History (1863-1877), with special focus on the period during Reconstruction when the Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced (1866-1876).

8. The phrase "background checks," which commonly appears as shorthand for investigations of those seeking to acquire and possess firearms and ammunition, did not enter American parlance until the twentieth century, but the principle behind background checks—that one's past record can disqualify a person from the full rights of gun ownership—goes back at least as far as the eighteenth century. U.S. legal authorities have always understood and often enforced the principle that one's past unlawful actions can be a bar to access to firearms. This Declaration examines one period in particular, the era of the Fourteenth Amendment, when authorities demanded that respect for the law be a requirement for access to firearms.

9. During the era of the Fourteenth Amendment, loyalty to the Union and its laws—federal, state, and local—was requisite to one's being assured the rights and privileges promised by the Amendment. Indeed, loyalty was at the core of the Amendment, and was enshrined in the Amendment's third clause, which imposed restrictions on office-holding on those who either had "engaged in insurrection or rebellion" against the country or had "given aid or comfort" to the insurrectionists.[1] Although the language of the Amendment's third clause mentioned only restrictions on office-holding, the congressional debates on the clause reveal that rights beyond office-holding were to be restricted. The disloyal were to be denied civil rights (which would necessarily include rights of firearms possession) and the loyal were

---

[1] U.S. Const. amend. XIV, § 3.

to be guaranteed those rights.[2] Loyalty was also at the core of laws passed in conjunction with the Amendment and to enforce the Amendment.[3] In all these measures, loyalty was measured by one's *past* actions, not merely by promises to be loyal in the future. During Reconstruction, law enforcers could ask anyone to swear an oath vowing past loyalty, and they investigated oath-takers for past disloyalty. Failure to satisfy the stringent standards of loyalty of the era was regarded by authorities as a sign of possible unlawful, even insurrectionary or treasonous behavior in the future. To preserve the security of the nation, of the states, and of local communities, authorities imposed proscriptions on the once-disloyal, whose past actions were regarded as unlawful. Proscriptions included explicit bans in the law, most commonly the denial of voting rights, but they also included non-statutory restrictions by civilian and military policing forces, including the denial of firearms and ammunition. Indeed, the policing of firearms acquisition and possession by pro-Union authorities during Reconstruction was considered by lawmakers a priority. Lawmakers during Reconstruction were chiefly concerned with the nation falling back into Civil War.[4] To prevent that from happening, lawmakers took steps to keep firearms from those who had been

---

[2] Mark A. Graber, *Punish Treason, Reward Loyalty: The Forgotten Goals of Constitutional Reform after the Civil War* (Lawrence: University Press of Kansas, 2023), 111-30; Jonathan Truman Dorris, *Pardon and Amnesty under Lincoln and Johnson: The Restoration of the Confederates to Their Rights and Privileges, 1861-1898* (Chapel Hill: University of North Carolina Press, 1953), 319-25. On firearms possession as a civil right included in the Fourteenth Amendment, see Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace, and Donald Kilmer, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3rd ed., New York: Wolters Kluwer, 2022), 465-71.

[3] Harold M. Hyman, *To Try Men's Souls: Loyalty Tests in American History* (Berkeley: University of California Press, 1959), 257-66; Dorris, *Pardon and Amnesty under Lincoln and Johnson*, 325-38.

[4] Graber, *Punish Treason, Reward Loyalty*, 162 (Republican lawmakers' "overarching concern with preventing rebel rule").

lawbreakers, including and especially past insurrectionaries, on the assumption that these people were most likely to lead the nation back into Civil War.

10. A crucial system used by Reconstruction-era authorities to keep firearms out of the hands of potential insurrectionaries was the administration of loyalty oaths that required those who took them to have clean legal records. Law enforcers investigated those who took the oath, looking for past connections to the Confederacy, past legal transgressions, and past declarations of intentions to jeopardize the safety and existence of the Union. Law enforcers made efforts to deny firearms to or seize firearms from those who refused to take the oath along with those who took the oath but were found by investigation to have lied under oath about their past lawfulness and loyalty. In interrogating the loyalty of those who possessed or wished to possess firearms, law enforcers during the era of the Fourteenth Amendment were performing tasks analogous to modern background checks.

## III. THE SCOPE OF THIS DECLARATION AND ITS CONNECTION TO THE HISTORY AND TRADITION OF FIREARMS REGULATION IN THE UNITED STATES

11. This Declaration covers the era of the Fourteenth Amendment. The resolution submitting the Amendment to the states for ratification was passed by Congress in 1866, and ratification was completed in 1868. But the era of the Fourteenth Amendment is here defined as beginning in 1863—the standard starting point of Reconstruction, but also the point at which elements that would make their way into the Fourteenth Amendment began to take shape—and ending in 1872, when national, state, and local authorities had made their last concerted efforts to enforce the Amendment.

12. The geographic scope of this Declaration is for the most part limited to the American South, and in particular those regions of the South that rebelled against the U.S. during the Civil War. The Fourteenth Amendment was created

with this region in mind, and the ancillary and enforcing legislation accompanying the Amendment were all aimed primarily at the South.

13. Why is the period of the Fourteenth Amendment so important to examine if one wants to understand the history and tradition of firearms regulation in general and background checks in particular? As the U.S. Supreme Court declared in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and reaffirmed in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), the Second Amendment did not apply to the states (i.e., did not restrict state laws) until and because of the Fourteenth Amendment. The public meaning of the Fourteenth Amendment at the time of its adoption was that it applied the Second Amendment to the states. But it was also the public meaning of the Fourteenth Amendment that enjoyment of Second Amendment rights required proof of past law-abiding behavior, specifically past, unbroken loyalty to the United States. Acts passed by the federal government during the era of the Fourteenth Amendment, including acts specifically to enforce the Amendment, empowered state and federal law enforcement officials to administer oaths that served as proof of past law-abiding behavior. The acts also empowered law enforcement officials to investigate the veracity of the oaths taken by examining the background of the people who took them.

## IV. RESEARCH MATERIALS AND METHODOLOGY

14. In preparing this Declaration, I researched standard scholarly works on the era of the Fourteenth Amendment. I also researched original documents from the era. These included newspaper and magazine articles contemporary to the period studied. The articles are accessible in commonly used databases by historians, such as Chronicling America and ProQuest Historical Newspapers. To research pamphlets and documents from local and state governments during the era, I relied on the HathiTrust digital library and ProQuest Civil War Era. For U.S. government documents of the era, I used the Hein Online database.

15. My research sought information on requirements linked to the privileges granted by the Fourteenth Amendment in general and firearms possession and usage in particular. The research covered the entire period of Reconstruction (1863-1877) but focused especially on the era of the Fourteenth Amendment (1863-1872).

## V. FINDINGS

16. From the moment that southern states began declaring themselves seceded from the Union, in 1860-61, and then into the actual Civil War and beyond, oaths of allegiance to one's community, state, and station were regular features of political life in the Union.[5] These oaths were commonly known as "loyalty oaths." In the Union during the Civil War, loyalty oaths were regularly administered to local, state, and national office-holders, as well as to members of certain professions, such as the clergy and lawyers. The form of these oaths was simple— and they will be called "simple oaths" throughout this Declaration. The simple oath was a pledge to be loyal to the Union and to abide by the U.S. Constitution, sometimes to one's state constitution, and to all acts adopted by civil law-making bodies of one's jurisdiction (local, state, and national), as well as to all measures imposed on civilian populations by U.S. military authorities. Simple oaths dealt with one's loyalty at the present and in the future. They did not require that one pledge to have been loyal in the past as well. As we shall see, policies requiring only a simple oath would give way by the time of the era of the Fourteenth Amendment to policies requiring a more soon stringent oath that affirmed one's past loyalty in addition to one's loyalty at present and in the future.[6]

---

[5] The Confederacy as well as the Union required oaths of allegiance. Because the Confederacy lost the Civil War, the oaths used by Confederate authorities during the Civil War became irrelevant to post-war loyalty policies in the Union, including such policies during the era of the Fourteenth Amendment. Thus the issue of Confederate loyalty oaths is not covered in this Declaration.

[6] William A. Blair, *With Malice toward Some: Treason and Loyalty in the*

8

17. Even before the era of the Fourteenth Amendment, local and state authorities during the Civil War might require of the citizenry more stringent standards of loyalty that looked to one's past behavior and reputation. Such stringent examinations by Union authorities of people's past records was particularly important in matters of arms-bearing, as communities in the North faced legitimate threats of armed insurrection from Confederate sympathizers in their midst. The danger of such armed conspirators was most severe in the Midwest, where there were populations with significant familial and political ties to the Confederacy. The presence of pro-Confederate sympathizers in the Midwest led to the much-publicized treason trials in Indiana in 1864. (These trials were the background to the 1866 U.S. Supreme Court case *Ex Parte Milligan*; Lambdin Milligan was one of those Indianans convicted of treason.) In this political climate in the Midwest, it was common for legal authorities to surveil and regulate those who sought to acquire firearms. For example, in one Ohio community, authorities declared that "arms and ammunition be disposed of with discretion and only to parties of undoubted Union sentiments." Officials in this community—known by their detractors as "district spies"—regularly investigated those who sought to obtain arms and ammunition or permits to deal in arms and ammunition.[7]

18. Despite their presence in the North during the Civil War, loyalty tests were most common in the South during the war, in the form of pro-Union loyalty oaths imposed on those in U.S. army-occupied areas of the South. The primary function of these oaths was to identify southerners who could be counted on to support the U.S. government as regions in the South underwent a restoration from pro-Confederate to pro-Union affiliation. The form of these oaths was simple—that

---

*Civil War Era* (Chapel Hill: University of North Carolina Press, 2019); 140-47, 269-71; Harold Melvin Hyman, *Era of the Oath: Northern Loyalty Tests during the Civil War and Reconstruction* (1954; repr., New York: Octagon Books, 1978), 21-47.

[7] *Urbana [Ohio] Union*, Aug. 28, 1867, p. 2.

is, they required a pledge only of present and future loyalty, with no regard to one's past sympathies.

19. This simple oath for southerners seeking to renounce their Confederate affiliation and restore their standing as U.S. citizens was part of President Abraham Lincoln's wartime reconstruction policy. In December 1863, Lincoln spelled out a proposal for restoring states in rebellion to the Union and bringing one-time Confederates back under the mantle of U.S. citizenship. The loyalty oath that Lincoln proposed was a simple oath. It read as follows:

> I, [name of oath-taker], do solemnly swear, in presence of Almighty God, that I will henceforth faithfully support, protect, and defend the Constitution of the United States and the Union of the States thereunder; and that I will, in like manner, abide by and faithfully support all acts of congress passed during the existing rebellion with reference to slaves, so long and so far as not repealed, modified, or held void by congress, or by decision of the supreme court; and that I will, in like manner, abide by and faithfully support all proclamations of the President made during the existing rebellion having reference to slaves, so long and so far as not modified or declared void by decision of the supreme court. So help me God.[8]

This oath, or variations of it, which covered only a person's present and future loyalties and law-abiding behaviors, became the standard oath used by U.S. officials and their allies during the Civil War at the state and local level.

20. However, some of Lincoln's fellow Republican lawmakers believed that a more stringent oath should be applied, one that looked not only to the oath-takers' present and future but also to their past. Specifically, this oath included a statement of one's *past* record of loyalty and lawfulness. This oath was commonly known as "the ironclad oath" or "the test oath." Congress began applying the oath to federal officeholders and jurors in 1862 and expanded the categories of people who had to take it over the course of the Civil War. The standard ironclad oath read as follows:

> I, [name of oath-taker], do solemnly swear (or affirm) that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance,

---

[8] Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 7: 54.

counsel, or encouragement to persons engaged in armed hostility thereto; that I have neither sought nor accepted nor attempted to exercise the functions of any office whatever, under any authority or pretended authority in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power or constitution within the United States, hostile or inimical thereto. And I do further swear (or affirm) that, to the best of my knowledge and ability, I will support and defend the Constitution of the United States, against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion, and that I will well and faithfully discharge the duties of the office on which I am about to enter, so help me God.[9]

The ironclad oath embraced the principle that in the determination of one's qualification for U.S. citizenship, one's past record relating to the law was at least as important as one's pledge to abide by the law in the future.

21. The ironclad oath was part of the proposed reconstruction plan offered by Republicans in Congress as an alternative to Lincoln's proposed reconstruction plan. Under Lincoln's proposed reconstruction plan of December 1863, the simple loyalty oath rather than the ironclad oath was to be the oath applied to southerners during the Civil War who sought to establish that they were Unionists, not Confederates. The congressional reconstruction plan offered as an alternative to Lincoln's became known as the Wade-Davis bill, named for its sponsors Senator Benjamin Wade and Representative Henry Winter Davis. The bill called for southern civilians to take an ironclad oath.[10] Congress passed the Wade-Davis bill in June 1864, but President Lincoln pocket-vetoed the measure. In August 1864, Wade and Davis issued a "manifesto" denouncing Lincoln's reconstruction policy

---

[9] Howard Gillman, Mark A. Graber, and Keith A. Whittington, *American Constitutionalism*, vol. 2, *Rights and Liberties* (New York, Oxford University Press, 2014), reprint at https://global.oup.com/us/companion.websites/fdscontent/uscompanion/us/static/companion.websites/9780199751358/instructor/chapter_6/testoaths.pdf (accessed August 11, 2023).

[10] https://www.archives.gov/milestone-documents/wade-davis-bill#:~:text=Be%20it%20enacted%20by%20the,governor%2C%20whose%20pay%20and%20emoluments (accessed August 11, 2023).

as too lenient on one-time Confederates and urging authorities to adopt the ironclad-oath policy in place of Lincoln's simple-oath policy. The position taken by Wade and Davis and their adherents was one of a number of factors that led to them being labeled Radical Republicans by their detractors (whereas Lincoln's faction of the Republican Party was known as "moderates" or "conservatives"). The so-called Radicals failed to pass a congressional reconstruction policy prior to 1865, the year in which the Civil War ended and Lincoln was assassinated. Thus, a universal ironclad-oath policy remained a proposal only, not the law, up to the point that Lincoln was succeeded by President Andrew Johnson. Johnson adopted reconstruction policies similar to those of Lincoln. Like Lincoln, he opposed ironclad oaths in favor of simple oaths. However, within two years of his taking office, Johnson would find himself on the outs of the political party that had installed him in the Executive Office. He and his followers by 1867 were a minority faction of the Republican Party, and those once denounced as "radicals" were now mainstream Republicans. Under this regime, which would orchestrate the adoption of the Fourteenth Amendment, ironclad oaths became the norm across the South.

22. Two related factors led ironclad oaths to replace simple oaths as the means by which southern whites were readmitted to national citizenship after the Civil War. First, Andrew Johnson became increasingly unpopular with Republican voters, in large part because of his leniency toward former Confederates. Johnson was liberal in granting pardons and amnesty to one-time Confederates. He also opposed measures popular among congressional Republicans for assuring equal rights to African Americans. Such measures included the Civil Rights Act of 1866, the act renewing the Freedman's Bureau (also of 1866), and the constitutional amendment that would become the Fourteenth Amendment (passed by Congress in 1866, ratified by the states in 1868). As mainstream Republicans turned against Johnson, they likewise tended to reject his preferred oath—the simple oath—in

favor of the ironclad oath. The second factor leading mainstream Republicans to embrace an ironclad-oath policy was the clear evidence cropping up across the southern landscape that simple oaths were failing to keep southern whites from remaining steadfast in their insurrectionary, white supremacist leanings. By late 1866, former Confederates who had taken the simple oath had regained control of southern state governments and had begun passing measures and taking actions that punished and disfranchised loyal white and Black Unionists. Included among such measures were "Black Codes," which were designed to keep newly freed African Americans in a state of subservience akin to slavery. Many of the "Black Codes" included clauses that prohibited Blacks from carrying or even possessing firearms. These neo-Confederate regimes ruling southern states through much of 1866 did little or nothing to prevent violence against white and Black Unionists. Indeed, the state laws prohibiting access to firearms to Blacks made violence by disloyal white supremacists against Blacks all the more likely. Thus, the spring and summer of 1866 witnessed two of the worst massacres of Blacks during Reconstruction, one in Memphis and one in New Orleans. These massacres, along with the policies of the neo-Confederate regiments generally, helped persuade mainstream Republicans that reconstruction policies based on simple loyalty oaths were insufficient; ironclad oaths must be imposed on any southern white seeking to become re-categorized as a loyal and lawful American.

23. Some of the first ironclad oaths in the post-war South appeared at the state level—specifically in Arkansas, Tennessee, and West Virginia, where Republicans rather than neo-Confederates controlled the state governments. In these states, ironclad oaths were required of whites who wanted to vote, to hold office, to serve as government employees, and even to be members of certain professions, including doctors, lawyers, and clergymen.[11] The iron-clad oath policy

---

[11] Kenneth R. Bailey, "Test Oaths, Belligerent Rights, and Confederate

was most strictly and widely imposed in Tennessee, the pro-Union government of which was seen as a model state regime by Republicans and a nightmare-scenario by former Confederates.[12] Not by coincidence, Tennessee became not only the first formerly seceded state to impose ironclad oaths vigorously, but also the first such state to restrict militia service and gun-access generally to those who took the ironclad oath.[13]

24. Ironclad-oath policies imposed by southern states were challenged by some former Confederates and ultimately were ruled upon by the U.S. Supreme Court in the "Test Oath Cases" of 1866-67.[14] The Court accepted much of the plaintiffs' argument that ironclad oaths were potentially tantamount to ex post facto laws and violative of Fifth Amendment rights against self-incrimination. However, the Court's ruling in the Test Oath Cases had little effect. As historians have shown, in practice, Republicans at both the state and national level continued to impose ironclad oaths, and these oaths became the law of the land, making the Court's ruling irrelevant.[15]

---

Money: Civil War Lawsuits Before the West Virginia Supreme Court of Appeals," *West Virginia History*, 1-22; Randy Finley, "In War's Wake: Health Care and Arkansas Freedmen, 1863-1868," *Arkansas Historical Quarterly*, 51 (Summer 1992), 148; Hyman, *To Try Men's Souls*, 163-66. The first post-war state constitution of Virginia also included an ironclad-oath policy, even though that state would briefly end up under the control of former Confederates. See Nicole Myers Turner, *Soul Liberty: The Evolution of Black Religious Politics in Postemancipation Virginia* (University of North Carolina Press, 2020), 55.

[12] Ted Tunnell, "Creating 'The Propaganda of History': Southern Editors and the Origins of 'Carpetbagger and Scalawag,'" *Journal of Southern History*, 72 (Nov. 2006), 807-08.

[13] Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction, 1867-1869* (Knoxville: University of Tennessee Press, 2005), 35-36.

[14] Hyman, *Era of the Oath*, 107-20.

[15] Philip S. Paludan, "John Norton Pomeroy, State Rights Nationalist," *American Journal of Legal History*, 12 (Oct. 1968), 279-80; Hyman, *To Try Men's Souls*, 260-61.

25. The struggle over ensuring loyalty and law-abiding behavior among southern whites was the context in which the 39th Congress, dominated by Republicans, created the measure that would become the Fourteenth Amendment. Congressional discussion and debate of the proposals that would cohere into the Amendment began in December 1865 and ended in June 1866. The Amendment is best-known for its first clause, which speaks of "privileges and immunities" and of "due process" and "equal protection." But, as the scholar Mark Graber has argued, the drafters of the Amendment were as interested in, if not more interested in, the third clause, which contained language excluding certain southern whites from citizenship. In other words, according to Graber, the Amendment was as much about denying citizenship to potentially disloyal southern whites as it was about assuring citizenship to Blacks and unquestionably loyal southern whites. Graber's study focuses especially on the "exclusion resolution" that eventually appeared in the Amendment's third clause. As the book's title indicates, a primary goal of the Amendment was to "punish treason" and "reward loyalty."[16]

26. The Fourteenth Amendment would not be ratified until 1868, but even before that date, the same Republican Congressmen who had drafted the measure passed other laws that required ironclad oaths of those known to have been or even suspected to have been Confederates or Confederate sympathizers. One of the most significant of these measures was the Reconstruction Act of 1867, which empowered local, state, and national authorities to administer ironclad loyalty oaths. The ironclad oaths administered typically included a pledge that the person taking the oath had never engaged in "armed hostility" against the United States. This broad language covered activity that went beyond acts of outright treason and insurrection. It covered any activity in which a person had carried out armed aggression against loyal Unionists. Thus, ironclad oaths might proscribe from the

---

[16] Graber, *Punish Treason, Reward Loyalty*, 38-40.

privileges of citizenship those who had engaged in unauthorized guerrilla activities or those who had simply committed armed robbery or assault against loyal Unionists.

27. The oath-taking system established by the 1867 Reconstruction Act replaced the "Provost Marshal system" established during the Civil War. During the war, U.S. Provost Marshals of occupying armies in the South would administer oaths to members of a community wishing to be considered for reinstatement to U.S. citizenship. Names of oath-takers were recorded in a log book, and members of local Provost Marshals' officers would be cognizant of which members of the community had refused to take the oath. The local roll of oath-takers acted in effect as a database for local law enforcement officers of who could be entrusted with the privileges of citizenship, which included voting, the receipt of food rations from the U.S. army, the admission to professions, and the purchase and sale of firearms and ammunition. With the Reconstruction Act of 1867, the work of registering and monitoring oath-takers—along with the duty of knowing who had refused to take the oath—passed to local and state constabularies and judges. Meanwhile, the U.S. army remained empowered to oversee the oath-taking system administered by civilian officials. If a local U.S. commander deemed that a community lacked loyal civilian law enforcers and judges, he could assume the duties of overseeing the monitoring of oath-taking. By this point—that is, by 1867, the year of the Reconstruction Act—almost all oaths were ironclad oaths. Thus, by statute and by the power vested in civilian law enforcement officials and U.S. army officers, the law regulated who was deemed loyal by requiring an examination of people's past records.

28. The system of tracking community members' past records via oath-administration was replicated in other facets of the U.S. Reconstruction program. For example, the U.S. Southern Claims Commission, established in 1871 to allow southerners who had always been loyal to file claims for property seized by military

personnel during the war, required claimants to take ironclad oaths. Commissioners were empowered to investigate claimants' records in regard to prior illegal and disloyal activity and to disqualify those who were found to have acted in ways that contradicted the ironclad oath that claimants had taken. Similarly, under the congressional acts passed in 1870 and 1871 that enforced the Fourteenth and Fifteenth Amendments—known popularly as "The Enforcement Acts" or "The Ku Klux Klan" acts—civilian and army investigators regularly administered ironclad oaths in their efforts to uncover violations of loyal Unionists' civil and political rights.[17]

29.   It should be noted that not all elements of the oath-taking system established during the era of the Fourteenth Amendment were spelled out in federal and state statutes. Statutes most commonly mentioned the administration of oaths in the context of establishing voter rolls for elections. However, much about the process of administering oaths and investigating the veracity of oath-takers was not spelled out in statutes. Rather, civilian and military law enforcers were understood to have discretion to administer the oath system in whatever way best "kept the peace." In other words, the day-to-day operation of the oath system at the local level followed the American tradition of police powers, by which law was embodied not only in explicit statutes but also in the discretionary actions of those empowered to "keep the peace." Included in peace-keeping, of course, was the maintenance of public safety in regard to dangerous weapons. Thus, law enforcers in the era of the Fourteenth Amendment could be expected to consult loyalty-oath records in determining who might be prevented from obtaining or possessing a dangerous weapon.

---

[17] See, for example, *U.S. Congressional Serial Set*, vol. 1308, 40th Cong., 1st sess., Sen. Exec. Doc. 14, "Message of President communicating correspondence on reconstruction, and opinions of Attorney General on construction of reconstruction acts," pp. 141-42. On the use of ironclad oaths by the Southern Claims Commission, see Hyman, *To Try Men's Souls*, 265.

30. One example from the historical record—many might be given—will help illuminate this point about the oath-taking system being integrated into traditional (though non-statutory) policing to ensure public safety. In Laurens, South Carolina, in October 1870, a man named Joseph Crews was both a leader of the local, pro-Union militia and a member of the board of canvassers. In this latter role, he had a record of all who were registered to vote in the community. This list necessarily represented those adult men in the community who had taken the ironclad oath. Those adult men in the community who were not on the list obviously had not taken the oath or had taken the oath but been disqualified because of past transgressions. The list thus served as a database of sorts for Crews as he determined who could protect the community and who threatened the community. It was crucial for Crews to have this database, as the community had been terrorized by Ku Klux Klansmen during September and early October, and he sought to do what he could to quell the violence. He gathered known loyal men into militia companies (most of these men were Black, some were white) and had them gather all the guns and ammunition that they could find from stores in town and place them under guard in Crews's house and in one other guarded location. His purpose was to ensure that none of these weapons was purchased or seized by those known to be disloyal—that is, those who had failed to pass the test-oath requiring a record of law-abiding behavior. This sequence of events was analogous to modern-day episodes in which law-enforcers use background checks to keep dangerous weapons out of the hands of those who have committed past unlawful conduct and are most likely to use them for unlawful purposes in the future.[18]

---

[18] Descriptions of Ku Klux Klan activity in and around Laurens, South Carolina prior to this episode, including attacks and killing of Black Americans, may be found here: "The Ku-Klux reign of terror. Synopsis of a portion of the testimony taken by the Congressional investigating committee. No. 5 (1872), https://www.loc.gov/resource/rbpe.23700800/?st=text (accessed August 11, 2023). The episode involving Crews, the voter lists, and the dangerous weapons, is described here: *U.S. Congressional Serial Set*, vol. 1529 (1871-72), 42nd Cong.,

## VI. CONCLUSION

31. During the era of the Fourteenth Amendment, federal, state, and local governments qualified access to the privileges and immunities protected by that Amendment—including the acquisition and possession of firearms—on sworn and evidenced past loyalty to the Union. To ensure that only loyal southerners enjoyed the privileges and rights afforded by the Amendment, all southerners were required to swear oaths of loyalty, and government officials were authorized to, and did, conduct investigations into the past behavior of those who took the oaths. Today, disloyalty to the United States is not an express bar to enjoying Second Amendment rights, but the use of contemporary background checks as an investigative tool to ensure that persons prohibited from acquiring and possessing firearms—due to, for example, a past felony conviction—are analogous to the oath requirements and investigations of the Reconstruction era.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August 15, 2023 at Providence, Rhode Island.

_____
Michael Vorenberg

---

2nd sess., "Affairs in Insurrectionary States," pt. 1, "Report and Minority Views," pp. 554-56.