ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
CHRISTINA R.B. LÓPEZ
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3479
  Fax:  (415) 703-1234
  E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his*
*official capacity as California Attorney*
*General*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **KIM RHODE et al.,** | 3:18-cv-00802-BEN-JLB |
| Plaintiffs, | |
| v. | **DECLARATION OF JENNIFER M. MCCUTCHEN** |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,** | Courtroom:   5A<br>Judge:         Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |
| Defendant. | |

1

**DECLARATION OF JENNIFER M. MCCUTCHEN**

I, Jennifer M. McCutchen, declare under penalty of perjury that the following is true and correct:

1.    I have been asked by the Office of the Attorney General of the California Department of Justice to prepare a declaration on the history of firearm and gunpowder restrictions applicable to certain groups, particularly Native peoples, during the colonial and Early Republic eras.  This declaration is based on my own personal knowledge and research, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

**PROFESSIONAL QUALIFICATIONS**

2.    I am an Assistant Professor of History at the University of St. Thomas in St. Paul, Minnesota.  I assumed this position on September 1, 2022.  From September 1, 2019, to August 31, 2022, I was an Assistant Professor of History at the University of Southern Maine.  I regularly offer courses in the colonial and Early Republic eras of United States History, the history of the American Revolution, and Native American History.

3.    I have a Ph.D. in History from Texas Christian University, awarded in 2019.  My expertise includes the history of trade, exchange, and diplomacy between Native peoples and Europeans in the eighteenth century, with a specific focus on gunpowder and firearms.  I have several publications in this field including peer-reviewed articles in the academic journals *Terrae Incognitae* and *Studies in Eighteenth-Century Culture*.  I also have a peer-reviewed article in *Ethnohistory* published in July 2023 titled "'They Will Know in the End that We are Men': Gunpowder and Gendered Discourse in Creek-British Diplomacy, 1763–1776."  I am currently completing an 80,000-word book manuscript, based on my dissertation research, which uses the gunpowder trade as a lens to explore diplomacy between members of the Creek Confederacy and British/American

1  officials during the second half of the eighteenth century.  The manuscript proposal

2  is currently under review with the University of Oklahoma Press.  My current

3  curriculum vitae is attached as **Exhibit A** to this declaration.

4      4.      I have provided written expert testimony in *Nguyen v. Bonta*, No. 3:20-

5  cv-02470 (S.D. Cal.).

6      5.      I am being compensated at a rate of $200 per hour.

7                      **PROFESSIONAL OPINIONS**

8      6.      I have been asked to provide an overview of the history of firearm,

9  gunpowder, and ammunition restrictions applicable to certain demographic groups,

10  particularly Native peoples, during the late colonial and founding/Early Republic

11  eras of the United States.  I use the terms "gunpowder" and "ammunition"

12  frequently in this declaration, and sometimes interchangeably.  Gunpowder refers to

13  black powder, which during the eighteenth-century consisted of 75% saltpeter, 15%

14  charcoal, and 10% sulfur.  Ammunition is defined as "cartridge cases, primers,

15  bullets, or propellant powder designed for use in any firearm."[1]  Below, I make

16  three basic points:

17      7.      First, firearms could not (as they cannot today) be used without proper

18  ammunition and because gunpowder (the projectile component of ammunition in

19  the historical period discussed) could not be produced in large quantities in North

20  America, gun owners in the colonial and Early Republic eras were consistently

21  concerned with securing stable access to gunpowder.  These gun owners included

22  large numbers of Native peoples, upon whose labor empires depended to support

23  their hunting-based colonial trade economies, as well as enslaved people, free

24  African Americans, and non-Protestant white settlers.

25  
26      [1] ATF.gov, "Firearms Gun Control Act Definitions – Ammunition," Bureau
of Alcohol, Tobacco, Firearms, and Explosives, last modified April 26, 2018,
27  accessed August 7, 2023, https://www.atf.gov/firearms/firearms-guides-
importation-verification-firearms-gun-control-act-definition-ammunition.
28

8.    Second, in the seventeenth and early eighteenth centuries, individual colonies looked to English legislation to prohibit Native peoples from accessing guns and accompanying ammunition accessories, like gunpowder, gunflints, and bullets.  This was largely due to perceived public safety risks associated with trading guns and ammunition with Native peoples, who existed outside of the English colonial polity.  Similarly, seventeenth-century firearms and gunpowder restrictions targeted non-Native groups, such as non-Protestant settlers and enslaved African Americans, who colonial governments deemed "dangerous" to the safety and security of white, Anglo-American populations.

9.    Third, by the second decade of the eighteenth century, colonial governments no longer sought to fully prohibit Native peoples from obtaining arms and ammunition.  Rather, they used seventeenth-century English law as precedent to more strictly regulate *how* Native peoples acquired guns, gunpowder, and ammunition.  This shift proved crucial for colonies that relied upon both the labor of Native hunters and Native consumers to fuel their economies.  It also created a space for Patriots and Loyalists, respectively, to use gunpowder as a bargaining chip to secure alliances during the American Revolution and provided a foundation from which the new United States attempted to use gunpowder and ammunition to secure Native dependence through the early nineteenth-century.  During this period, laws restricting access to guns and gunpowder for enslaved African Americans persisted and did not undergo any notable modifications until after the founding of the United States.  Access to guns, gunpowder, and ammunition for members of the above groups was not always controlled in the same manner or for the same reasons, but colonial and state governments felt these populations posed enough of a public safety risk to necessitate governmental oversight over their access to firearms and the tools that rendered them operational.

**I.    BACKGROUND ON GUNPOWDER, AMMUNITION, AND NATIVE PEOPLES AND OTHER POPULATIONS IN THE COLONIAL ERA**

10.    Anyone who used firearms during the colonial era (1600–1763), including colonial settlers and Native peoples, relied on the limited resource of gunpowder.  Gunpowder was a non-renewable resource that could not be manufactured in large quantities in North America during the colonial era of United States history.  It was difficult to produce, heavily subject to the skill of the manufacturer, and susceptible to damage by water, moisture, and other environmental factors.  The final product also depended on the quality of its ingredients which consisted of carbon (for combustion), sulfur (for instantaneous ignition), and saltpeter, or potassium nitrate (which provided the oxygen needed to facilitate an explosion).  Of the major components, carbon was the easiest to obtain, with sulfur a close second; Charcoal was readily available in English woodlands, and sulfur could be obtained from domestic mineral springs or imported from Southern Italy.  Saltpeter, the chief component of gunpowder and the rarest of the three, occurred naturally in crystallized form on the walls of caves and damp cellars or as a side effect of the bacterial break down of animal dung or guano.[2]

11.    While the English began producing gunpowder in London as early as the fourteenth century, gunpowder manufacture increased in the sixteenth century under the reigns of Henry VIII and Elizabeth I.  The Crown's appetite for saltpeter grew alongside the empire's expanding scale of warfare and increasing weapons

---

[2] Guano is excrement from bats, sea birds, and seals.  Bird guano, which contains the highest nitrogen levels of the three, can be found largely in South America, particularly in coastal Peru.  During the colonial period, as well as today, South American guano was used primarily for fertilizer.  While bat guano can be found in caves throughout North America, its use in large-scale gunpowder manufacture did not emerge until the last decade of the eighteenth century.  See David Cressy, *Saltpeter: The Mother of Gunpowder* (New York, NY: Oxford University Press, 2012), 10.

arsenal, and parliament understood the need for a self-sufficient gunpowder economy that did not depend on imported saltpeter supplies.  The Renaissance had encouraged alchemists, natural philosophers, and individuals in the military arts to think critically about pyrotechnics, creating a field of scientific and technical literature that brought mining, the extraction and refining of numerous metals and alloys, and knowledge of explosive-producing compounds to a wider audience.[3]  By the seventeenth century this field of study had encouraged English parliament to introduce "saltpeter ordinances," which allowed the government to dig for Saltpeter under private "pigeon houses, Stables, Cellars, Vaults, empty Ware-Houses, and other Out-houses."[4]  The need for saltpeter was a significant motivator of English colonization in the South Pacific and North America from the sixteenth through eighteenth centuries.  By the second half of the seventeenth century, imported saltpeter from India replaced the need for home-sourced supplies.[5]  Parliament

---

[3] Vannoccio Biringuccio, *The Pirotechnia of Vannoccio Biringuccio: The Classic Sixteenth Century Treatise on Metals and Metallurgy*, ed. Cyril Stanley Smith and Martha Teach Gnudi (Mineola, NY: Dover Publications, 1990); Cyprian Lucar, *Three bookes of colloquies concerning the arte of shooting in great and small peeces of artillerie* (London: Thomas Dawson, 1588), accessed August 7, 2023, https://quod.lib.umich.edu/e/eebo2/A13381.0001.001/1:6.2.12?rgn=div3;view=fulltext; Cressy, *Saltpeter*, 13-14.  It was Lucar who suggested that saltpeter could be extracted from the earth by digging "out of floors in cellars vaults, stables, ox-stalls, goat or sheep cotes, pigeon houses, or out of the lowermost rooms in other houses." Lucar, *Three books concerning the arte of shooting*, Appendix 5-11. Also quoted in Cressy, *Saltpter*, 20.

[4] An Ordinance enabling Saltpeter-men to make Gun-Powder, British History Online, last modified February 7, 1646, accessed August 7, 2023, https://www.british-history.ac.uk/no-series/acts-ordinances-interregnum/pp828-830.  At the height of its war with Spain, Elizabethan England consumed close to 100 tons of gunpowder per year.  By the 1630s, Charles I peacetime forces needed more than 250 tons of gunpowder.  This increased to 647 tons per year during the Seven Years' War and 1,600 tons per year during the American Revolution.

[5] Between 1601 and 1801, each British East India company ship devoted an

hoped North America would prove a similarly fruitful source of saltpeter, expressing confidence that their newly acquired colonies contained saltpeter "as good and as plentifully as any place in the world."[6]  But while Jamaica and Antigua had saltpeter deposits, and some islands off the coast of New England contained guano, none were abundant enough to produce allow for large-scale export and gunpowder manufacture.

12.   The lack of saltpeter in eastern North America posed a significant challenge to colonial ambitions, and it forced all who utilized firearms throughout the continent to depend on gunpowder manufactured in Europe.  This included enslaved peoples, non-Protestant white settlers, and large numbers of Native American men.[7]  The Jamestown settlers introduced guns to the Powhatan confederacy shortly after their arrival in North America in May 1607.[8]  Firearms became widely accessible to Native peoples a few decades later when Dutch traders from Long Island and the Connecticut River Valley introduced the flintlock musket to Native communities in the region.  Native groups like the Iroquois and the Pequot used these weapons to displace and subjugate nearby Native rivals, launching what historian David Silverman calls an Indian arms race.[9]  They also

average of sixteen percent of its cargo space to saltpeter.  The average weight of saltpeter on any given voyage was 452.8 cubic meters, or 1.6 metric tons.  See James W. Frey, "The Indian Saltpeter Trade, the Military Revolution, and the Rise of Britain as a Global Superpower," *The Historian* 71, no. 3 (Fall 2009): 507.

[6] Cressy, *Saltpeter*, 153.

[7] Enslaved peoples' responsibilities could include shooting vermin, hunting animals for food, and protecting the slaveholder's property, all of which required their use of firearms, gunpowder, and ammunition.

[8] John Smith, *The Generall Historie of Virginia, New England, and the Summer Isles* (Glasgow: James MacLehose and Sons, 1907), 1: 158–59.

[9] David J. Silverman, *Thundersticks: Firearms and the Violent Transformation of Native America* (Cambridge, MA: Harvard University Press, 2016), 23.

1  employed these weapons to challenge English colonial expansion as demonstrated

2  in two violent conflicts: the Pequot War (1636–1637) and King Philip's War

3  (1675–1676).  These patterns of gun-induced Native violence transformed the

4  Indian world and deeply influenced cross-cultural interactions between Native

5  peoples and European colonizers.  The Carolina colony's first English settlers, for

6  example, recounted meeting large groups of Natives who had traveled to Charles

7  Town from the interior seeking any means of defense against the neighboring

8  Westos, who "having guns and powder and shot . . . come upon these Indians here

9  in the time of their crop and destroy all by killing, carrying away their corn and

10  children."[10]

11       13.   By the late seventeenth and early eighteenth centuries, Native men had

12  become critical consumers of British guns, ammunition, and gunpowder, proving

13  both a boon and bane for colonial officials.  Arms manufacturers in Birmingham

14  and London, England, began manufacturing lightweight, flintlock muskets known

15  as "trade guns" specifically for Native customers.  In addition, many colonies relied

16  upon Native hunters to sustain their eighteenth-century economies in lieu of stable

17  cash crops, and the demands of the pelt, deerskin, and slave trades necessitated

18  Native access to guns and ammunition.[11]  Colonial officials understood the public

19  _____

20  [10] Stephen Bull, "Stephen Bull to Lord Ashley, September 12, 1670," in *The Shaftesbury Papers: South Carolina Historical Society,* ed. Langdon Cheves, 192–96 (Charleston, SC: Home House Press, 2010), 194; Matthew Jennings, "'Cutting One Anothers Throats': British, Native, and African Violence in Early Carolina," in *Creating and Contesting Carolina: Proprietary Era Histories,* ed. Michelle LeMaster and Bradford J. Wood (Columbia, SC: The University of South Carolina Press, 2013), 114.

24       [11] European colonization of North America can be defined as trade colonialism, a relationship in which the colonial periphery feeds the metropole with raw materials, and the metropole manufactures finished goods to sell in its colonies. Government-imposed tariffs regulate trade to ensure that capital accumulates in the mother country. In colonial North America, Native peoples served as primary producers of raw goods and consumers of finished goods, often acquired through

safety risks associated with arming large, potentially hostile, Native groups, and over the course of the eighteenth century put considerable effort into determining how many of their Native neighbors owned guns.  For example, estimates of Creek gun ownership ranged from 2,000 in the early 1700s, to 6,000 at the turn of the nineteenth century.[12]  Each Native gunman needed approximately two pounds of gunpowder per year to sustain their hunting yields.  Thus, during their peak era of firearms ownership, members of the Creek Confederacy needed 12,000 pounds of gunpowder annually to meet the demands of the Euro-American deerskin trade.[13]

14.    Gunpowder in this historical period is commonly referred to as black powder and is not to be confused with modern smokeless powder.  The quantity of gunpowder needed to fire a "trade gun"—the lightweight, .60 caliber flintlock muskets created for Native consumers in the eighteenth century—depended on

---

diplomatic mediation. Colonizers understood that to achieve their goals, they would have to provide Native peoples with tools that could expedite their labor—guns and gunpowder.  The danger, however, was that Native peoples could also use these tools to wage war on their enemies, both Indigenous and non-Indigenous.  For an overview of colonial theory, see Nancy Shoemaker, "A Typology of Colonialism," Perspectives on History, last modified October 1, 2015, accessed August 7, 2023, https://www.historians.org/research-and-publications/perspectives-on-history/october-2015/a-typology-of-colonialism.

[12] South Carolina enumerated 2,619 Creek gunmen in 1715.  A French report of a few years later put the number of gunmen at 2,500.  In 1764, John Stuart, who served as British Superintendent of Indian Affairs from 1762 until 1779, reported the number of Creek gunmen at 3,600.  In 1773, Governor Wright of Georgia reported that there were 4,000 Creek gunmen.  By the end of the eighteenth century, American estimates placed Creek military strength between 5,000 and 6,000 warriors.  Kathryn Holland Braund, *Deerskins and Duffels: The Creek Indian Trade with Anglo America, 1685–1815* (Lincoln, NE: University of Nebraska Press, 1993), 9; Kenneth Coleman and Milton Ready, eds., *Colonial Records of the State of Georgia: Volume 28, Part 2: Original Papers of Governor Wright, President Habersham, and Others, 1764–1782* (Athens, GA: University of Georgia Press, 1979), 189.

[13] Braund, *Deerskins and Duffels*, 71–72.

1  several factors, namely the quality of the powder and its granularity.  Native

2  gunowners usually received coarser and less desirable black powder than their

3  Euro-American counterparts, which required them to use slightly more gunpowder

4  on each shot.  A general rule of thumb for determining gunpowder use, however, is

5  one grain of powder for each numerical degree of caliber.[14]  Consequently, Native

6  trade gun owners would need 60 grains of powder for each shot if using a .60

7  caliber flintlock musket, allowing a Native gun owner to fire approximately 116

8  bullets per pound of gunpowder.  Historian Kathryn E. Holland Braund

9  conservatively estimates that the average Creek hunter killed about one hundred

10  deer per year—fifty for the European trade and fifty for home consumption.

11  Because flintlock muskets were less accurate than rifles, however, it usually took

12  more than one shot for even the most experienced Native hunter to achieve a kill.[15]

13  Thus, a Creek gunman in the late colonial and founding eras would need a

14  minimum of two pounds of gunpowder annually to simply sustain their hunting

15  yields.  This amount increases when accounting for priming, spillage, and other

16  forms of loss, as well as additional gunpowder for warfare, protection, and

17  tattooing.  Thus, gunpowder was a limited commodity in high demand by all people

18  who used firearms in the colonies, including Native peoples.

19

20

21

22      [14] The grain is an English unit of weight equating to 1/7000 of a pound.

23      [15] While Native men preferred rifles for their long-range accuracy, these
firearms produced larger holes in deerskins, potentially devaluing them.  Rifles
24  were also more dangerous to Indigenous enemies, posing a greater threat to colonial
populations.  Thus, colonists enacted laws and regulations to ensure that all
25  weapons traded to Native Americans were inferior to those owned by whites, with
late colonial-era trade restrictions coming to specify that rifles could not be traded
26  to Native peoples.  Angela R. Riley, "Indians and Guns," *The Georgetown Law
Journal* 100 (2012): 1690.

27

28

## II.   LAWS REGARDING THE TRADE OF GUNPOWDER, AMMUNITION, AND FIREARMS TO NATIVE AMERICANS AND OTHER POPULATIONS IN THE EARLY COLONIAL ERA

15.   During the early colonial era (1600-1720), laws were enacted and enforced that restricted the trade of gunpowder, ammunition, and firearms to Native Americans, enslaved peoples, and non-Protestant settlers.  Early North American gun legislation focused predominantly on Native Americans, though these laws were complicated by the financially lucrative nature of the eighteenth-century Native American firearms trade.  Figures of firearm and gunpowder use in the eighteenth-century Creek Confederacy reflect usage patterns of other North American Native groups during the period.[16]  These figures provide insight as to why colonies implemented strict laws regarding the trade of firearms and gunpowder to Native peoples in the seventeenth century, and why these laws shifted to allow limited Native access to gunpowder through government-controlled channels during the eighteenth and early nineteenth centuries.

16.   Because firearms were expensive and existing guns were reusable and repairable, North American gun owners came to prefer constant and reliable access to gunsmiths, as well as the tools that rendered firearms operational: gunpowder, ammunition, and gunflints.  Demand for gunpowder and ammunition came to shape cross-cultural diplomacy between Native peoples and European officials over the course of the eighteenth century.  The centrality of these goods to Native life, along with the Native peoples' inability to produce them, led colonial—and later, American—officials to view these commodities as tools through which they could attempt to control Native populations, force them to adhere to imperial interests, and secure Native American dependence.  But while colonial trade relationships rendered Native people dependent upon guns and gunpowder, they never became

---

[16] This is particularly true of Southeastern deer hunting groups, but also of confederacies in the Great Lakes region (like the Haudenosaunee/Iroquois), and in New England (like the Algonquian and Wabanaki peoples).

politically or economically dependent on colonial or imperial states.  In addition, most Native peoples remained well armed though the American Revolution and founding eras, sometimes owning better guns, and firing better shots, than their Euro-American enemies.[17]  This prompted widespread fear among settler populations and stimulated the creation of numerous laws aimed at limiting and controlling Native access to gunpowder and ammunition to protect public safety.

17.   Laws restricting the sale or trade of gunpowder and ammunition to Native Americans, and other "undesirable" populations, began to appear largely in the seventeenth century but were preceded by English laws that prohibited the possession and use of weapons by certain populations.  One of the earliest examples is the 1181 Assize of Arms in which King Henry II of England outlined "the obligation of all freemen of England to possess and bear arms in the service of the King and realm and to swear allegiance to the king."  Essentially restoring the ancient Anglo-Saxon militia system, the Assize "stipulated precisely the military equipment that each man should have according to his rank and wealth" to defend the crown.  Every knight, for example, "was to arm himself with a coat of mail, and shield and lance; every freeholder with lance and hauberk; every burgess and poorer freeman with lance and iron helmet."[18]  The Assize also established religious restrictions on weapons possession, stipulating that "Jews may not take up arms or armor in pledge."[19]  A later law, passed in 1403, prohibited the use of armor or

---

[17] Vanessa Holden, "Firearms and the Violent Transformation of Native America," SHEAR: Society for Historians of the Early American Republic, https://www.shear.org/2016/12/27/firearms-and-the-violent-transformation-of-native-america/.

[18] Thomas Haughton, *The Student's Summary of the Principal Events in English History with Notes* (London: George Philip and Son, 1887), 78.

[19] Joseph Jacobs, "Notes on the Jews of England under the Angevin Kings," *The Jewish Quarterly Review* 4, no. 4 (July 1892): 639.

arms in sensitive places by people not allowed by the king.[20]  By the sixteenth century, English authorities saw a need for legislation to control the ownership and use of firearms and other weapons.  This included a piece of legislation that limited the use of guns or crossbows to people who either possessed Royal permission or "[held] property to the value of 300 Marks."[21]  In 1541, Parliament's passage of "An Act Concerning Crossbows and Handguns" ordered that "no person or persons, other than such as have land, tenement, fees, annuities or office, to the yearly value of one hundred pounds aforesaid . . . shall carry or have . . . any crossbow bent or gun charged or furnished with powder, fire, or touche for the same, except it be in time and service of war."[22]  A 1662 English law allowed Crown officials to seize all guns from any person "judge[d] dangerous to the peace of the Kingdom."  Even after the English Bill of Rights established a right of the people to arm themselves, "the right was given only to Protestants, based on a continued belief that Catholics were likely to engage in conduct that would harm themselves or others and upset the peace."[23]

---

[20] 4 hen 4 c 29, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/4-hen-4-c-29/.

[21] "An Acte Avoidyng Shooting in Crossebowes and Gonnes," in Tom Warlow, *Firearms, the Law, and Forensic Ballistics.* (New York: CRC Press, 2005), 17.

[22] 33 Hen. 8, c. 6, § 1, Duke Center for Firearms Law, https://firearmslaw.duke.edu/ laws/33-hen-8-c-6-§-1-an-act-concernin-crossbows-and-handguns-1541/.

[23] 1689, 1 W. & M. st. 2, c. 2, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1689-1-w-m-st-2-c-2/; An Act for the better secureing the Government by disarming Papists and reputed Papists, 1 W. & M. ch. 15, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/an-act-for-the-better-secureing-the-government-by-disarming-papists-and-reputed-papists-1-w-m-ch-15-1689/.

18.   By the end of the seventeenth century, a significant number of Englishmen, at least on paper, were prohibited from owning guns or accessing gunpowder.  These laws served as precedent for those in colonial North America that sought to restrict access to guns and firearms on the grounds of religion or race. Early legislation included a Massachusetts law from 1637 aimed at disarming the followers of an extremist Puritan preacher named John Wheelwright.  The law required any individual who expressed "opinions & revelations" that "seduced & led [others] into dangerous errors" to turn in all "guns, pistols, swords, powder, shot, & match."[24]  A 1756 Maryland law allowed the Justice of the Peace to disarm any Catholic, and a Virginia law from the same year permitted the disarmament of any Catholic or Papist who refused to take an oath of loyalty to the colonial government.[25]

19.   Seventeenth-century restrictions on firearms ownership were also racially motivated, with the exception of a 1665 Connecticut law that prohibited the sale of guns, gunpowder and ammunition to Dutch and French men.[26]  A 1639 Virginia

---

[24] Nathaniel B. Shurtleff, *Records of the Governor and Company of the Massachusetts Bay in New England* (Boston: William White, 1853), 211–12. Accessed August 12, 2023, https://archives.lib.state.ma.us/handle/2452/802285.

[25] An Act to Prevent Popery within this Province, Votes and Proceedings of the Lower House of Assembly of the Province of Maryland, Duke Center For Firearms Law, https://firearmslaw.duke.edu/laws/an-act-to-prevent-popery-within-this-province-votes-and-proceedings-of-the-lower-house-of-assembly-of-the-province-of-maryland-22-may-1756/; An Act for Disarming Papists, and Reputed Papists, Refusing to Take the Oaths to the Government (1756), in 7 William W. Hening, The Statutes at Large, Being a Collection of all the Laws of Virginia 35–36 (Richmond: Franklin Press, 1809).

[26] The Public Records of the Colony of Connecticut, Duke Center For Firearms Law, https://firearmslaw.duke.edu/laws/the-public-records-of-the-colony-of-connecticut-prior-to-the-union-with-new-haven-colony-may-1665-page-113-114-image-125-126-1850-available-at-the-making-of-modern-law-primary-sources/.  This was based on the grounds that "the Dutch and French do sell and

law mandated that all persons, "except Negroes," were to be "provided with arms and ammunitions."[27]  A New York Law from 1664 deemed it illegal "for any slave to have or use any gun, pistol, sword, club, or any other kind of weapon whatsoever, but in the presence of his her or their Master or Mistress, and in their own ground" with a penalty of twenty lashes.[28]  A 1694 New Jersey law prohibited enslaved people from carrying "any gun or pistol . . . into the woods," without their slaveholder's consent.[29]  A violent rebellion of enslaved peoples in New York City in April of 1712 resulted in the enactment of harsher slave codes, including a prohibition on "any Negro, Indian, [or] Mulatto Slave from having or using any gun or pistol outside of their master's presence.[30]  This set a precedent for other colonies, with Maryland enacting a law in 1715 that banned "negro[es] or other slaves . . . [from]  carry[ing] any gun or any other offensive weapon, from off their master's land, without license from their said master."[31]  Laws disarming enslaved

---

trade to the Indians guns, pistols, and warlike instruments."

[27] PBS.org, Africans in America Part 1 – Colonial Laws, https://www.pbs.org/wgbh/aia/part1/1h315t.html.

[28] The Colonial Laws of New York From the Year 1664 To The Revolution, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/the-colonial-laws-of-new-york-from-the-year-1664-to-the-revolution-including-the-charters-to-the-duke-of-york-the-commissions-and-instructions-to-colonial-governors-the-dukes-laws-the-laws-of-the/.

[29] The Grants, Concessions, And Original Constitutions of the Province of New Jersey, Duke Center for Firearms Law. https://firearmslaw.duke.edu/laws/the-grants-concessions-and-original-constitutions-of-the-province-of-new-jersey-page-341-image-345-1881-available-at-the-making-of-modern-law-primary-sources/.

[30] An Act for the suppressing and punishing the conspiracy and insurrection of Negroes and other Slaves (1712), New York Slave Laws: Colonial Period, https://www.famous-trials.com/newyorkplot/367-slavelaws.

[31] An Act For The Speedy Trial of Criminals, and Ascertaining Their Punishment in the County Courts, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1715-md-laws-117-an-act-for-the-speedy-trial-of-criminals-and-ascertaining-their-punishment-in-the-county-courts-when-

African Americans were part of a larger effort to disarm individuals of diverse religious, racial, and socioeconomic backgrounds based on judgment of character, morality, and perceived threats to public safety.

20.   Laws banning the trade and sale of gunpowder to Native peoples make up most legislation in this area.  They appear as early as 1619, when Virginia passed legislation prohibiting individual settlers from selling or gifting arms and ammunition to Indians.[32]  During the colonial period, individual colonies formulated their own laws and policies regarding trade between settlers and Native peoples based on local-level needs.  Through the seventeenth century, laws prohibiting the trade of guns, gunpowder, and ammunition to Native Americans emerged in the New England colonies, which saw the rapid immigration of English-Protestant families after 1620.  Their settlement on Native lands produced violent cross-cultural conflicts like the Pequot War (1636) and King Philip's War (1675), producing legislation like a 1633 act from the Massachusetts Bay Colony which mandated "no person . . . shall . . . sell, give or barter, directly or indirectly, any gun or guns, powder, bullets, shot, lead, to any Indian whatsoever, or to any person inhabiting out of this jurisdiction."[33]

21.   The Mid-Atlantic colonies also passed numerous laws barring the sale of guns or gunpowder to Native peoples, with many of Virginia's laws emerging

---

prosecuted-there-and-for-payment-of-fees-due-from-criminal-persons-chap-26/.

[32] H.R. McIlwaine and John P. Kennedy, eds., "1619: Laws Enacted by the First General Assembly of Virginia," Online Library of Liberty, last modified August 1619, accessed August 8, 2023, https://oll.libertyfund.org/page/1619-laws-enacted-by-the-first-general-assembly-of-virginia.

[33] The Charters And General Laws Of The Colony And Province Of Massachusetts Bay, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/the-charters-and-general-laws-of-the-colony-and-province-of-massachusetts-bay-page-133-image-140-1814-available-at-the-making-of-modern-law-primary-sources/.

during a twenty-year period of warfare between English settlers and members of the Powhatan confederacy.[34]  A 1633 Virginia law stated that any individual person selling "guns, powder, shot, or any arms or ammunition unto any Indian or Indians within this territory" would face imprisonment.[35]  A January 1639 Virginia act reduced the punishment for general trading with the Indians, but stipulated that the trade of arms and ammunition would remain a felony.[36]  Punishment for trading guns to the Natives expanded in 1642 to include the forfeiture of one's estate.[37]  A 1649 Maryland law banned its inhabitants from selling or exchanging guns, ammunition, or "any other kind of martiall Armes" to Native peoples.[38]  New Netherland passed a law in 1645 prohibiting all persons from trading "any munitions of war with the Indians," and forbade their importation to the colony without explicit permission. Punishment, the act stipulated, could include death.[39]

---

[34] These conflicts are called the Anglo Powhatan Wars and took place between approximately 1622 and 1644.

[35] 1633 Va. Acts 219, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1633-va-acts-219/.

[36] *Statutes at Large: Collection of Virginia Laws from 1619*, archive.org, 226; https://archive.org/details/statutesatlargeb01virg/page/226/mode/2up; 1639 Va. Acts 224, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1639-va-acts-224-acts-of-january-6th-1639-act-xvii/.

[37] 1642 Va. Acts 255, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1642-va-acts-255-acts-of-march-2nd-1642-act-xxiii/.

[38] William Hand Browne, ed., *Archives of Maryland* (Baltimore: Maryland Historical Society, 1885), vol. 1: 250.

[39] A 1656 New Netherland law also prohibited the admission of armed Indians into cities, villages, and houses.  1656 N.Y. Laws 235, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1656-ny-laws-235/; 1645 N.Y. Laws 47, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1645-n-y-laws-47-by-the-director-and-council-of-new-netherland-further-prohibiting-the-sale-of-firearms-etc-to-indians/.

In 1676, the Plymouth colony also enacted a law against individual trading or selling arms and ammunition to Indians, a practice deemed to be "very poisonous and destructive to the English."[40]  Like New Netherland's law, anyone convicted of selling, bartering, or trading guns and ammunition to Native Americans could be put to death.[41]  A Virginia law, also enacted in 1676, made it a capital offense to sell guns or ammunition to the Indians, and declared that any colonist found within any Indian town or three miles without the English plantations with more than one gun and ten charges of powder and shot for his necessary use would be considered guilty of selling to the Indians, and punished accordingly.[42]

### III.  LAWS REGARDING THE TRADE OF GUNPOWDER, AMMUNITION, AND FIREARMS TO NATIVE AMERICANS AND OTHER POPULATIONS IN THE LATE COLONIAL AND FOUNDING ERAS

22.    While eighteenth-century laws continued to prohibit the private trade of guns and gunpowder with Native Americans, legislation did not seek to completely ban Native peoples from obtaining arms and ammunition.  Rather, colonies used existing English law as precedent for regulating the ability of Native peoples to acquire firearms and gunpowder because of their roles as hunters within colonial economies.  During this time, however, colonial governments continued to heavily restrict the ability of other groups, including enslaved peoples, from acquiring and

---

[40] 1675 Records of the Colony of New Plymouth, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/records-of-the-colony-of-new-plymouth-in-new-england-page-173-image-179-1856-available-at-the-making-of-modern-law-primary-sources/.

[41] 1675 Records of the Colony of New Plymouth, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/records-of-the-colony-of-new-plymouth-in-new-england-page-173-image-179-1856-available-at-the-making-of-modern-law-primary-sources/.

[42] William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619* (New York: R. & W. & G. Bartow, 1823), vol. 1: 441.

possessing firearms and gunpowder.  This shows that colonial and state governments believed these populations posed enough of a public safety risk to necessitate governmental regulation over their access to firearms and gunpowder, though they implemented control in different ways.

23.   A series of late seventeenth-century English legislative measures prohibited the importation of foreign weapons and associated goods with the goal of preventing "any design of Traitorous and factious persons who may by this [method] furnish themselves with . . . arms from beyond the state."[43]  These laws, put forth under the guise of public safety, "kept all malcontents, fanatics, and sectaries disarmed and under constant surveillance." [44]  The Game Act of 1671 further limited individual access to firearms and ammunition by raising property and wealth requirements to own guns to fifty times the level required to vote.[45] While it primarily sought to reserve hunting as a sport for the nobility and gentry, the Game Act of 1671 also was the first piece of hunting-related legislation to

---

[43] National Archives, London, "Proclamation Prohibiting the Importation of Firearms," Anglo American Legal Tradition, last modified September 4, 1661, accessed August 8, 2023, http://aalt.law.uh.edu/AALT7/C2/PC2no55/IMG_0190.htm; Joyce Lee Malcom, *To Keep and Bear Arms: The Origins of an Anglo-American Right* (Cambridge, MA: Harvard University Press, 1996), 48.

[44] Malcom, *To Keep and Bear Arms*, 49.  This included a series of concurrent Crown proclamations which declared that all who had fought for Parliament in the English Civil War were prohibited from carrying firearms.

[45] Diarmuid F. O'Scannlain, "Glorious Revolution to American Revolution: The English origin of the Right to Keep and Bear Arms," *Notre Dame Law Review* 95, no. 1 (December 2019): 402.  After 1430, English men were franchised to vote by virtue of possessing property of an annual rent of at least forty shillings, or two pounds. These men were called "forty-shilling freeholders." This standard remained unaltered in the seventeenth century. The basic requirement to hunt with firearms after 1671 was income of at least 100 pounds per year on "freehold estates" or 150 pounds per year on "leaseholds."  Malcom, *To Keep and Bear Arms*, 71; William Blackstone, *Commentaries on the Laws of England: In Four Books (Book 4)* 175 (Oxford: Clarendon Press, 1770): 175.

include guns on the list of prohibited devices, drawing a connection between wealth, status, and access to firearms and ammunition.  Together, these laws allowed the Crown to selectively disarm English subjects who they deemed a public safety risk, while effectively granting the government complete control over the production and distribution of firearms in the empire.

24.   Consequently, eighteenth-century colonial legislation began to explicitly state that only private trade was punishable by law; government-sponsored trade of arms and ammunition, regulated through a license from a specific colony, was acceptable.  This allowed colonies to design, implement, and manage their own trade to ensure that Native hunters had access to the goods they needed while restricting the actions of oft-unscrupulous private citizens.  Such a shift proved crucial for colonies that relied upon both the labor of Native hunters and the larger consumer patterns of Native communities to fuel their economies.  A 1723 Connecticut law, for example, prohibited all unlicensed persons within the colony from lending guns, ammunition, or associated goods to Native Americans.[46]  A 1763 Pennsylvania law explicitly banned unlicensed private citizens from exchanging guns, gunpowder, shot, bullets, lead, or other warlike stores to Native peoples.  Offenders were subject to "pay the sum of five hundred pounds . . . and shall be whipped with thirty-nine lashes on his bare back, well laid on, and be committed to the common goal [jail] of the county, there to remain twelve months without bail or mainprise."[47]  A Maryland law from 1763 prohibited "any Person or Persons within this Province to Sell or give any Indian Woman or Child any Gun

---

[46] 1723 Connecticut Acts 292, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1723-conn-acts-292-an-act-for-preventing-lending-guns-ammunition-etc-to-the-indians/.

[47] 1763 Pa. Laws 319, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1763-pa-laws-319-an-act-to-prohibit-the-selling-of-guns-gunpowder-or-other-warlike-stores-to-the-indians/.

Powder Shot or lead Whatsoever[,]" but allowed individuals to trade ammunition to Native men as long as the quantity did not exceed one pound of gunpowder or six pounds of shot or lead at any one time.[48]  Laws restricting free and enslaved African Americans from accessing guns and ammunition did not change much from the seventeenth to eighteenth centuries.  Legislation generally continued to require that enslaved people have a ticket or license from their master.  It was not until the founding that state legislatures began enacting laws completely banning enslaved people from accessing guns and ammunition.

25.   As part of their efforts to control Native access to gunpowder and firearms, colonies also sought to ensure that weapons and accompanying goods traded to Native Americans were inferior to those owned by whites.  A 1756 report from Indian agent Daniel Pepper illuminates British colonial concerns regarding Native access to rifles.  Pepper reported that the Cherokee and Upper Creeks were "getting into the Method of using Riffle Guns instead of Traders [trade guns] . . . as they can kill point blank at 200 yards distance.  This, in my humble opinion, puts them too much upon an equality with us in case of a breach."  As for legal ramifications, Pepper noted "the People who sell them to the Indians are generally poor, their Gun being the greatest part of their estate, a fine would be of little or no effect.  Imprisonment or something of corporal punishment would creat[e] a greater Dread."[49]  A 1764 draft trade regulation corroborates Pepper's concerns:

> Rifled Barreled Guns should certainly be prohibited; the Shawanese and Delawares, with many of their neighbours are become very fond of them [rifles], and use them with such dexterity, that they are capable of doing infinite damage, and as they are made in some of the frontier Towns, where the Indians will procure them at any Price . . . all white persons should be

---

[48] *Archives of Maryland*, vol. 58, 420.

[49] William L. McDowell, Jr., ed., *Documents Relating to Indian Affairs, 1754–1765 (South Carolina)* (Columbia, SC: South Carolina Department of Archives and History, 1970), 256.

restricted on a very severe penalty from selling them to any Indians.[50]

26.   The examples above indicate that laws prohibiting the sale of firearms and gunpowder to Native peoples took on many forms in the late colonial period, depending largely upon local political and/or economic needs.  Allowing each colony to establish its own trade laws supported local-level authority and broad government control, but a lack of unified Indian trade legislation led to limited imperial oversight in an empire whose identity was deeply intertwined with commerce.  This became a major concern for the Crown after the French and Indian War when the British increasingly sought to control the actions of both colonial and Native populations.  The Plan of 1764 imposed new, universal trade regulations aimed at demonstrating the empire's socio-economic and political dominance over North America's colonial and Native populations.  New policies provided the British Board of Trade executive authority to establish universal protocols for commerce with the Natives.  Individual colonies, who for most of the century had determined trade laws with nearby Native peoples, were now expected to follow imperial laws and regulations.

27.   Colonial officials quickly realized that a lack of local-level autonomy over Native trade laws created space for large numbers of corrupt, illegal traders to cross into Indian territory to conduct unauthorized exchange; something that motivated previous colonial policies aimed at government regulation.  A 1766 letter from Georgia's governor James Wright detailed how the Creeks and other Southeastern Native peoples, were "over Stock'd with goods by the great number of traders that go amongst them," and who were also "generally the very worst kind of

---

[50] Angela R. Riley, "Indians and Guns," *The Georgetown Law Journal* (2012), 100: 1690.

people."[51]  In February 1768, Indian Commissary Roderick McIntosh complained that the Upper Creek towns were swarmed with traders, whom he regarded as "notorious villains" for trading guns and gunpowder to Native men at prices below the established exchange rate.[52]  Thus, despite Britain's efforts to standardize Indian trade policies, the colonies' inability to make and enforce trade laws led to a significant uptick in illegal arms trading and, subsequently, Native violence.  The British Board of Trade's decision to return the management of the Indian trade to the colonial governments in late 1768 marked a return to policies that embraced local-level lawmaking to better control the actions of both traders and Native peoples.[53]  This elucidates that colonial officials felt Native access to gunpowder, guns, and ammunition posed a public safety threat significant enough to warrant legal action, but that laws needed to be created and enforced on the colonial level to control the actions of private citizens and traders whose attempts to trade with Native Americans outside of governmental oversight proved an equally significant threat.

28.   War also impacted trade customs and laws.  Before the American Revolution, Euro-American officials occasionally threatened to cut off the trade of gunpowder and firearms to Native peoples.  During the French and Indian War, for example, British General Jeffrey Amherst set forth a decree prohibiting representatives authorized to interact with Indian tribes on behalf of the colonies

---

[51] Coleman and Ready, *Colonial Records of Georgia v 28*, 157.

[52] Roderick McIntosh, "McIntosh to Stuart," February 8, 1768, Document 104, Thomas Gage Papers, William L. Clements Library, The University of Michigan, Ann Arbor, MI.

[53] Richard White, *The Roots of Dependency: Subsistence, Environment, and Social Change among the Choctaws, Pawnees, and Navajos* (Lincoln, NE: University of Nebraska Press, 1988), 72.

23

(Indian agents) from trading or gifting gunpowder and firearms to Native men, declaring both the dangers of this practice and the high financial cost to the British government.[54]  His proposal never came to fruition, however, as the complete stoppage of the trade would have signaled a declaration of war to Native peoples.

29.   During the American Revolution, Patriots and Loyalists attempted to use gunpowder and ammunition as a bargaining chip to secure Native support.  To be successful, officials from both sides needed to continue enforcing existing trade laws to ensure that access to guns, gunpowder, and ammunition reached Native Americans through government-regulated channels, and not through uncooperative or self-minded traders.  Though only limited records survive, a quantitative analysis of gunpowder imports reveal that the American colonies received an enormous amount of gunpowder—1,030,694 pounds total—during the three-year period of 1769 to 1771.  Later sources indicate that a significant portion of this gunpowder was earmarked for the Indian trade; in 1775 a group of South Carolina Patriots confiscated 13,000 pounds of gunpowder from the Loyalist cargo ship *Philippa.* They gave 8,000 pounds to the Georgia Provincial Congress, who promptly sent 2,000 pounds—or 25% of their haul—to neighboring Creeks and Cherokees.  The Provincial Congress stated directly that this gunpowder was a gift "not from the *King* or from the [royal] *Government* or from the *Traders,* but from the *People of the Province* [the rebels]."[55]

30.   The above example highlights how Patriots, Loyalists, and Native Americans used gunpowder as a tool of diplomatic negotiation during the Revolutionary period, a strategy that is reflected in several laws from the era.  At the same time, local jurisdictions enacted laws that sought to regulate access to

---

[54] Colin Calloway, *Pen, Ink, and Witchcraft: Treaties and Treaty Making in American Indian History* (New York, NY: Oxford University Press, 2013), 22.

[55] Sheldon S. Cohen, "The Philippa Affair," *The Georgia Historical Quarterly* 69, no. 3 (Fall 1985): 350–51.

guns and gunpowder for "high risk" individuals, often noted in the documentary record as white men who were deemed to be insufficiently loyal to the civil government.  A 1776 Pennsylvania law required all white males to take an oath of allegiance "before some one of the justices of the peace of the city or county where they shall respectively inhabit."  Failure to do so would result in their disarmament "by the lieutenant or sublieutenants of the city or counties respectively."[56]  A 1776 Massachusetts law similarly resolved to disarm "such persons as are notoriously disaffected to the cause of America, or who refuse to associate to defend by arms the United American Colonies."[57]  Three acts from Pennsylvania (1777, 1778, and 1779) and another from Virginia (1777) required white male gun owners to swear an oath of allegiance if they wished to retain their guns, with disarmament serving as punishment.[58]  Loyalty oaths allowed Patriots to regulate access to guns and

---

[56] *Military Obligation: The American Tradition* (1947), 23. https://firearmslaw.duke.edu/wp-content/uploads/2023/04/1777-PA-An-Act-to-regulate-the-Militia-of-the-Common-Wealth-of-Pennsylvania-§-9-10.pdf.

[57] Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80, no. 2 (2017): 72, accessed August 8, 2023, https://scholarship.law.duke.edu/cgi/viewcontent.cgi?article=4825&context=lcp 72; 1776 Pa. Laws 11, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1776-pa-laws-11-an-ordinance-respectingthe-arms-of-non-associators-§-1/; Statutes at Large of Pennsylvania from 1682 to 1801 vol. 9, https://babel.hathitrust.org/cgi/pt?id=mdp.39015051124082&seq=17; Act of Mar. 14, 1776, Duke Center for Firearms Law. https://firearmslaw.duke.edu/laws/act-of-mar-14-1776-ch-vii-1775-1776-mass-act-at-31-32-35/#.

[58] 1777 Pa. Laws 61, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1777-pa-laws-61-an-act-obliging-the-male-white-inhabitants-of-this-state-to-give-assurances-of-allegiance-to-the-same-and-for-other-purposes-therein-mentioned-ch-xxi-§§-2-4/; 1778 Pa. Laws 123, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1778-pa-laws-123/; 1779 Pa. Laws 193, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1779-pa-laws-193/; Act of May 5, 1777, Duke Center for Firearms Law, https://firearmslaw.duke.edu/ laws/act-of-may-5-1777-ch-

---

1  gunpowder for settler populations and gave rebel governments the authority to
2  disarm "high risk" peoples, revealing that Patriots used access to gunpowder and
3  firearms as tools of coercion and control in their attempts to secure support for the
4  Revolutionary cause.

5       31.   While the end of the American Revolution brought independence to
6  Britain's former North American colonies, the new United States inherited the
7  Crown's unresolved questions about relationships with Native nations.  To answer
8  these questions, United States policymakers looked to colonial-era laws regulating
9  the trade of gunpowder and firearms to Indians.  With Native diplomacy now under
10  the jurisdiction of the federal government, Congress reworked existing local-level
11  laws for national use.  The resulting Indian Trade and Intercourse Act (1790)
12  established that private individuals needed a license to conduct trade with Native
13  peoples and were required to renew their license every two years.  Sections of the
14  Indian Trade and Intercourse Act heavily emulated earlier, colonial-level firearms
15  regulations.  The 1796 "Act for Establishing Trading Houses with the Indian
16  Tribes," however, authorized the president to establish designated facilities—
17  known as "factories"—for the "purpose of carrying on a liberal trade with the
18  several Indian nations," and appoint agents to run them.  By providing goods to
19  Native peoples at-cost, these trading houses aimed to push out any illegal or foreign
20  competition while asserting control over the quality and quantity of goods Native
21  peoples acquired.  But Indian factories were not intended to be profit-seeking
22  ventures; they existed to impose federal authority over the 150,000 Native peoples
23  living between the Appalachian Mountains and the Mississippi River.  More
24  affordable than warfare against Native peoples, historian David Nichols describes

25
26
27  3-in-9-henings-statutes-at-large-281-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/.
28

26

Declaration of Jennifer M. McCutchen (3:18-cv-00802-BEN-JLB)

the Indian factory system as "conquest on the cheap," riddled with abuse and misconduct on the part of factory agents.[59]

32.    Notably, section seven of the 1796 "Act for Establishing Trading Houses" addresses firearms and associated goods.  Instead of placing a restriction upon private traders, it specifically prohibits agents from "purchas[ing], or receiv[ing] of any Indian, in the way of trade or barter, a gun or other article commonly used in hunting," imposing a one-hundred-dollar penalty for each offense.  This indicates that the success of factory system depended upon the sale of cheaply made goods to Native peoples, inferior to those made for white American populations.  By prohibiting factory agents from purchasing firearms, gunpowder, or ammunition from Native people, U.S. officials sought to curb the sale of arms outside the purview of the federal government.  Because it was not uncommon for Native peoples to access better-quality firearms from Spanish Florida or British Canada, factory agents could acquire these weapons and re-sell them to bolster their income.  Later laws included restrictions upon the sale of guns and gunpowder by private citizens, as evidenced by an 1807 Mississippi Territory law that prohibited white settlers from purchasing or trading guns or any tool used in hunting "with any Indian."[60]  Such actions would challenge U.S. efforts to control Native peoples

---

[59] David Andrew Nichols, *Engines of Diplomacy: Indian Trading Factories and the Negotiation of Empire* (Chapel Hill: University of North Carolina Press, 2016), 1.  Nichols writes that in 1821, Senator Thomas Hart Benton of Missouri accused the factors of "abuse and misconduct" characterizing the merchandise from Indian factories as "the rubbish of Georgetown retail stores."  Benton argued the system had achieved none of its goals and branded it "worse than useless."  The federal government disbanded the Factory system in the same year.

[60] Harry Toulmin, The Statutes of the Mississippi Territory, Revised and Digested by the Authority of the General Assembly, Duke Center for Firearms Law. https://firearmslaw.duke.edu/laws/harry-toulmin-the-statutes-of-the-mississippi-territory-revised-and-digested-by-the-authority-of-the-general-assembly-page-593-image-612-natchez-1807-available-at-the-making-of-modern-law-prima/.

through access to guns and gunpowder, and undermine their efforts to navigate the long-standing contradiction of providing firearms and ammunition to potentially dangerous outsiders.

33.   Federal regulation of the Indian trade occurred in conjunction with a rapidly expanding "cotton kingdom" in the American South.  With increasing numbers of enslaved people, early nineteenth century laws regarding gun use and ownership reflect a tightening of restrictions over both free and enslaved African Americans.  Unlike earlier laws which generally permitted limited gun use among enslaved individuals, legislation passed after the founding, particularly in Southern states and territories, frequently prohibited all enslaved African Americans from possessing guns, ammunition, or gunpowder.[61]  Subsequent legislation from Southern states and territories followed suit, severely restricting the abilities of

---

[61] Some northern states retained exceptions for enslaved peoples with their masters' permission.  One example is seen in a 1797 Delaware law which prohibited "any Negro or Mulatto slave" from possessing any gun, ammunition, or weapon without their master's license.  1797 Del. Laws 104, An Act for the Trial of Negroes Ch. 43, §6, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1797-del-laws-104-an-act-for-the-trial-of-negroes-ch-43-§6/; Charles Nettleton, Laws of the State of New Jersey Page 370–71, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/charles-nettleton-laws-of-the-state-of-new-jersey-page-370-371-image-397-398-1821-available-at-the-making-of-modern-law-primary-sources/.  This law prohibited "any negro or other slave" from hunting or carrying a gun on the first day of the week, or Sunday subject to imprisonment.  Other states enacted harsher restrictions upon free African Americans, generally prohibiting them from carrying firearms or other weapons without a license or special permission.  See 1806 Md. Laws 44, An Act To Restrain The Evil Practices Arising From Negroes Keeping Dogs, And To Prohibit Them From Carrying Guns Or Offensive Weapons, ch. 81, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1806-md-laws-44-an-act-to-restrain-the-evil-practices-arising-from-negroes-keeping-dogs-and-to-prohibit-them-from-carrying-guns-or-offensive-weapons-ch-81/; 1806 Va. Acts 51, ch. 94, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1806-va-acts-51-ch-94/.

African Americans, both free and unfree, from carrying or possessing firearms and ammunition.[62]  Thus, during the founding era, firearms restrictions applicable to Native peoples exhibited greater nuance than the strict prohibitions applicable to free African Americans and enslaved populations.

## CONCLUSIONS

34.    During the late colonial and founding eras, gun owners were consistently concerned with securing stable access the tools that rendered their firearms operational: gunpowder and ammunition.  Securing gunpowder was a challenge, as a lack of saltpeter in Eastern North America ensured that it could not be produced in large quantities in the colonies.  Gun owners in colonial America who sought stable access to gunpowder were diverse and included enslaved people, non-Protestant white settlers and large numbers of Native Americans, whose labor empires depended on to support their hunting-based colonial trade economies.  In the seventeenth and early eighteenth centuries, individual colonies looked to English legislation to enact numerous restrictions on Native peoples from accessing guns, and accompanying ammunition accessories, like gunpowder, gunflints, and bullets.  This was largely due to perceived public safety risks associated with trading guns and ammunition to Native Americans, who existed outside of the English colonial polity.

---

[62] These laws include: 1804 Miss. Laws 90-91, An Act Respecting Slaves, § 4, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1804-miss-laws-90-91-an-act-respecting-slaves-§-4/; Harry Toulmin, A Digest of the Laws of the State of Alabama, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/harry-toulmin-a-digest-of-the-laws-of-the-state-of-alabama-containing-the-statutes-and-resolutions-in-force-at-the-end-of-the-general-assembly-in-january-1823-to-which-is-added-an-appendix-conta/; Henry S. Geyer, A Digest of the Laws of Missouri Territory, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/henry-s-geyer-a-digest-of-the-laws-of-missouri-territory-comprising-an-elucidation-of-the-title-of-the-united-states-to-louisiana-constitution-of-the-united-states-treaty-of-session-organic-law/.

35.    By the second decade of the eighteenth century, however, colonial governments no longer sought to fully prohibit Native peoples from obtaining arms and ammunition.  This was because most North American colonies, and the larger English empire, depended upon Native laborers to support their hunting-based trade economies.  Consequently, colonial governments began to use seventeenth-century English law as precedent to more strictly regulate *how* Native Americans acquired guns, gunpowder, and ammunition.  This legislative shift, which was not mirrored with respect to enslaved populations, proved crucial for Patriots and Loyalists, who used gunpowder as a tool of negotiation to secure alliances during the American Revolution.  It also provided a foundation from which the new United States attempted to use the sale of guns, gunpowder, and ammunition in conjunction with their Indian Factory System to secure Native dependence through the early nineteenth-century.

36.    This brief account of laws regarding the sale, trade, and exchange of gunpowder and ammunition demonstrates that colonial governments, state governments, and the federal government viewed the trade and sale of gunpowder and firearms to certain racial, religious, or socioeconomic populations as a threat to public safety and the social moral character of their colonies.  Yet when it came to Native Americans, they did not seek to fully prohibit them from accessing these goods.  Rather, they understood the public safety risks associated with the unregulated trade of gunpowder and firearms to Native Americans, and created laws that restricted the ability of private citizens to trade these goods to Native peoples and other potentially dangerous individuals.  This allowed eighteenth and early nineteenth lawmakers to control not only how Native Americans gained access to gunpowder and other associated goods, repressing public safety concerns, but also exercise authority over diplomatic negotiations and alliance formation in ways that could possibly result in Native subordination and dependence.  While access to guns, gunpowder, and ammunition for members of the above groups was

1  not always controlled in the same manner, colonial and state governments felt these

2  populations posed enough of a public safety risk to necessitate governmental

3  regulation over their access to firearms and gunpowder.

4      I declare under penalty of perjury that the foregoing is true and correct.

5  Executed on August 16, 2023 at St. Paul, MN.

6

7  *Jennifer M. McCutchen*

8                  Jennifer M. McCutchen

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Jennifer M. McCutchen (3:18-cv-00802-BEN-JLB)