# EXHIBIT 1

Exhibit 1 - Jones Decl.
Page 001



CALIFORNIA
# DEPARTMENT OF JUSTICE

# ARMED AND PROHIBITED PERSONS SYSTEM (APPS) 2020

## ANNUAL REPORT TO THE LEGISLATURE

## SB 94 LEGISLATIVE REPORT

## CALENDAR YEAR 2020

Exhibit 1 - Jones Decl.
Page 002



# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*The Armed and Prohibited Persons System and Legislative Reporting Requirements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**2**

*COVID-19 Impact on APPS Enforcement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**2**

*APPS Database Analysis*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Recommendations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**4**

**ANNUAL REPORT TO THE JOINT LEGISLATIVE BUDGET COMMITTEE** . . . . **5**

*The APPS and Legislative Reporting Requirements* . . . . . . . . . . . . . . . . . . . . .**5**

*Overview of the Mandated Categories for Statistical Reporting* . . . . . . . . . . . .**5**

*Overview of the APPS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**6**

*Enforcement Teams* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**9**

*Mandated Statistics and Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**11**

**APPENDICES**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .**29**

*APPENDIX A: Relevant Key Terms and Definitions*. . . . . . . . . . . . . . . . . . . . . . 29

*APPENDIX B: Legislative History Relative to APPS* . . . . . . . . . . . . . . . . . . . . . .*32*

*APPENDIX C: Mandated Statistics – At a Glance*. . . . . . . . . . . . . . . . . . . . . . . .**34**

*APPENDIX D: Relational Diagram of the Bureau of Firearms Databases* . . . . .*36*

*APPENDIX E: Firearms Prohibiting Categories* . . . . . . . . . . . . . . . . . . . . . . . . .*37*

*APPENDIX F: Bureau of Firearms Regional and Field Offices* . . . . . . . . . . . . . 40

*APPENDIX G: Case Studies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*41*



# EXECUTIVE SUMMARY

## *The Armed and Prohibited Persons System and Legislative Reporting Requirements*

In 2006, the State of California became the first and only state in the nation with a system for monitoring known firearm owners who might fall into a prohibited status. The Armed and Prohibited Persons Systems (APPS) database cross-references firearms purchasers against other records for individuals who are prohibited from possessing firearms. The Department of Justice Bureau of Firearms (Bureau) utilizes Crime Analysts, Special Agents and Special Agent Supervisors to locate and disarm prohibited persons identified through the APPS database, thereby preventing and reducing incidents of violent crime.

The authority and specifications for this public reporting initiative were established in Senate Bill (SB) 140 (Stats. 2013, ch. 2), which sunset in 2019, and were reestablished with further specifications under SB 94 in 2019. SB 94 (Stats. 2019, ch. 25) requires the Department of Justice (Department) to report specified information related to the APPS database, including the number of individuals in the APPS database and the degree to which the backlog in the APPS has been reduced or eliminated. In this report, the term backlog is used in accordance with the SB 94 definition: the number of cases for which the Department did not initiate an investigation within six months of the case[1] being added to the APPS or a case for which the Department has not completed investigatory work within six months of initiating an investigation.

Prior to SB 94 going into effect, the Department communicated to the Department of Finance (DOF) and to the legislature that the current firearms database systems did not have the capability required to collect and report on the backlog as it has now been defined in statute  and certain of the other metrics newly required by SB 94. In response, the DOF worked with the Department to submit a Budget Change Proposal (BCP) requesting funding to support the upfront planning and analysis costs to determine how to create an updated database system that would be able to yield the requested data and have the improved capability of working with the APPS program. The Department has received the resources for the analysis phase of the modernization project.  Once the analysis is complete, and additional funding secured, the Department will be able to begin the upgrade process for the APPS and other systems.

## *COVID-19 Impact on APPS Enforcement*

As the COVID-19 pandemic began to unfold, states and local governments across the country began to declare a State of Emergency and issued shelter-in-place orders, and firearm and ammunition sales began to surge. Ammunition sales across the State were monitored by the Bureau through the accompanying ammunition eligibility check requirements. These ammunition eligibility checks revealed numerous attempted purchases by APPS individuals who are prohibited from owning and/or possessing firearms and/or ammunition.

Conversely, COVID-19 put the Bureau in a precarious position where it had to be cognizant of the risk of exposure for the safety of its own staff and the public. The significant public interaction inherent in APPS operations meant that sustaining prior levels of investigations posed unacceptable infection risks to Bureau personnel and the broader public.  Nevertheless, APPS enforcement efforts continued amidst the COVID-19 pandemic, albeit on a reduced level. Because APPS work requires extensive interaction with the public, the Bureau was forced to scale back its efforts. However, the Bureau needed to find a way to continue to protect the public and focused its efforts on those APPS individuals

---

1          Within the APPS database a case refers to one individual; therefore, the terms 'case' and 'individual' will be used interchangeably in this report.

Exhibit 1 - Jones Decl.
Page 004

that demonstrated their active possession of firearms through the attempted purchase of ammunition. While the Bureau's overall statistics are lower for 2020, this new process allowed for the Bureau to use information from recently rejected ammunition eligibility checks of APPS individuals to maximize its investigative efficiencies and continue disarming prohibited individuals — all while also minimizing public contact. This reduction of the Bureau/public interaction footprint further minimized the potential for enforcement related spread of the COVID-19.

In addition to the COVID-19 pandemic, 2020 was a year filled with other challenges including large wildfires that spread across the state, nationwide civil unrest and the aforementioned surges in firearm and ammunition sales. Each of these posed direct challenges to the Bureau, as APPS enforcement staff were required to assume responsibility for emergencies that were not part of their regular work profile.

During the pandemic, law enforcement staff have felt significant negative effects to mental health due to the additional stressors and uncertainty[2]. Despite extraordinarily demanding working conditions, the Bureau continued to work diligently to serve and protect the people of California.

## APPS Database Analysis

A comprehensive review of the APPS database reveals the following:

- In 2020, the Department removed 8,370 prohibited persons from the APPS database. At the same time, 10,762 prohibited persons were added to the APPS database. As of January 1, 2021, the APPS database had 23,598 armed and prohibited persons.

- The Bureau had between 32-35 Special Agents and between 13-14 Special Agent Supervisors working to address the ever-changing number of armed and prohibited individuals in 2020. Efforts to hire new sworn personnel continue to be thwarted by the difficult working conditions and lack of competitive compensation for Agents as compared to other state and local law enforcement agencies.

- As of January 1, 2020, 52 percent of prohibited individuals in the APPS database were prohibited due to a felony conviction, 22 percent were prohibited due to the Federal Brady Act, 20 percent were prohibited due to a restraining order, 19 percent were prohibited due to mental health triggering events, 10 percent were prohibited due to a misdemeanor conviction, and 6 percent were prohibited per the conditions of their probation. Persons can be prohibited under more than one category, which is why the total number exceeds 100 percent.

- In 2020, the Bureau recovered 1,243 firearms. Of these, 778 were firearms identified in the APPS database and 465 were non-APPS firearms[3].

- In 2020, the Bureau investigated approximately 5,322 individuals who were identified as armed and prohibited persons in the APPS database.

- The global COVID-19 pandemic impacted communities across the globe and directly affected APPS operations. The Bureau worked hard to adapt to daily changes and restrictions. APPS personnel disassociated approximately 79 fewer individuals every month COVID risk levels reached a "moderate risk" level or higher[4].

2       Police Stress, Mental Health, and Resiliency during the COVID-19 Pandemic. *Available at:* https://www.ncbi.nlm. nih.gov/pmc/articles/PMC7319488/

3       Firearms that were not known to be associated with but were in the possession of a prohibited individual.

4       Plan for Reducing COVID-19 and Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe. *Available at:* https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/COVID19CountyMonitoringOverview.aspx

Exhibit 1 - Jones Decl.
Page 005

- Due to limitations on traditional APPS enforcement, the Bureau explored using ammunition eligibility check denials as leads for enforcement and to assess the effectiveness of this approach. In 2020, there were 298 armed and prohibited individuals who attempted to purchase ammunition and were denied. Agents and Crime Analysts investigated and closed 73 of these denials. The remainder of the denials remain under investigation.

## Recommendations

After conducting an examination of the APPS program, the Department recommends the following steps to improve the removal of firearms from prohibited persons:

1. Fund the currently unfunded mandate that all California county courts confiscate or enforce the transfer or legal storage of known firearms from individuals at the time of conviction when an individual is prohibited due to a felony or qualifying misdemeanor.

2. Develop and fund a similar statewide county-level firearm confiscation system where firearms are confiscated from an individual at the time they are served with any type of restraining order. These firearms seizures must be documented in the Automated Firearms System (AFS) as required by existing law. These entries into AFS will prevent wasted and duplicative effort by DOJ and potentially other agencies.

3. Improve the recruitment and retention of Department sworn personnel by offering compensation that is competitive with other law enforcement agencies.

4. Improve existing coordination and cooperation with local law enforcement agencies through joint Task Forces with and under the direction of the Department. With additional funding, the Department could create new joint Task Forces with local law enforcement agencies. Improve local law enforcement reporting of firearms in their custody into AFS.

5. Continue with the modernization process of the existing firearms databases. Funding for Phase 1 of the modernization process has been secured. Phase 1 involves beginning the analysis of what will be required to create a comprehensive database that will automate many of the manual processes to improve overall efficiency, minimize risk, and stabilize employee resources. Once this initial analysis phase is complete, the Department will request additional resources to fund Phase 2, which will involve the implementation of the modernization project, through a BCP. The Department looks forward to continuing to work with the Governor and Legislature to fund the implementation of the modernization project.

6. Continue to partner with federal law enforcement agencies and engage with local law enforcement agencies to disarm individuals prohibited only due to Federal Brady Act.

The Department has been proactive and made efforts to implement four of the six recommendations outlined above. The Bureau has 1) expanded its recruitment efforts and begun hiring Special Agent Trainees, 2) worked diligently to create partnerships with local agencies, 3) worked to create partnerships with federal law enforcement agencies, and 4) secured the funding to begin the analysis phase of the firearms database modernization project. However, fully implementing the remaining recommendations will require legislative support and additional resources. Further explanation of these recommendations can be found on page 26.

Exhibit 1 - Jones Decl.
Page 006



# ANNUAL REPORT TO THE JOINT LEGISLATIVE BUDGET COMMITTEE

## *The APPS and Legislative Reporting Requirements*

This report presents a statistical summary of the APPS as mandated by SB 94 for the period of January – December 2020, as well as additional in-depth analysis of data through the history of the APPS. It also contains additional statistics to help provide context to the APPS — particularly in light of the unprecedented COVID-19 pandemic — and the workload that flows in and out of that system.[5]

California Penal Code section 30000 subdivision (a) requires the Department to maintain a "Prohibited Armed Persons File." This file is generated from a larger database known as the Armed and Prohibited Persons System that records all known firearms owners in the State of California and monitors various other data systems for prohibiting triggering events (PTE), such as a felony conviction or an active restraining order, to identify those persons within the system who are both armed and prohibited. The APPS program was mandated in 2001 (SB 950, Stat. 2001, ch. 944), then implemented in December 2006.

In 2013, the California Legislature passed SB 140, which appropriated $24 million dollars over a three-year period to the Department to address the growing number of records in the Armed and Prohibited Persons System. Additionally, SB 140 required the Department to submit annual reports detailing the progress made in reducing the backlog.

The APPS reporting provisions as outlined in SB 140 expired on March 1, 2019. In 2019, SB 94 was passed providing updated requirements regarding the mandated reporting of the APPS database statistics. Prior to the passing of SB 94, the Department communicated to the Department of Finance that it did not have the technological capability to report on the newly requested metrics and would need a BCP to begin the planning analysis necessary to develop a system that could. Regardless, the new provisions went into effect on June 27, 2019.

See Appendix B for additional legislative history relative to the APPS.

## *Overview of the Mandated Categories for Statistical Reporting*

Pursuant to Penal Code section 30012, no later than April 1, 2020, and no later than April 1 of each year thereafter, the California Legislature requires the Department to report annually to the Joint Legislative Budget Committee the following information for the immediately preceding calendar year:

(1) The total number of individuals in the Armed Prohibited Persons System (APPS) and the number of cases which are active and pending, as follows:

(A) (i) For active cases, the Department shall report the status of each case for which the department has initiated an investigation. This information shall include, at a minimum, the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system.

(ii) For purposes of this paragraph, "investigation" means any work conducted by sworn or

---

5        This report will use terms specific to the subject matter at hand. See Appendix A for the Relevant Key Terms and Definitions.

Exhibit 1 - Jones Decl.
Page 007

nonsworn staff to determine whether a prohibited person possesses one or more firearms, whether to remove the person from the database, or whether to shift the person to the pending caseload.

(B) For pending cases, the Department shall separately report the number of cases that are unable to be cleared, unable to be located, related to out-of-state individuals, related to only federal firearms prohibitions, and related to incarcerated individuals.

(2) The number of individuals added to the APPS database.

(3) The number of individuals removed from the APPS database, including a breakdown of the basis on which they were removed. At a minimum, this information shall separately report those cases that were removed because the individual is deceased, had prohibitions expire or removed, or had their cases resolved as a result of department firearm seizure activities.

(4) The degree to which the backlog in the APPS has been reduced or eliminated. For purposes of this section, "backlog" means the number of cases for which the department did not initiate an investigation within six months of the case being added to the APPS or has not completed investigatory work within six months of initiating an investigation on the case.

(5) The number of individuals in the APPS before and after the relevant reporting period, including a breakdown of why each individual in the APPS is prohibited from possessing a firearm.

(6) The number of agents and other staff hired for enforcement of the APPS.

(7) The number of firearms recovered due to enforcement of the APPS.

(8) The number of contacts made during the APPS enforcement efforts.

(9) Information regarding task forces or collaboration with local law enforcement on reducing the APPS file or backlog.

This report serves two functions: (1) it addresses the required reporting SB 94 mandate; and (2) it provides a comprehensive assessment of the APPS system, data, and Bureau enforcement activities.[6] The Department undertook this comprehensive assessment by: (1) analyzing historical information such as audit files of APPS data; (2) examining the APPS caseloads and workflow for the last calendar year; and (3) reviewing other administrative information.

## Overview of the APPS

The APPS database contains information on firearms either purchased or registered in California and the owners of those firearms. Consistent with legislative mandates, the database is the result of records and information originating in the Dealer Record of Sale (DROS) database and the AFS database. Combined, those records represent all individuals who purchased or transferred firearms legally and all known firearms associated with each individual.

Individuals are entered into APPS as soon as they legally purchase or acquire firearms. They are moved to the Armed and Prohibited File within the system if they become prohibited. Prohibited individuals are identified by daily manual queries of the databases that cross-reference the population of known firearms owners against individuals who may have had a PTE within the past 24 hours. New individuals

---

6       See Appendix C for a brief overview of the mandated statistical requirements.

Exhibit 1 - Jones Decl.
Page 008

are added daily, creating a constantly changing and growing dataset.

Armed and prohibited individuals, while the primary focus of the Department's enforcement efforts, are a subset representing less than one percent of the APPS database. As of January 1, 2021, there were 2,999,872 known firearm owners in APPS, of which 23,598 are prohibited from owning firearms in the Armed and Prohibited File. In order for the Department to identify those armed and prohibited individuals, the Department must first identify the armed population and then identify individuals who are also prohibited due to a triggering event.

From 2013 to 2020,[7] changing laws and regulations have introduced new offenses that prohibit firearm ownership, placing a growing number of individuals into APPS. Other factors such as ammunition eligibility checks, mandatory assault weapon registration and increased firearm sales have also contributed to the surge of identified prohibited individuals. Prohibitions may be due to a felony conviction, domestic violence conviction, one of forty-four other misdemeanor convictions, mental health-based prohibitions, various types of civil or criminal restraining orders, as well as other prohibitory categories. See Appendix D for firearm prohibiting categories.

Within the Armed and Prohibited Persons File, cases are separated into two broad categories of Active and Pending. Active cases are cases that have not yet been investigated or are in the process of being investigated but all investigative leads have not yet been exhausted. Pending investigations are investigations that have been thoroughly analyzed and all investigative leads have been exhausted; they are organized into the following sub-categories:

1.  Unable to clear: Cases that have been investigated by the Department's agents who have exhausted all investigative leads and remain unable to recover all firearms associated with the prohibited individual. If new information is identified, the case will be moved to active status.

2.  Unable to locate: Cases where the Department's agents have made at least three attempts to contact the individual but have not been able to locate them, even after exhausting all leads.

3.  Out-of-state: Cases where the Department's agents have determined that the prohibited person is no longer living in California.

4.  Federal Gun Control Act (Federal Brady Prohibition Only): Cases where a person is prohibited only under federal law; state, county and municipal law enforcement have no authority to enforce the federal only prohibition. Persons who have both a statewide and federal prohibition are not listed in this group.

5.  Incarcerated: Cases involving incarcerated individuals remain on the pending list, but the Department still tracks and monitors them. Once released, they are moved to active status.

The Department verifies new or updated information on all pending cases regularly. If any additional information becomes available on an APPS case in pending status (e.g., the firearm(s) associated with the APPS individual are located, records indicate a new address for the individual, or the individual is released from incarceration), the case is evaluated and transitioned back into the active status.

The current system includes 11 databases that do not communicate with one another or may only have one-way communication with another firearms database.[8] This requires a Crime Analyst to manually cross-reference records from one database to another while working to compile an individual package for investigation.

---

7       See Appendix B for a legislative history as related to APPS.
8       See Appendix D for a relational diagram of the Bureau's firearms databases.

Exhibit 1 - Jones Decl.
Page 009

Of the 11 databases, only five databases feed into the APPS for firearm association and prohibition determinations, these are:

1. The Automated Criminal History System (ACHS) established in 1971, the repository for state summary Criminal Offender Record Information (CORI).

2. The Wanted Persons System (WPS) established in 1971 as the first online system for the Department. It is a statewide computerized file of fugitives for whom arrest warrants have been issued.

3. The Automated Firearms System (AFS) created in 1980 to identify lost or stolen firearms and to associate firearms with individuals. It does that by tracking the serial number of every firearm owned by government agencies, handled by law enforcement (seized, destroyed, held in evidence, reported stolen, recovered), voluntarily recorded, or handled by a firearms dealer through transactions. Prior to 2014, most entries in AFS were handguns. Now, all newly acquired firearms, both handguns and long guns, are entered into AFS.

4. The California Restraining and Protective Order System (CARPOS), created in 1991, a statewide database of individuals subject to a restraining order. This system includes Domestic Violence Restraining Orders (DVRO), Gun Violence Restraining Orders (GVRO) as well as other types of restraining orders.

5. The Mental Health Reporting System (MHRS) established in 2012, a web-based application used by Mental Health Facilities, Superior Courts, Juvenile Courts, and Law Enforcement Agencies to report firearm prohibiting events (related to mental health) to the Department.

The APPS database is not an automated system that cross-references across all firearms databases; therefore, prior to creating a complete case package for investigation Crime Analysts must manually cross check multiple additional databases. As it stands, the system is extremely cumbersome to operate. When a user retrieves a single case, all information must be verified prior to action being taken by enforcement; that starts with confirming the individual's name, birthdate and driver's license number match across all systems. Then, using the Law Enforcement Agency Web (LEAWEB), the Crime Analyst will run a multiple query using the individual's driver's license number. LEAWEB is a California-unique database that queries some of California's databases like CARPOS, AFS, ACHS, MHRS, WPS and the Supervised Release Files, as well as the databases of the California Department of Motor Vehicles (DMV). Each case is highly variable, and the circumstances and information pertinent to each case will determine how a Crime Analyst conducts their research. For example, an individual can be prohibited under multiple categories; the prohibiting category determines which databases a Crime Analyst must use to verify the prohibition is still current and that the case is workable.

The complexity of the system can be seen even in the most straightforward of circumstances. In the case of an individual who has only one firearm and is only prohibited by one restraining order, the process would be as follows.

1. The analyst must confirm the restraining order is effective and that the individual was in fact served by either being present in court or was served by a processor.

2. Once this is verified, the analyst will try to pull the actual restraining order from an external database, the California Courts Protective Order Registry (CCPOR).

3. CCPOR is meant to be a centralized registry for restraining orders in California; unfortunately,

Exhibit 1 - Jones Decl.
Page 010

it has not been implemented across all county courts in the state. For these courts, the analyst must then contact the court directly to attempt to obtain a copy of the restraining order. Having an original copy can provide valuable additional information like confirming when, where and how the restraining order was served, the individual's last known address, and whether the individual has already surrendered their firearms.

4. Assuming the individual is still in possession of their firearm, the analyst must then pull descriptive information for all the firearms associated with the individual and run each individual serial number in AFS to confirm the individual is still associated with that firearm. The analyst may also have to establish there are no extenuating circumstances, such as the situation where the individual is not in possession with the firearm, but the databases do not reflect the change. This is sometimes caused by a keying error where the serial numbers are off by one, but all other information coincides. A keying error traditionally happens from data entry made by a firearms dealer, from the public via online reporting or law enforcement agencies that seize firearms.

5. In such circumstances, additional administrative work must be done by the Department to remove the association to that firearm from that individual.

6. Although LEAWEB does query the DMV, the query does not automatically pull an individual's ID photo or associated vehicles. To get that information, the Crime Analyst must perform additional, separate steps to pull relevant information, such as the most recently reported place of residence, from DMV registries.

7. Once all information is confirmed, and assuming the information supports investigative efforts, the package is then ready for agents to conduct enforcement actions.

As noted, this outlined process is for the simplest case possible with one prohibition and one firearm. Most cases involve additional factors such as additional firearms, prohibitions, combined federal and state prohibitions and/or criminal history, which make a case package much more difficult to compile.

The Department is supporting planning efforts for the Information Technology Firearms Modernization project that will replace and modernize the existing legacy infrastructure. While funding has been secured to begin Phase 1, which involves an analysis of the required work to complete the effort, future additional funding will be required to begin Phase 2, which will bring this project to fruition.

## Enforcement Teams

Each Bureau office has its own team of Special Agents for field operations. The Bureau also employs Crime Analysts in each of their six offices throughout the State.[9] The Crime Analysts access the APPS database daily and develop investigative packages of armed prohibited people for each team of agents to contact. Their jobs require crosschecking several databases to confirm addresses, photos, arrest records and status of APPS individuals, among other relevant information. Using their knowledge and expertise, they translate vast amounts of data into actionable information that allows the agents to do their investigations efficiently and effectively. The work is time intensive and requires great attention to detail as any error (typos, accidental variations, incorrect information, etc.) can lead to incorrect decisions or unnecessary investigative contacts. Modernizing the database system would allow for more accurate information in all reports and bolster success of operations by ensuring agents and other law enforcement partners are provided the most current information and not placed at unnecessary risk.

---

9       See Appendix E for a map of the various Bureau regional office jurisdictions

Exhibit 1 - Jones Decl.
Page 011

Using these investigative packages, Special Agents attempt to locate the firearm(s) associated with each APPS individual via consent search, probation or parole search, or a search warrant. Often, the APPS individual will be in possession of numerous firearms, many of which were not associated with that individual in the APPS database. This could be due to the APPS individual having long guns purchased by that individual prior to long gun requirements in 2014, firearms loaned to them by another person, firearms imported into California from another state, antique firearms, illegally purchased firearms, ghost guns[10] or stolen firearms.

Improving partnerships with local law enforcement agencies will help improve operation efficiency. Often agents contact an APPS individual only to find that local law enforcement has already seized the firearm(s) associated with that individual but failed to enter the seized firearm into AFS as required by law.[11] Entering that information would have removed the individual from the APPS database, allowing the Bureau's agents to focus on another case. Currently, the Bureau must reach out to the law enforcement agency to request they update AFS or ask for the police report in order to cross check the firearms seized and match the associated firearms in APPS. Unless that information matches and is verified, the individual cannot be removed from APPS. In 2020, 182 APPS investigations conducted by the Bureau involved firearms that were already in local law enforcement custody. The cost of such oversight cannot be recovered, resulting in duplicative efforts by the Bureau that reduce efficiency and waste resources. The Department's proposed plan to increase collaboration would help ensure the timely and accurate input of data by local law enforcement in statewide data systems.

Successful models of operations with local law enforcement have been a force multiplier for this program. For instance, the Contra Costa County Anti-Violence Support Effort Task Force (CASE) model, a collaboration between various state, local, and federal agencies conducted 52 firearms related cases and confiscated 97 firearms, 32 of which were APPS firearms.[12] As outlined in the recommendations, the Department wants to encourage these types of collaborative partnership operations and relationships with local agencies. Additional funding would allow the Department to expand on this work. The Department has seen how working with local law enforcement officers allows the Bureau's agents to conduct more operations and remove additional firearms from prohibited persons more efficiently. The Department is willing and ready to work with the legislature and our partners in local law enforcement to replicate that success across the state.

In an effort to increase these types of successful collaborative efforts, in December 2020, the Bureau established management and supervision of the Tulare County Agencies Regional Gun Violence Enforcement Team also known as the TARGET Task Force. This is a recent addition to the Bureau task force model and supports the value established through previous task force efforts, including the aforementioned CASE Task Force. Due to its recent launch, the 2020 APPS program numbers do not reflect the benefits of the TARGET taskforce, however the Bureau expects to report on the task force's APPS related statistics in future reports.

---

10      Ghost guns are firearms made by an individual, without serial numbers or other identifying markings. **Without a serial number, law enforcement cannot run a trace search on the firearm and the firearm does not have the legal requirements.**
11      Penal Code Section 11108.2 and 11108.3
12      For more on the CASE task force, refer to page 22

Exhibit 1 - Jones Decl.
Page 012

## *Mandated Statistics and Analysis*

Senate Bill 94 mandates the reporting of specific statistics for each calendar year. With 2020 being an unusual year due to the COVID-19 pandemic, any inferences compared to previous years should be made with caution. The mandated statistics for the current report are the following:

### The total number of individuals in the APPS

As of January 1, 2021, the APPS has 2,999,872 individuals of which 23,598 are armed and prohibited from possessing firearms.

### Breakdown on the status of active APPS cases

Active cases are individuals who are believed to reside in the state of California and are prohibited from owning a firearm in the state for one or more reasons. As outlined above, the statutory mandate described in Penal Code section 30012(a)(1)(A)(i) requires the Department to report on the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system. As stated previously, the Department alerted the Department of Finance it would be unable to provide these metrics without the necessary funding to update the current firearms databases.

### Status of the backlog

As discussed above, SB 94 defined the backlog as being cases for which the Department did not initiate an investigation within six months of the case being added to the APPS or for which it has not completed investigatory work within six months of initiating an investigation on the case. Once the Department receives full funding to complete the firearms modernization project, the new system will be better able to accommodate reporting on the status of the backlog.

### Breakdown of cases in the APPS database

As of January 1, 2021, the APPS has 2,999,872 individuals of which 23,598 are armed and prohibited from possessing firearms. This latter figure is further subcategorized into active and pending cases. Active cases are those for which the Department has not yet begun investigations or is in the process of investigating but has not yet exhausted all investigative leads. Pending investigations are those investigations that the Department has thoroughly analyzed and exhausted all investigative leads or determined that the person is not within the Department's jurisdiction. As of January 1, 2021, the system has 9,083 active cases and 14,515 pending cases. In addition to the pending category, there are 1,218 incarcerated people in APPS, who while technically pending represent a unique population and are thus counted separately.

Figure 1 shows the number of prohibited people in APPS each year. The number of prohibited people has generally increased since 2015 despite a small decrease during 2019. The reason for this increase is possibly due to the constant addition of new prohibited people despite efforts by APPS Agents to clear cases and the impact of the COVID-19 pandemic that hindered Bureau of Firearms Agents' enforcement efforts.

Exhibit 1 - Jones Decl.
Page 013

*Figure 1. The number of prohibited people in APPS as of January 1 each year*[13]



### Breakdown of pending APPS cases

Prohibited individuals in APPS may be assigned a "pending" status for one of four reasons: (1) the prohibited person has been investigated and all leads exhausted but agents have been unable to disassociate the individual from all known firearms (Unable to Clear); (2) the prohibited individual has moved and did not notify the Department of Motor Vehicles (Unable to Locate); (3) the prohibited individual has moved out of California (Out of State); or (4) the prohibited individual is prohibited due to federal prohibitions alone and the Bureau does not have the jurisdiction to investigate them (Federal Prohibition Only). Of the 14,515 pending cases, 6,955 (48%) were unable to be cleared, 2,215 (15%) were unable to be located, 3,859 (27%) moved out of state, and 1,486 (10%) were prohibited under federal prohibitions only (Figure 2).

---

13      This number excludes the individuals who are known to own firearms and are prohibited but are also known to be incarcerated for six months or more. While incarcerated individuals are technically in the pending category, it is assumed that they are not in possession of firearms while in custody and are therefore treated as a separate population. The Bureau receives state prison incarceration statuses nightly and individuals released from state custody are moved into the active caseload for the APPS enforcement team.

Exhibit 1 - Jones Decl.
Page 014

*Figure 2. Pending APPS cases separated by category as of January 1, 2021*



In 2020, 8,370 armed and prohibited people were removed from the APPS database. Removals from the armed and prohibited persons list occur for three reasons:

1. **Prohibition expires**: The prohibited person has their prohibition expire including the expiration of restraining orders, certain misdemeanor convictions, and mental health prohibitions after 5 years, after which time the individual is no longer prohibited.

2. **Disassociation from all known firearms**: The prohibited person has all of their known firearms disassociated from them, meaning that each firearm attributed to them within the APPS system has been accounted for by the Bureau and disassociated from the prohibited person.

3. **Deceased**: The prohibited person is deceased.

Table 1 reports the number of individuals removed from the APPS, separated by category.

*Table 1. Individual removed from APPS in 2020 separated by reasons for removal*

| Reason for Removal | Number of Individuals Removed |
|---|---|
| Prohibition expired/no longer prohibited | 5,291 |
| Disassociated from all known firearms | 2,822 |
| Deceased | 257 |

In instances where the Bureau is unable to locate the prohibited person or disassociate all known firearms, despite having exhausted all leads, the Bureau cannot remove the individual from APPS and must instead assign them to the pending category. Despite Bureau efforts, this often results from the inherent difficulty of confiscating firearms from individuals who are unwilling to surrender their firearms regardless of their prohibited status.

Exhibit 1 - Jones Decl.
Page 015

Of the 8,370 prohibited people removed from APPS this year, 2,822 removals were the result of enforcement efforts[14] – 1,393 fewer removals compared to 2019. The 2019 APPS report stated that 1,927 removals occurred in 2019. Yet, in reviewing the analyses from the 2019 report, the reports used to calculate the number of removals routinely undercounted the actual number of removals. The Department re-examined the analyses and found that the error was restricted to 2019 and developed a new, more accurate, method of determining the number of removals from APPS[15]. Using this new method of analysis 4,215 prohibited people were removed from the APPS list due to enforcement efforts in 2019. The reduction in removals from 2019 to 2020 can largely be attributed to the COVID-19 pandemic that impacted APPS Agents' enforcement efforts for most of the year. This is evident as January through March had the most removals in 2020, this was just prior to realizing the pandemic. This pattern of removals contrasts with 2019 and 2018 in which the most removals occurred in August to October.

*Figure 3. The yearly additions and removals from the APPS list as of January 1, 2021*



| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Removals | 5,433 | 5,748 | 5,347 | 5,708 | 6,459 | 8,130 | 8,937 | 9,470 | 9,424 | 10,681 | 10,064 | 8,370 |
| Additions | 8,647 | 7,095 | 6,087 | 6,470 | 7,938 | 7,371 | 8,930 | 10,413 | 10,572 | 11,333 | 9,266 | 10,762 |

Fewer removals were reported in 2020 compared to 2019 partially due to the Bureau's improved method for tracking and counting prohibited individuals and also due to limitation driven by COVID-19. In prior reports, the Bureau included every time a person's prohibition expired in the "no longer prohibited" count of individuals removed from APPS. However, counting each expiration inflated the reported number of "no longer prohibited" individuals because a person may become non-prohibited multiple times in a single year[16]. The Bureau refined their method of calculating "no longer prohibited"

14      Note that not all 2,822 individuals who were disassociated from their firearms resulted in firearm seizures by the Bureau. In some cases, Bureau investigations determined that local law enforcement agencies already seized the firearms but failed to record the recovery, the individual attempted to report the firearm lost/stolen, or the individual is in the process of lawfully selling or gifting the firearm to a friend or relative. For a breakdown of prohibition categories as a percentage of prohibited people see Figure 5 below.

15      People who become deceased or disassociated from all firearms are removed from the APPS database after 15 days. After that time, records of these individual can only be found in the audit files that catalogue all changes to the database. The prior method calculated the number of deceased people or people with no weapons every month using the APPS database, which did not account for people who had already been removed. The new method uses the audit files for a complete and accurate count of people.

16      There are various situations that may cause an individual to fall in and out of the APPS prohibited status. Examples include individuals that may become prohibited due to a warrant and then non-prohibited once they are arrested for

Exhibit 1 - Jones Decl.
Page 016

people in 2020 to only include a prohibited person whose prohibition expired in 2020 and who was non-prohibited on January 1, 2021.

The Armed and Prohibited Persons System is a highly dynamic database and newly armed and prohibited people continue to be added as many others are removed.

### The number of people in the APPS before and after the relevant reporting period

The relevant reporting period runs from January 1, 2020 through December 31, 2020. The Armed and Prohibited Persons System is a compiled list of all individuals who legally purchased or were transferred a firearm in California. It further categorizes individuals as either persons armed but not prohibited, armed and prohibited, and incarcerated and known to have possessed a firearm prior to incarceration. To account for late additions or removals from the system, the state of the APPS database is analyzed as of 1:00 AM January 1, 2021. At that time, the APPS database system contained 2,999,872 individuals, including 2,975,056 armed and not prohibited individuals, 1,218 incarcerated individuals, and 23,598 armed and prohibited individuals.

The number of people in the APPS database has increased 388,973 from the 2,610,899 people in the APPS as of January 1, 2020. While in line with the consistent growth in the APPS database since 2008, 2020 had roughly twice the yearly average increase since 2016. Despite the state having some of the nation's toughest firearm laws, the number of firearms owners has continuously increased in last ten years (Figure 4).

*Figure 4. The total number of people in APPS per year*



the warrant. In other cases, an individual may become prohibited due to an Emergency Protective Order, then a Temporary Restraining Order, and then a normal DVRO.  Each of the three orders would cause a PTE. As these orders expire or the judge in the case approves the next order in the series, it may result with three PTEs on one individual. Depending on the length of the prohibition, an individual may begin the month with three PTEs and end the month with only one PTE under their name. Similar variables can result from temporary GVROs, which last a few weeks, and "permanent" GVROs, which can last between one to five years.

Exhibit 1 - Jones Decl.
Page 017

**Number of Agents and other staff hired for enforcement of the APPS**

As of January 2020, the Bureau had 71 authorized permanent Special Agent Trainee, Special Agent, and Special Agent Supervisor positions with 45 filled and 26 vacant. By December 2020, the number of authorized positions was 75 with 50 filled and 25 vacant. As Table 2 shows, the number of filled and vacant positions fluctuates throughout the year reflecting the quick turnover rate of these positions. This reflects the Department's challenges in hiring and retaining agents despite having the authorized positions to fill. The Bureau has begun actively recruiting Special Agent Trainees due to challenges in recruitment for Special Agent and Special Agent Supervisor positions. And while this approach may ultimately benefit the Bureau by increasing the total number of Special Agents, it is disadvantageous in the short term due to the time and resources it takes to educate and train a Special Agent Trainee to perform at the level of a Special Agent.

In December 2020, the Bureau had 32 filled Special Agent positions (not including Special Agent trainees. In 2020, the Bureau hired 10 Special Agents and two Special Agent Trainees. Nine sworn personnel left the Bureau due to inter-departmental transfers and/or retirement, and three Special Agents promoted from within to Special Agent Supervisor positions. The fluctuation in Special Agent staffing levels due to transfer, promotion, and retirement affected the quantity of agents that were able to complete 2020 APPS enforcement investigations, continuing a trend of shifting levels of staffing with a greater workload that continues to accumulate.

*Table 2: Bureau of Firearms authorized positions for the relevant reporting period[17]*

| Bureau Positions | 1/1/2020 | | | 7/1/2020 | | | 1/1/2021 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filled | Vacant | Total authorized | Filled | Vacant | Total Authorized | Filled | Vacant | Total authorized |
| Special Agent | 32 | 25 | 57 | 35 | 22 | 57 | 33 | 22 | 55 |
| Special Agent Supervisor | 13 | 1 | 14 | 14 | 0 | 14 | 13 | 2 | 15 |
| Special Agent-in-Charge | 3 | 0 | 3 | 3 | 0 | 3 | 2 | 1 | 3 |
| Special Agent Trainee | 0 | 1 | 2 | 0 | 0 | 0 | 2 | 0 | 2 |
| **Total** | **45** | **26** | **71** | **52** | **22** | **74** | **50** | **25** | **75** |

The Bureau will continue to face challenges in recruiting Special Agents as long as its compensation is not competitive with compensation packages offered by other law enforcement agencies. Until additional funding is provided to increase salaries to competitive levels as illustrated in recommendation three, the Bureau can expect to continue to face challenges in recruitment and retention of agents for the Department's currently authorized positions.

---

17       From July 1, 2020 to January 1, 2021, there was a decrease of two authorized Special Agent positions because these were reclassified as Special Agent Supervisor and Special Agent Trainee positions. There was an increase of one in the authorized Special Agent Supervisor positions because of a position transfer from the Bureau of Investigations to the Bureau of Firearms.

Exhibit 1 - Jones Decl.
Page 018

A number of enforcement support staff assist Special Agents; these individuals are a significant asset to the Bureau. In 2020, the Bureau hired three enforcement support staff and saw two enforcement support staff separate from the Bureau for a net change of one.

## Number of contacts made during APPS enforcement efforts

The Bureau's agents and Crime Analyst are continuously working to research and develop viable APPS investigations to determine which leads will potentially provide the greatest possible number of positive results. Cases are pursued until all investigative leads are exhausted. Individuals are then either (1) disassociated from all of their firearms and removed from the APPS database or (2) moved to the pending category due to the existence of no further leads and are labeled "unable to clear".

During the course of an investigation, APPS agents may need to make repeated contacts with a prohibited individual in order to close a case. These repeated contacts occur because the APPS individual may (1) not be home at the time of the initial contact; (2) have moved and failed to update their address with the Department of Motor Vehicles; (3) have moved out of state; (4) claim the firearm(s) was already seized by local law enforcement or has been reported as lost or stolen; (5) be uncooperative and not forthcoming with information about the firearm(s), requiring further interviews and contacts; (6) claim to have given their firearm(s) to another person outside of the legal firearms transfer process, requiring agents to track down the firearm(s) and/or verify the provided information. However, due to extenuating circumstances brought on by the COVID-19 pandemic, the normal door-to-door protocol was shifted to minimize the potential risk of exposure by reducing points of contact.

In total, agents made nearly 16,000 contacts in 2020. With 33 APPS agents (not including supervisors), that represents an average of 40 contacts per month per agent. Overall, the monthly average number of contacts in 2020 is consistent with the number of contacts per month as in 2019. The consistent number of contacts is encouraging considering that COVID-19 greatly impacted enforcement efforts throughout the year. As in previous years, agents required an average of three separate contacts consisting of in-person interviews in order to close one APPS case.

Special Agent Supervisors are not included in these calculations because, although supervisors are involved in all field operations, their work focuses on being vigilant and available to make quick decisions for the safety of the team. In the course of an investigation, Special Agents take the lead on investigations and contacts to the APPS individual. Supervisors ensure the team adheres to Department policy, follows officer safety protocols, and uses proper investigative methods, so no violations of constitutional rights occur in the course of the investigation.

## Breakdown of why each person in the APPS is prohibited from possession of a firearm

Persons become prohibited in the APPS for several reasons. The following categories cover the types of events that can trigger a firearm prohibition.

- An individual may become prohibited under the Federal Brady Handgun Violence Prevention Act. Note, some individuals prohibited because of the Brady Act may not be prohibited under California State law (e.g., a dishonorable discharge in the military).

- An individual may be prohibited from owning a firearm as a condition of their probation.

- Individuals with felony convictions are prohibited from owning firearms.

- A juvenile who becomes a ward of the court may be prohibited.

Exhibit 1 - Jones Decl.
Page 019

- Mental health crises involving involuntary commitment may trigger a temporary prohibition.

- Some misdemeanor convictions may prohibit owning a firearm.

- Individuals may be temporarily prohibited due to restraining orders.

- Individuals may be temporarily prohibited due to a felony warrant.

- Individuals may be temporarily prohibited due to a misdemeanor warrant.

- Individuals may be prohibited due to offenses or triggering events occurring in other states.

***Reasons for new entry into APPS***

Many individuals are prohibited under several categories (Figure 5). As of January 1, 2021; there were 12,931 (52%) people prohibited due to a felony conviction, 5,126 (22%) prohibited due to the Federal Brady Act[18], 4,590 (20%) were prohibited due to restraining orders, 4,412 (19%) due to mental health prohibitions, 2,395 (10%) due to a misdemeanor conviction, 1,469 (6%) due to terms of their probation, 668 (3%) due to a felony warrant, 223 (3%) due to misdemeanor warrants, 16 (<1%) due to juvenile prohibitions, and 60 (<1%) due to other reasons[19].

*Figure 5. Prohibition categories as a percentage of prohibited people[20]*



These categories are largely consistent with 2019. Overall, federal and felony prohibitions saw the greatest change, both accounting for 2% fewer prohibition reasons in 2020 than in 2019. Probation and Misdemeanor Convictions fell 1% compared to 2019. Mental Health, and DVROs accounted for 1% more reasons than 2019. See Figure 6 for a complete comparison.

---

18      This figure includes individuals who may be prohibited under more than one category, including a Federal Brady prohibition. These are not solely Federal Brady only cases.
19      See Appendix E for a list of Prohibiting Triggering Events causing firearms prohibitions.
20      Many cases have more than one prohibition, so the numbers do not equal 100 percent.

Exhibit 1 - Jones Decl.
Page 020

*Figure 6. Prohibition categories as a percentage of prohibited people in 2020 and 2019*



## Number of firearms recovered

In 2020, the Bureau's Special Agents seized 778 APPS firearms, and 465 non-APPS firearms. See Figures 7 and 8 for a breakdown on the type of APPS and non-APPS firearms recovered. Non-APPS firearms refers to firearms that were not listed as being possessed by an APPS individual but are confiscated from APPS individuals by the Bureau's agents during investigations. Together, APPS and non-APPS firearms resulted in 1,243 total firearm seizures (Figure 9). Special Agents closed 5,322 APPS investigations due to enforcement efforts in 2020[21]. This number does not reflect the number of times Agents attempted to locate an APPS individual or had to visit third-party residences; it only captures the total number of closed cases[22]. The following graphs detail the number of firearms seized due to APPS enforcement in 2020, categorized by the type of firearms seized.

*Figure 7. APPS firearms seized in 2020*



---

21       Cases closed are not removed from the APPS. They remain in APPS in the "Pending" category.
22       Cases can also be closed when 1) agents or criminal analysts find the individual is deceased, 2) the individual has moved out of state and out of the Departments jurisdiction, 3) a criminal analyst corrects a data discrepancy, and the individual is cleared.

Exhibit 1 - Jones Decl.
Page 021

*Figure 8. Non-APPS firearms seized in 2020*



*Figure 9. The 1,243 firearms seized in 2020 separated by APPS type*



### Number of ghost guns recovered

Ghost guns, firearms constructed by private citizens, do not have a serial number, which means they are not registered and cannot be tracked by APPS or law enforcement. The Bureau's agents seized a total of 27 ghost guns in 2020, a 33 percent decrease in ghost gun seizures compared to the 41 ghost guns seized during 2019 APPS investigations. The reduced number of seized ghost guns compared to 2019 is to be expected considering the overall reduction in cases closed and firearms seized in 2020 as a result of the COVID-19 pandemic.

### Ammunition recovered

In 2020, Bureau Agents recovered 340 large capacity magazines, 1,403 standard capacity magazines and 283,562 rounds of ammunition.

Exhibit 1 - Jones Decl.
Page 022

*Ammunition purchase eligibility check program*

Proposition 63 (The Safety for All Act), as amended by Senate Bill (SB) 1235 (stats. 2016, ch. 55), was approved by voters in 2016. The intent of Prop 63 and SB 1235 was primarily to keep prohibited persons from acquiring ammunition in an effort to prevent gun violence. Under the new laws, ammunition must be purchased from or transferred by a California Ammunition Vendor in a face-to-face transaction. Effective July 1, 2019, the law required California Ammunition Vendors to submit eligibility checks for prospective purchasers to the BOF and obtain approval prior to selling or transferring ammunition. Thereafter, ammunition vendors are required to submit ammunition purchase details to the BOF. The eligibility checks ensure purchasers are not prohibited from owning or possessing ammunition due to a felony and/or violent misdemeanor conviction/warrant, domestic violence restraining order, or mental health issue.

On July 1, 2019, the BOF successfully deployed enhancements to the Dealer Record of Sale (DROS) Entry System, which allowed ammunition vendors to submit eligibility checks, and subsequently report ammunition purchases in compliance with Proposition 63.

In 2020, there were 298 armed and prohibited individuals who attempted to purchase ammunition and were denied through the ammunition eligibility check process. Bureau Agents used the intelligence garnered through the ammunition purchase denials to investigate and close 73 of these cases. These investigations resulted in the seizure of 65 APPS firearms (five assault weapons, 33 handguns, one receiver/frame only, 12 rifles, and 14 shotguns), 31 non-APPS firearms (one assault weapon, six ghost guns, eight handguns, four receivers/frames only, five rifles, and seven shotguns), 47 large capacity magazines, 114 standard magazines, and 41,325 rounds of ammunition. The remainder of the denial cases remain under investigation. All seizures resulting from these ammunition purchase eligibility check denials are included in the overall APPS statistics provided in *Number of firearms recovered* section of this report.

## Task Forces and collaboration with local law enforcement

As discussed in recommendation four, these are the types of programs the Bureau would like to expand. Receiving additional funding to reimburse local law enforcement agencies working with the Bureau in coordinated APPS enforcement activities would make this work possible.

### *Contra Costa County Anti-Violence Support Effort Task Force*

The Bureau currently manages the Contra Costa County Anti-Violence Support Effort (CASE) Task Force, whose primary mission is conducting complex firearms investigations and disarming prohibited, violent individuals in Contra Costa County. This Task Force consists of representatives from the following agencies:

- California Department of Justice, Bureau of Firearms

- Contra Costa County Sheriff's Department

- Contra Costa County Probation Department

- Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives

- Pittsburg Police Department

- California Highway Patrol

Exhibit 1 - Jones Decl.
Page 023

The CASE Task Force is a stand-alone task force with a broader overall mission. In 2020, it conducted 52 firearms related cases, including 24 probation/parole searches, eight search warrants, seven search warrant assists to local agencies and six APPS investigations. As a result of these investigations, the CASE Task Force arrested three armed and prohibited individuals for firearms-related offenses and seized 97 firearms, 32 of which were APPS firearms (four assault weapons, 11 handguns, and 17 rifle/ shotguns). The seizure of these 32 APPS firearms is reported with the overall APPS statistics. The 65 firearms seized during non-APPS investigations are not included in seizure totals for this report. Because not all gun crime in any county is committed by people in APPS, this task force focuses on investigating a broad range of subjects involved in firearms related crimes — including those in APPS. This is an excellent model for collaboration with local law enforcement agencies on both APPS and non-APPS related firearms investigations and affords a proactive approach to combating firearm violence. With additional funding, the Bureau would be able to replicate this model in strategic areas of the state.

***Tulare County Agencies Regional Gun Violence Enforcement Team***

In December 2020, the Bureau assumed management of the Tulare County Agencies Regional Gun Violence Enforcement Team also known as the TARGET Taskforce. Due to funding issues, management of this Task Force was taken over from the Department's Bureau of Investigation. The primary mission mirrors that of the CASE Task Force as the team is designed to investigate crimes involving gun violence and weapons violations and disarming prohibited, violent individuals in the Tulare County region. Through this task force, the Bureau has increased collaborative efforts and support of local law enforcement in the region. This Task Force consists of representative from the following agencies:

- California Department of Corrections and Rehabilitation
- California Department of Justice, Bureau of Firearms
- California Highway Patrol
- Tulare County Sheriff's Department
- Visalia Police Department

***Joint sweep investigations***

In addition to participating in the CASE Task Force and TARGET Task Force, the Bureau also conducts APPS sweeps on a regular basis throughout the state. These sweeps consist of Bureau personnel working together with allied law enforcement agencies in a certain region of the state for a period of several days or weeks conducting APPS investigations. However, because of the pandemic, these efforts were stymied as law enforcement across the state were forced to re-focus efforts accordingly.

The Bureau worked jointly with the following agencies on 2020 APPS investigations:

- Amador County Sheriff's Department
- California Highway Patrol
- California Department of Corrections

Exhibit 1 - Jones Decl.
Page 024

- Citrus Heights Police Department

- Clearlake Police Department

- Contra Costa County Probation Department

- Contra Costa Sheriff's Department

- Crescent City Police Department

- Fairfield Police Department

- Federal Bureau of Alcohol, Tobacco, Firearms and Explosives

- Lake County Sheriff's Department

- Long Beach Police Department

- Los Angeles County Sheriff's Department

- Nevada County Probation Department

- Nevada County Sheriff's Department

- Ontario Police Department

- Pasadena Police Department

- Pittsburg Police Department

- Placer County Probation Department

- Placer County Sheriff's Department

- Rialto Police Department

- Redlands Police Department

- Riverside Police Department

- Riverside County Sherriff's Department

- Roseville Police Department

- Sacramento County Sheriff's Department

- Sacramento Police Department

- San Bernardino County Sheriff's Department

- San Diego County Sheriff's Department

Exhibit 1 - Jones Decl.
Page 025

- San Joaquin County Sheriff's Department

- Shasta County Sheriff's Department

- Stockton Police Department

- Trinity County Sheriff's Department

- Yolo County Probation Department

This option of working collaboratively with local enforcement agencies could be enhanced and expanded with an appropriation of local assistance funding to reimburse participating agencies as outlined in recommendation four.

***Gun Violence Prevention Programs***

This program has been the most challenging to implement due to the complex nature of APPS data and investigations. Assembly Bill (AB) 74 provided grant funding to the Board of State and Community Corrections (BSCC) for Gun Violence Prevention Programs. In 2019, funds were disbursed by the BSCC to four counties; Alameda, San Diego, Santa Cruz and Ventura, to be allotted and spent over several fiscal years. San Diego and Alameda County each received $1 million and Ventura and Santa Cruz County received $750,000 and $250,000, respectively. Each county was also provided with the APPS list of armed and prohibited individuals and was assisted by the Bureau upon request. As of the publication of this report, San Diego County Sheriff's Office was the only agency that requested Bureau assistance for APPS investigations.

Pursuant to the statute, each of the participating agencies is required to provide data to the Department regarding APPS enforcement efforts. The Bureau has collected data from these four counties regarding the APPS related investigations they have completed in 2020 with the funding provided. The Bureau submitted a written request outlining the specific data required to ensure validation. As of the publication of this report, the Bureau received the following:

- San Diego County reported it conducted 79 independent APPS investigations resulting in the seizure of 28 firearms.

- Alameda County reported it conducted 89 independent APPS investigations resulting in the seizure of 23 firearms.

- Ventura County reported it made contact with 84 APPS individuals resulting in 43 firearms seized.

- Santa Cruz County reported 108 prohibited individuals resided in Santa Cruz County as of 1/1/20 and 151 as of 1/1/21. It further reported that 50 individuals were removed from APPS, with 49 being disassociated from all known firearms and one removed due to being deceased. Additionally, 17 prohibited individuals moved within Santa Cruz County, and 36 prohibited individuals who are "pending" in APPS reside in the county. The method in which Santa Cruz submitted this information did not allow for the Bureau to fully interpret or validate the data.

Additionally, the Department ran its own analysis on the APPS figures for these four counties.

Exhibit 1 - Jones Decl.
Page 026

The analysis found that there was an overall reduction of prohibited individuals in the four counties between 1/1/2020 and 1/1/2021 as illustrated in Figure 10. However these numbers do not discern whether the individual was no longer armed, no longer prohibited, deceased, or had moved out of the county.

*Figure 10. Prohibited individuals as of 1/1/2020 and 1/1/2021 by county*



Along with this analysis, the Bureau found discrepancies in the data submitted by all counties during validation and identified a need to implement a standardized process for reporting APPS data to the Department. This is particularly important when participating agencies find an individual has moved out of their county/jurisdiction, because participating counties have jurisdictional limitations whereas Department agents do not. In order for the Bureau to be able to cross reference the data, it must receive complete and accurate information in the manner that it was requested.  Accurate tracking of prohibited individuals is the foundation of the APPS enforcement process.

In an effort to codify and ensure collaboration between the Bureau and the participating counties in investigating and apprehending APPS subjects, the Bureau attempted to establish a memorandum of understanding (MOU) with each of the participating county Sheriff's Departments. Based on this process the only participating agency that has agreed to the MOU is the San Diego County Sheriff's Department.

## Supplemental analysis: Impact of COVID-19 on APPS cases

To investigate the potential impacts of the COVID-19 pandemic, the Bureau examined the number of prohibited people who were disassociated from all known firearms in 2020 compared to the four previous years while accounting for new COVID-19 cases and changing risk levels each month. The COVID-19 cases were defined as new cases per 100,000 people, and risk levels were defined by the California Department of Public Health as the average risk level (e.g., orange, red, purple) for the month[23].

The results of the analysis showed that APPS firearm removals were hindered by increasing COVID-19 risk levels. Every month the COVID-19 risk level was moderate or higher, APPS personnel were able to disassociate an estimated average of 79 fewer people per month from all their known firearms as

23        https://covid19.ca.gov/safer-economy/

Exhibit 1 - Jones Decl.
Page 027

compared to months in which the COVID-19 risk level was low or non-existent. Estimates varied from month to month, with as many as 128 fewer people or as few as 30 fewer people disassociated from their firearms due to APPS efforts per month. The per capita number of new COVID-19 cases did not appear to influence the number of prohibited people APPS Agents were able to disassociate from their firearms.

This analysis does not differentiate between cases closed by Crime Analysts, who review APPS records and find people who have been disassociated from firearms or can be designated as a pending cases, and those closed by field Agents. As field Agents are required to contact multiple people in-person and be exposed to COVID-19 with much greater regularity, it is reasonable to anticipate that Agent closures were more impacted than analyst closures, and accounting for that difference would show even greater effects due to COVID-19. Additionally, this analysis only examined prohibited individuals disassociated from all known firearms by APPS Agents and does not include cases that were moved to a pending status.

The continued effects of the COVID-19 pandemic remain to be seen; this analysis is only intended to provide a metric by which to gauge the effect of COVID-19 on workload metrics throughout 2020.

## Recommendations

The Department greatly appreciates Governor Gavin Newsom's and the Legislature's interest in sensible firearms regulation and enforcement, and additional financial support toward this effort. As noted throughout this report, the recommendations the Department proposes would help to not only report the mandated information, but also improve the efficiency and efficacy of the APPS program. To that end, the Department recommends the following:

1. Fund all California county courts to confiscate or enforce the transfer or legal storage of known firearms at the time of conviction when an individual is prohibited due to a felony or qualifying misdemeanor. Pursuant to Proposition 63 (2016), focus on obtaining firearms from armed and prohibited persons on the front-end of the process rather than at the end of the process. When an individual's conviction for a crime renders them prohibited, they are supposed to be notified at the time of conviction that they are prohibited from owning and possessing any firearms as well as how to turn over any firearms they have in their possession. This is the best opportunity to ensure prohibited persons are being disarmed. Felons and persons prohibited from possessing firearms by Penal Code section 29805 listed misdemeanors account for 59 percent of the APPS database, or 14,196 individuals. Given that the number of individuals prohibited due to a felony conviction has increased by 2,150 from last year suggests that relinquishment regulations are not being effectively implemented. A thorough court-based relinquishment program at the County level would aid in drastically reducing future APPS numbers.

2. Develop and fund a similar county-level firearm confiscation system where firearms are confiscated from the individual at the time they are served with the restraining order(s).

3. Currently, all individuals who are served restraining orders and are in possession of a firearm at the time they are served, end up in the APPS unless they are pursued and disarmed by local law enforcement agencies. If local law enforcement could disarm these individuals upon service of the various types of restraining orders, it could limit new additions to the armed and prohibited population in the APPS by up to 19 percent.

4. Improve the recruitment and retention of Special Agents by making their compensation competitive with other law enforcement agencies. Unlike many other law enforcement agencies, the Department's Special Agents are required to have a college education. However, entry-level

Exhibit 1 - Jones Decl.
Page 028

Agents are paid less than those in law enforcement agencies that do not have this same requirement. Seizing firearms from prohibited persons is dangerous and difficult work that requires quick decisions and analytical thinking. The agents who do this work should be competitively compensated for their efforts. The Department has moved to a more aggressive hiring model in an attempt at filling Special Agent and Special Agent Supervisor positions at a quicker rate to fill vacancies and keep pace with agent attrition. However, receiving additional funding and contracting for salary increases would greatly improve recruitment and retention of agents for the Department's currently authorized positions.

5. Continue to improve coordination and cooperation with local law enforcement agencies by establishing joint Task Forces with and under the direction of the Bureau. To expand and improve the existing programs requires additional funding, which the Department would manage. Funds would be managed and disbursed for the purpose of reimbursing local agency overtime for working with the Bureau on the APPS workload. Reimbursement would go toward personnel time and other applicable expenses incurred as a direct result of the involved agency's participation in the joint operations through the execution of an MOU with the Bureau. Additionally, the participating agencies would be required to report all data in a manner prescribed by the Department related to the seizure of firearms, ammunition, arrests, and all other information relevant to maintain adequate accountability of the APPS database. The agreement would also include administrative assistance efforts to help identify and reduce APPS firearms in locally managed evidence systems. All participating agencies would be required to assess firearms in their possession and develop a plan approved by the Bureau to ensure all the required entries into the Automated Firearms System are made in accordance with current state law. This would be a force multiplier for the Bureau that would ensure a statewide coordinated effort and maintain recordkeeping standards to ensure that the data in APPS is as current as possible.

6. Modernize the existing firearms databases and automate many of the manual processes to improve overall efficiency, risk mitigation, and stabilization of employee resources. As communicated to the Department of Finance when the Legislature implemented the current reporting requirements, the Department cannot fulfill this obligation until it modernizes the firearms databases. Such an undertaking requires substantial additional funding.

The following systems support the regulation, and enforcement actions relating to the manufacture, sale, ownership, safety training and transfer of firearms.

- Armed Prohibited Persons System (APPS)

- Automated Firearms System (AFS)

- California Firearms Information Gateway (CFIG)

- California Firearms Licensee Check (CFLC)

- Carry Concealed Weapons (CCW)

- Centralized List (CL)

- Certificate of Eligibility (COE)

- Consolidated Firearms Information System (CFIS)

- Dealer Record of Sale (DROS)

Exhibit 1 - Jones Decl.
Page 029

- DROS Entry System (DES)

- California Firearms Application Reporting System (CFARS)

- Firearms Certificate System (FCS)

- Assault Weapons Registration (AWR)

- Firearms Employment Application File (FEAF)

- Mental Health Reporting System (MHRS)

- Mental Health Firearms Prohibition System (MHFPS)

- Prohibited Applicant (PA)

This network of systems is incredibly complex and cumbersome to operate and navigate. Despite this monumental challenge, the Department has until recently, been able to meet legislative reporting mandates using these outdated databases. These databases are not flexible and were not created to be adaptable to meet additional demands. The Department has been able to partially adapt and circumvent issues despite using technology that is not equipped with automated processes to meet the specified conditions. Consequently, most, if not all queries must be pulled and cross-checked manually from database to database, hindering efficiency and introducing increased opportunities for error. Working to modify or maintain these legacy systems is no longer cost effective or a technologically viable option as the databases have become outdated technology that no longer meets the demands of the Legislature and the Department.

The Department received partial funding to pursue Phase 1 of this effort and is exploring modernization options to find a dynamic solution that would meet existing needs and be adaptable to evolving statutory mandates. However, additional funding will be required to begin Phase 2 and fully implement this project.

7. Continue working with Federal Law Enforcement partners and engage with local law enforcement agencies to disarm Federal Brady Act prohibition cases, the portion of the APPS database the Department is tasked with tracking but over which it has no jurisdiction. The Department has partnered with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in an attempt to reduce this section of the database. As part of its commitment to this effort, the Bureau has been actively participating in executive level meetings with the United States Attorney's Office (USAO) and the ATF regarding the USAO's gun violence reduction initiative, Project Guardian. In 2019, the Bureau began the preliminary work toward enforcement operations and provided several potential APPS targets which the ATF is currently reviewing. This pilot effort was set to begin in Sacramento County in the spring of 2020. Due to the COVID-19 pandemic, Bureau Special Agents did not work any joint APPS investigations with ATF in 2020. As of the publication of this report, the Bureau has three staff cross designated to enforce federal firearms laws. Additional staff statewide are undergoing the process to become cross designated with ATF. The Bureau anticipates rejoining ATF investigations once the COVID-19 situation improves.

Exhibit 1 - Jones Decl.
Page 030



# APPENDICES

## *APPENDIX A: Relevant Key Terms and Definitions*

This section provides definitions to key terms used throughout this report.

**Armed Prohibited Persons System (APPS)**. The Armed Prohibited Persons System is a database housed at the Department of Justice which contains a list of all individuals who are both armed (the department is aware of their ownership of one or more firearms) and prohibited (for one or more reasons they have been designated as not being permitted to possess firearms).

**Automated Criminal History System (ACHS)**. The repository for the state summary Criminal Offender Record Information (CORI). In addition, the Department transmits CORI to the Federal Bureau of Investigation (FBI).

**Automated Firearms System (AFS)**. This system was created in 1980 to identify lost or stolen firearms and connect firearms with persons. The system tracks serial numbers of every firearm owned by government agencies, handled by law enforcement (seized, destroyed, held in evidence, reported stolen, recovered), voluntarily recorded in AFS, or handled by a firearms dealer through transactions. Prior to 2014, most entries in AFS were handguns. Now, all newly acquired firearms, both handguns and long guns, are entered into AFS.

**Backlog.** The number of cases for which the Department did not initiate an investigation within six months of the case being added to the APPS or has not completed investigatory work within six months of initiating an investigation on the case.

**Bullet Button.** A product requiring a tool to remove an ammunition feeding device or magazine by depressing a recessed button or lever shielded by a magazine lock.

**Bullet Button Weapon.** A semiautomatic, centerfire or rimfire pistol with an ammunition feeding device that can be readily removed from the firearm with the use of a tool that has one or more specified features identified in Penal Code section 30515 and is included in the category of firearms that must be registered.

**California Restraining and Protective Order System (CARPOS)**. A statewide database of individuals subject to a restraining order.

**Cleared.** All cases in which the individual has died, the prohibition has expired or been reduced (e.g., the expiration of a temporary restraining order), or the individual has been disassociated from the firearm(s) such as selling, transferring, or turning over their firearm(s).

**Closed.** An investigation that has been fully investigated but the individual remains in APPS with a pending status (see definition of pending and sub-statuses definitions).

**Consolidated Firearms Information System (CFIS)**. This system consolidates numerous internal firearm applications within the California Justice Information Services Division (CJIS), the technology division within the Department. These applications include the Armed Prohibited Persons System (APPS), Assault Weapon Registration (AWR), Centralized List (CL), Carry Concealed Weapon (CCW), Dealers' Record of Sale (DROS), and Prohibited Applicant (PA).

Exhibit 1 - Jones Decl.
Page 031

**Contacts.** An attempt to locate an APPS individual at a potential current address. During face-to-face contact, agents will attempt a consent search if there are no search conditions due to parole or probation status. Sometimes consent is denied, and agents will leave the premises. If probable cause is developed at the scene, a search warrant will be requested and served that day.

**Dealers' Record of Sale (DROS).** This application is completed by firearms purchasers in California and is sent to the Department by licensed firearms dealers, which initiates the 10-day waiting period. The Department uses this information for a background check and the documentation of firearms ownership.

**Ghost Gun.** Ghost guns are firearms made by an individual, without serial numbers or other identifying markings.

**Gun Control Act (GCA).** The Gun Control Act (GCA), codified at 18 U.S.C. § 922(g), makes it unlawful for certain categories of persons to ship, transport, receive, or possess firearms or ammunition, to include any person:

- convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

- who is a fugitive from justice;

- who is an unlawful user of or addicted to any controlled substance (as defined in Section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 802);

- who has been adjudicated as a mental defective or has been committed to any mental institution;

- who is an illegal alien;

- who has been discharged from the Armed Forces under dishonorable conditions;

- who has renounced his or her United States citizenship;

- who is subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or child of the intimate partner; or

- who has been convicted of a misdemeanor crime of domestic violence.

The GCA at 18 U.S.C. § 992(n) also makes it unlawful for any person under indictment for a crime punishable by imprisonment for a term exceeding one year to ship, transport, or receive firearms or ammunition. Further, the GCA at 18 U.S.C. § 922(d) makes it unlawful to sell or otherwise dispose of firearms or ammunition to any person who is prohibited from shipping, transporting, receiving, or possessing firearms or ammunition. The Department refers to these prohibitions as Federal Brady prohibitions. Since these individuals are only prohibited due to federal law, the Department lacks jurisdictional authority to investigate these individuals, unless they also have a California prohibition. On January 1, 2019, there were 23,222 armed and prohibited persons in APPS (9,404 active and 13,818 pending). Of the 9,404 active cases, 1,595 are Federal Brady only cases.

**Mental Health Reporting System (MHRS)**. This is a web-based application used by Mental Health Facilities, Superior Courts, Juvenile Courts, and Law Enforcement Agencies to report firearm-prohibiting events related to mental health to the Department.

Exhibit 1 - Jones Decl.
Page 032

**Receiver.** The basic unit of a firearm which houses the firing and breech mechanisms and to which the barrel and stock are assembled.

**Statuses:**

**Active.** Individuals believed to reside in California who are prohibited (state, federally, or combination of state and federally prohibited) from possessing firearms. If the individual has a federal only prohibition from possessing firearms, the Department lacks the authority to investigate these federal prohibitions. This is also referred to as the APPS caseload.

**Pending. Also referred to as dormant.** Individuals previously investigated, but that cannot be currently investigated for one or more reasons. The Department works to reevaluate the statuses of these cases multiple times a year. These individuals fall into one of the following categories:

**Incarcerated.** These individuals are in state or federal prison. While they are incarcerated, these individuals are not included in the active records. Although technically under the pending category, incarcerated individuals are treated as a separate population because it is assumed that they are not in possession of firearms while in custody. Once the Department has received notification that they have been released, the individual is moved to the active status.

**No Longer Residing in California (Out-of-State)**. Individuals who were a resident of California, but now no longer live in this state. For example, when someone moves to another state and surrenders their California Driver License (CDL) before being issued a new license in their new state of residence.

**Unable to Clear (UTC)**. These cases have previously been investigated by DOJ Special Agents and all investigative leads have been exhausted. The individual still has one or more firearms associated with them. If new information is identified, the case will be moved to active status.

**Unable to Locate (UTL)**. These cases have previously been investigated by a DOJ Special Agent, but the agent is unable to locate the individual. It could be that the individual no longer lives at the address on file, family and friends are not able to provide useful location information, etc. If new location information is identified, the case will be moved to active status.

**Individuals having both state and federal prohibitions**. If APPS individuals have a combination of state and federal firearm prohibitions, then the Department has jurisdictional authority to investigate the matter related to the state prohibitions (e.g., felons, individuals with California restraining orders, misdemeanor conviction of domestic violence in California, and California mental health prohibitions).

**Wanted Persons System (WPS)**. This system was established in 1971 as the first online system for the Department. It is a statewide computerized file of fugitives for whom arrest warrants have been issued.

Exhibit 1 - Jones Decl.
Page 033

## APPENDIX B: Legislative History Relative to APPS

The following provides a brief overview of the legislative history affecting the Department's Armed and Prohibited Person program from 1999 to present. These legislative changes have exponentially increased the volume of prohibited individuals as the Legislature continues to increase the type and length of prohibitions. Other legislative changes with a substantial impact include evolving statutory and legal definitions as well as increases in the overall regulation of the various types of firearms, ammunition, and parts.

**1999**: APPS was conceptualized by the Legislature as a result of the proliferation of gun violence across the state and the nation.

**2001**: APPS was created in 2001 by Senate Bill (SB) 950 in response to high-profile murder cases involving people prohibited from owning firearms.

**2006**: APPS went into effect

**2013**: SB 140 passed the Senate and appropriated $24,000,000 from the Dealer Record of Sale Special Fund to the Department for three years to reduce the volume of pending APPS investigations.

**2014**: Effective January 1, 2014, a new California law (Assembly Bill 809, Stats. 2011, ch. 745) mandated the Department collect and retain firearm transaction information for all types of firearms, including long guns.

**2015**: After a 2013 audit by the Bureau of State Audits, the Bureau of Firearms finished manually inputting all of the cases into the APPS system.

**2016**: SB 140 funding expired.

Effective January 1, 2016, AB 1014 created the new prohibitory category of the Gun Violence Restraining Order.

**2017:** Effective January 1, SB 880 revised the definition of an "assault weapon", defined a "fixed magazine", and required those individuals lawfully in possession of an assault weapon without a fixed magazine to register the firearm.

As of August 2017, the Department also began processing "Bullet Button" Assault Weapon registrations pursuant to SB 880 and AB 1135. The Department was required by statute to accept applications for registration of these firearms until June 30, 2018. The background checks associated with these registrations identified additionally prohibited persons.

**2018:** Effective January 1, 2018, AB 785 added Penal Code section 422.6 (Criminal Threats) to the list of prohibiting misdemeanors. Effective July 1, 2018, AB 857 required the Department to begin issuing serial numbers for firearms manufactured by unlicensed individuals after a successful background check of the owner. The background checks associated with this process identified additional prohibited persons.

**2019:** Effective July 1, 2019, SB 1235 and Proposition 63 required ammunition to be sold only to an individual whose information matches an entry in the Automated Firearms System and who is eligible to possess ammunition, with some exceptions. It also required ammunition vendors to electronically submit to a database known as the Ammunition Purchase Records File, and thus to the Department, information regarding all ammunition sales and transfers.

Exhibit 1 - Jones Decl.
Page 034

Additionally, AB 3129 prohibited a person from ever possessing a firearm if that person is convicted of a misdemeanor violation of Penal Code Section 273.5 regarding the willful infliction of corporal injury resulting in a traumatic condition upon a spouse, cohabitant or other specified person. SB 746 required new residents to the State of California, within 60 days, to apply for a unique serial number or other identifying mark for any un-serialized firearm the resident manufactured or otherwise owns and intends to possess. SB 1100 prohibited the sale, supplying, delivery or giving possession or control of any firearm by a licensed dealer with some exceptions to any person under 21 years of age. SB 1200 expanded the definition of ammunition for the purposes of the Gun Violence Restraining Order law. SB 1346 clarified the definition of "multi-burst trigger activator" includes a bump stock, bump fire stock, or other similar device attached to, built into, or used in combination with a semiautomatic firearm to increase the rate of fire of that firearm.

AB 94 provided updated requirements regarding the mandated reporting of the APPS database statistics. It required the Attorney General to establish and maintain the Armed Prohibited Persons System (APPS) database. It also requires the Department to report no later than April 1, 2020, and no later than April 1 of each year thereafter, to the Joint Legislative Budget Committee and the fiscal committees of each house of the Legislature on specified information related to the APPS, including the number of individuals in the APPS and the degree to which the backlog in the APPS has been reduced or eliminated.

**2020:** Effective January 1, 2020, AB 1968 subjected individuals who have been taken into custody, assessed and admitted to a designated mental health facility twice within a one-year period, because they are a danger to self or others as a result of a mental health disorder, to a lifetime firearms prohibition subject to a petition for, and hearing on, a reinstatement of firearm ownership rights.

Additionally, AB 164 prohibited a person from possessing a firearm if that person is prohibited in another state and allows the Department and state and local law enforcement agencies to investigate and pursue these cases. AB 339 requires each specified law enforcement agency to develop and adopt written policies and standards relating to gun violence restraining orders. AB 12 increased the maximum duration of a gun violence restraining order from one year to between one and five years. It also allows for law enforcement officers to file a petition for a gun violence restraining order in the name of the law enforcement agency in which they are employed. AB 61 expanded the list of individuals who may request a gun violence restraining order. AB 1493 required that an individual subject to a gun violence restraining order can relinquish their own firearm rights through the courts.

Exhibit 1 - Jones Decl.
Page 035

## APPENDIX C: Mandated Statistics – At a Glance

**[1] The total number of individuals in the APPS and the number of cases which are active and pending.** The Armed and Prohibited Persons System has 2,999,872 individuals as of January 1, 2021. Of those individuals, 23,598 are prohibited from possessing firearms, with 9,083 of those cases being active and 14,515 of them being pending.

**[A][i] For active cases, the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system.** The APPS database is an outdated system that does not have the capability to track the time elapsed between a case entering the APPS to when a case was last worked. As a result, the Department does not have the ability to gather and report the requested information.

**[B] For pending cases, the department shall separately report the number of cases that are unable to be cleared, unable to be located, related to out-of-state individuals, related to only federal firearms prohibitions, and related to incarcerated individuals.** Of the 14,515 prohibited persons designated as pending cases, 6,955 (48%) were unable to be cleared, 2,215 (15%) were unable to be located, 3,859 (27%) moved out of state, and 1,486 (10%) were prohibited under federal prohibitions only. Additionally, there are 1,218 incarcerated individuals.

**[2] The number of individuals added to the APPS database.** Between January 1, 2020 and January 1, 2021, there were 10,762 additional known firearm owners who became prohibited. In the same time period, there were 8,370 individuals removed from the prohibited category. This resulted in the total number of armed and prohibited individuals increasing by 2,392.

[3] The number of individuals removed from the APPS database, including a breakdown of the basis on which they were removed.

*Table 1: Removals of Prohibited Persons in 2020 Separated by Reason for Removal*

| Reason for Removal | Number of Individuals Removed |
|---|---|
| Prohibition expired/no longer prohibited | 5,291 |
| Disassociated from all known firearms | 2,822 |
| Deceased | 257 |

[4] The degree to which the backlog in the APPS has been reduced or eliminated.

The updated definition defines the backlog as being cases for which the department did not initiate an investigation within six months of the case being added to the APPS or has not completed investigatory work within six months of initiating an investigation on the case. The APPS database does not have the technological capability of tracking the amount of time a case has been in the system. Gathering this information would require Crime Analyst review of each individual APPS entry, one-by-one and review the notes in each file. Lacking a more efficient way of gathering this information, the Department will be unable to provide these statistics until upgrades are made to the APPS database.

Exhibit 1 - Jones Decl.
Page 036

**[5] The number of individuals in the APPS before and after the relevant reporting period.**

*Table 3: The Total number of Individuals in APPS Before and After the Reporting Period Separated by Status*

| Status | Before Reporting Period | After Reporting Period |
|---|---|---|
| Armed and Not Prohibited | 2,610,899 | 2,999,872 |
| Armed and Prohibited | 22,424 | 23,598 |
| Incarcerated | 1,388 | 1,218 |

**[6] The number of Agents and other staff hired for enforcement of the APPS.** In 2020, the Department hired 10 Special Agents, two Special Agent Trainees and three support staff for APPS enforcement. The Department also saw the separation of nine Special Agents during 2020 due to inter-departmental transfer and/or promotion and had two Special Agents promote from within to Special Agent Supervisor positions, leaving the Department with a net increase of one Special Agent. The Department also saw the separation of two support staff for APPS enforcement resulting in a net change of one in support staff.

**[7] The number of firearms recovered due to enforcement of the APPS.** In 2020, Bureau Agents recovered 778 APPS firearms (i.e., firearms known in the APPS database), and 465 non-APPS firearms not associated with APPS individuals, for 1,243 total firearms recovered.

**[8] The number of contacts made during the APPS enforcement efforts.** In 2020, agents made nearly 16,000 contacts based on an average of three contacts per individual per case while working APPS investigations.

**[9] Information regarding task forces or collaboration with local law enforcement on reducing the APPS file or backlog.** The Department takes pride in its collaborative efforts with law enforcement partners. These efforts include leading the Contra Costa County Anti-Violence Support Effort (CASE) Task Force along with the recent addition of the TARGET Task Force, its partnership with the Los Angeles County Sheriff's Department on Dual Force operations, joint APPS sweeps with specific jurisdictions based on workload, regular communications for case de-conflictions, occasional patrol assistance for prisoner transport, booking, and search warrant assistance, and prosecutions by local district attorney offices.

Exhibit 1 - Jones Decl.
Page 037

## APPENDIX D: Relational Diagram of the Bureau of Firearms Databases



Exhibit 1 - Jones Decl.
Page 038

## APPENDIX E: Firearms Prohibiting Categories



**CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS
FIREARMS PROHIBITING CATEGORIES**



**State and federal law make it unlawful for certain persons to own and/or possess firearms, including:**

- Any person who has been convicted of, or has an outstanding warrant for, a felony under the laws of the United States, the State of California, or any other state, government, or country, or of an offense enumerated in subdivision (a), (b), or (d) of Section 23515, or who is addicted to the use of any narcotic drug

- Any person who has been convicted of an offense enumerated in Penal Code sections 29900 or 29905

- Any person who is ordered to not possess firearms as a condition of probation or other court order listed in Penal Code section 29815, subdivisions (a) and (b)

- Any person who has been convicted of, or has an outstanding warrant for, a misdemeanor listed in Penal Code section 29805 (refer to List of Prohibiting Misdemeanors)

- Any person who is adjudged a ward of the juvenile court because he or she committed an offense listed in Welfare and Institutions Code section 707(b), an offense described in Penal Code section 1203.073(b), or any offense enumerated in Penal Code section 29805

- Any person who is subject to a temporary restraining order or an injunction issued pursuant to Code of Civil Procedure sections 527.6 or 527.8, a protective order as defined in Family Code section 6218, a protective order issued pursuant to Penal Code sections 136.2 or 646.91, a protective order issued pursuant to Welfare and Institutions Code section 15657.03, or by a valid order issued by an out-of-state jurisdiction that is similar or equivalent to a temporary restraining order, injunction, or protective order, as specified above, that includes a prohibition from owning or possessing a firearm

- Any person who is subject to a Gun Violence Restraining Order (GVRO)

- Any person who is found by a court to be a danger to himself, herself, or others because of a mental illness

- Any person who is found by a court to be mentally incompetent to stand trial

- Any person who is found by a court to be not guilty by reason of insanity

- Any person who is adjudicated to be a mentally disordered sex offender

- Any person who is placed on a conservatorship because he or she is gravely disabled as a result of a mental disorder, or an impairment by chronic alcoholism

- Any person who communicates a threat to a licensed psychotherapist against a reasonably identifiable victim that has been reported by the psychotherapist to law enforcement

- Any person who is taken into custody as a danger to self or others under Welfare and Institutions Code section 5150, assessed under Welfare and Institutions Code section 5151, and admitted to a mental health facility under Welfare and Institutions Code sections 5151, 5152, or certified under Welfare and Institutions Code sections 5250, 5260, and 5270.15

- Any person who is addicted to the use of narcotics (state and federal)

- Any person who has been convicted of, or is under indictment or information in any court for a crime punishable by imprisonment for a term exceeding one year (federal)

- Any person who has been discharged from the military under dishonorable conditions (federal)

- Any person who is an illegal alien (federal)

- Any person who has renounced his or her US Citizenship (federal)

- Any person who is a fugitive from justice (federal)

Exhibit 1 - Jones Decl.
Page 039

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2020)

DEPARTMENT OF JUSTICE
PAGE 2 of 3



**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
# FIREARMS PROHIBITING CATEGORIES



## MISDEMEANORS

**Firearm prohibitions for misdemeanor violations of the offenses listed below are generally prohibiting for ten years from the date of conviction, but the duration of each prohibition may vary. All statutory references are to the California Penal Code, unless otherwise indicated.**

- Threatening public officers, employees, and school officials (Pen. Code, § 71.)

- Threatening certain public officers, appointees, judges, staff or their families with the intent and apparent ability to carry out the threat (Pen. Code, § 76.)

- Intimidating witnesses or victims (Pen. Code, § 136.1.)

- Possessing a deadly weapon with the intent to intimidate a witness (Pen. Code, § 136.5.)

- Threatening witnesses, victims, or informants (Pen. Code, § 140.)

- Attempting to remove or take a firearm from the person or immediate presence of a public or peace officer (Pen. Code, § 148(d).)

- A person who reports to a person that a firearm has been lost or stolen, knowing the report to be false (Pen. Code, § 148.5(f).)

- Unauthorized possession of a weapon in a courtroom, courthouse, or court building, or at a public meeting (Pen. Code, § 171b.)

- Bringing into or possessing a loaded firearm within the state capitol, legislative offices, etc. (Pen. Code, § 171c.)

- Taking into or possessing loaded firearms within the Governor's Mansion or residence of other constitutional officers (Pen. Code, 171d.)

- Supplying, selling or giving possession of a firearm to a person for participation in criminal street gangs (Pen. Code, § 186.28.)

- Assault (Pen. Code, §§ 240, 241.)

- Battery (Pen. Code, §§ 242, 243.)

- Sexual Battery (Pen. Code, § 243.4.)

- Assault with a stun gun or taser weapon (Pen. Code, § 244.5.)

- Assault with a deadly weapon other than a firearm, or with force likely to produce great bodily injury (Pen. Code, § 245.)

- Assault with a deadly weapon or instrument; by any means likely to produce great bodily injury or with a stun gun or taser on a school employee engaged in performance of duties (Pen. Code, § 245.5.)

- Discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3.)

- Shooting at an unoccupied aircraft, motor vehicle, or uninhabited building or dwelling house (Pen. Code, § 247.)

- Inflicting corporal injury on a spouse or significant other (Pen. Code, § 273.5.)  (Convictions on or before 12/31/2018.)

- Willfully violating a domestic protective order (Pen. Code, § 273.6.)

- Drawing, exhibiting, or using a deadly weapon other than a firearm (Pen. Code, § 417.)

- Inflicting serious bodily injury as a result of brandishing (Pen. Code, § 417.6.)

- Making threats to commit a crime which will result in death or great bodily injury to another person (Pen. Code, § 422.)

- Interference with the exercise of civil rights because of actual or perceived characteristics of the victim (Pen. Code, § 422.6.)

- Bringing into or possessing firearms upon or within public schools and grounds (Pen. Code, § 626.9.)

- Stalking (Pen. Code, § 646.9.)

Exhibit 1 - Jones Decl.
Page 040

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2020)

DEPARTMENT OF JUSTICE
PAGE 3 of 3




**CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS
FIREARMS PROHIBITING CATEGORIES**

- Carrying a concealed or loaded firearm or other deadly weapon or wearing a peace officer uniform while picketing (Pen. Code, §§ 830.95, 17510).

- Possessing a deadly weapon with intent to commit an assault (Pen. Code, § 17500.)

- Criminal possession of a firearm (Pen. Code, § 25300.)

- Armed criminal action (Pen. Code, § 25800.)

- Possession of ammunition designed to penetrate metal or armor (Pen. Code, § 30315.)

- Unauthorized possession/transportation of a machine gun (Pen. Code, § 32625.)

- Driver of any vehicle who knowingly permits another person to discharge a firearm from the vehicle or any person who willfully and maliciously discharges a firearm from a motor vehicle (Pen. Code, § 26100, subd. (b) or (d).)

- Firearms dealer who sells, transfers, or gives possession of any firearm to a minor or a handgun to a person under 21 (Pen. Code, § 27510.)

- Purchase, possession, or receipt of a firearm or deadly weapon by a person receiving in-patient treatment for a mental disorder, or by a person who has communicated to a licensed psychotherapist a serious threat of physical violence against an identifiable victim (Welf. & Inst. Code, § 8100.)

- Providing a firearm or deadly weapon to a person described in Welfare and Institutions Code sections 8100 or 8103 (Welf. & Inst. Code, § 8101.)

- Purchase, possession, or receipt of a firearm or deadly weapon by a person who has been adjudicated to be a mentally disordered sex offender or found to be mentally incompetent to stand trial, or not guilty by reason of insanity, and individuals placed under conservatorship (Welf. & Inst. Code, § 8103.)

- Bringing firearm related contraband into juvenile hall (Welf. & Inst. Code, § 871.5.)

- Bringing firearm related contraband into a youth authority institution (Welf. & Inst. Code, § 1001.5.)

- Theft of property less than $950.00, if property taken was a firearm (Pen. Code, § 490.2)

- Criminal storage of a firearm (Pen. Code, §§ 25100, 25135 or 25200)

- Various violations involving sales and transfers of firearms (Pen. Code, § 27590, subd. (c).)

**The following misdemeanor conviction results in a five year prohibition:**
- Every person who owns or possesses a firearm or ammunition with knowledge that he or she is prohibited from doing so as a result of a gun violence restraining order (Pen. Code, § 18205).

**The following misdemeanor convictions result in a lifetime prohibition:**
- Inflicting corporal injury on a spouse or significant other (Pen. Code, § 273.5 for convictions on or after 1/1/2019, per Pen. Code, § 29805(b), and a "misdemeanor crime of domestic violence" (18 U.S.C., § 921(a)(33)(A), 922(g)(9).)

- Assault with a firearm (Pen. Code, §§ 29800, subd. (a)(1), 23515, subd. (a).)

- Shooting at an inhabited or occupied dwelling house, building, vehicle, aircraft, housecar, or camper (Pen. Code, §§ 246, 29800, subd. (a)(1), 17510, 23515, subd. (b).)

- Brandishing a firearm in presence of a peace officer (Pen. Code §§ 417, subd. (c), 23515, subd. (d), 29800, subd. (a)(1).)

- Two or more convictions of Penal Code section 417, subdivision (a)(2) (Pen. Code § 29800. subd. (a)(2).)

**Note:  The Department of Justice provides this document for informational purposes only.  This list may not be inclusive of all firearms prohibitions.  For specific legal advice, please consult with an attorney licensed to practice law in California.**

Exhibit 1 - Jones Decl.
Page 041

## APPENDIX F: Bureau of Firearms Regional and Field Offices



## APPENDIX G: Case Studies

To better explain how APPS investigations are developed and to showcase some significant seizures, the Bureau identified five specific examples. The following examples are summary conclusions of actual investigations conducted throughout the state.

### Ammunition eligibility check identifies prohibited individual in Lancaster

In January 2020, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. This information was forwarded to the Bureau's Los Angeles Field Office for investigation. Special Agents reviewed the case and found the individual was prohibited from owning/possessing firearms due to a 5150 Welfare and Institutions Code (WIC) - Mental Health Prohibition. They were listed in the APPS database as illegally being in possession of 10 firearms.

Based on the individual's attempt to purchase ammunition and identification in the APPS, coupled with the investigative follow up and surveillance, a search warrant was obtained for the individual's residence in the City of Lancaster.

On July 22, 2020, Special Agents, along with Los Angeles Sheriff's Department (LASD) personnel, executed the search warrant at the individual's residence without incident. A search of the residence resulted in the seizure of three handguns, two shotguns, five rifles (three of which were assault weapons), 22-ammunition magazines (12 Standard/10 Large) and approximately 7,655 rounds of ammunition. All APPS firearms were located unsecured in the residence.



Exhibit 1 - Jones Decl.
Page 043

**Ammunition eligibility check identifies prohibited individual in Grass Valley**

On January 25, 2020, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. This information was forwarded to the Bureau's Sacramento Regional Office for investigation. On April 2, 2020, Special Agents reviewed the case and found the individual was prohibited from owning/possessing due to a Civil Harassment Restraining Order filed against him in Nevada County Superior Court effective August 20, 2018, expiring on August 20, 2021. A review of the APPS database revealed that the individual had 15 firearms listed in their name.

Based on the recent attempt to purchase ammunition, coupled with investigative follow up and surveillance, a search warrant was obtained for the individual's residence.

 On April 17, 2020, Special Agents with the assistance of the Nevada County Sheriff's Department, served the search warrant on the individual's residence in Grass Valley, CA. Special Agents made contact with the individual at the front door and informed them of the search warrant. The individual was compliant, and the Special Agents entered the residence without incident. A search of the residence resulted in the seizure of 1-APPS handgun, 2000 rounds of ammunition and 17 ammunition magazines.

During the interview, the individual stated they had given most of their firearms to a friend for safekeeping. The person was identified as residing in Newcastle, CA. Agents subsequently contacted the friend at the Newcastle residence. Based on a consent search, agents seized additional firearms belonging to the APPS individual, including one assault rifle, five standard rifles and five handguns.



Exhibit 1 - Jones Decl.
Page 044

## Probation search leads to multiple firearms seizures in Norwalk

Through APPS, the Bureau identified an individual prohibited from owning and/or possessing firearms or ammunition due to a condition of their probation out of Los Angeles Superior Court on October 7, 2019, expiring on October 7, 2022. The individual was listed in APPS as being in possession of 24 firearms.

On June 15, 2020, Special Agents along with Los Angele Sheriff's Department Detectives conducted a probation compliance search at the individual's residence in Norwalk, CA.

During the search of the residence, agents recovered 12 handguns, four rifles, two shotguns, one assault weapon, three large capacity magazines, 15 standard capacity magazines, and approximately 3,420 rounds of ammunition. One of the handguns was found to be loaded and unsecured in a bedroom closet. There were two children, one 16-year-old and one two-year-old, living with the individual at the residence. Through the investigation it was determined the children both had access to the bedroom closet and firearm.



Exhibit 1 - Jones Decl.
Page 045

**Alameda County APPS subject arrested for importing silencers from China**

In September 2020, agents from the Contra Costa Anti-Violence Support Effort (CASE) Task Force obtained information from the Department of Homeland Security (HSI) regarding an individual importing silencers into the United States from China. The subject of this investigation was believed to have obtained six silencers from China after two silencers were intercepted by HSI prior to arrival.

CASE agents conducted surveillance and located the individual's residence in Oakland, CA. A search warrant was later obtained for the individual and their residence

On September 23, 2020, CASE agents, along with Bureau of Firearms, Richmond Field Office Special Agents and HSI Agents executed a search warrant at the individual's residence. The individual was detained without incident and a search was conducted. The search of the residence resulted in the seizure of four 5.56 caliber assault rifles and 12 silencers. CASE agents also found evidence that the individual was manufacturing silencers inside a workshop in their basement. The individual was arrested, transported and booked into the Alameda County Jail.



Exhibit 1 - Jones Decl.
Page 046

**Ammunition eligibility check identifies prohibited subject in Lancaster**

On May 18, 2020, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. This information was forwarded to the Bureau's Los Angeles Field Office for investigation. Special Agents reviewed the case and found the individual prohibited from owning/possessing firearms, due to a Condition of Probation - Firearm Restriction, and was listed in APPS as being in possession of one firearm.

Based on the individual's attempt to purchase ammunition, coupled with investigative follow up and surveillance, a search warrant was obtained for the individual's residence in the City of Lancaster.

On July 22, 2020, Special Agents, along with Los Angeles Sheriff's Department personnel, executed a search warrant at the individual's residence without incident. The search of the residence resulted in the seizure of five handguns (3 of which were ghost guns), one assault weapon, one rifle, one shotgun, 11 ammunition magazines (8 Standard and 3 Large), 218 rounds of ammunition, and one 80 percent Glock lower jig assembly.

During the investigation, the individual admitted to the attempted ammunition purchase and acknowledged their firearms prohibition. Furthermore, the individual's father also admitted to the possession of several of the firearms, including the manufacture and possession of two of the assault weapons.



Exhibit 1 - Jones Decl.
Page 047

**Ammunition eligibility check identifies prohibited individual in Moreno Valley**

In April of 2020, a prohibited individual attempted to purchase ammunition twice and was flagged through the ammunition eligibility check process. This information was forwarded to the Bureau's Riverside Regional Office for investigation.

Agents discovered the individual was prohibited due to a January 2020 misdemeanor conviction for Penal Code section 246.3 - negligent discharge of a firearm. The individual was sentenced to informal probation and advised to relinquish their remaining firearms. The court noted that the individual did not comply with the relinquishment requirement. The individual was in APPS with 8 firearms recorded in their name.

Due to the recent attempts to purchase ammunition, coupled with investigative follow-up and surveillance, a search warrant was obtained for the individual's residence in Moreno Valley.

On May 7, 2020, Special Agents served the search warrant at the individual's residence. They were not home, but others were at the residence. When reached via telephone, the individual told agents that they had sold the outstanding APPS firearms on the street and were uncooperative as to their whereabouts. When asked about the gun safe in the bedroom closet, they said that they did not have the combination and it had not been opened in more than five years.

Agents gained entry into the individual's safe and discovered an unregistered assault weapon, two high-capacity magazines, and one standard-capacity magazine. Also found in the safe was the court-provided firearms relinquishment paperwork given to the individual in January 2020. Approximately 200 rounds of ammunition were also found throughout the residence.




Exhibit 1 - Jones Decl.

Page 048