# EXHIBIT 2

Exhibit 2 - Jones Decl.
Page 049



# ARMED AND PROHIBITED PERSONS SYSTEM REPORT 2021

*ANNUAL REPORT TO THE LEGISLATURE*
*SB 94 LEGISLATIVE REPORT*
*CALENDAR YEAR 2021*

Exhibit 2 - Jones Decl.
Page 050



## TABLE OF CONTENTS

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*The Armed and Prohibited Persons System and Legislative Reporting Requirements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*COVID-19 Impact on APPS Enforcement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

*APPS Database Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Recommendations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

**ANNUAL REPORT TO THE JOINT LEGISLATIVE  BUDGET COMMITTEE** . . .6

*The APPS and Legislative Reporting Requirements* . . . . . . . . . . . . . . . . . . . . . .6

*Overview of the Mandated Categories for Statistical Reporting* . . . . . . . . . . . .6

*Overview of the APPS Database* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Firearms Information Technology Systems Modernization (FITSM)* . . . . . . . . . 9

*Enforcement Teams* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11

*Mandated Statistics and Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

**APPENDICES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .36

*APPENDIX A: Relevant Key Terms and Definitions* . . . . . . . . . . . . . . . . . . . . . 36

*APPENDIX B: Legislative History Relative to APPS* . . . . . . . . . . . . . . . . . . . . . .39

*APPENDIX C: Mandated Statistics – At a Glance* . . . . . . . . . . . . . . . . . . . . . . . .41

*APPENDIX D: Relational Diagram of the Bureau of Firearms Databases* . . . . .43

*APPENDIX E: Firearms Prohibiting Categories* . . . . . . . . . . . . . . . . . . . . . . . . . 44

*APPENDIX F: Bureau of Firearms Regional and Field Offices* . . . . . . . . . . . . . .47

*APPENDIX G: Case Studies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*APPENDIX H: Gun Violence Reduction Program Awards* . . . . . . . . . . . . . . . . . 54

Exhibit 2 - Jones Decl.
Page 051



# EXECUTIVE SUMMARY

## *The Armed and Prohibited Persons System and Legislative Reporting Requirements*

In 2006, the State of California became the first and only state in the nation to monitor individuals who legally purchased or acquired firearms and later became prohibited from owning or possessing them. The Armed and Prohibited Persons Systems (APPS) database cross-references firearms purchasers against other records for individuals who are prohibited from owning or possessing firearms. The Department of Justice Bureau of Firearms (Bureau) utilizes Crime Analysts, Special Agents, and Special Agent Supervisors to locate and seize firearms from prohibited persons identified through the APPS database, thereby preventing and reducing incidents of violent crime.

The authority and specifications for this public reporting initiative were established in Senate Bill (SB) 140 (Stats. 2013, ch. 2), which sunset in 2019, and were reestablished with further specifications under SB 94 (Stats. 2019, ch. 25) in 2019. SB 94, which added section 30012 to the Penal Code, requires the Department of Justice (Department) to report specified information related to the APPS database, including the number of individuals in the APPS database and the degree to which the backlog in the APPS database has been reduced or eliminated. In this report, the term "backlog" is used in accordance with the definition created by SB 94 and codified in Penal Code section 30012, subdivision (a)(4): the number of cases for which the Department did not initiate an investigation within six months of the case[1] being added to the APPS database or a case for which the Department has not completed investigatory work within six months of initiating an investigation.

Prior to SB 94 going into effect, the Department communicated to the Department of Finance (DOF) and to the Legislature that the current firearms database systems did not have the capability required to collect and report on the backlog as it has now been defined in statute and certain other metrics newly required by SB 94. In response, the Department worked with DOF to submit a Budget Change Proposal (BCP) requesting funding to support the upfront planning and analysis costs to determine how to create an updated database system that would be able to yield the requested data and have the improved capability of working with the APPS database. The Department has received the resources for the analysis phase of the modernization project. Once the analysis is complete, and additional funding secured, the Department will be able to begin the upgrade process for the APPS database and other firearms IT systems.

## *COVID-19 Impact on APPS Enforcement*

For the first six months of 2021, California remained under the constraints of the Governor's Stay Home Order that was implemented early in the COVID-19 pandemic. During that time, APPS enforcement efforts continued at the same reduced level that they had in 2020. Because APPS work requires extensive face-to-face interaction with the public, the Bureau was forced to scale back APPS efforts in order to protect both Bureau personnel as well as the public. Nonetheless, agents still faced exposure to COVID-19 in the course of duty and in some instances were required to quarantine, further impacting APPS enforcement.

Firearm and ammunition sales began to surge at the beginning of the pandemic in 2020 and continued through 2021. To reduce face-to-face interactions during the Governor's Stay Home order, agents focused on identifying prohibited persons who were denied ammunition purchases because the

---

1   Within the APPS database a case refers to one individual; therefore, the terms 'case' and 'individual' will be used inter-changeably in this report.

Exhibit 2 - Jones Decl.
Page 052

attempt to purchase ammunition strongly suggests the possession of a firearm. These types of investigations are generally labor-intensive and may take longer than typical APPS investigations because closing a case requires numerous hours of surveillance followed by enforcement actions. However, they maximize investigative efficiencies in other ways, by providing up-to-date intelligence which facilitates locating prohibited persons and search warrants, where necessary. Ammunition denial investigations often lead to a higher seizure rate but a lower case closure rate because such investigations tend to require more time for surveillance and enforcement following an initial contact as compared to a non-ammunition denial investigation. For example, agents may initiate 10 regular APPS investigations in one shift, whereas ammunition denial investigations may require the team to devote an entire shift or more to one such investigation. Nevertheless, these cases were an efficient way for the Bureau to continue to protect the public by disarming prohibited individuals while also minimizing public contact in light of COVID-19. In 2021, there were 195 APPS investigations involving denied ammunition eligibility checks, of which the Bureau investigated and closed 123, resulting in 110 firearms seized.[2]  The remaining cases are still under investigation.

As pandemic restrictions were lifted and businesses began to reopen, the Bureau progressively increased APPS enforcement efforts to pre-pandemic levels. By the end of 2021, monthly productivity had returned to pre-pandemic levels.

To make up for the decline in productivity resulting from COVID-19 restrictions and safety measures, agents conducted four large-scale regional sweeps in the latter half of 2021. During these APPS sweeps, agents from around the state concentrated their enforcement efforts within an entire region in an effort to increase APPS case closures. These four sweeps covered large areas of California and were instrumental in reinvigorating enforcement efforts, while significantly contributing to the overall closure of cases in the second half of 2021 alone. The sweeps were successful not only due to the quantity of cases agents worked, but also due to continued collaboration with local law enforcement partners. Despite reduced APPS enforcement in the first six months of 2021, the regional sweeps conducted in the second half of the year helped boost case closures so that APPS productivity for the 2021 calendar year increased compared to that in 2020.

While these large-scale regional sweeps were an effective tool to boost enforcement efforts following the easing of pandemic-related restrictions, they involve inordinate travel and overtime, placing pressure on agents and their families. As such, while the APPS team is committed to public safety and proud of this accomplishment, continuously maintaining this level of enforcement activity in subsequent years is not sustainable long term. However, these regional sweeps helped the Bureau strengthen and establish relationships with local law enforcement partners that in the future will also support APPS enforcement efforts. As discussed later in this report, the Department's awarding of $4.9 million to 10 county sheriff's departments in December 2021—through the Department's Gun Violence Reduction Program—was intended to increase local law enforcement's resources and capacity to help the Department close APPS cases.

In addition to the COVID-19 pandemic, 2021 was a year filled with other challenges. Large wildfires that spread across the state limited agents' ability to work cases in certain regions during wildfire months. Furthermore, continued surges in firearm and ammunition sales strained Bureau resources due to the legislative mandate to complete background checks within a 10-day timeframe. Despite extraordinarily demanding working conditions, the Bureau continued to work diligently to serve and protect the people of California.

---

2          These figures are included within the total number of APPS cases in 2021.

Exhibit 2 - Jones Decl.
Page 053

## APPS Database Analysis

A comprehensive review of the APPS database reveals the following:

- In 2021, the Department removed 8,937 prohibited persons from the APPS database. At the same time, 9,848 prohibited persons were added to the APPS database. As of January 1, 2022, the APPS database had 24,509 armed and prohibited persons and 1,130 additional armed and prohibited individuals who were incarcerated.

- The Bureau had between 21-36 Special Agents and between 13-14 Special Agent Supervisors working to address the ever-changing number of armed and prohibited individuals in 2021.

- As of January 1, 2022, 54% of prohibited individuals in the APPS database were prohibited due to a felony conviction, 22% were prohibited due to the federal Brady Handgun Violence Prevention Act (18 U.S.C. §§ 921, 922), 21% were prohibited due to a restraining order, 20% were prohibited due to mental health triggering events, 10% were prohibited due to a qualifying misdemeanor conviction, and 5% were prohibited per the conditions of their probation. Persons can be prohibited under more than one category, which is why the total number exceeds 100%.

- In 2021, the Bureau recovered 1,428 firearms. Of these, 826 were firearms identified in the APPS database and 602 were non-APPS firearms, meaning firearms that were not known to be associated with the prohibited person but were in that person's possession.

- In 2021, the Bureau investigated approximately 6,663 individuals who were identified as armed and prohibited persons in the APPS database.

- In 2021, there were 195 armed and prohibited individuals who attempted to purchase ammunition and were denied. Agents and Crime Analysts investigated and closed 123 of these denial cases. The remainder of the denials remain under investigation.

## Recommendations

After conducting an examination of the APPS program, the Department recommends the following steps to improve the removal of firearms from prohibited persons:

1. Fund the currently unfunded mandate that all California county courts confiscate or enforce the transfer or legal storage of known firearms from individuals at the time of conviction when an individual becomes prohibited due to a felony or qualifying misdemeanor.

2. Develop and fund a similar statewide county-level firearm confiscation system where firearms are confiscated from an individual at the time they are served with any type of restraining order. These firearms seizures must be documented in the Automated Firearms System (AFS) as required by existing law. These entries into AFS will prevent unnecessary, duplicative efforts by the Department and potentially other agencies.

3. Improve the recruitment and retention of Department sworn personnel by offering compensation that is competitive with other law enforcement agencies. Despite a 12% pay increase that took effect in September 2021, Special Agent pay at the Department has not reached parity with comparable positions statewide.

4. Improve existing coordination and cooperation with local law enforcement agencies through Joint Task Forces with and under the direction of the Department. With additional funding, the Department could create new Joint Task Forces with local law enforcement agencies and improve local law enforcement reporting of firearms in their custody into AFS.

5. Continue with the modernization process of the existing firearms databases. Funding for Phase 1 of the modernization process has been secured. Funding for Stage 2 of the modernization process has been secured. Stage 2 involves the analysis and planning of what will be required to replace the existing systems and implement the recommended technical solution and approach, that will improve overall efficiency, minimize risk, and stabilize employee resources. Additional resources will be required to fund Stages 3 and 4, and the Project Execution Phase which will involve the implementation of the modernization project. The Department looks forward to continuing to work with the Governor and Legislature to fund the implementation of the modernization project.

6. Continue to partner with federal law enforcement agencies and engage with local law enforcement agencies to seize firearms from individuals prohibited only due to the federal Brady Handgun Violence Prevention Act (Federal Brady Act).

The Department has been proactive and made efforts to implement four of the six recommendations outlined above. The Bureau has (1) expanded its recruitment efforts and lowered vacancy rates by hiring Special Agent Trainees and recruiting new Special Agents who have law enforcement experience from state and local law enforcement agencies; (2) worked diligently to create partnerships with local agencies, (3) worked to create partnerships with federal law enforcement agencies; and (4) continued to provide data to information technology professionals in order to make progress in the multi-year firearms database modernization project. However, fully implementing the remaining recommendations will require legislative support and additional resources. Further explanation of these recommendations can be found on page 33.

Exhibit 2 - Jones Decl.
Page 055



# ANNUAL REPORT TO THE JOINT LEGISLATIVE BUDGET COMMITTEE

## *The APPS and Legislative Reporting Requirements*

This report presents a statistical summary of the APPS database, as mandated by SB 94, for the period of January to December 2021, as well as additional in-depth analyses of data through the history of the APPS database. It also contains additional statistics to help provide context to the APPS database — particularly in light of the unprecedented COVID-19 pandemic — and the workload that flows in and out of that system.[3]

Penal Code section 30000, subdivision (a) requires the Department to maintain a "Prohibited Armed Persons File." This file is generated from a larger database known as the Armed and Prohibited Persons System that records all known firearms owners in the State of California and monitors various other databases for prohibiting triggering events (PTE), such as a felony conviction or an active restraining order, to identify those persons within the system who are both armed and prohibited. The APPS program was mandated in 2001 (SB 950, Stat. 2001, ch. 944), then implemented in December 2006.

In 2013, the California Legislature passed SB 140, which appropriated $24 million dollars over a three-year period to the Department to address the growing number of records in the Armed and Prohibited Persons System. Additionally, SB 140 required the Department to submit annual reports detailing the progress made in reducing the backlog.

The APPS reporting provisions as outlined in SB 140 expired on March 1, 2019. In 2019, SB 94 was passed, which provided updated requirements regarding the mandated reporting of the APPS database statistics. Prior to the passing of SB 94, the Department communicated to the DOF that it did not have the technological capability to report on the new metrics requested in SB 94 and would need a BCP to begin the planning analysis necessary to develop a system that could report on such metrics. Regardless, the new provisions went into effect on June 27, 2019, and are codified at Penal Code section 30012.

See Appendix B for additional legislative history relative to the APPS database.

## *Overview of the Mandated Categories for Statistical Reporting*

Pursuant to Penal Code section 30012, no later than April 1, 2020, and no later than April 1 of each year thereafter, the Department must report annually to the Joint Legislative Budget Committee the following information for the immediately preceding calendar year:

> (1) The total number of individuals in the Armed Prohibited Persons System (APPS) and the number of cases which are active and pending, as follows:

> (A) (i) For active cases, the Department shall report the status of each case for which the department has initiated an investigation. This information shall include, at a minimum, the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system.

> (ii) For purposes of this paragraph, "investigation" means any work conducted by sworn or nonsworn staff to determine whether a prohibited person possesses one or more firearms, whether to remove the person from the database, or whether to shift the person to the pending

---

3          This report will use terms specific to the subject matter at hand. See Appendix A for the Relevant Key Terms and Definitions.

Exhibit 2 - Jones Decl.
Page 056

caseload.

(B) For pending cases, the Department shall separately report the number of cases that are unable to be cleared, unable to be located, related to out-of-state individuals, related to only federal firearms prohibitions, and related to incarcerated individuals.

(2) The number of individuals added to the APPS database.

(3) The number of individuals removed from the APPS database, including a breakdown of the basis on which they were removed. At a minimum, this information shall separately report those cases that were removed because the individual is deceased, had prohibitions expire or removed, or had their cases resolved as a result of department firearm seizure activities.

(4) The degree to which the backlog in the APPS has been reduced or eliminated. For purposes of this section, "backlog" means the number of cases for which the department did not initiate an investigation within six months of the case being added to the APPS or has not completed investigatory work within six months of initiating an investigation on the case.

(5) The number of individuals in the APPS before and after the relevant reporting period, including a breakdown of why each individual in the APPS is prohibited from possessing a firearm.

(6) The number of agents and other staff hired for enforcement of the APPS.

(7) The number of firearms recovered due to enforcement of the APPS.

(8) The number of contacts made during the APPS enforcement efforts.

(9) Information regarding task forces or collaboration with local law enforcement on reducing the APPS file or backlog.

This report serves two functions: (1) it addresses the SB 94 mandated reporting; and (2) it provides a comprehensive assessment of the APPS database and the Bureau's related enforcement activities.[4] The Department undertook this comprehensive assessment by: (1) analyzing historical information such as audit files of APPS data; (2) examining the APPS caseloads and workflow for the immediately preceding calendar year; and (3) reviewing other administrative information.

## Overview of the APPS Database

The APPS database contains information on firearms either legally acquired or registered in California and the owners of those firearms. Consistent with legislative mandates, the database is the result of records and information originating in the Dealer Record of Sale (DROS) database and the AFS database. Combined, those records represent all individuals who purchased or transferred firearms legally and all known firearms associated with each individual.

Individuals are entered into the APPS database as soon as they legally purchase or acquire a firearm. They are moved to the Prohibited Armed Persons File within the database if they become prohibited. Prohibited individuals are identified by daily manual queries of the databases that cross-reference the population of known firearm owners against individuals who may have had a PTE within the past 24 hours. New individuals are added daily, creating a constantly changing and growing dataset.

---

4        See Appendix C for a brief overview of the mandated statistical requirements.

Exhibit 2 - Jones Decl.
Page 057

Armed and prohibited individuals, while the primary focus of the Department's enforcement efforts, are a subset representing less than one percent of the APPS database. As of January 1, 2022, there were 3,199,394 known firearm owners in the APPS database, of which 24,509 are prohibited from owning or possessing firearms in the Prohibited Armed Persons File. In order for the Department to identify those armed and prohibited individuals, the Department must first identify individuals who have legally acquired a firearm(s) and then identify which of those individuals are also prohibited due to a triggering event.

Between 2013 to 2021,[5] changing laws have introduced new offenses that prohibit firearm ownership and/or possession, placing a growing number of individuals into the Prohibited Armed Persons File. Other factors such as ammunition eligibility checks, mandatory assault weapon registration, and increased firearm sales have also contributed to the surge of identified prohibited individuals. Prohibitions may be due to a felony conviction, domestic violence conviction, a qualifying misdemeanor conviction, mental health-based event, various types of civil or criminal restraining orders, as well as other prohibitory categories. See Appendix E for firearm prohibiting categories.

Within the Prohibited Armed Persons File, cases are separated into two broad categories of "Active" and "Pending."

"Active" cases are those that have not yet been investigated or are in the process of being investigated, but all investigative leads have not yet been exhausted.

"Pending" cases are those that have been thoroughly analyzed and all investigative leads have been exhausted. They are organized into the following sub-categories:

1. Unable to clear: Cases that have been investigated by the Department's agents who have exhausted all investigative leads and remain unable to recover all firearms associated with the prohibited individual. If new information is identified, the case will be moved to Active status.

2. Unable to locate: Cases where the Department's agents have made at least three attempts to contact the individual but have not been able to locate them, even after exhausting all leads.

3. Out-of-state: Cases where the Department's agents have determined that the prohibited person is no longer living in California.

4. Federal Gun Control Act (Federal Brady Act Prohibition Only): Cases where a person is prohibited only under federal law. State, county, and municipal law enforcement have no authority to enforce a prohibition based only on the Federal Brady Act. Persons who have both a statewide and federal prohibition are not listed in this group.

5. Incarcerated: Cases involving incarcerated individuals remain on the Pending list, but the Department still tracks and monitors them. Once released, they are moved to Active status. [6]

The Department verifies new or updated information on all Pending cases regularly. If any additional information becomes available on an APPS case in Pending status (e.g., the firearm(s) associated with the APPS individual are located, records indicate a new address for the individual, or the individual is released from incarceration), the case is evaluated and transitioned back into the Active status.

---

5       See Appendix B for a legislative history as related to APPS
6       While technically pending, for the purposes of this report, incarcerated individuals are counted separately and are not included in pending statistics.

Exhibit 2 - Jones Decl.
Page 058

The current system includes 11 databases that do not communicate with one another or may only have one-way communication with another firearms database.[7] This requires a Crime Analyst to manually cross-reference records from one database to another while working to compile an individual package for investigation.

Of the 11 databases, only five databases feed into the APPS database for firearm association and prohibition determinations, which include the:

1. Automated Criminal History System (ACHS); established in 1971, it is the repository for state summary Criminal Offender Record Information (CORI).

2. Wanted Persons System (WPS); established in 1971 as the first online system for the Department, it is a statewide computerized file of fugitives for whom arrest warrants have been issued.

3. Automated Firearms System (AFS); created in 1980 to identify lost or stolen firearms and to associate firearms with individuals. It does so by tracking the serial number of every firearm owned by government agencies, handled by law enforcement (seized, destroyed, held in evidence, reported stolen, recovered), voluntarily recorded, or handled by a firearms dealer through transactions. Prior to 2014, most entries in AFS were handguns. Since January 1, 2014, all new legally acquired firearms, both handguns and long guns, are entered into AFS.

4. California Restraining and Protective Order System (CARPOS); created in 1991, it is a statewide database of individuals subject to a restraining order. This system includes Domestic Violence Restraining Orders (DVRO), Gun Violence Restraining Orders (GVRO), and other types of restraining orders.

5. Mental Health Reporting System (MHRS); established in 2012, it is a web-based application used by Mental Health Facilities, Superior Courts, Juvenile Courts, and Law Enforcement Agencies to report firearm prohibiting events related to mental health to the Department.

The APPS database is not an automated system that cross-references across all firearms databases; therefore, prior to creating a complete case package for investigation, Crime Analysts must manually cross-check multiple additional databases. As it stands, the system is extremely cumbersome to operate. When a user retrieves a single case, all information must be verified prior to action being taken by agents. Such verification starts with confirming that the individual's name, birth date, and driver's license number match across all systems. Then, using the Law Enforcement Agency Web (LEAWEB), the Crime Analyst will run a multiple query using the individual's driver's license number. LEAWEB is a California unique database that queries some of California's databases like CARPOS, AFS, ACHS, MHRS, WPS, and the Supervised Release Files, as well as the databases of the California Department of Motor Vehicles (DMV). Each case is highly variable, and the circumstances and information pertinent to each case will determine how a Crime Analyst conducts their research. For example, an individual can be prohibited under multiple categories; the prohibiting category determines which databases a Crime Analyst must use to verify the prohibition is still current and that the case is workable by agents.

## *Firearms Information Technology Systems Modernization (FITSM)*

The Department initiated the Firearms Information Technology Systems Modernization Project in June 2020 and is currently in the Stage 2 Alternative Analysis Planning stage. The project is currently conducting an analysis of all firearm business processes and supporting systems, which includes market research to ultimately determine a modern solution and the timeline for the implementation of the new firearms systems. The Department hopes to complete the Stage 2 Alternatives Analysis

---

7       See Appendix D for a relational diagram of the Bureau's firearms databases.

Exhibit 2 - Jones Decl.
Page 059

by December 2022, and to select vendors to begin implementation by January 2024. The project is expected to identify many positive solutions to various firearms systems, including the APPS database.

The existing firearms systems utilized by the Department, law enforcement agencies, and other firearm stakeholders lack the modern network capabilities the Department needs to comply with legislative mandates and fulfill its commitment to public safety. The systems currently in use were built many years ago — dating as far back as 1980 — and have been modified piecemeal over the years in response to various legislative mandates. Each system uses different logic, meaning inputs cannot be easily transferred from one database to another, and modifications cannot be applied across multiple systems. These problems will persist and prevent the kind of automation that can enhance efficiency, thus causing increased workloads and missed operational opportunities until the Department can develop and implement the FITSM solution.

The complexity of the existing firearms systems can be seen even in the most straightforward of circumstances. In the case of an individual who has only one firearm and is prohibited only by one restraining order, the process would be as follows:

1. The Crime Analyst must confirm the restraining order is effective and that the individual was in fact served by either being present in court or was served by a processor.

2. Once this is verified, the Crime Analyst will try to pull the actual restraining order from an external database, the California Courts Protective Order Registry (CCPOR).

3. CCPOR is meant to be a centralized registry for restraining orders in California; unfortunately, it has not been implemented across all county courts in the state. For courts that do not use CCPOR, the Crime Analyst must contact the court directly to attempt to obtain a copy of the restraining order. Having an original copy can provide valuable additional information like confirming when, where, and how the restraining order was served; the individual's last known address; and whether the individual has already surrendered their firearm.

4. Assuming the individual is still in possession of their firearm, the Crime Analyst must then pull descriptive information for the firearm associated with the individual and run the serial number of the firearm in AFS to confirm the individual is still associated with that firearm. The Crime Analyst may also have to establish there are no extenuating circumstances, such as a situation where the individual is no longer in possession of the firearm, but the databases do not reflect the change. This is sometimes caused by a keying error where a serial number is off by one digit, but all other information coincides. A keying error traditionally happens from data entry made by a firearms dealer, by the public via online reporting, or by law enforcement agencies that seize firearms. In such circumstances, additional administrative work must be done by the Department to remove the association to that firearm from that individual.

5. Although LEAWEB queries the DMV, the query does not automatically pull an individual's identification photo or associated vehicles. To get such information, the Crime Analyst must perform additional, separate steps to pull relevant information, such as the most recently reported place of residence, from DMV registries.

6. Once all information is confirmed, and assuming the information supports investigative efforts, the package is then ready for agents to conduct enforcement actions.

As noted, this outlined process is for the simplest case possible with one prohibition and one firearm. Most cases involve additional factors such as additional firearms, prohibitions, combined federal and state prohibitions and/or criminal history, which make a case package much more difficult to compile.

Exhibit 2 - Jones Decl.
Page 060

The Department is supporting planning efforts for the FITSM project that will replace and modernize the existing legacy infrastructure. While funding has been secured to begin Stage 2, which involves an analysis and planning of the required work to complete the effort, future additional funding will be required to begin Stages 3 and 4, to select a vendor and initiate the implementation activities which will bring this project to fruition.

## Enforcement Teams

Each Bureau office has its own team of Special Agents for field operations. The Bureau also employs Crime Analysts in each of their six offices throughout the State.[8] The Crime Analysts access the APPS database daily and develop investigative packages of armed prohibited people for each team of agents to contact. Their jobs require crosschecking several databases to confirm addresses, photos, arrest records, and status of armed and prohibited individuals, among other relevant information. Using their knowledge and expertise, they translate vast amounts of data into actionable information that allows the agents to do their investigations efficiently and effectively. The work is time-intensive and requires great attention to detail as any error (typos, accidental variations, incorrect information, etc.) can lead to incorrect decisions or unnecessary investigative contacts. Modernizing the firearms IT systems would allow for more accurate information and bolster the success of operations by ensuring agents and other law enforcement partners are provided the most current information and not placed at unnecessary risk.

Using these investigative packages, Special Agents attempt to locate the firearm(s) associated with each armed and prohibited individual via a consent search, probation or parole search, or a search warrant. Often, the armed and prohibited individual will be in possession of numerous firearms, many of which were not associated with that individual in the APPS database. This could be due to the individual having: long guns purchased before long gun reporting requirements in 2014, firearms loaned to them by another person, firearms imported into California from another state, antique firearms, illegally purchased firearms, ghost guns,[9] or stolen firearms.

Improving partnerships with local law enforcement agencies will help to improve operation efficiency. Often, agents contact an armed and prohibited individual only to find that local law enforcement has already seized the firearm(s) associated with that individual but failed to enter the seized firearm into AFS as required by Penal Code sections 11108.2 and 11108.3. Entering that information would have removed the individual from the APPS database, allowing the Bureau's agents to focus on another case. Currently, the Bureau must reach out to the law enforcement agency to request they update AFS or ask for the police report in order to cross-check the firearms seized and match the associated firearms in the APPS database. Unless that information matches and is verified, the individual cannot be removed from the APPS database. In 2021, 150 APPS investigations conducted by the Bureau involved firearms that were already in local law enforcement custody. The cost of such oversight cannot be recovered, resulting in duplicative efforts by the Bureau that reduce efficiency and waste resources. The Department's proposed plan to increase collaboration would help ensure the timely and accurate input of data by local law enforcement agencies in statewide data systems.

Successful models of operations with local law enforcement have been a force multiplier for the APPS program. For instance, the Contra Costa County Anti-Violence Support Effort Task Force (CASE) is a collaboration between various state, local, and federal agencies. CASE conducted 93 firearms-related investigations and confiscated 62 firearms, 19 of which were APPS firearms.[10] As outlined in

---

8      See Appendix F for a map of the various Bureau regional office jurisdictions

9      Ghost guns are firearms made by an individual or group, without serial numbers or other identifying markings. Without a serial number, law enforcement cannot run a trace search on the firearm and the firearm does not have the legal requirements.

10    For more on the CASE task force, refer to page 28

Exhibit 2 - Jones Decl.
Page 061

the recommendations, the Department wants to encourage these types of collaborative partnership operations and relationships with local law enforcement agencies.

In an effort to increase these types of successful collaborative efforts, in December 2020, the Bureau established management and supervision of the Tulare County Agencies Regional Gun Violence Enforcement Team, also known as the TARGET Task Force. This is a recent addition to the Bureau task force model and supports the value established through previous task force efforts, including the aforementioned CASE Task Force. In 2021, state and local agencies working with TARGET conducted 169 firearms-related investigations and confiscated 90 firearms, 46 of which were APPS firearms. Like CASE, TARGET is collaboratively working with local, state, and federal partners to conduct APPS investigations as well as other investigations to reduce gun violence.

Additional funding to expand this task force model would allow the Department to expand on this collaborative work. The Department has seen how working with local law enforcement agencies allows the Bureau's agents to conduct more operations and remove additional firearms from prohibited armed persons more efficiently. The Department stands ready to work with the Legislature as well as local, state, and federal law enforcement partners to replicate that success across the state.

## Mandated Statistics and Analysis

Senate Bill 94 mandates the reporting of specific statistics for each calendar year. With 2020 and 2021 being unusual years due to the COVID-19 pandemic, any inferences drawn from comparisons to previous years should be made with caution. The mandated statistics for the current report are the following:

### The total number of individuals in the APPS Database

As of January 1, 2022, the APPS database contained 3,199,394 individuals, of which 24,509 were prohibited from owning or possessing firearms.

### Breakdown of the status of Active APPS cases

Active cases are those involving individuals who are believed to reside in the state of California, are prohibited from owning or possessing a firearm in the state for one or more reasons, and not yet been investigated or are in the process of being investigated, but all investigative leads have not yet been exhausted. As outlined above, the statutory mandate described in Penal Code section 30012, subdivision (a)(1)(A)(i) requires the Department to report on "the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system." As stated previously, the Department alerted the DOF that it would be unable to provide these metrics without the necessary funding to update the current firearms databases.

### Status of the APPS database backlog

As discussed above, SB 94 defined backlog as the number of cases for which the Department did not initiate an investigation within six months of the case being added to the APPS database or for which it has not completed investigatory work within six months of initiating an investigation on the case. Once the Department receives full funding to complete the firearms modernization project, the new system will be better able to accommodate reporting on the status of the backlog.

Exhibit 2 - Jones Decl.
Page 062

## Breakdown of cases in the APPS database

As of January 1, 2022, the APPS database contained 3,199,394 individuals, of which 24,509 were prohibited from owning or possessing firearms. This latter figure is further subcategorized into Active and Pending cases. Active cases are those for which the Department has not yet begun investigations or is in the process of investigating but has not yet exhausted all investigative leads. Pending cases are those investigations that the Department has thoroughly analyzed and exhausted all investigative leads or determined that the person is not within the Department's jurisdiction. As of January 1, 2022, there were 10,033 Active cases and 14,476 Pending cases. In addition to the Pending category, there are 1,130 incarcerated individuals, who while technically pending, represent a unique population that cannot be investigated until released from incarceration and moved to Active status. Therefore, they are counted separately for the purposes of this report, and are not figured in the Pending case statistics that follow.

Figure 1 shows the number of people in the Prohibited Armed Persons File within the APPS database each year. The number of prohibited people has generally increased since 2008, with only two substantial decreases in 2015 and 2020. The reason for the overall increase is potentially due to the consistent addition of new prohibited people despite efforts by Bureau agents to clear cases, as well as the recent impact of the COVID-19 pandemic that hindered the Bureau's enforcement efforts.

*Figure 1. The number of prohibited people in the APPS database as of January 1 each year[11]*



## Breakdown of the status of Pending APPS cases

Prohibited individuals in the APPS database may be assigned a Pending status for one of four reasons: (1) the prohibited person has been investigated and all leads have been exhausted, but agents have been unable to disassociate the individual from all known firearms (Unable to Clear); (2) agents have made at least three attempts to contact the prohibited individual but have not been able to locate

---

11        This number excludes individuals who are known to own firearms and are prohibited but are also known to be incarcerated for six months or more. While incarcerated individuals are technically in the Pending status, it is assumed that they are not in possession of firearms while in custody and are therefore treated as a separate population. The Bureau receives state prison incarceration statuses nightly and individuals released from state custody are moved into the Active status.

Exhibit 2 - Jones Decl.
Page 063

them, even after exhausting all leads (Unable to Locate); (3) the prohibited individual has moved out of California (Out of State); or (4) the prohibited individual is prohibited due to a Federal Brady Act prohibition (18 U.S.C. §§ 921, 922) alone and the Bureau does not have the jurisdiction to investigate them (Federal Brady Act Prohibition Only). Of the 14,476 Pending cases, 6,816 (47%) were unable to be cleared, 2,172 (15%) were unable to be located, 3,909 (27%) moved out of state, and 1,579 (11%) were prohibited under Federal Brady Act prohibitions only (Figure 2).

*Figure 2. Pending APPS cases separated by category as of January 1, 2022*



**Breakdown of the number of individuals removed from the APPS Database**

In 2021, 8,937 armed and prohibited people were removed from the APPS database. Removals from the Prohibited Armed Persons File occur for three reasons:

1. Prohibition expired: An individual's prohibition expired, which could result from the expiration of restraining orders, the end of a 10-year prohibition that resulted from a qualifying misdemeanor conviction, or the end of a 5-year prohibition that resulted from a mental health event.

2. Disassociated from all known firearms: The prohibited person has all of their known firearms disassociated from them, meaning that each firearm attributed to them within the APPS database has been accounted for by the Bureau and disassociated from the prohibited person.

3. Deceased: The prohibited person is deceased.

Exhibit 2 - Jones Decl.
Page 064

Table 1 reports the number of individuals removed from the APPS database, separated by category.

*Table 1. Individuals removed from the APPS database in 2021 separated by reasons for removal*

| Reason for Removal | Number of Individuals Removed |
|---|---|
| Prohibition expired/no longer prohibited | 5,365 |
| Disassociated from all known firearms | 3,221 |
| Deceased | 351 |

In instances where the Bureau is unable to locate the prohibited person or disassociate all known firearms from the prohibited person, despite having exhausted all leads, the Bureau cannot remove the individual from the APPS database and must instead assign them to the Pending category. Despite Bureau efforts, this often results from the inherent difficulty of confiscating firearms from individuals who are unwilling to surrender their firearms regardless of their prohibited status.

Of the 8,937 prohibited people removed from the APPS database this year, 3,221 removals were the result of enforcement efforts[12] – 397 more removals compared to 2020. Agents removed a higher number of prohibited individuals in the latter half of the year, with an average of 290 removals per month from July through December compared to an average 247 removals per month from January through June.

This pattern of removals more closely resembles the pattern from 2018 and 2019 in which a higher percentage of removals occurred in August through October. The greatest number of monthly removals in 2021 occurred in June and November, each exceeding 300 prohibited individuals disassociated from all firearms in those months.

*Figure 3. The yearly removals and additions from the APPS list as of January 1, 2022*



| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Removals | 5,433 | 5,748 | 5,347 | 5,708 | 6,459 | 8,130 | 8,937 | 9,470 | 9,424 | 10,681 | 10,064 | 8,370 | 8,937 |
| Additions | 8,647 | 7,095 | 6,087 | 6,470 | 7,938 | 7,371 | 8,930 | 10,413 | 10,572 | 11,333 | 9,266 | 10,762 | 9,848 |

■ Removals   ■ Additions

---

12      Note that not all 3,221 individuals who were disassociated from their firearms resulted in firearm seizures by the Bureau. In some cases, Bureau investigations determined that local law enforcement agencies already seized the firearms but failed to record the recovery, the individual attempted to report the firearm lost/stolen, or the individual is in the process of lawfully selling or gifting the firearm to a friend or relative. For a breakdown of prohibition categories as a percentage of prohibited people see Figure 5 below.

Exhibit 2 - Jones Decl.
Page 065

The past few years have seen an increase in prohibited individuals with Gun Violence Restraining Orders (GVROs) being entered into the APPS database (Figure 4). In 2016, with implementation of Assembly Bill 1014, California became one of the first states to enact a red flag law. The law initially allowed law enforcement officers and family members of a person they believed was a danger to themselves or others to petition the court to prohibit that person from possessing firearms under a GVRO. In 2020, Assembly Bill 61 expanded authorization to petition the court for a GVRO to employers, coworkers, and school employees. GVROs assist law enforcement in recovering firearms from individuals who have shown a probability to commit violence with a firearm or preventing those individuals from obtaining firearms in the first place. The Department views GVROs as a critical tool that saves lives, and the Bureau prioritizes GVRO-related APPS subjects for investigation. Law enforcement agencies are increasingly implementing GVROs as they recognize the positive impact on public safety. As such, the Department applauds these efforts to enhance public safety through the GVRO process.

*Figure 4. Number of GVROs Issued by Year[13]*



Restraining orders were a potentially effective means of removing people from the APPS database in 2021. Of the 3,221 individuals who were disassociated from all known firearms, 1,527 (47%) were prohibited, at least in part, because of restraining orders. Of the 5,365 people who had their prohibitions expire in 2021, 23 (<1%) individuals were prohibited, in part, due to restraining orders. Of the 351 people who became deceased in 2021, 49 (14%) were prohibited, in part, due to restraining orders. Restraining orders also seem to be highly effective at disassociating all firearms from prohibited people. As of January 1, 2022, three people who were prohibited due to restraining orders were designated Pending in comparison to the 1,527 people prohibited due to restraining orders who were disassociated with all known firearms.  As such, restraining orders provide a potentially efficient way of seizing all of a prohibited person's known firearms before their prohibitions expire.

In 2021, the months before California reopened from various COVID-19 restrictions showed fewer case closures than in the months after California's reopening. Bureau agents closed fewer cases on average in the first half of 2021, with 230 individuals disassociated from all known firearms per month between January and May. Meanwhile, Bureau agents increased the number of closures to an average of 290

13        This figure was created using CARPOS data, representing the GVROs currently in the database at a point in time. The counts for GVROS in 2016 and 2017 were extracted on 2/9/2018, on 1/19/2019 for the 2018 GVROs, on 1/29/2020 for the 2019 GVROs, on 1/20/2021 for the 2020 GVROs, and on 2/03/2022 for the 2021 GVROs.

Exhibit 2 - Jones Decl.
Page 066

individuals disassociated from all known firearms per month, an increase of 60 individuals per month, from July through December. June was separated because the Governor's emergency order was lifted halfway through the month, however, it was one of the most efficient months with 336 individuals disassociated from all known firearms. Results suggest that Bureau agents experienced difficulties closing cases due to the COVID-19 pandemic again in 2021 as in 2020.

The second half of 2021 saw substantially more case closures also in part because of the four large-scale regional sweeps that were performed in collaboration with local law enforcement agencies in the second half of the year. These sweeps were effective but increased the number of case closures above typical monthly numbers. It is important to note that the sweeps were possible, in part, because California lifted pandemic-related restrictions.

### The number of people in the APPS database before and after the relevant reporting period

The relevant reporting period runs from January 1, 2021, through December 31, 2021. The APPS database is a compiled list of all individuals who legally purchased or were transferred a firearm in California. It further categorizes individuals as either persons armed but not prohibited, armed and prohibited, and incarcerated and known to have possessed a firearm prior to incarceration. To account for late additions or removals from the system, the state of the APPS database was analyzed as of 1:30 AM on January 1, 2022. At that time, the APPS database system contained 3,199,394 individuals, including 3,173,755 armed and not prohibited individuals, 1,130 incarcerated individuals, and 24,509 armed and prohibited individuals.

The number of people in the APPS database has increased by 199,522 from the 2,999,872 people in the database as of January 1, 2021. The growth over 2021 was consistent with the 5-year average annual increase of 197,856 individuals and consistent with the pattern of yearly growth of armed individuals in the APPS database since 2008 (Figure 4). The APPS database is highly dynamic, and newly armed and prohibited people continue to be added as many others are removed.

*Figure 5. The total number of people in the APPS database per year*



Exhibit 2 - Jones Decl.
Page 067

## Breakdown of why each person in the APPS database is prohibited from possession of a firearm

Persons become prohibited in the APPS database for several reasons. The following categories cover the typical types of events that can trigger a firearm prohibition.

- An individual may become prohibited under the Federal Brady Act. Note, some individuals prohibited because of the Federal Brady Act may not be prohibited under California state law (e.g., a dishonorable discharge in the military).

- An individual may be prohibited from owning or possessing a firearm as a condition of their probation.

- Individuals with felony convictions are prohibited from owning firearms.

- A juvenile who becomes a ward of the court may be prohibited.

- Mental health crises involving involuntary commitment may trigger a temporary prohibition.

- Some misdemeanor convictions may prohibit owning a firearm.

- Individuals may be temporarily prohibited due to restraining orders.

- Individuals may be temporarily prohibited due to a felony warrant.

- Individuals may be temporarily prohibited due to a misdemeanor warrant.

- Individuals may be prohibited due to offenses or triggering events occurring in other states.

Many individuals are prohibited under several categories (Figure 5). As of January 1, 2022, there were 12,696 (54%) people prohibited due to a felony conviction, 5,130 (22%) prohibited due to the Federal Brady Act,[14] 4,912 (21%) were prohibited due to restraining orders, 4,754 (20%) due to mental health prohibitions, 2,469 (10%) due to a qualifying misdemeanor conviction, 1,219 (5%) due to terms of their probation, 411 (2%) due to a felony warrant, 137 (1%) due to misdemeanor warrants, 20 (<1%) due to juvenile prohibitions, and 54 (<1%) due to other reasons.[15]

---

14      This figure includes individuals who may be prohibited under more than one category, including a Federal Brady Act prohibition. These are not solely Federal Brady Act cases.
15      See Appendix E for a list of Firearm Prohibiting Categories.

Exhibit 2 - Jones Decl.
Page 068

*Figure 6. Prohibition categories as a percentage of prohibited people*[16]



The distribution among these categories is largely consistent with that in 2020. Overall, felony convictions were the only prohibition that saw greater than a 1% change, accounting for 2% greater prohibition reasons in 2021 than in 2020. Probation prohibitions fell 1% compared to 2020. Mental health and restraining orders accounted for 1% more compared to that in 2020. See Figure 6 for a complete comparison.

*Figure 7. Prohibition categories as a percentage of prohibited people in 2021 and 2020*



---

16       Many cases have more than one prohibition, so the numbers do not equal 100%.

Exhibit 2 - Jones Decl.
Page 069

**Number of Agents and other staff hired for enforcement of the APPS**

As of January 2021, the Bureau had 75 authorized permanent Special Agent Trainee, Special Agent, Special Agent Supervisor and Special Agent in Charge positions, with 50 filled and 25 vacant. By December 2021, there were 76 authorized positions, of which 53 were filled and 23 were vacant. As Table 2 shows, the number of filled and vacant positions fluctuates throughout the year reflecting the quick turnover rate of these positions. This illustrates the Department's challenges in hiring and retaining agents despite having the authorized positions to fill. In an effort to address the ongoing challenges with staffing, specifically recruitment at the Special Agent and Special Agent Supervisor classifications, the Bureau has continued recruiting Special Agent Trainees. While this approach may ultimately benefit the Bureau by increasing the total number of Special Agents, it can be challenging in the short term due to the time and resources it takes to educate and train a Special Agent Trainee to perform at the level of a Special Agent.

In December 2021, the Bureau had 36 filled Special Agent positions (not including Special Agent Trainees). In 2021, the Bureau hired 17 Special Agents and one Special Agent Trainee. Twenty sworn personnel left the Bureau due to inter-departmental transfers, and/or promotions, and one Special Agent promoted from within the Bureau to a Special Agent Supervisor position.[17] From July 1, 2021, to January 1, 2022, there was a decrease of three authorized Special Agent positions as they were reclassified to Special Agent Trainee positions, which was offset by an increase of two authorized Special Agent positions due to Special Agent Trainees promoting in place to Special Agents, for a total decrease of one authorized Special Agent position.[18]

A number of enforcement support staff assist Special Agents; these individuals are a significant asset to the Bureau. In 2021, one support staff separated from the enforcement teams. The Bureau is actively recruiting to fill this position.

The fluctuation in Special Agent staffing levels due to transfers and promotions affected the quantity of agents that were able to initiate and complete enforcement work in 2021.

---

17       Agent staffing temporarily fell in July 2021, as the Department's Division of Law Enforcement took on significant, additional statutorily-mandated workload.
18       Due to AB 2699, the Department was given one additional Special Agent position to investigate illegal firearms transactions.

Exhibit 2 - Jones Decl.
Page 070

*Table 2: Bureau of Firearms authorized positions for the relevant reporting period*

| Bureau Positions | 1/1/2021 | | | 7/1/2021 | | | 1/1/2022 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filled | Vacant | Total Authorized | Filled | Vacant | Total Authorized | Filled | Vacant | Total Authorized |
| Special Agent | 33 | 22 | 55 | 21 | 25 | 56 | 36 | 19 | 55 |
| Special Agent Supervisor | 13 | 2 | 14 | 13 | 2 | 15 | 14 | 1 | 15 |
| Special Agent in-Charge | 2 | 1 | 3 | 2 | 1 | 3 | 2 | 1 | 3 |
| Special Agent Trainee | 2 | 0 | 2 | 2 | 0 | 2 | 1 | 2 | 3 |
| **Total** | **50** | **25** | **75** | **38** | **38** | **76** | **53** | **23** | **76** |

The Bureau will continue to face challenges in recruiting Special Agents as long as its compensation is not competitive with compensation packages offered by other law enforcement agencies.

While the 12% pay increase for Special Agents that went into effect on September 1, 2021, was a step in the right direction, Special Agent monthly base salary at the Department continues to lag behind comparable positions at other law enforcement agencies.

While the Bureau had no retirements of sworn personnel in 2021, in forthcoming years the Division of Law Enforcement (which includes the Bureau), faces a substantial staffing shortfall as a result of projected retirements.

Exhibit 2 - Jones Decl.
Page 071

*Table 3: Projection of Retirement Eligibility within the Division of Law Enforcement[19]*

| Division of Law Enforcement - SA/SAS/SAC Retirement Eligible Counts | | | |
|---|---|---|---|
| Fiscal Year | Classification | Employees Eligible to Retire | Cumulative Fiscal Year Total |
| 21-22 | Special Agent | 21 | 48 |
| | Special Agent Supervisor | 19 | |
| | Special Agent in Charge | 8 | |
| 22-23 | Special Agent | 27 | 57 |
| | Special Agent Supervisor | 21 | |
| | Special Agent in Charge | 9 | |
| 23-24 | Special Agent | 30 | 65 |
| | Special Agent Supervisor | 26 | |
| | Special Agent in Charge | 9 | |
| 24-25 | Special Agent | 37 | 76 |
| | Special Agent Supervisor | 28 | |
| | Special Agent in Charge | 11 | |
| 25-26 | Special Agent | 42 | 85 |
| | Special Agent Supervisor | 31 | |
| | Special Agent in Charge | 12 | |
| 26-27 | Special Agent | 51 | 99 |
| | Special Agent Supervisor | 36 | |
| | Special Agent in Charge | 12 | |

Until additional bargaining unit contracts are amended to increase agent salaries to competitive levels, as requested in the Recommendations section, the Bureau can expect to continue to face challenges in the recruitment of agents for the Bureau's currently authorized positions.

## Number of contacts made during APPS enforcement efforts

The Bureau's agents and Crime Analysts are continuously working to research and develop viable APPS investigations to determine which leads will potentially provide the greatest possible number of positive results. Cases are pursued until all investigative leads are exhausted. Individuals are then either: (1) disassociated from all of their firearms and removed from the APPS database; or (2) moved to the Pending category due to the existence of no further leads and are labeled "unable to clear."

During the course of an investigation, Bureau agents may need to make repeated contacts with a prohibited individual in order to close a case. These repeated contacts occur because the APPS individual may (1) not be home at the time of the initial contact; (2) have moved and failed to update their address with the Department of Motor Vehicles; (3) have moved out of state; (4) claim the firearm(s) was already seized by local law enforcement or has been reported as lost or stolen; (5) be

---

19    The data in Table 3 was provided on February 17, 2022 by the Department's Office of Human Resources Data Analytics Unit and is based on vacancies and headcounts as of January 2021. The projected cumulative fiscal year totals increase each year as additional employees become retirement eligible, and the projection assumes the prior years' employees have not yet retired.

Exhibit 2 - Jones Decl.
Page 072

uncooperative and not forthcoming with information about the firearm(s), requiring further interviews and contacts; (6) claim to have given their firearm(s) to another person outside of the legal firearms transfer process, requiring agents to track down the firearm(s) and/or verify the provided information. However, due to extenuating circumstances brought on by the COVID-19 pandemic, the normal door-to-door protocol was shifted to minimize the potential risk of exposure by reducing points of contact.

In total, agents made nearly 21,000 contacts in 2021. With an average of 30 Bureau agents (not including supervisors) employed during 2021, that represents an average of 58 contacts per month per agent. Overall, the monthly average number of contacts in 2021 increased compared to 2020. The increased number of contacts is encouraging considering that COVID-19 remained a significant impact on enforcement efforts throughout the year. As in previous years, agents required an average of three separate contacts, which consisted of in-person interviews, in order to close one APPS case.

Special Agent Supervisors are not included in these calculations because, although supervisors are involved in all field operations, their work focuses on being vigilant and available to make quick decisions for the safety of the team. In the course of an investigation, Special Agents take the lead on investigations and contacts with the APPS individual. Supervisors ensure the team adheres to Department policy, follows officer safety protocols, and uses proper investigative methods so that no violations of constitutional rights occur in the course of the investigation.

### Number of firearms recovered

In 2021, the Bureau's Special Agents seized 826 APPS firearms, and 602 non-APPS firearms. See Figures 7 and 8 for a breakdown of the type of APPS and non-APPS firearms recovered. Non-APPS firearms refers to firearms that were not listed as being possessed by an APPS individual, but are confiscated from APPS individuals by the Bureau's agents during investigations. Together, APPS and non-APPS firearms resulted in 1,428 total firearm seizures (Figure 9). Bureau agents closed 6,663 APPS investigations due to enforcement efforts in 2021.[20] This number does not reflect the number of times Bureau agents attempted to locate an APPS individual or had to visit third-party residences; it only captures the total number of closed cases.[21] The following graphs detail the number of firearms seized due to APPS enforcement in 2021, categorized by the type of firearms seized.

---

[20]     Not all cases closed are removed from the APPS. They may remain in the Pending category.
[21]     Cases can also be closed when 1) agents or criminal analysts find the individual is deceased, 2) the individual has moved out of state and out of the Departments jurisdiction, 3) a criminal analyst corrects a data discrepancy, and the individual is cleared.

Exhibit 2 - Jones Decl.
Page 073

*Figure 8. APPS firearms seized in 2021*



*Figure 9. Non-APPS firearms seized in 2021*



Exhibit 2 - Jones Decl.
Page 074

*Figure 10. The 1,428 firearms seized in 2021 separated by APPS type*



Number of firearms seized in 2021

■ APPS  ■ Non-APPS

## Number of ghost guns recovered

Ghost guns are firearms constructed by private citizens that do not have a serial number, which means they are not registered and cannot be tracked by APPS or law enforcement. The Bureau's agents seized a total of 39 ghost guns in 2021, a 44% increase compared to the 27 ghost guns seized during 2020 APPS investigations, and comparable to the 41 ghost guns seized during 2019 APPS investigations. The return to a pre-pandemic number of seized ghost guns supports the argument that the 2020 reduction was, in part, due to reduced enforcement as a result of the rise of the COVID-19 pandemic.

The increase in the number of seized ghost guns indicated the effectiveness of the four sweeps conducted during 2021. Of the 39 ghost guns seized in 2021, nine were seized during the Bureau's four sweeps. These nine ghost guns account for 23% of all ghost guns seized overall and 75% of the 12 more ghost guns seized in 2021 compared to 2020.

When looking at data from the Unique Serial Number Application process, which shows how many California residents have applied to legally make personally manufactured firearms, there has been a slight decline in applications since 2018 (see Figure 10). However, the number of illegal ghost guns seized by law enforcement agencies in California has continued to rise drastically year after year, as evidenced by Figure 11. This contrast demonstrates that illegal ghost guns represent a growing threat to public safety (see Figure 12), and the Department continues to actively investigate illegal manufacturing and possession of them.

In response to the proliferation of crime and violence involving the use of ghost guns, and the overall increase in ghost gun seizures across the state, the Bureau will be expanding investigative efforts focused on ghost guns. The Department is actively working with law enforcement partners to establish collaborative investigative efforts aimed at addressing ghost gun activity.

Exhibit 2 - Jones Decl.
Page 075

*Figure 11. Unique Serial Number Applications (USNAs) from 2018-2021*



*Figure 12. Number of ghost guns seized by law enforcement 2015 – 2021[22]*



---

22      This data comes from reports to the Department of ghost guns seized in California by law enforcement seeking to comply with mandated reporting requirements outlined in Penal Code sections 11108.2 and 11108.3 and includes ghost guns seized by the Department.

Exhibit 2 - Jones Decl.
Page 076

*Figure 13. The number of unique serial number applications and ghost guns seized 2018-2021*



Additionally, effective July 1, 2022, California will become the first state to require a background check for the purchase of a firearm precursor part, which includes unfinished receivers and unfinished handgun frames. Senate Bill 118 (Stats. 2020, ch. 29) and Assembly Bill 879 (Stats. 2019, ch. 730) also created a new licensing structure for vendors to sell firearm precursor parts. In concurrence with the Legislature and Governor, the Department anticipates this law will further help keep firearms out of the hands of people prohibited from owning or possessing them.

### Ammunition recovered

In 2021, Bureau agents recovered 360 large-capacity magazines, 1,321 standard capacity magazines, and 329,826 rounds of ammunition.

### Ammunition purchase eligibility check program

Proposition 63 (The Safety for All Act), as amended by Senate Bill (SB) 1235 (Stats. 2016, ch. 55), was approved by voters in 2016. The intent of Proposition 63 and SB 1235 was primarily to keep prohibited persons from acquiring ammunition in an effort to prevent gun violence. Under the new laws, ammunition must be purchased from or transferred by a licensed California Ammunition Vendor in a face-to-face transaction. Effective July 1, 2019, the law required California Ammunition Vendors to submit eligibility checks for prospective purchasers to the Bureau and obtain approval prior to selling or transferring ammunition. Thereafter, California Ammunition Vendors are required to submit ammunition purchase details to the Bureau. The eligibility checks ensure purchasers are not prohibited from owning or possessing ammunition due to a felony and/or violent misdemeanor conviction/ warrant, domestic violence restraining order, or mental health issue.

On July 1, 2019, the Bureau successfully deployed enhancements to the Dealer Record of Sale (DROS) Entry System, which allowed California Ammunition Vendors to submit eligibility checks, and subsequently report ammunition purchases in compliance with Proposition 63.

Exhibit 2 - Jones Decl.
Page 077

Monitoring denied ammunition purchases is a smart intelligence gathering policy because it signals to Bureau agents when a person wishes to use firearms they are prohibited from owning, and it often provides more current addresses than those previously available in the APPS database. While the use of ammunition denial data is ancillary to regular APPS investigations, nearly every investigation results in a seizure of firearms and/or ammunition from a prohibited person, and sometimes ghost guns.

In 2021, there were 195 armed and prohibited individuals who attempted to purchase ammunition and were denied through the ammunition eligibility check process. Bureau agents used the intelligence garnered through the ammunition purchase denials to investigate and close 123 of these cases. These investigations resulted in the seizure of 43 APPS firearms (21 handguns, one receiver/frame only, 11 rifles, and 10 shotguns), 67 non-APPS firearms (one assault weapon, three ghost guns, 20 handguns, one receiver/frames only, 27 rifles, and 14 shotguns), 73 large-capacity magazines, 108 standard magazines, and 75,626 rounds of ammunition. The remainder of the denial cases remain under investigation. All seizures resulting from these ammunition purchase eligibility check denials are included in the overall APPS statistics provided in the "number of firearms recovered" section of this report.

## Task Forces and collaboration with local law enforcement

As discussed in the Recommendations section, these are the types of programs the Bureau would like to expand. Receiving additional funding to reimburse local law enforcement agencies working with the Bureau in coordinated APPS enforcement activities would make this work possible.

## Contra Costa County Anti-Violence Support Effort Task Force

The Bureau currently manages the Contra Costa County Anti-Violence Support Effort (CASE) Task Force, whose primary mission is conducting complex firearms investigations and seizing firearms from prohibited and violent individuals in Contra Costa County. This Task Force consists of representatives from the following agencies:

- California Department of Justice, Bureau of Firearms

- Contra Costa County Probation Department

- Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives

- San Francisco District Attorney's Office

- California Department of Corrections and Rehabilitation

- California Highway Patrol

The CASE Task Force is a stand-alone task force with a broader overall mission. In 2021, it conducted 93 firearms-related investigations, of which 25 were APPS-related. During these investigations, they conducted 47 probation or parole searches and executed 21 search warrants. As a result of these investigations, the CASE Task Force arrested 40 armed individuals for firearms-related offenses and seized 62 firearms, of which 19 were APPS firearms (eight assault weapons, 11 handguns). The seizure of these 19 APPS firearms is reported with the overall APPS statistics. The 43 firearms seized during non-APPS investigations are not included in seizure totals for this report. Because not all firearms crimes in any county are committed by people in the APPS database, this task force focuses on investigating a broad range of subjects involved in firearms-related crimes — including those

Exhibit 2 - Jones Decl.
Page 078

in the APPS database. This is an excellent model for collaboration with local, state, and federal law enforcement agencies on both APPS and non-APPS-related firearms investigations and affords a proactive approach to combating firearm violence.

## Tulare County Agencies Regional Gun Violence Enforcement Team

In December 2020, the Bureau assumed management of the Tulare County Agencies Regional Gun Violence Enforcement Team, which is also known as the TARGET Task Force. Due to funding issues, management of this task force was redirected from the Department's Bureau of Investigation. The primary mission mirrors that of the CASE Task Force as the team is designed to investigate crimes involving gun violence and to seize firearms from prohibited individuals in the Tulare County region. Through this task force, the Bureau has increased collaborative efforts and support of local and state law enforcement in the region. This task force consists of representatives from the following agencies:

- California Department of Corrections and Rehabilitation

- California Department of Justice, Bureau of Firearms

- Porterville Police Department

- Tulare County Sheriff's Department

- Visalia Police Department

In 2021, the TARGET Task Force conducted 169 firearms-related investigations, of which 126 were APPS investigations. During these investigations, they conducted 14 probation/parole searches and executed 11 search warrants. As a result of these investigations, the TARGET Task Force arrested 21 armed individuals for firearms-related offenses and seized 90 firearms, of which 46 were APPS firearms (one assault weapon, 36 handguns, 9 rifles/shotguns). The seizure of these 46 APPS firearms is reported with the overall APPS statistics. The 44 firearms seized during non-APPS investigations are not included in seizure totals for this report. Because not all firearms crimes in any county are committed by people in the APPS database, this task force focuses on investigating a broad range of subjects involved in firearms-related crimes — including those in the APPS database. This is an excellent model for collaboration with local, state, and federal law enforcement agencies on both APPS and non-APPS-related firearms investigations and affords a proactive approach to combating firearm violence.

With additional funding, the Bureau would be able to replicate these task force models in strategic areas of the state.

## Joint sweep investigations

In addition to participating in the CASE Task Force and TARGET Task Force, the Bureau also conducts collaborative APPS sweeps throughout the state upon request of a local or county law enforcement agency. These sweeps consist of Bureau personnel working together with allied law enforcement agencies in a certain jurisdiction of the state for a period of multiple days conducting APPS investigations. These sweeps became more essential in 2021 as the pandemic stymied investigations involving face-to-face public interactions. As previously mentioned, the Bureau conducted four regional sweeps in the latter half of 2021.

During these regional sweeps, Special Agents collaborated with local law enforcement agencies in a partnership to safely conduct APPS investigations. Although many law enforcement agencies

Exhibit 2 - Jones Decl.
Page 079

were unable to participate in the sweeps due to staffing issues, the Bureau still received assistance from multiple agencies throughout the state. Local patrol officers can act as a force multiplier to benefit APPS enforcement by providing additional information regarding the location of APPS subjects, and can assist with marked patrol vehicles. Local officers can also help expedite the transport and booking process of arrested subjects due to their familiarity with individual county processes. If the subject reports a missing or stolen firearm, the local law enforcement agency can work with the subject to promptly report that information into AFS, which may result in the removal of the subject from the APPS database.

The sweeps throughout the state increased APPS investigations while strengthening partnerships with local law enforcement agencies.

In 2021, four regional sweeps cumulatively investigated 1,263 cases, resulting in 55 arrests, and producing 297 firearm seizures, including 214 APPS firearms, 63 non-APPS firearms, 12 ghost guns, and 8 assault weapons.[23]

The Bureau worked jointly with the following agencies on 2021 APPS investigations:

- Alturas Police Department
- California Highway Patrol
- California Department of Corrections and Rehabilitation
- Contra Costa County Probation Department
- Contra Costa Sheriff's Department
- Gardena Police Department
- Federal Bureau of Alcohol, Tobacco, Firearms and Explosives
- Long Beach Police Department
- Los Angeles County Sheriff's Department
- Ontario Police Department
- Orange County Sheriff's Department
- Pasadena Police Department
- Porterville Police Department
- Rialto Police Department
- Redlands Police Department
- Riverside County Sheriff's Department
- Sacramento County Probation Department

23      These statistics are included in the total 2021 statewide seizure numbers.

- San Bernardino County Sheriff's Department

- San Diego County Sherriff's Department

- San Joaquin County Sheriff's Department

- San Francisco County District Attorney's Office

- Siskiyou County Sheriff's Department

- Tulare County Sheriff's Department

- Visalia Police Department

Looking forward, the Department expects to foster more partnerships for collaborative sweeps in 2022, particularly as the Gun Violence Reduction Program grant mentioned below allows more local agencies to fund positions that can assist the Department in APPS enforcement.

**Gun Violence Reduction Pilot Program**

Assembly Bill (AB) 74 provides grant funding to the Board of State and Community Corrections (BSCC) for Gun Violence Prevention Programs. In 2019, funds were disbursed by the BSCC to four counties; Alameda, San Diego, Santa Cruz and Ventura, to be allotted and spent over several fiscal years. San Diego and Alameda Counties each received $1 million and Ventura and Santa Cruz Counties received $750,000 and $250,000, respectively. In 2021, as in previous years, four county Sheriff's departments (Alameda, San Diego, Santa Cruz, and Ventura counties) participated in the Gun Violence Reduction Pilot Program (GVRPP) to investigate and close APPS cases.

In 2020, the Bureau identified a need to implement a standardized process for counties reporting APPS data to the Department and provided the counties with a template to report APPS cases worked by the counties to the Bureau. This year, three of the four counties utilized the template, and one provided information in a similar format. As a result, the Department was able to review these reports much more efficiently and accurately than in the previous year. While the Department identified small errors in their reporting, the Department was able to accurately report on the large majority of cases provided by each sheriff's department.

The Alameda County Sheriff's Office (ACSO) reported working 300 APPS cases in 2021, of which the Department found 242 individuals in the current APPS database. The Department's verified files included 100 (41%) Active cases, 11 (5%) Pending cases, and 131 (54%) cases removed from the APPS database. The Pending cases included one individual with only federal prohibitions, one individual who no longer lives in California, five individuals who could not be located after exhausting all leads, and four individuals whose cases could not be closed due to unaccounted firearms. The removals included 94 individuals whose prohibitions expired in 2021, 11 deceased individuals, and 26 individuals disassociated from all known firearms.

The San Diego County Sheriff's Office (SDSO) reported working 153 APPS cases in 2021, of which the Department found 150 individuals in the current APPS database. The Department's verified files included 85 (56%) Active cases, 45 (30%) Pending cases, and 20 (13%) cases removed from the APPS database. Of the removals, eight (5%) had their prohibitions expire during 2021, 11 (7%) of the individuals were disassociated from all their known firearms, and one person became deceased in 2021. Of the pending cases, 10 (6%) individuals had only federal prohibitions, one individual moved out of California, 29 (19%) were unable to be closed due to unaccounted firearms, and five (3%) of the

Exhibit 2 - Jones Decl.
Page 081

individuals were unable to be located.

The Santa Cruz County Sheriff's Office (SCSO) reported investigating 61 cases, of which the Department found 57 individuals in the current APPS database. The Department's verified records included 26 (46%) Active cases, 13 (23%) Pending cases, and 18 cases removed from the APPS database. The 18 (32%) individuals removed from the APPS database were comprised of one deceased individual, eight individuals who were disassociated from all known firearms, and nine individuals who had their prohibitions expire during 2021. The 13 (23%) Pending cases comprised five individuals who were prohibited due to federal prohibitions only, five individuals who had firearms that were unaccounted for and were unable to be closed, and three individuals who were unable to be located.

The Ventura County Sheriff's Office (VCSO) reported investigating 207 cases during 2021, of which the Department found 164 individuals in the current APPS database. The Department's verified records included 28 (17%) Active cases, 70 (43%) Pending cases, and 65 (40%) cases removed from the APPS database. The 65 (40%) individuals removed from the APPS database were comprised of 10 deceased people, 15 individuals who had their prohibitions expire, and 40 individuals who were disassociated from all known firearms. The 70 (43%) pending cases were comprised of eight individuals who were federally prohibited only, five who were incarcerated, 15 who moved out of California, 35 whose cases could not be closed because of unaccounted firearms, and seven who could not be located after exhausting all leads.

## Gun Violence Reduction Program

The Legislature expanded the scope of the Gun Violence Reduction Pilot Program by creating the Gun Violence Reduction Program (GVRP). Senate Bill 129 (SB 129), the California Budget Act of 2021, allocated $10.3 million for the GVRP. Unlike the GVRPP, which is operated by BSCC, GVRP is operated by the Department. Under the program, the Department awards grants to county sheriff's departments to support seizures of firearms and ammunition from prohibited individuals. This is a new and important program for the Department that increases collaboration with local law enforcement partners across the state toward the common goal of enhancing public safety and removing firearms and ammunition from prohibited persons. Collaboration between the Department and local law enforcement agencies has proven a successful model which streamlines APPS enforcement efficiencies.

Sheriff's departments that received GVRP funds were required to submit completed grant proposals to the Department by November 12, 2021. Pursuant to SB 129, the Department will make $10 million available over two grant cycles. Approximately five million dollars were awarded by January 1, 2022, and another $5 million will be awarded by January 1, 2023. In following the grant criteria outlined in SB 129, grant applicants were asked to provide clearly defined and measurable objectives for closing APPS cases and reducing the number of prohibited persons in possession of firearms. The sheriff's departments were also required to explain how the grants would enhance existing law enforcement activities and also how the funds would be used for new activities, including innovative techniques and approaches toward APPS enforcement.

In selecting grantees, pursuant to the parameters outlined in SB 129, counties with the highest per capita population of armed prohibited persons that also lacked a Bureau field office were prioritized. Priority was also given to departments that proposed innovative techniques and approaches to APPS enforcement, integrated APPS enforcement into existing operations, and presented a plan with the greatest likelihood of success.

In the first grant cycle, 10 county sheriff's departments were awarded grants to support activities related to seizing firearms and ammunition from individuals prohibited from owning or possessing them. The sheriff's departments of Contra Costa, Lake, Los Angeles, Orange, Sacramento, San Francisco,

Exhibit 2 - Jones Decl.
Page 082

Santa Barbara, Santa Clara, Santa Cruz, and Ventura counties received grant funding through the first cycle of the Department's Gun Violence Reduction Program. For more information on awards see Appendix H.

These grantees will report certain statistical information regarding this grant funding to the Department by February 1, 2023. With the vast reach of the areas of responsibility of the grant awardees, the Department anticipates a positive impact on APPS enforcement.

## Recommendations

The Department greatly appreciates Governor Gavin Newsom's and the Legislature's interest in sensible firearms regulation and enforcement, and additional financial support toward this effort. As noted throughout this report, the recommendations the Department proposes would help to not only report the information mandated under Penal Code section 30012, but would also improve the efficiency and efficacy of the APPS program. To that end, the Department recommends the following:

1. Fund all California county courts so that they can confiscate or enforce the transfer or legal storage of known firearms at the time of conviction, when an individual is prohibited due to a felony or qualifying misdemeanor. Pursuant to Proposition 63 (2016), the courts and probation departments should focus on obtaining firearms from armed and prohibited persons on the front-end of the process. When an individual's conviction for a crime renders them prohibited, they are supposed to be notified at the time of conviction that they are prohibited from owning and possessing any firearms as well as how to turn over any firearms they have in their possession. This is the best opportunity to ensure prohibited persons are being disarmed. Felons and persons prohibited from possessing firearms by qualifying misdemeanors account for 57% of the Prohibited Armed Persons File in the APPS database, or 14,561 individuals. Given that the number of individuals prohibited due to a felony conviction has increased by 392 from last year suggests that relinquishment regulations are not being effectively implemented. A thorough court-based relinquishment program at the county level would aid in drastically reducing future APPS numbers.

2. Develop and fund a similar county-level firearm confiscation system where firearms are confiscated from the individual at the time they are served with a restraining order(s). Currently, all individuals who are served restraining orders and are in possession of a firearm at the time they are served end up in the APPS database unless local law enforcement agencies seize the firearms from them. If local law enforcement agencies could seize the firearms from these individuals upon service of the various types of restraining orders, it could limit new additions to the Prohibited Armed Persons File in the APPS database by up to 19 percent.

3. Improve the recruitment of Special Agents by making their compensation competitive with other law enforcement agencies. Unlike many other law enforcement agencies, the Department's Special Agents are required to have a college education. However, entry-level Special Agents are paid less than those in law enforcement agencies that do not have this same requirement. While the 12% pay increase for Special Agents that went into effect on September 1, 2021, was a step in the right direction, Special Agent monthly base pay at the Department continues to lag behind comparable positions at other law enforcement agencies. Seizing firearms from prohibited persons is dangerous and difficult work that requires quick decisions and analytical thinking. The agents who do this work should be competitively compensated for their efforts. The Department has moved to a more aggressive hiring model in an attempt at filling Special Agent and Special Agent Supervisor positions at a quicker rate to fill vacancies and keep pace with agent attrition. However, receiving additional funding and contracting for salary increases would greatly improve recruitment of agents for the Department's currently authorized positions.

Exhibit 2 - Jones Decl.
Page 083

4. Continue to improve coordination and cooperation with local law enforcement agencies by establishing joint task forces with and under the direction of the Bureau. To expand and improve the existing programs requires additional funding, which the Department would manage. Funds would be managed and disbursed for the purpose of reimbursing local agency overtime for working with the Bureau on the APPS workload. Reimbursement would go toward personnel time and other applicable expenses incurred as a direct result of the involved agency's participation in the joint operations through the execution of a memorandum of understanding with the Bureau. A memorandum of understanding would also include administrative assistance efforts to help identify and reduce APPS firearms in locally managed evidence systems. All participating agencies would be required to assess firearms in their possession and develop a plan approved by the Bureau to ensure all the required entries into the AFS are made in accordance with current state law. This would be a force multiplier for the Bureau that would ensure a statewide coordinated effort and maintain recordkeeping standards to ensure that the data in the APPS database is as current as possible. Expansion of the GVRP grant program, which is expected to bolster existing APPS enforcement by sheriff's departments. Additionally, the participating sheriff's departments would be required to report all data in a manner prescribed by the Department or as required by law as it relates to the seizure of firearms, ammunition, arrests, and all other information relevant to maintain adequate accountability for the APPS database.

5. Modernize the existing firearms databases and automate many of the manual processes to improve overall efficiency, risk mitigation, and stabilization of employee resources. As communicated to the DOF when the Legislature implemented SB 94's current reporting requirements under Penal Code section 30012, the Department cannot fulfill this obligation until it modernizes the firearms databases.

   The following systems support the regulation, and enforcement actions relating to the manufacture, sale, ownership, safety training, and transfer of firearms.

   - Ammo Processor

   - Armed Prohibited Persons System (APPS)

   - Automated Firearms System (AFS)

   - California Firearms Information Gateway (CFIG)

   - California Firearms Licensee Check (CFLC)

   - Carry Concealed Weapons (CCW)

   - Centralized List (CL)

   - Consolidated Firearms Information System (CFIS)

   - Dealer Record of Sale (DROS)

   - DROS Entry System (DES)

   - California Firearms Application Reporting System (CFARS)

   - Firearms Certificate System (FCS)

Exhibit 2 - Jones Decl.
Page 084

- Assault Weapons Registration (AWR)

- Firearms Employment Application File (FEAF)

- Mental Health Reporting System (MHRS)

- Mental Health Firearms Prohibition System (MHFPS)

- Prohibited Applicant (PA)

This network of systems is incredibly complex and cumbersome to operate and navigate. Despite this monumental challenge, the Department has until recently been able to meet legislative reporting mandates using these outdated databases. These databases are not flexible and were not designed to be adaptable to meet additional demands. The Department has been able to partially adapt and circumvent issues despite using technology that is not equipped with automated processes to meet the specified conditions. Consequently, most, if not all queries must be pulled and cross-checked manually from database to database, hindering efficiency and introducing increased opportunities for error. Working to modify or maintain these legacy systems is no longer cost-effective or a technologically viable option as the databases have become outdated and no longer meet the demands of the Legislature and the Department.

The Department received initial funding to pursue Stage 2 of this effort and is exploring modernization options to find a dynamic solution that would meet existing needs and be adaptable to evolving statutory mandates. However, additional funding will be required to begin Stages 3 and 4 and fully implement this project.

6. Continue working with federal law enforcement partners and engage with local law enforcement agencies to disarm individuals prohibited only under the Federal Brady Act, the portion of the Prohibited Armed Persons File in the APPS database that the Department is tasked with tracking but over which it has no jurisdiction. The Department has partnered with the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) in an attempt to reduce this section of the database. The Bureau is pursuing collaborative investigative efforts with the ATF and local law enforcement agencies focused on ghost gun and firearms violence-related criminal activity. The Bureau collaboratively worked several joint firearms investigations with the ATF in 2021, and anticipates scaling those efforts across California with the ATF. As of the publication of this report, the Bureau has three staff cross-designated to enforce federal firearms laws. Additional staff statewide are undergoing the process to become cross-designated with ATF.

Exhibit 2 - Jones Decl.
Page 085



## APPENDICES

### *APPENDIX A: Relevant Key Terms and Definitions*

This section provides definitions to key terms used throughout this report.

**Armed Prohibited Persons System (APPS)**. The Armed Prohibited Persons System is a database housed at the Department of Justice which contains a list of all individuals who are both armed (the Department is aware of their ownership of one or more firearms) and prohibited (for one or more reasons they have been designated as not being permitted to own or possess firearms).

**Automated Criminal History System (ACHS)**. The repository for the state summary Criminal Offender Record Information (CORI). In addition, the Department transmits CORI to the Federal Bureau of Investigation (FBI).

**Automated Firearms System (AFS)**. This system was created in 1980 to identify lost or stolen firearms and connect firearms with persons. The system tracks serial numbers of every firearm owned by government agencies, handled by law enforcement (seized, destroyed, held in evidence, reported stolen, recovered), voluntarily recorded in AFS, or handled by a firearms dealer through transactions. Prior to 2014, most entries in AFS were handguns. Now, all newly acquired firearms, both handguns and long guns, are entered into AFS.

**Backlog.** The number of cases for which the Department did not initiate an investigation within six months of the case being added to the APPS database or has not completed investigatory work within six months of initiating an investigation on the case.

**Brady Handgun Violence Prevention Act.** The Federal Brady Act, codified at 18 U.S.C. § 922(g), makes it unlawful for   certain categories of persons to ship, transport, receive, or possess firearms or ammunition, to include any person:

- convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

- who is a fugitive from justice;

- who is an unlawful user of or addicted to any controlled substance (as defined in Section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 802);

- who has been adjudicated as a mental defective or has been committed to any mental institution;

- who is an illegal alien;

- who has been discharged from the Armed Forces under dishonorable conditions;

- who has renounced his or her United States citizenship;

- who is subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or child of the intimate partner; or

- who has been convicted of a misdemeanor crime of domestic violence.

Exhibit 2 - Jones Decl.
Page 086

Under 18 U.S.C. § 992(n), it is also unlawful for any person under indictment for a crime punishable by imprisonment for a term exceeding one year to ship, transport, or receive firearms or ammunition. Further, 18 U.S.C. § 922(d) makes it unlawful to sell or otherwise dispose of firearms or ammunition to any person who is prohibited from shipping, transporting, receiving, or possessing firearms or ammunition. The Department refers to these prohibitions as Federal Brady Act prohibitions. Since these individuals are only prohibited due to federal law, the Department lacks jurisdictional authority to investigate these individuals, unless they also have a California prohibition. On January 1, 2022, there were 24,509 armed and prohibited persons in the APPS database (10,033 active and 14,467 pending). Of the 14,467 pending cases, 1,579 are Federal Brady only cases.

**Bullet Button.** A product requiring a tool to remove an ammunition feeding device or magazine by depressing a recessed button or lever shielded by a magazine lock.

**Bullet Button Weapon.** A semiautomatic, centerfire or rimfire pistol with an ammunition feeding device that can be readily removed from the firearm with the use of a tool that has one or more specified features identified in Penal Code section 30515 and is included in the category of firearms that must be registered.

**California Restraining and Protective Order System (CARPOS).** A statewide database of individuals subject to a restraining order.

**Cleared.** All cases in which the individual has died, the prohibition has expired or been reduced (e.g., the expiration of a temporary restraining order), or the individual has been disassociated from the firearm(s) such as selling, transferring, or turning over their firearm(s).

**Closed.** Any investigation that has been fully investigated and the individual has been cleared from APPS, or all investigative leads are exhausted and the individual remains in APPS with a pending status (see definition of pending and sub-statuses definitions).

**Consolidated Firearms Information System (CFIS).** This system consolidates numerous internal firearm applications within the California Justice Information Services Division (CJIS), the technology division within the Department. These applications include the Armed Prohibited Persons System (APPS), Assault Weapon Registration (AWR), Centralized List (CL), Carry Concealed Weapon (CCW), Dealers' Record of Sale (DROS), and Prohibited Applicant (PA).

**Contacts.** An attempt to locate an APPS individual at a potential current address. During face-to-face contact, agents will attempt a consent search if there are no search conditions due to parole or probation status. Sometimes consent is denied, and agents will leave the premises. If probable cause is developed at the scene, a search warrant will be requested and served that day.

**Dealers' Record of Sale (DROS).** This application is completed by firearms purchasers in California and is sent to the Department by licensed firearms dealers, which initiates the 10-day waiting period. The Department uses this information for a background check and the documentation of firearms ownership.

**Ghost Gun.** Ghost guns are firearms made by an individual, without serial numbers or other identifying markings.

**Mental Health Reporting System (MHRS).** This is a web-based application used by Mental Health Facilities, Superior Courts, Juvenile Courts, and Law Enforcement Agencies to report firearm-prohibiting events related to mental health to the Department.

Exhibit 2 - Jones Decl.
Page 087

**Statuses:**

**Active.** Individuals believed to reside in California who are prohibited (state, federally, or a combination of state and federally prohibited) from owning or possessing firearms, and have not yet been investigated or are in the process of being investigated, but all investigative leads have not yet been exhausted.

**Pending.** Individuals previously investigated, but that cannot be currently investigated for one or more reasons. The cases are those that have been thoroughly analyzed and all investigative leads have been exhausted. These individuals fall into one of the following sub-categories:

**Incarcerated.** These individuals are in state or federal prison. While they are incarcerated, these individuals are not in Active status. Although technically under Pending status, incarcerated individuals are treated as a separate population for the purposes of this report because it is assumed that they are not in possession of firearms while in custody and cannot be investigated until they are released. Once the Department has received notification that they have been released, the individual is moved to the Active status.

**No Longer Residing in California (Out-of-State)**. Individuals who were a resident of California, but now no longer live in this state.

**Unable to Clear (UTC)**. These cases have previously been investigated by Bureau Special Agents and all investigative leads have been exhausted. The individual still has one or more firearms associated with them. If new information is identified, the case will be moved to Active status.

**Unable to Locate (UTL)**. These cases have previously been investigated by a Bureau Special    Agent, but the agent is unable to locate the individual. It could be that the individual no longer lives at the address on file, family and friends are not able to provide useful location information, etc. If new location information is identified, the case will be moved to active status.

**Federal Brady Act Prohibition Only**. Cases where a person is prohibited only under federal law. State, county, and municipal law enforcement have no authority to enforce a prohibition based only on the Federal Brady Act (see definition for Brady Handgun Violence Prevention Act for a list of federal prohibitions). Persons who have both a statewide and federal prohibition are not listed in this group.

**Individuals having both state and federal prohibitions**. If APPS database individuals have a combination of state and federal firearm prohibitions, then the Department has jurisdictional authority to investigate the matter related to the state prohibitions (e.g., felons, individuals with California restraining orders, qualifying misdemeanor convictions, and California mental health prohibitions).

**Wanted Persons System (WPS)**. This system was established in 1971 as the first online system for the Department. It is a statewide computerized file of fugitives for whom arrest warrants have been issued.

Exhibit 2 - Jones Decl.

Page 088



## APPENDIX B: Legislative History Relative to APPS

The following provides a brief overview of the legislative history affecting the Department's Armed and Prohibited Person program from 1999 to present. These legislative changes have exponentially increased the volume of prohibited individuals as the Legislature continues to increase the type and length of prohibitions. Other legislative changes with a substantial impact include evolving statutory and legal definitions as well as increases in the overall regulation of the various types of firearms, ammunition, and parts.

**1999**: APPS was conceptualized by the Legislature as a result of the proliferation of gun violence across the state and the nation.

**2001**: APPS was created in 2001 by Senate Bill (SB) 950 in response to high-profile murder cases involving people prohibited from owning firearms.

**2006**: The APPS database went into effect.

**2013**: SB 140 passed the Legislature and appropriated $24,000,000 from the Dealer Record of Sale Special Fund to the Department for three years to reduce the volume of pending APPS investigations.

**2014**: Effective January 1, 2014, a new California law (Assembly Bill 809, Stats. 2011, ch. 745) mandated the Department collect and retain firearm transaction information for all types of firearms, including long guns.

**2015**: After a 2013 audit by the Bureau of State Audits, the Bureau of Firearms finished manually inputting all of the cases into the APPS database.

**2016**: SB 140 funding expired. Effective January 1, 2016, AB 1014 created the new prohibitory category of the Gun Violence Restraining Order.

**2018:** Effective January 1, 2018, AB 785 added Penal Code section 422.6 (Criminal Threats) to the list of prohibiting misdemeanors. Effective July 1, 2018, AB 857 required the Department to begin issuing serial numbers for firearms manufactured by unlicensed individuals after a successful background check of the owner. The background checks associated with this process identified additional prohibited persons.

**2019:** Effective July 1, 2019, SB 1235 and Proposition 63 required ammunition to be sold only to an individual whose information matches an entry in the Automated Firearms System and who is eligible to possess ammunition, with some exceptions. It also required ammunition vendors to electronically submit to a database known as the Ammunition Purchase Records File, and thus to the Department, information regarding all ammunition sales and transfers.

Additionally, AB 3129 prohibited a person from ever possessing a firearm if that person is convicted of a misdemeanor violation of Penal Code Section 273.5 regarding the willful infliction of corporal injury resulting in a traumatic condition upon a spouse, cohabitant or other specified person. SB 746 required new California residents to, within 60 days of becoming a resident, apply for a unique serial number or other identifying mark for any un-serialized firearm the resident manufactured or otherwise owns and intends to possess in California. SB 1100 prohibited the sale, supplying, delivery or giving possession or control of any firearm by a licensed dealer, with some exceptions, to any person under 21 years of age. SB 1200 expanded the definition of ammunition for the purposes of the Gun Violence Restraining Order law.

Exhibit 2 - Jones Decl.
Page 089

SB 94 provided updated requirements regarding the mandated reporting of the APPS database statistics. It required the Department to report no later than April 1, 2020, and no later than April 1 of each year thereafter, to the Joint Legislative Budget Committee and the fiscal committees of each house of the Legislature on information related to the APPS database, as listed in Penal Code section 30012.

**2020:** Effective January 1, 2020, AB 1968 subjected individuals who have been taken into custody, assessed and admitted to a designated mental health facility twice within a one-year period, because they are a danger to self or others as a result of a mental health disorder, to a lifetime firearms prohibition subject to a petition for, and hearing on, a reinstatement of firearm ownership rights.

Additionally, AB 164 prohibited a person from possessing a firearm if that person is prohibited in another state and allows the Department and state and local law enforcement agencies to investigate and pursue these cases. AB 12 increased the maximum duration of a gun violence restraining order from one year to between one and five years. It also allows for law enforcement officers to file a petition for gun violence restraining orders in the name of the law enforcement agency in which they are employed. AB 61 expanded the list of individuals who may request a gun violence restraining order.

Exhibit 2 - Jones Decl.
Page 090

## APPENDIX C: Mandated Statistics – At a Glance[24]

[1]  **The total number of individuals in the APPS database and the number of cases which are active and pending.** The Armed and Prohibited Persons System has 3,199,394 individuals as of January 1, 2022. Of those individuals, 24,509 are prohibited from owning or possessing firearms, with 10,033 of those cases being Active and 14,467 of them being Pending.

[A][i] **For Active cases, the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system.** The APPS database is an outdated system that does not have the capability to track the time elapsed between a case entering the APPS database to when a case was last worked. As a result, the Department does not have the ability to gather and report the requested information.

[B] **For Pending cases, the Department shall separately report the number of cases that are unable to be cleared, unable to be located, related to out-of-state individuals, related to only federal firearms prohibitions, and related to incarcerated individuals.** Of the 14,467 prohibited persons designated as Pending cases, 6,816 (47%) were unable to be cleared, 2,172 (15%) were unable to be located, 3,909 (27%) moved out of state, and 1,579 (11%) were prohibited under federal prohibitions only. Additionally, there are 1,130 incarcerated individuals.

[2]  **The number of individuals added to the APPS database.** Between January 1, 2021 and January 1, 2022, there were 9,848 additional known firearm owners who became prohibited. In the same time period, there were 8,937 individuals removed from the prohibited category. This resulted in the total number of armed and prohibited individuals increasing by 911.

[3]  **The number of individuals removed from the APPS database, including a breakdown of the basis on which they were removed**.

*Table 1: Removals of Prohibited Persons in 2021 Separated by Reason for Removal*

| Reason for Removal | Number of Individuals Removed |
| --- | --- |
| Prohibition expired/no longer prohibited | 5,365 |
| Disassociated from all known firearms | 3,221 |
| Deceased | 351 |

[4]  **The degree to which the backlog in the APPS has been reduced or eliminated.**

Penal Code section 30012, subdivision(a)(4) defines "backlog" as being cases for which the Department did not initiate an investigation within six months of the case being added to the APPS database or has not completed investigatory work within six months of initiating an investigation on the case. The APPS database does not have the technological capability of tracking the amount of time a case has been in the system. Gathering this information would require that a Crime Analyst review each individual APPS entry, one-by-one and review the notes in each file. Lacking a more efficient way of gathering this information, the Department will be unable to provide these statistics until upgrades are made to the APPS database.

---

24    The numbers and letters below correspond to the subdivision number in Penal Code section 30012.

Exhibit 2 - Jones Decl.
Page 091

**[5] The number of individuals in the APPS before and after the relevant reporting period.**

*Table 3: The Total number of Individuals in APPS Before and After the Reporting Period Separated by Status*

| Status | Before Reporting Period | After Reporting Period |
|---|---|---|
| Armed and Not Prohibited | 2,999,872 | 3,173,755 |
| Armed and Prohibited | 23,598 | 24,509 |
| Incarcerated | 1,218 | 1,130 |

**[6] The number of Agents and other staff hired for enforcement of the APPS.** In 2021, the Bureau hired 17 Special Agents, one Special Agent Trainee and one support staff for APPS enforcement. Additionally, two existing Special Agent Trainees promoted into the Special Agent ranks. The Department also saw the separation of 20 Special Agents during 2021 due to inter-departmental transfer and/or promotion and had one Special Agent promote from within to Special Agent Supervisor position, leaving the Department with a net increase of three filled Special Agent positions. The Department also saw the separation of one support staff for APPS enforcement resulting in a net change of zero in support staff.

**[7] The number of firearms recovered due to enforcement of the APPS.** In 2021, Bureau Agents recovered 826 APPS firearms (i.e., firearms known in the APPS database), and 602 non-APPS firearms not associated with APPS individuals, for a total of 1,428 firearms recovered.

**[8] The number of contacts made during the APPS enforcement efforts**. In 2021, agents made nearly 21,000 contacts based on an average of three contacts per individual per case while working APPS investigations.

**[9] Information regarding task forces or collaboration with local law enforcement on reducing the APPS file or backlog.** The Department takes pride in its collaborative efforts with law enforcement partners. These efforts include leading the Contra Costa County Anti-Violence Support Effort (CASE) Task Force along with the recent addition of the TARGET Task Force, its partnership with the Los Angeles County Sheriff's Department on Dual Force operations, joint APPS sweeps with specific jurisdictions based on workload, and most recently the Gun Violence Reduction Program in which the Department has awarded grant funding to county sheriff's departments to support activities related to conducting APPS investigations.

Exhibit 2 - Jones Decl.
Page 092

## APPENDIX D: Relational Diagram of the Bureau of Firearms Databases



Exhibit 2 - Jones Decl.
Page 093

## *APPENDIX E: Firearms Prohibiting Categories*

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2020)

DEPARTMENT OF JUSTICE
PAGE 1 of 3




**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
## FIREARMS PROHIBITING CATEGORIES

**State and federal law make it unlawful for certain persons to own and/or possess firearms, including:**

- Any person who has been convicted of, or has an outstanding warrant for, a felony under the laws of the United States, the State of California, or any other state, government, or country, or of an offense enumerated in subdivision (a), (b), or (d) of Section 23515, or who is addicted to the use of any narcotic drug

- Any person who has been convicted of an offense enumerated in Penal Code sections 29900 or 29905

- Any person who is ordered to not possess firearms as a condition of probation or other court order listed in Penal Code section 29815, subdivisions (a) and (b)

- Any person who has been convicted of, or has an outstanding warrant for, a misdemeanor listed in Penal Code section 29805 (refer to List of Prohibiting Misdemeanors)

- Any person who is adjudged a ward of the juvenile court because he or she committed an offense listed in Welfare and Institutions Code section 707(b), an offense described in Penal Code section 1203.073(b), or any offense enumerated in Penal Code section 29805

- Any person who is subject to a temporary restraining order or an injunction issued pursuant to Code of Civil Procedure sections 527.6 or 527.8, a protective order as defined in Family Code section 6218, a protective order issued pursuant to Penal Code sections 136.2 or 646.91, a protective order issued pursuant to Welfare and Institutions Code section 15657.03, or by a valid order issued by an out-of-state jurisdiction that is similar or equivalent to a temporary restraining order, injunction, or protective order, as specified above, that includes a prohibition from owning or possessing a firearm

- Any person who is subject to a Gun Violence Restraining Order (GVRO)

- Any person who is found by a court to be a danger to himself, herself, or others because of a mental illness

- Any person who is found by a court to be mentally incompetent to stand trial

- Any person who is found by a court to be not guilty by reason of insanity

- Any person who is adjudicated to be a mentally disordered sex offender

- Any person who is placed on a conservatorship because he or she is gravely disabled as a result of a mental disorder, or an impairment by chronic alcoholism

- Any person who communicates a threat to a licensed psychotherapist against a reasonably identifiable victim that has been reported by the psychotherapist to law enforcement

- Any person who is taken into custody as a danger to self or others under Welfare and Institutions Code section 5150, assessed under Welfare and Institutions Code section 5151, and admitted to a mental health facility under Welfare and Institutions Code sections 5151, 5152, or certified under Welfare and Institutions Code sections 5250, 5260, and 5270.15

- Any person who is addicted to the use of narcotics (state and federal)

- Any person who has been convicted of, or is under indictment or information in any court for a crime punishable by imprisonment for a term exceeding one year (federal)

- Any person who has been discharged from the military under dishonorable conditions (federal)

- Any person who is an illegal alien (federal)

- Any person who has renounced his or her US Citizenship (federal)

- Any person who is a fugitive from justice (federal)

Exhibit 2 - Jones Decl.
Page 094

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2020)

DEPARTMENT OF JUSTICE
PAGE 2 of 3



## CALIFORNIA DEPARTMENT OF JUSTICE
### BUREAU OF FIREARMS
# FIREARMS PROHIBITING CATEGORIES



## MISDEMEANORS

**Firearm prohibitions for misdemeanor violations of the offenses listed below are generally prohibiting for ten years from the date of conviction, but the duration of each prohibition may vary. All statutory references are to the California Penal Code, unless otherwise indicated.**

- Threatening public officers, employees, and school officials (Pen. Code, § 71.)

- Threatening certain public officers, appointees, judges, staff or their families with the intent and apparent ability to carry out the threat (Pen. Code, § 76.)

- Intimidating witnesses or victims (Pen. Code, § 136.1.)

- Possessing a deadly weapon with the intent to intimidate a witness (Pen. Code, § 136.5.)

- Threatening witnesses, victims, or informants (Pen. Code, § 140.)

- Attempting to remove or take a firearm from the person or immediate presence of a public or peace officer (Pen. Code, § 148(d).)

- A person who reports to a person that a firearm has been lost or stolen, knowing the report to be false (Pen. Code, § 148.5(f).)

- Unauthorized possession of a weapon in a courtroom, courthouse, or court building, or at a public meeting (Pen. Code, § 171b.)

- Bringing into or possessing a loaded firearm within the state capitol, legislative offices, etc. (Pen. Code, § 171c.)

- Taking into or possessing loaded firearms within the Governor's Mansion or residence of other constitutional officers (Pen. Code, 171d.)

- Supplying, selling or giving possession of a firearm to a person for participation in criminal street gangs (Pen. Code, § 186.28.)

- Assault (Pen. Code, §§ 240, 241.)

- Battery (Pen. Code, §§ 242, 243.)

- Sexual Battery (Pen. Code, § 243.4.)

- Assault with a stun gun or taser weapon (Pen. Code, § 244.5.)

- Assault with a deadly weapon other than a firearm, or with force likely to produce great bodily injury (Pen. Code, § 245.)

- Assault with a deadly weapon or instrument; by any means likely to produce great bodily injury or with a stun gun or taser on a school employee engaged in performance of duties (Pen. Code, § 245.5.)

- Discharging a firearm in a grossly negligent manner (Pen. Code, § 246.3.)

- Shooting at an unoccupied aircraft, motor vehicle, or uninhabited building or dwelling house (Pen. Code, § 247.)

- Inflicting corporal injury on a spouse or significant other (Pen. Code, § 273.5.)  (Convictions on or before 12/31/2018.)

- Willfully violating a domestic protective order (Pen. Code, § 273.6.)

- Drawing, exhibiting, or using a deadly weapon other than a firearm (Pen. Code, § 417.)

- Inflicting serious bodily injury as a result of brandishing (Pen. Code, § 417.6.)

- Making threats to commit a crime which will result in death or great bodily injury to another person (Pen. Code, § 422.)

- Interference with the exercise of civil rights because of actual or perceived characteristics of the victim (Pen. Code, § 422.6.)

- Bringing into or possessing firearms upon or within public schools and grounds (Pen. Code, § 626.9.)

- Stalking (Pen. Code, § 646.9.)

Exhibit 2 - Jones Decl.
Page 095

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2020)

DEPARTMENT OF JUSTICE
PAGE 3 of 3



**CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS
FIREARMS PROHIBITING CATEGORIES**



- Carrying a concealed or loaded firearm or other deadly weapon or wearing a peace officer uniform while picketing (Pen. Code, §§ 830.95, 17510).

- Possessing a deadly weapon with intent to commit an assault (Pen. Code, § 17500.)

- Criminal possession of a firearm (Pen. Code, § 25300.)

- Armed criminal action (Pen. Code, § 25800.)

- Possession of ammunition designed to penetrate metal or armor (Pen. Code, § 30315.)

- Unauthorized possession/transportation of a machine gun (Pen. Code, § 32625.)

- Driver of any vehicle who knowingly permits another person to discharge a firearm from the vehicle or any person who willfully and maliciously discharges a firearm from a motor vehicle (Pen. Code, § 26100, subd. (b) or (d).)

- Firearms dealer who sells, transfers, or gives possession of any firearm to a minor or a handgun to a person under 21 (Pen. Code, § 27510.)

- Purchase, possession, or receipt of a firearm or deadly weapon by a person receiving in-patient treatment for a mental disorder, or by a person who has communicated to a licensed psychotherapist a serious threat of physical violence against an identifiable victim (Welf. & Inst. Code, § 8100.)

- Providing a firearm or deadly weapon to a person described in Welfare and Institutions Code sections 8100 or 8103 (Welf. & Inst. Code, § 8101.)

- Purchase, possession, or receipt of a firearm or deadly weapon by a person who has been adjudicated to be a mentally disordered sex offender or found to be mentally incompetent to stand trial, or not guilty by reason of insanity, and individuals placed under conservatorship (Welf. & Inst. Code, § 8103.)

- Bringing firearm related contraband into juvenile hall (Welf. & Inst. Code, § 871.5.)

- Bringing firearm related contraband into a youth authority institution (Welf. & Inst. Code, § 1001.5.)

- Theft of property less than $950.00, if property taken was a firearm (Pen. Code, § 490.2)

- Criminal storage of a firearm (Pen. Code, §§ 25100, 25135 or 25200)

- Various violations involving sales and transfers of firearms (Pen. Code, § 27590, subd. (c).)

**The following misdemeanor conviction results in a five year prohibition:**
- Every person who owns or possesses a firearm or ammunition with knowledge that he or she is prohibited from doing so as a result of a gun violence restraining order (Pen. Code, § 18205).

**The following misdemeanor convictions result in a lifetime prohibition:**
- Inflicting corporal injury on a spouse or significant other (Pen. Code, § 273.5 for convictions on or after 1/1/2019, per Pen. Code, § 29805(b), and a "misdemeanor crime of domestic violence" (18 U.S.C., § 921(a)(33)(A), 922(g)(9)).)

- Assault with a firearm (Pen. Code, §§ 29800, subd. (a)(1), 23515, subd. (a).)

- Shooting at an inhabited or occupied dwelling house, building, vehicle, aircraft, housecar, or camper (Pen. Code, §§ 246, 29800, subd. (a)(1), 17510, 23515, subd. (b).)

- Brandishing a firearm in presence of a peace officer (Pen. Code §§ 417, subd. (c), 23515, subd. (d), 29800, subd. (a)(1).)

- Two or more convictions of Penal Code section 417, subdivision (a)(2) (Pen. Code § 29800, subd. (a)(2).)

**Note:  The Department of Justice provides this document for informational purposes only.  This list may not be inclusive of all firearms prohibitions.  For specific legal advice, please consult with an attorney licensed to practice law in California.**

Exhibit 2 - Jones Decl.
Page 096

## APPENDIX F: Bureau of Firearms Regional and Field Offices



## APPENDIX G: Case Studies

To better explain how APPS investigations are developed and to showcase some significant seizures, the Bureau identified eight specific examples. The following examples are summary conclusions of actual investigations conducted throughout the state.

### Ammunition eligibility check identifies prohibited individual in Woodland Hills

In December 2020, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. This information was forwarded to the Bureau's Los Angeles Field Office for investigation. Special Agents reviewed the case and found the individual was prohibited from owning and possessing firearms due to a felony conviction.

As a result of the attempted purchase of ammunition, coupled with investigative follow-up and surveillance, a search warrant was obtained for the subject's residence in Woodland Hills.

In February 2021, Special Agents, with the assistance of Los Angeles County Sheriff's Department personnel, executed the search warrant at the individual's residence without incident. The search of the residence resulted in the seizure of a non-serialized 9 mm caliber semiautomatic handgun (ghost gun), a non-serialized .223 caliber assault weapon (ghost gun), along with ten ammunition magazines, and 500 rounds of ammunition. The individual was arrested and booked into Los Angeles County Jail on firearms related charges.



Exhibit 2 - Jones Decl.

Page 098

**Ammunition eligibility check identifies prohibited individual in Simi Valley**

In January 2021, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. This information was forwarded to the Bureau's Los Angeles Field Office for investigation. Special Agents reviewed the case and found the individual was prohibited from owning and possessing firearms due to a prohibition pursuant to Welfare and Institutions Code section 5150. Additionally, the individual was listed in the APPS database as illegally being in possession of two firearms.

Based on the individual's attempt purchase ammunition and identification in the APPS database, coupled with investigative follow-up and surveillance, a search warrant was obtained for the subject's residence in Simi Valley.

In February 2021, Special Agents, with the assistance of Los Angeles County Sheriff's Department personnel, executed the search warrant at the individual's residence without incident. The search of the residence resulted in the seizure of a short-barreled rifle, two additional rifles, one shotgun, seven ammunition magazines, approximately 2,000 rounds of ammunition, and metal knuckles.



Exhibit 2 - Jones Decl.
Page 099

**APPS investigation leads to the seizure of multiple firearms in Lincoln**

Through the APPS database, the Bureau identified an individual prohibited from owning and/or possessing firearms or ammunition due to a prohibition pursuant to Welfare and Institutions Code section 5150. Additionally, the individual was listed in the APPS database as illegally being in possession of seven firearms.

In February 2021, Special Agents conducted a consent search at the individual's residence in Lincoln. The search of the residence resulted in the seizure of an un-serialized AR-15 fully automatic machine gun (ghost gun) with an attached suppressor, one un-serialized AR style short barreled fully automatic machine gun (ghost gun), two shotguns, three handguns, one large capacity drum magazine (60 round), one large capacity rifle magazine, 11 handgun magazines, and approximately 7,000 rounds of ammunition.



Exhibit 2 - Jones Decl.
Page 100

**Ammunition eligibility check identifies prohibited individual in Hollister**

In March 2021, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. This information was forwarded to the Bureau's Fresno Regional Office for investigation. Special Agents reviewed the case and found the individual was prohibited from owning and possessing firearms and ammunition due to a felony conviction. Additionally, the individual was listed in the APPS database as illegally being in possession of a firearm.

Based on the individual's attempt to purchase ammunition and identification in the APPS database, coupled with the investigative follow up and surveillance, a search warrant was obtained for the individual's residence in the City of Hollister.

On May 4, 2021, Special Agents executed the search warrant at the individual's residence without incident. A search of the residence resulted in the seizure of 15 handguns, 11 shotguns, 24 rifles, 28 large capacity ammunition magazines, and approximately 16,000 rounds of ammunition. All APPS firearms were located unsecured in the residence.

The subject was arrested and booked into the San Benito County Jail for firearms related charges.



Exhibit 2 - Jones Decl.
Page 101

**Intercepted "fuel filter" silencer leads to seizure of firearms from convicted felon in Paso Robles**

In July 2021, Special Agents were contacted by the U.S. Department of Homeland Security regarding an individual that purchased a "fuel filter" silencer through the mail. The "fuel filter" silencer was a fully assembled monocore silencer that was designed to be directly attached to a firearm to reduce the noise produced by the firearm when fired. The individual that purchased the silencer was found to be a convicted felon.

Based on the above information coupled with investigative follow up and surveillance, a search warrant was obtained for the individual's residence in Paso Robles.

On July 22, 2021, Special Agents executed the search warrant at the individual's residence without incident. A search of the residence resulted in the seizure of two ghost gun assault weapons with one being a short-barreled rifle, five ghost handguns, 11 rifles, two shotguns, five large capacity magazines, 21 standard capacity magazines, miscellaneous guns parts, and 4,320 rounds of ammunition.

The individual was arrested and booked into the San Luis Obispo County Jail on assault weapons charges and being a felon in possession of firearms.



---

Exhibit 2 - Jones Decl.
Page 102

**Gun show investigation reveals felon purchasing "ghost guns" firearm parts in Highland**

In September 2021, Special Agents conducted an enforcement operation at a gun show venue in Southern California.  During the operation, Special Agents observed an individual determined to be a convicted felon purchase an AR15 upper receiver, a complete pistol ghost gun kit, and a gun magazine.  The individual was subsequently contacted and found in possession of the items as well as an additional gun magazine.  The individual was arrested for being a felon in possession of magazines, and was transported to the San Bernardino County Jail where he was booked.

Following the arrest, Special Agents responded to the individual's residence in Highland and obtained a search warrant.  The search warrant was executed without incident and resulted in the seizure of one shotgun, three ghost gun handguns, one .22 caliber handgun, one ghost gun short barrel rifle, one AR 15 upper receiver, one completed pistol lower receiver, three standard capacity magazines, five large capacity magazines, approximately 350 rounds of ammunition, eight firearm jigs, and various gun manufacturing tools and dyes.



Exhibit 2 - Jones Decl.
Page 103

**Prohibited subject arrested for being a felon in possession of "ghost guns" in Redlands**

In September 2021, the Bureau identified an individual attempting to conduct an illegal transfer of several firearms to himself. The individual was determined to be prohibited from possessing firearms and/or ammunition due to a misdemeanor conviction of assault with a deadly weapon. This information was forwarded to the Bureau's Riverside Regional Office for investigation.

Based on investigative follow up, agents obtained a search warrant for the individual's residence located in the City of Redlands.

In October 2021, Special Agents executed the search warrant at the individual's residence without incident. The search of the residence resulted in the seizure of five handguns, three shotguns, nine rifles, one ghost gun handgun, three ghost gun assault weapons, 16 magazines, one silencer, and approximately 8,100 rounds of ammunition.

The subject was arrested and booked into the San Bernardino County Jail for firearms related charges.



Exhibit 2 - Jones Decl.
Page 104

**Prohibited APPS subject found in possession of assault weapons in Fresno**

Through the APPS database, the Bureau identified an individual prohibited from owning and/or possessing firearms or ammunition due to a prohibition pursuant to Welfare and Institutions Code section 5150. The individual was listed in the APPS database as illegally being in possession of three firearms.

Through the ammunition eligibility check process, Special Agents determined the individual had recently, and just prior to becoming prohibited, purchased similar caliber ammunition as his listed firearms. Special Agents subsequently obtained a search warrant for his residence in Fresno.

On November 18, 2021, Special Agents executed the search warrant at the individual's residence without incident. A search of the residence resulted in the seizure of two assault weapons with one being un-serialized (ghost gun), three AR-15 lower receiver firearms (two ghost guns), one polymer 80 handgun lower receiver, two handguns, 26 standard magazines, 28 large capacity magazines, jigs and firearm parts (used to manufacture firearms), and approximately 6,654 rounds of ammunition.

The individual was arrested and booked into the Fresno County Jail for firearms related charges.



Exhibit 2 - Jones Decl.
Page 105

## APPENDIX H: Gun Violence Reduction Program Awards

**GUN VIOLENCE REDUCTION PROGRAM**
FISCAL YEAR 2021-22

| APPLICANT | SUMMARY OF AWARD | AWARD |
|---|---|---|
| Contra Costa County Sheriff's Office | Recover firearms and ammunition from domestic abusers and other prohibited persons in community via monthly compliance checks of persons on the monthly APPS report, training of sworn personnel, and collaboration with State and other local law enforcement agencies. | $332,205 |
| Lake County Sheriff's Office | Reduce the number of armed prohibited persons in Lake County via a combination of the following: increasing the frequency of APPS contacts and investigations, creating a notification program between the Sheriff's Office, the courts, and the District Attorney, coordinating with State and local law enforcement, training of sworn personnel, and performing APPS sweeps within the county. | $277,373 |
| Los Angeles County Sheriff's Office | Utilize funding to put an MOU in place between the Sheriff's Office and DOJ, to maintain the integrity of the currently-existing Major Crimes Bureau (MCB) APPS Task Force in conjunction with a well-established database, to do the following: significantly reduce APPS entries, allow for continued use of DOJ's APPS database, conduct weekly APPS operations, create APPS policies and procedures, increase field operations, improvement in APPS case files, and increased APPS-related communication with patrol station and dispatch center personnel. | $843,630 |
| Orange County Sheriff's Office | Enhance partnership with DOJ to improve the collection of firearms and ammunition from prohibited persons in the county via collaborative and/or independently-run APPS operations with or without DOJ, and through the designation of an APPS enforcement team to collaborate with DOJ, the courts, the District Attorney, and Probation Department, to conduct frequent probation/parole compliance checks of persons on the APPS list. | $316,285 |
| Sacramento County Sheriff's Office | Reduce gun violence in California by seizing firearms from prohibited persons via the enhancement of efforts between the Sheriff's Office and the DOJ, including the seizure of firearms from prohibited persons on the same day they become prohibited, daily hand-in-hand work with the DOJ, and entering of firearms stored at the Sheriff's property warehouse into the Automated Firearms System (AFS). | $887,275 |

Exhibit 2 - Jones Decl.
Page 106

| | | |
|---|---|---|
| San Francisco County Sheriff's Office | Enforce the prohibitions on firearm possession by persons who have a Domestic Violence Restraining Order or Domestic Violence Criminal Protective Order issued against them via the following: establishment of a county-level firearm confiscation system, reducing the APPS backlog through county-level partnering, recovering firearms through enforcement of firearms possession by persons with restraining orders, contacts made during restraining order contacts, court order compliance, domestic violence and elder abuse incidents involving a firearm, and implementation of a Domestic Violence Firearms Compliance Unit. | $301,554 |
| Santa Barbara County Sheriff's Office | Ensure that prohibited persons in the county are complying with the prohibition against owning, accessing, or possessing firearms and ammunition by investigating and seizing firearms, arresting and assisting in the prosecution of persons on the APPS list who violate laws and regulations; the creation of an APPS team that will collaborate with DOJ, ATF, the Probation Department, and local police to locate and remove firearms from prohibited persons; and via collaboration with the courts, background checks of APPS prohibited persons, and education of Sheriff's Office staff. | $539,660 |
| Santa Clara County Sheriff's Office | Utilize an innovative, multi-prong strategy to remove prohibited persons from the APPS database via the following actions: proactively working off of the APPS list to identify prohibited persons targets and subsequent intelligence gathering, reviews of all new cases of domestic violence, obtaining persons of interest for investigation, collaboration with the District Attorney, and rapid response to social media posts (threats to harm others/self, in writing or video). | $512,255 |
| Santa Cruz County Sheriff's Office | Reduce the number of persons on the APPS list by 35% over the next two years by conducting investigations of persons on the APPS list, seizing illegally-possessed firearms and ammunition, establishing a Gun Relinquish program in collaboration with the courts and District Attorney, specialized training of deputies, and the destruction of firearms. | $291,596 |
| Ventura County Sheriff's Office | Reduce the number of persons in the APPS database through intensive investigation and a focus on the recovery of firearms, sharing of APPS persons information with other California Sheriff's Offices to reduce APPS statewide, additions and improvements to the APPS investigation case management system, development of a Pre-APPS program, and creation of an APPS Coordinator. | $652,575 |

Exhibit 2 - Jones Decl.
Page 107