# EXHIBIT 3

Exhibit 3 - Jones Decl.
Page 108



C A L I F O R N I A

# DEPARTMENT OF JUSTICE

# ARMED AND PROHIBITED PERSONS SYSTEM REPORT 2022

*ANNUAL REPORT TO THE LEGISLATURE*
*SB 94 LEGISLATIVE REPORT*
*CALENDAR YEAR 2022*

Exhibit 3 - Jones Decl.
Page 109



# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*The Armed and Prohibited Persons System and Legislative Reporting Requirements* . . **2**

*APPS Database Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *3*

*Recommendations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *4*

**ANNUAL REPORT TO THE JOINT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

**LEGISLATIVE BUDGET COMMITTEE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **6**

*The APPS and Legislative Reporting Requirements* . . . . . . . . . . . . . . . . . . . . . . . . . *6*

*Overview of the Mandated Categories for Statistical Reporting* . . . . . . . . . . . . . . . . *6*

*Overview of the APPS Database* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *7*

*Enforcement Teams* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *11*

*Mandated Statistics and Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *12*

*APPS Report Detailed Recommendations* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *33*

**APPENDICES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **36**

*APPENDIX A: Relevant Key Terms and Definitions* . . . . . . . . . . . . . . . . . . . . . . . . *36*

*APPENDIX B: Legislative History Relative to APPS* . . . . . . . . . . . . . . . . . . . . . . . . *39*

*APPENDIX C: Mandated Statistics – At a Glance* . . . . . . . . . . . . . . . . . . . . . . . . . *41*

*APPENDIX D: Relational Diagram of DOJ's Bureau of Firearms Databases* . . . . . . . . *43*

*APPENDIX E: Firearms Prohibiting Categories* . . . . . . . . . . . . . . . . . . . . . . . . . . . *44*

*APPENDIX F: Bureau of Firearms Regional and Field Offices* . . . . . . . . . . . . . . . . . *49*

*APPENDIX G: Case Studies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *50*

*APPENDIX H: Gun Violence Reduction Program Awards* . . . . . . . . . . . . . . . . . . . . *57*

Exhibit 3 - Jones Decl.
Page 110



# EXECUTIVE  SUMMARY

## *The Armed and Prohibited Persons System and Legislative Reporting Requirements*

In 2006, California became the first and only state in the nation to monitor individuals who legally purchased or acquired firearms and later became prohibited from owning or possessing them. The Armed and Prohibited Persons System (APPS) database cross-references firearms purchasers against other records for individuals who are prohibited from owning or possessing firearms. The Department of Justice (DOJ) utilizes Crime Analysts, Special Agents, and Special Agent Supervisors to locate and seize firearms from prohibited persons identified through the APPS database, thereby preventing and reducing incidents of violent crime.

The authority and specifications for this public reporting initiative were established in Senate Bill (SB) 140 (Stats. 2013, ch. 2), which sunset in 2019, and were reestablished with further specifications under SB 94 (Stats. 2019, ch. 25) in 2019. SB 94, which added section 30012 to the California Penal Code, requires the DOJ to report specified information related to the APPS database, including the number of individuals in the APPS database and the degree to which the backlog in the APPS database has been reduced or eliminated. In this report, the term "backlog" is used in accordance with the definition created by SB 94 and codified in Penal Code section 30012, subdivision (a)(4): the number of cases for which the Department did not initiate an investigation within six months of the case[1] being added to the APPS database or a case for which DOJ has not completed investigatory work within six months of initiating an investigation.

Prior to the passage of SB 94, DOJ communicated to the Department of Finance (DOF) and to the Legislature that the current firearms database systems did not have the capability required to collect and report on the backlog as it has now been defined in statute and certain other metrics newly required by SB 94. In response, DOJ worked with DOF to submit a Budget Change Proposal (BCP) requesting funding to support the upfront planning and analysis costs to determine how to create an updated database system with the ability to track the requested data. DOJ has received the resources for the analysis phase of the modernization project. Once the analysis is complete, and additional funding secured, DOJ will begin the upgrade process for the APPS database and other firearms information technology (IT) systems.

### COVID-19 Impact on APPS Enforcement

As pandemic restrictions lifted and businesses reopened, DOJ progressively increased APPS enforcement. By the end of 2021, monthly productivity returned to pre-pandemic levels. Although the impact of COVID-19 proved much more manageable in 2022 than in the prior two years, Agents were occasionally exposed to COVID-19 and required to quarantine, which impacted APPS enforcement.

---

1   Within the APPS database, a 'case' refers to one individual; therefore, the terms 'case' and 'individual' will be used interchangeably in this report.

Exhibit 3 - Jones Decl.
Page 111

## APPS Database Analysis

A comprehensive review of the APPS database reveals the following:

- **Removals, Additions, and Incarcerations:** In 2022, DOJ removed 9,917 prohibited persons from the APPS database. At the same time, 9,277 prohibited persons were added to the APPS database. As of January 1, 2023, the APPS database contained 23,869 armed and prohibited persons.

- **Active and Pending Cases:** The Armed and Prohibited Persons System includes 9,294 Active cases and 14,575 Pending cases. Active cases have not yet been investigated or are in the process of being investigated. Pending cases have been thoroughly analyzed and all investigative leads have been exhausted. In addition to the 23,869 armed and prohibited person, there were 1,159 additional armed and prohibited persons who were incarcerated as of January 1, 2023.

- **Staff:** In 2022, DOJ's Bureau of Firearms had between 34-37 Special Agents and between 14-15 Special Agent Supervisors working to address the ever-changing number of armed and prohibited individuals.

- **Reasons for Prohibitions:** The statistics below outline the number of individuals in each prohibiting category of the APPS database, as of January 1, 2023. Persons can be prohibited under more than one category, which is why the total number exceeds 100%.

  - 12,745 (51%) were prohibited due to a felony conviction
  - 4,985 (20%) were prohibited due to the federal Brady Handgun Violence Prevention Act (18 U.S.C. §§ 921, 922)
  - 4,099 (16%) were prohibited due to a restraining order
  - 4,837 (19%) were prohibited due to mental health triggering events
  - 2,415 (10%) were prohibited due to a qualifying misdemeanor conviction
  - 768 (3%) were prohibited per the conditions of their probation.

- **Firearms Recovered:** In 2022, DOJ recovered 1,437 firearms. Of these, 916 (64%) were firearms identified in the APPS database and 521 (36%) were non-APPS firearms. Non-APPS firearms are those not known to be associated with the prohibited person but are found in that person's possession.

- **Investigated Individuals:** In 2022, DOJ investigated approximately 7,946 individuals who were identified as armed and prohibited persons in the APPS database.

- **Ammunition Denials:** In 2022, DOJ received reports of 194 armed and prohibited individuals who attempted to purchase ammunition and were denied. Agents and Crime Analysts investigated and closed 141 of these denial cases. The remainder of the denials remain under investigation.

Exhibit 3 - Jones Decl.
Page 112

## Recommendations

After conducting an examination of the APPS program, DOJ recommends the following steps to improve the removal of firearms from prohibited persons:

1. **Automatic Removal Post-Conviction:** Permanently fund the mandate that courts, through probation departments, and law enforcement agencies confiscate or enforce the transfer or legal storage of known firearms from individuals at the time of conviction when an individual becomes prohibited due to a felony or qualifying misdemeanor conviction.

   - *Reason for recommendation*: California Penal Code section 29810, describes the role of County courts in the post-conviction relinquishment process. Under this section, if a registered firearm owner is found guilty of a prohibiting crime and fails to relinquish the registered firearm, the courts must assign a probation officer to ensure the firearm is relinquished. However, local governments often lack the necessary resources to do so. Consequently, many individuals found guilty of a prohibiting crime to illegally own guns after their conviction. To aid in this effort, the California Legislature allocated $40,000,000 to the Judicial Council in the 2022 budget to support a court-based firearm relinquishment program. This program was established "to ensure the consistent and safe removal of firearms from individuals who become prohibited from owning or possessing firearms and ammunition pursuant to court order" (AB 178, 2022 Biennium, 2022 Reg. Sess. (Cal. 2022)).  This new grant represents a promising step toward alleviating DOJ's APPS workload and minimizing the threat posed by prohibited persons.

2. **Automatic Removal Post-Restraining Order:** Develop and fund a statewide, county-level firearm confiscation system for prohibitions that do not result from conviction of a state criminal charge. Firearms should be confiscated from an individual at the time they are served with any type of restraining order. Existing law requires that these firearms seizures must be documented in the Automated Firearms System (AFS). These entries into AFS would prevent unnecessary, duplicative efforts by DOJ and potentially other agencies.

   - *Reason for recommendation*: Law enforcement agencies (LEAs) are required to confiscate firearms from individuals immediately after they are issued a restraining order. However, a lack of accessible county-level data sometimes impedes their ability to identify and take action at the local level. A new county-level data system would empower localities to confiscate firearms from prohibited persons who pose a threat to their communities.

3. **Increase the Budget to Expand Coordinated Efforts with LEAs:** Increase the budget to create joint local-state task forces with and under the direction of DOJ. With additional funding, DOJ could create these Joint Task Forces and improve local LEA's reporting of firearms in their custody into the AFS. To further encourage participation, expand DOJ's previous Gun Violence Reduction Program (GVRP) funding eligibility beyond sheriff's offices to include other agencies tasked with firearm relinquishment, such as municipal law enforcement agencies and probation departments. Require and enforce that all GVRP awardees report on their annual progress to DOJ by January 15.

   - *Reason for recommendation*: The success of DOJ's existing Gun Violence Task Forces, such as Contra Costa County Anti-Violence Support Effort Task Force (CASE) and the Tulare County Regional Gang Enforcement Team (TARGET), illustrates that joint task forces yield exceptionally high rates of case closures and provide needed training to LEAs. Expanding this best-practice solution across the state could have a profound impact on the APPS program. While the program has shown promising ability to reduce the number of prohibited individuals within their jurisdiction, some

Exhibit 3 - Jones Decl.

Page 113

GVRP participants fail to promptly send the statistics included in the "Gun Violence Reduction Program" section of this report, impeding DOJ's ability to accurately assess their progress.

4. **Move Toward Competitive Salaries:** Improve the recruitment and retention of DOJ sworn personnel by offering compensation competitive with other LEAs.

- *Reason for recommendation*: Despite a 12% pay increase that took effect in September 2021, Special Agent pay at DOJ has not reached parity with comparable positions statewide. Consequently, DOJ struggles to recruit and retain qualified Special Agents.

5. **Modernize the Database:** Continue with the modernization process of the existing firearms databases.

- *Reason for recommendation*: Funding for Stages 1 and 2 of the modernization projects have been secured. However, additional resources will be required to fund Stages 3 and 4.

DOJ has proactively made efforts to implement four of the five recommendations outlined above. DOJ has (1) expanded its recruitment efforts and lowered vacancy rates by hiring Special Agent Trainees and recruiting new Special Agents with law enforcement experience from state and local law enforcement agencies; (2) worked diligently to create partnerships with local LEAs; (3) created partnerships and worked cases with federal LEAs; and (4) continued to provide data to IT professionals to make progress in the multi-year firearms database modernization project. However, fully implementing the remaining recommendations will require legislative support and additional resources. Further explanation of these recommendations can be found on page 33.

Exhibit 3 - Jones Decl.
Page 114

# ANNUAL REPORT TO THE JOINT LEGISLATIVE BUDGET COMMITTEE

## The APPS and Legislative Reporting Requirements

This report presents a statistical summary of the Armed and Prohibited Persons (APPS) database, as mandated by SB 94, for the period of January 1, 2022 to December 31, 2022. The report also contains additional in-depth analyses of data through the history of the APPS database and statistics to contextualize the APPS database — particularly in light of the unprecedented COVID-19 pandemic — and the workload that flows in and out of that system.[2]

Penal Code section 30000, subdivision (a) requires DOJ to maintain a "Armed and Prohibited Persons System." This file is generated from the larger APPS database, which records all known firearm owners in California. The system also monitors various other databases for prohibiting triggering events (PTE), such as a felony conviction or an active restraining order, to identify those persons within the system who are both armed and prohibited. The APPS program was created by legislation passed in 2001 (SB 950, Stat. 2001, ch. 944), then implemented in December 2006.

In 2013, the California Legislature passed SB 140, which appropriated $24 million over a three-year period to DOJ to address the growing number of records in APPS. Additionally, SB 140 required DOJ to submit annual reports detailing the progress made in reducing the backlog.

The APPS reporting provisions as outlined in SB 140 expired on March 1, 2019. In 2019, the legislature passed SB 94, which provided updated requirements regarding the mandated reporting of the APPS database statistics. Prior to the passage of SB 94, DOJ communicated to the DOF that it did not have the technological capability to report on the new metrics required by SB 94 and would need funding to begin the planning analysis necessary to develop a system that could report on such metrics. Regardless, the new provisions went into effect on June 27, 2019, and are codified in Penal Code section 30012.

See Appendix B for additional legislative history relative to the APPS database.

## Overview of the Mandated Categories for Statistical Reporting

Pursuant to Penal Code section 30012, no later than April 1, 2020, and no later than April 1 of each year thereafter, DOJ must report annually to the Joint Legislative Budget Committee the following information for the immediately preceding calendar year:

(1) The total number of individuals in the Armed and Prohibited Persons System (APPS) and the number of cases that are active and pending, as follows:

(A)(i) For active cases, DOJ shall report the status of each case for which DOJ has initiated an investigation. This information shall include, at a minimum, the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system.

(ii) For purposes of this paragraph, "investigation" means any work conducted by sworn or non sworn staff to determine whether a prohibited person possesses one or more firearms,

---

2    This report will use terms specific to the subject matter at hand. See Appendix A for the Relevant Key Terms and Definitions.

Exhibit 3 - Jones Decl.
Page 115

whether to remove the person from the database, or whether to shift the person to the pending caseload.

(B) For pending cases, DOJ shall separately report the number of cases that are unable to be cleared, unable to be located, related to out-of-state individuals, related to only federal firearms prohibitions, and related to incarcerated individuals.

(2) The number of individuals added to the APPS database.

(3) The number of individuals removed from the APPS database, including a breakdown of the basis on which they were removed. At a minimum, this information shall separately report those cases that were removed because the individual is deceased, had prohibitions expire or removed, or had their cases resolved as a result of department firearm seizure activities.

(4) The degree to which the backlog in the APPS has been reduced or eliminated. For purposes of this section, "backlog" means the number of cases for which DOJ did not initiate an investigation within six months of the case being added to the APPS or has not completed investigatory work within six months of initiating an investigation on the case.

(5) The number of individuals in the APPS before and after the relevant reporting period, including a breakdown of why each individual in the APPS is prohibited from possessing a firearm.

(6) The number of agents and other staff hired for enforcement of the APPS.

(7) The number of firearms recovered due to enforcement of the APPS.

(8) The number of contacts made during the APPS enforcement efforts.

(9) Information regarding task forces or collaboration with local law enforcement on reducing the APPS file or backlog.

This report serves two functions: (1) it addresses the SB 94 mandated reporting; and (2) it provides a comprehensive assessment of the APPS database and DOJ's related enforcement activities.[3] DOJ undertook this comprehensive assessment by: (1) analyzing historical information such as audit files of APPS data; (2) examining the APPS caseloads and workflow for the immediately preceding calendar year; and (3) reviewing other administrative information.

## Overview of the APPS Database

The APPS database contains information on firearms either legally acquired or registered in California and the owners of those firearms. Consistent with legislative mandates, the database is the result of records and information originating in the Dealer Record of Sale (DROS) database and the AFS database. Combined, those records represent all individuals who purchased or transferred firearms legally and all known firearms associated with each individual.

Individuals are entered into the APPS database when they legally purchase or acquire a firearm. They are moved to the Armed and Prohibited Persons System within the database if they become prohibited. Prohibited persons are identified by running daily manual queries of the databases that cross-reference the population of known firearm owners against individuals who may have had a prohibiting triggering event (PTE) within the past 24 hours. New individuals are added daily, creating a constantly changing and growing dataset.

---

3    See Appendix C for a brief overview of the mandated statistical requirements.

Exhibit 3 - Jones Decl.
Page 116

Armed and prohibited individuals are the primary focus of DOJ's enforcement efforts. However, they are a subset representing less than 1% of the APPS database. As of January 1, 2023, there were 3,347,221 known firearm owners in the APPS database, of which 23,869 are prohibited from owning or possessing firearms in the Armed and Prohibited Persons System. In order for DOJ to identify those armed and prohibited individuals, DOJ must first identify individuals who have legally acquired a firearm(s) and then identify which of those individuals are also prohibited due to a PTE.

From 2013 and 2022,[4] changing laws have introduced new offenses that prohibit firearm ownership and/ or possession, placing a growing number of individuals into the Armed and Prohibited Persons System. Other factors such as ammunition eligibility checks, mandatory assault weapon registration, and increased firearm sales have also contributed to the surge of identified prohibited individuals. Prohibitions may be due to a felony conviction, domestic violence conviction, a qualifying misdemeanor conviction, mental health-based event, various types of civil or criminal restraining orders, and other prohibitory categories. See Appendix E for firearm prohibiting categories.

Within the Armed and Prohibited Persons System, cases are separated into two broad categories of "Active" and "Pending."

Active cases have not yet been investigated or are in the process of being investigated, but all investigative leads have not yet been exhausted.

Pending cases have been thoroughly analyzed and all investigative leads were exhausted. For a detailed definition of the "pending category" please see Appendix A, Relevant Key Terms and Definitions.

1. **Unable to Clear:** Cases that have been investigated by the Department's agents who have exhausted all investigative leads and remain unable to recover all firearms associated with the prohibited individual. If new information is identified, the case will be moved to Active status.

2. **Unable to Locate:** Cases where the Department's agents have made at least three attempts to contact the individual but have not been able to locate them, even after exhausting all leads.

3. **Out-of-State:** Cases where the Department's agents have determined that the prohibited person is no longer living in California.

4. **Federal Gun Control Act (Federal Brady Act Prohibition Only):** Cases where a person is prohibited only under federal law. State, county, and municipal law enforcement have no authority to enforce a prohibition based only on the Federal Brady Act. Persons who have both a statewide and federal prohibition are not listed in this group.

5. **Incarcerated:** Cases involving incarcerated individuals remain on the Pending list, but the Department still tracks and monitors them. Once released, they are moved to Active status.

DOJ regularly verifies new or updated information on all Pending cases. If additional information becomes available on an APPS case in Pending status (e.g., the firearm(s) associated with the APPS individual are located, records indicate a new address for the individual, or the individual is released from incarceration), the case is evaluated and transitioned back into the Active status.

The current system includes 11 databases that do not communicate with one another or may only have one-way communication with another firearms database.[5] This requires a Crime Analyst to manually cross-reference records from one database to another while working to compile an individual package for investigation.

---

4   See Appendix B for a legislative history as related to APPS
5   See Appendix D for a relational diagram of DOJ's firearms databases.

Exhibit 3 - Jones Decl.
Page 117

Of the 11 databases, only five databases feed into the APPS database for firearm association and prohibition determinations. These databases include:

1. **Automated Criminal History System (ACHS)**: Established in 1971, ACHS is the repository for state summary Criminal Offender Record Information (CORI).

2. **Wanted Persons System (WPS)**: Established in 1971 as the first online system for the Department, WPS is a statewide computerized file of fugitives for whom arrest warrants have been issued.

3. **Automated Firearms System (AFS)**: Created in 1980 to identify lost or stolen firearms and to associate firearms with individuals. AFS tracks the serial number of every firearm owned by government agencies, handled by law enforcement (seized, destroyed, held in evidence, reported stolen, recovered), voluntarily recorded, or handled by a firearms dealer through transactions. Prior to 2014, most entries in AFS were handguns. Since January 1, 2014, all new legally acquired firearms, both handguns and long guns, are entered into AFS.

4. **California Restraining and Protective Order System (CARPOS):** Created in 1991, CARPOS is a statewide database of individuals subject to restraining and protective orders. This system includes Domestic Violence Restraining Orders (DVRO), Gun Violence Restraining Orders (GVRO), and other types of restraining and protective orders.

5. **Mental Health Reporting System (MHRS):** Established in 2012, MHRS is a web-based application used by Mental Health Facilities, Superior Courts, Juvenile Courts, and LEAs to report firearm prohibiting events related to mental health to DOJ.

The APPS database is not an automated system that cross-references all firearms databases; therefore, prior to creating a complete case package for investigation, Crime Analysts must manually cross-check multiple additional databases. The system is extremely cumbersome to operate. When a user retrieves a single case, all information must be verified prior to action taken by agents. Such verification starts with confirming the individual's name, birth date, and driver's license number match across all systems. Then, using the Law Enforcement Agency Web (LEAWEB), the Crime Analyst will run a multiple query using the individual's driver's license number. LEAWEB is a California unique database that queries some of California's databases, including CARPOS, AFS, ACHS, MHRS, WPS, and the Supervised Release Files, as well as the databases of the California Department of Motor Vehicles (DMV). Each case is highly variable, and the circumstances and information pertinent to each case will determine how a Crime Analyst conducts their research. For example, an individual can be prohibited under multiple categories; the prohibiting category determines which databases a Crime Analyst must use to verify the prohibition is still current and that the case is workable by agents.

### Firearms Information Technology Systems Modernization (FITSM) Project

DOJ initiated the FITSM in June 2020. Currently, the project is in Stage 2, the Alternative Analysis Planning stage. The project is conducting an analysis of all firearm business processes and supporting systems. This includes market research to ultimately determine a modern solution and the timeline for the implementation of the new firearms systems. DOJ's target submission of the Stage 2 Alternatives Analysis to the California Department of Technology for review and approval is scheduled for March 2023, and DOJ plans to select vendors to begin implementation of the FITSM by January 2024. The project is expected to identify many positive solutions to various firearms systems, including the APPS database.

The existing firearms systems utilized by DOJ, LEAs, and other firearm stakeholders lack the modern capabilities DOJ needs to comply with legislative mandates and fulfill its commitment to public safety.

Exhibit 3 - Jones Decl.

Page 118

The systems currently in use were built many years ago — dating as far back as 1980 — and have been modified piecemeal over the years in response to various legislative mandates. Each system uses different logic, meaning inputs cannot be easily transferred from one database to another, and modifications cannot be applied across multiple systems. These problems will persist and prevent the kind of automation to enhance efficiency, thus causing increased workloads and missed operational opportunities until DOJ can develop and implement the FITSM solution.

The complexity of the existing firearms systems can be seen even in the most straightforward of circumstances. In the case of an individual who has only one firearm and is prohibited only by one restraining order, the process would be as follows:

1. The Crime Analyst must confirm the restraining order is in effect and that the individual was served by either being present in court or was served by a processor.

2. Once this is verified, the Crime Analyst will try to pull the actual restraining order from an external database, the California Courts Protective Order Registry (CCPOR).

3. CCPOR is meant to be a centralized registry for restraining orders in California; unfortunately, it has not been implemented across all county courts in the state. For courts that do not use CCPOR, DOJ's Crime Analyst must contact the court directly to attempt to obtain a copy of the restraining order. Having an original copy can provide valuable additional information. For example, confirming when, where, and how the restraining order was served; the individual's last known address; and whether the individual has already surrendered their firearm.

4. Assuming the individual is still in possession of their firearm, the Crime Analyst must then pull descriptive information for the firearm associated with the individual and run the serial number of the firearm in the AFS to confirm the individual is still associated with that firearm. The Crime Analyst may also have to establish there are no extenuating circumstances, such as a situation where the individual is no longer in possession of the firearm, but the databases do not reflect the change. This is sometimes caused by a keying error where a serial number is off by one digit, but all other information coincides. A keying error traditionally happens from data entry made by a firearms dealer, by the public via online reporting, or by LEAs that seize firearms. In such circumstances, additional administrative work must be done by DOJ to remove the association of the firearm from the individual.

5. Although LEAWEB queries the DMV, the query does not automatically pull an individual's identification photo or associated vehicles. To obtain this information, the Crime Analyst must perform additional, separate steps to pull relevant information, such as the most recently reported place of residence, from DMV registries.

6. Once all information is confirmed, and assuming the information supports investigative efforts, the package is then ready for agents to conduct enforcement actions.

As noted, this outlined process is for the simplest case possible with one prohibition and one firearm. Most cases involve additional factors such as additional firearms, prohibitions, combined federal and state prohibitions and/or criminal history, which make a case package much more difficult to compile.

Planning efforts for the FITSM project include the replacement and modernization of the existing legacy infrastructure. While funding has been secured to begin Stage 2, which involves an analysis and planning of the required work to complete the effort, future additional funding will be required to begin Stages 3 and 4, to select a vendor and initiate the implementation activities which will bring this project to fruition.

Exhibit 3 - Jones Decl.
Page 119

## Enforcement Teams

**Crime Analysts:** Each of the DOJ's Bureau offices has its own team of Special Agents for field operations. DOJ also employs Crime Analysts in each of their six offices throughout the state.[6] The Crime Analysts access the APPS database daily and develop investigative packages of armed and prohibited people for each team of agents to contact. They are required to crosscheck several databases to confirm addresses, photos, arrest records, and the status of armed and prohibited individuals, among other relevant information. Using their knowledge and expertise, they translate vast amounts of data into actionable information which allows the agents to conduct their investigations efficiently and effectively. The work is time-intensive and requires great attention to detail as errors (typos, accidental variations, incorrect information, etc.) can lead to incorrect decisions or unnecessary investigative contacts. Modernizing the firearms IT systems will allow for greater accuracy, which will bolster the success of investigative operations by ensuring agents and other law enforcement partners are provided the most current information and avoid unnecessary contacts and risk.

**Special Agents:** Using these investigative packages, Special Agents attempt to locate the firearm(s) associated with each armed and prohibited individual via a consent search, probation or parole search, or a search warrant. Often, the armed and prohibited individual will be in possession of numerous firearms, many of which were not associated with that individual in the APPS database. This could be due to the individual having: long guns purchased before long gun reporting requirements in 2014, firearms loaned to them by another person, firearms imported into California from another state, antique firearms, illegally purchased firearms, ghost guns,[7] or stolen firearms.

**Partnerships with Local Law Enforcement Agencies (LEAs):** Improving partnerships with local LEAs will help to improve operation efficiency. Often, agents contact an armed and prohibited individual only to find that local law enforcement has already seized the firearm(s) associated with that individual but neglected to enter the seized firearm into the AFS, as required by Penal Code sections 11108.2 and 11108.3. Entering that information would have removed the individual from the APPS database, allowing DOJ's agents to focus on another case. Currently, DOJ must reach out to the LEAs to request they update the AFS, or ask for the police report to cross-check the firearms seized and match the associated firearms in the APPS database. Unless the information matches and is verified, the individual cannot be removed from the APPS database. In 2023, many APPS investigations conducted by DOJ involved firearms already in local law enforcement custody. The cost of such oversight cannot be recovered, resulting in duplicative efforts by DOJ that reduce efficiency and waste resources. DOJ's proposed plan to increase collaboration would help ensure the timely and accurate input of data by local LEAs in statewide data systems.

Successful models of operations with local law enforcement have been a force multiplier for the APPS program. For instance, the Contra Costa County Anti-Violence Support Effort Task Force (CASE) is a collaboration between various state, local, and federal agencies. CASE conducted 98 firearms-related investigations and confiscated 19 firearms, five of which were APPS firearms.[8] As outlined in the recommendations, DOJ encourages these types of collaborative partnership operations and relationships with local LEAs.

In an effort to increase these types of successful collaborative efforts, in December 2020, DOJ established management and supervision of the Tulare County Agencies Regional Gun Violence Enforcement Team, also known as the TARGET Task Force. This is a recent addition to DOJ task

---

6    See Appendix F for a map of the various Bureau regional office jurisdictions

7    Ghost guns are firearms made by an individual or group, without serial numbers or other identifying markings. Without a serial number, law enforcement cannot run a trace search on the firearm and the firearm does not have the legal requirements.

8    For more on the CASE and TARGET task forces, refer to page 26.

Exhibit 3 - Jones Decl.
Page 120

force model and supports the value established through previous task force efforts, including the aforementioned CASE Task Force. In 2022, state and local agencies working with TARGET conducted 277 firearms-related investigations and confiscated 149 firearms, 131 of which were APPS firearms. Like CASE, TARGET works collaboratively with local, state, and federal partners to conduct APPS investigations as well as other investigations to reduce gun violence.

Additional funding to expand this task force model would allow DOJ to amplify this collaborative work. DOJ has experienced the positive impact of working with local LEAs, allowing DOJ's agents to conduct more operations and remove additional firearms from prohibited armed persons more efficiently. DOJ stands ready to work with the Legislature and local, state, and federal law enforcement partners to replicate this success across the state.

## *Mandated Statistics and Analysis*

Senate Bill 94 mandates the reporting of specific statistics for each calendar year. As the COVID-19 pandemic affected enforcement actions during 2020 and 2021, any inferences drawn from comparisons to these years should be made with caution. The mandated statistics for the current report include the following:

### The Total Number of Individuals in the Apps Database

As of January 1, 2023, the APPS database contained 3,347,221 individuals, of which 23,869[9] were prohibited from owning or possessing firearms.

### Breakdown of the Status of Active APPS Cases

"Active cases" are those involving individuals believed to reside in the state of California, are prohibited from owning or possessing a firearm in the state for one or more reasons, and have not yet been investigated or are in the process of being investigated, but all investigative leads have not yet been exhausted.

### Status of the APPS Database Backlog

As outlined above, the statutory mandate described in Penal Code section 30012, subdivision (a)(1)(A) (i) requires DOJ to report "the number of cases that have not been actively investigated for 12 months or longer, along with a breakdown of the time period that has elapsed since a case was added to the system." As stated previously, DOJ alerted DOF prior to the passage of SB 94 that it would be unable to provide these metrics without the necessary funding to update the current firearms databases. While the FITSM project is ongoing, this continues to be the case.

SB 94 defined "backlog" as the number of cases for which DOJ did not initiate an investigation within six months of the case being added to the APPS database or for which it has not completed investigatory work within six months of initiating an investigation on the case. Once DOJ receives full funding to complete the FITSM, the new system will be better able to accommodate reporting on the status of the backlog.

---

9    This number excludes individuals who are known to own firearms and are prohibited but are also known to be incarcerated for six months or more. While incarcerated individuals are technically in the Pending status, it is assumed that they are not in possession of firearms while in custody and are therefore treated as a separate population. DOJ receives state prison incarceration statuses nightly and individuals released from state custody are moved into the Active status.

Exhibit 3 - Jones Decl.
Page 121

## Breakdown of Cases in the APPS Database

As of January 1, 2023, the APPS database contained 3,347,221 individuals, of which 23,869 were prohibited from owning or possessing firearms. This latter figure is further subcategorized into Active and Pending cases. "Active" cases are those for which DOJ has not yet begun investigations or is in the process of investigating but has not yet exhausted all investigative leads. "Pending" cases are those investigations that DOJ has thoroughly analyzed and exhausted all investigative leads or determined that the person is not within DOJ's jurisdiction. As of January 1, 2023, there were 9,294 Active cases and 14,575 Pending cases. In addition to the pending category, there are 1,159 incarcerated individuals. While technically in a pending status, incarcerated individuals represent a unique population that cannot be investigated until released from incarceration and moved to Active status.  Therefore, incarcerated individuals are counted separately for the purposes of this report, and are not figured in the Pending case statistics that follow.

Figure 1 shows the number of people in the Armed and Prohibited Persons System within the APPS database each year. The number armed and prohibited persons decreased as of January 1, 2023 in comparison to January 1, 2022. Substantial decreases have only occurred twice previously: between the 2014 and 2015 reporting years, and again between the 2019 and 2020 reporting years (Figure 1. 2015 & 2020). The reason for the overall decrease as of 2023 is potentially due to the reduced severity of the COVID-19 pandemic, increased cooperation with local LEAs through the Gun Violence Reduction Program (GVRP), and APPS enforcement sweeps during the year. APPS enforcement sweeps are multi-day operations in which DOJ works together with allied LEAs in a certain jurisdiction of the state. For more information on APPS enforcement sweeps, please see page 28 of this report.

*Figure 1. The number of prohibited people in the APPS database as of January 1 each year*



## Breakdown of the Status of Pending APPS Cases

Prohibited individuals in the APPS database may be assigned a Pending status for one of four reasons:

1. **Unable to Clear (UTC):** The prohibited person has been investigated and all leads have been exhausted, but agents have been unable to disassociate the individual from all known firearms.

Exhibit 3 - Jones Decl.
Page 122

2. **Unable to Locate (UTL):** Agents have made at least three attempts to contact the prohibited individual but have not been able to locate them, even after exhausting all leads.

3. **Out of State:** The prohibited individual has moved out of California.

4. **Federal Brady Act Prohibition Only**: The prohibited individual is prohibited due to a Federal Brady Act prohibition (18 U.S.C. §§ 921, 922) alone and DOJ does not have the jurisdiction to investigate them.

Of the 14,575 Pending cases, 6,693 (46%) were unable to be cleared, 2,334 (16%) were unable to be located, 3,955 (27%) moved out of state, and 1,593 (11%) were prohibited under Federal Brady Act prohibitions only (Figure 2).

*Figure 2. Pending APPS cases separated by category as of January 1, 2023*



**Breakdown of the Number of Individuals Removed from the APPS Database**

In 2022, 9,917 armed and prohibited people were removed from the APPS database. Removals from the Armed and Prohibited Persons System occur for one of three reasons:

1. **Prohibition Expired**: An individual's prohibition expired, which could result from the expiration of restraining orders, the end of a 10-year prohibition that resulted from a qualifying misdemeanor conviction, or the end of a 5-year prohibition that resulted from a mental health event.

2. **Disassociated from All Known Firearms**: The prohibited person has all of their known firearms disassociated from them, meaning each firearm attributed to them within the APPS database has been accounted for by DOJ and disassociated from the prohibited person.

3. **Deceased**: The prohibited person is deceased.

Exhibit 3 - Jones Decl.
Page 123

*Table 1. Individuals removed from the APPS database in 2022 separated by reasons for removal*

| Reason for Removal | Number of Individuals Removed |
|---|---|
| Prohibition expired/no longer prohibited | 5,940 |
| Disassociated from all known firearms | 3,598 |
| Deceased | 379 |

If DOJ is unable to locate the prohibited person or disassociate all known firearms from the prohibited person, despite having exhausted all leads, DOJ cannot remove the individual from the APPS database and must instead assign them to the Pending category. This often results from the inherent difficulty of confiscating firearms from individuals who are unwilling to surrender their firearms regardless of their prohibited status.

Of the 9,917 prohibited people removed from the APPS database this year, 3,598 removals were the result of enforcement efforts[10] – 377 more removals compared to 2021, an increase of almost 12%. The monthly average number of individuals disassociated from their known firearms was approximately 300, with a standard deviation of approximately 41 individuals from month to month.

Agents removed a higher number of prohibited individuals in the first half of the year, with an average of 311 removals per month from January through June, compared to an average 289 removals per month from July through December. The most productive month was March, with 375 prohibited individuals disassociated from all known firearms.

*Figure 3. The yearly removals and additions from the APPS list as of January 1, 2023*



| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Removals | 5,433 | 5,748 | 5,347 | 5,708 | 6,459 | 8,130 | 8,937 | 9,470 | 9,424 | 10,681 | 10,064 | 8,370 | 8,937 | 9,917 |
| Additions | 8,647 | 7,095 | 6,087 | 6,470 | 7,938 | 7,371 | 8,930 | 10,413 | 10,572 | 11,333 | 9,266 | 10,762 | 9,848 | 9,277 |

■ Removals   ■ Additions

---

10   Note that not all 3,598 individuals who were disassociated from their firearms resulted in firearm seizures by DOJ. In some cases, DOJ investigations determined that local law enforcement agencies already seized the firearms but failed to record the recovery, the individual attempted to report the firearm lost/stolen, or the individual is in the process of lawfully selling or gifting the firearm to a friend or relative. For a breakdown of prohibition categories as a percentage of prohibited people see Figure 4 below.

Exhibit 3 - Jones Decl.
Page 124

DOJ has experienced an increase in the past few years of prohibited individuals with Gun Violence Restraining Orders (GVROs) being entered into the APPS database. In 2016, with the implementation of Assembly Bill (AB) 1014, California became one of the first states to enact a red flag law. The law initially allowed law enforcement officers and family members of a person they believed was a danger to themselves or others to petition the court to prohibit that person from possessing firearms under a GVRO. In 2020, Assembly Bill (AB) 61 expanded authorization to petition the court for a GVRO to employers, coworkers, and school employees.

GVROs assist LEAs in recovering firearms from individuals who have shown a probability to commit violence with a firearm or to prevent those individuals from obtaining firearms. DOJ GVROs are a critical tool that saves lives, and DOJ prioritizes GVRO-related APPS subjects for investigation. LEAs are increasingly implementing GVROs as they recognize the positive impact on public safety. DOJ applauds these efforts to enhance public safety through the GVRO process.

DOJ improved the method of calculation and developed a new, more accurate method of determining the number of prohibited individuals with restraining orders whose prohibitions expired in 2022[11]. The new method uses audit dates to track individuals' statuses as they change in the APPS database. This allows for a more accurate count of people who remain within the system.

Of the 3,598 individuals who were disassociated from all known firearms in 2022, 2,047 (57%) were prohibited, at least in part, due to restraining orders. Meanwhile, of the 5,940 people who had their prohibitions expire in 2022, 4,065 (68%) individuals were prohibited, at least in part, due to restraining orders. Similarly, of the 379 people who became deceased in 2022, 51 (13%) were prohibited, at least in part, due to restraining orders.

As of January 1, 2023, 1,449 (10%) people who were prohibited due to restraining orders were designated "Pending" in comparison to the 2,047 (57%) people prohibited due to restraining orders who were disassociated with all known firearms. The data suggests that if individuals' firearms were disassociated at the time of them being served a restraining order, DOJ may be able to fully disassociate firearms from a significant proportion of the 4,065 individuals whose restraining orders expired in 2022.

## The Number of People in the APPS Database Before and After the Relevant Reporting Period

The relevant reporting period runs from January 1, 2022 through December 31, 2022. The APPS database is a compiled list of all individuals who legally purchased or were transferred a firearm in California. It further categorizes individuals as either persons armed but not prohibited, persons armed and prohibited, or persons incarcerated and known to have possessed a firearm prior to incarceration. To account for late additions or removals from the system, the state of the APPS database was analyzed as of 1:30 a.m. Pacific Standard Time on January 1, 2023. At that time, the APPS database system contained 3,347,221 individuals, including 3,322,193 armed and not prohibited individuals, 23,869 armed and prohibited individuals, and 1,159 incarcerated individuals.

The number of people in the APPS database grew by 147,827 in 2022. In other words, 147,827 individuals became registered firearm owners living in California at some point during 2022, either through purchasing a firearm or reporting a firearm in their possession. This number does not reflect existing firearm owners who acquired new firearms in 2022. The addition of 147,827 to the APPS database represents the median increase between 2019 and 2022. That annual growth is slightly lower than the average annual increase of the last five years, which was 194,131. The APPS database is highly

---

11    The new method uses audit dates to track individuals' statuses as they change in the APPS database. This allows for a more accurate count of people who remain within the system.

Exhibit 3 - Jones Decl.
Page 125

dynamic, and newly armed and prohibited people continue to be added as many others are removed. This increase represents both prohibited and non-prohibited persons in the APPS database.

*Figure 4. The total number of people in the APPS database per year*



## Breakdown of Why Each Person in the APPS Database is Prohibited from Possession of a Firearm

Persons become prohibited in the APPS database for several reasons. The following categories are the typical events, or PTEs, which can trigger a firearm prohibition.

- An individual may become prohibited under the Federal Brady Act. Note, some individuals prohibited under the Federal Brady Act may not be prohibited under California state law (e.g., a dishonorable discharge in the military).

- An individual may be prohibited from owning or possessing a firearm as a condition of their probation.

- Individuals with felony convictions are prohibited from owning firearms.

- A juvenile who becomes a ward of the court may be prohibited.

- Mental health crises involving involuntary commitment may trigger a temporary prohibition.

- Some misdemeanor convictions may prohibit owning a firearm.

- Individuals may be temporarily prohibited due to restraining orders.

- Individuals may be temporarily prohibited due to a felony warrant.

- Individuals may be temporarily prohibited due to a misdemeanor warrant.

- Individuals may be prohibited due to offenses or triggering events occurring in other states.

Exhibit 3 - Jones Decl.
Page 126

Many individuals are prohibited under several categories (Figure 5). The following is a breakdown by category as of January 1, 2023:

- 12,745 people prohibited due to a felony conviction, representing 51% of all active, pending, and incarcerated individuals in APPS.

- 4,985 (20%) are prohibited due to the Federal Brady Act[12]

- 4,099 (16%) prohibited due to restraining orders

- 4,837 (19%) prohibited due to mental health prohibitions

- 2,415 (10%) prohibited due to a qualifying misdemeanor conviction

- 768 (3%) prohibited due to terms of their probation

- 361 (1%) prohibited due to a felony warrant

- 118 (<1%) prohibited due to misdemeanor warrants

- 12 (<1%) prohibited due to juvenile prohibitions

- 52 (<1%) prohibited due to other reasons.[13]

*Figure 5. Prohibition categories as a percentage of prohibited people*[14]



The distribution among these categories is largely consistent with that in 2021. Overall, the categories with the greatest change between 2021 and 2022 were: probation prohibition, accounting for 2% fewer prohibitions than in 2021; restraining orders, which accounted for 3% fewer prohibitions than in 2021; and felony convictions, which accounted for 1% more prohibitions than in 2021. All other categories,

---

12   This figure includes individuals who may be prohibited under more than one category, including a Federal Brady Act prohibition. These are not solely Federal Brady Act cases.

13   See Appendix E for a list of Firearm Prohibiting Categories.

14   Many cases have more than one prohibition, which is why these numbers do not equal 100%.

Exhibit 3 - Jones Decl.
Page 127

including misdemeanors, felonies, mental health, and federal prohibitions remained unchanged. See Figure 6 for a complete comparison[15].

*Figure 6. Prohibition categories as a percentage of prohibited people in 2021 and 2022*



## Number of Agents and Other Staff Hired for Enforcement of the APPS

As of January 1 2022, DOJ had 76 authorized permanent Special Agent Trainee, Special Agent, Special Agent Supervisor and Special Agent in Charge positions. Of those positions, 53 were filled and 23 were vacant. By December 2022, DOJ continued to have 76 authorized permanent positions, of which 64 were filled and 13 were vacant. As Table 2 shows, the number of filled and vacant positions fluctuates throughout the year, reflecting the quick turnover rate of these positions. This illustrates DOJ's challenges hiring and retaining agents, despite having authorized positions to fill. In an effort to address the ongoing challenges with staffing, specifically recruitment at the Special Agent and Special Agent Supervisor classifications, DOJ has continued recruiting Special Agent Trainees. While this approach may ultimately benefit DOJ by increasing the total number of Special Agents, it can be challenging in the short term due to the time and resources required to educate and train a Special Agent Trainee to perform at the level of a Special Agent.

In December 2021, DOJ had 36 filled Special Agent positions (not including Special Agent Trainees). In 2022, DOJ hired seven Special Agents and 10 Special Agent Trainees. Four sworn personnel left DOJ due to inter-departmental transfers and/or promotions, and one Special Agent was promoted from within DOJ to a Special Agent Supervisor.[16] Due to the unique demands placed on APPS team members, Special Agent Trainees are required to meet high standards before promotion to Special Agent. While these high standards ensure a competent and seasoned task force, they present an obstacle for recruitment and retention. For example, between January 1, 2022, and December 1, 2022, there was a decrease of nine authorized Special Agent Trainees. In order to fill these positions while maintaining the high standards

---

15    Percentages for the Felony Conviction, Federal Brady, Restraining Order, and Probation categories were misprinted in the 2021 report. Their correct percentages are reported in Figure 5 above.

16    Agent staffing temporarily fell in 2022, as the Department's Division of Law Enforcement took on significant, additional statutorily-mandated workload.

Exhibit 3 - Jones Decl.
Page 128

for training, DOJ temporarily reclassified several "Special Agent" positions to "Special Agent Trainee" positions while the current agents finish their trainings.[17]

A number of enforcement support staff assist Special Agents; these individuals are a significant asset to DOJ. In 2022, three support staff separated from the enforcement teams. DOJ is actively recruiting to fill these positions.

The fluctuation in Special Agent staffing levels due to transfers and promotions affected the quantity of agents able to initiate and complete enforcement work in 2022.

*Table 2: DOJ authorized positions for the relevant reporting period*

| Bureau Positions | 1/1/2022 | | | 7/1/2022 | | | 1/1/2023 | | |
|---|---|---|---|---|---|---|---|---|---|
| | Filled | Vacant | Total Authorized | Filled | Vacant | Total Authorized | Filled | Vacant | Total Authorized |
| Special Agent | 36 | 19 | 55 | 34 | 15 | 49 | 35 | 13 | 48 |
| Special Agent Supervisor | 14 | 1 | 15 | 15 | 0 | 15 | 12 | 3 | 15 |
| Special Agent-in-Charge | 2 | 1 | 3 | 2 | 1 | 3 | 2 | 1 | 3 |
| Special Agent Trainee | 1 | 2 | 3 | 8 | 1 | 9 | 9 | 1 | 10 |
| **Total** | **53** | **23** | **76** | **59** | **17** | **76** | **58** | **18** | **76** |

DOJ expects it will continue to face challenges in recruiting Special Agents as long as its compensation is not competitive with compensation packages offered by other LEAs.

While the 12% pay increase for Special Agents that went into effect on September 1, 2021, was a step in the right direction, Special Agent monthly base salary at DOJ continues to lag behind comparable positions at other LEAs.

Although DOJ had five retirements of sworn personnel in 2022, it expects in forthcoming years the Division of Law Enforcement (which includes DOJ), will face a substantial staffing shortfall as a result of projected retirements (see Table 3).

---

17    Due to AB 2699, DOJ was given one additional Special Agent position to investigate illegal firearms transactions.

Exhibit 3 - Jones Decl.
Page 129

*Table 3: Projection of Retirement Eligibility within the Division of Law Enforcement[18]*

| Division of Law Enforcement - SA/SAS/SAC Retirement Eligible Counts | | | |
|---|---|---|---|
| Fiscal Year | Classification | Employees Eligible to Retire | Cumulative Fiscal Year Total |
| 21-22 | Special Agent | 12 | 20 |
| | Special Agent Supervisor | 6 | |
| | Special Agent in Charge | 2 | |
| 22-23 | Special Agent | 16 | 26 |
| | Special Agent Supervisor | 8 | |
| | Special Agent in Charge | 2 | |
| 23-24 | Special Agent | 21 | 37 |
| | Special Agent Supervisor | 9 | |
| | Special Agent in Charge | 7 | |
| 24-25 | Special Agent | 25 | 47 |
| | Special Agent Supervisor | 15 | |
| | Special Agent in Charge | 7 | |
| 25-26 | Special Agent | 27 | 54 |
| | Special Agent Supervisor | 20 | |
| | Special Agent in Charge | 7 | |
| 26-27 | Special Agent | 36 | 67 |
| | Special Agent Supervisor | 24 | |
| | Special Agent in Charge | 7 | |

Until salaries are increased to competitive levels, either through additional amendments to bargaining unit contracts or by way of another change, as requested in the "Recommendations" section, DOJ can expect to continue to face challenges recruiting agents to fill DOJ's authorized positions.

### Number of Contacts Made During APPS Enforcement Efforts

DOJ's agents and Crime Analysts are continuously working to research and develop viable APPS investigations to determine which leads will potentially provide the greatest possible number of positive results. Cases are pursued until all investigative leads are exhausted. Individuals are then either: (1) disassociated from all of their firearms and removed from the APPS database; or (2) moved to the Pending category due to the existence of no further leads and are labeled "unable to clear."

During the course of an investigation, Bureau agents may need to make repeated contacts with a prohibited individual to close a case. These repeated contacts occur because the APPS individual may (1) not be home at the time of the initial contact; (2) have moved and failed to update their address with the DMV; (3) have moved out of state; (4) claim the firearm(s) was already seized by local law enforcement or has been reported as lost or stolen; (5) be uncooperative and not forthcoming with

---

18   The data in Table 3 was provided on January 30, 2023 by DOJ's Office of Human Resources Data Analytics Unit and is based on vacancies and headcounts as of January 30 2023. The projected cumulative fiscal year totals increase each year as additional employees become retirement eligible, and the projection assumes the prior years' employees have not yet retired.

Exhibit 3 - Jones Decl.
Page 130

information about the firearm(s), requiring further interviews and contacts; and (6) claim to have given their firearm(s) to another person outside of the legal firearms transfer process, requiring agents to track down the firearm(s) and/or verify the provided information.

In total, agents made nearly 24,000 contacts in 2022. With an average of 35 Special Agents (not including supervisors or agents in training) employed during 2022, which represents an average of 57 contacts per month per agent.[19] Overall, the monthly average number of contacts per agent in 2022 remained comparable to 2021. As in previous years, agents required an average of three separate contacts, which consisted of in-person interviews, to close one APPS case.

Special Agent Supervisors are not included in these calculations because, although supervisors are involved in all field operations, their work focuses on being vigilant and available to make quick decisions for the safety of the team. Agents in training are likewise not included in these calculations because they accompany special agents during investigations. In the course of an investigation, special agents take the lead on investigations and contacts. Supervisors ensure their teams adhere to Department policy, follow officer safety protocols, and use proper investigative methods so that no violations of constitutional rights occur in the course of the investigation.

### Number of Firearms Recovered

In 2022, DOJ's Special Agents seized a total of 1, 437 firearms. Of these firearms 916 (64%) were firearms in listed in APPS, and 521 (36%) were firearms not listed in the system (non-APPS). See Figures 7 and 8 for a breakdown of the type of APPS and non-APPS firearms recovered. Together, APPS and non-APPS firearms resulted in 1,437 total firearm seizures (Figure 9). DOJ agents closed 7,946 APPS investigations due to enforcement efforts in 2022.[20] This number does not reflect the number of times DOJ agents attempted to locate an APPS individual or were required to visit third-party residences; it only captures the total number of closed cases.[21] The following graphs detail the number of firearms seized due to APPS enforcement in 2022, categorized by the type of firearms seized.

---

19   DOJ provides this number to illustrate the workload for each agent and compare year-to-year contacts per agent. However, agents always work in teams and will never contact a person in the Armed and Prohibited Persons System alone.

20   Not all cases closed are removed from APPS. They may remain in the Pending category.

21   Cases can also be closed when 1) agents or criminal analysts find the individual is deceased, 2) the individual has moved out of state and out of DOJ's jurisdiction, 3) a criminal analyst corrects a data discrepancy, and the individual is cleared.

Exhibit 3 - Jones Decl.
Page 131

*Figure 7. APPS firearms seized in 2022*



*Figure 8. Non-APPS firearms seized in 2022*



Exhibit 3 - Jones Decl.
Page 132

*Figure 9. The 1,437 firearms seized in 2022 separated by APPS type*



Non-APPS, 521

APPS, 916

**Number of Ghost Guns Recovered**

Ghost guns are firearms constructed by private citizens that do not have a serial number, which means they are not registered. By definition, ghost guns do not appear in the APPS database and cannot be tracked by law enforcement. DOJ's agents seized a total of 54 ghost guns in 2022, a 38% increase compared to the 39 ghost guns seized during 2021 APPS investigations.

The increase in the number of seized ghost guns in 2022 indicated the effectiveness of the two sweeps conducted during the year (see "Task Forces and Collaboration with Local Law Enforcement" for more information on DOJ's 2022 Sweeps). Of the 54 ghost guns seized in 2022, eight were seized during DOJ's two sweeps. These eight ghost guns account for approximately 15% of all ghost guns seized overall.

When looking at data from the Unique Serial Number Application (USNA) process, which shows how many California residents have applied to legally make personally manufactured firearms, there has been a slight decline in applications since 2018 (see Figure 11). However, the number of illegal ghost guns seized by law enforcement agencies continues to rise, as evidenced by figure 11. This contrast demonstrates illegal ghost guns remain difficult to track and represent a persistent threat to public safety. DOJ continues to actively investigate illegal manufacturing and possession of ghost guns.

In response to the overall increase in ghost gun seizures across the state, DOJ will be expanding its investigative efforts focused on ghost guns. DOJ is actively working with law enforcement partners to establish collaborative investigative efforts aimed at addressing ghost gun activity.

Exhibit 3 - Jones Decl.
Page 133

*Figure 10. Unique Serial Number Application (USNA) submissions granted serial numbers from 2018-2022*



*Figure 11. The number of unique serial number applications and ghost guns seized 2018-2022*[22]



Additionally, effective July 1, 2022, California became the first state to require a background check for the purchase of a firearm precursor part, which includes unfinished receivers and unfinished handgun frames. Senate Bill (SB) 118 (Stats. 2020, ch. 29) and Assembly Bill (AB) 879 (Stats. 2019, ch. 730) also created a new licensing structure for vendors to sell firearm precursor parts. In concurrence with the Legislature and the Governor, DOJ anticipates this law will further help keep firearms out of the hands of people prohibited from owning or possessing them.

---

22   This represents the total number of ghost guns seized by law enforcement in California. Law enforcement agencies are required to report ghost gun seizures to DOJ per California Penal Code section 11108.2.

Exhibit 3 - Jones Decl.
Page 134

## Ammunition Recovered

In 2022, DOJ agents recovered 308 large-capacity magazines, 2,123 standard capacity magazines, and 281,299 rounds of ammunition.

### *Ammunition Purchase Eligibility Check Program*

Proposition 63 (The Safety for All Act), as amended by Senate Bill (SB) 1235 (Stats. 2016, ch. 55), was approved by voters in 2016. The intent of Proposition 63 and SB 1235 was primarily to keep prohibited persons from acquiring ammunition in an effort to prevent gun violence. Under the new laws, ammunition must be purchased from or transferred by a licensed California Ammunition Vendor in a face-to-face transaction. Effective July 1, 2019, the law required California Ammunition Vendors to submit eligibility checks for prospective purchasers to DOJ and obtain approval prior to selling or transferring ammunition. Thereafter, California Ammunition Vendors are required to submit ammunition purchase details to DOJ. The eligibility checks ensure purchasers are not prohibited from owning or possessing ammunition due to a felony and/or violent misdemeanor conviction/warrant, domestic violence restraining order, or mental health issue.

On July 1, 2019, DOJ successfully deployed enhancements to the Dealer Record of Sale (DROS) Entry System, which allowed California Ammunition Vendors to submit eligibility checks, and subsequently report ammunition purchases in compliance with Proposition 63.

Monitoring denied ammunition purchases is an effective strategy because the attempted ammunition purchases signal to DOJ agents that a prohibited person still possesses and may be actively using a firearm. Additionally, it often provides more current addresses than those previously available in the APPS database. While the use of ammunition denial data is ancillary to regular APPS investigations, nearly every investigation results in a seizure of firearms and/or ammunition from a prohibited person.

In 2022, DOJ received reports of 194 armed and prohibited individuals who attempted to purchase ammunition and were denied through the ammunition eligibility check process. DOJ agents used the intelligence gathered through the ammunition purchase denials to investigate 194 individuals and close 141 of these cases. These investigations resulted in the seizure of 56 firearms, 39 APPS firearms (21 handguns, one receiver/frame only, 13 rifles, and four shotguns), 17 non-APPS firearms (three handguns, seven rifles, two short-barrel shotguns, and five shotguns), four large-capacity magazines, 55 standard magazines, and 6,621 rounds of ammunition. The remainder of the denial cases are under investigation. All seizures resulting from these ammunition purchase eligibility check denials are included in the overall APPS statistics provided in the "number of firearms recovered" section of this report.

## Task Forces and Collaboration with Local Law Enforcement

As discussed in the "Recommendations" section, these are the types of programs DOJ would like to expand. Receiving additional funding to reimburse local LEAs working with DOJ in coordinated APPS enforcement activities would make this work possible.

Exhibit 3 - Jones Decl.

Page 135

## Contra Costa County Anti-Violence Support Effort Task Force

DOJ currently manages the Contra Costa County Anti-Violence Support Effort (CASE) Task Force. The primary mission of CASE is to conduct complex firearms investigations and to seize firearms from prohibited and violent individuals in the Bay Area. This Task Force consists of representatives from the following agencies:

- California Department of Justice, Bureau of Firearms
- Contra Costa County Probation Department
- Federal Bureau of Alcohol, Tobacco, Firearms, and Explosives
- San Francisco District Attorney's Office
- California Department of Corrections and Rehabilitation
- California Highway Patrol

The CASE Task Force is a stand-alone task force dedicated to reducing firearm related crimes, identifying and apprehending persons prohibited persons, and assisting LEAs with specific firearm and crime related investigations. In 2022, it conducted 98 firearms-related investigations, of which 29 were APPS-related. During these investigations, they conducted 57 probation or parole searches and executed six search warrants. As a result of these investigations, the CASE Task Force arrested 29 armed individuals for firearms-related offenses and seized 19 firearms, of which five were APPS firearms (three rifle/shotguns, two handguns). The seizure of these five APPS firearms is reported with the overall APPS statistics. The 14 firearms seized during non-APPS investigations are not included in seizure totals for this report. Because not all firearms crimes in any county are committed by people in the APPS database, this task force focuses on investigating a broad range of subjects involved in firearms-related crimes — including those in the APPS database.

## Tulare County Agencies Regional Gun Violence Enforcement Team

In December 2020, DOJ assumed management of the Tulare County Agencies Regional Gun Violence Enforcement Team, also known as the TARGET Task Force. Due to funding issues, management of this task force was redirected from DOJ's Bureau of Investigation. The primary mission mirrors that of the CASE Task Force as the team is designed to investigate crimes involving gun violence and to seize firearms from prohibited individuals in the Tulare County region. Through this task force, DOJ has increased collaborative efforts and support of local and state law enforcement in the region. This task force consists of representatives from the following agencies:

- California DOJ, Bureau of Firearms
- California Department of Corrections and Rehabilitation
- Porterville Police Department
- Tulare County Sheriff's Department
- Visalia Police Department

In 2022, the TARGET Task Force conducted 277 firearms-related investigations, of which 131 were APPS investigations. During these investigations, they conducted 76 probation/parole searches and executed 34 search warrants. As a result of these investigations, the TARGET Task Force arrested 53 armed individuals for firearms-related offenses and seized 149 firearms, of which 33 were APPS

Exhibit 3 - Jones Decl.
Page 136

firearms (two assault weapon, 19 handguns, 10 rifles/shotguns, two receiver/frame only). The seizure of these 33 APPS firearms is reported with the overall APPS statistics.

The 116 firearms seized during non-APPS investigations are not included in seizure totals for this report. Because not all firearms crimes in any county are committed by people in the APPS database, this task force focuses on investigating a broad range of subjects involved in firearms-related crimes — including those in the APPS database. Like CASE, TARGET represents an efficient and effective model for collaboration with local, state, and federal LEAs on both APPS and non-APPS-related firearms investigations and affords a proactive approach to combating firearm violence.

### Joint Sweep Investigations

In addition to participating in the CASE Task Force and TARGET Task Force, DOJ also conducts collaborative APPS sweeps throughout the state upon request of a local or county LEA. These sweeps consist of Bureau personnel working together with allied LEAs in a certain jurisdiction of the state for a period of multiple days conducting APPS investigations. DOJ conducted two regional sweeps in 2022.

During these regional sweeps, Special Agents collaborated with local LEAs in a partnership to safely conduct APPS investigations. Although many LEAs were unable to participate in the sweeps due to staffing issues, DOJ still received assistance from multiple agencies throughout the state. Local patrol officers can act as a force multiplier to benefit APPS enforcement by providing additional information regarding the location of APPS subjects, and can assist with marked patrol vehicles. Local officers can also help expedite the transport and booking process of arrested subjects due to their familiarity with individual county processes. If the subject reports a missing or stolen firearm, the local law enforcement agency can work with the subject to promptly report that information into AFS, which may result in the removal of the subject from the APPS database.

These sweeps throughout the state increased APPS investigations while strengthening partnerships with local LEAs.

In 2022, two regional sweeps cumulatively investigated 777 cases, resulting in 21 arrests, and produced 141 firearm seizures, including 92 APPS firearms, 23 non-APPS firearms, eight ghost guns, and 18 assault weapons.[23]

DOJ worked jointly with the following agencies on 2022 APPS investigations:

- San Francisco District Attorney's Office,

- Santa Clara District Attorney's Office Inspector

- CASE Task Force

- Los Angeles Sheriff's Office

- Los Angeles Police Department

- Pomona Police Department

- Pasadena Police Department

- Azusa Police Department

---

23     These statistics are included in the total 2021 statewide seizure numbers.

Exhibit 3 - Jones Decl.
Page 137

- Los Angeles Probation Department

- TARGET Task Force

Looking forward, DOJ expects to foster more partnerships for collaborative sweeps in 2023, particularly as the Gun Violence Reduction Program grant allows more local agencies to fund positions that can assist DOJ in APPS enforcement.

## Bay Area Sweep

On January 10, 2022, APPS agents from throughout the state consolidated their investigative efforts in the Bay Area. Together with local and federal law enforcement, they engaged in a four-day sweep to remove firearms from individuals legally barred from possessing them. The teams thoroughly analyzed and exhausted their leads in 338 cases in the counties of Alameda, Contra Costa, Marin, Napa, Sacramento, San Francisco, Santa Clara, San Mateo, Sonoma, and Solano. The investigation resulted in the seizure of 27 firearms and eight arrests.

The operation was a joint effort with San Francisco District Attorney, Santa Clara District Attorney Inspector, and CASE Task Force.

## Los Angeles Sweep

On February 14, 2022, APPS agents from throughout the state consolidated their investigative efforts in the Los Angeles County Area. Together with local and federal law enforcement, they engaged in a five-day sweep to remove firearms from individuals legally barred from possessing them. The teams thoroughly analyzed and exhausted their leads in 439 cases. The investigation resulted in the seizure of 113 firearms and 13 arrests.

The operation was a joint effort with the Los Angeles Sheriff's Department, Los Angeles Police Department, Pomona Police Department, Pasadena Police Department, Azusa Police Department, and Los Angeles Probation Department.

## Gun Violence Reduction Program

Assembly Bill (AB) 74 provided grant funding to the Board of State and Community Corrections (BSCC) for statewide Gun Violence Prevention Programs. In 2019, funds were disbursed by the BSCC to four counties: Alameda, San Diego, Santa Cruz and Ventura to investigate and close APPS cases. Owing to its success, the legislature expanded the scope of the Gun Violence Reduction Pilot Program (GVRPP) by creating the Gun Violence Reduction Program (GVRP) through Senate Bill (SB) 129.

SB 129 allocated $10.3 million for two years for the GVRP. Unlike the GVRPP, which was operated by the BSCC, the GVRP is operated by DOJ. Under the program, DOJ awarded grants to county sheriff's departments to support seizures of firearms and ammunition from prohibited individuals. This program was designed to increase collaboration with local law enforcement across the state to enhance public safety by removing firearms and ammunition from prohibited persons. Collaboration between DOJ and local LEAs has proven a successful model which streamlines APPS enforcement efficiencies.

Pursuant to SB 129, DOJ made $10 million available over two grant cycles. Approximately $5 million was awarded by January 1, 2022, and nearly $3 million was awarded by January 1, 2023. Following the grant criteria outlined in SB 129, grant applicants were asked to provide clearly defined and measurable objectives for closing APPS cases and reducing the number of prohibited persons in possession of firearms. The sheriff's departments were also required to explain how the grants would enhance

Exhibit 3 - Jones Decl.
Page 138

existing law enforcement activities and also how the funds would be used for new activities, including innovative techniques and approaches toward APPS enforcement.

Pursuant to the parameters for grantee selection outlined in SB 129, DOJ prioritized counties with the highest per capita population of armed and prohibited persons that also lacked a DOJ field office. Grant priority was also given to departments that proposed innovative techniques and approaches to APPS enforcement, integrated APPS enforcement into existing operations, and presented a plan with the greatest likelihood of success.

In the first grant cycle, 10 county sheriff's departments were awarded grants to support activities related to seizing firearms and ammunition from individuals prohibited from owning or possessing them. The sheriff's departments and offices of Contra Costa, Lake, Los Angeles, Orange, Sacramento, San Francisco, Santa Barbara, Santa Clara, Santa Cruz, and Ventura counties received grant funding through the first cycle of DOJ's GVRP. The second grant cycle included the sheriff's departments and offices of Kings, Lassen, San Joaquin, Stanislaus, and Ventura. The results of the second round of GVRP grant funding will be included in next year's report. For more information on awards, see Appendix H.

The grantees listed below reported statistical information regarding the enforcement of this grant funding to DOJ by February 1, 2023. The statistical information demonstrated that most counties worked APPS cases throughout the year and provided DOJ with adequate data to analyze their progress during 2022. The requested statistical information included the number of individual cases investigated, the outcome of those investigations, and the number of prohibited APPS individuals before and after the reporting period.

DOJ then cross-referenced records provided by the grantee counties to data within the APPS database to verify that the county's reported cases exist in DOJ's APPS database. In some instances, records could not be verified because the grantee provided different identifying information than what is in the APPS database. These remain on the active list until DOJ or an LEA is able to conduct further investigations. In the meantime, only verified cases are included in GVRP analyses in this report.  The results reported below detail the records DOJ could find and their status as of January 1, 2023.

## Contra Costa County Sheriff's Office

The Contra Costa County Sheriff's Office received $332,205 in GVRP funding and reported working 17 APPS cases. DOJ verified 16 of the 17 reported cases. These 16 cases included one removed from the APPS prohibited list, six cases that are still labeled as active as of January 1, 2023, and nine as pending cases. The one removed individual was disassociated from all known firearms. Of the nine pending cases, three people were prohibited due to Brady prohibitions, two were unable to be closed, and four could not be located. By the end of their reporting period, Contra Costa County reported 27 fewer prohibited individuals in APPS within their jurisdiction.

## Lake County Sheriff's Office

The Lake County Sheriff's Office received $277,373 in GVRP funding and reported working 30 APPS cases but did not report the reduction of prohibited persons in APPS within the county in 2022. DOJ verified 13 out of the 30 reported cases. These 13 cases included one individual disassociated from all firearms, one individual who could not be located, one incarcerated individual, eight individuals who were active as of January 1 2023, and two who were not prohibited in APPS.

## Los Angeles County Sheriff's Department

The Los Angeles County Sheriff's Department received $843,630 in GVRP funding and reported working 162 cases but did not report the reduction of prohibited persons in APPS within the county to DOJ in 2022. DOJ verified 155 out of the 162 cases. These 155 cases included 46 individuals removed from the APPS prohibited list, 62 individuals still labeled as active as of January 1, 2023, 33 individuals still labeled as pending cases, and one incarcerated individual. There were a further five individuals removed from APPS prior to 2022 and eight reported individuals who were not prohibited from possessing firearms. Of the 46 removed cases, 37 were disassociated from all known firearms, eight had their prohibitions expire, and one was deceased. Of the 33 pending cases, 13 were unable to be closed, 17 were unable to be located, one had moved out of California, and two were prohibited only due to Federal Brady prohibitions.

## Orange County Sheriff's Department

The Orange County Sheriff's Department received $316,285 and reported working 178 cases. DOJ verified 175 of the 178 cases. These 175 cases included 60 individuals removed from the APPS prohibited list, 113 individuals still labeled as active as of January 1, 2023 and two individuals labeled as pending cases. Of the 60 removed cases, 35 were disassociated from all known firearms and 25 had their prohibitions expire. Of the two pending cases, one was unable to be located and one had moved out of California. By the end of their reporting period, the Orange County Sheriff's Department reported 25 fewer prohibited persons in APPS within their jurisdiction.

## Sacramento County Sheriff's Office

The Sacramento County Sheriff's Office received $887,275 in GVRP funding. The county reported working 59 cases and did not report the reduction of prohibited individuals in APPS within the county to DOJ in 2022. DOJ verified 58 of the 59 cases. These 59 cases included 18 individuals removed from the APPS prohibited list, 18 individuals still labeled as active as of January 1, 2023, and 19 individuals labeled as pending cases. Of the 18 removed cases, 15 were disassociated from all known firearms and three individuals were deceased. Of the 19 pending cases, four were unable to be located, 13 were unable to be closed, and one had moved out of California. There were an additional four individuals who were either not prohibited or removed from APPS in previous years.

## San Francisco County Sheriff's Department

The San Francisco County Sheriff's Department received $301,554 in GVRP funding and reported working 328 cases but did not report the reduction of prohibited persons in APPS within the county to DOJ in 2022. Due to extensive missing and improperly recorded data, DOJ was able to verify only five of the 328 cases. Of the five cases, two individuals were disassociated from all known firearms and three did not ever appear as prohibited in APPS. Due to significant gaps in data reporting, these results should not be afforded much weight.

## Santa Barbara County Sheriff's Office

The Santa Barbara County Sheriff's Office received $539,600 in GVRP funding and reported working 187 cases. DOJ verified all 187 cases. These 187 cases included 45 individuals removed from the APPS prohibited list, 28 individuals still labeled as active as of January 1, 2023, 102 cases labeled as pending cases, and 11 incarcerated individuals. Another individual who was reported was not prohibited in APPS. Of the 45 individuals removed from the APPS prohibited list, 20 were disassociated from all known firearms, four were deceased, and 21 had their prohibitions expire. Of the 102 pending cases, 15 individuals were prohibited only due to federal prohibitions, two had moved out of California, 56 were unable to be closed after exhausting all leads, 29 were unable to be located after exhausting all leads. By the end of their reporting period, the Santa Barbara County Sheriff's Office reported 24 fewer prohibited people in APPS within their jurisdiction.

Exhibit 3 - Jones Decl.
Page 140

**Santa Clara County Sheriff's Office**

The Santa Clara County Sheriff's Office received $512,255 in GVRP funding and reported working 19 cases. DOJ verified 14 of 19 cases. These 14 cases included 10 individuals removed from the APPS database, two individuals still labeled as active as of January 1, 2023 and two individuals labeled as incarcerated. Of the ten removed individuals, eight were disassociated from all known firearms and two had their prohibitions expire. By the end of their reporting period, the Santa Clara County Sheriff's Office reported 26 fewer prohibited individuals in APPS within their jurisdiction.

**Santa Cruz County Sheriff's Office**

The Santa Cruz County Sheriff's Office received $291,596 in GVRP funding and reported working 49 cases. DOJ verified 47 of 48 cases. These 47 cases included 30 individuals removed from the APPS database, 14 individuals still labeled as active as of January 1, 2023, and three individuals labeled as pending cases. Of the 30 removed individuals, 14 were disassociated from all known firearms, and 15 had their prohibitions expire. The three pending individuals could not be closed due to unaccounted for firearms after exhausting all leads. By the end of their reporting period, the Santa Cruz County Sheriff's Office reported 16 fewer prohibited individuals in APPS within the county to DOJ in 2022 within their jurisdiction.

**Ventura County Sheriff's Office**

The Ventura County Sheriff's Office received $652,575 in GVRP funding. The county reported working 110 cases and did not report the number of prohibited individuals in APPS removed from APPS in 2022. DOJ verified 85 of 110 cases. These 85 cases included 42 individuals removed from the APPS database, 12 individuals still labeled as active as of January 1, 2023, 13 individuals labeled as pending cases and five individuals who were incarcerated. Of the 42 removed individuals, 19 were disassociated from all known firearms, five individuals were deceased, and 18 had their prohibitions expire. Of the 13 pending cases, eight individuals could not be closed due to unaccounted for firearms after exhausting all leads, two could not be located after three separate attempts, two had moved out of California, and one was prohibited only due to federal prohibitions. A further 13 reported individuals were not prohibited in APPS.

**Firearms & Removal Reporting**

While most counties provided clear records on individuals investigated throughout the year, the firearm data and final status of individuals showed discrepancies between the information counties reported and information in DOJ's records. Counties often report firearms as being "cleared" or "recovered," and individuals as being "suspended" or "removed" from APPS, but DOJ's data contradicts these reports.

In order to better track prohibited persons and their firearms at the local level, DOJ will bolster its outreach efforts by conducting trainings and providing the GVRP grantee agencies with more specific exemplar statistical reporting documents.

Exhibit 3 - Jones Decl.
Page 141

## APPS Report Detailed Recommendations

DOJ greatly appreciates Governor Gavin Newsom's and the Legislature's interest in sensible firearms regulation and enforcement, and additional financial support toward this effort. As noted throughout this report, the recommendations proposed by DOJ would help to report the information mandated under Penal Code section 30012 and would also improve the efficiency and efficacy of the APPS program. To that end, DOJ recommends the following:

1. Continue to fund courts and probation departments so that they can confiscate or enforce the transfer or legal storage of known firearms at the time of conviction, when an individual is prohibited due to a felony or qualifying misdemeanor. Fund law-enforcement agencies to seize firearms that are not relinquished at or immediately after the time of prohibition. Pursuant to Proposition 63 (2016), the courts, probation departments, and local law enforcement agencies should focus on ordering firearms relinquishment and obtaining firearms from armed and prohibited persons on the front-end of the process. When an individual's conviction for a crime renders them prohibited, they are supposed to be notified at the time of conviction that they are prohibited from owning and possessing any firearms as well as how to turn over any firearms they have in their possession. This is the best opportunity to ensure prohibited persons are being disarmed. Felons and persons prohibited from possessing firearms by qualifying misdemeanors, account for 61% of the Armed and Prohibited Persons System in the APPS database, or 14,559 individuals. Recognizing the need for local governments to remove firearms from prohibited persons immediately post-conviction, the California Legislature allocated $40,000,000 to the Judicial Council in the 2022 budget to support a court-based firearm relinquishment program. This program was established "to ensure the consistent and safe removal of firearms from individuals who become prohibited from owning or possessing firearms and ammunition pursuant to court order" (AB 178, 2022 Biennium, 2022 Reg. Sess. (Cal. 2022)).  This new grant represents a promising step toward alleviating DOJ's APPS workload and minimizing the threat posed by prohibited persons.

2. Develop and fund a similar county-level firearm confiscation system where firearms are confiscated from the individual at the time they are served with a restraining order(s). Currently, all individuals who are served restraining orders and are in possession of a firearm at the time they are served end up in the APPS database unless local LEAs seize the firearms from them. If local LEAs could seize the firearms from these individuals upon service of the various types of restraining orders, it could limit new additions to the Armed and Prohibited Persons System in the APPS database by up to 17 percent.

3. Improve the recruitment of Special Agents by making their compensation competitive with other LEAs. Traditionally, proof of graduation from a police academy training program constitutes the main requirement for applicants seeking positions in law enforcement. However, DOJ's special agent requirements are significantly more rigorous. In addition to graduating from a police academy, Special Agents are  required to have spent one to two years in law enforcement and, in many cases,  have attended or graduated from college.  However, entry-level Special Agents are paid less than those in LEAs that do not have these same requirements. While the 12% pay increase for Special Agents that went into effect on September 1, 2021 was a step in the right direction, Special Agent monthly base pay at DOJ continues to lag behind comparable positions at other LEAs. Seizing firearms from prohibited persons is dangerous and difficult work that requires quick decision-making and superior analytical thinking. In order to recruit and maintain the caliber of individual necessary to perform this work, BOF must be able to offer competitive pay. Moreover, the agents who do this work should be competitively compensated for their efforts. DOJ has moved to a more aggressive hiring model in an attempt at filling Special Agent and Special Agent Supervisor positions at a quicker rate and keep pace with agent attrition.

Exhibit 3 - Jones Decl.
Page 142

However, receiving additional funding and contracting for salary increases would greatly improve recruitment of agents for DOJ's currently authorized positions.

4. Continue to improve coordination and cooperation with local LEAs by establishing joint task forces and expanding GVRP eligibility beyond Sheriff's offices to other agencies tasked with firearm relinquishment, such as municipal law agencies and probation departments. Funds would be managed and disbursed for the purpose of reimbursing local agency overtime for working with DOJ on the APPS workload. Reimbursement would go toward personnel time and other applicable expenses incurred as a direct result of the involved agency's participation in the joint operations through the execution of a memorandum of understanding with DOJ. A memorandum of understanding would also include administrative assistance efforts to help identify and reduce APPS firearms in locally managed evidence systems. All participating agencies would be required to assess firearms in their possession and develop a plan approved by DOJ to ensure all the required entries into the AFS are made in accordance with current state law. This would be a force multiplier for DOJ that would ensure a statewide coordinated effort and maintain recordkeeping standards to ensure that the data in the APPS database is as current as possible. Expansion of the GVRP grant program is expected to bolster existing APPS enforcement by law enforcement agencies. Additionally, the participating law enforcement agencies would be required to report all data in a manner prescribed by DOJ or as required by law as it relates to the seizure of firearms, ammunition, arrests, and all other information relevant to maintain adequate accountability for the APPS database.

5. Modernize the existing firearms databases and automate many of the manual processes to improve overall efficiency, risk mitigation, and stabilization of employee resources. As communicated to the DOF when the Legislature implemented SB 94's current reporting requirements under Penal Code section 30012, DOJ cannot fulfill this obligation until it modernizes the firearms databases.

The following systems support the regulation, and enforcement actions relating to the manufacture, sale, ownership, safety training, and transfer of firearms.

- Ammo Processor

- Armed and Prohibited Persons System (APPS)

- Automated Firearms System (AFS)

- California Firearms Information Gateway (CFIG)

- California Firearms Licensee Check (CFLC)

- Carry Concealed Weapons (CCW)

- Centralized List (CL)

- Consolidated Firearms Information System (CFIS)

- Dealer Record of Sale (DROS)

- DROS Entry System (DES)

- California Firearms Application Reporting System (CFARS)

- Firearms Certificate System (FCS)

- Assault Weapons Registration (AWR)

- Firearms Employment Application File (FEAF)

- Mental Health Reporting System (MHRS)

- Mental Health Firearms Prohibition System (MHFPS)

- Prohibited Applicant (PA)

This network of systems is incredibly complex and cumbersome to operate and navigate. Despite this monumental challenge, DOJ has been able to meet legislative reporting mandates using these outdated databases. These databases are not flexible and were not designed to be adaptable to meet additional demands. DOJ has been able to partially adapt and circumvent issues despite using technology that is not equipped with automated processes to meet the specified conditions. Consequently, most, if not all queries must be pulled and cross-checked manually from database to database, hindering efficiency and introducing increased opportunities for error. Working to modify or maintain these legacy systems is no longer cost-effective or a technologically viable option as the databases have become outdated and no longer meet the demands of the Legislature and DOJ.

DOJ received initial funding to pursue Stage 2 of this effort and is exploring modernization options to find a dynamic solution that would meet existing needs and be adaptable to evolving statutory mandates. However, additional funding will be required to begin Stages 3 and 4 and fully implement this project.

Exhibit 3 - Jones Decl.
Page 144

# APPENDICES

## APPENDIX A: Relevant Key Terms and Definitions

This section provides definitions to key terms used throughout this report.

**Armed and Prohibited Persons System (APPS)**. The APPS database, housed at the California Department of Justice (DOJ), which contains a list of all individuals who are both armed (DOJ is aware of their ownership of one or more firearms) and prohibited (for one or more reasons they have been designated as not being permitted to own or possess firearms).

**Automated Criminal History System (ACHS)**. The repository for the state summary Criminal Offender Record Information (CORI). In addition, DOJ transmits CORI to the Federal Bureau of Investigation (FBI).

**Automated Firearms System (AFS)**. This system was created in 1980 to identify lost or stolen firearms and connect firearms with persons. The system tracks serial numbers of every firearm owned by government agencies, handled by law enforcement (seized, destroyed, held in evidence, reported stolen, recovered), voluntarily recorded in AFS, or handled by a firearms dealer through transactions. Prior to 2014, most entries in AFS were handguns. Now, all newly acquired firearms, both handguns and long guns, are entered into AFS.

**Backlog.** The number of cases for which DOJ did not initiate an investigation within six months of the case being added to the APPS database or has not completed investigatory work within six months of initiating an investigation on the case.

**Brady Handgun Violence Prevention Act.** The Federal Brady Act, codified at 18 U.S.C. § 922(g), makes it unlawful for certain categories of persons to ship, transport, receive, or possess firearms or ammunition, to include any person:

- Convicted in any court of a crime punishable by imprisonment for a term exceeding one year;

- Who is a fugitive from justice;

- Who is an unlawful user of or addicted to any controlled substance (as defined in Section 102 of the Controlled Substances Act, codified at 21 U.S.C. § 802);

- Who has been adjudicated as a mental defective or has been committed to any mental institution;

- Who is an illegal alien;

- Who has been discharged from the Armed Forces under dishonorable conditions;

- Who has renounced his or her United States citizenship;

- Who is subject to a court order restraining the person from harassing, stalking, or threatening an intimate partner or child of the intimate partner; or

- Who has been convicted of a misdemeanor crime of domestic violence.

Under 18 U.S.C. § 992(n), it is also unlawful for any person under indictment for a crime punishable by imprisonment for a term exceeding one year to ship, transport, or receive firearms or ammunition. Further, 18 U.S.C. § 922(d) makes it unlawful to sell or otherwise dispose of firearms or ammunition to any person who is prohibited from shipping, transporting, receiving, or possessing firearms or ammunition. DOJ refers to these prohibitions as Federal Brady Act prohibitions. Since these individuals are only prohibited due to federal law, DOJ lacks jurisdictional authority to investigate these individuals, unless

Exhibit 3 - Jones Decl.
Page 145

they also have a California prohibition. On January 1, 2023, there were 23,869 armed and prohibited persons in the APPS database (9,294 active and 14,575 pending). Of the 14,575 pending cases, 1,593 are Federal Brady only cases.

**Bullet Button.** A product requiring a tool to remove an ammunition feeding device or magazine by depressing a recessed button or lever shielded by a magazine lock.

**Bullet Button Weapon.** A semiautomatic, centerfire or rim fire pistol with an ammunition feeding device that can be readily removed from the firearm with the use of a tool that has one or more specified features identified in Penal Code section 30515 and is included in the category of firearms that must be registered.

**California Restraining and Protective Order System (CARPOS)**. A statewide database of individuals subject to a restraining order.

**Cleared.** All cases in which the individual has died, the prohibition has expired or been reduced (e.g., the expiration of a temporary restraining order), or the individual has been disassociated from the firearm(s) such as selling, transferring, or turning over their firearm(s).

**Closed.** Any investigation that has been fully investigated and the individual has been cleared from APPS, or all investigative leads are exhausted and the individual remains in APPS with a pending status (see definition of pending and sub-statuses definitions).

**Consolidated Firearms Information System (CFIS).** This system consolidates numerous internal firearm applications within the California Justice Information Services Division (CJIS), the technology division within DOJ. These applications include the Armed and Prohibited Persons System (APPS), Assault Weapon Registration (AWR), Centralized List (CL), Carry Concealed Weapon (CCW), Dealers' Record of Sale (DROS), and Prohibited Applicant (PA).

**Contacts.** An attempt to locate an APPS individual at a potential current address. During face-to-face contact, agents will attempt a consent search if there are no search conditions due to parole or probation status. Sometimes consent is denied, and agents will leave the premises. If probable cause is developed at the scene, a search warrant will be requested and served that day.

**Dealers' Record of Sale (DROS).** This application is completed by firearms purchasers in California and is sent to DOJ by licensed firearms dealers, which initiates the 10-day waiting period. DOJ uses this information for a background check and the documentation of firearms ownership.

**Ghost Gun.** Ghost guns are firearms made by an individual, without serial numbers or other identifying markings.

**Mental Health Reporting System (MHRS).** This is a web-based application used by Mental Health Facilities, Superior Courts, Juvenile Courts, and LEAs to report firearm-prohibiting events related to mental health to DOJ.

Exhibit 3 - Jones Decl.
Page 146

**Statuses:**

**Active.** Individuals believed to reside in California who are prohibited (state, federally, or a combination of state and federally prohibited) from owning or possessing firearms, and have not yet been investigated or are in the process of being investigated, but all investigative leads have not yet been exhausted.

**Pending.** Individuals previously investigated, but that cannot be currently investigated for one or more reasons. The cases are those that have been thoroughly analyzed and all investigative leads have been exhausted. These individuals fall into one of the following sub-categories:

**Incarcerated.** These individuals are in state or federal prison. While they are incarcerated, these individuals are not in Active status. Although technically under Pending status, incarcerated individuals are treated as a separate population for the purposes of this report because it is assumed that they are not in possession of firearms while in custody and cannot be investigated until they are released. Once DOJ has received notification that they have been released, the individual is moved to the Active status.

**No Longer Residing in California (Out-of-State)**. Individuals who were a resident of California, but now no longer live in this state.

**Unable to Clear (UTC)**. These cases have previously been investigated by Bureau Special Agents and all investigative leads have been exhausted. The individual still has one or more firearms associated with them. If new information is identified, the case will be moved to Active status.

**Unable to Locate (UTL)**. These cases have previously been investigated by a Bureau Special Agent, but the agent is unable to locate the individual. It could be that the individual no longer lives at the address on file, family and friends are not able to provide useful location information, etc. If new location information is identified, the case will be moved to active status.

**Federal Brady Act Prohibition Only**. Cases where a person is prohibited only under federal law. State, county, and municipal law enforcement have no authority to enforce a prohibition based only on the Federal Brady Act (see definition for Brady Handgun Violence Prevention Act for a list of federal prohibitions). Persons who have both a statewide and federal prohibition are not listed in this group.

**Individuals Having Both State and Federal Prohibitions**. If APPS database individuals have a combination of state and federal firearm prohibitions, then DOJ has jurisdictional authority to investigate the matter related to the state prohibitions (e.g., felons, individuals with California restraining orders, qualifying misdemeanor convictions, and California mental health prohibitions).

**Wanted Persons System (WPS)**. This system was established in 1971 as the first online system for DOJ. It is a statewide computerized file of fugitives for whom arrest warrants have been issued.

Exhibit 3 - Jones Decl.
Page 147

## APPENDIX B: Legislative History Relative to APPS

The following provides a brief overview of the legislative history affecting DOJ's Armed and Prohibited Person program from 1999 to present. These legislative changes have exponentially increased the volume of prohibited individuals as the Legislature continues to increase the type and length of prohibitions. Other legislative changes with a substantial impact include evolving statutory and legal definitions as well as increases in the overall regulation of the various types of firearms, ammunition, and parts.

**1999**: APPS was conceptualized by the Legislature as a result of the proliferation of gun violence across the state and the nation.

**2001**: APPS was created in 2001 by Senate Bill (SB) 950 in response to high-profile murder cases involving people prohibited from owning firearms.

**2006**: The APPS database went into effect.

**2013**: SB 140 passed the Legislature and appropriated $24,000,000 from the Dealer Record of Sale Special Fund to DOJ for three years to reduce the volume of pending APPS investigations.

**2014**: Effective January 1, 2014, a new California law (Assembly Bill 809, Stats. 2011, ch. 745) mandated DOJ collect and retain firearm transaction information for all types of firearms, including long guns.

**2015**: After a 2013 audit by the Bureau of State Audits, DOJ finished manually inputting all of the cases into the APPS database.

**2016**: SB 140 funding expired. Effective January 1, 2016, AB 1014 created the new prohibitory category of the Gun Violence Restraining Order.

**2018:** Effective January 1, 2018, AB 785 added Penal Code section 422.6 (Criminal Threats) to the list of prohibiting misdemeanors. Effective July 1, 2018, AB 857 required DOJ to begin issuing serial numbers for firearms manufactured by unlicensed individuals after a successful background check of the owner. The background checks associated with this process identified additional prohibited persons.

**2019:** Effective July 1, 2019, SB 1235 and Proposition 63 required ammunition to be sold only to an individual whose information matches an entry in the Automated Firearms System and who is eligible to possess ammunition, with some exceptions. It also required ammunition vendors to electronically submit to a database known as the Ammunition Purchase Records File, and thus to DOJ, information regarding all ammunition sales and transfers.

Additionally, AB 3129 prohibited a person from ever possessing a firearm if that person is convicted of a misdemeanor violation of Penal Code Section 273.5 regarding the willful infliction of corporal injury resulting in a traumatic condition upon a spouse, cohabitant or other specified person. SB 746 required new California residents to, within 60 days of becoming a resident, apply for a unique serial number or other identifying mark for any unserialized firearm the resident manufactured or otherwise owns and intends to possess in California. SB 1100 prohibited the sale, supplying, delivery or giving possession or control of any firearm by a licensed dealer, with some exceptions, to any person under 21 years of age. SB 1200 expanded the definition of ammunition for the purposes of the Gun Violence Restraining Order law.

SB 94 provided updated requirements regarding the mandated reporting of the APPS database statistics. It required DOJ to report no later than April 1, 2020, and no later than April 1 of each year

Exhibit 3 - Jones Decl.
Page 148

thereafter, to the Joint Legislative Budget Committee and the fiscal committees of each house of the Legislature on information related to the APPS database, as listed in Penal Code section 30012.

**2020:** Effective January 1, 2020, AB 1968 subjected individuals who have been taken into custody, assessed and admitted to a designated mental health facility twice within a one-year period, because they are a danger to self or others as a result of a mental health disorder, to a lifetime firearms prohibition subject to a petition for, and hearing on, a reinstatement of firearm ownership rights.

Additionally, AB 164 prohibited a person from possessing a firearm if that person is prohibited in another state and allows DOJ, partners from other state agencies, and local LEAs to investigate and pursue these cases. AB 12 increased the maximum duration of a gun violence restraining order from one year to between one and five years. It also allows for law enforcement officers to file a petition for gun violence restraining orders in the name of the law enforcement agency in which they are employed. AB 61 expanded the list of individuals who may request a gun violence restraining order.

**2022:** AB 178 allocated $40 million to the Judicial Council to support a court-based firearm relinquishment program to ensure the consistent and safe removal of firearms from individuals who become prohibited from owning or possessing firearms and ammunition pursuant to court order. The funding is available until June 30, 2025. The first round of funding was distributed in January 2023.

Exhibit 3 - Jones Decl.
Page 149

## APPENDIX C: Mandated Statistics – At a Glance[24]

**[1] The Total Number of Individuals in the Apps Database and the Number of Cases which Are Active and Pending:** APPS has 3,347,221 individuals as of January 1, 2023. Of those individuals, 23,869 are prohibited from owning or possessing firearms, with 9,294 Active cases and 14,575 Pending cases.

**[A][i] For Active Cases, the Number of Cases That Have Not Been Actively Investigated for 12 Months or Longer, Along with a Breakdown of the Time Period That Has Elapsed since a Case Was Added to the System:** The APPS database is an outdated system that does not have the capability to track the time elapsed between a case entering the APPS database to when a case was last worked. As a result, DOJ does not have the ability to gather and report the requested information.

**[B] For Pending Cases, DOJ Shall Separately Report the Number of Cases That Are Unable to Be Cleared, Unable to Be Located, Related to Out-of-State Individuals, Related to Only Federal Firearms Prohibitions, and Related to Incarcerated Individuals:.** Of the 14,575 prohibited persons designated as Pending cases, 6,693 (46%) were unable to be cleared, 2,334 (16%) were unable to be located, 3,955 (27%) moved out of state, and 1,593 (11%) were prohibited under federal prohibitions only. Additionally, there are 1,159 incarcerated individuals.

**[2] The Number of Individuals Added to the APPS Database:** Between January 1, 2022 and January 1, 2023, there were 9,277 additional known firearm owners who became prohibited. In the same time period, there were 9,917 individuals removed from the prohibited category. This resulted in the total number of armed and prohibited individuals decreasing by 640.

**[3] The Number of Individuals Removed from the APPS Database, including a Breakdown of the Basis on Which They Were Removed:**

*Table 1: Removals of Prohibited Persons in 2022 Separated by Reason for Removal*

| Reason for Removal | Number of Individuals Removed |
| --- | --- |
| Prohibition expired/no longer prohibited | 5,940 |
| Disassociated from all known firearms | 3,598 |
| Deceased | 379 |

**[4] The Degree to Which the Backlog in the APPS Has Been Reduced or Eliminated:**
Penal Code section 30012, subdivision(a)(4) defines "backlog" as being cases for which DOJ did not initiate an investigation within six months of the case being added to the APPS database or has not completed investigatory work within six months of initiating an investigation on the case. The APPS database does not have the technological capability of tracking the amount of time a case has been in the system. Gathering this information would require that a Crime Analyst review each individual APPS entry, one-by-one and review the notes in each file. Lacking a more efficient way of gathering this information, DOJ will be unable to provide these statistics until upgrades are made to the APPS database.

---

24      The numbers and letters below correspond to the subdivision number in Penal Code section 30012.

Exhibit 3 - Jones Decl.
Page 150

**[5] The Number of Individuals in the APPS before and after the Relevant Reporting Period:**

*Table 2: The Total number of Individuals in APPS Before and After the Reporting Period Separated by Status*

| Status | Before Reporting Period | After Reporting Period |
|---|---|---|
| Armed and Not Prohibited | 3,173,755 | 3,322,193 |
| Armed and Prohibited | 24,509 | 23,869 |
| Incarcerated | 1,130 | 1,159 |

**[6] The Number of Agents and Other Staff Hired for Enforcement of the APPS:**

In 2022, DOJ hired seven Special Agents, nine Special Agent Trainee and two support staff for APPS enforcement. No existing Special Agent Trainees were promoted into the Special Agent ranks. DOJ also saw the separation of four Special Agents during 2022 due to inter-departmental transfer and/ or promotion and had one Special Agent promote from within to Special Agent Supervisor position, leaving DOJ with a net increase of 10 filled Special Agent positions. DOJ also saw the separation of one support staff for APPS enforcement and one internal promotion resulting in a net change of one in support staff.

**[7] The Number of Firearms Recovered Due to Enforcement of the APPS:**

In 2022, Bureau Agents recovered 916 (64%) APPS firearms (i.e., firearms known in the APPS database), and 521 (36%) non-APPS firearms not associated with APPS individuals, for a total of 1,437 firearms recovered.

**[8] The Number of Contacts Made during the APPS Enforcement Efforts:**

In 2022, agents made nearly 24,000 contacts based on an average of three contacts per individual per case while working APPS investigations.

**[9] Information regarding Task Forces or Collaboration with Local Law Enforcement on Reducing the APPS File or Backlog:**

DOJ takes pride in its collaborative efforts with law enforcement partners. These efforts include leading the CASE Task Force along with the recent addition of the TARGET Task Force, its partnership with the Los Angeles County Sheriff's Department on Dual Force operations, joint APPS sweeps with specific jurisdictions based on workload, and most recently the GVRP in which DOJ has awarded grant funding to county sheriff's departments to support activities related to conducting APPS investigations.

## APPENDIX D: Relational Diagram of DOJ's Bureau of Firearms Databases



Exhibit 3 - Jones Decl.
Page 152

## APPENDIX E: *Firearms Prohibiting Categories*

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2023)

DEPARTMENT OF JUSTICE
PAGE 1 of 5





### CALIFORNIA DEPARTMENT OF JUSTICE
### BUREAU OF FIREARMS
# FIREARM PROHIBITING CATEGORIES

**Persons who fall into the following categories are prohibited from owning and/or possessing firearms under California and/or federal law for the time periods described below. Please note that the Department of Justice provides this document for informational purposes only. This list may not be inclusive of all firearm prohibitions. For specific legal advice, please consult with an attorney.**

### *Lifetime Prohibitions*

#### *Convictions*

- Any person who has been convicted of, or has an outstanding warrant and knowledge of the same for, a felony under the laws of the United States, the State of California, or any other state, government, or country. (Cal. Penal Code § 29800(a)(1), (a)(3); 18 U.S.C. § 922(g)(1).)

- Any person who has been convicted of a "violent offense" listed in California Penal Code section 29905. (Cal. Penal Code § 29900(a)(1).)

- Any person with two or more convictions for exhibiting any firearm in a rude, angry, or threatening manner in the presence of another person, except in self-defense, in violation of Penal Code section 417, subdivision (a)(2). (Cal. Penal Code § 29800(a)(2).)

- Any person convicted of a misdemeanor violation of the following offenses:

  ➢ Assault with a firearm. (Cal. Penal Code §§ 29800(a)(1), 23515(a), 245(a)(2).)

  ➢ Assault with a machinegun, assault weapon, or .50 BMG rifle. (Cal. Penal Code §§ 29800(a)(1), 23515(a), 245(a)(3).)

  ➢ Shooting at an inhabited dwelling house, housecar, or camper, or at an occupied building, vehicle, or aircraft. (Cal. Penal Code §§ 29800(a)(1), 23515(b), 246.)

  ➢ Exhibiting any firearm in a rude, angry, or threatening manner in the presence of a peace officer. (Cal. Penal Code §§ 29800(a)(1), 23515(d), 417(c).)

  ➢ Inflicting corporal injury on a spouse or significant other under California Penal Code section 273.5, if convicted on or after January 1, 2019. (Cal. Penal Code § 29805(b).)

- Any person who has been convicted in any court of a misdemeanor crime of domestic violence. (18 U.S.C. § 922(g)(9).)

#### *Mental Health*

- Any person who is found by a court of any state to be a danger to others because of a mental disorder or mental illness. (Cal. Welf. & Inst. Code § 8103(a).)

- Any person who is found by a court of any state to be a mentally disordered sex offender. (Cal. Welf. & Inst. Code § 8103(a).)

- Any person who is found by a state or federal court to be not guilty by reason of insanity. (Cal. Welf. & Inst. Code § 8103(b), (c).)

- Any person who is found by a state or federal court to be mentally incompetent to stand trial. (Cal. Welf. & Inst. Code § 8103(d).)

- Any person who, within one year, is taken into custody two or more times as a danger to self or others under Welfare and Institutions Code section 5150 and assessed and admitted to a mental health facility. (Cal. Welf. & Inst. Code § 8103(f)(1)(B).)

- Any person who has been adjudicated as a mental defective or who has been committed to a mental institution. (18 U.S.C. § 922(g)(4).)

#### *Miscellaneous*

- Any person who is a fugitive from justice. (18 U.S.C. § 922(g)(2).)

- Any person who is an alien illegally or unlawfully in the United States, or admitted to the United States under a nonimmigrant visa (subject to certain exceptions). (18 U.S.C. § 922(g)(5).)

- Any person who has been discharged from the military under dishonorable conditions. (18 U.S.C. § 922(g)(6).)

- Any person who has renounced his or her United States citizenship. (18 U.S.C. § 922(g)(7).)

Exhibit 3 - Jones Decl.
Page 153



### CALIFORNIA DEPARTMENT OF JUSTICE
### BUREAU OF FIREARMS
## FIREARM PROHIBITING CATEGORIES



**10-Year Prohibitions**

*When a person has been convicted of, or has an outstanding warrant and knowledge of the same for, a misdemeanor violation of any of the offenses listed below (Cal. Penal Code § 29805(a), (c), (d)):*

- Threatening public officers, employees, and school officials. (Cal. Penal Code § 71.)

- Threatening certain public officers, appointees, judges, staff or their families with the intent and apparent ability to carry out the threat. (Cal. Penal Code § 76.)

- Intimidating witnesses or victims. (Cal. Penal Code § 136.1.)

- Possessing a deadly weapon with the intent to intimidate a witness or victim. (Cal. Penal Code § 136.5.)

- Using force or threatening to use force against a witness, victim, or informant. (Cal. Penal Code § 140.)

- Attempting to remove or take a firearm from the person or immediate presence of a public or peace officer. (Cal. Penal Code § 148(d).)

- Knowingly making a false report to a peace officer that a firearm has been lost or stolen. (Cal. Penal Code § 148.5(f).)

- Unauthorized possession of a weapon in a courtroom, courthouse, or court building, or at a public meeting. (Cal. Penal Code § 171b.)

- Bringing into or possessing a loaded firearm within the State Capitol, any legislative office, any legislative hearing room, or any office of the Governor or any other constitutional officer. (Cal. Penal Code § 171c(a)(1).)

- Bringing onto the grounds a loaded firearm, or possessing a loaded firearm within, the Governor's Mansion or residence of any other constitutional officer. (Cal. Penal Code § 171d.)

- Knowingly supplying, selling, or giving possession of a firearm to a person to commit a felony while actively participating in a criminal street gang. (Cal. Penal Code § 186.28.)

- Assault. (Cal. Penal Code §§ 240, 241.)

- Battery. (Cal. Penal Code §§ 242, 243.)

- Sexual Battery. (Cal. Penal Code § 243.4.)

- Assault with a stun gun or taser weapon. (Cal. Penal Code § 244.5.)

- Assault with a deadly weapon other than a firearm, or assault with force likely to produce great bodily injury. (Cal. Penal Code § 245(a)(1), (4).)

- When the victim is a school employee engaged in performance of duties, assault with a firearm, assault with a deadly weapon or instrument, assault by any means likely to produce great bodily injury, or assault with a stun gun or taser. (Cal. Penal Code § 245.5.)

- Discharging a firearm or BB gun in a grossly negligent manner. (Cal. Penal Code § 246.3.)

- Shooting at an unoccupied aircraft or motor vehicle, or at an uninhabited building or dwelling house. (Cal. Penal Code § 247.)

- Inflicting corporal injury on a spouse or significant other, if convicted before January 1, 2019. (Cal. Penal Code § 273.5.)

- Intentionally and knowingly violating a protective or restraining order. (Cal. Penal Code § 273.6.)

- Exhibiting any deadly weapon or firearm in a rude, angry, or threatening manner in the presence of another person, except in self-defense. (Cal. Penal Code § 417.)

- Intentionally inflicting serious bodily injury as a result of exhibiting a deadly weapon or firearm in the presence of another person. (Cal. Penal Code § 417.6.)

- Making threats to commit a crime which will result in death of, or great bodily injury to, another person. (Cal. Penal Code § 422.)

- Interference with the exercise of civil rights because of actual or perceived characteristics of the victim. (Cal. Penal Code § 422.6.)

Exhibit 3 - Jones Decl.
Page 154

STATE OF CALIFORNIA
PROHIBITING CATEGORIES (Rev. 03/2023)

DEPARTMENT OF JUSTICE
PAGE 3 of 5




### CALIFORNIA DEPARTMENT OF JUSTICE
### BUREAU OF FIREARMS
# FIREARM PROHIBITING CATEGORIES

- Possessing a firearm in a place the person knows or reasonably should know is a school zone. (Cal. Penal Code § 626.9.)

- Stalking. (Cal. Penal Code § 646.9.)

- Wearing a peace officer uniform while engaged in picketing or other public informational activities relating to a concerted refusal to work. (Cal. Penal Code §§ 830.95.)

- Possessing a deadly weapon with the intent to commit an assault. (Cal. Penal Code § 17500.)

- Carrying a concealed firearm, loaded firearm, or other deadly weapon while engaged in picketing or other public informational activities relating to a concerted refusal to work. (Cal. Penal Code § 17510.)

- Carrying a firearm in a public place or on a public street while masked. (Cal. Penal Code § 25300.)

- Carrying a loaded firearm with the intent to commit a felony. (Cal. Penal Code § 25800.)

- Possession of handgun ammunition designed primarily to penetrate metal or armor. (Cal. Penal Code § 30315.)

- Unauthorized possession or knowing transportation of a machinegun. (Cal. Penal Code § 32625.)

- As the driver or owner of any vehicle, knowingly permitting another person to discharge a firearm from the vehicle, or any person who willfully and maliciously discharges a firearm from a motor vehicle. (Cal. Penal Code § 26100(b), (d).)

- A firearms dealer who sells, transfers, or gives possession of a handgun, semiautomatic centerfire rifle, completed frame or receiver, or firearm precursor part to a person under 21 years of age, when no exception applies. (Cal. Penal Code § 27510.)

- Purchase, possession, or receipt of a firearm or deadly weapon by a person receiving in-patient treatment for a mental disorder while a danger to self or others, or by a person who has communicated to a licensed psychotherapist a serious threat of physical violence against an identifiable victim. (Welf. & Inst. Code § 8100.)

- Knowingly providing a deadly weapon or firearm to a person described in Welfare and Institutions Code sections 8100 or 8103. (Cal. Welf. & Inst. Code § 8101.)

- Purchase, possession, or receipt of a firearm or deadly weapon by a person who has been found by a court to be a danger to others because of a mental disorder or mental illness, to be a mentally disordered sex offender, to be not guilty by reason of insanity, or to be mentally incompetent to stand trial. (Cal. Welf. & Inst. Code § 8103(a), (b), (c), (d).)

- Purchase, possession, or receipt of a firearm by a person placed under a conservatorship for specified reasons, by a person taken into custody as a danger to self or others under Welfare and Institutions Code section 5150 and assessed and admitted to a mental health facility, or by a person certified for intensive treatment under Welfare and Institutions Code sections 5250, 5260, or 5270.15. (Cal. Welf. & Inst. Code § 8103(e), (f)(1)(A), (g).)

- Knowingly bringing a firearm into, or knowingly possessing a firearm in, a juvenile facility. (Cal. Welf. & Inst. Code § 871.5.)

- Knowingly bringing a firearm into, or knowingly possessing a firearm in, a Youth Authority institution or camp. (Cal. Welf. & Inst. Code § 1001.5.)

- Grand theft of a firearm. (Cal. Penal Code § 487.)

- Various violations involving sales and transfers of firearms. (Cal. Penal Code § 27590(c).)

- Storing a firearm knowing that a child or person prohibited from possessing firearms is likely to gain access to the firearm, if convicted on or after January 1, 2020. (Cal. Penal Code § 25100.)

- While residing with a person prohibited from possessing firearms, failing to keep the firearm secure in the residence in one of the specified manners, if convicted on or after January 1, 2020. (Cal. Penal Code § 25135.)

- Storing a firearm knowing that a child or person prohibited from possessing firearms is likely to gain access to the firearm, and the child or prohibited person accesses the firearm and carries it off-premises, if convicted on or after January 1, 2020. (Cal. Penal Code § 25200.)

- Willfully harming, injuring, or endangering the health of a child, if convicted on or after January 1, 2023. (Cal. Penal Code § 273a.)

- Willfully harming, injuring, or endangering the health of an elder or dependent adult, or falsely imprisoning an elder or dependent adult, if convicted on or after January 1, 2023. (Cal. Penal Code § 368(b), (c), (f).)

Exhibit 3 - Jones Decl.
Page 155



**CALIFORNIA DEPARTMENT OF JUSTICE
BUREAU OF FIREARMS
FIREARM PROHIBITING CATEGORIES**



- Knowingly helping a person prohibited from possessing firearms to manufacture a firearm, or knowingly manufacturing a firearm without a valid state or federal serial number, if convicted on or after January 1, 2023. (Cal. Penal Code § 29180(e), (f).)

### *Juvenile Prohibitions*

- Until 30 years of age or older, any person who is adjudged a ward of the juvenile court under Welfare and Institutions Code section 602 because the person committed an offense listed below (Cal. Penal Code § 29820):

  ➢ An offense listed in Welfare and Institutions Code section 707(b);

  ➢ An offense listed in Penal Code section 29805;

  ➢ A controlled substance offense listed in paragraphs (B), (C), (D), (E), or (F) of Penal Code section 29820(a)(1);

  ➢ Carrying a loaded firearm in public under Penal Code section 25850;

  ➢ Carrying a concealed firearm under Penal Code section 25400(a); or

  ➢ As the driver or owner of a motor vehicle, knowingly permitting another person to bring a firearm into the vehicle, under Penal Code section 26100(a).

### *Non-Lifetime Mental Health Prohibitions*

- For the period of admittance until discharge from a mental health facility, any person who is receiving in-patient treatment at a mental health facility for a mental disorder and is a danger to self or others. (Cal. Welf. & Inst. Code § 8100(a).)

- For the period of the conservatorship, any person who is placed under a conservatorship by a state or federal court because he or she is gravely disabled from a mental disorder or chronic alcoholism and the court finds that possession of a firearm would endanger the person or others. (Cal. Welf. & Inst. Code § 8103(e).)

- For a period of 5 years from the date that a licensed psychotherapist reports to a local law enforcement agency, any person who communicates a serious threat of physical violence to a licensed psychotherapist against a reasonably identifiable victim and the psychotherapist reports the threat to law enforcement. (Cal. Welf. & Inst. Code § 8100(b).)

- For a period of 5 years after being released from a mental health facility, any person who is taken into custody as a danger to self or others under Welfare and Institutions Code section 5150, assessed, and admitted to a mental health facility. (Cal. Welf. & Inst. Code § 8103(f).)

- For a period of 5 years, any person certified for intensive treatment under Welfare and Institutions Code sections 5250, 5260, or 5270.15. (Cal. Welf. & Inst. Code § 8103(g).)

### *Non-Lifetime Court-Ordered Prohibitions*

- For the period of probation, any person who is ordered to not possess firearms as a condition of probation. (Cal. Penal Code § 29815.)

- For the period that a court order is in effect, any person who is subject to one of the following orders that includes a prohibition from owning or possessing a firearm (Cal. Penal Code § 29825):

  ➢ A civil harassment temporary restraining order under Code of Civil Procedure section 527.6;

  ➢ A workplace violence temporary restraining order under Code of Civil Procedure section 527.8;

  ➢ A private postsecondary school violence temporary restraining order under Code of Civil Procedure section 527.85;

  ➢ A domestic violence protective order under Family Code section 6218;

  ➢ A criminal protective order under Penal Code section 136.2;

  ➢ A stalking protective order under Penal Code section 646.91;

  ➢ An elder or dependent adult abuse temporary restraining order under Welfare and Institutions Code section 15657.03; or

  ➢ A valid order issued by an out-of-state jurisdiction that is similar or equivalent to a temporary restraining order, injunction, or protective order, as specified in Penal Code section 29825.

Exhibit 3 - Jones Decl.
Page 156





**CALIFORNIA DEPARTMENT OF JUSTICE**
**BUREAU OF FIREARMS**
## FIREARM PROHIBITING CATEGORIES

- For a period of 21 days, any person subject to a temporary emergency Gun Violence Restraining Order (GVRO) or subject to an ex parte GVRO. (Cal. Penal Code §§ 18148, 18165.)

- For a period of 1 to 5 years, any person subject to a GVRO after notice and hearing. (Cal. Penal Code § 18170.)

- For a period of 5 years after an existing GVRO expires, any person who possesses a firearm or ammunition while knowingly subject to a GVRO prohibiting the person from doing so and is convicted for such possession. (Cal. Penal Code § 18205.)

- Any person who is subject to a court order that meets certain requirements and restrains the person from harassing, threatening, stalking, or threatening an intimate partner or child. (18 U.S.C. § 922(g)(8).)

### *Miscellaneous Prohibitions*

- Any person who is addicted to the use of any narcotic drug. (Cal. Penal Code § 29800(a)(1).)

- Any person who is an unlawful user of or addicted to any controlled substance. (18 U.S.C. § 922(g)(3).)

Exhibit 3 - Jones Decl.
Page 157

## APPENDIX F: Bureau of Firearms Regional and Field Offices



Exhibit 3 - Jones Decl.
Page 158

## APPENDIX G: Case Studies

### Prohibited APPS Subject Found in Possession of Machine Guns

In October 2022, the Bureau identified an individual who owned a firearm, despite the fact that he was prohibited from owning and possessing firearms or ammunition due to a felony conviction. Agents conducted investigative follow-up and subsequently obtained a search warrant for the individual's residence in Elk Grove, California. Special Agents with the assistance of the Elk Grove Police Department Special Weapons and Tactics (SWAT) Team, served a search warrant at the subject's residence. As a result of the search warrant, agents seized one AR-15 style rifle machine gun, one AR-15 style pistol machine gun, one Polymer 80 handgun (ghost gun) with a auto switch attached, one stolen handgun, one complete Polymer 80 handgun (ghost gun), three suppressors, 15 ghost gun receivers/frames, 15 large capacity magazines, and approximately 1,200 rounds of ammunition. Special Agents also located ten 3D-printed handgun receivers and frames, two 3D printers, and filament for the printers. The subject was arrested and his criminal case is pending with the court.



Exhibit 3 - Jones Decl.
Page 159

## Intercepted Russian Imported Packages Lead to Seizure of Machine Guns from San Luis Obispo Subject

In June of 2022, the Homeland Security Investigations, in coordination with the U.S. Customs and Border Protection, contacted Department special agents regarding a subject receiving machine gun parts from Russia. A total of four packages were intercepted with one package containing two AK style machine gun lower receivers with no serial numbers and stamped "Made in Russia." Based on the above information coupled with investigative follow up, agents secured a search warrant for the individual's residence in San Luis Obispo, California. In October of 2022, Special Agents served the search warrant at the individual's residence. A search of the residence resulted in the seizure of 16 unregistered assault weapons, five unserialized AK style machine guns, 45 AK style unserialized machine gun kits (several stamped "Made in Russia"), two silencers, one unregistered .50 caliber BMG rifle, 420 large capacity magazines, and approximately 150 rounds of ammunition. The subject was arrested, with criminal cases pending in court.



Exhibit 3 - Jones Decl.
Page 160

## Ammunition Eligibility Check Identifies Prohibited Individual in Redlands

In November of 2022, an individual attempted to purchase ammunition and was flagged as prohibited through the ammunition eligibility check process. Special Agents reviewed the case and found the individual was prohibited from owning and possessing firearms due to a misdemeanor conviction for willful discharge of a firearm. The individual had four firearms registered in his name in APPS. Agents subsequently obtained a search warrant for the subject's residence in Redlands, California. The search resulted in two handguns, seven rifles (including an unregistered assault weapon and a short barrel rifle), two shotguns, 11 magazines, and approximately 1,200 rounds of ammunition. The subject was arrested, with criminal cases pending in court.



Exhibit 3 - Jones Decl.

Page 161

## Riverside County APPS Subject Arrested for Being in Possession of Numerous Firearms while Prohibited Due to a Mental Health Commitment

In August of 2022, the Bureau identified a subject who resided in Menifee, California and was prohibited from owning or possessing firearms due to a mental health condition. It was determined the subject had several firearms recorded in his name, two of which were assault weapons. Agents conducted a preliminary investigation and found that the Menifee Police Department had responded to the subject's residence in January of 2022. During the January 2022 incident, the subject fired one of his firearms into his bedroom closet, believing someone was hiding there. At the time of that incident, Menifee Police Department seized the subject's firearm. Agents, believing the subject could potentially have additional firearms obtained and served a search warrant at the subject's residence. Agents subsequently located 54 firearms located throughout the house, including two AR-15 style assault rifles, two UZI assault weapons, 35 handguns, 15 rifles, 157 magazines and approximately 2,200 rounds of miscellaneous caliber ammunition. The subject was arrested and booked into Riverside County Jail.



Exhibit 3 - Jones Decl.
Page 162

**Glendora Subject Arrested for Being in Possession of Numerous Assault Weapons while Prohibited Due to a Criminal Protective Order**

In February of 2022, the Bureau identified a subject who resided in Glendora as being prohibited from owning or possessing firearms due to having a criminal protective order issued to him. Agents attempted to contact the subject at his residence, but were unable to locate him. A short time later, agents were able to contact the subject's wife and subsequently obtained a search warrant for the residence. While agents were conducting the search of the residence they were able to contact the prohibited person. Their search of the residence resulted in the seizure of: one short barrel rifle, five assault weapons, one rifle, four shotguns, one rifle lower, six handguns, 33 miscellaneous caliber magazines, and approximately 10,336 rounds of ammunition. The subject was arrested and his criminal case is pending with the court.



Exhibit 3 - Jones Decl.
Page 163

**Gun Show Investigation Results in the Seizure of Numerous Ghost Gun Assault Weapons**

In October of 2022, agents conducted an enforcement action at a gun show located in the Ontario Convention Center. During the operation, agents observed an individual, who they determined to be a convicted felon, purchase a rifle stock, a bolt barrier, and an upper receiver for an AR style rifle. Agents conducted additional investigative follow up, and obtained a search warrant for the subject's residence in Ventura.

Agents subsequently served the search warrant at the residence and seized the following items: one short barrel rifle, eight assault weapons (all ghost guns), two machine guns, six rifles, 12 lower receiver frames, seven handguns (three were ghost guns), two shotguns, 43 miscellaneous caliber large capacity magazines, 120 miscellaneous caliber standard capacity magazines, approximately 80,000 rounds of ammunition, a 3D printer, and miscellaneous gun/ammo manufacturing parts. The subject was arrested, with a criminal case pending in court.



Exhibit 3 - Jones Decl.
Page 164

## Gun Show Investigation Results in the Seizure of Assault Weapons

In August of 2022, Special Agents, with the assistance of the Sacramento County Sheriff's deputies, conducted an enforcement operation at a gun show in Red Bluff, California. Inside the gun show, Special Agents observed a firearms dealer selling two assault weapons. The dealer did not possess the proper permits to sell or possess the assault weapons. Agents contacted the dealer and seized two assault weapons and four magazines. They then searched his residential dealership. The subject was arrested and his criminal cases are pending with the court.



Exhibit 3 - Jones Decl.
Page 165

## *APPENDIX H: Gun Violence Reduction Program Awards*



**GUN VIOLENCE REDUCTION PROGRAM**
FISCAL YEAR 2022-23

| APPLICANT | SUMMARY OF AWARD | AWARD |
|---|---|---|
| Kings County Sheriff's Office | Investigate and bring resolution to 67 APPS subjects in Kings County.  Research and eliminate firearm transfers that were not completed properly.  Collaborate with courts, District Attorney, Probation Department and Parole Offices on subjects navigating through the court system that will become prohibited in the near future. | $355,686 |
| Lassen County Sheriff's Office | Reduce the number of APPS cases in Lassen County through APPS related investigations as well as general law enforcement investigations.  Increase the number of cases filed and convictions obtained in armed prohibited person cases.  Reduce the number of stolen firearms in possession of prohibited persons.  Work with the courts, District Attorney, Public Defender and Probation Department on identifying persons likely to become prohibited and help in educating the person(s) on their options available to them for legally disposing of or transferring their firearm(s). | $322,249 |
| San Joaquin County Sheriff's Office | Create a Gun Violence Prevention Team focusing first on subjects from APPS that pose the most risk to the public (e.g., gang affiliations, domestic violence restraining orders, etc.).  Determine level of threat of subjects and resources needed (e.g., Veterans Affairs, mental health clinicians, Probation Department, etc.).  Work with local entities to address new subjects added to APPS timely. | $987,072 |
| Stanislaus County Sheriff's Office | Reduce the 1,008 firearms associated with 413 armed prohibited persons in Stanislaus County.  Contact mental health prohibited persons regarding firearm possession.  Utilize the National Integrated Ballistic Information Network to seek out new offenders that are matched from ballistic data. | $568,604 |
| Ventura County Sheriff's Office | Reduce the number of individuals in APPS through intensive investigation and focus on recovery of firearms.  Improve and make additions to the APPS investigation case management system that tracks, stores and combines data from a variety of sources regarding APPS subjects and investigations.  Development of a Pre-APPS program that will allow for the legal removal of firearms from individuals with a qualifying incident (e.g., restraining order, 5150 commitment, etc.) before they are placed in APPS.  Check range records, intelligence reports and social media investigation information to help identify prohibited persons in possession of firearms. | $555,876 |

Exhibit 3 - Jones Decl.
Page 166



**CALIFORNIA DEPARTMENT OF JUSTICE**

### GUN VIOLENCE REDUCTION PROGRAM
FISCAL YEAR 2022-23

| APPLICANT | SUMMARY OF AWARD | AWARD |
|---|---|---|
| Kings County Sheriff's Office | Investigate and bring resolution to 67 APPS subjects in Kings County.  Research and eliminate firearm transfers that were not completed properly.  Collaborate with courts, District Attorney, Probation Department and Parole Offices on subjects navigating through the court system that will become prohibited in the near future. | $355,686 |
| Lassen County Sheriff's Office | Reduce the number of APPS cases in Lassen County through APPS related investigations as well as general law enforcement investigations.  Increase the number of cases filed and convictions obtained in armed prohibited person cases.  Reduce the number of stolen firearms in possession of prohibited persons.  Work with the courts, District Attorney, Public Defender and Probation Department on identifying persons likely to become prohibited and help in educating the person(s) on their options available to them for legally disposing of or transferring their firearm(s). | $322,249 |
| San Joaquin County Sheriff's Office | Create a Gun Violence Prevention Team focusing first on subjects from APPS that pose the most risk to the public (e.g., gang affiliations, domestic violence restraining orders, etc.).  Determine level of threat of subjects and resources needed (e.g., Veterans Affairs, mental health clinicians, Probation Department, etc.).  Work with local entities to address new subjects added to APPS timely. | $987,072 |
| Stanislaus County Sheriff's Office | Reduce the 1,008 firearms associated with 413 armed prohibited persons in Stanislaus County.  Contact mental health prohibited persons regarding firearm possession.  Utilize the National Integrated Ballistic Information Network to seek out new offenders that are matched from ballistic data. | $568,604 |
| Ventura County Sheriff's Office | Reduce the number of individuals in APPS through intensive investigation and focus on recovery of firearms.  Improve and make additions to the APPS investigation case management system that tracks, stores and combines data from a variety of sources regarding APPS subjects and investigations.  Development of a Pre-APPS program that will allow for the legal removal of firearms from individuals with a qualifying incident (e.g., restraining order, 5150 commitment, etc.) before they are placed in APPS.  Check range records, intelligence reports and social media investigation information to help identify prohibited persons in possession of firearms. | $555,876 |

Exhibit 3 - Jones Decl.
Page 167