C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM RHODE, et al.,<br>  Plaintiffs,<br>v.<br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br>  Defendant. | Case No.: 3:18-cv-00802-BEN-JLB<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT'S EXPERT DECLARATIONS** |

## INTRODUCTION

On July 18, 2023, in response to the State's request at the July 17, 2023, hearing that the Court allow the State to submit information from purported experts on the history of firearm regulation, the Court ordered the State to "name and file an expert report(s) or declaration(s) regarding the American history and tradition of background checks" within 30 days. ECF No. 90. The Court ordered Plaintiffs to file any response brief or rebuttal expert declaration(s) thereto within 45 days. *Id*. On August 16, 2023, the State submitted declarations from three purported historians in support of its claim that California's Ammunition Laws have been historically accepted. This is Plaintiffs' brief responding to the State's declarations, along with a supporting rebuttal declaration from a historian attached hereto.

The State's additional declarations do nothing to save California's Ammunition Laws from presumptive unconstitutionality under *Bruen*'s historical analysis. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022). If anything, they confirm that the State cannot carry its burden under that analysis. To survive *Bruen*'s primary standard, government must show a historical tradition of "distinctly similar" laws to the modern law being challenged. *Id.* at 2133. Neither the State's previous briefing nor any of its latest declarations even purport to identify a single "distinctly similar" historical law to any of California's Ammunition Laws, let alone a tradition. As a result, the State has implicitly conceded that it can only prevail under *Bruen*'s "more nuanced approach" of reasoning by analogy. But California's Ammunition Laws do not qualify for that more liberal analysis and, even assuming they did, as with the laws that the State previously provided in its surveys, Dkt. Nos. 79-1; 79-2, virtually none of the laws provided in the State's latest declarations are "relevantly similar" to California's Ammunition Laws to meet even that more liberal standard. As explained below, those laws are almost universally from an irrelevant time period or share neither the "how" nor the "why" with California's Ammunition Laws. Indeed, the State's own experts repeatedly distinguish those laws' "how" and the "why" from California's Ammunition

Laws. What's more, the State's experts' descriptions of many of those laws are not accurate and thus cannot be relied on.

This Court should thus grant summary judgment in Plaintiffs' favor.

# ARGUMENT

**A. California's Ammunition Laws do not qualify for *Bruen*'s "more nuanced approach"**

*Bruen*'s "more nuanced approach" permits reasoning by analogy only when "unprecedented societal concerns or dramatic technological changes" make the search for "distinctly similar" historical laws futile. *Id.* at 2132. There may be some things new under the sun, but the commercial availability of ammunition (including ammunition sold today) and the risk that dangerous individuals might avail themselves of it, is not one of them. Indeed, the State's latest declarations, and previous briefing, all purport to establish that hundreds of years of American and pre-American tradition have accepted restrictions on certain individuals from accessing weapons due to the danger they pose to society.

As a result, to prevail the State must show a historical tradition of laws that are "distinctly similar" to California's Ammunition Laws. *Id.* at 2133. The State again fails to identify a single such law in its new declarations, let alone any tradition of such laws. Not one of the laws cited by the State's purported experts remotely resembles any of California's first-of-their-kind laws. That is the end of the analysis here. For, when "a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S.Ct. at 2131. But, even assuming that California's Ammunition Laws deserve *Bruen*'s "more nuanced approach," they fail even under that more lenient standard.

/ / /

/ / /

/ / /

### B. None of the State's New Declarations Saves California's Ammunition Laws, even under *Bruen*'s "more nuanced approach"

*Bruen*'s "more nuanced approach" demands that the State present "well established and representative" historical analogues. *Bruen*, 142 S. Ct. at 2133. While the State need not identify a "historical twin," it must present a genuine analogue that is "relevantly similar" to the modern restriction it seeks to defend. *Id*. at 2132-33. In evaluating whether proposed analogues may be "relevantly similar," *Bruen* identified "at least two metrics: *how* and *why* the regulations burden a law-abiding citizen's right to armed self-defense." *Id*. at 2133 (emphasis added). The State has submitted three declarations from purported experts: Robert Spitzer; Michael Vorenberg; and Jennifer M. McCutchen. As with the laws that the State listed in its previously filed surveys, Dkt. Nos. 79-1; 79-2, virtually none of the various proposed "analogues" that the State's purported experts have included in their declarations share even remote resemblances with the provisions that make up California's ammunition scheme. *See* Plaintiffs' Disagreement re Defendant's Survey of Relevant Statutes (Dkt. No. 79-3). They also suffer from various other issues, such as being from irrelevant time periods and being inaccurately described.

#### 1. Spitzer Declaration

Spitzer's basic premise is that firearm and ammunition licensing laws have been prevalent throughout American history. As an initial matter, few of the licensing laws that Spitzer cites are from before 1868. *See* Decl. of Clayton Cramer, ¶ 5. According to *Bruen*, they are thus of little value. *Bruen*, 142 S. Ct. at 2154. What's more, Spitzer exaggerates the prevalence of permitting laws. In fact, few of the laws he claims to be permitting laws actually are. Decl. of Clayton Cramer, ¶ 22. Rather, they are comprised of no discharge laws, fire-prevention laws, hunting license laws, and others. *Id.*, at ¶¶ 7-17. And hardly any, if any, of the laws Spitzer cites constitute screening of potential *ammunition* purchasers.

Additionally, Spitzer's reliance on supposed licensing laws for enslaved persons and Freedmen that existed in Southern and border states, Spitzer Decl. at ¶56, cannot be

relied on as supporting an American tradition of screening and recording *all* law-abiding *citizens'* ammunition purchases, as California's ammunition scheme does. Their discriminatory purpose has nothing to do with preventing crime, but rather subjugation of people the government wants subjugated.

### 2. Vorenberg Declaration

Vorenberg's declaration is primarily focused on loyalty oaths during and following the Civil War "for the most part limited to the American South, and in particular those regions of the South that rebelled against the U.S. during the Civil War." Vorenberg Decl. at ¶12. Such war-specific enactments that only apply to some in a portion of the country for a short period of time can hardly be considered "relevantly similar" to California's peacetime ammunition restrictions that apply to virtually all in perpetuity. Decl. of Clayton Cramer, ¶¶ 29, 36-37. They certainly did not have the same "why" as California's ammunition restrictions. Indeed, Vorenberg himself explains that "[t]he primary function of these oaths was to identify southerners who could be counted on to support the U.S. government as regions in the South underwent a restoration from pro-Confederate to pro-Union affiliation." Vorenberg Decl. at ¶18; *see also* ¶25 (the provision "was as much about denying citizenship to potentially disloyal southern whites as it was about assuring citizenship to Blacks and unquestionably loyal southern whites."). It is also worth noting that Vorenberg incorrectly claims that the punishment for those who refused a loyalty oath was loss of civil rights beyond qualification for office; it was limited to restrictions on holding office. Decl. of Clayton Cramer, ¶ 32. Of course, the "how" is also very different, as loyalty oaths do not resemble California's system of requiring updating of records and payment of fees to be able to exercise rights.

### 3. McCutchen Declaration

McCutchen identifies various restrictions relating to enslaved people, Indians, and other subjugated peoples. To any reasonable person, these restrictions are patently distinguishable from California's ammunition scheme in the "how" and the "why" they were imposed. Indeed, McCutchen herself explains that "[a]ccess to guns, gunpowder,

and ammunition for members of [those] groups was not always controlled in the same manner or for the same reasons . . ..." McCutchen Decl. at ¶9. She provides as examples that colonial and later, American officials viewed firearms and ammunition as "tools through which they could attempt to control Native populations, force them to adhere to imperial interests, and secure Native American dependence." *Id*. at 16. She also identified "U.S. efforts to control Native peoples through access to guns and gunpowder . . .." *Id*. at 32. In other words, by explaining the government's deplorable motives, she concedes that under *Bruen* these laws were not "relevantly similar" to the purported purpose of California's ammunition scheme, which is not race-based, but criminal focused.

What's more, apparently McCutchen has the purpose of the laws about trading with Indians backwards. They were to *protect* Indians, not treat them as a dangerous segment of society. Decl. of Clayton Cramer, ¶ 44. If there is an appropriate California analogy to these laws, it would be a prohibition on gun dealers purchasing ammunition from retail customers, not the other way around.[1]

*   *   *   *

In sum, these three new declarations all seem to perpetuate the State's misplaced argument from its February 10, 2023, brief, that the laws provided in its surveys demonstrate "a tradition of historical laws prohibiting dangerous or unvirtuous persons from possessing *firearms*" and that "[t]he Ammunition Laws' background check requirements are relevantly similar to the background check laws already approved by the Supreme Court in *Bruen*" because they "arose out of that tradition." Defendant's Brief in Response to the Court's Order Entered on February 7, 2023 at 3. But, as the Ninth Circuit recently explained in a decision finding Hawaii's butterfly knife ban to violate the Second Amendment, showing a general tradition of regulation is insufficient under

---

[1] And in any case, Native Americans were not considered part of "the people" in the founding era or for many years thereafter. Rather, they were considered people of foreign nations. That is why *treaties* were made with various tribes and ratified by the Senate. This would change over time, and by 1924, all Native Americans were granted citizenship with the Indian Citizenship Act, 8 U.S.C. §1401(b).

*Bruen*. Government must show a tradition of laws that are similar in the specific subject matter and the means by which the law regulates conduct. *Teter v. Lopez*, No. 20-15948, 2023 WL 5008203, at *11 (9th Cir. Aug. 7, 2023); *see also Antonyuk v. Hochul*, 635 F. Supp. 3d 111, 131 (N.D.N.Y. 2022) ("generally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared."). Because none of the laws that any of the new declarations identify meet either of those criteria, they are irrelevant and should be ignored by this Court.

As this Court discussed at the July 17, 2023, hearing, the legislature replaced the system that the voters implemented with Proposition 63. At most, the State's new expert declarations purport to support background checks as a *general concept*. But even if they had done that successfully, it would not save the troubled system at issue here, as the State's experts of course cite no historical laws that resulted in the wrongful rejection of close to 1 in 10 people who attempted ammunition purchases for trivial discrepancies with their state records, as the law at issue here does. *See* Fifth Supp. Decl. of Mayra G. Morales ¶¶ 14, 27 (Dkt. No. 92-11) (explaining that about 11% of applicants are rejected on the AFS Checks, but "address mismatches, no apparent AFS entry, and name mismatches" accounted for 85% of those rejections).

The State's own data shows that from January to June of 2023, the AFS Check denied 141 prohibited persons, but it wrongfully rejected 58,087 people. *Id*. at p. 15 (Table 1.1). In other words, the State's "background check" system wrongfully rejects around 410 people for each prohibited person it rightfully denies. That is far from an acceptable ratio, especially when close to 40% of people denied by the AFS Check do not successfully purchase ammunition even after six months following the denial. *Id*. at ¶ 31.

None of this is acceptable under *Bruen*. While the Court may have sanctioned permitting and background checks generally in the context of the right to carry, it also warned that when such schemes are put towards "abusive ends", constitutional challenges are appropriate. *Bruen*, 142 S. Ct. at n. 9. It is hard to imagine anything more abusive than a "background check" that denies hundreds of times more law-abiding citizens than

prohibited persons; especially without a straightforward system for those wrongly rejected to quickly and efficiently overcome the mostly trivial reasons for their purchase rejections.

## CONCLUSION

Because nothing in any of the three declarations that the State has submitted saves California's Ammunition Laws from presumptive unconstitutionality, based on the above and previous briefing and evidence that Plaintiffs have submitted, this Court should grant summary judgment in Plaintiffs' favor.

Dated: October 2, 2023　　　　　　　　　**MICHEL & ASSOCIATES, P.C.**

　　　　　　　　　　　　　　　　　　　　*s/Sean A. Brady*
　　　　　　　　　　　　　　　　　　　　Sean A. Brady
　　　　　　　　　　　　　　　　　　　　Email: sbrady@michellawyers.com
　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Rhode, et al. v. Bonta*
Case No.: 3:18-cv-00802-JM-JMA

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**PLAINTIFFS' RESPONSE TO DEFENDANT'S EXPERT DECLARATIONS**

on the following parties by electronically filing the foregoing on October 2, 2023, with the Clerk of the District Court using its ECF System, which electronically notifies them.

  John D. Echeverria
  Deputy Attorney General
  john.echeverria@doj.ca.gov
  Anthony P. O'Brien
  Deputy Attorney General
  anthony.obrien@doj.ca.gov
  Christina R.B. Lopez
  Deputy Attorney General
  christina.lopez@doj.ca.gov
  455 Golden Gate Ave., Suite 11000
  San Francisco, CA 94102-7004
    *Attorneys for Defendant Attorney*
    *General Rob Bonta*

    I declare under penalty of perjury that the foregoing is true and correct. Executed on October 2, 2023, at Long Beach, CA.

*[signature]*
Laura Palmerin