C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KIM RHODE, et al.,<br><br>              Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as Attorney General of the State of California,<br><br>              Defendant. | Case No.: 3:18-cv-00802-BEN-JLB<br><br>**DECLARATION OF CLAYTON CRAMER IN RESPONSE TO DECLARATIONS OF DEFENDANT'S EXPERT WITNESSES** |

I, Clayton Cramer, make this declaration of my own personal knowledge and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein:

1. My M.A. in History is from Sonoma State University in California. I teach history at the College of Western Idaho. I have nine published books, mostly scholarly histories of weapons regulation. My 18 published articles (mostly in law reviews) have been cited in *D.C. v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) vacated by *Jones v. Bonta*, 47 F.4th 1124 (9th Cir. 2022)(remanded to the district court for further proceedings consistent with *Bruen*); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) cert. granted by *Young v. Hawaii*, 142 S.Ct. 2895 (judgment vacated and case remanded to the Ninth Circuit for further consideration in light of *Bruen*); *State v. Sieyes*, 168 Wash.2d 276 (Wash. 2010); *Senna v. Florimont*, 196 N.J. 469 (N.J. 2008); *Mosby v. Devine*, 851 A.2d 1031 (R.I. 2004). A comprehensive list of my scholarly works and citations can be found at https://claytoncramer.com/scholarly/journals.htm.

2. In several cases, my work has been cited in defense of laws limiting firearms ownership: *State v. Roundtree* (Wisc. 2021); *State v. Christen* (Wisc. 2021); *King v. Sessions* (E.D.Penn. 2018). My work was also cited by the dissent in *McDonald* v. *Chicago*, 130 S.Ct. 3022 (2010). *Id.* at 3132 (Breyer, J. diss.).

3. I am being compensated at an hourly rate of $150 by Plaintiffs for preparing this declaration responding to the declarations filed in support of the State of California by Robert Spitzer, Michael Vorenberg, and Jennifer M. McCutchen. My compensation is not contingent on the results of my analysis or the substance of any testimony.

## Rebuttal to Declaration of Robert Spitzer

**I.      Historically Relevant Background Check & Licensing Laws**

4. At ¶9, Spitzer claims that "Modern background checks for firearms purchases as we understand them did not begin until the 20th century. However, the absence of modern background check technologies in early America did not mean that

evaluations of those entitled to have weapons did not occur or exist." According to Spitzer at ¶10: "Weapons licensing or permitting, which dates to the 1700s and became more wide-ranging and widespread in the 1800s and early 1900s, was a widespread and varied regulatory tool utilized in America." As supposed evidence, Spitzer asserts at ¶28 that his Exhibits B and C demonstrate "In all, a total of at least 45 states plus the District of Columbia enacted some type of licensing law from the 1700s through the early 1900s. At least 29 states enacted 62 licensing requirement laws for individuals as a pre-requisite for their weapons ownership during this time."

5.   There are, at first glance, a lot of such licensing laws in Spitzer's Exhibit B, especially if you do not look them up in Exhibit C. But few are from before 1868, the year the Fourteenth Amendment was adopted, and even many of those turn out to be less than Spitzer's Exhibit B would suggest. In the following paragraphs, we will examine each such category of pre-1868 law in date of passage order.

A.   **"Carry or Have" Licensing Laws**

6.   *None* of his "Carry or Have" licensing laws predate 1868.

B.   **"Fire or Discharge" Licensing Laws**

7.   A few of his "Fire or Discharge Permit" laws predate 1868, but few are actually permit laws. Connecticut 1835 is a New London ordinance: "That no gun or pistol shall be fired at any time within the limits of said city, unless on some public day of review, and then by order of the officers of the military companies of said city, or by permission of the mayor, or one of the aldermen of said city…" This is in no way a background check or licensing law. It prohibits *discharge* of firearms (and fireworks) except as part of a militia exercise. It is not clear whether the "permission of the mayor" provision was anything but part of a general prohibition.

8.   The following list includes all of Spitzer's other pre-1868 ordinances prohibiting discharge of firearms, and often fireworks. While licenses *might* be issued by the city government, there is no language implying any sort of background check for the license to issue.

| State (from Exhibit B) | Year (from Exhibit B) | City (from Exhibit C) |
|---|---|---|
| Connecticut | 1845 | New Haven |
| Illinois | 1841 | Quincy |
| Indiana | 1855 | Jeffersonville |
| Michigan | 1848 | Detroit |
| Minnesota | 1858 | St. Paul |
| Missouri | 1843 | Kansas City |
| New Hampshire | 1823 | Portsmouth |
| New York | 1824 | Schenectady |
| Ohio | 1823 | Marietta |
| Oregon | 1868 | Portland |
| South Carolina | 1802 | Charleston |
| Virginia | 1859 | Richmond |

9. Some of the laws Spitzer cites are general fire protection measures such as St. Paul's 1858 ordinance, which prohibited "any person to fire or discharge any cannon, gun, fowling piece, pistol or fire arms of any description, or fire, explode or set off any squib, cracker or other thing containing powder or other combustible or explosive material, or to exhibit any fire works or make or exhibit any bonfire…"

10. Other discharge license laws that Spitzer lists include a variety of nuisances of urban life such as this 1713 Philadelphia ordinance and with no provision for receiving a license:

> This Act inflicts 5s penalty on persons riding a gallop and 10s for persons trotting, with Drays or their Teams in the streets, and 5th for suffering a Dog or a Bitch going at large; or firing a Gun without license, or if a Negro be found in any disorderly practices or other Misbehaviors may be whipped 21 lashes for any one offence or committed to prison, which words "other misbehaviors," are very uncertain and give very arbitrary power where the punishment is great. [(Summary of Statute from Archive compilation)].

11. Spitzer lists Pennsylvania as having two 1721 laws and a 1750 law on this subject. Examining primary sources[1] and even his own version cited as "Act of 26th August 1721. 1721[An Act of 9th of February, 1750-51" have a 1750-51 date, not 1750. There is a similar, although not identical, 1721 statute which again is primarily a fire hazard law:

> If any person or persons within the towns of Chester, Bristol, Germantown, Darby or Chichester, shall set on fire their chimneys to cleanse them, or shall suffer them or any of them to take fire, and blaze out at the top, and be duly convicted thereof, by one credible witness before any one justice of the peace of the said counties, such person or persons shall forfeit and pay for every such offence twenty shillings, for the use of the said towns respectively, where such offence shall happen. 2. SECT. IV. If any person or persons, of what sex, age, degree or quality soever, shall fire any gun or other fire arms, or shall make or cause to be made, or sell or utter, or offer to expose to sale any squibs, rockets, or other fire works, or shall cast, throw or fire any squibs, rockets, or other fire works, within the city of Philadelphia, without the governor's special license for the same…[2]

12. Spitzer's 1824 Pennsylvania law is again a ban on firing guns or cannon, but also to "illuminate, or cause to be illuminated, any house within the regulated parts…." In other words, it is a fire-prevention law.

13. Iowa 1843: none of the Iowa laws in Exhibit C show such a year; there is an 1853 Davenport ordinance similar in effect to the others.

14. Spitzer's Exhibit B lists 45 laws requiring a "Fire or Discharge Permit," only some of which predate 1868, and none of which shows evidence that they involved a background check. To the extent they required permission, this seems to have been a phrase allowing the city government to make special exemptions to a standard prohibition on *discharge* of firearms, not acquisition.

---

[1] DIGEST OF THE LAWS OF PENNSYLVANIA FROM THE YEAR ONE THOUSAND SEVEN HUNDRED, TO THE SIXTEENTH DAY OF JUNE, ONE THOUSAND EIGHT HUNDRED AND THIRTY- SIX, 5th ed. 432 (1837).

[2] Id., at 431.

### C. "Hunt Sport"

15. Spitzer lists "Hunt Sport" among his licensing laws. *None* predates 1868. They are hunting license laws

### D. "Gunpowder Explosives Licensing"

16. Licensing of explosives is a common feature of American law. Gunpowder, especially in large quantities, is a substantial fire and explosive risk. A 1782 Pennsylvania law prohibited storing more than 30 pounds of gunpowder in Philadelphia or within two miles, except in the public powder magazine.[3] Minor revisions were made in 1787.[4] New York limited possession in New York City to 28 pounds, separated into seven-pound containers, except in the public magazine.[5] These restrictions were not intended to address crime, but rather fire hazards. See the Boston ordinance . The preamble "WHEREAS the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves when a fire happens to break out in the said town"[6]

17. Ammunition is not an explosive. Even the smokeless powder that goes into manufactured ammunition or used by reloaders to make their own ammunition is not.[7] Federal explosives law specifically excepts "small arms ammunition and components thereof" from the definition of explosives.[8]

### E. "Seller Registers Buyer"

18. *None* of Spitzer's laws in this category predate 1868.

---

[3] 11 PENNSYLVANIA STATUTES AT LARGE 209-12.
[4] 12 PENNSYLVANIA STATUTES AT LARGE 416-23.
[5] 2 LAWS OF THE STATE OF NEW-YORK 191-3 (1792).
[6] Charter and Ordinances of the City of Boston, Together with the Acts of the Legislature Relating to the City 142-143 (1834)
[7] Bureau of Alcohol, Tobacco, Firearms and Explosives, ATF FEDERAL EXPLOSIVES LAW AND REGULATIONS 69 (2007).
[8] Id., at 61.

DECLARATION OF CLAYTON CRAMER
18cv802

### F. "Reg Tax"

19. Spitzer's collection of laws here includes an 1867 Alabama tax on pistols and Bowie knives, and a very similar 1867 Washington Co., Mississippi ordinance. Both laws were adopted in the immediate aftermath of emancipation. While neither law is explicitly racially discriminatory, the annual tax of $3 certainly had a disparate impact on freedmen.

20. Spitzer also lists two post-1868 laws: a North Carolina 1909 law, which only licensed dealers "in pistols, guns, dirks, bowie knives, sling shots, brass or metal knuckles or other like deadly weapons with no mention of ammunition, and a South Carolina 1923 law which taxed ammunition.

21. All of his "Reg Tax" examples both before and after the Fourteenth Amendment came from states with a tradition of slavery that were trying to keep their black populations subservient with Jim Crow type laws.

## II. Summary

22. Spitzer's claims about firearms and ammunition licensing fall into two general categories: laws and ordinances passed before 1868 and laws passed after 1868. Essentially all of the statutes and ordinances he cites that predate 1868 are neither licensing nor background check laws. They are bans on behavior that qualified as a fire hazard or public nuisance. That some of these laws allowed for permission from city government to violate suggests that this terminology was a phrase that allowed for exceptional events such as public celebrations (*e.g.,* Fourth of July).

23. Many of Spitzer's examples, such as hunting licenses, and gun powder and explosives regulations, are simply inapposite to Proposition 63's ammunition background check.

24. Much of Spitzer's declaration seeks to justify background checks as part of a long tradition of weapons regulation. The same could be said of miscegenation laws, slavery, one man/one woman marriage laws, sodomy laws, and police abuse of suspect rights. I rather doubt Spitzer or any court would find that argument compelling.

**Rebuttal to Declaration of Michael Vorenberg**

**I.     The Validity of Wartime Acts**

    **A.     War and Civil Liberties Do Not Play Well Together**

25.     Prof. Vorenberg's declaration concentrates almost entirely on Civil War and postbellum loyalty oaths. I would hope that Prof. Vorenberg can distinguish California's situation from 1861-65 where entire state governments engaged in acts of treason leading to, by the latest estimates, 750,000 dead.[9] The national capital was on the frontlines of the war.

Wars are never friends of civil liberties. During the Civil War:

> Union generals took measures to prevent newspapers from publishing battle plans and to keep Confederate sympathizers from aiding the enemy by disseminating military information or discouraging enlistments….
>
> Throughout the war, newspaper reporters and editors were arrested without due process for opposing the draft, discouraging enlistments in the Union army, or even criticizing the income tax.
>
> Handling dissent in the North presented an unprecedented difficulty for the Lincoln administration. From the start of Lincoln's presidency, the Northern press gave voice to many of his critics. Newspapers argued that secession was the inevitable consequence of his policy toward the South. As the war dragged on, the opposition press grew louder, demanding compromise with the Confederacy to halt the bloodshed.
>
> In New York and New Jersey, two grand juries drew up presentments against newspapers that had been critical of the Union effort, which one paper called the "unholy war." One grand jury presented a list of newspapers that encouraged the rebels, explaining, "The Grand Jury are aware that free governments allow liberty of speech and of the press to their utmost limits, there is, nevertheless, a limit. If a person in a fortress or an army were to preach to the soldiers submission to the enemy, he would be treated as an offender. Would he be

---

[9] Rachel Coker, *Historian revises estimate of Civil War dead*, https://discovere.binghamton.edu/news/civilwar-3826.html, last accessed September 11, 2023.

more culpable than the citizen who, in the midst of the most formidable conspiracy and rebellion, tells the conspirators and rebels that they are right, encourages them to persevere in resistance and condemns the effort of loyal citizens to overcome and punish them as an 'unholy war'?"[10]

26. Lincoln's delegation to a general the authority to suspend the writ of *habeas corpus* "for the public safety" is well-known from Justice Taney's opinion Ex Parte Marryman.[11]

27. Less well-known is the court-martial of a civilian, Clement Vallandigham, who was then deported from the United States. His crime was speaking in opposition to the War.[12]

28. When a majority of Maryland's legislature turned pro-secession, and the Union government feared a special session might be called, Secretary of War Cameron directed Gen. Banks "to arrest all or any number of the members, if necessary, but in any event to do the work effectively."[13]

29. If Vorenberg's argument that Civil War violations of the Bill of Rights justify Prop. 63, then every Civil War violation of the Bill of Rights can be allowed by the states. This would lead to an extraordinary reinterpretation of the 14th Amendment.

**B.   Fourteenth Amendment Disqualifier**

30. Vorenberg at ¶9 discussing the Fourteenth Amendment:

Indeed, loyalty was at the core of the Amendment, and was enshrined in the Amendment's third clause, which imposed restrictions on office-holding on those who either had "engaged in insurrection or rebellion" against the country or had "given aid or comfort" to the insurrectionists. Although the language of the Amendment's third clause mentioned only restrictions on office-

---

[10] David Asp, *Civil War, U.S.,* THE FIRST AMENDMENT ENCYCLOPEDIA, https://mtsu.edu/first-amendment/article/1059/civil-war-u-s, last accessed September 11, 2023.
[11] Ex Parte Marryman, 17 F. Cas. 144 (C.C.D. Md. 1861).
[12] Thomas E. Powell, ed., 1 DEMOCRATIC PARTY OF THE STATE OF OHIO 142-144 (1913).
[13] George B. McClellan, MCCLELLAN'S OWN STORY: THE WAR FOR THE UNION 146-147 (1887).

holding, the congressional debates on the clause reveal that rights beyond office-holding were to be restricted. The disloyal were to be denied civil rights (which would necessarily include rights of firearms possession) and the loyal were to be guaranteed those rights.

31. I reviewed all four sources in Vorenberg's footnote for this claim. On the alleged loss of civil rights including firearm possession Vorenberg cites Mark A. Graber, *Punish Treason, Reward Loyalty: The Forgotten Goals of Constitutional Reform after the Civil War* (Lawrence: University Press of Kansas, 2023), 111-30; Jonathan Truman Dorris, *Pardon and Amnesty under Lincoln and Johnson: The Restoration of the Confederates to Their Rights and Privileges, 1861-1898* (Chapel Hill: University of North Carolina Press, 1953), 319-25. On firearms possession as a civil right included in the Fourteenth Amendment, he cites Nicholas J. Johnson, David B. Kopel, George A. Mocsary, E. Gregory Wallace, and Donald Kilmer, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3rd ed., New York: Wolters Kluwer, 2022), 465-71. None of these sources support even slightly, "the congressional debates on the clause reveal that rights beyond office-holding were to be restricted. The disloyal were to be denied civil rights (which would necessarily include rights of firearms possession)…" The discussion in Dorris' book discusses civil rights in the same paragraph as holding public office. There is *no* discussion of firearms possession; this is a surprising error considering Vorenberg's supposed expertise in this period. Vorenberg's parenthetical reference appears to be his interpolation of firearms possession as a civil right.

32. Vorenberg missed that the Fourteenth Amendment limited the punishment to permanent disqualification for future public office:

> No person shall be a Senator or Representative in Congress, or elector of President and Vice-President, or hold any office, civil or military, under the United States, or under any State, who, having previously taken an oath, as a member of Congress, or as an officer of the United States, or as a member of any State legislature, or as an executive or judicial officer of any State, to support the Constitution of the United States.

33. It also was limited to those who "shall have engaged in insurrection or rebellion against the same, or given aid or comfort to the enemies thereof." If congressional debate discussed taking away civil rights from traitors, it is odd that the language did not extend beyond disqualification from holding public office.

34. Vorenberg also tells us at ¶10 that: "Law enforcers made efforts to deny firearms to or seize firearms from those who refused to take the oath along with those who took the oath but were found by investigation to have lied under oath about their past lawfulness and loyalty." Oddly, he cites no sources for that claim. On the other hand, Congress' comprehensive CONSTITUTION ANNOTATED lists only one case that seems relevant to this question.[14] What constitutes rebellion?[15]

35. It is at least arguable that Congress has made this provision irrelevant by repealing "all political disabilities imposed by the third section of the fourteenth article of amendments of the Constitution of the United States… except Senators and Representatives of the thirty-sixth and thirty-seventh Congresses, officers in the judicial, military, and naval service of the United States, heads of departments, and foreign ministers of the United States."[16]

**II.   Summary**

36. California is not engaged in a civil war (at least by my reading of news reports). Emergency measures that we can look upon later with disappointment seem a poor justification of current state laws.

37. Vorenberg's claims derive from a period of unprecedented chaos, during which civil liberties took second place to winning a war, and focus on punishments limited to treason against the United States.

---

[14] U.S. Congress, *Amdt14.S3.1 Overview of Disqualification Clause*, CONSTITUTION ANNOTATED, https://constitution.congress.gov/browse/essay/amdt14-S3-1/ALDE_00000848/, last accessed September 12, 2023.
[15] United States v. Powell, 27 F. Cas. 605, 65 N. C. 709 (1871).
[16] Ch. 193, Stats. At Large, 42nd Cong., 2nd sess. (1872).

**Rebuttal to Declaration of Jennifer M. McCutchen**

**I.      Colonial Regulation of Guns and Gunpowder Transfers to Indigenous People**

38.     McCutchen in ¶30 points to the various Test Acts adopted during the Revolution that disarmed those who would not swear a loyalty oath to the Revolutionary governments. She claims that "[a]t the same time, local jurisdictions enacted laws that sought to regulate access to guns and gunpowder for "high risk" individuals, often noted in the documentary record as white men who were deemed to be insufficiently loyal to the civil government."  McCutchen should have looked up the statutes instead of relying on secondary sources, some of which are at links that are now dead.[17]  Had she looked up the 1776 Pa. Laws 11 statute cited in her dead link,[18] she would have noticed that the Pennsylvania law says nothing about gunpowder.  And only the Massachusetts Test Act provided for confiscation of ammunition.[19]  See also Maryland's "An Act to collect arms," which again does not reference ammunition, and exempts pistols from the ban.[20]

39.     The essence of McCutchen's claim is that the regulation of transfer of firearms and gunpowder was nearly laissez faire for whites who held to orthodox Protestant beliefs (as McCutchen's ¶18 notes), prohibitory for blacks who were perceived as an inherently dangerous population to arm, and a regulated approach for Indians, analogous to California's Proposition 63.

40.     At ¶32, McCutchen attempts to establish that the "Act for Establishing Trading Houses" (1796) regulated transfers of firearms to the Indians: "By prohibiting

---

[17] Military Obligation: The American Tradition (1947), 23.
https://firearmslaw.duke.edu/wp-content/uploads/2023/04/1777-PA-An-Act-toregulate-the-Militia-of-the-Common-Wealth-of-Pennsylvania-§-9-10.pdf; Pa. Laws 11, Duke Center for Firearms Law, https://firearmslaw.duke.edu/laws/1776-pa-laws-11-an-ordinance-respectingthe-arms-of-non-associators-§-1/.
[18] "An Ordinance Respecting the Arms of Non-Associators," Ch. DCCXXIX, 9 STATUTES AT LARGE OF PENNSYLVANIA FROM 1682-1801 11-12 (1903).
[19] 5 ACTS AND RESOLVE, PUBLIC AND PRIVATE, OF THE PROVINCE OF THE MASSACHUSETTS BAY 479 (1886), ch. 21.
[20] "An Act to Collect Arms," 203 ARCHIVES OF MARYLAND 278 (1787).

1  factory agents from purchasing firearms, gunpowder, or ammunition from Native people,
2  U.S. officials sought to curb the sale of arms outside the purview of the federal
3  government."  Her own quotation of the statute as well as checking the statute (which
4  McCutchen neglects to do) shows that the regulation prohibited "factory agents from
5  purchasing" arms and gunpowder *from* the Indians.  This statute does not limit or regulate
6  in any way the transfer of guns or ammunition *to* Indians. Her claim, "Because it was not
7  uncommon for Native peoples to access better-quality firearms from Spanish Florida or
8  British Canada, factory agents could acquire these weapons and re-sell them to bolster
9  their income," has no supporting evidence.[21]

10    41.    Her only citation to defend her claim that this law limited transfers of
11  firearms to the Indians: "Harry Toulmin, The Statutes of the Mississippi Territory,
12  Revised and Digested by the Authority of the General Assembly, Duke Center for
13  Firearms Law. https://firearmslaw.duke.edu/laws/harry-toulmin-the-statutes-of-the-
14  mississippi-territory-revised-and-digested-by-the-authority-of-the-general-assembly-
15  page-593-image-612-natchez-1807-available-at-the-making-of-modern-law-prima/."
16  Following the link takes you to Duke University's selectively quoted version of what
17  turns out not to be a Mississippi Territorial statute at all.  Had McCutchen looked up that
18  printed volume (which took me two seconds to find), she would have seen that this was
19  in the "Federal Laws" section of that volume.  It is "An Act to regulate trade and
20  intercourse with the Indian tribes, and to preserve peace on the frontiers" (1802).[22]  Along
21  with § 9's prohibition:

22      That if any Articles such citizen, or other person, shall
        purchase, or which shall receive of any Indian, in the way of
23

---

[21] And her secondary source states that the penalty is $50, not $100 as erroneously stated in her declaration.

[22] THE STATUTES OF THE MISSISSIPPI TERRITORY, REVISED AND DIGESTED BY THE AUTHORITY OF THE GENERAL ASSEMBLY 588-601 (1807).

13
DECLARATION OF CLAYTON CRAMER
18cv802

    trade or barter, a gun, or other article commonly used in hunting…[23]

42. § 10 uses similar language regarding horses:

    That no such citizen, or other person, shall be permitted to purchase any horse of an Indian, or of any white man in the Indian territory, without special license for that purpose…[24]

43. Even if McCutchen's claim that the goal of such laws was to prevent Indian agents from purchasing these weapons to "re-sell them to bolster their Income," what explains the parallel restriction about purchasing horses "or other article commonly used in hunting"?

44. The goal of the various laws regulating trade with the Indians was to prevent whites from taking advantage of Indians. Explaining the Maine Land Claims Act: "Pursuant to those basic principles, one of the first actions by the newly formed Congress was the enactment of the Non-Intercourse Act in 1790. That statute regulated commerce with Indian tribes and prohibited transfers of tribal land unless Congress approved them."[25]

45. McCutchen's claim at ¶ 36 that governments "created laws that restricted the ability of private citizens to trade these goods to Native peoples and other potentially dangerous individuals" is clearly false, even by her own quotations. These laws restricted the ability of private citizens to exchange goods for guns and numerous other commodities such as cooking utensils and clothes; they in no way restricted transfer of guns or ammunition to Indians.

/ / /

---

[23] Id. at 593.
[24] Id.
[25] Maine Indian Tribal-State Commission, *Summary of the Maine Indian Land Claims Settlement of 1980,* https://www.mitsc.org/mitsc-narrative-summaries/summary-of-the-maine-indian-land-claims-act-of-1980, last accessed September 6, 2023.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on October 2, 2023.

_____
Clayton Cramer
Declarant

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Rhode, et al. v. Bonta*
Case No.: 3:18-cv-00802-JM-JMA

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**DECLARATION OF CLAYTON CRAMER IN RESPONSE TO DECLARATIONS OF DEFENDANT'S EXPERT WITNESSES**

on the following parties by electronically filing the foregoing on October 2, 2023, with the Clerk of the District Court using its ECF System, which electronically notifies them.

John D. Echeverria
Deputy Attorney General
john.echeverria@doj.ca.gov
Anthony P. O'Brien
Deputy Attorney General
anthony.obrien@doj.ca.gov
Christina R.B. Lopez
Deputy Attorney General
christina.lopez@doj.ca.gov
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
    *Attorneys for Defendant Attorney*
    *General Rob Bonta*

    I declare under penalty of perjury that the foregoing is true and correct. Executed on October 2, 2023, at Long Beach, CA.

*[signature]*
Laura Palmerin