1  ROB BONTA
   Attorney General of California
2  R. MATTHEW WISE
   Supervising Deputy Attorney General
3  JOHN D. ECHEVERRIA
   Deputy Attorney General
4  SEBASTIAN BRADY
   Deputy Attorney General
5  State Bar No. 330904
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3592
7   Fax:  (415) 703-5480
    E-mail:  Sebastian.Brady@doj.ca.gov
8  *Attorneys for Defendant Rob Bonta, in his*
   *official capacity as California Attorney*
9  *General*

10              IN THE UNITED STATES DISTRICT COURT

11            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12                         CIVIL DIVISION

| KIM RHODE et al., | 3:18-cv-00802-BEN-JLB |
|---|---|
| Plaintiffs, | **DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S EXPERT DECLARATIONS** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,** | Dept:         5A<br>Judge:        Hon. Roger T. Benitez<br>Action Filed:  April 26, 2018 |
| Defendant. | |

1

**INTRODUCTION**

Defendant Rob Bonta, in his official capacity as Attorney General of the State of California, hereby replies, by leave of Court, to Plaintiffs' Response to Defendant's Expert Declarations. Dkts. 95, 95-1; *see* Dkt. 98. This filing supplements the arguments and evidence that the Attorney General has submitted previously in this case—including that the Ammunition Laws are presumptively lawful conditions or qualifications on the sale of arms under *District of Columbia v. Heller*, 554 U.S. 570 (2008), and that Plaintiffs' claims regarding certain allegedly unconstitutional applications of those laws do not amount to a facial challenge. *See* Dkt. 81 at 17, 11-13.

At this Court's direction, the Attorney General submitted—as relevant here—three expert declarations detailing the history of background checks in America and the long tradition of firearm and ammunition restrictions that were antecedents to today's background check laws. Dkt. 92. Plaintiffs' responses—both their brief and the rebuttal from their purported expert, Clayton Cramer[1]—fail to undermine this evidence. Dkts. 95, 95-1. They ignore, and hence leave unrebutted, significant portions of the declarations. Of the evidence they do confront, they mistakenly suggest that historical analogues that were not literal background check laws are irrelevant, ignoring *Bruen*'s requirement that "the government identify a well-established and representative historical *analogue*, not a historical *twin*." *New York State & Rifle Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022). Cramer and Plaintiffs also reject a number of laws cited by the Attorney General's experts because they postdate the Fourteenth Amendment's ratification in 1868—even though the Supreme Court has cited Reconstruction-era laws and even later sources in defining the scope of the Second Amendment. And where they do wrestle with the evidence cited by the Attorney General's experts, Cramer and Plaintiffs

---

[1] Cramer is a software engineer who serves as an adjunct history instructor at the College of Western Idaho. *See* https://cwi.edu/person/faculty/clayton-cramer.

misunderstand and misconstrue the historical record. Properly analyzed under *Bruen*, the Ammunition Laws are constitutional.

## ARGUMENT

### I. DECLARATION OF PROFESSOR ROBERT SPITZER

Professor Spitzer is an emeritus professor of political science at the State University of New York at Cortland and an adjunct professor at the College of William and Mary School of Law. Spitzer Decl. ¶ 2, Dkt. 92-1. He has a Ph.D. in government and has researched and written on firearm policy, with a focus on the history of American firearm laws, for more than three decades. *Id.* ¶¶ 2–3. His declaration recounts the history of firearm background checks in the United States and addresses the historical precursors to California's background check requirements for ammunition sales—licensing and permitting laws and weapon confiscation laws. *Id.* ¶¶ 10–11. As for licensing and permitting laws, Professor Spitzer identifies several different categories of relevant regulation: licensing of carrying or possessing weapons, *id.* ¶¶ 34–44, 55–57; licensing or permitting for the discharge of firearms, use of explosives, and possession of gunpowder, *id.* ¶¶ 45–48; and licensing and recording requirements on commercial vendors, *id.* ¶¶ 49–54. As for weapon confiscation laws, Professor Spitzer identifies a host of statutes that penalized various offenses—from disloyalty to firearms offenses to hunting offenses—with the seizure of the offender's firearms or ammunition. *Id.* ¶¶ 59–75.

Cramer observes that "[m]uch of Spitzer's declaration seeks to justify background checks as part of a long tradition of weapons regulation." Cramer Decl. ¶ 24, Dkt. 95-1. Indeed. That is what *Bruen* requires. *Bruen*, 142 S. Ct. at 2127 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). Cramer also objects to Professor Spitzer's testimony because the laws he cites are not actually "background check laws." Cramer Decl. ¶ 22; *see also id.* ¶¶ 8, 14. That misses the point: Professor Spitzer himself acknowledges that

3

modern background checks did not begin until the 20th century. Spitzer Decl. ¶ 9. His testimony explains that historical precursors to background check laws—laws limiting possession or use of firearms absent some form of license or permission, and laws confiscating weapons based on past behavior or other characteristics— have long been part of the American tradition, dating back to the 1700s. *Id.* ¶¶ 10– 12; *see Bruen*, 142 S. Ct. at 2132 ("When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy.").[2]

Cramer and Plaintiffs fail to acknowledge—much less contend with—any of Professor Spitzer's testimony regarding weapon confiscation laws. They also refuse to contend with any of the licensing laws Professor Spitzer cites that post-date 1868. *See* Br. at 4, Dkt. 95; Cramer Decl. ¶¶ 6, 15, 18, 22. But *Bruen* itself considered as part of its core historical analysis two statutes from the 1870s—an 1871 statute and an 1875 statute—without commenting on their vintage. *See Bruen*, 142 S. Ct. at 2152–53. And it recognized that evidence from even later than that, though less probative of the original understanding of the scope of the right, may still confirm the scope of that right if consistent with the text of the Second Amendment and the regulatory traditions at the time of ratification. *Cf. id.* at 2137; *see also District of Columbia v. Heller*, 554 U.S. 570, 616–19 (2008) (considering sources from "late-19th-century legal scholar[s]").

Cramer and Plaintiffs also reject laws restricting the rights of enslaved people and Freedmen because of their discriminatory purpose. Br. at 4–5; Cramer Decl. ¶ 21. But "[w]hile some of these categorical prohibitions of course would be impermissible today under other constitutional provisions, they are relevant here in determining the historical understanding of the right to keep and bear arms."

---

[2] In any event, the absence of an exact background check precursor in 1791 or 1868 is beside the point. *Bruen* disclaims any need for the state to identify a "dead ringer," *Bruen*, 142 S. Ct. at 2133, and it has already blessed background check laws based on objective criteria, *id.* at 2138 n.9.

*United States v. Jackson*, 69 F.4th 495, 503 (8th Cir. 2023); *see also Kanter v. Barr*, 919 F.3d 437, 458 & n.7 (7th Cir. 2019) (Barrett, J., dissenting) (relying on laws disarming enslaved people even though "such race-based exclusions would be unconstitutional today"), *abrogated by Bruen*, 142 S. Ct. 2111.[3]

To the extent Cramer and Plaintiffs contend with Professor Spitzer's testimony, they primarily assert that the laws he cites are not actually licensing laws. *See* Br. at 4; Cramer Decl. ¶¶ 7, 22. That is wrong. For example, Cramer rejects Professor Spitzer's citation to an 1835 New London, Connecticut statute that barred discharging pistols in city limits except, among other things, "'by permission of the mayor, or one of the aldermen,'" by flatly asserting, without further explanation, that "[i]t is not clear whether the 'permission of the mayor' provision was anything but part of a general prohibition." Cramer Decl. ¶ 7 (quoting The By-Laws of the City of New London, with the Statute Laws of the State of Connecticut Relative to Said City Page 47-48, Image 47-48 (1855), available at The Making of Modern Law: Primary Sources). Cramer also suggests that a 1713 Philadelphia ordinance that barred "firing a Gun without license" was not a licensing statute because it had "no provision for receiving a license." *Id.* ¶ 10. In these instances and others, Cramer fails to provide a reasoned explanation to substantiate his conclusion that the cited laws are not relevant historical analogues.

In addition, Cramer and Plaintiffs assert that some of the 45 historical laws that Professor Spitzer cites requiring a license to fire a gun are not relevant because, in their view, the laws served a different purpose than the Ammunition Laws. Br. at 4; Cramer Decl. ¶¶ 9–12. But it is unclear why a historic firearm discharge

---

[3] In addition to being unconstitutional, such status-based laws—and the laws targeting Native Americans discussed *infra*—are based on odious views and stereotypes. But excluding them from consideration would distort the historical record. *See* Jacob D. Charles, *On Sordid Sources in Second Amendment Litigation*, 76 Stan. L. Rev. Online 30, 37 (2023); *see also id*. at 31 ("Without a full picture of past laws—the prosaic and prejudiced alike—courts risk impermissibly narrowing the range of legislative options the ratifiers understood to be consistent with the right to keep and bear arms.").

licensing provision, *see, e.g.*, Cramer Decl. ¶ 10, would not be analogous to the Ammunition Laws when both were designed to serve public safety interests—and should be assessed under a "more nuanced approach." *See* Dkt. 81 at 14–15 (quoting *Bruen*, 142 S. Ct. at 2132). In any event, of the 45 firearm discharge license laws cited by Professor Spitzer, Cramer identifies only a handful that suffer from this supposed defect. *See* Cramer Decl. ¶¶ 9–12.

## II. DECLARATION OF PROFESSOR MICHAEL VORENBERG

Professor Vorenberg is an associate professor of history at Brown University with a Ph.D. in history. Vorenberg Decl. ¶ 2, Dkt. 92-7. His extensive scholarship focuses on the history of Reconstruction and the Fourteenth Amendment. Professor Vorenberg's testimony describes the Reconstruction-era practice of using evidence of one's loyalty to the Union as a type of proto-background check necessary to exercise certain civil rights—including, in some instances, firearm-related rights. *Id.* ¶¶ 7–10. He focuses on the use of "ironclad oaths," which required the oath-taker to swear that they had never voluntarily borne arms against the Union or otherwise participated in the rebellion. *Id.* ¶ 20. Throughout Reconstruction, as a matter of statute and as a matter of practice, federal, state, and local authorities used the administration of the ironclad oath as a means of maintaining order. *Id.* ¶ 29. This included requiring the oath as a condition for voting, practicing certain professions, receiving certain government aid—and accessing firearms and ammunition. *Id.* ¶¶ 23, 27–29.

Cramer and Plaintiffs dismiss Professor Vorenberg's declaration as drawing too heavily on wartime sources. Br. at 5; Cramer Decl. ¶¶ 25–29, 36–37. But, as Professor Vorenberg expressly notes, his declaration covers the entire period of Reconstruction (1863-1877) with a particular focus on the era of the Fourteenth Amendment (1863-1872). Vorenberg Decl. ¶ 15. The bulk of his declaration covers the period after the Civil War. *Id.* ¶¶ 22–30; *see, e.g., id.* ¶ 22 ("Two related factors led ironclad oaths to replace simple oaths as the means by which southern

whites were readmitted to national citizenship *after the Civil War*." (emphasis added)). And the Supreme Court itself has used this sort of Reconstruction-era history in defining the scope of the Second Amendment right. *See Bruen*, 142 S. Ct. at 2150–53; *Heller*, 554 U.S. at 614–16.

Moreover, Cramer and Plaintiffs myopically focus on Professor Vorenberg's discussion of the Fourteenth Amendment, *see* Cramer Decl. ¶¶ 30–35; Br. at 5, and miss the broader thrust of his testimony—that, during Reconstruction, "[t]o preserve the security of the nation, of the states, and of local communities, authorities imposed proscriptions on the once-disloyal, whose past actions were regarded as unlawful." Vorenberg Decl. ¶ 9. This included restrictions on the civil rights of former rebels. Some states, for example, used the ironclad oath as a screening mechanism for exercising voting rights. *Id.* ¶¶ 9, 29; *see, e.g.*, An Act to Provide for a Convention to Revise and Amend the Constitution, § 2, 1867 N.Y. Laws 286, 287; An Act to Amend the Laws Relating to Elections by the People, § 2, 1865 W. Va. Acts 47, 47; *see also* An Act to Provide for the More Efficient Government of the Rebel States, § 5, 14 Stat. 428, 429 (1867) (voting for delegates to constitutional conventions in rebel states could exclude those "as may be disenfranchised for participation in the rebellion"). States imposed various other restrictions on civil rights based on the loyalty oath Professor Vorenberg describes. Vorenberg Decl. ¶¶ 23, 27–30.

The manifold restrictions imposed by dint of one's prior disloyalty extended to firearms and ammunition. As Professor Vorenberg recounts, a local South Carolina official used records of the loyalty oath to determine who could be trusted to gather firearms from stores in the community and store them safely. Vorenberg Decl. ¶ 30. And Kansas prohibited the carrying of "a pistol, bowie-knife, dirk, or other deadly weapon" by "any person who has ever borne arms against the government of the United States." An Act Regulating Crimes and Punishments, § 282, 1868 Kan. Sess. Laws 317, 378.

### III. DECLARATION OF PROFESSOR JENNIFER M. MCCUTCHEN

Professor McCutchen is an assistant professor of history at the University of St. Thomas with a Ph.D. in history. McCutchen Decl. ¶¶ 2–3, Dkt. 92-9. She researches the history of trade and exchange between Europeans and Native Americans in the 18th century, with a focus on gunpowder and firearms. *Id.* ¶ 3. Professor McCutchen testifies here about the history of restricting the access of certain groups to firearms and gunpowder in colonial America and around the founding. *Id.* ¶ 1. She explains that, in addition to restricting access to firearms and ammunition by enslaved people and other groups perceived as a threat to public safety, early colonies barred selling firearms and ammunition to Native Americans. *Id.* ¶¶ 18–21. Later, however, colonies began barring only private trade in firearms and ammunition with Native Americans; government-sponsored trade, by contrast, was permitted. *Id.* ¶ 24. In doing so, colonial lawmakers sought to ensure that Native Americans had *some* access to firearms and ammunition—an economic imperative at the time—while also ensuring that colonists retained superior firepower. *Id.* ¶¶ 13, 25–30. They maintained this general approach even as some colonies sought to fully disarm other groups of people deemed dangerous—especially people who failed loyalty oaths or tests. *Id.* ¶ 30. After independence, the nascent federal government similarly sought to regulate, rather than prohibit outright, trade with Native Americans—in firearms and in goods more broadly—through a scheme known as the Indian factory system. *Id.* ¶¶ 31–32.

Plaintiffs broadly assert that laws regulating Native Americans are not analogous here because the Ammunition Laws are "not race-based, but criminal focused," and are in any event irrelevant because Native Americans were outside the American political community at the time. *See* Br. at 6 & n.1. Both assertions should be rejected. *See Jackson*, 69 F.4th at 502–04 (holding that "[h]istory shows that the right to keep and bear arms was subject to restrictions that included prohibitions on possession by certain groups of people" based in part on fact that

8

"[i]n colonial America, legislatures prohibited Native Americans from owning firearms"); *see also Kanter*, 919 F.3d at 458 (Barrett, J., dissenting) (concluding that "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety," based in part on the fact that "Slaves and Native Americans . . . were thought to pose more immediate threats to public safety and stability and were disarmed as a matter of course"). *But see United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023) ("Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community . . . as much as they were about curtailing violence or ensuring the security of the state."), *cert. granted*, 143 S. Ct. 2688 (2023).

To the extent they address the evidence Professor McCutchen has brought to bear, Cramer and Plaintiffs ignore the entire body of pre-independence history and instead contest her claims regarding federal regulation of trade with Native Americans.[4] Cramer Decl. ¶¶ 40–45; Br. at 6. Even on that limited front, they fail. While they claim that the laws Professor McCutchen cites "were to *protect* Indians, not treat them as a dangerous segment of society," Br. at 6; *see* Cramer Decl. ¶ 44, they offer no evidence for this assertion beyond a single website discussing a law that Professor McCutchen did not cite, *see* Cramer Decl. ¶ 44 & n.25. Nor do they explain how restricting access to goods protected Native Americans. Cramer's extended argument that the "Act to Regulate Trade and Intercourse with the Indian Tribes, and to Preserve Peace on the Frontiers" did not restrict trade from factory agents to Native Americans, *id.* ¶¶ 41–43, ignores other sections of this statute that prohibited Americans from attempting to reside in Native American towns or

---

[4] Cramer also takes issue with the discussion of acts by revolutionary colonies to disarm insufficiently loyal subjects because not all of these laws specifically mention ammunition. Cramer Decl. ¶ 38. But throughout history, governments have permissibly exercised their authority to regulate in different ways, and with different levels of comprehensiveness. The cited laws are thus relevant. *See Bruen*, 142 S. Ct. at 2133 ("[A]nalogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*.").

hunting camps "as a trader, without license" from the government, and that provided that citizens who tried to do so would be forced to "forfeit all the merchandise *offered for sale, to the Indians*, or found in [their] possession." An Act to Regulate Trade and Intercourse with the Indian Tribes, and to Preserve Peace on the Frontiers, §§ 7, 8, 1 Stat. 469, 471 (1796) (emphasis added).

## CONCLUSION

Nothing in Plaintiffs' response or Cramer's declaration undermines the constitutionality of the Ammunition Laws under *Bruen*. For these reasons, and those provided in the Attorney General's prior briefing, Plaintiffs' Second Amendment, dormant Commerce Clause, and preemption claims fail as a matter of law.[5]

Dated: November 2, 2023                Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General


*/s Sebastian Brady*
SEBASTIAN BRADY
Deputy Attorney General
*Attorneys for Defendant Rob Bonta, in his official capacity as California Attorney General*

---

[5] The Ammunition Laws are constitutional and should be upheld. Nevertheless, as previously requested, if the Court is inclined to rule in Plaintiffs' favor, the Attorney General respectfully requests a 30-day stay of enforcement of any injunction to allow him to seek a stay from the United States Court of Appeals for the Ninth Circuit.

# CERTIFICATE OF SERVICE

Case Name:  *Rhode v. Becerra*          Case No.  3:18-cv-00802-BEN-JLB

I hereby certify that on November 2, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

- **DEFENDANT'S REPLY TO PLAINTIFFS' RESPONSE TO DEFENDANT'S EXPERT DECLARATIONS**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on November 2, 2023, at San Francisco, California.

M. Mendiola
Declarant

*M. Mendiola*
Signature

SA2018101286
43947057.docx