ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
MEGHAN H. STRONG
Deputy Attorney General
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  Telephone: (415) 510-3479
  Fax: (415) 703-1234
  E-mail: John.Echeverria@doj.ca.gov
*Attorneys for Defendant Rob Bonta, in his*
*official capacity as California Attorney*
*General*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **KIM RHODE et al.,** | Case No. 3:18-cv-00802-BEN-JLB |
| Plaintiffs, | |
| **v.** | **DEFENDANT'S OMNIBUS BRIEF** |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,** | Dept:            5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:   April 26, 2018 |
| Defendant. | |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................. 1

Argument ....................................................................................................... 2

    I.     The Ammunition Laws Comport with the Second Amendment .......... 2

          A.     Plaintiffs Cannot Show that the Ammunition Laws Burden Conduct that Is Presumptively Protected by the Second Amendment .................................................................... 3

          B.     The Ammunition Laws Are Consistent with the Nation's Historical Tradition of Firearm Regulation ................................ 7

    II.    The Ammunition Laws Do Not Violate the Dormant Commerce Clause .................................................................................................. 12

          A.     Courts Exercise Extreme Caution in Evaluating Dormant Commerce Clause Claims ....................................... 12

          B.     The Ammunition Laws Are Not Discriminatory ..................... 12

          C.     The Ammunition Laws Should Be Upheld Under *Pike* ........... 16

    III.   The Ammunition Laws Are Not Preempted by Federal Law ............. 19

          A.     Section 926A Applies Only to Firearms, Not Ammunition ..... 20

          B.     Even if § 926A Covers Ammunition, Section 30314 Is Not Preempted .................................................................. 24

Conclusion .................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

CASES

*Altria Grp., Inc. v. Good*
  555 U.S. 70 (2008) ...................................................................... 21, 23

*Antonyuk v. Chiumento*
  __ F.4th __, 2023 WL 8518003 (2d Cir. Dec. 8, 2023) ..................... 10

*Bates v. Dow Agrosciences LLC*
  544 U.S. 431 (2005) .............................................................................. 23

*Burgess v. United States*
  553 U.S. 124 (2008) .............................................................................. 20

*Chicanos Por La Causa, Inc. v. Napolitano*
  558 F.3d 856 (9th Cir. 2009) ............................................................... 25

*Clark v. Cmty. for Creative Non-Violence*
  468 U.S. 288 (1984) ................................................................................ 3

*Conway v. Taylor's Executor*
  66 U.S. 603 (1861) ................................................................................ 12

*Dep't of Revenue of Ky. v. Davis*
  553 U.S. 328 (2008) .............................................................................. 18

*District of Columbia v. Heller*
  554 U.S. 570 (2008) ................................................................... 2, 4, 5, 8

*Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const.*
  *Trades Council*
  485 U.S. 568 (1988) .............................................................................. 24

*Exxon Corp. v. Governor of Maryland*
  437 U.S. 117 (1978) .............................................................................. 17

*Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*
  746 F. Supp. 1415 (E.D. Cal. 1990) .................................................... 24

*Gen. Motors Corp. v. Tracy*
  519 U.S. 278 (1997) .............................................................................. 12

## <u>TABLE OF AUTHORITIES</u>
### (continued)

<u>Page</u>

*Granholm v. Heald*
    544 U.S. 460 (2005) .............................................................. 19

*Great Atl. & Pac. Tea Co. v. Cottrell*
    424 U.S. 366 (1976) .............................................................. 18

*Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*
    530 U.S. 1 (2000) .............................................................. 21

*Jackson v. City & Cnty. of San Francisco*
    746 F.3d 953 (9th Cir. 2014) ............................................... 4

*Koons v. Platkin*
    2023 WL 3478604 (D.N.J. May 16, 2023) .......................... 6

*Lamie v. U.S. Trustee*
    540 U.S. 526 (2004) .............................................................. 21

*McDonald v. City of Chicago*
    561 U.S. 742 (2010) ........................................................... 4, 7

*Medtronic, Inc. v. Lohr*
    518 U.S. 470 (1996) .............................................................. 21

*Meese v. Keene*
    481 U.S. 465 (1987) .............................................................. 21

*N.Y. State Firearms Ass'n v. Nigrelli*
    2023 WL 8495198 (W.D.N.Y. Sept. 21, 2023) ............... 5, 6

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
    2023 WL 4552284 (N.D. Cal. July 13, 2023) ..................... 6

*Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*
    567 F.3d 521 (9th Cir. 2009) ............................................. 13

*Nat'l Ass'n of Optometrists & Opticians v. Harris*
    682 F.3d 1144 (9th Cir. 2012) .................................. 17, 18, 19

*Nat'l Pork Producers Council v. Ross*
    6 F.4th 1021 (9th Cir. 2021) .............................................. 16

# TABLE OF AUTHORITIES
### (continued)

Page

*National Pork Producers Council v. Ross* (*National Pork*)
  598 U.S. 356 (2023) ...............................................................*passim*

*Nationwide Biweekly Administration, Inc. v. Owen*
  873 F.3d 716 (9th Cir. 2017) ................................................. 15

*New York State Rifle & Pistol Ass'n v. Bruen*
  597 U.S. 1 (2022) ..................................................................*passim*

*Pharm. Research & Mfrs. of Am. v. Cnty. of Alameda*
  768 F.3d 1037 (9th Cir. 2014) ........................................... 13, 19

*Pike v. Bruce Church, Inc.*
  397 U.S. 137 (1970) ..............................................................*passim*

*Rocky Mountain Gun Owners v. Polis* (*Rocky Mountain*)
  __ F. Supp. 3d __, 2023 WL 8446495 (D. Colo. Nov. 13, 2023) ........ 4, 8, 10, 11

*S.D. Myers, Inc. v. City & Cnty. of San Francisco*
  253 F.3d 461 (9th Cir. 2001) ................................................. 18

*Schaffer ex rel. Schaffer v. Weast*
  546 U.S. 49 (2005) .................................................................. 3

*Teixeira v. Cnty. of Alameda*
  873 F.3d 670 (9th Cir. 2017) .................................................. 4

*United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*
  550 U.S. 330 (2007) .............................................................. 13

*United State v. Ramirez*
  2014 WL 4365075 (S.D. Tex. Sept. 2, 2014) .......................... 23

*United States v. Chovan*
  735 F.3d 1127 (9th Cir. 2013) .............................................. 15

*United States v. Jackson*
  69 F.4th 495 (8th Cir. 2023) ................................................... 9

*United States v. Perez-Garcia*
  2022 WL 17477918 (S.D. Cal. Dec. 6, 2022) ........................... 4

iv

1
2

## **TABLE OF AUTHORITIES**
### (continued)

**Page**

3
4

*United States v. Rahimi*
  No. 22-915 ................................................................................................ 9

5
6

*United States v. Saleem*
  __ F. Supp. 3d __, 2023 WL 2334417 (W.D.N.C. Mar. 2, 2023)...................... 6

7
8

*United States v. White*
  2023 WL 6066201 (S.D.N.Y. Sept. 18, 2023) ................................ 9, 10

9
10

*United States v. Young*
  639 F. Supp. 3d 515 (W.D. Pa. 2022) .................................................... 9

11

*Williams v. McFadden*
  __ F. Supp. 3d __, 2023 WL 4919691 (W.D.N.C. Aug. 1, 2023) ...................... 6

12
13

S<small>TATUTES AND</small> B<small>ILLS</small>

14
15
16
17

United States Code, Title 18
  § 921(a)(3) .......................................................................................... 20
  § 921(a)(17)(A)..................................................................................... 20
  § 923(c)................................................................................................ 22
  § 925(a)(1) ........................................................................................... 22
  § 926A ........................................................................................ *passim*
  § 927 ...............................................................................2, 20, 22, 23

18
19
20
21

Omnibus Crime Control and Safe Streets Act of 1968,
  Pub. L. No. 90-351, 82 Stat. 197
  § 901(a)(1) ........................................................................................... 23
  § 901(a)(4) ........................................................................................... 23

22

Brady Handgun Violence Prevention Act of 1993................................ 8

23

Senate Bill 1235 ...................................................................................... 1

24
25
26

2016 Cal. Legis. Serv. Prop. 63
  § 3 ...............................................................................................13, 19
  § 15 ....................................................................................................... 1

27

2016 Cal. Stat., Chapter 55 ...................................................................... 1

28

1

## TABLE OF AUTHORITIES
### (continued)

2

Page

3    California Penal Code

4       § 30312 ...................................................................................... *passim*

         § 30312(a)(2) .......................................................................................... 14

5       § 30312(b) ............................................................................................... 14

6       § 30314 ...................................................................................... *passim*

         § 30314(a) ................................................................................................ 2

7       § 30342 .................................................................................................... 1

8       § 30347 .................................................................................................... 1

         § 30348 .................................................................................................... 1

9       § 30350 .................................................................................................... 1

10      § 30352 ............................................................................................ 1, 3, 5

         § 30363 .................................................................................................... 1

11      § 30370 ...................................................................................... *passim*

12      § 30370(c) ................................................................................................ 6

         § 30370(e) ................................................................................................ 6

13      § 30385 ............................................................................................... 1, 12

14      § 30390 ............................................................................................... 1, 12

         § 30395 ............................................................................................... 1, 12

15

16   Act of Dec. 1775, *The Public Records of the Colony of Connecticut*
     *from May, 1775 to June, 1775, inclusive* 193 (Charles J. Hoadley

17   ed., 1890) ................................................................................................ 9

18   Act of 1776, 7 *Records of the Colony of Rhode Island & Province*

19   *Plantations in New England* 567 (John Rossell Bartlett ed., 1862) .................. 10

20   Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89

21   (Walter Clark ed., 1905) ......................................................................... 10

22   Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the*
     *State of New Jersey* 90 (1777) .................................................................... 9

23

24   Act of Feb. 16, 1787, §§ 1-3, 1 *Private & Special Statutes of the*
     *Commonwealth of Massachusetts* 145-47 (1805) ............................................ 10

25

26   An Act Regulating Crimes and Punishments, § 282, 1868 Kan. Sess.
     Laws 317, 378.......................................................................................... 10

27

     1881 Ill. Laws 73-74, § 3 ........................................................................... 11

28

Defendant's Omnibus Brief (3:18-cv-00802-BEN-JLB)

# TABLE OF AUTHORITIES
## (continued)

**Page**

1820 N.H. Laws 275, § 7 ........................................................................ 11

1776 N.J., Acts. § 6 ............................................................................... 11

N.Y. Exec. Law § 228 ............................................................................. 5

N.Y. Penal Law §§ 400.02, 400.03 ........................................................ 5

**REGULATIONS**

California Code of Regulations, Title 11
   § 4263 ................................................................................................ 1
   § 4263(a)(2) ....................................................................................... 3

**CONSTITUTIONAL PROVISIONS**

United States Constitution
   Article I, § 8, cl. 3 ............................................................................ 2
   Second Amendment .................................................................... *passim*

**OTHER AUTHORITIES**

132 Cong. Rec. H4102-03 (June 24, 1986) ......................................... 22

132 Cong. Rec. S8215-01 (June 24, 1986) .......................................... 21

4 *Journals of the Continental Congress 1774-1789* (Worthington
   Chauncey Ford ed., 1906) (Mar. 14, 1776) ..................................... 9

**INTRODUCTION**

The Court should uphold the challenged Ammunition Laws for reasons discussed in the Attorney General's prior briefing in this matter and based on the evidence presented in this case.[1]  Each of Plaintiffs' claims fails as a matter of law.[2]

***First***, the Ammunition Laws comport fully with the Second Amendment and satisfy the text-and-history standard announced in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).  The Ammunition Laws' requirements for the purchase, transport, and possession of ammunition are constitutional at both stages of the *Bruen* inquiry.  Plaintiffs cannot meet their threshold burden because the laws are presumptively lawful conditions and qualifications on the sale of arms— not presumptively unconstitutional requirements.  Even if Plaintiffs could show that the laws burden presumptively protected conduct, the laws are consistent with the Nation's tradition of firearm regulation.  They are comparable to background checks used in "shall-issue" States that do not violate the Second Amendment.  *See Bruen*, 597 U.S. at 38 n.9.  Background checks can be traced back to the early

---

[1] The Attorney General uses "Ammunition Laws" to refer to statutory and regulatory provisions challenged in Plaintiffs' First Amended Complaint: California Penal Code sections 30312, 30314, 30342, 30347, 30348, 30350, 30352, 30363, 30370, 30385, 30390, and 30395, and California Code of Regulations, tit. 11, § 4263. Dkt. 9 at 31. The statutory provisions were enacted by Proposition 63, as amended by Senate Bill 1235. 2016 Cal. Stat., ch. 55. The Attorney General incorporates by reference his prior submissions in this matter. *See* Dkt. 11, 13, 34, 42, 48, 53, 59, 79, 81, 82, 86, 92, 100. As discussed, Plaintiffs cannot show that the Ammunition Laws are facially unconstitutional, *see* Dkt. 81 at 11-13, and any constitutional infirmity of part of the Ammunition Laws would not warrant invalidation of them all, *cf.* 2016 Cal. Legis. Serv. Prop. 63, § 15 (severability clause). Moreover, Plaintiffs have failed to present evidence that any of the individual Plaintiffs have been unable to acquire ammunition as a result of the Ammunition Laws. *See* Dkt. 81 at 10; Dkt. 93-1–93-5 (declarations of Plaintiffs Rhode, Brennan, Henry, Johnson, and Welvang).

[2] The Court previously dismissed Plaintiffs' equal protection claim (Count 8). Dkt. 16 at 8.

twentieth century and are consistent with restrictions enacted during the founding and Reconstruction. California's ammunition background checks "are designed to ensure only that those bearing arms" in California "are, in fact, 'law-abiding, responsible citizens,'" and the laws employ "narrow, objective, and definitive standards" for determining when someone is eligible to purchase ammunition. *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).

**Second**, Plaintiffs cannot show that the Ammunition Laws violate the dormant Commerce Clause. U.S. Const. art. I, § 8, cl. 3. Under the Supreme Court's recent decision in *National Pork Producers Council v. Ross* (*National Pork*), 598 U.S. 356 (2023), the Ammunition Laws do not discriminate against out-of-state vendors, nor are they designed to benefit in-state vendors. The Ammunition Laws are generally applicable and seek to protect the public from prohibited persons and unserialized firearms. And any out-of-state burdens are not clearly in excess of the putative (and actual) in-state, public-safety benefits.

**Finally**, Plaintiffs cannot show that 18 U.S.C. § 926A preempts California Penal Code section 30314(a). Section 926A provides a safe harbor for transporting a firearm from one location where the individual may lawfully possess that firearm to another place where the individual may lawfully possess that firearm. That limited protection does not, by its terms, extend to ammunition, and thus there is no "direct and positive conflict" such that the federal and state laws "cannot be reconciled." 18 U.S.C. § 927.

## ARGUMENT

### I. THE AMMUNITION LAWS COMPORT WITH THE SECOND AMENDMENT

Plaintiffs' Second through Seventh Claims for Relief challenge the Ammunition Laws under the Second Amendment.[3] Those claims fail because the

---

[3] Plaintiffs' Second Amendment claims challenge the requirement that all ammunition sales be conducted in face-to-face transactions, Cal. Penal Code § 30312 (Count 2); the prohibition on importing ammunition acquired out-of-state

1    Ammunition Laws are constitutional under *Bruen*'s text-and-history standard.  That

2    standard requires courts to first determine whether "the Second Amendment's plain

3    text covers an individual's conduct" regulated by the challenged law.  *Bruen*, 597

4    U.S. at 17.  If it does, the Second Amendment "presumptively protects that

5    conduct," and only "then" does the burden shift to the government to "demonstrate

6    that the regulation is consistent with this Nation's historical tradition of firearm

7    regulation."  *Id.*  None of the challenged Ammunition Laws violate the Second

8    Amendment.

9          **A.   Plaintiffs Cannot Show that the Ammunition Laws Burden
           Conduct that Is Presumptively Protected by the Second
10          Amendment**

11         The threshold question under the *Bruen* framework is whether plaintiffs have

12    carried their burden to establish that "the Constitution presumptively protects" their

13    proposed course of conduct.  *Bruen*, 597 U.S. at 17; *cf. Schaffer ex rel. Schaffer v.*

14    *Weast*, 546 U.S. 49, 56-57 (2005); *Clark v. Cmty. for Creative Non-Violence*, 468

15    U.S. 288, 293 n.5 (1984).  To answer that question, the Court addresses whether

16    "the Second Amendment's plain text covers [the] conduct."  *Bruen*, 597 U.S. at 24.

17    That inquiry considers "the normal and ordinary meaning of the Second

18    Amendment" as well as its "historical background."  *Id.* at 20 (internal quotation

19    marks omitted).  Plaintiffs cannot meet their burden at the threshold stage of the

20    *Bruen* inquiry.  *See* Dkt. 81 at 15-18.

21         The plain text of the Second Amendment protects a right to "keep and bear

22    Arms."  U.S. Const. amend. II.  Even though the Second Amendment does not

23    _____

24    without delivering the ammunition to a licensed ammunition vendor, *id.* § 30314
       (Count 3); the record-keeping and reporting requirements imposed on licensed

25    vendors, *id.* § 30352 (Count 4); the requirement that all ammunition purchasers

26    pass a background check prior to taking possession of ammunition purchased in a
       transaction, *id.* § 30370 (Count 5); the authorization for licensed vendors to charge

27    a fee to store ammunition, Cal. Code Regs., tit. 11, § 4263(a)(2) (Count 6); and the

28    cumulative effect of the Ammunition Laws (Count 7).

reference a right to acquire or purchase Arms or mention ammunition, it "protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). That would include a "corresponding right" to "obtain bullets necessary to use" firearms for self-defense. *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014), *abrogated on other grounds by Bruen*, 597 U.S. 1.  Nothing in the Ammunition Laws, however, prevents law-abiding citizens from acquiring ammunition.  Instead, those laws impose certain conditions on the lawful acquisition of ammunition.  Plaintiffs' proposed course of conduct—e.g., purchasing ammunition without a background check and without engaging in an in-person transaction—is not covered by the "plain text" of the Second Amendment or any ancillary right.  *See* Dkt. 81 at 15-17; *see also Rocky Mountain Gun Owners v. Polis* (*Rocky Mountain*), __ F. Supp. 3d __, 2023 WL 8446495, at *8 (D. Colo. Nov. 13, 2023) (concluding that "the relevant conduct impacted by [a firearm-purchase] waiting period—the receipt of a paid-for firearm without delay—is not covered" by the plain text, even though the law applies to firearm sales).

Even if the plain text covers Plaintiffs' proposed course of conduct, they still cannot meet their threshold burden under *Bruen* because "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures."  *Heller*, 554 U.S. at 626-27 & n.26; *accord McDonald v. City of Chicago*, 561 U.S. 742, 787 (2010).  This limitation on the scope of the Second Amendment was not called into question by *Bruen*.  *See Bruen*, 597 U.S. at 80-81 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626-27 & n.26); *see also United States v. Perez-Garcia*, 2022 WL 17477918, at *4 (S.D. Cal. Dec. 6, 2022) (*Heller*'s non-exhaustive examples of "'presumptively lawful' regulations are consistent with *Bruen*'s reasoning").  Conditions and qualifications on the sale of arms or ammunition are presumptively lawful at the threshold stage of the *Bruen* inquiry.  *See, e.g.*, *Rocky Mountain*, 2023 WL 8446495, at *11 (holding that a

4

waiting period to deliver firearms after purchase is a "condition on the commercial sale of a firearm" that is "presumptively lawful under *Heller*").

The Ammunition Laws' background check and related requirements are—like waiting-periods—presumptively lawful conditions and qualifications on the sale of arms. *See* Dkt. 81 at 16-17.[4]  California is not alone in extending the use of background checks to ammunition sales.  New York recently implemented its background check requirements for ammunition purchases, including the imposition of fees associated with the costs of administering the background check system.  *See* N.Y. Penal Law §§ 400.02, 400.03; N.Y. Exec. Law § 228.  A district court determined that a Second Amendment challenge to those new requirements was unlikely to succeed on the merits.  *See N.Y. State Firearms Ass'n v. Nigrelli*, 2023 WL 8495198, at *4 (W.D.N.Y. Sept. 21, 2023) (denying motion for temporary restraining order).  The court held that New York's background checks for ammunition sales are "comparable to the 'shall-issue' regimes sanctioned by *Bruen*" because "licensed dealers and sellers of ammunition have no discretion to withhold ammunition based on any 'formation of an opinion'" if the purchaser passes the background check.  *Id.* at *3 (citation omitted).  It did not matter that background checks for ammunition sales are administered more frequently than background checks for firearm purchases or carry permits because the frequency of the checks is "determined by the purchaser and not the government."  *Id.*  The court observed that there was nothing "novel" or uniquely "burdensome" about extending background checks to ammunition sales.  *Id.*  Finally, the court held that the Second Amendment is not a "legal impediment" to the imposition of fees for ammunition

---

[4] In addition, the recordkeeping and reporting requirements applicable to licensed ammunition vendors, *see* Cal. Penal Code § 30352, do not burden conduct covered by the plain text of the Second Amendment.  *See Bruen*, 597 U.S. at 17; Dkt. 81 at 24.  Even if they did, they are presumptively lawful conditions on the sale of ammunition.

1    sales.  *Id.* at *4.  The court observed that the fees defrayed the costs of

2    administering the background check system, though it noted that "exorbitant fees"

3    can "deny ordinary citizens" their Second Amendment rights and can be challenged

4    "on a case-by-case basis."  *Id.* at *4 (quoting *Bruen*, 597 U.S. at 38 n.9).

5           As with New York's ammunition-sale requirements, California's Ammunition

6    Laws do not burden conduct covered by the plain text of the Second Amendment

7    and are presumptively lawful conditions on firearm-related sales.  The background

8    checks are based on objective criteria.  *See* Dkt. 81 at 3-7.  Over 99 percent of all

9    ammunition background checks utilize standard AFS checks, which cost $1 and are

10   completed in mere seconds.  Dkt. 92-11 ¶¶ 11-12.  The fees required to conduct the

11   background checks are de minimis and defray the costs of administering the

12   background check system.  *See* Cal. Penal Code § 30370(c) (authorizing the

13   Department to recover "the cost of processing and regulatory and enforcement

14   activities related to this section by charging the ammunition transaction or purchase

15   applicant a fee not to exceed the fee charged for" firearm sales); *id.* § 30370(e)

16   (charging ammunition purchasers and transferees $1 per transaction to cover "the

17   reasonable cost of regulatory and enforcement activities").  Courts routinely uphold

18   firearm-related taxes and fees at the threshold stage of the *Bruen* inquiry—without

19   any historical analysis—provided the fee is not so exorbitant as to functionally deny

20   the right to keep and bear arms.  *See, e.g.*, *United States v. Saleem*, __ F. Supp. 3d

21   __, 2023 WL 2334417, at *11 n.9 (W.D.N.C. Mar. 2, 2023); *Nat'l Ass'n for Gun*

22   *Rights, Inc. v. City of San Jose*, 2023 WL 4552284, at *8 (N.D. Cal. July 13, 2023);

23   *Koons v. Platkin*, 2023 WL 3478604, at *32-33 (D.N.J. May 16, 2023); *Williams v.*

24   *McFadden*, __ F. Supp. 3d __, 2023 WL 4919691, at *6 (W.D.N.C. Aug. 1, 2023).

25          Whatever technical problems individuals may encounter in certain

26   ammunition transactions, such problems cannot support the facial invalidation of

27   the Ammunition Laws.  *See Nigrelli*, 2023 WL 8495198, at *4 ("Technical glitches

28   cannot serve to undermine constitutionally permissible regulatory regimes.").  And

1   Plaintiffs fail to produce evidence that the Ammunition Laws were enacted or are
2   implemented in bad faith, or that the system has deprived them of the ability to
3   acquire ammunition. *See id.* ("There is no allegation of bad faith on the part of the
4   State, and [plaintiff] has not alleged that the system has been down for any
5   excessively lengthy period of time that would warrant the Court's intervention.");
6   *Bruen*, 597 U.S. at 38 n.9 (authorizing challenges to shall-issue regimes "put
7   toward abusive ends" for example, where "lengthy wait times in processing license
8   applications or exorbitant fees deny ordinary citizens their right to public carry").
9   California's Ammunition Laws' background check and related requirements are
10  constitutional at the threshold stage of the *Bruen* inquiry.

11      **B.     The Ammunition Laws Are Consistent with the Nation's
12              Historical Tradition of Firearm Regulation**

13      Even if Plaintiffs could establish that the conditions on the sale of ammunition
14  imposed by the Ammunition Laws burden conduct presumptively protected by the
15  Second Amendment, California's restrictions are justified because they are
16  consistent with "the historical tradition that delimits the outer bounds of the right to
17  keep and bear arms." *Bruen*, 597 U.S. at 19.  The government must justify a
18  regulation by establishing that it falls within a historical tradition of laws that are
19  "relevantly similar," in the sense that they "impose a comparable burden on the
20  right of armed self-defense" that "is comparably justified." *Id.* at 28-29.  There is
21  no need to identify "a historical *twin*" or "a dead ringer" for purposes of that
22  "analogical inquiry." *Id.* at 29-30.  And when the challenged regulation
23  "implicat[es] unprecedented societal concerns or dramatic technological changes,"
24  that "may require a more nuanced approach." *Id.* at 27.  The historical analysis
25  required under *Bruen* does not impose "a regulatory straightjacket" on government
26  regulations. *Id.* at 30.  States may regulate arms in different ways and
27  "experiment[]" with reasonable weapon restrictions. *McDonald*, 561 U.S. at 785
28  (plurality opinion).

Here, a more nuanced approach to the historical analysis is required because the type of background checks required under the Ammunition Laws—or those required to purchase a firearm or to obtain a permit to carry in public, for that matter—were not possible during the founding or Reconstruction due to obvious technological limitations.  *See* Dkt. 81 at 18-19; Dkt. 92-1 ¶ 15.[5]  The ability to conduct "wide-ranging and rapid background checks" did not exist until the end of the nineteenth century, and the first background check requirement for firearm purchases was not enacted until 1911.  Dkt. 92-1 ¶¶ 15, 18.  Rapid background checks were not possible until the development of computers and the rise of the Internet in the 1990s, *id.* ¶ 21, during which the federal background check system for firearm purchases was enacted with the passage of the Brady Handgun Violence Prevention Act in 1993.  *Id.* ¶ 20.  Therefore, it is not surprising that background check requirements did not exist during the founding or Reconstruction.[6]  Unlike *Bruen* and *Heller*, this is not a "straightforward case," because "firearm access and technology, along with violent crime, was drastically different" during the eighteenth and nineteenth centuries.  *Rocky Mountain*, 2023 WL 8446495, at *19.

Under a more nuanced approach, California's ammunition background check system is consistent with the Nation's regulatory tradition.  As with shall-issue permitting schemes, the background checks "are designed to ensure only that those bearing arms in a jurisdiction are, in fact, 'law-abiding, responsible citizens.'"  *Bruen*, 597 U.S. at 38 n.9.  They are consistent with the Nation's historical tradition

[5] A more nuanced approach is also warranted here for the independent reason that the Ammunition Laws address the unprecedented societal concern of "ghost guns," which can be built without passing a background check.  *See* Dkt. 81 at 19.

[6] It is also unsurprising that legislatures during those times did not require firearm purchases to be in-person.  Dkt. 92-1 ¶ 16 (explaining the rise of mail-order firearm purchases in the late nineteenth century); *cf. Rocky Mountain*, 2023 WL 8446495, at *16 (noting that it was "logical that waiting-period laws were not adopted" during "the founding and in the century that followed" because "firearms were not as readily available for purchase").

of limiting access to firearms and ammunition by individuals deemed to pose a danger to society.  Dkt. 79 (surveys of historical laws); Dkt. 81 at 20-25; Dkt. 82 at 4-5; Dkt. 92-1 ¶¶ 24-69; Dkt. 92-9 ¶¶ 8-9; *see United States v. Jackson*, 69 F.4th 495, 502-05 (8th Cir. 2023) (describing the history of laws preventing certain groups from possessing arms); *United States v. White*, 2023 WL 6066201, at *6 (S.D.N.Y. Sept. 18, 2023) (crediting "compelling evidence of a tradition" "barring those deemed dangerous from possessing ammunition"); *United States v. Young*, 639 F. Supp. 3d 515, 525 (W.D. Pa. 2022) (noting that "it was not only firearms, but also ammunition and other associated accessories that had been historically regulated").[7]  There is also a long tradition of using licenses and permits to "limit (and not categorically prohibit) those who may engage in certain firearms-related activities."  Dkt. 92-1 ¶ 33; *see id.* ¶¶ 24-75.

During the founding era, the Continental Congress and numerous States also enacted laws disarming loyalists and other citizens who opposed the American cause or refused to swear allegiance to the new Republic.  *See* 4 *Journals of the Continental Congress 1774-1789*, at 205 (Worthington Chauncey Ford ed., 1906) (Mar. 14, 1776) (recommending that the colonies "disarm[]" all persons "who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies").[8]  These laws

---

[7] This tradition is squarely at issue in *United States v. Rahimi*, No. 22-915, pending before the U.S. Supreme Court.  That case was argued and submitted on November 7, 2023, and a decision is forthcoming.  This Court may wish to defer its decision in this case until the issuance of the *Rahimi* opinion.

[8] *See* Dkt. 79-1 at 10-11 (oath requirements in Pennsylvania, Virginia, and Massachusetts); *see also* Act of Dec. 1775, *The Public Records of the Colony of Connecticut from May, 1775 to June, 1776, inclusive* 193 (Charles J. Hoadly ed., 1890) (disarming any person "duly convicted" of "libel or defam[ation]" of the resolutions of the "Congress of the United Colonies, or the General Assembly of this Colony"); Act of Sept. 20, 1777, ch. 40, § 20, *Acts of the General Assembly of the State of New Jersey* 90 (1777) (authorizing officials to deprive and take from

are "compelling evidence of a tradition of barring those deemed dangerous from possessing ammunition." *White*, 2023 WL 6066201, at *6. Loyalty oaths were again imposed during Reconstruction as a condition to exercise a range of constitutional rights, including accessing firearms and ammunition. Dkt. 92-7 ¶¶ 7-20. "Ironclad oaths" were sometimes imposed to require people to swear that they, in the past, had not borne arms against the United States or participated in rebellion. *Id.* ¶ 20; *cf.* An Act Regulating Crimes and Punishments, § 282, 1868 Kan. Sess. Laws 317, 378 (prohibiting any person "who has ever borne arms against the government of the United States" from carrying "any pistol, bowie-knife, dirk or other deadly weapon").[9]

The Ammunition Laws are consistent with this history of firearm and ammunition regulation.[10]  They impose a comparable burden on the right to armed

---

"Persons as they shall judge disaffected and dangerous to the present government, all the Arms, Accoutrements and Ammunition which they own or possess"); Act of 1777, ch. 6, § 9, 24 *The State Records of North Carolina* 89 (Walter Clark ed., 1905) (providing that all persons who "fail[] or refus[e] to take the Oath of Allegiance" "shall not keep Guns or other Arms within his or their house"); Act of 1776, 7 *Records of the Colony of Rhode Island & Province Plantations in New England* 567 (John Rossell Bartlett ed., 1862) (authorizing the taking of "all arms, ammunition and warlike stores" from any person who refused to take an oath of allegiance to the United American Colonies); Act of Feb. 16, 1787, §§ 1-3, 1 *Private & Special Statutes of the Commonwealth of Massachusetts* 145-47 (1805) (disarming participants in Shays' Rebellion for three years as a condition to being pardoned).

[9] Reconstruction-era analogues are relevant to the *Bruen* analysis. *See Antonyuk v. Chiumento*, __ F.4th __, 2023 WL 8518003, at *15-16 (2d Cir. Dec. 8, 2023) (explaining why "the prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points").

[10] It does not matter that an alternative background check system might be preferable to Plaintiffs, *see* July 17, 2023 Hrg. Tr. at 33, because the "how" and "why" of the Ammunition Laws are comparable to historical analogues. *See Rocky Mountain*, 2023 WL 8446495, at *19 ("Perhaps the state could impose a more narrowly tailored requirement, but that is not the inquiry here.").

self-defense, as shown by the fact that none of the Plaintiffs have been unable to acquire ammunition. *See* Dkt. 93-1–93-5. That burden is no more severe than the burden imposed by the categorical disarmament laws and practices of the founding or Reconstruction eras. Moreover, the Ammunition Laws' modest burden is comparably justified because the laws prohibit individuals deemed under state and federal law to pose public-safety risks from purchasing ammunition. *Cf. Rocky Mountain*, 2023 WL 8446495, at *19 (holding that a waiting period was relevantly similar to licensing laws).[11]

In addition to the background check requirement, the Ammunition Laws include attendant requirements that are necessary to effectuate the background check system, including fees and importation restrictions. These requirements should be assessed as part of the background check system. Nevertheless, they also have independent historical analogues. There is a robust tradition of governments imposing fees related to ammunition. *See, e.g.*, Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Alderman, and Commonality, of the City of New York 19 (1763) (charging fee for the transportation of gunpowder); 1776 N.J. Acts 6-7, § 6 (charging fee for inspection of gunpowder for sale); 1820 N.H. Laws 275, § 7 (same). Record-keeping requirements also have historical precedent. *See* Dkt. 92-1 ¶¶ 52-54. In 1881, for example, Illinois created a system of recordkeeping for all sales of deadly weapons, requiring each seller to maintain a register detailing each transaction that was made open to the public, subject to a fine of up to $200 (the equivalent of $6,000 today) for failing to comply. 1881 Ill. Laws 73-74, § 3.

---

[11] Notably, the district court in *Rocky Mountain* received testimony from Professor Spitzer, 2023 WL 8446495, at *9, who provided similar testimony in this case, *see* Dkt. 92-1. That court also considered testimony from Professor Cramer, but found "his testimony had significant shortcomings in persuasiveness and credibility." *Rocky Mountain*, 2023 WL 8446495, at *6.

Because the Ammunition Laws are consistent with the Nation's tradition of firearm regulation, they do not violate the Second Amendment. Accordingly, Counts 2 through 7 fail as a matter of law.

## II. THE AMMUNITION LAWS DO NOT VIOLATE THE DORMANT COMMERCE CLAUSE

Plaintiffs' First Claim for Relief contends that California Penal Code sections 30312, 30314, 30370, and 30385 violate the dormant Commerce Clause. Dkt. 9 ¶¶ 83-91. This claim fails as a matter of law.

### A. Courts Exercise Extreme Caution in Evaluating Dormant Commerce Clause Claims

The Supreme Court has long observed that "'[e]xtreme caution' is warranted" in cases such as this one involving claims that a state law violates the dormant Commerce Clause. *Nat'l Pork*, 598 U.S. at 390 (quoting *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 310 (1997)). "Preventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something courts should do only 'where the infraction is clear.'" *Id.* (quoting *Conway v. Taylor's Executor*, 66 U.S. 603, 634 (1861)).

In *National Pork*, the Supreme Court reaffirmed that the "concern with preventing purposeful discrimination against out-of-state economic interests" is what lies at the "very core" of dormant Commerce Clause jurisprudence. *Id.* at 369, 371; *see id.* at 374-76. The Ammunition Laws are not discriminatory, and under *National Pork*, that is the end of the inquiry. Yet even if the Ammunition Laws imposed a substantial burden on interstate commerce, the laws must be upheld under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), because Plaintiffs cannot show that the purported burden clearly exceeds the laws' safety benefits.

### B. The Ammunition Laws Are Not Discriminatory

Laws that apply equally to in-state and out-of-state entities do not discriminate against interstate commerce and therefore do not violate the Commerce Clause.

1   *Nat'l Pork*, 598 U.S. at 369-70; *Pharm. Research & Mfrs. of Am. v. Cnty. of*
2   *Alameda*, 768 F.3d 1037, 1042 (9th Cir. 2014) (laws that treat "all private
3   companies exactly the same" do not discriminate against interstate commerce
4   (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550
5   U.S. 330, 342 (2007))); *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc.*
6   *v. Brown*, 567 F.3d 521, 525 (9th Cir. 2009) (same).  Here, the Ammunition Laws
7   do not have a discriminatory purpose nor are they discriminatory on their face or in
8   their application.  They were not passed to disadvantage out-of-state ammunition
9   vendors or benefit in-state vendors; rather, they were passed with the express goal
10  of reducing gun violence and keeping Californians safe.  2016 Cal. Legis. Serv.
11  Prop. 63 § 3 (Purpose and Intent).  And by their terms, they apply equally to all
12  entities, regardless of their location.  The Ammunition Laws' requirements are not
13  determined by vendors' locations, but instead impose uniform requirements on all
14  ammunition purchases to achieve the aim of keeping ammunition out of the hands
15  of dangerous individuals.

16      Plaintiffs allege that, as a practical matter, the Ammunition Laws discriminate
17  against out-of-state vendors and subject them to disparate burdens.  Dkt. 9 ¶¶ 82-91.
18  These conclusory allegations, however, are belied by the fact that *all* vendors—
19  whether they are in-state or out-of-state—are subject to the *same* burdens.

20      First, Plaintiffs allege that the Ammunition Laws prohibit out-of-state vendors
21  from engaging in direct-to-consumer sales to California residents and restrict their
22  access to the California ammunition market.  Dkt. 9 ¶¶ 84-85.  Not so.  Out-of-state
23  vendors are permitted to sell ammunition to California residents; if they do not have
24  a physical presence and license in California themselves, out-of-state vendors are
25  simply required to process the sale through a licensed ammunition vendor in
26  California.  Cal. Penal Code § 30312.  This requirement applies to *all* vendors,
27  including, for example, in-state vendors who lack a license and/or a brick-and-
28  mortar location to process transactions in person; it is not a special condition

1   imposed only on out-of-state vendors.  *Id.*  To the extent Plaintiffs complain that

2   out-of-state vendors are barred from selling to California residents in direct-to-

3   consumer sales via mail-order, Dkt. 9 ¶ 55-56, this too is a restriction that applies to

4   all vendors.  Under section 30312(b), no vendor anywhere in the United States, in

5   or out of California, is permitted to sell and ship ammunition via mail-order

6   because all sales are required to take place in face-to-face transactions.

7       Second, Plaintiffs allege that the Ammunition Laws discriminate against out-

8   of-state vendors because the laws authorize licensed vendors to charge a fee to

9   process out-of-state transactions.  Dkt. 9 ¶ 86.  But Section 30312 does not impose

10  a special fee on out-of-state vendors.  Rather, it requires any in-state or out-of-state

11  vendor who lacks a license to process its ammunition sales through a licensed

12  ammunition vendor and authorizes licensed ammunition vendors to charge the

13  purchaser an "administrative fee . . . in an amount to be set by the Department of

14  Justice" for processing those transactions.  Cal. Penal Code § 30312(a)(2).

15      Third, Plaintiffs contend that section 30314 discriminates against out-of-state

16  vendors by prohibiting California residents from transporting ammunition

17  purchased out-of-state back into California.  Dkt. 9 ¶ 84.  To begin, section 30314

18  does not in fact prohibit out-of-state vendors from selling to California residents.

19  Cal. Penal Code § 30314.  California residents are free to purchase ammunition out-

20  of-state, use it out-of-state, and then return to California, and section 30314 does

21  not regulate that sale or any of the related conduct.  *See id.*  California residents are

22  also permitted to bring ammunition they purchase out-of-state back into California,

23  provided they first deliver it to a licensed vendor to be processed in the same

24  manner as every other in-state ammunition sale.  *Id.*  In either case, the law does not

25  bar or discriminate against out-of-state sales.  To the contrary, section 30314

26  ensures that all ammunition possessed in California is held to the same standard for

27  lawful possession, regardless of where it is purchased.

28

1    Finally, Plaintiffs allege that section 30370 of the Ammunition Laws imposes

2    "an unreasonable fee on non-residents who purchase ammunition in California for

3    the first time" and that "[s]uch fee is not imposed upon residents of California who

4    have previously purchased ammunition or firearms from California."  Dkt. 9 ¶ 90.

5    As the individual Plaintiffs are all California residents and the non-resident vendor

6    Plaintiffs do not claim to have attempted to purchase ammunition and been

7    subjected to such a fee (and do not purport to have imminent plans to do so in the

8    future), Plaintiffs do not have standing to bring such a challenge.  *United States v.*

9    *Chovan*, 735 F.3d 1127, 1135 (9th Cir. 2013) ("A person to whom a statute

10   properly applies can't obtain relief based on arguments that a differently situated

11   person might present." (internal quotation marks and citation omitted)), *abrogated*

12   *on other grounds by Bruen*, 597 U.S. 1.  Setting aside this standing issue, Plaintiffs'

13   complaint about fees on non-residents is not an accurate description of the law.

14   Section 30370 provides for different types of background checks and their

15   associated fees, but it differentiates between the circumstances of the background

16   check and ammunition purchase, not whether the purchaser is a California resident.

17   The statute applies equally to all purchasers regardless of their residence.  *See* Cal.

18   Penal Code § 30370.

19   Because the Ammunition Laws "impose[] the same burdens on in-state

20   [vendors] that [they] impose[] on out-of-state ones," they are not discriminatory.

21   *Nat'l Pork*, 598 U.S. at 370; *see also id.* at 378 ("the presence or absence of

22   discrimination in practice prove[s] decisive").  Although the Court previously drew

23   comparisons between this case and *Nationwide Biweekly Administration, Inc. v.*

24   *Owen*, 873 F.3d 716 (9th Cir. 2017), *see* Dkt. 16 at 3-6; Dkt. 60 at 100-03, that

25   comparison should be reexamined.  Unlike in *Nationwide*, where the challenged

26   law was discriminatory on its face because it required businesses to incorporate in

27   California, 873 F.3d at 736-37, the Ammunition Laws do not include a similar

28   requirement.  Instead, they affirmatively provide unlicensed and out-of-state

vendors a means to legally sell ammunition to California residents.  Because the Ammunition Laws are not discriminatory, they do not violate the dormant Commerce Clause.

## C.   The Ammunition Laws Should Be Upheld Under *Pike*

While "no clear line separates the *Pike* line of cases from [the Supreme Court's] core antidiscrimination precedents," *Nat'l Pork*, 598 U.S. at 377 (internal quotation marks and citation omitted), the *Pike* inquiry can serve to illuminate hidden protectionism, *id.* at 378-79; *see also id.* at 391 (Sotomayor, J., concurring in part); *id.* at 393 (Barrett, J., concurring in part).  The five justices in the *National Pork* majority did not agree on a single approach "to [*Pike*] challenges premised on . . . nondiscriminatory burdens," *id.* at 379 (internal quotation marks omitted), but all five agreed that such challenges face a high bar and have rarely, if ever, succeeded, *id.* at 379 & n.2.  Four of those five justices—Justices Thomas, Sotomayor, Kagan, and Gorsuch—ultimately applied a standard essentially identical to the standard applied by the Ninth Circuit.  *Id.* at 383-85 (plurality opinion).  Under that approach, a plaintiff must demonstrate that the "challenged law imposes 'substantial burdens' on interstate commerce *before* a court may assess the law's competing benefits or weigh the two sides against each other."  *Id.* at 383 (emphasis in original); *cf. Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032 (9th Cir. 2021).  Three of those five justices—Justices Thomas, Gorsuch, and Barrett—would have gone even further.  They would have barred *Pike* claims altogether when the State's proffered interests in support of the challenged law and the plaintiffs' asserted burdens from compliance are "incommensurable."  *Nat'l Pork*, 598 U.S. at 382.  "In a functioning democracy," those three justices explained, "policy choices" about how to "weigh the relevant 'political and economic' costs and benefits" properly "belong to the people and their elected representatives."  *Id.*

The upshot is that Ninth Circuit precedent requiring a threshold showing that the challenged law imposes a substantial burden on interstate commerce remains good law.  The *Pike* standard does not protect a business's preferred "methods of operation." *Nat'l Pork*, 598 U.S. at 384 (plurality opinion) (quoting *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 127 (1978)).  Nor does a state regulation violate the dormant Commerce Clause "merely because it affects interstate commerce." *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012).

Plaintiffs complain of two categories of purported "burdens."  First, Plaintiffs allege that the Ammunition Laws prevent out-of-state vendors from selling ammunition to California consumers via mail-order, Dkt. 9 ¶ 55-56; Cal. Penal Code § 30312, but the dormant Commerce Clause does not protect "the particular structure or methods of operation in a retail market." *Exxon*, 437 U.S. at 127.  The ban on mail-order sales that stems from the Ammunition Laws' requirement that sales occur in face-to-face transactions—which, as already discussed, applies equally to all vendors—simply forecloses one method of operation.  It does not substantially burden all interstate commerce.

Second, Plaintiffs complain that the requirement that out-of-state vendors process their transactions through licensed vendors burdens interstate commerce and that the Ammunition Laws put out-of-state vendors that do not have a physical presence in California "at the whim of licensed vendors that do." Dkt. 9 ¶¶ 31, 57.[12]  Plaintiffs' allegations regarding this burden are not borne out by the evidence they have submitted.  Although Plaintiffs' declarations indicate that some

---

[12] To the extent Plaintiffs' alleged burden on this front also relies on the fees that out-of-state vendors may incur in the course of processing their transactions through licensed vendors, "the mere loss of profits" is not a sufficient burden on interstate commerce. *Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1152 n.11 (citing *Exxon*, 437 U.S. at 127).

California vendors may have refused to process certain transactions, they do not establish that this requirement has the practical effect of preventing out-of-state vendors from doing business in California.  Dkt. 93-6 ¶¶ 8-9 (stating that some California vendors have processed orders for Able's Sporting, Inc., which made, on average, a few sales per month to California consumers); Dkt. 93-7 ¶ 9 (stating that some California vendors have agreed to process transactions for Ammunition Depot).[13]

Although this Court left the door open at the pleading stage for Plaintiffs to develop evidence showing a substantial burden, they have failed to do so.  *See* Dkt. 16 at 7-8.  But even if the Ammunition Laws were to impose a substantial burden on interstate commerce—a showing that Plaintiffs have not made here— *Pike* balancing favors upholding those laws.  The standard under *Pike* is exacting: "[a]bsent discrimination," a law "will be upheld unless the burden imposed on [interstate] commerce is *clearly excessive* in relation to the putative local benefits." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338-39 (2008) (quoting *Pike*, 397 U.S. at 142 (emphasis added)).  Burdens on commerce that result from regulations pursuant to the State's police power to protect public safety are generally not regarded as significant even if they involve some loss of trade.  *See Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1148 (citing *Great Atl. & Pac. Tea Co. v. Cottrell*, 424 U.S. 366, 371 (1976)).

Here, the State has an overriding interest in public safety and preventing crime that supports the Ammunition Laws.  Dkt. 60 at 64 ("Few would dispute that the

---

[13] Even if some application of the Ammunition Laws as to out-of-state vendors imposes a significant burden on interstate commerce, that would render the laws unconstitutional only as applied in that scenario; it would not amount to a facial claim that the Laws violate the dormant Commerce Clause in all circumstances.  *See S.D. Myers, Inc. v. City & Cnty. of San Francisco*, 253 F.3d 461, 471 (9th Cir. 2001) (considering whether an ordinance that was not facially invalid may nonetheless "be invalidated as applied" under *Pike*).

state has a legitimate interest in increasing public safety and preventing crime."). Proposition 63 advanced this interest and was intended to keep "ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition."  2016 Cal. Legis. Serv. Prop. 63 § 3, ¶ 2.  Although *Pike* simply considers the regulation's "putative benefits," *see Nat'l Ass'n of Optometrists & Opticians*, 682 F.3d at 1155, evidence shows that the Ammunition Laws have been effective at achieving their aim.  *See, e.g.*, Dkt. 53 ¶¶ 54-56; Dkt. 92-11 ¶ 56 & tbl. 1.1, 2.1; Dkt. 92-12 ¶ 4.

The Ammunition Laws' purpose and benefits are deserving of significant weight in the *Pike* analysis because they are rooted in safety, rather than motivated by the interests in economic protectionism that the dormant Commerce Clause is traditionally concerned with preventing.  *Compare Granholm v. Heald*, 544 U.S. 460, 472 (2005) ("States may not enact laws that burden out-of-state producers or shippers simply to give a competitive advantage to in-state businesses."), *with Pike*, 397 U.S. at 143 ("We are not, then, dealing with 'state legislation in the field of safety where the propriety of local regulation has long been recognized'" (citation omitted)).  "[R]egulations that touch upon safety are those that the [Supreme] Court has been most reluctant to invalidate" under the dormant Commerce Clause and such laws receive a "strong presumption of validity."  *Pharm. Research & Mfrs. of Am.*, 768 F.3d at 1045 (ellipsis and citation omitted).  Under *Pike*, the Ammunition Laws should be upheld.  *See Nat'l Pork*, 598 U.S. at 382 (plurality opinion) ("In a functioning democracy, policy choices like these usually belong to the people and their elected representatives.").

### III.  THE AMMUNITION LAWS ARE NOT PREEMPTED BY FEDERAL LAW

Plaintiffs' Ninth Claim for Relief challenges Penal Code section 30314 on the grounds that it is preempted by 18 U.S.C. § 926A.  Dkt. 9 ¶¶ 131-33.  By its plain language, and as evidenced by congressional intent, § 926A's safe harbor does not extend to ammunition, and thus cannot preempt section 30314, which applies only

19

to ammunition.  Even if § 926A were construed to extend the safe harbor to the transportation of ammunition, it does not directly conflict with section 30314 and thus does not preempt that statute.

Section 926A provides a safe harbor for any law-abiding citizen "to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm."  California's section 30314, meanwhile, provides that "a resident of this state shall not bring or transport into this state any ammunition that he or she purchased or otherwise obtained from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312."

Congress did not intend for § 926A to occupy the field of firearms regulation. 18 U.S.C. § 927 ("No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter"). Section 926A does not preempt any state law, except in the narrow circumstance in which "there is a *direct and positive conflict* between" the two laws, such that "the two cannot be reconciled or consistently stand together."  *Id.* (emphasis added). Here, Plaintiffs have failed to demonstrate the existence of such a conflict.

## A.   Section 926A Applies Only to Firearms, Not Ammunition

Section 926A authorizes an individual "to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm."  18 U.S.C. § 926A.  Section 926A's definition of "firearm" does not include ammunition.  18 U.S.C. § 921(a)(3) (defining "firearm"); *see also id.* § 921(a)(17)(A) (separately defining "ammunition").  Section 926A's safe harbor thus addresses only firearms, not ammunition.  *See Burgess v. United States*, 553 U.S. 124, 129-30 (2008) ("Statutory definitions control the meaning of statutory words in the usual case. . . .

As a rule, a definition which declares what a term means excludes any meaning that is not stated." (cleaned up)); *see also Meese v. Keene*, 481 U.S. 465, 484 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term.").

Plaintiffs contend that because § 926A references ammunition in a later clause, the safe harbor protects ammunition as well.  Dkt. 12 at 18.  But this reading is not consistent with the statute's plain language.  After limiting the safe harbor to the transportation of firearms, § 926A imposes prerequisites to invoking its protections, namely that ammunition transported with a firearm, if any, must be stored outside the firearm and in a secure container.  *See* 18 U.S.C. § 926A.  This is a *limitation* on the safe harbor, ensuring that any ammunition being transported cannot readily be used with a firearm, not an extension of its protections to cover the transportation of ammunition.  Plaintiffs' reading expands the statute in a manner that is unsupported by its text, and the Court should decline to adopt it.  *See Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("[W]hen the statute's language is plain, the sole function of the courts . . . is to enforce it according to its terms." (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000))).

That § 926A's safe harbor extends only to firearms is reinforced by the legislative history and Congress's purpose, which is "'the ultimate touchstone' in every pre-emption case." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  Like the statute's plain text, the legislative history references only firearms within § 926A's safe harbor, and the only references to ammunition are those discussing § 926A's new requirement that any firearms being transported must be unloaded.  *See* 132 Cong. Rec. S8215-01 (June 24, 1986) ("only persons able to lawfully possess firearms under Federal law can rely upon the safe harbor provisions in 926A to transport firearms in interstate commerce" (statement of Sen. Thurmond)).  While the

original version of § 926A was meant to "allow travelers who lawfully possessed weapons to travel to hunting grounds in other States," a subsequent amendment was necessary to clarify that a person transporting a firearm was entitled to take advantage of the safe harbor only if "the possession is lawful where the traveler starts and is lawful in the destination State."  132 Cong. Rec. H4102-03 (June 24, 1986) (statement of Rep. Hughes).  And the provision addressing ammunition on which Plaintiffs rely was added only "to protect law enforcement officers who may be making traffic stops by requiring that the weapon be unloaded and clarifying that it not be readily accessible."  *Id.*  It was not added to extend the safe harbor to the transportation of ammunition.

If Congress had intended for the safe harbor to include ammunition, it could have written the statute to allow persons "to transport a firearm *and ammunition* for any lawful purpose."  It chose not to, evidencing an intent that § 926A should not apply to ammunition.  Where Congress intended a statute to protect both firearms and ammunition, it stated so explicitly.  *See, e.g.*, 18 U.S.C. § 923(c) (providing that a license issued by the Attorney General "shall entitle the licensee to transport, ship, and receive firearms *and ammunition*" (emphasis added)); *id.* § 925(a)(1) (providing that the chapter's provisions shall not apply to "any firearm *or ammunition* imported for, sold or shipped to, or issued for the use of, the United States or any department or agency thereof" (emphasis added)).

A narrow reading of § 926A's safe harbor is also consistent with § 927, in which Congress made clear that it did *not* intend for § 926A to occupy the field and that it should preempt conflicting state laws only in the narrowest circumstances— where "there is a direct and positive conflict between" state and federal law so great that "the two cannot be reconciled or consistently stand together."  18 U.S.C. § 927. In passing § 927, Congress sought to correct a problem of "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce, and that the existing Federal controls over such traffic do not adequately enable the States to

1   control this traffic within their borders through exercise of their police power."
2   Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351,
3   § 901(a)(1), 82 Stat. 197, 225 (1968).  Congress also found that "the acquisition on
4   a mail-order basis of firearms other than a rifle or shotgun by nonlicensed
5   individuals, from a place other than their State of residence, has materially tended
6   to thwart the effectiveness of State laws and regulations, and local ordinances."  *Id.*
7   § 901(a)(4), 82 Stat. at 225.  Congress thus intended to give power back to the
8   States to enact the sort of laws at issue here—which protect public safety by
9   regulating the trafficking of arms into the State and restrict the ordering of arms and
10  ammunition by mail.  Reading § 926A's safe harbor narrowly to apply only to
11  firearms is thus consistent with Congress's intent.  *See United State v. Ramirez*,
12  2014 WL 4365075, at *3 (S.D. Tex. Sept. 2, 2014) (§ 927 acknowledges "a general
13  presumption against federal preemption of state laws").

14          When read in this manner, section 30314 and § 926A do not conflict.  A
15  California resident transporting a firearm into California from a neighboring state
16  can comply with section 30314 by not traveling with any ammunition while also
17  satisfying the prerequisites for § 926A's safe harbor—the firearm would be
18  unloaded and the ammunition storage requirement would not apply (because there
19  would not be "any ammunition").  18 U.S.C. § 926A.  But even if the Court were
20  inclined to read the safe harbor as protecting the transportation of ammunition, the
21  Court should decline to do so under basic principles of preemption and statutory
22  construction.  When considering a preemption challenge involving a statute that "is
23  susceptible of more than one plausible reading, courts ordinarily 'accept the reading
24  that disfavors pre-emption.'"  *Altria Grp., Inc.*, 555 U.S. at 77 (quoting *Bates v.*
25  *Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).  Indeed, the Supreme Court has
26  explained that courts have a "*duty* to accept the reading that disfavors pre-emption."
27  *Bates*, 544 U.S. at 449 (emphasis added).  This approach is consistent with the
28  "elementary rule" that "every reasonable construction must be resorted to, in order

to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988) (citation omitted).

The plain text of § 926A, congressional intent, and canons of statutory construction support a determination that § 926A's safe harbor does not extend to ammunition and thus does not directly and positively conflict with section 30314.

**B.    Even if § 926A Covers Ammunition, Section 30314 Is Not Preempted**

Even if § 926A's safe harbor protects a right to transport ammunition, there is still no "direct and positive conflict" between it and section 30314.  Both on its face and as applied to Plaintiffs, section 30314 can be harmonized with § 926A.  Section 926A does not permit unfettered interstate transport of firearms without exception. It has "two important qualifications":  the person transporting the weapon must be both (1) entitled, by law, to possess the weapon in the place from which the person is transporting it; and (2) entitled, by law, to possess it in the place to which it is being transported.  *Fresno Rifle & Pistol Club, Inc. v. Van de Kamp*, 746 F. Supp. 1415, 1427 (E.D. Cal. 1990) (holding California's ban on the transport or import of assault weapons in the state was not preempted by § 926A).  Under sections 30312 and 30314, residents may not lawfully possess ammunition if it has not been processed through a licensed ammunition vendor.  Therefore, residents who do not comply with the Ammunition Laws' requirement that they first deliver their out-of-state ammunition to a licensed ammunition vendor are not "legally entitled to possess it in the place to which it is being transported" and are ineligible for § 926A's safe harbor.  *See id.* at 1427.  In contrast, if a resident complies with the Ammunition Laws' requirements, he may lawfully possess it and transport it into California, consistent with § 926A.  In this manner, an individual either complies with both statutes or neither.  The two are in alignment and do not conflict.

At the motion to dismiss phase, the Court gave Plaintiffs the chance to engage in "further factual development" to establish a conflict.  Dkt. 16 at 12.  But even after submitting numerous factual declarations, *see* Dkt. 93-1–93-14, Plaintiffs have been unable to develop facts that would establish a conflict between sections 926A and 30314 as applied to them.  The Plaintiffs who indicate an intent to transport out-of-state ammunition into California state that they wish to bring it back to their home in California.  *See, e.g.*, Dkt. 93-1 ¶¶ 4, 9; Dkt. 93-4 ¶ 6.  Because Plaintiffs cannot legally possess the ammunition they seek to transport in California without complying with the Ammunition Laws, these declarations do not create a conflict as applied any more than one exists on the face of the statute.  To comply with both § 926A and section 30314, Plaintiffs need only ship their out-of-state ammunition to a licensed ammunition vendor to be processed lawfully.[14]

Even if the term "firearm" in § 926A encompasses ammunition—and the better interpretation of the statute confirms it does not, *supra*—Plaintiffs have failed to show the "direct and positive conflict" required to establish that § 926A preempts section 30314, and their Ninth Claim for Relief fails as a matter of law.

## CONCLUSION

The Court should uphold the Ammunition Laws and enter judgment in the Attorney General's favor.

---

[14] To the extent Plaintiffs contend that section 30314 would be preempted in the hypothetical scenario of a Californian transporting ammunition *through* California, that would also be insufficient.  "For conflict preemption to apply, the conflict must be an *actual* conflict, not merely a hypothetical or potential conflict." *Chicanos Por La Causa, Inc. v. Napolitano*, 558 F.3d 856, 863 (9th Cir. 2009) (emphasis added and citation omitted).  Plaintiffs have declared that they seek to bring ammunition *into* California *to stay*; none declare they seek merely to bring ammunition *through* the State.  Dkt. 93-1–93-14.  Plaintiffs cannot establish preemption based on an unfounded hypothetical conflict.  *Chicanos Por La Causa, Inc.*, 558 F.3d at 863.

Dated:  December 13, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
R. MATTHEW WISE
Supervising Deputy Attorney General
MEGHAN H. STRONG
Deputy Attorney General


*s/ John D. Echeverria*

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Rob Bonta,*
*in his official capacity as California*
*Attorney General*

26