UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIM RHODE, et al., | Case No.:  18-cv-802-BEN (JLB) |
| Plaintiffs, | DECISION |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

## I.    INTRODUCTION

In 2016, California voters approved a statewide ballot measure known as Proposition 63.  Proposition 63 created a background check system for the purchasing of ammunition.  The voters approved a system where gun owners would apply for an ammunition purchase permit.  The permit would cost $50 and it would be good for four years.  The permit would be renewable and revocable upon a disqualifying event.  Under the Proposition 63 approach, when a gun owner wanted to purchase ammunition, he

1

would submit his ammunition purchase permit to a licensed vendor and the permit would be checked with the State for current validity.[1]

_____

[1] Proposition 63 (November 8, 2016), Article 4, Ammunition Purchase Authorizations provided, *inter alia*,

30370. (a) (1) Commencing on January 1, 2019, any person who is 18 years of age or older may apply to the Department of Justice for an ammunition purchase authorization.

(2) The ammunition purchase authorization may be used by the authorized person to purchase or otherwise seek the transfer of ownership of ammunition from an ammunition vendor, as that term is defined in Section 16151, and shall have no other force or effect.

(3) The ammunition purchase authorization shall be valid for four years from July 1, 2019, or the date of issuance, whichever is later, unless it is revoked by the department pursuant to subdivision (b).

(b) The ammunition purchase authorization shall be promptly revoked by the department upon the occurrence of any event which would have disqualified the holder from being issued the ammunition purchase authorization pursuant to this section. If an authorization is revoked, the department shall upon the written request of the holder state the reasons for doing so and provide the holder an appeal process to challenge that revocation.

(c) The department shall create and maintain an internal centralized list of all persons who are authorized to purchase ammunition and shall promptly remove from the list any persons whose authorization was revoked by the department pursuant to this section. The department shall provide access to the list by ammunition vendors for purposes of conducting ammunition sales or other transfers, and shall provide access to the list by law enforcement agencies for law enforcement purposes.

(d) The department shall issue an ammunition purchase authorization to the applicant if all of the following conditions are met:

(1) The applicant is 18 years of age or older.

(2) The applicant is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law.

(3) The applicant pays the fees set forth in subdivision (g).

(e) (1) Upon receipt of an initial or renewal application, the department shall examine its records, and the records it is authorized to request from the State Department of State Hospitals, pursuant to Section 8104 of the Welfare and Institutions Code, and if authorized, the National Instant Criminal Background Check System, as described in Section 922(t) of Title 18 of the United States Code, in order to determine if the applicant

2

However, before election day the state legislature enacted Senate Bill 1235. Senate Bill 1235 "prospectively amended" aspects of Proposition 63 -- including the ammunition purchase permit program.  Instead of creating a system using an ammunition purchase permit that was valid for four years, Senate Bill 1235 requires residents to submit to an automated background check every time they need to buy ammunition.[2] The new requirement went into effect on July 1, 2019.  It is Senate Bill 1235's requirement of a background check *for every purchase* that is challenged here.  Why the

———————————————

is prohibited from possessing or acquiring ammunition under subdivision (a) of Section 30305 or federal law.

(2) The applicant shall be approved or denied within 30 days of the date of the submission of the application to the department. If the application is denied, the department shall state the reasons for doing so and provide the applicant an appeal process to challenge that denial.

(3) If the department is unable to ascertain the final disposition of the application within 30 days of the applicant's submission, the department shall grant authorization to the applicant.

(4) The ammunition purchase authorization number shall be the same as the number on the document presented by the person as bona fide evidence of identity.

(f) The department shall renew a person's ammunition purchase authorization before its expiration, provided that the department determines that the person is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law, and provided the applicant timely pays the renewal fee set forth in subdivision (g).

(g) The department may charge a reasonable fee not to exceed fifty dollars ($50) per person for the issuance of an ammunition purchase authorization or the issuance of a renewal authorization, however, the department shall not set these fees any higher than necessary to recover the reasonable, estimated costs to fund the ammunition authorization program provided for in this section and Section 30352, including the enforcement of this program and maintenance of any data systems associated with this program.

[2] The resulting "pre-amendments" by Senate Bill 1235 created a curious and complicated patchwork quilt of new Penal Code provisions covering ammunition sales, purchases, and background checks.  Some provisions spring from SB 1235; others flow from Proposition 63.  Senate Bill 1235 §19(a) anticipated the passage of Proposition 63 with the following language: ". . . if the Safety for All Act of 2016 is enacted by the voters at the November 8, 2016, statewide general election and becomes effective . . . Sections 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, and 14 shall not become operative."

3

legislature eliminated the voter-approved 4-year permit system in favor of an every-purchase background check scheme is not apparent.[3] Without prejudging the discarded 4-year permit system envisioned by the voters of California, such a system would clearly be a more reasonable constitutional approach than the current scheme.

Today, a person may choose to submit to a full credit check to buy an automobile. But he is not required to pass the same credit check every time he needs to refill his car with gas or recharge his battery at a charging station. And the Constitution does not mention a right to own automobiles (or carriages or horses). Similarly, when a person chooses to buy a firearm, he is required to undergo a full background check. However, until now, he was not required to also go through a background check every time he needs to refill his gun with ammunition. And the Bill of Rights commands that the right to keep and bear arms shall not be infringed. With the recently enacted ammunition background check laws, gun owners in California undergo background checks more than one million times each year simply to buy ammunition. They are not allowed to buy ammunition from out-of-state vendors and have it delivered to their homes. They are not allowed to buy ammunition in Arizona or Nevada and bring it with them back into California. Though they are citizens entitled to enjoy all of the constitutional rights, Californians are denied the Second Amendment right to buy ammunition for self-defense at least 11% of the time because of problems with the background check system.

In earlier proceedings, this Court found the background check and anti-importation provisions likely violate both the Second Amendment and the dormant Commerce Clause and entered a preliminary injunction. *See Rhode v. Becerra,* 445 F. Supp. 3d 902 (S.D. Cal. 2020). That Order was appealed. The Court of Appeals remanded the case for

---

[3] The text of SB 1235 does not state the reason or offer a justification for the change. For many years, ammunition control has been unsuccessfully proposed as a more effective approach for gun control. *See e.g.,* Brendan J. Healey, *Plugging the Bullet Holes in U.S. Gun Law: An Ammunition-Based Proposal for Tightening Gun Control*, 32 J. Marshall L. Rev. 1 (1998).

further proceedings consistent with *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).[4]  After remand and pursuant to F.R.C.P. 65(a)(2), the Court consolidated a hearing on the renewed motion for preliminary injunction with a trial on the merits.

## II.    THE CHALLENGED STATE LAW PROVISIONS

Ammunition sales in California must now be conducted by a state-licensed ammunition vendor in a face-to-face transaction.  Cal. Penal Code § 30312(a)-(b).  A California resident who seeks to buy firearm ammunition must first pay for and pass an electronic background check each time he or she wishes to make a purchase.  The buyer must prove he is a Citizen of the United States and a California resident in order to submit to the background check.  The background check must report that the buyer is not a prohibited person, or more specifically, that the buyer is an "authorized" person.  Cal. Penal Code § 30370.  In the language of the statute, to buy ammunition one must be: "A person authorized to purchase ammunition pursuant to Section 30370."  Cal Penal Code § 30352(c)(1).  "[T]he ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition.  If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer."  Cal. Penal Code § 30352(d).

The law provides an exception for ammunition purchased at a commercial target range, but the ammunition must not leave the range.  Cal. Penal Code § 30312(c)(9).  There is also an exception for purchasing ammunition from a spouse, registered domestic partner, or immediate family member.  Cal. Penal Code § 30312(c)(10).  However, without a spouse, partner, or family member to buy from, there is nowhere else in

---

[4] Appeal No. 20-55437, Order (filed Nov. 17, 2022).

California one may go to buy ammunition for defense of self, defense of family, defense of property, use in a militia, hunting, or recreational shooting.[5]

A person who needs to buy ammunition has four paths to seek authorization: two types of background checks, a certificate of eligibility verification check, and a firearm purchase check.  Today, the cost of submitting to a background check varies between $1 for the "standard check" and $19 for the "basic check."  The certificate of eligibility verification check requires first obtaining a current certificate of eligibility which demands one go through a time-consuming and expensive process.  The fees for a firearm purchase check (and any ammunition at the same time) are currently $37.19.[6]  Whichever path is taken, the background check cost is the same to buy one round or one thousand rounds.  A person in California may not purchase from vendors outside of California unless the ammunition is delivered directly to an in-state, California-licensed ammunition vendor, whereupon the buyer must then pass the background check in a face-to-face transaction.  *See* Cal. Penal Code §§ 30312, 30314, 30370, and 30385.  All of this was described in detail in the earlier Order.

## III.    THE PLAINTIFFS' CONTINUING ARTICLE III STANDING

This Court previously found that Plaintiffs had Article III standing at the outset of this case.  Defendant continues to challenge the plaintiffs' Article III standing.  Now that all of the evidence has been received,[7] Plaintiffs' standing may be considered again.  "To satisfy Article III standing, a plaintiff must show: (1) an injury in fact that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) a causal connection between the injury and the challenged action of the defendant; and (3) that it

---

[5] There are the usual exceptions for law enforcement officers.  *See* Cal. Penal Code §§ 30312, 30314.

[6] The fees include the Dealer's Record of Sale Fee of $31.19, the Firearm Safety Fee of $1, and the Firearms Safety Enforcement Fee of $5.

[7] *See e.g.,* Declarations of Plaintiffs gathered in Plaintiffs' Resp. to Order Entered on July 18, 2023, Dkt. 93.

18-cv-802-BEN (JLB)

is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Teter v. Lopez*, 76 F.4th 938, 943 (9th Cir. 2023) (quoting *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) (cleaned up)). Under this standard, which is the same standard applied previously, Plaintiffs have proven that they continue to suffer injuries in fact that are actual and ongoing, that the injuries are directly traceable to the Defendant who is the official responsible for enforcement of the ammunition laws and that the injuries would be redressed by an injunction against enforcement – a remedy this court can provide. Therefore, Plaintiffs continue to have Article III standing.

## IV.  DISCUSSION

Plaintiffs claim the ammunition background check laws are invalid for three main reasons. *First*, the ammunition background check scheme violates the Second Amendment to the U.S. Constitution. *Second*, the anti-importation aspect of the ammunition laws violates the Article 1, § 8, clause 3 of the Constitution, known as the dormant Commerce Clause. *Third*, the anti-importation provision for individuals is preempted by 18 U.S.C. § 926A. This Court agrees.

### A.  The Second Amendment

*A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.* U.S. Const. amend. II.

In the earlier Order, it was determined that the state background check laws were likely to violate Second Amendment rights because they failed the multi-step intermediate scrutiny test adopted after *District of Columbia v. Heller*, 554 U. S. 570 (2008) and *McDonald v. Chicago*, 561 U. S. 742 (2010) in *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). In *Bruen*, the Supreme Court rejected the old approach of using different levels of scrutiny, holding instead that,

> when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest.

> Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 17 (cleaned up).  Applying *Bruen*'s new lesson, this Court's conclusion remains the same: the California ammunition background check laws violate a citizen's right to bear arms.  Once it becomes clear that acquiring ammunition is conduct covered by the plain text of the Second Amendment, it should be no surprise to discover that the government is *unable* to do that which it must now do: demonstrate that California's first-of-its-kind sweeping statewide restriction on buying firearm ammunition is consistent with this Nation's historical tradition of firearm regulation.  Because these laws are not consistent with the Nation's history and tradition, they must yield to the Constitution.

All agree that the ammunition necessary to use a gun is covered by the Second Amendment's protection for keeping and bearing arms.  The Attorney General correctly concedes that, "[e]ven though the Second Amendment does not reference a right to acquire or purchase Arms or mention ammunition, it 'protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense.'"[8] The Attorney General agrees that the core right to possess a firearm for self-defense, "would include a 'corresponding right' to 'obtain bullets necessary to use' firearms for self-defense."[9] *Teixeira* makes it perfectly clear.  "We recognized in *Jackson* that, although the Second Amendment 'does not explicitly protect ammunition . . . , without bullets, the right to bear arms would be meaningless.'  *Jackson* thus held that 'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them."

---

[8] Def.'s Omnibus Brief, Dkt. 103 at 3-4 (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

[9] *Id*. at 4 (quoting *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)).

*Teixeira,* 873 F.3d at 677.  This is the historically traditional view.  *Teixeira* pointed out that only three years after the Fourteenth Amendment was adopted, "[t]he Tennessee Supreme Court cogently observed in 1871, interpreting that state's constitution, that 'the right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, *and to purchase and provide ammunition suitable for such arms*, and to keep them in repair."  *Teixeira*, 873 F.3d at, 678 (quoting *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871)) (emphasis added).  After all, and as *Jackson* observed, "[a] regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose," and "*Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves."  *Jackson*, 746 F.3d at 967.  Plaintiffs assert that this is enough to shift the burden to the government to demonstrate a history and tradition of ammunition background checks.

In contrast, the Attorney General makes two arguments to end the case here, at the textual level, before he has to shoulder the burden of demonstrating a history and tradition of constitutional ammunition background checks.  First, he retreats and says that purchasing ammunition without a background check is not *really* covered by the plain text of the Second Amendment or any ancillary right.[10]  Second, he says that the background check laws are simply "presumptively lawful regulatory measures."[11]  Neither argument is persuasive.  The first argument employs a rhetorical device to over-describe in detail the asserted constitutional wrong.  Having over-described the alleged constitutional right, it is then argued that the detailed description of the asserted right is not covered by the plain text of the Constitution.  This is an example:

> Here, Plaintiffs wish to purchase ammunition without passing a background check.  They also wish to purchase ammunition without having to complete a face-to-face transaction at a

---

[10] *Id.*
[11] *Id.* at 4-7.

18-cv-802-BEN (JLB)

licensed firearms dealer, and without the dealer retaining records of the transaction.  This conduct is not covered by the plain text of the Second Amendment.[12]

The flaw in this approach is that it focuses on the details of the constitutional wrong and then asserts that these details are not covered by the text of the Constitution. For example, suppose a plaintiff described the wrong like this:  having been threatened by lawless rioting two blocks from home and with more threatened violence anticipated, plaintiff desires to buy ammunition for his firearm today so as to be able to defend himself and his household tonight, but is unable to do so because the background check system erroneously reports that he is not an authorized purchaser.  The government would then say that the wrong, as described, is not covered by the plain text of the Second Amendment.  But all a plaintiff needs to allege is that by preventing him from buying ammunition, the government's background check system infringed his right to bear arms for self-defense.  That is what is done here.  For example, the Plaintiffs allege that "[f]or those who do not have access to a nearby ammunition vendor or FFL, Section 30312 bans and criminalizes the only method by which those affected persons can obtain ammunition for self-defense."[13]  The Court finds that Plaintiffs' allegations of constitutional wrong are covered by the plain text.

The Attorney General's second argument relies on an old justification while at the same time avoiding *Jackson*.  He points out that the Supreme Court presumes that conditions and qualifications on the commercial sale of arms are lawful, citing *Heller*, 554 U.S. at 626-27 & n.26 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions and . . . laws imposing conditions and qualifications on the commercial sale of arms.").  The Attorney General then claims that the ammunition

---

[12] Def.'s Brief in Resp. to the Court's Order, Dkt. 81 at 16
[13] Amended Complaint, Dkt. 9 at ¶94 (Second Claim for Relief).

18-cv-802-BEN (JLB)

background check laws are no more than "conditions and qualifications on the commercial" buying of ammunition that are presumptively lawful.

*Heller* did not decide that conditions and qualifications on the commercial buying of ammunition -- erected and stacked to the extent that would-be lawful purchasers are delayed and denied -- would be presumptively lawful. *Heller* did not say that every condition or qualification a government could impose on buying a firearm or ammunition is beyond constitutional review. *Heller* answered a different question holding that the Second Amendment protects an individual right and that a complete prohibition on possession of a handgun and requiring the inoperability of a gun in the home violates the Second Amendment. *Id.* at 635. When *Heller* was decided, no state in the nation had ever required a background check for ammunition.

Whatever firearm regulations may be thought of as presumptively lawful under *Heller*, ammunition regulations are not among them. This is not a question of first impression. It was already decided in *Jackson*. *Jackson* said unambiguously that, "*Heller* does not include ammunition regulations in the list of 'presumptively lawful' regulations." 746 F.3d at 968. And *Jackson* said, "[c]onducting our historical review, we conclude that prohibitions on the sale of ammunition do not fall outside 'the historical understanding of the scope of the Second Amendment right.'" *Id.* (quoting *Heller*, 554 U.S. at 625).

Because ammunition sale prohibitions and regulations are covered by the Second Amendment, the presumption is that such restrictions are infringements. The State may overcome the presumption, but it needs to do so as *Bruen* teaches. In other words, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17; *Atkinson v. Garland*, 70 F.4th 1018, 1020 (7th Cir. 2023) ("Accordingly, when the Second Amendment's 'plain text' covers the regulated conduct, the government has only one way to defend the regulation—by proving that it is 'consistent with this Nation's historical tradition of firearm regulation.'").

18-cv-802-BEN (JLB)

The Attorney General also relies on a footnote in *Bruen* to argue that background checks are permissible. *Bruen*'s footnote nine says:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a permit." Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion,"—features that typify proper-cause standards like New York's. That said, *because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.*

597 U.S. at 38 and n.9 (citations omitted) (emphasis added). The Attorney General posits that footnote nine provides constitutional approval of the background check laws. He does not acknowledge that the California architecture may be that abusive permitting scheme which footnote nine describes as constitutionally suspect: "regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* This lawsuit is that constitutional challenge to an ammunition purchase authorization regime where record data mismatches, lengthy and occasionally infinite wait times, and sometimes exorbitant fees, are currently denying ordinary citizens their right to public carry.

In the earlier Order, the cumbersome and byzantine background check system was described in detail and need not be repeated here.  In 2019, the laws were new and the procedures and systems were being put in place for the first time.  The evidence proved that during the first seven months of operation, 101,047 law-abiding gun owners who established their citizenship and underwent background checks were nevertheless rejected.  The 2019 rejection rate was 16%.  Overwhelmingly, the rejections were either because the state had no record of gun ownership or because of personal identifier mismatches.  *Rhode*, 445 F. Supp. 3d at 917-918.

One would expect problems and errors in a new system as extensive and ungainly as California's unprecedented ammunition background check system.  Unfortunately, today the background check rejection rate is lower at 11%, but it is still too high.[14]  In the first six months of 2023, there were 538,359 background checks.  Of those, 58,087 individuals were rejected because of a failure to match an AFS record.[15]  These are citizens with Second Amendment rights to protect themselves who were blocked from buying ammunition.  The Attorney General says that technical rejections are fixable.  Yet, evidencing the difficulty of overcoming system rejections, of the 7,342 people who were rejected by a Standard background check in January of last year, 2,722 individuals (37%) had still not successfully purchased ammunition six months later.[16]  Some have likely given up trying.[17]

---

[14] Even those who have gone through the complicated and time-consuming process of obtaining a current California Certificate of Eligibility were rejected 9% of the time.  *See* Fifth Supplemental Declaration of Morales, Dkt. 92-11 at ¶53.

[15] Three reasons for rejections (address mismatches; no apparent AFS record; name mismatches) accounted for about 85% of all rejections in 2023.  *See* Fifth Supplemental Declaration of Morales, Dkt. 92-11 at ¶27.

[16] *See* Fifth Supplemental Declaration of Morales, Dkt. 92-11 at ¶31.

[17] The State estimated (before the laws were implemented) that there would be thirteen million ammunition background checks per year.  Since then, there has been something closer to only one million background checks each year.  One explanation

Ostensibly, the entire reason for the implementation of California's sweeping ammunition purchase background check is to prevent dangerous prohibited persons from acquiring bullets for their guns.  Of those same 583,359 persons who submitted to ammunition background checks in the first half of 2023, only .03% (141 individuals) were denied because they were found on the Armed Prohibited Person System list.[18] The Court asked the Attorney General to provide information about the ultimate resolution of cases where persons who wanted to buy ammunition were reported to be prohibited persons.  Special Agent Sidney Jones[19] provided case dispositions for prohibited persons denied the purchase of ammunition between July 1, 2019 and January 31, 2020.[20] During those seven months, 770 ammunition buyers were rejected as prohibited persons.[21]  At least sixteen of the 770 persons rejected were later determined to have been incorrectly identified as prohibited persons and should have been authorized to purchase ammunition.  *See Rhode*, 445 F. Supp. 3d at 924.  Agent Jones states that those 770 background check rejections prompted 51 investigations that resulted in firearms, magazines, or ammunition seizures.[22] From those 51 investigations, 15 individuals were arrested.[23]  In the end, the government obtained four felony and two misdemeanor convictions.[24] To sum up, approximately 635,000 residents were required to undergo background checks in the last half of 2019, the denials of which prompted the arrests of 15 individuals which led to six criminal convictions.

---

could be that the onerous and inescapable burden of the present system are chilling the rights of law-abiding gun owners.  *See Rhode*, 445 F. Supp. 3d at 924 and nn.27 and 28.

[18] *See* Fifth Supplemental Declaration of Morales, Dkt. 92-11 at ¶11.

[19] Special Agent in Charge for the California Department of Justice, Bureau of Firearms.

[20] *See* Declaration of Sidney Jones, Dkt. 92-12 at ¶22.

[21] *See* Third Supp. Morales Declaration, Dkt. 53, at ¶6.

[22] *See* Declaration of Sidney Jones, Dkt. 92-12 at ¶27.

[23] *Id.* at ¶28.

[24] *Id.* at ¶28.  Jones notes the disposition of the majority of charges is unknown to him and some cases may still be ongoing.

18-cv-802-BEN (JLB)

In the first half of last year, 589,087 individuals traveled to an ammunition vendor to buy ammunition. They proved their citizenship and residency with identification documents and paid for a background check. The State's computers rejected 58,087 or 11% of them. This is an average of 322 individuals rejected every day. How many of the 58,087 needed ammunition to defend themselves against an impending criminal threat and how many were simply preparing for a sporting event, we will never know. What is known is that in almost all cases, the 322 individuals that are rejected each day are being denied permission to freely exercise their Second Amendment right -- a right which our Founders instructed shall not be infringed.

The Fifteenth Amendment directs that the right to vote shall not be denied or abridged. A state law requiring identification before voting, where 4.5% of all voters lacked the requisite identification documents to vote, was struck down because the excessive burden abridged the constitutional right, and more specifically for violating the Voting Rights Act (legislation that flows from the Fifteenth Amendment).[25] If a state identification requirement for voting which burdens 4.5% of registered voters is an

---

[25] *See Veasey v. Abbott*, 830 F.3d 216, 250 (5th Cir. 2016), *cert. denied*, 580 U.S. 1104 (2017) ("The district court found that 608,470 registered voters, or 4.5% of all registered voters in Texas, lack SB 14 ID."). The *Veasey* court noted the kinds of burdens for obtaining identification documents to vote. They are the same kinds of burdens that Plaintiffs face in this case in order to be eligible for the ammunition background check. *Id*. at 254 ("The district court found that 'the Plaintiffs demonstrated the impact' of SB 14 along several axes, including: (1) the difficulty of obtaining an EIC and voting with the proper ID because of Texas's poor implementation of this program; (2) the cost of underlying documents necessary to obtain an EIC or other SB 14 ID; (3) difficulties with delayed, nonexistent, out-of-state, or amended birth certificates due to nontraditional births and errors on birth certificates; (4) long distances and other travel issues that made getting to a registrar and DPS office problematic for many Plaintiffs; (5) a strict disability exemption; and (6) a burdensome alternative of voting absentee. Some of the Plaintiffs faced difficulties along multiple axes in attempting to get SB 14 ID and vote in person.").

18-cv-802-BEN (JLB)

unconstitutional burden on the Fifteenth Amendment, surely a state identification requirement that blocks an untold number of gun owners from undergoing an ammunition background check and then rejects 11% of those who are checked, is likewise an unconstitutional burden on the Second Amendment.  "The constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"  *Bruen*, 597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780).

If any background check system satisfies *Bruen*'s footnote nine description of a scheme put to abusive ends, as opposed to the system originally approved by the voters, this may be it.  In other words, assuming *arguendo* that there is a presumption in favor of a background check condition or qualification on the buying of ammunition, the presumption has been overcome.  Consequently, the burden is now on the government to demonstrate a history and tradition of regulation similar to the ammunition background check laws challenged here.

### 1. History and Tradition of Background Checks

For conducting the historical inquiry, *Bruen* identifies a number of guidelines.  The first, and perhaps the most important for this case, is that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."  *Bruen*, 597 U.S. at 26.  Also, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional."  *Id.* at 26-27.  "[C]ases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," and analogical reasoning.  *Id.* at 27.  "Determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.'"  *Id.* at 28-29. *Bruen* notes,

analogical reasoning under the Second Amendment is neither a

1
2
3
4
5
6
7

> regulatory straitjacket nor a regulatory blank check.  On the one hand, courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so "risks endorsing outliers that our ancestors would never have accepted."  On the other hand, analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin.  So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster.

8   *Id*. at 30.

9   ### 2.  1791 to 1868

10       *Bruen* teaches the most significant historical evidence comes from the years 1791

11   to 1868 with emphasis placed on the earlier time period.  *Id*. at 34-38.  *Bruen* says, "[T]he

12   scope of the protection applicable to the Federal Government and States is pegged to the

13   public understanding of the right when the Bill of Rights was adopted in 1791."  *Id*. at 37.

14   Among those, courts afford greater weight to historical analogues more contemporaneous

15   to the Second Amendment's ratification.  *United States v. Rahimi*, 61 F.4th 443, 456 (5th

16   Cir. 2023), *cert granted*, 143 S. Ct. 2688 (2023).  British sources pre-dating the

17   Constitution are not particularly instructive because the American Revolution was a

18   rejection of British rule.  Sources post-enactment are also less helpful.  *Bruen*, 597 U.S. at

19   36 ("Similarly, we must also guard against giving postenactment history more weight

20   than it can rightly bear.").  "[T]o the extent later history contradicts what the text says,

21   the text controls . . . .  Thus, post-ratification adoption or acceptance of laws that are

22   inconsistent with the original meaning of the constitutional text obviously cannot

23   overcome or alter that text."  *Id*. (citations omitted) (cleaned up).  Late nineteenth century

24   evidence is not particularly instructive: "because post-Civil War discussions of the right

25   to keep and bear arms 'took place 75 years after the ratification of the Second

26   Amendment, they do not provide as much insight into its original meaning as earlier

27   sources.'"  *Id*. (quoting *Heller*, 554 U.S. at 614).

28

There is little reason to rely on laws from the later part of the 1800's or the 1900's rather than ones put into effect at the time of the founding. *See Worth v. Harrington,* No. 21-CV-1348 (KMM/LIB), 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Policy Coalition, Inc. v. McCraw*, No. 4:21-CV-1245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR-22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 597 U.S. at 83 (Barrett, J., concurring) "[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights."); *but see Hanson v. D.C.,* No. CV 22-2256 (RC), 2023 WL 3019777, at *16 (D.D.C. Apr. 20, 2023) ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

### 3. The State's List of Relevant Laws

Because it is the government's burden to justify its laws with a national "historical tradition of firearm regulation," the State was directed to create a list of relevant laws regulating arms dating from the time of the Second Amendment to twenty years after the Fourteenth Amendment.  The State went far beyond.  The State produced a list of 148 laws covering 535 years -- from 1403 to 1938.[26]  Many of the entries are not particularly relevant because they came much earlier, or much later than the most significant time period of 1791-1868.  The first 54 laws by the Attorney General pre-date the adoption of the Second Amendment.  The last 40 laws on the list post-date the adoption of the Fourteenth Amendment; 38 of the 40 post-Fourteenth Amendment laws date from the twentieth century.

---

[26] *See* Def.'s Survey of Relevant Statutes, Dkt. 79, Exhibit 1 & 2 (citations to these entries herein are indicated by brackets [--].).

### 4. No Historical Twins; No Dead Ringers

The Attorney General has put together a list of 50 laws dating from the most important historical time period. Among these 50 are 15 territorial regulations which are not particularly helpful in establishing a tradition.[27] There are no historical twins and no dead ringers among the State's 50. The Attorney General has not identified a single historical law that required a citizen to pass a background check in order to purchase ammunition. Citizens were free in every state to buy ammunition at any time and without qualification.

Certainly, since the Founding, some citizens were dangerous and presented a risk of armed violence to others. To borrow Plaintiffs' words, "[t]here may be some things new under the sun, but the commercial availability of ammunition and the risk that dangerous individuals might avail themselves of it is not one of them."[28] The Attorney

---

[27] *Bruen* has already considered such territorial regulations and found that they are not particularly helpful. "First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition . . . ." *Bruen*, 597 U.S. at 67. "These territorial 'legislative improvisations,' which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'" *Id*. (quoting *Heller*, 554 U.S. at 614). "Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality." *Id*. at 68. "[W]e fail to see how they inform 'the origins and continuing significance of the Amendment.'" *Id*. (quoting *Heller*, 554 U.S. at 592). "Finally, these territorial restrictions deserve little weight because they were — consistent with the transitory nature of territorial government — short lived . . . . Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation." *Id*. at 69 (citations omitted). One commentator disagrees and argues that territorial regulations should enjoy more Second Amendment significance because they were adopted with consideration for the Bill of Rights. *See Andrew Willinger, The Territories Under Text, History, and Tradition (2023)*, (https://ssrn.com/abstract=4372185). Even so, they suggest an absence regulation on buying ammunition during the most important historical period.

[28] Plaintiffs' Response to Def.'s Brief, Dkt. 85 at 5.

General has not identified a historical law that required every citizen, as California's laws do, to receive permission before buying ammunition. No such tradition has been established or suggested. States could have addressed the problem of dangerous armed citizens in this way, but they did not. Based on the historical record prepared by the Attorney General, when states addressed the concern at all, they addressed it by later seizing firearms from the individual rather than preventing ahead of time the acquisition of ammunition by all individuals.

The Attorney General asks to be excused from identifying historical laws similar to the laws challenged here because of the internet and ghost guns.[29] The internet and computers have made it possible to run rapid background checks. So, the type of background check now required by the ammunition laws was not possible during the Founding or Reconstruction era. Because of the technological advancement, a more nuanced approach to the historical analysis is required, argues the Attorney General.

While the methods and means of running a background check have changed and improved, the flaw in the government's argument is that there are no historical laws that have been identified that required ammunition background checks by any means, however slow or imperfect they might have been. Background checks in some form must have been performed in the many nineteenth century cases where licenses were required for carrying concealed firearms.[30] As one court said of such nineteenth century firearm licensing schemes, "[t]here are a lot of them." *Antonyuk v. Chiumento*, 2023 U.S. App. LEXIS 32492, *80 (2nd Cir. Dec. 8, 2023) (collecting numerous firearm licensing schemes from the years immediately following ratification of the Fourteenth Amendment that authorized a local official to issue permits in his limited discretion). It is difficult to

---

[29] Def.'s Omnibus Brief, Dkt. 103 at 8 & n.5.

[30] Even today, California state law delegates to local county sheriffs the task of conducting background checks on concealed carry applicants. *See* Cal. Penal Code § 26150(a).

18-cv-802-BEN (JLB)

see how the existence of the internet requires the more nuanced approach of analogical reasoning. Even if the advent of government database searching *via* the internet justified a prohibited persons clearance check, such a check could be accomplished with the more reasonable 4-year purchase permit card that the voters approved in Proposition 63.

Guns made without serial numbers, or "ghost guns" as the government refers to them, have been in existence throughout the eighteenth and nineteenth centuries. *United States v. Price*, 635 F. Supp. 3d 455, 464 (S.D. W.V. 2022) ("A firearm without a serial number in 1791 was certainly not considered dangerous or unusual compared to other firearms because serial numbers were not required or even commonly used at that time."). Until the mid-twentieth century, the requirement of a serial number on a firearm was unknown. "Serial numbers were not broadly required for all firearms manufactured and imported in the United States until the passage of the Gun Control Act of 1968." *Id.* at 462. Even if one argued that a prohibited person with a ghost gun could be blocked with a background check, the check could be accomplished with the more reasonable 4-year purchase permit card that the voters approved in Proposition 63. While not judging the ultimate constitutionality of an ammunition permit card approach, certainly the 4-year ammunition permit system voted for by Californians would be a more reasonable way of conducting background checks.

In the end, neither of these asserted technological advances justify using a more nuanced approach of considering historical analogues. Quite the opposite. This is the type of case *Bruen* contemplated when it said, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. Consequently, the absence of a distinctly similar historical ammunition background check regime is evidence of its inconsistency with Second Amendment rights.

### 5.  A More Nuanced Approach – Looking for Historical Analogues

The Attorney General asks for leeway to use the more nuanced approach of looking for relevant historical analogues, as described by *Bruen*.  This Court is not persuaded that a more nuanced approach is justified.  Nevertheless, it does not matter because neither has the Attorney General identified a relevant historical analogue.  Instead, it points to twentieth century background check laws and says that they are lineal descendants of laws.  According to the Attorney General, "Despite appearing in the 20th century, these restrictions and requirements are "'lineal descendants' of historical laws banning dangerous people from possessing guns."[31] The logic is opaque.

What are the 50 historical laws dating from 1789 to 1868 that the Attorney General has compiled as potential historical analogues?  One would expect to find laws or ordinances that required a gunsmith to check with the local sheriff before selling a firearm.  Or one might expect to find laws that restricted gunsmiths from selling to any customer who was a stranger in his community.  Or perhaps there would be historical laws uncovered requiring a customer's proof of citizenship before a merchant was allowed to sell him gunpowder.  These could be apt analogues to demonstrate a related historical tradition of constitutional regulation.

Nothing like this appears in the State's compilation of laws.

The State's compilation lists 48 laws which made it a crime to possess a gun and ammunition by Negros, Mulattos, slaves, or persons of color, and two laws that prohibited sales to Indians.[32]  For example, the Attorney General lists a 1798 Kentucky law which prohibited any "Negro, mulatto, or Indian" from possessing any gun or ammunition. [57]  An 1846 North Carolina law offers another example wherein it was prohibited to sell or deliver firearms to "any slave." [92] This is the third time the

---

[31] Def.'s Brief in Resp., Dkt. 82 at 4 (quoting *Kanter v. Barr*, 919 F.3d 437, at 464 (7th Cir. 2019) (Barrett, J., dissenting)).

[32] *See* Def.'s Survey of Relevant Statutes, Dkt. 79, Exhibit 1 & 2, [55] to [105].

Attorney General has cited these laws in support for its laws and restrictions implicating the Second Amendment. These fifty laws identified by the Attorney General constitute a long, embarrassing, disgusting, insidious, reprehensible list of examples of government tyranny towards our own people.[33]

The government took a similar legal position before the Fifth Circuit Court of Appeals in *Rahimi*. That court found that such laws were not relevantly similar to the modern law at issue:

> The Government next points to laws in several colonies and states that disarmed classes of people considered to be dangerous, specifically including those unwilling to take an oath of allegiance, slaves, and Native Americans. These laws disarmed people thought to pose a threat to the security of the state due to their perceived lack of loyalty or societal status. "While public safety was a concern, most disarmament efforts were meant to prevent armed rebellions. The early Americans adopted much of that tradition in the colonies."
> But we question at a threshold level whether colonial and state laws disarming categories of "disloyal" or "unacceptable" people present tenable analogues to § 922(g)(8). Laws that disarmed slaves, Native Americans, and disloyal people may well have been targeted at groups excluded from the political community—i.e., written out of "the people" altogether—as much as they were about curtailing violence or ensuring the security of the state. Their utility as historical analogues are therefore dubious, at best. In any event, these laws fail on substance as analogues to § 922(g)(8), because out of the gate, why they disarmed people was different. The purpose of laws disarming "disloyal" or "unacceptable" groups was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of "domestic gun abuse," posed by another individual. Thus, laws disarming "dangerous"

---

[33] The Attorney General notes that "the listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter." *See* Def.'s Survey of Relevant Statutes, Dkt. 79, Exhibit 1, n.2.

18-cv-802-BEN (JLB)

classes of people are not "relevantly similar" to § 922(g)(8)
such that they can serve as historical analogues.

*United States v. Rahimi*, 61 F.4th 443, 456-57 (5th Cir. 2023), *cert granted*, 143 S. Ct. 2688 (2023).  Much the same can be said in this case.  These laws that disarmed slaves and Indians were targeted at groups excluded from the political community — "i.e., written out of 'the people' altogether."  At the time these laws existed, neither people of color, nor native Americans were considered citizens of the United States.  So, it makes little sense to argue, as the Attorney General implicitly does, that historical restrictions placed on non-citizens, who were not accorded constitutional protections, now justify placing similar modern restrictions on citizens who do enjoy constitutional rights.[34]

The Attorney General may complain that his list has 100 more laws to consider. They do not help his case.  The 38 later laws that date from the twentieth century cannot confirm an earlier tradition of constitutional regulation that simply did not exist.  The 54 laws that predate the adoption of the Second Amendment are much of the same sort that come thereafter.  They are restrictions on ammunition possession by slaves [17, 27, 28, 29, 30, 31, 34, 36, 37, 38, 43, 44], negroes [6, 28, 29, 30, 31, 35, 36, 37], mulattos [28, 29, 37], Indians [2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, 16, 18, 21, 22, 23, 24, 29, 32, 33, 41, 42, 46], Catholics [26, 40], Acadians [39], Dutch and Frenchmen [19].  For the same reasons stated earlier, these repugnant historical examples of prejudice and bigotry will

---

[34] *C.f. Range v. A.G. United States*, 69 F.4th 96, 104-105 (3rd. Cir. 2023) (*en banc*) ("The Government's attempt to identify older historical analogues also fails.  The Government argues that 'legislatures traditionally used status-based restrictions' to disarm certain groups of people.  Apart from the fact that those restrictions based on race and religion now would be unconstitutional under the First and Fourteenth Amendments, the Government does not successfully analogize those groups to Range and his individual circumstances.  That Founding-era governments disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks does nothing to prove that Range is part of a similar group today.  And any such analogy would be 'far too broad.'").

not be used to justify the State's current infringement on the constitutional rights of citizens.

Lastly, the Attorney General argues that its ammunition background check laws have a historical analogue in loyalty oaths that were required for a short time by some of the newly created United States.[35] At the time of the American war of independence, there were newly formed states that required residents to declare their allegiance to the new nation. For example, Pennsylvania gave itself the power to disarm any of its people who were "disaffected to the liberty and independence" of the Commonwealth in 1779. [52, 53] But such laws served to distinguish among the people within a new state. These types of laws were necessary to differentiate between those who were willing to swear an oath of allegiance to be part of the new nation and those who still considered themselves subjects of King George with no interest in becoming new citizens. In essence, individuals who refused to pledge their allegiance were considered non-citizens and therefore would not enjoy the rights and privileges (or obligations) of a new citizen. Disarming those loyal to the enemy was also a good military strategy.

Today, it makes little sense to argue that disarmament laws targeting non-citizens who were not entitled to constitutional protections now justify placing similar modern restrictions on citizens who do enjoy constitutional rights. Note that it is already generally unlawful for a non-citizen to purchase or possess a firearm or ammunition. Title 18 U.S.C. § 922(g)(5). *Heller* explained that "the people" as used in the Constitution refers to all citizens. Because the Second Amendment right presumptively belongs to all Americans, analogues to antiquated laws mistreating slaves and Native Americans are improper analogues. *Range v. A.G. United States*, 69 F.4th 96, 101 (3rd. Cir. 2023) (*en banc*) ("But *Heller* said more; it explained that 'the people' as used throughout the Constitution 'unambiguously refers to all members of the political

---

[35] *See* Def.'s Omnibus Brief at 9.

community, not an unspecified subset.'  So, the Second Amendment right, *Heller* said, presumptively 'belongs to all Americans.'") (quoting *Heller*, 554 U.S. at 580-81).

The state's ammunition background check regime turns that constitutional presumption the wrong way around.  It treats all citizens as if they do not enjoy a right to buy ammunition.  It forces Americans to entreat and supplicate the state for permission.  Only when the State is satisfied that a citizen has proven that they meet the qualifications – only then – does the state issue its stamp of authorization.  *See* Cal. Penal Code § 30352(d) ("[T]he ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition.").  This is not the language of a right; this is the language of a government license or grant of a privilege.

In the end, the State has failed to carry its burden to demonstrate that the ammunition background check laws "are consistent with this Nation's historical tradition of firearm regulation," as required by *Bruen*.  *Bruen* cautions, "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risks endorsing outliers that our ancestors would never have accepted.'"  597 U.S. at 30.  A sweeping background check requirement imposed every time a citizen needs to buy ammunition is an outlier that our ancestors would have never accepted for a citizen.  Therefore, California's ammunition background check system laws are unconstitutional and shall not be enforced.

**B.  The Dormant Commerce Clause**

Plaintiffs also claim that the anti-importation provisions of the ammunition laws, California Penal Code §§ 30312, 30314, 30370, and 30385, violate the dormant Commerce Clause because they favor businesses in California by erecting a barrier to ammunition sellers in other states.  As this Court explained in its previous order, Article I, § 8, clause 3 of the Constitution, gives Congress the power "[t]o regulate commerce ... among the several states."  This affirmative grant of power to Congress includes a negative implication, which restricts the ability of states to regulate and interfere with

interstate commerce. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019); *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 571 (1997). That restriction upon the states, coined the dormant Commerce Clause, prohibits economic protectionism. "[R]egulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" are impermissible. *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) ("This reading effectuates the Framers' purpose to 'prevent a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'").

Previously, this Court found the anti-importation provisions of the ammunition sales laws likely violate the dormant Commerce Clause. California's anti-importation of ammunition restrictions are much like the case of *Granholm v Heald*, 544 U.S. 460, 465-66 (2005), which invalidated state laws regulating the sale of wine from out-of-state wineries to consumers in Michigan and New York. "[T]he object and effect of the laws are the same: to allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so, or, at the least, to make direct sales impractical from an economic standpoint."[36] The Court re-adopts its conclusions set out more fully at *Rhode*, 445 F. Supp. 3d at 948-953.

Since that time, the Supreme Court has decided *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023). *National Pork* reminds courts that "extreme caution" should be used when considering dormant Commerce Clause claims. *Id*. at 1165. The Supreme Court said, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme

---

[36] *See also Dean Milk Co. v. Madison,* 340 U.S. 349 (1950). This Court previously suggested a number of steps out-of-state ammunition vendors could take to protect California's interest in preventing sales to prohibited persons.

delicacy,' something courts should do only 'where the infraction is clear.'" *Id.* While mindful of this cautionary instruction, this Court concludes that California's ammunition anti-importation laws are exactly the kind of laws where the infraction is clear. The Attorney General has pointed to no other laws in the nation that erect a similar barrier to this one, keeping away out-of-state ammunition sellers and guaranteeing all sales originate with, or flow through, only in-state ammunition sellers. It is precisely such purposeful discrimination that lies at the core of the Supreme Court's dormant Commerce Clause concerns. *Nat'l Pork*, 143 S. Ct. at 1153 ("Today, this antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence.") (Citation omitted). "State laws that discriminate against interstate commerce face 'a virtually per se rule of invalidity.'" *Granholm*, 544 U.S. at 476 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)). The solution, for the benefit of the nation as a whole, is to enjoin enforcement of these protectionist laws and permit out-of-state businesses to sell directly to California's residents.

### C. Preemption by 18 U.S.C. § 926A

Plaintiffs claim that 18 U.S.C. § 926A preempts the ammunition provisions in California Penal Code § 30314 that prohibit a resident from bringing ammunition back into the state. The claim was not part of the earlier preliminary injunction; the claim was considered on the initial motion to dismiss.[37] Title 18 U.S.C. § 926A is part of what is known as the federal Firearm Owners Protection Act and ensures that a person may carry a firearm "from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," provided the person properly stores the firearm. This law expressly contemplates that ammunition will be transported with a firearm. The Plaintiffs argue that the California ammunition anti-importation laws, specifically California Penal Code § 30314, conflict with and stand as

---

[37] *See* Order (filed Oct. 17, 2018), Dkt. 16 at 8-11.

an obstacle to the accomplishment of 18 U.S.C. § 926A's purposes, which include the free transport of firearms and ammunition across state lines.

The California statute says, "a resident of this state shall not bring or transport into this state any ammunition that he or she purchased or otherwise obtained from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312." Cal. Pen. Code § 30314(a). There are some exceptions which do not save the statute.[38] Subsection (c) makes a violation an infraction for the first offense and either an infraction or a misdemeanor for subsequent offenses. In contrast, 18 U.S.C. § 926A provides,

> Notwithstanding any other provision of any law or any rule or regulation of a State or any political subdivision thereof, any person who is not otherwise prohibited by this chapter from transporting, shipping, or receiving a firearm shall be entitled to transport a firearm for any lawful purpose from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm if, during such transportation the firearm is unloaded, and neither the firearm nor any *ammunition* being transported is readily accessible or is directly accessible from the passenger compartment of such transporting vehicle: *Provided*, That in the case of a vehicle without a compartment separate from the driver's compartment the firearm or *ammunition* shall be contained in a locked container other than the glove compartment or console.

(Emphasis added.)

There appears to be a direct conflict between the two statutes. When a law-abiding California resident buys ammunition outside of the state and brings it back into

---

[38] Section 30314(b) provides a list of exceptions of which only one is pertinent here. Subsection (b)(6) exempts "A person who acquired the ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720." The statute does not claim to apply to non-residents brining ammunition into the state.

California, § 30314 prohibits the conduct.  This is the case even if the resident complies with § 926A's condition keeping the ammunition in a place not accessible from the passenger compartment of the transporting vehicle and the firearm unloaded.  In what is likely an otherwise common occurrence with hunters and motorhome travelers, § 30314 criminalizes that which § 926A immunizes.  It is difficult to read the two statutes otherwise.  There is a direct and positive conflict between the two provisions and the two cannot be reconciled.  In such cases, the federal statute preempts the state statute.  *See* 18 U.S.C. § 927 ("No provision of this chapter shall be construed as indicating an intent on the part of the Congress to occupy the field in which such provision operates to the exclusion of the law of any State on the same subject matter, unless there is a direct and positive conflict between such provision and the law of the State so that the two cannot be reconciled or consistently stand together.").

The Attorney General argues that § 926A does not apply to ammunition although the statute mentions ammunition twice.  The Attorney General says that § 926A does not apply to ammunition because the definition of a firearm in § 921 does not include ammunition, thus, the safe harbor provision is only for transporting a firearm.  But the statute clearly anticipates a person traveling with both a firearm and ammunition.  While the Attorney General sees this as an expansion of the safe harbor, the simplest reading of the statute is that a person may lawfully transport both his firearm and his ammunition, so long as it is done as prescribed.  The Attorney General then contends that the legislative history shows that Congress intended to ensure safe passage for a firearm – not its ammunition.  However, statutory text is clear on its face and resort to legislative history in such a case is unwarranted.  Next, the Attorney General contends that its residents can enjoy the safe harbor of § 926A while complying with § 30314 by simply traveling without ammunition.[39]  That requires a strained reading of the federal statute.  The plain

---

[39] Def.'s Omnibus Brief at 23.

reading of § 926A provides a safe harbor for travelling with both a firearm and ammunition.  For California residents travelling home with newly acquired ammunition for their firearm, the metaphorical harbor is anything but safe.

In a final push, the Attorney General maintains that even if § 926A does cover ammunition, § 30314 is still not preempted.[40] The argument hinges on an unorthodox view that since California residents cannot legally bring ammunition into the state, then they cannot legally possess the ammunition they brought in.  And if they cannot legally possess the ammunition they brought in, then they do not qualify under § 926A's second proviso, *i.e.*, that the person transporting the firearm and ammunition be "entitled by law to possess it in the place to which it is being transported."  That notion hangs on a cramped view of a citizen's federal constitutional right to keep and bear arms, which is a right a citizen enjoys everywhere in the country.  Here, it is the case that California Penal Code § 30314(a) directly conflicts with 18 U.S.C. § 926A and is therefore preempted to the extent that it criminalizes a resident who transports a firearm and ammunition in compliance with the requirements of § 926A, and state enforcement is enjoined.

## V.    CONCLUSION

The ammunition background checks laws have no historical pedigree and operate in such a way that they violate the Second Amendment right of citizens to keep and bear arms.  The anti-importation components violate the dormant Commerce Clause and to the extent applicable to individuals travelling into California are preempted by 18 U.S.C. § 926A.  Perhaps the simpler, 4-year and $50 ammunition purchase permit approved by the voters in Proposition 63, would have fared better.

Accordingly, the Court permanently enjoins the State of California from enforcing the ammunition sales background check provisions found in California Penal Code §§ 30352 and 30370(a) through (e), and the ammunition anti-importation provisions found

---

[40] *Id.* at 24.

in §§ 30312(a) and (b) and 30314(a).  Criminal enforcement of California Penal Code §§ 30312(d), 30314(c), and 30365(a) by the Attorney General and all other law enforcement defendants is permanently enjoined.

**Therefore, IT IS HEREBY ORDERED that:**

1.  Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing the ammunition sales background check provisions found in California Penal Code §§ 30352 and 30370(a) through (e), and the ammunition anti-importation provisions found in §§ 30312(a) and (b) and 30314(a), as well as the criminal enforcement of California Penal Code §§ 30312(d), 30314(c), and 30365(a).

2.  Defendant Attorney General Rob Bonta shall provide forthwith, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statutes.

DATED: January 30, 2024

_____

**HON. ROGER T. BENITEZ**
United States District Judge

32

18-cv-802-BEN (JLB)